ORIGINAL

LINDA S. FANG (CA Bar No. 240245)
(Email: lfang@gslaw.org)
JAY SMITH (CA Bar No. 166105)
(Email: js@gslaw.org)
**GILBERT & SACKMAN**
**A LAW CORPORATION**
3699 Wilshire Boulevard, Suite 1200
Los Angeles, California 90010
Tel: (323) 938-3000
Fax: (323) 937-9139

FILED
CLERK, U.S. DISTRICT COURT
MAY - 3 2013
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

Attorneys for Plaintiffs-Relator

*[Additional Counsel Listed on Following Page]*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| [UNDER SEAL],<br><br>Plaintiffs,<br>*Ex rel.*<br><br>[UNDER SEAL],<br><br>Plaintiff-Relator,<br><br>v.<br><br>[UNDER SEAL],<br><br>Defendants. | Case No. 10-cv-03165 GHK (SSx)<br><br>Hon. George H. King<br><br>**FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**<u>FILED UNDER SEAL</u>**<br>**Pursuant to Protective Order Dated April 16, 2013**<br>**[Exempt From ECF]** |

REUBEN A. GUTTMAN *(pro hac vice application to be submitted)*
(Email: rguttman@gelaw.com)
TRACI L. BUSCHNER *(pro hac vice application to be submitted)*
(Email: tbuschner@gelaw.com)
DAVID T. FISCHER *(pro hac vice application to be submitted)*
(Email: dfischer@gelaw.com)
**GRANT & EISENHOFER P.A.**
1920 L Street, N.W., Suite 400
Washington, DC 20036
Tel: (202) 386-9500
Fax: (202) 386-9505

JAY W. EISENHOFER *(pro hac vice application to be submitted)*
(Email: jeisenhofer@gelaw.com)
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501

JOHN C. KAIRIS *(pro hac vice application to be submitted)*
(Email: jkairis@gelaw.com)
**GRANT & EISENHOFER P.A.**
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100

Attorneys for Plaintiffs-Relator

ORIGINAL

LINDA S. FANG (CA Bar No. 240245)
(Email: lfang@gslaw.org)
JAY SMITH (CA Bar No. 166105)
(Email: js@gslaw.org)
**GILBERT & SACKMAN**
**A LAW CORPORATION**
3699 Wilshire Boulevard, Suite 1200
Los Angeles, CA 90010
Tel: (323) 938-3000
Fax: (323) 937-9139

Attorneys for Plaintiffs-Relator Beverly Brown

FILED
CLERK, U.S. DISTRICT COURT
MAY - 3 2013
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

*[Additional Counsel Listed on Following Page]*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO,

Plaintiffs,
*Ex rel.*

BEVERLY BROWN,

Plaintiff-Relator,

v.

CELGENE CORPORATION, NATIONAL COMPREHENSIVE CANCER NETWORK INC., THOMSON REUTERS CORP., AMERICAN SOCIETY OF HEALTH-SYSTEM PHARMACISTS INC., and REED ELSEVIER PLC AND REED ELSEVIER NV,

Defendants.

Case No. 10-cv-03165 GHK (SSx)

**FIRST AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

**<u>FILED UNDER SEAL</u>**
**Pursuant to Protective Order Dated April 16, 2013 [Exempt From ECF]**

REUBEN A. GUTTMAN *(pro hac vice application to be submitted)*
(Email: rguttman@gelaw.com)
TRACI L. BUSCHNER *(pro hac vice application to be submitted)*
(Email: tbuschner@gelaw.com)
DAVID T. FISCHER *(pro hac vice application to be submitted)*
(Email: dfischer@gelaw.com)
**GRANT & EISENHOFER P.A.**
1920 L Street, N.W., Suite 400
Washington, DC 20036
Tel: (202) 386-9500
Fax: (202) 386-9505

JAY W. EISENHOFER *(pro hac vice application to be submitted)*
(Email: jeisenhofer@gelaw.com)
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501

JOHN C. KAIRIS *(pro hac vice application to be submitted)*
(Email: jkairis@gelaw.com)
**GRANT & EISENHOFER P.A.**
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100

Attorneys for Plaintiff-Relator Beverly Brown

# I. INTRODUCTION

1. This case is about Defendant Celgene Corporation's ("Celgene" or the "Company") misbranding, including off-label marketing of Thalomid (thalidomide, the drug that resulted in many of the safety rules enforced by the FDA) and Revlimid (lenalidomide, a related compound); its concealment of Thalomid and Revlimid's risks; and its payment of kickbacks to induce sales. It is also about Celgene's efforts to influence drug compendia publishers and the contents of the drug compendia by paying kickbacks to the doctors employed by the drug compendia defendants, and Celgene's efforts to market its drugs for uses mentioned in, but not supported by, the drug compendia.

2. For Thalomid along, Celgene managed to generate yearly sales in the hundreds of millions of dollars for a pharmaceutical product that the Food and Drug Administration ("FDA") approved in 1998, initially, to treat a skin condition associated with leprosy. There are, on average, only 200 new leprosy cases a year in the United States. Celgene was able to generate this large volume of sales by marketing Thalomid for numerous off-label uses, concealing its risks, and through the payment of kickbacks.

3. In the late 1950s and early 1960s, Chemie Grünenthal ("Grünenthal"), a Germany company that hired several Nazi doctors and scientists, manufactured thalidomide (the active ingredient in Thalomid). Grünenthal's thalodomide was used throughout Europe and Canada to treat morning sickness in pregnant women. By 1961, however, thalidomide had been identified as the cause of between 10,000 and 20,000 serious birth defects, including severely deformed, or all-together missing, limbs. Although the FDA refused to approve thalidomide during this period, samples were linked to at least 17 cases of severe birth defects in America. Because of the thalidomide scandal, Congress strengthened the Food Drug & Cosmetics Act (FDCA)in 1962 to require pharmaceutical companies to demonstrate a drug's efficacy and safety to the FDA to gain approval to market the drug in the United States.

4. In 1998, FDA approved Thalomid solely for treatment of an exceedingly rare skin disease associated with leprosy. In May 2006, the FDA issued an additional indication for Thalomid, when used in combination with the drug dexamethasone, for treatment of newly diagnosed multiple myeloma ("MM"). Celgene was able to generate sales exceeding a hundred million dollars a year for Thalomid from 1998 through 2005, culminating in sales of approximately $389 million in 2005. From 2002 through 2009, Thalomid generated more than $2.7 billion in total sales for Celgene with Medicare and other government programs paying for the majority of those sales.

5. On December 27, 2005, the FDA approved Celgene's Revlimid for treatment of a relatively uncommon subtype of the blood disorder myelodisplastic syndrome (MDS). Notwithstanding that there are only approximately 2,300 to 3,400 new cases each year of this type of blood disorder, Celgene – as it did with Thalomid – was able to generate hundreds of millions of dollars in sales to Medicare and other government programs though its misbranding and off label marketing of Revlimid and the payment of kickbacks. Revlimid sales in 2008 and 2009 totaled more than $1.7 billion.

6. The FDA prohibits Celgene, and other pharmaceutical companies, from marketing drugs for off-label uses. Federal law also prohibits Celgene, and other pharmaceutical companies, from paying kickbacks to induce drug sales or from making misrepresentations with regard to the safety and efficacy of drugs.

7. In 1998, after Celgene received FDA approval of Thalomid solely for treatment of an exceedingly rare skin disease associated with leprosy, Celgene directed its employees to systematically misbrand and off-label market Thalomid for a host of cancers, uses that were not approved. Similarly, when Revlimid was approved in 2006 for treatment of a relatively uncommon subtype of a blood disorder, Celgene dispatched its sales force to market Revlimid for other uses and in drug combinations not approved by the FDA. To further its wrongful scheme and off-label marketing activities, Celgene systematically paid kickbacks in order to boost sales of Thalomid and Revlimid.

8. Because thalidomide caused severe birth defects, when Celgene sought Thalomid's (and later Revlimid's) approval, the FDA mandated that the Company implement a restricted distribution system requiring physicians to follow specific procedures before prescribing these drugs. Celgene, however, deliberately transformed an FDA-mandated program designed to protect patients against the risks of horrific birth defects associated with Thalomid and Revlimid into a carefully orchestrated nationwide campaign to unlawfully market these drugs. Under the guise of assisting physicians with the FDA restrictions, Celgene dispatched more than 100 agents across the country, operating under purposefully misleading titles, including Immunology Specialist and Hematology Oncology Consultant, to improperly but surreptitiously market the drugs. Gaining access to doctors' offices through this program, the Immunology Specialists and Hematology Oncology Consultants have carried out Celgene's unlawful marketing objectives. While these agents were purportedly in the business of implementing measures to prevent birth defects, they were and continue to be paid bonuses based on (off-label and on-label) drug sales.

9. During relevant time periods, Celgene marketed Thalomid for treatment of many other uses, including the following unapproved "off-label" conditions:

(i) bladder cancer;

(ii) breast cancer;

(iii) brain cancer;

(iv) cervical cancer;

(v) colorectal cancer;

(vi) esophageal cancer;

(vii) kaposi sarcoma;

(viii) leukemia (including, but not limited to, chronic lymphocytic leukemia ("CLL"));

(ix) lung cancer;

(x) lymphoma;

(xi) melanoma (i.e., skin cancer);

(xii) prostate cancer;

(xiii) pancreatic cancer;

(xiv) renal (i.e., kidney) cancer;

(xv) thyroid cancer;

(xvi) multiple myeloma (prior to the FDA's May 26, 2006 approval of a form of multiple myeloma as an indication for Thalomid);

(xvii) multiple myeloma, not in combination with the drug, dexamethasone;

(xviii) relapsed or refractory multiple myeloma;

(xix) myelodysplastic syndromes;

(xx) ovarian cancer; and

(xxi) uterine cancer.

10. During the entire time period, there were other, FDA approved treatments for all of these diseases. Celgene's off-label marketing of Thalomid exposed patients to magnified risk of potentially fatal blood clots, potentially fatal skin conditions, severe nerve damage, and decreased white blood cell counts, and other side effects.

11. During relevant time periods, Celgene's unapproved "off-label" marketing of Revlimid included proposed treatment of the following conditions:

(i) brain cancer;

(ii) leukemia (including, but not limited to, CLL);

(iii) lymphoma;

(iv) myelofibrosis;

(v) myelodysplastic syndromes (all types);

(vi) multiple myeloma (prior to the FDA's approval of a form of multiple myeloma as an indication for Revlimid);

(vii) multiple myeloma, not in combination with the drug, dexamethasone;

(viii) newly-diagnosed multiple myeloma;

(ix) prostate cancer; and

(x) and stem-cell transplant maintenance therapy.

12. During the entire time period, there were other, FDA approved treatments for all of these diseases. As with Thalomid, Revlimid exposed patients to risks of potentially fatal blood clots, potentially fatal skins conditions, severe nerve damage, and decreased white blood cell counts. In addition, Revlimid exposes patients to risk of potentially fatal hemorrhages.

13. In furtherance of its unlawful marketing scheme, Celgene trained and encouraged sales representatives to market these drugs for off-label uses with full knowledge of the increased risks these off-label uses might pose to patients, and without proper clinical evidence of their safety and/or efficacy for those off-label purposes. As a consequence of Celgene's wrongdoing, patients were placed at significant risk of physical and financial harm.

14. Celgene also paid numerous doctors kickbacks in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the Stark Law, 42 U.S.C. § 1395nn and 42 C.F.R. § 411.350 et seq., by providing cash and other incentives to induce doctors to promote and prescribe these drugs, including for off-label use.

15. Celgene also influenced the drug compendia by paying doctors kickbacks in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the Stark Law, 42 U.S.C. § 1395nn and 42 C.F.R. § 411.350 *et seq.*, to include the use of these drugs in the drug compendia by providing cash and other incentives. The four drug compendia, which are owned by Defendants American Society Of Health-System Pharmacists, Inc.; the National Comprehensive Cancer Network, Inc.; Thomson Reuters Corp.; Reed Elsevier PLC, and Reed Elsevier NV (collectively, "the Drug Compendia Defendants") contain an index of various pharmaceuticals products. For each product, the compendia include information about the product's pharmacologic and pharmacokinetic properties (such as adverse effects, and drug interactions) and the FDA approved indications for that drug. The compendia also, however, include information about use of the product for diseases not approved by the FDA or listed in the label (i.e., "off-label"). Because

the compendia can, in certain limited circumstances, be used to obtain Medicare or Medicaid reimbursement for an off-label indication, Celgene deliberately worked to get the drug compendia to include off-label uses of Thalomid and Revlimid. As part of these efforts, it paid kickbacks to doctors that the Drug Compendia Defendants employed to assist in preparing their compendia.

16. Celgene caused false claims to be submitted in violation of the law for payment by federal and state agencies or programs by:

- systematically engaging in illegal off-label marketing of its drugs, Thalomid (generic name "thalidomide") and Revlimid (generic name "lenalidomide");
- furthering the unlawful off-label marketing of Thalomid and Revlimid through violations of continuing medical education ("CME") rules and regulations by directing and controlling physician speaker programs that purport to be unbiased;
- unlawfully promoting Thalomid and Revlimid in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the Stark Law, 42 U.S.C. § 1395nn and 42 C.F.R. § 411.350 et seq., by providing cash and other incentives to induce doctors to promote and prescribe these drugs, including for off-label uses;
- unlawfully tampering with Revlimid prescriptions to deceive Medicare, Medicaid, and other government-funded programs into believing that off-label prescriptions were for on-label indications; and
- unlawfully influencing the drug compendia publishers and the contents of the drug compendia by paying kickbacks in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

17. Relator Beverly Brown, a current and long-time employee at Celgene, has knowledge of Celgene's national scheme to off-label and otherwise unlawfully market Revlimid and Thalomid. Relator was trained by Celgene to promote off-label uses for both Thalomid and Revlimid, and was specifically directed to market such off-label uses to physicians.

18. Celgene's illegal marketing activities for Thalomid and Revlimid caused federal, state and local government health care programs to pay for millions of prescriptions which it would not have paid but for Celgene's activities. In addition to the federal healthcare dollars expended through Medicare and Medicaid, state

governments spend money through Medicaid, as well as through their state workers' insurance plans. Furthermore, the city of Chicago expends municipal dollars to insure its own workers. Had federal, state, and city programs, including Medicare and Medicaid, known that such prescriptions were induced by illicit incentives or illegal off-label marketing to physicians for non-approved purposes, they would not have reimbursed claims for Thalomid or Revlimid.

19. Relator discovered Celgene's wrongful conduct while she employed by Celgene. She conducted her own investigations in furtherance of a False Claims Act qui tam action and disclosed her findings to the United States Government and the states prior to filing this action.

20. On behalf of the United States of America and on behalf of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Iowa, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, Wisconsin, the District of Columbia, and the City of Chicago, pursuant to the qui tam provisions of the Federal False Claims Act , 31 U.S.C. §§ 3729 et seq. and similar state law and municipal provisions, Plaintiff and "Relator" Beverly Brown files this qui tam Complaint against Defendant Celgene Corporation ("Celgene" or the "Company").

# TABLE OF CONTENTS


Page

I. INTRODUCTION ........ 1

II. JURISDICTION AND VENUE ........ 11

III. PARTIES ........ 11

IV. STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANT CELGENE'S FALSE CLAIMS ACT VIOLATIONS ........ 14

- A. Federal Government Health Programs ........ 14
- B. The False Claims Act ........ 17
- C. FDA Regulations ........ 17
- D. The Medicare Fraud & Abuse/Anti-Kickback Statute ........ 20
- E. Stark Law - The Medicare/Medicaid Self-Referral Statute ........ 21
- F. Medicare and Medicaid Coverage of Off-Label Prescriptions ........ 22

V. SPECIFIC ALLEGATIONS OF CELGENE'S FALSE CLAIMS ........ 24

- A. Celgene's Prescription Drugs Thalomid and Revlimid ........ 24
  - 1. Thalomid's FDA-Approved Uses and Restrictions ........ 24
  - 2. Revlimid's FDA-Approved Uses and Restrictions ........ 25
  - 3. Safety Issue: FDA Warnings Concerning Potentially Fatal Side Effects of Thalomid and Revlimid ........ 26
    - a. History of Thalomid ........ 26
    - b. Thalomid's and Revlimid's Black Box Warnings Concerning Venous Thromboembolism ........ 28
    - c. Thalomid's and Revlimid's Additional Safety Risks ........ 30
- B. Celgene Staffed And Rewarded A Sales Force That Aggressively Marketed Thalomid and Revlimid Off-Label ........ 31
- C. Celgene Was Aware Of The Serious Risks Of VTE And PE Caused By Thalomid And Revlimid But Trained Its Sales Force To Conceal These Facts ........ 33
- D. Celgene Markets Thalomid Off-Label ........ 37
- 1. Misbranding of Thalomid For Breast Cancer ........ 37
- 2. Misbranding of Thalomid For Colorectal (colon) Cancer ........ 37
- 3. Misbranding of Thalomid For Kidney Cancer ........ 39
- 4. Misbranding of Thalomid For Prostate Cancer ........ 40
- 5. Celgene Trained Its Sales Personal To "Probe" Physicians In Order to Induce Discussions of Off-Label Thalomid Uses ........ 40
- 6. Celgene Directed Its Sales Force to Secure Off-Label Medical Request Forms To Provide Cover For The Company ........ 44

7. Celgene Directed Its Sales Force To "Push The Dose" With Thalomid 45

8. Celgene Brought Sales Representatives To Its Headquarters To Learn To Off-label Market Thalomid ........ 46

9. Celgene Utilized National Sales Meetings To Train And Encourage Sales Personnel To Off-Label Market Thalomid ........ 46

10. Management Accompanied Relator and Other Sales Representatives on Sales Calls ........ 47

11. Relator And Other Sales Representatives Were Required To Conduct Training Sessions Concerning Thalomid's Off-Label Uses ........ 49

12. Celgene Manipulated Continuing Medical Education Programs To Off-Label Market Thalomid ........ 49

13. Celgene Temporarily Changed Course In Preparation For Revlimid's Anticipated FDA Approval ........ 50

E. Celgene Misbranded Thalomid By Making Representations Unsupported By Thalomid's FDA-Approved Prescribing Information. 51

F. Celgene Markets Revlimid For Off-label Uses ........ 51

1. MDS ........ 51

2. Multiple Myeloma (MM) ........ 52

3. Like Thalomid, Celgene Off-Label Marketed Revlimid For A Variety Of Cancers And Other Ailments ........ 54

G. Celgene Details Off-Label Uses Of Thalomid And Revlimid Using Studies And Abstracts That Failed To Provide Scientific Support For The Off-Label Uses ........ 54

H. Celgene Directs Sales Representatives To Encourage Physicians to Switch Patients From Thalomid To Revlimid Regardless Of Whether The Patients Are Healthy And Stable ........ 57

I. Celgene Pays Kickbacks To Physicians To Prescribe Revlimid And To Encourage Other Physicians To Prescribe The Drug ........ 58

J. Celgene Directly Targets Federal And State Healthcare Dollars ........ 61

1. Celgene Created a Position, the Patient Support Coordinator, to Assist Patients in obtaining Government Funding for these Drugs ........ 62

2. Celgene Targeted Veterans Administrations And TRICARE ........ 64

K. Celgene Pays Patients Kickbacks To Induce Revlimid Prescriptions.... 65

L. Celgene Manipulates RevAssist To Cause Medicare And Medicaid To Pay For Off-Label Revlimid Prescriptions ........ 67

M. Celgene's Marketing of Thalomid and Revlimid Was Successful And Generated Billions of Dollars of Prescriptions ........ 70

N. The Off-label Uses of Thalomid and Revlimid Are Not Supported by the Drug Compendia ........ 71

O. The Inclusion of Off-label Uses of Thalomid and Revlimid Not Supported in the Relevant Medical Compendia Are The Result of Kickbacks and Conflicts of Interest Between the Compendia, Celgene and Other Pharmaceutical Companies ........ 74

REQUEST FOR TRIAL BY JURY .................................................................... 97

## II. JURISDICTION AND VENUE

21. Relator brings this action on behalf of herself and on behalf of the United States for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, and on behalf of and on behalf of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Iowa, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, Wisconsin, the District of Columbia, and the City of Chicago for violations of the State False Claims Acts.

22. This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 and supplemental jurisdiction over the counts relating to the State False Claims Acts pursuant to 28 U.S.C. § 1367.

23. This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found in and transact business in this District. In addition, the acts prohibited by 31 U.S.C. §3729 occurred in this District.

24. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

25. There has been no public disclosure of the allegations herein. To the extent that there has been a public disclosure unknown to the Relator, she is the "original source" under 31 U.S.C. § 3730(e)(4). Relator has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing this qui tam action based on that information. *See* 31 U.S.C. § 3730(e)(4).

## III. PARTIES

26. Relator Beverly Brown was employed Celgene from 2001 to 2011, working in Los Angeles, California and surrounding areas. Her job titles have included S.T.E.P.S. (System for Thalidomide Education and Prescribing Safety) Field

Coordinator, Immunology Specialist, and Hematology Oncology Consultant. Although Celgene gave her these technical and science-related job titles, Relator was actually a pharmaceutical sales representative who received a base salary and bonuses based on the volume of both on-label and off-label sales of Thalomid and Revlimid in her sales district. Relator was a top performer, winning commendations from Celgene for her sales performance.

27. Defendant Celgene is a Delaware corporation, with its headquarters and principal place of business in Summit, New Jersey. Celgene is a global biopharmaceutical company engaged in the global business of discovery, development, manufacturing, marketing, and sale of prescription drugs and other products for the prevention, diagnosis, and treatment of diseases. In fiscal years 2008 and 2009, Celgene earned nearly $2.7 billion in total revenues, with blockbuster drugs Revlimid and Thalomid accounting for more than $1.7 billion and nearly $440 million in sales, respectively. Both Thalomid and Revlimid have consistently generated large revenues for the Company. From 2002 through 2009, Thalomid generated more than $2.7 billion in total sales. Similarly, from December 2005 (i.e., Revlimid's entry into the market ) through 2009, Revlimid has accounted for more than $4.1 billion in revenues. According to Company estimates (*see* Celgene Q4 2008 Earnings Call (Jan. 29, 2009)), as well as industry analysis (*see* Credit Suisse Analyst Report (Apr. 1, 2009)), Medicare pays for the majority of Thalomid and Revlimid prescriptions.

28. Defendant National Comprehensive Cancer Network, Inc. (NCCN) is a not-for-profit alliance of 23 of the world's leading cancer centers was formed with its headquarters in and principal place of business in Fort Washington, PA. NCNN is a Delaware domestic company, incorporated on November 29, 1993. NCCN publishes the "NCCN Drugs & Biologics Compendium" (the "NCCN Compendium") which purports to list "appropriate uses of" pharmaceuticals to treat a variety of cancers. The NCCN Compendium is indexed by drug or biological agent rather than by disease.

29. The Micromedex DrugDex compendia ("DrugDex") was published by Thomson Corporation through 2008 when Thompson merged with Reuters Group PLC to form Thomson Reuters Corporation. It was then published by Thomson Reuters through June 6, 2012 when it, and other assets were acquired by Veritas Capital and the company was renamed Truven Health Analytics. Defendant Thomson Reuters Corporation's corporate headquarters is located at 3 Times Square in New York, NY and it was incorporated under the Business Corporations Act (Ontario). DrugDex purports to list information about pharmaceuticals including uses of pharmaceuticals to treat a variety of medical conditions.

30. Defendant American Society of Health-System Pharmacists, Inc. publishes AHFS Drug Information ("AHFS DI"). The American Society of Health-System Pharmacists has its headquarters and principal place of business in Bethesda, Maryland. It is a professional organization whose members are mostly pharmacists, pharmacy technicians, and pharmacy students. It is a Maryland domestic corporation founded on September 18, 1984 with a principal place of business at 4630 Montgomery Ave., Bethesda, MD. The AHFS DI is a drug compendia that purports to list information about pharmaceuticals including uses of pharmaceuticals to treat a variety of medical conditions.

31. Elsevier/Gold Standard publishes the Clinical Pharmacology drug compendia. It is owned by Elsevier which is part of Reed Elsevier Group PLC. The Reed Elsevier Group PLC is jointly owned by Defendants Reed Elsevier PLC and Reed Elsevier NV (collectively "Reed Elsevier"). Reed Elsevier PLC was incorporated in 1894 in the United Kingdom and its principal offices are located at 1-3 Strand, London WC2N 5JR, United Kingdom. Reed Elsevier NV was incorporated in 1903 in the Netherlands and its principal offices are located at Radarweg 29, Amsterdam 1043 NX, Netherlands. The Clinical Pharmacology drug compendia purports to list information about pharmaceuticals including uses of pharmaceuticals to treat a variety of medical conditions.

# IV. STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANT CELGENE'S FALSE CLAIMS ACT VIOLATIONS

## A. Federal Government Health Programs

32. The federal and state governments, primarily but not exclusively through their Medicaid and Medicare programs, are among the principal purchasers of Celgene's pharmaceutical products.

33. Medicare is a federal government health program primarily benefiting the elderly that Congress created in 1965 when it adopted Title XVIII of the Social Security Act. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS").

34. There are four parts to Medicare: Medicare Part A (hospital insurance); Medicare Part B (medical insurance); Medicare Part C (Medicare Advantage, which was formerly known as Medicare + Choice); and Medicare Part D (prescription drug coverage which was enacted as part of the Medicare Modernization Act of 2003 (MMA) and went into effect on January 1, 2006).

35. Medicare Part A generally pays for inpatient services for eligible beneficiaries in hospital, hospice and skilled nursing facilities, as well as some home healthcare services. 42 U.S.C. §§ 1395e - 42 U.S.C. §§ 1395i-5. Prescription drugs are covered under Medicare Part A only if they are administered on an inpatient basis in a hospital or similar setting.

36. Medicare Part B and covers some healthcare benefits not provided by Medicare Part A services and products not covered by Part A, generally on an outpatient basis. Doctor's visits and other services are covered by Part B, as are occupational and physical therapists, outpatient care and additional home health care. Medicare Part B pays for some types of prescription drugs that are not administered in a hospital setting. 42 U.S.C. § 1395k(a); 42 U.S.C. § 1395x(s)(2); 42 C.F.R.§ 405.517. These typically include drugs administered by a physician or other provider in an outpatient setting, some orally administered anticancer drugs and antiemetics (drugs which control the side

effects caused by chemotherapy), and drugs administered through durable medical equipment such as a nebulizer. 42 U.S.C. § 1395k(a); 42 U.S.C. § 1395x(s)(2); 42 C.F.R. § 405.517.

37. Medicare Part C, in effect, combines both Part A and Part B. Part C differs, however, because it is supplied through private insurance companies. Medicare beneficiaries, essentially, have the option to receive their Medicare benefits through private health insurance plans, instead of through the original Medicare plan (Parts A and B). Originally, these programs were known as "Medicare+Choice" or "Part C" plans. Following to the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 – which created Part D – "Medicare+Choice" plans were changed by adding prescription drug coverage and became known as "Medicare Advantage" (MA) plans. Currently, more than 25% of all Medicare beneficiaries are in a MA plan.

38. On January 1, 2006, Part D of the Medicare program began providing drug coverage for all beneficiaries. This drug benefit covers drugs that are considered "covered outpatient drugs" under 42 U.S.C. § 1396r-8(k).

39. Congress created Medicaid at the same time it created Medicare in 1965 when Title XIX was added to the Social Security Act. Medicaid is a public assistance program that provides payment of medical expenses to primarily low-income patients. Funding for Medicaid is shared between the federal government and the state governments. The federal government also separately matches certain state expenses incurred in administering the Medicaid program. While specific Medicaid coverage guidelines vary from state to state, Medicaid's coverage is generally modeled after Medicare's coverage, except that Medicaid usually provides more expansive coverage than does Medicare.

40. Medicaid has broad coverage for prescription drugs, including self-administered drugs. Nearly every state has opted to include basic prescription drug coverage in its Medicaid plan.

41. Medicaid pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") through CMS. 42 U.S.C. §§ 1396a(a)-(b). After states pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to rates the states establish, the federal government then pays each state a statutorily-established share of "the total amount expended ... as medical assistance under the State plan ...." *See* 42 U.S.C. §§ 1396b(a)(1), 1396b(a)(1), 1903(a)(1). This federal-to-state payment is known as federal financial participation ("FFP").

42. TRICARE is the health care system of the United States military, designed to maintain the health of active duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries, including dependents of active duty personnel and certain military retirees and their dependents. The program operates through various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian health care providers. TRICARE is a triple-option benefit program designed to give beneficiaries a choice between health maintenance organizations, preferred provider organizations and fee-for-service benefits. Five managed care support contractors create networks of civilian health care providers.

43. Whereas Tricare treats active duty military and their dependents, the Veterans Administration ("VA") provides health care and other benefits to veterans of the military through its nationwide network of hospitals and clinics

44. The Federal Employees Health Benefits Program ("FEHBP") provides health insurance coverage for more than 8 million federal employees, retirees, and their dependents. FEHBP is a collection of individual health care plans, including the Blue Cross and Blue Shield Association, Government Employees Hospital Association, and Rural Carrier Benefit Plan. FEHBP plans are managed by the Office of Personnel Management.

45. While each government-funded health program establishes its own reimbursement criteria, none knowingly pay for medications that are not prescribed for a

medically accepted indication, or that are prescribed as a result of false or misleading information disseminated by the pharmaceutical manufacturer to either the payors or the healthcare providers. In addition, none of the government-funded health care programs willingly pay for prescription drugs the prescribing of which was the result of, or was influenced by, unlawful inducements from or unlawful marketing activities by the pharmaceutical manufacturer.

**B. The False Claims Act**

46. The Federal False Claims Act provides that any person who knowingly presents or causes another to present a false or fraudulent claim for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the government. 31 U.S.C. § 3729(a) (1)(A), (B). Twenty-eight states, the District of Columbia, and the City of Chicago have enacted analogous false claims act statutes that apply to Medicaid fraud.

**C. FDA Regulations**

47. The FDA regulates drugs based on the "intended uses" for such products. Before marketing and selling a prescription drug, a manufacturer must demonstrate to the FDA that the product is safe and effective for each intended use. 21 U.S.C. § 331(d); 21 U.S.C. §§ 355(a), 360b(a).

48. The FDA reviews pharmaceutical manufacturers' applications for new drugs to determine whether the drugs' intended uses are safe and effective. *See* 21 U.S.C. § 355. Once a drug is approved for a particular use, doctors are free to prescribe the drug for "non-indicated" or off-label purposes. While doctors may independently request information from drug manufacturers about such off-label uses, with very few exceptions, the FDA prohibits drug manufacturers from marketing or promoting drugs for uses, i.e., indications not explicitly approved by the FDA. As described above, "off-label" refers to-the marketing of an FDA-approved drug for uses that have not undergone FDA scrutiny and approval, i.e., for purposes not approved by the FDA.

49. Under the statute, qualified medical professionals may provide purely scientific medical information for uses other than that approved by the FDA; all other sales and marketing presentations, promotions and marketing to physicians for uses other than that approved by the FDA is considered off-label marketing or "misbranding" proscribed by the FDA. *See* 21 U.S.C. §§ 331(a)-(b), 352(a), (f). This includes any attempts by a pharmaceutical sales representative to solicit discussions with physicians concerning off-label use.

50. Strong policy reasons exist for strict regulation of off-label marketing. Off-label promotion bypasses the FDA's strict review and approval process, and removes the incentive to obtain definitive clinical study data showing the efficacy and safety of a product and, accordingly, the medical necessity for its use.

51. Pursuant to the Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. §§ 301, *et seq.*, the FDA strictly regulates the content of direct-to-physician product promotion and drug labeling information used by pharmaceutical companies to market and sell FDA-approved prescription drugs.

52. FDA interprets "labeling" in its regulations broadly to include items that are "1) descriptive of a drug: 2) supplied by the manufacturer or its agents; and 3) intended for use by medical personnel." 21 C.F.R. § 202.1. The FDCA defines both misleading statements and the failure to reveal material facts in a label or product labeling as "misbranding." 21 U.S.C. § 321(n). Labeling includes, brochures, booklets, detailing pieces, literature, reprints, sound recordings, exhibits and audio visual material. 21 C.F.R. § 202.1 (l)(2).

53. The FDA regulations deem "advertising" to include media-based activities that appear in magazines, newspapers, professional journals and on television, radio, and telephone communications systems. *See* 21 C.F.R. § 202.1(l)(1). Courts have consistently held that oral statements made by a company's sales representative relating to a pharmaceutical product constitute commercial advertising or promotion. *See Abbott*

*Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 10 (7th Cir. 1992) (interpreting the Lanham Act).

54. Pharmaceutical promotional and marketing materials and presentations lacking in fair balance or that are otherwise false or misleading "misbrand" a drug in violation of the Food, Drug and Cosmetics Act, 21 U.S.C. §§ 301, 321, 331, 352, 360b, 371, 21 C.F.R. § 202.1(e)(6), (e)(7), 21 C.F.R. § 1.21.

55. Such violations exist where promotional and marketing materials and presentations for an FDA approved drug:

- Minimize, understate, or misrepresent the risks, contra-indications, and complications associated with that drug;
- Overstate or misrepresent the risks, contra-indications, and complications associated with any competing drugs;
- Reference "off-label" uses of the drug — i.e., those uses which are not indicated by the FDA — or expressly or implicitly promote unapproved uses and dosing regimens for which the drug is not indicated;
- Fail to reveal facts material in light of its representations or material with respect to consequences that may result from the use of the drug as recommended or suggested in the advertisement;
- Contain representations or suggestions, not approved or permitted in the labeling, that is not demonstrated by substantial evidence or substantial clinical experience;
- Present information from a study in a way that implies that the study represents larger or more general experience with the drug than it actually does;
- Use a quote or paraphrase out of context to convey a false or misleading idea; or
- Are otherwise false, misleading or lacking in fair balance in the presentation of information about the drug being marketed or any competing drug.

*See* 21 C.F.R. § 202.1 (e)(4)(5)(6), (7).

56. Oral statements and written materials presented at industry-supported activities, including lectures and teleconferences, provide evidence of a product's intended use. If these statements or materials promote a use inconsistent with the product's FDA-approved labeling, it is misbranded as it fails to provide adequate directions for all intended uses.

### D. The Medicare Fraud & Abuse/Anti-Kickback Statute

57. The Medicare Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), which also applies to the state Medicaid programs, provides penalties for individuals or entities that knowingly and willfully offer, pay, solicit or receive remuneration to induce the referral of business reimbursable under a federal health benefits program. The offense is a felony punishable by fines of up to $25,000 and imprisonment for up to 5 years.

58. In accordance with the Anti-Kickback Statute, Medicare regulations directly prohibit providers from receiving remuneration paid with the intent to induce referrals or business orders, including the prescription of pharmaceuticals; paid as a result of the volume or value of any referrals or business generated. *See* 42 C.F.R. § 1001.952(f). Such remunerations are kickbacks when paid to induce or reward physicians' prescriptions. Kickbacks increase government-funded health benefit program expenses by inducing medically inappropriate overutilization of prescription drugs and excessive reimbursements. Kickbacks also reduce a patient's healthcare choices, as physicians may prescribe drug products based on the physician's own financial interests rather than according to the patient's medical needs.

59. The Medicare Anti-Kickback Statute contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute. *See* 42 U.S.C. § 1320a-7(b)(3). None of the statutory exceptions or regulatory safe harbors protects the Defendants' conduct in this case.

60. The Balanced Budget Act of 1997 amended the Act to add administrative civil penalties of $50,000 for each act violating the Anti-Kickback Statute, as well as an assessment of not more than three times the amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of that amount was offered, paid, or received for a lawful purpose. *See* 42 U.S.C. § 1320a-740(7).

61. More recently, the Patient Protection and Affordable Care Act ("PPACA"), Public Law No. 111-148, Sec. 6402(g), amended the Medicare Anti-Kickback Statute or "Social Security Act," 42 U.S.C. § 1320a-7b(b), to specifically allow violations of its

"anti-kickback" provisions to be enforced under the False Claims Act. The PPACA also amended the Social Security Act's "intent requirement" to make clear that violations of the Social Security Act's anti-kickback provisions, like violations of the False Claims Act, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation." *Id.* at Sec. 6402(h).

62. As detailed below, Celgene's marketing of Thalomid and Revlimid repeatedly violated provisions of the Anti-Kickback Statute, which in turn violates the False Claims Act because Celgene's improper kickbacks and incentives induced physicians to prescribe Thalomid and Revlimid when they otherwise would not have and many of those prescriptions were paid for by Medicare, Medicaid and other government funded health insurance programs. The Drug Compendia Defendants receipt of kickbacks, made by Celgene to doctors paid by the Drug Compendia Defendants to advise them regarding their compendia, also violated provisions of the Anti-Kickback Statute, which in turn violates the False Claims Act because these improper kickbacks and incentives induced Medicare, Medicaid and other government funded health insurance programs to pay for prescriptions of Thalomid and Revlimid when they otherwise would not have.

**E. Stark Law - The Medicare/Medicaid Self-Referral Statute**

63. The Medicare/Medicaid Self-Referral Statute, 42 U.S.C. § 1395nn, et seq., known as the "Stark" law, prohibits a pharmaceutical manufacturer from paying remuneration to physicians for referring Medicare and Medicaid patients to the manufacturer for certain "designated health services," including drug prescriptions, where the referring physician has a nonexempt "financial relationship" with that manufacturer. 42 U.S.C. § 1395nn(a)(1), (h)(6). The Stark law provides that the manufacturer shall not cause to be presented a Medicare or Medicaid claim for such prescriptions. Stark also prohibits payment of claims for prescriptions rendered in violation of its provisions. 42 U.S.C. § 1395nn(a)(1), (g)(1).

64. Celgene's marketing of Thalomid and Revlimid repeatedly violated the Stark law, which in turn violates the False Claims Act, because Celgene's unlawful payments and services to prescribing physicians induced those physicians to prescribe these drugs when they otherwise would not have done so. Many of those prescriptions were paid for by government funded health insurance programs.

**F. Medicare and Medicaid Coverage of Off-Label Prescriptions**

65. Prior to the introduction of Part D on January 1, 2006, Medicare provided limited benefits for outpatient drugs such as Thalomid and Revlimid. Medicare would pay for anti-cancer drugs in an out-patient context under Part B only if the drug was prescribed for an indication or use for which the drug had specifically been approved by the FDA, of if the drug was prescribed for a "medically accepted indication" which was defined as a use of a drug that was supported by one or more citations in certain specified drug compendia published by third parties, *see* 42 U.S.C. § 1395x(t)(2)(B)(ii)(I), or by "clinical evidence in peer reviewed medical literature appearing in publications which have been identified … by the Secretary." 42 U.S.C. § 1395x(t)(2)(B)(ii)(II).

66. For its first three years, the Medicare Part D coverage of drugs used off-label was more limited than in the Part B program. The regulations that implemented Part D prohibited coverage of off-label use of prescription drugs, unless the prescribed use was supported in 1 of 3 medical compendia used to define "medically accepted indications" in the Medicaid program. 42 C.F.R. § 423.100. The 3 compendia that were accepted by the Part D program were AHFS DI, USP DI (or its successor), and DRUGDEX. If the drug was not supported in any of these 3 specified compendia, Part D plans could not cover the drugs, regardless of any medical necessity or evidence of clinical effectiveness, including evidence from clinical research published in peer-reviewed medical journals. The Medicare Improvements for Patients and Providers Act of 2008 (MIPPA) expanded the Medicare Part D drug coverage to off-label uses of

anticancer drugs so that it is consistent with Part B coverage. Pub. L. No. 110-275, 122 Stat. 2494.

67. Medicaid is administered on a state-by-state basis but the states are required to adhere to federal statutes, regulations and guidelines. Federal law permits states to pay for any drug for any indication, but they will not receive FFP if the drug, as prescribed, is not for a medically acceptable use. FFP is available to states only for "covered outpatient drugs." 42 U.S.C. § 1396b(i)(10). "Covered outpatient drugs" do not include drugs that are "used for a medical indication which is not a medically accepted indication." *Id.*, § 1396r-8(k)(3). A medically-accepted indication is defined as a use "which is approved under the" FDCA or which is "supported by one or more citations included or approved for inclusion" in specified drug compendia. *Id.* §§ 1396r-8(k)(6); 1396r-8(g)(1)(B)(l). As a result, Medicaid programs do not provide off-label drug coverage greater than Medicare.

68. Coverage of off-label drug use by TRICARE, the VA and other federal and state health care programs is similar to Medicare and Medicaid coverage. *See* TRICARE Policy Manual 6010.54-M, Chapter 8, Section 9.1;

69. At all times relevant to Defendants' conduct, and as more fully described below, the off-label uses of Thalomid and Revlimid were not "medically accepted" as those uses were not supported in the relevant drug compendia. Alternatively, to the extent that Medicare, Medicaid and other government providers did believe that the drug compendia supported an off-label use of Thalomid and Revlimid, the drug compendia provided such support as the result of the kickbacks the Drug Compendia Defendants received from Celgene.

## V. SPECIFIC ALLEGATIONS OF CELGENE'S FALSE CLAIMS

### A. Celgene's Prescription Drugs Thalomid and Revlimid

#### 1. Thalomid's FDA-Approved Uses and Restrictions

70. Thalidomide, marketed by Celgene under the brand name Thalomid, was first approved by the FDA in 1998 for the treatment of erythema nodosum leprosum ("ENL"), a rare skin condition associated with leprosy. The drug is and was approved to treat "cutaneous manifestations of moderate to severe" ENL, as well as to prevent and suppress recurrences of ENL on human skin. ENL is an exceedingly uncommon skin condition that affects very few Americans each year. According to the Health Resources and Service Administration, a division of the United States Department of Health and Human Resources ("HHS"), there were a mere 137 new cases of leprosy in America in 2006 and there was total of 1,600 cases from 1998 through 2009. Thus, the number of patients suffering from ENL – a subset of the total leprosy population – is quite small.

71. In May 2006, the FDA issued an additional indication for Thalomid, when used in combination with the drug, dexamethasone, for treatment of newly diagnosed multiple myeloma ("MM"). MM is a cancer of the blood, like leukemia. An MM patient's plasma cells grow uncontrollably in the bone marrow, destroying the bone and escaping into the peripheral circulation. MM can cause patients to experience bleeding, increased rates of infection, kidney damage, bone disease, and death.

72. Thalomid is approved only in combination with another drug, dexamethasone, for patients who have newly diagnosed MM. Thalomid has never been approved as a solo or "monotherapy" treatment for MM, meaning a drug administered by itself and not in combination with other drugs or in combination with any drug other than dexamethasone. In addition, Thalomid has never received FDA approval for treatment of patients with MM who have received a prior drug therapy.

73. While the price of Thalomid varies by dose and duration, Thalomid prescriptions can cost as much as $12,000 per year per patient.

74. From 1998 to the present day, Celgene marketed Thalomid for several other diseases, including bladder cancer; breast cancer; brain cancer; cervical cancer; colorectal cancer; esophageal cancer; kaposi sarcoma; leukemia (including, but not limited to, chronic lymphocytic leukemia ("CLL")); lymphoma; melanoma; prostate cancer; pancreatic cancer; renal (i.e., kidney) cancer; thyroid cancer; multiple myeloma (prior to the FDA's May 26, 2006 approval of Thalomid to treat a new onset (only) of this disease); multiple myeloma, not in combination with the drug, dexamethasone; relapsed or refractory multiple myeloma; myelodysplastic syndromes; ovarian cancer; and uterine cancer.

### 2. Revlimid's FDA-Approved Uses and Restrictions

75. Lenalidomide, marketed by Celgene under the brand name Revlimid, was first approved by the FDA on December 27, 2005 for an extremely narrow indication: the treatment of patients with transfusion-dependent anemia due to low or intermediate risk myelodysplastic syndrome ("MDS") only when associated with a deletion 5q cytogenic abnormality (i.e., total deletion of the long arm of chromosome 5) with or without additional cytogenic abnormalities. MDS refers to a group of blood disorders that prevents human bone marrow from producing healthy blood cells. Although MDS includes a range of blood disorders, Revlimid is only indicated for the specific MDS-subtype of "low or intermediate risk" with "a deletion 5q cytogenic abnormality with or without additional cytogenic abnormalities." Stated differently, Revlimid is not indicated, and has never been indicated, for MDS patients (a) who do not have deletion 5q cytogenic abnormality or (b) who do not have low or intermediate risk MDS. Only about 20% to 30% of patients with MDS have deletion 5q cytogenic abnormality. According to the Leukemia & Lymphoma Society, there are roughly 11,400 new cases of MDS (all types) each year, which equates to only 2,300 to 3,400 new cases of MDS with 5q cytogenic abnormality each year.

76. Despite Revlimid's narrow indication, Celgene marketed and continues to market the drug for all types of MDS, as well as a host of other off-label indications,

including brain cancer; leukemia (including, but not limited to, CLL); lymphoma; myelofibrosis; multiple myeloma (prior to Revlimid receiving FDA approval to treat a certain indication of this disease); multiple myeloma not in combination with the drug, dexamethasone; newly-diagnosed multiple myeloma; prostate cancer; and stem-cell transplant maintenance therapy after stem cell transplant.

77. In June 2006, Revlimid received FDA approval, when taken in combination with dexamethasone, for MM patients who have received at least one prior therapy. Unlike Thalomid, Revlimid is not approved for newly diagnosed MM, but only for those who have already received another treatment other than Revlimid.

78. Revlimid is extremely expensive; prescriptions can cost as much as $120,000 per year per patient.

### 3. Safety Issue: FDA Warnings Concerning Potentially Fatal Side Effects of Thalomid and Revlimid

#### a. History of Thalomid

79. Thalodomide, which Celgene later marketed as Thalomid, was first manufactured in 1957 by Chemie Grunenthal, a German pharmaceutical company that hired several Nazi doctors and scientists. For example, it employed Martin Staemmler, a leading proponent of the Nazi "racial hygiene" program who, following Germany's invasion of Poland, worked with the SS on its population policy. He was Grünenthal's head of pathology at the time thalidomide was being sold. Grünenthal also employed Otto Ambros, one of the four inventors of the nerve gas sarin. In 1948, Ambros was found guilty at Nuremberg of mass murder and enslavement and sentenced to eight years in prison. He was the chairman of Grünenthal's advisory committee at the time of the development of thalidomide.

80. In 1958, thalidomide was being used throughout Europe and Canada to treat morning sickness in pregnant women. By 1961, however, thalidomide had been identified as the cause of between 10,000 and 20,000 serious birth defects, including severely deformed, or all-together missing, limbs. Thalidomide was not approved by the

FDA during this period, but samples of thalidomide were blamed for at least 17 cases of severe birth defects in America.

81. Specifically in response to the horror stories concerning thalidomide and birth defects, in 1962, Congress passed the Kefauver Harris Amendment, which for the first time required pharmaceutical companies to demonstrate a drug's efficacy and safety to the FDA in to obtain approval to market the drug in the United States, and also required drug advertisements to disclose information about potential side effects to consumers.

82. More than thirty years later, in 1998, when the FDA approved thalidomide (now marketed as Thalomid) for treatment of ENL, the FDA required Celgene to take multiple precautions to prevent Thalomid from, once again, causing severe birth defects. In addition to requiring Celgene to place a black-box warning on Thalomid's product labeling, the FDA required Celgene to take the remarkable step of creating a distribution system to prevent fetal exposure to Thalomid.

83. Specifically, as a condition of FDA approval, Celgene created the "System for Thalidomide Education and Prescribing Safety" ("S.T.E.P.S."), which requires all Thalomid-prescribing physicians to register with Celgene. It also requires all prescribing physicians to counsel patients on the risks of sexual activity during Thalomid use. Before a physician can prescribe Thalomid, the physician must notify Celgene through an automated system that he or she has counseled the patients on the risks of birth defects; then a Thalomid prescription is authorized by Celgene. Because of the S.T.E.P.S. program, Celgene has detailed records regarding every Thalomid prescription including all of the prescriptions submitted to Medicare, Medicaid, TRICARE, the VA and other government payors.

84. As Revlimid is in the same class of drugs as Thalomid, it too can cause birth defects. Revlimid's black box warning concerning risks of birth defects caused by Revlimid when taken during pregnancy recommends all female patients of childbearing potential obtain two negative pregnancy tests before starting Revlimid and use two

forms of contraception during and four weeks after taking Revlimid. The black box warning for birth defects is as follows:

> **WARNING: FETAL RISK, HEMATOLOGIC TOXICITY, and DEEP VEIN THROMBOSIS AND PULMONARY EMBOLISM**
> **Do not use REVLIMID during pregnancy. Lenalidomide, a thalidomide analogue, caused limb abnormalities in a developmental monkey study. Thalidomide is a known human teratogen that causes severe life-threatening human birth defects. If lenalidomide is used during pregnancy, it may cause birth defects or death to a developing baby. In women of childbearing potential, obtain 2 negative pregnancy tests before starting REVLIMID® treatment. Women of childbearing potential must use 2 forms of contraception or continuously abstain from heterosexual sex during and for 4 weeks after REVLIMID treatment [see Warnings and Precautions (5.1), and Medication Guide (17)]. To avoid fetal exposure to lenalidomide, REVLIMID is only available under a restricted distribution program called "RevAssist®" (5.2). Information about the RevAssist program is available at www.REVLIMID.com or by calling the manufacturer's toll-free number 1-888-423-5436.**

85. When the FDA first approved Revlimid in December 2005, it mandated a similar distribution system called RevAssist. As explained in more detail below, Celgene ultimately manipulated the cumbersome nature of RevAssist to cause Medicare, Medicaid, and other government funded programs to cover the high-cost of off-label Revlimid prescriptions. Because of the RevAssist program, Celgene has detailed records regarding every Thalomid prescription including all of the prescriptions submitted to Medicare, Medicaid, TRICARE, the VA and other government payors.

**b. Thalomid's and Revlimid's Black Box Warnings Concerning Venous Thromboembolism**

86. Cancer patients, including those with MM, already have a high risk of developing venous thromboembolism ("VTE"), which are blood clots that form within a vein. According to a 2005 article entitled *Deep Vein Thrombosis in Cancer: the scale of the problem and approaches to management* published in the Annals of Oncology, VTE is found at autopsy in at least 50% of cancer patients. Annals of Oncology, 16(5): 696-701 (May 2005).

87. VTEs are called deep venous thromboses ("DVT"s) when they form within the deep veins of the leg, the pelvic veins, or other veins, when the clots travel to the lungs, they are called pulmonary embolisms ("PE"s). PEs compromise lung function

and can be fatal. All forms of VTEs are potentially fatal. Short of death, VTEs may cause heart complications, ulcers, and vein damage which can permanently impair blood flow.

88. Both Thalomid and Revlimid further exacerbate the risk of VTEs in cancer patients. After Thalomid received its MM indication in May 2006, the FDA required Celgene to add the following black-box warning:

> **The use of Thalomid® (thalidomide) in multiple myeloma results in an increased risk of venous thromboembolic events, such as deep venous thrombosis and pulmonary embolus. This risk increases significantly when thalidomide is used in combination with standard chemotherapeutic agents including dexamethasone. In one controlled trial, the rate of venous thromboembolic events was 22.5% in patients receiving thalidomide in combination with dexamethasone compared to 4.9% in patients receiving dexamethasone alone (p = 0.002). Patients and physicians are advised to be observant for the signs and symptoms of thromboembolism. Patients should be instructed to seek medical care if they develop symptoms such as shortness of breath, chest pain, or arm or leg swelling. Preliminary data suggest that patients who are appropriate candidates may benefit from concurrent prophylactic anticoagulation or aspirin treatment.**

89. Revlimid carries a similar black-box warning concerning risk of VTEs in MM patients, and due to the seriousness of the risk, Revlimid's product information includes an additional warning concerning VTEs and MM The following is the FDA required black box warning for Revlimid concerning VTEs:

> **WARNING: FETAL RISK, HEMATOLOGIC TOXICITY, and DEEP VEIN THROMBOSIS AND PULMONARY EMBOLISM**
>
> **...**
>
> **Deep Vein Thrombosis and Pulmonary Embolism**
> **REVLIMID has demonstrated an increased risk of deep vein thrombosis (DVT) and pulmonary embolism (PE) in patients with multiple myeloma who were treated with REVLIMID and dexamethasone therapy. Patients and physicians are advised to be observant for the signs and symptoms of thromboembolism. Patients should be instructed to seek medical care if they develop symptoms such as shortness of breath, chest pain, or arm or leg swelling. It is not known whether prophylactic anticoagulation or antiplatelet therapy prescribed in conjunction with REVLIMID may lessen the potential for venous thromboembolic events. The decision to take prophylactic measures should be done carefully after an assessment of an individual patient's underlying risk factors.**

90. Since Thalomid was indicated solely for ENL from 1998 to 2006, Thalomid's product information never carried a black-box warning specifically concerning VTEs in MM patients from 1998 through 2006. Moreover, since Thalomid

and Revlimid are only FDA approved for MM and MDS, neither drug carries warnings concerning the potential risks of VTEs in other forms of cancer.

91. Doctors that prescribed Thalomid for MM prior to its receiving an MM indication in 2006 were never specifically warned of the risks of VTEs in MM patients taking Thalomid by the label. Furthermore, at all relevant times, physicians prescribing Thalomid or Revlimid for cancers other than MM were not, and are not, warned about the drugs' association with VTEs in various types of other cancers.

**c. Thalomid's and Revlimid's Additional Safety Risks**

92. In addition to the risk of potentially fatal blood clots, Thalomid and Revlimid can cause other serious side effects. Celgene's off-label marketing of Thalomid and Revlimid unnecessarily exposed patients to these risks.

93. Revlimid's package insert includes a black-box warning concerning hematologic toxicity □ neutropenia and thrombocytopenia. The Revlimid black box warning also warns provides:

> **WARNING: FETAL RISK, HEMATOLOGIC TOXICITY, and DEEP VEIN THROMBOSIS AND PULMONARY EMBOLISM**
> **...**
> **Hematologic Toxicity (Neutropenia and Thrombocytopenia)**
> **REVLIMID can cause significant neutropenia and thrombocytopenia. Eighty percent of patients with del 5q myelodysplastic syndromes had to have a dose delay/reduction during the major study. Thirty-four percent of patients had to have a second dose delay/reduction. Grade 3 or 4 hematologic toxicity was seen in 80% of patients enrolled in the study. Patients on therapy for del 5q myelodysplastic syndromes should have their complete blood counts monitored weekly for the first 8 weeks of therapy and at least monthly thereafter. Patients may require dose interruption and/or reduction. Patients may require use of blood product support and/or growth factors [see Dosage and Administration (2.2)].**

94. Patients with neutropenia have low white blood cell counts, which can seriously compromise their ability to fight off infections. Thrombocytopenia sufferers, by contrast, have low blood platelet levels, which can make it difficult for the blood to clot. Thrombocytopenia can cause patients to suffer hemorrhages, which can lead to

death. The black box warns that patients taking Revlimid can suffer from these types of hematologic toxicity.

95. Revlimid and Thalomid can also cause peripheral neuropathy (i.e., nerve damage), which can be severe and potentially permanent. Finally, both drugs can cause Stevens-Johnson Syndrome, a painful and dangerous condition causing skin to necrose and peel-off, as in a third-degree burn. Stevens-Johnson Syndrome can be fatal.

96. On April 8, 2011, the FDA issued a safety announcement concerning Revlimid's potential for causing new malignancies. The FDA announced that clinical trials conducted both within and outside the United States "found that patients treated with Revlimid (lenalidomide) may be at an increased risk of developing new types of cancer compared to patients who did not take the drug." The cancers associated with Revlimid and Thalomid use include acute myelogenous leukemia (AML) and B-cell lymphoma malignancies. Revlimid and Thalomid, are currently under continued investigation by the FDA.

**B. Celgene Staffed And Rewarded A Sales Force That Aggressively Marketed Thalomid and Revlimid Off-Label**

97. When Relator was hired at Celgene in April 2001 she was immediately directed by Celgene to commence marketing Thalomid to physicians for off-label uses. To accomplish this task, Relator and other Celgene sales professionals were dispatched to physicians under false pretenses. When Relator joined Celgene in 2001, she was given the title "Immunology Specialist," which indicated to physicians that Relator was a medical professional, as opposed to a sales representative. Relator has no formal medical training at any level, nor has she ever studied immunology. Yet Celgene required Relator to hold herself out as competent to educate physicians and other medical practitioners in immunology.

98. Celgene also gave Relator the title "S.T.E.P.S. Field Coordinator" – a reference to Thalomid's FDA-mandated education, recordkeeping and distribution system – and dispatched her to medical practices under the guise of assisting physicians

with the FDA-required S.T.E.P.S. program. But Relator's and other sales representative's purported assistance with S.T.E.P.S. was a "bait-and-switch," in that the program merely provided Celgene with an additional opportunity to off-label market Thalomid to captive physicians who required help in complying with S.T.E.P.S.

99. More specifically, Relator and the other 100-plus S.T.E.P.S. Field Coordinators from across the country were dispatched to physicians' offices where they instructed physicians on procedures for registering themselves and their patients taking Thalomid with S.T.E.P.S. and the requirement to contact Celgene directly each time the physician wrote a Thalomid prescription. It was during these S.T.E.P.S. meetings with physicians that Relator marketed, at Celgene's direction, Thalomid for off-label uses.

100. In or about December 2004, Celgene changed Relator's title from Immunology Specialist to Hematology Oncology Consultant ("HOC"). Relator's job duties stayed exactly the same, but since Thalomid was being marketed for both blood disorders (hematology) and cancers (oncology), Celgene believed the HOC title more accurately reflected the message its sales force was communicating to physicians. Again, while Relator has no formal medical training, Celgene required and continued to require her to hold herself out to physicians as learned in both hematology and oncology. In reality, Relator was a sales representative, and her compensation depended significantly upon her ability to market Thalomid and Revlimid to physicians.

101. Relator and other sales personnel were and are rewarded by Celgene for their off-label sales. Celgene's compensation and bonus structure incentivizes its sales force to meet or exceed certain benchmarks in drug sales. A March 23, 2003, Celgene memorandum from Dwight D'Iorio – Celgene's then-National Executive Director of Sales – distributed to Relator and other Celgene sales professionals states that Relator and her colleagues would have "the opportunity to earn additional bonus money with each additional sales level achieved," at a time when Thalomid was approved only for a single, rare indication related to leprosy.

102. Relator received Celgene stock options, cash bonuses, and vacations based on her off-label sales of Thalomid and Revlimid. In 2003 Relator was a member of the "Diamond Club" which, according to Celgene management, "represents the pinnacle of success at Celgene." Diamond Club members are "in the top 15% of performers" based on drug sales and receive a Movado watch, which is enhanced with a diamond each additional year the salesperson remains a Diamond Club member.

103. Celgene holds an annual "Chairman's Challenge," which is a bonus program that rewards sales personnel for gross on-label and off-label Thalomid and Revlimid sales and each salesperson's ability to exceed certain sales benchmarks. A March 2003 Chairman's Challenge announcement from Dwight D'Iorio states, "As promised at the National Sales Meeting there will be an additional bonus opportunity if we achieve an even higher level of sales success."

### C. Celgene Was Aware Of The Serious Risks Of VTE And PE Caused By Thalomid And Revlimid But Trained Its Sales Force To Conceal These Facts

104. As explained above, Thalomid and Revlimid elevated the risk of developing VTE, particularly in patients with MM or other forms of cancer. The VTEs could arise in the form of clots in certain veins or PEs in the lungs.

105. At the time Celgene promoted and marketed Thalomid and Revlimid off-label, the Company was aware of the elevated risks of VTEs that these drugs posed to cancer patients. Celgene knew about various trials showing an increased incidence of VTEs in cancer patients taking Thalomid, and received reports from the Company's sales personnel that doctors were concerned about prescribing Thalomid to their cancer patients.

106. Shortly after Relator started with Celgene in 2001, she was part of a conference call with Celgene sales professionals and other Celgene employees in which the participants discussed these risks posed by the use of Thalomid, but the sales professionals were instructed to withhold this information and not provide any warning to doctors. The Celgene sales professionals were told that doctors would see the DVTs

and PEs as side effects in MM patients, but should address the issue by simply stating that people with MM have a greater chance of developing VTE, rather than warning the doctors that use of Thalomid by patients with MM would increase the patients' risk of developing VTE.

107. Celgene specifically addressed the drug trials and doctors' concerns about Thalomid in its education and training materials provided to its sales personnel, including a document entitled "Thomboembolism Backgrounder" distributed in 2004. In that document, Celgene acknowledged that VTEs had been reported when thalidomide first began to be prescribed for MM, prostate cancer and other types of cancer, beginning around 2000. In fact, as noted in the Backgrounder, "[b]ecause of a high incidence of this effect, some clinical trials with thalidomide were suspended."

108. The Backgrounder also discussed the results of a survey by the Canadian Coordinating Office for Health Technology Assessment which results were published in January 2004, stating:

> This report noted several studies where a high incidence of thromboembolism (15% to 50%) was reported. In a few trials, thromboembolism was reported in 5% to 10% of patients. ... A study by Bowcock et al. (2002) reported thromboembolism in 7 of 23 patients (30%) who received thalidomide as a single agent.
>
> Several reports have described thromboembolism in patients who received thalidomide as part of treatment for prostate cancer. For example, in a study by Home et al. (2003), venous thromboembolism was reported in 0% of patients who received docetaxel alone, vs. 19% of patients who received docetaxel and thalidomide.
>
> VTE has also been reported in patients who received thalidomide as treatment for other cancer types, including renal cell carcinoma, myelodysplastic syndrome, and mantle cell lymphoma.

109. Despite these numerous studies showing increased risk of VTE in cancer patients taking thalidomide, Celgene told its sales professionals that there was no cause for alarm or need to warn doctors. In the Backgrounder, Celgene stated "The reasons for development of VTE with thalidomide use in cancer patients are not clearly understood." Celgene further stated that:

> Several reports have noted that thromboembolism is relatively uncommon when thalidomide is given as a single-agent therapy, and that the greatest incidence has come when thalidomide is used in combination with chemotherapy and/or corticosteroids.

110. Celgene provided its sales professionals with "suggested approaches" to dealing with doctors who raised concerns about prescribing thalidomide, providing the following "statements from recent publications":

> Thromboembolic events associated with thalidomide do not appear to be specific for MM, which should be taken into account when thalidomide is administered to patients with other malignant disorders, in particular solid tumors, who already have a substantially increased risk of deep-vein thrombosis.
>
> ... [C]areful monitoring for DVT should be recommended for patients enrolled in investigational clinical trials including thalidomide as part of therapy for MM. In these patients prophylactic low-dose warfarin should be considered in an attempt to reduce the risk for DVT.

111. In a section of the Backgrounder headed "Management," Celgene suggested that use of warfarin be proposed in conjunction with thalidomide to reduce the risk of VTE. The Backgrounder stated:

> Management of patients who have thromboembolic episodes in association with thalidomide use is similar to approaches described earlier in this program. Anticoagulation therapy (heparin, with or without warfarin) plus other approaches used in treatment of DVT and/or PE may be provided.
>
> When anticoagulant therapy is provided, DVT may not require discontinuance of thalidomide. Thalidomide has been resumed safely, in combination with warfarin, in patients who experienced thrombolic events.
>
> Some clinicians have provided warfarin prophylactically to cancer patients who are treated with thalidomide. The combined use of these agents may decrease the incidence of thromboembolism; however, this has yet to be established through controlled clinical trials.

112. In short, Celgene instructed its sales personnel not to warn doctors about the increased risk of developing VTE in cancer patients taking thalidomide. If the doctors raised this risk as an issue, Celgene trained its sales personnel to discount that

risk and suggest that the doctors prescribe an anticoagulation therapy such as warfarin to purportedly decrease the risk of VTE.

113. Celgene also told its sales personnel to propose the use of baby aspirin if a doctor raised the issue of VTE. As purported support for that instruction, Celgene provided to its sales personnel copies of an article by Mohamad A. Hussein, titled "Thromboembolism Risk Reduction In Multiple Myeloma Patients Treated With Immunomodulatory Drug Combinations," which, in turn, discussed the results of various trials. Celgene provided its sales personnel a summary of the Hussein article. In the summary, Celgene noted that aspirin reduced the incidence of VTE, and that, as concluded in the Hussein article:

> Strategies to reduce the risk of VTE associated with thalidomide and lenalidomide combinations while maintaining activity should consider the prophylactic use of anti-coagulants. There are no randomized trials to favor one anticoagulation agent or regiment over another in this setting.

114. What Celgene did not tell its sales personnel was that the American Academy of Chest Physicians – in its most recent (2004) Guidelines – states that aspirin should not be used for VTE prophylaxis for any patient group (the Academy rates this recommendation 1A, their strongest rating). Nor did Celgene tell its sales personnel that the American College of Physicians (an association of internists) has never recognized aspirin as appropriate for thromboprophylaxis. Nor did Celgene provide an objective analysis of the various studies discussed in the Hussein article, or discuss any of the problems of those studies (such as their small size) or other problems (such as the failure to provide information on the number of patients or length of the trial).

115. The problems with the studies and lack of detail would prevent any reasonable physician from relying upon them. Celgene was, however, directing its sales representatives to recommend that doctors prescribe aspirin to their patients taking Thalomid as a way to reduce the risk of developing VTE. This put patients' lives and health at serious risk.

### D. Celgene Markets Thalomid Off-Label

116. From the beginning of Relator's tenure at Celgene, Relator and other sales representatives were systematically directed to market Thalomid for a variety of off-label cancers and other ailments. When Relator joined Celgene in April 2001, Thalomid was only approved for treatment of ENL and did not receive an additional indication until a full five years later, in May 2006. Nevertheless, Celgene never provided Relator any information or training concerning Thalomid's use in ENL. Celgene never provided Relator with any studies, pamphlets, or educational materials of any sort concerning the sole disease for which Thalomid, at the time, was indicated. In her nearly twelve years at Celgene, Relator has never even met a physician who, to her knowledge, treats ENL. Furthermore, there are, on average, a mere twelve leprosy cases are treated in California each year, meaning ENL patients are virtually non-existent in her sales territory.

117. By contrast, since 2001, Celgene immersed Relator and other sales representatives in training materials concerning a litany of diseases – primarily cancers – for which Thalomid was not FDA approved. Relator was provided stacks of studies by Celgene's national headquarters so that she could detail physicians on these off-label uses. In addition, Celgene has off-label materials that are designed specifically to be used in sales calls.

#### 1. Misbranding of Thalomid For Breast Cancer

118. Through discussions with fellow sales representatives, Relator has learned that Celgene began off-label marketing Thalomid almost immediately upon receiving FDA approval. For instance, a fellow West Region sales representative told Relator that in or about 1999 or 2000, Jerome Zeldis, Celgene's then-Medical Director, accompanied her on a sales call to a preeminent breast cancer physician in Texas, in order to convince the breast cancer doctor to prescribe Thalomid to all of his breast cancer patients.

#### 2. Misbranding of Thalomid For Colorectal (colon) Cancer

119. Celgene mounted an extensive effort to promote the off-label use of Thalomid for colorectal cancer despite the fact that it is not FDA approved for this

indication and there is no support in any of the compendia (recognized by the Social Security Act, Section 1861(t)(2))B)) for that off-label use.

120. In 2000, Celgene provided Relator with a binder of materials entitled "Colorectal Cancer" to be used in promoting the use of Thalomid in patients with colorectal cancer. Among other points made in the binder, Celgene provided "Selling points of Thalomid use" including that Thalomid is "responsible for the reduction of gastrointestinal toxicities/diarrhea seen with Irinotecan"; "the case of Thalomid used with Irinotecan combo treatment will result in more patients being able to tolerate the dosage regimens of Irinotecan and therefore improve antitumor outcomes"; and that Thalomid may "ultimately prolong survival." Celgene promoted Thalomid to treat colorectal cancer despite that the fact that in 2000, and today, there is no evidence that it provides benefits for patients with colorectal carcinoma at any stage of disease, either alone or in combination with other agents.

121. Other materials purportedly prepared "For Training and Educational Purposes" and provided to Relator and other Celgene sales personnel include a memorandum titled "Use of Thalidomide in Combination Therapy with Irinotecan in the Treatment of Metastic Colorectal Cancer," an August 2000 Lancet article by Dr. Rangasnamy Govindarajan and others titled "Effects of Thalomid on the Gastrointestinal Toxic Effects of Irinotecan (CPT-11)," and an August 2000 memorandum titled "Thalidomide Reduces Side Effects of Chemotherapy for Colon Cancer," which presented the purported benefits of using thalidomide in combination with Irinotecan in colorectal cancer patients. In addition to noting a reduced overall incidence of diarrhea in patients given the combination therapy, the 2000 memorandum stated that "[a]necdotally, thalidomide as monotherapy has been noted to be associated with clinical improvement in a few patients with metastatic colorectal carcinoma." However, the memorandum based its conclusion on small, preliminary studies. The Govindarajan study was, moreover, a pilot clinical trial involving only 9 patients of which only 8 completed the chemotherapy regimen and 1 required a dose reduction of thalidomide for

somnolence. Of the remaining 7 patients, only 1 had a complete response and another patient attained partial remission. Also, irinotecan is known to have activity in this disease, and the relative contribution of thalidomide is not clear. These results were far short of being sufficiently conclusive to be used for Thalomid treatment decisions and subsequent small studies in 2003, 2006, and 2007 reported a lack of radiographic response to thalidomide.

### 3. Misbranding of Thalomid For Kidney Cancer

122. Celgene provided Relator and other sales personnel with "training" materials to be used to promote the use of Thalomid in patients with kidney (renal cell) cancer. These materials, purportedly authored or assembled by Hank Schwarz, a Clinical Science Liaison, stated that:

> Thalomid appears to have anti-angiogenic benefits. Since kidney cancer is very vascular and attracts blood vessels, anti-angiogenic therapy is the next frontier in the battle against kidney cancer.

123. The training materials provided by Celgene to its sales force provided the following summaries of ongoing trials about Thalomid:

> Despite employing a low dose of thalidomide, we observed encouraging responses in patients with renal cell carcinoma. In 18 patients treated for renal carcinoma, three showed partial responses to thalidomide and 13 showed stable disease, three of them for more than 3 months.
>
> * * *
>
> Our findings suggest that thalidomide may be useful in the management of advanced renal cell carcinoma and possibly of symptomatic benefit in other solid malignancies.

124. There is no clear published evidence of clinical benefits of thalidomide in renal cell carcinoma at any stage of disease, either alone or in combination with other therapies. Early studies used duration of stable disease as an endpoint, which is generally not meaningful as an endpoint in this disease which can have long indolent periods. A negative study in 2006 led authors to conclude that the risks of thalidomide outweigh potential benefits, and publications subsequently recommended against use of thalidomide in this disease.

### 4. Misbranding of Thalomid For Prostate Cancer

125. Celgene directed Relator and others to off-label market Thalomid for all forms of prostate cancer even though it was not approved by the FDA for this indication nor was it listed in any compendia as indicated for the treatment of any form of prostate cancer. There is no clear published evidence of clinical benefits of Thalomid in prostate cancer at any stage of the disease, either alone or in combination with chemotherapy.

126. Relator and her colleagues at Celgene were provided with copies of an abstract by Dr. William Figg and others that appeared in the July 2001 issue of Clinical Cancer Research. The objective of the study was to evaluate the response rates (tumor measurements and changes in PSA levels) associated with low-dose and high-dose thalidomide in patients with androgen-independent prostate cancer (AIPC). The results were, however, inconclusive. Only 50 patients were enrolled in the low-dose arm; and the high-dose arm was terminated due to the high number of individuals who could not tolerate the dose. There were 560 adverse events reported, ranging from constipation to fatigue to suicide. About 30% of the patients had a decline of 40% or more in their PSA, but there was no control group. Nonetheless, Relator used this abstract in promoting the use of Thalomid for all forms of prostate cancer, not just AIPC.

### 5. Celgene Trained Its Sales Personal To "Probe" Physicians In Order to Induce Discussions of Off-Label Thalomid Uses

127. Celgene trained Relator and her colleagues to "probe" physicians on a variety of off-label uses for Thalomid. More specifically, Celgene directed Relator to ask physicians if they treated patients who suffered from a number of cancers and other diseases so that Relator could segue into Thalomid's use for these off-label purposes. For instance, Celgene managers directed Relator to ask physicians, "Do you treat any [off-label disease] patients?" If a physician responded "yes," Relator was told to highlight studies that purportedly showed strong data that supported Thalomid's use for the off-label indication. A 2002 "Celgene Field Contact Report" written by Relator's then-district sales manager, Deanna Harding, directed Relator to "Identify your goal

before walking into the office and establish an appropriate probe question to get you into a discussion."

128. The materials Celgene provided to Relator also described the following "Potential Probes" to use with doctors in promoting the off-label use of Thalidomid as a combination treatment with Irinotecan in colorectal cancer patients: "What are your biggest concerns for treating colorectal pts [patients]?"; "Where do you see Thalomid fitting into your treatment regimen?"; and "How do you feel about combining an immunomodulator's agent with a cytotoxic agent?"

129. Other training materials provided suggested questions to pose to doctors to propose that thalidomide be prescribed for kidney cancer. For example, Celgene materials stated:

> Dr. Smith, do you have any renal cell patients that have failed IL-2? … Thalidomide and its analogs overcome drug resistance of human multiple myeloma cells to conventional therapy. … This is why thalidomide is being tried in over 10 clinical trials in the U.S. for renal cell cancer.

130. But many of the studies Relator was required to emphasize to physicians were abstracts (i.e., brief summaries), or contained insufficient numbers of patients to determine the efficacy of Thalomid in the particular disease.

131. For example, in or about 2001 or 2002, shortly after Relator began working for Celgene, she attempted to market Thalomid for smoldering MM (i.e., early-stage, asymptomatic MM) at the Ventura, California Hematology and Oncology Clinic. It is Relator's understanding that smoldering MM is never treated, since it is asymptomatic and treatment (which always has side effects) does not affect the course of the disease. Nevertheless, Relator provided physicians at the Ventura facility with a study where 12 total patients were treated with Thalomid for smoldering MM. The head physician at the Ventura practice, Dr. Kelley, harshly scolded Relator for attempting to market Thalomid based on a woefully inadequate study.

132. Celgene also provided its sales force with a written off-label marketing plan for Thalomid in 2004 at a Celgene National Sales Meeting at the Lacosta Resort and Spa in Carlsbad, California, which was attended by the entire Celgene sales force from across the country, including Celgene's marketing department, and top-level Celgene management, including Sol J. Barer, then-President and COO, and then-CEO, John Jackson. At that meeting, Larry Bishop, the West Region Sales Director, provided the Celgene sales force with the "2004 Business Plan West Region (the 'Plan')." The Plan focused "solely on Thalomid," and instructed sales personnel to, inter alia, "[e]mphasize MM, MDS and targeted solid tumor activity[1] on every [sales] call." In other words, although Thalomid was (a) not approved for MM[2] at the time the memorandum was distributed, (b) was and is not approved for MDS, and (c) was never approved for additional cancers, Celgene's senior management specifically directed Relator and her colleagues to market Thalomid for those diseases "on every call."

133. The 2004 Plan also provides a "Market Analysis Summary" which reported Celgene's West Region, through 2003, caused physicians to prescribe Thalomid to 230 brain cancer patients, 400 melanoma patients, 1000 MM patients, 730 MDS patients, 45 ovarian cancer patients, 250 prostate cancer patients, and 420 renal cell (i.e., kidney) cancer patients. Celgene's West Region was just one of Celgene's sales districts. The Plan also set "specific additional new patient goals, by malignancy."

134. The 2004 Plan encouraged Celgene sales representatives to use numerous off-label studies, journal articles and abstracts identified in the document when marketing Thalomid for off-label uses.

135. The Plan did nothing more than reiterate and memorialize management's previous (and continuing) directives to off-label market Thalomid. Relator's superiors,

---

[1] "[T]argeted solid tumor activity" refers to cancers.

[2] As stated above, Thalomid did not receive FDA approval for MM until May 2006. Even in 2006, however, Thalomid received the narrow indication for treatment of newly diagnosed MM, and only when it is taken in combination with the agent, dexamethasone.

at times, referenced the Plan. For instance, in Relator's 2003 Performance Evaluation, completed in early 2004, Relator's then-district sales manager, Jeff Rowell ("Rowell"), instructed Relator to "Implement Larry Bishop's Regional Plan by targeting the selected tumors with the selected reference materials."

136. Relator successfully implemented the Plan. Every week, Celgene's national operations distributed spreadsheets summarizing Relator's and other sales representatives' sales data. Most of these sales report spreadsheets included a tab labeled "Indication and Duration Reports," which documented Relator's total Thalomid prescriptions for the current year as well as any "New [Thalomid] Patients" Relator successfully obtained. Each spreadsheet breaks these figures down by total numbers of patients and total Thalomid capsules prescribed. According to Relator's April 16, 2004 sales report, as of April 2004, Relator successfully caused physicians to prescribe 11,116 Thalomid capsules for MM patients, 504 for renal cell cancer patients, 1,148 for MDS patients, 196 for melanoma patients, 168 for prostate cancer patients, 112 for ovarian cancer patients, and 3,080 for patients suffering from "Other" ailments. Strikingly, ENL – the only disease for which Thalomid was indicated, i.e., FDA approved, until May 2006 – is not listed on any of these Celgene-generated spreadsheets.

137. Similarly, at the end of certain quarters, Celgene distributed spreadsheets to Relator and her colleagues that included a tab labeled "Indication Breakdown" and that provided the "Total Business" for Thalomid in specific diseases. According to the Celgene spreadsheet for the first quarter of 2004, from the first quarter of 2003 through the first quarter of 2004, Celgene's West Region sales force successfully caused physicians to prescribe: 131,702 Thalomid capsules for MM patients, 13,608 for MDS patients, and 1,484 for prostate cancer patients, and a total of 190,342 capsules for all patients combined. Critically, this same spreadsheet indicates that zero physicians in the region prescribed Thalomid for ENL.

### 6. Celgene Directed Its Sales Force to Secure Off-Label Medical Request Forms To Provide Cover For The Company

138. Celgene, like other pharmaceutical companies, used "medical information request forms" to memorialize physician requests for off-label information. Believing that a physician's unsolicited or voluntary request directly to the company for such information generally is not considered evidence of company's intent to misbrand or off-label market a drug, Celgene subverted the "medical information request" process by requiring its sales force to verbally discuss off-label uses of its drugs during visits with physicians and then ask physicians to request materials from Celgene, using "medical information request" forms. The forms, which were filled out by sales representatives and signed by physicians were designed to make it appear as though a physician's request for off-label information from Celgene's medical services department was entirely voluntary and unsolicited.

139. In complying with Celgene's directives, Relator routinely encouraged physicians to order off-label information from Celgene's medical services department during her sales pitches. If the physician agreed, Relator commonly filled out the form for the physician and then asked the physician sign. Relator sent the signed medical information request forms to Celgene's headquarters in Summit, New Jersey, which in turn sent the information to the physician.

140. Celgene put intense pressure on Relator and other sales personnel to secure as many medical information request forms as possible. Relator's 2003 Performance Evaluation directed Relator to "obtain a signed Medical Services Request form on each call." Furthermore, Relator and other sales representatives who failed to secure sufficient numbers of these medical information request forms were routinely admonished by their superiors.

141. Moreover, at almost every national sales meeting, a member of Celgene's marketing department would stand and commend the Celgene regional sales force that secured the greatest number of medical information request forms during the previous

year. Some of Celgene's highest level management, including Sol J. Barer (Celgene's Chief Operating Officer from March 1994 to May 1, 2006; Chairman and Chief Executive Officer from May 2006 until June 2010; Executive Chairman from June 2010 until December 2010; and Non-Executive Chairman from January 2011 until June 2011), who were present at these meetings, joined in applauding the regional team that secured the most off-label request forms.

142. Celgene's directive to circumvent the "medical information request" process not only furthered its goal of unlawfully increasing its sales of Thalomid and Revlimid, but provided needed but superficial "cover" were regulators to learn that the Company had unlawfully distributed materials outside the drugs' labeling.

### 7. Celgene Directed Its Sales Force To "Push The Dose" With Thalomid

143. Thalomid grows more expensive the higher the dose. Accordingly, Celgene directed sales representatives, including Relator, to encourage physicians to prescribe high doses of Thalomid, and sales representatives received larger bonuses based on higher dosages. Celgene's marketing strategy focused on diseases where patients in a study were given very high doses of Thalomid. For example, Celgene's managers directed Relator to target physicians who treated renal cell (i.e., kidney) cancer, because there existed published studies where renal cell cancer patients were treated with up to 1200mg of Thalomid per day (1200mg is a very high dose of Thalomid). Relator was provided stacks of these and other studies to distribute directly to physicians by Allison Tozer, a Medical Information Specialist at Celgene's headquarters in New Jersey. Celgene directed Relator to detail physicians concerning these studies and related off-label uses of Thalomid.

144. Relator also targeted physicians that treated glioblastoma (i.e., brain cancer) patients, because other studies used extremely high Thalomid dosage levels in treatment. In an effort to target these physicians, Celgene's national sales operations provided Relator and other sales representatives a list of physicians in their areas that prescribed

Temodar, a popular brain cancer medication. Celgene closely tracked physicians that prescribed Temodar.

145. Notwithstanding Celgene's efforts to target brain and kidney cancer specialists, Relator and other representatives often encountered resistance from physicians related to "pushing the dose," because many patients could not tolerate high dosage levels of Thalomid. Elevated doses of Thalomid can cause conditions such as pathological blood clots (which are potentially fatal), peripheral neuropathy, neutropenia, and constipation.

**8. Celgene Brought Sales Representatives To Its Headquarters To Learn To Off-label Market Thalomid**

146. Celgene sent its sales force to the Company's headquarters in Summit, New Jersey to participate in routinely conducted off-label training sessions. For example, in or about 2004, Larry Bishop, who authored the 2004 marketing plan, conducted a "Phase II Training" to assist Celgene's sales force in marketing Thalomid for a number of off-label uses. The Phase II Training materials discussed Thalomid use in the following cancers: prostate, ovarian, melanoma, renal, colorectal, brain, pancreatic, bladder, esophageal, gastric, testicular, cervical, uterine, breast, and thyroid. Following the Phase II training session, Bishop circulated a number of off-label studies (concerning these diseases) to sales representatives for use in detailing physicians. Mandatory training seminars similar to Bishop's Phase II Training were routinely conducted at Celgene's headquarters in Summit, New Jersey.

**9. Celgene Utilized National Sales Meetings To Train And Encourage Sales Personnel To Off-Label Market Thalomid**

147. Celgene held annual national sales meetings throughout the country, where Celgene trained and encouraged Relator and other sales representatives to off-label market Thalomid. These meetings were attended by up to 500 Celgene employees (depending on whether Celgene's international divisions attended), including employees in Celgene's sales and marketing departments as well as Celgene's top executive officers, including John Jackson and Sol J. Barer.

148. At the 2003 and 2004 national meetings, Larry Bishop, then-West Regional sales director, conducted trainings to assist Celgene's sales force in marketing Thalomid for various off-label uses. Following these sessions, Bishop circulated a number of off-label studies concerning a variety of diseases to sales representatives. As discussed above, Bishop's Plan was distributed and discussed in training sessions at Celgene's 2004 national meeting.

149. At national sales meetings, Celgene used individuals being treated with Thalomid who suffered from life-threatening diseases, which were outside Thalomid's label, to attest to the drug's efficacy. These individuals were introduced to the sales force both informally and on-stage. Specifically, at the 2003 National Sales meeting in West Palm Beach, a Celgene employee introduced a patient suffering from melanoma, who spoke about her success on Thalomid. Relator also recalls a patient taking Thalomid as a single agent for multiple myeloma speaking at a national meeting. Following these patient presentations, a Celgene employee routinely closed the meeting by emphasizing the importance of providing off-label information to physicians so that similar patients could receive Thalomid therapy.

### 10. Management Accompanied Relator and Other Sales Representatives on Sales Calls

150. Managers joined Relator and other sales representatives on their sales calls at least once every three months to ensure that sales representatives were effectively marketing Thalomid off-label. During Relator's first four months at Celgene, in or about July 2001, Relator's then-district sales manager, Deana Harding, accompanied Relator on a full day of sales calls. After those calls, in Relator's "Celgene Field Contact Report," Harding wrote, "I would like to hear you articulate the newly diagnosed [MM] data next time we are together; as well as the thought leaders [sic] dosing guidelines to move your MDs forward." Similarly, in a 2002 report, Harding instructed Relator to "Brush up on your MDS and Figg data so that after Myeloma you have an alternative message." "Figg data" refers to a study concerning Thalomid use in

prostate cancer. Relator memorized portions of the Figg study in an effort to promote Thalomid in prostate cancer.

151. In Relator's 2003 performance evaluation, Relator's then-district sales manager, Jeff Rowell, commented on a ride-along he had had with Relator, writing, "You are not afraid to seek to seek additional uses of Thalomid beyond Multiple Myeloma as evidenced by seeing you discuss data on MDS, Renal Cell Carcinoma, Prostate Cancer. Colorectal Cancer, Melanoma, and other tumor types [with physicians]."[3] Based on this, and other performance measures, Rowell rated Relator's 2003 job performance "EE" for "Exceeds Exceptions."

152. Moreover, Relator's managers conducted ride-alongs after Relator and other sales representatives had secured signed off-label medical information request forms. When Relator returned with her manager, she asked the physician whether he or she had received the off-label information requested. Relator then often asked the physician for assurances that he or she would prescribe Thalomid for that specific off-label use. This would show Relator's manager that, not only was she securing off-label information requests, but that she was succeeding in securing new prescriptions.

153. Celgene's highest level management, stationed in New Jersey, also conducted ride-alongs with Relator and other sales representatives. In 2001, Celgene's Vice President of Sales, Dwight D'Iorio, rode along with Relator. Moreover, Relator is aware of John Jackson, Celgene's former CEO, performing a ride-along with at least one

---

[3] As Harding's and Rowell's words plainly show, years before Celgene received approval for treatment of newly diagnosed MM, Celgene already considered Thalomid an MM medication. In a 2003 letter from Barer to Relator, Barer warned of the competition that Thalomid could face for treatment of MM: "[o]ur commercial force will face competition: Velcade will be approved sometime this year for ***myeloma***. While we believe that it will be relegated to a salvage role and doesn't have the wealth of evidence Thalomid has[,] it is important to remember ***that we will for the first time have competition***." Thalomid did not receive an MM indication for more than three years after Barer's letter.

representative, Jackie Qwon – a representative in the Rockville, Maryland area – in or about 2003 or 2004.

### 11. Relator And Other Sales Representatives Were Required To Conduct Training Sessions Concerning Thalomid's Off-Label Uses

154. Despite Relator's lack of formal medical training, she and other Celgene sales representatives were required to present information to fellow sales personnel concerning Thalomid's use in various off-label diseases. Celgene required that these presentations not only convey medical information to be communicated to physicians, but that they provide strategies for encouraging physicians to prescribe for the off-label uses.

155. For example, in or about 2003, two of Relator's fellow sales representatives, Alana Torgelson and Suzanna Zalutko, conducted training on Thalomid's use in colorectal cancer. The colorectal cancer training materials provided "Selling points of Thalomid use" in colorectal cancer, as well as "Potential Probes" for physicians, including "What is your treatment regimen for [colorectal cancer] [patients]?" Another of Relator's colleagues, Hank Schwarz, conducted a "Kidney Cancer" training session in or about 2004, which included similar hypothetical "probe" questions. In or about 2003 or 2004, Relator conducted a training session concerning Thalomid's use in prostate cancer. Relator felt uncomfortable giving this presentation, as she had no formal medical training, let alone training concerning prostate cancer.

### 12. Celgene Manipulated Continuing Medical Education Programs To Off-Label Market Thalomid

156. To further its off-label marketing of Thalomid, Celgene utilized multiple continuing medical education ("CME") programs led by speakers paid by Celgene to tout the benefits of using Thalomid for non-indicated diseases. Relator and other sales representatives were required to bring CME programs to physicians' practices in her area, in order to encourage physicians to prescribe Thalomid for off-label uses.

157. For example, in or about 2004, Celgene provided educational grants for various CME programs concerning Thalomid treatment in MM, MDS, and renal cell carcinoma, among other diseases. These CMEs consisted of speakers paid by Celgene to promote Thalomid's off-label uses. In or about 2003 or 2004, Howard A. Burris, III ("Burris") performed Celgene-sponsored speeches concerning "Recent Developments and Future Directions in the Treatment of Renal Cell Carcinoma." At the time, Burris was both a paid Celgene consultant and a member of Celgene's Speakers Bureau.

158. Relator and other sales representatives were pressured to bring Burris and other CME presenters to medical practices to encourage off-label Thalomid use. Relator kept "Oncology Profiling Notes" which tracked her experiences at various physicians' practices where she promoted Thalomid. In one set of Relator's notes from 2004 (i.e., while Thalomid was still indicated solely for ENL), Relator described how she considered bringing Dr. Burris to one medical practice, Kaiser Woodland Hills, to present a renal cell cancer CME, but decided to conduct a CME concerning Thalomid for MM, since that practice treated a greater number of MM patients: "Met with CME coordinator to bring Dr. Bargolie to Kaiser Woodland Hills for the morning tumor boards . . . I originally planned on Dr. Burris for renal cell, but Woodland Hills has more MM."

### 13. Celgene Temporarily Changed Course In Preparation For Revlimid's Anticipated FDA Approval

159. At the 2005 National Sales Meeting, Celgene's Senior Vice President of Sales and Marketing, Francis Brown ("Brown"), told Celgene's sales force that they would no longer be compensated for Thalomid sales. In 2005, Celgene was anticipating FDA approval of Revlimid, and the Company was worried that the FDA would question Thalomid's high volume sales because Thalomid was only approved for ENL at the time. Brown said that Celgene intended to tell the FDA that Celgene's sales force was paid for administering the S.T.E.P.S. distribution system, and not for Thalomid sales. This would indicate to the FDA that Celgene's sales force was not paid or incentivized to market Thalomid off-label.

160. Brown also told Celgene sales personnel that not providing bonuses for off-label sales would show the FDA that sales representatives were not being encouraged to off-label market. Despite these statements, Celgene did provide bonuses in 2005. Brown said this would "protect" the sales representatives and Celgene and would show the FDA that the Company was not "out of line."

161. In reality, Celgene had misbranded Thalomid for years, and rewarded its sales force handsomely for their misbranded sales.

### E. Celgene Misbranded Thalomid By Making Representations Unsupported By Thalomid's FDA-Approved Prescribing Information

162. In addition to marketing Thalomid off-label, Celgene routinely made false statements to physicians concerning Thalomid's effectiveness in certain patient populations. These representations constituted illegal misbranding, because they were unsupported by Thalomid FDA-approved prescribing information.

163. The off-label uses of Thalomid and Revlimid were not supported by scientific evidence demonstrating their effectiveness. Additionally, there were other available drugs there were more effective, safe and/or less expensive. For example, prior to 2006 there was no published evidence regarding the effectiveness of Thalomid to treat ovarian cancer. Studies published in 2006, 2007, 2010 and 2012 failed to show that Thalomid provides meaningful benefits for patients with ovarian cancer at any stage of the disease, either alone or in combination with other agents and that it may cause harm. Similarly, there is no evidence that Thalomid provides clinical benefits for patients with colon/colorectal cancer, small cell lung cancer (SCLC), prostate cancer, kidney cancer (renal cell carcinoma).

### F. Celgene Markets Revlimid For Off-label Uses

#### 1. MDS

164. When Revlimid was launched in December 2005, it was approved solely for treatment of transfusion-dependent anemia due to low or intermediate risk MDS

associated with a deletion 5q cytogenic abnormality.[4] As previously alleged, 5q cytogenic abnormality is relatively uncommon, as only 20% to 30% of MDS patients suffer from the condition. Nevertheless, Celgene immediately began directing Relator and other sales representatives to market the drug off-label for all types of MDS, including "high risk" MDS, and MDS without the 5q cytogenic abnormality.

165. Subsequent to Revlimid's launch, Celgene provided Relator and other sales representatives information concerning Revlimid's use in non-indicated forms of MDS. For example, one document Celgene provided to Relator includes a "Field question/objection addressed: Doesn't Revlimid only work in those patients with a del5q abnormality" and provides study results that a sales representative can recite to a physician suggesting Revlimid's purported efficacy in general MDS. Relator would probe physicians as to whether they treat general MDS, and then provide this information. Moreover, Relator memorized portions of a study in the New England Journal of Medicine that included partial findings concerning Revlimid's alleged efficacy in general MDS. Relator provided this information to physicians throughout her employment at Celgene.

166. As with Thalomid, Relator was pressured to persuade physicians to sign medical request forms for off-label uses of Revlimid. And, based on Relator's ability to effectively market Revlimid for general MDS, Relator was able to routinely secure these forms for general MDS.

167. Similarly, as with Thalomid, Relator's managers continue to conduct routine ride-alongs to ensure that Relator effectively markets Revlimid for off-label uses.

### 2. Multiple Myeloma (MM)

168. While Revlimid was launched in December 2005, it was not until June 2006 that the drug received FDA approval for treatment of MM. Moreover, Revlimid's June 2006 approval was only for MM patients who have received at least one prior

[4] To this day, Revlimid is still not FDA-approved for any other type of MDS.

therapy and only when Revlimid is taken in combination with the drug, dexamethasone.[5] Not surprisingly, however, upon Revlimid's December 2005 launch, Celgene immediately instructed Relator and other to begin marketing Revlimid for MM.

169. Furthermore, despite the narrow MM indication for which Revlimid was eventually approved, at all relevant times since Revlimid entered the market, Celgene directed Relator and others to market Revlimid for the following off-label uses (a) newly-diagnosed MM (i.e., MM patients who have not received at least one prior therapy, (b) monotherapy for MM; and (c) in combination with drugs other than dexamethasone for MM.

170. Continuing through, at least, 2011, Celgene provides studies to Relator and other sales representatives concerning non-indicated Revlimid uses for MM. These compilations provided to Relator include studies concerning Revlimid use in combination with drugs other than dexamethasone, including Bortezomib and Melphalan. Additionally, the materials provided to Relator include studies concerning "Monotherapy with Revlimid", and "Newly Diagnosed [MM] and Revlimid.

171. At the time that Celgene was off-label marketing Revlimid, Celgene knew that the drug could cause other cancers, particularly in patients with newly-diagnosed MM. Clinical trials had demonstrated an increased risk of such patients developing acute myelogenous leukemia, myelodysplastic syndromes, and Hodgkin's lymphoma. Celgene instructed Relator and others, however, to keep this information from physicians, rather than warning them about this risk.

172. In May 2012, the FDA announced that information about this risk posed by Revlimid would be added to the drug's label.

---

[5] As noted above, Revlimid is still only approved for this narrow MM indication.

### 3. Like Thalomid, Celgene Off-Label Marketed Revlimid For A Variety Of Cancers And Other Ailments

173. Sales representatives have been directed to off-label market the drug for a host of cancers, and Celgene was implicitly encouraging Relator to off-label market Revlimid for a wide array of other diseases though the duration of her employment.

174. Specifically, upon Revlimid's launch, Celgene provided Relator with "Revlimid Standard Letters" or a list and compilation of studies concerning off-label uses for Revlimid. These compilations include studies concerning Revlimid use in a host of off-label cancers, as well as off-label treatments for MM and MDS.

## G. Celgene Details Off-Label Uses Of Thalomid And Revlimid Using Studies And Abstracts That Failed To Provide Scientific Support For The Off-Label Uses

175. Celgene provided Relator, and her colleagues in sales at the Company, various studies and abstracts to use in discussions with physicians regarding off-label uses of Thalomid and Revlimid, along with a "Launch 2006 Reprint Cheat Sheet" which summarized the various abstracts and studies to be used in promoting Thalomid and Revlimid. These studies and abstracts failed, however, to provide scientific support for the proposed off-label uses.

176. For example, Celgene provided its sales personnel a reprint of an article in the December 2005 issue of Blood by Dr. Vincent Rajkumar and others to detail physicians about the use of Revlimid for newly diagnosed MM. However, Dr. Rajkumar received grant support from Celgene, and there was no control group.

177. The study compared results from the use of lenalidomide and dexamethasone with the use of thalidomide and dexamethasone. Dr. Rajkumar suggested that the prior drug combination was more effective than the latter in treating MM, with lower toxicity. The article, however, provided no information about the thalidomide group, such as the number of patients, trial period or treatment regimen. Without that information, physicians would not be able to draw any reliable conclusions about how lenalidomide compares to thalidomide.

178. Celgene also provided its sales personnel with copies of what it represented was an article by Michael Wang and other authors, appearing in the December 2008 issue of Blood, for use in persuading physicians that Revlimid could be used in patients previously treated with Thalomid. The article was, however, an advertisement. It was paid for by Celgene and nine of the twelve authors received financial support from Celgene (including four Celgene employees), Dr. Wang received honoraria from Celgene as well as research funding for this project, and the studies discussed in the article were likewise funded by Celgene. The advertisement appeared to be a legitimate article in a respected journal; only if a reader happened to read a footnote in small type would the reader realize that this was not a peer-reviewed article but an advertisement paid for by Celgene.

179. The Wang advertisement does not describe any new study, but merely examines a subset of data obtained from two prior studies conducted by Celgene. The authors analyzed only certain data and results from those prior studies and concluded (from preliminary data in early phase 1 and 2 trials) that lenalidomide (Revlimid) alone and in combination with dexamethasone produced a response in patients who had previously received thalidomide. The subgroups analyzed by Wang, however, number as few as ten or fifteen patients – numbers that are too small to provide meaningful results. The advertisement noted that the analysis "is a post hoc analysis, performed without pre-specified power calculation or adjustment for multiplicity, and is therefore considered exploratory in nature." Moreover, the data also demonstrated that a patient who was first treated with thalidomide is not likely to do as well on Revlimid as a patient previously treated with another drug.

180. Celgene also distributed a document titled "Renal Cell Carcinoma Express Report" from the 38th Annual Meeting of the American Society of Clinical Oncology in 2002 to be used by Relator and others to promote the use of thalidomide for renal cell carcinoma. The material consisted largely of an editorial by Dr. Howard Burris and a summary of presentations by Dr. Robert Amato and Dr. Sandy Srinivas.

181. The studies described in the material are too small to be meaningful. The material discusses the first phase of a study involving only 15 patients treated with thalidomide and IL-2, where after 12 weeks 8 patients demonstrated a positive response while in 7 patients the disease progressed. There was no discussion of adverse events.

182. Another trial involved only 14 patients, randomized to two groups with different doses of thalidomide. All 7 patients in the high dose group required dose reduction because of toxicity, and 2 patients developed DVT. There was no information on disease responses, and the "disease stabilization" rate was 46%, which could be consistent with the natural progress of renal cell carcinoma. Nevertheless, the summary concludes that "thalidomide, either as single-agent or in combination with immunotherapy, often achieves disease stabilization in this otherwise progressive carcinoma." The studies – small, lacking important information, and otherwise incomplete – even taken together, provide no meaningful support for this sweeping conclusion.

183. Another document Celgene provided to Relator allegedly providing support for the use of, and marketing of, Thalomid to treat renal cell carcinoma was a study by Dr. Danai Daliani and others, supported by Celgene, published in the August 2002 issue of Lancet. This was a pilot study involving only 20 patients, of which only 2 showed any response at all to thalidomide treatment; furthermore, the disease progressed in all 20 patients. Dr. Daliani reviews the results of various small studies (some of which found a response, others which did not) and concludes that "Together, our data show some antitumor activity of thalidomide in heavily pretreated patients with [metastic] RCC and warrant evaluation of the role of thalidomide in RCC patients in controlled, randomized trials." Even though the studies in the Daliani material were small, preliminary, showed that thalidomide had serious toxicities, and were not intended to provide a basis for treating patients, Celgene used the material to promote the use of Thalomid for renal cell carcinomas.

184. In short, the articles and studies used by Celgene to off-label market Thalomid and Revlimid lacked sufficient information or indicia of reliability for physicians to use in making decisions about treatment and prescribing Thalomid or Revlimid.

**H. Celgene Directs Sales Representatives To Encourage Physicians to Switch Patients From Thalomid To Revlimid Regardless Of Whether The Patients Are Healthy And Stable**

185. Since Revlimid is considerably more expensive than Thalomid ($10,000 per month for Revlimid, compared to up-to $1,000 per month for Thalomid), Celgene pressured Relator and other sales personnel to move stable, relatively health patients doing well on Thalomid to Revlimid even though the products had different indications. This practice, which serves no medical purpose, places patients at risk of potentially fatal VTE and peripheral neuropathy, among other serious ailments. Furthermore, this practice causes the federal, state, and city governments to expend significant, additional funds to cover the far higher cost of Revlimid. And as explained in more detail below, Celgene provides free Revlimid prescriptions to patients that it believed would soon enroll in a government health program. Since Revlimid is far more expensive than Thalomid, these free prescriptions induce patients to switch from Thalomid to Revlimid – prescriptions that were ultimately paid for by Medicare and other government-funded insurance.

186. In a February 11, 2008, email from Shawn Tomasello, Celgene's Vice President of Sales, Tomasello refers to the need to "crack" physicians who have prescribed Thalomid but not Revlimid. In the February 2008 email, Tomasello circulates a list of physicians who have prescribed Thalomid but not Revlimid and writes "Let's get a plan together on what we need to convert these docs . . . I am sure there are nuances for some that we will not crack but other should be ready for 'cracking.'"

187. Similarly, Celgene holds "Rev/Dex" contests, which award the sales representatives and sales teams that successfully move the most MM patients from Thalomid to Revlimid. A November 7, 2008 email from Tomasello to Celgene's sales

force and sales and marketing departments states, "Looks like Atlantic Central is leading the way in quarterly standings with an average of 6.10 patients converting from Thalomid MM to Revlimid MM . . . Keep up the great work with our customers!" Representatives who are successful in converting physicians from Thalomid to Revlimid earn points that can be exchanged for gifts, including airline tickets, vacations, clothing, appliances, jewelry. In 2009, Relator used her Rev/Dex contest points to purchase airfare.

188. Celgene trained Relator and other sales representatives to moving physicians from Thalomid to Revlimid. Relator participated in Phase III training at Celgene's corporate headquarters in New Jersey where she was required to "Identify 10 prescribers that have written Thalomid MM but not Revlimid MM" and then list, "tactics you will employ with these prescribers" and "probing questions you might ask."

189. Celgene accomplished these goals, in part, by misbranding Revlimid. Specifically, Celgene directed Relator to make unsubstantiated claims concerning the supposed superiority of Revlimid to Thalomid. While there are no head-to-head trials comparing Revlimid's versus Thalomid's efficacy in, for instance, MM patients, Celgene specifically instructed Relator to make claims to physicians that Revlimid is a more effective medication for the disease. These representations constituted unlawful misbranding since they were not supported by Revlimid's FDA-approved labeling.

190. Lastly, Celgene marketed Revlimid to physicians in this fashion prior to receiving FDA approval for the drug, in an effort to begin convincing physicians that they would want to change switch their patients from Thalomid to Revlimid.

### I. Celgene Pays Kickbacks To Physicians To Prescribe Revlimid And To Encourage Other Physicians To Prescribe The Drug

191. The federal anti-kickback statute makes it unlawful to pay remuneration in any form to induce the generation of business reimbursable by Medicare, Medicaid, or any other government-funded insurance program.

192. Immediately after Revlimid's launch, Relator and other sales representatives began receiving intense pressure to find physicians Celgene could pay to

promote Revlimid. In addition, Celgene sales representatives were forced to take these physicians to other medical practices where the physicians could promote Revlimid use. These practices constitute illegal kickbacks meant to directly and/or indirectly encourage the writing of Revlimid prescriptions.

193. Celgene designates certain physicians as "Thought Leaders." A Thought Leader is an experienced, respected physician with a high volume of Revlimid prescriptions. After Celgene designates a physician as a Thought Leader, the Thought Leader is connected with a company called Envision, which trains the Thought Leaders to give presentations, and facilitates Thought Leader programs. Celgene refers to the programs as "Envision Programs." Envision Programs can take nearly any form. More specifically, an Envision Program can be a one-on-one, in-office conversation between a Thought Leader and another physician or a breakfast, lunch or dinner presentation either within or outside of a physician's practice. Physicians are typically paid anywhere from $1,600 to $4,000 for each Envision Program he or she conducts. Certain physicians were paid even more. For example, Relator is aware of a Dr. Berenson in California who receives upwards of $10,000 to conduct Envision Programs.

194. From 2006 through 2009, Relator was generally required to facilitate 15 or 16 Envision Programs per year. Within Relator's sales district, total Envision Program goals are generally to exceed 150 programs per year. Tellingly, Celgene strongly encourages Relator and other sales representatives to hold Envision Programs at physicians practices where Celgene can get the most bang for its buck. Multiple emails from Relator's manager ordered Relator and her fellow sales representatives to "target" physicians who are high Dacogen (a competitor MDS drug) and Velcade (a competitor MM drug) prescribers in an effort to convert those physicians to Revlimid.[6]

---

[6] Dacogen is FDA-approved for treatment all types of MDS, while Velcade is indicated for *all* types of MM. As stated throughout the Complaint, Revlimid is indicated *solely* for low to intermediate risk MDS with deletion 5q cytogenic abnormality, and previously treated MDS. By encouraging sales representatives to target

195. For instance, an August 31, 2009 email from Relator's current district sales manager, Shawn Gormish, to Relator and other sales representatives stated that sales representatives should focus on "opportunities in high Velcade or Dacogen accounts" and to "capitalize on ROI" (i.e., return on investment). For 2009, Celgene's budget for Envision Programs was $5 million. In 2008, Relator alone facilitated more than $45,000 in Envision Programs.

196. Relator and other sales representatives were praised for holding high numbers of Envision Programs and, likewise, were penalized for failing to meet certain quotas. In Relator's 2006 Performance Evaluation, Gormish praised Relator for developing Thought Leaders and utilizing Envision Programs, writing "You developed the following advocates: Dr. George Somlo and Dr. Amrita Krishnan, both attended MM speaker training and Dr. Somlo also attended the MDS advisory board . . . Bev, I am especially proud of this effort . . . [T]he envision programs worked for you." Relator was similarly praised in her 2008 Performance Evaluation: "[O]f particular note of Business management is your ability to use your envision promotional programs which you have completed 16 envision programs . . . In 2009, continue to analyze your business needs and place your envision programs."

197. An August 25, 2008 email from Gormish praised Relator and two other sales representatives who had "planned or executed the most" Envision Programs. The email continues by encouraging other sales representatives to do more programs: "Per the guidance on our last Conference call, I would like everyone to end up with at least 16, those who have 12 or more, please keep planning and executing where your territory needs . . . The district average per territory, should at least [sic] 16 programs per HOC. That would place the great Hollywood district at 160 for the year."

---

Dacogen and Velcade prescribers and market Revlimid as a competitor drug, Celgene further caused its sales representatives to off-label market Revlimid.

198. Celgene also violated the anti-kickback statute by unlawfully promoting Revlimid through its "Speaker Corps" speakers series. Celgene engaged numerous speakers who frequently spoke on predetermined topics areas such as "Recent Developments and Future Directions in the Treatment of Multiple Myeloma," or "The Role of Revlimid (lenalidomide) in Multiple Myeloma." The doctors engaged as speakers for Celgene spoke frequently, often multiple times a day, and received generous compensation from Celgene for their often limited speaking engagements. Celgene's most active Revlimid speakers, many considered "core faculty" for the Speaker Corps series include: Steven T. Rosen, MD, Kenneth Anderson, MD, Bart Barlogie, MD, PhD, James R. Berenson, MD, Gregory Berk, MD, Ivan Borrello, MD Asher Chanan-Khan, MD, Raman K. Desikan, MD, Philip Greipp, MD, Mohamad A. Hussein, MD, Sundar Jagannath, MD, Robert A. Kyle, MD, Alan List, MD, Sangar Lonial, MD, Jayesh Mehta, MD, Nikhil Munshi, MD, Prabhjit Purewal, MD, Azra Raza, MD, Paul Richardson, MD, Eric K. Rowinsky, MD, David S. Siegel, MD, PhD, Seema Singhal, MD, Gordon Srkalovic, MD, PhD, Stefano Tarantolo, MD, Steven Treon, MD, MA, PhD, Robert A. Vescio, MD, and Thomas Witzig, MD.

199. Several of these speakers were engaged multiple times by Relator or other speakers in Relator's district. For example, James R. Berenson was engaged to speak 22 times between May 2009 and April 2010. Quite often, Dr. Berenson spoke multiple times in one day giving the same speech for the same Celgene sales representative. Another speaker, Dr. Azra Raza was listed as – and paid for – giving four speeches for the same representative on the same day.

### J. Celgene Directly Targets Federal And State Healthcare Dollars

200. Throughout Relator's tenure at Celgene, she and other sales representatives have been immersed in educational materials concerning government insurance programs. In or about 2006 Celgene sent Relator a booklet entitled "Reimbursement in the Oncology Market." The booklet contains a section entitled "Key Payers for Chemotherapeutic Drugs," that states "Because the average age of a multiple myeloma

patient is 65 or greater, Medicare is the primary payer for most patients and is therefore essential to Celgene's business." The booklet continues with a discussion of, *inter alia*, Medicare and Medicaid.

201. Moreover, due to the high cost of Thalomid and Revlimid, Celgene knew it could raise the volume of Thalomid and Revlimid prescriptions by assuring doctors that government programs could mitigate the costs of the drugs. For example, in or about 2006, Celgene provided Relator with a DVD entitled "Medicare Part D and Beyond: Facilitating Patient Access to Novel Therapeutics in Oncology." Celgene directed Relator and other sales personnel to provide this DVD to physicians to help them better understand how Medicare could pay for Thalomid and Revlimid. Similarly, in 2008, Relator was praised by Gormish for her "thorough understanding of Reimbursement for Medicare [P]art D," which she was able to effectively communicate to physicians.

202. As suggested above, a large percentage of Revlimid and Thalomid prescriptions are paid for by Medicare. As Celgene's President and Chief Operating Officer, Robert J. Hugin, stated on January 29, 2009 Earnings Conference Call, a majority of [Revlimid] patients are most likely Medicare." Similarly, an April 1, 2009, Credit Suisse analyst report states that "Medicare . . . patients account for the lion's share of [Celgene's] revenue."

### 1. Celgene Created a Position, the Patient Support Coordinator, to Assist Patients in obtaining Government Funding for these Drugs

203. In 2006, Celgene created the Patient Support Coordinator (the "PSC").[7] The PSC provides "reimbursement assistance" to patients prescribed Thalomid, Revlimid and other Celgene drugs. The program consists of individuals called Patient Support Specialists ("PSS"s) who assist patients in enrolling in Medicare or Medicaid, and help patients receive reimbursement from government-funded insurance. The primary PSS responsible for Relator's sales district was Samuel Vasquez ("Vasquez").

---

[7] Celgene recently changed PSC's name to "Celgene Patient Support," to "revitalize[e]" the program's image.

Essentially, a sales representative, such as Relator, informs a physician about the PSC anticipating that the physician will then refer his or her patient to the program. The PSC has caused Medicare and Medicaid to pay for a greater number of off-label Thalomid and Revlimid prescriptions.

204. Celgene sales representatives touted the PSC to physicians in order to encourage them to prescribe Thalomid and Revlimid. Moreover, at the Celgene National Sales meeting in 2009 in Scottsdale, Arizona, sales representatives were told to encourage physicians to enroll as many patients as possible in the PSC. A prime example of Celgene efforts with the PSC is contained in a November 17, 2009 email sent by Katherine Stultz ("Stultz") – Celgene Director of Patient Support and Reimbursement Services – to Celgene's national sales force in which Stultz directs Celgene's sales force to distribute PSC materials concerning Medicare enrollment to physicians. Specifically, Stultz writes the following:

> Next week each of you will receive an auto shipment of the "**Reminder Medicare Part D enrollment cards**" . . . Please utilize these cards to remind your office this is the only time of year to enroll patients in Medicare Part D . . . Most important – these cards are a trigger to come to our team for assistance if they or their patients have questions about coverage of a Celgene product in any Medicare Part D plan.

(emphasis in original).

205. Celgene's efforts have been very successful. A September 28, 2009 email from Vasquez states that "there is a rise in the number of cases I am currently handing . . . due to the Patient Support initiative to enroll patients into Medicare Part D." Vasquez's email includes a chart showing Thalomid and Revlimid patients for whom Vasquez is assisting with Medicare and Medicaid. Prior to the surge in enrollment, roughly one-third of Revlimid and Thalomid takers were enrolled in the PSC.

206. The Patient Support Specialists were acutely aware which prescriptions were being paid by Medicare, Medicaid and other government payors since this was their job. Celgene passed on this information to its sales force in effort to generate additional sales. Additionally, as a result of Celgene's introduction of the Patient

Support Specialists it possessed detailed information regarding prescriptions submitted to Medicare, Medicaid and other government payors. Such as the Revlimid prescriptions submitted to Medicare that were prescribed by Dr. Leland Green on January 10, 2007; Dr. David Leibowitz on December 26, 2006 and on January 18, 2007; Dr. Jeffery Wolf on January 15, 2007 and on January 31, 2007; Dr. Veena Charu on January 16, 2007 and on May 2, 2007; Dr. Samar Shihabi on February 1, 2007; Dr. Michael Kosmo on March 6, 2007; Dr. Howard Chen on March 7, 2007; Dr. John Kailath on March 8, 2007; Dr. Jason Salgnick on March 14, 2007; Dr. John Gunnel on March 12, 2007; Dr. David Bodkin on March 23, 2007; Dr. Patrick Sheeny on April 6, 2007 and on May 30, 3007; Dr. Jeffery Shinoda on April 11, 2007; Dr. Jonathan Blitzer on April 17, 2007; Dr. John Siebel on April 16, 2007; Dr. William Read on April 23, 2007; Dr. Salomon Hamburg on April 26, 2007; Dr. Michelle Rooney on April 26, 2007; Dr. Madhu Jodhani on May 1, 2007; Dr. Kathleen Turner-Hubbard on May 14, 2007 and on May 30, 2007 and on June 27, 2007; Dr. John Clune on May 16, 2007; Dr. Marilyn Norton on June 5, 2007; Dr. Lynn Bemiller on June 18, 2007; Dr. Anna Ganeles on June 28, 2007; Dr. Robert Klein on June 22, 2007; Dr. Jareed Manscor on July 2, 2007; and Dr. Harry Menco on July 12, 2007.

### 2. Celgene Targeted Veterans Administrations And TRICARE

207. In addition to directly targeting Medicare and Medicaid dollars, Celgene targeted Veterans Administration patients. A 2007 Company newsletter titled, "What's Up In Summit?" (a reference to Celgene's headquarters in Summit, New Jersey) provides "Tips for Working a VA" for sales representatives who are "having trouble meeting with [their] VA Hematologists/Oncologists."

208. Moreover, at all relevant times, Relator promoted Thalomid and Revlimid for off-label uses at the North Hills VA in North Los Angeles County, CA.

209. In or about 2004, Relator learned that the North Hills VA treated many MM patients, but with VAD, a combination of generic chemotherapy drugs.[8] Around that

[8] In 2004, Thalomid was not indicated for MM.

time, Celgene informed Relator that TRICARE offered a minimal $5 co-pay on the otherwise expensive Thalomid (TRICARE beneficiaries are often treated at VA facilities). Relator, however, experienced great difficulties penetrating this VA, notwithstanding that she had informed physicians of patients' mere $5 co-pay for their Thalomid prescriptions. Accordingly, at a 2004 Diamond Club Meeting, Relator approached then-COO, Barer, concerning her difficulties persuading VA physicians to prescribe Thalomid for MM. Barer agreed with Relator that it was an interesting problem, and then allowed other sales reps to interject and offer their strategies for penetrating VAs. Barer told Relator that he would have to contemplate the issue and see if he could come up with any solutions.

210. Celgene's marketing to TRICARE and VA physicians was successful. As a result of Celgene's RevAssist and S.T.E.P.S. programs and its Patient Support Specialists, Celgene possesses detailed records of the false claims paid by the VA and TRICARE including but not certainly not limited to TRICARE prescriptions of Revlimid written by Dr. John Wilkinson on April 3, 2007; Dr. David Bodkin on April 1, 2007; Dr. David Campbell on May 7, 2007; Dr. Ram Lanchandani on May 11, 2007; Dr. Jareed Manscor on May 15, 2007; Dr. John Kailath on May 29, 2007; Dr. Nanda Miswas on June 25, 2007; Dr. Carolyn Wild on July 10, 2007 and on August 14, 2007; Dr. Peter Wittlinger on August 13, 2007; Dr. Dennis Hillard on August 27, 2007; Dr. Veena Charu on September 4, 2007; Dr. Kai Zu on November 1, 2007; and Dr. Phillip Dreisbach on November 14, 2007.

**K. Celgene Pays Patients Kickbacks To Induce Revlimid Prescriptions**

211. As explained above, the federal Anti-Kickback Statute makes it unlawful to pay remuneration in any form to induce the generation of business reimbursable by Medicare, Medicaid, or any other government-funded insurance program. Furthermore, in 2005, HHS and the Office of the Inspector General ("OIG") issued guidance concerning, *inter alia*, inducements paid to Medicare and Medicaid patients (or potential patients) that could induce prescriptions. 70 Fed. Reg. 224 (Nov. 22, 2005). More

specifically, according to the OIG, when pharmaceutical companies provide free drugs that may generate additional prescriptions, those free drugs can constitute unlawful kickbacks.

212. Currently, Celgene provides free Revlimid and Thalomid prescriptions to patients who are not insured under Medicare Part D but who are eligible for the program. Since patients can enroll in Medicare Part D only from November 15 through December 31 of each year, many patients who are eligible for Medicare do not have access to health insurance until the end of the year enrollment period. Due to Revlimid's and Thalomid's high cost (up to $10,000 and $1,000 per month, respectively) many patients are unable to afford the drugs until they can enroll in Medicare. Accordingly, these patients may opt for alternative and less expensive drug regimens. To either procure or retain this potentially lost business, Celgene supplies these patients with free Revlimid and Thalomid prescriptions. *See* Celgene Patient Support, http://www.celgenepatientsupport.com/ (stating that a "Celgene Patient Support® Specialist" can "[h]elp you apply for the Celgene free medication program"). Since these patients would otherwise undergo less expensive therapies, and instead are induced by Celgene to take Revlimid or Thalomid (the high cost of which is shouldered by Medicare when the patient ultimately enrolls), these free prescriptions constitute illegal kickbacks. Celgene possess records relating to these free prescriptions and accordingly is aware of the resulting false claims submitted to Medicare.

213. Additionally, when a patient is enrolled in Medicare or Medicaid, Celgene will enroll the patient in a foundation that assists with the patient's out of pocket expenses, or co-pay, for Revlimid or Thalomid. This conduct constitutes an illegal kickback as well, since it has the effect of keeping the patients on the expensive drug, the high cost of which is ultimately shouldered by government-funded insurance. The foundations' enrollment records contained detailed information regarding numerous Medicare and Medicaid beneficiaries and the resulting false claims submitted to Medicare and Medicaid.

### L. Celgene Manipulates RevAssist To Cause Medicare And Medicaid To Pay For Off-Label Revlimid Prescriptions

214. As explained in section V. A. 3., supra, due to the high risk of birth defects with Thalomid and Revlimid, the FDA requires Celgene to implement strict distribution systems for each drug. Revlimid prescribers must comply with the RevAssist system, which operates in the following manner.

215. First, the physician uses RevAssist software (loaded onto computer via CD and accessible online) to create a Patient-Physician Agreement Form ("PPAF"). The PPAF has a patient information page, where the physician selects the patient's "Diagnosis" from a "drop-down" menu of ICD-9 codes, which are three to five digit codes indicating the disease for which a patient is receiving Revlimid. This is a one-time process for each new Revlimid patient.

216. The physician then completes a survey either online or via telephone, where he or she warrants that the patient has been counseled about the risk of birth defects and the need to engage in protected sex while taking Revlimid. After completing the survey, the physician receives an authorization number from Celgene that allows him or her to write the prescription. A physician must complete this survey every time he or she writes a prescription. Physicians may only write a prescription for a one-month or less supply of Revlimid, and may not include refills in any prescription. Thus, for a patient who takes Revlimid long-term, a physician must write a new prescription every month.

217. Once the physician writes a prescription, RevAssist requires the physician to fill-out a dedicated RevAssist prescription form. This form can be generated through RevAssist software, be faxed to the physician from Celgene, or downloaded from the Celgene's website. The form has a blank field for the "Patient's Diagnosis Code (ICD-9 Code)."

218. The physician is then required to submit the prescription to a "specialty pharmacy" which must be specifically licensed to supply Revlimid. When the specialty

pharmacy receives the prescription form, the pharmacist must contact Celgene and confirm the physician's authorization code.

219. In or about 2006, shortly after Revlimid's launch, Relator's manager, Gormish, directed Relator and other sales representatives to "change the [ICD 9] codes" on Revlimid prescriptions that were written for off-label indications to reflect that the prescriptions were for on label uses. These specific directives continued until as recently as March of 2009. At the 2009 national sales meeting in Scottsdale, Arizona, during a "district break-out session," the manager of the West Region's PSC, Tom Girrardi, directed the West Region sales representatives to change the codes on physicians' Revlimid prescriptions.

220. Relator has refused to take part in the scheme. In October 2008, Relator wrote a letter to Celgene stating that she understood changing ICD-9 codes was unlawful. Moreover, Relator participated as a third party in a deposition brought by a former Celgene sales representative who claimed unlawful discharge in the summer of 2009. During the deposition, Relator reiterated her position concerning changing ICD-9 codes.[9]

221. Since Relator stalwartly refused to participate in Celgene's unlawful code-changing practice, she never inquired as to how she could change physicians' prescription forms. Nevertheless, from 2006 through 2011, Relator has observed

---

[9] In response to her opposition to Celgene's violations outlined in this Complaint, Relator, for the first time in her career at Celgene, received poor performance reviews. For instance, during the week of March 6, 2010, Gormish provided Relator with her 2009 performance evaluation, which stated that Relator "needs improvement." When Relator inquired about the basis for her poor performance review, Gormish provided very little explanation. Furthermore, Relator asked Gormish for her current "ranking" among Celgene's sales force. Gormish was initially unable to provide Relator her current ranking, instead telling her that her rank fell somewhere between 80 and 100 out of 102 total sales representatives. On March 10, 2010, Gormish forwarded to Relator an email from a member of Celgene's West Region that stated that Relator is currently the 98th ranked (out of 102) sales representatives within the Company. According to Relator, this sales rank is incorrect, as she out-performed many of her peers within the Company.

activities within Celgene that suggest the various ways Celgene personnel accomplish this task.

222. Without FDA approval, Celgene has modified its RevAssist program under the guise of "assisting" physicians with RevAssist's cumbersome process. With RevAssist, Celgene is supposed to require physicians to use a specific RevAssist prescription form provided by the Company. But Celgene allows at least one specialty pharmacy, PharmaCare Specialty Pharmacy ("PharmaCare"), to create its own prescription form for physicians who write Revlimid prescriptions. This new prescription form requires the physician to check one of two boxes that include a corresponding on-label ICD-9 code for either MDS or MM. The physician can also check a box for "Other" which is adjacent to a blank line.

223. The PharmaCare prescription form is laid-out in this manner to encourage physicians to check a box that corresponds to an on-label ICD-9 code, even if the prescription is off-label. Moreover, Relator believes that PharmaCare specialty pharmacists may "doctor" prescriptions where the "Other" box is checked, and fill-in an on-label ICD-9 code. These prescription forms are then submitted to Medicare, Medicaid, or other government insurers. Relator and her fellow sales representatives have received intense pressure from Gormish to encourage physicians to send all prescriptions to PharmaCare, which distributes this alternate prescription form.

224. Similarly, Relator learned that shortly before a patient's prescription ends, PharmaCare may be sending physicians pre-prepared prescription forms that merely require the physician to sign for a patient's refill. These forms contain on-label ICD-9 codes, which most physicians will not bother to change.

225. Relator is also aware that Greater Sacramento Specialty Pharmacy engaged in similar practices, including code manipulation as PharmaCare. Other RevAssist specialty pharmacies include Walgreens Specialty Pharmacy, PharmaCare Specialty Pharmacy, Caremark Connect, Aetna Specialty Pharmacy, McKesson Specialty

Pharmacy, BioScrip Pharmacy, US Bioservices, Medco Special Care Pharmacy, Medmark Pharmacy, Advanced Care Scripts, and Axium Healthcare Pharmacy, Inc.

226. Additionally, Relator is aware of at least one practice in the Los Angeles area that has had its Revlimid prescriptions for prostate cancer patients changed to on-label, MDS ICD-9 codes. Specifically, the Compassionate Oncology Medical Group in Los Angeles, run by Dr. Bob Liebowitz, predominately treats prostate cancer patients. Celgene's records indicate that Dr. Liebowitz is one of the highest-volume prescribers of Revlimid for MDS. On information and belief, Dr. Liebowitz's off-label Revlimid prescriptions have, in fact, been unlawfully altered.

### M. Celgene's Marketing of Thalomid and Revlimid Was Successful And Generated Billions of Dollars of Prescriptions

227. Celgene's marketing efforts in support of Thalomid and Revlimid were, and are, successful. Due to its marketing of these products, it was able to generate hundreds of millions of dollars in prescriptions that should never have existed. Given the absence of scientific evidence to support the use of Thalomid and Revlimid to treat the off-label indications for which it was marketing, the only explanation for the dramatic increases in Thalomid and Revlimid sales is the effectiveness of Celgene's marketing scheme flagrantly and fraudulently promoting these products for off-label uses.

228. Celgene had revenues of $224 million in 2003 for Thalomid which rose to $309 million in 2004. Its yearly Thalomid revenues further increased to $389 million in 2005, $433 million in 2006, and $447 million in 2007.

229. Its marketing of Revlimid was similarly successful. Celgene had revenues for Revlimid of $320 million in 2006 and $773 million in 2007. Its income from Revlimid sales continued to skyrocket as it obtain revenues of $1.325 billion for Revlimid in 2008, $1.706 billion in 2009, $2.47 billion in 2010, $3.2 billion in 2011 and $3.7 billion in 2012.

230. Celgene's marketing of Thalomid and Revlimid was designed to, and did, induce physicians to prescribe, and federal and state health care programs to pay for, Thalomid and Revlimid prescriptions that they otherwise would not have prescribed and

paid for, respectively. Celgene's fraudulent marketing efforts including its off-label marketing, its payment of kickbacks to doctors and compendia, its sponsorship of CME events and direct marketing to physicians, and its marketing to insurers, caused increases in 1) the number of Thalomid and Revlimid prescriptions; 2) Medicare, Medicare and other government health program payments for Thalomid and Revlimid; and 3) profits from Thalomid and Revlimid.

**N. The Off-label Uses of Thalomid and Revlimid Are Not Supported by the Drug Compendia**

231. As described above, in certain limited circumstances Medicare, Medicaid and other government health care programs will cover anti-cancer drugs if the off-label use was supported by a drug compendia. CMS' Medicare Benefit Policy Manual provides additional guidance with regard to Medicare reimbursement for non-FDA approved uses of anti-cancer drugs. *See* Medicare Benefit Policy Manual § 50.4.5. None of the compendia has a section entitled "Uses Supported by Citation" which would track the language of the statute, and each is arranged differently. As a result, the requirements to cover drugs for their medically accepted indications must be determined by examining each compendia to determine their organizational structure and where in that structure the supported uses are found. CMS's Medicare Benefit Policy Manual details what is considered support:

> In general, a use is identified by a compendium as medically accepted if the: 1. indication is a Category 1 or 2A in NCCN, or Class I, Class IIa, or Class IIb in DrugDex; or, 2. narrative text in AHFS-DI or Clinical Pharmacology is supportive.

*Id.*

232. Originally, the statute listed three compendia: American Medical Association Drug Evaluations (AMA-DE), United States Pharmacopoeia Drug Information for the Health Professional (USP-DI), and American Hospital Formulary Service Drug Information (AHFS-DI), 42 U.S.C. § 1395x. Subsequently, the first two stopped publication, and in 2008 CMS added National Comprehensive Cancer Network

Drugs and Biologics Compendium, Thomson Micromedex DrugDex, and Clinical Pharmacology to the list of compendia (effective, June 5, June 10 and July 2, 2008 respectively). The drug compendia are not always published or updated every year.

233. AHFS-DI is published by the American Society Of Health-System Pharmacists; the NCCN Drugs and Biologics Compendium is published by the National Comprehensive Cancer Network; Thompson Micromedex DrugDex is published by Thompson Reuters; and Clinical Pharmacology is published by Reed Elsevier PLC And Reed Elsevier NV (collectively, "the Drug Compendia Defendants").

234. Because the Medicare statutory compendia exception exists only for anti-cancer treatments, prescriptions for non-cancer treatment can never fall within this narrow exception to the federal and state health care programs' prohibition against coverage of off-label prescriptions.

**1. The Drug Compendia Do Not Support The Off-label Uses of Thalomid Marketed By Celgene**

235. From 1998 to the present day, Celgene marketed Thalomid for several other diseases, including bladder cancer, breast cancer, brain cancer, cervical cancer, colorectal cancer, esophageal cancer, kaposi sarcoma, leukemia (including, but not limited to, chronic lymphocytic leukemia ("CLL")), lymphoma, melanoma, prostate cancer, pancreatic cancer, renal (i.e., kidney) cancer, thyroid cancer, multiple myeloma (prior to the FDA's May 26, 2006 approval of Thalomid to treat a certain subset of this disease), multiple myeloma, not in combination with the drug, dexamethasone, relapsed or refractory multiple myeloma, ovarian cancer, and uterine cancer.

236. Of these 20 diseases, the 2001 edition of UPS-DI lists Thalidomide as accepted for only a subset of one: "multiple myeloma ... Thalidomide is indicated in the treatment of advanced, refractory multiple myeloma." The 2007 edition of UPS-DI contained that same language regarding multiple myeloma but by this time the FDA had approved the use of this drug "in combination with dexamethasone is indicated for the treatment of patients with newly diagnosed multiple myeloma.

237. The 2011 edition of DrugDex provides no support for any of the off-label uses of Thalomid promoted by Celgene.

238. The 2001 edition of AHFS-DI provides even less support than the 2001 UPS-DI for the off-label uses of Thalomid promoted by Celgene. It notes that there is "some evidence that thalidomide may have antitumor activity; however, further study is needed to establish safety and efficacy of the drug in the treatment of various malignancies and identify optimal dosages of the drug in patients with cancer." With regard to multiple myeloma, it briefly describes one unidentified study of patients with refractory or relapsed multiple myeloma but cautions that "ongoing study is necessary, including further elucidation of optimal dosage and schedule of therapy …." The 2011 AHFS-DI states that thalidomide "is used in combination with dexamethasone for the treatment of newly diagnosed multiple myeloma" but "there are no data demonstrating a clinical benefit (e.g., improvement in survival)" even though by this time, this was an FDA approved indication.

### 2. The Drug Compendia Do Not Support The Off-label Uses of Revlimid Marketed By Celgene

239. During relevant time periods, Celgene's unapproved "off-label" marketing of Revlimid included proposed treatment of brain cancer, leukemia (including, but not limited to, CLL), lymphoma, myelofibrosis, myelodysplastic syndromes (all types), multiple myeloma (prior to the FDA's approval of Revlimid to treat an indication for this disease), multiple myeloma, not in combination with the drug, dexamethasone, newly-diagnosed multiple myeloma, prostate cancer, and stem-cell transplant maintenance therapy. The 2007 edition of the USP-DI provides no support for any of these indications (it states that Revlimid is "accepted" only for "Patients with transfusion-dependent anemia due to low- or intermediate-1-risk myelodysplastic syndromes (MDS) associated with a deletion 5q abnormality with or without additional cytogenetic abnormalities," which is the FDA-approved indication found on the label).

240. Similarly, the 2011 edition of the AHFS also only lists as accepted indications the indications found on the FDA approved label.

241. Of the combined thirty off-label uses Celgene promoted for Thalomid and Revlimid none (with the possible exception of a rather limited use of Thalomid to treat advanced, refractory multiple myeloma), are supported by the relevant drug compendia. Accordingly, Medicare, Medicaid or other government healthcare programs should not pay for Thalomid and Revlimid prescriptions to treat these conditions and they were not "medically accepted." 42 U.S.C. § 1395x(t)(2)(B)(ii)(I).

242. Celgene's use of the drug compendia in its marketing efforts was pervasive and long standing. Relator, at Celgene's instruction, began using the drug compendia as early as 2003. She and other sales personnel used the compendia – or summaries of the compendia – in attempts to persuade prescribers to prescribe Thalomid, and later Revlimid, for off-label uses and to persuade them that Medicare, Medicaid and other government programs would pay for those prescriptions even though the compendia, in truth, did not support such uses and, as described below, were tainted by kickbacks.

**O. The Inclusion of Off-label Uses of Thalomid and Revlimid Not Supported in the Relevant Medical Compendia Are The Result of Kickbacks and Conflicts of Interest Between the Compendia, Celgene and Other Pharmaceutical Companies**

243. As described above, the off-label uses of Thalomid and Revlimid were not supported by the drug compendia. In some instances, the compendia specifically state that certain uses of Thalomid and Revlimid that were promoted by Celgene were not medically accepted. For example, the 2001 USP-DI states, under the heading "Acceptance not established," that "[u]se of thalidomide for the treatment of Kaposi's sarcoma has not been established." The 2007 edition of the USP-DI has the exact same language regarding Kaposi's sarcoma and also lists other off-label uses, including renal cell carcinoma and first-line or relapsed/refractory melanoma, under "Acceptance not established." Accordingly, Medicare, Medicaid or other government healthcare programs should not pay for Thalomid and Revlimid prescriptions to treat the conditions that even the drug compendia state are not medically accepted; these uses are not "medically accepted." 42 U.S.C. § 1395x(t)(2)(B)(ii)(I).

244. Pharmaceutical companies, however, have long known that a mere mention in a compendia, even if unfavorable, can be used to market the drug. They also know that, in some instances, a mere mention is enough to mislead Medicare Administrative Contractors (previously called Fiscal Intermediaries) to believe that a use is supported and to pay claims on behalf of Medicare. The pharmaceutical companies capitalize on the confusion that is caused because of the differing formats of each compendia.

245. In all cases, Celgene makes payments to doctors for the purpose of influencing sales of its products. It made payments to doctors as a result of their employment by the drug compendia and these payments, like all of Celgene's payments, are for that singular purpose: increasing sales of Thalomid and Revlimid.

246. Pharmaceutical companies have worked to get the drug compendia to mention off-label uses and have made payments to the doctors advising the compendia. For example, of the 30 doctors used by the National Comprehensive Cancer Network (NCCN) compendia to prepare its section on Multiple Myeloma, 16 had received money from Celgene. Three of these 16 – Dr. Kenneth Anderson, Dr. Seema Singhal and Dr. Steven Treon – were also considered "core faculty " for the Speaker Corps series as described above. *See*, supra ¶ 198.

247. Dr. Kenneth Anderson, moreover, is a close friend of Sol Barer, Celgene's Chief Operating Officer from March 1994 to May 1, 2006; Chairman and Chief Executive Officer from May 2006 until June 2010; Executive Chairman from June 2010 until December 2010; and Non-Executive Chairman from January 2011 until June 2011.

248. Similarly, 17 out of 27 NCCN's Acute Myeloid Leukemia panel members 15 out of 31 NCCN's Hodgkin Lymphoma panel members have a financial relationship with Celgene and/or with other companies. The other compendia are also advised by doctors who received payments from Celgene and/or other companies.

249. Celgene is aware of the role played by the drug compendia and has worked systematically to increase the off-label uses of its products in the compendia. In Celgene's 3rd quarter of 2007 earnings call with investors, Bob Hugin, Celgene's

president and COO, stated that "Independent third-party non-profit foundations assisting patients with co-payment funding continue to play an essential role in facilitating access for senior citizens covered under the Medicare Part D program. Reimbursement is increasingly difficult for patient's prescribed therapies not yet specifically approved by the FDA for the indication or not compendia listed. Importantly, REVLIMID dexamethasone very recently became compendia listed as a treatment for newly diagnosed multiple myeloma."

250. Later in that same 2007 earnings call, Sol Barer, Celgene's then-Chairman and CEO, responding to a question about increasing sales of Celgene's products to treat MDS, acknowledged the key role of the compendia and said that "we got to work hard to get compendia listing" because without the listing Medicare Part D would not pay, doctors would not prescribe, and Celgene could not increase its sales.

251. Because compendia listing directly affect Celgene's sales, and thus its stock price, Celgene often included information regarding compendia listing in its press releases. For example, its 2008 Third Quarter Financial Results Year-Over-Year press release reported that REVLIMID was newly "[l]isted in The Drug Dex Compendia for Relapsed/Refractory Chronic Lymphocytic Leukemia and also "[l]isted in The National Comprehensive Cancer Network Compendium for Low- to Intermediate-1 MDS." The press release went on to report that one of Celgene's "2008/2009 Objectives" was to "[a]chieve Compendia Listing for REVLIMID in NHL [Non-Hodgkin's Lymphomas]."

252. The Drug Compendia Defendants have set up policies that regulate how much the doctors they employ can receive from pharmaceutical companies. Thompson Reuters' Micromedex DrugDex allows its physician "advisors" to receive up to $100,000 a year while NCCN and AHFS-DI allows the doctors it pays to serve on its panels to receive up to $50,000 a year from pharmaceutical companies. Reed Elsevier's Clinical Pharmacology allows its physician "advisors" to receive up to $25,000 a year from pharmaceutical companies (and it allows them to own up to $100,000 in the stock of a pharmaceutical company).

253. The Drug Compendia Defendants' so-called conflict provisions do not avoid conflicts and kickbacks; they encourage it. These purported conflict of interest policies provide pharmaceutical companies with detailed guides showing whom to pay, and how much to pay, to secure compendia coverage for off-label uses of their products so that government health care plans, including Medicare and Medicaid, will pay for off-label prescriptions to treat conditions for which neither safety nor efficacy has been established (in contrast to the FDA approved, on-label uses, for which safety and efficacy have been established).

254. The Drug Compendia Defendants disclose some of the kickbacks paid to the doctors they use to determine if the compendia will support off-label uses. Disclosure of such illegal conduct, however, does not render the conduct legal.

255. The Drug Compendia Defendants and the doctors also failed to disclose other conflicts such as Dr. Kenneth Anderson's personal relationship with Sol Barer.

256. Practicing doctors were often surprised by some of the uses Celgene asserted were supported by the compendia. For example, in February 2007 Dr. Richy Agajanian expressed surprise to Relator that the NCCN compendia had added Revlimid with dexamethasone as primary inductive therapy (i.e., for patients who have not previously at least one prior therapy).

257. Celgene's payments to the physicians who are responsible for determining whether Celgene's products are supported by the Compendia are kickbacks under the Medicare Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). Celgene's payment of kickbacks to these physicians employed by the Drug Compendia Defendants result false claims being submitted to Medicare and other federal and state health care programs for thousands, if not millions, of additional prescriptions.

## COUNT ONE
## Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)[10]

258. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

259. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1).

260. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to Medicaid, Medicare, and other Government funded health insurance programs false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Thalomid and Revlimid.

261. The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

262. By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

## COUNT TWO
## Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)[11]

263. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

264. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(2).

265. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be made or used

---

[10] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, .*e.g.*, 31 U.S.C. § 3729(a)(1).

[11] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, .*e.g.*, 31 U.S.C. § 3729(a)(2).

false records or statements that caused false claims to be paid or approved by the United States Government.

266. The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed.

267. By reason of these payments, the United States has been damaged, and continues to be damaged in a substantial amount.

**COUNT THREE**
**California False Claims Act., Cal. Gov't Code § 12651 et seq.**

268. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

269. This is a claim for treble damages and civil penalties under the California False Claims Act. Cal. Gov't Code § 12651 et seq.

270. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the California Medicaid Program (i.e., Medi-Cal) false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Thalomid and Revlimid.

271. The California Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

272. By reason of these payments, the California Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT FOUR**
**Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5, et seq.**

273. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

274. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

275. This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5 , et. seq.

276. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Colorado Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

277. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Colorado False Claims Act.

278. The Colorado Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

279. By reason of these payments, the Colorado Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT FIVE**
**Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b et seq.**

280. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

281. This is a claim for treble damages and civil penalties under the Connecticut False Claims Act, Conn. Gen. Stat. §17b-301b, et seq.

282. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Delaware Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Thalomid.

283. The Connecticut Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

284. By reason of these payments, the Connecticut Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT SIX**
**Delaware False Claims Act, Del. Code Ann. tit. 6, § 1201 et seq.**

285. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

286. This is a claim for treble damages and civil penalties under the Delaware False Claims Act. Del Code Ann. tit. 6, § 1201 et seq.

287. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Delaware Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Thalomid.

288. The Delaware Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

289. By reason of these payments, the Delaware Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT SEVEN**
**Florida False Claims Act, Fla. Stat. Ann. § 68.081 et seq.**

290. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

291. This is a claim for treble damages and civil penalties under the Florida False - Claims Act. Fla. Stat. Ann. § 68.081 et seq.

292. By virtue of, the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Florida Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Thalomid and Revlimid.

293. The Florida Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

294. By reason of these payments, the Florida Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT EIGHT**
**Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168 et seq.**

295. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

296. This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168 et seq.

297. By virtue of, the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Georgia Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Thalomid and Revlimid.

298. The Georgia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

299. By reason of these payments, the Georgia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT NINE**
**Hawaii False Claims Act, Haw. Rev. Stat. § 661-22 et seq.**

300. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

301. This is a claim for treble damages and civil penalties under the Hawaii False Claims Act. Haw. Rev. Stat. § 661-22 et seq.

302. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to

the Hawaii Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Thalomid and Revlimid.

303. The Hawaii Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

304. By reason of these payments, the Hawaii Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT TEN**
**Illinois Whistleblower Reward and Protection Act,**
**740 Ill. Comp. Stat. 175/1 et seq.**

305. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

306. This is a claim for treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act. 740 111. Comp. Stat. 175/1 et seq.

307. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Illinois Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Thalomid and Revlimid.

308. The Illinois Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

309. By reason of these payments, the Illinois Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT ELEVEN**
**Indiana False Claims and Whistleblower Protection Act,**
**Indiana Code § 5-11-5.5**

310. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

311. This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5.

312. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Indiana Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Thalomid and Revlimid.

313. The Indiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

314. By reason of these payments, the Louisiana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWELVE**
**Maryland False Health Claims Act of 2010, Md. Code Ann. §§ 2-601 et seq.**

315. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

316. This is a claim for treble damages and civil penalties under the Maryland False Health Claims Act, Md. Code Ann. §§ 2-601 et seq.

317. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Maryland Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

318. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Maryland False Health Claims Act.

319. The Maryland Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed. By reason of these payments, the Maryland Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT THIRTEEN**
**Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1 et seq.**

320. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

321. This is a claim for treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law. La. Rev. Stat. Ann. § 46:439.1 et seq.

322. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Louisiana Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for off label uses of Thalomid and Revlimid.

323. The Louisiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

324. By reason of these payments, the Louisiana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT FOURTEEN**
**Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, § 5(A)-(0)**

325. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

326. This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act. Mass. Ann. Laws ch. 12, § 5(A)-(0).

327. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Massachusetts Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Thalomid and Revlimid.

328. The Massachusetts Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

By reason of these payments, the Massachusetts Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT FIFTEEN**
**Michigan Medicaid False Claims Act, MCLS § 400.601 et seq.**

329. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

330. This is a claim for treble damages and civil penalties under the Michigan Medicaid False Claims Act, MCLS § 400.601 et seq.

331. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Michigan Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Thalomid and Revlimid.

332. The Michigan Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

333. By reason of these payments, the Michigan Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT SIXTEEN**
**Minnesota False Claims Act Minn. State Minn. Stat. § 15C.01 et seq.**

334. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

335. This is a claim for treble damages and civil penalties under the Minnesota False Claims Act Minn. Stat. § 15C.01 et seq.

336. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Minnesota Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

337. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Minnesota False Claims Act.

338. The Minnesota Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by the Defendants, paid for claims that otherwise would not have been allowed.

339. By reason of these payments, the Minnesota Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT SEVENTEEN**
**Montana False Claims Act, Mont. Code Anno §17-8-401 et seq.**

340. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

341. This is a claim for treble damages and civil penalties under the Montana False Claims Act. Mont. Code Anno. § 17-8-401 et seq.

342. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Montana Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

343. The Montana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

344. By reason of these payments, the Montana Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT EIGHTEEN**
**Nevada False Claims Act, Nev. Rev. Stat. §357.010 et seq.**

345. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

346. This is a claim for treble damages and civil penalties under the Nevada False Claims Act. Nev. Rev. Stat. §357.010 et seq.

347. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Nevada Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Thalomid and Revlimid.

348. The Nevada Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

349. By reason of these payments, the Nevada Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT NINETEEN**
**New Hampshire Medicaid Fraud and False Claims,**
**N.H. Rev. Stat. Ann. § 167:61 et seq.**

350. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

351. This is a claim for treble damages and civil penalties under the New Hampshire Medicaid Fraud and False Claims Law, N.H. Rev. Stat. Ann. § 167:61, et seq.

352. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the New Hampshire Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Thalomid and Revlimid.

353. The New Hampshire Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

354. By reason of these payments, the New Hampshire Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWENTY**
**New Jersey False Claims Act, N.J. Stat. §2A:32C-1 et seq.**

355. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

356. This is a claim for treble damages and civil penalties under the New Jersey False Claims Act. N.J. Stat. § 2A:32C-1 et seq.

357. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the New Jersey Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

358. The New Jersey Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

359. By reason of these payments, the New Jersey Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWENTY-ONE**
**New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 et seq.**

360. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

361. This is a claim for treble damages and civil penalties under the New Mexico Medicaid False Claims Act. N.M. Stat. Ann. § 27-14-1 et seq.

362. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the New Mexico Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Thalomid and Revlimid.

363. The New Mexico Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

364. By reason of these payments, the New Mexico Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWENTY-TWO**
**New York False Claims Act, N.Y. CLS St. Fin. § 186 et seq.**

365. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

366. This is a claim for treble damages and civil penalties under the New York False Claims Act, N.Y. CLS St. Fin. § 186 et seq.

367. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the New York Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Thalomid and Revlimid.

368. The New York Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

369. By reason of these payments, the New York Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWENTY-THREE**
**North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 et seq.**

370. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

371. This is a claim for treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 et seq.

372. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the North Carolina Medicaid program for false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

373. The North Carolina Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

374. By reason of these payments, the New York Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWENTY-FOUR**
**Oklahoma Medicaid False Claims Act, 63 Okl. St. §5053 et seq.**

375. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

376. This is a claim for treble damages and civil penalties under the Oklahoma Medicaid False Claims Act. 63 Okl. St. § 5053 et seq.

377. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Oklahoma Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

378. The Oklahoma Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

379. By reason of these payments, the Oklahoma Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWENTY-FIVE**
**Rhode Island False Claims Act, R.I. Gen. Laws §9-1.1-1 et seq.**

380. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

381. This is a claim for treble damages and civil penalties under the Rhode Island False Claims Act. R.I. Gen. Laws § 9-1.1-1 et seq.

382. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be

presented to the Rhode Island Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

383. The Rhode Island Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

384. By reason of these payments, the Rhode Island Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWENTY-SIX**
**Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 et seq. and Tennessee False Claims Act, Tenn. Code Ann. § 4-18-101 et seq.**

385. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

386. This is a claim for treble damages and civil penalties under the Tennessee Medicaid False Claims Act, and the Tennessee False Claims Act. Tenn. Code Ann. § 71-5-181 et seq.; Tenn. Code Ann. § 4-18-101 et seq.

387. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Tennessee Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Thalomid and Revlimid.

388. The Tennessee Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

389. By reason of these payments, the Tennessee Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWENTY-SEVEN**
**Texas Medicaid Fraud Prevention Act,**
**Tex. Hum. Res. Code Ann. § 36.001 et seq.**

390. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

391. This is a claim for treble damages and civil penalties under the Texas Medicaid Fraud Prevention Act. Tex. Hum. Res. Code Ann. § 36.001 et seq.

392. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Texas Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Thalomid and Revlimid.

393. The Texas Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

394. By reason of these payments, the Texas Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWENTY-EIGHT**
**Virginia Fraud Against Taxpayers Act, Va. Code Ann. §8.01-216 et seq.**

395. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

396. This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act. Va. Code Ann. §8.01-21.6 et seq.

397. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the Virginia Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Thalomid and Revlimid.

398. The Virginia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

399. By reason of these payments, the Virginia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT TWENTY-NINE**
**Washington Medicaid Fraud False Claims Act,**
**Rev. Code Wash. §§ 48.80.010 et seq.**

400. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

401. This is a claim for treble damages and civil penalties under the Washington Medicaid Fraud False Claims Act, Rev. Code Wash. §§ 48.80.010 et seq.

402. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Washington Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

403. Moreover by virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants conspired to commit violations of the Washington Medicaid Fraud False Claims Act.

404. The Washington Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed. By reason of these payments, the Washington Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT THIRTY**
**Wisconsin False Claims Act, Wis. Stat. §20.931 et seq.**

405. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

406. This is a claim for treble damages and civil penalties under the Wisconsin False Claims Act. Wis. Stat. § 20.931 et seq.

407. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Wisconsin Medicaid Program false or fraudulent claims for payment or approval and/or knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement.

408. The Wisconsin Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

409. By reason of these payments, the Wisconsin Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT THIRTY-ONE**
**District of Columbia False Claims Act, D.C. Code § 2-308.03 et seq.**

410. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

411. This is a claim for treble damages and civil penalties under the District of Columbia False Claims Act. D.C. Code § 2-308.03 et seq.

412. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to the District of Columbia Medicaid Program false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Thalomid and Revlimid.

413. The District of Columbia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

414. By reason of these payments, the District of Columbia Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT THIRTY-TWO**
**City of Chicago False Claims Act, Chicago Mun. Code Chapter 1-22 et seq.**

415. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

416. This is a claim for treble damages and civil penalties under the City of Chicago False Claims Act, Chicago Municipal Code Chapter 1-22, et seq.

417. By virtue of the kickbacks, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly caused to be presented to

the City of Chicago false or fraudulent claims for the improper payment or approval of prescriptions for off-label uses of Thalomid and Revlimid.

418. The City of Chicago, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

419. By reason of these payments, the City of Chicago has been damaged, and continues to be damaged in a substantial amount.

WHEREFORE, Relator requests that judgment be entered against Defendants, ordering that:

(i) Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, et seq., and the State False Claims Acts;

(ii) Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions, plus the appropriate amount to the States under similar provisions of the state false claims acts;

(iii) The Relator be awarded the maximum "relator's share" allowed pursuant to 31U.S.C. § 3730(d) and similar provisions of the state false claims acts;

(iv) The Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts;

(v) Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

(vi) Defendants disgorge all sums by which it has been enriched unjustly by its wrongful conduct; and

(vii) The United States, the States, and the Relator recover such other relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: May 3, 2013

Respectfully submitted,

**GILBERT & SACKMAN, A Law Corporation**

By: ______________________
Linda S. Fang
Jay Smith

**GRANT & EISENHOFER P.A.**
Reuben A. Guttman
Traci L. Buschner
David T. Fischer
Jay W. Eisenhofer
John C. Kairis

Attorneys for Plaintiff-Relator Beverly Brown

## CERTIFICATE OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 3699 Wilshire Boulevard, Suite 1200, Los Angeles, California 90010.

On May 3, 2013, I served the following document(s) described as **FIRST AMENDED COMPLAINT** on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

**SEE ATTACHED LIST**

**XX** **BY MAIL:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing with the United States Postal Service. Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business. Such envelope(s) were placed for collection and mailing with postage thereon fully prepaid at Los Angeles, California, on that same day following ordinary business practices. (C.C.P. § 1013 (a) and 1013a(3))

☐ **BY FACSIMILE:** At approximately _____, I caused said document(s) to be transmitted by facsimile pursuant to Rule 2008 of the California Rules of Court. The telephone number of the sending facsimile machine was _____. The name(s) and facsimile machine telephone number(s) of the person(s) served are set forth in the service list. The document was transmitted by facsimile transmission, and the sending facsimile machine properly issued a transmission report confirming that the transmission was complete and without error.

☐ **BY OVERNIGHT DELIVERY:** I deposited such document(s) in a box or other facility regularly maintained by the overnight service carrier, or delivered such document(s) to a courier or driver authorized by the overnight service carrier to receive documents, in an envelope or package designated by the overnight service carrier with delivery fees paid or provided for, addressed to the person(s) served hereunder. (C.C.P. § 1013(d)(e))

☐ **BY E-MAIL TRANSMISSION:** On this date, I caused said document(s) to be transmitted via email to the e-mail addresses set forth below.

☐ **BY HAND DELIVERY:** I delivered such envelope(s) by hand to the office of the addressee(s). (C.C.P. § 1011(a)(b))

☐ **BY PERSONAL SERVICE:** I personally delivered such envelope(s) to the addressee(s). (C.C.P. § 1011)

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on May 3, 2013 at Los Angeles, California.

Zachary Armstrong

**SERVICE LIST**

Attorney General Eric H. Holder
United States Department of Justice
950 Pennsylvania Avenue., NW
Washington, DC 20530
(202) 514-2001

Ms. Joyce R. Branda
Deputy Director
c/o Jamie A. Yavelberg
William E. Olson
Attorneys, Civil Division
Commercial Litigation Branch
Civil Fraud
U.S. Department of Justice
601 D Street, NW
Washington, DC 20530
(202) 307-0231
(202) 616-3085 (fax)

Inspector General Michael E. Horowitz
Office of the Inspector General
950 Pennsylvania Avenue., NW
Washington, DC 20530-0001
(202) 514-3435
(202) 514-4001 (fax)
pafairs@oig.hhs.gov

André Birotte, Jr.
United States Attorney
c/o Howard Daniels
Assistant United States Attorney
Central District of California
312 North Spring Street
Suite 1200
Los Angeles, CA 90012
(213) 894-6947

Attorney General Kamala D. Harris
Office of the Attorney General
1300 "I" Street
Sacramento, CA 94244-2550
(916) 445-9555

Deputy A.G. Brian V. Frankel
California Department of Justice
Bureau of Medi-Cal Fraud
and Elder Abuse
1455 Frazee Road, Suite 315
San Diego, CA 92108

Attorney General George Jepsen
Office of the Attorney General
State of Connecticut
55 Elm Street
Hartford, CT 06101
(860) 808-5318
(860) 808-5387 (fax)
attorney.general@po.state.ct.us

Attorney General Joseph R. Biden, III
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
(302) 577-8400
(302) 577-2496 (fax)
Attorney.General@State.DE.US

Attorney General Pam Bondi
Office of the Attorney General
State of Florida
The Capitol PL-01
Tallahassee, FL 32399-1050
(850) 414-3300
(487) 487-9475 (fax)
Ag.mccollum@myfloridalegal.com

Jeff Atwater, Chief Financial Officer
Division of Legal Services
Florida Department of
Financial Services
200 East Gaines Street
Tallahassee, FL 32399
(850) 513-3110
(850) 413-7460 (fax)

Attorney General Sam Olens
Office of the Attorney General
40 Capitol Square, SW
Atlanta, GA 30334
(404) 656-3300
(404) 657-8733 (fax)

Attorney General David M. Louie
Office of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1500
(808) 586-1239 (fax)

Susana A. Mendoza, City Clerk
City of Chicago
121 North LaSalle Street, Room 107
Chicago, IL 60602
(312) 742-5375
cityclerk@cityofchicago.org

Stephen R. Patton, Corporation Counsel
City of Chicago, Law Department
121 North LaSalle Street, Room 600
Chicago, IL 60602
(312) 744-0200
(312) 744-8538 (fax)

Attorney General Lisa Madigan
Chicago Main Office
100 West Randolph Street
Chicago, IL 60601
(312) 814-3000
(312) 814-3806 (fax)

Attorney General Greg Zoeller
Office of the Indiana Attorney General
Indiana Government Center South
302 West Washington Street, 5th Floor
Indianapolis, IN 46204
(317) 232-6201
(317) 232-7979 (fax)
constituent@atg.in.gov

David Thomas
Inspector General of Indiana
315 West Ohio Street
Room 104
Indianapolis, IN 46202
(317) 232-3850

Attorney General James Caldwell
1885 North 3rd Street
Baton Rouge, LA 70802
(225) 326-6705
(225) 326-6793 (fax)
AdminInfo@ag.state.la.us

Attorney General Martha Coakley
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 727-2200
(617) 727-3251 (fax)

Attorney General Bill Schuette
Michigan Department of the Attorney General
Lansing Office
G. Mennen Williams Building
7th Floor
525 West Ottawa Street
Lansing, MI 48909
(517) 373-1110
(517) 373-3042
miag@michigan.gov

Attorney General Steve Bullock
Department of Justice
215 North Sanders Street
Helena, MT 59620
(406) 461-1264
steve@stevebullock.com

Attorney General Catherine Cortez Masto
Office of the Attorney General
100 North Carson Street
Carson City, NV 89701-4717
(775) 684-1100
(775) 684-1108 (fax)

Attorney General Michael A. Delaney
33 Capitol Street
Concord, NH 03301
(603) 271-3658
(603) 271-2110 (fax)

Attorney General Jeffrey S. Chiesa
Office of the Attorney General
25 Market Street
Trenton, NJ 08625-0080
(609) 292-4925
(609) 292-3508 (fax)

Attorney General Gary King
408 Galisteo Street
Santa Fe, NM 87501
(505) 827-6000
(505) 827-5826 (fax)

Attorney General Eric Schneiderman
Office of the Attorney General
The Capitol, 2nd Floor
Albany, NY 12224-0341
(800) 771-7755
serveAG@oag.state.ny.us

Attorney General Roy Cooper
North Carolina Department of Justice
Legal Services Department
9001 Mail Service Center
Raleigh, NC 27699-9901
(919) 716-6400
(919) 716-6750 (fax)

Attorney General Scott Pruitt
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921

Attorney General Peter Kilmartin
Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400

Attorney General Robert E. Cooper, Jr.
Office of the Attorney General
Cordell Hull Building, Ground Floor
425 Fifth Avenue North
Nashville, TN 37243-3400
(615) 741-3491

Attorney General Greg Abbott
c/o Kerry Ascher
Christen Nedwick
Office of the Attorney General
300 W. 15th Street
Austin, TX 78701
(512) 463-2100
greg.abbott@oag.state.tx.us
Kerry.ascher@texasattorneygeneral.gov
Christen.nedwick@texasattorneygeneral.gov

Attorney General Kenneth T. Cuccinelli
Office of the Attorney General
900 East Main Street
Richmond, VA 23219

Attorney General Irvin Nathan
John A. Wilson Building
1350 PA Ave, NW
Suite 409
Washington, DC 20009
(202) 727-3400
(202) 347-8922 (fax)

Attorney General J. B. Van Hollen
Wisconsin Department of Justice
Risser Justice Center
17 West Main Street
Madison, WI 53703
(608) 266-1221
(608) 267-2779 (fax)

Attorney General John Suthers
Office of the Attorney General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203

Attorney General Bob Ferguson
Office of the Attorney General
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188

Attorney General Lori Swanson
Office of the Attorney General
1400 Bremer Tower
445 Minnesota Street
St. Paul, MN 55101

Attorney General Douglas F. Gansler
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202