# EXHIBIT A

E-FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 10-3165-GHK (SSx) | Date | July 10, 2014 |
|---|---|---|---|
| Title | *United States of America, et al., ex rel. Brown v. Celgene Corporation* | | |

| Presiding: The Honorable | **GEORGE H. KING, CHIEF U.S. DISTRICT JUDGE** | |
|---|---|---|

| Beatrice Herrera | N/A | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiff: | Attorneys Present for Defendant: |
|---|---|
| None | None |

**Proceedings:** **(In Chambers) Order re:** (1) Defendant's Motion to Dismiss [Dkt. No. 106]; (2) Defendant's Motion to Strike Paragraph 88 of Third Amended Complaint [Dkt. No. 108]

This matter is before us on (1) Defendant's Motion to Dismiss Plaintiff-Relator's Third Amended Complaint ("TAC") and (2) Defendant's Motion to Strike Paragraph 88 of TAC. We have considered the papers filed in support of and in opposition to these Motions and deem them appropriate for resolution without oral argument. L.R. 7-15. As the Parties are familiar with the facts, we will repeat them only as necessary. Accordingly, we rule as follows:

## I.    Background

Plaintiff-Relator Beverly Brown ("Brown") brought this *qui tam* action against Defendant Celgene Corporation ("Celgene") on April 27, 2010. The District of Columbia, the city of Chicago, the named state plaintiffs, and the United States have declined to intervene. Brown's TAC alleges that Celgene defrauded government-funded heathcare programs—including Medicare, Medicaid, TRICARE, the VA, and the Federal Employees Health Benefits Program—by systematically promoting the drugs Thalomid and Revlimid[1] for non-reimbursable off-label uses and paying illegal kickbacks to physicians.

---

[1] Thalomid, which was banned in the United States in the 1960s for causing birth defects, was approved by the FDA for the limited purpose of treating a skin disease associated with leprosy in 1998. (TAC ¶ 2). In 2006, the FDA also approved Thalomid for treating newly diagnosed patients with multiple myeloma ("MM"), a plasma cell cancer, in combination with another drug, dexamethasone. (*Id.* ¶ 11). This approval was contingent on the placement of a black box warning that Thalomid caused birth defects and increased the risk of venous thromboembolism (blood clots that form within veins). (*Id.* ¶¶ 11, 97). Celgene developed Revlimid, a derivative of Thalomid, in 2005. (*Id.* ¶ 9). The FDA approved Revlimid for treating a relatively uncommon subtype of the blood disorder myelodysplastic syndrome ("MDS"), an early stage of cancer. In 2006, Revlimid, in combination with dexamethasone, was also approved for MM patients who had received at least one prior therapy. (*Id.* ¶ 9). In light of the

E-FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 10-3165-GHK (SSx) | Date | July 10, 2014 |
|---|---|---|---|
| Title | *United States of America, et al., ex rel. Brown v. Celgene Corporation* | | |

Brown was employed by Celgene from 2001 to 2011 as a pharmaceutical sales representative (though she was given technical titles like Immunology Specialist and Hematology Oncology Consultant), and she received bonuses based on the amount of Thalomid and Revlimid sold in her district. (TAC ¶ 26). Brown alleges that Celgene's unlawful promotion of Thalomid and Revlimid for unapproved uses caused "federal, state, and local government health care programs . . . to pay for millions of prescriptions that never would have been submitted for reimbursement but for Celgene's activities." (TAC ¶ 18). Based on these allegations, Brown asserts violations of the Federal False Claims Act ("FCA"), several analogous state false claims statutes,[2] and California's Insurance Frauds Prevention Act.

Celgene now moves to dismiss Brown's TAC in its entirety under Rule 12(b)(6) for failure to state a claim and under Rule 9(b) for insufficient particularity. In the alternative, if we do not dismiss the entire TAC, Celgene seeks to dismiss certain classes of claims that it asserts cannot give rise to FCA liability as a matter of law. Celgene also argues that some of the state law claims are subject to dismissal, in whole or in part, for various independent reasons. Finally, Celgene moves to strike Paragraph 88 of the TAC on the grounds that it contains inflammatory and irrelevant allegations.

## II.   Motion to Dismiss

### A.   Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). It must contain factual allegations sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570. In considering a motion to dismiss, we must accept the allegations of the complaint as true and construe them in the light most favorable to the plaintiff. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). We need not accept as true, however, legal conclusions "cast in the form of factual allegations." *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

---

known risk of birth defects and blood clots, "the FDA mandated that [Celgene] implement a restricted distribution system requiring physicians to follow specific procedures before prescribing [Thalomid and Revlimid]." (*Id.* ¶¶ 13, 92, 94).

[2] The Parties have stipulated to the dismissal of Count Thirteen of the TAC, violation of the Maryland False Health Claims Act. They have also stipulated to narrow many of the other state claims based on the enactment date of the states' statutes. [*See* Dkt. No. 111].

E-FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3165-GHK (SSx) | Date | July 10, 2014 |
|---|---|---|---|
| Title | *United States of America, et al., ex rel. Brown v. Celgene Corporation* | | |

**B.      Brown Adequately Alleges the Elements of an FCA Claim**

The FCA was enacted as a remedial statute to combat fraud on the government. *See United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). To this end, the statute is broadly construed to reach "all fraudulent attempts to cause the Government to pay out sums of money." *Id.* at 233; *see also Cook Cnty., Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 129 (2003) ("Congress wrote expansively, meaning to reach all types of fraud, without qualification, that might result in financial loss to the Government" (internal citation and quotation marks omitted)). The FCA is violated, *inter alia*, when a person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). To state a claim under § 3729(a)(1)(A), a relator must allege: "(1) a false or fraudulent claim (2) that was material to the decision-making process (3) which defendant presented, or caused to be presented, to the United States for payment or approval (4) with knowledge that the claim was false or fraudulent." *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1047 (9th Cir. 2012). Celgene moves to dismiss the TAC in its entirety on the grounds that (1) it fails to adequately allege that any claims were materially false or fraudulent; and (2) it does not plausibly plead that Celgene's misconduct caused any false claims to be submitted to the government.

**1.      Claim Falsity**

Celgene first argues that Brown's FCA claims fail as a matter of law because she has failed to allege any cognizable "false or fraudulent claims." "An actual false claim is the *sine qua non* of an FCA violation." *Cafasso v. General Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotation marks and alterations omitted). The false claims "contemplated by the FCA take many forms." *Id.* This case involves "implied false certifications." A claim is false under an implied certification theory when it contains no express statement regarding compliance with a statute or regulation but, by the very fact that it has been submitted, falsely implies compliance with any statutory or regulatory precondition to obtaining the requested government benefit. *See Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 996-98 (9th Cir. 2010) (recognizing that the FCA "contemplates an implied false certification claim"); *see also Mikes v. Straus*, 274 F.3d 687, 699 (2d Cir. 2001) ("An implied false certification claim is based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment."). In essence, the implied false certification theory is one of fraud by omission—the claim is false because the claimant has failed to disclose a statutory or regulatory violation that would make it ineligible for reimbursement. "Put another way, if a [claimant] is asking for payment, it is fair to assume that she has done everything necessary to merit reimbursement. If she has not, there is a problem." *United States v. Spectrum, Inc.*, __ F. Supp. 2d __, 2014 WL 2620981, at *8 (D.D.C. June 13, 2014); *see also U.S. ex rel. Willard v. Humana Health Plan of Texas, Inc.*, 336 F.3d 375, 382 (5th Cir. 2003) ("Implied certification amounts to nothing more than an alternative expression of the well-accepted idea that billing the government for something not delivered may constitute a false claim.").

To adequately allege false claims based on an implied false certification theory, a relator must

E-FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3165-GHK (SSx) | Date | July 10, 2014 |
|---|---|---|---|
| Title | *United States of America, et al., ex rel. Brown v. Celgene Corporation* | | |

"provide a reasonable basis to infer that (1) the [claimant] explicitly undertook to comply with a law, rule or regulation that is implicated in submitting a claim for payment[3] and that (2) claims were submitted (3) even though the [claimant] was not in compliance with that law, rule, or regulation." *Ebeid*, 616 F.3d at 998. Here, Brown alleges that Celgene caused claims to be submitted that (a) falsely implied they were for reimbursable, medically accepted uses, and (b) falsely implied compliance with the Anti-Kickback Statute.

As an initial matter, Celgene contends that Brown has failed to adequately allege any false claims because Brown's TAC "never once refers to a certification, or even uses the word 'certify.'" (Mot. 7). Although Celgene is correct that a claim can only be legally false if it expressly or implicitly certifies compliance with a statutory or regulatory condition of payment, a relator need not use the words "certification" or "certify" to state a claim. The Ninth Circuit has expressly held that "there is no special significance to the term 'certification,'" and we should not regard it as somehow "talismanic." *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006). Moreover, in *Ebeid*, the Ninth Circuit reiterated that a complaint need only make "allegations that the government paid claims because it believed [claimants were] in compliance with laws upon which payment was conditioned" to raise an implied false certification theory—the phrase "implied false certification" does not need to actually appear in the complaint. 616 F.3d at 999 n.5; *accord U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 313 (3d Cir. 2011) (holding that a complaint need not allege that a claimant certified compliance to adequately plead a false claim under an implied certification theory). We therefore reject Celgene's formalistic argument that Brown's FAC claim fails simply because the TAC does not label the allegedly false claims as "implied false certifications."[4]

Celgene also appears to suggest that Brown's claims fail because she does not allege that any implied certifications were made *by Celgene*. This argument misses the point. Of course Celgene did not itself falsely certify compliance with any condition of payment. This is because it did not itself submit any claims to the government. But FCA liability is not limited to claimants. *See* 31 U.S.C. § 3729(a)(1)(A) (imposing liability on those who knowingly *cause* false claims to be submitted for payment). The FCA has a far broader reach. *See Neifert-White Co.*, 390 U.S. at 232 ("[T]he [False Claims] Act was intended to reach all types of fraud, without qualification, that might result in financial

---

[3] Where, as here, the claims at issue are reimbursements for medical items or services and the "law, rule or regulation" is a federal insurance program's coverage limitations, this element is essentially self-satisfying. *See, e.g.*, *Ebeid*, 616 F.3d at 996-97 (recognizing that by submitting a Medicare reimbursement form, a claimant implicitly certifies that claim is for a covered item or service).

[4] In its Statement of Interest Regarding Defendant's Motion to Dismiss, the Government likewise disagrees with Celgene's argument, noting that whether a complaint explicitly alleges any express or implied certification of compliance is "irrelevant." "Rather, the core question for 'falsity' under the False Claims Act is whether the government received a claim for payment from a healthcare provider for an item or service that was not legally reimbursable." (U.S. Stmt. of Interest 6).

E-FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3165-GHK (SSx) | Date | July 10, 2014 |
|---|---|---|---|
| Title | *United States of America, et al., ex rel. Brown v. Celgene Corporation* | | |

loss to the Government."). Accordingly, even though Celgene did not itself falsely certify compliance with any legal condition of payment, it is still susceptible to liability because it allegedly caused claimants to implicitly make such false certifications and thereby caused the submission of false claims. *See, e.g., U.S. ex rel. Bergman v. Abbot Labs.*, 2014 WL 348583, at *7 (E.D. Pa. Jan. 30, 2014) ("An FCA violation occurs under implied false certification when a defendant . . . *causes to be submitted* a request for payment without disclosing that it is in violation of a regulation that affect[s] its eligibility for payment."). That the claimants themselves may not have been aware of their non-compliance makes no difference—the claims would still be false. *See U.S. ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377, 390 (1st Cir. 2011) (explaining that the "Supreme Court has long held that a non-submitting entity may be liable under the FCA for knowingly causing a submitting entity to submit a false or fraudulent claim, and it has not conditioned this liability on whether the submitting entity knew or should have known about a non-submitting entity's unlawful conduct").

As set forth above, Brown alleges two categories of legally false claims—both of which are cognizable under the FCA. We now address Brown's two theories of legal falsity in turn.

**a.      Claims for Uses That Are Not Medically Accepted are "False"**

First, Brown alleges that claims were false because they were for off-label uses that are not covered by Medicare and Medicaid. Whether an off-label, non-FDA-approved use is covered by these government programs turns on whether such use is a "medically accepted indication." An indication is "medically accepted" for purposes of the Medicaid statute if it is "supported by one or more citations" in any of the statutorily recognized drug compendia. 42 U.S.C. §§ 1396r-8(k)(6). Until January 1, 2009, Medicare Part D defined "medically accepted indication" in the same way as the Medicaid statute. Since January 1, 2009, Medicare Part D has also covered off-label uses that are part of an anti-cancer chemotherapeutic regimen if the use is (i) "supported by one or more citations" in certain compendia (including the three compendia recognized in the Medicaid statute) *and* not identified "as not indicated in one or more such compendia" or (ii) "medically accepted based on supportive clinical evidence in peer reviewed medical literature appearing in [certain] publications." *See* 42 U.S.C. §§ 1395w-102(e)(4), 1395x(t)(2)(B).[5]

Brown alleges that Celgene promoted Thalomid and Revlimid for uses that are not "medically accepted" and thereby knowingly caused false claims to be submitted for reimbursement. Celgene argues that its allegedly unlawful off-label promotion cannot support an FCA claim premised on an implied certification theory because (i) improper promotion does not violate any condition of payment, and (ii) Brown has failed to adequately allege that the off-label uses Celgene promoted were not reimbursable.

---

[5] The Parties do not dispute that the other government healthcare programs have materially similar coverage standards for off-label, non-FDA-approved uses. (TAC ¶ 61); *see also Strom ex rel. U.S. v. Scios, Inc.*, 676 F. Supp. 2d 884, 885 n.1 (N.D. Cal. 2009).

E-FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3165-GHK (SSx) | Date | July 10, 2014 |
|---|---|---|---|
| Title | *United States of America, et al., ex rel. Brown v. Celgene Corporation* | | |

This first argument misses the point. While it may be true that an FCA claim cannot be predicated on off-label promotion alone, here Brown alleges not only that Celgene engaged in off-label promotion, but also that Celgene's promotion caused false claims to be submitted for reimbursement. That Celgene's off-label promotion itself does not violate a condition for payment is therefore immaterial. It is enough that Brown alleges that non-reimbursable claims that violated statutory conditions of payment resulted from Celgene's misconduct. In other words, the falsity here lies in the submission of non-reimbursable claims, not in Celgene's off-label promotion alone. And courts are in broad agreement that a claim for reimbursement from Medicare or Medicaid is "false" when it is statutorily ineligible for such reimbursement. *See, e.g.*, *Ebeid*, 616 F.3d at 1001 (recognizing that because certification of compliance with Medicare regulations may be inferred from the submission of a Medicare claim, regulations that set forth conditions of payment may serve as the basis for an implied false certification); *Mikes*, 274 F.3d at 700 (holding that a medical provider's reimbursement claim is false when it violates express statutory requirements for reimbursement); *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975) (finding that claims for services that were not covered by Medicare were false); *U.S. ex rel. Colquitt v. Abbott Labs.*, 864 F. Supp. 2d 499, 530 (N.D. Tex. 2012) ("Medicare claims for expenses that are not covered and are ineligible for payment are false claims."); *Strom*, 676 F. Supp. 2d at 891 ("Because [Medicare] permits reimbursement only for 'reasonable and necessary' treatments, a prescription of [a drug] in a context where it is not 'reasonable' or 'necessary' would be statutorily ineligible for reimbursement. This satisfies the FCA's requirement of a 'false' statement."). In sum, Celgene's argument that the TAC insufficiently explains "what legal requirement was violated here" is unconvincing. The legal premise underlying Brown's theory is clear—she alleges that claims were false because they violated the Medicare/Medicaid statutes' requirements for reimbursement. Such claims are false for purposes of the FCA. Accordingly, so long as Brown has plausibly alleged that claims submitted as a result of Celgene's off-label promotion were, in fact, non-reimbursable, she will have sufficiently alleged the falsity element of her FCA claim.

Second, Celgene maintains that its off-label promotion cannot serve as a predicate for a false claim because Brown has failed to plausibly allege that it promoted non-reimbursable uses. We disagree. Brown identifies 19 off-label uses of Thalomid and 9 off-label uses of Revlimid that Celgene promoted. (TAC ¶¶ 63, 82, 86). She alleges that these 28 off-label, non-FDA-approved uses were not covered by federal healthcare programs because they were not "medically accepted" within the meaning of the Medicaid and Medicare statutes. (TAC ¶¶ 63, 64). Celgene counters that Brown's "blanket assertion" that the compendia did not provide adequate support for these 28 uses "is not remotely plausible." (Mot. 8). As support for this proposition, Celgene asks that we take judicial notice of excerpts from DrugDex (one of the statutorily approved compendia) that purportedly "indisputably support numerous off-label indications" identified in the TAC. (Mot. 8-9).

The DrugDex excerpts proffered by Celgene, however, do not undermine Brown's allegations that Celgene promoted non-reimbursable off-label uses. Whether or not any particular use is "supported" by the compendia is a complex, case-by-case inquiry not susceptible to resolution on a motion to dismiss, and expert testimony is often necessary to discern whether a mention in a

E-FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 10-3165-GHK (SSx) | Date | July 10, 2014 |
|---|---|---|---|
| Title | *United States of America, et al., ex rel. Brown v. Celgene Corporation* | | |

compendium in fact constitutes sufficient support. *See United States v. King-Vassel*, 728 F.3d 707, 717 (7th Cir. 2013); *Abbott Labs.*, 2014 WL 348583, at *9 n.8 (finding that the compendia did not "resolve as a matter of law (or fact) whether TriCor was marketed for medically unnecessary uses"); *United States ex rel. Rost v. Pfizer, Inc.*, 253 F.R.D. 11, 16 (D. Mass. 2008) (finding that it was unable to assess whether DrugDex entry supported drug's off-label use based on preliminary record at motion to dismiss stage). As the Government explained in its Statement of Interest:

> Evaluation of whether a compendium citation supports use of a drug for a particular indication involves a factual inquiry that should not be resolved at the motion to dismiss stage. Specifically, resolution of the question whether a particular use which a manufacturer is promoting is "supported by" a compendium citation depends on the exact use being promoted, the content of the compendium citation with respect to that exact use, and the scope and outcome of the studies as described in the compendium. Moreover, some studies which a compendium cites may well indicate that a particular off-label use has shown little to no efficacy in treating a medical condition or presents serious safety concerns for a particular patient population. . . . This Court should find that the factual record at the motion to dismiss stage is insufficient to make such a determination.

(U.S. Stmt. of Interest 6-7). In sum, the DrugDex excerpts are of little help in resolving this Motion because we cannot draw any broad, generally applicable inferences from them. The extent to which DrugDex supports any particular off-label use promoted by Celgene, if any, is a fact-specific inquiry that we are ill-suited to resolve without a more developed evidentiary record.

Celgene's argument to the contrary is belied by its own evidence. It tells us that we can easily determine whether DrugDex supports any broad category of uses by "referenc[ing] . . . a simple numerical rating." (Reply 7). Citing the *Medicare Benefits Policy Manual*, Celgene professes that all uses categorized as Class I, IIa, or IIb are supported by DrugDex. But the analysis in fact requires additional steps. For one thing, the *Medicare Benefits Policy Manual* "is a guide for intermediaries in applying the Medicare statute and reimbursement regulations and does not have the binding effect of law or regulation." *Nat'l Med. Enters. v. Bowen*, 851 F.2d 291 (9th Cir. 1988). In any event, the Manual itself states that a DrugDex rating of I, IIa, or IIb only constitutes support "in general." (Def's RJN Ex. 19, § 50.4.5). The Manual therefore contemplates exceptions and does not set forth a bright-line rule. This is because uses categorized by DrugDex as Class IIb are "indicated in some, *but not most*, cases." *See* DrugDex Recommendation and Evidence Ratings Reference. Almost all the uses that Celgene contends have "indisputable support" are categorized as Class IIb. That these uses have medical acceptance in "some, but not most, cases" does nothing to undermine the plausibility of Brown's allegation that Celgene promoted Thalomid and Revlimid for non-reimbursable uses. Given that these uses had only limited support in DrugDex in certain narrow circumstances, Celgene's alleged aggressive, misleading off-label marketing could easily have caused claims for non-reimbursable uses.

E-FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3165-GHK (SSx) | Date | July 10, 2014 |
|---|---|---|---|
| Title | *United States of America, et al., ex rel. Brown v. Celgene Corporation* | | |

Moreover, consistent with the Medicare statute as of January 1, 2009, the Manual explains that off-label uses are only covered when they are both supported by one or more compendia *and* "**not** listed as unsupported, not indicated, not recommended, or equivalent terms" in any of the other compendia. (Def's RJN Ex. 19, § 50.4.5). In other words, for any claims submitted after January 1, 2009, the DrugDex compendium alone cannot be used to determine whether any particular use was reimbursable. Before we could conclude that the DrugDex excerpts undermine Brown's allegations, we would also have to survey the relevant entries in the other compendia to ensure that they were either supportive or neutral. In sum, while the DrugDex entries might allow us to determine that certain narrow uses prior to January 1, 2009 had medical support, this fact says nothing about whether the off-label uses promoted by Celgene caused false claims to be submitted to the government. The DrugDex entries proffered by Celgene are therefore insufficient to resolve Brown's claims at this early stage.

At bottom, Celgene's argument on this point seems to conflate pleading requirements with Brown's ultimate burden to prove her claims. *See U.S. ex rel. Fox Rx, Inc. v. Omnicare, Inc.*, 2013 WL 2303768, at *6 (N.D. Ga. May 17, 2013). Our job at this stage is not to test the sufficiency of the evidence underlying Brown's allegations or to resolve factual disputes about the meaning of that evidence. *See id.* So long as Brown alleges facts plausibly suggesting that the uses at issue were not "medically accepted," we must accept her allegations as true. Brown's allegations meet this plausibility threshold here. The TAC alleges, *inter alia*: (i) that the FDA has only approved Thalomid and Revlimid for limited purposes (¶¶ 79-81, 84-85); (ii) that there are many serious safety risks attendant with Thalomid and Revlimid use (¶¶ 89-104, 153); (iii) that Celgene purposely concealed these risks (¶¶ 116-128) and used misleading, unreliable studies to suggest that off-label uses had medical support (¶¶ 154-176, 192-199); and (iv) that Celgene even tried to improperly influence the compendia by bribing physicians who worked on them (¶¶ 65, 249). These allegations are sufficient to give rise to a plausible inference that Celgene promoted off-label uses that were not supported by the compendia.[6] *See Starr v.*

---

[6] In support of its argument that Brown has failed to adequately allege that the off-label uses were not medically accepted, Celgene relies heavily on *U.S. ex rel. Simpson v. Bayer Corp.*, 2014 U.S. Dist. LEXIS 51342 (D.N.J. Apr. 11, 2014). In *Simpson*, although the court decided that it "need not determine which off-label uses of [the drug] the 2000 DrugDex actually supports," it nevertheless concluded that the relator's complaint did "not plausibly allege that the off-label uses of [the drug] that [defendant] promoted lacked medical acceptance." 2014 U.S. Dist. LEXIS 51342, at *33. The court instructed the relator to "point to specific statements in the 2000 DrugDex entry to demonstrate that it does not support each individual off-label use." *Id.*, at *35. Without more specific allegations regarding the compendium entry, the court said it could not "reasonably infer which uses [were] not 'reasonable and necessary' under Medicare." *Id.* We decline to follow *Simpson*. *Simpson* essentially requires relators in Brown's position to "prove a negative." This approach would necessitate a complaint of several hundred pages in this case—this cannot be what is required. We cannot reasonably expect Brown to describe the relevant entries in each of the four statutorily recognized compendia for all 28 off-label uses. *See, e.g., U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) ("To require these details at pleading is one small step shy of requiring production of actual documentation with the complaint . . . and [is] significantly more than any federal pleading rule contemplates."). At

E-FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3165-GHK (SSx) | Date | July 10, 2014 |
|---|---|---|---|
| Title | *United States of America, et al., ex rel. Brown v. Celgene Corporation* | | |

*Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011) ("The standard at this stage of the litigation is not that plaintiff's explanation must be true or even probable. The factual allegations of the complaint need only 'plausibly suggest an entitlement to relief.'" (internal citation omitted)). Based on the foregoing, Brown's first theory of claim falsity—premised on claims for non-reimbursable off-label uses—has been sufficiently alleged.

### b.    Claims Resulting from Kickbacks Are "False"

Brown's second theory of claim falsity is premised on violations of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b).[7] The AKS prohibits any person from offering any kind of remuneration to induce the purchase, order, or recommendation "of any item or service for which payment may be made in whole or in part under a Federal health care program." *Id.* Here, Brown alleges that Celgene violated the AKS by using financial incentives to induce physicians to promote and prescribe Thalomid and Revlimid for off-label uses. (TAC ¶¶ 235-249). Celgene argues that Brown's claims premised on AKS violations fail as a matter of law because AKS compliance was not a condition of payment prior to May 23, 2010. We reject this argument.

All claims that result from unlawful kickbacks are false for purposes of the FCA. On May 23, 2010, Congress amended the AKS to make this abundantly clear. *See* 42 U.S.C. § 1320a-7b(g) ("[A] claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]."). Celgene takes this amendment to mean that prior to May 23, 2010, AKS compliance was not a condition of payment. Celgene is wrong. The amendment merely clarified existing law; it did not change it. *See U.S. ex rel. Westmoreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 52 (D. Mass. 2011) ("The amendment's legislative history . . . evinces Congress' intent to clarify, not alter, existing law that claims for payment made pursuant to illegal kickbacks are false under the False Claims Act."). Prior to this clarifying amendment, courts consistently held that non-compliance with the AKS rendered a claim non-payable and that a FCA claim

---

this stage, general allegations regarding the lack of compendia support suffice (so long as such allegations are plausible in light of the full context of the complaint). Moreover, for some of the uses allegedly promoted by Celgene, such as for colorectal cancer, Brown alleges that "there is no evidence" Thalomid provides any benefit "at any stage of disease, either alone or with other agents." (TAC ¶ 164; *see also, e.g.*, ¶ 195). For these uses that allegedly have a complete and categorical lack of support, it is hard to see how Brown could provide additional details to make her allegations meet Celgene's high standard of plausibility.

[7] Brown's TAC also asserts violations of the Stark Law, 42 U.S.C. § 1395nn, which prohibits a physician from making a referral to an entity that furnishes designated health services for payment if the physician has a financial relationship with that entity. In her Opposition, however, Brown does not respond to Celgene's argument that her Stark Law theory fails as a matter of law because Celgene does not furnish "designated health services" within the meaning of the statute. Accordingly, Brown's FCA claims are **DISMISSED** to the extent they are premised on violations of the Stark Law.

E-FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3165-GHK (SSx) | Date | July 10, 2014 |
|---|---|---|---|
| Title | *United States of America, et al., ex rel. Brown v. Celgene Corporation* | | |

could therefore be premised on an AKS violation. *See, e.g., U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 313-14 (3d Cir. 2011); *U.S. ex rel. McNutt v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005); *United States v. Rogan*, 459 F. Supp. 2d 692, 714 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008); *U.S. ex rel. Ortega v. Columbia Healthcare, Inc.*, 240 F. Supp. 2d 8, 13 n.5 (D.D.C. 2003).

And, as the Government notes in its Statement of Interest, the conclusion of these courts is consistent with sound policy and the "premise underlying the payment scheme in federal health insurance programs." (U.S. Stmt. of Interest 10, 12); *see also Westmoreland*, 812 F. Supp. 2d at 53 ("[T]he conclusion that compliance is precondition of payment is rendered inescapable when the purpose of the Anti-Kickback Statute is considered within the context of the Medicare statute."). Given that these programs only pay for "reasonable and necessary" items and services, 42 U.S.C. § 1395y(a)(1), they clearly would not pay for claims tainted by kickbacks. The integrity of such claims would be undermined by the possibility that the drugs were prescribed to benefit the provider financially, not because they were "reasonable and necessary" for treatment. (*See* U.S. Stmt. of Interest 10 (explaining the "clear" "rationale for non-payment of kickback-tainted claims"); *see also Wilkins*, 659 F.3d at 314 ("[T]he Government does not get what it bargained for when a [claimant] is paid by CMS for services tainted by a kickback.").

Accordingly, certification of compliance with the AKS may be properly inferred from providers' submission of Medicare/Medicaid claims. Because the government would not knowingly reimburse kickback-tainted claims, any claims resulting from Celgene's alleged kickbacks constitute false claims.

**2.    Causation**

Celgene next attacks the sufficiency of the causation element of Brown's FCA claim. It contends that Brown has not plausibly alleged that it caused the submission of false claims. Courts borrow general tort law principles to analyze the FCA's causation element. *See U.S. ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 244 (3d Cir. 2004). Under these principles, Celgene may be liable for false claims submitted by others if its conduct was a substantial factor in bringing about the false claims and such claims were a foreseeable and natural consequence of its conduct. *See id.*; *U.S. ex rel. Humane Soc. of U.S. v. Hallmark Meat Packing Co.*, 2013 WL 4713557, at *11 (C.D. Cal. Apr. 30, 2013).

Here, there is a plausible causal connection between Celgene's conduct and the submission of false claims. The causal chain is straightforward: (1) Celgene allegedly fraudulently promoted Thalomid and Revlimid for non-reimbursable, off-label uses to physicians, (2) this off-label marketing caused physicians to write off-label prescriptions, and (3) many of these non-reimbursable prescriptions were submitted to government payors for reimbursement. Brown's allegations sufficiently raise an inference of both proximate and but for causation. As the Government explains in its Statement of Interest, "a defendant drug manufacturer could reasonably foresee that a comprehensive marketing scheme involving [a] large number of salespeople furnishing large numbers of physicians with

E-FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3165-GHK (SSx) | Date | July 10, 2014 |
|---|---|---|---|
| Title | *United States of America, et al., ex rel. Brown v. Celgene Corporation* | | |

information about off-label use of a drug in a manner which is not a medically accepted indication could cause providers to prescribe the drug for those off-label indications." (U.S. Stmt. of Interest 14). Indeed, such prescriptions were not only foreseeable, they were an intended consequence of Celgene's alleged fraudulent scheme. (*See, e.g.*, TAC ¶ 19). We can likewise reasonably infer that Celgene's alleged misleading marketing was a substantial factor in at least some physicians' decisions to prescribe Thalomid and Revlimid for non-reimbursable uses. Finally, given that "a large percentage of Revlimid and Thalomid prescriptions are paid for by Medicare," Celgene could likewise reasonably foresee that these off-label prescriptions would result in false claims for reimbursement. (TAC ¶ 252).

Celgene argues that we should instead presume that physicians based their prescription decisions on their own independent medical judgment and the needs of their patients, not any conduct by Celgene.[8] We disagree. That physicians exercised their independent judgment does not defeat the causal connection here—Brown specifically alleges Celgene manipulated physicians' judgment with misleading articles and studies such that they could not make "objective and informed decisions." (*See, e.g.*, TAC ¶ 176); *see also, e.g.*, *U.S. ex rel. Nathan v. Takeda Pharms. North Am., Inc.*, 2011 WL 3911095, at *5 (E.D. Va. Sept. 6, 2011), *aff'd*, 707 F.3d 451 (4th Cir. 2013) (noting that causation will be sufficiently pled, notwithstanding independent judgment of physicians, where there are allegations "that the judgment of [the] physician was altered or affected by the defendant's fraudulent activities"). While we certainly cannot infer that *no* Thalomid and Revlimid prescriptions for off-label uses would have been written absent Celgene's alleged misconduct, this does not mean that Brown has not plausibly alleged that at least *some* doctors were substantially influenced by Celgene's marketing. To suggest that Celgene's alleged expansive, multi-faceted efforts to create an off-label market for Thalomid and Revlimid did not cause physicians to prescribe Thalomid or Revlimid for non-reimbursable uses strains credulity. It is implausible that a fraudulent scheme on the scope of that alleged by Brown would be entirely feckless. Accordingly, "[r]ather than showing a lack of proximate causation, [Celgene's] argument presents a question . . . regarding the total number of prescriptions that were attributable to [Celgene's] actions." *See In re Neurontin Mktg. & Sales Prac. Litig.*, 712 F.3d 21, 39 (1st Cir. 2013). Such an argument about the potential scope of Celgene's liability is premature at this stage. *See Strom*, 676 F. Supp. 2d at 894 ("While there may . . . be factual disputes as to which claims, if any, were the result of Defendants' fraudulent activity, it is not Plaintiff's burden to prove such causation at the pleading stage."). Thus, Brown has sufficiently alleged that Celgene caused the submission of false

---

[8] Celgene makes a lot out of the fact that the TAC includes anecdotes of some physicians rebuffing Celgene's advances. Because of these anecdotes, Celgene suggests that "the only inference that can be drawn from the Complaint[]. . . is that physicians did *not* prescribe Thalomid or Revlimid for off-label uses because of Celgene's alleged promotion." (Resp. to U.S. Stmt. of Interest 5-6). This is a fatuous argument. Brown explicitly alleges that in her experience these doctors who were not convinced by Celgene's fraudulent practices "were the exception." (TAC ¶ 159). That the TAC includes the details of these "exceptional" interactions to highlight the wrongfulness of Celgene's alleged practices does not mean that we should infer that Celgene's marketing efforts were wholly unsuccessful—particularly given that Brown alleges otherwise.

E-FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3165-GHK (SSx) | Date | July 10, 2014 |
|---|---|---|---|
| Title | *United States of America, et al., ex rel. Brown v. Celgene Corporation* | | |

claims.[9]

### 3. The TAC Satisfies Rule 9(b)

Finally, Celgene argues that the TAC should be dismissed in its entirety for failing to satisfy Rule 9(b)'s heightened pleading requirements. Because the FCA sounds in fraud, Brown's TAC must be pled with particularity. *See Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001). "Rule 9(b) requires a party to state with particularity the circumstances constituting fraud or mistake, including the who, what, when, where, and how of the misconduct charged." *Ebeid*, 616 F.3d at 998. In an FCA case, the "use of representative examples is simply one means of meeting the pleading obligation." *Id.* The relator is not required to "identify representative examples of false claims." *Id.* Particularly where, as here, the defendant is alleged to have induced third parties to submit false claims, the relator cannot reasonably be expected to allege details about the individual claims that were submitted. *See, e.g.*, *U.S. ex rel. Duxbury v. Ortho Biotech Products, L.P.*, 579 F.3d 13, 29 (1st Cir. 2009). Instead, it is sufficient to allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* (adopting Fifth Circuit's standard set forth in *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009)). In short, to comply with Rule 9(b), Brown's allegations of fraud must be "specific enough to give [the defendant] notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee*, 236 F.3d at 1019 (internal citation and quotation marks omitted). Brown's TAC meets this standard.

Celgene cannot reasonably suggest that the 100-plus pages in the TAC do not give adequate notice of the misconduct alleged—as a direct participant in Celgene's off-label promotion, Brown "sets out the particular workings of a scheme that was communicated directly to [her] by those perpetrating the fraud." *Grubbs*, 565 F.3d at 191; *see also U.S. v. Kaplan, Inc.*, 517 F. App'x 534, 536 (9th Cir. 2013). In addition to detailed, particularized factual allegations regarding Celgene's fraudulent marketing scheme, Brown also "suppl[ies] reasonable indicia that false claims were actually submitted." *Ebeid*, 616 F.3d at 999. She notes, for example, that by Celgene's own estimates "Medicare and Medicaid paid for the majority of Thalomid and Revlimid prescriptions." (TAC ¶¶ 27, 252). Taken together with her allegations that industry analysts estimate that "almost all" of Celgene's sales are for off-label uses and that she never was trained to market the drugs on-label (*id.* ¶¶ 7, 131), it is easy to infer that claims for non-reimbursable, off-label uses were submitted to Medicare and Medicaid. Brown also alleges that Celgene's fraudulent marketing scheme specifically targeted government payors because of the drugs' high cost. (*See, e.g., id.* ¶¶ 94, 218-221, 250-256). For example, Celgene sales representatives urged physicians to enroll their patients in Medicare. (*Id.* ¶ 219). In addition, "[u]nder

---

[9] Celgene also insists that Brown's allegations are insufficient to satisfy the causation element because she has not identified any specific examples of a physician prescribing Thalomid or Revlimid as a result of Celgene's off-label promotion or kickbacks. Because this boils down to a particularity argument, we address it in the section that follows.

E-FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3165-GHK (SSx) | Date | July 10, 2014 |
|---|---|---|---|
| Title | *United States of America, et al., ex rel. Brown v. Celgene Corporation* | | |

the guise of giving away free drugs," Celgene allegedly marketed Thalomid and Revlimid for unapproved uses to cancer patients "just prior" to their enrollment in government health care plans. (*Id.* ¶¶ 208, 211). As a direct result of this scheme, Brown alleges that false claims were submitted to Medicare. (*Id.* ¶ 210).

Accordingly, although she does not provide the details of any representative false claim caused by Celgene's alleged misconduct, Brown's TAC contains sufficient "indicia that false claims were actually submitted." *Ebeid*, 616 F.3d at 999; *see also Duxbury*, 579 F.3d at 29-30; *Abbot*, 2014 WL 348583, at *12. In fact, "[i]t would stretch the imagination to infer the inverse." *See Grubbs*, 565 F.3d at 192. To conclude that Brown's allegations do not reasonably suggest that false claims were actually submitted would require far more strained leaps of logic. We would have to believe that: (i) while Celgene went to the trouble of systematically implementing a multi-pronged fraudulent scheme to create an off-label market for Thalomid and Revlimid, (ii) these alleged fraudulent practices did not sway physicians to write prescriptions for off-label uses; but (iii) Celgene nevertheless maintained its ineffectual fraudulent scheme for years and years. *See id.*

Based on the foregoing, Celgene's Motion is **DENIED** insofar as it seeks to dismiss Brown's federal FCA claim. Brown has plausibly—and with particularity—stated a claim for relief under the federal FCA.

**C.     State Law Claims**

Celgene argues that all of Brown's non-California state law claims should be dismissed because Brown "fails to allege any connection to or knowledge of activities in those other states." (Mot. 19). This argument is not well taken. Brown's TAC makes allegations about Celgene's nationwide, systemic practices, not California-specific allegations. There is no reason to conclude that Celgene's alleged misconduct was limited to California.

Celgene also suggests that all of Brown's state law claims should be dismissed because she did not adequately follow these states' pre-filing requirements. Specifically, Celgene contends that Brown did not properly disclose her allegations to the state governments and prematurely unsealed her complaint before the states declined to intervene. As an initial matter, there is no reason to conclude that Brown did not adequately comply with both of these pre-filing requirements. (*See* TAC ¶ 19 (noting that Brown "disclosed her findings to . . . the states prior to filing this action); Dkt. No. 59 (notification of the states' declination prior to unsealing)). In any event, these pre-filing requirements are "solely for the benefit of the government," *U.S. ex rel. Maxfield v. Wasatch Constructors*, 2005 U.S. Dist. LEXIS 10162, at *2 (D. Utah May 27, 2005), and here the State Plaintiffs have indicated that Brown substantially complied with their pre-filing requirements and should not be procedurally barred from continuing this litigation. (*See* States' Jt. Stmt. of Interest 8).

E-FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3165-GHK (SSx) | Date | July 10, 2014 |
|---|---|---|---|
| Title | *United States of America, et al., ex rel. Brown v. Celgene Corporation* | | |

Finally, Celgene contends that several of Brown's state law claims fail as a matter of law for various independent reasons. We now address each of these arguments in turn.

### 1. Minnesota Claim (Count 17) and Colorado Claim (Count 5)

Celgene argues that Brown's Minnesota and Colorado claims are procedurally barred by these states' first-to-file provisions. Celgene is correct. These states' first-to-file provisions are modeled on the materially identical first-to-file bar in the federal FCA. They provide that "[w]hen a person brings a [*qui tam*] action, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5); *see also* Minn. Stat. § 15C.05(b); Colo. Rev. Stat. Ann. § 25.5-4-306(2)(3). This jurisdictional bar is "exception-free." *United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1183 (9th Cir. 2001). It "bars later-filed actions alleging the same material elements of fraud described in an earlier suit, regardless of whether the allegations incorporate somewhat different details." *Id.* at 1189. The first-to-file bar serves two purposes: "to promote incentives for whistle-blowing insiders and to prevent opportunistic successive plaintiffs." *Id.* at 1187. In sum, the first-to-file bar discourages piggyback claims that would provide no additional benefit to the government, "since once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds." *Id.* at 1189 (quoting *United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 234 (3d Cir. 1998)).

Here, Brown's Minnesota and Colorado claims were not added to Brown's complaint until May 3, 2013, several months after David Schmidt had already brought materially indistinguishable claims under these statutes in the Eastern District of Texas. *See* Fifth Am. Compl., *U.S. ex rel. Schmidt v. Celgene Corp.*, No. 4:11-cv-00094-RAS-DDB (E.D. Tex. Feb. 8, 2013). That Schmidt's action was later dismissed is immaterial. *See Lujan*, 243 F.3d at 1188 ("To hold that a later dismissed action was not a then-pending action would be contrary to the plain language of the statute and the legislative intent."). Thus, Brown's Minnesota and Colorado claims are **DISMISSED** as procedurally barred.

### 2. California Insurance Frauds Prevention Act Claim (Count 4)

Celgene moves to dismiss Brown's claim under California's Insurance Frauds Prevention Act ("IFPA") on the grounds that it is time-barred in its entirety. We agree. The IFPA requires that civil actions be brought within "three years after the discovery of the facts constituting the grounds for commencing the action." Cal. Ins. Code § 1871.7. Here, Brown did not seek leave to add her IFPA claim to her complaint until October 1, 2013. Given that her IFPA claim has the exact same factual predicates as her other claims (*see* TAC ¶ 278), we can assume that she had discovered the relevant facts for her IFPA claim at the very latest by April 27, 2010, when she filed her original Complaint. Her November 6, 2013 IFPA claim was therefore at least five months too late. Moreover, Brown's Opposition fails to address Celgene's SOL argument with respect to her IFPA claim. Accordingly, Brown's IFPA claim is **DISMISSED** as untimely.

E-FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3165-GHK (SSx) | Date | July 10, 2014 |
|---|---|---|---|
| Title | *United States of America, et al., ex rel. Brown v. Celgene Corporation* | | |

### 3.      New Mexico Claim (Count 22)

Celgene argues that Brown's New Mexico claim fails because she lacks statutory standing to assert it.  New Mexico's Medicaid False Claims Act provides that a "private civil action may be brought by an affected person . . . on behalf of the person bringing suit and for the state."  N.M. Stat. § 27-14-7(B).  In a summary fashion, Celgene contends that Brown cannot fairly be construed as an "affected person" simply because she is a California resident and has no connection to the state of New Mexico.  However, Celgene provides no basis for us to adopt this limited reading of "affected person."  When Delaware's FCA contained similar "affected person" language, that statute defined "affected person" as an "employee or former employee" of the defendant.  *See* Del. Code Ann. Tit. 6 § 1202(1) (2000).  Brown would clearly qualify as an "affected person" under this definition.  Given that Celgene's cursory, two-sentence argument offers no reason why we should adopt a more limiting reading of New Mexico's use of "affected person," we **DENY** its motion to dismiss Brown's New Mexico claim.

### 4.      Washington Claim (Count 30)

Finally, Celgene moves to dismiss Brown's Washington claim because the TAC cites Rev. Code Wash. § 48.80.010, *et seq.*, the Washington Health Care False Claim Act, which does not permit *qui tam* actions.  As Brown explains in her Opposition, her citation to the Health Care False Claim Act was a mere "scrivener's error," and she intended to cite the Medicaid Fraud False Claims Act, Rev. Code Wash. § 74.66.005.  Because this miscitation appears to be little more than a good-faith clerical mistake, we shall deem Count 30 as asserting a claim under the Medicaid Fraud False Claims Act, Rev. Code Wash. § 74.66.005.  Celgene's motion to dismiss Count 30 is **DENIED** on this ground.

### D.      Celgene's Alternative Request to Narrow Claims

As an alternative to complete dismissal, Celgene requests that we "narrow" Brown's causes of action by dismissing certain classes of claims that it purports cannot give rise to false claim liability as a matter of law.  All of these arguments go to the potential scope of Celgene's liability, not to whether Brown has stated a claim under the federal and state FCA statutes.  We disfavor motions to dismiss that only seek to "narrow," rather than eliminate a claim entirely.  Accordingly, at this early stage we decline to consider Celgene's arguments, which at best would only result in piecemeal relief.  To the extent that Brown seeks to recover for any claims that are time-barred or not false as a matter of law, Celgene can raise these arguments at summary judgment.  Moreover, our decision here does not prevent Celgene from making arguments about the appropriate scope of discovery before the magistrate judge.

### III.     Motion to Strike

Under Federal Rule of Civil Procedure 12(f), a "court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  Although generally disfavored, a motion to strike is well-taken when "it is clear that the matter to be stricken could have no possible bearing on the

E-FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-3165-GHK (SSx) | Date | July 10, 2014 |
|---|---|---|---|
| Title | *United States of America, et al., ex rel. Brown v. Celgene Corporation* | | |

subject matter of the litigation." *LeDuc v. Kentucky Central Life Ins. Co.*, 814 F. Supp. 820, 830 (N.D. Cal. 1992). We have broad discretion to grant or deny a motion to strike. *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010).

Celgene moves to strike Paragraph 88 of the TAC on the grounds that it contains inflammatory and irrelevant allegations. We agree. Although this historical material may be true, it is wholly irrelevant to this case, and Brown would in no way be prejudiced by its removal. Paragraph 88 of the TAC is hereby **STRICKEN**.

**IV.    Conclusion**

As set forth above, Celgene's Motion to Dismiss is **GRANTED in part** and **DENIED in part**. In summary, Celgene's Motion to Dismiss is **DENIED** except insofar as it seeks to dismiss Brown's Minnesota, Colorado, and IFPA claims—these three claims are **DISMISSED**. Finally, Celgene's Motion to Strike Paragraph 88 of the TAC is **GRANTED**. Celgene **SHALL** answer the surviving portions of the TAC **within 14 days hereof**.

**IT IS SO ORDERED.**

|  | -- | : | -- |
|---|---|---|---|
| Initials of Deputy Clerk | | Bea | |

# EXHIBIT B

# (FILED UNDER SEAL)

# EXHIBIT C
# (FILED UNDER SEAL)

# EXHIBIT D
# (FILED UNDER SEAL)

# EXHIBIT E

# (FILED UNDER SEAL)

# EXHIBIT F

Case 2:10-cv-03165-RGK-SS Document 224-1 Filed 09/22/15 Page 23 of 48 Page ID #:5863

Because of the prevalence of α-receptors on the prostatic capsule, prostatic adenoma, and bladder trigone and the relative absence of these receptors on the bladder body, α-adrenergic blocking agents decrease urinary outflow resistance in men.

## Uses

### ■ Benign Prostatic Hyperplasia

Tamsulosin is used to reduce urinary obstruction and relieve associated manifestations in hypertensive or normotensive patients with symptomatic benign prostatic hyperplasia (BPH, benign prostatic hypertrophy). Tamsulosin relieves mild to moderate obstructive manifestations (e.g., hesitancy, terminal dribbling of urine, interrupted or weak stream, impaired size and force of stream, sensation of incomplete bladder emptying or straining) and improves urinary flow rates in a substantial proportion of patients and may be a useful alternative to surgery, particularly in those who are awaiting or are unwilling to undergo surgical correction of the hyperplasia (e.g., via transurethral resection of the prostate [TURP]) or who are not candidates for such surgery. Therapy with $α_1$-adrenergic blocking agents appears to be less effective in relieving irritative (e.g., nocturia, daytime frequency, urgency, dysuria) than obstructive symptomatology, although tamsulosin also has been shown to be effective in relieving irritative symptoms. In addition, therapy with $α_1$-adrenergic blocking agents generally can be expected to produce less subjective and objective improvement than prostatectomy, and periodic monitoring (e.g., performance of digital rectal examinations, serum creatinine determinations, serum prostate specific antigen [PSA] assays) is indicated in these patients to detect and manage other potential complications of or conditions associated with BPH (e.g., obstructive uropathy, prostatic carcinoma).

Results of several controlled studies indicate that tamsulosin is more effective than placebo and limited data suggest that the drug is at least as effective as other $α_1$-adrenergic blocking agents (e.g., doxazosin, prazosin, terazosin) in the management of BPH. While symptomatic improvement has been maintained for up to at least 60 weeks of tamsulosin therapy in some patients, the long-term effects of α-adrenergic blocking agents on the need for surgery and on the frequency of developing BPH-associated complications such as acute urinary obstruction remain to be established. Although tamsulosin appears to be associated with a decreased incidence of adverse cardiovascular effects including hypotension, dizziness, and syncope, patients should be warned of the possibility of tamsulosin-induced postural dizziness and measures to take if it develops (e.g., sitting, lying down). During initiation of tamsulosin therapy, patients should be cautioned to avoid situations where injury could result if syncope occurs. If syncope occurs, the patient should be placed in a recumbent position and treated supportively as necessary.

Allergic-type reactions, including skin rash, pruritus, urticaria, and angioedema of the tongue, lips, and face, have been reported in some patients with positive rechallenge of tamsulosin therapy.

The possibility of carcinoma of the prostate and other conditions associated with manifestations that mimic those of BPH should be excluded in any patient for whom tamsulosin therapy for presumed BPH is being considered.

The manufacturer states that tamsulosin should not be used in the management of hypertension.

For additional information on the use of $α_1$-blockers in the management of BPH, see Uses: Benign Prostatic Hyperplasia, in Prazosin 24:08.

## Dosage and Administration

### ■ Administration

Tamsulosin is administered orally. Because food may decrease peak plasma concentrations of tamsulosin and lengthen the time to achievement of peak plasma concentrations and decrease oral bioavailability of the drug, the manufacturer recommends that tamsulosin be taken 30 minutes after a meal; it is recommended that the drug be taken after the same meal each day. Patients should be advised that the capsules must be swallowed intact and *not* be opened, chewed, or crushed.

### ■ Dosage

The manufacturer states that safety and efficacy of tamsulosin in children younger than 18 years of age have not been established, and clinical experience in these patients is not available.

*Benign Prostatic Hyperplasia*

For the management of benign prostatic hyperplasia (BPH), the usual initial adult dosage of tamsulosin is 0.4 mg once daily. About 2–4 weeks may be needed to adequately assess the response at this dosage. To achieve the desired improvement in symptoms and/or urinary flow rates, subsequent dosage may be increased to 0.8 mg daily as needed. If tamsulosin is discontinued for several days at either dosage (i.e., 0.4 or 0.8 mg daily), therapy with the drug should be reinstituted at the lower daily dosage. Although the elimination half-life may be slightly prolonged and intrinsic clearance of

tamsulosin may be decreased in patients 55 years of age and older, the manufacturer makes no specific recommendations for dosage adjustment in such patients.

The manufacturer states that tamsulosin should not be used concomitantly with other α-adrenergic blocking agents.

### ■ Dosage in Renal and Hepatic Impairment

Although protein binding of tamsulosin may be altered in patients with mild to moderate (i.e., creatinine clearance of 30–70 mL/minute per 1.73 m²) or severe (i.e., creatinine clearance of 10 to less than 30 mL/minute per 1.73 m²) renal impairment and in patients with moderate hepatic impairment resulting in changes of overall plasma concentrations of the drug, alterations in intrinsic clearance and concentrations of unbound tamsulosin do not appear to be substantial. Therefore, the manufacturer states that dosage adjustment in such patients is not necessary. However, tamsulosin has not been studied in patients with end-stage (i.e., creatinine clearance of less than 10 mL/minute per 1.73 m²) renal disease.

**SumMon®** (see Users Guide). For additional information on this drug until a more detailed monograph is developed and published, the manufacturer's labeling should be consulted. It is *essential* that the labeling be consulted for detailed information on the usual cautions, precautions, and contraindications.

## Preparations

**Tamsulosin**

**Oral**

| Capsules | 0.4 mg | | Flomax®, Boehringer Ingelheim |
|---|---|---|---|

*Selected Revisions January 2000, © Copyright, June 1998. American Society of Health-System Pharmacists, Inc.*

# Thalidomide



## Chemistry and Stability

### ■ Chemistry

Thalidomide, a synthetic glutamic acid derivative, is an immunomodulatory agent. The drug is structurally similar to, but pharmacologically different from, glutethimide. Thalidomide contains a phthalimide ring and a glutarimide ring; the glutarimide ring is similar to that contained in glutethimide and may be responsible for the sedative and hypnotic effects of thalidomide. Because the glutarimide ring has a single asymmetric carbon (chiral center), thalidomide may exist as either an optically active levorotatory or dextrorotatory enantiomer. The enantiomers rapidly interconvert in vivo and in vitro; it is unknown whether the enantiomers have distinct pharmacologic properties. Thalidomide is commercially available as a 1:1 racemic mixture of the 2 enantiomers with a net optical rotation of zero.

Thalidomide occurs as a white to off-white, nearly odorless, crystalline powder. The drug has a solubility of 45–60 µg/mL in water at 25°C. Thalidomide enantiomers are 3–5 times more soluble than the racemic drug. While the aqueous solubility of racemic thalidomide has been reported to be 50 µg/mL, the aqueous solubility of the separate enantiomers has been reported to be 250 µg/mL.

### ■ Stability

Commercially available thalidomide capsules should be stored at 15–30°C and protected from light.

In vitro in whole blood, serum, or plasma, thalidomide undergoes chiral inversion and spontaneous hydrolysis. All 4 amide bonds of the drug are susceptible to hydrolytic cleavage at pH exceeding 6. Inversion of the enantiomers occurs at a greater rate in vitro in blood at 37°C than in vivo. The rate of inversion and hydrolysis of thalidomide is pH dependent and increases with pH over the range of 7–7.5.

## Pharmacology

### ■ Mechanism of Action

Thalidomide is an immunomodulatory agent with anti-inflammatory activity. The drug also has anti-angiogenic effects and sedative and hypnotic effects.

The mechanism(s) of action of the immunomodulatory and anti-inflammatory effects of thalidomide are complex and have not been fully determined; these effects appear to result in part from modulation of tumor necrosis factor alpha (TNF-α) levels, costimulatory or adjuvant effect on T-cells resulting in increased T-cell proliferation and increased production of interleukin-2 and interferon-γ, and/or modulation of leukocyte migration and chemotaxis.

The immunomodulatory and anti-inflammatory effects of thalidomide differ from those of other immunosuppressive agents, including corticosteroids, cyclosporin (e.g., cyclosporine) or macrolide (e.g., tacrolimus) immunosuppressants, pentoxifylline, immunosuppressive purine analogs (e.g. azathioprine) and purine metabolism inhibitors (e.g., mycophenolic acid), and also differ from those of nonsteroidal anti-inflammatory agents. Thalidomide does not appear to interfere with important host antimicrobial mechanisms; the drug has no substantial inhibitory effect on lymphocyte proliferation, does not impair delayed-type hypersensitivity reactions, and does not impair granuloma formation.

Thalidomide has no direct antibacterial activity against *Mycobacterium leprae*. In addition, results of an in vitro study using *Enterocytozoon bieneusi*, *Encephalitozoon intestinalis*, and *E. cuniculi* indicate that thalidomide has no direct activity against microsporidia.

### ■ Immunomodulatory Effects

Use of thalidomide in the management of erythema nodosum leprosum (ENL) reactions in leprosy patients and for the treatment of various inflammatory and/or dermatologic disorders is based on the drug's immunomodulatory effects. Thalidomide's immunomodulatory effects may result from modulation of TNF-α levels, costimulatory or adjuvant effect on T-cells resulting in increased T-cell proliferation and increased production of interleukin-2 and interferon-γ, and/or modulation of leukocyte extravascular migration mechanisms. However, in vitro studies and preliminary clinical studies indicate that the immunomodulatory effects of thalidomide vary considerably under different conditions, and some evidence indicates that effects of the drug may be species specific.

The difficulty in characterizing thalidomide's mechanism of action has been attributed in part to numerous in vivo metabolites that result from the combination of optical enantiomerism, hydrolysis, and hydroxylation of the drug. In studies of enantiomerically stable thalidomide analogs (with an α-methyl group attached to the chiral carbon), levorotatory analogs demonstrated more immunomodulatory, sedative, and teratogenic activity, and more inhibition of TNF-α release, than dextrorotatory analogs. Although apparent enantiomer-specific effects of thalidomide have been reported from in vitro and in vivo studies, data from such studies are limited by rapid racemization and the pharmacokinetics of the drug in the system being studied, and should be interpreted with caution. Spontaneous hydrolysis of thalidomide yields products that do not appear to have immunomodulatory activity; the extent of hepatic metabolism of the drug appears to be limited, and some experts state that insufficient evidence exists to support speculation that formation of active metabolites is required for thalidomide's effects.

The immunomodulatory effects of thalidomide may be related to suppression of excessive TNF-α production; however, there also is some evidence that thalidomide is capable of enhancing TNF-α synthesis. The drug selectively inhibits the production of TNF-α by cultured human monocytes (possibly by inhibiting production and/or enhancing the degradation of TNF-α messenger RNA) without influencing either general protein synthesis or the production of other monocyte-derived cytokines (e.g., IL-1, IL-6, GM-CSF). Administration of thalidomide has been reported to decrease circulating TNF-α levels in patients with erythema nodosum leprosum (ENL).

Wasting syndrome and the associated systemic symptoms (e.g., anorexia, fever) also may be mediated by excessive TNF-α production, and there is limited evidence that thalidomide may reduce plasma TNF-α concentrations and ameliorate wasting in patients with HIV infection and/or tuberculosis. However, the role of TNF-α in HIV infection is unclear because evidence of TNF-α production in patients with HIV infection is inconsistent and includes reports of undetected, increased, or unchanged production of the cytokine. Also, serum and plasma TNF-α levels fluctuate because of the cytokine's short half-life, and may not accurately reflect the actual extent of TNF-α production and/or the degree of TNF-α-related toxicities. Such discrepancies in apparent TNF-α levels may result from the different assays used, or from defects in the methods used to determine in vitro and in vivo cytokine production. In addition, cytokines may be produced and act locally in tissue, and it is possible that circulating levels of TNF-α do not reflect tissue activity.

The effect of thalidomide on TNF-α levels, HIV replication, and HIV disease manifestations such as wasting is unclear. In one limited controlled study of patients with wasting syndrome associated with HIV-1 infection (with or without tuberculosis), those receiving thalidomide experienced a substantially greater weight gain than those receiving placebo; however, only the patients with HIV and tuberculosis experienced decreased plasma TNF-α and decreased plasma HIV-1 RNA levels while receiving thalidomide, and these patients experienced a higher mean weight gain than those with HIV infection alone. Data from some studies in patients with HIV infection indicate that thalidomide inhibited TNF-α activation of latent HIV-1 in monocytes and reduced replication of the virus; however, some evidence indicates that thalidomide *increases* plasma TNF-α and soluble TNF-α type II receptor levels in patients with HIV infection, and may increase HIV replication. In a placebo-controlled study in HIV-infected patients, thalidomide therapy (200 mg daily for 4 weeks) apparently had no inhibitory effect on HIV replication and no effect on plasma TNF-α levels, but did increase plasma levels of soluble IL-2 receptor, soluble CD8 antigen, and IL-12. In addition, in vitro studies using purified T-cells from these patients indicated that exposure to thalidomide resulted in a costimulatory effect resulting in increased production of IL-2 and interferon-γ.

There is evidence that thalidomide induces down-modulation of selected cell surface adhesion molecules involved in leukocyte migration, and the drug's immunomodulatory mechanism of action may result in part from modulation of cellular interactions involving direct physical contact (i.e., adhesion and detachment) of leukocytes with endothelial cells. Limited data indicate that thalidomide may modulate TNF-α induction of endothelial cell adhesion molecules; this effect may interfere with leukocyte adhesion to endothelium, and prevent the initiation of leukocytic extravasation into inflammatory foci. Also, once adhesion of leukocytes to vascular endothelium occurs, thalidomide may interfere with their detachment, and impede transmigration of leukocytes into extravascular tissue. Although thalidomide may up- or down-modulate different adhesion receptors, and its effects on various types of leukocytes is variable, treatment with thalidomide induces a prompt reduction in the number of neutrophils and CD4+ T-cells in the lesions of patients with ENL. Leukocyte infiltration and cytokine (especially TNF-α) responses are present in focal inflammatory lesions characterized by post-capillary vasculitis (e.g., ENL lesions and mucocutaneous aphthae), and these immunopathologic conditions are those most clearly responsive to thalidomide. Such antivasculitic effects also may be enhanced by thalidomide's modulation of TNF-α synthesis or release. However, the exact mechanism of action for the drug's clinical immunomodulatory activity is unclear, and further study is required to elucidate the drug's mechanism of action.

### ■ Effects on Angiogenesis

Thalidomide inhibits angiogenesis, and it has been suggested that the teratogenic effects of thalidomide on fetal limbs may be related to inhibition of blood vessel growth in the developing fetal limb bud. Thalidomide's anti-angiogenic effects have been demonstrated in several animal angiogenesis models; however, there is evidence that the drug's anti-angiogenic effects may be species specific and possibly may be related to a species-specific metabolite and/or metabolic activation. Thalidomide reduced the area of vascularization in a rabbit corneal model of induced neovascularization. The drug also inhibited angiogenesis in a rat aorta model and in human aortic endothelial cells when human or rabbit microsomes were present, but not when rat microsomes were present.

The mechanism of thalidomide's anti-angiogenic effects is unknown. It has been suggested that inhibition of cytokine synthesis (especially that of TNF-α) may contribute to thalidomide's anti-angiogenic effect; however, there is some evidence from animal models that thalidomide's effect on angiogenesis is independent of the drug's effect on TNF-α and possibly may result from a direct inhibitory effect on some component of angiogenesis.

### ■ Sedative and Hypnotic Effects

Thalidomide has CNS depressant effects and causes sedation. The drug has a prompt sedative effect, and does not cause a hangover. The glutarimide ring contained in thalidomide appears to be responsible for the sedative and hypnotic effects of the drug; the ring is structurally similar to ring moieties contained in some other sedative and hypnotic drugs (e.g., glutethimide). Thalidomide may activate a sleep center in the forebrain, a mechanism of action unlike that of barbiturates. Thalidomide has little acute CNS toxicity, and does not cause incoordination or respiratory depression even at large doses. (See Acute Toxicity.) While thalidomide initially was investigated for use as a sedative and hypnotic in the late 1950s, the drug is no longer promoted for use as a sedative and hypnotic because of its teratogenic risk. (See Uses: Overview.)

## Pharmacokinetics

The pharmacokinetics of thalidomide have been studied in healthy adults; adults with leprosy, adults with human immunodeficiency virus (HIV) infection, and geriatric men with prostate cancer. While there is some evidence that bioavailability of oral thalidomide (i.e., peak plasma concentrations, area under the plasma concentration-time curve [AUC]) may be greater in leprosy patients than in healthy individuals, results of a single-dose study indicate that the pharmacokinetics of thalidomide in HIV-infected individuals are similar to

those in healthy individuals. Age-related changes in the pharmacokinetics of thalidomide have not been observed in healthy individuals, leprosy patients 20–69 years of age, or prostate cancer patients 55–80 years of age. The pharmacokinetics of thalidomide have not been studied to date in individuals younger than 18 years of age. While limited data indicate that the pharmacokinetics of thalidomide are similar in males and females, specific comparative studies have not been performed to determine whether there are any gender- or race-related differences in the pharmacokinetics of the drug. The pharmacokinetics of thalidomide in patients with renal or hepatic impairment have not been determined.

Based on studies in healthy adults and HIV-infected patients, the pharmacokinetics of thalidomide can best be described by a single-compartment model with first-order absorption and elimination. Results of studies in healthy adults indicate that accumulation of thalidomide does not occur, and pharmacokinetic parameters are similar following single or multiple doses of the drug.

### ▪ Absorption

The absolute bioavailability of thalidomide administered as the commercially available racemic mixture of the drug has not been determined to date, in part because racemic thalidomide has poor aqueous solubility. The limited aqueous solubility of racemic thalidomide does not appear to be due to a lipophilic structure, since the drug has a relative distribution between lipid and aqueous phases of about 2:1. However, the 4 carboxyl groups of the racemic form of the drug appear to interact through hydrogen bonding to result in relative aqueous insolubility. In contrast, the pure levorotatory or dextrorotatory enantiomers of thalidomide are 3–5 times more soluble than the racemic drug and are more readily absorbed.

Following oral administration of racemic thalidomide, the drug is slowly absorbed from the GI tract, and some interindividual variation in absorption has been reported. When thalidomide is administered in increasing doses in healthy individuals, the extent of absorption (as measured by the AUC) increases proportionally with increasing dose; however, peak plasma concentrations of the drug increase in a less than proportional manner and the time to peak plasma concentrations is delayed, indicating that thalidomide's poor aqueous solubility affects the rate of oral absorption.

Mean peak plasma concentrations of thalidomide generally are attained 2.5–6 hours after an oral dose. In a study in healthy men 21–43 years of age who received a single 200-mg dose of thalidomide given as tablets (not commercially available in the US), mean peak plasma concentrations of 1.15 µg/mL were attained at a mean of 4.4 hours. In healthy women 21–45 years of age who received a single 200-mg dose of thalidomide given as 50- or 100-mg capsules (100-mg capsules not commercially available in the US), mean peak plasma concentrations of 2.3–3.2 µg/mL were attained within about 6 hours. In healthy adults who received a single 50-, 200-, or 400-mg oral dose of thalidomide as 50-mg capsules, mean peak plasma concentrations of 0.62, 1.76, or 2.82 µg/mL, respectively, were attained at 2.9, 3.5, or 4.3 hours, respectively, after the dose.

In adults with leprosy who received a single 400-mg oral dose of thalidomide as 50-mg capsules, peak plasma concentrations of 3.44 µg/mL were attained 5.7 hours after the dose.

In adults with HIV infection (without active opportunistic infections or concomitant disease that potentially could alter drug absorption) who received a single 100- or 300-mg dose of thalidomide as capsules, mean peak plasma concentrations of the drug were 1.2 or 3.5 µg/mL, respectively, and were attained at a mean of 3.4 hours after either dose. In another study in asymptomatic HIV-infected adults who received single 100- or 200-mg doses of the drug, peak plasma concentrations averaged 1.2 or 1.9 µg/mL, respectively, and were attained at 2.5 or 3.3 hours, respectively.

In men 55–80 years of age with prostate cancer who received a single 200- or 800-mg oral dose of thalidomide as 50-mg capsules, median peak plasma concentrations were 1.97 or 4.42 µg/mL, respectively, and were attained at a median of 3.32 or 4.42 hours, respectively, after the dose. When these patients received multiple doses of thalidomide, mean peak plasma concentrations at steady state were 1.8 µg/mL in those receiving 200 mg once daily and 7.57 µg/mL in those receiving 800 mg daily.

Food may delay but does not appear to substantially affect the extent of absorption of thalidomide. Administration of thalidomide with a high-fat meal increased the time to peak plasma concentration to approximately 6 hours, but resulted in less than a 10% change in either the AUC or peak plasma concentration of the drug.

### ▪ Distribution

Information on distribution of thalidomide in humans is not available. Although pharmacologic and adverse effects of thalidomide appear to be organ specific, such effects do not correspond well with pharmacokinetic distribution data obtained in animals. While results of some animal studies indicate that high concentrations of thalidomide are found in the GI tract, liver, and kidneys, and lower concentrations are found in muscle, brain, and adipose tissue, other distribution studies in animals have failed to detect substantial accumulation of the drug in any particular organ. When radiolabeled thalidomide was administered to animals in one study, there was an even distribution of radioac-

tivity, except for slight enhancement of radioactivity in kidneys, liver, biliary tissue, white (but not grey) matter of the CNS, and peripheral nerve trunks. In rabbits, thalidomide concentrations in CSF are about 50% of concurrent plasma concentrations of the drug. It is not known if thalidomide is present in sperm or seminal fluid.

Thalidomide crosses the placenta in humans and in animals. Malformations of human fetuses exposed to thalidomide during the first trimester of pregnancy exhibit striking organ specificity. Fetal skeletal deformities involving the loss of part or all of one or more bones are most common, but fetal deformities may occur in almost any organ of the body and defects of internal organs accompany some skeletal deformities (e.g., amelia, phocomelia). Seemingly isolated neurodevelopmental regions (e.g., the eyes, ears, and possibly some brain stem neurons innervating facial muscles) are affected in cases of thalidomide embryopathy, but other neurodevelopmental defects rarely occur, and the skin and the lymphatic organs are notably not affected by fetal exposure to thalidomide. (See Teratogenic Effects under Pregnancy, Fertility, and Lactation: Pregnancy, in Cautions.)

The apparent volume of distribution of thalidomide has been reported to be 69.9–82.7 L in HIV-infected adults.

The manufacturer states that the extent of plasma protein binding of thalidomide is unknown. Results of an in vitro study indicate that the levorotatory or dextrorotatory enantiomers of thalidomide are 55 or 66%, respectively, bound to plasma proteins.

### ▪ Elimination

The mean elimination half-life of thalidomide following a single 200-mg oral dose ranges from 3–6.7 hours, and the elimination half-life appears to be similar following multiple doses of the drug. In a study in healthy adults who received a single 50-, 200-, or 400-mg oral dose of the drug, the mean elimination half-life of thalidomide was 5.5, 5.5, or 7.3 hours, respectively. The mean elimination half-life of thalidomide was 6.9 hours in adults with leprosy who received a single 400-mg oral dose and 4.6–6.5 hours in HIV-infected adults who received a single 100- to 300-mg dose.

While the exact metabolic fate of thalidomide in humans is not known, numerous metabolites may be formed as a result of optical enantiomerism and hydrolysis and hydroxylation of the drug. Commercially available thalidomide is a 1:1 racemic mixture of the dextrorotatory and levorotatory enantiomers of the drug, and chiral inversion and spontaneous hydrolysis of the enantiomers occurs in vivo or in vitro. The half-life for racemization of an enantiomer in whole blood is about 2.25 hours. In vivo, chiral inversion appears to occur principally in the circulation and in albumin-rich extravascular sites. Chiral inversion and hydrolysis of thalidomide apparently occur by several different mechanisms.

Thalidomide does not induce or inhibit its own metabolism; when the drug was administered to healthy women at a dosage of 200 mg once daily for 18 days, similar pharmacokinetics were observed on the first and last day of dosage. Hepatic metabolism of thalidomide is limited, and only the parent compound appears to be metabolized by cytochrome P-450 (CYP) isoenzymes.

The principal metabolic pathway of thalidomide appears to be nonenzymatic spontaneous hydrolysis. All 4 amide bonds in thalidomide are susceptible to hydrolytic cleavage and, under physiologic conditions, ring opening occurs first in the phthalimide moiety. Spontaneous hydrolysis to form more than 10 metabolites occurs rapidly in vitro, with a mean half-life (dependent on incubation temperature and pH) of 2–5 hours for both optical isomers. There is evidence that thalidomide metabolites formed by spontaneous hydrolysis in vitro have no immunomodulatory activity; however, further study is required to characterize the pharmacologic activity, if any, of metabolites formed in vivo.

Hydroxylation can occur at 4 sites in thalidomide (i.e., 2 sites in each of the phthalimide and glutarimide moieties). Metabolism and some pharmacologic effects of thalidomide may be species specific. Hydroxylated metabolites have been identified in species sensitive to the teratogenic effects of thalidomide (e.g., rabbit), and there is evidence that rat (a species *not* sensitive to teratogenic effects of the drug) microsomes are not able to produce a metabolite that is toxic to lymphocytes in other species. Intermediary forms (i.e., arene oxides or epoxides) proposed to be responsible for the teratogenic effects of the drug have not been demonstrated, hydroxylated metabolites resulting from epoxide activation have not been confirmed in human samples, and in vitro human microsomal preparations do not appear to catalyze the formation of hydroxylated metabolites.

The exact route of elimination of thalidomide in humans is unknown. Thalidomide is not appreciably excreted via the kidneys in humans. Although total body clearance of the drug is about 170–207 mL/minute, unmetabolized thalidomide has a renal clearance of 1.15–1.38 mL/minute and less than 0.7% of the drug is excreted in urine as unchanged drug. Thalidomide is thought to be hydrolyzed to numerous metabolites; however, in individuals who received a single oral dose of the drug, only 0.02% of the dose was eliminated in urine as 4-hydroxy thalidomide 12–24 hours after administration. At 48 hours after a single oral dose, thalidomide is not detectable in urine.

## Uses

### ■ Overview

Thalidomide is labeled by the US Food and Drug Administration (FDA) for acute treatment of cutaneous manifestations of moderate to severe erythema nodosum leprosum (ENL) in leprosy patients and for maintenance therapy for prevention and suppression of cutaneous manifestations of ENL recurrence. The drug has been designated an orphan drug by the US Food and Drug Administration (FDA) for the treatment of ENL and treatment and maintenance of reactional lepromatous leprosy. Thalidomide also has been designated an orphan drug by the FDA for treatment of wasting syndrome associated with human immunodeficiency virus (HIV) infection†; prevention and treatment of severe recurrent aphthous stomatitis in severely, terminally immunocompromised patients†; prevention and treatment of graft-versus-host disease in patients receiving bone marrow transplantation†; treatment of multiple myeloma†; treatment of clinical manifestations of mycobacterial infection caused by *Mycobacterium tuberculosis* and nontuberculous mycobacteria†; treatment of Crohn's disease†; and treatment of primary brain tumors†. In addition, thalidomide has been used for the treatment of a variety of inflammatory and/or dermatologic disorders, treatment of various HIV-associated conditions, and treatment of various malignancies.

### Restricted Distribution

Because thalidomide is a known human teratogen and can cause severe, life-threatening birth defects or fetal death if given during pregnancy (see Teratogenic Effects under Pregnancy, Fertility, and Lactation: Pregnancy, in Cautions), the drug was approved by the FDA for marketing in the US in 1998 only under a special restricted distribution program, the System for Thalidomide Education and Prescribing Safety (STEPS), designed to help ensure the safe and effective prescribing, dispensing, and use of commercially available thalidomide. In the US, the STEPS distribution program restricts access to commercially available thalidomide to prescribing clinicians, pharmacies, and patients who are registered in the program and mandates compliance with registration, education, and safety requirements of the program. (See Dosage and Administration: Restricted Distribution Program.) The STEPS program minimizes, but may not completely eliminate, the risk that thalidomide may inadvertently be given to a pregnant woman. Thalidomide also is available in the US for use in clinical trials under protocol conditions. *The risks versus benefits of thalidomide must be addressed each time use of the drug is being considered.*

### Past and Current Therapeutic Perspective

In the late 1950s, thalidomide was marketed in several other countries, including the United Kingdom and Canada, and was available over-the-counter in some countries (e.g., Germany) for use as a sedative and for the treatment of various conditions, including asthma, hypertension, migraine, and common symptoms of early pregnancy (e.g., morning sickness), often in combination with other drugs. Thalidomide was being used in clinical studies in the US, but did not receive FDA approval at that time principally because of European reports of thalidomide-associated peripheral neuropathy that may be irreversible and unanswered questions about potential adverse effects on fetuses. Because of thalidomide's prompt sedative effects, lack of hangover, and apparent safety (in regards to overdosage), the drug was considered to be a safe alternative to barbiturates, and its manufacturer at that time promoted it as a nontoxic drug with no adverse effects, and completely safe for administration to pregnant women. However, reports of serious adverse effects soon appeared and use of thalidomide was linked to an epidemic of severe and often fatal fetal and neonatal malformations (most frequently phocomelia) that affected children in 46 countries. During that time, 17 babies were born in the US with thalidomide-associated phocomelia to mothers who received the drug from overseas sources or received premarketing samples distributed by drug company representatives. In 1961, the manufacturer withdrew thalidomide from the world market.

A few years later, there were reports that leprosy patients with inflammatory lesions related to ENL reactions had experienced improvement in these lesions while receiving thalidomide as a sedative. The discovery of thalidomide's therapeutic efficacy in the treatment of ENL led to investigations that revealed the anti-inflammatory and immunomodulatory effects of the drug and prompted studies evaluating the drug in various autoimmune or inflammatory diseases and various conditions in HIV-infected patients. In addition, in vitro and animal studies indicated that thalidomide has anti-angiogenesis activity, investigations were initiated to evaluate use of the drug for a variety of neoplastic diseases. Most information to date regarding use of thalidomide for the treatment of inflammatory or immune disorders or for the treatment of patients with HIV infection or malignancy consists of case reports or data obtained from uncontrolled studies in a limited number of patients. Well-controlled clinical studies are needed to evaluate the safety and efficacy of thalidomide for these various indications.

### ■ Erythema Nodosum Leprosum

Thalidomide is used for acute treatment of cutaneous manifestations of moderate to severe erythema nodosum leprosum (ENL) reactions (lepra type 2 reactions) in leprosy patients, and also is used for maintenance therapy for prevention and suppression of cutaneous manifestations of ENL recurrence. Thalidomide has been used in conjunction with corticosteroid therapy for the acute treatment of ENL reactions that include moderate to severe neuritis in addition to cutaneous manifestations; however, thalidomide should *not* be used alone as monotherapy for treatment of ENL reactions complicated by neuritis. In these situations, thalidomide generally is initiated in conjunction with systemic corticosteroid therapy and the corticosteroid is slowly withdrawn if neuritis resolves.

ENL is a recurrent, immunologically mediated syndrome that occurs principally in patients with multibacillary leprosy. While ENL reactions have been reported to occur in 10–50% of lepromatous leprosy patients and 25–30% of borderline lepromatous patients, these reactions are being reported less frequently in patients receiving the currently recommended multidrug antileprosy regimens that include clofazimine than in those who received dapsone monotherapy. ENL usually occurs after initiation of anti-infective therapy for leprosy (generally within the first 2 years of treatment), although occasionally it may occur spontaneously in untreated lepromatous leprosy patients or after treatment is discontinued. These reactions are considered to be a manifestation of the disease rather than an adverse reaction to antileprosy regimens. Clinical symptoms include cutaneous papules or nodules that are painful or tender, erythematous, and histologically vasculitic; the papules may pustulate and ulcerate, appear as recurrent crops, and are widely distributed, generally appearing on extensor surfaces of the extremities and on the face. Cutaneous symptoms of ENL may be accompanied by peripheral neuritis (usually of the ulnar nerve), fever, malaise, wasting, uveitis, lymphadenitis orchitis, and glomerulonephritis. Histologically, ENL is an acute vasculitis or panniculitis that is thought to be secondary to immune (i.e., antigen-antibody) complex deposition.

Depending on the severity of manifestations, ENL reactions generally are treated using analgesics, corticosteroids, and/or thalidomide; clofazimine also has anti-inflammatory effects and is beneficial in the treatment of ENL reactions. While mild ENL reactions in some patients may be adequately managed with a nonsteroidal anti-inflammatory agent (e.g., aspirin, indomethacin) and bedrest, moderate to severe ENL reactions generally are treated with corticosteroids and/or thalidomide, and hospitalization may be required. The antileprosy regimen usually is continued while the ENL reaction is treated. Corticosteroid therapy (usually prednisolone) generally is effective for the treatment of moderate and severe ENL and usually is necessary when ENL is complicated by neuritis; however, long-term therapy may be required and there is a risk that ENL patients (especially those with chronic ENL) may become steroid dependent.

In patients already receiving clofazimine as part of a multidrug antileprosy regimen, a temporary increase in clofazimine dosage may allow a reduction in corticosteroid requirements; clofazimine dosage effective for the treatment of ENL reactions is slightly higher than that usually recommended for the treatment of leprosy. However, clofazimine is not as effective or as rapidly acting as corticosteroids or thalidomide in the treatment of ENL and should not be initiated as the sole agent for the treatment of severe ENL.

Thalidomide is effective for the treatment of moderate to severe ENL reactions, and some clinicians suggest that thalidomide may be the drug of choice for the treatment of these reactions, especially severe, recurrent reactions, in part because a prompt response to thalidomide generally is obtained and because of concerns related to long-term use of corticosteroids in leprosy patients. However, the risks versus benefits of thalidomide therapy must be considered, especially in women of childbearing age. Early diagnosis and treatment of ENL is important since these reactions are associated with considerable morbidity, especially if chronic, recurrent ENL occurs. Therapy for leprosy and leprosy reactional states should be undertaken in consultation with an expert in the treatment of leprosy. In the US, the Gillis W. Long Hansen's Disease Center at 800-642-2477 should be contacted for further information on the management of leprosy reactional states.

Information regarding safety and efficacy of thalidomide for the treatment of cutaneous manifestations of moderate to severe ENL is derived from more than 30 years of experience with the drug, open-label and controlled studies and case reports involving leprosy patients from many different countries, and a retrospective study of leprosy patients treated in the US by the US Public Health Service (USPHS). There is evidence that use of thalidomide in leprosy patients with moderate to severe ENL reactions can result in prompt resolution of the signs and symptoms of ENL, and the drug has been effective in patients with severe chronic ENL refractory to corticosteroid therapy. In one controlled study in patients with ENL cutaneous lesions who received 7-day regimens of thalidomide (400 mg daily) or placebo, a response (i.e., complete remission of symptoms or advanced remission of about 50% of existing ENL skin lesions) occurred in 66 or 9% of treatment courses in patients receiving thalidomide or placebo, respectively. In a similar study, a complete response (i.e., the absence of skin lesions) occurred in 75 or 25%

of treatment courses in patients receiving thalidomide or aspirin, respectively. Efficacy of thalidomide for the treatment of chronic ENL reactions has been evaluated in 2 limited crossover studies of hospitalized, corticosteroid-dependent ENL patients who were receiving dapsone and were treated with a 4- to 6-week regimen of thalidomide (300 mg daily) or placebo. In the first crossover study, the weekly corticosteroid dosage could be reduced in about 89% of patients while thalidomide was administered, but corticosteroid dosage had to be increased when placebo was administered. In the second crossover study, 100 or 12.5% of patients decreased their weekly dosage of corticosteroids while receiving a 6-week regimen of thalidomide or placebo, respectively.

Information regarding safety and efficacy of thalidomide for the prevention of ENL relapse is limited, and labeling for this use is based on data obtained from a retrospective evaluation of ENL patients treated by the USPHS. A subset of these ENL patients receiving thalidomide had repeated relapse of ENL symptoms when thalidomide was discontinued, but remission of symptoms when treatment with the drug was reinitiated.

■ **Inflammatory and/or Dermatologic Disorders**
Based on the beneficial effects of thalidomide in the treatment of inflammatory dermatoses associated with ENL, the drug has been used for the treatment of a variety of inflammatory and/or dermatologic disorders, including Behcet's syndrome†, erosive lichen planus†, erythema multiforme†, lupus erythematosus† (discoid lupus erythematosus, subacute or chronic cutaneous lupus erythematosus, cutaneous manifestations of systemic lupus erythematosus),prurigonodularis†, actinic prurigo†, cutaneous Langerhans cell histiocytosis†, uremic pruritus†, porphyria cutanea tarda†, and pyoderma gangrenosum†. There is evidence that thalidomide can be beneficial and may result in improvements in the dermatologic and mucocutaneous manifestations of these conditions; however, there is recurrence of lesions and symptoms in many patients when the drug is discontinued and long-term maintenance therapy may be necessary. Most clinicians recommend that thalidomide be used for the treatment of inflammatory and/or dermatologic disorders only in selected patients with severe refractory disease unresponsive to other appropriate agents (e.g., corticosteroids).

*Behcet's Syndrome*
In patients with Behcet's syndrome†, a chronic inflammatory disease of unknown etiology characterized by recurrent orogenital ulceration, skin lesions, and arthritic symptoms that may be complicated by GI, ocular, and neurologic involvement, thalidomide therapy (100–400 mg daily) has resulted in resolution of dermatologic, mucocutaneous, and arthritic manifestations of the disease. However, symptoms and/or lesions generally recur within several weeks after the drug is discontinued. In a randomized, double-blind, placebo-controlled study in adult males with Behcet's syndrome with mucocutaneous lesions (without major organ involvement), a complete response (resolution of orogenital ulcers and follicular lesions) was obtained in 6 or 16% of patients receiving thalidomide in a dosage of 100 or 300 mg daily, respectively; there were no complete responses in those receiving placebo. While there are some reports that GI, ophthalmic, and/or neurologic symptoms also may improve during thalidomide therapy, further study is needed to determine whether thalidomide has any clinically important effect on these manifestations of the disease.

*Other Dermatologic Disorders*
Thalidomide has *not* been effective when used for the treatment of toxic epidermal necrolysis†. In a limited placebo-controlled study in adults with toxic epidermal necrolysis, there was no evidence that thalidomide had any beneficial effect on necrolysis and patients receiving thalidomide had a higher mortality rate than those receiving placebo. In addition, there has been at least one reported case of a patient developing toxic epidermal necrolysis while receiving thalidomide.

■ **Uses in HIV-infected Patients**
Thalidomide is being investigated for a variety of uses in HIV-infected patients, including treatment of HIV-associated aphthous ulcers†, HIV-associated diarrhea†, HIV-associated wasting syndrome†, and Kaposi's sarcoma†. The drug also has been used as an adjunct to anti-infective agents in the treatment of mycobacterial infections†, including *Mycobacterium tuberculosis* and *M. avium* complex (MAC) infections, in HIV-infected patients. While evidence is accumulating that thalidomide may provide some benefits in HIV-infected patients (e.g., promote healing of aphthous ulcers, ameliorate weight loss), further study is needed to evaluate safety and efficacy of thalidomide in HIV-infected patients and to determine whether the drug may increase viral load (i.e., plasma HIV-1 RNA levels) and/or may be associated with an increased incidence of adverse effects in this patient population.

*HIV-associated Aphthous Ulcers*
Thalidomide (100–300 mg once daily) has been effective for the treatment and prevention of oropharyngeal, esophageal, and anogenital aphthous ulcers in HIV-infected patients†. The drug has been effective for the treatment of severe recurrent aphthous stomatitis in HIV-infected patients, and also has been effective for the treatment of severe recurrent aphthous stomatitis in immunocompetent patients or patients who are immunocompromised but not

HIV-infected† (see Uses: Recurrent Aphthous Stomatitis). Thalidomide is not considered a drug of first choice for the treatment of aphthous ulcers in HIV-infected patients, but may be effective in patients with recurrent ulcers refractory to other therapies (e.g., corticosteroids).

Efficacy of thalidomide for the treatment of oral and esophageal aphthous ulcers in HIV-infected patients has been evaluated in a phase II double-blind, placebo-controlled study through the National Institute of Allergy and Infectious Diseases (NIAID) AIDS Clinical Trials Group (ACTG) (study ACTG 251). HIV-infected patients with oral aphthous ulcers were randomized to receive a 4-week regimen of thalidomide (200 mg once daily) or placebo; if healing of ulcers was not complete after this regimen, an additional 4-week regimen of thalidomide was administered. At 4 weeks, a complete response was obtained in 55 or 7% of patients receiving thalidomide or placebo, respectively.

*HIV-associated Wasting Syndrome*
Thalidomide has been used for the treatment of wasting syndrome in a limited number of HIV-infected patients† and also has been used for the treatment of cachexia in other severely immunocompromised patients† (e.g., cancer patients). There is some evidence that thalidomide therapy (50–400 mg daily) may decrease elevated TNF-α plasma concentrations and may promote weight gain in HIV-infected patients. However, thalidomide may increase plasma TNF-α concentrations in some HIV-infected patients. The precise role of TNF-α in the wasting syndrome is unclear and additional study is necessary to evaluate the safety and efficacy of thalidomide in the treatment of HIV-associated wasting syndrome.

*HIV-associated Diarrhea*
Thalidomide has been used with some success in a limited number of patients for the treatment of HIV-associated diarrhea, including microsporidiosis†. In one group of HIV-infected patients with chronic diarrhea and weight loss caused by *Enterocytozoon bieneusi* infection that was not responsive to albendazole, use of thalidomide (100 mg daily for 4 weeks) had a beneficial effect (i.e., complete or partial clinical response including increased weight and decreased stool frequency) in 55% of patients. Although there is evidence that thalidomide may relieve some symptoms of microsporidian enteritis in some patients, results of an in vitro study indicate that the drug has no direct activity against microsporidia.

*Kaposi's Sarcoma*
There is at least one case report of improvement in cutaneous lesions of Kaposi's sarcoma† in HIV-infected patients receiving thalidomide for the treatment of aphthous ulcers and several patients enrolled in a phase I, dose-ranging, open-label study evaluating thalidomide in AIDS-related Kaposi's sarcoma had partial responses to the drug. However, safety and efficacy of thalidomide for the treatment of Kaposi's sarcoma have not been established, and further study is needed to determine whether thalidomide has any beneficial effect on regression of Kaposi's sarcoma. A phase II study has been initiated through the National Cancer Institute (NCI) to evaluate efficacy of thalidomide in HIV-infected patients who have cutaneous Kaposi's sarcoma lesions and evidence of disease progression in the 2 months prior to study enrollment; preliminary results indicate that some patients may have a partial response to the drug when given in dosages of 200–1000 mg daily.

■ **Neoplastic Diseases**
Because there is evidence that thalidomide is an inhibitor of angiogenesis, the drug is being evaluated for the treatment of a variety of malignancies, including advanced or metastatic breast cancer†, Kaposi's sarcoma†, melanoma†, multiple myeloma†, ovarian cancer†, primary brain tumors† (recurrent high-grade astrocytomas and mixed gliomas), androgen-independent prostate cancer†, and renal carcinoma†. There is some evidence that thalidomide may have antitumor activity; however, further study is needed to establish safety and efficacy of the drug in the treatment of various malignancies and identify optimal dosages of the drug in patients with cancer. Phase II studies have been initiated to evaluate efficacy of thalidomide for the treatment of Kaposi's sarcoma in HIV-infected patients (see Kaposi's Sarcoma under Uses: Uses in HIV-infected Patients), recurrent high-grade gliomas, androgen-independent prostate cancer, and metastatic breast cancer.

*Multiple Myeloma*
Several phase II studies have been initiated to evaluate use of thalidomide (usually as part of a combination regimen) for the treatment of refractory or relapsed multiple myeloma. In a study in patients whose myeloma had relapsed after high-dose chemotherapy, thalidomide therapy (titrated up to 800 mg daily, if tolerated) resulted in a 25 to at least 90% reduction in serum and urine paraproteins (myeloma protein, Bence Jones protein) in 32% of patients, with several achieving complete remission. This response was apparent within 2 months in about 80% of responders and was associated with decreased plasma cells in bone marrow (indicating a reduction in tumor burden) and increased hemoglobin concentrations; substantial changes in microvascular density of bone marrow were not apparent. At 1 year, estimates of mean event-free and overall survival were 22 and 58%, respectively. While ongoing study is necessary, including further elucidation of optimal dosage and schedule of therapy, thalidomide appears to induce marked and potentially durable

responses cause initial tumor regression, including patients in whom disease has relapsed. In addition, the role of the drug as monotherapy and as a component of chemotherapeutic regimens in earlier stages of the cancer remains to be determined.

### Cachexia

Thalidomide also has been used for the treatment of cachexia† in patients with advanced cancer, and there is some evidence that the drug may provide benefits in these patients in terms of improvement in symptoms of insomnia, nausea, appetite, and feelings of well-being. (See Uses in HIV-infected Patients: HIV-associated Wasting Syndrome, in Uses.)

### ▣ Graft-versus-host Disease

Thalidomide has been used with some success for the treatment of graft-versus-host disease† (GVHD) in adult and pediatric bone marrow transplant recipients, but has been associated with increased morbidity and mortality when used for prophylaxis of chronic GVHD in adult bone marrow transplant recipients.

Thalidomide generally has been used in allogeneic bone marrow transplant recipients for the treatment of chronic or refractory GVHD unresponsive to other therapies (e.g., corticosteroids, azathioprine, tacrolimus, cyclosporine, antithymocyte globulin); only limited information is available regarding use of the drug for the treatment of acute GVHD. In a study in adult and pediatric patients with chronic or refractory GVHD who received thalidomide therapy (800–1600 mg daily for a median duration of 240 days), a complete response was obtained in 32% and a partial response was obtained in 27%; the overall survival rate was 64%. Thalidomide has been effective when used for the treatment of chronic or corticosteroid-dependent GVHD in pediatric patients 0.5–17 years of age†.

When thalidomide was used for prophylaxis of chronic GVHD in a controlled study of adult allogeneic bone marrow transplant patients who had no evidence of active acute GVHD at study entry, those receiving thalidomide (200 mg twice daily beginning 80 days after transplant) experienced a higher incidence of chronic GVHD and had a substantially higher mortality rate compared with those receiving placebo. Chronic GVHD occurred in 64 or 38% of patients receiving thalidomide or placebo, respectively; overall mortality was about 39 or 8%, and mortality from GVHD was about 21 or 4% in those receiving thalidomide or placebo, respectively.

### ▣ Recurrent Aphthous Stomatitis

Thalidomide has been effective when used for the treatment of severe aphthous oral ulcers in patients with recurrent aphthous stomatitis† (RAS). The drug has been used effectively for the treatment of RAS in immunocompetent adults and pediatric patients and also has been effective when used in immunocompromised patients, including cancer patients and HIV-infected patients (see Uses in HIV-infected Patients: HIV-associated Aphthous Ulcers, in Uses).In a placebo-controlled cross-over study in patients with severe RAS, a complete clinical remission was obtained in 48 or 9% of patients receiving thalidomide or placebo, respectively. Oral ulcers generally heal within 1–6 weeks after initiation of thalidomide therapy (100–300 mg daily), but higher dosage may be needed in some patients (400–600 mg daily) and ulcers may relapse when the drug is discontinued. In some patients, relapse may be prevented or treated using thalidomide maintenance therapy (50–100 mg daily).

### ▣ GI Disorders

#### Crohn's Disease

Thalidomide has been used with some success in a limited number of patients for the treatment of refractory Crohn's disease†. In patients with disease refractory to usually recommended therapies (including corticosteroids, sulfasalazine, azathioprine), thalidomide therapy (100–300 mg daily) resulted in resolution of small bowel ulceration, bleeding, and pain. In at least one patient with Crohn's disease, thalidomide therapy also resulted in resolution of severe, recurrent oral aphthous ulcers.

#### Other GI Disorders

Thalidomide also has been used with some success in a limited number of patients for the treatment of ulcerative colitis†, but additional study is needed.

### ▣ Other Uses

Thalidomide has been used in a limited number of patients for the treatment of refractory ankylosing spondylitis†, refractory rheumatoid arthritis†, or sarcoidosis†, but additional study and experience are needed.

Because thalidomide is an inhibitor of angiogenesis and there is some evidence that loss of vision in the severe, wet form of macular degeneration may be related to angiogenesis in the blood vessels behind the macula, the drug is being investigated for the treatment of macular degeneration†.

### Cautions

Thalidomide is a known human teratogen and has caused severe, life-threatening birth defects or fetal death when used during pregnancy. (See Precautions and Contraindications: Teratogenic Precautions and Contraindica-

---

tions, in Cautions.) Another potentially severe adverse effect with thalidomide is peripheral neuropathy that may be irreversible. Other adverse effects reported with thalidomide generally are mild to moderate in severity, and usually do not require discontinuation of the drug. The most common adverse effects of thalidomide are CNS effects (e.g., drowsiness, somnolence, dizziness) and dermatologic effects (e.g., rash).

Information on adverse effects of thalidomide reported by the manufacturer was obtained principally from controlled clinical studies in leprosy patients who received thalidomide in a dosage of 50–300 mg daily for the treatment of erythema nodosum leprosum (ENL) and controlled clinical studies in patients with human immunodeficiency virus (HIV) infection who received thalidomide in a dosage of 100–200 mg daily. Additional information on adverse effects of thalidomide reported by the manufacturer was obtained from uncontrolled clinical studies in ENL patients, uncontrolled studies or case reports involving patients who received thalidomide for a wide variety of investigational uses, and spontaneous reports from other sources. The manufacturer states that the incidence of adverse effects reported in these uncontrolled studies and other sources is unknown, and a causal relationship between some of these effects and thalidomide has not been established. Although thalidomide received approval by the US Food and Drug Administration (FDA) in 1998 for use in the treatment of ENL in leprosy patients, data regarding the safety and efficacy of the drug have been accumulating since the drug first became available for use in Europe in the late 1950s.

### ▣ Nervous System Effects

#### Peripheral Neuropathy

Thalidomide may cause potentially severe nerve damage (i.e., polyneuritis or peripheral neuropathy) that may be irreversible. The incidence of peripheral neuropathy in patients receiving thalidomide has been reported to range from less than 1% to more than 70%. Incidence data regarding this adverse effect has been difficult to obtain, in part because the drug often is used in patients with diseases that may be associated with neuropathy (e.g., leprosy patients with ENL, patients with HIV infection) and it may be difficult to differentiate the neuropathologic symptoms and changes caused by the underlying disease from those caused by the drug.

Despite long-term experience with use of thalidomide in leprosy patients with ENL, there have been few reports of thalidomide-associated peripheral neuropathy in these patients; in some studies, less than 1% of patients receiving the drug for treatment of ENL experienced peripheral neuropathy. It has been suggested that this may not be an accurate reflection of the incidence of this adverse effect in these patients since peripheral neuritis was not recognized as a potential adverse effect of thalidomide in early studies of the drug, in part because ENL patients frequently have neuropathy in association with their disease and may not have reported such effects while receiving the drug. Therefore, preexisting neuropathy in ENL patients may complicate recognition of thalidomide-associated peripheral neuropathy. In addition, such symptoms may be difficult to monitor since ENL neuritis may improve during thalidomide therapy, but relapse after therapy with the drug is discontinued.

In controlled studies in HIV-infected patients, neuropathy occurred in 7–8% of those receiving thalidomide. In one limited study in HIV-infected patients receiving thalidomide 400 mg daily for 3 months, 7% of patients experienced neuropathy symptoms requiring discontinuation of the drug. In other limited studies, 4% of HIV infected patients receiving 200–300 mg of thalidomide for 14–21 days experienced severe symptoms of neuropathy. It has been suggested that HIV-infected patients may be particularly susceptible to the development of thalidomide-associated polyneuritis. However, since axonal degeneration with clinical and electrophysiologic symptoms resembling those of thalidomide-associated polyneuropathy may occur in HIV-infected patients and other forms of polyneuropathy (including demyelinating and polyradiculopathy) also are reported in such patients, it may be difficult to differentiate neuropathologic changes caused by the underlying disease from those caused by thalidomide.

In a retrospective study of patients receiving thalidomide for a variety of dermatologic conditions, thalidomide-associated peripheral neuropathy occurred in 21–50% of patients and was most frequent in women and geriatric patients. Limited data indicate that peripheral neuropathy occurs in up to 75% of patients receiving thalidomide for the treatment of prurigo nodularis†.

Thalidomide-associated peripheral neuropathy generally has been reported with chronic use of the drug over a period of months, but also has been reported with relatively short-term use of the drug. The correlation between peripheral neuropathy and the cumulative thalidomide dose is unclear; symptoms have been reported to begin after a cumulative dose of 40–50 g in some patients, but also have occurred with no apparent relationship to cumulative dose. There have been some cases when symptoms of thalidomide-associated peripheral neuropathy were not apparent until after the drug was discontinued.

Polyneuropathic symptoms may improve in some patients when thalidomide is discontinued, but symptoms may resolve slowly or not at all after discontinuance of the drug. In a study of patients with thalidomide-induced peripheral neuropathy who were followed for 4–6 years after discontinuing the drug, 25% experienced full recovery, 25% had some improvement of

symptoms, and 50% had no improvement in signs and symptoms of neu-ropathy.

Clinical symptoms of thalidomide-induced neuropathy include predominantly symmetric painful paresthesia of the hands and feet, often accompanied by sensory loss in lower limbs. Muscle weakness and cramps, signs of pyramidal tract involvement, and carpal tunnel syndrome have been reported often. An unpleasant pedal symptom, described as "tightness around the feet," was reported in 8–47% of patients in some studies. In early reports, thalidomide-associated peripheral neuropathies were characterized mostly by sensory symptoms, including hypoesthesia and hyperesthesia, hyperalgesia, impaired temperature sensitivity, and impaired vegetative (i.e., autonomic) nervous functions. These symptoms occasionally were accompanied by mild proximal muscle weakness, or evidence of pyramidal tract damage, but motor disturbances appeared to occur rarely. Muscle weakness rapidly improved after discontinuance of the drug, but sensory deficits were slow to improve, and occasionally worsened even while the patient was not receiving thalidomide. Because there was no substantial correlation between the severity of the condition and the total dose of the drug, and because discontinuance of thalidomide did not result in improvement in many cases, initially it could not be established that such neurologic disturbances were actually caused by thalidomide. Subsequently, the association between thalidomide and peripheral neuropathies was established in clinical studies of patients with discoid lupus erythematosus, prurigo nodularis, and aphthous stomatitis; in these studies, the neurologic status of patients was assessed before and after initiation of thalidomide therapy.

Physiologically, thalidomide polyneuropathy is characterized by axonal degeneration without demyelinization (i.e., a "dying back process"). Electrophysiologic alteration principally is characterized by a decreased sensory action potential amplitude on medial nerves of the arm, and peroneal and sural (medial cutaneous) nerves of the leg, with relative conservation of conduction velocities; however, decreased sensory and motor conduction velocities have been observed. Also, increased somatosensory latency of activation after sural nerve stimulation may occur in the absence of clinical abnormalities in patients receiving thalidomide. Because electrophysiologic alterations may occur before the onset of subjective symptoms, the reported incidence of neuropathy in thalidomide studies is higher if neurophysiologic tests, rather than clinical symptoms, are used for diagnosis.

*Other Nervous System Effects*

Thalidomide exhibits sedative and hypnotic effects, and drowsiness and somnolence are common during therapy with the drug. In controlled clinical studies, adverse nervous system effects (other than peripheral neuritis) occurred in 54% of ENL patients receiving thalidomide, and 34–56 or 34% of HIV-infected patients receiving thalidomide or placebo, respectively. Drowsiness occurred in 38% and malaise occurred in 8% of ENL patients receiving thalidomide, and drowsiness occurred in 36–38 or 11% of HIV-infected patients receiving thalidomide or placebo, respectively. Headache occurred in about 12% of leprosy ENL patients receiving thalidomide, and 17–19 or 11% of HIV-infected patients receiving thalidomide or placebo, respectively. Vertigo occurred in 8% and dizziness occurred in 4–25% of ENL patients receiving thalidomide; dizziness occurred in 19% of HIV-infected patients receiving the drug. Paresthesia occurred in 6–16 or 11% of HIV-infected patients receiving thalidomide or placebo, respectively, and also has been reported when the drug was used in ENL patients. Tremor occurred in 4% of leprosy patients with ENL receiving thalidomide, and agitation or nervousness occurred in 3–9% of HIV-infected patients receiving the drug. Insomnia occurred in 9 or 6% of HIV-infected patients receiving thalidomide or placebo, respectively.

Adverse nervous system effects reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include abnormal gait, abnormal thinking, amnesia, anxiety, ataxia, causalgia, circumoral paresthesia, confusion, decreased libido, decreased reflexes, dementia, dysesthesia, depression, emotional lability, euphoria, hypalgesia, hyperesthesia, hostility, hyperkinesia, incoordination, meningitis, neuralgia, neuritis, neurologic disorder, neuropathy, peripheral neuritis, and psychosis. Carpal tunnel disorder, foot drop, hangover effect, migraine, or suicide attempt was reported in at least one patient receiving thalidomide.

■ **Dermatologic and Sensitivity Reactions**

Adverse dermatologic effects occur commonly in patients receiving thalidomide. In controlled clinical studies, adverse dermatologic effects occurred in 42% of ENL patients receiving thalidomide, and 47–56 or 54% of HIV-infected patients receiving thalidomide or placebo, respectively. Rash occurred in 21% of ENL patients receiving thalidomide, and 25 or 31% of HIV-infected patients receiving thalidomide or placebo, respectively. Maculopapular rash occurred in 4% of ENL patients receiving thalidomide, and 17–19 or 6% of HIV-infected patients receiving thalidomide or placebo, respectively. Pruritus occurred in 3–8% of ENL patients receiving thalidomide, and 3–6 or 6% of HIV-infected patients receiving thalidomide or placebo, respectively. Fungal dermatitis or nail disorder occurred in 4% of ENL patients receiving thalidomide, and 3–9% of HIV-infected patients receiving thalidomide. Peripheral edema occurred in 4–8% of ENL patients and 3–8% of HIV-infected patients

receiving thalidomide. Facial edema occurred in 4% and urticaria occurred in 1–2% of ENL patients receiving thalidomide. Sweating occurred in 12 or 11% of HIV-infected patients receiving thalidomide or placebo, respectively. Acne occurred in 3–11% of HIV-infected patients receiving thalidomide.

In one limited study in HIV-infected patients, 14% of those receiving thalidomide (400 mg daily for 3 months) experienced severe skin reactions; these reactions resulted in discontinuance of drug in 7%. In another limited study in HIV-infected patients (with or without tuberculosis) who received thalidomide (300 mg daily for 3 weeks), 30% experienced severe rash that was associated with low CD4⁺ T-cell counts. The mean CD4⁺ T-cell count was 17 or 216 cells/mm³ in those with or without rash, respectively. Thalidomide was discontinued and rash resolved in 25% of patients. However, one patient with rash continued to receive thalidomide because of a missed appointment and subsequently developed Stevens-Johnson syndrome with desquamation that resolved after discontinuance of the drug.

Hypersensitivity reactions characterized by cutaneous and/or febrile symptoms have been reported in HIV-infected patients receiving thalidomide. In some of these HIV-infected patients, rechallenge with thalidomide resulted in accelerated hypersensitivity, including hypotension. Therefore, some clinicians state that if thalidomide rechallenge in an HIV-infected patient is unavoidable (e.g., to elucidate a drug reaction in a patient receiving a complex drug regimen), the patient should be hospitalized when the drug is administered and for at least 24 hours following the rechallenge.

Adverse dermatologic and hypersensitivity reactions reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include allergic reaction, alopecia, angioedema, benign skin neoplasm, dry skin, eczema, exfoliative dermatitis, herpes simplex, ichthyosis, incomplete Stevens-Johnson syndrome, perifollicular thickening, photosensitivity, psoriasis, seborrhea, skin discoloration, skin disorder, skin necrosis, urticaria, and vesiculobullous rash. Erythema nodosum, myxedema, petechiae, or purpura was reported in at least one patient receiving thalidomide. In a glioblastoma patient who discontinued thalidomide therapy because of full-body maculopapular rash, toxic epidermal necrolysis occurred following rechallenge with a single 100-mg dose of the drug.

■ **GI Effects**

In controlled clinical studies, adverse GI effects occurred in 21% of ENL patients receiving thalidomide, and 44–50 or 43% of HIV-infected patients receiving thalidomide or placebo, respectively. Diarrhea occurred in 4% and nausea occurred in 4–6% of ENL patients receiving thalidomide; diarrhea and nausea occurred in 17 and 12% of HIV-infected patients, respectively, receiving the drug. Vomiting has been reported in 1–2% of ENL patients receiving the drug. Abdominal pain and constipation occurred in 4–11% of ENL, and 3–19% of HIV-infected patients receiving thalidomide. Oral candidiasis occurred in 4% of ENL and 6–11% of HIV-infected patients receiving thalidomide. Tooth pain occurred in 4% of ENL patients receiving thalidomide. Dry mouth occurred in 8–9 or 6–72% of HIV-infected patients receiving thalidomide or placebo, respectively. Anorexia occurred in 3–9 or 6% of HIV-infected patients receiving thalidomide or placebo, respectively. Flatulence occurred in 8 or 6% of HIV-infected patients receiving thalidomide or placebo, respectively.

Adverse GI effects reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include enlarged abdomen, increased appetite and weight gain, colitis, dry mouth, dyspepsia, dysphagia, eructation, esophagitis, flatulence, gastroenteritis, GI disorder, GI hemorrhage, gum disorder, intestinal obstruction, parotid gland enlargement, periodontitis, stomatitis, taste perversion, tongue discoloration, tooth disorder, and vomiting. Aphthous stomatitis or stomach ulcer has been reported in at least one patient receiving thalidomide.

■ **Respiratory Effects**

In controlled clinical studies, adverse respiratory effects occurred in 12% of ENL patients receiving thalidomide, and 19–25 or 26% of HIV-infected patients receiving thalidomide or placebo, respectively. Pharyngitis occurred in 4% of ENL patients, and 6–8 or 6% of HIV-infected patients receiving thalidomide or placebo, respectively. Sinusitis or rhinitis occurred in 4% of ENL patients, and sinusitis occurred in 3–8 or 6% of HIV-infected patients receiving thalidomide or placebo, respectively.

Adverse respiratory effects reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include apnea, bronchitis, cough, emphysema, epistaxis, lung disorder, lung edema, pneumonia (including that caused by *Pneumocystis carinii*), pulmonary embolus, rales, upper respiratory infection, and voice alteration. Also, dyspnea has been reported in at least one patient receiving thalidomide.

■ **Genitourinary Effects**

In controlled clinical studies, adverse genitourinary effects occurred in 8% of ENL patients receiving thalidomide, and 6–17 or 11% of HIV-infected patients receiving thalidomide or placebo, respectively. Impotence occurred in 8% of ENL patients and 3–12% of HIV-infected patients receiving thalidomide. Albuminuria occurred in 3–8 or 6% of HIV-infected patients receiving thalido-

mide or placebo, respectively. Hematuria occurred in 11 or 3% of HIV-infected patients receiving thalidomide or placebo, respectively.

Adverse genitourinary effects reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include hematuria, orchitis, proteinuria, pyuria, and urinary frequency. Acute renal failure, amenorrhea, enuresis, metrorrhagia, or oliguria has been reported in at least one patient receiving thalidomide.

### Hematologic Effects

In controlled clinical studies, adverse hematologic effects occurred in 22–41 or 29% of HIV-infected patients receiving thalidomide or placebo, respectively. Leukopenia occurred in 17–25 or 9% of HIV-infected patients receiving thalidomide or placebo, respectively; in one study, leukopenia occurred in 14% of HIV-infected patients receiving the drug. Lymphadenopathy occurred in 6–12 or 9% of HIV-infected patients receiving thalidomide or placebo, respectively. Anemia occurred in 6–12 or 9% of HIV-infected patients receiving thalidomide or placebo, respectively.

Adverse hematologic effects reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include aplastic anemia, cyanosis, decreased CD4+ T-cell count, erythrocyte sedimentation rate increase, eosinophilia, granulocytopenia, hypochromic anemia, leukemia, leukocytosis, leukopenia, macrocytic anemia, megaloblastic anemia, microcytic anemia, elevated mean corpuscular volume, abnormal erythrocyte count, and thrombocytopenia. Chronic myelogenous leukemia, erythroleukemia, nodular sclerosing Hodgkin's disease, lymphopenia, or pancytopenia has been reported in at least one patient receiving thalidomide.

### Musculoskeletal Effects

In controlled clinical studies, asthenia occurred in 8% of ENL patients receiving thalidomide, and 6–22 or 3% of HIV-infected patients receiving or placebo, respectively. Back pain occurred in 4% of ENL patients and 6% of HIV-infected patients receiving thalidomide. Neck pain and neck rigidity each occurred in 4% of patients with ENL receiving thalidomide.

Adverse musculoskeletal effects reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include arthritis, bone tenderness, hypertonia, joint disorder, leg cramps, myalgia, myasthenia, periosteal disorder, and upper extremity pain.

### Cardiovascular Effects

Adverse cardiovascular effects reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include angina pectoris, arrhythmia, atrial fibrillation, bradycardia, cerebral ischemia, cerebrovascular accident, chest pain, congestive heart failure, deep thrombophlebitis, heart arrest, heart failure, hypertension, hypotension, murmur, myocardial infarction, palpitation, pericarditis, peripheral vascular disorder, postural (orthostatic) hypotension, syncope, tachycardia, thrombophlebitis, thrombosis, and vasodilation. Raynaud's syndrome has been reported in at least one patient receiving thalidomide.

The manufacturer states that, although bradycardia has been reported in patients receiving thalidomide, medical or other intervention was not required and the clinical importance and underlying etiology of bradycardia in these patients are unknown.

### Hepatic Effects

In controlled clinical studies, increased serum AST (SGOT) concentrations occurred in 3–12 or 6% of HIV-infected patients receiving thalidomide or placebo, respectively; multiple abnormalities in liver function test results occurred in 9% of HIV-infected patients receiving thalidomide.

Adverse hepatic effects reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include increased liver function test results, increased serum ALT (SGPT) concentrations, bilirubinemia, cholangitis, cholestatic jaundice, enlarged liver, and hepatitis. Bile duct obstruction has occurred in at least one patient receiving thalidomide.

### Ocular and Otic Effects

Adverse ocular and otic effects reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include amblyopia, conjunctivitis, dry eye, ocular disorder, ocular pain, lacrimation disorder, retinitis, deafness, and tinnitus. Diplopia or nystagmus has occurred in at least one patient receiving thalidomide.

### Effects on HIV Viral Load and Tumor Necrosis Factor

Increased HIV viral load (i.e., increased plasma HIV-1 RNA levels) and increased levels of plasma tumor necrosis factor alpha (TNF-α) and increased TNF-α receptor type II have been reported in some HIV-infected patients receiving thalidomide. In one controlled study in HIV-infected patients, median plasma HIV-1 RNA levels increased by 0.42 $\log_{10}$ copies/mL in patients receiving thalidomide compared with a 0.05 $\log_{10}$-copies/mL increase in those receiving placebo. A similar trend of increased HIV load was reported in another study in HIV-infected patients. However, the clinical importance of

these effects is unknown since the patients involved were not receiving the potent antiretroviral agent combination regimens currently recommended for HIV-infected patients. (See Pharmacology: Immunomodulatory Effects.)

### Other Adverse Effects

In controlled clinical studies, accidental injury occurred in 4% of ENL patients, and 6 or 3% of HIV-infected patients receiving thalidomide or placebo, respectively. Chills occurred in 4% of ENL patients, and 9 or 11% of HIV-infected patients receiving thalidomide or placebo, respectively. Pain occurred in 8% of ENL patients, and 3 or 6% of HIV-infected patients receiving thalidomide or placebo, respectively. Fever occurred in 19–22 or 17% of HIV-infected patients receiving thalidomide or placebo, respectively. Infection occurred in 6–8 or 3% of HIV-infected patients receiving thalidomide or placebo, respectively. Hyperlipidemia occurred in 6–9 or 3% of HIV-infected patients receiving thalidomide or placebo, respectively.

Other adverse effects reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include avitaminosis, altered hormone concentrations, altered alkaline phosphatase concentrations, dehydration, increased BUN, decreased creatinine clearance, inappropriate antidiuretic hormone concentrations, increased serum creatinine, electrolyte abnormalities, hypocalcemia, hypercholesterolemia, hyperglycemia, hyperkalemia, hyperlipidemia, hypoproteinemia, hyperuricemia, increased lactic dehydrogenase, increased lipase, decreased phosphorus, amyloidosis, ascites, chills and fever, cellulitis, cyst, diabetes, fever, flu-like syndrome, hernia, moniliasis, palpable spleen, pancreatitis, sarcoma, sepsis, and viral infection. Galactorrhea, gynecomastia, hypomagnesemia, hypothyroidism, and lymphedema have occurred in at least one patient receiving thalidomide.

### Precautions and Contraindications

*Teratogenicity Precautions and Contraindications*

Because thalidomide is a known human teratogen (see Teratogenic Effects under Pregnancy, Fertility, and Lactation: Pregnancy), the drug is commercially available in the US only through a restricted distribution program, the System for Thalidomide Education and Prescribing Safety (STEPS) designed to minimize the chance of fetal exposure and help ensure the safe and effective prescribing, dispensing, and use of thalidomide. Thalidomide may be prescribed only by licensed physicians who are registered in the STEPS program and understand the risk of teratogenicity if thalidomide is used during pregnancy. For information on the distribution program, see Dosage and Administration: Restricted Distribution Program.

Thalidomide is contraindicated in pregnant women and should be used in females of childbearing potential only when alternative therapies are considered inappropriate and the patient is capable of understanding and complying with the patient registration, education, and safety requirements of the STEPS program, including mandatory contraceptive measures and pregnancy testing. Female patients should be advised to immediately discontinue taking thalidomide and inform their clinician if they become pregnant (or for any reason they think they might be pregnant), miss a menstrual period, experience unusual menstrual bleeding, or stop using contraceptive measures. (See Pregnancy, Fertility, and Lactation: Pregnancy, in Cautions.)

Thalidomide should be used in sexually mature males only when the patient is capable of understanding and complying with the patient registration, education, and safety requirements of the STEPS program, including mandatory contraceptive measures for men. Male patients receiving thalidomide should be instructed to inform their clinician if they have unprotected heterosexual intercourse while receiving thalidomide or during the first month after discontinuing the drug or if they think that their sexual partner may be pregnant.

Patients should be advised to take thalidomide only as prescribed, and in compliance with the requirements of the STEPS program. Patients should be warned not to share thalidomide with anyone else and to keep the drug out of the reach of children. In addition, patients should be instructed not to donate blood and male patients should be warned not to donate sperm while taking thalidomide.

**Contraceptive Measures.** All women and adolescent females of childbearing potential and all sexually mature males receiving thalidomide must use effective contraceptive measures (which may include abstinence) to help ensure that fetal exposure to thalidomide does not occur. Contraceptive measures are indicated even in females with a history of infertility. The only females who do not need to observe mandatory contraceptive measures are those who have undergone hysterectomy or who are postmenopausal and have had no menses for at least 24 consecutive months.

All women and adolescent females of childbearing potential *must* use 2 reliable forms of contraception simultaneously (unless the patient chooses to remain continuously abstinent from engaging in heterosexual intercourse) beginning 1 month prior to initiating thalidomide therapy and continuing until 1 month after thalidomide therapy is discontinued. The patient must use at least 2 birth control methods; preferably one should be a highly effective birth control method (intrauterine device [IUD]; oral, injectable, or implanted hormonal contraceptives; tubal ligation; vasectomized partner) *and* one should be an effective barrier method (latex condom, diaphragm, cervical cap). How-

ever, if either IUD or hormonal contraceptive use is contraindicated in the female, 2 other effective methods may be used. Females of childbearing potential receiving thalidomide concomitantly with any other drug that can reduce efficacy of oral contraceptives must use 2 *other* effective methods of contraception or abstain from heterosexual intercourse. Drugs that may interfere with effectiveness of oral contraceptives include protease inhibitors (e.g., amprenavir, indinavir, nelfinavir, ritonavir, saquinavir), griseofulvin, rifampin, rifabutin, phenytoin, or carbamazepine. (See Drug Interactions: Hormonal Contraceptives and Drugs that Interfere with Hormonal Contraceptives.)

Sexually mature males (including those who have successfully undergone vasectomy) receiving thalidomide must completely avoid unprotected sexual intercourse with women because it is unknown if thalidomide is present in sperm or seminal fluid. While receiving thalidomide and for at least 1 month after discontinuing the drug, sexually mature males must use a latex condom each time they have sexual intercourse with a woman.

All females of childbearing potential must be tested for pregnancy within the 24 hours immediately prior to the first dose of thalidomide using a reliable serum pregnancy test with the sensitivity to detect human serum chorionic gonadotropin (HCG) concentrations of 50 mIU/mL. The prescribing clinician should not provide the woman with a prescription for thalidomide until a written report of the pregnancy test is available indicating that results are negative. Serum pregnancy tests must then be repeated at regular intervals during thalidomide therapy (i.e., weekly during the first month, then every 2 or 4 weeks in women with irregular or regular menstrual cycles, respectively). Pregnancy tests also should be performed if a patient misses her period or if there is any abnormality in menstrual bleeding. If pregnancy occurs during thalidomide therapy, the drug should be discontinued immediately. (See Pregnancy under Cautions: Pregnancy, Fertility, and Lactation.)

*Peripheral Neuropathy Precautions and Contraindications*

Because thalidomide may cause peripheral neuropathy which can be irreversible, patients should be instructed to immediately report initial symptoms (e.g., numbness, tingling, pain or a burning sensation in the hands and feet) of peripheral neuropathy to their prescribing clinician. To ensure that early signs of neuropathy are detected, patients should be examined, counseled, and questioned regularly during thalidomide therapy (i.e., monthly for the first 3 months of thalidomide treatment, and periodically thereafter).

Early detection and differential diagnosis of thalidomide-induced neuritis may be difficult in leprosy patients with ENL and in HIV-infected patients because neuritis associated with these diseases may be similar to that caused by thalidomide.

To assist in detection of asymptomatic neuropathy, the manufacturer states that consideration should be given to using electrophysiologic testing, consisting of sensory nerve action potential (SNAP) amplitude measurement at baseline and every 6 months thereafter. If manifestations of peripheral neuropathy develop, thalidomide should be discontinued immediately (if clinically appropriate) to minimize further damage. Usually, treatment with thalidomide should be resumed only if manifestations of neuropathy return to baseline.

Drugs known to be associated with peripheral neuropathy should be used with caution in patients receiving thalidomide. (See Drug Interactions: Drugs Associated with Peripheral Neuropathy.)

*CNS Precautions and Contraindications*

Patients should be warned that thalidomide frequently causes drowsiness and somnolence, and may impair their ability to perform hazardous activities requiring mental alertness or physical coordination (e.g., operating machinery, driving a motor vehicle). Patients also should be warned not to take any other drugs that may cause drowsiness without consulting their clinician. Patients should be advised that thalidomide may potentiate the drowsiness caused by alcohol. (See Drug Interactions: CNS Agents.)

*Other Precautions and Contraindications*

Because thalidomide may cause dizziness and orthostatic hypotension, patients receiving the drug should be instructed to sit upright for a few minutes before standing up from a reclining position.

Because decreased leukocyte counts, including neutropenia, have been reported in patients receiving thalidomide, the drug should not be initiated in patients with absolute neutrophil counts (ANC) less than 750/mm³. Leukocyte counts and differentials should be routinely monitored, especially in patients who are prone to neutropenia (e.g., HIV-infected patients). If the ANC decreases to less than 750/mm³ while the patient is receiving thalidomide, the patient's drug regimen should be reevaluated and consideration given to withholding thalidomide if clinically appropriate.

Because increases in viral load (i.e., increased plasma HIV-1 RNA levels) have been reported when thalidomide was used in some HIV-infected patients, the manufacturer states that plasma HIV-1 RNA levels should be measured after the first and third months of thalidomide treatment and every 3 months thereafter.

Thalidomide is contraindicated in patients who are hypersensitive to the drug or any ingredient in the formulation. The drug should be discontinued if signs and symptoms of hypersensitivity (e.g., erythematous macular rash associated with fever, tachycardia, hypotension) occur and are severe; if thalid-

omide therapy is resumed and the reaction recurs, thalidomide should be permanently discontinued. Because hypersensitivity reactions characterized by cutaneous and/or febrile manifestations have been reported in HIV-infected patients receiving thalidomide and because rechallenge with the drug resulted in accelerated hypersensitivity (including hypotension) in some of these patients, some clinicians recommend that if thalidomide rechallenge is unavoidable in an HIV-infected patient (e.g., to elucidate a drug reaction in a patient receiving a complex drug regimen), the patient should be hospitalized when the drug is administered and for at least 24 hours following the rechallenge.

### ■ Pediatric Precautions

Although safety and efficacy of thalidomide in pediatric patients younger than 12 years of age have not been established, the drug has been used in a limited number of children 6 months to 12 years of age†. The manufacturer states that when thalidomide was used in a limited number of patients 11–17 years of age (usually in a dosage of 100 mg daily), response rates and safety profile were similar to those observed in adults. When thalidomide was used for the treatment of graft-versus-host disease in a limited number of bone marrow transplant recipients 1.5–17 years of age†, adverse effects of the drug included somnolence (which required discontinuance of the drug in at least one child), constipation, and a syndrome of rash, eosinophilia, and pancreatitis (which resolved after the drug was discontinued).

Thalidomide is contraindicated in adolescent females of childbearing potential (i.e., those who are sexually mature, have had menses at some time during the 24 consecutive months preceding initiation of treatment with thalidomide, have not undergone a hysterectomy) unless alternative therapies are considered inappropriate and the patient is capable of complying with the contraceptive measures (which may include abstinence) designed to help ensure that fetal exposure to thalidomide does not occur. (See Teratogenic Precautions and Contraindications: Contraceptive Measures, in Cautions.)

For males and females 18 years of age and younger, a parent or legal guardian must be educated concerning the hazards of thalidomide and agree to ensure that the minor complies with all requirements of the STEPS program.

### ■ Geriatric Precautions

Safety and efficacy of thalidomide in geriatric patients have not been specifically studied to date. Thalidomide has been used in clinical studies that included patients up to 90 years of age, and adverse effects reported in those older than 65 years of age were similar to those reported in younger adults.

### ■ Mutagenicity and Carcinogenicity

There was no evidence of mutagenic effects when thalidomide was evaluated in vitro using bacterial test systems (Ames test using *Salmonella typhimurium* and *Escherichia coli*), in vitro using mammalian test systems (Chinese hamster ovary cells, AS52/XPRT mammalian cell forward gene mutation assay), in vitro using human lymphocytes (chromosome aberration assay, micronucleus assay), or in vivo using mammalian test systems (CD-1 mice, micronucleus test). While there have been a few unsubstantiated reports that positive results were obtained when thalidomide was tested for mutagenicity in *Salmonella* and mouse bone marrow cells, these results have not been confirmed.

Although thalidomide is teratogenic, the drug is *not* considered to be mutagenic in humans. A report that 2 men with birth defects attributed to thalidomide exposure each fathered a child with birth defects resulted in speculation that thalidomide may be mutagenic in addition to teratogenic and capable of causing second generation birth defects. However, there is no evidence to support such a hypothesis and experts state that the birth defects in both these children were *not* the result of parental thalidomide exposure but probably occurred because of genetic abnormalities related to spontaneous mutations that occurred in the parents. The fathers of both children may have had malformations caused in part by thalidomide exposure, but the father of one child had anomalies that were quite atypical from those associated with thalidomide exposure. While only limited information is available about one of the children, both appeared to have limb formation abnormalities similar to those of their respective fathers. Since mutagens attack genes at random, if thalidomide did have a mutagenic effect distinct from its teratogenic effect, it is unlikely that the mutations would result specifically in limb malformations. There is no evidence that the incidence of birth defects in children born to parents with birth defects related to thalidomide exposure is any higher than that reported in the general population and no evidence that thalidomide-associated birth defects are inheritable.

Long-term studies to evaluate the carcinogenic potential of thalidomide have not been performed to date.

### ■ Pregnancy, Fertility, and Lactation

*Pregnancy*

Thalidomide is a known human teratogen, and can cause severe, life-threatening birth defects or fetal death if taken during pregnancy. The drug can cause teratogenic effects even if only a single dose of the drug (e.g., 50–100 mg) is taken during pregnancy. Since the risks clearly outweigh any possible benefits in women who are or may become pregnant, thalidomide

is contraindicated in such women. If the drug is inadvertently administered during pregnancy or if a patient becomes pregnant while receiving the drug, the drug should be discontinued immediately and the patient referred to an obstetrician-gynecologist experienced in reproductive toxicity for further evaluation and counseling. The patient should be informed that if their clinician is not available, information about emergency contraception (including information regarding clinicians who provide emergency contraceptive services) can be obtained by calling 888-668-2528 or by using other sources (e.g., http://www.opr.princeton.edu/ec). For information about postcoital contraception, see Estrogen-Progestin Combinations and Progestins in Contraceptives 68:12. Any suspected exposure of a fetus to thalidomide should be reported to the FDA MedWatch Program at 800-FDA-1088 and also reported to the manufacturer.

To minimize the chance of fetal exposure and help ensure the safe and effective use of thalidomide in the US, patients must be registered in the STEPS program before they can receive commercially available drug. (See Dosage and Administration: Restricted Distribution Program.) The STEPS program includes mandatory contraceptive measures for both men and women, as well as mandatory pregnancy testing to confirm that a woman is not pregnant before thalidomide therapy is initiated and did not become pregnant during or immediately after therapy with the drug. (See Contraceptive Measures under Precautions and Contraindications: Teratogenicity Precautions and Contraindications, in Cautions.)

Thalidomide is contraindicated in women of childbearing potential unless alternative therapies are considered to be inappropriate and the patient is capable of understanding and following the conditions of the STEPS program, including mandatory contraceptive measures designed to ensure that the woman is essentially unable to become pregnant while receiving thalidomide. Women of childbearing potential are considered to be women and adolescent females who are sexually mature, have had menses at some time in the 24 consecutive months preceding initiation of treatment with thalidomide (i.e., are not postmenopausal), and have not undergone a hysterectomy. It is mandatory that such women (even if they are infertile) agree *not* to try to become pregnant for at least 1 month after discontinuing thalidomide treatment, and comply with effective contraceptive measures (which may include abstinence) for at least 1 month prior to, throughout, and for at least 1 month after completion of thalidomide therapy. In addition, a reliable serum pregnancy test with the sensitivity to detect human serum chorionic gonadotropin (HCG) concentrations of 50 mIU/mL must be performed within 24 hours prior to beginning thalidomide therapy, and results must be negative. Serum pregnancy tests must then be repeated at regular intervals during thalidomide therapy (i.e., weekly during the first month, then every 2 or 4 weeks in women with irregular or regular menstrual cycles, respectively). Pregnancy testing and counseling should be performed if a patient misses her period or if there is any abnormality in menstrual bleeding during thalidomide therapy.

Thalidomide is contraindicated in sexually mature males unless the patient is capable of understanding and following the conditions of the STEPS program, including mandatory contraceptive measures. Because it is unknown if thalidomide is present in sperm or seminal fluid, sexually mature males (including those who have successfully undergone vasectomy) receiving thalidomide must not have unprotected sexual intercourse with women. These men must use a latex condom each time sexual intercourse with a woman occurs during and for at least 1 month after discontinuing the drug.

### Teratogenic Effects

It has been estimated that there were more than 10,000 reported cases of infants born with birth defects related to use of thalidomide in pregnant women in other countries between 1957 (when thalidomide was first introduced in the world market) and 1963 (several years after the drug was removed from the world market). Although thalidomide was not commercially available in the US at that time, there were at least 17 reports of infants with thalidomide-associated birth defects being born to women in the US during those years; these women had received the drug from overseas sources or received premarketing samples distributed by drug company representatives.

A variety of human fetal abnormalities related to thalidomide administration during pregnancy have been documented. The most common birth defects reported following fetal exposure to thalidomide are musculoskeletal fetal abnormalities involving the loss of all or part of one or more bones; however, fetal deformities may occur in almost any organ of the body and defects of internal organs have been reported with some skeletal abnormalities. The mortality rate at or shortly after birth in infants born with thalidomide-induced abnormalities has been reported to be about 40%; most fatalities are related to serious malformations of internal organs.

Skeletal deformities caused by thalidomide include amelia (absence of legs and/or arms) and absence of bones; phocomelia (short legs and/or arms) and bone hypoplasia; hand deformities (e.g., radial club hand); thumb aplasia, hypoplasia, triphalangia, and nonopposability; finger aplasia, hypoplasia, fixed flexion, and syndactyly; and hip dysplasia and dislocation. Skeletal deformities appear to follow the craniocaudal progression of fetal morphogenesis. Most individuals with thalidomide defects of the upper limbs have normal lower limbs, some have defects of all limbs, but those with normal upper limbs and deformed lower limbs are rare. When substantial parts of bones are

missing, the muscles normally attached to them are hypoplastic, but the degree of muscle hypoplasia does not always correspond to the level of bone loss (e.g., marked hypoplasia of shoulder and upper arm muscles may occur in a patient with a humerus of normal length). In general, more pronounced shortness of stature than that associated only with short leg bones occurs, resulting from poor growth, spinal osteochondritis, and progressive kyphosis. Thalidomide-induced skeletal deformities usually are bilaterally symmetric, similar to malformations reported with other teratogenic drugs. However, the extent of symmetry varies with the nature of the defect, both in the number of appreciably asymmetric deformities and in the closeness of the match between left and right.

The next most common group of abnormalities reported following fetal exposure to thalidomide are craniofacial and orofacial fetal abnormalities involving the eye, ear, and nerve supplies to the face, external ocular muscles, and lacrimal glands; these deformities tend to occur in a variety of combinations and permutations. External ear deformities tend to be bilateral and symmetric, and include anotia, microtia or microprimna, and small or absent auditory canals. Individuals with anotia and a blind or absent external auditory canal (meatus) are profoundly deaf in the affected ear. Facial palsy may occur (usually unilaterally rather than bilaterally) and almost always is associated with anotia or microtia on the same side. Abnormalities of ocular structures occur frequently, including anophthalmos, microphthalmos coloboma of the iris and retina, and conjunctival dermoid cyst. Microphthalmos and coloboma often occur together, and are predominantly bilateral. Restricted ocular movements may occur; ocular movement defects are nearly always associated with otic defects, often associated with facial weakness, and tend to be bilateral. Tear-saliva syndrome (crocodile tears) has been reported, in which tears are secreted in association with eating (rather than saliva) but may not be secreted in association with crying. This syndrome results from incorrect neural connections (probably in the brain stem), is bilateral or unilateral, and usually is associated with otic abnormalities and ocular movement defects. Less common orofacial defects that have reported include cleft palate, high arched palate, bifid uvula, palatal palsy, cleft lip, choanal atresia, and mandibular and dental abnormalities.

Other fetal deformities that have been associated with thalidomide exposure during pregnancy include congenital heart defects and other cardiovascular malformations (e.g., patent ductus arteriosus, ventricular and/or atrial septal defects, pulmonary stenosis); renal and urinary tract malformations (e.g., defects of the kidney, ureter, and bladder); genital malformations (e.g., hypospadias, vaginal atresia, fallopian tube interruption, bicornate uterus, hypoplasia of the scrotum or labia, and undescended, small, or absent testis); GI tract malformations (e.g., duodenal atresia, duodenal stenosis, pyloric stenosis, anorectal stenosis, imperforate anus with fistula, anteriorly placed anus); gallbladder aplasia; and respiratory tract malformations.

Most teratogenic effects appear to have occurred as the result of exposure to thalidomide early in pregnancy, and there is some evidence that a distinct window of embryonic sensitivity to thalidomide's teratogenic effects exists (i.e., from about 34–50 days after the beginning of the last menstrual period). Some malformations appear to be associated with particular periods of embryonic exposure, including aplasia of the ear or stenosis of the rectum which appear to be associated with exposure to thalidomide at 34–38 or 49–50 days, respectively, after the beginning of the last menstrual period. However, incorrect reporting of the dates of last menstrual periods and/or thalidomide administration dates as well as atypical menstrual cycle duration may have resulted in considerable inaccuracy in these data. It has been suggested that limb defects may be secondary to an inhibition of blood vessel growth in the developing fetal limb bud, and studies of thalidomide's effects in fetal animal tissues have suggested that neural as well as limb development effects occur. The risk of potentially severe birth defects occurring following fetal thalidomide exposure later in pregnancy is unknown, but may be substantial. Animal studies to characterize the effects of thalidomide on late stage pregnancy have not been conducted. While numerous mechanisms for thalidomide-induced fetal abnormality and mortality have been proposed, some have been refuted and others have not been adequately studied; additional study is required to elucidate how thalidomide causes teratogenic effects in fetuses.

### Fertility

Animal studies have not been conducted to date to determine whether thalidomide affects fertility, and the effect of thalidomide on fertility in humans has not been determined. It is not known if thalidomide is present in sperm or seminal fluid.

### Lactation

It is not known whether thalidomide is distributed into human milk. Because many drugs are distributed into milk, and because of the potential for serious thalidomide-related adverse effects in nursing infants, a decision should be made whether to discontinue nursing or the drug, taking into account the importance of the drug to the mother.

Case 2:10-cv-03165-RGK-SS Document 224-1 Filed 09/22/15 Page 33 of 48 Page ID #:5873

## Chronic Toxicity

Physical and/or psychologic dependence have not been reported in individuals receiving thalidomide. However, the manufacturer states that, like other anxiolytic, sedative, and hypnotic drugs, it is possible that habituation to the sedative and hypnotic effects of thalidomide could occur.

Chronic use of thalidomide may result in potentially severe peripheral neuropathy, which can be irreversible. (See Cautions: Peripheral Neuropathy.) To ensure early detection of thalidomide-induced neuropathy, patients should be examined regularly (i.e., monthly for the first 3 months of thalidomide therapy, and periodically thereafter). Consideration should be given to using electrophysiologic testing, consisting of sensory nerve action potential (SNAP) amplitude measurement at baseline and every 6 months thereafter.

## Acute Toxicity

### ■ Pathogenesis

Limited information is available on the acute toxicity of thalidomide in humans. The commercially available racemic mixture of thalidomide appears to have a low potential for acute toxicity, principally because racemic thalidomide has poor aqueous solubility and limited absorption as the result of interaction (i.e., hydrogen bonding) between carboxyl groups of the racemates. In addition, the drug is rapidly and spontaneously hydrolyzed in vivo to numerous metabolites and accumulation of the drug does not occur, even in patients with severe renal impairment. Although the $LD_{50}$ of either the levorotatory or dextrorotatory enantiomers of thalidomide is about 0.5 g/kg in rodents, animal studies indicate that racemic thalidomide is not fatal when given in doses of 10 g/kg.

### ■ Manifestations

Overdosage of thalidomide may cause prolonged sleep as a result of the drug's sedative and hypnotic effects, but fatalities are unlikely since the drug does not cause respiratory depression. In 3 reported suicide attempts involving deliberate ingestion of up to 14.4 g of thalidomide, all 3 individuals recovered without reported sequelae.

## Drug Interactions

### ■ Hormonal Contraceptives and Drugs that Interfere with Hormonal Contraceptives

Concomitant administration of thalidomide and oral contraceptives containing ethinyl estradiol and norethindrone does not appear to affect the pharmacokinetics of the hormones. In 2 studies in healthy women 21–45 years of age who received a 3-week regimen of thalidomide (200 mg of thalidomide daily) followed by a single oral dose of an estrogen-progestin combination oral contraceptive (70 µg of ethinyl estradiol and 2 mg of norethindrone), the pharmacokinetics of both ethinyl estradiol and norethindrone were the same as those obtained in these women when the contraceptive was administered without thalidomide.

While it is unlikely that thalidomide would affect efficacy of oral contraceptives since the drug does not appear to affect the pharmacokinetics of the hormones, other drugs that the patient may be receiving, including HIV protease inhibitors (e.g., amprenavir, indinavir, nelfinavir, ritonavir, saquinavir), griseofulvin, rifampin, rifabutin, phenytoin, or carbamazepine, may affect efficacy of oral contraceptives. Because it is mandatory that women of childbearing potential receiving thalidomide use *effective* contraceptive measures for at least 1 month prior to, throughout, and for at least 1 month after completion of thalidomide therapy, women of childbearing potential receiving thalidomide concomitantly with any other drug that can reduce efficacy of oral contraceptives must use 2 *other* effective methods of contraception or abstain from heterosexual intercourse. (See: Contraceptive Measures under Precautions and Contraindications: Teratogenicity Precautions and Contraindications, in Cautions.)

### ■ CNS Agents

Thalidomide has been reported to enhance the sedative effects of some drugs, including barbiturates, chlorpromazine, and reserpine, and may potentiate the somnolence caused by alcohol.

### ■ Drugs Associated with Peripheral Neuropathy

Because of the potential for additive effects, drugs known to be associated with peripheral neuropathy (e.g., certain antiretroviral agents [e.g., didanosine, zalcitabine], certain antineoplastic agents [e.g., paclitaxel; platinum-containing drugs such as cisplatin; vinca alkaloids such as vincristine]) should be used with caution in patients receiving thalidomide.

## Dosage and Administration

### ■ Administration

Thalidomide is administered orally. Because administration with a high-fat meal substantially delays the time to peak plasma concentrations of thalidomide, the drug should be administered with water at least 1 hour after a meal.

When thalidomide is given as a single daily dose, the manufacturer recommends that the dose preferably be given at bedtime (to minimize the sedative effects of the drug) with water and at least 1 hour after the evening meal. When high daily dosage of thalidomide is necessary (e.g., 400 mg daily), the daily dose may be given as a single dose at bedtime or, alternatively, in divided doses given with water at least 1 hour after meals.

### ■ Dosage

*Erythema Nodosum Leprosum*

For acute treatment of cutaneous manifestations of moderate to severe erythema nodosum leprosum (ENL) in adults and children 12 years of age or older, thalidomide should be initiated at a dosage of 100–300 mg daily. Patients weighing less than 50 kg should receive a low initial dosage of thalidomide (e.g., 100 mg daily). For the treatment of severe cutaneous ENL reactions or in patients who previously required high thalidomide dosages to control an ENL reaction, the drug may be initiated at a dosage up to 400 mg daily.

Thalidomide generally should be continued until signs and symptoms of active ENL reaction have subsided (usually at least 2 weeks), and dosage should then be gradually reduced. The manufacturer recommends that daily dosage of thalidomide be reduced in 50-mg increments every 2–4 weeks until the drug is discontinued or recurrence of ENL occurs. Patients who have recurrence of ENL while thalidomide dosage is being reduced and those who have a documented history indicating that prolonged maintenance treatment is necessary to prevent recurrence of cutaneous ENL should be maintained on the minimum dosage of the drug required to control the reaction. Thereafter, gradual decrease and discontinuance of maintenance dosage should be attempted every 3–6 months.

Patients with moderate to severe neuritis associated with severe ENL reactions may receive corticosteroid therapy concomitantly with thalidomide; corticosteroid dosage may be tapered and the corticosteroid discontinued when neuritis has ameliorated.

*Recurrent Aphthous Stomatitis*

For the treatment of recurrent aphthous stomatitis† in adults, including those who are HIV-infected, thalidomide dosages of 100–300 mg daily have been used. However, higher dosages (e.g., 400–600 mg daily) may be necessary in some patients. The optimum duration of thalidomide therapy has not been elucidated, but ulcers may relapse following discontinuance of the drug.

*Graft-versus-host Disease*

For the *treatment* of graft-versus-host disease† (GVHD), thalidomide dosages of 800–1600 mg daily have been used. The drug should *not* be used for prophylaxis of chronic GVHD. (See Uses: Graft-versus-host Disease.)

*Multiple Myeloma*

The optimum dosage and schedule of thalidomide therapy for multiple myeloma† remain to be established. (See Neoplastic Diseases: Multiple Myeloma, in Uses.)

### ■ Restricted Distribution Program

*Because thalidomide is a known human teratogen and can cause severe, life-threatening birth defects if administered during pregnancy, commercially available thalidomide must be obtained through a restricted distribution program, the System for Thalidomide Education and Prescribing Safety (STEPS), designed to help ensure that fetal exposure to the drug does not occur.* Clinicians, pharmacies, and patients must be registered in the STEPS program before they can prescribe, dispense, and receive thalidomide, and compliance with all terms outlined in the program is mandatory. The STEPS program controls access to thalidomide; educates STEPS participants (clinicians, pharmacists, patients) about the risks associated with thalidomide and the procedural requirements for safe use of the drug; and monitors compliance with the registration, education, and safety requirements of the program.

The STEPS program was created by Celgene in collaboration with the US Food and Drug Administration (FDA), the Birth Defects Branch of the US Centers for Disease Control and Prevention (CDC), and patient advocacy groups (e.g., the Thalidomide Victims Association of Canada). While the program was based on safety models currently in use for isotretinoin and clozapine, it incorporates additional controls and compliance monitoring not included in prior drug distribution programs. For information regarding the STEPS program, Celgene's customer service department should be contacted at 888-423-5436.

*Prescribing Clinicians*

Before prescribing thalidomide, clinicians must be registered in the STEPS Prescriber Registry and must agree to prescribe the drug in accordance with the STEPS patient eligibility criteria and monitoring procedures. Clinicians can be registered by returning a completed, signed registration card to Celgene. Clinicians must agree to provide comprehensive patient counseling on the benefits and risks of thalidomide as outlined in the STEPS informed consent document; provide appropriate contraception counseling and pregnancy testing or refer the patient to a qualified obstetrics-gynecology specialist for such counseling; complete the prescriber portion of the patient monitoring survey; and submit a copy of the completed informed consent document (signed by the patient and prescriber) and a copy of the patient monitoring survey.

Clinicians must agree to write each prescription for no more than a 28-day supply of thalidomide at a time (with no refills), inform the patient that each prescription must be filled within 7 days of being written, and encourage the patient to return all unused thalidomide to the dispensing pharmacy. The STEPS program does not allow automatic prescription refills, and the clinician must ensure that patients return for monthly office visits to obtain subsequent prescriptions for thalidomide. At each monthly visit and before a new prescription for the drug is issued, the clinician must provide the patient with additional counseling about adverse effects of thalidomide and the use of appropriate contraceptive measures; ensure that a serum pregnancy test is performed in any female patient of childbearing potential; ask the patient to complete a patient survey form about their compliance with contraceptive measures, pregnancy testing, and drug therapy; and submit the completed patient survey form as directed by the STEPS program.

*Dispensing Pharmacies*

To receive thalidomide from the manufacturer for dispensing, pharmacies must be registered in the STEPS Pharmacy Dispensing Registry and agree to comply with all requirements of the program. The director of pharmacy or head pharmacist registers the pharmacy by returning a completed, signed pharmacy registration card to Celgene. After the manufacturer enters all of the information provided by the pharmacist into the dispensing database, the pharmacy will be eligible to dispense thalidomide, and the manufacturer will provide a continuing education monograph to the pharmacy. The registering pharmacist must agree to inform all staff pharmacists of the dispensing procedures for thalidomide.

When a new patient presents an initial prescription for thalidomide to the pharmacy, the pharmacist must collect from the patient a copy of the STEPS informed consent document (signed by the patient and a registered prescriber) and a copy of the completed patient monitoring survey. The pharmacist will then register the patient into the STEPS distribution database using a patient registration form provided by the manufacturer. Subsequent to successful patient registration, the manufacturer will ship the drug to the registered pharmacy for arrival within 2 days.

All prescriptions for thalidomide must be presented to the pharmacist in person, and may not be communicated to the pharmacist over the phone. When the patient submits a subsequent prescription for the drug, the pharmacist must record the prescription with the STEPS registry (by telephone or on-line transmission) to verify that the patient already is registered in the STEPS program.

The pharmacist may not fill a single thalidomide prescription for more than a 28-day supply of the drug; automatic refills are not allowed. The pharmacist must verify that each prescription was written within the preceding 7 days, and must *not* dispense the drug if the prescription was written more than 7 days previously, or if there is (or should be) more than a 7 day supply of the drug remaining from the preceding prescription. Pharmacists must encourage all patients to return all unused drug to the dispensing pharmacy, where it will be accepted and destroyed or returned to the manufacturer.

*Patients*

To receive commercially available thalidomide, a patient must be registered in the STEPS program and agree to comply with all requirements of the program, including mandatory contraceptive measures. Patients can receive a prescription for thalidomide from the prescribing physician only after the patient has received comprehensive counseling on the benefits and risks of thalidomide as outlined in the STEPS informed consent document; has demonstrated to the clinician that they are capable of understanding the risks associated with thalidomide and instructions on use of the drug; has received appropriate contraception counseling and pregnancy testing either from the prescribing clinician or a qualified obstetrics-gynecology specialist; and has signed the informed consent document and completed the patient monitoring survey. As part of the educational requirements of the program, the patient must view the patient-oriented video and/or read the patient brochure provided by the manufacturer and must understand their contents. For minors 18 years of age or younger, a parent or legal guardian must be educated concerning the hazards of thalidomide and agree to ensure that the minor complies with all requirements of the STEPS program.

Female patients in the STEPS program who are of childbearing potential (i.e., adolescents and women who are sexually mature, have had menses at

least once in the 24 consecutive months preceding initiation of thalidomide, have not undergone a hysterectomy) must agree to use effective contraceptive measures (which may include abstinence) for at least 1 month prior to, through-out, and for at least 1 month after completion of thalidomide therapy. These women must have a confirmed negative pregnancy test result prior to initiation of thalidomide therapy and also must agree to have regular, repeat pregnancy tests throughout therapy (i.e., once weekly during the first month and monthly or every 2 weeks in women with regular or irregular menstrual cycles, respectively). (See Pregnancy under Cautions: Pregnancy, Fertility, and Lactation.) Male patients in the STEPS program must agree to use a latex condom every time they have sexual intercourse with a woman. All patients must agree to *not* share their thalidomide with anyone else (even if the other individual has similar symptoms); to keep the drug out of the reach of children; and to not donate blood or sperm while receiving thalidomide.

The patient must present a copy of the completed informed consent document (signed by the patient and registered prescriber) and patient monitoring survey to the dispensing pharmacist who then registers the patient with Celgene. Once a patient is registered in the STEPS distribution database and has received their first 28-day supply of thalidomide, they must return to the prescribing clinician at monthly intervals to receive subsequent prescriptions for thalidomide; the program does not allow automatic refills. At each monthly visit to the prescribing clinician and before a new prescription for the drug is issued, the patient must receive additional counseling about adverse effects of thalidomide and the use of appropriate contraception, receive a serum pregnancy test (if female and of childbearing potential), and complete a patient monitoring survey.

*Monitoring and Compliance*

Compliance with the educational, informed consent, and pregnancy-testing components of the STEPS program is monitored through the patient surveys that must be completed by prescribing clinicians and patients when each initial and subsequent prescription of thalidomide is written. The surveys are designed to monitor compliance with, and implementation and execution of STEPS safety procedures, and to analyze outcomes.

The STEPS program also is monitored by a quality assurance committee composed of Celgene employees, agents, and consultants. In addition, all aspects of the STEPS program are subject to FDA audits. Although the FDA is not directly responsible for the operation of the STEPS program registry, the FDA can verify that the STEPS program is operating appropriately by conducting periodic inspections of pharmacies, and by reviewing data from and procedures of the clinicians and patient registry. State boards of pharmacy have no regulatory oversight of the registry process.

The STEPS program is *not* designed to restrict prescribing and dispensing of commercially available thalidomide to only the FDA-labeled use of the drug. The registration system will collect information regarding any disease for which the drug is being used, regardless of FDA-approved labeling; therefore, clinicians registered in the STEPS program are not restricted from prescribing the drug for unlabeled (off-label) uses.

Although the STEPS program is highly restrictive and minimizes the risk that thalidomide may inadvertently be given to a pregnant woman, the risk of such exposure may not be completely eliminated. The FDA states that if there is even *one* fetal exposure to thalidomide, the entire distribution system will be reevaluated, and steps will be taken to ensure that all deficiencies are corrected.

---

## Preparations

### Thalidomide

**Oral**

| | | |
|---|---|---|
| Capsules | 50 mg | Thalomid®, Celgene |

†Use is not currently included in the labeling approved by the US Food and Drug Administration.

© Copyright, November 1999, American Society of Health-System Pharmacists, Inc.

# EXHIBIT G

## (FILED UNDER SEAL)

# EXHIBIT H

**Natalizumab**   BIOLOGIC RESPONSE MODIFIERS

duction of leukocyte migration into brain parenchyma and reduction of plaque formation detected by magnetic resonance imaging (MRI) following repeated administration of natalizumab. The clinical relevance of these findings to humans is unknown. However, there is evidence that CSF attained from natalizumab-treated MS patients has decreased levels of all major lymphocyte subsets.

## Advice to Patients

Importance of patients being counseled on and understanding the benefits and risks of natalizumab before the initial prescription is written. Patients must understand the risks of natalizumab treatment, including the risk of progressive multifocal leukoencephalopathy (PML) and other opportunistic infections.

Advise patients to read the natalizumab medication guide before therapy is initiated and before each dose of the drug.

Importance of promptly informing clinicians of any new or worsening symptoms (e.g., new or sudden change in thinking, eyesight, balance, strength) that have persisted over several days.

Importance of patients informing all their clinicians that they are receiving natalizumab.

Advise patients that they will need to be evaluated by their prescriber at 3 and 6 months after the first natalizumab infusion and at least once every 6 months during therapy.

Importance of discontinuing natalizumab and reporting any symptoms consistent with a hypersensitivity reaction (e.g., urticaria with or without associated symptoms such as itching or trouble breathing) that occur during or following IV infusion of the drug.

Importance of informing clinicians if fever or infection (including shingles or any unusually long-lasting infection) occurs.

Importance of informing clinicians of existing or contemplated concomitant therapy, including prescription and OTC drugs, and any concomitant illnesses.

Importance of women informing clinicians if they are or plan to become pregnant or plan to breast-feed.

Importance of informing patients of other important precautionary information. (See Cautions.)

**Overview® (see Users Guide). For additional information on this drug until a more detailed monograph is developed and published, the manufacturer's labeling should be consulted. It is *essential* that the manufacturer's labeling be consulted for more detailed information on usual cautions, precautions, contraindications, potential drug interactions, laboratory test interferences, and acute toxicity.**

## Preparations

Natalizumab is available only through a restricted distribution program (TOUCH® Prescribing Program). (See Dosage and Administration: Restricted Distribution Program.)

## Natalizumab

**Parenteral**

| | |
|---|---|
| For injection, 300 mg/15 mL concentrate, for IV infusion only | Tysabri®, Elan(manufactured by Biogen Idec) |

†Use is not currently included in the labeling approved by the US Food and Drug Administration

© Copyright, October 2006, American Society of Health-System Pharmacists, Inc.

# Thalidomide

■ Thalidomide, a synthetic glutamic acid derivative, is an immunomodulatory agent with anti-inflammatory, antiangiogenetic, and sedative and hypnotic activity; the drug is also a potent teratogen.

## Uses

■ **Overview** Thalidomide is labeled by the US Food and Drug Administration (FDA) for acute treatment of cutaneous manifestations of moderate to severe erythema nodosum leprosum (ENL) in leprosy patients and for maintenance therapy for prevention and suppression of cutaneous manifestations of ENL recurrence. The drug has been designated an orphan drug by the US Food and Drug Administration (FDA) for the treatment of ENL and treatment and maintenance of recurrent lepromatous leprosy. Thalidomide also has been designated an orphan drug by the FDA for treatment of wasting syndrome associated with human immunodeficiency virus (HIV) infection†; prevention and treatment of severe recurrent aphthous stomatitis in severely, terminally immunocompromised patients†; prevention and treatment of graft-versus-host disease in patients receiving bone marrow transplantation†; treatment of multiple myeloma†; treatment of clinical manifestations of mycobacterial infection caused by *Mycobacterium tuberculosis* and nontuberculous mycobacteria†; treatment of Crohn's disease†; and treatment of primary brain tumors†. In addition, thalidomide has been used for the treatment of a variety of inflammatory and/or dermatologic disorders, treatment of various HIV-associated conditions, and treatment of various malignancies.

*Restricted Distribution* Because thalidomide is a known human teratogen and can cause severe, life-threatening birth defects or fetal death if

given during pregnancy (see Teratogenic Effects under Pregnancy, Fertility, and Lactation: Pregnancy, in Cautions), the drug was approved by the FDA for marketing in the US in 1998 only under a special restricted distribution program, the System for Thalidomide Education and Prescribing Safety (STEPS), designed to help ensure the safe and effective prescribing, dispensing, and use of commercially available thalidomide. In the US, the STEPS distribution program restricts access to commercially available thalidomide to prescribing clinicians, pharmacies, and patients who are registered in the program and mandates compliance with registration, education, and safety requirements of the program. (See Dosage and Administration: Restricted Distribution Program.) The STEPS program minimizes, but may not completely eliminate, the risk that thalidomide may inadvertently be given to a pregnant woman. Thalidomide also is available in the US for use in clinical trials under protocol conditions. *The risks versus benefits of thalidomide must be addressed each time use of the drug is being considered.*

*Past and Current Therapeutic Perspective* In the late 1950s, thalidomide was marketed in several other countries, including the United Kingdom and Canada, and was available over-the-counter in some countries (e.g., Germany) for use as a sedative and for the treatment of various conditions, including asthma, hypertension, migraine, and common symptoms of early pregnancy (e.g., morning sickness), often in combination with other drugs. Thalidomide was being used in clinical studies in the US, but did not receive FDA approval at that time principally because of European reports of thalidomide-associated peripheral neuropathy that may be irreversible and unanswered questions about potential adverse effects on fetuses. Because of thalidomide's prompt sedative effects, lack of hangover, and apparent safety (in regards to overdosage), the drug was considered to be a safe alternative to barbiturates, and its manufacturer at that time promoted it as a nontoxic drug with no adverse effects, and completely safe for administration to pregnant women. However, reports of serious adverse effects soon appeared and use of thalidomide was linked to an epidemic of severe and often fatal fetal and neonatal malformations (most frequently phocomelia) that affected children in 46 countries.During that time, 17 babies were born in the US with thalidomide-associated phocomelia to mothers who received the drug from overseas sources or received premarketing samples distributed by drug company representatives. In 1961, the manufacturer withdrew thalidomide from the world market.

A few years later, there were reports that leprosy patients with inflammatory lesions related to ENL reactions had experienced improvement in these lesions while receiving thalidomide as a sedative. The discovery of thalidomide's therapeutic efficacy in the treatment of ENL led to investigations that revealed the anti-inflammatory and immunomodulatory effects of the drug and prompted studies evaluating the drug in various autoimmune or inflammatory diseases and various conditions in HIV-infected patients. In addition, after in vitro and animal studies indicated that thalidomide has anti-angiogenesis activity, investigations were initiated to evaluate use of the drug for a variety of neoplastic diseases. Most information to date regarding use of thalidomide for the treatment of inflammatory or immune disorders or for the treatment of patients with HIV infection or malignancy consists of case reports or data obtained from uncontrolled studies in a limited number of patients. Well-controlled clinical studies are needed to evaluate the safety and efficacy of thalidomide for the treatment of these various indications.

■ **Erythema Nodosum Leprosum** Thalidomide is used for acute treatment of cutaneous manifestations of moderate to severe erythema nodosum leprosum (ENL) reactions (lepra type 2 reactions) in leprosy patients, and also is used for maintenance therapy for prevention and suppression of cutaneous manifestations of ENL recurrence. Thalidomide has been used in conjunction with corticosteroid therapy for the acute treatment of ENL reactions that include moderate to severe neuritis in addition to cutaneous manifestations; however, thalidomide should *not* be used alone as monotherapy for treatment of ENL reactions complicated by neuritis. In these situations, thalidomide generally is initiated in conjunction with systemic corticosteroid therapy and the corticosteroid is slowly withdrawn if neuritis resolves.

ENL is a recurrent, immunologically mediated syndrome that occurs principally in patients with multibacillary leprosy. While ENL reactions have been reported to occur in 10–50% of lepromatous leprosy patients and 25–30% of borderline lepromatous patients, these reactions are being reported less frequently in patients receiving the currently recommended multidrug antileprosy regimens that include clofazimine than in those who received dapsone monotherapy. ENL usually occurs after initiation of anti-infective therapy for leprosy (generally within the first 2 years of treatment), although occasionally it may occur spontaneously in untreated lepromatous leprosy patients or after treatment is discontinued. These reactions are considered to be a manifestation of the disease rather than an adverse reaction to antileprosy regimens. Clinical symptoms include cutaneous papules or nodules that are painful or tender, erythematous, and histologically vasculitic; the papules may pustulate and ulcerate, appear as recurrent crops, and are widely distributed, generally appearing on extensor surfaces of the extremities and on the face. Cutaneous symptoms of ENL may be accompanied by peripheral neuritis (usually of the ulnar nerve), fever, malaise, wasting, uveitis, lymphadenitis orchitis, and glomerulonephritis. Histologically, ENL is an acute vasculitis or panniculitis that is thought to be secondary to immune (i.e., antigen-antibody) complex deposition.

Depending on the severity of manifestations, ENL reactions generally are treated using analgesics, corticosteroids, and/or thalidomide; clofazimine also has anti-inflammatory effects and is beneficial in the treatment of ENL reac-

tions. While mild ENL reactions in some patients may be adequately managed with a nonsteroidal anti-inflammatory agent (e.g., aspirin, indomethacin) and bedrest, moderate to severe ENL reactions generally are treated with corticosteroids and/or thalidomide, and hospitalization may be required. The antileprosy regimen usually is continued while the ENL reaction is treated. Corticosteroid therapy (usually prednisolone) generally is effective for the treatment of moderate and severe ENL and usually is necessary when ENL is complicated by neuritis; however, long-term therapy may be required and there is a risk that ENL patients (especially those with chronic ENL) may become steroid dependent.

In patients already receiving clofazimine as part of a multidrug antileprosy regimen, a temporary increase in clofazimine dosage may allow a reduction in corticosteroid requirements; clofazimine dosage effective for the treatment of ENL reactions is slightly higher than that usually recommended for the treatment of leprosy. However, clofazimine is not as effective or as rapidly acting as corticosteroids or thalidomide in the treatment of ENL and should not be initiated as the sole agent for the treatment of severe ENL.

Thalidomide is effective for the treatment of moderate to severe ENL reactions, and some clinicians suggest that thalidomide may be the drug of choice for the treatment of these reactions, especially severe, recurrent reactions, in part because a prompt response to thalidomide generally is obtained and because of concerns related to long-term use of corticosteroids in leprosy patients. However, the risks versus benefits of thalidomide therapy must be considered, especially in women of childbearing age. Early diagnosis and treatment of ENL is important since these reactions are associated with considerable morbidity, especially if chronic, recurrent ENL occurs. Therapy for leprosy and leprosy reactional states should be undertaken in consultation with an expert in the treatment of leprosy. In the US, the Gillis W. Long Hansen's Disease Center at 800-642-2477 should be contacted for further information on the management of leprosy reactional states.

Information regarding safety and efficacy of thalidomide for the treatment of cutaneous manifestations of moderate to severe ENL is derived from more than 30 years of experience with the drug, open-label and controlled studies and case reports involving leprosy patients from many different countries, and a retrospective study of leprosy patients treated in the US by the US Public Health Service (USPHS). There is evidence that use of thalidomide in leprosy patients with moderate to severe ENL reactions can result in prompt resolution of the signs and symptoms of ENL, and the drug has been effective in patients with severe chronic ENL refractory to corticosteroid therapy. In one controlled study in patients with ENL cutaneous lesions who received 7-day regimens of thalidomide (400 mg daily) or placebo, a response (i.e., complete remission of symptoms or advanced remission of about 50% of existing ENL skin lesions) occurred in 66 or 9% of treatment courses in patients receiving thalidomide or placebo, respectively. In a similar study, a complete response (i.e., the absence of skin lesions) occurred in 75 or 25% of treatment courses in patients receiving thalidomide or aspirin, respectively. Efficacy of thalidomide for the treatment of chronic ENL reactions has been evaluated in 2 limited crossover studies of hospitalized, corticosteroid-dependent ENL patients who were receiving dapsone and were treated with a 4- to 6-week regimen of thalidomide (300 mg daily) or placebo. In the first crossover study, the weekly corticosteroid dosage could be reduced in about 89% of patients while thalidomide was administered, but corticosteroid dosage had to be increased when placebo was administered. In the second crossover study, 100 or 12.5% of patients decreased their weekly dosage of corticosteroids while receiving a 6-week regimen of thalidomide or placebo, respectively.

Information regarding safety and efficacy of thalidomide for the prevention of ENL relapse is limited, and labeling for this use is based on data obtained from a retrospective evaluation of ENL patients treated by the USPHS. A subset of these ENL patients receiving thalidomide had repeated relapse of ENL symptoms when thalidomide was discontinued, but remission of symptoms when treatment with the drug was reinitiated.

■ **Inflammatory and/or Dermatologic Disorders** Based on the beneficial effects of thalidomide in the treatment of inflammatory dermatoses associated with ENL, the drug has been used for the treatment of a variety of inflammatory and/or dermatologic disorders, including Behcet's syndrome†, erosive lichen planus†, erythema multiforme†, lupus erythematosus† (discoid lupus erythematosus, subacute or chronic cutaneous lupus erythematosus, cutaneous manifestations of systemic lupus erythematosus), prurigo nodularis†, actinic prurigo†, cutaneous Langerhans cell histiocytosis†, uremic pruritus†, porphyria cutanea tarda†, and pyoderma gangrenosum†. There is evidence that thalidomide can be beneficial and may result in improvements in the dermatologic and mucocutaneous manifestations of these conditions; however, there is recurrence of lesions and symptoms in many patients when the drug is discontinued and long-term maintenance therapy may be necessary. Most clinicians recommend that thalidomide be used for the treatment of inflammatory and/or dermatologic disorders only in selected patients with severe refractory disease unresponsive to other appropriate agents (e.g., corticosteroids).

*Behcet's Syndrome* In patients with Behcet's syndrome†, a chronic inflammatory disease of unknown etiology characterized by recurrent orogenital ulceration, skin lesions, and arthritic symptoms that may be complicated by GI, ocular, and neurologic involvement, thalidomide therapy (100–400 mg daily) has resulted in resolution of dermatologic, mucocutaneous, and arthritic manifestations of the disease. However, symptoms and/or lesions generally recur within several weeks after the drug is discontinued. In a randomized,

double-blind, placebo-controlled study in adult males with Behcet's syndrome with mucocutaneous lesions (without major organ involvement), a complete response (resolution of orogenital ulcers and follicular lesions) was obtained in 6 or 16% of patients receiving thalidomide in a dosage of 100 or 300 mg daily, respectively; there were no complete responses in those receiving placebo. While there are some reports that GI, ophthalmic, and/or neurologic symptoms also may improve during thalidomide therapy, further study is needed to determine whether thalidomide has any clinically important effect on these manifestations of the disease.

*Other Dermatologic Disorders* Thalidomide has *not* been effective when used for the treatment of toxic epidermal necrolysis†. In a limited placebo-controlled study in adults with toxic epidermal necrolysis, there was no evidence that thalidomide had any beneficial effect on necrolysis and patients receiving thalidomide had a higher mortality rate than those receiving placebo. In addition, there has been at least one reported case of a patient developing toxic epidermal necrolysis while receiving thalidomide.

■ **Uses in HIV-infected Patients** Thalidomide is being investigated for a variety of uses in HIV-infected patients, including treatment of HIV-associated aphthous ulcers†, HIV-associated diarrhea†, HIV-associated wasting syndrome†, and Kaposi's sarcoma†. The drug also has been used as an adjunct to anti-infective agents in the treatment of mycobacterial infections†, including *Mycobacterium tuberculosis* and *M. avium* complex (MAC) infections, in HIV-infected patients. While evidence is accumulating that thalidomide may provide some benefits in HIV-infected patients (e.g., promote healing of aphthous ulcers, ameliorate weight loss), further study is needed to evaluate safety and efficacy of thalidomide in HIV-infected patients and to determine whether the drug may increase viral load (i.e., plasma HIV-1 RNA levels) and/or may be associated with an increased incidence of adverse effects in this patient population.

*HIV-associated Aphthous Ulcers* Thalidomide (100–300 mg once daily) has been effective for the treatment and prevention of oropharyngeal, esophageal, and anogenital aphthous ulcers in HIV-infected patients†. The drug has been effective for the treatment of severe recurrent aphthous stomatitis in HIV-infected patients, and also has been effective for the treatment of severe recurrent aphthous stomatitis in immunocompetent patients or patients who are immunocompromised but not HIV-infected† (see Uses: Recurrent Aphthous Stomatitis). Thalidomide is not considered a drug of first choice for the treatment of aphthous ulcers in HIV-infected patients, but may be effective in patients with recurrent ulcers refractory to other therapies (e.g., corticosteroids).

Efficacy of thalidomide for the treatment of oral and esophageal aphthous ulcers in HIV-infected patients has been evaluated in a phase II double-blind, placebo-controlled study through the National Institute of Allergy and Infectious Diseases (NIAID) AIDS Clinical Trials Group (ACTG) (study ACTG 251). HIV-infected patients with oral aphthous ulcers were randomized to receive a 4-week regimen of thalidomide (200 mg once daily) or placebo; if healing of ulcers was not complete after this regimen, an additional 4-week regimen of thalidomide was administered. At 4 weeks, a complete response was obtained in 55 or 7% of patients receiving thalidomide or placebo, respectively.

*HIV-associated Wasting Syndrome* Thalidomide has been used for the treatment of wasting syndrome in a limited number of HIV-infected patients† and also has been used for the treatment of cachexia in other severely immunocompromised patients† (e.g., cancer patients). There is some evidence that thalidomide therapy (50–400 mg daily) may decrease elevated TNF-$\alpha$ plasma concentrations and may promote weight gain in HIV-infected patients. However, thalidomide may increase plasma TNF-$\alpha$ concentrations in some HIV-infected patients. The precise role of TNF-$\alpha$ in the wasting syndrome is unclear and additional study is necessary to evaluate the safety and efficacy of thalidomide in the treatment of HIV-associated wasting syndrome.

*HIV-associated Diarrhea* Thalidomide has been used with some success in a limited number of patients for the treatment of HIV-associated diarrhea, including microsporidiosis†. In one group of HIV-infected patients with chronic diarrhea and weight loss caused by *Enterocytozoon bieneusi* infection that was not responsive to albendazole, use of thalidomide (100 mg daily for 4 weeks) had a beneficial effect (i.e., complete or partial clinical response including increased weight and decreased stool frequency) in 55% of patients. Although there is evidence that thalidomide may relieve some symptoms of microsporidian enteritis in some patients, results of an in vitro study indicate that the drug has no direct activity against microsporidia.

*Kaposi's Sarcoma* There is at least one case report of improvement in cutaneous lesions of Kaposi's sarcoma† in HIV-infected patients receiving thalidomide for the treatment of aphthous ulcers and several patients enrolled in a phase I, dose-ranging, open-label study evaluating thalidomide in AIDS-related Kaposi's sarcoma had partial responses to the drug. However, safety and efficacy of thalidomide for the treatment of Kaposi's sarcoma have not been established, and further study is needed to determine whether thalidomide has any beneficial effect on regression of Kaposi's sarcoma. A phase II study has been initiated through the National Cancer Institute (NCI) to evaluate efficacy of thalidomide in HIV-infected patients who have cutaneous Kaposi's sarcoma lesions and evidence of disease progression in the 2 months prior to study enrollment; preliminary results indicate that some patients may have a partial response to the drug when given in dosages of 200–1000 mg daily.

■ **Neoplastic Diseases** Because there is evidence that thalidomide is an inhibitor of angiogenesis, the drug has been evaluated for the treatment of a

**Thalidomide**  BIOLOGIC RESPONSE MODIFIERS

variety of malignancies, including advanced or metastatic breast cancer†, Kaposi's sarcoma†, melanoma†, multiple myeloma†, ovarian cancer†, primary brain tumors† (recurrent high-grade astrocytomas and mixed gliomas), androgen-independent prostate cancer†, and renal carcinoma†. There is some evidence that thalidomide may have antitumor activity; however, further study is needed to establish safety and efficacy of the drug in the treatment of various malignancies and identify optimal dosages of the drug in patients with cancer. Phase II studies have been initiated to evaluate efficacy of thalidomide for the treatment of Kaposi's sarcoma in HIV-infected patients (see Kaposi's Sarcoma under Uses: Uses in HIV-infected Patients), recurrent high-grade gliomas, androgen-independent prostate cancer, and metastatic breast cancer.

*Multiple Myeloma*  Several phase II studies have been initiated to evaluate use of thalidomide (usually as part of a combination regimen) for the treatment of refractory or relapsed multiple myeloma. In a study in patients whose myeloma had relapsed after high-dose chemotherapy, thalidomide therapy (titrated up to 800 mg daily, if tolerated) resulted in a 25 to at least 90% reduction in serum and urine paraproteins (myeloma protein, Bence Jones protein) in 32% of patients, with several achieving complete remission. This response was apparent within 2 months in about 80% of responders and was associated with decreased plasma cells in bone marrow (indicating a reduction in tumor burden) and increased hemoglobin concentrations; substantial changes in microvascular density of bone marrow were not apparent. At 1 year, estimates of mean event-free and overall survival were 22 and 58%, respectively. While ongoing study is necessary, including further elucidation of optimal dosage and schedule of therapy, thalidomide appears to induce marked and potentially durable responses in some patients with multiple myeloma, including those whose disease has relapsed. In addition, the role of the drug as monotherapy and as a component of chemotherapeutic regimens in earlier stages of the cancer remains to be determined.

*Cachexia*  Thalidomide also has been used for the treatment of cachexia† in patients with advanced cancer, and there is some evidence that the drug may provide benefits in these patients in terms of improvement in symptoms of insomnia, nausea, appetite, and feelings of well-being. (See Uses in HIV-infected Patients: HIV-associated Wasting Syndrome, in Uses.)

■ **Graft-versus-host Disease**  Thalidomide has been used with some success for the *treatment* of graft-versus-host disease† (GVHD) in adult and pediatric bone marrow transplant recipients, but has been associated with increased morbidity and mortality when used for *prophylaxis* of chronic GVHD in adult bone marrow transplant recipients.

Thalidomide generally has been used in allogeneic bone marrow transplant recipients for the *treatment* of chronic or refractory GVHD unresponsive to other therapies (e.g., corticosteroids, azathioprine, tacrolimus, cyclosporine, antithymocyte globulin); only limited information is available regarding use of the drug for the treatment of acute GVHD. In a study in adult and pediatric patients with chronic or refractory GVHD who received thalidomide therapy (800–1600 mg daily for a median duration of 240 days), a complete response was obtained in 32% and a partial response was obtained in 27%; the overall survival rate was 64%. Thalidomide has been effective when used for the treatment of chronic or corticosteroid-dependent GVHD in pediatric patients 0.5–17 years of age†.

When thalidomide was used for *prophylaxis* of chronic GVHD in a controlled study of adult allogeneic bone marrow transplant patients who had no evidence of active acute GVHD at study entry, those receiving thalidomide (200 mg twice daily beginning 80 days after transplant) experienced a higher incidence of chronic GVHD and had a substantially higher mortality rate compared with those receiving placebo. Chronic GVHD occurred in 64 or 38% of patients receiving thalidomide or placebo, respectively; overall mortality was about 39 or 8%, and mortality from GVHD was about 21 or 4% in those receiving thalidomide or placebo, respectively.

■ **Recurrent Aphthous Stomatitis**  Thalidomide has been effective when used for the treatment of severe aphthous oral ulcers in patients with recurrent aphthous stomatitis† (RAS). The drug has been used effectively for the treatment of RAS in immunocompetent adults and pediatric patients and also has been effective when used in immunocompromised patients, including cancer patients and HIV-infected patients (see Uses in HIV-infected Patients: HIV-associated Aphthous Ulcers, in Uses).In a placebo-controlled cross-over study in patients with severe RAS, a complete clinical remission was obtained in 48 or 9% of patients receiving thalidomide or placebo, respectively. Oral ulcers generally heal within 1–6 weeks after initiation of thalidomide therapy (100–300 mg daily), but higher dosage may be needed in some patients (400–600 mg daily) and ulcers may relapse when the drug is discontinued. In some patients, relapse may be prevented or treated using thalidomide maintenance therapy (50–100 mg daily).

■ **GI Disorders**  *Crohn's Disease*  Thalidomide has been used with some success in a limited number of patients for the treatment of refractory Crohn's disease† (e.g., in those with moderately to severely, chronically active or fistulizing disease). In patients who did not respond to or were intolerant of usually recommended therapies (e.g., corticosteroids, sulfasalazine, azathioprine, mercaptopurine, methotrexate), thalidomide therapy (50–300 mg daily) resulted in resolution of small bowel ulceration, bleeding, or pain and improvement related to quality of life or symptoms associated with fistulas. In at least one patient with Crohn's disease, thalidomide therapy also resulted in resolution of severe, recurrent oral aphthous ulcers.

Limited data indicate that thalidomide (100 mg daily) may be effective in maintaining response in patients with chronically active and fistulizing refractory Crohn's disease whose disease has responded to infliximab (dosage of 5 mg/kg administered as one or more infusions in patients with chronically active disease and 3 or more infusions in those with fistulizing disease). The median follow-up was 238 days from initiation of thalidomide therapy and 265 days after the last infusion of infliximab. Remission rates (full improvement) with thalidomide were 92, 83, or 83% at 3, 6, or 12 months, respectively, after the last dose of infliximab.

(For further information on the management of Crohn's disease, see Uses: Crohn's Disease, in Mesalamine 56:36).

*Other GI Disorder*  Thalidomide also has been used with some success in a limited number of patients for the treatment of ulcerative colitis†, but additional study is needed.

■ **Other Uses**  Thalidomide has been used in a limited number of patients for the treatment of refractory ankylosing spondylitis†, refractory rheumatoid arthritis†, or sarcoidosis†, but additional study and experience are needed.

Because thalidomide is an inhibitor of angiogenesis and there is some evidence that loss of vision in the severe, wet form of macular degeneration may be related to angiogenesis in the blood vessels behind the macula, the drug is being investigated for the treatment of macular degeneration†.

## Dosage and Administration

■ **Administration**  Thalidomide is administered orally. Because administration with a high-fat meal substantially delays the time to peak plasma concentrations of thalidomide, the drug should be administered with water at least 1 hour after a meal.

When thalidomide is given as a single daily dose, the manufacturer recommends that the dose preferably be given at bedtime (to minimize the sedative effects of the drug) with water and at least 1 hour after the evening meal. When high daily dosage of thalidomide is necessary (e.g., 400 mg daily), the daily dose may be given as a single dose at bedtime or, alternatively, in divided doses given with water at least 1 hour after meals.

■ **Dosage**  *Erythema Nodosum Leprosum*  For acute treatment of cutaneous manifestations of moderate to severe erythema nodosum leprosum (ENL) in adults and children 12 years of age or older, thalidomide should be initiated at a dosage of 100–300 mg daily. Patients weighing less than 50 kg should receive a low initial dosage of thalidomide (e.g., 100 mg daily). For the treatment of severe cutaneous ENL reactions or in patients who previously required high thalidomide dosages to control an ENL reaction, the drug may be initiated at a dosage up to 400 mg daily.

Thalidomide generally should be continued until signs and symptoms of active ENL reaction have subsided (usually at least 2 weeks), and dosage should then be gradually reduced. The manufacturer recommends that daily dosage of thalidomide be reduced in 50-mg increments every 2–4 weeks until the drug is discontinued or recurrence of ENL occurs. Patients who have recurrence of ENL while thalidomide dosage is being reduced and those who have a documented history indicating that prolonged maintenance treatment is necessary to prevent recurrence of cutaneous ENL should be maintained on the minimum dosage of the drug required to control the reaction. Thereafter, gradual decrease and discontinuance of maintenance dosage should be attempted every 3–6 months.

Patients with moderate to severe neuritis associated with severe ENL reactions may receive corticosteroid therapy concomitantly with thalidomide; corticosteroid dosage may be tapered and the corticosteroid discontinued when neuritis has ameliorated.

*Recurrent Aphthous Stomatitis*  For the treatment of recurrent aphthous stomatitis† in adults, including those who are HIV-infected, thalidomide dosages of 100–300 mg daily have been used. However, higher dosages (e.g., 400–600 mg daily) may be necessary in some patients. The optimum duration of thalidomide therapy has not been elucidated, but ulcers may relapse following discontinuance of the drug.

*Crohn's Disease*  For the management of refractory Crohn's disease† in adults, thalidomide dosages of 50–300 mg daily have been used. Thalidomide dosages of 100 mg daily have been used in maintenance therapy of chronically active or fistulizing refractory Crohn's disease† in patients whose disease has responded to infliximab.

*Graft-versus-host Disease*  For the *treatment* of graft-versus-host disease† (GVHD), thalidomide dosages of 800–1600 mg daily have been used. The drug should *not* be used for prophylaxis of chronic GVHD. (See Uses: Graft-versus-host Disease.)

*Multiple Myeloma*  The optimum dosage and schedule of thalidomide therapy for multiple myeloma† remain to be established. (See Neoplastic Diseases: Multiple Myeloma, in Uses.)

■ **Restricted Distribution Program**  *Because thalidomide is a known human teratogen and can cause severe, life-threatening birth defects if administered during pregnancy, commercially available thalidomide must be obtained through a restricted distribution program, the System for Thalidomide Education and Prescribing Safety (STEPS), designed to help ensure that fetal exposure to the drug does not occur.* Clinicians, pharmacies, and patients must be registered in the STEPS program before they can prescribe, dispense, and receive thalidomide, and compliance with all terms outlined in the program is

mandatory. The STEPS program controls access to thalidomide; educates STEPS participants (clinicians, pharmacists, patients) about the risks associated with thalidomide and the procedural requirements for safe use of the drug; and monitors compliance with the registration, education, and safety requirements of the program.

The STEPS program was created by Celgene in collaboration with the US Food and Drug Administration (FDA), the Birth Defects Branch of the US Centers for Disease Control and Prevention (CDC), and patient advocacy groups (e.g., the Thalidomide Victims Association of Canada). While the program was based on safety models currently in use for isotretinoin and clozapine, it incorporates additional controls and compliance monitoring not included in prior drug distribution programs. For information regarding the STEPS program, Celgene's customer service department should be contacted at888-423-5436.

**Prescribing Clinicians**   Before prescribing thalidomide, clinicians must be registered in the STEPS Prescriber Registry and must agree to prescribe the drug in accordance with the STEPS patient eligibility criteria and monitoring procedures. Clinicians can be registered by returning a completed, signed registration card to Celgene. Clinicians must agree to provide comprehensive patient counseling on the benefits and risks of thalidomide as outlined in the STEPS informed consent document; provide appropriate contraception counseling and pregnancy testing or refer the patient to a qualified obstetrics-gynecology specialist for such counseling; complete the prescriber portion of the patient monitoring survey; and submit a copy of the completed informed consent document (signed by the patient and prescriber) and a copy of the patient monitoring survey.

Clinicians must agree to write each prescription for no more than a 28-day supply of thalidomide at a time (with no refills), inform the patient that each prescription must be filled within 7 days of being written, and encourage the patient to return all unused thalidomide to the dispensing pharmacy. The STEPS program does not allow automatic prescription refills, and the clinician must ensure that patients return for monthly office visits to obtain subsequent prescriptions for thalidomide. At each monthly visit and before a new prescription for the drug is issued, the clinician must provide the patient with additional counseling about adverse effects of thalidomide and the use of appropriate contraceptive measures; ensure that a serum pregnancy test is performed in any female patient of childbearing potential; ask the patient to complete a patient survey form about their compliance with contraceptive measures, pregnancy testing, and drug therapy; and submit the completed patient survey form as directed by the STEPS program.

**Dispensing Pharmacies**   To receive thalidomide from the manufacturer for dispensing, pharmacies must be registered in the STEPS Pharmacy Dispensing Registry and agree to comply with all requirements of the program. The director of pharmacy or head pharmacist registers the pharmacy by returning a completed, signed pharmacy registration card to Celgene. After the manufacturer enters all of the information provided by the pharmacist into the dispensing database, the pharmacy will be eligible to dispense thalidomide, and the manufacturer will provide a continuing education monograph to the pharmacy. The registering pharmacist must agree to inform all staff pharmacists of the dispensing procedures for thalidomide.

When a new patient presents an initial prescription for thalidomide to the pharmacy, the pharmacist must collect from the patient a copy of the STEPS informed consent document (signed by the patient and a registered prescriber) and a copy of the completed patient monitoring survey. The pharmacist will then register the patient into the STEPS distribution database using a patient registration form provided by the manufacturer. Subsequent to successful patient registration, the manufacturer will ship the drug to the registered pharmacy for arrival within 2 days.

All prescriptions for thalidomide must be presented to the pharmacist in person, and may not be communicated to the pharmacist over the phone. Before dispensing thalidomide, the pharmacist must activate the authorization number on every prescription by calling the Celgene® Customer Care Center at 1-888-423-5436 and obtaining a confirmation number; this number must be written on the thalidomide prescription.

The pharmacist may not fill a single thalidomide prescription for more than a 28-day supply of the drug; automatic refills are not allowed. The pharmacist must verify that each prescription was written within the preceding 7 days, and must not dispense the drug if the prescription was written more than 7 days previously, or if there is (or should be) more than a 7-day supply of the drug remaining from the preceding prescription. Blister packs containing the drug must be dispensed intact (i.e., the drug may not be repackaged). Pharmacists must encourage all patients to return all unused drug to the dispensing pharmacy, where it will be accepted and destroyed or returned to the manufacturer.

**Patients**   To receive commercially available thalidomide, a patient must be registered in the STEPS program and agree to comply with all requirements of the program, including mandatory contraceptive measures, and participation in a telephone survey and patient registry while taking thalidomide. Patients can receive a prescription for thalidomide from the prescribing clinician only after the patient has received comprehensive counseling on the benefits and risks of thalidomide as outlined in the STEPS informed consent document, has demonstrated to the clinician that they are capable of understanding the risks associated with thalidomide and instructions on use of the drug, has received appropriate contraception counseling and pregnancy testing either from the prescribing clinician or a qualified obstetrics-gynecology specialist, has had

any questions answered by the clinician, and has signed the informed consent document and completed the patient monitoring survey. As part of the educational requirements of the program, the patient must view the patient-oriented video titled *Important Information for Men and Women Taking Thalomid® (thalidomide)* and/or read the patient brochure provided by the manufacturer and must understand their contents, including other possible health problems resulting from thalidomide adverse effects. The patient also must understand that thalidomide must be kept out of the reach of children, and must *never* be given to women who are able to have children. The patient must have been warned by the clinician that an unborn baby will almost certainly have serious birth defects and even die if a woman becomes pregnant or is pregnant while taking thalidomide. For minors 18 years of age or younger, a parent or legal guardian must be educated concerning the hazards of thalidomide and agree to ensure that the minor complies with all requirements of the STEPS program.

Female patients in the STEPS program who are of childbearing potential (i.e., adolescents and women who are sexually mature, have had menses at some time in the 24 consecutive months preceding initiation of thalidomide, have not undergone a hysterectomy) must agree to use effective contraceptive measures (which may include abstinence) for at least 4 weeks prior to, throughout, and for at least 4 weeks after completion of thalidomide therapy. These women must have a confirmed negative pregnancy test result prior to initiation of thalidomide therapy and also must agree to have regular, repeat pregnancy tests throughout therapy (i.e., once weekly during the first month and monthly or every 2 weeks in women with regular or irregular menstrual cycles, respectively). (See Pregnancy under Cautions: Pregnancy, Fertility, and Lactation.) Male patients in the STEPS program must agree to use a latex condom every time they have sexual contact with a woman of childbearing potential. All patients must agree to not share their thalidomide with anyone else (even if the other individual has similar symptoms); to keep the drug out of the reach of children; and to not donate blood or semen while receiving thalidomide.

The patient must present a copy of the completed informed consent document (signed by the patient and registered prescriber) and patient monitoring survey to the dispensing pharmacist who then registers the patient with Celgene. Once a patient is registered in the STEPS distribution database and has received their first 28-day supply of thalidomide, they must return to the prescribing clinician at monthly intervals to receive subsequent prescriptions for thalidomide; the program does not allow automatic refills. At each monthly visit to the prescribing clinician and before a new prescription for the drug is issued, the patient must receive additional counseling about adverse effects of thalidomide and the use of appropriate contraception, receive a serum pregnancy test (if female and of childbearing potential), and complete a patient monitoring survey.

**Monitoring and Compliance**   Compliance with the educational, informed consent, and pregnancy-testing components of the STEPS program is monitored through the patient surveys that must be completed by prescribing clinicians and patients when each initial and subsequent prescription of thalidomide is written. The surveys are designed to monitor compliance with, and implementation and execution of STEPS safety procedures, and to analyze outcomes.

The STEPS program also is monitored by a quality assurance committee composed of Celgene employees, agents, and consultants. In addition, all aspects of the STEPS program are subject to FDA audits. Although the FDA is not directly responsible for the operation of the STEPS program registry, the FDA can verify that the STEPS program is operating appropriately by conducting periodic inspections of pharmacies, and by reviewing data from and procedures of the clinicians and patient registry. State boards of pharmacy have no regulatory oversight of the registry process.

The STEPS program is *not* designed to restrict prescribing and dispensing of commercially available thalidomide to only the FDA-labeled use of the drug. The registration system will collect information regarding any disease for which the drug is being used, regardless of FDA-approved labeling; therefore, clinicians registered in the STEPS program are not restricted from prescribing the drug for unlabeled (off-label) uses.

Although the STEPS program is highly restrictive and minimizes the risk that thalidomide may inadvertently be given to a pregnant woman, the risk of such exposure may not be completely eliminated. The FDA states that if there is even *one* fetal exposure to thalidomide, the entire distribution system will be reevaluated, and steps will be taken to ensure that all deficiencies are corrected.

## Cautions

Thalidomide is a known human teratogen and has caused severe, life-threatening birth defects or fetal death when used during pregnancy. (See Precautions and Contraindications: Teratogenic Precautions and Contraindications, in Cautions.) Another potentially serious adverse effect reported with thalidomide is peripheral neuropathy that may be irreversible. Other adverse effects reported with thalidomide generally are mild to moderate in severity, and usually do not require discontinuance of the drug. The most common adverse effects of thalidomide are CNS effects (e.g., drowsiness, somnolence, dizziness) and dermatologic effects (e.g., rash).

Information on adverse effects of thalidomide reported by the manufacturer was obtained principally from controlled clinical studies in leprosy patients who received thalidomide in a dosage of 50–300 mg daily for the treatment of erythema nodosum leprosum (ENL) and controlled clinical studies in patients

**Thalidomide**                    BIOLOGIC RESPONSE MODIFIERS

with human immunodeficiency virus (HIV) infection who received thalidomide in a dosage of 100–200 mg daily. Additional information on adverse effects of thalidomide reported by the manufacturer was obtained from uncontrolled clinical studies in ENL patients, uncontrolled studies or case reports involving patients who received thalidomide for a wide variety of investigational uses, and spontaneous reports from other sources. The manufacturer states that the incidence of adverse effects reported in these uncontrolled studies and other sources is unknown, and a causal relationship between some of these effects and thalidomide has not been established. Although thalidomide received approval by the US Food and Drug Administration (FDA) in 1998 for use in the treatment of ENL in leprosy patients, data regarding the safety and efficacy of the drug have been accumulating since the drug first became available for use in Europe in the late 1950s.

■ **Nervous System Effects**   *Peripheral Neuropathy*   Thalidomide may cause potentially severe nerve damage (i.e., polyneuritis or peripheral neuropathy) that may be irreversible. The incidence of peripheral neuropathy in patients receiving thalidomide has been reported to range from less than 1% to more than 70%. Incidence data regarding this adverse effect has been difficult to obtain, in part because the drug often is used in patients with diseases that may be associated with neuropathy (e.g., leprosy patients with ENL, patients with HIV infection) and it may be difficult to differentiate the neuropathologic symptoms and changes caused by the underlying disease from those caused by the drug.

Despite long-term experience with use of thalidomide in leprosy patients with ENL, there have been few reports of thalidomide-associated peripheral neuropathy in these patients; in some studies, less than 1% of patients receiving the drug for treatment of ENL experienced peripheral neuropathy. It has been suggested that this may not be an accurate reflection of the incidence of this adverse effect in these patients since peripheral neuritis was not recognized as a potential adverse effect of thalidomide in early studies of the drug, in part because ENL patients frequently have neuropathy in association with their disease and may not have reported such effects while receiving the drug. Therefore, preexisting neuropathy in ENL patients may complicate recognition of thalidomide-associated peripheral neuropathy. In addition, such symptoms may be difficult to monitor since ENL neuritis may improve during thalidomide therapy, but relapse after therapy with the drug is discontinued.

In controlled studies in HIV-infected patients, neuropathy occurred in 7–8% of those receiving thalidomide. In one limited study in HIV-infected patients receiving thalidomide 400 mg daily for 3 months, 7% of patients experienced neuropathy symptoms requiring discontinuance of the drug. In other limited studies, 4% of HIV infected patients receiving 200–300 mg of thalidomide for 14–21 days experienced severe symptoms of neuropathy. It has been suggested that HIV-infected patients may be particularly susceptible to the development of thalidomide-associated polyneuritis. However, since axonal degeneration with clinical and electrophysiologic symptoms resembling those of thalidomide-associated polyneuropathies may occur in HIV-infected patients and other forms of polyneuropathy (including demyelinating and polyradiculopathy) also are reported in such patients, it may be difficult to differentiate neuropathologic changes caused by the underlying disease from those caused by thalidomide.

In a retrospective study of patients receiving thalidomide for a variety of dermatologic conditions, thalidomide-associated peripheral neuropathy occurred in 21–50% of patients and was most frequent in women and geriatric patients. Limited data indicate that peripheral neuropathy occurs in up to 75% of patients receiving thalidomide for the treatment of prurigo nodularis†.

Thalidomide-associated peripheral neuropathy generally has been reported with chronic use of the drug over a period of months, but also has been reported with relatively short-term use of the drug. The correlation between peripheral neuropathy and the cumulative thalidomide dose is unclear; symptoms have been reported to begin after a cumulative dose of 40–50 g in some patients, but also have occurred with no apparent relationship to cumulative dose. There have been some cases when symptoms of thalidomide-associated peripheral neuropathy were not apparent until after the drug was discontinued.

Polyneuropathic symptoms may improve in some patients when thalidomide is discontinued, but symptoms may resolve slowly or not at all after discontinuance of the drug. In a study of patients with thalidomide-induced peripheral neuropathy who were followed for 4–6 years after discontinuing the drug, 25% experienced full recovery, 25% had some improvement of symptoms, and 50% had no improvement in signs and symptoms of neuropathy.

Clinical symptoms of thalidomide-induced neuropathy include predominantly symmetric painful paresthesia of the hands and feet, often accompanied by sensory loss in lower limbs. Muscle weakness and cramps, signs of pyramidal tract involvement, and carpal tunnel syndrome have been reported often. An unpleasant painful symptom, described as "tightness around the feet," was reported in 8–9% of patients in some studies. In early reports, thalidomide-associated peripheral neuropathies were characterized mostly by sensory symptoms, including hypoesthesia and hyperesthesia, hyperalgesia, impaired temperature sensitivity, and impaired vegetative (i.e., autonomic) nervous functions. These symptoms occasionally were accompanied by mild proximal muscle weakness, or evidence of pyramidal tract damage, but motor disturbances appeared to occur rarely. Muscle weakness rapidly improved after discontinuance of the drug, but sensory deficits were slow to improve, and occasionally worsened even while the patient was not receiving thalidomide. Because there was no substantial correlation between the severity of the condition and the total dose of the drug, and because discontinuance of thalidomide

did not result in improvement in many cases, initially it could not be established that such neurologic disturbances were actually caused by thalidomide. Subsequently, the association between thalidomide and peripheral neuropathies was established in clinical studies of patients with discoid lupus erythematosus, prurigo nodularis, and aphthous stomatitis; in these studies, the neurologic status of patients was assessed before and after initiation of thalidomide therapy.

Physiologically, thalidomide polyneuropathy is characterized by axonal degeneration without demyelinization (i.e., a "dying back process"). Electrophysiologic alteration principally is characterized by a decreased sensory action potential amplitude on medial nerves of the arm, and peroneal and sural (medial cutaneous) nerves of the leg, with relative conservation of conduction velocities; however, decreased sensory and motor conduction velocities have been observed. Also, increased somatosensory latency of activation after sural nerve stimulation may occur in the absence of clinical abnormalities in patients receiving thalidomide. Because electrophysiologic alterations may occur before the onset of subjective symptoms, the reported incidence of neuropathy in thalidomide studies is higher if neurophysiologic tests, rather than clinical symptoms, are used for diagnosis.

*Other Nervous System Effects*   Thalidomide exhibits sedative and hypnotic effects, and drowsiness and somnolence are common during therapy with the drug. In controlled clinical studies, adverse nervous system effects (other than peripheral neuritis) occurred in 54% of ENL patients receiving thalidomide, and 34–56 or 34% of HIV-infected patients receiving thalidomide or placebo, respectively. Drowsiness occurred in 38% and malaise occurred in 8% of ENL patients receiving thalidomide, and drowsiness occurred in 36–38 or 11% of HIV-infected patients receiving thalidomide or placebo, respectively. Headache occurred in about 12% of leprosy ENL patients receiving thalidomide, and 17–19 or 11% of HIV-infected patients receiving thalidomide or placebo, respectively. Vertigo occurred in 8% and dizziness occurred in 4–25% of ENL patients receiving thalidomide; dizziness occurred in 19% of HIV-infected patients receiving the drug. Paresthesia occurred in 6–16 or 11% of HIV-infected patients receiving thalidomide or placebo, respectively, and also has been reported when the drug was used in ENL patients. Tremor occurred in 4% of leprosy patients with ENL receiving thalidomide, and agitation or nervousness occurred in 3–9% of HIV-infected patients receiving the drug. Insomnia occurred in 9 or 6% of HIV-infected patients receiving thalidomide or placebo, respectively.

Adverse nervous system effects reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include abnormal gait, abnormal thinking, amnesia, anxiety, ataxia, causalgia, circumoral paresthesia, confusion, decreased libido, decreased reflexes, dementia, dysesthesia, depression, emotional lability, euphoria, hypalgesia, hyperesthesia, hostility, hyperkinesia, incoordination, meningitis, neuralgia, neuritis, neurologic disorder, neuropathy, peripheral neuritis, and psychosis. Carpal tunnel disorder, foot drop, hangover effect, migraine, or suicide attempt was reported in at least one patient receiving thalidomide.

Seizures, including tonic-clonic (grand mal) seizures, have been reported during postmarketing experience with thalidomide. Because the reports of seizures in patients receiving thalidomide were submitted voluntarily from a population of unknown size, their frequency cannot be estimated. Most of the patients in whom seizures were reported had disorders that may have predisposed them to seizure activity, and it currently is not known whether thalidomide has any epileptogenic activity.

■ **Dermatologic and Sensitivity Reactions**   Adverse dermatologic effects occur commonly in patients receiving thalidomide. In controlled clinical studies, adverse dermatologic effects occurred in 42% of ENL patients receiving thalidomide, and 47–56 or 54% of HIV-infected patients receiving thalidomide or placebo, respectively. Rash occurred in 21% of ENL patients receiving thalidomide, and 25 or 31% of HIV-infected patients receiving thalidomide or placebo, respectively. Maculopapular rash occurred in 4% of ENL patients receiving thalidomide, and 17–19 or 6% of HIV-infected patients receiving thalidomide or placebo, respectively. Pruritus occurred in 3–8% of ENL patients receiving thalidomide, and 3–6 or 6% of HIV-infected patients receiving thalidomide or placebo, respectively. Fungal dermatitis or nail disorder occurred in 4% of ENL patients receiving thalidomide, and 3–9% of HIV-infected patients receiving thalidomide. Peripheral edema occurred in 4–8% of ENL patients and 3–8% of HIV-infected patients receiving thalidomide. Facial edema occurred in 4% and urticaria occurred in 1–2% of ENL patients receiving thalidomide. Sweating occurred in 12 or 11% of HIV-infected patients receiving thalidomide or placebo, respectively. Acne occurred in 3–11% of HIV-infected patients receiving thalidomide.

Severe, potentially fatal skin reactions including Stevens-Johnson syndrome and toxic epidermal necrolysis, which may be fatal, have been reported. In one limited study in HIV-infected patients, 14% of those receiving thalidomide (400 mg daily for 3 months) experienced severe skin reactions; these reactions resulted in discontinuance of drug in 7%. In another limited study in HIV-infected patients (with or without tuberculosis) who received thalidomide (300 mg daily for 3 weeks), 30% experienced severe rash that was associated with low $CD4^+$ T-cell counts. The mean $CD4^+$ T-cell count was 17 or 216 cells/mm³ in those with or without rash, respectively. Thalidomide was discontinued and rash resolved in 25% of patients. However, one patient with rash continued to receive thalidomide because of a missed appointment and subsequently developed Stevens-Johnson syndrome with desquamation that resolved after discontinuance of the drug.

Thalidomide                                          BIOLOGIC RESPONSE MODIFIERS

Hypersensitivity reactions characterized by cutaneous and/or febrile symptoms have been reported in HIV-infected patients receiving thalidomide. In some of these HIV-infected patients, rechallenge with thalidomide resulted in accelerated hypersensitivity, including hypotension. Therefore, some clinicians state that if thalidomide rechallenge in an HIV-infected patient is unavoidable (e.g., to elucidate a drug reaction in a patient receiving a complex drug regimen), the patient should be hospitalized when the drug is administered and for at least 24 hours following the rechallenge.

Adverse dermatologic and hypersensitivity reactions reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include allergic reaction, alopecia, angioedema, benign skin neoplasm, dry skin, eczema, exfoliative dermatitis, herpes simplex, ichthyosis, incomplete Stevens-Johnson syndrome, perifollicular thickening, photosensitivity, psoriasis, seborrhea, skin discoloration, skin disorder, skin necrosis, urticaria, and vesiculobullous rash. Erythema nodosum, myxedema, petechiae, or purpura was reported in at least one patient receiving thalidomide. In a glioblastoma patient who discontinued thalidomide therapy because of full-body maculopapular rash, toxic epidermal necrolysis occurred following rechallenge with a single 100-mg dose of the drug.

■ **GI Effects**   In controlled clinical studies, adverse GI effects occurred in 21% of ENL patients receiving thalidomide, and 44–50 or 43% of HIV-infected patients receiving thalidomide or placebo, respectively. Diarrhea occurred in 4% and nausea occurred in 4–6% of ENL patients receiving thalidomide; diarrhea and nausea occurred in 17 and 12% of HIV-infected patients, respectively, receiving the drug. Vomiting has been reported in 1–2% of ENL patients receiving the drug. Abdominal pain and constipation occurred in 4–11% of ENL patients and 3–19% of HIV-infected patients receiving thalidomide. Oral candidiasis occurred in 4% of ENL patients and 6–11% of HIV-infected patients receiving thalidomide. Tooth pain occurred in 4% of ENL patients receiving thalidomide. Dry mouth occurred in 8–9 or 6–72% of HIV-infected patients receiving thalidomide or placebo, respectively. Anorexia occurred in 3–9 or 6% of HIV-infected patients receiving thalidomide or placebo, respectively. Flatulence occurred in 8 or 6% of HIV-infected patients receiving thalidomide or placebo, respectively.

Adverse GI effects reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include enlarged abdomen, increased appetite and weight gain, colitis, dry mouth, dyspepsia, dysphagia, eructation, esophagitis, flatulence, gastroenteritis, GI disorder, GI hemorrhage, gum disorder, intestinal obstruction, parotid gland enlargement, periodontitis, stomatitis, taste perversion, tongue discoloration, tooth disorder, and vomiting. Aphthous stomatitis or stomach ulcer has been reported in at least one patient receiving thalidomide.

■ **Respiratory Effects**   In controlled clinical studies, adverse respiratory effects occurred in 12% of ENL patients receiving thalidomide, and 19–25 or 26% of HIV-infected patients receiving thalidomide or placebo, respectively. Pharyngitis occurred in 4% of ENL patients, and 6–8 or 6% of HIV-infected patients receiving thalidomide or placebo, respectively. Sinusitis or rhinitis occurred in 4% of ENL patients, and sinusitis occurred in 3–8 or 6% of HIV-infected patients receiving thalidomide or placebo, respectively.

Adverse respiratory effects reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include apnea, bronchitis, cough, emphysema, epistaxis, lung disorder, lung edema, pneumonia (including that caused by *Pneumocystis carinii*), pulmonary embolus, rales, upper respiratory infection, and voice alteration. Also, dyspnea has been reported in at least one patient receiving thalidomide.

■ **Genitourinary Effects**   In controlled clinical studies, adverse genitourinary effects occurred in 8% of ENL patients receiving thalidomide, and 6–17 or 11% of HIV-infected patients receiving thalidomide or placebo, respectively. Impotence occurred in 8% of ENL patients and 3–12% of HIV-infected patients receiving thalidomide. Albuminuria occurred in 3–8 or 6% of HIV-infected patients receiving thalidomide or placebo, respectively. Hematuria occurred in 11 or 3% of HIV-infected patients receiving thalidomide or placebo, respectively.

Adverse genitourinary effects reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include hematuria, orchitis, proteinuria, pyuria, and urinary frequency. Acute renal failure, amenorrhea, enuresis, metrorrhagia, or oliguria has been reported in at least one patient receiving thalidomide.

■ **Hematologic Effects**   In controlled clinical studies, adverse hematologic effects occurred in 22–41 or 29% of HIV-infected patients receiving thalidomide or placebo, respectively. Leukopenia occurred in 17–25 or 9% of HIV-infected patients receiving thalidomide or placebo, respectively; in one study, leukopenia occurred in 14% of ENL patients receiving the drug. Lymphadenopathy occurred in 6–12 or 9% of HIV-infected patients receiving thalidomide or placebo, respectively. Anemia occurred in 6–12 or 9% of HIV-infected patients receiving thalidomide or placebo, respectively.

Adverse hematologic effects reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include aplastic anemia, cyanosis, decreased CD4+ T-cell count, erythrocyte sedimentation rate increase, eosinophilia, granulocytopenia, hypochromic anemia, leukemia, leukocytosis, leukopenia, macrocytic anemia, megaloblastic anemia, microcytic anemia, elevated mean corpuscular volume, abnormal erythrocyte count, and thrombocytopenia. Chronic myelogenous leukemia, erythroleukemia, nodular

sclerosing Hodgkin's disease, lymphopenia, or pancytopenia has been reported in at least one patient receiving thalidomide.

■ **Musculoskeletal Effects**   In controlled clinical studies, asthenia occurred in 8% of ENL patients receiving thalidomide, and 6–22 or 3% of HIV-infected patients receiving thalidomide or placebo, respectively. Back pain occurred in 4% of ENL patients and 6% of HIV-infected patients receiving thalidomide. Neck pain and neck rigidity each occurred in 4% of patients with ENL receiving thalidomide.

Adverse musculoskeletal effects reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include arthritis, bone tenderness, hypertonia, joint disorder, leg cramps, myalgia, myasthenia, periosteal disorder, and upper extremity pain.

■ **Cardiovascular Effects**   Adverse cardiovascular effects reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include angina pectoris, arrhythmia, atrial fibrillation, bradycardia, cerebral ischemia, cerebrovascular accident, chest pain, congestive heart failure, deep thrombophlebitis, heart arrest, heart failure, hypertension, hypotension, murmur, myocardial infarction, palpitation, pericarditis, peripheral vascular disorder, postural (orthostatic) hypotension, syncope, tachycardia, thrombophlebitis, thrombosis, and vasodilation. Raynaud's syndrome has been reported in at least one patient receiving thalidomide.

The manufacturer states that, although bradycardia has been reported in patients receiving thalidomide, medical or other intervention was not required and the clinical importance and underlying etiology of bradycardia in these patients are unknown.

■ **Hepatic Effects**   In controlled clinical studies, increased serum AST (SGOT) concentrations occurred in 3–12 or 6% of HIV-infected patients receiving thalidomide or placebo, respectively; multiple abnormalities in liver function test results occurred in 9% of HIV-infected patients receiving thalidomide.

Adverse hepatic effects reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include increased liver function test results, increased serum ALT (SGPT) concentrations, bilirubinemia, cholangitis, cholestatic jaundice, enlarged liver, and hepatitis. Bile duct obstruction has occurred in at least one patient receiving thalidomide.

■ **Ocular and Otic Effects**   Adverse ocular and otic effects reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include amblyopia, conjunctivitis, dry eye, ocular disorder, ocular pain, lacrimation disorder, retinitis, deafness, and tinnitus. Diplopia or nystagmus has occurred in at least one patient receiving thalidomide.

■ **Effects on HIV Viral Load and Tumor Necrosis Factor**   Increased HIV viral load (i.e., increased plasma HIV-1 RNA levels) and increased levels of plasma tumor necrosis factor alpha (TNF-$\alpha$) and soluble TNF-$\alpha$ receptor type II have been reported in some HIV-infected patients receiving thalidomide. In one controlled study in HIV-infected patients, median plasma HIV-1 RNA levels increased by 0.42 $\log_{10}$ copies/mL in patients receiving thalidomide compared with a 0.05 $\log_{10}$-copies/mL increase in those receiving placebo. A similar trend of increased HIV load was reported in another study in HIV-infected patients. However, the clinical importance of these effects is unknown since the patients involved were not receiving the potent antiretroviral agent combination regimens currently recommended for HIV-infected patients. (See Pharmacology: Immunomodulatory Effects.)

■ **Other Adverse Effects**   In controlled clinical studies, accidental injury occurred in 4% of ENL patients, and 6 or 3% of HIV-infected patients receiving thalidomide or placebo, respectively. Chills occurred in 4% of ENL patients, and 9 or 11% of HIV-infected patients receiving thalidomide or placebo, respectively. Pain occurred in 8% of ENL patients, and 3 or 6% of HIV-infected patients receiving thalidomide or placebo, respectively. Fever occurred in 19–22 or 17% of HIV-infected patients receiving thalidomide or placebo, respectively. Infection occurred in 6–8 or 3% of HIV-infected patients receiving thalidomide or placebo, respectively. Hyperlipidemia occurred in 6–9 or 3% of HIV-infected patients receiving thalidomide or placebo, respectively.

Other adverse effects reported in patients with ENL or HIV infection receiving thalidomide in uncontrolled studies include avitaminosis, altered hormone concentrations, altered alkaline phosphatase concentrations, dehydration, increased BUN, decreased creatinine clearance, inappropriate antidiuretic hormone concentrations, increased serum creatinine, electrolyte abnormalities, hypocalcemia, hypercholesterolemia, hyperglycemia, hyperkalemia, hyperlipidemia, hypoproteinemia, hyperuricemia, increased lactic dehydrogenase, increased lipase, decreased phosphorus, amyloidosis, ascites, chills and fever, cellulitis, cyst, diabetes, fever, flu-like syndrome, hernia, moniliasis, palpable spleen, pancreatitis, sarcoma, sepsis, and viral infection. Galactorrhea, gynecomastia, hypomagnesemia, hypothyroidism, and lymphedema have occurred in at least one patient receiving thalidomide.

■ **Precautions and Contraindications**   *Teratogenicity Precautions and Contraindications*   Because thalidomide is a known human teratogen (see Teratogenic Effects under Pregnancy, Fertility, and Lactation: Pregnancy), the drug is commercially available in the US only through a restricted distribution program, the System for Thalidomide Education and Prescribing Safety (STEPS) designed to minimize the chance of fetal exposure and help ensure the safe and effective prescribing, dispensing, and use of thalidomide. Thalidomide may be prescribed only by licensed physicians who are

**Thalidomide**                    BIOLOGIC RESPONSE MODIFIERS

registered in the STEPS program and understand the risk of teratogenicity if thalidomide is used during pregnancy. For information on the distribution program, see Dosage and Administration: Restricted Distribution Program.

Thalidomide is contraindicated in pregnant women and should be used in females of childbearing potential only when alternative therapies are considered inappropriate and the patient is capable of understanding and complying with the patient registration, education, and safety requirements of the STEPS program, including mandatory contraceptive measures and pregnancy testing. Female patients should be advised to immediately discontinue taking thalidomide and inform their clinician if they become pregnant (or for any reason they think they might be pregnant), miss a menstrual period, experience unusual menstrual bleeding, or stop using contraceptive measures. (See Pregnancy, Fertility, and Lactation: Pregnancy, in Cautions.)

Thalidomide should be used in sexually mature males only when the patient is capable of understanding and complying with the patient registration, education, and safety requirements of the STEPS program, including mandatory contraceptive measures for men. Male patients receiving thalidomide should be instructed to inform their clinician if they have unprotected heterosexual sexual contact while receiving thalidomide or during the first 4 weeks after discontinuing the drug or if they think that their sexual partner may be pregnant.

Patients should be advised to take thalidomide only as prescribed, and in compliance with the requirements of the STEPS program. Patients should be warned not to share thalidomide with anyone else and to keep the drug out of the reach of children. In addition, patients should be instructed not to donate blood and male patients should be warned not to donate semen while taking thalidomide.

**Contraceptive Measures.** All women and adolescent females of childbearing potential and all sexually mature males receiving thalidomide must use effective contraceptive measures (which may include abstinence) to help ensure that fetal exposure to thalidomide does not occur. Contraceptive measures are indicated even in females with a history of infertility. The only females who do not need to observe mandatory contraceptive measures are those who have undergone hysterectomy or who are postmenopausal and have had no menses for at least 24 consecutive months.

All women and adolescent females of childbearing potential *must* use 2 reliable forms of contraception simultaneously (unless the patient chooses to remain continuously abstinent from engaging in heterosexual sexual contact) beginning 4 weeks prior to initiating thalidomide therapy and continuing until 4 weeks after thalidomide therapy is discontinued. The patient must use at least 2 birth control methods; preferably one should be a highly effective birth control method (intrauterine device [IUD]; oral, injectable, or implanted hormonal contraceptives; tubal ligation; vasectomized partner) and one should be an effective barrier method (latex condom, diaphragm, cervical cap). However, if either IUD or hormonal contraceptive use is contraindicated in the female, 2 other effective methods may be used. Females of childbearing potential receiving thalidomide concomitantly with any other drug that can reduce efficacy of oral contraceptives must use 2 *other* effective methods of contraception or abstain from heterosexual sexual contact. Drugs that may interfere with the effectiveness of oral contraceptives include protease inhibitors (e.g., amprenavir, indinavir, nelfinavir, ritonavir, saquinavir), griseofulvin, rifampin, rifabutin, phenytoin, or carbamazepine. (See Drug Interactions: Hormonal Contraceptives and Drugs that Interfere with Hormonal Contraceptives.)

Sexually mature males (including those who have successfully undergone vasectomy) receiving thalidomide must completely avoid unprotected sexual contact with women of childbearing potential because thalidomide is present in semen. While receiving thalidomide and for at least 4 weeks after discontinuing the drug, sexually mature males must use a latex condom each time they have sexual contact with a woman of childbearing potential.

All females of childbearing potential must be tested for pregnancy within the 24 hours immediately prior to the first dose of thalidomide using a reliable serum pregnancy test with the sensitivity to detect human serum chorionic gonadotropin (HCG) concentrations of 50 mIU/mL. The prescribing clinician should not provide the woman with a prescription for thalidomide until a written report of the pregnancy test is available indicating that results are negative. Serum pregnancy tests must then be repeated at regular intervals during thalidomide therapy (i.e., weekly during the first month, then every 2 or 4 weeks in women with irregular or regular menstrual cycles, respectively). Pregnancy tests also should be performed if a patient misses her period or if there is any abnormality in menstrual bleeding. If pregnancy occurs during thalidomide therapy, the drug should be discontinued immediately. (See Pregnancy under Cautions: Pregnancy, Fertility, and Lactation.)

***Peripheral Neuropathy Precautions and Contraindications*** Because thalidomide may cause peripheral neuropathy that can be irreversible, patients should be instructed to immediately report initial symptoms (e.g., numbness, tingling, pain or a burning sensation in the hands and feet) of peripheral neuropathy to their prescribing clinician. To ensure that early signs of neuropathy are detected, patients should be examined, counseled, and questioned regularly during thalidomide therapy (i.e., monthly for the first 3 months of thalidomide treatment, and periodically thereafter).

Early detection and differential diagnosis of thalidomide-induced neuritis may be difficult in leprosy patients with ENL and in HIV-infected patients because neuritis associated with these diseases may be similar to that caused by thalidomide.

To assist in detection of asymptomatic neuropathy, the manufacturer states that consideration should be given to using electrophysiologic testing, consist-

ing of sensory nerve action potential (SNAP) amplitude measurement at baseline and every 6 months thereafter. If manifestations of peripheral neuropathy develop, thalidomide should be discontinued immediately (if clinically appropriate) to minimize further damage. Usually, treatment with thalidomide should be resumed only if manifestations of neuropathy return to baseline.

Drugs known to be associated with peripheral neuropathy should be used with caution in patients receiving thalidomide. (See Drug Interactions: Drugs Associated with Peripheral Neuropathy.)

***CNS Precautions and Contraindications*** Patients should be warned that thalidomide frequently causes drowsiness and somnolence, and may impair their ability to perform hazardous activities requiring mental alertness or physical coordination (e.g., operating machinery, driving a motor vehicle). Patients also should be warned not to take any other drugs that may cause drowsiness without consulting their clinician. Patients should be advised that thalidomide may potentiate the drowsiness caused by alcohol. (See Drug Interactions: CNS Agents.)

Because seizures, including tonic-clonic (grand mal) seizures, have been reported during postmarketing experience with thalidomide, the manufacturer states that patients with a history of seizures or other risk factors for the development of seizures should be monitored closely for clinical changes that could precipitate acute seizure activity.

***Other Precautions and Contraindications*** Because thalidomide may cause dizziness and orthostatic hypotension, patients receiving the drug should be instructed to sit upright for a few minutes before standing up from a reclining position.

Because decreased leukocyte counts, including neutropenia, have been reported in patients receiving thalidomide, the drug should not be initiated in patients with absolute neutrophil counts (ANC) less than 750/mm³. Leukocyte counts and differentials should be routinely monitored, especially in patients who are prone to neutropenia (e.g., HIV-infected patients). If the ANC decreases to less than 750/mm³ while the patient is receiving thalidomide, the patient's drug regimen should be reevaluated and consideration given to withholding thalidomide if clinically appropriate.

Because increases in viral load (i.e., increased plasma HIV-1 RNA levels) have been reported when thalidomide was used in some HIV-infected patients, the manufacturer states that plasma HIV-1 RNA levels should be measured after the first and third months of thalidomide treatment and every 3 months thereafter.

Thalidomide is contraindicated in patients who are hypersensitive to the drug or any ingredient in the formulation. The drug should be discontinued if signs and symptoms of hypersensitivity (e.g., erythematous macular rash associated with fever, tachycardia, hypotension) occur and are severe; if thalidomide therapy is resumed and the reaction recurs, thalidomide should be permanently discontinued. Because hypersensitivity reactions characterized by cutaneous and/or febrile manifestations have been reported in HIV-infected patients receiving thalidomide and because rechallenge with the drug resulted in accelerated hypersensitivity (including hypotension) in some of these patients, some clinicians recommend that if thalidomide rechallenge is unavoidable in an HIV-infected patient (e.g., to elucidate a drug reaction in a patient receiving a complex drug regimen), the patient should be hospitalized when the drug is administered and for at least 24 hours following the rechallenge.

Because severe, potentially fatal skin reactions, including Stevens-Johnson syndrome and toxic epidermal necrolysis, have been reported with thalidomide therapy, the drug should be discontinued if a rash occurs and should be resumed only after appropriate clinical evaluation. If the rash is exfoliative, purpuric, or bullous or if Stevens-Johnson syndrome or toxic epidermal necrolysis is suspected, use of thalidomide should *not* be resumed.

■ **Pediatric Precautions** Although safety and efficacy of thalidomide in pediatric patients younger than 12 years of age have not been established, the drug has been used in a limited number of children 6 months to 12 years of age†. The manufacturer states that when thalidomide was used in a limited number of patients 11–17 years of age (usually in a dosage of 100 mg daily), response rates and safety profile were similar to those observed in adults. When thalidomide was used for the treatment of graft-versus-host disease in a limited number of bone marrow transplant recipients 1.5–17 years of age†, adverse effects of the drug included somnolence (which required discontinuance of the drug in at least one child), constipation, and a syndrome of rash, eosinophilia, and pancreatitis (which resolved after the drug was discontinued).

Thalidomide is contraindicated in adolescent females of childbearing potential (i.e., those who are sexually mature, have had menses at some time during the 24 consecutive months preceding initiation of treatment with thalidomide, have not undergone a hysterectomy) unless alternative therapies are considered inappropriate and the patient is capable of complying with the contraceptive measures (which may include abstinence) designed to help ensure that fetal exposure to thalidomide does not occur. (See Teratogenic Precautions and Contraindications: Contraceptive Measures, in Cautions.)

For males and females 18 years of age and younger, a parent or legal guardian must be educated concerning the hazards of thalidomide and agree to ensure that the minor complies with all requirements of the STEPS program.

■ **Geriatric Precautions** Safety and efficacy of thalidomide in geriatric patients have not been specifically studied to date. Thalidomide has been used in clinical studies that included patients up to 90 years of age, and adverse effects reported in those older than 65 years of age were similar to those reported in younger adults.

■ **Mutagenicity and Carcinogenicity**   There was no evidence of mutagenic effects when thalidomide was evaluated in vitro using bacterial test systems (Ames test using *Salmonella typhimurium* and *Escherichia coli*), in vitro using mammalian test systems (Chinese hamster ovary cells, AS52/XPRT mammalian cell forward gene mutation assay), in vitro using human lymphocytes (chromosome aberration assay, micronucleus assay), or in vivo using mammalian test systems (CD-1 mice, micronucleus test). While there have been a few unsubstantiated reports that positive results were obtained when thalidomide was tested for mutagenicity in *Salmonella* and mouse bone marrow cells, these results have not been confirmed.

Although thalidomide is teratogenic, the drug is *not* considered to be mutagenic in humans. A report that 2 men with birth defects attributed to thalidomide exposure each fathered a child with birth defects resulted in speculation that thalidomide may be mutagenic in addition to teratogenic and capable of causing second generation birth defects. However, there is no evidence to support such a hypothesis and experts state that the birth defects in both these children were *not* the result of parental thalidomide exposure but probably occurred because of genetic abnormalities related to spontaneous mutations that occurred in the parents. The fathers of both children may have had malformations caused in part by thalidomide exposure, but the father of one child had anomalies that were quite atypical from those associated with thalidomide exposure. While only limited information is available about one of the children, both appeared to have limb formation abnormalities similar to those of their respective fathers. Since mutagens attack genes at random, if thalidomide did have a mutagenic effect distinct from its teratogenic effect, it is unlikely that the mutations would result specifically in limb malformations. There is no evidence that the incidence of birth defects in children born to parents with birth defects related to thalidomide exposure is any higher than that reported in the general population and no evidence that thalidomide-associated birth defects are inheritable.

Long-term studies to evaluate the carcinogenic potential of thalidomide have not been performed to date.

■ **Pregnancy, Fertility, and Lactation**   *Pregnancy*   Thalidomide is a known human teratogen, and can cause severe, life-threatening birth defects or fetal death if taken during pregnancy. The drug can cause teratogenic effects even if only a single dose of the drug (e.g., 50–100 mg) is taken during pregnancy. Since the risks clearly outweigh any possible benefits in women who are or may become pregnant, thalidomide is contraindicated in such women. If the drug is inadvertently administered during pregnancy or if a patient becomes pregnant while receiving the drug, the drug should be discontinued immediately and the patient referred to an obstetrician-gynecologist experienced in reproductive toxicity for further evaluation and counseling. The patient should be informed that if their clinician is not available, information about emergency contraception (including information regarding clinicians who provide emergency contraceptive services) can be obtained by calling888-668-2528 or by using other sources (e.g., http://www.opr.princeton.edu/ec). For information about postcoital contraception, see Estrogen-Progestin Combinations and Progestins in Contraceptives 68:12. Any suspected exposure of a fetus to thalidomide should be reported to the FDA MedWatch Program at800-FDA-1088 and also reported to the manufacturer.

To minimize the chance of fetal exposure and help ensure the safe and effective use of thalidomide in the US, patients must be registered in the STEPS program before they can receive commercially available drug. (See Dosage and Administration: Restricted Distribution Program.) The STEPS program includes mandatory contraceptive measures for both men and women, as well as mandatory pregnancy testing to confirm that a woman is not pregnant before thalidomide therapy is initiated and did not become pregnant during or immediately after therapy with the drug. (See Contraceptive Measures under Precautions and Contraindications: Teratogenic Precautions and Contraindications, in Cautions.)

Thalidomide is contraindicated in women of childbearing potential unless alternative therapies are considered to be inappropriate and the patient is capable of understanding and following the conditions of the STEPS program, including mandatory contraceptive measures designed to ensure that the woman is essentially unable to become pregnant while receiving thalidomide. Women of childbearing potential are considered to be women and adolescent females who are sexually mature, have had menses at some time in the 24 consecutive months preceding initiation of treatment with thalidomide (i.e., are not postmenopausal), and have not undergone a hysterectomy. It is mandatory that such women (even if they are infertile) agree *not* to try to become pregnant for at least 4 weeks after discontinuing thalidomide treatment, and comply with effective contraceptive measures (which may include abstinence) for at least 4 weeks prior to, throughout, and for at least 4 weeks after completion of thalidomide therapy. In addition, a reliable serum pregnancy test with the sensitivity to detect human serum chorionic gonadotropin (HCG) concentrations of 50 mIU/mL must be performed within 24 hours prior to beginning thalidomide therapy, and results must be negative. Serum pregnancy tests must then be repeated at regular intervals during thalidomide therapy (i.e., weekly during the first month, then every 2 or 4 weeks in women with irregular or regular menstrual cycles, respectively). Pregnancy testing and counseling should be performed if a patient misses their period or if there is any abnormality in menstrual bleeding during thalidomide therapy.

Thalidomide is contraindicated in sexually mature males unless the patient is capable of understanding and following the conditions of the STEPS program, including mandatory contraceptive measures. Because thalidomide is present in semen, sexually mature males (including those who have successfully undergone vasectomy) receiving thalidomide must not have unprotected sexual contact with women of childbearing potential. These males must use a latex condom each time sexual contact with a woman occurs during and for at least 4 weeks after discontinuing the drug.

*Teratogenic Effects*   It has been estimated that there were more than 10,000 reported cases of infants born with birth defects related to use of thalidomide in pregnant women in other countries between 1957 (when thalidomide was first introduced in the world market) and 1963 (several years after the drug was removed from the world market). Although thalidomide was not commercially available in the US at that time, there were at least 17 reports of infants with thalidomide-associated birth defects being born to women in the US during those years; these women had received the drug from overseas sources or received premarketing samples distributed by drug company representatives.

A variety of human fetal abnormalities related to thalidomide administration during pregnancy have been documented. The most common birth defects reported following fetal exposure to thalidomide are musculoskeletal fetal abnormalities involving the loss of all or part of one or more bones; however, fetal deformities may occur in almost any organ of the body and defects of internal organs have been reported with some skeletal deformities. The mortality rate at or shortly after birth in infants born with thalidomide-induced skeletal deformities has been reported to be about 40%; most fatalities are related to serious malformations of internal organs.

Skeletal deformities caused by thalidomide include amelia (absence of legs and/or arms) and absence of bones; phocomelia (short legs and/or arms) and bone hypoplasia; hand deformities (e.g., radial club hand); thumb aplasia, hypoplasia, triphalangia, and nonopposability; finger aplasia, hypoplasia, fixed flexion, and syndactyly; and hip dysplasia and dislocation. Skeletal deformities appear to follow the craniocaudal progression of fetal morphogenesis. Most individuals with thalidomide defects of the upper limbs have normal lower limbs, some have defects of all limbs, but those with normal upper limbs and deformed lower limbs are rare. When substantial parts of bones are missing, the muscles normally attached to them are hypoplastic, but the degree of muscle hypoplasia does not always correspond to the level of bone loss (e.g., marked hypoplasia of shoulder and upper arm muscles may occur in a patient with a humerus of normal length). In general, more pronounced shortness of stature than that associated only with short leg bones occurs, resulting from poor growth, spinal osteochondritis, and progressive kyphosis. Thalidomide-induced skeletal deformities usually are bilaterally symmetric, similar to malformations reported with other teratogenic drugs. However, the extent of symmetry varies with the nature of the defect, both in the number of appreciably asymmetric deformities and in the closeness of the match between left and right.

The next most common group of abnormalities reported following fetal exposure to thalidomide are craniofacial and orofacial fetal abnormalities involving the ear, eye, and nerve supplies to the face, external ocular muscles, and lacrimal glands; these deformities tend to occur in a variety of combinations and permutations. External ear deformities tend to be bilateral and symmetric, and include anotia, microtia or micropinna, and small or absent auditory canals. Individuals with anotia and a blind or absent external auditory canal (meatus) are profoundly deaf in the affected ear. Facial palsy may occur (usually unilaterally rather than bilaterally) and almost always is associated with anotia or microtia on the same side. Abnormalities of ocular structures occur frequently, including anophthalmos, microphthalmos coloboma of the iris and retina, and conjunctival dermoid cyst. Microphthalmos and coloboma often occur together, and are predominantly bilateral. Restricted ocular movements may occur; ocular movement defects are nearly always associated with otic defects, often associated with facial weakness, and tend to be bilateral. Tear-saliva syndrome (crocodile tears) has been reported, in which tears are secreted in association with eating (rather than saliva) but may not be secreted in association with crying. This syndrome results from incorrect neural connections (probably in the brain stem), is bilateral or unilateral, and usually is associated with otic abnormalities and ocular movement defects. Less common orofacial defects that have reported include cleft palate, high arched palate, bifid uvula, palatal palsy, cleft lip,choanal atresia, and mandibular and dental abnormalities.

Other fetal deformities that have been associated with thalidomide exposure during pregnancy include congenital heart defects and other cardiovascular malformations (e.g., patent ductus arteriosus, ventricular and/or atrial septal defects, pulmonary stenosis); renal and urinary tract malformations (e.g., defects of the kidney, ureter, and bladder); genital malformations (e.g., hypospadias, vaginal atresia, fallopian tube interruption, bicornate uterus, hypoplasia of the scrotum or labia, and undescended, small, or absent testis); GI tract malformations (e.g., duodenal atresia, duodenal stenosis, pyloric stenosis, anorectal stenosis, imperforate anus with fistula, anteriorly placed anus); gallbladder atresia; and angiography tract malformations.

Most teratogenic effects appear to have occurred as the result of exposure to thalidomide early in pregnancy, and there is some evidence that a distinct window of embryonic sensitivity to thalidomide's teratogenic effects exists (i.e., from about 34–50 days after the beginning of the last menstrual period). Some malformations appear to be associated with particular periods of embryonic exposure, including aplasia of the ear or stenosis of the rectum which appear to be associated with exposure to thalidomide at 34–38 or 49–50 days, respectively, after the beginning of the last menstrual period. However, incorrect reporting of the dates of last menstrual periods and/or thalidomide administration as well as atypical menstrual cycle duration may have resulted

in considerable inaccuracy in these data. It has been suggested that limb defects may be secondary to an inhibition of blood vessel growth in the developing fetal limb bud, and studies of thalidomide's effects in fetal animal tissues have suggested that neural as well as limb development effects occur. The risk of potentially severe birth defects occurring following fetal thalidomide exposure later in pregnancy is unknown, but may be substantial. Animal studies to characterize the effects of thalidomide on late stage pregnancy have not been conducted. While numerous mechanisms for thalidomide-induced fetal abnormality and mortality have been proposed, some have been refuted and others have not been adequately studied; additional study is required to elucidate how thalidomide causes teratogenic effects in fetuses.

*Fertility*   Animal studies have not been conducted to date to determine whether thalidomide affects fertility, and the effect of thalidomide on fertility in humans has not been determined. Thalidomide is present in semen.

*Lactation*   It is not known whether thalidomide is distributed into human milk. Because many drugs are distributed into milk, and because of the potential for serious thalidomide-related adverse effects in nursing infants, a decision should be made whether to discontinue nursing or the drug, taking into account the importance of the drug to the mother.

## Drug Interactions

▨ **Hormonal Contraceptives and Drugs that Interfere with Hormonal Contraceptives**   Concomitant administration of thalidomide and oral contraceptives containing ethinyl estradiol and norethindrone does not appear to affect the pharmacokinetics of the hormones. In 2 studies in healthy women 21–45 years of age who received a 3-week regimen of thalidomide (200 mg of thalidomide daily) followed by a single oral dose of an estrogen-progestin combination oral contraceptive (70 mcg of ethinyl estradiol and 2 mg of norethindrone), the pharmacokinetics of both ethinyl estradiol and norethindrone were the same as those obtained in these women when the contraceptive was administered without thalidomide.

While it is unlikely that thalidomide would affect efficacy of oral contraceptives since the drug does not appear to affect the pharmacokinetics of the hormones, other drugs that the patient may be receiving, including HIV protease inhibitors (e.g., amprenavir, indinavir, nelfinavir, ritonavir, saquinavir), griseofulvin, rifampin, rifabutin, phenytoin, or carbamazepine, may affect efficacy of oral contraceptives. Because it is mandatory that women of childbearing potential receiving thalidomide use *effective* contraceptive measures for at least 4 weeks prior to, throughout, and for at least 4 weeks after completion of thalidomide therapy, women of childbearing potential receiving thalidomide concomitantly with any other drug that can reduce efficacy of oral contraceptives must use 2 *other* effective methods of contraception or abstain from heterosexual sexual contact. (See: Contraceptive Measures under Precautions and Contraindications: Teratogenicity Precautions and Contraindications, in Cautions.)

▨ **CNS Agents**   Thalidomide has been reported to enhance the sedative effects of some drugs, including barbiturates, chlorpromazine, and reserpine, and may potentiate the somnolence caused by alcohol.

▨ **Drugs Associated with Peripheral Neuropathy**   Because of the potential for additive effects, drugs known to be associated with peripheral neuropathy (e.g., certain antiretroviral agents [e.g., didanosine], certain antineoplastic agents [e.g., paclitaxel; platinum-containing drugs such as cisplatin; vinca alkaloids such as vincristine]) should be used with caution in patients receiving thalidomide.

## Acute Toxicity

▨ **Pathogenesis**   Limited information is available on the acute toxicity of thalidomide in humans. The commercially available racemic mixture of thalidomide appears to have a low potential for acute toxicity, principally because racemic thalidomide has poor aqueous solubility and limited absorption as the result of interaction (i.e., hydrogen bonding) between carboxyl groups of the racemates. In addition, the drug is rapidly and spontaneously hydrolyzed in vivo to numerous metabolites and accumulation of the drug does not occur, even in patients with severe renal impairment. Although the $LD_{50}$ of either the levorotatory or dextrorotatory enantiomers of thalidomide is about 0.5 g/kg in rodents, animal studies indicate that racemic thalidomide is not fatal when given in doses of 10 g/kg.

▨ **Manifestations**   Overdosage of thalidomide may cause prolonged sleep as a result of the drug's sedative and hypnotic effects, but fatalities are unlikely since the drug does not cause respiratory depression. In 3 reported suicide attempts involving deliberate ingestion of up to 14.4 g of thalidomide, all 3 individuals recovered without reported sequelae.

## Chronic Toxicity

Physical and/or psychologic dependence have not been reported in individuals receiving thalidomide. However, the manufacturer states that, like other anxiolytic, sedative, and hypnotic drugs, it is possible that habituation to the sedative and hypnotic effects of thalidomide could occur.

Chronic use of thalidomide may result in potentially severe peripheral neuropathy, which can be irreversible. (See Cautions: Peripheral Neuropathy.) To ensure early detection of thalidomide-induced neuropathy, patients should be examined regularly (i.e., monthly for the first 3 months of thalidomide therapy,

and periodically thereafter). Consideration should be given to using electrophysiologic testing, consisting of sensory nerve action potential (SNAP) amplitude measurement at baseline and every 6 months thereafter.

## Pharmacology

▨ **Mechanism of Action**   Thalidomide is an immunomodulatory agent with anti-inflammatory activity. The drug also has anti-angiogenic effects and sedative and hypnotic effects.

The mechanism(s) of action of the immunomodulatory and anti-inflammatory effects of thalidomide are complex and have not been fully determined; these effects appear to result in part from modulation of tumor necrosis factor alpha (TNF-α) levels, costimulatory or adjuvant effect on T-cells resulting in increased T-cell proliferation and increased production of interleukin-2 and interferon-γ, and/or modulation of leukocyte migration and chemotaxis.

The immunomodulatory and anti-inflammatory effects of thalidomide differ from those of other immunosuppressive agents, including corticosteroids, cyclosporin (e.g., cyclosporine) or macrolide (e.g., tacrolimus) immunosuppressants, pentoxifylline, immunosuppressive purine analogs (e.g. azathioprine) and purine metabolism inhibitors (e.g., mycophenolic acid), and also differ from those of nonsteroidal anti-inflammatory agents. Thalidomide does not appear to interfere with important host antimicrobial mechanisms; the drug has no substantial inhibitory effect on lymphocyte proliferation, does not impair delayed-type hypersensitivity reactions, and does not impair granuloma formation.

Thalidomide has no direct antibacterial activity against *Mycobacterium leprae*. In addition, results of an in vitro study using *Enterocytozoon bieneusi*, *Encephalitozoon intestinalis*, and *E. cuniculi* indicate that thalidomide has no direct activity against microsporidia.

▨ **Immunomodulatory Effects**   Use of thalidomide in the management of erythema nodosum leprosum (ENL) reactions in leprosy patients and for the treatment of various inflammatory and/or dermatologic disorders is based on the drug's immunomodulatory effects. Thalidomide's immunomodulatory effects may result from modulation of TNF-α levels, costimulatory or adjuvant effect on T-cells resulting in increased T-cell proliferation and increased production of interleukin-2 and interferon-γ, and/or modulation of leukocyte extravascular migration mechanisms. However, in vitro studies and preliminary clinical studies indicate that the immunomodulatory effects of thalidomide vary considerably under different conditions, and some evidence indicates that effects of the drug may be species specific.

The difficulty in characterizing thalidomide's mechanism of action has been attributed in part to numerous in vivo metabolites that result from the combination of optical enantiomerism, hydrolysis, and hydroxylation of the drug. In studies of enantiomerically stable thalidomide analogs (with an α-methyl group attached to the chiral carbon), levorotatory analogs demonstrated more immunomodulatory, sedative, and teratogenic activity, and more inhibition of TNF-α release, than dextrorotatory analogs. Although apparent enantiomer-specific effects of thalidomide have been reported from in vitro and in vivo studies, data from such studies are limited by rapid racemization and the pharmacokinetics of the drug in the system being studied, and should be interpreted with caution. Spontaneous hydrolysis of thalidomide yields products that do not appear to have immunomodulatory activity; the extent of hepatic metabolism of the drug appears to be limited, and some experts state that insufficient evidence exists to support speculation that formation of active metabolites is required for thalidomide's effects.

The immunomodulatory effects of thalidomide may be related to suppression of excessive TNF-α production; however, there also is some evidence that thalidomide is capable of enhancing TNF-α synthesis. The drug selectively inhibits the production of TNF-α by cultured human monocytes (possibly by inhibiting production and/or enhancing the degradation of TNF-α messenger RNA) without influencing either general protein synthesis or the expression of other monocyte-derived cytokines (e.g., IL-1, IL-6, GM-CSF). Administration of thalidomide has been reported to decrease circulating TNF-α levels in patients with erythema nodosum leprosum (ENL).

Wasting syndrome and the associated systemic symptoms (e.g., anorexia, fever) also may be mediated by excessive TNF-α production, and there is limited evidence that thalidomide may reduce plasma TNF-α concentrations and ameliorate wasting in patients with HIV infection and/or tuberculosis. However, the role of TNF-α in HIV infection is unclear because evidence of TNF-α production in patients with HIV infection is inconsistent and includes reports of undetected, increased, or unchanged production of the cytokine. Also, serum and plasma TNF-α levels fluctuate because of the cytokine's short half-life, and may not accurately reflect the actual extent of TNF-α production and/or the degree of TNF-α-related toxicities. Such discrepancies in apparent TNF-α levels may result from the different assays used, or from defects in the methods used to determine in vitro and in vivo cytokine production. In addition, cytokines may be produced and act locally in tissue, and it is possible that circulating levels of TNF-α do not reflect tissue activity.

The effect of thalidomide on TNF-α levels, HIV replication, and HIV disease manifestations such as wasting is unclear. In one limited controlled study of patients with wasting syndrome associated with HIV-1 infection (with or without tuberculosis), those receiving thalidomide experienced a substantially greater weight gain than those receiving placebo; however, only the patients with HIV and tuberculosis experienced decreased plasma TNF-α and decreased plasma HIV-1 RNA levels while receiving thalidomide, and these patients ex-

perienced a higher mean weight gain than those with HIV infection alone. Data from some studies in patients with HIV infection indicate that thalidomide inhibited TNF-α activation of latent HIV-1 in monocytes and reduced replication of the virus; however, some evidence indicates that thalidomide *increases* plasma TNF-α and soluble TNF-α type II receptor levels in patients with HIV infection, and may increase HIV replication. In a placebo-controlled study in HIV-infected patients, thalidomide therapy (200 mg daily for 4 weeks) apparently had no inhibitory effect on HIV replication and no effect on plasma TNF-α levels, but did increase plasma levels of soluble IL-2 receptor, soluble CD8 antigen, and IL-12. In addition, in vitro studies using purified T-cells from these patients indicated that exposure to thalidomide resulted in a costimulatory effect resulting in increased production of IL-2 and interferon-γ.

There is evidence that thalidomide induces down-modulation of selected cell surface adhesion molecules involved in leukocyte migration, and the drug's immunomodulatory mechanism of action may result in part from modulation of cellular interactions involving direct physical contact (i.e., adhesion and detachment) of leukocytes with endothelial cells. Limited data indicate that thalidomide may modulate TNF-α induction of endothelial cell adhesion molecules; this effect may interfere with leukocyte adhesion to endothelium, and prevent the initiation of leukocytic extravasation into inflammatory foci. Also, once adhesion of leukocytes to vascular endothelium occurs, thalidomide may interfere with their detachment, and impede transmigration of leukocytes into extravascular tissue. Although thalidomide may up- or down-modulate different adhesion receptors, and its effects on various types of leukocytes is variable, treatment with thalidomide induces a prompt reduction in the number of neutrophils and CD4⁺ T-cells in the lesions of patients with ENL. Leukocyte infiltration and cytokine (especially TNF-α) responses are present in focal inflammatory lesions characterized by post-capillary vasculitis (e.g., ENL lesions and mucocutaneous aphthae), and these immunopathologic conditions are those most clearly responsive to thalidomide. Such antivasculitic effects also may be enhanced by thalidomide's modulation of TNF-α synthesis or release. However, the exact mechanism of action for the drug's clinical immunomodulatory activity is unclear, and further study is required to elucidate the drug's mechanism of action.

### ▪ Effects on Angiogenesis

Thalidomide inhibits angiogenesis, and it has been suggested that the teratogenic effects of thalidomide on fetal limbs may be related to inhibition of blood vessel growth in the developing fetal limb bud. Thalidomide's anti-angiogenic effects have been demonstrated in several animal angiogenesis models; however, there is evidence that the drug's anti-angiogenic effects may be species specific and possibly may be related to a species-specific metabolite and/or metabolic activation. Thalidomide reduced the area of vascularization in a rabbit corneal model of induced neovascularization. The drug also inhibited angiogenesis in a rat aorta model and in human aortic endothelial cells when human or rabbit microsomes were present, but not when rat microsomes were present.

The mechanism of thalidomide's anti-angiogenic effects is unknown. It has been suggested that inhibition of cytokine synthesis (especially that of TNF-α) may contribute to thalidomide's anti-angiogenic effect; however, there is some evidence from animal models that thalidomide's effect on angiogenesis is independent of the drug's effect on TNF-α and possibly may result from a direct inhibitory effect on some component of angiogenesis.

### ▪ Sedative and Hypnotic Effects

Thalidomide is a CNS depressant effects and causes sedation. The drug has a prompt sedative effect, and does not cause a hangover. The glutarimide ring contained in thalidomide appears to be responsible for the sedative and hypnotic effects of the drug; the ring is structurally similar to ring moieties contained in some other sedative and hypnotic drugs (e.g., glutethimide). Thalidomide may activate a sleep center in the forebrain, a mechanism of action unlike that of barbiturates. Thalidomide has little acute CNS toxicity, and does not cause incoordination or respiratory depression even at large doses. (See Acute Toxicity.) While thalidomide initially was investigated for use as a sedative and hypnotic in the late 1950s, the drug is no longer promoted for use as a sedative and hypnotic because of its teratogenic risk. (See Uses: Overview.)

## Pharmacokinetics

The pharmacokinetics of thalidomide have been studied in healthy adults, adults with leprosy, adults with human immunodeficiency virus (HIV) infection, and geriatric men with prostate cancer. While there is some evidence that bioavailability of oral thalidomide (i.e., peak plasma concentrations, area under the plasma concentration-time curve [AUC]) may be greater in leprosy patients than in healthy individuals, results of a single-dose study indicate that the pharmacokinetics of thalidomide in HIV-infected individuals are similar to those in healthy individuals. Age-related changes in the pharmacokinetics of thalidomide have not been observed in healthy individuals, leprosy patients 20–69 years of age, or prostate cancer patients 55–80 years of age. The pharmacokinetics of thalidomide have not been studied to date in individuals younger than 18 years of age. While limited data indicate that the pharmacokinetics of thalidomide are similar in males and females, specific comparative studies have not been performed to determine whether there are any gender- or race-related differences in the pharmacokinetics of the drug. The pharmacokinetics of thalidomide in patients with renal or hepatic impairment have not been determined.

Based on studies in healthy adults and HIV-infected patients, the pharmacokinetics of thalidomide can best be described by a single-compartment model

with first-order absorption and elimination. Results of studies in healthy adults indicate that accumulation of thalidomide does not occur, and pharmacokinetic parameters are similar following single or multiple doses of the drug.

### ▪ Absorption

The absolute bioavailability of thalidomide administered as the commercially available racemic mixture of the drug has not been determined to date, in part because racemic thalidomide has poor aqueous solubility. The limited aqueous solubility of racemic thalidomide does not appear to be due to a lipophilic structure, since the drug has a relative distribution between lipid and aqueous phases of about 2:1. However, the 4 carboxyl groups of the racemic form of the drug appear to interact through hydrogen bonding to result in relative aqueous insolubility. In contrast, the pure levorotatory or dextrorotatory enantiomers of thalidomide are 3–5 times more soluble than the racemic drug and are more readily absorbed.

Following oral administration of racemic thalidomide, the drug is slowly absorbed from the GI tract, and some interindividual variation in absorption has been reported. When thalidomide is administered in increasing doses in healthy individuals, the extent of absorption (as measured by the AUC) increases proportionally with increasing dose; however, peak plasma concentrations of the drug increase in a less than proportional manner and the time to peak plasma concentrations is delayed, indicating that thalidomide's poor aqueous solubility affects the rate of oral absorption.

Mean peak plasma concentrations of thalidomide generally are attained 2.5–6 hours after an oral dose. In a study in healthy men 21–43 years of age who received a single 200-mg dose of thalidomide given as tablets (not commercially available in the US), mean peak plasma concentrations of 1.15 mcg/mL were attained at a mean of 4.4 hours. In healthy women 21–45 years of age who received a single 200-mg dose of thalidomide given as 50- or 100-mg capsules (100-mg capsules not commercially available in the US), mean peak plasma concentrations of 2.3–3.2 mcg/mL were attained within about 6 hours. In healthy adults who received a single 50-, 200-, or 400-mg oral dose of thalidomide as 50-mg capsules, mean peak plasma concentrations of 0.62, 1.76, or 2.82 mcg/mL, respectively, were attained at 2.9, 3.5, or 4.3 hours, respectively, after the dose.

In adults with leprosy who received a single 400-mg oral dose of thalidomide as 50-mg capsules, peak plasma concentrations of 3.44 mcg/mL were attained 5.7 hours after the dose.

In adults with HIV infection (without active opportunistic infections or concomitant disease that potentially could alter drug absorption) who received a single 100- or 300-mg dose of thalidomide as capsules, mean peak plasma concentrations of the drug were 1.2 or 3.5 mcg/mL, respectively, and were attained at a mean of 3.4 hours after either dose. In another study in asymptomatic HIV-infected adults who received single 100- or 200-mg doses of the drug, peak plasma concentrations averaged 1.2 or 1.9 mcg/mL, respectively, and were attained at 2.5 or 3.3 hours, respectively.

In men 55–80 years of age with prostate cancer who received a single 200- or 800-mg oral dose of thalidomide as 50-mg capsules, median peak plasma concentrations were 1.97 or 4.42 mcg/mL, respectively, and were attained at a median of 3.32 or 4.42 hours, respectively, after the dose. When these patients received multiple doses of thalidomide, mean peak plasma concentrations at steady state were 1.8 mcg/mL in those receiving 200 mg once daily and 7.57 mcg/mL in those receiving 800 mg daily.

Food may delay but does not appear to substantially affect the extent of absorption of thalidomide. Administration of thalidomide with a high-fat meal increased the time to peak plasma concentration to approximately 6 hours, but resulted in less than a 10% change in either the AUC or peak plasma concentration of the drug.

### ▪ Distribution

Information on distribution of thalidomide in humans is not available. Although pharmacologic and adverse effects of thalidomide appear to be organ specific, such effects do not correspond well with pharmacokinetic distribution data obtained in animals. While results of some animal studies indicate that high concentrations of thalidomide are found in the GI tract, liver, and kidneys, and lower concentrations are found in muscle, brain, and adipose tissue, other distribution studies in animals have failed to detect substantial accumulation of the drug in any particular organ. When radiolabeled thalidomide was administered to animals in one study, there was an even distribution of radioactivity, except for slight enhancement of radioactivity in kidneys, liver, biliary tissue, white (but not grey) matter of the CNS, and peripheral nerve trunks. In rabbits, thalidomide concentrations in CSF are about 50% of concurrent plasma concentrations of the drug. Thalidomide is present in semen; in at least one study, the drug was detectable in the semen of HIV-infected men receiving thalidomide 100 mg daily.

Thalidomide crosses the placenta in humans and in animals. Malformations of human fetuses exposed to thalidomide during the first trimester of pregnancy exhibit striking organ specificity. Fetal skeletal deformities involving the loss of part or all of one or more bones are most common, but fetal deformities may occur in almost any organ of the body and defects of internal organs accompany some skeletal deformities (e.g., amelia, phocomelia). Seemingly isolated neurodevelopmental regions (e.g., the eyes, ears, and possibly some brain stem neurons innervating facial muscles) are affected in cases of thalidomide embryopathy, but other neurodevelopmental defects rarely occur, and the skin and the lymphatic organs are notably not affected by fetal exposure to thalidomide. (See Teratogenic Effects under Pregnancy, Fertility, and Lactation: Pregnancy, in Cautions.)

The apparent volume of distribution of thalidomide has been reported to be 69.9–82.7 L in HIV-infected adults.

enantiomers of thalidomide are 55 and 66%, respectively, bound to plasma proteins.

**Elimination** The mean elimination half-life of thalidomide following a single 200-mg oral dose ranges from 3–6.7 hours, and the elimination half-life appears to be similar following multiple doses of the drug. In a study in healthy adults who received a single 50-, 200-, or 400-mg oral dose of the drug, the mean elimination half-life of thalidomide was 5.5, 5.5, or 7.3 hours, respectively. The mean elimination half-life of thalidomide was 6.9 hours in adults with leprosy who received a single 400-mg oral dose and 4.6–6.5 hours in HIV-infected adults who received a single 100- to 300-mg dose.

While the exact metabolic fate of thalidomide in humans is not known, numerous metabolites may be formed as a result of optical enantiomerism and hydrolysis and hydroxylation of the drug. Commercially available thalidomide is a 1:1 racemic mixture of the dextrorotatory and levorotatory enantiomers of the drug, and chiral inversion and spontaneous hydrolysis of the enantiomers occurs in vivo or in vitro. The half-life for racemization of an enantiomer in whole blood is about 2.25 hours. In vivo, chiral inversion appears to occur principally in the circulation and in albumin-rich extravascular sites. Chiral inversion and hydrolysis of thalidomide apparently occur by several different mechanisms.

Thalidomide does not induce or inhibit its own metabolism; when the drug was administered to healthy women at a dosage of 200 mg once daily for 18 days, similar pharmacokinetics were observed on the first and last day of dosage. Hepatic metabolism of thalidomide is limited, and only the parent compound appears to be metabolized by cytochrome P-450 (CYP) isoenzymes.

The principal metabolic pathway of thalidomide appears to be nonenzymatic spontaneous hydrolysis. All 4 amide bonds in thalidomide are susceptible to hydrolytic cleavage and, under physiologic conditions, ring opening occurs first in the phthalimide moiety. Spontaneous hydrolysis to form more than 10 metabolites occurs rapidly in vitro, with a mean half-life (dependent on incubation temperature and pH) of 2–5 hours for both optical isomers. There is evidence that thalidomide metabolites formed by spontaneous hydrolysis in vitro have no immunomodulatory activity; however, further study is required to characterize the pharmacologic activity, if any, of metabolites formed in vivo.

Hydroxylation can occur at 4 sites in thalidomide (i.e., 2 sites in each of the phthalimide and glutarimide moieties). Metabolism and some pharmacologic effects of thalidomide may be species specific. Hydroxylated metabolites have been identified in species sensitive to the teratogenic effects of thalidomide (e.g., rabbit), and there is evidence that rat (a species not sensitive to teratogenic effects of the drug) microsomes are not able to produce a metabolite that is toxic to lymphocytes in other species. Intermediary forms (i.e., arene oxides or epoxides) proposed to be responsible for the teratogenic effects of the drug have not been demonstrated, hydroxylated metabolites resulting from epoxide activation have not been confirmed in human samples, and in vitro human microsomal preparations do not appear to catalyze the formation of hydroxylated metabolites.

The exact route of elimination of thalidomide in humans is unknown. Thalidomide is not appreciably excreted via the kidneys in humans. Although total body clearance of the drug is about 170–207 mL/minute, unmetabolized thalidomide has a renal clearance of 1.15–1.38 mL/minute and less than 0.7% of the drug is excreted in urine as unchanged drug. Thalidomide is thought to be hydrolyzed to numerous metabolites; however, in individuals who received a single oral dose of the drug, only 0.02% of the dose was eliminated in urine as 4-hydroxy thalidomide 12–24 hours after administration. At 48 hours after a single oral dose, thalidomide is not detectable in urine.

## Chemistry and Stability

**■ Chemistry** Thalidomide, a synthetic glutamic acid derivative, is an immunomodulatory agent. The drug is structurally similar to, but pharmacologically different from, glutethimide. Thalidomide contains a phthalimide ring and a glutarimide ring; the glutarimide ring is similar to that contained in glutethimide and may be responsible for the sedative and hypnotic effects of thalidomide. Because the glutarimide ring has a single asymmetric carbon (chiral center), thalidomide may exist as either an optically active levorotatory or dextrorotatory enantiomer. The enantiomers rapidly interconvert in vivo and in vitro; it is unknown whether the enantiomers have distinct pharmacologic properties. Thalidomide is commercially available as a 1:1 racemic mixture of the 2 enantiomers with a net optical rotation of zero.

Thalidomide occurs as a white to off-white, nearly odorless, crystalline powder. The drug has a solubility of 45–60 mcg/mL in water at 25°C. Thalidomide, enantiomers are 3–5 times more soluble than the racemic drug. While the aqueous solubility of racemic thalidomide has been reported to be 50 mcg/mL, the aqueous solubility of the separate enantiomers has been reported to be 250 mcg/mL.

**■ Stability** Commercially available thalidomide capsules should be stored at 15–30°C and protected from light.

In vitro in whole blood, serum, or plasma, thalidomide undergoes chiral inversion and spontaneous hydrolysis. All 4 amide bonds of the drug are susceptible to hydrolytic cleavage at pH exceeding 6. Inversion of the enantiomers occurs at a greater rate in vitro in blood at 37°C than in vivo. The rate of inversion and hydrolysis of thalidomide is pH dependent and increases with pH over the range of 7–7.5.

Because thalidomide is a known human teratogen and can cause birth defects or death to an unborn baby during pregnancy, commercially available thalidomide must be obtained through a restricted distribution program, the System for Thalidomide Education and Prescribing Safety (STEPS) designed to help ensure that fetal exposure to the drug does not occur. Restricted Distribution Program under Dosage and Administration.

### Thalidomide

| Oral | | |
|---|---|---|
| Capsules | 50 mg | Thalomid®, Celgene |

†Use is not currently included in the labeling approved by the US Food and Drug Administration

*Selected Revisions January 2007. © Copyright, November 1999, American Society of Health-System Pharmacists, Inc.*

# BONE RESORPTION INHIBITORS

## Alendronate Sodium

**■** Alendronate sodium, a synthetic bisphosphonate analog of pyrophosphate, is a bone resorption inhibitor.

### Uses

**■ Osteoporosis** Alendronate is used in the treatment and prevention of osteoporosis in postmenopausal women and for the treatment of osteoporosis in men. Alendronate also is used in the treatment of corticosteroid-induced osteoporosis.

*Prevention in Postmenopausal Women* Alendronate is used for the *prevention* of osteoporosis in postmenopausal women. Alendronate is used adjunctively with other measures (e.g., diet, calcium, vitamin D, weight-bearing exercise, physical therapy, avoidance of excessive cigarette smoking and/or alcohol consumption) to retard further bone loss and the progression of osteoporosis in postmenopausal women. The goal of preventive therapy is preservation of bone mass and a resultant decrease in fracture risk.

Osteoporosis, a systemic skeletal disease characterized by low bone mass and microarchitectural deterioration of bone tissue with consequent increased bone fragility and susceptibility to fracture, is observed in a large proportion of postmenopausal women. Adult women have less bone mass than men at all ages, and decreased production of estrogen at menopause is associated with accelerated bone loss, particularly from the lumbar spine, for about 5 years, during which time skeletal mass loss averages 3% per year. While the risk of postmenopausal osteoporosis cannot be quantified by a single clinical finding or test result, many risk factors have been identified, with the probability of developing osteoporosis increasing with multiple risk factors. Risk factors include premature ovarian failure; a family history of osteoporosis; a small, slim body frame; endocrine disorders such as thyrotoxicosis, hyperparathyroidism, Cushing's syndrome, hyperprolactinemia, insulin-dependent diabetes mellitus (type 1, IDDM); cigarette smoking; drinking excessive amounts of alcohol; a sedentary lifestyle and/or lack of physical exercise; low body weight; moderately low body mass (e.g., at least 1 standard deviation below the the mean for healthy young adult women); and low dietary calcium intake. White or Asian women, particularly those who are thin or small and have a positive family history of osteoporosis, are at a higher risk for the disease than are black women. Premature ovarian failure (surgical or nonsurgical) hastens the onset of osteoporosis, and estrogen deficiency in premenopausal women (e.g., secondary to anorexia nervosa- or exercise-induced amenorrhea or to hyperprolactinemia) induces bone loss and may reduce peak bone mass.

Alendronate has been evaluated for the prevention of osteoporosis in postmenopausal women in 2 double-blind, placebo-controlled studies of 2 or 3 years' duration that included 2056 women (40–60 years of age). In these studies, therapy with alendronate 5 mg daily increased bone mineral density (BMD), as determined by dual-energy radiographic absorption (DXA) measurements, in the lumbar spine, femoral neck, trochanter bone, and total body. While women receiving placebo lost approximately 1% of BMD per year, substantial increases in BMD were observed in women receiving alendronate. In one of the studies that included postmenopausal women who had experienced menopause 6–36 months before initiation of the study, administration of alendronate (5 or 10 mg daily given for 3 years or, alternatively, 20 mg daily given for 2 years, followed by administration of placebo daily for at year 3) years was associated with a 1–4% increase in lumbar spine, femoral neck, and trochanter BMD and 0.3–1% increase in total body BMD compared with baseline, while placebo recipients lost about 2–4% BMD in these sites; a lower dosage (1 mg daily) of alendronate for 3 years attenuated but did not fully prevent losses in BMD relative to those in women receiving placebo. Limited data indicate that alendronate (5 mg daily) reduced the rate of bone loss on forearm by about half relative to placebo. In a 1-year controlled study in postmenopausal women with osteoporosis, alendronate 70 mg once weekly produced increases in BMD similar to those observed with a dosage of 10 mg daily.

The effect of alendronate on BMD versus that of estrogen or raloxifene

Results of an in vitro study indicate that the dextrorotatory and levorotatory enantiomers of thalidomide are 55 and 66%, respectively, bound to plasma proteins.

◼ **Elimination**   The mean elimination half-life of thalidomide following a single 200-mg oral dose ranges from 3–6.7 hours, and the elimination half-life appears to be similar following multiple doses of the drug. In a study in healthy adults who received a single 50-, 200-, or 400-mg oral dose of the drug, the mean elimination half-life of thalidomide was 5.5, 5.5, or 7.3 hours, respectively. The mean elimination half-life of thalidomide was 6.9 hours in adults with leprosy who received a single 400-mg oral dose and 4.6–6.5 hours in HIV-infected adults who received a single 100- to 300-mg dose.

While the exact metabolic fate of thalidomide in humans is not known, numerous metabolites may be formed as a result of optical enantiomerism and hydrolysis and hydroxylation of the drug. Commercially available thalidomide is a 1:1 racemic mixture of the dextrorotatory and levorotatory enantiomers of the drug, and chiral inversion and spontaneous hydrolysis of the enantiomers occurs in vivo or in vitro. The half-life for racemization of an enantiomer in whole blood is about 2.25 hours. In vivo, chiral inversion appears to occur principally in the circulation and in albumin-rich extravascular sites. Chiral inversion and hydrolysis of thalidomide apparently occur by several different mechanisms.

Thalidomide does not induce or inhibit its own metabolism; when the drug was administered to healthy women at a dosage of 200 mg once daily for 18 days, similar pharmacokinetics were observed on the first and last day of dosage. Hepatic metabolism of thalidomide is limited, and only the parent compound appears to be metabolized by cytochrome P-450 (CYP) isoenzymes.

The principal metabolic pathway of thalidomide appears to be nonenzymatic spontaneous hydrolysis. All 4 amide bonds in thalidomide are susceptible to hydrolytic cleavage and, under physiologic conditions, ring opening occurs first in the phthalimide moiety. Spontaneous hydrolysis to form more than 10 metabolites occurs rapidly in vitro, with a mean half-life (dependent on incubation temperature and pH) of 2–5 hours for both optical isomers. There is evidence that thalidomide metabolites formed by spontaneous hydrolysis in vitro have no immunomodulatory activity; however, further study is required to characterize the pharmacologic activity, if any, of metabolites formed in vivo.

Hydroxylation can occur at 4 sites in thalidomide (i.e., 2 sites in each of the phthalimide and glutarimide moieties). Metabolism and some pharmacologic effects of thalidomide may be species specific. Hydroxylated metabolites have been identified in species sensitive to the teratogenic effects of thalidomide (e.g., rabbit), and there is evidence that rat (a species *not* sensitive to teratogenic effects of the drug) microsomes are not able to produce a metabolite that is toxic to lymphocytes in other species. Intermediary forms (i.e., arene oxides or epoxides) proposed to be responsible for the teratogenic effects of the drug have not been demonstrated, hydroxylated metabolites resulting from epoxide activation have not been confirmed in human samples, and in vitro human microsomal preparations do not appear to catalyze the formation of hydroxylated metabolites.

The exact route of elimination of thalidomide in humans is unknown. Thalidomide is not appreciably excreted via the kidneys in humans. Although total body clearance of the drug is about 170–207 mL/minute, unmetabolized thalidomide has a renal clearance of 1.15–1.38 mL/minute and less than 0.7% of the drug is excreted in urine as unchanged drug. Thalidomide is thought to be hydrolyzed to numerous metabolites; however, in individuals who received a single oral dose of the drug, only 0.02% of the dose was eliminated in urine as 4-hydroxy thalidomide 12–24 hours after administration. At 48 hours after a single oral dose, thalidomide is not detectable in urine.

## Chemistry and Stability

◼ **Chemistry**   Thalidomide, a synthetic glutamic acid derivative, is an immunomodulatory agent. The drug is structurally similar to, but pharmacologically different from, glutethimide. Thalidomide contains a phthalimide ring and a glutarimide ring; the glutarimide ring is similar to that contained in glutethimide and may be responsible for the sedative and hypnotic effects of thalidomide. Because the glutarimide ring has a single asymmetric carbon (chiral center), thalidomide may exist as either an optically active levorotatory or dextrorotatory enantiomer. The enantiomers rapidly interconvert in vivo and in vitro; it is unknown whether the enantiomers have distinct pharmacologic properties. Thalidomide is commercially available as a 1:1 racemic mixture of the 2 enantiomers with a net optical rotation of zero.

Thalidomide occurs as a white to off-white, nearly odorless, crystalline powder. The drug has a solubility of 45–60 mcg/mL in water at 25°C. Thalidomide enantiomers are 3–5 times more soluble than the racemic drug. While the aqueous solubility of racemic thalidomide has been reported to be 50 mcg/mL, the aqueous solubility of the separate enantiomers has been reported to be 250 mcg/mL.

◼ **Stability**   Commercially available thalidomide capsules should be stored at 15–30°C and protected from light.

In vitro in whole blood, serum, or plasma, thalidomide undergoes chiral inversion and spontaneous hydrolysis. All 4 amide bonds of the drug are susceptible to hydrolytic cleavage at pH exceeding 6. Inversion of the enantiomers occurs at a greater rate in vitro in blood at 37°C than in vivo. The rate of inversion and hydrolysis of thalidomide is pH dependent and increases with pH over the range of 7–7.5.

## Preparations

Because thalidomide is a known human teratogen and can cause life-threatening birth defects if administered during pregnancy, commercially available thalidomide must be obtained through a restricted distribution program, the System for Thalidomide Education and Prescribing Safety (STEPS) designed to help ensure that fetal exposure to the drug does not occur. (See Restricted Distribution Program under Dosage and Administration.)

**Thalidomide**

| Oral | | | |
|---|---|---|---|
| Capsules | 50 mg | Thalomid®, Celgene | |

†Use is not currently included in the labeling approved by the US Food and Drug Administration

Selected Revisions January 2007, © Copyright, November 1999, American Society of Health-System Pharmacists, Inc.

# BONE RESORPTION INHIBITORS

## Alendronate Sodium

◼ Alendronate sodium, a synthetic bisphosphonate analog of pyrophosphate, is a bone resorption inhibitor.

## Uses

◼ **Osteoporosis**   Alendronate is used in the treatment and prevention of osteoporosis in postmenopausal women and for the treatment of osteoporosis in men. Alendronate also is used in the treatment of corticosteroid-induced osteoporosis.

*Prevention in Postmenopausal Women*   Alendronate is used for the *prevention* of osteoporosis in postmenopausal women. Alendronate is used adjunctively with other measures (e.g., diet, calcium, vitamin D, weight-bearing exercise, physical therapy, avoidance of excessive cigarette smoking and/or alcohol consumption) to retard further bone loss and the progression of osteoporosis in postmenopausal women. The goal of preventive therapy is preservation of bone mass and a resultant decrease in fracture risk.

Osteoporosis, a systemic skeletal disease characterized by low bone mass and microarchitectural deterioration of bone tissue with consequent increased bone fragility and susceptibility to fracture, is observed in a large proportion of postmenopausal women. Adult women have less bone mass than men at all ages, and decreased production of estrogen at menopause is associated with accelerated bone loss, particularly from the lumbar spine, for about 5 years, during which time skeletal mass loss averages 3% per year. While the risk of postmenopausal osteoporosis cannot be quantified by a single clinical finding or test result, many risk factors have been identified, with the probability of developing osteoporosis increasing with multiple risk factors. Risk factors include premature ovarian failure; a family history of osteoporosis; a small, slim body frame; endocrine disorders such as thyrotoxicosis, hyperparathyroidism, Cushing's syndrome, hyperprolactinemia, insulin-dependent diabetes mellitus (type 1, IDDM); cigarette smoking; drinking excessive amounts of alcohol; a sedentary lifestyle and/or lack of physical exercise; low body weight; moderately low body mass (e.g., at least 1 standard deviation below the mean for healthy young adult women); and low dietary calcium intake. White or Asian women, particularly those who are thin or small and have a positive family history of osteoporosis, are at a higher risk for the disease than are black women. Premature ovarian failure (surgical or nonsurgical) hastens the onset of osteoporosis, and estrogen deficiency in premenopausal women (e.g., secondary to anorexia nervosa- or exercise-induced amenorrhea or to hyperprolactinemia) induces bone loss and may reduce peak bone mass.

Alendronate has been evaluated for the prevention of osteoporosis in postmenopausal women in 2 double-blind, placebo-controlled studies of 2 or 3 years' duration that included 2056 women (40–60 years of age). In these studies, therapy with alendronate 5 mg daily increased bone mineral density (BMD), as determined by dual-energy radiographic absorption (DXA) measurements, in the lumbar spine, femoral neck, trochanter bone, and total body. While women receiving placebo lost approximately 1% of BMD per year, substantial increases in BMD were observed in women receiving alendronate. In one of the studies that included postmenopausal women who had experienced menopause 6–36 months before initiation of the study, administration of alendronate (5 or 10 mg) daily given for 3 years or, alternatively, 20 mg daily given for 2 years, followed by administration of placebo daily for 1 year) at 3 years was associated with a 1–4% increase in lumbar spine, femoral neck, and trochanter BMD and 0.3–1% increase in total body BMD compared with baseline, while placebo recipients lost 1–2% of BMD in these sites; a lower dosage (1 mg daily) of alendronate for 3 years attenuated but did not fully prevent losses in BMD relative to those in women receiving placebo. Limited data indicate that alendronate (5 mg daily) reduced the rate of bone loss on forearm by about half relative to placebo. In a 1-year controlled study in postmenopausal women with osteoporosis, alendronate 70 mg once weekly produced increases in BMD similar to those observed with a dosage of 10 mg daily.

The effect of alendronate on BMD versus that of estrogen or raloxifene