1  Thomas H. Bienert, Jr., State Bar No. 135311
2  tbienert@bmkattorneys.com
   Ariana Seldman Hawbecker, State Bar No. 190506
3  ahawbecker@bmkattorneys.com
4  BIENERT, MILLER & KATZMAN, PLC
   903 Calle Amanecer, Suite 350
5  San Clemente, California 92673
6  Tel: (949) 369-3700/Fax: (949) 369-3701

7  Reuben A. Guttman (admitted pro hac vice)
8  rguttman@gbblegal.com
   Traci L. Buschner (admitted pro hac vice)
9  tbuschner@gbblegal.com
10 Justin S. Brooks (admitted pro hac vice)
   jbrooks@gbblegal.com
11 Dan Guttman (admitted pro hac vice)
   diguttman@aol.com
12 GUTTMAN, BUSCHNER & BROOKS PLLC
13 1625 Massachusetts Ave., NW, Suite 500
   Washington, DC 20036
14 Tel: (202) 800-3001/Fax: (202) 827-0041

15
16 Richard A. Harpootlian (admitted pro hac vice)
   rah@harpootlianlaw.com
17 Christopher P. Kenney (admitted pro hac vice)
   cpk@harpootlianlaw.com
18 RICHARD A. HARPOOTLIAN, PA
   1410 Laurel Street
19 Post Office Box 1090 (29201)
   Columbia, South Carolina 29202
20 Tel: (803) 252-4848/Fax: (803) 252-4810

21
22 Nancy Gertner (admitted pro hac vice)
   ngertner@law.harvard.edu
23 Langdell 328
   1525 Massachusetts Ave.
24 Cambridge, Massachusetts 02138
25 Tel: (617) 851-3812

26
27 Attorneys for Plaintiff - Relator
   BEVERLY BROWN
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO,<br><br>　　　　　　　Plaintiffs,<br>　　　　　　　*Ex rel.*<br><br>BEVERLY BROWN,<br><br>　　　　　　　Plaintiff-Relator,<br><br>v.<br><br>CELGENE CORPORATION,<br><br>　　　　　　　Defendant. | Case No. 10-cv-03165 GHK (SSx)<br>Assigned to the Honorable George H. King<br><br>**DECLARATION OF CHARLES L. BENNETT, M.D., Ph.D, M.P.P.  IN SUPPORT OF RELATOR'S MOTION TO DE-DESIGNATE CERTAIN CONFIDENTIAL DOCUMENTS AND STRIKE PARAGRAPH 5 OF THE PROTECTIVE ORDER** |

**DECLARATION OF CHARLES L. BENNETT, M.D., Ph.D, M.P.P. IN SUPPORT OF RELATOR'S MOTION TO DE-DESIGNATE CERTAIN CONFIDENTIAL DOCUMENTS AND STRIKE PARAGRAPH 5 OF THE PROTECTIVE ORDER**

I, Charles L. Bennett, M.D., Ph.D, M.P.P. declare as follows:

1.　　I am a practicing oncologist and pharmacovigilance investigator who focuses on identification and characterizing the causes, course, prevention, treatment, and outcomes

of near fatal and fatal side effects of therapies administered in the disciplines of hematology and oncology domains.

2.   I was retained as a rebuttal expert by Relator for this action and prepared an expert rebuttal report for Relator that rebuts the testimony of various experts retained by Celgene Corporation.  I have now been asked to submit a declaration addressing the public interest in disclosure of certain information learned through this litigation.

**Qualifications and Background**

3.   By way of further background, I have a master's degree and a Ph.D. in public policy and have published a large body of research on health care fraud investigations involving pharmaceuticals—including misbranding and off-label marketing.  I am a board-certified oncologist and board eligible hematologist specializing in research on adverse effects of drugs.

4.   I founded and was previously the principal investigator for a multi-year National Institutes of Health R01 multi-year grant called Research on Adverse Drug Events and Reports (RADAR), a project that investigates and disseminates information about adverse drug and device reactions.  My work with the RADAR project focused on multiple myeloma.

5.   I led the identification of deep vein thrombosis (DVT) and venous thromboembolism (VTE) associated with thalidomide in 2002 (the American Journal of Medicine) and thalidomide and lenalidomide in 2006 in the Journal of the American Medical Association (JAMA).   This work formed the factual basis of the first ever successful Citizen Petition submitted in 2005 by a state Attorney General (current U.S. Senator Richard Blumenthal) in collaboration with an academic researcher.  This work involved collaborations with leading hematologists focused on multiple myeloma.  The final manuscript in JAMA in 2005 was co-authored with Paul Richardson MD of the Dana Farber Cancer Institute and Jeff Zonder MD from the Medical College of Wisconsin.

6.   I currently lead the only state-endowed pharmacovigilance program in the country, and its core initiative has been the Southern Network on Adverse Reactions

(SONAR) project that is also funded by a R01 from the National Institutes of Health. This program is a markedly upgraded effort from my earlier RADAR project.

7.     I have practiced as a clinical hematologist/oncologist at a number of Veterans Administration (VA) medical centers, including: the Durham VA, the Chicago Lakeside VA, and the Jesse Brown VA. I currently continue to practice clinical oncology at the WJB Dorn VA Medical Center in Columbia, South Carolina. I have had extensive interactions with a large number of oncologists at ground rounds in community hospitals without academic affiliations and continue to routinely interact with such oncologists at WBJ Dorn.

**Overview**

8.     In reviewing the documents, and deposition testimony in my role as an expert in this action, I saw a broad array of information regarding the safety and efficacy of thalidomide derivatives, Celgene's interactions with physicians and other actors in the health care arena, and the operations of the statutory drug compendia that is not publicly-known and, to my knowledge, is not available to physicians or patients from any other source.

9.     Although the information I have reviewed in this case implicates wide-ranging issues that are at the forefront of the national debate on healthcare today, I focus here on information that most imminently compromises patient health and safety and the independent judgment of physicians. The documents and testimony I have reviewed in this case show that there has been an alarming absence of public disclosure of the profound health and safety concerns regarding Celgene's products. This has jeopardized and continues to jeopardize patient safety by, among other things, compromising the ability of oncologists and patients to make reasoned decisions as to the prescription and use of Thalomid and Revlimid and newer thalidomide drugs like Pomalyst. It accordingly is critical to patient safety that the previously undisclosed safety information brought to light in this case be made available to physicians and patients without further delay.

10.     In particular, it is my belief that in the interest of patient safety, the documents and deposition testimony included in the accompanying Appendix of Exhibits as Exhibits

1 through 44, should immediately be disclosed to physicians, patients, and the public at large.[1] The reasons for this are described in detail below.

**DVTs – Safety Concerns with Revlimid, Thalomid, and Pomalyst**

11.    First and foremost, this litigation has produced information that implicates critical safety issues involving Celgene's immunomodulatory (iMID) drugs Revlimid, Thalomid, and its newer iMID drug Pomalyst.  The evidence I reviewed strongly indicates that Celgene concealed the safety threats created by its drugs, most notably the likelihood that Thalomid and Revlimid patients could develop deadly deep vein thrombosis (DVT) and pulmonary embolism (PE).

12.    Oncologists and other practitioners need to be aware of Celgene's history misrepresenting and concealing the safety profile of Thalomid so that they can make reasoned assessment of the safety concerns regarding Celgene today.  Celgene's actions have continued consequences. As a result of Celgene's actions, medical professionals and patients still lack adequate information regarding DVT today, including (and most notably) information on the optimal ways to prevent and treat thalidomide-associated DVT in multiple myeloma patients.  Celgene also promoted the use of Revlimid to treat chronic lymphocytic leukemia ("CLL") outside clinical trials during a period when safe and effective dosing was not known.  Information regarding these issues would immediately benefit patients and oncologists in their prescribing decisions and further provide a catalyst to induce Celgene to present the findings of its post-marketing safety studies for Thalomid and Revlimid and timely conduct and report the results of safety studies it must conduct for Pomalyst.

---

[1] Most of these are Celgene documents or deposition testimony of its employees.  But Exhibits 10, 17-20, and 34-37 are publicly available articles or, as I understand it, otherwise belong to third parties who do not object to the contents being made public.  In conjunction with Celgene's documents, these exhibits will assist physicians and patients in making informed decisions and assessing treatment options.

13.     As noted, I have long studied DVT and VTE associated with Thalomid and Revlimid,[2] and my work formed the factual basis of the first ever successful Citizen Petition submitted by a state Attorney General in collaboration with an academic researcher.  I continued to study serious drug events associated Thalomid and Revlimid after the FDA largely granted our Citizen's Petition.  In 2013, following the culmination of years of study, national drug safety expert Tom Moore and I reported that only 1% of all VTEs/DVTs associated with thalidomide were ever reported to the FDA.[3]  Those documents indicate that Celgene underreported and failed to disclose serious adverse events.

14.     For example, I reviewed an October 2000 email exchange between Celgene's Chief Medical Officer Jerry Zeldis and Celgene's Executive Director of Drug Safety Todd Clark.  *See* CELBRN1263480, attached as **Exhibit 1**.  In this email, Mr. Clark initially complains about a sales representative's notation of adverse experiences of Thalomid patients in a Western Activity report (*id.*), which is exactly what the sales representative should have done.  Sales representatives' accurate documentation of adverse events is important.  All evidence of adverse events should be brought to the attention of the FDA, where adverse events are made publicly accessible, thus allowing practitioners and the

---

[2] A venous thrombus is a blood clot (thrombus) that forms within a vein.  Thrombosis is a term for a blood clot occurring inside a blood vessel.  A common type of venous thrombosis is a deep vein thrombosis (DVT), which is a blood clot in the deep veins of the leg.  If the thrombus breaks off (embolizes) and flows towards the lungs, it can become a life-threatening pulmonary embolism (PE), a blood clot in the lungs.  When a blood clot breaks loose and travels in the blood, this is called a venous thromboembolism (VTE).  The abbreviation DVT/PE refers to a VTE where a deep vein thrombosis (DVT) has moved to the lungs.

[3] *See* Moore TJ, Bennett CL. Underreporting of hemorrhagic and thrombotic complications of pharmaceuticals to the U.S. Food and Drug Administration: Empirical findings for warfarin, clopidogrel, ticlopidine, and thalidomide. A report from the Southern Network on Adverse Reactions (SONAR). *Seminars in Thrombosis & Hemostasis*. 2012; 38: 905-907.

1 | public at large to understand the prevalence and severity of side effects of drugs and
2 | facilitating further safety investigations.[4]

3 |      15.    In this email exchange, Celgene's Director of Safety Todd Clark admonished:
4 | "Putting such [adverse event] statements in writing in an internal Celgene document is
5 | potentially a glaring red flag to the FDA, identifying you as having violated Federal Law
6 | by not reporting these events…." Exhibit 1, CELBRN1263480. In response to Mr. Clark's
7 | email, Celgene's Chief Medical Officer Jerry Zeldis responded "Please do not send such
8 | explicit e-mails to the field. This is a non-erasable message that can be audited by the
9 | FDA." *Id.* Mr. Clark wrote back that the field force was producing "…clear documentation
10 | of their failure to meet their regulatory obligations…." He further complained "[t]hey have
11 | been reminded/warned by D. D'Iorio and me [not to do this], and continue to be
12 | noncompliant." *Id.*[5] From these emails, it appears that the focus (and based on my studies,
13 | the seeming end result) of Zeldis and Clark's approach was to hide adverse event data from
14 | the FDA and prevent sales representatives from documenting evidence of such events rather
15 | than taking steps to ensure Celgene sales representatives accurately documented adverse
16 | events so that Celgene would meet its lawful reporting obligations.[6]

17 |

---

18 | [4] Today, adverse events are made accessible on the FDA's website. Should additional
19 | information be desired, an individual or entity may submit a FOIA request to obtain additional detail.

20 | [5] As I understand it Dwight D'Iorio is Celgene's Vice President of Sales and has long held
21 | senior sales positions.

22 | [6] In related correspondence, Celgene's Vice President of Global Clinical Research and Development Jay Kaminski, writes to Zeldis after reviewing this email chain, stating:
23 | "Jerry, your group never ceases to amaze me. I believe there may be other ways of more effectively communicating key messages, don't you think? Certainly does not bode well
24 | for increased communication increased AE reporting. People may in fact get 'gun shy' and based on fear and intimidation. This is not the first time I have seen this."
25 | CELBRN1263344, attached as **Exhibit 2**. Zeldis purports to agree and claims that he did "not like the way that Todd reacted" but his focus remains on avoiding detection and
26 | action by the FDA and preparing reports in a way that does not identify adverse events; he
27 | writes: "I do think that he has identified a major problem that could result in a warning letter from the FDA – if we are audited and there is internal communications amongst the
28 | sales force about AEs that were not sent to the FDA, we are vulnerable. In that respect, your group never 'ceases to amaze me.'" *Id.*

16.     Steps taken by Celgene to avoid full disclosure of adverse events to the FDA – in conjunction with evidence that the true degree of adverse events for thalidomide drugs is far higher – is something doctors prescribing Celgene's drugs and patients taking those drugs need to know in order to make fully-informed decisions about the safety and efficacy of those drugs.

17.     Documents I have reviewed in this case also demonstrate that Dr. Zeldis and other senior management were well aware of the existence of DVT patients and the need for prophylaxis by at least 2001 and even had views as to appropriate prophylaxis.  For example, in a July 22, 2001 email to Celgene's Clinical Science Liaison Doris Wong, Dr. Zeldis expressly recognized the risks of administering thalidomide with Adriamycin without an adequate anticoagulant, stating that "[c]oumadin is not adequate anticoagulation." CELBRN1271586, attached as **Exhibit 3**.  However, when physicians working on protocols with Celgene wished to provide patients with some type of prophylaxis around this time, Celgene's response was to tell them to take out the prophylactic regimen entirely.  CELBRN1270593, attached as **Exhibit 4** (Doris Wong telling physician who wanted to use coumadin in prostate cancer patients to use nothing).  In February of 2001, Jerry Zelids was informed of the deaths of seven Thalomid patients from pulmonary embolous/DVT and relayed this information to then-COO (and later CEO) Sol Barer. *See* CELBRN1268305, attached as **Exhibit 5**.  Zeldis also wanted to limit any independent studies on DVT, stating that researchers should "cooperate with Celgene so that we can do what is best for our patients and develop guidelines to prevent medical misadventures" and if anyone wished "to investigate the etiology of DVT in thalidomide treated patients, they should send [him] an LOI or a protocol."  CELBRN1945071, attached as **Exhibit 6**.  He also campaigned to minimize awareness of the DVT risks from Thalomid. *See* CELBRN1267935, attached as **Exhibit 7** (asking a physician, though his assistant "to consider adding [in an upcoming publication] a sentence stating that, in most instances, the development of DVT were managed medically and did not result in the discontinuation of thalidomide therapy").  In response to questions by Vice President of

Marketing Todd Hyde's question as to why a study not managed by Celgene might have found high rates of DVT among renal patients treated with thalidomide, Zeldis stated that renal cancer "might produce some apoptosis that could result in an exacerbation of the platelet activation thus resulting in increased coagulapthy, including DVT. Otherwise, 'my arms are getting tired, waving them around as I attempt to rationalize an answer to your question.'" CELBRN1268201, attached as **Exhibit 8**.[7]

18.    It is critical that doctors understand Celgene's historical efforts to minimize the DVT risks of its drugs to critically evaluate representations regarding safety today. Physicians continue to be uncertain as to which agent is optimal for VTE prophylaxis and for which patient. VTE prophylaxis is associated with risks of severe and fatal hemorrhage, and patients with certain risk factors who are poor candidates for one prophylaxis agent and who may be optimal candidates for another prophylaxis agent. In contrast, administering prophylaxis agents that are associated with low success rates for prophylaxis may result in early mortality from a pulmonary emobolism. Therefore, this uncertainty can lead to early mortality in a patient with multiple myeloma – either from a thrombotic event or a hemorrhagic event.

19.    Other documents I have reviewed in this case further show that while Celgene knew Thalomid was an *independent* risk factor for the development of DVT in cancer patients, it instructed its sales representatives to tell doctors otherwise. Documents show that in June 2003, Celgene Chief Medical Officer Jerry Zeldis organized a training to "review DVTs" and "discuss methods to improve" sales representatives' "knowledge of what data are available and how best to formulate request so that prescribers' information needs are met." CELBRN1254450-53 at CELBRN1254452, attached as **Exhibit 11**. A June

---

[7] Celgene has also minimized DVT risks in its labeling. Celgene provided drug company Pharmion with an exclusive license to sell Thalomid in Australia and other country outside the United states and caucused with Pharmion on safety issues and "DVT/thrombosis" at least as early as 2002. *See, e.g.*, CELBRN0314093, attached as **Exhibit 9**. Following this caucus, Pharmion's 2003 Australian label disclosed the nature and extent of DVT risks in a way that Celgene's 2003 label did not. **Exhibit 10** is a table with relevant excerpts from the two labels.

2004 Celgene Market Research document described Thalomid as carrying "[r]isks of DVT" and "Toxicity risks." CELBRN0096467, slide 33-34, attached as **Exhibit 12**. Yet in an August 2003 Field Contact report evaluation, sales representative ▮▮▮▮▮ interaction with a ▮▮▮▮ states that "[t]here was mention of DVT's as a result of Thalomid, and you opened up a discussion surrounding the 10-20% NDMM will see DVT's regardless of therapy choice and he totally agreed." CELBRN1432439, attached as **Exhibit 13**. As discussed above, this representation is contrary to the knowledge Zeldis and Celgene management exhibited that DVT was observed to be higher in multiple myeloma patients treated with Thalomid. There appears to be a significant discrepancy between the safety risks Celgene management knew of and what it allowed to be disclosed. Concealing safety issues is not fair balance and does not allow oncologists to assess the safety information.

20. As noted above, physicians must be aware of Celgene's history misrepresenting and concealing the safety profile of Thalomid so that they can make reasoned assessment of the safety concerns regarding Celgene today. But even more critical, they need to be aware that appropriate information on prophylaxis *still* has not been made available because Celgene delayed the completion of its post-marketing safety studies on Thalomid and Revlimid and the results have not yet been reported.

21. On May 8, 2006, Carl Huntley, a project manager for FDA, communicated to Megan Parsi, Celgene's Director of Regulatory Affairs, written comments regarding the sNDA 21-430 application for thalidomide and the safety data from the EA100 trial. The memo communicated FDA's safety questions that should be addressed in a REQUIRED phase 4 post-marketing commitment. The safety questions were:

> What is the failure for each of the different types of VTE prophylaxis (e.g. antiplatelet or anticoagulant therapy) for MM patients treated with a thalidomide-containing regimen?
>
> What is the failure rate for each type of DVT treatment for those patients with MM and a DVT who continue to receive ongoing treatment with thalidomide?
>
> What is the failure rate for each type of post-DVT VTE prophylaxis for those patients with MM and a DVT who continue to receive ongoing treatment with thalidomide?

The memo stated that a phase 4 post-marketing commitment request was to Celgene to conduct an epidemiologic study that would address the three questions using the STEPS patient registry database.

22.     Similar studies have been required for Revlimid and Pomalyst.  Celgene agreed as a post-approval commitment that it would conduct these epidemiologic studies of alternative VTE prophylaxis strategies.   This information is extremely important in developing evidence based VTE prophylaxis recommendations.  But as of today, more than 9 years after Celgene received the FDA mandate, there are no publicly available results from any post-approval commitment studies.

23.     Non-public documents I have seen for the first time in Celgene's production indicate that Celgene did finally complete its obligations as to Thalomid and Revlimid in March of 2014.  *See,* CELBRN3140465, attached as **Exhibit 14**; CELBRN3791157, attached as **Exhibit 15**; CELBRN368418, attached as **Exhibit 16**.  But the results of the required studies have never been released to the public.  This information is critical to inform clinicians about the best approach to VTE prophylaxis among MM or cancer patients who receive thalidomide.  But it has never been publicized.

24.     Celgene should immediately release the results of the studies it performed pursuant to the FDA's mandate.  Celgene's motivation for failing to publicize information on prophylaxis is unclear, but it could be that the most appropriate prophylaxis curries some measurable heightened risk of bleeding – requiring a delicate balancing act – and potentially causing some physicians to prefer alternative cancer therapies where DVT is less of a risk and prophylaxis is not needed.  Or it could be that Celgene's epidemiological studies found that prophylaxis was less effective than anticipated, casting raising concerns about the suitability of treatment with Thalomid and Revlimid.  If that is the case, the results are particularly important to release to the public.  But at an absolute minimum, doctors and patients considering use of Celgene's drugs deserve to know that additional studies have been performed, that the results exist, and that Celgene has elected not to publicly disclose

1  those results. Public disclosure of the documents Celgene has produced in this case will
2  allow for that.

3      25.   Disclosure of this information is particularly important because Celgene has
4  outstanding commitments to *conduct* these safety studies for Pomalyst, which has narrower
5  indications than Revlimid and Thalomid and for which there is less known information on
6  safety and side effects. Indeed, the FDA has already rejected the viability of Celgene's
7  attempt to rest on a spontaneous postmarketing adverse events reported under subsection
8  505(k)(1) of the FDCA, finding that it needed to conduct formal studies because
9  spontaneous observance of adverse events would "not be sufficient to assess the known
10  serious risk of venous thromboembolic events (VTE)" and requiring Celgene to conduct a
11  similar observational multi-site inception cohort study of Pomalyst users.[8] Celgene is to
12  complete the study by March of 2016 and present a final report submission in January of
13  2017. Celgene should not again be permitted to delay these important commitments. In
14  addition to the disclosure of results for Revlimid and Thalomid – which is needed now –
15  the disclosure of its past acts (delays in completing and failure to report study results) can
16  and should serve as a catalyst for public pressure to ensure Celgene meets its obligations
17  this time, timely completing safety studies and reporting results on Pomalyst.

18      26.   DVT issues are particularly salient because of their potential severity and the
19  nature of multiple myeloma, the primary disease Celgene's iMIDs treat.[9] Although there
20  are no absolutes in medicine, as a general matter, multiple myeloma is correctly recognized
21  as an incurable disease. Accordingly, the success of a drug in treating multiple myeloma is
22  typically viewed based on its ability to prolong survival – in particular, progression-free
23  survival – and improve the quality of life. As such, it is absolutely essential that doctors
24  and patients have all available safety information and are made aware that Celgene

25

26  ————————
27  [8] http://www.accessdata.fda.gov/drugsatfda_docs/appletter/2013/204026Orig1s000ltr.pdf
[9] A report by Visiongain, a business intelligence provider based in London, estimates that
28  Celgene earns approximately 84% of its total revenues from multiple myeloma treatment.
*See http://marketrealist.com/2015/08/celgene-company-focused-multiple-myeloma-space/*

1 previously delayed in satisfying post-marketing safety obligations for Thalomid and
2 Revlimid and currently has outstanding safety studies that must be completed for Pomalyst.

3     27.    With respect to Pomalyst, the most recent studies Celgene conducted to fulfill
4 the FDA's accelerated approval requirements found that Pomalyst prolonged median
5 progression-free survival by less than 2 months.[10] Similarly, studies have found that
6 Revlimid maintenance therapy delays the worsening of multiple myeloma for patients who
7 have undergone a stem cell transplantation but does not prolong overall survival above and
8 beyond placebo.[11] Patients should have the absolute right – in consultation with their
9 physicians – to decide whether the benefit of limited increases in survival or progression-
10 free survival outweigh the risks of debilitating and potentially deadly side effects. This is
11 particularly so because there are numerous drugs that treat multiple myeloma other than
12 thalidomide-based drugs. To make these determinations, patients and their physicians must
13 have the most accurate, up-to-date safety information, including the documents Celgene has
14 produced in this case but has never disclosed to the public.

15 **Celgene's Off-Label Promotional Publications Policy**

16     28.    The documents I have reviewed in this case relating to Celgene's Off-Label
17 Promotional Publications Policy also implicate serious issues of public concern.

18     29.    For years, articles on off-label (and on-label) uses of Celgene's thalidomide
19 drugs have appeared in journals under the putative authorship of oncologists and
20 hematologists with disclosures along the lines of "We thank Anna Georgieva, MD, PhD

---

[10] Median progression-free survival with Pomalyst plus low-dose dexamethasone was 3.6 months and median progression-free survival with high-dose dexamethasone alone was 1.8 months. *See, e.g.,* http://ir.celgene.com/releasedetail.cfm?releaseid=908418

[11] This is concerning, particularly because of Revlimid's link to secondary cancers, seen especially in the transplant setting. The risk of secondary cancers might be acceptable by a clear survival benefit, but not by merely showing a delay in time to progression. *See, e.g.* Rajkumar SV, Gahrton G, Bergsagel PL: Approach to the treatment of multiple myeloma: A clash of philosophies. Blood 118:3205-3211, 2011. It would be worthwhile to conduct comprehensive studies comparing Revlimid and other (potentially less toxic) cancer drugs for this group as opposed to comparing Revlimid and a placebo. This has been done and continues, to some degree.

(Excerpta Medica) for assistance in the preparation of the manuscript.  Editorial support was funded by Celgene"; "[t]he authors received editorial support in the preparation of this manuscript, funded by Celgene"; "The authors received copyediting and formatting support from Excerpta Medica, which was funded by the Celgene corporation," or identification that "authors have served as consultants and participate as lecturers" in Celgene's speakers' bureaus.  *See* **Exhibits 17-20.**[12]  Generally, a statement insisting that the authors are responsible for all content and editorial decisions accompanies such disclosures.

30.   From my personal experience in reviewing numerous articles submitted to peer-reviewed journals, I can say that scientific publications funded by pharmaceutical companies who provide editorial assistance have a different flow and feel even when the author does maintain control of content.[13]  But, here disclosures of "editorial support" of Excerpta Medica and "financial support" of Celgene do not come close to identifying the nature of Celgene's relationship with Excerpta Medica, Celgene's role in the planning of these publications, Celgene's ability to dictate or influence publication content, and the role that these publications play in Celgene's larger promotional strategies.

31.   The Celgene documents I have reviewed in this case show that beginning as early as 2006, Celgene contracted with Excerpta Medica, then a component of leading scientific/medical publisher Elsevier, to execute a promotional publications strategy that would have the effect of converting scientific publications into marketing tools for Celgene. *See, e.g.*, CELBRN0280497, attached as **Exhibit 21**. ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*id.* at CELBRN0280500), and the documents show that it did so successfully.  The arrangement initially covered Revlimid.   Today, journal articles on Celgene's newer thalidomide

---

[12] These exhibits are publicly available, but I am providing them for the convenience of the Court.

[13] My publications have only once utilized a medical writer and on a rare occasion has my research received funding from pharmaceutical companies. On only one occasion have I co-authored a publication in which a pharmaceutical company provided medical-writing assistance.

derivative Pomalyst also identify "editorial assistance" of Excerpta Medica and funding support by Celgene. *See* Exhibit 20.

32.   Celgene's arrangement with Excerpta Medica is noteworthy and disturbing in both its apparent intent and sweeping scope. With respect to intent, the Celgene documents produced in this case show that Celgene and Excerpta Medica ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████    CELBRN3310509-659 at CELBRN3310610, attached as **Exhibit 22.** With respect to scope, my review of Celgene-produced status reports prepared for Celgene by Excerpta Medica and updates prepared for Celgene's Board of Directors on execution of this promotional strategy, it is clear that Celgene and Excerpta Medica played a role in the design and editing of the majority of publications on use of Revlimid. *E.g.* CELBRN0754351, 2007 Board of Directors Presentation, attached as **Exhibit 24** (at slides 35-39); CELBRN0961785, Revlimid Publications Quarterly Status update March 28, 2007, attached as **Exhibit 25**; CELBRN0049528 (Priority Publications 2009), attached as **Exhibit 26**; *see also* CELBRN0135338, 2008 Board of Directors Presentation, attached as **Exhibit**

**23** (particularly slides 26, 37).[14]  Particularly as time passed, there have been comparatively few independent publications on Revlimid.[15]

33.    But the most disturbing aspect to me is the significant amount of control Celgene's relationship with Excerpta Medica afforded it as far as getting publications on the market under the names of physicians and influencing the content of these publications. Indeed, in a non-public internal email in which Celgene employees debated over who should be listed as lead author, Celgene's Director of Clinical Science Marta Olesnyckyj declared that Excerpta Medica staff should be listed as authors because "[t]hey 'drive' the work also and review all drafts" while "[v]endors are [simply] paid for their work and that should be enough."  **Exhibit 27,** CELBRN2237540-547 at CELBRN2237540.   And Celgene's "publications status reports" show that Celgene had substantial involvement and

---

[14] The Board was updated on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮        *Id.* at slides 20-12, 26

[15] In the 2009 document (Exhibit 26), I counted ▮ planned publications for 2009 (both priority and "non-priority" shown in an appendix) for use of Revlimid in multiple myeloma, MDS, and wholly off-label disease states like CLL and NHL.  Celgene identified ▮ of these publications as "independent" although these "independently developed" publications were to be authored by many I recognize from the other documents in this action as Celgene KOLs and promotional speakers (▮▮▮▮▮▮▮and ▮▮▮▮▮▮▮▮▮▮, for example).  These physicians also published "non-independent publications. ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮         *See* Exhibit 26, slides 8-9.  Excerpta Medica's status reports also differentiated between publications planned and subject to review by Celgene and Excerpta Medica and non-Excerpta Medica publications that are "tracked" only. *See, e.g.,* **Exhibit 25**, CELBRN0961785, slide 17

1  authority on all steps of the publication process, from study selection,[16] to researcher and
2  author selection, to editing. **Exhibit 25**, CELBRN0961785, p. 5.

3      34.    Celgene's documents further show that, in many cases, Celgene and Excerpta
4  Medica already had a specific manuscript planned but had not yet chosen an author or target
5  journal. **Exhibit 25** at 21, 24. 39, 30, 53-59. With respect to content preparation, Excerpta
6  Medica was responsible for developing the outline of every publication in which it had
7  involvement. *Id.* at 5. Although authors reviewed the outline, Celgene also reviewed and
8  approved the outline before the first draft was written. In some cases, authors could write
9  the first draft, but Excerpta Medica was also authorized to write initial drafts wholecloth.
10 *Id.* Drafts were then reviewed by Celgene as well as the putative authors. Celgene had to
11 approve the final draft in order for submission to journals to take place. *Id.*

12     35.    The Celgene documents further indicate ████████████████████
13 ████████████████████████████████████████████████████████████████████,
14 ████████████████████████████████████████████████████████████████████████
15 ████████████████████████████████████████████████████████████████████████
16 ████████████████████████████████████████████████████████████████████,
17 ████████████████████████████████████████████████████. **Exhibit 25**,
18 CELBRN0961785 at 63. To my knowledge, the FDA never approved such messaging and
19 was not informed that Celgene had a significant role in the study and dissemination of
20 materials detailing the off-label use of Celgene's drugs to treat CLL. In fact, the FDA
21 ultimately halted a clinical trial of Revlimid for CLL "because of significant safety
22 concerns" and evidence of tumor flare reactions.[17] As I discuss elsewhere, Celgene itself

23

---

24 [16] Celgene exercised significant oversight over the clinical data that formed the bases of
25 publications, capitalizing on the fact that Thalomid and Revlimid are restricted drugs that
   are only distributable under a REMS program to restrict access to drugs to trial designs it
26 liked, controlling researcher selection and patient population (only choosing healthier
   patients who were not "the walking dead" to ensure more favorable study results) and
27 discontinuing favorable trial. *See, e.g.,* Deposition of Jerry Zeldis at 152:10-15,
   CELBERN1271586-86, relevant excerpts attached as **Exhibit 28.**
28 [17] *See* http://www.fda.gov/Drugs/DrugSafety/ucm361444.htm

first identified these concerns in clinical studies and took the position Revlimid should not be used to treat CLL outside clinical trials because of unacceptable toxicity, but nonetheless continued to use Excerpta Medica to publish on CLL's off-label use in medical journals.

36.    It is my view, based on extensive interactive with community oncologists and journal editors, that oncologists and journals have no idea as to the nature of the Celgene/Excerpta Medica relationship and do not appreciate Celgene's role in the publications published under the putative authorship of physicians based on disclosures that Excerpta Medica provided "editorial assistance" and Celgene financial assistance. Oncologists and other physicians, as well as journal editors, are entitled to disclosure of the Celgene/Excerpta Medica relationship and promotional strategy so that they have the necessary information to make reasoned assessments of publications in which Celgene and Excerpta Medica are involved, including whether those publications reflect valid, unbiased science upon which doctors can rely in making treatment decisions for their patients.

37.    As a further illustration of this point, Celgene's documents show that ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (*see* **Exhibit 22** at CELBRN3310539), ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇ ▇▇▇ ▇▇▇▇ ▇▇ ▇▇▇▇▇▇▇ ▇▇▇▇ ▇▇▇▇ *See* **Exhibit 30** JD_ENVISION000001.[18]    Physicians, as well as their patients, need to know this information so that they can make informed treatments decisions.

**The Drug Compendia's Ability to Serve as Tools For Safe and Effective Off-Label Use**

38.    This case has also produced important documents and testimony regarding the statutory drug compendia and treatment guidelines issued by the National Comprehensive Cancer Network (NCCN) that should be available publicly.

39.    The drug compendia are essentially summaries of drug information that are compiled by experts who have reviewed clinical data on drugs.   In theory, the compendia

---

[18] For example, ▇▇▇▇▇▇▇, one of Celgene's KOLs with whom Excerpta Medica noted it had recent contact, received ▇▇▇▇▇ from Celgene as a promotional speaker for Revlimid.  Many of the other KOLs received research funding from Celgene.

18

serve as guides to clinicians on the safe and effective off-label uses of drugs.  But the documents and testimony in this case shows how the compendia can become a tool pharmaceutical companies use to secure reimbursement.

40.    A threshold concern is sales representatives' use of compendia to promote off-label uses.  I have reviewed Celgene documents showing that Celgene instructed sales representatives to make representations regarding content of the compendia to promote off-label uses.  It is important for oncologists to recognize that Celgene's sales representatives are told to reference the compendia to push them to prescribe for off-label uses.

41.    By way of example, in February of 2000, Celgene's Director of Government Relations and Public Policy, Eileen Finnegan, claimed that the AHFS compendium **"recognized THALOMID'S effectiveness in several off-label indications including many cancer uses (breast, ovarian, head etc.)."** **Exhibit 31**, CELBRN0317545.  Email recipient and sales manager Deanna Pankey responded by calling for Celgene sales representatives to "incorporate into your calls [to physicians] when you hear that reimbursement is an obstacle."  *Id.*    Other documents confirm that Celgene's sales representatives routinely made representations regarding the compendia in their sales calls to try and get physicians to prescribe Celgene's drugs for off-label uses.  In a September 2003 Monthly Activity Report, a sales representative named ▮▮▮ stated she had been using "▮▮▮

▮▮▮

▮▮▮

▮▮▮

▮▮▮[19]  Other documents also suggest this was by design:  A May 2004 document titled "BusinessAcumen and Business  Planning" ▮▮▮

---

[19] CELBRN1432314-15, attached as **Exhibit 32**.

1 ██████████████████████████████████████████████████████

2 ██████████████████████████ [20]

3       42.    The problem with this practice is that such representations stem from profit-

4 seeking motives, are biased, and may not be accurate.  In the case of Finnegan, they

5 certainly were inaccurate.  Contrary to Finnegan's email, AHFS did not recognize that

6 Thalomid effectively treated the cancers she identified.   Through 2008, the AHFS

7 compendium stated that Thalomid was "being evaluated for the treatment of a variety of

8 malignancies, including advanced or metastatic breast cancer], Kaposi's sarcoma]',

9 melanoma+', multiple myeloma]', ovarian cancer+', primary brain tumors]' (recurrent

10 highgrade astrocytomas and mixed gliomas), androgen independent prostate cancer+', and

11 renal carcinoma]" warning that that *"further study [was] needed to establish safety and*

12 *efficacy of the drug in the treatment of [the] various malignancies and identify optimal*

13 *doses of the drug in patients with cancer."*[21]   In the intervening years, any oncologists

14 giving credence to Celgene's claims and making prescribing decisions, in whole or in part,

15 based on them would have been doing so based on a falsehood.

16       43.    This danger was and is especially real because few, if any, oncologists actually

17 consult the compendia.  In my experience, community oncologists – with whom I interact

18 at the VA and community hospitals without a research arm – do not consult the compendia

19 (or scientific literature) and are highly vulnerable to representations from sales

20 representatives.  In fact, for many such oncologists, sales representative may serve as the

21 principal source of information on drug uses.  Sales representatives should not be making

22 representations that the compendia show an off-label use has efficacy or is reimbursable,[22]

23 but if they do, oncologists should be aware that sales representatives' claims regarding the

24 compendia may not be accurate and should not be relied on.  Although these particular

25

26 [20] CELBRN0096904-16, attached as **Exhibit 33**.

27 [21] *See* AHFS 2008 Thalomid Listing, attached as **Exhibit 34** (emphasis added).

28 [22] Celgene's CEO has acknowledged this point.  *See*
https://obroncology.com/documents/OBR_0108_Compendia.pdf

1  documents (and the dialogue they engender) will help oncologists recognize that they need
2  to review the compendia themselves if they want to use the compendia as tools to assist
3  them in making prescription determinations, other documents and testimony need to be
4  made public because they show the compendia have limited value.

5      44.    The compendia have limited value, both because of inadequate conflict of
6  interest policies, and in some cases, because they do not contain adequate information on
7  safe and effective dosing for off-label uses of drugs, problems that the documents and
8  testimony in this case show Celgene exploited.

9      45.    One example of this revealed by Celgene's documents relates to Dr. ▮▮▮▮
10 ▮▮▮▮▮.    The compendia and NCCN treatment guidelines, on which the NCCN
11 compendium is based have conflict of interest policies requiring outside physicians
12 involved in developing off-label recommendations to disclose financial ties to
13 pharmaceutical companies and other conflicts of interest.   Under the current NCCN
14 Conflicts of Interest policy, a member is ineligible to sit on a panel if he or she discloses
15 more than $20,000 in payments from a pharmaceutical company in the form of promotional
16 speaker's fees in the prior year.  Deposition of Joan McClure ("McClure Dep.") at 162:16-
17 164:1 (relevant excerpts attached as **Exhibit 35**; see also McClure Dep. Exhibit 13, attached
18 hereto as **Exhibit 36**.  NCCN does not do an independent review to determine whether
19 outside physicians are accurately disclosing their affiliation or financial ties to
20 pharmaceutical companies, and instead relies upon the physicians themselves to make
21 accurate and complete disclosures.  McClure Dep at 165:11-166:13, 188:22-25.

22     46.    The NCCN Guidelines Panel had a teleconference on August 13, 2012,
23 resulting in a modest update for the NCCN Multiple Myeloma guidelines V.1.2013.[23]  Dr.
24 ▮▮▮▮▮ was among the panel members.  Pursuant to NCCN policy, each panel member
25 was required to make conflict of interest disclosures.[24]   Dr. ▮▮▮▮▮▮ disclosed
26 participation on a Scientific Advisory Board or status as a consultant or expert witness for

27 _____

28 [23] *See* http://www.nccn.org/disclosures/transparency.aspx

[24] http://www.nccn.org/disclosures/PanelDisclosureList.aspx?MeetingId=375&GroupId=0

Celgene, but claimed that he had not participated in a speakers' bureau or any other promotional board for Celgene or any other company.[25]  Celgene's internal documents produced in this case show ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████  █████████████████████████████████████

██████████████████████████████  ██████████████████████████████████

███████████████████████  ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████ [30]

47.    Physicians who have little experience with the compendia should be aware that the conflict of interests polices of compendia are based on the self-disclosure of outsider reviewers who may have significant financial ties to pharmaceutical companies.  More importantly, they should be aware that some of Celgene's most highly paid KOLs drafted the guidelines on off-label use of its drugs, notwithstanding the fact that conflict of interest

_____

[25] *Id.*

[26] JD_ENVISION000001, relevant excerpts attached as **Exhibit 30**.  This is a document showing promotional speakers' fees to Celgene's speakers.  There are numerous speakers. I am only showing portions of the spreadsheet that depict payments to the speakers I discuss in this declaration.

[27] *Id.*

[28] *Id.*

[29] http://www.nccn.org/disclosures/PanelDisclosureList.aspx?MeetingId=199&GroupId=0

[30] JD_ENVISION000001 (Exhibit 30).  ████████████████████████████
█████████████  For unknown reasons, NCCN has not published on its website Version 1.2011 of the NCCN Multiple Myeloma Guidelines – which had a number of updates from Version 3.2010 and was the product a February 22, 2011 meeting – or any associated disclosures and meeting evidence.  *See* http://www.cap.org/apps/docs/committees/immunology/myeloma.pdf  Drs. ████████ and ████████████ both attended this meeting.  Likewise, it did not publish meeting evidence of a July 26, 2011 meeting – or associated disclosures – that resulted in an updated Version 1.2012 Guidelines.  *See* http://myeloma.org/pdfs/10_Steps/Step01/2012-%20NCCN_Guidelines.pdf  Dr. ████████ was a writing committee member for this revision.  *Id.*

1  policies are supposed to prevent individuals receiving such significant remuneration from
2  a pharmaceutical company from undertaking such a role.

3      48.    But there is other information I reviewed in this case regarding Celgene and
4  the compendia that is even more troubling. It calls into question DrugDex's usefulness as
5  a guide on safe and effective off-label uses of oncology drugs. Celgene capitalized on the
6  DrugDex compendium's lax approach to safety and vetting of off-label indications to
7  capitalize on DrugDex's listing of an off-label use of Revlimid it knew was dangerous.

8      49.    I reviewed testimony highlighting the fact that Celgene's CEO Robert Hugin
9  lauded the use of Revlimid to treat CLL at an investor conference in 2008 based on its
10 listing in the DrugDex compendium. *See* Deposition of Robert Hugin at 162:2-173:23,
11 attached as **Exhibit 37.** He highlighted this listing to investors even though Celgene had
12 already twice written to JCO of "notable adverse reactions" when Revlimid was used for
13 CLL. Celgene first published a letter to the editor of the Journal of Clinical Oncology in
14 2007, warning of "notable adverse reactions," including two deaths, from two recent studies
15 conducted by Celgene.[31] In May of 2008, the Journal of Clinical Oncology published an
16 article Celgene employees helped write that contained even stronger warnings, including
17 warnings that higher-dose Revlimid was "associated with unacceptable toxicity."[32] In both
18 the article and the Letter to the Editor, Celgene cautioned that CLL should not be used
19 outside clinical trials.

20     50.    I have seen no evidence that Celgene took adequate steps to otherwise address
21 the safety threat. In testimony, Celgene's Director of Drug Safety John Freeman claimed
22 Celgene took "highly effective action" through its communications to JCO, suggesting

23

24 _____

25 [31] *See* Letter, Tumor Lysis Syndrome/Tumor Flare Reaction in Lenalidomide-Treated
26 Chronic Lymphocytic Leukemia, J. of Clin. Oncology (2007), available at
   http://jco.ascopubs.org/content/25/31/5047.full

27 [32] *See* L.A. Andritsos et al., Higher Doses of Lenalidomide Are Associated With
   Unacceptable Toxicity Including Life-Threatening Tumor Flare in Patients With Chronic
28 Lymphocytic Leukemia, J. of Clin. Oncology (May 2008), available at
   http://jco.ascopubs.org/content/26/15/2519.full

Celgene had no moral obligation to do anything else.[33]  I reject that.  Celgene's inaction caused DrugDex to maintain this listing into 2014, never including the dose escalation scheme or any dosing information at all beyond identifying doses associated with adverse effects in Celgene's clinical trials.  In the face of Celgene contradictory (but accurate) warnings of the dangers of Revlimid use in CLL, Hugin's laudatory representations of DrugDex listing had their intended effect in investment community.  For example in October of 2008, an investor posted on investor village that "Revlimid [was] listed in Drug/Dex Compendia for Refractory/Relapsed CLL!!!!!!!!!!!!" and that this was "very, very, very good news.  Time for analysts to raise 2009 and 2010 off label Revlimid sales."[34]  Another investor posted "[d]idn't expect that until 2009. This is the best news from CELG in a long time. **Early**. Nice."[35]

51.    Celgene's clinical trials never identified a safe and effective dosing scheme to treat CLL patients with Revlimid.  Instead, the life-threatening side effects identified in patient trials led the FDA to require Celgene to halt clinical trials of Revlimid for CLL and include a "warning and precautions" section in Revlimid's package insert, adding warnings about increased mortality, tumor flare reaction and tumor lysis syndrome.[36]  In 2013, the FDA required Celgene to place a "limitations of use" of use statement on Revlimid's label stating that the drug is "not indicated and is not recommended for the treatment of patients with chronic lymphocytic leukemia (CLL) outside of controlled clinical trials."  Revlimid's label info still contains this warning.  The warning came 6 years too late.  Just as a responsible drug company that cared about safety would have sought to adopt the Pharmion label in 2003, a responsible drug company would sought a labeling change for Revlimid in

---

[33] Deposition of John Freeman ("Freeman Dep.") at 253:15-254:11; *see generally* 249:23-256:1 for context, attached as **Exhibit 38**.

[34] http://www.investorvillage.com/mbthread.asp?mb=341&tid=5942694&showall=1

[35] *Id.* (emphasis in original).

[36] Indeed, Freeman testified that tumor lysis syndrome is like a nuclear implosion in the body.  Freeman Dep. at 216-218.

1  2007. Instead, Celgene appears to have provided its sales representatives with literature on
2  use of Revlimid to treat CLL and instructed its sales representatives to promote this use
3  outside clinical trials. For example, after taking the position that CLL should not be used
4  off-label, Celgene made sure off-label publications on use of Revlimid to treat CLL"
5  continued to be disseminated, and reports from one of Celgene's vendor ImpactRx, whose
6  products document interactions between sales representative sand physicians, evidence
7  sales representatives' discussions with physicians on the use of Revlimid to treat CLL. *See*
8  **Exhibit 39**, CELBRN0303825, pp. 75-77.

9    52.   With respect to DrugDex, it continued to list Revlimid for CLL in 2014, after
10 the FDA's effective confirmation that the drug was contraindicated outside clinical trials.
11 To the extent any practitioners read the monograph this way or accepted any assertions by
12 Celgene sales representatives to this effect, it did their patients a disservice and
13 compromised safety. This is particularly true to the extent any patients were
14 asymptomatic.[37] Reviewing the Freeman and Hugin deposition testimony in conjunction
15 with Celgene's warnings on use of Revlimid to treat CLL and DrugDex's Revlimid listing
16 on CLL will help physicians appreciate that mere listing of an off-label use of one of
17 Celgene's thalidomide drugs by a compendium does not mean the drug is safe or effective
18 for that disease state and does not mean the drug should be prescribed for that use.

19 **Sampling of Business Plans Directing Off-Label Promotion and Evidence of Such**

20   53.   Finally, a sampling of non-public Celgene Business Plans produced in this case
21 that direct the promotion of off-label uses and field status reports or activity reports
22 highlight how sales representative implement these directives in interactions with
23 physicians should be publicly disclosed to the medical community. Disclosure of a small
24

25 [37] CLL progresses slowly in most cases, and it is generally recognized that early
26 intervention does not improve survival or quality of life. Thus, CLL typically is not
   treated until symptoms or clinical indicators have progressed to a point where it may
27 begin to affect the patient's quality of life. To the extent the DrugDex CLL monograph
   contributed to any practitioner's early treatment of CLL, it unjustifiably exposed patients
28 to risks of tumor flare and tumor lysis, putting them in danger for no reason. That is not
   what a compendium should do, and the CLL story needs to be highlighted publicly.

1  sample will sensitize physicians as to how pharmaceutical companies manipulate them and
2  provide a context to assess sales representatives' representations on safety and efficacy,
3  particularly as to off-label uses.

4      54.   I summarize the below aspects of 3 Celgene Business Plans that are relevant
5  for off-label purposes.

6  • **Celgene's Year 2000 Thalomid Marketing Plan** (CELBRN1573074-107),
7    attached as



25  • **2004 Business Plan, West Region (BROWN00000705-721),** attached as **Exhibit**
     **41**:

27  _____

28  [38] The target "audience" for virtually every initiative – conducted by sales representatives
     and otherwise – was oncologists and hematologists.

- **2006 Revlimid Pacific Coast Sales District Launch Plan (CELBRN0205655),** attached as **Exhibit 42**:

55.    In addition to these plans, it is important for physicians to see examples of how Celgene sales representatives have implemented management's directives to promote to

---

[39] The mere "existence" of published data demonstrating "activity" by no means demonstrates efficacy with respect to treating the malignancy, let alone identifying what safe treatment or appropriate dosing would be. Published data could include a single case study in which remission was found after use of Thalomid, without any replication in any other individual or controls considering other drugs used or confounds.

them off-label.  In addition to sales representative misusing the compendia to promote off-label as discussed above (*see* ¶¶ 40-43) I note the following examples:

- **July 2003 Field Activity Report (CELBRN0834595-600),** attached as **Exhibit 43**:



*Id.*

- **2004 Strategic Business Plan of Mary Ann Ruszinko (CELBRN0396493-501),** attached as **Exhibit 44**:



CELBRN0396493.

56.     Physicians should understand that Celgene sales representative received instructions to promote and did promote targeted off-label messages in order to hit specific revenue goals for particular off-label indications and were praised for verbalizing off-label information and building and capitalizing on relationships with physicians to move product off-label.  This will provide a framework for assessment of any representatives of safety and efficacy in the off-label context.  This is particularly important because thalidomide derivative Pomalyst, which is more potent than its predecessors, has narrower indications than Thalomid and Revlimid and less is known about its safety and toxicity profile. Pomalyst is only approved for patients who have received at least two prior therapies including Revlimid and a proteasome inhibitor and have demonstrated disease progression

---

[40] *Id.* at CELBRN0834596.
[41] *Id.* CELBRN0834597

1    on or within 60 days of completion of the last therapy.[42]  Particularly with Celgene's post-

2    marketing safety studies outstanding, physicians should be sensitized and on the lookout

3    for representations, consistent with past practice, along the lines that Pomalyst is "not just

4    for advance refractory multiple myeloma" and that it is effective and safe in earlier

5    iterations of the disease or in other types of cancer for which it is not approved.

6

7         Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is

8    true and correct.

9

10   Dated: January 14, 2016

11

12                                          Charles L. Bennett, M.D., Ph.D, M.P.P.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   ---
     [42] It is not approved for MDS at all.

                                          29