# EXHIBIT A

# Filed Under Seal

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO,<br><br>Plaintiffs, ex rel.,<br><br>BEVERLY BROWN,<br><br>Plaintiff-Relator,<br><br>vs.<br><br>CELGENE CORPORATION,<br><br>Defendant. | ) Case No. 10-cv-03165 GHK (SSx) |

---

VIDEO DEPOSITION UPON ORAL EXAMINATION OF

WILLIAM BENSINGER, M.D.

---

701 Fifth Avenue, Suite 4200

Seattle, Washington

DATE: Wednesday, December 16, 2015 at 9:04 a.m.

REPORTED BY: Donald W. McKay, RMR, CRR, CCR 3237

A P P E A R A N C E S

FOR THE PLAINTIFFS AND THE PLAINTIFF-RELATOR:

REUBEN A. GUTTMAN, ESQ.
TRACI L. BUSCHNER, ESQ.
Guttman Buschner & Brooks PLLC
1625 Massachusetts Avenue, N.W.
Suite 500
Washington, D.C. 20036
202.800.3001
rguttman@gbblegal.com
tbuschner@gbblegal.com

FOR THE DEFENDANT:

KIMBERLY A. DUNNE, ESQ.
Sidley Austin LLP
555 West Fifth Street
Suite 4000
Los Angeles, California 90013
213.896.6659
kdunne@sidley.com
-and-
AMY L. DeLINE, ESQ.
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
202.736.8512
adeline@sidley.com

ALSO PRESENT:
MELODY SORENSEN
Videographer



Seattle, Washington; Wednesday, December 16, 2016
9:04 a.m.

THE VIDEOGRAPHER: We're now on the record. Today's date is December 16, 2015. The time is approximately 9:04 a.m.

This is the video deposition of Dr. William Bensinger, taken by counsel for the plaintiff.

The location is 701 Fifth Avenue, Seattle, Washington.

My name is Melody Sorensen, legal videographer, representing A. William Roberts, Jr. and Associates.

This deposition is being taken in the matter of USA versus Celgene Corporation, Case No. 10-cv-03165 GHK (SSx).

Counsel, please introduce yourselves for the record.

MR. GUTTMAN: Reuben Guttman on behalf of Beverly Brown, the relator in this case, acting on behalf of the United States of America and the various states. To my left is Traci Buschner. We're both from the firm of Guttman Buschner & Brooks PLLC.

MS. DUNNE: Kimberly Dunne and Amy DeLine from Sidley Austin, on behalf of Celgene Corporation.

THE VIDEOGRAPHER: The court reporter will now



swear in the witness and we'll begin.

WILLIAM BENSINGER, M.D. called as a witness in the above-entitled cause, being first duly sworn, testified as follows:

E X A M I N A T I O N

BY MR. GUTTMAN:

**Q. Dr. Bensinger, good morning. My name is Reuben Guttman. To my left is Traci Buschner. We, of course, introduced ourselves before we went on the record. We'll be taking your deposition today, which means I'll be asking you a series of questions. Although we are not in a court of law, I'll be asking these questions as if we are in a court of law. And the answers to the questions that I pose today may very well be used in a court of law.**

**If I ask you any question that you don't understand, please let me know and I'll try to make myself clear. Do you understand, sir?**

A. Yes.

**Q. You'll do that? You'll ask me to restate the question if you don't understand it?**

A. Yes.



**Q. Fair enough. Have you been deposed before, sir?**

A. Yes.

**Q. On how many occasions?**

A. To the best of my recollection, two or three times.

**Q. Have you ever testified in trial, sir?**

A. At least once.

**Q. Where was that case tried?**

A. In Washington, D.C.

**Q. In what capacity did you testify?**

A. It was regarding a lawsuit filed by a patient who visited the emergency room at Sibley Hospital about -- nearly 40 years ago.

**Q. So you testified in the capacity as an expert?**

A. I was one of the persons being sued, along with the hospital.

**Q. What was the caption of the case?**

A. In essence, she had cut her finger on a piece of glass, and I examined her in the emergency room. I referred her to a plastic surgeon, but she failed to go to the plastic surgeon. Ultimately, she had a tendon tear, and she sued for damages based on a failure to diagnose the tendon tear.

**Q. You were the treating physician?**

A. Yes.

Page 6

**Q. What was the result of the lawsuit?**

A. As I recall, it was settled. It was not -- it was -- it didn't go to any final conclusion in the trial, although I did testify.

**Q. Do you remember who the plaintiff was?**

A. No.

**Q. But you were a defendant?**

A. I was.

**Q. Were there any other defendants?**

A. The hospital.

**Q. Sibley?**

A. Yes.

**Q. S-I-B-L-E-Y?**

A. Yes.

**Q. Were there any other defendants other than you and Sibley?**

A. Not that I recall, but this was 40 years ago.

**Q. You said two to three other times, you've testified in deposition -- two to three times, you've testified in depositions, once in open court. Can you tell me about the two to three times you've testified in depositions.**

A. The most recent one was a year ago regarding a case involving Takeda Pharmaceutical and Sandoz, and I was an expert witness in that case.

Page 7

**Q. An expert witness for Sandoz?**

A. For Takeda.

**Q. What was the case about?**

A. It involved a patent infringement regarding the formulation of a drug called Velcade.

**Q. What is Velcade?**

A. It's a drug used to treat multiple myeloma, primarily. It's good for other conditions as well, but --

**Q. What was the result of that lawsuit?**

A. I believe Takeda lost the lawsuit. That was my understanding.

**Q. Do you remember which attorneys retained you?**

A. No. I mean, I could find out, but I don't remember their names.

**Q. With regard to the other occasions that you testified, can you tell me about that.**

A. There were a couple of cases where I was asked as an expert to review a couple of failures to diagnose diseases -- cancer conditions in a timely fashion. But I don't recall the details of them.

**Q. Do you remember which firms retained you?**

A. No.

**Q. And that's it?**

A. Yes. I don't do this very often.

Page 8

**Q. In addition to the occasion in Washington where you were sued for malpractice, have you personally ever been sued for malpractice other than that?**

A. There was another case that involved the Fred Hutchinson Center. It was a complicated case of a woman who was treated on a research protocol, and it centered around the availability of an oral and an IV form of an investigational drug. And the consent form stated that both forms would be available; however, when the patient became ill and needed these drugs, only the oral form was available and the IV drug form was not available. So there was a suit over that in terms of, I guess, failure to provide proper informed consent.

**Q. So you were being alleged of not providing proper informed consent?**

A. Because this IV form of the drug was not made available when the patient needed it.

**Q. Do you have an understanding, one way or another, as to whether providing informed consent is an ethical obligation of physicians in the State of Washington?**

A. Yes.

**Q. Yes, you have an understanding? What's your understanding?**

A. It's something that we're expected to provide.

Page 9

**Q. What was the result of that lawsuit against you, sir?**

A. I was ultimately dropped from the suit, but it was settled.

**Q. Do you remember the name of the plaintiff?**

A. No.

**Q. How many years ago was this?**

A. Twelve maybe. Maybe 15.

**Q. Were you deposed in that case?**

A. I don't recall. I might have been, but I can't remember.

**Q. Was that suit brought in the State of Washington?**

A. Yes.

**Q. In state court or federal court?**

A. I don't remember.

**Q. Were you a defendant in any other cases?**

A. Not to my recollection.

**Q. You mentioned that approximately 40 years ago, you were practicing medicine in the District of Columbia. When did you leave the District of Columbia to come to Washington?**

A. Oh, about 38 years ago, something like that.

**Q. So approximately two years after that malpractice suit, you left the District of Columbia to**

**come to the State of Washington?**
A. That's approximately correct.
**Q. Why did you do that?**
A. Well, I was -- when I was in Washington, D.C., I was actually at the National Institutes of Health, performing research and training. And the job at the emergency room was just a moonlighting job to provide extra money. So I would work shifts in the emergency room. I needed to complete my training and specialty in internal medicine, and ultimately, I sought additional training in the field of oncology. And one of the -- one of several programs that I looked at and were available to me was here in Washington. And I liked the program and I liked the people I talked to, and made the decision to move out here to finish my training.
**Q. When you were at Sibley 40 years ago, were you licensed to practice medicine in the District of Columbia?**
A. Yes.
**Q. Are you still licensed to practice medicine in the District of Columbia?**
A. No. I let that lapse.
**Q. When did you let it lapse?**
A. I don't recall.
**Q. Why did you let it lapse?**



A. Because I was living in Washington State. I didn't see any reason that I would, in the foreseeable future, move back to Washington, D.C. And I felt it was an unnecessary expense. It costs hundreds of dollars each year to keep your license up to date in various places, and I just didn't see the point in maintaining that expense.
(Exhibit 1 marked for identification.)
MR. GUTTMAN: You guys have seen this before. Just checking. I don't want to surprise you at all.
BY MR. GUTTMAN:
**Q. You have in front of you, Doctor, what has been marked as Exhibit No. 1. Can you identify this document, sir.**
A. Yes.
**Q. What is it?**
A. It's my expert report on this case.
**Q. When you say your expert report, what do you mean by that?**
A. Well, I mean that I prepared the majority of this report for the case.
**Q. When you say you prepared the majority of this report, which parts of the report didn't you prepare?**
A. Well, I didn't do the actual typing of the information.



**Q. Who did that?**
A. I don't know specifically who did it, but it was provided to me by the attorneys for Celgene.
**Q. Where was this report physically prepared?**
A. I don't know.
**Q. When is the first time you saw this report -- a draft of this report?**
A. It was several months ago.
**Q. That's when you first saw a draft of the report?**
A. Yes.
**Q. Tell me where you were when you first saw the draft of the report.**
A. I'm sorry. I didn't understand --
**Q. Tell me where you were when you first saw the draft?**
A. I was in Seattle.
**Q. How was the draft transmitted to you?**
A. Electronically.
**Q. From where?**
A. Again, I can't tell you where. I don't know.
**Q. Was it transmitted to your office?**
A. Yes.
**Q. You said several months ago. Approximately when was that, sir?**
A. I think it was around September, but I'm not



certain.
**Q. September of 2000 --**
A. '15.
**Q. All right. And when the report came to you in draft form, how many pages, approximately, was it?**
A. I didn't count the pages.
**Q. Was it about as thick as it is now?**
A. Well, it was electronic, so I couldn't tell you how thick it was.
**Q. Did you print it out?**
A. No.
**Q. Read it on your screen?**
A. Yes.
**Q. Then what did you do with it, if anything?**
A. I made changes and edits that I thought needed to be done and sent those back.
**Q. But you didn't prepare the first draft of this report?**
A. I didn't write the first draft of the report. The report was based, though, on my review of a number of documents, and is based on the notes that were prepared and given to the attorneys.
**Q. What notes?**
MS. DUNNE: I'm going to object to anything substantive. Process is fine, but the substance of the

drafts is privileged.
BY MR. GUTTMAN:
**Q. What notes?**
A. They were notes regarding my review of several different compendia. They were also notes based on a number of publications, some of which I provided and supplemented, some of which were provided by the attorneys.
**Q. But you don't remember their names?**
A. The names?
**Q. Of the attorneys?**
A. It was Amy DeLine who is right here, and Jim -- I can't remember Jim's last name.
**Q. Do you know whether anybody else other than you and the attorneys provided input into this report?**
A. No.
MS. DUNNE: Objection. Misstates the facts.
BY MR. GUTTMAN:
**Q. Did you rely on any other experts with regard to anything that may appear in this report?**
A. No.
**Q. Let's walk through this report a little bit, as we may do through the day. Turning your attention to page one.**
[redacted]



[redacted] **What is the Fred Hutchinson Cancer Research in Seattle, Washington?**
A. The Fred Hutchinson Cancer Research Center is a private, non-profit research institution.
**Q. Is that affiliated with the University of Washington in any way, shape, or form, to your knowledge?**
A. Yes.
**Q. What is the affiliation?**
A. It has a formal affiliation with the University of Washington.
[redacted]
**Why did you leave?**
A. I had been there for 38 years. There were some



opportunities available to me at Swedish Hospital in terms of other research programs. There was the ability to build a new program at Swedish Hospital as part of a group of physicians that I have known and worked with in the past. And it was a -- I was ready for a change.
**Q. How come you didn't keep your affiliation and go to Swedish Hospital?**
A. You can't do that, because Swedish doesn't have a formal affiliation with the University of Washington. So I had to give that up.
**Q. There was no way, for example, that you could have been a professor emeritus?**
A. There is a process for getting an affiliate investigator and a -- I think perhaps a clinical professor. It's not quite the same thing, but that process is still working its way through the system.
**Q. Were you ever subject to any discipline while you were at the University of Washington or affiliated with the University of Washington?**
A. No.
**Q. Have you ever been the subject of any discipline as a physician?**
A. No.
**Q. Has anybody filed any charges or claims against you, making allegations of a disciplinary nature, other**



**than the malpractice suits you've talked about?**
A. No.
**Q. With regard to this report, which is Exhibit No. 1, and the attachments, did you read through this report line by line?**
A. I read through the report, yes.
**Q. Well, did you read through the report line by line?**
A. What do you mean by line by line?
**Q. Well, word for word as opposed to skimming it.**
A. I read the report.
**Q. But can you testify under oath that you actually read every word in this report?**
A. I read every word in this report.
**Q. And that's your testimony under oath?**
A. Yes.
**Q. Did you read every word in the exhibits attached to the report?**
A. I'd have to refer to those exhibits.
**Q. Let's talk about your CV, for example.**
A. Okay.
**Q. Did you read your CV to make sure that it is a true and accurate representation of your bona fides, your qualifications?**
A. I haven't reread my CV, no.

**Q. When was the last time you checked your CV for accuracy?**
A. Probably six months ago.
**Q. Is this a CV that you have submitted to others in addition to attaching it to this report to submit to the plaintiff whistleblower in this case?**
A. I don't understand your question.
**Q. Who have you submitted this CV to, other than us?**
A. I've used this CV for lots of things.
**Q. Well, give me a list.**
A. I don't have a list to provide you. When I do, for example, continuing medical education programs, one of the things they always ask for is my CV. But I send it to people that ask for it, if I think it's an appropriate thing, but I don't keep a list of it.
[redacted]



[redacted]



[redacted]
MS. DUNNE: Objection, argumentative.
BY MR. GUTTMAN:
[redacted]
So the National Comprehensive Cancer Center is a group of hospitals and teaching institutions that are an independent organization. They have within them, panels that review guidelines for various malignancies. And each center, each member center, nominates a person to serve on the review committee for a particular disease category. And I was nominated to serve on the Myeloma Guidelines Committee.
[redacted]



[redacted]
**Q. Okay. Now, have you been affiliated with the NCCN since 2004?**
A. Yes.
**Q. Were you affiliated with the NCCN before 2004?**
A. It's possible.
**Q. How did you become affiliated, in the first instance, with NCCN?**
A. As I stated to you previously, I was nominated by the institution where I worked.
**Q. That was the University of Washington?**
A. It was the Fred Hutchinson Center.
**Q. How is it that you became a vice-chair in or about 2008?**
A. I was asked by the head of the guidelines committee group if I would be willing to serve as the vice-chair.
**Q. What did you say?**

Page 22

A. I said yes.
**Q. What responsibilities did you undertake as vice-chair?**
A. I had to serve in the absence of the chair's availability to sign off on documents or approve various documents regarding the guidelines. In addition, I attended board meetings annually at one of the NCCN's annual meetings.
**Q. So one of your responsibilities was signing off on guidelines in the absence of the chair?**
A. Yes.
**Q. And did you, in fact, do that?**
A. Yes.
**Q. How often did you do that?**
A. Several times, but I don't recall the exact numbers.
**Q. Do you maintain any records of when you did that?**
A. No.
**Q. Do you have a recollection of which drugs were involved in the guidelines that you signed off on?**
A. Not specifically.
**Q. How about generally?**
A. Yeah, they would be all the drugs that are used to treat multiple myeloma. So they would include

Page 23

Velcade, Revlimid, thalidomide, carfilzomib, Doxil.
**Q. So you signed off on guidelines with regard to Velcade, Revlimid, thalidomide, and Doxil, at least?**
A. On occasion, yes.
**Q. You say on occasion. How many occasions, sir?**
A. I don't recall that.
**Q. Before you were a vice-chair, what were your responsibilities?**
A. I was one of the regular panel members. And my duties were to participate in meetings that were held approximately every six months, where we would review the current guidelines, and review any new literature that appeared, and decide whether it was necessary to change the guidelines to keep them current.
**Q. Were these guidelines merely reflective of the on-label use of these drugs?**
A. The guidelines included both on-label and off-label use.
**Q. Did you ever sign off on any guidelines regarding the off-label use of Velcade?**
A. I don't recall specifically.
**Q. How about Revlimid?**
A. Again, I don't recall specifically.
**Q. But if you signed off, your signature would be on record someplace. Right?**

Page 24

A. I'm not sure of the process. This type of thing was generally done by phone or e-mails, but I don't recall exactly how that process took place.
**Q. Were you compensated, in any way, shape, or form, with your work with regard to NCCN?**
A. The bulk of the work I did was non-compensated, however, I would be asked to speak occasionally at NCCN-sponsored meetings. Usually that was in Hollywood, Florida, in March, but they also had meetings in New York or San Francisco on a semiannual basis. And if I was asked to speak at that meeting, I was compensated.
**Q. Who compensated you?**
A. The NCCN.
**Q. How much were you compensated?**
A. The usual fee was $2,500.
**Q. And you had no problem speaking for $2,500? That was okay with you?**
A. Yes.
**Q. Would you have spoken for $1,000?**
A. Probably.
**Q. Would you have spoken for $500?**
A. I probably would have spoken for free if they had not offered to compensate me at all. I felt that this was an important work as part of the educational process for physicians.

Page 25

**Q. Over the years, how much money did you receive in compensation -- that is, speaking compensation -- from NCCN?**
A. I don't know.
[redacted]
MS. DUNNE: Objection, misstates the evidence.
THE WITNESS: [redacted]
BY MR. GUTTMAN:
[redacted]

[redacted]

**Q. What were your responsibilities there?**

A. So along with another chairman, I ran and reviewed guidelines, meetings, and reviewed various aspects of guidelines that dealt with preventing and treating infections in cancer patients.

**Q. Did the guidelines involve the use of any drugs?**

A. Yes.

**Q. Which drugs?**

A. Numerous antibiotics.

**Q. Which ones?**

A. There are too many that I could list for you. I mean, it was dozens.

**Q. Give me ten. Five.**

A. Ciprofloxacin, fluconazole, acyclovir, valacyclovir, levofloxacin, gentamicin.

**Q. With regard to those drugs, do you do any work for the manufacturers of those drugs?**

A. No.

**Q. Have you been a consultant to any of the manufacturers of those drugs?**

A. I'm not certain, because some of these drugs may be made by companies that also make some cancer drugs that I've worked with. So I really couldn't say for



sure.

**Q. Have you ever done any speaking on behalf of companies that make drugs that you dealt with in your capacity as co-chairman of the NCCN Clinical Practice Guidelines in Oncology for the prevention and treatment of cancer-related infections?**

A. No.

[redacted]

A. I've given promotional speaking engagements for Celgene and spoken on behalf of drugs that Celgene markets.

**Q. Promotional speaking engagements. What do you mean by "promotional speaking engagements"?**

A. These are talks that are fairly tightly controlled, in which a dedicated slide deck is prepared by the company, and you present the data of that slide deck and the slides to an audience.

**Q. So you don't do any preparation, yourself.**

A. We're not allowed to for those talks.

**Q. Why not?**

A. Because of FDA guidelines and rules that the



company has regarding what can be talked about and what cannot be talked about. So they strictly prepare a slide deck that is within the guidelines, and you're not allowed to add to it or change it or augment it in any way.

**Q. So you just get up there and read from the slide deck?**

A. Well, I talk from my knowledge of what the slide deck says, yes.

**Q. But you don't have a lot of latitude to deviate from the slide deck?**

A. We're not given much latitude.

**Q. Why do they pick you as opposed to some other doctor?**

A. Because I have a lot of expertise in the treatment of multiple myeloma, and it's primarily been a focus of my research activities for the last 20 years.

**Q. Why are they called promotional talks?**

A. I couldn't tell you the reason they're called promotional talks, but they deal with drugs that are promoted. So other than that, I can't tell you.

**Q. Promoted in what sense?**

A. Well, they're marketed.

**Q. Marketed. Have you ever recommended to any other doctor that they write a prescription for any**



**Celgene product?**

A. Sure.

**Q. Which products?**

A. Revlimid and thalidomide.

**Q. At these talks that you just discussed, the promotional talks, did you ever recommend that those listening, the doctors in attendance, write prescriptions for either Revlimid or thalidomide?**

MS. DUNNE: Objection, vague.

THE WITNESS: I don't make specific recommendations in those talks about writing a prescription. I talk about the data of what the study shows that I'm presenting that may involve either Revlimid or thalidomide within the scope of the talk, and it's left to the audience to decide whether or not to use the drug.

BY MR. GUTTMAN:

**Q. During those talks, have you ever recommended that doctors think about using thalidomide or Revlimid to treat their patients?**

MS. DUNNE: Objection, asked and answered.

THE WITNESS: Again, I review the data on the slides. I don't make a specific recommendation. I review the data, discuss the data, but it's left to the audience to decide whether or not to use the drug.

BY MR. GUTTMAN:
**Q. These promotional talks that you've discussed, how many of them have you given?**
A. You know, I don't know the exact number, but I would say it's quite a few.
**Q. More than 100?**
A. I couldn't tell you that. I don't know.
**Q. Have you spoken or given a promotional talk on the drug thalidomide?**
A. I'm not sure. I don't recall.
**Q. Have you ever traveled to give a promotional talk?**
A. Yes.
**Q. Where have you traveled to, to give a promotional talk?**
A. I've traveled as far north as Alaska and as far east as Montana or Salt Lake in Utah.
**Q. How much do you charge, if anything, to give a promotional talk?**
A. The fee that I'm compensated for, for the talks, is $4,000.
**Q. You say "the talks." Are you talking about with regard to Revlimid?**
A. Yes. But I've given other talks for other companies about other drugs.



**Q. Which companies have you given talks for?**
A. I've given talks for Onyx or Amgen Pharmaceutical. That's it.
**Q. When you talk for Onyx, what drugs are you promoting?**
A. A drug called carfilzomib.
MS. DUNNE: Objection, misstates the evidence.
BY MR. GUTTMAN:
**Q. What is carfilzomib?**
A. It's a cancer drug used primarily for the treatment of multiple myeloma.
**Q. Is it FDA approved to treat multiple myeloma?**
A. Yes.
**Q. When did it secure FDA approval?**
A. I don't recall the exact date.
**Q. How much does Onyx pay you to talk on behalf of carfilzomib?**
A. $4,000.
**Q. And Amgen, what drugs do you talk on behalf --**
A. Well, Amgen bought Onyx. So that's why I said Onyx and Amgen.
**Q. Any other companies that you give talks on behalf of?**
A. No. I've been asked, but I haven't accepted.
**Q. Which companies have asked you?**



A. Bristol-Myers, Takeda, Millennium, Janssen, Novartis.
**Q. Millennium manufactures Velcade?**
A. Yes.
**Q. You've never given a talk promoting Velcade?**
A. No.
**Q. These companies, when they've asked you, have they offered you money to do it?**
A. Yes.
**Q. How much have they offered?**
A. The numbers range from $3- to $4,000.
**Q. Now, you've said you've given talks as far east as Montana and as far north as Alaska. I gather most of your talks are in the Seattle area on behalf of Revlimid?**
A. The Great Northwest, sort of the Northwest region.
**Q. When you give those talks, does Celgene pay for your travel?**
A. Yes.
**Q. Pay for your hotel?**
A. Yes.
**Q. And they pay for your air fare, I gather, if you fly by plane?**
A. Yes.



**Q. Is it first class or coach?**
A. Coach.
**Q. Is there a meal allowance?**
A. Yes. I can submit expenses for meals.
**Q. What is the smallest audience that you've actually given a talk to when you've given a promotional speech on behalf of Revlimid?**
A. Probably four or five people.
**Q. Where was that?**
A. I don't recall.
**Q. Have you ever been brought to a doctor's office to speak to a doctor?**
A. Yes.
**Q. On how many occasions?**
A. Several. Again, I can't tell you how many.
**Q. And that was in the State of Washington?**
A. Well, I know it was in Alaska, and I think once or twice in Montana.
**Q. And you went to the doctor's office to speak just to the doctor?**
A. Well, to the group of doctors. Usually it's several doctors, and there is often nurses and pharmacists that attend as well.
**Q. In one office?**
A. Yes.

**Q. Do you get paid the same speaking fee, $4,000?**
A. Yes.
**Q. Have you ever been asked by Celgene to give promotional talks by telephone?**
A. I have.
**Q. Tell me about those occasions.**
A. I haven't done it.
**Q. What has Celgene asked you?**
A. I'm sorry?
**Q. When they've asked you to do it, what have they asked you specifically?**
A. They've asked me if I would be willing to call a physician or talk to a physician by telephone and give a promotional message.
**Q. Did Celgene indicate that if you did that, they would pay you for that?**
A. Yes.
**Q. How much would they pay you for that?**
A. I don't recall the amount.
**Q. Do you know whether Celgene does that with other doctors?**
A. It's my understanding that that's possible.
**Q. Who at Celgene asked you to do that?**
A. I don't recall.
**Q. Why did you say you would not do that?**



A. I didn't want to do it. It's just not something I wanted to do.
**Q. Was there any specific reason?**
A. No.
**Q. Did you think it was ethical?**
A. I didn't think about the ethics. It didn't occur to me. I just didn't want to do it.
**Q. When you say the ethics didn't occur to you, you didn't think about the ethics, why not?**
A. Because it didn't arise in that situation.
**Q. Well, what situation did it arise in?**
A. That's a very vague question. I really can't answer that.
**Q. Well, when you say it didn't arise in that situation, what do you mean by that? You must be referring to some situation.**
A. I meant that it didn't occur to me at the time that I declined to do the talks.
**Q. When did you start doing promotional talks for Celgene on behalf of its products?**
A. I don't recall exactly, but it was a number of years ago.
**Q. Was it before 2008?**
A. I'm not sure.
**Q. What caused you to give these talks?**



A. I was asked by Celgene representatives to do it. And I felt it had some value, not only in terms of educating physicians, but it was also, I felt, a way to talk to doctors in the area that were referring patients to me and meet with them face to face.
**Q. Who asked you to do these talks at Celgene?**
A. It was some Celgene representatives.
**Q. Do you remember any names?**
A. No.
**Q. Do you remember the name of anybody you've dealt with at Celgene over the years?**
A. I'm trying to think of who our rep is. I think Tom Eichert is his name. He's a Celgene sales rep.
**Q. How do you spell his last name?**
A. I can't tell you that.
**Q. Say it for me one more time.**
A. Tom Eichert.
**Q. How often have you dealt with Mr. Eichert?**
A. Half a dozen times at least.
**Q. Is there anybody else at Celgene you've dealt with over the years?**
A. I'm trying to remember names. I'm not very good at remembering names, but I don't recall.
**Q. Can you think of any name of any individual who has worked for Celgene or works for Celgene that you've**



**communicated with over the years?**
A. I do have a friend who works for Celgene. His name is Jeff Tokish.
**Q. What does Mr. Tokish do?**
A. He is a -- I'm not sure what his actual title is, but his job is to keep in touch with key opinion leaders in the field of hematologic malignancies, and just talk to them and keep in touch with them.
**Q. When you say he's a friend, why is he a friend?**
A. We have common interests.
**Q. Have you ever done anything with Mr. Tokish on a social as opposed to non-business level?**
A. Yes.
**Q. What have you done?**
A. We've flown to Alaska together in my airplane.
**Q. What else?**
A. That's the main thing.
**Q. You used the phrase "key opinion leader." What does that mean?**
A. It's a term that Celgene and I think other companies use to define physicians who are respected in a particular field due to their research and knowledge.
**Q. Are you a key opinion leader?**
A. I believe I am considered one, yes.
**Q. Do you know whether being a key opinion leader**

**has anything to do with that person's ability to influence prescription writing habits?**
MS. DUNNE: Objection, vague.
THE WITNESS: No.
BY MR. GUTTMAN:
**Q. When is the first time you heard the phrase "key opinion leader" used?**
A. It was several years ago.
**Q. Where were you when you heard it?**
A. I don't recall.
**Q. Was that at a meeting with Celgene?**
A. I don't recall.
**Q. We've talked about these promotional talks that you've given on behalf of Celgene products. What other things have you done for Celgene over the years?**
A. I've participated in advisory boards. I've also performed research on Celgene products.
**Q. Anything else?**
A. No.
**Q. What advisory boards have you participated on?**
A. So, periodically, Celgene has convened advisory boards to discuss current data in the treatment of multiple myeloma. Often it's done after a national or international meeting. And they'll convene a group of experts and go through data that's presented, and try to



get feedback on our opinions about it.
**Q. Do you receive an honorarium for participating on these advisory boards?**
A. Usually.
**Q. What is the honorarium?**
A. It's somewhere in the range of $1,500 to $2,500. It depends on the meeting.
**Q. Do you have to do any work to prepare for the meeting?**
A. Sometimes you'll need to review abstracts from the meeting and be prepared to discuss the abstracts.
**Q. Does Celgene pay for your travel to the meeting?**
A. It depends on the situation. If the meeting is held in conjunction with a national meeting or something, usually not. They have, however, convened separate meetings. And in that case, if the meeting is not in conjunction with another meeting, they will pay for travel.
**Q. You mean like a separate meeting right after the national meeting?**
A. No. I mean if they just decide they want to have a meeting and it's not in association with any other meeting that I'm attending, they will pay for travel for that.
**Q. How many of these advisory board meetings have**



**you participated in?**
A. Somewhere in the neighborhood of eight to ten, I'd guess.
**Q. Then you said the other thing you did was you participated in studies or trials?**
A. Yes.
**Q. Tell me about that.**
A. So I participated in trials, testing drugs, thalidomide or Revlimid, in various situations. Some of the trials were trials that were generated by the company and designed to examine certain end points that they're interested in. Some of the trials are trials that I designed and then submitted a request to the company to support the trial.
**Q. Let's break it down. Upon how many occasions did Celgene fund studies or trials that you initiated, investigator or initiated trials?**
A. Two that come to mind.
**Q. Was there a name given to those? Can you identify which ones they were?**
A. If I had the trial in front of me, I could. They didn't have specific names, if that's what you're referring to.
**Q. Numbers?**
A. Yeah. Usually they were numbers.



**Q. What were the numbers?**
A. I don't recall.
**Q. What were you examining?**
A. One of the trials, for example, was the use of Revlimid for patients with multiple myeloma who had relapsed after an allogeneic stem cell transplant. So this was a trial testing the drug's efficacy and safety in that scenario.
**Q. Was the drug indicated for that use?**
A. No. It wasn't indicated for it.
**Q. And Celgene funded that trial that you did?**
A. They did provide support, yes.
**Q. Was that trial written up anywhere?**
A. Yes.
**Q. Where was it written up?**
A. It was written up in Bone Marrow Transplantation.
**Q. Are you one of the authors of the article?**
A. I'm the first author.
**Q. Who are the other authors?**
A. I don't recall.
**Q. When was that published?**
A. A couple of years ago. Maybe two.
**Q. With regard to that publication, what, if any, support did Celgene provide?**
A. They provided monetary support for running the

study. So the clinical trial. They funded the clinical trial personnel that monitored the patients and kept track of the data.
**Q. Did they fund your work personally, either directly or indirectly?**
A. You mean did they pay my salary? Is that what you're asking?
**Q. Or part of your salary.**
A. It might have been a small amount. But it was pretty small. It was maybe five percent.
**Q. Well, what is your salary?**
A. I don't recall what it was back then.
**Q. Was it more than $100,000?**
A. Yes. It was more than $100,000.
**Q. More than $500,000?**
A. No.
**Q. More than $400,000?**
A. No.
**Q. Between two and five hundred thousand?**
A. Something in that range.
**Q. Now, with regard to the publication, itself, did Celgene provide any help with regard to the publication?**
A. No.
**Q. Any editing help?**
A. No.



**Q. Did Celgene supply any biostatisticians?**
A. No.
**Q. Whose biostatisticians were used?**
A. I used the ones at the Fred Hutchinson Center.
**Q. That was one of the two trials that Celgene funded that you said you initiated. What was the other?**
A. The other was a trial involving a combination of Velcade cyclophosphamide dexamethasone and Velcade thalidomide dexamethasone for newly diagnosed patients with multiple myeloma.
**Q. When was that conducted?**
A. About five years ago.
**Q. Was that study written up?**
A. Yes.
**Q. Where?**
A. In the British Journal of Hematology.
**Q. Were you an author?**
A. I was the lead author.
**Q. Did Celgene provide any help in regard to the publication, itself?**
A. No.
**Q. Any writing help?**
A. No.
**Q. Any editing help?**
A. No.



**Q. Now, there are studies or trials that you participated in that Celgene initiated. Is that right?**
A. Yes.
**Q. Tell me about those.**
A. So one of the trials was a very early trial with monotherapy with Revlimid for relapsed/refractory multiple myeloma, and I was one of a number of participants.
**Q. Was that study written up?**
A. Yes.
**Q. Was it published?**
A. Yes.
**Q. Where?**
A. I think it might have been in Blood, but I'm not certain of that. I was not the first author.
**Q. Did you participate in the writing of that study?**
A. I was involved in editing drafts and making comments and suggestions, yes.
**Q. Do you know if anybody at Celgene was involved in editing drafts?**
A. I don't know.
**Q. Have you ever heard of an entity called Excerpta Medica?**
A. Yes.



**Q. What is it?**
A. As I recall, it's a medical writing company.
**Q. You say a medical writing company. What does that mean?**
A. It's a company that is engaged in the practice of writing articles, writing abstracts.
**Q. Do you know whether that company does any work for Celgene?**
A. Not specifically, no.
**Q. Not specifically, no, meaning what?**
A. Meaning just what I said.
**Q. Has Celgene ever told you, one way or another, whether it has a relationship or had a relationship with Excerpta Medica?**
A. No.
**Q. With regard to this article that you just talked about that was published in Blood, do you know whether Excerpta Medica had any role in the publication of that article?**
A. I don't recall.
**Q. Do you know which, if any, Celgene personnel had any role in the publication of that article?**
A. I don't know. I don't recall.
**Q. Do you know which, if any, Celgene biostatisticians had a role in the publication of that**

**article?**
A. No.
**Q. Do you know, one way or another, as to whether Celgene has a -- or had a publication strategy?**
MS. DUNNE: Objection, vague.
THE WITNESS: What do you mean by "a publication strategy"?
BY MR. GUTTMAN:
**Q. In other words, laid out a plan to have a certain number of articles published every year.**
A. I have no knowledge of that.
**Q. So that was never disclosed to you?**
A. No.
**Q. You talked about the study that was published in Blood. Were there any other studies that you participated in that were initiated by Celgene?**
A. There were others, but I don't recall the specifics.
**Q. Well, how many others?**
A. Several.
**Q. Several meaning how many?**
A. Several meaning I don't recall the numbers.
**Q. Well, with regard to the two that you initiated, where were those conducted?**
A. I'm sorry?



**Q. Strike that. With regard to the two that you initiated, the first two that you talked about, where you went to Celgene and said, "I have an idea for a study," and Celgene funded it, were those conducted at the Fred Hutchinson Cancer Center?**
A. One of the studies was conducted exclusively at the Fred Hutchinson Center; the other was conducted at the Hutchinson Center, but several other centers around the country.
**Q. But at least that study involved the University of Washington, then.**
A. Yes.
**Q. And the second study, did that involve the Fred Hutchinson Cancer Center and the University of Washington?**
A. Yes.
**Q. And the other studies that you did that were initiated by Celgene, did they involve the Fred Hutchinson Cancer Center and the University of Washington?**
A. Yes.
**Q. When did you first begin doing studies for Celgene?**
A. I don't recall the exact date.
**Q. Did they approach you or did you approach them?**



A. I actually don't recall.
[redacted]



[redacted]

[redacted]

**Q. In order for you to accept money from Celgene for a study or trial that is conducted or partially conducted at Fred Hutchinson or the University of Washington, are there any disclosures that you have to make to the University of Washington or Fred Hutchinson?**

MS. DUNNE: Objection, misstates the evidence.

THE WITNESS: Can you tell me what you mean.

BY MR. GUTTMAN:

**Q. Well, you said that some of this work that you did for Celgene was being done at Fred Hutchinson or the University of Washington. Right?**

A. Yes.

**Q. In order to do that at Fred Hutchinson or the University of Washington, what are the things that you had to do to get approval for that?**

A. So this involved a contract between the Fred Hutchinson Center and Celgene. There was a budget that had to be prepared, protocol that had to be reviewed, and go through various committees to be approved.



**Q. Anything else?**

A. I did have to say whether or not I participated in any -- had any significant equity interest in Celgene or received money from Celgene for things.

**Q. Did you do that? Did you do that?**

A. I tried to, yes.

**Q. When you say you tried to, what do you mean by "tried to"?**

A. Well, I mean that I can't tell you that I did it in 100 percent of the cases, but I tried to do it whenever I was asked.

**Q. Well, you're talking about humans that are going through clinical trials. Why is it that you can't tell me you did it in 100 percent of the cases?**

MS. DUNNE: Objection, argumentative.

THE WITNESS: Because I don't have -- I don't recall exactly the circumstances.

BY MR. GUTTMAN:

**Q. Well, do you have a specific recollection of disclosing to the University of Washington or Fred Hutchinson that you had done promotional speaking for Celgene?**

A. Yes.

**Q. Did you do that in writing?**

A. I believe I did, yes.



**Q. Who did you write to?**

A. Who did I write to?

**Q. Yes. Who did you make the disclosure to?**

A. To the institution.

**Q. Do you remember when you did it?**

A. No.

**Q. Do you remember who you addressed your communication to?**

A. Not specifically.

**Q. How about generally?**

A. There is a process for that, that I went through to disclose it.

MS. DUNNE: We've been going a little over an hour. So I would like to take a break.

MR. GUTTMAN: Let me ask a couple more questions. Okay. Let's take a break. That's fine.

THE VIDEOGRAPHER: Going off the record. It's 10:12.

(Recess taken from 10:12 to 10:29.)

THE VIDEOGRAPHER: We're back on the record at 10:29. This is Disc 2 in the deposition of Dr. William Bensinger.

BY MR. GUTTMAN:

[redacted]



[redacted]

MR. GUTTMAN: Let's mark this as Exhibit No. 2.

(Exhibit 2 marked for identification.)

BY MR. GUTTMAN:

**Q. I'm showing you what has been marked as Exhibit No. 2, which is a document that's multi-paged.** [redacted]

**Have you seen this document before?**

MS. DUNNE: Object, lack of foundation.

MR. GUTTMAN: We'll find out.

THE WITNESS: I have not.

BY MR. GUTTMAN:

[redacted]

Page 54

[redacted]

Q. In other words, did Celgene ever disclose to you or any other doctor that you're aware of that it was tracking or generated tracking and/or generating publications?

MS. DUNNE: Objection, misstates the evidence.

THE WITNESS: No.

BY MR. GUTTMAN:

[redacted]

Q. Did Celgene ever disclose to you that it had a strategy to increase the number of publications?

A. No.

Q. Then there is something that says, "GAP - Audience." Did Celgene ever disclose to you that it had

Page 55

something called a GAP analysis?

A. No.

[redacted]

Q. Did Celgene ever disclose to you or any other doctor, to your knowledge, that it had a strategy to maintain noise on effectiveness and safety of lenalidomide?

A. No.

Q. Did it ever disclose to you that as to a priority, this was their number one priority?

A. No.

MS. DUNNE: Objection, misstates the evidence, foundation.

THE WITNESS: No.

BY MR. GUTTMAN:

[redacted]

Page 56

[redacted]

MS. DUNNE: They all say that. Which page? Is it the first page of the small print?

MR. GUTTMAN: No. The third page in.

MS. BUSCHNER: The third page of the small print.

MS. DUNNE: Do you have that, Doctor?

THE WITNESS: I'm not sure I'm on the right page.

MS. DUNNE: Start with the next one and go two more.

THE WITNESS: Two more from this one.

MS. DUNNE: Correct. I think.

THE WITNESS: Okay.

BY MR. GUTTMAN:

[redacted]

Page 57

[redacted]

[redacted]

**Q. Well, before that study went to print and bore your name, did you make any inquiry to see who other than the authors -- the listed authors actually were involved in the drafting of that article that bore your name?**

A. No.

**Q. Why not?**

A. My interest was in the article, not in how the process evolved for it to be written. So I was given the draft of the article to comment on and edit and make my recommendations about it, but I really wasn't interested in who actually wrote the first draft.

**Q. Celgene never disclosed to you that they had a whole publication strategy with messaging buried into these articles that bore the names of people like you and Dr. Richardson?**

MS. DUNNE: Objection, lack of foundation, misstates the evidence.

MR. GUTTMAN: You can answer the question, sir.

THE WITNESS: No.

BY MR. GUTTMAN:

[redacted]



[redacted]

**Q. Why did you determine that the work was more laborious than you originally anticipated?**



A. It involved a lot of very detailed analysis of the compendia, looking at the various dates when the compendia were published and whether a particular indication for a particular disease was approved or not. It involved a lot of extra work that I had not anticipated initially, and I felt that this was a proper compensation for my time.

**Q. Do you maintain a copy of the compendia?**

A. A personal copy?

**Q. Yes.**

A. No.

**Q. Do you know whether the institution that you were working at when this report was sent to us maintained a copy of the compendia?**

A. No.

**Q. Did you have access at all to a copy of the compendia when you wrote this report?**

MS. DUNNE: Objection, vague as to "the compendia."

MR. GUTTMAN: I strike the question.

BY MR. GUTTMAN:

**Q. When this report was written, did you have access to the compendia?**

A. I used copies of the compendia to prepare my report.



**Q. Who gave you the copies?**

A. They were provided by the attorneys.

**Q. Which compendia?**

A. All of them.

**Q. Which ones?**

A. All the ones that I used.

**Q. Which ones?**

A. There was AHFS, DrugDex, NCCN, and there was at least one other.

**Q. Can you remember the name of the other?**

A. Not at this moment. I can look it up if you'll give me a minute to look for it.

[redacted].

[redacted]

[redacted]

**Q. Did you tell Celgene or its representatives that for $750 an hour, you couldn't do the work?**

A. I told them I required a higher rate.

**Q. What was different about the work specifically that you didn't anticipate?**

A. It involved a lot more detailed analysis and careful reading of the compendia, of multiple compendia, for both thalidomide and Revlimid, and it was a lot harder work than I anticipated initially.

**Q. Why didn't you just bill for more hours?**

A. I billed for the hours that I required to do it. I didn't think it was legitimate to bill extra hours if I didn't put the hours in. It was just the scope and nature was a lot harder when I did it.

**Q. In terms of your methodology in preparing or having this report prepared, whoever prepared it, tell me exactly what the methodology was that you used.**

A. I looked at the compendia at particular time points, for particular diseases and particular stages of the disease, for each drug, for both thalidomide and for Revlimid. I supplemented this with articles that supported or didn't support the various indications. If the articles that I had were inadequate, I obtained



additional articles and reviewed them as well. And ultimately listed, within a fairly large sheet of tables, at each time point, when -- or if -- when or if a particular indication could be supported for use. And did that chronologically.

**Q. For every study that's listed in the report, did you read each of those studies?**

A. I didn't read each one in detail. I read selected ones when necessary.

[redacted]

**Q. Have you personally ever prescribed thalidomide or Thalomid to treat bladder cancer?**

A. No.

**Q. Have you personally ever prescribed thalidomide to treat brain cancer?**

A. No.

**Q. Have you personally ever prescribed thalidomide or Thalomid to treat breast cancer?**

A. No.



**Q. Have you personally ever prescribed Thalomid to treat cervical cancer?**

A. No.

**Q. Have you personally ever prescribed Thalomid to treat colorectal cancer?**

A. No.

**Q. Have you personally ever prescribed Thalomid to treat esophageal cancer?**

A. No.

**Q. Have you personally ever prescribed Thalomid to treat Kaposi's sarcoma?**

A. No.

**Q. Have you personally ever prescribed Thalomid to treat leukemia, including but not limited to chronic lymphocytic leukemia?**

A. Yes.

**Q. On how many occasions?**

A. Once or twice.

**Q. When did you do that?**

A. A number of years ago.

**Q. Was that before or after the FDA approved Thalomid for treatment other than ENL?**

A. Other than what?

**Q. ENL. Do you know what ENL is?**

A. No. ENL?



**Q. Yes.**

A. Are you talking about leprosy?

**Q. Is ENL leprosy?**

A. I'm not familiar with the acronym you're using, so you'll have to tell me what that means.

**Q. It's hard for me to pronounce. I'm going to have to go get my pronunciation sheet. I am not a doctor. That's why I'm deposing you. I need the expert.**

A. That doesn't mean I know all the acronyms you use.

**Q. Well, do you know when Thalomid -- do you know what Thalomid was originally put on the market for?**

A. Yes. It was originally on the market for a form of leprosy.

**Q. What form of leprosy?**

A. Again, I'm not an expert in leprosy, sir.

**Q. Okay. Well, do you know -- when you say "form of leprosy" -- what is leprosy?**

A. It's an infectious disease.

**Q. Do you know when Thalomid got that approval for the form of leprosy?**

A. No.

**Q. Do you know whether Thalomid ever got approval to treat anything other than that form of leprosy?**

A. Are you referring to approval for leprosy or approval for treatment of other diseases?

**Q. Something other than leprosy.**

A. Yes.

**Q. When?**

A. I don't recall the date, but it was approved for the treatment of multiple myeloma.

**Q. Who approved it for the treatment of multiple myeloma?**

A. The FDA.

[redacted]

MR. GUTTMAN: I see.

MS. DUNNE: Objection. Misstates the evidence as far as "any FDA approval."

BY MR. GUTTMAN:

**Q. Have you ever prescribed Thalomid to treat lung**



**cancer?**

A. No.

**Q. Have you ever prescribed Thalomid to treat lymphoma?**

A. Yes.

**Q. On how many occasions?**

A. Several. Perhaps four to five.

**Q. When?**

A. Sometime in the 2000s.

**Q. Before 2006 or after 2006?**

A. I do not recall.

**Q. Within the last ten years?**

A. Possibly, but I'm not certain.

**Q. Have you ever prescribed Thalomid to treat melanoma?**

A. No.

**Q. Have you ever prescribed Thalomid to treat myelofibrosis?**

A. No.

**Q. Have you ever prescribed Thalomid to treat prostate cancer?**

A. No.

**Q. Have you ever prescribed Thalomid to treat stem cell transplant maintenance therapy?**

A. Yes.



**Q. When?**

A. Sometime in 2000s.

**Q. How many patients?**

A. A number, but I can't recall the exact number.

**Q. More than ten?**

A. Probably.

**Q. More than 20?**

A. I'm not certain.

**Q. So you can't say more than 20?**

A. I'm not certain.

**Q. More than 50?**

A. Again, I'm not certain.

**Q. Well, over the last ten years, how many patients have you treated for cancer?**

A. Hundreds.

**Q. Thousands?**

A. No. Not thousands, but hundreds.

**Q. Not more than 1,000?**

A. I can't say for sure, but probably not more than 1,000.

**Q. I think I missed some here. Have you ever wrote a prescription to treat a patient with Thalomid who had new onset multiple myeloma prior to FDA approval in 2006?**

A. I believe, yes.



**Q. How many patients?**

A. I don't recall the number.

**Q. Have you ever prescribed Thalomid to treat a patient who had multiple myeloma not in combination with the drug dexamethasone?**

A. Yes.

**Q. When?**

A. It was used for one of the maintenance therapies after stem cell transplant.

**Q. When did you do that?**

A. Again, I don't recall the exact date that I started, but it was in the 2000s.

**Q. Have you ever prescribed Thalomid to treat myelodysplastic syndromes.**

A. You asked me that and the answer was no.

**Q. Just to be clear, I asked you about ovarian, pancreatic, prostate, renal, thyroid, and uterine cancer.**

A. Actually, no.

**Q. So let's go through this. I want to make sure that I've got all this covered. Okay?**

**Have you ever prescribed Thalomid to treat ovarian cancer?**

A. No.

**Q. Have you ever prescribed Thalomid to treat**

pancreatic cancer?
A. No.
Q. Have you ever prescribed Thalomid to treat prostate cancer?
A. No.
Q. Have you ever prescribed Thalomid to treat renal cancer?
A. No.
Q. Have you ever prescribed Thalomid to treat thyroid cancer?
A. No.
Q. Have you ever prescribed Thalomid to treat uterine cancer?
A. No.
Q. Now, I'm going to ask you a different set of questions.
Have you ever recommended to anybody, any physician, that Thalomid be tried for the treatment of bladder cancer?
A. No.
Q. Have you ever recommended that Thalomid be tried for the treatment of brain cancer?
A. No.
Q. Have you ever recommended that Thalomid be tried for the treatment of breast cancer?



A. No.
Q. How about cervical cancer?
A. No.
Q. Colorectal cancer?
A. No.
Q. Esophageal cancer?
A. No.
Q. Kaposi's sarcoma?
A. No.
Q. How about leukemia, including but not limited to chronic lymphocytic leukemia?
A. I don't recall, but it's possible.
Q. Have you ever recommended that Thalomid be tried for the treatment of lung cancer?
A. No.
Q. Have you ever recommended Thalomid be tried for the treatment of lymphoma?
A. Again, I don't recall exactly, but it's possible.
Q. Have you ever recommended that Thalomid be tried for the treatment of melanoma?
A. No.
Q. Have you ever recommended that Thalomid be tried for the treatment of new onset multiple myeloma?
A. I think it's highly likely, yes.



Q. Have you ever recommended that Thalomid be used in combination with drugs other than dex?
A. Yes.
Q. Have you ever recommended that Thalomid be used for MDS?
A. No.
Q. Why not?
A. I don't see those patients, typically.
Q. Have you ever recommended Thalomid be used to treat ovarian cancer?
A. No.
Q. Pancreatic cancer?
A. No.
Q. Prostate?
A. No.
Q. Renal?
A. No.
Q. Thyroid?
A. No.
Q. Or uterine?
A. No.
[redacted]
Q. Have you ever written a prescription for



Revlimid to treat brain cancer?
A. No.
Q. Have you ever written a prescription for the use of Revlimid to treat leukemia, including but not limited to CLL?
A. Yes.
Q. How many times?
A. Several.
Q. Several meaning what?
A. Somewhere between one and four times.
Q. Have you ever written a prescription for Revlimid to treat lymphoma?
A. Yes.
Q. How many times?
A. Several. Perhaps four to five.
Q. Have you ever written a prescription for Revlimid to treat multiple myeloma prior to the FDA approving it for that treatment?
A. Yes.
Q. How many times?
A. A lot. Perhaps several dozen.
Q. Did you recommend to others that they try it?
A. When asked, I have recommended it, yes.
Q. Have you written a prescription for Revlimid to treat newly diagnosed multiple myeloma?

A. Yes.
**Q. How many times?**
A. Dozens.
**Q. Have you recommended that others try the drug?**
A. Yes.
**Q. Have you recommended that Rev be used in combination with drugs other than dex?**
A. Yes.
**Q. On what occasions have you recommended to others to do that?**
A. Multiple occasions. It depends on the particular patient's situation. I can't tell you specifically other than if you give me a particular instance. But there are occasions when it's suitable.
**Q. Have you written a prescription for Rev to treat MDS?**
A. No.
**Q. Never?**
A. No.
**Q. Have you recommended to others that they write prescriptions for Rev to treat MDS?**
A. No.
**Q. Why not?**
A. Because I don't see those patients.
**Q. And Rev with regard to myelofibrosis -- have you ever written a prescription to use Rev in the treatment of myelofibrosis?**



A. No.
**Q. Have you recommended to others that Rev be used to treat myelofibrosis?**
A. No.
**Q. Prostate cancer? Have you ever written --**
A. No.
**Q. No? And have you ever recommended to others that they use Rev to treat prostate cancer?**
A. I said no.
**Q. Stem cell transplant maintenance therapy?**
A. Yes.
**Q. And you've written prescriptions for that?**
A. I have.
**Q. And you've recommended to others that they write prescriptions for that?**
A. Yes.
MR. GUTTMAN: Let's mark this as Exhibit No. 3.
(Exhibit 3 marked for identification.)
BY MR. GUTTMAN:
**Q. I'm showing you what has been marked as Exhibit No. 3, which says -- bears the letterhead of Jones Day, and it appears to bear your signature on page 339. Do you see that, sir?**



A. I do.
**Q. Can you identify this document?**
A. This is the initial retention letter that was sent by Jones Day.
**Q. When you say "initial," I gather there was another retention letter?**
A. Yes.
**Q. When was that executed?**
A. Sometime after this one.
**Q. How many pages was that?**
A. Similar size.
**Q. And you signed that, I gather.**
A. I did.
**Q. If you look at the second paragraph of the first page, it says, "We intend that your work, opinions, conclusions and communications will be covered by the attorney-client privilege, attorney work product rule, and/or expert preparation privilege, to the extent provided by law, and you agree to do all things necessary to preserve those privileges."**
**What is your understanding of that sentence, sir?**
A. My understanding is that certain aspects of the work that I performed are considered confidential and privileged and are not to be disclosed outside of my relationship with these attorneys.



**Q. So, for example, the document that I showed you,** [redacted] **are you not allowed to disclose the existence of that document outside the confines of this case?**
A. Sir, I'm not an attorney, so I can't answer that question. I had never seen that document before. But I don't know -- I'm not in a position to answer that question. I simply don't know.
**Q. Do you know an individual by the name of Tom Cavanaugh?**
A. I have heard of Tom Cavanaugh and I have met him on occasion.
**Q. Who is Tom Cavanaugh?**
A. He's involved in the sales of Revlimid.
**Q. What's your understanding of his responsibilities?**
A. I really don't know what his responsibilities are. I know that he is one of the higher-up personnel at Celgene, but I don't -- I don't exactly know what his duties are.
MR. GUTTMAN: Let's mark this as Exhibit No. 4.
(Exhibit 4 marked for identification.)
BY MR. GUTTMAN:
[redacted]

[redacted]



[redacted]

MR. GUTTMAN: Let's mark this as Exhibit No. 5.
(Exhibit 5 marked for identification.)
BY MR. GUTTMAN:

[redacted]

**Q. Do you recall ever doing any work with Mr. Zeldis -- Dr. Zeldis?**
A. Not specifically. But again, I have participated in trials for Celgene. So I'm sure he had some interactions -- I've had some interactions with him.
**Q. Do you know, one way or another, as to whether Mr. Zeldis is a doctor or not a doctor or what his pedigree is?**
A. Since his title says M.D., Ph.D., I would say



he's a doctor.
**Q. Do you have a recollection of being an author with Dr. Zeldis of any particular publication?**
A. I don't have a recollection of that, no.
MR. GUTTMAN: No. 6.
(Exhibit 6 marked for identification.)
BY MR. GUTTMAN:
**Q. Just so we're clear about the methodology and time spent on this matter, I'm showing you Exhibit No. 6. I want you to identify this document for me, sir.**
A. These are two bills that I prepared to Jones Day. Actually, it's three, I guess. There is one on the back here. So it's three bills.
**Q. Are there any other bills that you sent to Jones Day for your work?**
A. Not yet. I haven't billed them for the work that I've done this fall.
**Q. Well, when you say "this fall," what do you mean by that?**
A. Well, this billing is through the middle of September. So I haven't billed them for time that I've put in since then.

[redacted]



[redacted]

**Q. When was this report actually completed, if you know?**
A. Sometime prior to that date.
**Q. Do you know when it was completed?**
A. Not exactly, no.
**Q. Why not?**
A. Because I don't have a recollection of those precise dates.
**Q. Between the 17th and the 25th, do you know whether you put any time into this report?**
A. I would have to refer to my records at home, looking at the hours that I've spent. I do keep track of that, but I don't have it with me.
**Q. Do you have a specific recollection of it?**
A. No.
**Q. Do you have a specific recollection of like, for example, working up until the last minute to get it done?**
A. No.
**Q. Well, what was the last thing you did before this report went out the door, from whichever door it went out of?**
A. I reviewed it and made edits to it and changes

that I felt were appropriate.
**Q. Do you know who the principal author that is the writer of this report is?**
MS. DUNNE: Objection, misstates the evidence.
THE WITNESS: I'm the principal author of it. I prepared all the information and opinions upon which this report is based. That included reviewing the compendia as I've outlined to you, reviewing the relevant articles that I felt had bearing on it.
BY MR. GUTTMAN:
**Q. What's your definition of what it means to be an author?**
MS. DUNNE: Objection, vague.
THE WITNESS: I think an author can participate in a number of things. It depends on the context you're referring to.
BY MR. GUTTMAN:
**Q. Well, you tell me.**
A. You're asking the question. You need to be more specific.
**Q. I think of an author from my days in elementary school when they say put pen to paper and write the work and make it your own piece of work. Is that what you understand an author to be?**
A. I think that's one description of what an author



is, but I think an author can do other things.
**Q. You tell me. You've listed a number of --**
A. Well, in this case, I prepared documents where I gave my opinions about whether a particular drug like Revlimid or thalidomide would be accepted for a particular use, at a particular time, by reviewing not only the various compendia, but reviewing the relevant literature. I put that information into documents. And that was the basis of a report that was written up. So I believe I'm an author of that -- of this document.
**Q. The first page of Exhibit No. 6 says, "Teleconf DeLine, Stansel." Who is DeLine and Stansel?**
A. DeLine refers to counsel here, and her colleague -- I believe it's Jim Stansel, if I'm not mistaken.
**Q. Then it says, "Review Rev MM lit," and there are entries on 8/6/15, 8/18-19/15, 8/21-22/15.**
**What literature were you reviewing?**
A. I was reviewing publications that are listed in the -- I believe in this document.
**Q. In a ballpark range, do you have any notion or idea of how much time you spent between the 17th and 25th of September 2015 on this matter?**
A. No.
MS. DUNNE: Objection, asked and answered.



THE WITNESS: I don't.
MR. GUTTMAN: I'm going to show you Exhibit No. 7.
(Exhibit 7 marked for identification.)
BY MR. GUTTMAN:
[redacted]



[redacted]
**Q. Do you have a recollection of this?**
A. No.
**Q. Do you know what is being referred to here?**
A. I really do not.
**Q. Do you know what NCCN meeting they're talking about?**
A. Not specifically. As I said, the NCCN met several times.
**Q. This would be a guidelines meeting?**
A. You know, this is the first time I've seen this document. I don't know where this came from. I don't know what the genesis of it is. I have no idea what this refers to.
**Q. When you participated in NCCN meetings to discuss various uses of drugs, were there occasions where representatives of the pharmaceutical industry -- that is, companies -- were present?**
A. No.
**Q. Were those meetings closed door?**

A. Yes.

[redacted]

**Q. Are you still affiliated with NCCN?**

A. No.

**Q. In no way, shape, or form, are you affiliated with NCCN?**

A. I have no affiliation with NCCN.

**Q. When did you cease your affiliations with NCCN?**

A. When I resigned from the University of Washington and the Fred Hutchinson Center.



**Q. That would be July of '15?**

A. Yes.

[redacted]

MS. DUNNE: Objection, speculation. Calls for a conclusion.

THE WITNESS: [redacted]

BY MR. GUTTMAN:

[redacted]

(Exhibit 8 marked for identification.)

BY MR. GUTTMAN:

[redacted]



[redacted]

**Q. Now, what was the NCCN guidelines meeting?**

A. So this is an annual meeting that the NCCN sponsors. The target is primarily physicians. And it covers a variety of malignancies, including myeloma. And basically, it's an update of the data and the guidelines. And it's primarily targeted to help physicians treat patients.

**Q. Is this a meeting that industry representatives can attend?**

A. Yes.

[redacted]

**Q. Have you ever talked to any Celgene**



**representatives about the content or what goes on at these NCCN guidelines meetings, the private meetings?**

A. No.

[redacted]

[redacted]

MR. GUTTMAN: This will be No. 9.

(Exhibit 9 marked for identification.)

BY MR. GUTTMAN:

[redacted].

[redacted]



[redacted]

MR. GUTTMAN: Ten.

(Exhibit 10 marked for identification.)

BY MR. GUTTMAN:

[redacted]



[redacted]

MS. DUNNE: Objection, lack of foundation.

BY MR. GUTTMAN:

[redacted]

MR. GUTTMAN: Let's mark this as Exhibit No. 11.

(Exhibit 11 marked for identification.)

BY MR. GUTTMAN:

[redacted]



[redacted]

Page 94

[redacted]

MS. DUNNE: [redacted]

BY MR. GUTTMAN:

[redacted]

MS. DUNNE: Objection, lack of foundation.

BY MR. GUTTMAN:

[redacted]

Page 95

[redacted]

Page 96

[redacted].

[redacted]

MR. GUTTMAN: Let's grab a cup of coffee.

Page 97

THE VIDEOGRAPHER: Do you want to go off the record?

THE WITNESS: Are we taking a break?

MR. GUTTMAN: Five minutes, if you want.

MS. DUNNE: Why don't we take a ten-minute break now and come back and do another hour before lunch?

MR. GUTTMAN: Sounds good.

THE VIDEOGRAPHER: Going off the record. 11:26.

(Recess taken from 11:26 to 11:41.)

THE VIDEOGRAPHER: We're back on the record at 11:41.

MR. GUTTMAN: Let's mark this as 12A and this as 12B.

(Exhibit 12A marked for identification.)

(Exhibit 12B marked for identification.)

BY MR. GUTTMAN:

**Q. I'm giving you -- or you have in front of you two documents. One is marked 12A and one is marked 12B. I'll represent to you that Celgene produced to the relator-plaintiff in this case, documents reflecting various amounts of money paid for promotional speakers. And the larger document, 12B, are payments made to a lot of speakers, and 12A is just a breakdown of the payments made to you. Okay?**

A. Yes.

**Q. First, have you seen these documents before?**
A. No.
**Q. Now, 12A reflects that from October 4, 2006, through July 9, 2013, Celgene or its contractor, Envision, paid you the sum of $269,000. Do you see that?**
A. Yes.
**Q. Do you have any reason to believe that is incorrect?**
A. Well, this is the first time I've seen this. And I can only assume that what you've told me is correct, that it came from Celgene. So I have no reason to dispute it.
**Q. Now, did you, yourself, keep records of how much money you were paid for promotional speaker programs?**
A. No.
**Q. Why not?**
A. It just wasn't something I did.
**Q. There was no reason that you can think of that would have required you to keep records of how much money you were paid for promotional speaker programs?**
A. It was not something I customarily did. I did get, at the end of the year, a -- I think it's a 1099, that tabulated the amount of money I received from Envision, which was the company that Celgene contracted



with for these talks. Other than that, that's it.
**Q. With regard to the amount of money you received from Envision, as noted on your 1099, I gather you provided that information to your accountant?**
A. Yes.
**Q. And it was disclosed to the Internal Revenue Service?**
A. Of course.
**Q. Can you think of any other entity you disclosed that information to?**
A. The NCCN asked for information like that. And at a later point in time -- what I mean by that is last couple of -- last few years, I think the university asked for that information.
**Q. When you say the NCCN asked for information like that, what do you mean?**
A. They wanted to know about money received from companies.
**Q. And did you tell the NCCN the amount that you received from Envision?**
MS. DUNNE: Objection, vague as to time.
BY MR. GUTTMAN:
**Q. At all ever?**
A. There were times that I disclosed it, yes.
**Q. And there were times that you didn't disclose**



**it. Right?**
A. Because it wasn't required.
**Q. You spoke as a promotional speaker for Celgene in the years 2006, 2007, 2008, 2009, 2010, 2011, and 2012, and 2013. Is that right?**
MS. DUNNE: Objection, misstates the evidence.
BY MR. GUTTMAN:
**Q. Excuse me, not 2009.**
A. Yes.
**Q. Now, did you give promotional talks for Celgene where you were paid by an entity other than Envision?**
A. No.
**Q. Did you give promotional talks for Celgene where you were paid by Celgene, itself?**
A. It's possible that I was for some activities, but I don't recall the specifics.
**Q. Now, when you first started giving promotional talks for Celgene, you were paid, it says, $3,000. Is that right?**
A. That's what this record reflects, yes.
**Q. And then it increased to $4,000 per talk. Right?**
A. Yes.
**Q. Can you tell me why it increased from three to four.**



A. Celgene determined when I asked that I was eligible to receive a higher payment.
**Q. Why were you eligible?**
A. I think it's based on my standing in the field.
**Q. Based on your standing as a key opinion leader, you mean?**
A. I would assume so, yes.
**Q. What factors go into that standing?**
MS. DUNNE: Objection, lack of foundation.
BY MR. GUTTMAN:
**Q. If you know.**
A. I cannot tell you specifically what those factors are.
**Q. Now, with regard to NCCN, you were a member -- you were an NCCN guidelines panel member. Is that right?**
A. Yes.
**Q. And you were an NCCN guidelines panel member for what years?**
A. Sometime in early 2000 to 2015. Sometime in early 2000 to 2015.
MR. GUTTMAN: Let's mark this as Exhibit No. 13.
(Exhibit 13 marked for identification.)
BY MR. GUTTMAN:
**Q. Showing you Exhibit No. 13, which says, "NCCN**

**Disclosure Policies and Potential Conflicts of Interest." Do you see this?**
A. I do.
**Q. Have you seen this document before?**
A. Yes.
**Q. When is the last time you saw this document?**
A. I think I saw it yesterday.
**Q. Before yesterday, when is the last time you saw the document?**
A. Probably six months ago.
**Q. And before that?**
A. I don't recall.
**Q. While you were an NCCN panel member, do you have a recollection of ever reviewing this document?**
MS. DUNNE: Objection, lack of foundation.
THE WITNESS: I don't have a specific recollection of it.
BY MR. GUTTMAN:
**Q. Do you have a specific recollection of NCCN ever training you on this document?**
A. No.
MS. DUNNE: Just to make the record clear, the document is dated December 14th. Is that when you pulled it?
MR. GUTTMAN: Yes.



MS. DUNNE: Okay.
BY MR. GUTTMAN:
**Q. Do you have a recollection of NCCN ever training you or other panel members on conflicts of interest?**
A. I don't have a specific recollection of that.
**Q. Do you have a specific recollection of NCCN requiring you to sign a conflicts of interest policy?**
A. They did require us to fill out a conflict of interest form, yes.
**Q. Did you do that?**
A. Yes.
**Q. And how often did you do that?**
A. It was required on a semiannual basis.
**Q. Every six months?**
A. Roughly. Yes.
**Q. Tell me what you did personally to keep track of your own internal records to make sure that that form was filled out accurately.**
A. Well, I disclosed to the NCCN my relationships with various companies. The dollar amounts changed over the years. This is -- this reflects their most current policy, but the dollar amounts of what had to be reported differed. Originally, there were no dollar amounts that were reported. So this evolved over time. And I tried to disclose all of my relationships to the



NCCN as required.
**Q. Do you recall any training with regard to the changes that NCCN gave you?**
A. No.
**Q. So you're telling me that the first time you actually saw this policy was six months ago?**
A. I'm saying that the first time I remember seeing it.
**Q. Well, at any time, did NCCN send you a copy -- a paper copy of the conflict of interest policy?**
A. No. It's all done on line.
**Q. Did they send you an on-line copy of it?**
A. You could access an on-line copy of it, yes.
**Q. But did anybody actually distribute to you on line a copy of the policy?**
A. No.
**Q. In other words, nobody ever said to you, please read this policy and make sure you understand it?**
A. What they sent us was an e-mail to say, "Please complete your on-line disclosures of conflicts of interest." That's what we would receive.
**Q. Who did you get that from at NCCN?**
A. From NCCN.
**Q. Who?**
A. I don't recall.



**Q. Does NCCN have an ethics officer?**
A. I don't know.
**Q. Does NCCN have somebody who is in charge of conflicts of interest?**
A. I suspect they do, but again, I don't know who that is.
**Q. At any of your meetings at NCCN, were ethics -- was ethics ever discussed?**
MS. DUNNE: Objection, vague.
MR. GUTTMAN: Strike the question.
BY MR. GUTTMAN:
**Q. Were conflicts of interest ever discussed at any of your meetings at NCCN?**
A. Only to the extent that we're asked to complete the conflict of interest forms. And if we hadn't completed it, I think we were not allowed to participate in the discussions.
**Q. Now, you were both a vice-chair and a chairman of NCCN guideline panels. Right?**
A. Yes.
**Q. And as a chairman or a vice-chairman, tell me what you did specifically to familiarize yourself with these policies, if anything.**
A. Nothing more than what I stated.
**Q. Directing your attention to the paragraph --**

**one, two, three, four, five -- "This document has been developed to provide guidance to the NCCN Governance Committee, NCCN staff, the chairpersons of the NCCN Guidelines Panels, and the NCCN Guidelines Panel members on how external relationships will be identified and disclosed, and what actions an NCCN Guidelines Panel chair may take to safeguard the integrity of a discussion from conflicting interests." Do you see that?**

A. Yes.

**Q. As an NCCN chair, what, if any, policies or protocols did you put in place with regard to conflicts of interest?**

A. I don't recall doing any specific policies.

**Q. As an NCCN vice-chair, what, if any, protocols or policies did you put in place with regard to conflicts of interest?**

A. I don't recall doing anything.

**Q. Did you ever make inquiries of members of the panels that you chaired with regard to the relationships that the panel members had with industry?**

MS. DUNNE: Objection, misstates the evidence.

THE WITNESS: I didn't make specific inquiries, but that information was provided to us.

BY MR. GUTTMAN:



**Q. Are you familiar with something called a disclosure of external relationships form?**

A. Yes.

**Q. What is that?**

A. It's a form where you disclose what companies you're involved with, in what capacity.

**Q. Did you receive that form to fill out?**

A. Again, this is done on line.

**Q. Now, on page three of four, it says, "Ineligibility for Continued NCCN Guidelines Panel Service. If an NCCN Guidelines Panel member has a disclosed individual annual financial relationship that is greater than $20,000 or if his or her disclosed aggregate annual financial relationships are greater than $50,000, the NCCN Guidelines Panel member will be deemed ineligible for continued NCCN Guidelines Panel service." Do you see that?**

A. Yes.

**Q. Now, there were years that you received more than $20,000 from Celgene for promotional speaking. Right?**

A. Yes.

**Q. Can you tell me why you weren't disqualified from being on a panel.**

MS. DUNNE: Objection, lack of foundation for



the time frame covered by this policy.

THE WITNESS: Yes. This reflects the current policy, and it's not clear to me that this specific policy was in place during those years.

BY MR. GUTTMAN:

**Q. Well, are you telling me that you have specific knowledge that there was a different policy in place?**

A. The policy did evolve over time.

**Q. Can you tell me, as a former chair, how it evolved.**

A. They created different buckets for different activities, and the dollar amounts changed over time, but I don't recall the specific amounts.

MR. GUTTMAN: Mark this as Exhibit No. 14.

(Exhibit 14 marked for identification.)

BY MR. GUTTMAN:

**Q. Exhibit No. 14 is a document that says, "About NCCN, Multiple Myeloma/Systemic Light Chain Amyloidosis/Waldenstrom's Macroglobulinemia Panel - Disclosures." And our expert here can probably pronounce this much better than I can.**

**Have you seen this document before?**

A. No.

**Q. Do you know what this document is?**

A. It looks like it's a compilation of disclosures



of relationships with various companies.

**Q. Do you see your name listed here as a panel member?**

A. I do.

**Q. And you were a panel member for what particular panel?**

A. This is the myeloma amyloidosis guidelines.

**Q. Were Celgene products discussed at this panel?**

A. Yes.

**Q. Which products?**

A. Thalidomide and Revlimid.

**Q. And it says here, under "Clinical Research Support/Data Safety Monitoring Board" -- it says that you have relationships with a number of companies, including Celgene. Do you see that?**

A. Yes.

**Q. That's a correct statement. Right?**

A. That's correct.

**Q. And then it says, "Scientific Advisory Boards, Consultant, or Expert Witness," that you had relationships with a number of companies, including Celgene. That's correct. Right?**

A. Yes.

**Q. And then it says, "Promotional Advisory Board, Consultants, or Speakers Bureau" -- it says, "None." Do**

**you see that?**
A. I see that.
**Q. That is indeed a false statement. Correct? For this time period.**
A. I didn't prepare this. This was prepared from disclosures that were filled out, and I don't know the process for how it was filled out.
**Q. Well, Doctor, you're the one who made the disclosures. Right?**
MS. DUNNE: Please let the witness finish his answer.
THE WITNESS: So I can't be sure this is correct in relation to how I filled it out. It may be correct, but it may not be. I'm not sure.
BY MR. GUTTMAN:
**Q. Well, you're the one who made the disclosures. Right?**
A. I filled out an on-line form with that -- with regard to that, yes. I disclosed -- I disclosed that I had relationships with these various companies. Some of these bucket lists, as you put them, these tables, changed over time. And how NCCN made the determination based on what I filled out, I don't recall. I mean, they didn't tell us about the process.
**Q. But as of May 22nd of 2012, you were a speaker**



**for Celgene -- a promotional speaker for Celgene. Right?**
A. Yes.
**Q. So this statement here that NCCN distributed to the public on the website is just a false statement. Right?**
MS. DUNNE: Objection, lack of foundation, argumentative.
THE WITNESS: This document is different from what happened, yes.
BY MR. GUTTMAN:
**Q. When you say "different from what happened" -- different from what happened because you actually were a promotional speaker. Right?**
A. I did do promotional speaking during that time.
**Q. Okay.**
A. But again, I don't know how this was filled out, based on what I put in.
**Q. Well, when you say "how this was filled out" -- is there anybody other than you that filled out forms that were sent to NCCN on your behalf?**
A. No. But this is not based -- this is not what I filled out. I didn't fill in these boxes. NCCN did. And I don't recall what their process was when they had these things prepared.



**Q. Well, would you agree with me that there is one of two possibilities, you got it wrong or NCCN got it wrong?**
A. I would say that's likely.
**Q. Are there any other possibilities?**
A. I can't think of any other.
MR. GUTTMAN: No. 15.
(Exhibit 15 marked for identification.)
BY MR. GUTTMAN:
**Q. No. 15 is yet another disclosure from -- to NCCN -- strike it.**
**No. 15 is yet another disclosure, dated 8/13/2012. Do you see this?**
A. Yes.
**Q. And again, during this time period, for William Bensinger, it says none under "Promotional Advisory Boards, Consultant, or Speakers Bureau." Do you see that?**
A. Yes.
**Q. So it's not just a mistake that was made once; we see it here now a second time. Right?**
A. Yes. But it doesn't mean that there was any change in what I filled out or anything. I'm not sure that between May and August, I was asked to change any disclosures or recertify my disclosures. So this just



reflects what was there in May.
**Q. Do you recall making a second report between May and August?**
A. No.
(Exhibit 16 marked for identification.)
BY MR. GUTTMAN:
**Q. This one is 2/26/2013. Do you see that?**
A. Yes.
**Q. This is Exhibit 16.**
A. Yes.
**Q. Again, it says that you're doing clinical research support/data safety monitoring for Celgene; you're on a scientific advisory board, consultant, or expert witness for Celgene. And again, under "Promotional Advisory Boards, Consultant, or Speakers Bureau," it says, "None." Right?**
A. Correct.
**Q. And that, again, is inaccurate information. Right?**
A. I was doing promotional talks, yes.
(Exhibit 17 marked for identification.)
BY MR. GUTTMAN:
**Q. This is an NCCN disclosure from May 28, 2013, Exhibit No. 17. Do you see that?**
A. Yes.

Page 114

**Q. And under "William Bensinger," it shows you have relationships with Celgene for clinical research support/data safety monitoring; scientific advisory boards, consultant, or expert witness; but it specifically says no relationship or "None" underneath "Promotional Advisory Boards, Consultant or Speakers Bureau." Do you see that?**
A. Yes.
**Q. Again, this is inaccurate information. Right?**
A. It's the same as the others.
(Exhibit 18 marked for identification.)
BY MR. GUTTMAN:
**Q. Exhibit No. 18 is another NCCN disclosure, from September 27, 2013. Next to "William Bensinger," it's got a listing for "Promotional Advisory Boards, Consultants, or Speakers Bureau." Underneath that, it says, "None." This again is yet another inaccurate statement. Right?**
A. It's the same.
(Exhibit 19 marked for identification.)
BY MR. GUTTMAN:
**Q. Exhibit No. 19 is yet another disclosure. This is from 12/20/2013. Across from "William Bensinger," where it says, "Promotional Advisory Board, Consultant or Speakers Bureau," it says, "None," with regard to**

Page 115

**relationships. This again is yet another example of an inaccuracy. Right?**
A. Yes.
(Exhibit 20 marked for identification.)
BY MR. GUTTMAN:
**Q. Exhibit No. 20. Again, underneath -- another NCCN disclosure. It says, "Promotional Advisory Boards, Consultants, or Speakers Bureau," and across from "William Bensinger," it says, "None." Yet another inaccuracy. Right?**
A. Well, at that point in time, I had quit giving promotional talks. So I'm not sure I would agree with you.
**Q. Now, at least through Exhibit 19, you're telling me that every six months, you gave information to NCCN about your relationships with pharmaceutical companies, including Celgene. Right?**
A. I filled out a disclosure, yes.
**Q. Did you keep copies of the disclosures?**
A. No.
**Q. Are you telling me that you personally filled out the disclosure or you had somebody do it for you?**
A. No. I filled it out.
**Q. Did you understand that you had an obligation to tell the truth when you filled it out?**

Page 116

A. I tried my best to tell the truth, and I disclosed relationships that I had with these various companies.
**Q. Do you understand, one way or another, that in or about November of 2008, the NCCN was identified by the Health and Human Services department of the United States Government as a compendia for the purposes of Medicare reimbursement?**
A. That was done, I know. I don't know the timing of that, but it might have been around that time.
**Q. And you understand, do you not, that in certifying or approving NCCN as a compendia, CMS specifically required a stringent conflict of interest policy.**
A. Yes.
**Q. And you understand that because CMS and the Department of Health and Human Services received letters from at least four United States senators with regard to NCCN's request to get approval from CMS as a compendia. Right?**
MS. DUNNE: Objection, lack of foundation.
THE WITNESS: If you say so. I don't know.
BY MR. GUTTMAN:
**Q. What do you understand about the importance of adhering to a conflict of interest policy with regard to**

Page 117

**NCCN?**
MS. DUNNE: Objection, vague.
THE WITNESS: I think the idea is to disclose any potential conflicts of interest.
BY MR. GUTTMAN:
**Q. Do you think that it's important for NCCN and the public to know that a chairman of a guidelines committee is a promotional speaker for a major pharmaceutical company?**
A. I think it would be important. But can I say one thing. I think you're confusing compendia with guidelines, and I think they're different. The compendia, I had nothing to do with.
**Q. What about the guidelines?**
A. Yes. The guidelines. But the guidelines don't say that you should use a specific drug. In fact, there is no priority listed for the drugs in the guidelines. And the guidelines -- the judgment -- the score, if you will, the evidence, is based on published studies.
**Q. What, in your mind, is the difference between the guidelines component of NCCN and the compendia component of NCCN?**
A. Compendia is a much more specific bit of information about drugs and how they're used. Guidelines are general guidelines about the treatment of

a particular disease. And the drugs are mentioned, but they're not given any priority. It doesn't say that one is better than another or anything like that. It just lists them and references the evidence supporting it.

**Q. Are you telling me that the guidelines have no influence on the NCCN compendia?**

A. That's not what I said. I said they're different.

**Q. What influence do the guidelines have on the compendia?**

MS. DUNNE: Objection, lack of foundation.

THE WITNESS: I don't know if there is any influence of the guidelines on the compendia. I had nothing to do with the compendia and never have.

BY MR. GUTTMAN:

**Q. Do you know how the NCCN compendia is prepared?**

A. No.

**Q. What is the significance, in your mind, of the guidelines with regard to how a practitioner works?**

A. I think the guidelines are useful for practitioners. It tells them about how to diagnose a disease, how to characterize a disease, and how to give -- it gives them guidance about treatment strategies and monitoring, and provides help for evidence supporting the various treatment strategies.



**Q. Now, with regard to this question of conflict of interest, are there any other institutions that you've worked with that have conflict of interest policies?**

A. Sure.

**Q. Which ones?**

A. The Fred Hutchinson Center and the University of Washington have conflict of interest policies.

(Exhibit 21 marked for identification.)

BY MR. GUTTMAN:

**Q. You have in front of you Exhibit No. 21.**

A. Yes.

**Q. Can you identify this document, sir?**

A. It looks like a University of Washington conflict of interest policy.

**Q. When is the last time -- strike that.**

**Have you ever seen this document before?**

A. Actually, no.

**Q. So this is the first time you're reviewing this document?**

A. Yes.

**Q. Now, you understood, as you testified, that the University of Washington, during your lengthy tenure there, did indeed have a conflict of interest policy. Right?**

A. I think they probably did, yes.



**Q. Probably did.**

A. Well, I didn't look at it, as I just told you.

**Q. I want to turn your attention to page three of eight, Exhibit 21. No. 3, it says, "Participation on Speakers Bureaus or Other Promotional Activities." Do you see that?**

A. Yes.

**Q. It says, "SoM" -- what is that? School of Medicine?**

A. I guess that's what that means. I'm not sure.

**Q. "School of Medicine faculty may not present at programs designed solely or predominantly for company promotional, sales or marketing purposes even in those circumstances where the faculty retain control of the content of the presentation and/or any slides that may accompany the presentation. Examples of activities that are not appropriate for faculty participation include: any arrangement or speaking engagement in activities commonly called a 'speakers bureau'; inclusion on a list maintained by a commercial entity for the purpose of retaining or recommending an individual as a speaker, when the individual has agreed to be included on the list; and participation as a speaker, panelist, presenter, or commentator in any activity or event funded, directly or indirectly, by a commercial entity,**



**where the event is, or may be perceived to be, a promotional event for the sponsoring organization and/or its products or services."**

**Do you see that?**

A. I do.

**Q. Is this the first time anybody has read this paragraph to you?**

A. Yes.

**Q. As you sit here today, with all the money that you received from Celgene for promotional speaking, is it your position that you have been in compliance with this policy?**

MS. DUNNE: Objection, lack of foundation as to when it was implemented.

THE WITNESS: This is the first time I've become aware of this. So I can't answer. I don't know.

BY MR. GUTTMAN:

[redacted]

[redacted]

MS. DUNNE: Objection, argumentative.

THE WITNESS: [redacted]

BY MR. GUTTMAN:

[redacted]

**Q. In fact, you didn't write any of this report. Right?**

A. I prepared the information on which this report is based.

**Q. I can save you a lot of time. We can go through paragraph by paragraph or you can just tell me that you didn't put pen to paper or fingers to a key pad and**



**write this report.**

MS. DUNNE: Objection, argumentative, and misstates the evidence.

THE WITNESS: As I told you before, I didn't do the typing of this document.

BY MR. GUTTMAN:

**Q. Okay. Did you ever disclose to anybody at the University of Washington the actual payments that you received from Envision on behalf of Celgene?**

A. No.

**Q. And you didn't do that notwithstanding the fact that on University of Washington laboratory property, you were conducting trials on behalf of Celgene Corporation, sir?**

MS. DUNNE: Objection, lack of foundation, misstates the evidence.

MR. GUTTMAN: He's already testified to that.

THE WITNESS: Actually, the trials that I conducted took place at the Fred Hutchinson Center and the Seattle Cancer Care Alliance. They did not take place at the University of Washington.

MR. GUTTMAN: Fair enough. Let's mark the next exhibit.

(Exhibit 22 marked for identification.)

BY MR. GUTTMAN:



**Q. Exhibit No. 22, at the far top left-hand side, it says, "Fred Hutchinson Cancer Research Center, A Life of Science." I believe you're familiar with that logo. Right, sir?**

A. Yes.

**Q. It says, "Conflict of Interest Policy." Are you familiar with this document, sir?**

A. Yes.

**Q. What is it?**

A. It's the Hutchinson Center's Conflict of Interest Policy.

**Q. When is the last time you saw this document?**

A. Probably about two years ago.

**Q. If you look at the bottom left-hand corner, it says, "Effective August 24, 2012." Do you see that?**

A. Right.

**Q. Now, you indicated that you were doing trials, studies, at the Fred Hutchinson Cancer Center on behalf of Celgene. Right?**

A. Yes.

**Q. I want to direct your attention to paragraph No. 5 -- excuse me -- page five, where it says, "Prohibited Financial Interest." Are you familiar with this paragraph, sir?**

A. Yes.



**Q. What is your understanding of it, sir?**

A. That you're limited to $10,000 per year payments from companies.

**Q. Now, can you explain to me how you were in compliance with this policy, sir.**

MS. DUNNE: Objection, vague as to time frame.

THE WITNESS: When I became aware of this policy two years ago, I quit doing promotional talks.

BY MR. GUTTMAN:

**Q. So you're saying you became aware of this policy specifically when two years ago?**

A. In the summer of 2013.

**Q. How did you become aware of this policy?**

A. I think there might have been a meeting about this in which the policy was stated.

**Q. Did you ever disclose to the Fred Hutchinson Cancer Center the magnitude of dollars that you had received from Celgene?**

A. No.

**Q. Do you think, after this deposition, you're going to go back to the Fred Hutchinson Cancer Center and make that disclosure, sir?**

A. No.

**Q. Are you telling me that that is information that you're going to keep confidential?**

MS. DUNNE: Objection, misstates the evidence.
THE WITNESS: I see no reason to disclose it to the Hutchinson Center since I no longer work there.
BY MR. GUTTMAN:
**Q. But don't you think that the work that you supervised or did still impacts patients?**
A. Yes. And I stand behind the work I did. I think the work I did was quality work and was not influenced by any of these payments that I received.
**Q. How can you possibly say that after receiving over a quarter of a million dollars from Celgene, just for promotional speaking alone, it wasn't influenced?**
A. I think that just because I received money for talking about their drugs doesn't necessarily mean that I'm tainted in some way. I think the work I did was quality work, I stand behind the work, and I feel proud of the work I've done. So it has, you know, nothing -- I don't think this has any relevant bearing.
**Q. Well, if it's not tainted, then why not make the disclosure, if you're so confident that it's not tainted?**
A. Because I don't think it's necessary.
**Q. Well, don't you think that transparency with regard to science gives people confidence in the results?**



MS. DUNNE: Objection, vague.
THE WITNESS: I think it's too vague for you to say that. I just -- I don't think that's necessarily the case.
MR. GUTTMAN: Let's mark this as the next one.
(Exhibit 23 marked for identification.)
BY MR. GUTTMAN:
**Q. Are you familiar with Exhibit No. 23, sir?**
A. No.
**Q. Just so I'm clear, are you telling me that two years ago was the first time that you learned that there was any conflict of interest policy at the University of Washington?**
A. It was the first time I learned that there was a dollar amount on the conflict of interest policies.
**Q. Well, what was the policy that you thought was in place?**
A. That you had to disclose your outside interests, which I did. I disclosed that I went to advisory boards and I did some speaking for them, but not the dollar amounts.
**Q. Not 260 some odd thousand dollars worth of speaking?**
A. That's over a number of years.
(Exhibit 24 marked for identification.)



BY MR. GUTTMAN:
**Q. I'm going to show you this exhibit, No. 24.**
[redacted]
**Q. I'm showing you what has been marked as Exhibit 24. Are you familiar with this document, sir?**
A. Yes.
**Q. What is it?**
A. It's a letter to the editor taking issue with some of the aspects of the conflict of interest policy and prohibitions of various research -- of various universities.
**Q. When is the last time you had an opportunity to review this document?**
A. When it was written.
**Q. When was that?**
A. That was around 2009 -- the end of 2009, as I recall.
**Q. Now, there is a whole number of people that have signed this letter to the editor. Do you see that?**
A. I see that.
**Q. Tell me how it is that your name came to be put on this letter to the editor.**



A. As I recall, there were a number of people who are listed here that felt that there had to be significant pushback to the notion of conflicts of interest; and that simply by working with companies and dealing with them in close hand, there was some inherent conflict or inherent -- it was inherently bad. And it was felt by a number of people -- and I agreed with this -- that these activities are part of the development of drugs, they're part of education to the community, and they provide a valuable service to physicians in practice and to the academic community at large. So we drafted a letter, which is reflected here, and signed on to it.
**Q. Who drafted it?**
A. I don't recall specifically the people, but all of us had an opportunity to look at the letter and edit it and -- but it was -- some of the people in this list did the initial draft, and then all of us had a chance to look it over.
**Q. Who did the initial draft?**
A. I don't recall.
**Q. Can you think of anybody in this list who did the initial draft?**
A. I can't tell you specifically. I don't remember.

**Q. Can you tell me what contributions you made to this letter specifically.**
A. I did some of the editing on it and wording.
**Q. Which wording did you do?**
A. I don't recall.
**Q. Now, a number of these doctors who signed it, including yourself, and Dr. Barlogie and Sagar Lonial, received money from Celgene. Right?**
A. Yes. In addition to other companies.
**Q. Dr. Kyle receives money from Celgene, if you know?**
A. Actually, I don't -- I can't tell you specifically who received money from these institutions. I don't know that.
**Q. Can you rule out, as you sit here today, that a draft of this document was not reviewed by a pharmaceutical company?**
MS. DUNNE: Objection, lack of foundation.
THE WITNESS: I simply don't know.
BY MR. GUTTMAN:
**Q. Now, who is the individual or company or entity that suggested this article?**
MS. DUNNE: Objection, vague as to "this article."
MR. GUTTMAN: This article is Exhibit No. 24.



MS. DUNNE: There are many letters. Just a compilation?
MR. GUTTMAN: You can answer.
THE WITNESS: It was one of the authors on this letter. There may have been several, actually.
BY MR. GUTTMAN:
**Q. Is there any reason that you can think of that you didn't disclose in this letter to the editor that you, along with some of the other authors, were receiving significant money from pharmaceutical companies, including Celgene?**
A. That wasn't the point of the letter.
**Q. Well, don't you think it's important for the reader to understand that the people who were writing this letter were actually promotional speakers for Celgene and other companies?**
A. That's overly broad. And a lot of these people, I think, were not promotional speakers for the company. So I don't think it applies. I don't think it has relevance.
**Q. Can you identify an individual on this list of signees who is not a promotional speaker?**
MS. DUNNE: Objection, lack of foundation.
THE WITNESS: There are some, but I can't tell you who they are. I don't have that information in



front of me.
BY MR. GUTTMAN:
**Q. Now, with regard to the University of Washington policy that we talked about earlier that prohibits its faculty from being promotional speakers, do you agree with that policy or disagree with it?**
A. I actually don't agree with it.
**Q. Why not?**
A. Because I think it's overly restrictive, and I think it doesn't accomplish anything in terms of understanding about how to use drugs to treat patients.
**Q. But just as to the promotional speaker prohibition in the policy, are you telling me you disagree with that with regard to the University of Washington policy?**
A. Yes. I'm telling you I don't agree with it.
**Q. So you think that the University of Washington should not have promulgated a rule that says doctors like Bill Bensinger can't give the same canned speech over and over and over again for a drug company.**
A. I think that doctors should -- that work for the University of Washington should not be prohibited from giving promotional talks.
**Q. And getting a quarter of a million dollars from a drug company?**



MS. DUNNE: Objection, lack of foundation, misstates the evidence.
THE WITNESS: What kind of answer are you looking for here? I'm sorry. I don't understand.
BY MR. GUTTMAN:
**Q. Well, have you ever heard the phrase "informed consent"?**
A. Yes.
**Q. What does that mean to you?**
A. Informed consent is when you tell a patient about a procedure or treatment or study that they may become involved in; and try to give them complete information about the risks and the benefits, alternatives to therapy, alternatives to no treatment.
**Q. You've told me, during the course of this deposition, that you have written prescriptions for Revlimid and Thalomid. Right?**
A. Yes.
**Q. And both of those are Celgene products.**
A. Yes.
**Q. Can you think of a single instance where you ever disclosed to a patient that you were a promotional speaker for Celgene?**
A. I don't recall that I did, no.
**Q. Can you think of a single instance where you**

**disclosed to a patient, in these obviously dire circumstances, that their doctor -- you, Bill Bensinger -- had been paid 250 plus thousand dollars by the very company's drugs you were writing a prescription for?**

A. No.

MS. DUNNE: Are we close to taking a break for lunch?

MR. GUTTMAN: Yeah. We're good. Take a break.

THE VIDEOGRAPHER: Going off the record at 12:36.

(Lunch recess taken from 12:36 to 1:28.)

THE VIDEOGRAPHER: We're back on the record at 1:28. This is Disc 3 in the deposition of Dr. William Bensinger.

BY MR. GUTTMAN:

**Q. Dr. Bensinger, in the course of the trials or studies that you've worked on with regard to the drug, Revlimid, have you ever experienced a situation where a patient has died as a result of an adverse event?**

A. There have been patients who have died, as I recall, yes.

**Q. Tell me about those situations.**

A. So the only one that comes to mind was a patient who died of a pulmonary embolus. Now, the patient, to



be fair, was on two other drugs. So the patient was receiving carfilzomib and dexamethasone as well, and had actually had several cycles of the treatment, and had had an excellent response; and died suddenly at home, ultimately was found to have had a pulmonary embolus. And the patient was on an antiplatelet drug to reduce the chance of blood clots, but obviously that wasn't enough.

**Q. When did that occur?**

A. It occurred about five years ago, as I recall.

**Q. Any other deaths that you can recall --**

A. You know, there are patients who have died of progressive myeloma, but I don't -- I don't think I've had patients die -- I'm sorry. Can I go back to that. You're saying have I had patients ever die of any drug or are you talking about --

**Q. Revlimid.**

A. Revlimid.

**Q. Right.**

A. You're just talking about Revlimid.

**Q. Correct.**

A. Yeah. I don't think I've had any others.

**Q. When that happened, what did you do?**

A. Well, we talked to the -- talked to his wife. We actually needed -- obviously wanted to get an



autopsy, because it was a sudden death. So we didn't know why he died. We only found this out when the autopsy was done. But I reported it as an adverse event to Celgene and to my IRB, because the patient was on a study.

**Q. Other than that, have you had adverse events with regard to studies of the drug, Revlimid?**

A. Sure. I mean, there are rashes that can occur with it. There are -- I mentioned blood clots. I've had blood clots occur without, you know, serious -- I mean fatal consequences. Blood clots can occur in the legs. Patients will develop neutropenia on the drug. So that has occurred.

**Q. What is neutropenia?**

A. That's a low neutrophil count, which is a type of white blood cell.

I'm trying to think of what else has occurred. That's about it.

**Q. When these adverse events have occurred, were there ever discussions of them at advisory board meetings that you've attended?**

A. Yes.

**Q. Okay. Tell me about that.**

A. Well, I -- most of the advisory boards for -- not just for Celgene drugs, but for any company's drugs,



discussions include the data of particular studies that are done, but they -- what is discussed is not only the benefit and efficacy, but the side-effects of the drugs, some of which are minor, but some of which may be more severe. So this is common, I think, with all drugs, that they all have side-effects.

**Q. I'm a layperson. So I keep hearing about drugs in terms of safety and efficacy.**

A. Um-hmm.

**Q. Safety and efficacy. What's more important?**

A. It depends on the situation. It's not something you can say one is necessarily better than the other. It depends on the patient. It depends on their clinical situation, where they're at in their disease course. You know, when you're talking about safety and efficacy -- well, I'll just leave it at that. It depends on the situation.

**Q. But is it important when you prescribe a drug to also consider the safety of a drug in addition to the efficacy?**

A. Sure. You always have to consider the risks as well as the benefits.

(Exhibit 25 marked for identification.)

BY MR. GUTTMAN:

[redacted]

[redacted]
[redacted].
[redacted]



[redacted]
[redacted].
[redacted]
MS. DUNNE: Objection, vague.



THE WITNESS: [redacted]
BY MR. GUTTMAN:
[redacted].
[redacted]
MS. DUNNE: Objection, misstates the evidence.
THE WITNESS: [redacted]
BY MR. GUTTMAN:
[redacted]
MS. DUNNE: Objection, vague.
THE WITNESS: [redacted]
BY MR. GUTTMAN:



[redacted]

[redacted].
[redacted].
[redacted]
MS. DUNNE: Objection, lacks foundation.
THE WITNESS: [redacted]
BY MR. GUTTMAN:



[redacted].
[redacted].
[redacted]
MS. DUNNE: Objection, vague.
THE WITNESS: [redacted]
BY MR. GUTTMAN:
[redacted]



MS. DUNNE: Objection, vague again.
THE WITNESS: [redacted]
BY MR. GUTTMAN:
[redacted]
A. Of course. [redacted]
**Q. Now, you said that you've been practicing medicine for about 40 years?**
A. Roughly.
**Q. You don't look like you've been practicing that long. You look much longer. That's a compliment.**
A. Does it require a response?
**Q. No. You could say thank you, but it's not required.**
A. Okay.
**Q. See, you're getting the hang of this. You're asking me questions now.**
**When did you first start practicing in the area of oncology?**
A. So that was actually during my fellowship at the University of Washington; and that's when I began to see patients who are being treated for hematologic malignancies, primarily with stem cell transplantation. So that would have been in 19 -- sometime mid 1977 on.



**Q. Explain to me how the stem cell transplantation helps impact the disease.**
A. The drugs that we have to treat myeloma and most other forms of cancer work by poisoning or damaging the cancer cells. All of these drugs have side-effects. I'm not aware of a single cancer drug that doesn't have significant side-effects. So to a lesser extent, they will cause damage or harm to normal cells in the body. We know from a lot of studies, mainly in animals, but also studies in patients, that higher doses of drugs are more effective at controlling cancer than lesser doses. As you increase the doses of these drugs, though, you do tend to have more side-effects to normal tissues in the body. Some of the tissues in your body are more sensitive than others, and so are adversely affected to a greater extent. Your bone marrow is very sensitive to the effects of a lot of chemotherapeutic agents. So when you use higher doses of drugs, you generally damage the bone marrow to a greater degree. The bone marrow's job is to produce blood cells. So the bone marrow, if it's damaged sufficiently, will quit producing blood cells, which is a -- unfortunately, it's incompatible with life if your bone marrow quits working. A stem cell transplant is a tool or technique to circumvent the side-effect of that heavy-dose chemotherapy. So what we

do is we collect stem cells from a patient at an appropriate time. Those cells are frozen and preserved. And we can then administer these high doses of chemotherapy designed to destroy the cancer. The inevitable side-effect is it also destroys the bone marrow. But we wait for the person's body to metabolize the drugs and get rid of them. We then take some of these stem cells out of the freezer, thaw them out and give them back to the patient, much like a blood transfusion. Those cells circulate in the blood and hone in on the bone marrow; and after about ten days or two weeks, begin to grow and produce new blood cells. So a transplant is a form of supportive care to help the patient get through the more intensive chemotherapy, but it's the intensive chemotherapy that is primarily responsible for treating the cancer.

**Q. Chemotherapy means what, just drugs?**

A. Yes.

**Q. A doctor could say that any type of drug is chemotherapy. It's not just a term used for cancer drugs.**

A. In a broad sense, yes. But for those of us in the medical oncology community, chemotherapy generally refers to anti-cancer drugs. If you're talking about an antibiotic, you talk about an antibiotic, you don't talk about chemotherapy for bacterial infections.



**Q. Thalidomide, Thalomid, and Revlimid, are they chemotherapeutic drugs?**

A. They are anti-cancer drugs, but they are believed to work somewhat differently from other types of chemotherapy. So they're a different class of drugs. The term that's been used is immunomodulatory drugs.

**Q. When you say "believed to work differently," why do you use the word "believed"?**

A. Because even with all the data and all the studies that have been done, the exact mechanism of how a drug like thalidomide or Revlimid or pomalidomide kills cancer cells is unclear.

**Q. Does thalidomide cure cancer?**

A. That's a very vague question. What are you referring to? In what context?

**Q. In any context. Can thalidomide cure cancer?**

A. I don't believe thalidomide, by itself, can cure cancer; but it's possible, in combinations with other drugs, that some patients may be cured.

**Q. When you say "possible," what do you base that possibility on?**

A. Studies that have shown that certain groups of patients, for example, with multiple myeloma, who are treated with combinations that include thalidomide, get long-lasting remissions, and that some of these remissions remain durable for five to ten years or more. To be cured of a cancer, a person has to survive essentially long enough to be definitively shown not to have a recurrence, or alternatively, to die of some other disease, like cardiac or lung disease, much, much later.



**Q. Can you think of a single patient where thalidomide, by itself, cured their cancer?**

A. Not personally, but there are data in the literature of patients enjoying long, long remissions with this. But the follow-ups have been relatively short; three, four, five years.

**Q. So we don't know.**

A. We don't know for sure. You asked me if I thought it could, and my answer was yes, I think it could, in combination with other drugs.

**Q. But not by itself?**

A. I don't think, by itself, it has enough activity to do it. I think you have to use it with other drugs.

**Q. What other drugs?**

A. Drugs like melphalan, drugs like prednisone or dexamethasone.

**Q. Slow down for me so I can write this down. Melphalan.**



A. Melphalan.

**Q. Dex.**

A. Dexamethasone. Prednisone. One or the other usually. Drugs like Velcade.

**Q. When was Velcade approved by the FDA?**

A. I don't know exactly. I think it was sometime in 2004.

**Q. Was that approved as a single agent?**

A. Yes.

**Q. Do you know whether Velcade can cure cancer?**

MS. DUNNE: Objection, vague.

THE WITNESS: Again, this is a vague question. What cancer are you referring to?

BY MR. GUTTMAN:

**Q. Multiple myeloma.**

A. Okay. I think that it is possible that a small number -- and by that, I mean only a few percent -- of patients who receive Velcade in combinations with other drugs may ultimately be cured of their cancer. But it's a small number.

**Q. Now, you've been a consultant to Millennium. Is that right?**

A. I have.

**Q. Velcade must have been a break-through drug for that company.**

MS. DUNNE: Objection, lack of foundation, unless you know.
THE WITNESS: Velcade was an important drug for the treatment of multiple myeloma, just as some of the other drugs we're referring to today are important.
BY MR. GUTTMAN:
**Q. Now, can Revlimid, as a single agent, cure multiple myeloma?**
MS. DUNNE: Objection, vague.
MR. GUTTMAN: If you know.
THE WITNESS: Again, I don't think so, by itself.
BY MR. GUTTMAN:
**Q. Can it cure it with dexamethasone?**
A. Probably not.
**Q. Why not?**
A. Well, because it doesn't destroy all the myeloma cells in a person. And the majority of patients who are treated with Revlimid, or even combinations, are going to be left with small numbers of cells -- small numbers of myeloma cells that survive the treatment. And those are the cells that eventually will result in a recurrence of the disease.
**Q. So why would you use Revlimid as opposed to Velcade?**



A. It's not an either/or thing. A patient with myeloma, by and large, is going to see all of these drugs eventually. So whether you treat them with Velcade initially or Revlimid initially, they're going to get to see all of these drugs. Because when their disease recurs, if they haven't received one drug, they're going to receive one of the other drugs. And that's going to be the case until they die of recurrent disease. So it's never a question of one versus the other; it's a question of when.
**Q. One of the things that you mentioned earlier was this question of dosing. Right?**
A. (No response).
**Q. And if you know a drug is effective or can be effective, but you don't know what the exact dosing should be, what do you as a doctor do?**
A. I think that you consult the literature and see what other people have reported in terms of dosing and the side-effects and the effectiveness, and ultimately use what you hope is going to be a relatively safe and effective dose.
**Q. Now, you've got to help me through this. There are some drugs, I assume, like -- my doctor says -- I call him up and I say, you know, "I'm having trouble breathing," and he says, "I'll write you a prescription**



**for an antibiotic, or I can send you for a chest x-ray to see if you have pneumonia; but if it cures your problem, you're probably okay." Have you ever given that kind of advice to a patient?**
A. Not in so many words.
**Q. I'm probably using the wrong words. My doctor, if he read this, probably wouldn't be happy with me. But the point I'm trying to get at is, there are certain drugs, I assume, like antibiotics, where the level of detriment, if you will, by increasing the dosage, probably is not going to be as severe as when you give a drug like Thalomid or Revlimid.**
A. Yes.
**Q. So in contrast to, for example, an antibiotic, a drug like Revlimid or Thalomid, you really have to get the dosing right, otherwise you can do serious harm to the patient.**
MS. DUNNE: Objection, vague.
THE WITNESS: So I don't think it's correct to compare treating somebody's pneumonia with an antibiotic to treating a patient with cancer.
BY MR. GUTTMAN:
**Q. Okay.**
A. The risk/benefit is very different for a patient with active cancer than it is for a person who has



pneumonia. And a person with pneumonia, you want to give them a drug that's going to cure their infection, but has minimal side-effects. In a person with cancer, your goal is to control their cancer. And the side-effects that occur sometimes could be bad, but at the same time, the potential benefit in controlling their cancer makes it worthwhile to assume a greater level of risk than it would be if the person had a pneumonia. So I think that makes a big difference in the calculus, as a medical oncologist treating cancer.
**Q. Do you consider yourself an expert on autologous stem cell transplants in multiple myeloma?**
A. Yes.
**Q. For the record, what is an autologous stem cell transplant? What does autologous mean?**
A. Autologous means you're using your own stem cells.
**Q. Is autologous stem cell transplant -- do you consider that a good treatment for multiple myeloma?**
A. Yes.
**Q. Does it prolong disease-free survival?**
A. Yes.
**Q. Is it a standard of care for many multiple myeloma patients?**
A. Yes.

**Q. And it was first introduced at least earlier than the mid '80s. Is that right?**
A. Yes.
**Q. In the 1970s, when you began in this area of endeavor. Right?**
A. Yeah. The late '70s, early '80s, I think is roughly correct.
**Q. Is melphalan still part of some regimens for first-line treatment of multiple myeloma for non-transplant candidates according to the NCCN guidelines?**
A. It is included in the guidelines as one possible treatment.
**Q. When was melphalan first used to treat MM?**
A. Forty years ago, if not longer.
**Q. Is Velcade a good treatment for multiple myeloma?**
A. Yes.
**Q. Is Velcade a first line for multiple myeloma, according to the NCCN guidelines?**
A. Yes.
**Q. Does Velcade have a black box warning?**
A. I think it might, but I'm not certain of that. I'd have to look at the label.
**Q. Well, in comparison to the risk profile of**



**Revlimid or Thalomid, which has a more dangerous risk profile?**
A. I think -- again, you can't make generalities about these drugs. It depends on the patient; it depends on the situation. All of these drugs have risks. All of these drugs have side-effects. But you can't make generalizations that one is better or one is safer than the other.
**Q. Now, Velcade was first approved by the FDA for the treatment of MM in 2003. Is that about right?**
A. I believe that's correct. I think I might have said 2004, but I could be off by that.
**Q. Do you know how long it took the FDA to approve Velcade for MM?**
A. It was several years, but I don't recall the exact timeline.
**Q. Would it surprise you if I told you it was four months?**
A. I don't think that's accurate.
**Q. What year was Velcade approved for all multiple myeloma, relapsed/refractory, after two treatments, initial treatment?**
A. I don't recall the exact dates of those timelines. I would have to look at the record to see when -- the initial approval was for relapsed, and it



received approval later for front-line therapy. But they weren't in the same time frame.
**Q. Now, Thalomid came out on the market to treat this disease histology of leprosy, as you say, sometime around the late 1990s, 1998. Right?**
A. Again, if you say so. I don't know the exact timeline.
**Q. Well, why did it take at least seven years, if not longer, to get FDA approval for the use of Thalomid to treatment a form of multiple myeloma?**
MS. DUNNE: Objection, lack of foundation.
THE WITNESS: Since I don't work for the FDA, I'm not in a position to state why it took so long.
BY MR. GUTTMAN:
**Q. Do you know what accelerated approval is at the FDA?**
A. Yes.
**Q. What is it?**
A. Accelerated approval is a process whereby the FDA will give early approval to a drug based on early data with surrogate end points usually for effectiveness.
**Q. Do you know what priority review is at the FDA?**
A. In a general sense, I know what it is.
**Q. Generally, what is it?**
A. Generally, it's that the FDA will consider early



approval in an accelerated fashion for a drug that they think may have potential utility.
**Q. And fast-track approval?**
A. I don't know the difference between fast track and accelerated.
**Q. So you understand that there are approval processes to get a drug approved quickly with the FDA if it's, I guess, breakthrough therapy?**
A. There are approval processes for that, yes.
**Q. Well, do you know whether Celgene ever tried to use those processes with regard to its products, Revlimid and Thalomid?**
MS. DUNNE: Objection, lack of foundation, and really beyond the scope of his expert opinion.
THE WITNESS: I really don't know.
BY MR. GUTTMAN:
**Q. Okay. I want to go back to your report for a second, Exhibit No. 1, paragraph 34.**
**Putting that aside for a moment, has it been your experience that early trials sometimes miss the hazards and adverse events that could be related to a drug?**
A. I think that a lot of trials that deal with limited numbers of patients with a limited amount of follow-up will miss some of the side-effects that occur,

compared to a larger number of patients treated with a given drug and longer follow-up, yes.

[redacted]



[redacted]



[redacted]

MS. DUNNE: Can you say that again, please. Which paragraph?

BY MR. GUTTMAN:

[redacted].

[redacted]



[redacted].

[redacted]

MS. DUNNE: Objection, vague.

THE WITNESS: [redacted]

BY MR. GUTTMAN:

[redacted]

MS. DUNNE: Objection, vague.

THE WITNESS: [redacted]

BY MR. GUTTMAN:

[redacted].

[redacted]

Page 162

[redacted].

[redacted]

Page 163

[redacted]

MS. DUNNE: Objection, vague as to type of drug.

THE WITNESS: [redacted]

BY MR. GUTTMAN:

**Q. So I want to walk through at least -- we're sort of doing this in an, I guess, non-sequential sort of way. But if you could sort of walk me through decade by decade, as you've been practicing, what the treatments are for multiple myeloma, starting from the '70s, going to today.**

Page 164

A. So the drugs that were used in the '70s and '80s were combinations of melphalan and prednisone. A combination known as VAD, V-A-D. And there were some other multi-drug combinations. One was called VBMCP, which was a four -- excuse me -- a five-drug combination. And high-dose melphalan, which came about in the late '70s, early '80s. Those were essentially the only drugs that were available for the treatment of myeloma.

The next drug that came along that had utility was thalidomide. And that came about in, you know, late 1999, early 2000.

**Q. When did you write your first prescription for thalidomide?**

A. I don't recall specifically the date, but I believe it was sometime in the year 2000.

**Q. When you say the drug had utility, why did you use the word "utility"?**

A. It's just a term that I use. It means that it has effect -- it has a certain degree of efficacy. It can reduce the tumor burden in patients with myeloma.

And then after thalidomide, the next drug that became available was Velcade. Around that time, I think was when I first started doing some of the trials with Revlimid. But then Revlimid became the next drug to be

Page 165

used right around -- perhaps before Revlimid, there was a drug approved called Doxil, which was a form of adriamycin that was approved.

Then after that, the next drug that was approved was carfilzomib. And after that, pomalidomide, a third generation of the same class of drugs that thalidomide and Revlimid were in.

**Q. What is the difference between Velcade and thalidomide?**

MS. DUNNE: I'm going to object. All these questions are really beyond the scope of his expert report.

BY MR. GUTTMAN:

**Q. What is the difference between Velcade and Thalomid?**

A. They're a different class of drugs.

**Q. What is the difference?**

A. Thalidomide is the so-called immunomodulatory drug that seems to work at least in part through the immune system. Although as I mentioned, we don't know the exact mechanism of action. Velcade is a proteasome inhibitor, which is a class of drugs that inhibits an organelle in cells called the proteasome. So it's a completely different class of drug.

**Q. In terms of the risk profile between Thalomid**

Page 166

**and Velcade, what is the difference?**

A. Thalidomide can cause rashes. It can cause blood clots in patients who are susceptible, especially when used with a drug like dexamethasone. It can cause sleepiness in some patients. It can cause neuropathy.

Velcade can cause neuropathy, also, but somewhat different kind of pattern. It can affect platelet counts, so it can lower platelet counts. It has some GI side-effects. Some patients complain of a discomfort -- a vague discomfort in their GI tract.

[redacted]

A. No.

**Q. Do you know an individual by the name of Paul Richardson?**

Page 167

A. Yes.

**Q. Do you know whether he studied deep-vein thrombosis?**

A. I don't remember specifically, but he might have.

**Q. Do you know an individual by the name of Charles Bennett?**

A. I know him, yes.

**Q. Do you know whether he studied deep-vein thrombosis with regard to thalidomide?**

A. I don't know.

**Q. So is it a fair statement that you haven't read any studies by either Dr. Richardson or Dr. Bennett or both together with regard to the issue of deep-vein thrombosis and thalidomide?**

A. It's probably a fair statement that I haven't read those particular articles they've authored, but I've read other articles on deep-vein thrombosis. They're not the only ones who have published in that field.

**Q. Now, dex, you indicated earlier, had a long history, I guess, or a history of use in treating multiple myeloma before doctors started trying thalidomide. Right?**

A. Yes.

Page 168

**Q. And was dex used as a single agent?**

A. Yes.

**Q. Do you have an understanding, one way or another, as to whether mixing the thalidomide in with the dex increased the potential for deep-vein thrombosis?**

A. Yes.

**Q. When did you get that understanding?**

A. Some years ago.

**Q. Would you say it would have been as early as 2001 or 2002?**

MS. DUNNE: Objection, lack of foundation.

THE WITNESS: Again, I don't know the exact date that I remembered that. But it was certainly a fairly early complication that was observed in patients who received thalidomide.

BY MR. GUTTMAN:

**Q. Well, the studies that you're citing here in paragraph 125 date back to as early as 2001, 2002.**

A. Right.

**Q. So is it a fair statement that the increased risk should have been known as early as that date?**

A. Probably, yes.

**Q. Do you know what the actual elevated risk is percentage-wise?**

Page 169

A. It varied from study to study. The risk could be anywhere from ten percent to as high as 40 or 50 percent. It also depended on whether prophylaxis was used to prevent DVTs.

**Q. What kind of prophylaxis?**

A. There have been a number of things tried. Aspirin is one that's been used. Coumadin is another. And low molecular weight heparin.

MS. DUNNE: I'm going to ask permission just to make a standing objection to all this line of questioning as it is beyond the scope of his report, rather than reiterate each time.

BY MR. GUTTMAN:

**Q. Now, when is the last time that you have read the package insert for Thalomid?**

A. It's probably been a while.

**Q. More than a couple of years?**

A. Probably.

**Q. How about Revlimid?**

A. I've read the Revlimid package insert within probably the last six months.

**Q. Do you know whether there is a black box warning on the package insert for Thalomid with regard to DVTs when the drug is used in combination with other drugs, including dex?**

A. There is absolutely a warning. I don't know for sure if it's a, quote, black box warning, but there is no question there is a warning in the package insert.

**Q. Do you know whether patients died from DVTs when they took Thalomid in combination with dex?**

A. I'm certain that is the case.

[redacted]

**Q. How do you treat patients with CLL?**

A. The treatment of CLL has evolved over the years. The early treatment involved alkylating agents, and then a drug called fludarabine was used, and another drug, rituximab, was used. Revlimid has activity in CLL. More recently, there has been a number of new drugs that have come along that have significant activity and probably have improved the treatment, such as ibrutinib and idelalisib.

**Q. Have you ever written a prescription for Revlimid to treat CLL?**

A. I believe, in the past, I have written a couple.



Not very many.

**Q. A couple meaning like one or two?**

A. Yes.

**Q. Why only one or two?**

A. Because I don't routinely treat CLL. So it's not a group of patients that I routinely see.

**Q. Is there a large population of patients who have CLL in the United States?**

A. Yes. It's a very common disease.

**Q. How large is the population?**

A. I don't remember the actual demographics of it, but it's more than multiple myeloma. Actually, I take it back. It's not more than multiple myeloma. I'm thinking about this. It's somewhat less than myeloma, but it's fairly common.

**Q. But for a drug company, it's a relatively large market.**

MS. DUNNE: Objection.

THE WITNESS: Well, it's -- I would guess that it's a reasonable market.

BY MR. GUTTMAN:

**Q. Now, do you know -- strike that.**

**Have you actually read the -- strike that.**

**Does the FDA package insert for Revlimid mention its use in treating CLL at all?**



A. There is something in there about it, but I don't remember the details of it.

**Q. As best you can recall.**

A. I just -- I can't recall the details. If you show me the packet, I can look at it and tell you.

**Q. Do you know whether the FDA has stated, either in the package insert or in some other place, that the use of Revlimid to treat CLL is contraindicated; that is, not a good thing?**

MS. DUNNE: Objection, vague as to time.

THE WITNESS: Again, I don't recall specifically what the package insert said, so I would hesitate to give you an opinion about that.

BY MR. GUTTMAN:

**Q. Do you recall ever receiving any information from Celgene with regard to the side-effects that a patient may face if he or she is given Revlimid for the treatment of CLL?**

A. Have I ever received information from Celgene about this?

**Q. Yes.**

A. I don't think I have.

**Q. Do you have a recollection of anybody at Celgene giving you, as a promotional speaker, information about the side-effects with regard to the use of Revlimid to**



**treat CLL?**

A. Not to my recollection.

**Q. As an advisory board member, do you recall having any discussion about the use of Revlimid in the treatment of CLL?**

A. So almost all the advisory boards that I have participated in were focused on multiple myeloma. I suspect if Celgene wanted information on CLL, they would have convened a group of CLL experts to discuss that.

**Q. Who are the CLL experts that you know of?**

A. One of them is a colleague of mine by the name of John Pagel. There are bunches -- there is lots of others. I don't know all their names.

**Q. Do you know a Dr. Chanan-Khan?**

A. Yes.

**Q. Is he considered a CLL expert?**

A. Probably, yes.

**Q. Would he be your first choice as a go-to person if you had CLL?**

A. John Pagel would be.

**Q. Not Chanan-Khan?**

A. Correct.

**Q. Why?**

A. Because I know him better, and I know he's done a lot of work in CLL.

**Q. Now, if the FDA approves a package insert that a drug is contraindicated for a specific treatment, does that mean the compendia can override the FDA statement if it wants to?**

MS. DUNNE: Objection, improper hypothetical.

THE WITNESS: You know, I would have to read what the statement said in the package insert. I would have to actually read it and see. It may be that the contraindication covers only a specific instance and not just a broad diagnosis. So it would really depend on what the statement said. If it said don't ever treat anybody with CLL with this drug, I think that would take precedence. But if it were just conditional and it depended on the situation, it may not.

BY MR. GUTTMAN:

**Q. What if the package insert said only use this to treat CLL in a trial?**

MS. DUNNE: Objection, improper hypothetical.

THE WITNESS: I think that's a little more vague. Because they're not -- they're not saying you can't use the drug. They're just saying you should use it in a trial.

BY MR. GUTTMAN:

[redacted]



MS. DUNNE: We've been going about an hour. So just at an appropriate time for a break.

MR. GUTTMAN: Yes.

BY MR. GUTTMAN:

[redacted].

[redacted]



[redacted]

**Q. But you are a promotional speaker for the product, Revlimid. Right?**



A. For myeloma.

**Q. I see. Do you think that Celgene should be promoting the drug Revlimid to treat CLL?**

MS. DUNNE: Objection, vague, and certainly beyond the scope.

THE WITNESS: Yeah, this is outside the scope of what I've been asked to give an opinion on.

BY MR. GUTTMAN:

**Q. Well, given what the FDA said on its package insert about the use of Revlimid to treat CLL, would you as a doctor use Revlimid to treat CLL?**

A. If I had a patient with relapsed CLL who had failed all of the standard drugs and I had -- you know, basically, this was a drug they hadn't seen and their disease was progressing, I would consider the use of this drug.

**Q. But not as a first line?**

A. Probably not.

**Q. So, in other words, if there was absolutely no other alternative, as an absolute last resort, that's when you might use it?**

A. That's probably when I would consider it, yes.

**Q. And you would only consider it; you wouldn't definitely turn to it?**

A. You know, I'm not -- these are hypotheticals,

and I'm not going to tell you that I will absolutely do something or won't do something. It really would depend on the particular situation in the patient.
MR. GUTTMAN: Okay. Let's take a break.
THE VIDEOGRAPHER: Going off the record at 2:35.
(Recess taken from 2:35 to 2:54.)
THE VIDEOGRAPHER: We're back on the record at 2:54.
BY MR. GUTTMAN:
**Q. Dr. Bensinger, do you ever use the compendia to give you guidance on what drugs to prescribe patients?**
A. Personally, not routinely.
**Q. Ever? That you can think of.**
A. I can't remember a particular case.
**Q. Do you know of any doctor who uses the compendia to determine what drugs to give patients?**
A. I have talked to doctors that have mentioned consulting the compendia for use of a drug. Yes.
**Q. If you read a study where only two patients were involved -- right -- would the results of that study give you a level of confidence, if any, about using the drug?**
MS. DUNNE: Objection, improper hypothetical.
THE WITNESS: So it really would depend on the details of the study, it would depend on the disease, it



would depend on the results of the study, and it would depend on the particular patient that I was confronted with regarding the possible use of the drug. I think, in general, I like studies that have more than one or two patients, as a generality, but there are exceptions to that.
BY MR. GUTTMAN:
**Q. Well, how many patients do you like in a study?**
A. Again, it's a hypothetical. It varies according to the situation. It varies according to the disease. It varies according to the patient situation. It varies according to the details of the study. So it's impossible to give you a blanket answer to that. I would have to look at the particular trial, and I'd have to look at it in the context of the particular patient.
**Q. You say you'd have to look at the trial. Would you mean that you'd have to look at something more than an article?**
A. It's basically what I've stated.
**Q. In other words, would you have to actually look at the raw data, look at the patients, whatever the files are that made up the article?**
A. Again, it depends on what the study -- the article says -- the details of the article, whether that would be sufficient. But it wouldn't just be the



article. It would be, also, the patient, what the patient's situation was, their particular type of disease, and what prior treatments they've had. So it's pretty complex. And every patient is different. Every patient is an individual. So I think it just depends on that.
[redacted],
[redacted]
(Exhibit 26 marked for identification.)



BY MR. GUTTMAN:
[redacted].
[redacted].
[redacted]

Page 182

[redacted]

MS. DUNNE: Objection --

THE WITNESS [redacted]

BY MR. GUTTMAN:

[redacted]

Page 183

[redacted]

MS. DUNNE: Objection, lack of foundation.

THE WITNESS: [redacted]

Page 184

[redacted]

BY MR. GUTTMAN:

[redacted]

**Q. Do you know an individual by the name of Joan McClure?**

A. Yes.

**Q. Who is Joan McClure?**

A. She's one of the senior people at the NCCN.

**Q. With regard to the guideline that we talked about that said that you can't serve on a panel -- a Guidelines Panel if you are paid more than $20,000 from a drug company, if Ms. McClure said that policy had been in effect for at least five years, would you have any reason to doubt her?**

A. No.

(Exhibit 27 marked for identification.)

BY MR. GUTTMAN:

**Q. Exhibit No. 27 is a subpoena that was served on you. Do you recall getting this document, sir?**

A. I'm not sure if this is -- is this the subpoena that was served at the Hutchinson Center? Because it looks like it was. I was never served this document.

**Q. You were never served this document?**

Page 185

A. No. I ultimately got a copy of it.

MS. DUNNE: Take a look through the entire document, the second page.

THE WITNESS: Page two?

MS. DUNNE: (Indicating).

THE WITNESS: Which page are you referring to?

MS. DUNNE: I just wanted to make sure you were looking through the entire document so you knew what subpoena you were looking at.

THE WITNESS: Yeah. Again, I think this -- if this is the document that was served at the Hutchinson Center, I never got this. I did ultimately get an electronic copy from the attorneys at the Hutchinson Center.

BY MR. GUTTMAN:

**Q. Okay. And when you got that copy, what did you do with it?**

A. I talked to the attorneys, and they said they would handle it.

**Q. So you did nothing?**

A. I did nothing personally, no.

**Q. Who were those attorneys?**

A. One is named William Leedom and the other is -- what's his name? I'm forgetting the other name right now. But they represent the Fred Hutchinson Center.

**Q. With regard to the various compendia [redacted], do you view all of them as having the same degree of reliability?**

A. You know, it's a difficult question, because I don't routinely consult them and use them. So it's difficult to say for sure if they're all the same. I know that at least one of the compendia has gone out of publication, so it's no longer around.

**Q. Is there a particular compendia which was more expansive in counseling use of drugs than others?**

MS. DUNNE: Objection, misstates the evidence.

THE WITNESS: They all had their pluses and minuses. I don't think -- it's hard for me to say that one is a gold standard compared to the others.

BY MR. GUTTMAN:

**Q. What were the pluses and minuses of each of them?**

A. Some of them adopted a rating system where they gave their opinion about the evidence and the strength of the evidence; others had more of a narrative where they talked about the various studies that were done. They're just different.

**Q. Prior to you being tasked to do what it is you've done for Jones Day pursuant to contract, have you ever embarked on any analysis of the compendia before?**



A. No.

**Q. Do you consider yourself an expert in the compendia?**

MS. DUNNE: Objection, vague.

THE WITNESS: I consider myself an expert in cancer therapy and stem cell transplantation, with a particular focus on hematologic malignancies, but not an expert in compendia.

BY MR. GUTTMAN:

**Q. With regard to the studies that each of the compendia might have relied upon, did you do any analysis to determine whether the authors of those studies were influenced by payments made to them by the pharmaceutical industry?**

MS. DUNNE: Objection, lack of foundation, assumes facts not in evidence.

THE WITNESS: I had no knowledge of that.

BY MR. GUTTMAN:

**Q. Do you know whether any compendia that you reviewed actually looked at raw data?**

A. From the best I can tell from the review that I did, I don't think that any of these looked at raw data.

**Q. Do you know whether -- when the FDA looks at a drug to approve it, in terms of giving it an indication, whether the FDA looks at raw data?**



A. I know that in many cases, they do. As part of the review process, they solicit from the company not only the study and the results of the study, but the actual raw patient data, and they will often do their own analysis of that data.

**Q. Do you know whether any of the compendia are set up to do that?**

A. I don't know.

**Q. And do you know whether NCCN is set up to do that?**

A. I know, from my experience with NCCN, that we did not look at data in that way. We looked at primarily published studies.

**Q. And all of the compendia have access to the same published studies, I assume. Right?**

MS. DUNNE: Objection, lack of foundation.

If you know.

BY MR. GUTTMAN:

**Q. If you know.**

A. I don't know, but I would assume that they all do.

**Q. It's not that there is one compendia publisher who has more inside information than some other publisher.**

A. I wouldn't think so.



**Q. Well, if that's the case, how come all their recommendations are not exactly the same?**

A. I think that's not uncommon when you have early studies of drugs. When there is early data where you may have smaller numbers of studies -- or smaller numbers of patients in studies, I think you're then going to have a genuine disagreement among reviewers as to the adequacy of the data. And I think that that's part of medicine.

MR. GUTTMAN: I think I may actually be finished, shockingly. But I need about five minutes just to review my notes, if it's okay with you guys.

MS. DUNNE: Sure. And I have a couple of minor clarifying questions.

THE VIDEOGRAPHER: Going off the record at 3:13.

(Recess taken from 3:13 to 3:31.)

THE VIDEOGRAPHER: We're back on the record at 3:31.

BY MR. GUTTMAN:

**Q. Do you know an individual by the name of Robert Knight?**

A. Yes. I haven't seen him in a great many years, but a long time ago, yes.

**Q. Who is Robert Knight?**

A. He was a physician that worked for Celgene, but

I can't recall his capacity.
**Q. Laurie Kenvin? Does that ring a bell?**
A. No.
**Q. Never heard that name before?**
A. Laura who?
**Q. Kenvin, K-E-N-V-I-N.**
A. It doesn't ring a bell to me.
**Q. K-E-N-V-I-N.**
A. No.
**Q. Zhinuan Yu, Z-H-I-N-U-A-N space Yu, last name.**
A. No.
**Q. It doesn't ring a bell?**
A. No.
**Q. Ashraf Z. Badros?**
A. Yes. I know him.
**Q. Who is he?**
A. He's a physician that works in the field of myeloma. I believe he is at the University of Maryland, but I'm not absolutely certain about that, currently. He may have been in another place at the time.
**Q. David Irwin, does that name ring a bell?**
A. No.
**Q. With regard to David Irwin and Laurie Kenvin and Zhinuan Yu, do you have any recollection whatsoever of writing anything with them?**



MS. DUNNE: Objection, lack of foundation.
THE WITNESS: Not specifically.
(Exhibit 28 marked for identification.)
BY MR. GUTTMAN:
[redacted].
[redacted]



[redacted]
(Exhibit 29 marked for identification.)
BY MR. GUTTMAN:
[redacted]



[redacted].
[redacted]
MS. DUNNE: Objection, lack of foundation.
BY MR. GUTTMAN:
[redacted].
[redacted]

[redacted]

MS. DUNNE: Objection, lack of foundation.

THE WITNESS: [redacted]

BY MR. GUTTMAN:

[redacted]

MS. DUNNE: Objection, misstates the evidence, lack of foundation.

THE WITNESS: [redacted].

BY MR. GUTTMAN:

[redacted]

MS. DUNNE: Objection, lack of foundation, misstates the evidence.

THE WITNESS: [redacted]

BY MR. GUTTMAN:

[redacted]



[redacted]

MS. DUNNE: Objection, vague, lack of foundation and speculation.

THE WITNESS: [redacted]

BY MR. GUTTMAN:

[redacted]



[redacted].

[redacted]

MR. GUTTMAN: That's it. Reserve questions until time of trial.

MS. DUNNE: I have a couple of clarifying questions I wanted to ask.

EXAMINATION

BY MS. DUNNE:

**Q. Dr. Bensinger, you said earlier that you did not review all the studies referenced in your report. What did you do for purposes of listing studies or literature in your materials considered --**

MR. GUTTMAN: Objection to form.

MS. DUNNE: Strike that. I'll ask it again.

BY MS. DUNNE:

**Q. When you said you did not review all the studies referenced in your report, what did you mean?**

A. What I meant is I didn't read each of the studies that are referenced in detail. Often, I knew the basis of most -- of many of the studies and didn't



need to get into the nitty-gritty. There were occasional studies where I had to read it in more detail to refresh my memory, to really just do that, so that I was aware of some of the details that I might have forgotten for the study. But that was -- you know, those were the literature that I felt either supported or didn't support the use of Revlimid for certain indications.

And then the other materials were, of course, the compendia. And generally speaking, I took the compendia listings at face value. So if they listed something, I read in detail what they said about the listing and what they used to support it or not support it, and that's how I made -- that's how I made the basis of the report.

BY MS. DUNNE:

**Q. When you reached a conclusion that the compendia entries supported the use of Thalomid or Revlimid in a particular disease state, did that equate to a determination that you would definitely use Thalomid or Revlimid every time in that disease state?**

A. No. It really was a determination that it might be appropriate to use the drug in that indication for a particular patient at that point in their disease category -- disease process. But it would depend on the

particulars of the patient. So I couldn't give a blanket statement and say I would always use it, but I think it would be something that I would consider using.

MS. DUNNE: All right. No further questions.

MR. GUTTMAN: Thank you.

THE VIDEOGRAPHER: We're going off the record at 3:43. This concludes the video deposition of Dr. William Bensinger. We are now off the record.

THE REPORTER: Signature is reserved?

MS. DUNNE: Yes. He's going to review. Right.

(Deposition adjourned at 3:43 p.m.)

(Signature reserved.)



C E R T I F I C A T E

STATE OF WASHINGTON )
) ss
COUNTY OF KING )

I, the undersigned Washington Certified Court Reporter, hereby certify:

That the foregoing deposition upon oral examination of the witness named herein was taken stenographically before me and transcribed under my direction;

That the witness was duly sworn by me pursuant to RCW 5.28.010 to testify truthfully;

That the transcript of the deposition is a full, true and correct transcript to the best of my ability;

That I am neither an attorney for, nor a relative or employee of any of the parties to the action or any attorney or counsel employed by the parties hereto, nor financially interested in its outcome.

I further certify that in accordance with CR 30(e), the witness was given the opportunity to examine, read, and sign the deposition, within 30 days upon its completion and submission, unless waiver of signature was indicated in the record.

*Donald W. McKay*

Donald W. McKay, RMR, CRR
Washington Certified Court Reporter No. 3237
License effective until: 07/02/2016



I N D E X


| EXAMINATION BY | PAGE |
|---|---|
| MR. GUTTMAN | 4 |
| MS. DUNNE | 196 |


E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Expert Report of William Bensinger, M.D. | 11 |
| Exhibit 2 | E-mail chain, the most recent dated February 27, 2007, to Marcel Meijer, et al., from Katherine Stultz, re: MM meeting agenda and updated status report (CELBRN2310082 - 2310084) with attachment (CELBRN2310085) | 53 |
| Exhibit 3 | Letter dated January 14, 2014, to Dr. William Bensinger, M.D., from Toni-Ann Citera, re: United States of America, et al., ex rel. Beverly Brown v. Celgene Corporation (CELBENSINGER00000337 - 340) | 75 |
| Exhibit 4 | E-mail dated June 30, 2006, to William Bensinger from Tom Cavanaugh, re: Approved!, with attachment (CELBRN2548570 - 2548609) | 77 |
| Exhibit 5 | E-mail dated January 3, 2001, to Jerry Zeldis, et al., from Jerry Zeldis, re: Draft MM protocol (CELBRN1267875 - 1267881) | 79 |
| Exhibit 6 | Composite of invoices to Toni Citera from William I. Bensinger, M.D. (CELBENSINGER00000334 - 336) | 80 |




E X H I B I T S (continued)


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 7 | E-mail chain, the most recent dated September 9, 2006, to Brian Gill and Sol Barer from Perry Karsen, re: Thomas Weisel - complete e-mail (CELBRN0768025 - 0768028) | 84 |
| Exhibit 8 | E-mail chain, the most recent dated March 9, 2008, to Sol Barer, et al., from Mark Alles, re: FW: NCCN annual meeting (CELBRN0731806 - 731807) | 87 |
| Exhibit 9 | E-mail to Tom Tomayko, et al., from Vincent Cocilovo, re: First online MM promotional speaker training (CELBRN0582623), with attachment (CELBRN0582624) | 90 |
| Exhibit 10 | E-mail dated November 1, 2010, to Jeff Rowell from Jessica Kann, re: 11.02.10 Celgene speaker program, with attachment (CELBRN0490518 - 490529) | 91 |
| Exhibit 11 | E-mail chain, the most recent dated October 24, 2005, to John Chin from Mark Bauer, re: FW: Bensinger's presentations - Arizona Ad Board (CELBRN0110254), with attachment (CELBRN0110255) | 92 |
| Exhibit 12A | Breakdown of payments made to William Bensinger (not stamped) | 97 |
| Exhibit 12B | Spreadsheet of payments made (JD_ENVISION00001) | 97 |
| Exhibit 13 | Document titled NCCN Disclosure Policies and Potential Conflicts of Interest (not stamped) | 101 |
| Exhibit 14 | Document titled About NCCN - Disclosures as of 05/22/2012 (not stamped) | 108 |

E X H I B I T S (continued)


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 15 | Document titled About NCCN - Disclosures as of 08/13/2012 (not stamped) | 112 |
| Exhibit 16 | Document titled About NCCN - Disclosures as of 02/26/2013 (not stamped) | 113 |
| Exhibit 17 | Document titled About NCCN - Disclosures as of 05/28/2013 (not stamped) | 113 |
| Exhibit 18 | Document titled About NCCN - Disclosures as of 09/27/2013 (not stamped) | 114 |
| Exhibit 19 | Document titled About NCCN - Disclosures as of 12/20/2013 (not stamped) | 114 |
| Exhibit 20 | Document titled About NCCN - Disclosures as of 05/06/2014 (not stamped) | 115 |
| Exhibit 21 | Document titled UW School of Medicine Policy on Potential Financial Conflicts of Interest for Commercial and Non-Profit Entities (not stamped) | 119 |
| Exhibit 22 | Document titled Fred Hutchinson Cancer Research Center Conflict of Interest Policy, effective August 24, 2012 (not stamped) | 123 |
| Exhibit 23 | Document titled Fred Hutch Policy and Guidelines for Involvement with Outside Interests, revised June 10, 2015 (not stamped) | 127 |
| Exhibit 24 | Document titled Letters to the Editor, Mayo Clinic Proceedings, February 2010 (not stamped) | 127 |




E X H I B I T S (continued)


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 25 | E-mail chain, the most recent dated March 26, 2004, to Robert Hugin from John Jackson, re: FW: SAEs (CELBRN0792840 - 792841) | 137 |
| Exhibit 26 | E-mail dated August 16, 2006, to Sol Barer, et al., from Brian Gill, re: Unique opportunity for Celgene sponsored NCCN Journalist workshop (CELBRN0767155 - 767158) | 180 |
| Exhibit 27 | Notice of Subpoena re: Dr. William Bensinger | 184 |
| Exhibit 28 | E-mail chain, the most recent dated May 29, 2009, to Sol Barer from Jerry Zeldis, re: FW: Published online: Richardson, et al., Safety and efficacy of single-agent lenalidomide in patients with relapsed and refractory multiple myeloma (CELBRN0794234 - 794235), with attachment (CELBRN0794236 - 794267) | 191 |
| Exhibit 29 | Presentation titled Optimizing the Hematology Franchise Strategy at ASH 2012, November 14, 2012 (CELBRN2791570 - 2791641) | 192 |




Errata Sheet

NAME OF CASE: United States of America, et al v Celgene Corporation

DATE OF DEPOSITION: 12/16/2015

NAME OF WITNESS: William Bensinger MD

Reason Codes:

1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

Page _____ Line ______ Reason ______

From ____________________ to ____________________

_______________________

**Exhibits**

**BENSINGER.EXH. 001**
11:8,13 17:4 58:23 66:12 80:24 121:18 157:18 160:17 200:9
**BENSINGER.EXH. 002**
53:5,6,8,9 77:3 200:10
**BENSINGER.EXH. 003**
75:19,20,22,23 200:14
**BENSINGER.EXH. 004**
77:22,23,25 200:17
**BENSINGER.EXH. 005**
79:3,4 200:20
**BENSINGER.EXH. 006**
80:6,10 83:11 200:22
**BENSINGER.EXH. 007**
84:2,3,4,6 201:3
**BENSINGER.EXH. 008**
87:19,21 201:6
**BENSINGER.EXH. 009**
90:4,6 201:9
**BENSINGER.EXH. 010**
91:3,5 201:12
**BENSINGER.EXH. 011**
92:18,19,21 201:15
**BENSINGER.EXH. 012A**
97:12,14,18 201:18
**BENSINGER.EXH. 012B**
97:13,15,18 201:20
**BENSINGER.EXH. 013**
101:22,23,25 201:21
**BENSINGER.EXH. 014**
108:14,15,17 201:23
**BENSINGER.EXH. 015**
112:8 202:3
**BENSINGER.EXH. 016**
113:5,9 202:5
**BENSINGER.EXH. 017**
113:21,24 202:7
**BENSINGER.EXH. 018**
114:11,13 202:9
**BENSINGER.EXH. 019**
114:20,22 115:14 202:11
**BENSINGER.EXH. 020**
115:4,6 202:13
**BENSINGER.EXH. 021**
119:8,10 120:4 202:15
**BENSINGER.EXH. 022**
123:24 124:1 202:18
**BENSINGER.EXH. 023**
127:6,8 202:21
**BENSINGER.EXH. 024**
127:25 128:8 130:25 202:23
**BENSINGER.EXH. 025**
137:23,25 203:3
**BENSINGER.EXH. 026**
180:25 181:2 183:14,22 203:6
**BENSINGER.EXH. 027**
184:18,20 203:9
**BENSINGER.EXH. 028**
191:3,5 203:10
**BENSINGER.EXH. 029**
192:16,18 203:16

**$**

**$1,000**
24:19 59:6 61:16
**$1,500**
39:6
**$10,000**
125:2
**$100,000**
42:13,14 49:1,7
**$154,400**
49:21
**$2,500**
24:15,16 39:6
**$20,000**
107:13,20 184:13
**$269,000**
98:5
**$3,000**
100:18
**$3-**
32:11
**$4,000**
30:21 31:18 32:11 34:1 100:21
**$400,000**
42:17
**$50,000**
107:15 182:3
**$500**
24:21
**$500,000**
42:15
**$703,374**
49:19
**$750**
59:3,16 61:15 62:4

**(**

**(1)**
85:1
**(2)**
85:4

**0**

**01/07/2008**
49:1
**01/31/2016**
49:1
**07/02/2016**
199:21
**0794236**
191:10

**1**

**1**
11:8,13 17:4 58:23 66:12 80:24 121:18 157:18 160:17
**1,000**
68:18,20
**10**
91:3,5
**10-cv-03165**
3:14
**100**
30:6 51:10,14
**1000-fold**
95:14
**1099**
98:23 99:3
**10:12**
52:18,19
**10:29**
52:19,21
**11**
92:18,19,21
**113**
158:20
**11:26**
97:8,9
**11:41**
97:9,11
**12**
138:10 175:18
**12/20/2013**
114:23
**120**
180:10
**125**
166:12 168:19
**126**
158:14
**12:36**
134:11,12
**12A**
97:12,14,18,23 98:3
**12B**
97:13,15,18,22
**13**
61:14 63:10 66:11 101:22,23,25 138:17 160:11,16
**130**
158:14
**131**
174:24 175:12
**132**
174:25 175:22
**139**
175:13
**14**
108:14,15,17
**14th**
102:23
**15**
9:8 13:3 87:1 112:7, 8,10,12
**16**
3:1,5 113:5,9
**160**
175:23
**161**
175:24
**163**
158:20
**163-C5013-04020526**
138:9
**17**
113:21,24
**17th**
81:11 83:22
**18**
114:11,13 160:19
**19**
90:14 114:20,22 115:14 144:25
**1970s**
154:4
**1977**
144:25
**1979**
15:23
**1990s**
156:5
**1998**
156:5
**1999**
160:19 162:10 164:12
**1:28**
134:12,14

**2**

**2**
52:21 53:5,6,9 77:3

**2/26/2013** 113:7
**20** 28:17 63:13 68:7,9 115:4,6
**200-** 95:14
**2000** 13:2 101:20,21 164:12,16
**2000s** 67:9 68:2 69:12
**2001** 166:19 168:11,19
**2002** 166:20 168:11,19
**2003** 155:10
**2004** 20:8,14 21:1,10,12 138:10 142:9,13 149:7 155:12
**2006** 66:15 67:10 68:24 78:2 90:10 98:3 100:4
**2007** 54:3 100:4
**2008** 20:16 21:21 35:23 89:24 100:4 116:5
**2009** 100:4,8 128:19
**2010** 26:1 100:4
**2011** 100:4
**2012** 100:5 110:25 124:15 192:21 193:2,21
**2013** 98:4 100:5 113:23 114:14 125:12 176:5
**2015** 3:5 15:23 26:1 80:25 83:23 101:20, 21
**2016** 3:1
**21** 119:8,10 120:4
**22** 123:24 124:1
**22nd** 110:25
**23** 127:6,8 193:20
**24** 121:19 124:15 127:25 128:2,8 130:25
**25** 80:25 137:23,25
**250** 134:3
**2548570** 78:1
**25th** 81:11 83:23
**26** 54:3 180:25 181:2 183:14,22
**260** 127:22
**27** 114:14 184:18,20
**27.11** 160:12,17
**28** 113:23 138:10 191:3,5
**29** 192:16,18
**2:35** 178:5,6
**2:54** 178:6,8

**3**

**3** 75:19,20,23 90:10 120:4 134:14
**30** 78:2 138:9 199:15
**30(e)** 199:14
**3237** 199:20
**33** 61:17
**339** 75:24
**34** 157:18
**36** 194:20
**38** 9:23 15:25 94:19 158:3
**3:13** 189:15,16
**3:31** 189:16,18
**3:43** 198:7,11

**4**

**4** 77:22,23,25 98:3 176:5
**40** 5:13 6:17 9:19 10:16 144:9 169:2 194:25

**5**

**5** 79:3,4,6 124:22
**5.28.010** 199:9
**50** 68:11 169:2
**50,000** 95:1,8
**54** 121:20

**6**

**6** 80:5,6,10 83:11

**7**

**7** 84:3,4,6
**70** 158:12
**701** 3:9
**70s** 154:6 163:24 164:1, 7
**73** 80:25
**73-year-old** 138:10
**7th** 88:5

**8**

**8** 66:11 87:19,21
**8/13/2012** 112:13
**8/18-19/15** 83:17
**8/21-22/15** 83:17
**8/6/15** 83:17
**80** 180:7
**80s** 154:2,6 164:1,7
**8:55** 181:13
**8th** 181:8

**9**

**9** 20:16 90:3,4,6 98:4
**9:04** 3:2,6
**9:35** 181:14

**A**

**a.m.** 3:2,6 181:14
**ability** 16:2 20:1 38:1 199:10
**abnormal** 161:3
**above-entitled** 4:4
**absence** 22:4,10
**absolute** 177:20
**absolutely** 143:21 162:9 170:1 177:19 178:1 190:19
**abstracts** 39:10,11 45:6
**academic** 129:11
**accelerated** 156:15,19 157:1,5
**accept** 50:7
**accepted** 31:24 83:5
**access** 60:16,23 104:13 188:14
**accompany** 120:16
**accomplish** 132:10
**accordance** 199:14
**accountant** 99:4
**accuracy** 18:2 93:21
**accurate** 17:23 94:12,14 155:19 195:11
**accurately** 103:18
**achieve** 193:6,12 194:8
**achieved** 175:17 180:14
**acronym** 48:18 65:4 170:10
**acronyms** 65:10
**acting** 3:19
**action** 165:21 199:12
**actions** 106:6
**active** 152:25 160:21,22, 24
**activities** 28:17 100:15 108:12 120:5,16,18 129:8 193:11
**activity** 55:3 120:24 148:19 161:2 170:18,20 183:15
**actual** 11:24 20:6 37:5 123:8 168:24 171:11 188:4

**acyclovir** 26:16
**Ad** 92:23 93:11
**add** 28:4
**added** 176:3
**addition** 8:1 18:5 22:6 130:9 137:19 139:15 141:19
**additional** 10:10 63:1 158:8,10 159:3
**Additionally** 89:11
**additive** 158:10
**addressed** 52:7
**addressing** 193:7
**adequacy** 189:8
**adequate** 61:19
**adhering** 116:25
**adjourned** 198:11
**administer** 146:3
**Administration** 19:3
**adopted** 186:18
**adriamycin** 165:3
**advanced** 142:5,15 160:25 162:23
**adverse** 134:20 136:3,6,19 138:7 139:12,15,16, 20 140:4,6,13 157:21 158:9
**adversely** 145:15
**advertise** 19:13,14
**advice** 152:4
**advisory** 38:16,20,21 39:3,25 93:14 109:19,24 112:16 113:13,15 114:3,6,15,24 115:7 127:19 136:20,24 173:3,6 193:21 194:1
**affairs** 79:11
**affect** 166:7
**affected** 145:15
**affiliate** 16:13
**affiliated** 15:6 16:18 21:9,12, 14 86:18,20
**affiliation** 15:10,11 16:6,9 86:22
**affiliations** 86:23
**aforementioned** 143:10
**agency** 139:21
**agent** 57:8 142:7,16 149:8 150:7 158:5 160:21 168:1
**agents** 145:17 170:16
**aggregate** 107:14
**agree** 76:19 112:1 115:12 132:5,7,16
**agreed** 120:22 129:7
**agreement** 61:21
**AHFS** 61:8
**air** 32:23
**airplane** 37:15
**Alaska** 30:16 32:13 33:17 37:15
**alerting** 176:21
**alkylating** 170:16
**allegations** 16:25
**alleged** 8:14 63:13
**Alles** 87:22 89:6
**Alliance** 123:20
**allogeneic** 41:6
**allowance** 33:3
**allowed** 27:23 28:4 77:4 105:16
**alternative** 177:20
**alternatively** 148:5
**alternatives** 133:14
**America** 3:20
**American** 183:1,9
**Amgen** 31:2,19,20,21
**amount** 34:19 42:9 98:24 99:2,19 127:15 157:24
**amounts** 97:21 103:20,22,24 108:12,13 127:21
**Amy** 3:23 14:12
**amyloidosis** 109:7
**Amyloidosis/ waldenstrom's** 108:19
**analysis** 55:1 59:4 60:1 62:8 186:25 187:12 188:5
**and/or** 54:9 76:18 120:15 121:2
**Anderson** 89:15
**Andrew** 89:5
**animal** 96:11,23
**animals** 145:9
**annual** 22:8 87:24 88:10 89:6,15 107:12,14 181:7
**annually** 22:7
**answers** 4:16
**anti-cancer** 146:24 147:4
**antibiotic** 146:25 152:1,14,20
**antibiotics** 26:11 152:9
**anticipate** 62:7
**anticipated** 59:6,25 60:6 62:11 193:8
**antiplatelet** 135:6
**apologies** 89:13
**apologize** 89:12
**apparently** 139:13
**appeared** 23:13
**appearing** 183:21
**appears** 75:24 77:25 91:6 93:17
**applies** 131:19
**approach** 47:25
**approval** 31:14 50:21 65:21, 24 66:1,2,18,19,23 68:23 91:19 116:19 155:25 156:1,9,15, 19,20 157:1,3,6,9 155:9,20 157:7 165:2,3,4
**approve** 22:5 155:13 187:24
**approved** 31:12 50:25 60:4 64:21 66:6,8 78:6 142:9,13 149:5,8
**approves** 174:1
**approving** 73:18 116:12
**approximately** 3:6 9:19,24 10:2 12:23 13:5 23:11
**area** 32:14 36:4 144:19 154:4
**argumentative** 20:4 51:15 111:8 122:10 123:2
**arise** 35:10,11,14
**Arizona** 92:22 93:3,11
**arrangement** 120:18
**arrhythmia** 143:12
**arrive** 59:17
**article** 41:17 45:16,19,22 46:1 57:22 58:5,9, 11 130:22,24,25 179:18,22,24 180:1 191:6,9,10,17,22 192:12,13
**articles** 45:6 46:10 58:16 62:23,25 63:1 82:9 167:17,18
**ASH** 192:21 193:2,6,11, 21
**Ashraf** 190:14
**aspects** 26:6 76:23 128:12
**Aspirin** 169:7
**Associates** 3:12
**association** 39:22
**assume** 57:6 98:11 101:7 151:23 152:9 153:7 181:20 188:15,20
**assumes** 187:16

**atrial**
138:12
**attached**
17:17 58:25 59:2 93:2,7
**attaching**
18:5
**attachment**
91:14,15
**attachments**
17:4 122:9
**attend**
33:23 88:17
**attendance**
29:7 91:12
**attended**
22:7 84:23 136:21
**attending**
39:23 88:6
**attention**
14:23 20:7 53:21,24 54:14 58:24 84:7, 12,21 94:18 105:25 120:3 121:19 124:21 158:3,12 160:11,16 166:11 170:7 174:24 181:13 193:4 194:20,25
**attorney**
76:17 77:6 199:11, 12
**attorney-client**
76:17
**attorneys**
7:13 12:3 13:22 14:8,11,15 61:2 77:1 185:13,18,22
**audience**
27:21 29:15,25 33:5 54:25 181:11
**augment**
28:4
**Augmented**
95:22
**August**
112:24 113:3 124:15
**Austin**
3:24
**author**
41:18 43:17,18 44:15 80:2 82:2,5, 12,14,21,24,25 83:1,10 162:14
**authored**
167:17
**authors**
41:17,19 58:4 131:4,9 187:12
**autologous**
15:14,16,19 153:11, 14,15,16,18
**automatically**
162:18
**autopsies**
141:6
**autopsy**
136:1,3 140:18,24 141:1,8
**availability**
8:7 22:5
**Avenue**
3:9
**Aviation**
19:2
**aware**
54:8 84:23 121:16 125:7,10,13 145:6 197:4

**B**

**B-o-c-c-i-a**
90:23
**babies**
92:16
**back**
11:3 13:16 20:6 42:12 48:2 52:20 58:23 80:14 97:6,10 121:18 125:21 134:13 135:14 146:9 157:17 159:4 160:7 162:9 168:19 170:7 171:13 178:7 189:17
**background**
176:11
**bacterial**
147:1
**bad**
129:6 153:5
**Badros**
190:14
**ballpark**
83:21
**Barer**
84:8,14,15,18 87:22 138:1,2 183:13
**Barlogie**
130:7
**base**
147:21
**based**
5:22 13:20,21 14:5 82:7 84:24 101:4,5 110:23 111:18,22 117:19 121:20 122:22 156:20 158:15,22 159:2,7 180:12 193:9
**basically**
88:13 92:15 177:14 179:19
**basis**
24:10 83:9 103:13 159:25 196:25 197:14
**Bauer**
92:21,25
**bear**
75:24
**bearing**
82:9 126:18
**bears**
75:23 91:7
**Becker**
50:3,5
**began**
59:4 144:22 154:4
**begin**
4:1 47:22 146:12
**Beginning**
180:10
**begins**
53:10 78:1 87:21 191:9
**behalf**
3:18,20,24 27:2,14 31:16,19,23 32:14 33:7 35:20 38:14 111:21 123:9,13 124:18
**believed**
147:5,8,9
**bell**
190:2,7,12,21
**benefit**
137:3 153:6 158:8, 10,24
**benefits**
133:13 137:22
**Bennett**
167:7,13
**Bensinger**
3:8 4:3,10 48:17 49:18 52:22 78:3 84:25 89:17 90:6 93:3 112:16 114:1, 14,23 115:9 132:19 134:3,15,17 138:20 178:10 196:14 198:8
**Bensinger's**
92:22
**bet**
183:11
**Beverly**
3:19
**big**
153:9
**bill**
62:12,14 78:5 89:16 132:19 134:2
**billed**
62:13 80:17,22
**billing**
80:21
**bills**
80:12,14,15
**biostatisticians**
43:1,3 45:25 192:8
**birth**
92:16
**birthplace**
18:17
**bit**
14:22 63:10 117:23
**black**
154:22 169:22 170:2
**bladder**
63:18 70:19
**blanket**
179:13 198:2
**blood**
44:14 45:17 46:15 135:7 136:9,10,11, 16 143:10 145:20, 21 146:9,10,12 166:3 191:7,9
**board**
22:7 39:25 92:23 93:11,14 109:13,24 113:13 114:24 136:20 173:3 193:21 194:1
**boards**
38:16,20,22 39:3 109:19 112:17 113:15 114:4,6,15 115:7 127:19 136:24 173:6
**Boccia**
90:22
**Bock**
87:24
**body**
145:8,14 146:6
**bona**
17:23
**bone**
41:16 49:17 145:16, 19,20,23 146:5,11 161:4
**bore**
57:22 58:2,5,16
**bother**
86:5,9 194:15
**bottom**
25:5 93:7 95:12 96:14 124:14 138:8
**bought**
31:20
**bowel**
138:17
**box**
154:22 169:22 170:2
**boxes**
111:23
**Braden**
89:6
**brain**
63:21 70:22 73:1 158:19 159:12,15, 19,23
**brands**
193:11
**break**
40:15 52:14,16 97:3,5 134:7,9 175:2 178:4
**break-through**
149:24
**breakdown**
97:23
**breakthrough**
157:8
**breast**
63:24 70:25
**breathing**
151:25

**Brian**
84:8,17 183:13
**Bristol-myers**
32:1
**British**
43:16
**broad**
131:17 146:22 174:10
**Brooks**
3:22
**brought**
9:12 33:11
**Brown**
3:19
**bucket**
110:21
**buckets**
108:11
**budget**
50:23
**build**
16:3
**bulk**
24:6
**bullet**
183:19
**bunches**
173:12
**burden**
164:21
**Bureau**
109:25 112:17 113:16 114:7,16,25 115:8
**bureau'**
120:19
**Bureaus**
120:5
**buried**
58:15
**Buschner**
3:21,22 4:11 56:8

**C**

**calculus**
153:10
**call**
34:12 151:24
**Callahan**
194:23
**called**
4:3 7:5 19:16 28:18, 19 31:6 44:23 55:1 107:1 120:19 164:4 165:2,23 166:21 170:17 176:13
**Calls**
87:7
**cancer**
7:20 15:1,3,4 20:10, 17 26:7,24 31:10 47:5,14,19 63:18, 21,24 64:2,5,8 67:1, 21 68:14 69:18,23 70:1,4,7,10,13,19, 22,25 71:2,4,6,14 72:10,12 73:1 75:7, 10 121:21 123:20 124:2,18 125:17,21 145:4,5,6,11 146:4, 16,20 147:13,14,17, 19 148:3,9 149:10, 13,19 152:21,25 153:3,4,7,10 158:19 159:12,15,19,23 187:6
**cancer-related**
25:25 27:6
**cancers**
195:25
**candidates**
154:10
**canned**
132:19
**capacities**
27:10
**capacity**
5:10,14 27:4 107:6 190:1
**caption**
5:17
**cardiac**
143:12 148:6
**Cardizem**
138:13
**care**
123:20 146:13 153:23
**careful**
62:9
**carefully**
92:9
**carfilzomib**
23:1 31:6,9,17 135:2 165:5
**case**
3:14,19 5:8,17 6:24, 25 7:3 8:4,5 9:9 11:17,21 18:6 39:16 55:3 77:5 83:3 93:24 97:20 127:4 140:19 142:17 151:8 162:19 170:6 178:14 189:1
**cases**
7:18 9:17 51:10,14 96:10 143:12 180:13 188:1
**catch**
19:25 21:5
**category**
20:23 85:1,4 175:20 197:25
**caused**
35:25 140:8,11 141:15 143:8
**Cavanaugh**
77:11,12,14 78:2,5 87:23 90:7
**Cavanaugh's**
78:25
**CC-5013**
57:5,8 94:15,20 96:12 138:9
**cease**
86:23
**CELBRN2310082**
53:12
**CELBRN2310085**
53:24 55:22
**CELDOJ0767155**
181:3
**Celgene**
3:14,24 12:3 27:9, 14 29:1 32:18 34:3, 8,15,20,23 35:20 36:1,6,7,11,13,20, 25 37:2,20 38:11, 14,15,17,21 39:12 40:16 41:11,24 42:22 43:1,5,19 44:2,20 45:8,12,21, 24 46:4,16 47:3,4, 18,23 48:7,13 49:10,21,22 50:7, 16,23 51:3,4,22 54:4,7,21,25 55:10 57:20 58:14 62:3 77:20 78:23 79:11, 19 84:16 86:3,5 87:6,13 88:25 93:15 97:19 98:4,12,25 100:3,10,13,14,18 101:1 107:20 109:8, 15,22 111:1 113:12, 14 114:2 115:17 121:10 123:9,13 124:19 125:18 126:11 130:8,10 131:11,16 133:19, 23 136:4,25 157:10 172:16,19,23 173:8 176:21 177:2 181:6 182:3 183:6 189:25 192:11,14,18,19 193:14 194:7
**cell**
15:14 41:6 67:24 69:9 75:12 96:10 136:16 144:24 145:1,24 153:12,14, 18 180:11 187:6
**cells**
145:5,8,20,22 146:1,2,8,10,12 147:13 150:18,20, 21,22 153:17 161:3 165:23
**center**
8:5 15:4 20:17,21 21:19 43:4 47:5,7,8, 14,19 48:21 50:23 86:25 119:6 123:19 124:2,18 125:17,21 126:3 184:23 185:12,14,25
**Center's**
124:10
**centered**
8:6
**centers**
47:8
**central**
139:21
**certainty**
192:7
**certificate**
138:19
**Certified**
199:5,20
**certify**
199:5,14
**certifying**
116:12
**cervical**
64:2 71:2
**Chain**
108:18
**chair**
22:10 106:7,11 108:9
**chair's**
22:4
**chaired**
106:20
**chairman**
26:4 105:18,21 117:7
**chairpersons**
106:3
**challenges**
193:7
**Chanan-khan**
173:14,21
**chance**
129:18 135:7
**change**
16:5 23:14 28:4 61:22,24 112:23,24 159:8 176:4
**changed**
103:20 108:12 110:22 158:25 159:4
**characterization**
25:20
**characterize**
118:22
**charge**
30:18 105:3
**charged**
59:18,21
**charges**
16:24
**Charles**
167:6
**check**
182:2
**checked**
18:1
**checking**
11:10
**chemotherapeutic**
145:17 147:3
**chemotherapy**
145:25 146:4,14,15, 17,20,23 147:1,6 158:7
**chemotherapy,'**
166:19
**chest**
152:1
**chief**
79:10
**Chin**
89:5 92:22

**choice**
173:18
**chronic**
64:14 66:14 71:11 170:11
**chronologically**
63:5
**Ciprofloxacin**
26:16
**circulate**
146:10
**circumstances**
51:17 120:14 134:2
**circumvent**
145:24
**cite**
166:19,20
**citing**
168:18
**claims**
16:24
**clarify**
20:13
**clarifying**
189:14 196:9
**class**
33:1 147:6 165:6, 16,22,24
**classifies**
175:20
**clear**
4:21 69:16 80:8 102:22 108:3 127:10 159:11
**Clinic**
91:11 128:4
**clinical**
16:14 20:10 25:23 27:4,9 42:1 51:13 54:16 78:15,17 85:1 109:12 113:11 114:2 137:13 175:14 176:3,7 183:9 196:5
**CLL**
73:5 84:19 170:9, 10,14,15,18,24 171:5,8,25 172:8,18 173:1,5,8,9,10,16, 19,25 174:12,17 175:13 176:2,6,15, 23 177:3,10,11,12 194:20 195:3,7,23 196:4
**close**
129:5 134:7
**closed**
85:25 88:23
**clots**
135:7 136:9,10,11 143:10 166:3
**CMS**
116:12,16,19
**co-chair**
25:25
**co-chairman**
25:23 27:4
**Co-op**
193:20 194:1
**coach**
33:1,2
**Cocilovo**
90:7
**coffee**
96:25
**colleague**
50:5 83:14 88:2 173:11
**collect**
146:1
**colorectal**
64:5 71:4
**Columbia**
9:21,25 10:18,21 20:2
**combination**
43:7 48:10 69:4 72:2 74:7 91:21 142:18 148:17 158:6 162:22 164:3, 6 169:24 170:5
**combinations**
147:19,25 149:18 150:19 164:2,4
**Comm**
91:6
**comment**
58:11
**commentator**
120:24
**comments**
44:19
**commercial**
120:20,25
**committed**
192:19
**committee**
20:22,24 21:23 106:3 117:8
**committees**
50:25
**common**
37:10 137:5 171:9, 15 183:12
**commonly**
120:19
**communicated**
37:1
**communication**
52:8 87:5
**communications**
76:16
**community**
129:10,11 143:25 146:23
**companies**
26:24 27:3 30:25 31:1,22,25 32:7 37:21 85:23 99:18 103:20 107:5 109:1, 14,21 110:20 115:16 116:3 125:3 129:4 130:9 131:11, 16 182:10,13,21 183:1,2,4,12
**company**
27:20 28:1 40:11,14 45:2,3,5,7 87:5 98:25 117:9 120:12 130:17,21 131:18 132:20,25 149:25 171:16 184:14 188:2
**company's**
134:4 136:25
**compare**
152:20
**compared**
96:12 158:1 186:14
**comparison**
154:25
**comparisons**
96:11
**compendia**
14:5 60:2,3,8,14,17, 19,23,24 61:3 62:9, 20 63:11 82:8 83:7 116:7,12,19 117:11, 13,21,23 118:6,10, 13,14,16 122:1 158:4 174:3 178:10, 15,18 182:19,22 186:1,7,9,25 187:3, 8,11,19 188:6,14,22 197:10,11,17
**compendium**
121:20 176:4
**compensate**
24:23
**compensated**
24:4,11,12,14 25:6, 11,15 30:20
**compensation**
25:2,17 60:7 61:19
**competitor**
193:10
**competitors**
193:9
**compilation**
108:25 131:2
**complain**
166:9
**complaint**
63:14
**complete**
10:9 48:6,12 84:11 104:20 105:14 133:12
**completed**
49:3 81:3,6 90:11 105:16 142:20
**completely**
165:24
**completion**
199:15
**complex**
180:4
**compliance**
121:11 125:5
**complicated**
8:5
**complication**
168:15
**compliment**
144:12
**component**
117:21,22
**Comprehensive**
20:9,17
**concern**
176:15
**concludes**
198:7
**conclusion**
6:3 87:8 139:23 197:17
**conclusions**
76:16 87:10
**Concomitant**
138:15
**conditional**
174:13
**conditions**
7:8,20 96:9
**conducted**
43:11 46:24 47:4,6, 7 50:8,9 123:19 143:4
**conducting**
123:13
**conference**
159:17
**confidence**
126:24 178:21
**confident**
126:20
**confidential**
76:24 125:25
**confines**
77:5
**conflict**
103:8 104:10 105:15 116:13,25 119:1,3,7,14,23 124:6,10 127:12,15 128:12 129:6
**conflicting**
106:8
**conflicts**
102:1 103:4,7 104:20 105:4,12 106:12,17 117:4 129:3
**confronted**
179:2
**confusing**
117:11
**Congress**
181:7
**conjunction**
39:14,17
**consent**
8:8,13,15,19 133:7, 10
**consequences**
136:11
**consideration**
56:20
**considerations**
84:19
**considered**
37:24 76:24 158:14

173:16 193:18 196:17

**consult** 151:17 186:5

**consultant** 26:21 27:9 109:20 112:17 113:13,15 114:4,6,24 149:21

**Consultants** 109:25 114:16 115:8

**consulting** 178:18

**content** 89:1 120:15

**context** 82:15 147:16,17 179:15

**continued** 107:10,16

**continues** 175:25

**continuing** 18:13

**contract** 50:22 186:24

**contracted** 98:25

**contractor** 98:4

**contraindicated** 172:8 174:2

**contraindication** 174:9

**contrast** 152:14

**contribute** 191:17,22

**contributions** 130:1

**control** 120:14 153:4

**controlled** 27:19 138:12 176:3,7

**controlling** 145:11 153:6

**convene** 38:24

**convened** 38:21 39:15 93:14 173:9

**convey** 94:13

**copies** 60:24 61:1 89:18 115:19

**copy** 58:25 60:8,9,14,16 104:9,10,12,13,15 185:1,13,16

**corner** 54:16 124:14

**Corporation** 3:14,24 123:14

**correct** 10:2 18:19 19:7,19 21:1 25:19 26:2 49:20,23 56:16 57:2 94:3 96:17,20 98:12 109:17,18,22 110:3,12,13 113:17 121:25 122:6 135:21 142:8 152:19 154:7 155:11 173:22 181:20 199:10

**corrections** 192:2,4

**corticosteroids** 158:7

**costs** 11:4

**Coumadin** 169:7

**counsel** 3:8,16 83:13 199:12

**counseling** 186:10

**count** 13:6 136:15

**country** 47:9

**counts** 166:8

**COUNTY** 199:3

**couple** 7:18,19 41:22 52:15 99:13 141:10 169:17 170:25 171:2 189:13 196:9

**court** 3:25 4:15,16,18 6:20 9:15 199:5,20

**covered** 69:21 76:16 108:1 193:5

**covers** 88:12 174:9

**Cox** 90:8

**CR** 199:14

**CRA** 48:16,17 49:18

**created** 108:11

**critical** 193:7,11

**CRR** 199:20

**cultures** 96:10

**cup** 96:25

**cure** 147:14,17,18 149:10 150:7,14 153:2

**cured** 147:20 148:3,9 149:19 161:5

**cures** 152:2

**current** 19:17,21,22 23:12,14 38:22 49:5 103:21 108:2

**curriculum** 58:25

**customarily** 98:22

**customers** 193:8

**cut** 5:18

**CV** 17:20,22,25 18:1,4,8,10,14 19:1 48:2,4 128:3

**cycles** 135:3

**cyclophosphamide** 43:8 48:10

**cytogenics** 89:10

**cytokine** 95:14

**D**

**D.C.** 5:9 10:4 11:3 18:20

**damage** 145:8,18

**damaged** 145:21

**damages** 5:22

**damaging** 145:4

**dangerous** 155:1

**data** 27:20 29:12,22,24 38:22,25 42:3 54:18 88:13 89:8 91:18 137:1 147:10 148:10 156:21 159:7,8,9 162:24 179:21 187:20,22,25 188:4,5,12 189:4,8 192:3 193:9,10

**date** 3:5 11:5 31:15 47:24 49:5 66:6 69:11 81:5 138:13,14 139:18 164:15 168:13,19,22

**dated** 78:2 80:24 90:10 102:23 112:12

**dates** 21:3 60:2 81:10 155:23

**David** 190:21,23

**day** 14:23 75:23 76:4 80:13,16 186:24

**days** 82:21 138:16 146:11 199:15

**deal** 28:20 157:23

**dealing** 129:5

**dealt** 26:6 27:3 36:10,18,20 78:22

**Dear** 88:2

**death** 136:1 138:19,21 140:6,8,12,16 141:11

**death's** 195:19

**deaths** 135:11 141:5,14,15,22 142:21 143:1,8,19 144:6 176:12,15,18,20

**decade** 163:22,23

**December** 3:1,5 102:23

**decide** 23:13 29:15,25 39:21

**decision** 10:15

**deck** 27:19,21 28:3,7,9,11

**declined** 35:18

**dedicated** 27:19

**deemed** 107:16

**deep-vein** 166:14,17 167:2,9,14,18 168:5

**defects** 92:16

**defendant** 6:7 9:17

**defendants** 6:9,15

**define** 37:21 90:13

**definition** 82:11

**definitively** 148:4

**degree** 145:19 164:20 186:3

**Deline** 3:23 14:12 83:12,13

**deliver** 183:16

**delivered** 88:3

**demographics** 171:11
**demonstrated** 175:15
**denied** 141:2,3
**department** 116:6,17
**depend** 174:10 178:2,24,25 179:1,2 195:15 197:25
**depended** 169:3 174:14
**depends** 39:7,13 74:11 82:15 137:11,13,17 155:4, 5 179:23 180:5
**deposed** 5:1 9:9
**deposing** 65:8
**deposition** 3:7,13 4:13 6:19 52:21 78:20 125:20 133:16 134:14 198:7,11 199:6,10, 15
**depositions** 6:20,22
**depression** 138:14
**derive** 158:8
**description** 59:15 82:25
**designed** 40:11,13 120:12 146:4
**destroy** 146:4 150:17
**destroys** 146:5
**detail** 63:8 196:24 197:2, 12
**detailed** 60:1 62:8
**details** 7:21 141:25 143:5 172:2,4 178:25 179:12,24 197:4
**determination** 61:18 110:22 197:20,22
**determine** 57:4 59:24 142:3,4 178:16 187:12
**determined** 61:16 101:1
**detriment** 152:10
**develop** 136:12
**developed** 106:2
**development** 129:9
**deviate** 28:10
**dex** 48:10,11 72:2 74:7 85:3 149:2 167:21 168:1,5 169:25 170:5
**dexamethasone** 43:8,9 69:5 91:22 135:2 142:18 148:23 149:3 150:14 166:4
**diagnose** 5:23 7:19 118:21
**diagnosed** 43:9 73:25 176:13
**diagnosis** 174:10
**die** 135:14,15 148:5 151:8
**died** 134:20,21,25 135:4, 12 136:2 170:4 195:23,24
**differed** 103:23
**difference** 117:20 153:9 157:4 159:5 165:8,14,17 166:1
**differently** 147:5,8
**difficult** 186:4,6
**dire** 134:1
**direct** 84:21 124:21 166:11 181:13
**Directing** 105:25
**direction** 199:7
**directly** 42:5 120:25
**director** 15:13
**disagree** 132:6,14
**disagreement** 189:7
**Disc** 52:21 134:14
**disciplinary** 16:25
**discipline** 16:17,21
**disclose** 52:12 54:4,7,21,25 55:10,15 77:4 87:16 99:25 103:25 107:5 117:3 123:7 125:16 126:2 127:18 131:8
**disclosed** 46:12 58:14 76:25 99:6,9,24 103:19 106:6 107:12,13 110:19 116:2 127:19 133:22 134:1 143:23
**disclosing** 51:20
**disclosure** 52:3 102:1 107:2 112:10,12 113:23 114:13,22 115:7,18, 22 125:22 126:20
**disclosures** 50:10 104:20 108:20,25 110:6,9, 16 112:25 115:19
**discomfort** 166:9,10
**discuss** 29:24 38:22 39:11 85:21 93:4 173:9
**discussed** 29:5 30:2 78:19 90:1 105:8,12 109:8 137:2 195:16
**discussion** 106:8 173:4 192:4
**discussions** 105:17 136:20 137:1
**disease** 20:22 60:4 62:22 65:20 118:1,22 137:14 145:2 148:6 150:23 151:6,9 156:4 161:2 163:18 171:9 177:15 178:25 179:10 180:3 195:17 197:19,21,24,25
**disease-free** 153:21
**diseases** 7:20 62:21 66:2
**dispute** 98:13
**disqualified** 107:23
**Distinct** 195:3
**distribute** 104:14
**distributed** 92:11 111:4
**distribution** 91:25 92:4
**District** 9:20,21,25 10:17,21 19:21 20:1
**Division** 15:23
**doctor** 11:12 28:14,25 33:12,20 54:8 55:11 56:10 65:8 79:23 80:1 110:8 134:2 146:19 151:16,23 152:6 177:11 178:15
**doctor's** 33:11,19
**doctors** 29:7,19 33:21,22 34:21 36:4 53:1 94:2 130:6 132:18, 21 167:23 178:17
**document** 11:14 53:9,14 57:23,25 76:2 77:2, 5,7 80:10 83:10,20 85:17 87:3 88:21 97:22 102:4,6,9,14, 20,23 106:1 108:17, 22,24 111:9 119:12, 16,19 123:5 124:7, 12 128:8,16 130:16 159:21 181:2,3 184:21,24,25 185:3, 8,11 191:6 192:18, 24
**documents** 13:21 22:5,6 83:3,8 97:18,20 98:1
**dollar** 103:20,22,23 108:12 127:15,20
**dollars** 11:4 125:17 126:11 127:22 132:24 134:3
**Donald** 199:20
**door** 81:23 85:25 195:19
**dosage** 152:10
**dose** 151:21
**doses** 145:10,11,12,18 146:3
**dosing** 151:12,15,18 152:16
**doubt** 184:16
**Doxil** 23:1,3 165:2
**dozen** 36:19 73:21
**dozens** 26:14 74:3
**draft** 12:7,9,12,15,17 13:5,17,19 58:11,13 129:18,20,23 130:16 192:5
**drafted** 129:12,14
**drafting** 57:22 58:5
**drafts** 14:1 44:18,21
**drawn** 139:24
**dropped** 9:3
**Dropping** 25:5
**drug** 7:5,7 8:8,11,16 29:16,25 30:9 31:6,

10 41:9 62:22 63:12 66:18 69:5 74:4 83:4 91:19 92:8,10 96:3,6,19 117:16 132:20,25 134:18 135:6,15 136:7,12 137:18,19 138:22 139:19 140:9,14 141:22 145:6 146:19 147:12 149:24 150:3 151:6, 14 152:12,15 153:2 156:20 157:1,7,22 158:2,6,24 162:16, 22 163:14,16,17 164:10,17,22,25 165:2,4,19,24 166:4 169:24 170:17 171:16 174:2,12,21 176:14 177:3,14,16 178:18,22 179:3 182:10,13,20,25 183:2,4,11 184:14 187:24 197:23

**drug's**
41:7

**Drugdex**
61:8 159:6,25 160:3 175:11,19,25 180:10,19,24

**drugs**
8:10 22:20,24 23:16 26:8,10,18,19,22, 23,24 27:3,14 28:20 30:25 31:4,19 40:8 72:2 74:7 85:21 90:2 117:17,24 118:1 126:14 129:9 132:11 134:4 135:1 136:25 137:3,5,7 145:3,5,10,12,18 146:7,17,21,24 147:3,4,6,7,20 148:17,20,21,22 149:4,19 150:5 151:3,5,7,23 152:9 155:4,5,6 162:21 164:1,8 165:6,16,22 169:24 170:19 177:13 178:11,16 186:10 189:4 195:25

**due**
37:22 141:21

**duly**
4:5 199:8

**Dunne**
3:23 13:24 14:17 20:4 25:18 29:9,21 31:7 38:3 46:5 50:12 51:15 52:13 53:15 54:11 55:18 56:5,10,13,16 58:18 60:18 66:22 82:4,13 83:25 87:7 92:5 94:6,10 97:5 99:21 100:6 101:9 102:15, 22 103:1 105:9 106:22 107:25 110:10 111:7 116:21 117:2 118:11 121:13 122:10 123:2,15 125:6 126:1 127:1 130:18,23 131:1,23 133:1 134:7 139:25 140:17,22 142:22 143:15 144:1 149:11 150:1,9 152:18 156:11 157:13 160:13 161:10,16 163:14 165:10 168:12 169:9 171:18 172:10 174:5,18 175:1 177:4 178:23 182:4 183:23 185:2, 5,7 186:11 187:4,15 188:16 189:13 191:1 193:15 194:3, 9,16 195:12 196:9, 13,19,20 197:16 198:4,10

**durable**
148:2 180:13

**duties**
23:10 77:21

**DVD**
85:4

**DVTS**
169:4,23 170:4

**E**

**e-mail**
53:10 77:25 78:2 79:2,6 84:7,11,13, 17 87:22 89:5 90:6 91:5 92:21 104:19 137:25 138:1 139:12 141:6

**e-mails**
24:2 191:6

**e.g**
158:7

**earlier**
56:24 78:20,21 132:4 151:11 154:1 162:24 167:21 191:20 193:17 196:14

**earliest**
162:10

**early**
44:5 101:20,21 154:6 156:20,25 157:20 164:7,12 168:10,15,19,22 170:16 189:3,4

**east**
30:17 32:12

**edit**
58:11 129:16

**edited**
192:1

**editing**
42:24 43:24 44:18, 21 130:3

**editor**
128:4,11,22,25 131:8

**edits**
13:15 81:25 192:12

**educating**
36:3

**education**
18:13 129:9

**educational**
24:24

**effect**
164:20 184:15 196:1

**effective**
54:17 124:15 145:11 151:14,15, 21 195:7 199:21

**effectiveness**
55:5,12 151:19 156:21

**effects**
145:17 158:9

**efficacy**
41:7 55:4 57:4 96:3 137:3,8,10,16,20 142:5 158:8 164:20 175:19 191:11

**efficacy,'**
176:1

**Eichert**
36:13,17,18

**either/or**
151:1

**electronic**
13:8 185:13

**Electronically**
12:18

**elementary**
82:21

**elevated**
168:24

**eligible**
85:3 101:2,3

**embarked**
186:25

**embolize**
143:11

**embolus**
134:25 135:5

**emergency**
5:12,19 10:7,8

**emeritus**
16:12

**employed**
199:12

**employee**
199:12

**enclosing**
138:1 191:6

**end**
40:11 98:23 128:19 156:21

**endeavor**
154:5

**endpoint**
175:17

**engaged**
45:5

**engagement**
59:3 120:18

**engagements**
27:13,16,17 59:1

**England**
160:19 161:21

**enjoying**
148:11

**ENL**
64:22,24,25 65:3

**enrolled**
191:19,21

**entire**
142:24 185:2,8

**entitled**
191:10

**entity**
44:23 99:9 100:11 120:20,25 130:21

**entries**
63:12 83:17 197:18

**entry**
158:4,17,18,20,22 175:12,14,22 176:1, 4 180:8

**Envision**
91:6 98:5,25 99:3, 20 100:11 123:9

**equate**
197:19

**equity**
51:3

**error**
19:20,25 21:5

**esophageal**
64:8 71:6

**essence**
5:18

**essentially**
59:10,12,13 148:4 164:7

**established**
195:6

**et al**
166:16

**ethical**
8:20 35:5

**ethics**
35:6,8,9 105:1,7,8

**evaluate**
63:11

**evaluation**
19:11

**event**
91:9 120:24 121:1,2 134:20 136:3 139:15,20 140:4,6, 13 176:21 181:18

**events**
49:25 136:6,19 138:7 139:13,17 157:21 181:22

**eventually**
57:16 150:22 151:3

**evidence**
25:18 31:7 50:12 54:11 55:18 58:19 66:22 82:4 85:2 100:6 106:22 117:19 118:4,25 123:3,16 126:1 133:2 140:17 158:18 175:20,25 186:11,19,20

187:16 194:9,17
**evolve**
108:8
**evolved**
58:10 103:24 108:10 170:15
**exact**
21:3 22:15 30:4 31:15 47:24 62:2 68:4 69:11 78:19 147:11 151:15 155:16,23 156:6 165:21 168:13
**examination**
199:6
**examine**
40:11 199:14
**examined**
5:19
**Examiner**
19:2
**examining**
41:3
**Examples**
120:16
**Exams**
19:16
**excellent**
135:4
**exception**
163:5,7
**exceptions**
163:2 179:5
**Excerpta**
44:23 45:14,18 57:21
**exclusively**
47:6
**excuse**
87:13 89:11 100:8 124:22 164:5
**executed**
61:25 76:8
**exhibit**
11:8,13 17:4 53:5,6, 8 58:23,24 59:1,2 66:12 75:19,20,22 77:3,22,23,25 79:3, 4 80:6,10,24 83:11 84:2,4,6 87:19,21 90:4,6 91:3,5 92:18, 19,21 97:14,15 101:22,23,25 108:14,15,17 112:8 113:5,9,21,24 114:11,13,20,22 115:4,6,14 119:8,10 120:4 121:18 123:23,24 124:1 127:6,8,25 128:2,8 130:25 137:23,25 157:18 160:17 180:25 181:2 183:14,22 184:18, 20 191:3,5 192:16, 18
**exhibits**
17:17,19
**existence**
77:4
**expansive**
186:10
**expected**
8:25 193:9,10
**expense**
11:4,7
**expenses**
33:4
**experience**
157:20 163:3 188:11
**experienced**
134:19
**expert**
5:14 6:25 7:1,19 11:17,18 59:1 65:9, 17 76:18 96:23 108:20 109:20 113:14 114:4 153:11 157:14 165:11 173:16 187:2,5,8
**expertise**
28:15 59:19
**experts**
14:19 38:25 173:9, 10
**explain**
21:4 49:4 86:2 125:4 145:1 158:21
**exploring**
166:13
**extent**
76:18 105:14 145:7, 16
**external**
106:5 107:2
**extra**
10:8 60:5 61:19 62:14

**F**

**face**
36:5 172:17 197:11
**fact**
22:12 117:16 122:19 123:11
**factor**
95:7
**factors**
101:8,13
**facts**
14:17 187:16
**faculty**
15:21 120:11,14,17 132:5
**failed**
5:20 177:13
**failure**
5:22 8:13
**failures**
7:19
**fainted**
138:17
**fair**
5:1 18:23,25 53:3 123:22 135:1 142:12 167:12,16 168:21
**fairly**
27:18 48:12 63:2 168:14 171:15
**Faleck**
138:2
**fall**
80:18,19
**false**
25:7 110:3 111:5
**familial**
138:14
**familiar**
65:4 107:1 124:3,7, 23 127:8 128:8 166:21 194:4
**familiarize**
105:22
**family**
141:4
**fare**
32:23
**fashion**
7:20 157:1
**fast**
157:4
**fast-track**
157:3
**fatal**
136:11
**favor**
175:19
**favorable**
175:15
**favors**
176:1
**FDA**
27:25 31:12,14 64:21 66:10,18,23 68:23 73:17 142:9, 14 143:13 149:5 155:9,13 156:9,12, 16,20,22,25 157:7 171:24 172:6 174:1, 3 177:9 187:23,25 196:3
**FDA-APPROVED**
176:5
**February**
54:3 138:10,17
**federal**
9:15 19:2
**fee**
24:15 30:20 34:1
**feedback**
39:1
**feel**
87:3,12,16 126:16
**fell**
138:18
**fellowship**
144:21
**felt**
11:3 24:23 36:2,3 60:6 61:18 82:1,9 129:2,7 138:21 197:6
**fibrillation**
138:12
**fides**
17:23
**field**
10:11 37:7,22 101:4 167:20 190:17
**filed**
5:11 16:24
**files**
179:22
**fill**
103:8 107:7 111:23
**filled**
103:18 110:6,7,13, 18,23 111:17,19,20, 23 112:23 115:18, 21,23,25 143:1
**final**
6:3 142:1
**financial**
107:12,14 124:23
**financially**
199:13
**find**
7:14 53:16 175:25 182:16
**fine**
13:25 52:16
**finger**
5:18
**fingers**
122:25
**finish**
10:15 110:10
**finished**
49:6 189:11
**firm**
3:22
**firms**
7:22
**first-line**
154:9 162:17
**five-drug**
164:5
**flip**
58:23
**Flipping**
53:24 55:22
**Florida**
24:9
**flown**
37:15
**fluconazole**
26:16
**fludarabine**
170:17
**fly**
32:24
**focus**
28:17 84:6,12 141:23 187:7
**focused**
89:15,17 173:7
**follow-up**

157:25 158:2 180:16
**follow-ups** 148:12
**Foon** 194:23
**foregoing** 199:6
**foreseeable** 11:2
**forgetting** 185:24
**forgotten** 197:5
**form** 8:7,8,10,11,16 13:5 15:7 24:5 65:14,16, 18,22,25 86:20 87:17 103:9,17 107:2,5,7 110:18 146:13 156:10 165:2 170:12 191:18 196:18
**formal** 15:11 16:9
**forms** 8:9 105:15 111:20 145:4
**formulation** 7:5
**Forty** 154:15
**found** 135:5 136:2
**foundation** 53:15 55:19 58:18 92:5 94:6,10 101:9 102:15 107:25 111:7 116:21 118:11 121:13 123:15 130:18 131:23 133:1 142:22 150:1 156:11 157:13 168:12 183:23 187:15 188:16 191:1 193:15 194:3, 10,16 195:12
**fourth** 122:7
**frame** 108:1 125:6 156:2
**franchise** 192:21 193:1,5,10
**Franchises** 194:21
**Francisco** 24:10
**Fred** 8:4 15:1,2,4 21:19 43:4 47:5,7,13,18 50:9,11,16,19,22 51:20 84:25 86:25 119:6 123:19 124:2, 18 125:16,21 185:25
**free** 24:22
**freezer** 146:8
**friday** 88:4
**friend** 37:2,9
**front** 11:12 40:21 97:17 119:10 132:1 192:22 195:16
**front-line** 156:1
**frontline** 85:2
**frozen** 146:2
**full** 199:10
**fund** 40:16 42:4
**funded** 41:11 42:1 43:6 47:4 48:13 49:2 120:25
**Funding** 48:3,16
**future** 11:3 56:20

G

**GAP** 54:24 55:1
**gather** 18:20 19:5 32:13,23 76:5,12 93:23 99:3 139:15
**gathering** 141:12
**gave** 61:1 83:4 93:16 104:3 115:15 186:19
**general** 89:25 91:10 117:25 156:23 163:9,11 179:4
**generalities** 155:3
**generality** 162:19,25 163:1,7, 17 179:5
**generalizations** 155:7
**generally** 22:23 24:2 52:10 145:18 146:23 156:24,25 197:10
**generated** 40:10 54:9 162:24
**generating** 54:9
**generation** 165:6
**genesis** 85:18
**gentamicin** 26:17
**genuine** 189:7
**GHK** 3:14
**GI** 166:8,10
**Gill** 84:8,17 183:13
**give** 16:10 18:11 19:5 26:15 30:11,14,18 31:22 32:18 34:3,13 35:25 61:12 74:13 100:10,13 118:23 132:19 133:12 146:9 152:11 153:2 156:20 159:18 172:13 177:7 178:11,16,21 179:13 181:18 198:1
**giving** 97:17 100:17 115:11 132:23 172:24 187:24
**glass** 5:19
**glioblastoma** 158:23
**go-to** 173:18
**goal** 153:4
**gold** 186:14
**good** 4:10 7:8 36:22 97:7 134:9 153:19 154:16 172:9
**Governance** 106:2
**Government** 116:7
**grab** 96:25
**great** 32:16 90:12 92:15 182:24 189:22
**greater** 107:13,14 145:16, 19 153:7
**group** 16:4 20:18 21:23 33:21 38:24 94:13 159:6 171:6 173:9
**groups** 147:23
**grow** 146:12
**guess** 8:12 18:23 40:3 80:13 120:10 157:8 163:21 167:22 171:19
**guidance** 106:2 118:23 178:11
**guideline** 105:19 184:11
**guidelines** 20:10,20,24 21:22 22:6,10,21 23:2,12, 14,15,17,19 25:23 26:5,6,8 27:5,25 28:3 85:15 88:4,9, 14 89:2 101:15,18 106:4,6 107:10,11, 15,16 109:7 117:7, 12,14,15,17,18,21, 25 118:5,9,13,19,20 121:21 154:11,12, 20 184:13
**Guttman** 3:18,22 4:9,11 11:9, 11 14:2,18 20:5 25:21 29:17 30:1 31:8 38:5 46:8 50:14 51:18 52:15, 23 53:5,7,16,18 54:13 55:21 56:7,18 58:20,22 60:20,21 66:21,24 75:19,21 77:22,24 79:3,5 80:5,7 82:10,17 84:2,5 87:11,20 90:3,5 91:2,4 92:6, 18,20 94:7,11 96:25 97:4,7,12,16 99:22 100:7 101:10,22,24 102:18,25 103:2 105:10,11 106:25 108:5,14,16 110:15 111:11 112:7,9 113:6,22 114:12,21 115:5 116:23 117:5 118:15 119:9 121:17 122:13 123:6,17,22,25 125:9 126:4 127:5,7 128:1 130:20,25 131:3,6 132:2 133:5 134:9,16 137:24 140:3,20,25 142:25 143:17 144:5 149:14 150:6,10,13 152:22 156:14 157:16 160:15 161:12,18 163:19 165:13 168:17 169:13 171:21 172:14 174:15,23 175:3,4 177:8 178:4,9 179:7 181:1 182:7 184:2,19 185:15 186:15 187:9,18 188:18 189:10,19 191:4 192:17 193:16 194:6,12,19 195:18 196:7,18 198:5
**guys** 11:9 189:12

H

**habits** 38:2
**Half** 36:19
**Hampshire** 18:18
**hand** 129:5
**handle** 185:19

**hang** 144:17
**happened** 25:20 78:9,14 111:10,12,13 135:23 161:15
**happy** 152:7
**hard** 65:6 186:13
**harder** 62:11,16
**harm** 145:8 152:16
**hazards** 157:21
**head** 21:22
**Health** 10:5 116:6,17
**heard** 38:6,9 44:23 57:13, 15 77:12 133:6 159:17 190:4 193:1, 3
**hearing** 137:7 194:11
**heavy-dose** 145:25
**held** 23:10 39:14
**helps** 145:2
**hematologic** 37:7 144:23 180:8, 14 181:7 187:7
**Hematology** 43:16 183:1 192:21 193:1
**heparin** 169:8
**Herbert** 138:1
**hereto** 58:25 59:2 199:12
**hesitate** 172:12
**high** 92:9,12 146:3 169:2
**high-dose** 164:6
**high-risk** 89:10
**higher** 59:15 62:5 101:2 145:10,18
**higher-up** 77:19
**highest** 85:1
**highly** 71:25
**histology** 156:4
**history** 167:22
**Hollywood** 24:8
**home** 81:13 135:4
**hone** 146:11
**honorarium** 39:2,5
**hope** 151:20
**hospital** 5:12,16 6:10 16:1,3, 7
**hospitals** 20:18
**hotel** 32:21
**hour** 52:14 59:4,7,16 61:16 62:4 97:6 175:1
**hours** 59:3 62:12,13,14,15 81:14
**Hugin** 87:23
**Human** 116:6,17
**humans** 51:12 96:15
**hundred** 42:19
**hundreds** 11:4 68:15,17
**Hutch** 48:24 84:25
**Hutchinson** 8:5 15:1,2,4 21:19 43:4 47:5,7,8,14,19 48:21 50:9,11,16, 19,23 51:21 86:25 119:6 123:19 124:2, 10,18 125:16,21 126:3 184:23 185:11,13,25
**hx** 138:11
**hypothetical** 174:5,18 178:23 179:9
**hypotheticals** 177:25
**hypothyroidism** 166:14

**I**

**ibrutinib** 170:21
**idea** 47:3 83:22 85:18 86:4 88:22 117:3
**idelalisib** 170:22
**identification** 11:8 53:6 75:20 77:23 79:4 80:6 84:4 87:19 90:4 91:3 92:19 97:14,15 101:23 108:15 112:8 113:5,21 114:11,20 115:4 119:8 123:24 127:6, 25 137:23 180:25 184:18 191:3 192:16
**identified** 106:5 116:5
**identify** 11:13 40:20 76:2 78:22 80:10 91:15 119:12 131:21
**IFN** 95:22
**II** 175:14
**IIB** 159:1,4 175:25
**IIB.'** 175:21
**III** 158:13 159:1
**IL-2** 95:22
**ill** 8:10
**immune** 165:20
**immunomodulator** 94:21
**immunomodulatory** 147:7 165:18
**impact** 145:2
**impacts** 126:6
**impetus** 53:1
**implemented** 121:14
**importance** 116:24
**important** 24:24 117:6,10 131:13 137:10,18 150:3,5
**impossible** 179:13
**improper** 86:14 87:5 174:5,18 178:23
**improved** 170:21
**improvements** 180:14,15
**improving** 192:20
**inaccuracy** 115:2,10 122:8,12
**inaccurate** 113:18 114:9,17
**inadequate** 62:25
**incident** 138:25
**include** 22:25 84:19 120:17 137:1 147:25
**included** 15:17 23:17 82:7 91:19 120:22 138:11,15 154:12 193:18
**including** 53:11 64:14 66:13 71:10 73:4 79:7 88:12 109:15,21 115:17 130:7 131:11 166:13 169:25 175:15
**inclusion** 120:19
**incompatible** 145:22
**inconsistent** 25:14
**incorrect** 98:9
**increase** 54:16,22 61:17 145:12
**increased** 59:6 61:15 95:19 100:21,24 166:17 168:5,21 175:16
**increasing** 152:10
**independent** 20:19
**Indicating** 185:5
**indication** 60:4 63:4 142:14,18 143:11 187:24 197:23
**indications** 62:24 63:13 197:8
**indirectly** 42:5 120:25
**individual** 36:24 57:14,15 77:10 90:25 107:12 120:21,22 130:21 131:21 162:12 166:24 167:6 180:5 184:6 189:20
**individual's** 57:11
**individuals** 87:23
**industry** 85:22 88:16 106:21 187:14
**Ineligibility** 107:10
**ineligible** 107:16
**inevitable** 146:5
**infection** 153:2
**infections** 25:25 26:7 27:6 147:1

**infectious** 65:20
**influence** 38:2 118:6,9,13
**influenced** 126:9,12 187:13
**inform** 87:4
**information** 11:25 82:6 83:8 94:5,9,12,14 99:4, 10,11,14,15 106:24 113:18 114:9 115:15 117:24 122:21 125:24 131:25 133:13 139:21 143:13,19 159:3 172:15,19,24 173:8 182:16,17 188:23
**informed** 8:13,15,19 133:6,10
**infringement** 7:4
**inherent** 129:5,6
**inherently** 129:6
**inhibitor** 95:1 165:22
**inhibits** 165:22
**initial** 76:3,5 129:18,20,23 155:22,25 162:20
**initially** 59:2,5 60:6 62:11 151:4
**initiated** 40:16,17 43:6 44:2 46:16,23 47:2,18
**input** 14:15 192:15
**inquiries** 106:19,23
**inquiry** 58:3
**insert** 78:1 91:16,20 169:15,20,23 170:3 171:24 172:7,12 174:1,7,16 177:10 196:3
**inside** 188:23
**instance** 21:15 74:14 133:21, 25 174:9
**Institutes** 10:5
**institution** 15:5 21:17 52:4 60:12
**institutions** 20:18 119:2 130:13
**integrity** 106:7
**intend** 76:15
**intended** 181:11 193:5
**intensive** 146:14,15
**interacting** 193:8
**interaction** 79:1
**interactions** 79:20
**interest** 51:3 58:9 102:2 103:4,7,9 104:10,21 105:4,12,15 106:13, 17 116:13,25 117:4 119:2,3,7,14,23 124:6,11,23 127:12, 15 128:12 129:4
**interested** 40:12 58:13 199:13
**interests** 37:10 106:8 127:18
**interference** 86:11,12
**internal** 10:10 99:6 103:17
**international** 38:24
**introduce** 3:16
**introduced** 4:12 154:1
**investigated** 86:15 87:14 139:23
**investigational** 8:8
**investigator** 16:14 40:17 138:21 141:14
**invitation** 91:7
**involve** 26:8 29:13 47:13,18 48:7 96:10
**involved** 7:4 8:4 22:21 44:18, 20 47:10 48:24 50:22 57:21 58:5 60:1,5 61:20 62:8 77:15 107:6 133:12 170:16 178:20
**involving** 6:24 43:7 48:9
**IRB** 136:4
**Irwin** 190:21,23
**issue** 128:11 167:14
**IV** 8:7,11,16

**J**

**Jackson** 138:1
**Janssen** 32:1
**January** 138:10
**Jeff** 37:3 91:6
**Jerry** 79:6
**Jessica** 91:5
**Jim** 14:12 83:14
**Jim's** 14:13
**Joan** 184:6,9
**job** 10:6,7 15:15 37:6 145:20
**John** 88:5 89:5 92:22 138:1 173:12,20
**Jones** 75:23 76:4 80:12,15 186:24
**Journal** 43:16 160:19 161:21
**journalist** 181:6
**Jr** 3:12
**judgment** 117:18
**July** 15:23 26:1 87:1 98:4
**June** 78:2

**K**

**K-e-n-v-i-n** 190:6,8
**Kann** 91:5
**Kaposi's** 64:11 71:8
**Karsen** 84:8,18
**Katherine** 53:10,19 90:7
**Kathryn** 93:7
**Ken** 89:15
**Kenneth** 194:23
**Kenvin** 190:2,6,23
**key** 37:6,18,23,25 38:6 101:5 122:25 193:4, 7
**kills** 147:13
**Kimberly** 3:23
**kind** 133:3 152:4 166:7 169:5
**kinds** 180:9 195:25
**KING** 199:3
**knew** 86:3,5 141:17 185:8 196:24
**Knight** 189:21,24
**knowledge** 15:8 28:8 37:22 46:11 55:11 108:7 143:14 187:17
**KOL** 176:22 193:11,14, 18,23
**KOLS** 176:21 183:16 194:8
**Kyle** 130:10

**L**

**label** 154:24
**labeling** 176:5
**laboratory** 96:6,7 123:12
**laborious** 59:5,11,14,25
**lack** 53:15 58:18 92:5 94:6,10 101:9 102:15 107:25 111:7 116:21 118:11 121:13 123:15 130:18 131:23 133:1 150:1 156:11 157:13 168:12 183:23 187:15 188:16 191:1 193:15 194:3, 10,16 195:12
**lacks** 142:22
**laid** 46:9
**Lake** 30:17
**lapse** 10:22,23,25
**large** 63:2 129:12 138:17 151:2 171:7,10,16 182:14
**larger** 97:22 158:1
**late** 154:6 156:5 164:7, 11
**latitude** 28:10,12
**Laura** 190:5

**Laurie**
190:2,23
**law**
4:15,16,18 76:19
**lawsuit**
5:11 6:1 7:10,11 9:1
**layperson**
137:7
**lead**
43:18
**leader**
37:18,23,25 38:7 101:5
**leaders**
37:7
**learn**
141:19
**learned**
79:12 127:11,14
**leave**
9:21 15:24 137:16
**Leedom**
185:23
**left**
3:21 4:11 9:25 29:15,24 150:20
**left-hand**
54:15 124:1,14
**legal**
3:11
**legitimate**
62:14
**legs**
136:12
**lenalidomide**
54:17 55:5,8,13 94:20 191:11
**lengthy**
119:22
**leprosy**
65:2,3,15,16,17,19, 22,25 66:1,3 156:4
**lesser**
145:7,11
**letter**
61:23 76:3,6 128:4, 11,22,25 129:12,16 130:2 131:5,8,12,15
**letterhead**
75:23
**letters**
116:17 131:1
**leukemia**
64:14,15 66:13,14 71:10,11 73:4 170:11,12
**level**
37:12 85:1 152:9 153:8 161:1 178:21
**levofloxacin**
26:17
**license**
11:5 19:6,11,21,22 199:21
**licensed**
10:17,20
**Licenses**
19:17
**life**
124:2 145:23
**Light**
108:18
**Likewise**
158:4
**limitation**
176:3
**limited**
54:18 64:14 66:14 71:10 73:4 125:2 157:24
**list**
18:11,12,16 26:13 48:3,6 85:4 120:19, 23 129:17,22 131:21
**listed**
58:4 63:2,6 83:2,19 90:15 109:2 117:17 128:3 129:2 160:8 162:12 193:23 197:11
**listening**
29:7
**listing**
48:20 59:1 114:15 160:7 196:16 197:13
**listings**
197:11
**lists**
110:21 118:4
**lit**
83:16
**literature**
23:12 53:1 83:8,18 144:4 148:11 151:17 196:16 197:6
**lived**
161:7,9,11
**lives**
192:20
**living**
11:1 161:13
**location**
3:9
**logo**
124:3
**long**
142:1 144:12 148:4, 11 155:13 156:13 167:21 189:23
**long-lasting**
148:1
**longer**
126:3 144:12 154:15 156:9 158:2 186:8
**Lonial**
130:7
**looked**
10:12 62:20 160:2 162:9 180:21 187:20,22 188:12
**lost**
7:11
**lot**
28:10,15 60:1,5 62:8,10,16 73:21 97:22 122:23 131:17 145:9,17 157:23 173:25 182:9 183:2
**lots**
18:10 173:12
**low**
136:15 169:8
**lower**
166:8
**lunch**
97:6 134:8,12
**lung**
66:25 71:14 148:6
**lungs**
143:11
**lymphocytic**
64:15 66:14 71:11 170:11
**lymphoma**
67:4 71:17 73:12 180:9,12
**lysis**
176:13

**M**

**M.D.**
4:3 79:25
**M.meijer@elsevier.com**
53:11
**Macroglobulinemia**
108:19
**made**
8:16 10:14 13:15 20:3 21:6,7 26:24 81:25 97:22,24 110:8,16,22 112:20 130:1 176:16 179:22 187:13 192:1,4 197:14
**magnitude**
125:17
**main**
37:17
**maintain**
19:6 22:17 55:4,12 60:8
**maintained**
54:5 60:14 120:20 180:14
**maintaining**
11:6
**maintenance**
67:24 69:8 75:12
**major**
25:14 88:3 117:8
**majority**
11:20,22 150:18
**make**
4:20 17:22 26:24 27:3 29:10,23 50:11 52:3 58:3,11 69:20 82:23 87:10 89:18 102:22 103:17 104:18 106:19,23 125:22 126:19 155:3,7 169:10 185:7
**makes**
139:21 153:7,9
**making**
16:25 44:18 113:2
**male**
138:10
**malignancies**
20:20 37:7 88:12 144:24 180:8 181:7 187:7
**malpractice**
8:2,3 9:25 17:1
**Manchester**
18:18
**mantle**
180:11
**manufacturers**
26:19,22
**manufactures**
32:3
**manuscript**
56:19 192:1
**Manuscripts**
56:1
**Marcel**
53:22 57:11,20,23 77:3
**March**
24:9 88:5
**mark**
53:5 75:19 77:22 79:3 87:22 89:6 92:18,21,25 93:2 97:12 101:22 108:14 123:22 127:5
**marked**
11:8,13 53:6,8 75:20,22 77:23 79:4 80:6 84:4 87:19 90:4 91:3 92:19 97:14,15,18 101:23 108:15 112:8 113:5, 21 114:11,20 115:4 119:8 123:24 127:6, 25 128:7 137:23 180:25 181:2 184:18 191:3 192:16
**marker**
161:2
**market**
65:13,14 156:3 171:17,20
**marketed**
28:23,24
**marketing**
88:6 120:13 194:8
**markets**
27:15
**marrow**
41:16 49:17 145:16, 19,20,23 146:6,11
**marrow's**
145:19

**marrows** 161:4
**Marta** 53:11
**Maryland** 190:18
**materials** 196:17 197:9
**matter** 3:13 59:3 80:9 83:23 87:13 182:17
**Maurizio** 166:16
**Maximizing** 193:6
**Mayo** 128:4
**Mcclure** 184:7,9,14
**Mckay** 199:20
**MDS** 72:5 74:16,21 183:16
**meal** 33:3
**meals** 33:4
**meaning** 45:10,11 46:21,22 73:9 96:7,9 142:7, 12 171:2
**means** 4:13 19:5 65:5 82:11 120:10 146:17 153:16 158:5 160:24 163:17 164:19 194:18
**meant** 35:17 196:23
**mechanics** 143:7
**mechanism** 143:7 147:11 165:21
**mechanisms** 143:9
**Meckfessel** 88:5 89:5
**Medica** 44:24 45:14,18 57:21
**medical** 18:13 19:2,16 45:2, 3 53:1 79:10,11 138:11 143:25 144:3 146:23 153:10
**Medicare** 116:8
**medications** 138:15
**medicine** 9:20 10:10,17,20 15:22 20:1 120:9,11 144:9 160:20 161:21 189:9
**meet** 36:5
**meeting** 24:11 38:11,24 39:7,9,11,12,13,14, 16,17,19,20,22,23 85:11,15 86:3 87:24 88:4,6,9,10,16,19, 23,24 89:7,15,24 90:19 91:17 93:3,8 125:14 182:23
**meetings** 22:7,8 23:10 24:8,9 25:12 26:5 39:16,25 84:24 85:20,25 89:2 90:1,20 105:7,13 136:21 183:3
**Meijer** 53:22 57:11,20,24 77:4
**melanoma** 67:15 71:21
**Melody** 3:11
**melphalan** 148:22,25 149:1 154:8,14 164:2,6
**member** 20:14,21 101:14,15, 18 102:13 107:11, 15 109:3,5 173:3
**members** 23:9 103:4 106:4, 19,21
**memo** 183:13
**memorialized** 161:20
**memorializes** 61:22
**memory** 181:19 183:25 184:4 197:3
**mention** 90:22 171:24
**mentioned** 9:19 49:24 77:3 90:21 118:1 136:9 141:9 151:11 165:20 178:17
**message** 34:14
**messages** 193:7,10
**messaging** 58:15
**met** 77:12 79:14 85:13
**metabolize** 146:6
**methodology** 62:17,19 80:8
**metric** 175:17
**mg/d** 138:9
**mice** 96:19,21
**Michael** 90:8
**mid** 144:25 154:2
**middle** 80:21
**Millennium** 32:1,3 49:25 50:1 149:21
**million** 126:11 132:24
**mind** 40:18 117:20 118:18 134:24
**mine** 50:5 173:11
**minimal** 153:3
**minor** 137:4 189:13
**minuses** 186:13,16
**minute** 48:8 61:12 81:19 183:18
**minutes** 97:4 189:11
**misrepresenting** 19:25
**missed** 68:21
**misstates** 14:17 25:18 31:7 50:12 54:11 55:18 58:19 66:22 82:4 100:6 106:22 123:3, 16 126:1 133:2 140:17 186:11 194:9,17
**misstating** 52:25
**mistake** 20:3 21:6,7 112:20
**mistaken** 83:15
**mixing** 168:4
**MM** 54:15 56:1 83:16 85:2 89:17 90:11 154:14 155:10,14 183:16
**MM-014** 56:20
**modulation** 95:14
**molecular** 169:8
**moment** 61:11 88:20 157:19
**monetary** 41:25
**money** 10:8 25:1 32:8 49:8 50:7 51:4 97:21 98:15,21,24 99:2,17 121:9 126:13 130:8, 10,13 131:10
**monitored** 42:2
**monitoring** 109:13 113:12 114:3 118:24
**monoclonal** 161:1
**monotherapy** 44:6
**Montana** 30:17 32:13 33:18
**months** 12:8,23 18:3,21 19:24 23:11 102:10 103:14 104:6 115:15 155:18 169:21 175:18 180:15,22
**moonlighting** 10:7
**morning** 4:10
**move** 10:15 11:3 193:20
**moved** 18:20
**movement** 138:17
**multi-center** 57:3
**multi-drug** 164:4
**multi-paged** 53:9
**multiple** 7:7 20:11 22:25 28:16 31:11,12 38:23 41:5 43:10 44:7 57:6 62:9 66:7, 8 68:23 69:4 71:24 73:17,25 74:11 78:7 91:23 108:18 138:20 142:6,16 147:24 149:15 150:4,8 153:12,19, 23 154:9,16,19 155:20 156:10 160:22,25 163:24 166:18 167:23 171:12,13 173:7 191:12
**myelodysplastic** 69:14
**myelofibrosis** 67:18 74:25 75:2,5 194:21
**myeloma** 7:7 20:11,23 22:25 28:16 31:11,12 38:23 41:5 43:10 44:7 57:6 66:7,9 68:23 69:4 71:24 73:17,25 78:7 88:4, 6,12 91:23 109:7 135:13 138:9,20 139:8 142:6,16 145:3 147:24 149:15 150:4,8,17, 21 151:2 153:12,19, 24 154:9,17,19 155:21 156:10 160:22,25 161:3

162:11 163:24 164:9,21 166:18 167:23 171:12,13, 14 173:7 177:1 190:18 191:12
**Myeloma/systemic** 108:18

**N**

**named** 185:23 199:7
**names** 7:15 14:9,10 36:8, 22,23 40:22 58:16 78:23 173:13
**narrative** 186:20
**national** 10:5 20:9,17 38:23 39:14,20
**nature** 16:25 62:16
**nausea** 138:16
**NCCN** 21:10,12,15 24:5,13 25:3,7,12,17 27:4 61:8 84:24 85:11, 13,20 86:16,18,21, 22,23 87:4,13,17,24 88:4,9,10 89:2,6,15 99:11,15,19 101:14, 15,18,25 102:13,19 103:3,6,19 104:1,3, 9,22,23 105:1,3,7, 13,19 106:2,3,4,6, 11,15 107:10,11,15, 16 108:18 110:22 111:4,21,23 112:2, 11 113:23 114:13 115:7,15 116:5,12 117:1,6,21,22 118:6,16 121:20,21 154:10,20 181:6,7, 25 182:2,9 183:15 184:1,10 188:9,11
**NCCN'** 20:10
**NCCN'S** 22:7 25:23 116:19
**NCCN-SPONSORED** 24:8
**necessarily** 126:14 127:3 137:12
**necrosis** 95:7
**needed** 8:10,17 10:9 13:15 135:25
**neighborhood** 40:2
**Network's** 20:10
**neuropathy** 138:11 166:5,6
**neutropenia** 136:12,14
**neutrophil** 136:15
**newly** 43:9 73:25 176:13
**night** 78:6
**nineteen** 180:15
**nitty-gritty** 197:1
**noise** 55:4,12
**nominated** 20:23 21:16
**nominates** 20:21
**non-business** 37:12
**non-compensated** 24:6
**non-hodgkin's** 180:11
**non-human** 96:13
**non-profit** 15:5
**non-sequential** 163:21
**non-transplant** 154:10
**normal** 145:8,13
**north** 30:16 32:13
**Northwest** 19:3 32:16
**noted** 99:3 183:22
**notes** 13:21,23 14:3,4,5 88:7 189:12
**notion** 83:21 129:3
**notwithstanding** 123:11
**Novartis** 32:2
**November** 90:10 116:5 160:19 176:5
**number** 13:20 14:6 19:23 30:4 35:21 44:7 46:10 53:10,13,25 54:16,22 55:16 64:20 68:4 69:2 78:19 79:6 82:15 83:2 89:22 90:14 94:1 109:14,21 127:24 128:21 129:1,7 130:6 139:12 149:17,20 158:1,22 166:12 169:6 170:19 176:19 182:15
**numbers** 22:16 32:11 40:24, 25 41:1 46:22 142:2 150:20 157:24 160:10 161:3 189:5, 6
**Numerous** 26:11
**nurses** 33:22
**NYC** 181:8

**O**

**oath** 17:12,15
**object** 13:24 53:15 165:10
**objection** 14:17 20:4 25:18 29:9,21 31:7 38:3 46:5 50:12 51:15 54:11 55:18 58:18 60:18 66:22 82:4,13 83:25 87:7 92:5 94:6,10 99:21 100:6 101:9 102:15 105:9 106:22 107:25 111:7 116:21 117:2 118:11 121:13 122:10 123:2,15 125:6 126:1 127:1 130:18,23 131:23 133:1 139:25 140:17,22 142:22 143:15 144:1 149:11 150:1,9 152:18 156:11 157:13 161:10,16 163:14 168:12 169:10 171:18 172:10 174:5,18 177:4 178:23 182:4 183:23 186:11 187:4,15 188:16 191:1 193:15 194:3, 9,16 195:12 196:18
**objectives** 193:5,8,12 194:8
**obligation** 8:20 87:4,12,16 115:24
**observed** 168:15
**obtain** 19:6
**obtained** 62:25
**obtaining** 180:12
**occasion** 8:1 23:4,5 77:13 79:15
**occasional** 197:2
**occasionally** 24:7
**occasions** 5:3 7:16 23:5 33:14 34:6 40:15 64:17 67:6 74:9,11,14 85:21
**occur** 35:7,8,17 135:9 136:8,10,11 153:5 157:25
**occurred** 135:10 136:13,17, 19 176:20
**occurs** 53:4
**October** 98:3
**odd** 127:22
**off-label** 23:18,20 63:13
**offered** 24:23 32:8,10
**office** 12:21 33:11,19,24
**officer** 79:11 105:1
**official** 183:15
**Olesnyckyj** 53:12
**on-label** 23:16,17
**on-line** 104:12,13,20 110:18
**oncologist** 153:10
**oncology** 10:11 15:23 20:11 25:24 27:5 144:20 146:23 183:10
**online** 90:11
**onset** 68:23 71:24
**Onyx** 31:2,4,16,20,21 49:18,19
**open** 6:20 88:24
**open-label** 57:3
**ophthalmologist** 55:23
**opinion** 37:6,18,23,25 38:7 101:5 157:14 159:5 172:13 177:7 186:19
**opinions** 39:1 76:15 82:6 83:4
**opportunities** 16:1 193:6 195:20
**opportunity** 128:15 129:16 162:4,7 181:5 195:3 199:14
**opposed** 17:10 28:13 37:12 150:24
**Optimizing** 192:20
**oral**

8:7,10 199:6
**order** 50:7,19
**organelle** 165:23
**organization** 20:19 121:2
**organizations** 182:25
**original** 160:3
**originally** 59:25 65:13,14 103:23
**outcome** 199:13
**outlined** 82:8
**ovarian** 69:16,23 72:10
**overly** 131:17 132:9
**override** 174:3
**oversaw** 15:16

**P**

**p.m.** 198:11
**package** 78:1 91:16,19 169:15,20,23 170:3 171:24 172:7,12 174:1,7,16 177:9 196:3
**packet** 172:5
**pad** 122:25
**Pagel** 173:12,20
**pages** 13:5,6 53:13 55:22 76:10
**paid** 34:1 97:21 98:5,15, 21 100:11,14,18 134:3 181:23,24 184:13
**Pamela** 50:5
**pancreatic** 69:17 70:1 72:12
**panel** 20:9 23:9 101:15,18 102:13 103:4 106:4, 6,21 107:10,11,15, 16,24 108:19 109:2, 5,6,8 184:12,13
**panelist** 120:23
**panels** 20:19 105:19 106:4, 20
**paper** 82:22 89:11 104:10 122:25
**Paradigm** 195:4
**paragraph** 14:25 15:20 25:5,6, 22 58:24 61:14 63:10 66:11 76:14 84:20,22 89:7,12 105:25 121:7,20 122:4,24 124:21,24 157:18 158:3,12 160:11,14,17 166:11 168:19 170:8 175:11 180:7
**paragraphs** 174:24
**Paramedics** 138:18
**paraphrased** 59:10,12,13
**Parker** 89:6
**paroxysmal** 138:12
**part** 16:3 24:24 42:8 129:8,9 144:7 154:8 165:19 188:1 189:9
**partial** 180:13
**partially** 50:8
**participants** 44:8
**participate** 23:10 44:16 82:14 105:16
**participated** 38:16,20 40:1,5,8 44:2 46:16 51:2 79:19 85:20 89:22 90:19 160:5 173:7
**participating** 39:2
**participation** 78:15 120:4,17,23
**particulars** 198:1
**parties** 199:12
**parts** 11:23
**past** 15:20 16:5 59:18 170:25
**patent** 7:4
**patient** 5:11 8:9,17 68:22 69:4 133:10,22 134:1,20,24,25 135:1,6 136:4 137:13 139:3,4,5,6, 9,19 146:1,9,14 148:8 151:1 152:4, 17,21,24 155:4 172:17 177:12 178:3 179:2,11,15 180:1,4,5 188:4 195:19 197:24 198:1
**patient's** 74:12 180:2
**patients** 15:19 19:10 26:7 29:20 36:4 41:5 42:2 43:9 66:13 68:3,13 69:1 72:8 74:24 78:6 85:2 88:15 89:10 91:23 126:6 132:11 134:21 135:12,14, 15 136:12 144:23 145:10 147:20,24 148:11 149:18 150:18 153:24 157:24 158:1,23 160:5,8,10,24 161:5,7,19 164:21 166:3,5,9,17 168:15 170:4,14 171:6,7 175:18 176:6,13 178:11,16,19 179:5, 8,21 180:12,13,23 189:6 191:11,19,21 192:3,20 195:22,24
**pattern** 166:7
**Paul** 57:1 166:24
**pay** 31:16 32:18,21,23 34:16,18 39:12,17, 23 42:6
**payment** 101:2
**payments** 97:22,23 123:8 125:2 126:9 187:13
**pedigree** 79:24
**pen** 82:22 122:25
**pending** 141:8
**people** 10:14 18:15 33:8 53:11 58:16 78:22 79:7 84:15,23 91:12 122:1 126:24 128:21 129:1,7,15, 17 131:14,17 151:18 184:10 192:13
**perceived** 121:1
**percent** 42:10 51:10,14 61:17 149:17 169:2, 3
**percentage-wise** 168:25
**perform** 49:8 59:19
**performed** 38:17 76:24
**performing** 10:6
**period** 110:4 112:15 159:2
**periodically** 38:21
**permission** 169:9
**Perry** 84:8,18
**person** 20:21 79:14 148:3 150:18 152:25 153:1,3,8 162:13 173:18
**person's** 38:1 146:6
**personal** 60:9
**personally** 8:2 19:14 42:4 63:17,20,23 64:1,4, 7,10,13 78:8 103:16 115:21 148:10 159:16 178:12 185:21
**personnel** 15:17 42:2 45:21 77:19
**persons** 5:15
**Petruzzi** 89:6
**Ph.d.** 79:25
**pharmaceutical** 6:24 31:3 85:22 87:5 115:16 117:9 130:17 131:10 187:14
**pharmacists** 33:23
**phase** 162:23,24 175:14
**phone** 24:2
**phrase** 37:18 38:6 133:6
**physically** 12:4
**physicals** 19:5
**physician** 5:24 15:1 16:22 20:9 34:13 70:18 189:25 190:17
**physicians** 8:20 16:4 24:25 36:3 37:21 88:11,15 129:11
**pick** 28:13 183:16
**piece** 5:18 82:23 192:6
**Pilot** 19:16
**pilot's** 19:6,11
**place** 24:3 106:12,16 108:4,7 123:19,21 127:17 158:14 172:7 190:20

**places** 11:6
**plaintiff** 3:8 6:5 9:5 18:6
**plan** 46:9
**plane** 32:24
**plastic** 5:20,21
**platelet** 166:7,8
**PLLC** 3:22
**pluses** 186:12,16
**pneumonia** 138:13 152:2,20 153:1,9
**point** 11:6 63:3 99:12 115:11 131:12 143:3 152:8 163:4 197:24
**pointed** 122:5
**points** 40:11 62:21 156:21
**poisoning** 145:4
**policies** 102:1 105:23 106:11,14,16 119:3, 7 127:15
**policy** 103:7,22 104:6,10, 15,18 108:1,3,4,7,8 116:14,25 119:14, 23 121:12 124:6,11 125:5,7,10,13,15 127:12,16 128:12 132:4,6,13,15 184:14
**pomalidomide** 147:12 165:5
**population** 171:7,10 176:15,17
**pose** 4:17
**position** 20:12 77:8 121:11 156:13
**positive** 180:12
**possibilities** 112:2,5
**possibility** 147:22 158:11
**possibly** 67:13 126:10 158:10
**post-thal** 89:9
**potent** 94:21 95:1,8
**potential** 92:9,11,12,16 102:1 117:4 153:6 157:2 168:5
**practice** 10:17,20 20:1,10 25:23 27:4 45:5 129:11
**practicing** 9:20 144:8,11,19 163:23
**practitioner** 118:19
**practitioners** 118:21
**precedence** 174:13
**precise** 81:10
**prednisone** 148:22 149:3 164:2
**predominantly** 120:12
**pregnant** 92:17
**preparation** 27:22 76:18
**prepare** 11:23 13:17 28:2 39:8 60:24 110:5
**prepared** 11:20,22 12:4 13:22 27:19 39:11 48:20, 23 50:24 62:18 80:12 82:6 83:3 93:18,20 110:5 111:25 118:16 122:1,21
**preparing** 48:25 62:17
**prescribe** 137:18 178:11
**prescribed** 63:17,20,23 64:1,4, 7,10,13 66:25 67:3, 14,17,20,23 69:3, 13,22,25 70:3,6,9, 12
**prescription** 28:25 29:12 38:2 53:2 68:22 72:25 73:3,11,16,24 74:15 75:1 134:4 151:25 164:13 170:23
**prescriptions** 29:8 74:21 75:14,17 133:16
**present** 27:20 85:23 120:11
**presentation** 84:24 93:16,18 94:19 120:15,16 182:3 183:22
**presentations** 88:3 92:22 93:3,8, 20
**presented** 38:25
**presenter** 120:24
**presenting** 29:13
**preserve** 76:20
**preserved** 146:2
**pretty** 42:10 180:4
**prevent** 169:4
**preventing** 26:6
**prevention** 25:24 27:5
**previously** 21:16
**primarily** 7:8 28:16 31:10 88:11,14 144:24 146:15 188:13
**primidone** 138:15
**principal** 82:2,5
**print** 13:10 56:6,9 58:2
**prior** 68:23 73:17 78:7 81:5 91:24 180:3 186:23
**priority** 55:16 117:17 118:2 156:22
**private** 15:5 89:2
**privilege** 76:17,18
**privileged** 14:1 76:25
**privileges** 76:20
**problem** 24:16 152:3
**Proc** 128:4
**procedure** 133:11
**Proceedings** 128:5
**process** 13:25 16:13,16 24:1,3,25 52:11 58:10 110:7,24 111:24 156:19 188:2 197:25
**processes** 157:7,9,11
**produce** 145:20 146:12
**produced** 97:19
**producing** 145:21
**product** 29:1 76:17 176:25
**production** 95:23
**products** 29:3 35:20 38:14,17 109:8,10 121:3 133:19 157:11
**professor** 16:12,15
**profile** 154:25 155:2 165:25
**program** 10:14 15:14 16:3 90:17 91:25 92:4
**programs** 10:12 16:2 18:13 98:15,21 120:12
**progressing** 177:15
**progression-free** 175:16,18
**progressive** 135:13
**prohibited** 124:23 132:22
**prohibition** 132:13
**prohibitions** 128:13
**prohibits** 132:4
**proliferation** 95:19
**prolong** 153:21
**promoted** 28:21,22
**promoting** 31:5 32:5 177:3
**promotional** 27:9,13,16,17 28:18,20 29:6 30:2, 8,11,15,19 33:6 34:4,14 35:19 38:13 49:25 51:21 90:11 97:21 98:15,21 100:3,10,13,17 107:20 109:24 111:1,14,15 112:16 113:15,20 114:6,15, 24 115:7,12 117:8 120:5,13 121:2,10 125:8 126:12 131:15,18,22 132:5, 12,23 133:22 172:24 176:24
**promulgated** 132:18
**pronounce** 65:6 108:21
**pronunciation** 65:7
**proper** 8:13,15 60:6
**property** 123:12
**prophylaxis** 169:3,5
**prostate** 67:21 69:17 70:4 72:14 75:7,10

**proteasome** 165:21,23
**proteins** 161:2
**protocol** 8:6 50:24
**protocols** 15:18 106:12,15
**proud** 126:16
**prove** 196:1
**proved** 59:5
**provide** 8:13,25 10:7 18:12 25:13 41:12,24 42:22 43:19 106:2 129:10
**provided** 12:3 14:6,7,15 41:25 49:8,10,19,22 61:2 76:19 99:4 106:24 192:19
**providing** 8:14,19 88:7
**public** 111:5 117:7 143:23 182:17 183:7
**publication** 41:23 42:21,22 43:20 45:18,22,25 46:4,6 58:15 80:3 161:20 186:8
**publications** 14:6 54:2,5,10,17, 22 83:19 128:3
**published** 41:21 44:11 45:17 46:10,14 49:4,12 57:16 60:3 117:19 144:3 160:20 167:19 188:13,15 191:6,9
**publisher** 188:22,24
**pulled** 102:24
**pulmonary** 134:25 135:5
**purported** 180:7
**purpose** 120:20 142:10
**purposes** 116:7 120:13 196:16
**pursuant** 186:24 199:8
**pushback** 129:3
**put** 48:19 62:15 65:13 80:23 81:12 82:22 83:8 106:12,16 110:21 111:18 122:25 128:24 159:6 182:3
**putting** 157:19 192:12

**Q**

**qualifications** 17:24
**quality** 126:8,16
**quarter** 126:11 132:24
**question** 4:19,24 18:7 35:12 58:20 60:20 77:7,9 82:19 105:10 119:1 140:2 147:15 149:12 151:9,10,12 170:3 186:4
**questioning** 169:11
**questions** 4:14,15,17 52:16 70:16 144:18 165:11 189:14 196:7,10 198:4
**quickly** 157:7
**quit** 115:11 125:8 145:21
**quits** 145:23
**quote** 170:2

**R**

**RADAR** 166:21
**Ralph** 90:22
**ran** 26:4 50:6
**range** 32:11 39:6 42:20 83:21
**rashes** 136:8 166:2
**rate** 59:3,6,15,17,18,21 61:15,17,22 62:5
**rates** 175:15,16
**rating** 158:13,25 159:4 186:18
**rats** 96:19,21
**raw** 179:21 187:20,22, 25 188:4
**RCW** 199:9
**reached** 175:18 197:17
**read** 13:12 17:4,6,7,11, 13,14,17,22 19:24 21:4 28:6 53:1 63:7, 8 96:2,4,5 104:18 121:6 152:7 160:1,3 161:25 162:2 167:12,17,18 169:14,20 171:23 174:6,8 178:19 180:20 196:23 197:2,12 199:14
**reader** 131:14
**reading** 62:9 89:11
**ready** 16:5
**reason** 11:2 28:19 35:3 78:24 98:8,12,19 126:2 131:7 162:20 176:14 181:20 184:16
**reasonable** 171:20
**reasons** 158:24
**recall** 6:2,17 7:21 9:10 10:24 21:2 22:15 23:6,21,23 24:3 30:10 31:15 33:10 34:19,24 35:21 36:23 38:10,12 41:2,20 42:12 45:2, 20,23 46:17,22 47:24 48:1,15 51:17 62:1 66:6,16 67:11 68:4 69:2,11 71:12, 18 78:18 79:16 89:21 93:13 100:16 102:12 104:2,25 106:14,18 108:13 110:23 111:24 113:2 128:20 129:1, 15,21 130:5 133:24 134:22 135:10,11 142:1 155:15,23 164:15 172:3,4,11, 15 173:3 176:19 184:21 190:1 194:11
**receive** 25:1 39:2 101:2 104:21 107:7 149:18 151:7
**received** 51:4 78:7 91:23 98:24 99:2,17,20 107:19 116:17 121:10 123:9 125:18 126:9,13 130:8,13 151:6 156:1 168:16 172:19 176:14 182:2
**receives** 130:10 139:19
**receiving** 126:10 131:10 135:2 166:18 172:15
**recent** 6:23 59:1
**recently** 170:19
**recertify** 112:25
**recess** 52:19 97:9 134:12 178:6 189:16
**recollection** 5:4 9:18 18:24 21:2 22:20 51:19 80:2,4 81:9,16,18 85:7 89:23,25 90:16,18 91:9,10 102:14,17, 19 103:3,5,6 139:2 172:23 173:2 176:21 190:24
**recommend** 29:6 73:22
**recommendation** 29:23 175:21,22,24 176:16
**recommendations** 29:11 54:15 58:12 159:25 189:2
**recommended** 28:24 29:18 70:17, 21,24 71:13,16,20, 23 72:1,4,9 73:23 74:4,6,9,20 75:4,9, 16 85:1 176:7
**recommending** 120:21
**record** 3:4,17 4:12 23:25 52:17,20 97:2,8,10 100:20 102:22 134:10,13 153:14 155:24 178:5,7 189:15,17 198:6,8 199:16
**records** 22:17 81:13 98:14, 20 103:17
**recurrence** 148:5 150:23
**recurrent** 151:8
**recurs** 151:6
**reduce** 135:6 164:21
**reduction** 161:1
**reductions** 161:3
**refer** 17:19 81:13
**reference** 138:4,5
**referenced** 95:12 180:19 192:3 196:15,22,24
**references** 118:4
**referred** 5:20 85:9
**referring** 35:16 36:4 40:23 66:1 78:13,15 82:16 139:4 143:4 147:16 149:13 150:5

182:22,23 185:6
**refers** 83:13 85:19 88:22 146:24
**reflected** 61:23 129:12
**reflecting** 97:20
**reflection** 49:7
**reflective** 23:15
**reflects** 98:3 100:20 103:21 108:2 113:1
**refractory** 57:6 162:21 175:13 180:11 191:12
**refresh** 197:3
**regard** 7:16 14:19 17:3 20:25 23:2 24:5 26:18 30:23 41:23 42:21,22 43:19 45:16 46:23 47:1 48:13 58:1 66:11 74:25 96:21 99:2 101:14 104:2 106:12,16,20 110:19 114:25 116:18,25 118:19 119:1 122:8 126:24 132:3,14 134:18 136:7 139:13 141:5, 13 157:11 167:10, 14 169:23 172:16, 25 184:11 186:1 187:10 190:23 192:12
**regimens** 154:8
**region** 19:3 32:17
**regular** 23:9
**regulated** 92:10
**reimbursement** 116:8
**reiterate** 169:12
**relapsed** 41:6 57:5 142:5,16 155:25 162:21 175:12 177:12
180:11 191:12
**relapsed/refractory** 44:6 89:8,16 155:21 160:21 162:18 163:13
**related** 138:21 140:15 157:21
**relation** 110:13 193:11
**relationship** 45:13 57:24 77:1 107:12 114:5
**relationships** 103:19,25 106:5,20 107:2,14 109:1,14, 21 110:20 114:2 115:1,16 116:2
**relative** 199:11
**relator** 3:19 63:13
**relator-plaintiff** 97:20
**released** 175:11
**relevance** 131:20
**relevant** 82:9 83:7 126:18
**reliability** 186:3
**relied** 187:11
**relies** 175:14
**rely** 14:19
**remain** 148:2
**remained** 158:17 175:23
**remains** 158:18 175:24
**remember** 6:5 7:13,15,22 9:5, 11,16 14:9,13 36:8, 10,22 52:5,7 61:10 78:24 79:2 104:7 129:25 141:25 143:5 161:23 167:4 171:11 172:2 178:14
**remembered** 168:14
**remembering** 36:23
**remissions** 148:1,2,11
**renal** 69:17 70:6 72:16
**rep** 36:12,13
**repeating** 193:17
**report** 11:17,18,21,23 12:4,6,7,9,12 13:4, 18,19,20 14:15,20, 22 17:3,5,6,7,11,13, 14,18 18:5 20:6,7 21:5 52:24 54:2,5 59:5 60:13,17,22,25 62:18 63:6 80:24 81:3,12,23 82:3,7 83:9 113:2 122:4,8, 19,21 123:1 157:17 160:3,12 165:12 166:19,20 169:11 170:8,10 174:25 180:7 186:2 196:15, 22 197:15
**reported** 103:23,24 136:3 138:19 139:16,20 140:4 141:6,22 143:13,21 144:6 151:18 159:24 176:12,18
**reporter** 3:25 198:9 199:5,20
**reports** 162:10
**represent** 97:19 185:25
**representation** 17:23
**representatives** 36:1,7 62:3 85:22 88:16 89:1
**representing** 3:12
**request** 40:13 116:19
**require** 103:8 144:13
**required** 62:5,13 98:20 100:2 103:13 104:1 116:13 144:15 193:12
**requirement** 143:22
**requiring** 103:7
**reread** 17:25
**research** 8:6 10:6 15:1,3,4,5 16:2 28:17 37:22 38:17 48:3,16 109:12 113:12 114:2 124:2 128:13
**Reserve** 196:7
**reserved** 198:9,12
**resigned** 86:24
**resort** 177:20
**respect** 193:9
**respected** 37:21
**response** 135:4 144:13 151:13 175:15
**responses** 160:25 180:13
**responsibilities** 15:15 22:2,9 23:8 26:3 77:17,18
**responsible** 146:16
**restate** 4:23
**restricted** 91:25 92:4
**restrictive** 132:9
**result** 6:1 7:10 9:1 134:20 150:22
**results** 126:25 141:8 144:2 178:20 179:1 188:3
**resume** 19:24 48:2,19
**resumes** 48:25
**retain** 120:14
**retained** 7:13,22
**retaining** 120:21
**retention** 61:23 76:3,6
**Reuben** 3:18 4:10
**Rev** 74:6,15,21,25 75:1, 4,10 83:16 89:9
**Rev/dex** 85:3 89:8
**Revenue** 99:6
**review** 7:19 13:20 14:4 15:17 20:9,20,22 23:11,12 29:22,24 39:10 83:16 93:21 128:16 156:22 162:5,8 187:21 188:2 189:12 196:15,21 198:10
**reviewed** 26:5 50:24 63:1 81:25 122:3,15 130:16 162:3 182:20 187:20
**reviewers** 189:7
**reviewing** 82:7,8 83:6,7,18,19 102:14 119:18
**revive** 138:19
**Revlimid** 23:1,3,22 29:4,8,14, 19 30:23 32:15 33:7 40:9 41:5 44:6 54:2, 5 55:8 57:8 62:10, 23 72:22,23 73:1,4, 12,17,24 77:15 78:6 83:5 90:1 91:21,24 94:15,20 96:21 109:11 133:17 134:19 135:17,18, 20 136:7 139:5,6,9 140:9,11,16 141:13, 15 142:5,10,15 143:7,12 147:2,12 150:7,19,24 151:4 152:12,15 155:1 157:12 158:5 164:25 165:1,7 169:19,20 170:18, 24 171:24 172:8,17, 25 173:4 175:13 176:2,25 177:3,10, 11 195:3,6,23 196:3

197:7,18,21
**Richardson** 56:21 57:1 58:17 166:25 167:13
**rid** 146:7
**ring** 190:2,7,12,21
**risk** 153:8 154:25 155:1 165:25 166:17 168:22,24 169:1
**risk/benefit** 152:24
**risks** 133:13 137:21 155:6 158:9
**rituximab** 170:18
**RMR** 199:20
**Robert** 87:22 189:20,24
**Roberts** 3:12
**role** 45:18,22,25 192:11
**room** 5:12,19 10:7,9
**roughly** 103:15 144:10 154:7
**routinely** 171:5,6 178:12 186:5
**Rowell** 91:6
**rule** 76:17 130:15 132:18 163:9,11
**rules** 27:25
**running** 15:16 41:25

S

**S-i-b-l-e-y** 6:13
**SAE** 138:7
**SAES** 138:2,6
**safe** 54:18 151:20 195:6,16
**safeguard** 106:7
**safer** 155:8
**safety** 41:7 55:3,5,12 57:4 109:13 113:12 114:3 137:8,10,15,19 142:4 191:10
**Sagar** 130:7
**salary** 42:6,8,11
**sales** 36:13 77:15 120:13
**Salt** 30:17
**San** 24:10
**Sandoz** 6:24 7:1
**sarcoma** 64:11 71:8
**save** 122:23
**scenario** 41:8
**school** 15:22 82:22 120:8,11
**science** 124:3 126:24
**scientific** 109:19 113:13 114:3
**scope** 29:14 62:15 157:14 165:11 169:11 177:5,6
**score** 117:18
**screen** 13:12
**seattle** 3:1,9 12:16 15:2,3 32:14 123:20 138:20
**secure** 20:11 31:14
**Seema** 162:12
**selected** 63:9
**semiannual** 24:10 103:13
**senators** 116:18
**send** 18:14 104:9,12 152:1
**senior** 84:15 184:10
**sense** 28:22 146:22 156:23
**sensitive** 145:15,16
**sentence** 76:21 122:14
**separate** 39:16,19
**separately** 122:1
**September** 12:25 13:2 80:22,25 83:23 114:14 181:8
**sequence** 159:11
**series** 4:14
**serve** 20:22,23 21:23 22:4 184:12
**served** 20:8 25:25 27:8 184:20,23,24,25 185:11
**service** 99:7 107:11,17 129:10
**services** 59:19 116:6,17 121:3
**session** 89:21
**sessions** 88:4 89:22
**set** 70:15 96:9 188:6,9
**setting** 96:6,7 162:21
**settled** 6:2 9:4
**severe** 137:5 152:11
**shape** 15:7 24:4 86:20 87:17 191:18
**sheet** 63:2 65:7
**shifts** 10:8
**shockingly** 189:11
**short** 148:13
**show** 84:2 128:2 172:5
**showed** 77:2 88:21
**showing** 53:8 75:22 80:9 101:25 128:7 158:23 160:20 191:5
**shown** 147:23 148:4
**shows** 29:13 114:1
**Sibley** 5:12 6:11,16 10:16
**side** 124:1
**side-effect** 145:25 146:5
**side-effects** 137:3,6 145:5,7,13 151:19 153:3,5 155:6 157:25 166:9,13 172:16,25
**Sidley** 3:24
**sign** 22:5 23:19 103:7 199:15
**signature** 23:24 75:24 198:9,12 199:15
**signed** 22:21 23:2,24 76:12 128:22 129:13 130:6
**signees** 131:22
**significance** 118:18
**significant** 51:3 129:3 131:10 145:7 170:20
**signing** 22:9
**similar** 59:19 76:11
**similarly** 176:6
**simply** 77:9 88:24 129:4 130:19
**Singhal** 162:13
**single** 133:21,25 142:7,16 145:6 148:8 149:8 150:7 158:5 160:21 168:1
**single-agent** 57:5 142:5 191:11 195:7
**sir** 4:21 5:1,6 9:2 11:14 12:24 23:5 48:2 58:20 65:17 75:25 76:22 77:6 78:25 79:7 80:11 119:12 121:18,20 122:4,14 123:14 124:4,7,24 125:1,5,22 127:8 128:8 184:21
**sit** 121:9 130:15 195:10
**site** 121:21
**situation** 35:10,11,15,16 39:13 74:12 134:19 137:11,14,17 155:5 174:14 178:3 179:10,11 180:2 195:15
**situations** 40:9 134:23
**size** 76:11
**skimming** 17:10
**sleepiness** 166:5
**slide** 27:19,20 28:3,6,8,11 93:8 95:12
**slides** 27:21 29:23 89:18 120:15

**slot** 181:14
**Slow** 148:24
**small** 42:9,10 56:6,8 149:16,20 150:20
**smaller** 189:5
**smallest** 33:5
**so-called** 165:18
**social** 37:12
**Society** 183:1,9
**Sol** 84:8,14,15,17,18 87:22 137:25 138:2 183:13
**solely** 120:12
**solicit** 188:2
**Som** 120:8
**somebody's** 152:20
**someplace** 23:25
**Sorensen** 3:11
**sort** 32:16 90:20 163:20, 21,22
**sought** 10:10
**Sounds** 97:7
**space** 190:10
**speak** 24:7,11 25:12 33:12,19 94:13
**speaker** 90:12 98:15,21 100:3 110:25 111:1, 14 117:8 120:21,23 131:22 132:12 133:23 172:24 176:24
**speakers** 90:14 97:21,23 109:25 112:17 113:15 114:6,16,25 115:8 120:5,19 131:15,18 132:5
**speaking** 24:16 25:2 27:2,13, 16,17 34:1 49:25 51:21 94:1 107:20 111:15 120:18 121:10 126:12 127:20,23 197:10
**special** 91:25 92:3
**specialty** 10:9
**specific** 18:24 29:10,23 35:3 40:22 51:19 81:16, 18 82:20 89:23 90:18 102:16,19 103:5,6 106:14,23 108:3,6,13 117:16, 23 170:8 174:2,9 183:24 184:4
**specifically** 12:2 22:22 23:21,23 34:11 45:9,10 52:9 62:6 74:13 79:18 84:12 85:13 93:13 101:12 105:22 114:5 116:13 125:11 129:15,24 130:2,13 164:15 167:4 172:11 191:2, 25 192:10
**specifics** 46:18 100:16
**speculation** 87:7 141:10 195:13
**speech** 33:7 132:19
**spell** 36:14
**spent** 80:9 81:14 83:22
**spoke** 89:17 100:3
**spoken** 24:19,21,22 27:14 30:8
**sponsored** 181:6
**sponsoring** 121:2
**sponsors** 88:11
**ss** 199:3
**SSX** 3:15
**staff** 48:21,23,24 106:3
**stages** 62:21
**stand** 48:18 126:7,16
**standard** 153:23 177:13 186:14
**standing** 101:4,5,8 169:10
**stands** 138:7
**Stansel** 83:12,14
**start** 35:19 56:13 144:19
**started** 69:12 100:17 164:24 167:23
**starting** 163:24
**state** 8:20 9:12,15 10:1 11:1 33:16 156:13 197:19,21 199:2
**stated** 8:8 21:16 105:24 125:15 172:6 179:19
**statement** 21:1 25:7,16 53:3 94:24 95:4,17,25 109:17 110:3 111:4, 5 114:18 121:24 122:18 142:12 163:8 167:12,16 168:21 174:3,7,11 195:11,14 198:2
**statements** 96:2,5
**states** 3:20,21 116:7,18 171:8 176:1,6
**Status** 54:2,5
**stem** 15:14 41:6 67:23 69:9 75:12 144:24 145:1,23 146:1,8 153:12,14,16,18 187:6
**stenographically** 199:7
**stimulation** 95:19,22
**stood** 138:18
**stopped** 142:19
**strategies** 118:24,25
**strategy** 46:4,7 54:22 55:11 58:15 192:21 193:2 194:7
**strength** 175:20 186:19
**strengthened** 89:9
**strictly** 28:2
**strike** 47:1 60:20 61:14 105:10 112:11 119:15 161:24 171:22,23 196:19
**stringent** 116:13
**strong** 89:9
**studied** 167:2,9
**studies** 40:5,16 44:1 46:15 47:6,17,22 48:6 50:1 55:3 56:23 63:7 95:9,10,11 96:11,13 117:19 124:18 134:18 136:7 137:1 141:21 145:9,10 147:11,23 158:15,23 159:3,24 160:1,4,6,9 166:12 167:13 168:18 176:16 179:4 186:21 187:10,13 188:13,15 189:4,5,6 196:15,16,21,24,25 197:2
**study** 29:12 42:1 43:13 44:9,17 46:14 47:4, 10,13 48:9,14 49:3, 5,9 50:8 56:20 57:3, 4,16 58:2 63:6 133:11 136:5 138:22 140:9 141:23,24 142:3,24 143:4 144:7 159:21 160:20 161:19,22, 25 166:21,22 169:1 175:16 178:19,20, 25 179:1,8,12,23 180:18,19,20 188:3 197:5
**stuff** 193:19
**Stultz** 53:10,19 90:8
**Subcontract/cra** 50:3
**subject** 16:17,21 87:24 92:22 181:5
**subjects** 57:5
**submission** 199:15
**submit** 18:5 33:4
**submitted** 18:4,8 40:13
**subpoena** 184:20,22 185:9
**subsequent** 176:4
**substance** 13:25 158:17
**substantially** 175:23
**substantive** 13:25
**success** 90:12,13
**sudden** 136:1
**suddenly** 135:4
**sued** 5:15,22 8:2,3
**sufficient** 179:25
**sufficiently** 145:21
**suggested** 130:22 159:5
**suggestions** 44:19
**suggests** 86:10

**suit**
8:12 9:3,12,25
**suitable**
74:14
**suits**
17:1
**sum**
98:5
**summary**
88:3 90:13
**summer**
125:12 162:3
**supervised**
126:6
**supplemented**
14:7 62:23
**supply**
43:1
**support**
25:13 40:14 41:12, 24,25 62:24 63:12 78:9 162:16,18 163:16 182:9,13,20, 23,25 183:2 197:7, 13
**support/data**
109:13 113:12 114:3
**supported**
62:24 63:4 91:18 158:16 183:11 197:6,18
**supporting**
54:18 118:4,25
**supportive**
146:13 158:15,19 159:1,2,10 175:12, 22
**supports**
158:4 180:8,10,18
**supposed**
142:3,4
**surgeon**
5:20,21
**surprise**
11:10 155:17 163:4 182:6,8 194:13
**surrogate**
156:21
**survival**
153:21 175:16,19
**survive**
148:3 150:21
**susceptible**
166:3
**suspect**
105:5 140:11 173:8 192:14
**suspected**
138:21 140:8 141:14
**swear**
4:1
**Swedish**
16:1,3,7,8
**sworn**
4:5 199:8
**syndromes**
69:14
**synopsis**
160:2
**system**
16:16 165:20 186:18

**T**

**T-cell**
95:19
**tables**
63:3 110:21
**tabulated**
98:24
**tainted**
126:15,19,21
**Takeda**
6:24 7:2,11 32:1 59:23
**taking**
4:13 97:3 128:11 134:7
**talk**
17:20 28:8 29:12,14 30:8,12,15,19 31:4, 16,19 32:5 33:6 34:13 36:4 37:8 59:16 91:10 100:21 146:25 159:18 181:18,23,24 186:2
**talked**
10:14 17:1 28:1,2 38:13 45:16 46:14 47:2 78:18 88:25 91:17,18 122:9 132:4 135:24 160:10 178:17 184:11 185:18 186:21 191:20
**talking**
30:22 51:12 56:23 65:2 72:22 85:11 88:20 96:15,18 126:14 135:16,20 137:15 138:25 146:24 159:12
**talks**
27:18,23 28:18,20 29:5,6,11,18 30:2, 20,22,24 31:1,2,22 32:12,14,18 34:4 35:18,19,25 36:6 38:13 99:1 100:10, 13,18 113:20 115:12 125:8 132:23
**Tara**
194:23
**target**
88:11
**targeted**
88:14
**tasked**
186:23
**teaching**
20:18
**team**
88:6
**tear**
5:22,23
**technique**
145:24
**Teleconf**
83:11
**telephone**
34:4,13
**telling**
104:5 108:6 115:14, 21 118:5 125:24 127:10 132:13,16
**tells**
118:21
**ten**
26:15 40:2 58:24 67:12 68:5,13 79:2 91:2 143:5 146:11 148:2 169:2 180:15
**ten-minute**
97:5
**tend**
145:13
**tendon**
5:21,23
**tense**
15:21
**tenure**
119:22
**teratogenic**
96:15,22
**teratogenicity**
92:9,13,15
**term**
37:20 59:14 146:20 147:7 164:19 193:3 194:4
**terms**
8:12 16:2 36:2 48:22 62:17 92:10 132:10 137:8 151:18 161:1 165:25 187:24
**testified**
4:5 5:6,14 6:19,20, 21 7:17 57:13 119:21 123:17
**testify**
5:10 6:4 17:12 195:10 199:9
**testimony**
17:15 193:17
**testing**
40:8 41:7
**tetragenicity**
92:12
**THAL/DEX**
84:25
**thalidomide**
23:1,3 29:4,8,14,19 30:9 40:9 43:9 48:11 62:10,22 63:14,17,20,23 83:5 94:21 96:12 109:11 138:11 147:2,12,14, 17,18,25 148:9 158:24 159:14,18, 22 162:11 164:11, 14,22 165:6,9,18 166:2,18 167:10,15, 24 168:4,16
**Thalomid**
63:18,24 64:1,4,7, 10,13,22 65:12,13, 21,24 66:13,25 67:3,14,17,20,23 68:22 69:3,13,22,25 70:3,6,9,12,18,21, 24 71:13,16,20,23 72:1,4,9 96:22 133:17 147:2 152:12,15 155:1 156:3,9 157:12 158:5,19 160:20 165:15,25 166:13 169:15,23 170:5 180:9 197:18,20
**thaw**
146:8
**theory**
175:7
**therapies**
69:8 158:7
**therapy**
67:24 75:12 78:8 91:24 133:14 156:1 157:8 158:19 162:17 187:6 195:7
**thick**
13:7,9
**thing**
16:15 18:16,25 24:1 37:17 40:4 81:22 117:11 151:1 172:9
**things**
18:10,14 38:15 48:3 50:20 51:4 52:24 76:19 82:15 83:1 89:14 111:25 151:11 169:6
**thinking**
171:14
**thought**
13:15 127:16 148:16 192:2
**thousand**
42:19 127:22 134:3
**thousands**
68:16,17
**thrombosis**
166:14,17 167:3,10, 15,18 168:6
**thyroid**
69:17 70:10 72:18
**tightly**
27:18
**time**
3:5 12:6 18:1,22 35:17 36:16 38:6 60:7 61:19 62:2,20 63:3 79:12 80:9,22 81:12 83:6,22 85:16 98:10 99:12,21 102:6,8 103:24 104:5,7,9 108:1,8, 12 110:4,22 111:15 112:15,21 115:11 116:10 119:15,18 121:6,15 122:3,5,23 124:12 125:6 127:11,14 128:15 142:1 146:2 153:6

156:2 158:17 159:2 161:24 162:2,4,7 164:23 169:12,14 172:10 175:2 180:10,15,21 189:23 190:20 196:8 197:21
**timeline** 155:16 156:7
**timelines** 155:24
**timely** 7:20
**times** 5:5 6:18,19,21 22:15 36:19 73:7, 10,14,20 74:2 85:14 95:1,8 99:24,25
**timing** 84:19 116:9
**tissues** 145:13,14
**title** 37:5 79:25
**TNF** 95:2,6
**today** 4:13,17 121:9 122:9 130:15 150:5 163:25 195:10
**Today's** 3:5
**Tokish** 37:3,4,11
**told** 45:12 49:13 57:20 62:5 94:15 98:11 120:2 123:4 133:15 155:17 183:21
**Tom** 36:13,17 77:10,12, 14 78:2 84:11 87:23,24 90:7
**Tomayko** 90:7
**tool** 145:24
**top** 18:17 53:25 54:15 56:19 84:7 87:21 91:21 124:1
**topics** 193:5
**touch** 37:6,8
**Traci** 3:21 4:11
**track** 42:3 81:14 103:16 157:4
**Tracked** 57:10
**tracking** 54:9
**tract** 166:10
**trails** 84:19
**trained** 90:14
**training** 10:6,9,11,15 90:12, 17 102:20 103:3 104:2
**transcribed** 199:7
**transcript** 199:10
**transfusion** 146:10
**transmitted** 12:17,21
**transparency** 126:23
**transplant** 15:14,17 41:6 49:17 67:24 69:9 75:12 89:17 145:24 146:13 153:15,18
**transplantation** 41:16 144:24 145:1 187:6
**transplants** 15:19 85:3 153:12
**travel** 32:19 39:12,18,24
**traveled** 30:11,14,16
**treat** 7:7 22:25 29:20 31:12 63:12,18,21, 24 64:2,5,8,11,14 65:25 66:25 67:3, 14,17,20,23 68:22 69:3,13,22,25 70:3, 6,9,12 72:10 73:1,4, 12,17,25 74:15,21 75:5,10 88:15 132:11 142:15 145:3 151:3 154:14 156:3 159:15,18 170:14,24 171:5 172:8 173:1 174:11, 17 176:2 177:3,10, 11 180:9 195:23 196:4
**treated** 8:6 66:12 68:14 144:23 147:25 150:19 158:1
**treating** 5:24 26:7 146:16 152:20,21 153:10 159:23 167:22 171:25
**treatment** 15:19 25:24 27:5 28:16 31:11 38:22 64:22 66:2,7,8 70:18,22,25 71:14, 17,21,24 73:18 75:1 85:2 89:16 91:22 117:25 118:23,25 121:21 133:11,14 135:3 150:4,21 153:19 154:9,13,16 155:10,22 156:10 164:8 170:15,16,21 172:18 173:5 174:2 175:12
**treatments** 155:21 163:23 180:3
**tremor** 138:14
**trial** 5:6 6:4 40:14,21 41:7,11,13 42:1,2 43:7 44:5 48:11 50:6,8 139:9,13 141:13 142:19,20 162:15 174:17,22 176:3,17 179:14,16 191:19,22 196:5,8
**trials** 40:5,8,10,12,16,17 41:4 43:5 44:1,5 50:1 51:13 78:16,17 79:19 123:13,18 124:17 134:17 157:20,23 162:20 164:24 175:14,19 191:20
**trials.'** 176:7
**trouble** 151:24
**true** 17:23 25:16 94:24 95:4,17,25 121:24 163:8 182:19 199:10
**truth** 115:25 116:1
**truthfully** 199:9
**tumor** 95:7 164:21 176:13
**turn** 54:14 58:24 94:18 120:3 121:19 170:7 174:24 177:24 193:4 194:20
**turning** 14:23 19:1 20:6 53:21 158:3,12 160:11,16 194:25
**Twelve** 9:8
**type** 24:1 136:15 146:19 163:14 180:2
**types** 147:5 195:24
**typically** 72:8
**typing** 11:24 123:5

**U**

**U.S.** 88:6 193:20 194:1
**ultimately** 5:21 9:3 10:10 63:2 135:5 149:19 151:19 185:1,12
**Um-hmm** 137:9
**umbrella** 183:15
**unable** 138:18
**unchanged** 158:17 175:23
**unclear** 147:13 158:25
**uncommon** 182:24 189:3
**underlying** 158:15 159:7,8
**underneath** 19:17 49:21 84:13 89:4 114:5,16 115:6
**undersigned** 199:5
**understand** 4:20,21,24 12:13 18:7 82:24 104:18 115:24 116:4,11,16, 24 131:14 133:4 140:1 157:6 158:13
**understanding** 7:12 8:18,23,24 18:21 34:22 76:21, 23 77:16 78:12 92:8 125:1 132:11 143:6, 9 168:3,8
**understood** 119:21
**undertake** 22:2
**undue** 86:11,12
**Unique** 181:5
**unit** 15:17
**United** 3:20 116:6,18 171:8
**universities** 128:14
**university** 15:6,11,22 16:9,18, 19 21:18 47:10,14, 19 50:9,11,17,20 51:20 86:24 99:13 119:6,13,22 123:8, 12,21 127:12 132:3, 14,17,22 144:22 190:18
**unnecessary** 11:4
**untreated** 176:15
**update** 88:13
**USA** 3:14
**usual** 24:15
**Utah** 30:17
**uterine** 69:17 70:13 72:20
**utility** 157:2 164:10,17,18

**V**

**V-a-d** 164:3
**VAD** 85:3 164:3
**vague** 29:9 35:12 38:3 46:5 60:18 82:13 87:9 99:21 105:9 117:2 125:6 127:1,2 130:23 139:25 140:22 143:15 144:1 147:15 149:11,12 150:9 152:18 161:10,16 163:14 166:10 172:10 174:20 177:4 187:4 195:12, 14
**valacyclovir** 26:17
**valuable** 129:10
**Vancouver** 91:11
**varied** 169:1
**varies** 179:9,10,11
**variety** 88:12
**VBMCP** 164:4
**Velcade** 7:5,6 23:1,3,20 32:3,5 43:8 48:10 85:3 138:12 149:4, 5,10,18,24 150:3,25 151:4 154:16,19,22 155:9,14,20 164:23 165:8,14,21 166:1,6
**versions** 192:1
**versus** 3:14 151:9
**vice-chair** 20:14,15,25 21:3, 20,24 22:3 23:7 105:18 106:15
**vice-chairman** 20:8 105:21
**video** 3:7 198:7
**view** 186:2
**Vince** 90:7
**visited** 5:12
**vitae** 58:25
**volume** 158:14,20 175:13, 23,24 180:10
**volumes** 158:16
**VP** 79:11

**W**

**wait** 146:6 183:18
**waiver** 199:15
**walk** 14:22 94:19 163:20, 22
**wanted** 35:2 78:5 94:4 99:17 135:25 173:8 182:16 185:7 196:10
**wanting** 19:6
**warning** 154:22 169:22 170:1,2,3 196:2
**Washington** 3:1,10 5:9 8:1,21 9:13,22 10:1,4,13 11:1,3 15:2,3,7,12, 22 16:9,18,19 18:20 21:18 33:16 47:11, 15,20 50:10,11,17, 20 51:20 86:25 119:7,13,22 123:8, 12,21 127:13 132:3, 15,17,22 144:22 199:2,5,20
**website** 19:15 111:5 183:8
**Wednesday** 3:1
**week** 19:9,10 84:24
**weeks** 146:12
**weight** 169:8
**Weisel** 84:11
**whatsoever** 190:24
**whichever** 81:23
**whistleblower** 18:6
**white** 136:16
**wife** 135:24
**William** 3:7,12 4:3 52:21 78:3 84:25 112:15 114:1,14,23 115:9 134:14 138:20 185:23 198:8
**woman** 8:5
**women** 92:16
**word** 17:10,13,14,17 147:9 164:18
**wording** 130:3,4
**words** 46:9 54:7 59:8 104:17 152:5,6 175:9 177:19 179:20
**work** 10:8 24:5,6,24 25:7, 12,14,17 26:18 39:8 42:4 45:7 50:15 59:24 60:5 61:20 62:4,6,11 76:15,17, 24 79:16 80:16,17 82:22,23 126:3,5,7, 8,15,16,17 132:21 145:4 147:5,8 156:12 165:19 173:25
**worked** 15:18 16:4 21:17 26:25 36:25 119:3 134:18 189:25 192:14
**working** 16:16 60:13 81:19 129:4 145:23
**works** 36:25 37:2 96:6,12 118:19 190:17
**workshop** 181:6 183:14,17
**worldwide** 192:20
**worth** 127:22
**worthwhile** 153:7
**write** 13:19 28:25 29:7 52:1,2 53:2 59:9 74:20 75:16 82:22 122:14,16,19 123:1 148:24 151:25 164:13
**writer** 82:3
**writes** 78:5
**writing** 29:11 38:2 43:22 44:16 45:2,3,6 51:24 131:14 134:4 190:25 191:22
**written** 41:13,15,16 43:13 44:9 58:10 60:22 72:25 73:3,11,16,24 74:15 75:1,7,14 83:9 122:17 128:17 133:16 144:3 159:21 170:23,25
**wrong** 89:12 112:2,3 152:6
**wrote** 58:13 59:8 60:17 68:21 94:20 175:7

**X**

**x-ray** 152:1

**Y**

**year** 6:23 11:5 46:10 98:23 125:2 155:20 164:16
**years** 5:13 6:17 9:7,19,23, 24 10:16 15:25 19:23 25:1 28:17 35:22 36:11,21 37:1 38:8,15 41:22 43:12 64:20 67:12 68:13 79:2 99:13 100:4 101:19 103:21 107:19 108:4 124:13 125:8,11 127:11,24 135:10 143:5 144:9 148:2, 13 154:15 155:15 156:8 166:12 168:9 169:17 170:15 184:15 189:22
**yesterday** 102:7,8
**York** 24:10
**Yu** 190:10,24

**Z**

**Z-h-i-n-u-a-n** 190:10
**Zangari** 166:16
**Zeldis** 79:6,9,13,17,23 80:3
**Zhinuan** 190:10,24

# EXHIBIT C

# Filed Under Seal