# EXHIBIT A

JONES DAY

555 SOUTH FLOWER STREET • FIFTIETH FLOOR • LOS ANGELES, CALIFORNIA 90071-2300
TELEPHONE: 213-489-3939 • FACSIMILE: 213-243-2539

Direct Number: (213) 243-2445
bhershman@JonesDay.com

JP011055:1500704449
501872-650-001

January 5, 2016

BY EMAIL AND FEDERAL EXPRESS

Thomas H. Bienert, Jr.
Bienert, Miller & Katzman, PLC
903 Calle Amanecer, Suite 350
San Clemente, California 92673

Reuben A. Guttman, Esq.
Guttman, Buschner & Brooks PLLC
1625 Massachusetts Avenue, N.W., Suite 500
Washington, D.C. 20006

Richard A. Harpootlian, Esq.
Richard A. Harpootlian, PA
1410 Laurel Street
Post Office Box 1090 (29201)
Columbia, South Carolina 29202

Re: *United States et al. ex rel. Beverly Brown v. Celgene Corporation*, No. 10-cv-01365 (C.D. Cal.)

Dear Counsel:

We write to address the supplemental expert report of Dr. Joel W. Hay served on December 7, 2015, and corrected on December 10, 2015 (the "Supplemental Report"). As described in more detail below, Dr. Hay's Supplemental Report goes beyond the permissible scope of supplementation contemplated by the court's order in this case and the Federal Rules of Civil Procedure. If Relator Beverly Brown ("Relator") fails to correct the issues identified in this letter, Celgene will seek relief from the court to strike and exclude those portions of the Supplemental Report outside the proper scope of supplementation. This letter serves as the initial meet and confer notice on this issue under Local Rule 37-1.

While Relator represented to Celgene and the court that "Dr. Hay's proposed supplementation will excise the unusable Humana data analysis and supplant it with an analysis of Part A and Part B data," (Dkt. 247 [Relator's *Ex Parte* Application] at 8:16-18), the Supplemental Reports goes far beyond this scope. As an initial matter, the Supplemental Report fails to clearly identify the basis of Dr. Hay's expert opinions in this case. In addition, the expert opinions offered in the Supplemental Report go far beyond replacing the Humana data analysis with the analysis of Part A and Part B data, and instead offers new opinions based on information

that was available prior to the deadline for the initial expert disclosures. This analysis should have been included in Dr. Hay's initial expert disclosure, and Relator cannot meet her burden of showing the failure to do so was justified or harmless to Celgene.

**A. The Supplemental Report Fails to Clearly Identify the Basis of Dr. Hay's Expert Opinions In this Case.**

As an initial matter, it is unclear what portions of Dr. Hay's initial expert report have been "excised" or "supplanted" and which continue to form the basis of his expert opinions in this case. Dr. Hay's initial report included 103 paragraphs of opinions and appendices A-I. The Supplemental Report includes 68 paragraphs of opinions and appendices A-G. While there is some overlap in the opinions and appendices in the two reports, some material in the supplemental report appears to supplant the original report, while other material initially included in the original report is no longer included in the supplemental report. This leaves Celgene guessing as to the final content and basis of Dr. Hay's expert opinions in this case. For example, Appendix D in the original report represented the "Key Assumptions and Technical Appendix," while Appendices D-G in the supplemental report now seem to supplant the key assumptions and technical information contained in Appendix D in the original report. Appendix E in the original report included the "ICD-9 Codes Categorization," while this appendix is no longer included in the supplemental report.

The legal opinions in the Supplemental Report are similarly confusing in failing to identify what portions of his original report Dr. Hay intends to "supplant" and which paragraphs continue to form the basis of his expert opinions. Dr. Hay vaguely states that "[e]xcept where important to understand these supplemental calculations, I do not reincorporate factual predicates … addressed in my Opening Report or in my Rebuttal Report of October 26, 2015." *Id.* at ¶ 3. At the same time, Dr. Hay "incorporate[s] by reference all material set forth in my prior reports in this case" (*id.* at ¶ 3), suggesting that all the material in the original report still forms the basis of his opinions. At other times, Dr. Hay repeats opinions and analysis from the original report. *See, e.g., id.* at ¶ 39 ("Directly below, I restate my original analysis to provide context and in the interest of completeness. I then provide additional observations and information based on this new evidence."). It is unclear what paragraphs in the original report have been supplanted by the analysis in the Supplemental Report, and which portions of the original report continue to have force in this litigation.

Furthermore, it is unclear what portions of his original report have been abandoned in Dr. Hay's Supplemental Report. For example, Dr. Hay states: "I have limited my updated damages calculations to Medicare, Medicaid, Tricare and Veterans Affairs program damages. It is still my opinion that other state and federal programs (e.g., FEHBP, state retirees, Indian Health Services, 340B Public Clinics, corrections inmates, etc.) also suffered legitimate damages because these entities paid for off-label prescriptions of Thalomid and Revlimid." Supplemental Report at ¶ 9. Similarly, Dr. Hay's supplemental report provides updated damages calculations

for only some of the state Medicaid programs included in the original report. *Id.* at ¶¶ 28-29. Dr. Hay states that "I have limited my updated damages calculations to state and federal programs that are either parties in this action and/or have been subpoenaed for Revlimid and Thalomid claims and expenditure information." *Id.* at ¶ 9. While Relator's counsel has clarified in subsequent communications that Relator does not intend to seek damages for these programs, these statements in the Supplemental Report create confusion. As currently drafted, the Supplemental Report suggests that any information contained in Dr. Hay's original report may still form the basis of his expert opinions in the case. *Id.* at ¶ 68 ("I intend to present information at trial from this report ***and previous reports*** as well as prepare rebuttal reports as requested.") (emphasis added).

Pursuant to Rule 26(a)(2)(B), an expert report must contain, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B). As currently drafted, the combination of Dr. Hay's original expert report and the Supplemental Report fails to meet this basic requirement of Rule 26(a) in that the two reports do not provide a clear and complete statement of Dr. Hay's expert opinions nor the facts and data considered by Dr. Hay in forming those opinions.

Relator must clarify, by identifying specific paragraphs, which opinions in the original report are "supplanted" and which continue to form the basis of Dr. Hay's expert opinions. Given the considerable delay already caused by the Supplemental Report, Celgene expects a prompt response to allow its expert sufficient time to formulate a rebuttal report. Please clarify this issue no later than January 11, 2015.

**B. The Supplemental Report Contains Opinions Beyond the Scope of the Court's Order in this Case.**

Relator sought *ex parte* relief to allow Dr. Hay to submit a supplemental report based on third-party Centers for Medicare & Medicaid Services' ("CMS") delay in producing accessible Medicare Part A and Part B data. *See* Dkt. 247 (Relator's *Ex Parte* Application) at 3:15-17 ("*Ex parte* relief is warranted because Dr. Hay is only now in the position to review the recently corrected Medicare data, to use it to finalize his report, and to make it available, should Celgene need it for use in deposing Dr. Hay and otherwise preparing its defense."). The Court's November 4, 2015 order granting Relator's request was based on Relator's representation to the court that "Dr. Hay submitted his Report without the benefit of a complete set of Medicare data due to difficulties in obtaining the data from the government, and the government's production of a corrupted database." Dkt. 253 (11/4/2015 Order) at p. 2. The court's finding of "good cause" was also based on the fact that "Relator did not receive a usable copy of the Medicare Part A and B data she requested until one week before Dr. Hay's initial report was due," and that this "was due primarily to factors beyond Relator's control." *Id.*

Yet rather than supplement his report to simply "excise the unusable Humana data analysis and supplant it with an analysis of Part A and Part B data," (Dkt. 247 [Relator's *Ex Parte* Application] at 8:16-18) – as Relator told the Court he would do – Dr. Hay used this opportunity to rewrite his original expert report to offer entirely new theories of damages based on information that was available prior to the original report and to offer other opinions about the evidence, including the following: (1) "Charitable Foundation Kickback Damages," Supplemental Report at ¶¶ 55-66 (pp. 39-49); (2) Medicare kickback damages predicated on *all on-label prescriptions* beyond those written by the physicians in Celgene's Revlimid Speakers Program, *id.* at ¶¶ 30-50; (3) "Reasonableness of Speakers' Compensation," *id.* at ¶¶ 51-54; and (4) "Medicare Advantage Plan (Medicare Part C) Damages, *id.* at ¶¶ 19-23.

As an illustration, the Supplemental Report includes Section I, entitled "Charitable Foundation Kickback Damages," and spans for 10 pages. *See* Supplemental Report at ¶¶ 55-66 (pp. 39-49). Dr. Hay offers the expert opinion that "Celgene payments to certain charitable foundations were a ruse to cover the fact that these payments were actually illegal kickbacks designed to hide the fact that Celgene was contributing these payments to the foundations to get Medicare patients to use more Thalomid and Revlimid." *Id.* at ¶ 55. Dr. Hay's opinions are "based on the assumption that prescriptions for Celgene products in which non-profits paid the co-pay are tainted by kickbacks." *Id.* at ¶ 56. Under this theory, such prescriptions would be "tainted" regardless of whether they were prescribed on-label or off-label. Thus, there is no justification for why this analysis and these opinions had to wait for production of Part A and Part B data. This is evidenced by the fact that the majority of the evidentiary cites in this section of the report are not to purported late-produced data, but rather to publicly-available information. Indeed, Dr. Hay cites publicly-available websites 14 times in this section of the report. Dr. Hay also cites, quotes from, and relies heavily on the deposition testimony of Katherine Stultz in this portion of the report. *See, e.g., id.* at ¶¶ 63-64. This deposition was conducted on June 10, 2015 – nearly four months before Dr. Hay submitted his ***initial report***. Dr. Hay also cites documents with the Bates prefix "CDF_CLG"—some of which Relator produced to Celgene on August 25, 2015. The Supplemental Report is replete with other similar citations to and reliance on documents and evidence that were available before September 25, 2015. There is absolutely no justification for the late disclosure of these opinions ***more than 10 weeks*** after the deadline for initial expert disclosures in this case.

The court granted Relator's *ex parte* application to allow Dr. Hay to submit a supplemental expert report after the deadline for initial expert disclosures based on the narrow representation that the report would replace Humana data with Part A and Part B data from third-party CMS. Despite representations to the court that "the opinions expected to be expressed in Relator's supplemental expert report are not expected to differ significantly from Dr. Hay's initial report" (Dkt. 247 at 18:14-16), Relator has taken this opportunity to reformulate entirely new damages theories. The Part A and Part B data was not necessary for the formulation of

these new opinions and theories, yet Relator attempts to insert new theories on damages under the guise of "supplementation" at this late stage in the litigation.

C. **The Supplemental Report Fails to Meet the Standard for Supplementation Under Rule 26(e).**

As Celgene has previously pointed out, "supplementary disclosures do not permit a party to introduce new opinions after the disclosure deadline under the guise of a 'supplement.' Although Rule 26(e) obliges a party to 'supplement or correct' its disclosures upon information later acquired, this 'does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report (indeed, the lawsuit from the outset). To rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports ....'" *Plumley v. Mockett*, 836 F. Supp. 2d 1053, 1062 (C.D. Cal. 2010) (quoting *Beller ex. rel. Beller v. United States*, 221 F.R.D. 696, 701 (D.N.M. 2003)). "Excluding expert evidence as a sanction for failure to disclose expert witnesses in a timely fashion is 'automatic and mandatory' unless the party can show the violation is 'either justified or harmless.'" *Carson Harbor Village, Ltd. v. Unocal Corp.*, No. 96-cv-3281-MMM, 2003 WL 22038700, at *2 (C.D. Cal. Aug. 8, 2003) (citation omitted).

Relator failed to disclose the full extent of Dr. Hay's expert opinions in his initial report. While the Court held that Rule 26(e)'s requirement to "supplement or correct" initial disclosures provided some latitude to allow Relator to replace initial calculations based on Humana data with calculations based on Part A and Part B data, neither the Rules nor the Court's order provide a license to rewrite Dr. Hay's expert report, particularly on the basis of information that was available at the time the initial report was submitted. Providing such opinions ten weeks after the deadline for initial disclosures causes substantial prejudice and harm to Celgene.

Thus, unless Relator amends the Supplemental Report to limit it to that represented to the Court—namely replacing Humana data with Part A and Part B data—Celgene will move to exclude the Supplemental Report under Federal Rule of Civil Procedure 37 as a sanction for failing to properly disclose the expert opinions by the deadline for initial expert disclosures of September 25, 2015.

Pursuant to Local Rule 37-1, please advise when you are available for a telephonic meet and confer conference to discuss these issues, no later than January 15, 2016, within ten (10) days of this letter.

Very truly yours,

Brian Hershman, es

Brian Hershman

cc (via email): Kimberly A. Dunne, Esq
Michelle Goodman, Esq.
Sean A. Commons, Esq.
Traci Buschner, Esq.
Justin Brooks, Esq.
Karen P. Hewitt, Esq.
Toni-Ann Citera, Esq.

# EXHIBIT B

Case 2:10-cv-03165-GHK-SS Document 247 Filed 10/22/15 Page 1 of 23 Page ID #:6376

Thomas H. Bienert, Jr., State Bar No. 135311
tbienert@bmkattorneys.com
Ariana Seldman Hawbecker, State Bar No. 190506
ahawbecker@bmkattorneys.com
BIENERT, MILLER & KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Tel: (949) 369-3700/Fax (949) 369-3701

Reuben A. Guttman *(admitted pro hac vice)*
rguttman@whistleblower.com
Traci L. Buschner *(admitted pro hac vice)*
tbuschner@gbblegal.com
Justin S. Brooks *(admitted pro hac vice)*
jbrooks@gbblegal.com
Dan Guttman *(admitted pro hac vice)*
diguttman@aol.com
GUTTMAN, BUSCHNER & BROOKS PLLC
1625 Massachusetts Ave., NW, Suite 500
Washington, DC 20036
Tel: (202) 800-3001/Fax: (202) 827-0041

Richard A. Harpootlian (*admitted pro hac vice*)
rah@harpootlianlaw.com
Christopher P. Kenney (*admitted pro hac vice*)
cpk@harpootlianlaw.com
RICHARD A. HARPOOTLIAN, PA
1410 Laurel Street
Post Office Box 1090 (29201)
Columbia, South Carolina 29202
Tel: (803) 252-4848/Fax: (803) 252-4810

Nancy Gertner (*admitted pro hac vice*)
ngertner@law.harvard.edu
Langdell 328
1525 Massachusetts Ave.
Cambridge, Massachusetts 02138
Tel. (617) 851-3812

*Attorneys for Plaintiff - Relator*
*BEVERLY BROWN*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO,

Plaintiffs,
*Ex rel.*

BEVERLY BROWN,

Plaintiff-Relator,

v.

CELGENE CORPORATION,

Defendant.

Case No. 10-cv-03165 GHK (SSx)
Assigned to the Honorable George H. King

**PLAINTIFF-RELATOR'S *EX PARTE* APPLICATION TO SET DEADLINES FOR SUPPLEMENTATION OF EXPERT REPORTS UNDER RULE 26(e) AND TO PARTIALLY AMEND THE SCHEDULING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES**

Third-Party Fact Discovery: closed
Rebuttal Expert Deadline: October 25, 2015
Expert Discovery Cutoff: November 20, 2015
Pretrial Conf. Date: Not set
Trial Date: Not set

Plaintiff-Relator Beverly Brown ("Relator") hereby moves *ex parte* for an order setting deadlines for the supplementation of expert reports under Fed. R. Civ. P. 26(e), and to partially amend the Scheduling Order under Fed. R. Civ. P. 16(b)(4) and Local Rule 6-14 to allow for Relator's damages expert, Dr. Joel Hay, to supplement his expert report after the current deadline for the conclusion of expert discovery Supplementation is necessary because: (1) Medicare data is superior to other available data sets and is needed to conduct

an optimal damages analysis; and (2) Relator received an incomplete and defective set of Medicare data, preventing Dr. Hay from conducting the most complete analysis.

The difficulty obtaining Medicare data was beyond the control of Dr. Hay and counsel for Relator. Prior to the deadline for disclosing initial expert reports, critical Medicare data needed for Dr. Hay's report was produced late by the Government – despite Plaintiff-Relator's diligent efforts to obtain it – and in a corrupted format making it impossible to use. To meet the Court-ordered deadlines, Dr. Hay used data from Medicare intermediary Humana (the "Humana data") that is held by the University of Southern California ("USC"). USC initially told Dr. Hay he could use the data. It was only after Dr. Hay already submitted his report that USC's Office of Compliance told him the Humana data could not be used in litigation and could not be produced to Celgene. For that reason, Dr. Hay needs additional time, up to and including December 7, 2015, to analyze the Government's Medicare A and B data, which first became accessible mere days before this motion was filed.

*Ex parte* relief is warranted because Dr. Hay is only now in the position to review the recently corrected Medicare data, to use it to finalize his report, and to make it available, should Celgene need it[1] for use in deposing Dr. Hay and otherwise preparing its defense.

Celgene is not prejudiced by supplementation. Consistent with their reading of the Federal Rules, Relator's counsel informed Celgene by September 1, 2015 that Dr. Hay planned to supplement his report if he did not receive the necessary data sets in time to complete his analysis. Relator reiterated this several times in a variety of different forums without any objection by Celgene. Additionally, Relator is prepared to go forward with

[1] CMS sent the original A and B data to both Relator and Celgene and advised Relator that Celgene was having also access issues. Relator does not believe that CMS sent Celgene a corrected data set. Relator does not know whether Celgene has attempted to analyze any of the A and B data but can make the corrected data available to Celgene or request that CMS provide Celgene a copy.

other expert discovery.[2] No trial date is set in this matter, and summary judgment filings are not due until late January 2016.

Last week, Relator's counsel sought a stipulation from Defendant, which would address the supplementation of Dr. Hay's report and a commensurate modification of the Scheduling Order. Celgene objected to supplementation for the first time. *See* Declaration of Justin S. Brooks at ¶ 26. In accordance with Local Rule 7-19, Celgene's counsel was notified by October 19, 2015, that this application would be filed.

The contact information for Defendant's counsel is as follows:

Karen P. Hewitt (State Bar Number 145309)
kphewitt@jonesday.com
Brian D. Hershman (State Bar Number 168175)
bhershman@jonesday.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071.2300
Telephone: (213) 489-3939
Facsimile: (213) 243-2539

Kimberly A. Dunne (State Bar Number 142721)
kdunne@sidley.com
Michelle B. Goodman (State Bar Number 218607)
mgoodman@sidley.com
Sean A. Commons (State Bar Number 217603)
scommons@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

Toni-Ann Citera (admitted *pro hac vice*)
tcitera@jonesday.com
JONES DAY
222 East 41st Street

---

[2] Should Celgene want to continue other expert discovery or any supplemental reports from them, Relator would agree to such continuances.

Case 2:10-cv-03165-GHK-SS Document 247 Filed 10/22/15 Page 5 of 23 Page ID #:6380

New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

James C. Stansel (admitted *pro hac vice*)
jstansel@sidley.com
SIDLEY AUSTIN LLP
1501 K. St. NW
Washington, DC 20005
Telephone: (202) 736-8092
Facsimile: (202) 736-8711

For the reasons set forth herein and in the accompanying Memorandum of Points and Authorities, Declarations of Justin S. Brooks and Dr. Joel Hay and exhibits thereto, Relator respectfully asks the Court to issue an order setting deadlines for the supplementation of expert reports under Fed. R. Civ. P. 26(e), or, in the alternative, to partially amending the Scheduling Order to allow for the supplementation of Relator's expert report submitted by Dr. Joel Hay to occur by December 7, 2015 and any discovery necessary to be completed by Defendant as a result of the supplementation.

Case 2:10-cv-03165-GHK-SS Document 247 Filed 10/22/15 Page 6 of 23 Page ID #:6381

Dated: October 22, 2015

BIENERT, MILLER & KATZMAN, PLC

By: *Thomas H. Bienert, Jr.*
Thomas H. Bienert, Jr.
Ariana Seldman Hawbecker

Reuben A. Guttman *(admitted pro hac vice)*
Traci L. Buschner *(admitted pro hac vice)*
Justin S. Brooks (*admitted pro hac vice)*
GUTTMAN, BUSCHNER & BROOKS PLLC

Richard A. Harpootlian (*admitted pro hac vice*)
Christopher P. Kenney (*admitted pro hac vice*)
RICHARD A. HARPOOTLIAN, PA

Nancy Gertner (*admitted pro hac vice*)

*Attorneys for Plaintiff-Relator*
*BEVERLY BROWN*

## MEMORANDUM OF POINTS AND AUTHORITIES

Pursuant to Federal Rule of Civil Procedure 26(e) and Federal Rule of Civil Procedure 16(b)(4) and Local Rule 16-14, Plaintiff-Relator Beverly Brown ("Relator" or "Brown"), by and through the undersigned counsel, moves this Court for a six week extension of the current expert disclosure and discovery deadlines to allow for the supplementation of expert testimony by Dr. Joel Hay, Relator's sole damages expert.[3] This motion is made following email discussions and a conference of counsel pursuant to Local Rule 7-3, which took place on October 21, 2015.

Although supplementation of expert reports is contemplated by Fed. R. Civ. P. 26(a)(2)(E) and 26(e)(1)(A) and Relator notified Celgene that Dr. Hay planned to supplement his report prior to serving it, the current Scheduling Order does not specify a time for supplementation of expert reports. *See* Dkt. No. 192. Celgene now objects to any such supplementation or extending the deadlines for expert discovery. The current Scheduling Order sets a deadline of September 25, 2015 for expert reports, October 25, 2015 for expert rebuttal reports and close of expert discovery on November 20, 2015. Dr. Hay submitted his initial report on September 25, 2015 without the benefit of a complete set of Medicare data. Medicare produced the data late, and the data provided could not be used because it was corrupted. Dr. Hay now has, in useable fashion, the Medicare data he needs to complete his analysis, but will not be able to meet the November 20, 2015 discovery cut-off date because it will take approximately six weeks for Dr. Hay and his team to, process, review and assess the data. Accordingly, Relator seeks an Order extending expert discovery only as to Dr. Hay's report.

Supplementation is necessary due to problems obtaining the Medicare data, all of which were beyond the control of Dr. Hay and counsel for Relator. Relator subpoenaed this data in November 2014, more than eleven months ago, and worked diligently with the Government to get it despite numerous delays not caused by Relator's counsel. The

[3] Relator does not seek to supplement any other expert report.

Government did not produce Medicare Part A and B data to the parties until the end of August 2015 and produced it corrupted.[4] As discussed in detail below, Relator acted promptly and diligently to secure a replacement set. But the replacement set that was produced to Relator **a mere week before Dr. Hay's report was due.**

To remedy the lack of Part A and Part B data and meet the deadlines in this case, Dr. Hay obtained permission from the University of Southern California ("USC") to pay for and use data from Medicare intermediary Humana (the "Humana data") that USC maintained. Only after the report was submitted, did USC change course. After the report was submitted USC's Office of Compliance called and told Dr. Hay the Humana data could not be produced to Defendant. Relator sought the production of the Humana data through a formal subpoena after USC stated their data set could not be produced to Celgene, but the scope and timing of such production is unclear.

In preparing his supplemental report, Dr. Hay discovered that the replacement set of Part A and B data **was still unusable**. Counsel for Relator and Dr. Hay again worked with the Government to get the issues resolved but were not successful until October 20, 2015, two days before the filing of this motion. Dr. Hay's proposed supplementation will excise the unusable Humana data analysis and supplant it with an analysis of Part A and Part B data, data that allows for a more accurate damages analysis.[5]

---

[4] The parties split the $160,000 cost of Part A, B, and D data from the Government. CMS produced the Part D data approximately one month before producing the A and B data, and unlike the A and B data, the Part D data was not corrupted. Dr. Hay's report includes Part D data, but the Part A and Part B data is needed to derive more information about the Part D claims.

[5] The Part A and B data is needed to determine when patients – in their disease cycle – were placed on the drugs at issue in this case, whether false billing codes were used to describe the patient's disease state to CMS, *and* whether the patient was put on a drug combinations not approved by the Food and Drug Administration ("FDA"). The timing of the prescriptions is important because the FDA has *only* approved the use of Thalomid with another drug, dexamethasone, for newly diagnosed multiple myeloma patients. Also until 2015, Revlimid was only approved in combination with dexamethasone for patients with multiple myeloma after another drug regimen was tried.

In an attempt to prevent prejudice associated with the exchange of data and supplementation, counsel for Relator consulted with Defendants in order to reach agreement on an extension that would satisfy both parties. Declaration of Justin S. Brooks ("Brooks Decl.") ¶¶ 24-26. Notwithstanding these efforts, Defendant objected to any extension in this matter and will oppose efforts by Relator to use a supplemental report by Dr. Hay. *Id*. Currently, fact discovery has closed and there is no trial date set. Under the Court's current Scheduling Order, expert discovery ends on November 20, 2015. Dr. Hay can supplement his report by early December and will work to make himself available for deposition at a time of Defendant's choosing. Summary judgment briefs are not due until January 29, 2015. The parties timely completed the mediation ordered by the court, and a second mediation session is scheduled for February 2, 2016, a few days after the submission of summary judgment briefing. In short, there is sufficient time within the current Scheduling Order to accommodate the supplementation of the Hay damages report without delaying briefing, settlement discussions, or trial. Accordingly, no prejudice will result to Defendant.

For these reasons, as discussed in greater detail below, Relator respectfully requests that this Court: (1) set the deadline for Dr. Hay's supplementation of his report for December 7, 2015; (2) allow Defendant sufficient time to review his amended report – which is not expected to change substantially from the original report – and provide any desired rebuttal, and (3) allow Defendant to take Dr. Hay's deposition after the conclusion of expert discovery set forth in the current Scheduling Order.

## FACTUAL BACKGROUND

Relator served subpoenas for documents and data on the Centers for Medicare & Medicaid Services ("CMS") in November of 2014 and served virtually identical subpoenas on a number of state Medicaid Agencies by April 2, 2015. *See* Brooks Decl. Ex.s A, B, C. Most relevant to this motion, Relator sought Medicare claims and services data from CMS

Case 2:10-cv-03165-GHK-SS Document 247 Filed 10/22/15 Page 10 of 23 Page ID #:6385

for Revlimid and Thalomid patients.[6] Three Medicare components are required for the damages analysis of Relator's expert: Medicare Part D, Medicare Part A, and Medicare Part B. Relator's subpoena sought data from all of these components.

At issue here is the belated and defective production of Medicare Part A and B data. Medicare Part A covers Medicare inpatient care, and Medicare Part A data includes diagnosis information on Thalomid and Revlimid patients who were diagnosed at a variety of facilities. Medicare Part B covers services such as lab tests, surgeries, and doctor visits. The data are highly relevant to determination of oncology indications and off-label uses of Revlimid and Thalomid.

The Medicare Part A and B data were requested and are particularly relevant here because it is necessary to properly analyze drug combinations and lines of therapy.[7] Hay Decl. ¶ 7. This is critical because Thalomid and Revlimid are, and were during the relevant times, only approved for use in combination with certain other drugs and to treat certain stages of disease. *Id*. For example, in 2006, the FDA approved Thalomid to treat newly diagnosed multiple myeloma in combination with dexamethasone but did not approve it as a monotherapy. *Id*. Similarly, in 2006, the FDA approved Revlimid in combination with dexamethasone for use in multiple myeloma patients who had received at least one therapy. *Id*. But it did not approve Revlimid as a monotherapy or, until 2015, for the treatment of newly diagnosed multiple myeloma. *Id*. Accordingly, Relator's expert sought Medicare

---

[6] A majority of damages in this case stem from claims for non-reimbursable uses of Thalomid and Revlimid that Medicare should not have paid; however, payments from Medicaid for off-label and non-reimbursable uses is also a significant component of damages, and data from certain state Medicaid agencies remains forthcoming. For Dr. Hay's December 7, 2015 report, the Court should also allow him to analyze data that was not produced by state Medicaid agencies in time for the filing of his September 25, 2015 report.

[7] In cancer, in particular, treatment is assessed pursuant to lines of therapy. For example, the national Cancer Institute at the National Institutes of Health, defines second-line therapy as treatment that is given when initial treatment (first-line therapy) does not work or stops working. *See, e.g.*, http://www.cancer.gov/publications/dictionaries/cancer-terms?cdrid=346513

parts A and B data as it is necessary to identify drug combinations and lines of therapy to get a complete picture of the extent of off-label use. *Id*.

On April 16, 2015, Relator's attorneys and damages expert had a comprehensive teleconference with CMS to discuss the precise data Relator's expert needed. In advance of the teleconference, CMS provided a data dictionary of available fields so that Relator's expert could determine what he needed. Brooks Decl. ¶ 2. The call with CMS was productive and CMS confirmed they could produce all the fields requested for parts A, B, and D data within twelve weeks. Hay Decl. ¶ 8. On June 18, 2015, the Court granted the parties stipulation to extend the completion of expert discovery to November 20, 2015 and the deadline for submission of expert reports from July 24, 2015 to September 25, 2015. *Id.*

As CMS's original, promised production date began to approach, counsel for Relator contacted CMS to determine when the data would be produced and if anything else was needed from the parties. Brooks Decl. ¶ 3. CMS informed counsel that counsel would need to execute a protective order that was specific to CMS but was amenable to certain changes to satisfy the Court or tailor the order to the case at bar. *Id*.

On June 18, 2015. Relator's counsel emailed a proposed protective order to Celgene counsel. Counsel asked Celgene to "please provide any additional changes you feel are necessary" so he could "finalize with CMS so that we may file a Stipulated Protective Order and move forward on obtaining the data." Brooks Ex. D. Hearing nothing by June 22, counsel sent a reminder email on June 22, 2015 to Celgene's counsel, noting that "CMS has confirmed these redlines are acceptable" and that they would "format properly and execute" if "Defendant has nothing further." *Id*. Relator's counsel did not receive a response to this follow-up email either. Brooks Decl. ¶ 5.

On June 26, 2015, counsel for Relator again sent the draft protective order to counsel for Celgene[8] so that Sidley Austin and Jones Day could approve one of the steps necessary

[8] Counsel sent the stipulation to Heidi Wendel, an attorney with whom he had just had a call in connection with subpoenas to a different third party.

to obtain the data. Counsel for Celgene responded that day stating they would "get back [ ] as soon as possible." Brooks Decl. Ex. E. Without any further response and without receiving any comment on the protective order in the following four days, Relator's counsel again wrote to Celgene, expressing "concern[ ] that the delay in execution of the protective order and ensuing delay in getting CMS data could ultimately result in a need to push the expert discovery deadline back." Brooks Decl. Ex. F. Celgene's counsel Ms. Wendel called Relator's counsel to state that she understood the concern. Brooks Decl. ¶ 7. Relator's counsel received redlines to the Stipulated Protective Order from Celgene and immediately provided them to CMS on June 30, 2015. Brooks Decl. Ex. G. Upon hearing that CMS did not object to Defendant's redlines, counsel for Relator immediately contacted counsel for Celgene to relay the message and get permission to file. Brooks Decl. Ex. H. Celgene confirmed, and the Stipulated Protective Order was filed roughly two weeks after Relator sent it to Celgene for review. Dkt. No. 196. Magistrate Judge Suzanne Segal entered the Stipulated Protective Order the following day. Dkt. No. 197.

CMS sent Medicare Part D to counsel on or around July 23, 2015, and Relator's expert Dr. Hay received it shortly thereafter. Brooks Decl. Ex. H; Hay Decl. ¶ 9. But CMS did not produce the Medicare A and B data needed to assess lines of therapy and drug combinations until approximately August 22, 2015. Hay Decl. ¶ 10. During the period between July 23, 2015 and August 22, 2014, Relator's counsel made numerous telephonic inquiries and sent a number of emails regarding the status of the A and B data. Brooks Decl. ¶ 11. For example, on August 4, 2015, Relator's counsel emailed CMS attorney Eden Heard to ask for an update on the timeline for Part A and B data; Ms. Heard responded the following day to both Relator and Celgene's counsel, noting they "both inquired about the status of the hard drives" and that data loading was "a time consuming process, and only one person is available to load the files." Brooks Decl. Ex. J.

Relator's counsel again emailed Ms. Heard on August 13, 2015 to get a "better sense on when" A and B data would be ready. In an effort motivate CMS to act promptly, Relator expressed concern regarding the ability to meet the deadlines for initial exchange of expert

reports. Brooks Decl. Ex. K. In response to counsel's email, Ms. Heard explained that the A and B hard drives should be ready to ship overnight mail by the middle of the following week, which would have provided Dr. Hay ample time to complete his analysis. *Id.* Indeed, if Dr. Hay had received complete and uncorrupted A and B data within that time frame, he would have been able to complete his analysis with time to spare. Hay Decl. ¶ 10. But the data was defective.

By August 24, 2015, Dr. Hay and his team determined that the A and B data were not accessible. *Id*. at 11. Relator's counsel promptly contacted CMS to explain that his expert could not access the Part A and B data and requested a call with CMS and its tech people; he was told that "[o]pposing counsel had problems too." Brooks Decl. Ex. L. Counsel for Relator again contacted Ms. Heard on August 26, noting that "[t]he deadline for [Relator's] expert report [was] fast approaching" and was told that Ms. Heard "left multiple messages and emails for the technical contacts" and would "escalate the matter." Brooks Decl. Ex. M.

Several teleconferences and extensive email communications with CMS could not resolve the matter. Hay Decl. ¶ 11; Brooks Decl. Ex. N. On September 1, 2015 computer analyst Larry Shaw emailed to say that he thought the files "were bad" and that CMS would regenerate a hard drive. Brooks Decl. Ex. N at 2. CMS professed that regeneration of the hard-drive was a high priority but was "[n]ot sure how long" it would take. Brooks Decl. Ex. N at 1. Questioning whether she would receive data in time but believing that Rule 26(e) allowed her to supplement her expert report, Relator continued to press Medicare on the timeline for production (*see* Brooks Decl. Ex. O) but explored alternative means of obtaining the data necessary to prepare an initial expert report.

Relator's expert had access to Humana data through his work with the University of Southern California and substituted data analysis from Humana claims data on the percent of Thalomid and Revlimid that was used off-label in order to calculate damages for Medicare and other government payers, while calculating the actual total Revlimid and Thalomid Medicare payments from the Medicare Part D data. Hay Decl. ¶ 12. The Humana

data reviewed belongs to the University of Southern California ("USC"), but USC initially told Dr. Hay he could purchase and use the Humana data in the litigation. *Id.* It was only after Dr. Hay filed his report that the USC Office of Compliance said that Relator would not be able to use the data in litigation. *Id.*

Consistent with the ability and obligation to supplement based on late-produced third-party discovery, Relator clearly and consistently announced her intent to supplement her expert report in numerous communications. For example, on September 1, 2015, in response to an email from Ms. Dunne noting – among other things – that mediation should take place after service of expert reports, Relator's counsel "agree[d] to keep the expert report deadline as is, recognizing that there could be some supplemental reporting by the expert(s)."[9] Brooks Decl. Ex. Q. Celgene did not object or raise any concerns in response to the statement that Relator expected to supplement her reports. Brooks Decl. ¶ 17. In the cover letter serving Dr. Hay's report and that of another expert, Relator also clearly stated that she "intend[ed] to supplement these reports after [receiving] all outstanding documents from third parties and tak[ing] all depositions, as required by the Federal Rules." Brooks Decl. Ex. R. Relator expressly addressed the fact that 'information requested by Relator many months ago just arrived, including the Medicare Part A and B data, which originally came to the parties in a corrupted format." *Id.* Moreover, Dr. Hay's report itself expressly identifies the missing Medicare A and B data and states that he would supplement his analysis when it was produced. Hay Decl. ¶ 16.

Having received the new Medicare A and B data approximately 1 week before Dr. Hay filed his initial report, albeit too near the deadline to analyze the data (Hay Decl. ¶ 12), Relator expected to supplement fairly promptly. However, when Dr. Hay and his team went to assess the second drive of Part A and B data, they determined that it remained

---

[9] In order to respect the confidential nature of the ongoing mediation with Judge Phillips, Relator has not provided the earlier emails in the chain. A second mediation session is scheduled for February 2, 2016, following summary judgment briefing, and Relator wishes to respect the mediation privilege and not divulge substantive communications regarding the mediation.

inaccessible. Hay Decl. ¶ 14. Although the data was readable this time, CMS did not explain the complicated merge codes necessary to merge these files with our Part D data. *Id.* All initial efforts to resolve the data issues with CMS were unsuccessful. After email correspondence, Relator's counsel and Dr. Hay had another call with CMS on October 16, 2015; they were still unable to fully identify or resolve the issues. *Id.* It was not until a follow-up call on October 20, 2015, in which CMS included its outside contractor Larry Shaw, that CMS was able to identify and explain the steps necessary to link the Part A and Part B data to the Part D data so that an analysis can be conducted. *Id.*

Dr. Hay has conducted an analysis of the tasks he needs to perform to complete and supplement his expert report and believes this will take approximately 6 weeks. *Id.* ¶ 17. Dr. Hay could more promptly supplement with Celgene's internal data and has offered to do so, Brooks Decl. Ex. S at 4, but the analysis would not be as robust and accurate as the Medicare data allows. *Id.* ¶ 15.[10]

In a series of emails between October 16, 2015 and October 19, 2015, Relator's counsel again raised the issue of supplementation with Celgene, noting that Dr. Hay was prepared to supplement the following week and offering to allow Celgene to serve a supplemental rebuttal report. Brooks Decl. Ex. S at 4. Counsel noted that the supplemental report would not be the final report because of continued problems with Medicare data. *Id.* Objecting for the first time to any of Relator's communications regarding supplementation, Celgene objected to the submission of seriatim rebuttal reports. *Id.* at 16. Relator's counsel noted that Relator would certainly give Celgene the time it needed to prepare a final rebuttal report in response to Dr. Hay's final expert report and also identified her belief that Rule 26(e) contemplates and requires supplementation. *Id.* at 2-3.

---

[10] Humana data identical or similar to that in USC's possession may also be forthcoming pursuant to a subpoena Relator issued, but the scope and precise timing of production remains unclear.

## ARGUMENT

### I. PLAINTIFF SHOULD BE ALLOWED TO SUBMIT A SUPPLEMENTAL EXPERT REPORT

Federal Rule of Civil Procedure Rule 26(e)(1) provides that

> A party who has made a disclosure under Rule 26(a) . . . ***must supplement*** or correct its disclosure or response:
>
> (A) in a timely manner ***if the party learns that in some material respect the disclosure or response is incomplete or incorrect***, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; . . .

(emphasis added). Thus "Rule 26 anticipates that an expert's written report may need to be updated to reflect newly discovered evidence after it has been disclosed." *Churchill v. United States*, 2011 U.S. Dist. LEXIS 13761, 2011 WL 444849, at *4 (E.D. Cal. Feb. 8, 2011). Relator learned only after timely submitting Dr. Hay's initial expert report that the Humana data on which he relied could not be utilized and that Celgene could not be given the underlying data. Thus, Relator's expert report was rendered "incomplete or incorrect."

In *Sherwin-Williams Co. v. JB Collision Services*, the district court explained that "'[s]upplementing an expert report pursuant to Rule 26(e) means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure.'" 2015 U.S. Dist. LEXIS 30022, *16-17 (S.D. Cal. Mar. 11, 2015) (quoting *Gerawan Farming, Inc. v. Rehig Pacific Co.*, 2013 U.S. Dist. LEXIS 67957, 2013 WL 1982797, at *5 (E.D. Cal. May 13, 2013)) (internal quotation marks omitted). Here, Dr. Hay's initial report is unusable through no fault of his own. This creates an interstice on damages that renders the report both incomplete and incorrect. Further, Relator timely sought but was not able to access the third-party CMS data prior to his initial disclosure, again, through no fault of his own.

The court in *Sherwin-Williams* also held, "[t]he time for supplementation is not limited to the discovery period," as set forth in Rule 26(e)(2). *Id*. (citing *Dayton Valley*

Case 2:10-cv-03165-GHK-SS Document 247 Filed 10/22/15 Page 17 of 23 Page ID #:6392

*Investors v. Union Pacific R. Co.*, 2010 U.S. Dist. LEXIS 108232, 2010 WL 3829219 (D. Nev. 2010)); see also Advisory Comm. Notes to 1993 Amendments ("Supplementations need not be made as each new item of information is learned but should be made at appropriate intervals during the discovery period, and with special promptness as the trial date approaches."). Relator has not delayed in seeking to supplement her damages expert's report, and the modest extension Relator seeks will not prejudice Celgene. Indeed, Rule 26(e) further provides that

> For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. ***Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due***.

Fed. R. Civ. P. 26(e)(2) (emphasis added). The scheduling order in this case did not address supplementation of expert reports (Dkt. No. 192), and no date has been set for pretrial disclosures. Thus a supplemental report filed by December 7, 2015, would be timely.

Further, Relator has an affirmative duty to supplement her experts' reports under Rule 26(e). *See Lindner v. Meadow Gold Dairies, Inc.*, 249 F.R.D. 625, 635 (D. Haw. 2008) ("Fed. R. Civ. P. 26(e) requires a party to 'supplement or correct' a disclosure upon information later acquired . . . .") (internal quotations omitted).

Further, allowing supplementation here would be harmless. The court in *United States v. 14.3 Acres of Land*, 2008 U.S. Dist. LEXIS 66667, *8 (S.D. Cal. Aug. 29, 2008), denied a motion to strike supplemental expert reports. The court explained that, "as a threshold matter, the Court must determine whether the [initial] report satisfies the requirements of Rule 26(a)(2)(B)(i). This classification in turn impacts whether the [second] report should be considered a new report or a supplemental report." *Id*. at *14. Here, Relator fully complied with her initial disclosure obligations under Rule 26(a)(2)(B)(i) by submitting a complete report based on relevant data by the initial deadline. The report was

Case 2:10-cv-03165-GHK-SS Document 247 Filed 10/22/15 Page 18 of 23 Page ID #:6393

subsequently rendered inoperative by USC's withdrawal of permission to use and produce the Humana data. Although certain analyses are possible with Part A and B data that are not permissible with the data to which Dr. Hay previously had access, the principal methodology will remain the same.

The *Durham* court held that plaintiff could "not otherwise assert any basis for prejudice" where '[t]rial is not for several months such that it will not be disrupted by this disclosure" and plaintiffs "have long been aware" of the opinion expressed in the supplemental report. 2011 U.S. Dist. LEXIS 72068, at *37-38. No prejudice can be shown here either. The supplemental report Relator seeks to provide does not constitute a "sandbagging" effort by the Relator, *14.3 Acres of Land*, 2008 U.S. Dist. LEXIS 66667, at *17, as Relator identified her intention to supplement Dr. Hay's report well before the initial reports were filed. Nor will Celgene be prejudiced by the short extension Relator seeks. Relator has already offered to postpone Celgene's rebuttal with respect to Dr. Hay's report and his deposition. Moreover, the opinions expected to be expressed in Relator's supplemental expert report are not expected to differ significantly from Dr. Hay's initial report.

The Court should set deadlines to allow Relator to supplement Dr. Hay's report by December 7, 2015, and allow Celgene adequate opportunity to prepare rebuttal testimony and depose Dr. Hay.

## II. THERE IS GOOD CAUSE TO AMEND THE SCHEDULING ORDER

There is also good cause to amend the scheduling order with respect to expert discovery. See *Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 2015 U.S. Dist. LEXIS 108381, *9 (E.D. Cal. Aug. 17, 2015); *Lara v. Sutter Davis Hosp*., No. 12-2407, 2014 U.S. Dist. LEXIS 272, 2014 WL 28817, at *1 n.1 (E.D. Cal. Jan. 2, 2014).

Under Rule 16(b) of the Federal Rules of Civil Procedure, "[a] schedule shall not be modified except upon a showing of good cause." Fed. R. Civ. Proc. 16(b). "[T]he focus of the [good cause] inquiry is upon the moving party's reasons for seeking modification." *Johnson v. Mammoth Recreations. Inc*., 975 F.2d 604, 607 (9th Cir. 1992). "A district court

Case 2:10-cv-03165-GHK-SS Document 247 Filed 10/22/15 Page 19 of 23 Page ID #:6394

may modify the pretrial schedule if it cannot reasonably be met despite the diligence of the party seeking the extension." *Truong v. Sacramento County Sheriff Dep't*, 2012 U.S. Dist. LEXIS 163689, *2 (E.D. Cal. Nov. 15, 2012) (*quoting Johnson*, 975 F.2d at 609 (9th Cir. 1992)) (internal citations omitted). Rule 16(b)'s "good cause" standard primarily considers the diligence of the party seeking the amendment. *Johnson*, 975 F.2d at 609. *See also Zivkovic v. Southern California Edison Co*., 302 F.3d 1080, 1087 (9th Cir. 2002). Because diligence is the focus of the inquiry, prejudice to the party opposing the modification is not a prerequisite; it does, however, "supply additional reasons to deny [the] motion." *Johnson*, 975 F.2d at 609.

**A. Relator Has Been Diligent**

As explained by the court in *DatCard Sys. v. PacsGear, Inc*. "a modification [of the scheduling order] is permitted only upon a showing of 'good cause,' which requires evidence that Plaintiff has behaved with reasonable diligence." 2011 U.S. Dist. LEXIS 137502, *3-4 (C.D. Cal. Nov. 29, 2011) (holding that service of substantial discovery after deadline for amending pleadings caused delay and, finding no fault by the moving party, modified scheduling order to allow amendment of answer and counterclaim). The court identified the following factors to consider:

> (1) the party was diligent in assisting the Court in creating a workable Rule 16 order . . . ; (2) that [its] noncompliance with a Rule 16 deadline occurred or will occur, notwithstanding [its] diligent efforts to comply, because of the development of matters which could not have been reasonably foreseen or anticipated [4] at the time of the Rule 16 scheduling conference . . . ; and (3) that [it] was diligent in seeking amendment of the Rule 16 order, once it became apparent that [it] could not comply with the order.

(quoting *Jackson v. Laureate, Inc*., 186 F.R.D. 605, 608 (N.D. Cal. 1999) (alterations in original). The court granted the motion to amend finding that "three months is not a *per se* excessive amount of time in which to bring a motion to amend" and there was no prejudice to the non-moving party." *Id*. The court in *Jackson* reasoned that, absent

> allegations that Plaintiff was not diligent in assisting the Court in creating the Scheduling Order, the issue of diligence is twofold: first, whether the noncompliance with the Scheduling Order occurred notwithstanding Plaintiff's diligent efforts to comply, because of the development of matters which could not have been reasonably foreseen or anticipated at the time of the scheduling conference; second, whether Plaintiff was diligent in seeking amendment of the Scheduling Order, once it became apparent that amendment was necessary.

186 F.R.D. at 609. In *Quicksilver Air Inc. v. Helicopter Engine Repair Overhaul Servs.*, 2014 U.S. Dist. LEXIS 148177, *19 (C.D. Cal. Oct. 16, 2014), for example, the court revised the scheduling order to allow a defendant to retain and disclose expert witnesses who were supposed to be retained by a defendant that settled, citing no fault by defendant and a "manifest need" for presentation of causation information by the experts). Relator's inability to provide the Hay supplemental expert report any sooner than December 7, 2015 is due entirely to matters outside of her control. She has complied with all scheduling orders and other deadlines and has been diligently seeking the required Medicare data since November 2014, shortly after the start of discovery. As set forth in substantial detail above, Relator's counsel had countless communications and interactions with Medicare, both to obtain the data and to resolve defects once the data was received.

At the time of the scheduling conference, Relator could not have reasonably foreseen that it would take CMS nearly a year to produce useable data in response to Relator's subpoena. Moreover, once it became apparent that Dr. Hay would not receive the necessary Part A and Part B data from CMS, he immediately sought and received permission to use similar data held by USC. It was not until after Dr. Hay's expert report was timely submitted on September 25, 2015, that he was notified by USC that he could not use the Humana data for his expert report or produce it to Celgene. At all times, third parties CMS and USC controlled the data essential for Dr. Hay's damages analysis, and Relator could not have avoided this necessary extension.

### B. Celgene Will Not Be Prejudiced by a Short Extension of the Expert Discovery Deadlines

Prejudice may "supply additional reasons to deny [a] motion" to amend a scheduling order. *Johnson*, 975 F.2d at 609. But any prejudice Celgene may assert in allowing Relator to serve the Hay supplemental expert report shortly after the scheduling order deadline is "readily resolved by extending [Celgene's] opportunity to procure rebuttal testimony." *Quicksilver Air*, 2014 U.S. Dist. LEXIS 148177, at *19; *see also DatCard Sys. V. PacsGear, Inc.*, 2011 U.S. Dist. LEXIS 137502 at *5 ("potential prejudice … can be cured" through allowing the opposing party sufficient time to respond). Indeed, Relator already sought to resolve this matter without burdening the Court by offering Celgene the opportunity to postpone submitting its rebuttal to Dr. Hay's expert report until it was supplemented. Even more significant, Celgene was informed of Relator's intention to supplement by September 1, 2015, well before expert reports were served. Relator and her counsel (and Dr. Hay himself in the body of the report) reiterated this a number of times. Clearly, there was no effort by Relator to "surprise" Celgene. On the contrary, Celgene's objection is surprising.

Finally, Relator does not propose to alter the dates for summary judgment motions, which is January 29, 2016, by virtue of Dr. Hay's supplementation. There should be ample time to accommodate Relator's supplementation and subsequent discovery without altering the date summary judgment briefs are due.

## CONCLUSION

For the foregoing reasons, Relator respectfully requests that the Court issue deadlines for supplementation of expert reports and appropriate discovery no earlier than December 7, 2015. There is good cause to amend the Scheduling Order to allow Dr. Hay to submit his final expert report on December 7, 2015, after the current deadline for expert discovery.

Relator does not request any other amendments to the Scheduling Order.

Case 2:10-cv-03165-GHK-SS Document 247 Filed 10/22/15 Page 22 of 23 Page ID #:6397

Dated: October 22, 2015

BIENERT, MILLER & KATZMAN, PLC

By: *Thomas H. Bienert, Jr.*
Thomas H. Bienert, Jr.
Ariana Seldman Hawbecker

Reuben A. Guttman *(admitted pro hac vice)*
Traci L. Buschner *(admitted pro hac vice)*
Justin S. Brooks (*admitted pro hac vice)*
GUTTMAN, BUSCHNER & BROOKS PLLC

Richard A. Harpootlian (*admitted pro hac vice*)
Christopher P. Kenney (*admitted pro hac vice*)
RICHARD A. HARPOOTLIAN, PA

Nancy Gertner (*admitted pro hac vice*)

*Attorneys for Plaintiff-Relator*
*BEVERLY BROWN*

# CERTIFICATE OF SERVICE

That I am a citizen of the United States and am a resident or employed in Orange County, California; that my business address is 903 Calle Amanecer, Suite 350, San Clemente, California 92673; that I am over the age of 18 and not a party to the above-entitled action.

That I am employed by a member of the United States District Court for the Central District of California and at whose direction I caused service of **PLAINTIFF-RELATOR'S EX PARTE APPLICATION TO SET DEADLINES FOR SUPPLEMENTATION OF EXPERT REPORTS OR PARTIALLY AMEND THE SCHEDULING ORDER** on the interested parties as follows:

**X** **BY ELECTRONIC MAIL:** by electronically filing the foregoing with the Clerk of the District Court using its ECF System pursuant to the Electronic Case Filing provision of the United States District Court General Order and the E-Government Act of 2002, which electronically notifies said parties in this case:

| | | |
|---|---|---|
| Brian Hershman<br>bhershman@jonesday.com | Michelle B. Goodman<br>mgoodman@sidley.com | Kimberly A Dunne<br>kdunne@sidley.com |
| Sean A Commons<br>scommons@sidley.com | Toni-Ann Citera<br>tcitera@jonesday.com | Karen Hewitt<br>kphewitt@jonesday.com |
| jdelmedico@JonesDay.com | Howard F. Daniels<br>howard.daniels@usdoj.gov | Jay Edward Smith<br>js@gslaw.org |

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on October 22, 2015, at San Clemente, California.

*/s/ Michele Ueda /s/*
Michele Ueda

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. CV 10-3165 GHK (SS) Date: November 4, 2015
Page 1 of 3

Title: United States of America, et al., ex rel Beverly Brown v. Celgene Corporation

---

DOCKET ENTRY: **ORDER GRANTING PLAINTIFF-RELATOR BEVERLY BROWN'S EX PARTE APPLICATION FOR AN ORDER TO SET DEADLINES FOR SUPPLEMENTATION OF EXPERT REPORTS UNDER RULE 26(e), OR, IN THE ALTERNATIVE, TO PARTIALLY AMEND THE SCHEDULING ORDER (Dkt. No. 247)**

PRESENT:

**HONORABLE SUZANNE H. SEGAL, UNITED STATES MAGISTRATE JUDGE**

| Marlene Ramirez | CS 11-2-15 | None |
|---|---|---|
| Deputy Clerk | Court Reporter/Recorder | Tape No. |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANTS: |
|---|---|
| Thomas H. Bienert, Jr. | Brian D. Hershamn<br>Michelle Beth Goodman |

**PROCEEDINGS:**

On October 22, 2015, Plaintiff-Relator Beverly Brown ("Relator") filed an Ex Parte Application for an Order to Set Deadlines for Supplementation of Expert Reports under Rule 26(e), or, in the Alternative, to Partially Amend the Scheduling Order. (Dkt. No. 247). Relator filed a Notice of Errata the next day attaching an identical copy of the Application with the addition of a table of contents and authorities. ("Application" or "Appl.," Dkt. No. 248). Also on October 23, 2015, Defendant filed an Opposition to the Application. ("Opp.," Dkt. No. 249). On October 29, 2015, Judge King referred to the Matter to the above-referenced Magistrate Judge. (Dkt. No. 250). On November 2, 2015,

Case 2:10-cv-03165-GHK-SS Document 253 Filed 11/04/15 Page 2 of 3 Page ID #:6790

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. CV 10-3165 GHK (SS) Date: November 4, 2015


Title: United States of America, et al., ex rel Beverly Brown v. Celgene Corporation

---

the Court held a hearing. For the reasons stated below, Relator's Application is GRANTED.

Relator seeks an extension of the expert disclosure and discovery deadlines to allow for supplementation of expert testimony by Dr. Joel Hay, Relator's sole damages expert. The current Scheduling Order set September 25, 2015 as the deadline for the initial exchange of expert reports, October 25, 2015 as the deadline for the exchange of expert rebuttal reports, and the close of expert discovery on November 20, 2015. (Dkt. No. 192). The Parties have exchanged initial and rebuttal reports. However, Relator contends that Dr. Hay submitted his Reports without the benefit of a complete set of Medicare data due to difficulties in obtaining the data from the government, and the government's production of a corrupted database. (Appl. at 1-2). Defendant argues that Relator merely wishes to replace the Humana data set that Dr. Hay used in both his initial and rebuttal Reports with a different set of data to pursue new damages theories. Celgene further argues that it will be prejudiced in light of the time and money it has expended in rebutting Dr. Hay's Report, and that Relator will reap an undue benefit because Dr. Hay has already received Defendant's expert damages Report. (Dkt. No. 249 at 12-13).

The Court finds good cause to extend the deadlines. The Court finds that Dr. Hay's inability to timely use Medicare data in his Reports was due primarily to factors beyond Relator's control. Relator subpoenaed Medicare data from the government in November 2014, but Medicare produced the data late and initially in corrupted form. (Appl. at 1). Relator did not receive a usable copy of the Medicare Part A and B data she requested until one week before Dr. Hay's initial report was due. (Hay Decl. ¶ 12). Furthermore, Relator notified Defendant both before, at the time of, and after the service of Dr. Hay's initial Report that although Relator would adhere to the deadlines set in the Court's Scheduling Order, she intended to supplement the Report in light of the government's untimely production. (Brooks Decl. Exhs. Q, R & S). In addition, the Court notes that there is a strong federal policy favoring decisions on the merits. See Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986). Allowing the supplementation of Dr. Hay's report will further this policy.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. CV 10-3165 GHK (SS) Date: November 4, 2015


Title: United States of America, et al., ex rel Beverly Brown v. Celgene Corporation

---

The Court therefore GRANTS Relator's Application to the extent that it seeks an extension of the relevant pretrial deadlines.

Accordingly, the Parties are hereby ORDERD to meet and confer and to submit a stipulation for a proposed amended pretrial schedule, including the extension of any date that will be impacted by this revised deadline, within seven days of the date of this Order. If the Parties cannot agree, each side shall submit its own proposed revised schedule (entitled "Notice of Proposed Amended Schedule") within seven days of the date of this Order.

IT IS SO ORDERED.

00:48
Initials of Deputy Clerk mr

# EXHIBIT D

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, ex rel. Beverly Brown, Plaintiff-Relator | ) | |
| v. | ) | Civil Action No. CV10-03165 GHK (SSx) |
| Celgene Corporation, Defendant | ) | |

**CORRECTED EXPERT REPORT OF JOEL W. HAY, PH.D.**

April 22, 2016

# TABLE OF CONTENTS

**Page**

I. Introduction ..........1

II. Background and qualifications ..........1

III. Summary of Opinions ..........5

IV. Celgene Sales Representatives, at the Direction of Management, Aggressively Promoted Off-Label Uses of Revlimid and Thalomid ..........11

A. Off-label sales of Thalomid and Revlimid are thoroughly tainted by aggressive allegedly illegal promotion by Celgene Sales Representatives ..........12

B. Celgene aggressively marketed and sold Thalomid and Revlimid for oncology off-label indications ..........16

1. Celgene made sales and marketing plans for off-label indications ..........16

2. Celgene Appears to Have Promoted Off-Label Uses by Misrepresenting Compendia Support ..........20

3. Celgene employed an extensive "publications strategy" ..........21

4. Transcripts of physicians coversations with sales representatives show sales visits are permeated with illegal promotion ..........22

5. Celgene provided articles and training for non-labeled uses of Thalomid and Revlimid ..........25

6. Celgene pushed for doses that were not indicated in the label ..........26

7. Unreasonably high number of sales contacts with physicians for few leprosy patients ..........26

C. The Food and Drug Administration sent warning letters to Celgene for promoting Thalomid for off-label oncology indications ..........28

IV. Assumptions and Data sources for damages calculations ..........29

V. Damages Calculation Methodology ..........35

VI. Damage Calculations ..........32

A. Medicare Part D Damages ..........35

B. Pre-2006 Medicare Advantage Plan (Medicare Part C) Damages ..........38

C. Tricare Damages ..........41

D. VA Damages ....................................................................................42

E. Medicaid Damages ..........................................................................46

F. Kickback Damages Predicated on Payments to Promotional Speakers..................................................................................51

G. Kickbacks in the Form of Payments to Physicians ..............................52

1. Higher paid speakers prescribed significantly more than lower paid prescribers ..........................................................................55

2. Examples of some speaker payments made to physicians and the prescribing pattern seen ......................................................56

3. Reasonableness of Speakers' Compensation ..............................60

H. Charitable Foundation Kickback Damages.........................................61

VII. Rebuttal Testimony and Testimony at Trial ..................................................70

Appendix A: Curriculum Vitae of Joel H. Hay, PhD…………………………....73

Appendix B: List of Dr. Joel Hay's recent legal case reports and testimony……142

Appendix C: List of materials used to write report....…………………………148

Appendix D: Medicare Analysis Method for On/Off-Label Thalomid and Revlimid Use and Damages Calculations...................................................................159

Appendix E: Tricare Analysis Methodology for On/Off-Label ..........................164

Thalomid and Revlimid Use and Damages Calculations ....................................164

Appendix F: Medicaid Data Analysis Methodology ...........................................168

Appendix G: Medicare KOL damages Methodology..........................................174

Appendix H: PANF charitable foundation related damages to Medicare Program ..................................................................................................189

Appendix I: Methodology for calculating the total number of prescriptions (and costs associated) by KOLs in Celgene's Revlimid Speaker's program using RevAssist data:...........................................................................................192

Appendix J: Methodology for investigating statistically significant difference in prescribing behavior of Celgene's high paid vs. low paid KOLs from Revlimid Speakers program..........................................................................................203

## I. Introduction

1. I, Joel W. Hay, Ph.D., having been retained by counsel for Relator, Beverly Brown, to provide expert testimony on her behalf in the above-captioned action, submit this Expert Report. This report supplants the prior versions of my report dated September 25, 2015 and December 7, 2015.

2. This report incorporates and reflects new and corrected information recently provided by CMS, TRICARE, and other health care programs, which in some instances necessitated renewed evaluation and consideration of available evidence. This report also reflects evaluation and analysis of data and information that I had received too close in time to the due dates of earlier versions of my report to incorporate into those versions. In addition, where I believed it might be helpful, I have provided additional clarification and explanation for my opinions, and have also corrected typographical and similar errors.

3. This report incorporates and reflects all data and information that has been provided to me to date. If additional data or information becomes available in the future and I am asked to do so, I will update my report to reflect and incorporate such data and information.

## II. Background and qualifications

4. I am a tenured Full Professor and Founding Chair of Pharmaceutical Economics and Policy in the School of Pharmacy, with joint appointments in the Schaeffer Center for Health Policy and Economics and in the Department of Economics at the University of Southern California (USC). I also serve as the USC Project Coordinator for the Rand Evidence-Based Medicine Practice Centers of Southern California, funded by the U.S. Agency for Healthcare Research and Quality. I am a Health Economics Research Scholar at the UCLA Center for Pediatric Vaccine Research. I am a founding Executive Board member of the American Society for Health Economics. I am also an extramural grants reviewer for the U.S. Agency for Healthcare Research and Quality.

5. Our academic department at USC is the largest and most prominent department in the United States focused specifically on pharmaceutical economics and health economics. Since I initiated the graduate programs in Pharmaceutical Economics and Policy in 1994, we have graduated over 120 Ph.D. and M.S. students in this field. We currently have 32 graduate students in residence.

6. I earned my B.A. *summa cum laude* in economics from Amherst College in 1974, and my M.A., M.Phil., and Ph.D. in economics from Yale University between 1976-1980. I have taught at Yale University, Stanford University, University of California Santa Barbara, the University of Connecticut, and USC.

7. From 1978-1980, I was an Assistant Research Professor at USC. From 1980-1984, I was an Assistant Professor in the School of Dental Medicine and the Department of Economics at the University of Connecticut. I was a Senior Policy Analyst with Project Hope from 1983-1985. From 1985-1992, I was a Senior Research Fellow at the Hoover Institution at Stanford University. I have been a tenured faculty member at USC since 1992.

8. I have authored or coauthored over 500 scientific reports, articles, and abstracts, including over 180 peer-reviewed scientific articles in the fields of pharmaceutical economics, health economics, health care markets, outcomes research, disease management, statistics, econometrics, epidemiology, and health care in journals, including: *American Journal of Cardiology*, *American Journal of Managed Care*, *American Journal of Public Health*, *Archives of Neurology*, *Cancer*, *Haemophilia*, *Health Care Financing Review*, *Health Affairs*, *Health Economics, Health Policy, JAMA, Journal of AIDS, Journal of the American Geriatrics Society, Journal of Business & Economic Statistics*, *Journal of Clinical Gastroenterology*, *Journal of Health Economics, Journal of Health Politics, Policy and Law, Journal of Human Resources, Journal of the National Comprehensive Cancer Network, Journal of the Royal Statistical Association, Medical Care, Pediatrics, Pharmacoepidemiology & Drug Safety, Psychiatric Services,* and *Value in Health.*

9. I have served as a consultant to the U.S. Centers for Medicare and Medicaid Services, U.S. Agency for Healthcare Research and Quality, U.S. Centers for Disease Control and Prevention, U.S. Public Health Service, U.S. Food and Drug Administration (FDA), U.S. Environmental Protection Agency, Government of Hungary, Hong Kong Centre for Economic Research, Hong Kong Medical Executives Association, World Bank, California AIDS Commission, California Medi-Cal Drug Advisory Board, County of San Diego Medically Indigent Adult Program, and County of Sacramento Homeless Program.

10. I have also written numerous health-related op-eds published in papers such as the Los Angeles Times, New York Times, Newsday, Sacramento Bee, San Diego Union, San Francisco Chronicle and Wall Street Journal. I have been interviewed numerous times on television and radio regarding health-related and drug-related policy issues, including media networks such as American Public Media, Australian Broadcasting Corporation, BBC, PBS, CBS, ABC, NBC, NPR, Fox News, C-SPAN, Al Jazeera and Air America.

11. I have served as a member of the Expert Advisory Panel on Drug Utilization Review, United States Pharmacopeial Convention; and a member of the JAMA Web Site HIV/AIDS Editorial Review Panel. I am a founder and founding member of the Board of Directors of the International Society for Pharmacoeconomics and Outcomes Research. Outcomes research is the field of using rigorous scientific evidence to evaluate the tangible outcomes of drugs and other treatments on patients' quality of life and ability to function in their chosen activities (*e.g.*, work, family, social activities, leisure).

12. As a pharmaceutical economist, I have taught and studied about pharmaceutical marketing and drug promotion activities for more than three decades. I have participated in pharmaceutical company-sponsored advisory boards dealing with marketing and promotion issues for nearly all of the major and many smaller pharma companies. I have opined on

pharmaceutical marketing and promotion in numerous legal cases, including several False Claims Actions.[1]

13. I was a founding Executive Committee member for the federally sponsored Southern California Evidence-Based Medicine Practice Center (EPC) started in 1998 and funded by the federal Agency for Healthcare Research and Quality. This Center is the key regional site for developing and evaluating medical and clinical evidence regarding comparative treatment effectiveness. The Southern California EPC is a collaborative research network managed at the Rand Corporation but collaborating with all the major academic medical research centers in southern California, including Rand, USC, UCLA, UCI, UCSD, UCR, Cedars-Sinai, Kaiser-Permanente Division of Research, and the Greater Los Angeles Veteran Affairs Healthcare System. I was the USC project coordinator for this EPC for 13 years and focused on the study design, statistical evaluation, and outcomes evidence associated with treatment alternatives for various diseases and conditions.

14. The Agency for Healthcare Research and Quality (AHRQ) is the primary federal agency within the US Department of Health and Human Services tasked with evaluating and promulgating scientific evidence on the quality and value of medical care. My doctoral research was funded by the predecessor federal agency to AHRQ in 1978-1980. Since then I have participated in numerous AHRQ-funded projects and have served as an appointed external grants reviewer for AHRQ for the past four years as well as previously and subsequently on an ad hoc basis.

15. I served as the Founding Editor-in-Chief of *Value in Health*, the peer-reviewed scientific journal of the International Society for Pharmacoeconomics and Outcomes Research,

[1] For example, three recent cases on which I worked are: *United States of America, et al. ex rel. James Garbe v. Kmart Corporation*, Case No. 3:12-cv-00881-NJR-PMF. United States District Court, Southern District of Illinois; *United States of America, et al. ex rel. Helen Ge, M.D. v. Takeda Pharmaceutical Company Ltd. Et al.*, Case No. 1-11-cv-10343-PBS. United States District Court, District of Massachusetts; *United States of America, et al. ex rel. Helen Ge, M.D. v. Takeda Pharmaceutical Company Ltd.* Case No. 1:10-CV-11043-FDS. United States District Court, District of Massachusetts.

from its 1998 inception until 2003. In its first scientific citation impact factor, *Value in Health* was ranked number one in two categories for the year 2004 by the ISI Journal Citation Reports® (JCR) with an impact factor of 3.657. *Value in Health* led all other journals listed both in the Health Care Sciences and Services category in the JCR Science Edition and in the Health Policy & Services category in the JCR Social Sciences Edition. These categories include all scientific journals relating to health economics and pharmaceutical economics.

16. I have provided expert reports and testimony in numerous court and arbitration panel actions relating to pharmaceutical and medical issues. A more complete listing of my qualifications and publications is outlined on my *curriculum vitae*, which is attached as Appendix A. A list of my recent legal case reports and testimony are attached as Appendix B. A list of the materials that I have considered in writing this report is included in Appendix C.

17. I am being compensated for my testimony in the present case at my standard rate of $975.00 per hour, plus any reasonable out-of-pocket expenses. No payments to me are contingent upon the outcome of this or any other hearings or litigation or upon the nature of my opinions.

## III. Summary of Opinions

18. My summary off-label damages calculations relating to Celgene's off-label promotional activities are as follows:[2]

[2] These damages presentations are in summary format. Alternative presentations of the damages, by payor, year, drug, on-label, off-label, etc. are included in the supplementary programs and documents submitted with this report. Should the Court or finder of fact require an additional categorization of the damages calculations, this can also be provided with the same data and methods.

| Off-label Damages Summary: Thalomid | | | | | |
|---|---|---|---|---|---|
| | **Off-Label claims** | **Costs due to Off-Label Claims** | **Trebling** | **Civil Penalties per Claim** | **Total Off-Label Damages** |
| Medicare Part D | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Medicare Advantage Plans (Part C pre-2006) | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Tricare | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Veterans Affairs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Medicaid Programs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| Off-label Damages Summary: Revlimid | | | | | |
|---|---|---|---|---|---|
| | **Off-Label claims** | **Costs due to Off-Label Claims** | **Trebling** | **Civil Penalties per Claim** | **Total Off-Label Damages** |
| Medicare Part D | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Tricare | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Veterans Affairs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Medicaid Programs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| Off-label Damages Summary: Revlimid and Thalomid | | | | | |
|---|---|---|---|---|---|
| | Off-Label claims | Costs due to Off-Label Claims | Trebling | Civil Penalties per Claim | Total Off-Label Damages |
| Medicare Part D | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Medicare Advantage Plans (Part C pre- 2006) | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Tricare | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Veterans Affairs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Medicaid Programs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

19. Counsel has informed me that the amount of civil penalties per claim is expected to increase pursuant to statute in the near future. If and when a new range of civil penalties applies to each false claim, I will update my calculations.

20. As explained below, it is reasonable to conclude that all Thalomid and Revlimid on-label prescriptions are also tainted by kickbacks. On that basis I have included calculations of the on-label damages to government payors for Revlimid and Thalomid purchases.

| On-label Damages Summary: Thalomid | | | | | |
|---|---|---|---|---|---|
| | On-label claims | Costs due to on-label Claims | Trebling | Civil Penalties per Claim | Total on-Label Damages |
| Medicare Part D | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Tricare | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Veterans Affairs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Medicaid Programs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| On-label Damages Summary: Revlimid | | | | | |
|---|---|---|---|---|---|
| | **On-label claims** | **Costs due to on-label Claims** | **Trebling** | **Civil Penalties per Claim** | **Total on-Label Damages** |
| Medicare Part D | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Tricare | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Veterans Affairs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Medicaid Programs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| On-label Damages Summary: Revlimid and Thalomid | | | | | |
|---|---|---|---|---|---|
| | **On-label claims** | **Costs due to on-label Claims** | **Trebling** | **Civil Penalties per Claim** | **Total on-Label Damages** |
| Medicare Part D | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Tricare | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Veterans Affairs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Medicaid Programs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

21. Total on-label and off-label damages are calculated as follows:

| Total (on-label and off-label) Damages Summary: Thalomid | | | | | |
|---|---|---|---|---|---|
| | **Total claims** | **Costs due to Total Claims** | **Trebling** | **Civil Penalties per Claim** | **Total Damages** |
| Medicare Part D | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Medicare Advantage Plan (Part C pre-2006) | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Tricare | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Veterans Affairs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Medicaid Programs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| Total (on-label and off-label) Damages Summary: Revlimid | | | | | |
|---|---|---|---|---|---|
| | **Total claims** | **Costs due to Total Claims** | **Trebling** | **Civil Penalties per Claim** | **Total Damages** |
| Medicare Part D | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Tricare | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Veterans Affairs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Medicaid Programs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| Total (on-label and off-label) Damages Summary: Revlimid and Thalomid | | | | | |
|---|---|---|---|---|---|
| | **Total claims** | **Costs due to Total Claims** | **Trebling** | **Civil Penalties per Claim** | **Total Damages** |
| Medicare Part D | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Medicare Advantage Plan (Part C pre-2006) | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Tricare | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Veterans Affairs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Medicaid Programs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

22. The additional data I received also enabled me to compute additional damages due to on-label prescribing and payments to charitable foundations, promotional speakers, and KOLs as described in detail below. Counsel has instructed me to assume for purposes of calculating damages that the evidence will show that these payments constitute kickbacks under applicable law. These damages overlap to some extent with the Summary Damages listed above, but they are factually based on Celgene's conduct, and redundancies would be eliminated should the Court or Jury exclude some portion of the Summary Damages listed above from the damages award. They are, thus, appropriate additional bases for recovery and any redundancies can be eliminated following findings of fact.

| Damages to Medicare program due to prescriptions written by Celgene's Revlimid promotional speakers (KOLs) | | | | | | |
|---|---|---|---|---|---|---|
| **Drug** | **Indication** | **Scripts** | **Straight line damages** | **Treble damages** | **Civil Penalties** | **Total damages** |
| Thalomid | Off-Label | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | On-Label | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | Total | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Revlimid | Off-Label | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | On-Label | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| Damages to Medicare program due to payments to non-profit foundations | | | | | | |
|---|---|---|---|---|---|---|
| **Drug** | **Indication** | **Claims paid through PANF co-pays** | **Damages to Medicare due to PANF copays** | **Trebling** | **Civil penalties** | **Total damages** |
| **Thalomid** | Off-Label | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | On-Label | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Revlimid** | Off-Label | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | On-Label | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

## IV. Celgene Sales Representatives, at the Direction of Management, Aggressively Promoted Off-Label Uses of Revlimid and Thalomid

23. Relator's counsel has informed me that they believe the evidence will show that (1) Celgene engaged in extensive and wide-ranging off-label promotion of Thalomid and Relimid over the relevant time periods, affecting all channels of information available to doctors regarding the safety and efficacy of both drugs, and (2) Celgene's off-label promotion so thoroughly infected the market for both drugs that all off-label prescriptions for both drugs were tainted by Celgene's off-label promotion. For purposes of my damages calculations, and based

on my more than 30 years of experience studying the pharmaceutical industry, Relator's counsel asked me to opine on whether it would be reasonable for the trier of fact to reach these conclusions.

24. To test the reasonableness of these conclusions, I reviewed a significant volume of evidence provided by Relator's counsel, as set forth in Appendix C. As described more fully below, my review of that evidence has caused me to conclude that it would be reasonable for the trier of fact to conclude that Celgene engaged in extensive and wide-ranging off-label promotion of Thalomid and Relimid over the relevant time periods, affecting all channels of information available to doctors regarding the safety and efficacy of both drugs, and that all off-label prescriptions for both drugs between 2001 and the present were tainted by Celgene's off-label promotion. The evidence I've reviewed and discussed here and in my Rebuttal Report of October 25, 2015 shows that Celgene operated in the pharmaceutical marketplace like an athlete on illegal steroids, making it impossible, given available and non-destroyed data, to distinguish its genuine accomplishments from what it had done illegally to gain its position in the market. My review of the evidence has caused me to further conclude that it would be reasonable for the trier of fact to conclude that all on-label prescriptions for both Thalomid and Revlimid between 2006 and the present were likewise tainted by Celgene's payment of kickbacks and made possible by Celgene's early and ongoing unfair and unbalanced promotional activities.[3]

### A. Off-label sales of Thalomid and Revlimid are thoroughly tainted by aggressive allegedly illegal promotion by Celgene Sales Representatives

25. As shown in this section immediately below, the evidence I have reviewed supports the conclusion that Celgene engaged in extensive and aggressive promotion of Thalomid and Revlimid for uses that were not indicated on the FDA-approved product marketing labels, or were not indicated on the FDA-approved marketing labels at the time the Celgene sales

[3] The off-label promotion referenced in my report is only a sampling based on documents and testimony that I have reviewed. I do not purport to have reviewed or discuss the full body of evidence regarding Celgene's promotional activities.

force promoted these off-label uses of Thalomid and Revlimid. Furthermore, that evidence shows that Celgene sales representatives frequently provided physicians and other prescribers with journal articles and other materials that discussed, verbalized and orally discussed these materials, and in many cases appear to have misrepresented safe and efficacious off-label use of Thalomid and/or Revlimid and the existence and nature of support for off-label uses.[4] Moreover, rather than engaging in responsible good faith efforts to monitor and eliminate such illegal promotion, evidence I reviewed shows that Celgene executives and top management were aware of and ***actively encouraged this illegal promotion*** by the Celgene sales force.

26. Based on my experience, as well as advice from counsel, I understand such off-label promotion by pharmaceutical sales representatives to be illegal under the Food Drug and Cosmetics Act ("FDCA") and implementing regulations (*e.g.* 21 U.S.C. §§ 331(a)-(b), 352(a), (f); 21 U.S.C. § 301, et seq.; 21 C.F.R. § 202.1.; 21 U.S.C. § 321(n)), as well as the False Claims Act (and similar state laws) where it induces the presentation of claims to government payors for non-reimbursable uses of drugs. *See, e.g.*, 31 U.S.C. § 3729(a)(1)(A); 31 U.S.C. § 3729(a)(1)(B); 42 U.S.C. § 1369r-8(k). I also understand from counsel and direct review of warning letters issued to Celgene by the FDA that Celgene was governed by more stringent restrictions on the distribution and promotion of Thalomid and Revlimid than exist for virtually any other drugs under subpart H of FDA regulations. 21 CFR § 314.520(H), 21 CFR § 314.550(H) ("Subpart H").

27. It is my opinion, based on more than three decades of experience with drug marketing and promotion, that this extensive illegal promotion thoroughly tainted the decisions by prescribers to carefully and reasonably weigh the treatment options regarding off-label indications for Thalomid and Revlimid.[5] Likewise, the statutory compendia, scientific literature,

---

[4] See, for example, the Report of Stephen Z. Fadem, M.D., FACP, FASN. September 24, 2015.

[5] The extent to which physician decision-making is affected by drug company marketing is the subject of a number of academic studies, including for example Zipkin, Daniella A.; Steinman, Michael A., Interactions Between Pharmaceutical Representatives and Doctors in Training; A Thematic Review, J Gen. Intern. Med. 2005; 20:777-786; Schwartz, Thomas L.; Kuhles, Daniel

and other factors that could otherwise provide a reasoned basis for physicians to provide off-label appear thoroughly tainted and compromised by Celgene's marketing and promotional efforts. Based on the extensiveness of Celgene's promotional and marketing efforts and, it is my opinion that a jury or other factfinder could reasonably conclude that Celgene's illegal conduct is responsible for ***ALL*** of the off-label sales of Thalomid and Revlimid. Moreover, as discussed in my Rebuttal Report of 10-26-15, without regard to fair balance in promotion and marketing, Celgene exhibited so much control over the entire market perceptions of Thalomid and Revlimid through ghost-written scientific articles, compendia, kickbacks to Key Opinion Leaders (KOLs) and promotional speakers, and total control of access to investigational drug for scientific research that on-label sales of Thalomid and Revlimid were also tainted by Celgene's illegal behavior.

28. Physicians and other prescribers have a reasonable expectation that sales promotion messages they hear from pharmaceutical sales representatives such as those from Celgene are not illegal and follow FDA guidelines for fair balance, covering accurate and reliable on-label use of their products. Even those doctors who may not have fully remembered which indications were on-label or off-label, or who may have believed themselves that their own prescribing was independent of Celgene promotion were unquestionably influenced by the Celgene-sponsored Key Opinion Leaders promoting off-label indications, the Celgene-sponsored marketing materials promoting off-label indications and their own physician colleagues who were influenced by sales representatives promoting off-label indications. Many doctors, knowing that anything that Celgene sales representatives said could be reasonably presumed not to be illegal and to fit within the FDA-approved marketing label, have inaccurately assumed that

J., II; Wade, Michael; Masand, Prakash S., Newly Admitted Psychiatric Patient Prescriptions and Pharmaceutical Sales Visits, Annals of Clinical Psychiatry; Sep. 2001; 13, 3; pg. 159; Berndt, Ernst R.; Bui, Linda; Reiley, David R.; Urban, Glen L., Information, Marketing, and Pricing in the U.S. Antiulcer Drug Market, The American Econ. Rev.; May 1995; 85, 2; Pg. 100; Norris, Pauline; Herxheimer, Andrew; Lexchin, Joel; Mansfield, Peter, Drug Promotion: What We Know, What We Have Yet to Learn, WHO/EDM/PAR/2004.3.

whatever the sales representatives were telling them was within the FDA-approved marketing indications.

29. Pharmaceutical companies wouldn't spend huge sums on marketing and promotion, including allegedly illegal promotion, if physicians based their prescribing decisions only on their "training and experience, their independent medical judgment, existing clinical studies and medical literature" as Celgene has stated in a Court filing I reviewed. Dkt. No. 125 at 18. Nor would there be a need for sales representatives to detail physicians or verbalize and discuss the benefits of off-label uses purportedly evidenced by literature they provide. That literature should speak for itself and experienced physicians should be capable of evaluating it based on its merits without self-serving promotional and marketing efforts of pharmaceutical companies.[6]

30. Celgene's self-serving claim flies in the face of an enormous body of market research, psychological and behavioral economics literature that demonstrates that while people, including experts, believe that they make rational and objective decisions, their actual decisions are unconsciously influenced by a host of subjective and arbitrary factors.[7] As but one example, Nobel Prize winning psychologist Prof. Daniel Kahneman points to the fact that parole boards are more likely to grant parole to inmates immediately after eating meals than during other times of the day. Prof. Kahneman's book, *Thinking Fast and Slow*, provides several examples of physicians making decisions on subjective rather than objective criteria. For example Kahneman notes:[8]

---

[6] In this case, as I describe, I have seen evidence that the scientific literature on Celgene's drugs itself is tainted because it had an arrangement with a medical writing company to place marketing messages in articles on off-label uses.

[7] Moreover, Celgene's claims ignore the evidence that Celgene both improperly manipulated and misrepresented the medical literature as to safe and effective uses of Thalomid and Revlimid, as addressed more fully by Relator's clinical expert, Dr. Fadem, based on his review of the discovery produced and scientific literature. See Fadem Report.

[8] Kahneman, Daniel. *Thinking, Fast and Slow* (Kindle Locations; 6173-6175, 7668-7671). Farrar, Straus and Giroux. Kindle Edition. 2011.

…preferences of physicians and patients between hypothetical therapies for lung cancer varied markedly when their probable outcomes were described in terms of mortality or survival. Surgery, unlike radiation therapy, entails a risk of death during treatment. As a consequence, the surgery option was relatively less attractive when the statistics of treatment outcomes were described in terms of mortality rather than in terms of survival. …An important finding of the study is that physicians were just as susceptible to the framing effect as medically unsophisticated people (hospital patients and graduate students in a business school). Medical training is, evidently, no defense against the power of framing…

31. Should further information be provided to me to show that some percentage of Thalomid and Revlimid sales were not due to illegal promotion, or should the Court or Jury find that some percentage of Thalomid and Revlimid off-label sales were not tainted by Celgene's extensive and pervasive off-label marketing and promotion activities, it would be straightforward for me to update and adjust all of my damages calculations by any such Court-ordered percentage adjustment.

### B. Celgene aggressively marketed and sold Thalomid and Revlimid for oncology off-label indications

#### 1. Celgene made sales and marketing plans for off-label indications

32. The "2004 Business Plan: Western Region" was created for the January 1, 2004 Celgene Corporation West Region comprising twenty-two states. This plan was by regional sales director Larry Bishop (then one of three regional directors) and provided specific goals in overall sales, new patient growth, targeted malignancies (at a time in which Celgene had no FDA approved cancer uses), among other things. The plan clearly emphasizes and calls for sales representatives to promote and sell Thalomid for off-label indications when it was only approved for Leprosy:[9]

[redacted]

[9] Cavanaugh Exhibit 32 BB2-0000002

Section 4.1 of the same Business Plan states:

[redacted]

33. Marketing presentations and business plans from as early as 2001 show plans to market, promote and sell off-label uses of Thalomid. E.g.; Thalomid Marketing Overview submitted by Amy C. Cavers, Director, Marketing Oncology. Multiple pages are devoted to current (off-label) use.[10]

34. Off-label marketing and sales plans are not limited to Thalomid and not limited to Celgene's earlier years. In the lead up to the 2006 launch of Revlimid, the Pacific Coast Sales District prepared a business plan.[11] The plan focused on targeting "Tier One Targets" (presumably highest potential prescribers). With regard to "Physicians," the plan stated:

[redacted]

However, Revlimid has only been approved in treatment of Myelodyplastic Syndrome with 5q deletion (-5q syndrome drug).

35. [redacted]

---

[10] CELBRN0714359.

[11] CELBRN0204655, Revlimid Launch; Pacific Coast District Business Plan, at page 40.

[redacted][12]

36. Long before Thalomid had any cancer indication, a 2001 Powerpoint slideset presentation states: "Four events occurred last year that transformed Celgene": (Slide 2 Notes) Discussion about Thalomid revenues increased substantially "…as it became an established drug in the armamentarium for the treatment of Multiple Myeloma: additionally it established Celgene as a commercial oncology company."[13]

37. A 2004 email chain regarding running a report on the number of patients for various diseases that were treated with Thalomid include off-label indications such as melanoma, prostate, renal, and MDS. Jonathan Merle, a sales manager in Celgene's Western region indicates he is "using this information to find out where the focus has been (or not been) and to demonstrate potential in some areas such as prostate cancer and the potential for penetration in these areas."[14] Likewise, in a March 8, 2004 email to all Florida sales representatives, Florida District Manager Eileen Bohannon praised a sales representative's strategies and success in convincing practitioners to use Thalomid for treatment of multiple myeloma, MDS, prostate cancer, and other off-label uses, noting they probably earned him "3 ovary patients" just that week and would effectively "increase sales."[15] The email was circulated throughout the organization with praise by management, reaching Tom Cavanaugh, who I understand now serves as Celgene's Vice President of U.S. Sales & Marketing.[16]

38. In late 2006, [redacted], a Celgene sales representative in the West Region, used [redacted] to present a CME at Hoag Hospital in Orange County. She confronted him after he failed to mention in a CME the use of Revlimid to treat non 5q deletion

---

[12] CELBRN0095298, CELBRN0095301.

[13] CELBRN0714068.

[14] CELBRN0212364.

[15] CELBRN0212346-47.

[16] *Id.*

MDS patients. She learned to chase down doctors after learning that Shawn Gormish, their manager, had done the same thing following a CME at UCLA.[17]

39. Though Thalomid didn't receive a multiple myeloma indication until 2006, Celgene's 2013 Corporate Responsibility document states in its timeline "1998 - FDA approves the use of thalidomide for treatment of multiple myeloma – Celgene markets it as THALOMID® and begins shipments":




[17] TAC ¶ 205.

**2. Celgene Appears to Have Promoted Off-Label Uses by Misrepresenting Compendia Support**

40. In a February 18, 2000 email from Eileen Finnegan to some of Celgene's most senior management and sales managers, including then CEO Sol Barer, current CEO Robert Hugin, Director of Medical Affairs Ken Resztak, and sales manager Deanna Pankey, Finnegan proclaimed that "[t]he AHFS (American Hospital Formulary Service) Drug Information, which is being released today from the printers, **has recognized THALOMID'S effectiveness in several off-label indications including many cancer uses (breast, ovarian, head etc.)"**[18] As explained by Dr. Steven Z. Fadem, Relator's clinical expert, through 2008, the AHFS stated that Thalomid was "being evaluated for the treatment of a variety of malignancies, including advanced or metastatic breast cancer], Kaposi's sarcoma]', melanoma+', multiple myeloma]', ovarian cancer+', primary brain tumors]' (recurrent high-grade astrocytomas and mixed gliomas), androgenindependent prostate cancer+', and renal carcinoma]" but that "further study [was] needed to establish safety and efficacy of the drug in the treatment of [the] various malignancies and identify optimal doses of the drug in patients with cancer." Dkt. No. 224 at 7 n.4; Expert Report of Steven Z. Fadem ¶ 80. Dr. Fadem opined that Ms. Finnegan's interpretation of the compendium was "not scientifically plausible." Dkt. No. 224 at 7 n.4; Expert Report of Steven Z. Fadem ¶¶ 79-81. Indeed, even as a matter of common sense, Finnegan's characterization of the compendium language is a misrepresentation. It is not possible to state that Thalomid's effectiveness was "recognized" by the compendium when the compendium states Thalomid was being evaluated for these uses but that further study was *needed* to establish safety and efficacy. Finnegan's representation of the compendium was greeted as "[g]reat news regarding the Compendia!" and treated as a rallying call to sales representatives to "incorporate into your calls [to physicians] when you hear that reimbursement is an obstacle."[19]

[18] CELBRN0317545 (emphasis in the original).

[19] *Id.* Although it makes sense to note this here, I primarily leave it to others to address Celgene's representations of the compendia to promote sales of Revlimid and Thalomid, and in

### 3. Celgene employed an extensive "publications strategy"

41. Coincident with the launch of Revlimid, Celgene employed an entity called Excerpta Medica to engage in a comprehensive publications strategy. Celgene used Excerpta Medica to release numerous scientific publications on off-label uses of Revlimid. Documents reviewed indicate purposes behind the retention of Excerpta Medica and release of these publications on off-label use were to "negate competitor claims," "create noise" and "raise awareness/maintain noise in absences of data."[20] "Publication planning" was included in Celgene's marketing budget. For example, Celgene's 2007 marketing budget included [redacted] for publication planning for Revlimid.[21] Dozens of line items in Celgene's marketing budget are for Excerpta Medica.[22] Excerpta Medica's "Publication plan development" made it clear the publication management would include "desired position in each indication" and "[c]onsistent messaging for publications," including specific consistent messages to be used across publications addressing off-label uses of Revlimid for CLL and NHL.[23]

42. Publication status reports show that Excerpta Medica successfully published high numbers of publications on off-label uses of Revlimid, such as use of Revlimid to treat CLL and NHL and the use of Revlimid to treat multiple myeloma in a manner that was not FDA approved.[24] Celgene had extensive involvement in the publication process. Along with Excerpta Medica, Celgene confirmed the content of these publications, confirmed the authors of these publications, reviewed drafts, edited the drafts, and ultimately had final approval over the publications.[25] Celgene's Board of Directors received periodic reports on Celgene's publications

---

particular whether Celgene promoted sales by misrepresenting the compendia or scientific literature.

[20] CELBRN3310509 at 102.

[21] CELBRN064011 at 1.

[22] *Id.* at 20.

[23] CELBRN0961785 at 4, 49, 63.

[24] *Id.*

[25] *Id.* at 5.

released through Excerpta Medica.[26] In late 2008, the Marketing Department expressed dismay that Excerpta Medica was not releasing publications fast enough. In October 2008, Braden Parker – the Director of Oncology Marketing – wrote to Senior Vice President of Marketing Francis Brown on the speed of publication release, stating:

[redacted].[27]

43. Although I am not opining on whether such activity is legal or illegal – particularly as I understand that the FDA imposes unique restrictions on the promotion of restricted subpart H drugs like Revlimid and Thalomid – the evidence I have reviewed indicates that Celgene viewed these publications on off-label uses of its drugs as key promotional efforts.

**4. Transcripts of physicians coversations with sales representatives show sales visits are permeated with illegal promotion**

44. Celgene employed a third party vendor (Impact Rx) to provide Celgene officials with "reports from doctors on what Celgene sales representatives told them about Revlimid."[28] The reports of these communications are referred to as "verbatim reports." The examples of the "verbatim" reports for the time period of 2009-2010 were available to me for review. I note that because of Celgene's document destruction policy (CELBRN0573547), details of these and other Celgene sales rep visits were unavailable from Celgene.

[26] CELBRN0754351 at 35.

[27] CELBRN0137120.

[28] Such reports were available to me for the 2009-2010 time period. CELBRN0175405, CELBRN0223299, CELBRN0229517, CELBRN0322454, CELBRN0322658, CELBRN0347838, CELBRN0348853, CELBRN0354694, CELBRN0354904, CELBRN1189552, CELBRN1190162, CELBRN1558694

45. Verbatim reports show that in direct violation of FDA requirements on drug promotion Celgene sales representatives discusssed off-label indications of Thalomid and Revlimid.[29] In particular, hundreds of verbatims show sales representatives discussed Revlimid for lines of therapies that weren't indicated. For example, in 2010 when Revlimid was only approved for second line multiple myeloma and only in combination with dexamethasone; verbatims from Celgene's Oncolink Promotion reports record unaided messages such as:[30]

> **"Discussed the use of Revlimid in multiple myeloma, both in first and second line settings. Also, in combination with other agents, as well."**

46. Another example below shows discussion of first-line use of Revlimid for multiple myeloma. This discussion also suggests that sales representatives discussed the possibility of treatment of Revlimid in treatment of cancers such as Chronic Lymphocytic Leukemia (CLL) in 2010, despite there being no CLL indication for Revlimid:[31]

> **"…Extensive discussion about the use of Revlimid for the treatment of multiple myeloma. Now it's FDA approved for first line use. Also discussed…it's possibilities in the treatment of non 5q- syndromes and possibly CLL."**

47. Verbatims also suggest that Celgene sales representatives misrepresented to physicians that Revlimid was indicated as a first-line treatment for Multiple Myeloma when it was not. For example:[32]

---

[29] CELBRN0175405, CELBRN0223299, CELBRN0229517, CELBRN0322454, CELBRN0322658, CELBRN0347838, CELBRN0348853, CELBRN0354694, CELBRN0354904, CELBRN1189552, CELBRN1190162, CELBRN1558694

[30] CELBRN0175405.

[31] CELBRN0303825.

[32] CELBRN0175405.

> **"Today was Celgene day in the office, and the rep and I talked about one of their great products, called Revlimid, which has a first line indication for multiple myeloma, in combination with dexamethasone, low-dose dexamethasone, good responses, first line, and, in particular, it has a great application for those individuals who are potential candidates to undergo stem cell transplantation for multiple myeloma."**

48. There are numerous additional verbatims showing sales discussion about the use of Revlimid and Thalomid that are not within the labeled indications. For example:[33]

> **"So the rep really talked about Revlimid, the fact that it will be combined with Velcade, but had to be combined in a lower dose."**
>
> **"Discussed use of Revlimid both for multiple myeloma and in MDS that is not 5q minus."**
>
> **"…[The rep] also talked about using Revlimid as a part of Velcade/Revlimid/Decadron up front treatment, especially in patients who were eligible to going on to treatment. We also talked about again Revlimid being used for the deletion 5 chromosome MDS and also using for patients who do not have deletion 5 but have high risk refractory MDS."**

49. According to Celgene' Director of Marketing Mark Alles, *any* discussion of off-label use by sales representatives was improper and should not have occurred, whether or not in response to physicians; rather, sales representatives should have referred physicians to Celgene's Medical Affairs group to answer any questions regarding off-label use.[34] However, these reports

[33] CELBRN0303825.

[34] Deposition of Mark Alles at 151:2-25. I understand Relator's counsel maintain that it was also illegal under subpart H and other FDCA regulations and laws applicable to Celgene.

were disseminated among Celgene's senior management. For example, Head of Sales Shawn Tomasello received these verbatim reports on "Revlimid Promotion" in connection with an analytical report from ImpactRx and circulated them to Celgene's entire Sales Directors Distribution list with a directive to review the information closely."[35] I have not seen any documents or testimony that Celgene took any steps to proscribe or stop such conduct.

50. In Chad Saward's Monthly Activity report, under "Accomplishments" he wrote "submitted nearly 30 Med Request Forms," and under "Goals" he wrote "submit a Med. Info Req form for nearly every call," and "I discussed colorectal, prostate, renal cell carcinoma, melanoma MDS and MM (TAC ¶ 183)."

**5. Celgene provided articles and training for non-labeled uses of Thalomid and Revlimid**

51. During her sales training at Celgene, the Relator and her colleagues were given copies of an abstract by Dr. William Figg and others that appeared in the July 2001 issue of Clinical Cancer Research. Deena Harding, then Celgene Sales Manager, told the Relator to use it when calling upon doctors who treated prostate cancer, a disease for which Thalomid had no indication.[36]

52. Celgene distributed a document titled "Renal Cell Carcinoma Express Report from the 38th Annual Mtg of ASCO to be used by Relator and others to promote the use of Thalidomide for renal cell carcinoma in 2002, again outside the Thalomid indications.[37]

53. In March 2002; ISIS 2002 NYC – [redacted], of Celgene's sales group, presented a PowerPoint slide set on the Mid-South Region, in which she sought to emphasize Solid Tumor and found ways to justify being in the doctor's office with co-promotion or product acquisition information outside the Thalomid label.[38]

---

[35] CELBRN0322327

[36] TAC ¶ 155

[37] TAC ¶ 172

[38] CELBRN0178363

54. In or about 2003, the Relator's fellow sales representatives [redacted] and [redacted], conducted training on Thalomid's use in colorectal cancer, a disease completely outside of Thalomid's labeled indications. The training materials provided "Selling points of Thalomid Use" in colorectal cancer, as well as "Potential Probes" for physicians, including "What is your treatment regimen for [colorectal cancer] [patients]?"[39]

55. In 1999, Celgene strategized on how they could train sales representatives to sell Thalomid for off-label indications.[40]

> "Could we possibly have a program where we train reps on the way to sell drug off of protocol? Many reps seem to get caught up in the idea that all patients are on protocol. We need to emphasize the large number of patients that don't qualify for protocols and can use Thalomid?"

56. A notice of an August 15, 2003 meeting between Sol Barer, who was then CEO of Celgene, Wayne Pines and others discusses potential ways to disseminate information to doctors on Thalomid in melanoma from two JOC publications (Sol Barer, Francis Brown), despite Thalomid having never received any such marketing indications.[41]

### 6. Celgene pushed for doses that were not indicated in the label

57. There are also notes from sales representatives that indicate discussions with physicians about Thalomid doses not indicated on the FDA-approved marketing label.[42]

### 7. Unreasonably high number of sales contacts with physicians for few leprosy patients

58. According to Celgene's 2000 10-K, filed with the Securities and Exchange Commission, it had 98 sales representatives as of February 15, 2001, who were "engaged in sales

---

[39] TAC ¶ 207.

[40] CELBRN0316185.

[41] CELBRN1352139, CELBRN1355311.

[42] CELDOJ014072.

and commercialization activities." Per Celgene's 2005 10-K, it had 204 employees "who were engaged in sales and commercialization activities" as of March 1, 2005. Documents for the time-period of August 2004 to October 2005 show between 4,000 and 5,000 Celgene sales rep contacts *per month* with physicians even though there were only 130 or so new leprosy cases per year.[43] More than 80% of these contacts were with physicians belonging to hem-oncology and oncology specialties, while dermatologists and internal medicine specialties treat leprosy.[44] The large number of sales contacts is evidence that the lion's share of sales contacts were being made for promoting off-label indications.[45] This is also evident from the fact that during the same period, Celgene sold about [redacted] Thalomid capsules per month.[46] Other than for off-label marketing purposes, there is nothing in the evidence I have reviewed to suggest why Celgene would initiate 5,000 sales contacts per month selling [redacted] capsules per month when there were 131 new leprosy cases each year. In an August 15, 2006 email from Jerry Zeldis (a longstanding chief medical director at Celgene) to Francis Brown (Celgene's Senior VP of marketing and sales), Curtis Quigley (Celgene's Vice President of Sales Operation and Distribution, serving directly under Brown), with cc to Barer, Hugin and Stirling, provided Thalomid patient and prescription milestones since the September 1998 launch of Thalomid. Zeldis writes "Wow! Who would ever imagine that there were that many leprosy patients in the US - since the FDA clearly does not allow non-ENL [leprosy patients] to receive thalidomide."[47]

---

[43] CELBRN3542176, CELBRN3542179, CELBRN3542182. See also; for Leprosy cases per year: http://www.hrsa.gov/hansensdisease/dataandstatistics.html accessed September 19, 2015.

[44] CELBRN3542176, CELBRN3542179, CELBRN3542182.

[45] In my experience it would not even take one full-time sales representative to detail all doctors treating 130 new leprosy patients per year. Celgene should not have been sending sales representatives to detail physicians on off-label uses. It should have left them to their own devices to decide appropriate off-label use based on their "training and experience, their independent medical judgment, existing clinical studies and medical literature…." as it claims to have done.

[46] CELBRN0574956, CELBRN0774524, CELBRN0781605, CELBRN0483855, CELBRN0751139, CELBRN0985199.

[47] CELBRN0147024, CELBRN0766998.

So Celgene executives themselves cynically acknowledged that all these Thalomid sales were not for leprosy patients and that these sales contacts and Thalomid capsules sold were for conditions not indicated on the label. Rather than being alarmed and taking good faith actions to ensure that Celgene was marketing their products within the FDA-approved labels, these Celgene executives apparently joked among themselves about the fact that Thalomid sales vastly exceeded what was necessary to treat the small number of leprosy patients in the U.S.

59. For these reasons, and given that from the marketing information I have reviewed, there is no indication that Celgene constrained this off-label marketing, my damages model assumes a one hundred percent (100%) causal relationship between Celgene's illegal activities and its off-label sales; *i.e.*, that all off-label use of Thalomid and Revlimid was tainted by off-label promotion. It is also reasonable to conclude that a large portion of all sales of Thalomid and Revlimid were tainted by Celgene's illegal activities.

60. Should additional evidence or Court findings establish that some level of Thalomid and Revlimid sales were not due to off-label promotion or other illegal activities, it will be straightforward to adjust my damages calculations by the relevant percentage.

### C. The Food and Drug Administration sent warning letters to Celgene for promoting Thalomid for off-label oncology indications

61. The FDA contacted Celgene in mid-1998 to "discuss concerns about promotion materials containing uses of thalidomide other than those" approved by the FDA. A few months later, the FDA issued an untitled letter to Celgene regarding three of its press releases regarding Thalomid that were "misleading".[48]

62. In 2000, the FDA sent another warning letter to Celgene regarding its "promotional activities that state or suggest that Thalomid is safe and effective for use in treating multiple myeloma" and its representations "to physicians that Thalomid can be used to treat

[48] http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM167840.pdf accessed on September 23, 2015.

various cancers ….” Although noting specific interactions between sales representatives and physicians that had been brought to its attention, the FDA largely focused on Celgene's dissemination of third party press releases on off-label uses and public statements Celgene made at investor meetings regarding its plans for sales representatives to engage in off-label "detail" sessions with physicians, stating that "Celgene is demonstrating a continuing pattern and practice of violative behavior…."[49]

63. Although Celgene may have stopped issuing press releases lauding the use of off-label uses of Thalomid after receiving these warning letters, as noted above, its business plans and other documents make it clear that it used sales representatives to heavily promote off-label uses in individual interactions with physicians and influenced the content of scientific articles on off-label uses of its drugs, methods that are more difficult for the FDA and other governing bodies to detect.

## IV. Assumptions and Data sources for damages calculations

64. I have been advised by counsel that if a government plaintiff paid for any part of a prescription of Thalomid or Revlimid, and if that claim was an off-label prescription due to allegedly illegal marketing promotion by Celgene, then the portion of that claim paid by the government plaintiff is recoverable as damages. Counsel has further advised me that under the federal False Claims Act (31 U.S.C. §§ 3729–3733, also called the "Lincoln Law") each such claim partially reimbursed by a federal government health care payer (e.g., Medicare, Medicaid, Veterans Affairs, Tricare, etc.) is further subject to a maximum potential additional penalty of $11,000 per prescription claim and potential treble damages. Likewise, I proceed under the

[49]http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM165843.pdf accessed September 23, 2015

assumption that all on-label prescriptions caused by kickbacks violate the FCA and that the full value of reimbursement for such prescriptions is reimbursable as damages.

65. In this report, I have calculated the damages to Medicare, Medicaid, Veterans Affairs, Tricare and other federal and state government programs due to illegal kickbacks and off-label marketing and promotion of Thalomid and Revlimid using data sources provided by counsel as well as publicly available resources for analysis by this report deadline (See Appendices D-H for details). Given the overwhelming evidence that Celgene's illegal kickbacks, as well as their marketing and promotion lacking fair balance, tainted the entire market for Thalomid and Revlimid sales,[50] I have also provided a damage calculation scenario where the on-label sales for Thalomid and Revlimid are also recoverable damages.

66. I have requested Celgene's data on all Thalomid and Revlimid marketing and promotion including sales visits and spending on KOL meetings and CME programs. Thus far, most of these data haven't been made available to me. Through discovery, I was able to get reasonably complete information only for August 2004 through June 2006. In my professional experience, pharmaceutical companies maintain detailed and comprehensive time-specific records of their drug-specific promotional and marketing spending and provider contact interactions. However, in a 2008 email I reviewed called a "Disposal Notice," Celgene employees were instructed to destroy all Activity Reports, Weekly Activity Reports, Monthly Reports, District Manager Reports, Field contact records, and Meeting records that predated 2006 or 2007.[51] I also understand from conversations with counsel that email files from key custodians no longer exist, possibly because Celgene did not have a document retention policy in place addressing email preservation until November 2011. Thus, it may be that Celgene has not preserved the documents I would need to perform the most comprehensive analysis.

[50] See Hay Rebuttal Report, October 26, 2015.

[51] I do not know whether a similar directive was issued later that would have addressed documents that post-date 2007.

67. Regardless of the reasons, information I would have liked to analyze – including particular sets of data available for discrete periods of the relevant timeframe that I *did* analyze – were not available to me. In particular, rebates provided by Celgene to government payors would have served as a useful data point, but this does not affect my assumption that Celgene's illegal activity infected its sales during this period. I reviewed subpoenas by Celgene to third parties asking for rebate information, so it may be that Celgene destroyed this information also.

68. At pages 27 through 28 of my September 25, 2015 Report, I explained that "Medicare Part A and Part B data were provided to me too close to my initial report deadline to be analyzed," and accordingly was not utilized in my damage calculations at that time. Additionally, I noted that I had not been provided with Medicare Advantage data on sales of Thalomid and Revlimid, and that my Medicare damages calculations accordingly were understated. I also noted that I had not received data from all state Medicaid agencies. I am still missing some data. For example, California continues to promise production and claims they are close to producing but has not provided a set date by which they promise to produce.

69. Certain information regarding the Medicare Part D and Tricare data were ambiguous in the prior production and were not clarified prior to the submission of my Supplemental Report of 12-7-15. This affected the damages calculations for all of the programs contained in that Supplemental Report. Based on new data received from Tricare and clarifications about the Medicare Part D file descriptions that I received from CMS, I have updated my damages calculations for all of the programs contained in my Supplemental Report of 12-7-16.

70. As a general matter, I reserved the right to update my opinions if new information was made available to me and have done so based on this new data as well as deposition testimony and documents produced by third party promotional speakers or Key Opinion Leaders (KOLs) that was received in time to analyze. *See* Appendix C for additional details.

## V. Damages Calculation Methodology

71. In calculating damages due to Celgene's illegal off-label promotion, I have followed the same fundamental approach used in my Opening Report. Based on the new data and file clarifications, I have updated my damage calculations utilizing my original methodology. In doing so, I also have relied at times on the data and information previously received, including that which formed the basis for the opinions in my Opening Report. In many instances, the new data and information permitted me to analyze the existing data in a more complete and refined way, test and confirm my earlier assumptions and conclusions, and thus reach more complete and refined opinions.

72. I have limited my updated damages calculations to Medicare, Medicaid, Tricare, and Veterans Affairs program damages. It is still my opinion that other state and federal programs (e.g., FEHBP, state retirees, Indian Health Service, 340B Public Clinics, corrections inmates, etc.) also suffered legitimate damages because these entities paid for tainted off-label or on-label prescriptions of Thalomid and Revlimid. However, for specificity and precision, I have limited my updated damages calculations to state and federal programs that are either parties in this action and/or have been subpoenaed for Revlimid and Thalomid claims and expenditure information. Should counsel direct me to do so, I will further update my damages calculations to include the additional government programs previously included in my Opening Report.

73. Most branded drug payment programs include rebate, discounts, coupons, and other price reduction mechanisms that ensure that neither the list (published) prices such as the Wholesale Acquisition Cost (WAC) nor the Average Wholesale Price (AWP), nor the prices listed in most claims history files nor other drug dispensation files, represent the true transaction prices for these drugs. There are often confidential rebates and kickbacks (reverse payments) that flow back from the brand drug manufacturer to other parties on both the demand and supply

side of the pharmaceutical market place.[52] I have asked repeatedly for Celgene's detailed accounting records on Thalomid and Revlimid sales and rebates, to no avail. As also stated in my October 26, 2015 Rebuttal Report, despite what we've learned about Celgene's data destruction policies and despite Celgene requesting some of the information I seek from third parties, it is inconceivable to me that Celgene does not possess detailed financial records on all of the rebates, discounts, and other price givebacks and kickbacks that it provided to all customers for all sales of Thalomid and Revlimid. In any event, such information was not available to me. I have refrained from resorting to inaccurate records of "average drug rebates" disclosed in the literature, and will not attempt to consider drug rebates until and unless Celgene discloses its true detailed price rebates and kickbacks on Thalomid and Revlimid sales. Should that event that place, I would be able to further refine my damages calculations to account for this rebate and other information.

74. After receiving new data and information (in particular Medicare A and B data) following the submission of my September 25, 2015 Report, I analyzed this data in relation to to payments Celgene made to non-profit charitable foundations that it characterized as "donations." I updated my damages calculations accordingly. These charitable foundations would have used the payments from Celgene to fund patient co-pays for cancer drugs, including Revlimid and Thalomid. I reviewed guidance from the Office of the Inspector General (OIG) explaining that

[52] Hay JW, Smeeding J, Carroll NV, Drummond M, Garrison LP, Mansley EC, Mullins CD, Mycka JM, Seal B, Shi L. Good Research Practices in Measuring Drug Costs for Cost Effectiveness Analysis: A Report of the ISPOR Drug Cost Task Force. Value in Health 2010; 13(1):3-7. Mansley E, Carroll N, Chen K, Shah N, Tak Piech C, Hay JW, Smeeding J. Good Research Practices for Measuring Drug Costs in Cost Effectiveness Analyses: A Managed Care Perspective - A Report of the ISPOR Drug Cost Task Force Part III. Value in Health 2010; 13(1):14-17. Mullins CD, Seal B, Seoane-Vazquez E, Sankaranarayanan J, Asche C, Jayadevappa R, Lee W, Romanus D, Wang J, Hay JW, Smeeding J. Good Research Practices for Measuring Drug Costs in Cost Effectiveness Analyses: A Report of the ISPOR Drug Cost Task Force – Part IV: Medicare, Medicaid and Other US Government Payers Perspectives. Value in Health 2010; 13(1):18-24.

an arrangement under which a pharmaceutical company makes payments to a non-profit organization that, in turn, funds co-pays for Medicare patients may constitute a violation of the Anti-Kickback Statute because a potential purpose and effect of the company's payment to the non-profit is to illegally fund patient co-pays. It is further my understanding that Relator contends that the purpose and effect of Celgene's payments to non-profits was to fund Medicare patient co-pays in violation of the Anti-Kickback Statute. In light of this, I have utilized the new data and information, as well as existing data amenable to further analysis based on the new data and information, to calculate the damages resulting from Celgene's payments to non-profit organizations that then funded Medicare patient co-pays. For the purposes of this portion of my damages analysis, I am proceeding under the assumption that Celgene's payments to these charitable foundations constitutes kickbacks.

75. In addition, new data and information in the form of documents and deposition testimony from Celgene's promotional speakers and KOLs allowed me to both analyze this new information in and of itself and to further analyze existing data in order to refine my prior kickback analysis. This analysis assesses compelling evidence that, from the time the FDA approved Thalomid for treatment of ENL in 1998, Celgene's promotional efforts thoroughly saturated the available channels of information for Revlimid and Thalomid during the relevant time periods through, among other things, payments to KOLs and other speakers and endorsers, payments to non-profit organizations, influence over clinical trials and scientific literature, and sales visits. This Celgene Thalomid and Revlimid information channel saturation strategy and process is detailed in my Rebuttal Report of October 26, 2015.

76. This level of market influence through promotional efforts is unprecedented in my more than 30 years of experience studying the pharmaceutical industry, and the data from these third parties supports a conclusion that Celgene's pervasive payments in addition to its off-label promotional efforts thoroughly tainted the market. Among other things, I am unaware of any other company whose entire business model was to off-label market for unapproved indications rather than for the very narrow label indications where I understand that legal promotion is

allowed. It would thus be reasonable to conclude that Celgene built a previously non-existent market on a foundation of illegal promotion. Nor have I ever studied a company that employed such extensive efforts to influence and manipulate the literature and scientific data regarding its products, and to provide such extensive payments to doctors who promoted and prescribed its products.

77. It is my understanding that Relator contends that Celgene's various promotional efforts were illegal, either because they constituted off-label promotion in violation of the False Claims Act, violated the Anti-Kickback Statute, or both. If the trier of fact agrees with this contention, then it would be reasonable to further conclude that all prescriptions – both off-label and on-label – of both Revlimid and Thalomid during the relevant time period resulted from Celgene's illegal conduct. Therefore, I have included additional damages calculations based on all Thalomid and Revlimid sales to government programs, including both off-label and on-label prescriptions.

78. Should the Court or Jury find that some portions of Thalomid or Revlimid prescriptions were not generated by illegal activities and are not part of legitimate recoverable damages, it will be straightforward for me to revise my damages calculations to exclude (e.g., on a pro rata basis) any such legitimate portion of Thalomid and Revlimid sales.[53]

## VI. Damage Calculations

### A. Medicare Part D Damages

79. I was able to reach a more nuanced determination on Medicare Part D off-label damages than I did in the Opening Report by using Parts A and B data on diagnostic coding that

[53] For example, the trier of fact may conclude that the initial on-label prescriptions for Thalomid for ENL, representing 0.26% of Thalomid sales prior to 2006, were legal. Nevertheless, as described above, it would be reasonable for the trier of fact to conclude that a substantial portion of the Thalomid and Revlimid on-label sales are also tainted by illegal promotion, such as KOL kickbacks, Celgene's absolute control and sign-off on who got investigative drug for clinical trials and ghost-written "scientific" articles funded by Celgene, etc. Therefore as one scenario for damages calculation I include all of the on-label damages, precisely so the decision about pro-rating those damages can be done by the Court or the jury.

CMS produced after my report was due. Other than Thalomid and Revlimid, I did not have access to Part D drug usage for Medicare, so the calculations of off-label prescriptions are conservative. However, the Medicare A and B data allowed me to determine whether the patient was diagnosed with ENL, MM, MDS or MCL. It also allowed me to determine when the patient was diagnosed with any of these conditions, helping me to determine lines of therapy. This is important for a determination of off-label damages because during much of the relevant times Thalomid and Revlimid were only approved in treatment of certain disease states. Revlimid was approved for treatment in only more aggressive diseases states as a second line therapy up until February 2015.

80. Other than Thalomid and Revlimid payments, I did not have access to Part D drug usage (e.g., dexamethasone) for Medicare, so the calculations of off-label prescriptions are conservative, because I was unable to examine whether patients were using other medications besides Thalomid or Revlimid. For example, use of Revlimid not solely in combination with dexamethasone was not an on-label indication for much of the relevant time period. Lacking any measure of dexamethasone Part D drug use (or other Part D chemotherapy drug use), I conservatively assumed that all use of Thalomid or Revlimid was not *per se* off-label with respect to indications requiring or limiting combination and/or step therapies if such an off-label use determination required Part D data on other drugs to establish whether the use was consistent with the FDA label at the time.

81. For my determination of whether the use of Revlimid or Thalomid was on-label or off-label, I used the diagnostic code information in the Medicare Parts A and B data and the time of diagnosis and therapy to determine the line of therapy for Revlimid and Thalomid and other diagnostic conditions consistent with the labeled indications (e.g., Myelodysplastic Syndrome (MDS) with a deletion 5q cytogenic abnormality). The programming logic is described in Appendix D.

82. The Part D damages are shown in the Tables below by year or portion of year (if there was a change in Thalomid or Revlimid label indications in a specific year). CMS clarified

that the Part D data that we received included both Medicare Advantage and other Medicare Part D claims for the time period beginning in 2006. Should more recent and/or more detailed Part D data be made available to me I would intend to updates these 2006-2014 damage calculations, if requested by counsel.

**Revlimid On-Label and Off-Label Damages**

| YEAR | Scripts | CPP | LISC_SUB | Trebling CPP | Trebling LISC_SUB | Civil Penalty | Total |
|---|---|---|---|---|---|---|---|
| 2006 Before 06/29/06 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2006 After 06/29/06 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2007 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2008 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2009 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2010 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2011 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2012 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2013 Before 06/05/13 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2013 After 06/05/13 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2014 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

**Thalomid On-Label and Off-Label damages**

| YEAR | Scripts | CPP | LISC_SUB | Trebling CPP | Trebling LISC_SUB | Civil Penalty | Total |
|---|---|---|---|---|---|---|---|
| 2006 Before 05/25/06 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2006 After 05/25/06 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2007 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2008 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2009 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2010 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2011 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2012 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2013 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2014 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

**B. Pre-2006 Medicare Advantage Plan (Medicare Part C) Damages**

83. Since the 1970s, Medicare Advantage (also referred to as Medicare Part C) has been a long-standing alternative Medicare drug reimbursement program that provides managed health care benefits to Medicare recipients who voluntarily opt out of the traditional Medicare fee-for-service program in favor of a managed care plan option (e.g., Kaiser, Group Health Cooperative, Harvard-Pilgrim, etc.). Prior to 2006, millions of Medicare recipients were enrolled in Medicare Advantage plans (then called Medicare + Choice) with oral medication coverage benefits for outpatient oncology drugs. As of 2003, approximately 75% of Medicare beneficiaries had an outpatient drug benefit.[54] Prior to the inception of Medicare Part D, Thalomid and other oral prescription drugs were covered by a number of sources, including Medicare Part C. As Celgene documents themselves show, if Thalomid and other outpatient self-administered drugs were not expressly covered by Medicare Parts A and B, they could be covered by Medicare Part C (Medicare Advantage), Medicaid, private insurance, or supplemental insurance such as Medigap.[55] Thalomid and certain other oral drugs could also be covered through the Medicare Replacement Drug Demonstration project prior to the inception of Medicare Part D.[56]

84. Celgene's own Revlimid Corporate Accounts 2005 Business Plan (May 19, 2005) acknowledges that even before Part D, Medicare was the largest single payer for oncology drugs.[57] In fact, coverage of oral medications was one of the primary reasons why Medicare Part

---

[54] CELBRN0098775-883 at CELBRN0098788.

[55] *Id.* at CELBRN0098800.

[56] Likewise, documents produced by the Patient Access Network Foundation (PANF) show that it paid Thalomid co-pays and that the balance was covered by Medicare Advantage, Medicare A, or Medicare B, depending on the claim and the patient's available coverage. *See infra.*

[57] Revlimid 2005 Business Plan, slide 39. [redacted]

C plans were popular enough to attract between 13% and 18% of the entire Medicare population between 1999 and 2005.[58]

85. ResDAC confirmed in an email to me from Lori Siedelman, MPH (November 4, 2015) that CMS' Prescription Drug Event (PDE) file for Medicare Part D claims excludes drug utilization that is covered by Medicare Advantage plans. This was further confirmed to me in a teleconference that I had on November 24, 2015 with CMS officials arranged through CMS Legal Counsel, Ms. Eden Heard. Nevertheless, a more recent clarification from CMS (CMS conference call January 5, 2016) indicated that the PDE files that we received from CMS on Medicare Part D included patients covered by Medicare Advantage. I have therefore updated my Part D damages to include the Medicare Advantage patients beginning in 2006.

86. However, the Medicare Parts A and B data that I received excluded all Medicare Advantage patients. This complicated my ability to assess off-label use of Thalomid and Revlimid for Medicare Advantage patients, since my primary strategy for determining off-label use of these drugs is based on diagnostic information available in the Parts A and B claims data. My resolution of this issue was to compare the off-label use of these drugs for patients who never joined a Medicare Advantage plan to the off-label use of these drugs among patients who joined a Medicare Advantage plan only at least six months subsequent to using the Medicare fee-for-service program, giving a minimum six-month assessment of whether their use of Revlimid or Thalomid was on- or off-label. The percent of off-label drug use was very similar in these two groups [redacted] for Thalomid and [redacted] for Revlimid), so I applied the rate of

[58] Gretchen Jacobson, Anthony Damico, Tricia Neuman and Marsha Gold. Medicare Advantage 2015 Spotlight: Enrollment Market Update. Kaiser Family Foundation, June, 2015. In fact, prior to Part D coverage in 2006, patients with excessive drug costs, such as Thalomid patients with drug costs of several thousand dollars per month, would be precisely the Medicare patients most likely to sign up for a Medicare + Choice plan if they had no other source of drug coverage.

off-label use in the later-joining Medicare Advantage patients to determine the off-label use in the entire Medicare Advantage patient population.[59]

87. For the period 1999 through 2005, I calculated the Medicare Part C damages by projecting Thalomid claims and costs per beneficiary from the 2006 Medicare Part D Thalomid claims and costs per Medicare Advantage beneficiary. I also account for the fact that only 75% Medicare Advantage beneficiaries had drug coverage prior to 2006. For 1999 to 2005, I only present the Thalomid off-label Part C damages calculations, since essentially all of the Celgene prescriptions prior to 2006 were for Thalomid and according to Celgene's own STEPS data, [redacted] of Thalomid sales prior to 2006 were for off-label prescriptions. Should more detailed data on Part C payments for Thalomid, I will be able to update my damages calculations for the Part C program.

**Part C Thalomid Off-Label Damages by Year**

| YEAR | Part C Beneficiaries (Millions) | Off-Label Count | Off-Label Cost | Trebling | Civil Penalties per Claim | Total Off-Label Damages |
|---|---|---|---|---|---|---|
| 1999 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2000 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2001 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2002 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2003 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2004 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2005 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

[59] Jacobson et al. 2015, *op cit*. I always intended to update my Medicare calculation to include Part C damages explicitly. In my initial report I calculated placeholder straight-line damages for Part C based on Celgene's STEPS data. I then lacked the more-nuanced Parts A and B information that I promised in my Opening Report and in my Rebuttal Report I would use to update all of my Medicare damages calculations once I received them. Since I now have this information for my Supplemental Report, I have performed a more precise explicit calculation of the Part C damages.

**C. Tricare Damages**

88. The Tricare damages calculation methodology and data sources are explained in Appendix E.

89. Across different datasets such as Tricare (where diagnosis information is available for all patients who received either Thalomid or Revlimid), Medicare (where diagnosis information is missing for approximately 5% of the patients who either received Thalomid or Revlimid), and Florida Medicaid (where diagnosis information is available only on a very small subset of patients -- less than 10% -- who either received Revlimid of Thalomid), with different sample sizes and somewhat different population demographics, we see fairly consistent off-label use of Thalomid (Medicare: Thalomid off-label use is [redacted];Tricare: Thalomid off-label use is [redacted] Florida: Thalomid off-label use is [redacted]. For Revlimid we see [redacted] off-label use in Tricare data, [redacted] off-label use in Florida data and [redacted] off-label use in Medicare data. It is also important to note that information on the availability of dexamethasone was not present in Tricare and Medicare datasets. This tells me that were the information on dexamethasone use and use of other outpatient medications available to me for Medicare and Tricare, my off-label damages for Revlimid will most likely increase. Should more recent and/or more detailed information on Tricare Thalomid and Revlimid payments be made available to me I will be able to update my calculations of Tricare damages.

**Tricare Revlimid Off-Label and All Claims Damages Calculations**

| | Off label claims | Off-label Damages to Tricare | Civil penalties | Treble damages | Total off-label damages |
|---|---|---|---|---|---|
| January to June 28, 2006 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| June 29 2006 to June 4 2013 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| June 5 2013 to Feb 16 2015 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| From Feb 17 2015 to Sep 30 2015 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
|---|---|---|---|---|---|
| | Total claims | Total Damages to Tricare | Civil penalties | Treble damages | Total damages |
| January to June 28, 2006 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| June 29 2006 to June 4 2013 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| June 5 2013 to Feb 16 2015 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| From Feb 17 2015 to Sep 30 2015 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

**Tricare Thalomid Off-Label and All Claims Damages Calculations**

| | Number of Off-Label claims | Off-Label Cost | Trebling | Civil Penalties per Claim | Total Off-Label Damages |
|---|---|---|---|---|---|
| 10/1/2001 – 5/24/2006 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 5/25/2006 – 9/30/2015 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | All Claims Count | All Claims Cost | Trebling | Civil Penalties per Claim | Total All Claims Damages |
| 10/1/2001 – 5/24/2006 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 5/25/2006 – 9/30/2015 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

### D. VA Damages

90. The Department of Veterans Affairs did not provide counsel any claims information on Revlimid or Thalomid patients treated under the Veterans Health Administration

(VHA). To calculate VA program damages, I used the ratio of VHA total health care expenditures to Medicare health care expenditures for each year 1999-2014 and applied that ratio to Medicare off-label, on-label, and total damages for Thalomid and Revlimid.[60] This ratio approach is not necessarily conservative since VHA expenditures include health facility construction and other items that don't reflect direct patient care, unlike Medicare health care expenditures. However, given that the average age of VA patients is 58 and they are overwhelmingly male, there is unlikely to be much of a demographic bias when applying these expenditure ratios to Medicare Thalomid and Revlimid damages.

91. Should more detailed and/or more recent VA Thalomid and Revlimid claims information be made available to me it will be straightforward for me to update these VA damages calculations.

**VA Revlimid Off-Label Damages by Year**

| YEAR | Off-Label Count | Off-Label Cost | Trebling | Civil Penalties per Claim | Total Off-Label Damages |
|---|---|---|---|---|---|
| 2006 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2007 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2008 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2009 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2010 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2011 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2012 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2013 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2014 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

[60] http://www.va.gov/vetdata/Expenditures.asp; https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NationalHealthAccountsHistorical.html

## VA Thalomid Off-Label Damages by Year

| YEAR | Off-Label Count | Off-Label Cost | Trebling | Civil Penalties per Claim | Total Off-Label Damages |
|---|---|---|---|---|---|
| 1999 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2000 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2001 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2002 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2003 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2004 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2005 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2006 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2007 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2008 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2009 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2010 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2011 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2012 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2013 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2014 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

## VA Revlimid On-Label and Off-Label Damages by Year

| YEAR | Total Count | Total Cost | Trebling | Civil Penalties per Claim | Total On-label and Off-label Damages |
|---|---|---|---|---|---|
| 2006 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2007 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2008 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2009 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2010 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2011 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2012 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2013 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2014 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

**VA Thalomid On-Label and Off-Label Damages by Year**

| YEAR | Total Count | Total Cost | Trebling | Civil Penalties per Claim | Total On-Label and Off-Label Damages |
|---|---|---|---|---|---|
| 1999 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2000 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2001 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2002 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2003 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2004 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2005 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2006 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2007 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2008 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2009 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2010 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2011 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2012 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2013 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2014 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

### E. Medicaid Damages

92. Calculated Medicaid damages are shown in the Tables below. Except for the Florida Medicaid program, off-label damages are based on the Tricare off-label percentage calculation described above and in Appendix E.[61] After research to determine the provenance and completeness of the Medicaid State Drug Utilization Data (SDUD),[62] and after comparing it to the Thalomid and Revlimid claims that we obtained from those state Medicaid programs that cooperated with our data requests (see Table footnotes below), I am satisfied that SDUD is a more precise data source for Medicaid Thalomid and Revlimid claims than the Medicaid drug data source I used in my September 25, 2015 Report. For states other than those listed in the Medicaid Table footnotes, Thalomid and Revlimid claims and expenditures are taken from the SDUD data.

93. The Medicaid Program damages analysis methods are described in Appendix F.

[61] We applied the Tricare claims off-label percentage calculations to all Medicaid programs except Florida. Tricare had detailed diagnostic information on over 11,000 Revlimid and Thalomid patients from the year 2001. This is the most detailed data covering most time-period available to me. As explained above, the Tricare Thalomid off-label use is [redacted] and Revlimid off-label use is [redacted] while for the Florida Medicaid program Thalomid off-label use is [redacted] and Revlimid off-label use is [redacted]. Both, in turn, are similar to the Medicare off-label percentages that we calculate from the Medicare Parts A and B claims data for Thalomid. However, Medicare data time-period begins only from 2006 and diagnosis information on a significant patient population is missing along with those for patients on Medicare Advantage (Medicare: Thalomid off-label use is [redacted]).

[62] http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Benefits/Prescription-Drugs/Medicaid-Drug-Programs-Data-and-Resources.html (accessed November 11, 2015).

**Medicaid Thalomid Off-Label Damages Calculations (1998-2015Q2)**[63]

| State | Off-label claims count | Off-label claims cost | Trebling | Civil Penalties Per claim | Total Off-Label Damages |
|---|---|---|---|---|---|
| California | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Connecticut | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Delaware | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Florida | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Georgia | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Hawaii | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Illinois | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Indiana | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Louisiana | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Massachusetts | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Michigan | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Montana | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Nevada | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| New Hampshire | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| New Jersey | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| New Mexico | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| New York | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| North Carolina | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Oklahoma | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Rhode Island | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Tennessee | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Texas | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Virginia | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Washington | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Washington D.C. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Wisconsin | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

[63] Damages for the states of New York, Delaware, Wisconsin, Florida, Texas, New Jersey, Nevada, Louisiana and Washington D.C. were calculated from the Medicaid claims data counsel provided to me and are limited to those time-periods.

**Medicaid Thalomid All Claims Damages Calculations (1998-2015Q2)[64]**

| State | All claims count | All claims cost | Trebling | Civil penalties per claim | Total All claims damages |
|---|---|---|---|---|---|
| California | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Connecticut | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Delaware | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Florida | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Georgia | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Hawaii | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Illinois | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Indiana | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Louisiana | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Massachusetts | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Michigan | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Montana | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Nevada | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| New Hampshire | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| New Jersey | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| New Mexico | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| New York | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| North Carolina | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Oklahoma | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Rhode Island | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Tennessee | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Texas | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Virginia | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Washington | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Washington D.C. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Wisconsin | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

64 Damages for the states of New York, Delaware, Wisconsin, Florida, Texas, New Jersey, Nevada, Louisiana and Washington D.C. were calculated from the Medicaid claims data counsel provided to me and are limited to those time-periods.

**Medicaid Revlimid Off-Label Damages Calculations (2006-2015Q2)[65]**

| State | Off-label claims count | Off-label claims cost | Trebling | Civil Penalties Per claim | Total Off-Label Damages |
|---|---|---|---|---|---|
| California | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Connecticut | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Delaware | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Florida | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Georgia | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Hawaii | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Illinois | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Indiana | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Louisiana | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Massachusetts | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Michigan | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Montana | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Nevada | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| New Hampshire | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| New Jersey | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| New Mexico | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| New York | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| North Carolina | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Oklahoma | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Rhode Island | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Tennessee | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Texas | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Virginia | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Washington | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Washington D.C. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Wisconsin | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **TOTAL** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

[65] Damages for the states of New York, Delaware, Wisconsin, Florida, Texas, New Jersey, Nevada, Louisiana and Washington D.C. were calculated from the Medicaid claims data counsel provided to me and are limited to those time-periods.

**Medicaid Revlimid All Claims Damages Calculations (2006-2015Q2)**[66]

| State | All claims count | All claims cost | Trebling | Civil penalties per claim | Total All claims damages |
|---|---|---|---|---|---|
| California | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Connecticut | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Delaware | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Florida | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Georgia | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Hawaii | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Illinois | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Indiana | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Louisiana | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Massachusetts | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Michigan | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Montana | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Nevada | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| New Hampshire | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| New Jersey | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| New Mexico | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| New York | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| North Carolina | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Oklahoma | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Rhode Island | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Tennessee | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Texas | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Virginia | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Washington | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Washington D.C. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Wisconsin | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **TOTAL** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

[66] Damages for the states of New York, Delaware, Wisconsin, Florida, Texas, New Jersey, Nevada, Louisiana and Washington D.C. were calculated from the Medicaid claims data counsel provided to me and are limited to those time-periods.

**F. Kickback Damages Predicated on Payments to Promotional Speakers**

94. Relator's counsel has informed me that they believe the evidence will show that Celgene made various forms of payments to physicians in order to induce those physicians to prescribe Celgene drugs, recommend Celgene drugs to others, or both, as well as to reward physicians for doing these things. Relator's counsel has further informed me that they contend such payments constitute violations of federal and state Anti-Kickback statutes. At counsel's request, I reviewed documents, data, and testimony relating to Celgene's payments to physicians generally, Celgene's payments to specific physicians, and the prescribing behavior of those specific physicians, in order to test the reasonableness of Relator's assertion that Celgene made payments for the purpose of inducing or rewarding physicians for prescribing or recommending Celgene drugs. I also calculated the value of the prescriptions written by physicians to whom Celgene made such payments as a measure of damages for Celgene's violations of Anti-Kickback laws. My methodology for these damage calculations is described in Appendix G.

95. These damages are redundant with my other Medicare damages calculations but provide an independent source of justifiable damages. Here I present the on-label damages and off-label damages based on diagnostic information verified from the Medicare Parts A and B data. If asked, I am prepared to update these KOL on-label damages calculations.

| Damages to Medicare program due to off-label claims from Celgene Revlimid promotional speakers | | | | | |
|---|---|---|---|---|---|
| **Drug** | **Off-Label Scritps** | **Off-Lable Cost** | **Trebling** | **Civil Penalty** | **Total off-Label Damages** |
| Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| Damages to Medicare program due to on-label claims from Celgene Revlimid promotional speakers | | | | | |
|---|---|---|---|---|---|
| **Drug** | **On-Label Count** | **On-Label Cost** | **Trebling** | **Civil Penalty** | **Total on-label damages** |
| Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

96. The documents and testimony I reviewed showed that Celgene used its substantial economic resources to influence and curry favor with numerous constituencies for the purpose of causing prescriptions to be written. Payments were made under the guise of speaker programs, consultancy relationships, participation in clinical trials, and the granting of authorships to academics and others wanting to bolster their resumes. Payments were also made to non-profit foundations that had the ability to impact prescribing, ordering, recommendation, use and/or reimbursement of Revlimid and Thalomid.

97. Although this was clear, to a large degree, when I submitted my September 25, 2015 report, I was unable to conduct a complete analysis because third party productions from Medicare and Celgene's promotional speakers and Key Opinion Leaders ("KOLs") were not provided in time to analyze. With the benefit of these additional productions and deposition testimony from one of Celgene's promotional speakers, I have been able to conduct a more complete and nuanced analysis.

98. Furthermore, my analysis presented here is very conservative. First, if the Court or the jury were to find that Celgene's payments to physicians and other kickbacks so tainted the market that all Celgene prescriptions were a product of those kickbacks, then the proper measure of damages would be the value of all on-label and off-label prescriptions, as set forth in the Summary of Opinions section above. Additionally, of the Court or jury were to find that Anti-Kickback laws apply to bonus and other compensation paid by Celgene to its sales

representatives (who I am informed operated under various titles), then every prescription would likewise be the result of kickbacks.

### G. Kickbacks in the Form of Payments to Physicians

99. Historically, some drug companies have provided compensation to expert physicians and other KOLs to speak to other doctors and clinicians in fair and balanced presentations on the role of the sponsor's drugs in patient management. This, of course, does not mean that such conduct is legal. It is noteworthy that one prominent pharmaceutical company, GlaxoSmithKline ("GSK"),[67] cancelled its promotional speakers program and that major universities, including Harvard Medical School, have also categorically prohibited their physicians from participating in pharmaceutical companies' promotional speaker's programs.[68] Pharmaceutical companies are now required to publicly disclosure payments to doctors under the Physician Payment Sunshine Act.[69]

---

[67] *See, e.g.,* http://www.propublica.org/article/glaxosmithkline-to-quit-paying-doctors-for-promotional-talks

[68] https://hms.harvard.edu/about-hms/integrity-academic-medicine/faculty-policies-integrity-science/policy-conflicts-interest

[69] Even CME programs have come under increased scrutiny, which makes sense given pharmaceutical companies' ability and inclination to use physician speakers as tools to promote both on-label and off-label uses of drugs under the guise of education. Indeed, CMS has abandoned an exemption which previously allowed for unreported compensation to physicians at accredited or certified continuing education events. Soon, even indirect payments will need to be reported if a drug manufacturer requires, directs, instructs or causes a third party to pay a covered a recipient. Celgene and other manufacturers making indirect payments to CME organizations for physicians-related CME will have to report the payments if the identity of physicians attendees and speakers are known. *See, e.g.,* https://www.cms.gov/openpayments/index.html http://www.lexology.com/library/detail.aspx?g=60512c39-74f5-442e-a606-fda60ff9a29b; http://www.mmm-online.com/pharmaceutical/cms-updates-cme-guidance/article/427425/. Celgene's conduct over the last several decades underscores the need for these changes. From the outset, Celgene viewed paid CME and other speakers as key agents to promote off-label uses to promote off-label uses of Thalomid. *See, e.g.* [redacted]

100. As I understand it, and as counsel has advised, under existing law if even one purpose of a pharmaceutical KOL program is to induce and/or reward such doctors for prescribing the KOL sponsor's own drugs or recommending that others do so, such conduct taints prescriptions under the federal and state anti-kickback statutes. Counsel has advised me and presented evidence from Celgene's document production indicating that a significant if not the primary purpose of Celgene's KOL speaker program was to reward Celgene's promotional speakers and/or KOLs for writing substantial numbers of prescriptions for Thalomid and Revlimid or to otherwise induce such speakers to recommend others to do so, based on Celgene's remuneration.[70]

101. Based on my review of the documents and testimony provided to me, it is my opinion that a jury or other fact finder could reasonably make findings that the prescriptions written by the speakers themselves are a product of Celgene's payments, particularly based on the evidence I describe below that such prescribers' behavior has changed in relation to these physicians' participation in these speakers programs. In such cases, all Medicare prescriptions written by Celgene's promotional speakers (or KOLs of any type) would represent illegal kickback damages.[71] If a jury or other fact finder further credited an argument that Celgene co-

---

[redacted]. In order to accomplish this, Celgene created a "Visiting Faculty Program" of speakers in 1999 to give speeches on use of Thalomid in hematologic uses and solid tumors. *Id.* at CELBRN1573096-98; *see also* 1999 Thalomid Marketing Plan, CELBRN1573539-562 at CELBRN1573546 (stating that "MEC [was] not doing a good job in terms of managing the Speaker's program" and more and better speakers "for solid tumors" were needed).

[70] *See, e.g.* CELBRN0200954 (promotional budget document); CELBRN064011 (promotional budget document); CELBRN1199112 (Promotional Speakers' Bureau launch document); CELBRN1793011 (assessing success of speakers' programs as a function of Return on Investment and increased prescription of Celgene's drugs by speakers and those they influence); CELBRN1793012 (same); CELBRN0341872 (same); CELBRN350180 (same); CELBRN0341872 (same), CELBRN0160314 (same); CELBRN0168985.

[71] Counsel has represented that based on the evidence and testimony produced in discovery in this case, Relator can establish as a legal matter – through statutory authority, case law, and Office of the Inspector General (OIG) guidance – that Celgene's payment of speakers' fees was illegal and violated the Anti-Kickback Statute.

opted the entire market with the use of payments and other forms of remuneration to physicians, third party organizations, non-governmental organizations ("NGOs"), etc., (and that all prescriptions were influenced by and a product of Celgene's efforts), a proper measure of illegal kickback damages would be all prescriptions, even beyond those written by the physicians Celgene paid directly. *See infra.*

102. I was also provided with legal authority, as well the expert report submitted in another case that was upheld on appeal to the U.S. Court of Appeals for the Fourth Circuit, that indicates all prescriptions tainted by kickbacks or improper referrals are false claims for the purposes of the False Claims Act, and that the full amount of government money paid in connection with these prescriptions is properly included in a damages analysis.[72] I have thus conducted an analysis based on the presumption that Celgene's payment of speakers fees constitute kickbacks and that the prescriptions written by physicians who received these fees are tainted, rendering the full amount of government money expended on each prescription appropriate for inclusion in damages. Should any of these presumptions be disproven or should it be shown at trial that certain of these prescriptions should not be considered false claims subject to the False Claims Act, I can refine my damages assessment accordingly.

103. As its earliest Marketing Plans evidence, Celgene perceived a need to enlist health care professionals and third party organizations, including non-government organizations, to champion its products. Celgene used paid speakers at the earliest stages of promotion of Thalomid and continued these efforts with Revlimid.

---

[72] *E.g. U.S. v. Rogan*, 517 F.3d 449 (7th Cir. 2008); *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364 (4th Cir. 2015); *U.S. ex rel. Drakeford v. Tuomey*, 976 F. Supp. 2d 776 (D.S.C. 2013); *U.S ex rel. Freedman v. Suarez-Hoyos*, 2012 U.S. Dist. LEXIS 135230, at *15 (M.D. Fla. Sept. 22, 2012) ("assuming the Government proves that it paid claims that were tainted by a kickback arrangement and that it would not have paid such claims had it known the truth, the amount of the Government's damages resulting from the payment of such claims equals the full amount that Medicare paid"); Expert Report of Ruben Steck, *Drakeford v. Tuomey,* Case No. 05-02858, Dkt. No. 671-5 (D.S.C. Oct. 15, 201).

104. As a microcosm of the impact of Celgene's use of money to induce the ordering or recommending of prescriptions, I was able to make the most complete observations with regard to the speaker program for Revlimid. Recent documentary and testimonial evidence I reviewed, such as the deposition of Dr. Ralph Boccia – taken shortly before my original report was due – has enabled me to bolster these observations.

**1. Higher paid speakers prescribed significantly more than lower paid prescribers**

105. I investigated whether there is a statistically significant difference in prescribing behavior of the physicians who received high payments from Celgene for speaking arrangements compared to those who received low payments over the years for Celgene's Revlimid Speaker Program. High paid physicians were defined as physicians who received more than $100,000 from Celgene over the period of 2006-2014. I conducted this analysis using different thresholds i.e. threshold of $100,000, $150,000 and $200,000 as a high payment. The prescribing behavior was measured based on the prescriptions of Revlimid over this time frame considered.[73] This analysis reveals that at every threshold higher paid speakers prescribed statistically significantly more than low paid KOL prescribers ($p<0.001$) (see Appendix I and Appendix J for methodology).

**2. Examples of some speaker payments made to physicians and the prescribing pattern seen**

106. Celgene paid [redacted] for Revlimid-related speaking engagements beginning in Q1 2006 through Q1 2014 according to the ENVISION data.[74] This resulted in [redacted] claims of which [redacted] were Medicare Revlimid claims.

[73] I conducted this analysis using RevAssist data (Opening Report Appendix D.15) since it should consist of the entire universe of prescriptions for Revlimid through each of the physicians. Since Medicare prescriptions are a part of the RevAssist data, any result that applies to RevAssist data should apply to Medicare data as well (given there is appropriate sample size to conduct the test in Medicare data).

[74] JD_ENVISION000001. Please note: Counsel tells me that Envision Communications is a global medical education company that provides strategic planning, development, and

107. Celgene paid [redacted] for Revlimid-related speaking engagements between 19th December 2006 to 21st August 2014. This resulted in [redacted] claims of which [redacted] were Medicare Revlimid claims.

108. Celgene paid [redacted] for Revlimid-related speaking engagements between 23rd March 2006 to 13th March 2013. The RevAssist data shows an increase in prescriptions during the time that Celgene made these speaker payments. This resulted in [redacted] claims of which [redacted] were Medicare Revlimid claims.

109. Celgene paid [redacted] for Revlimid-related speaking engagements between 8th August 2006 to 23th October 2014. As with many other Celgene KOL payments, this payment appears excessive for speaking arrangements over the years. This payment resulted in [redacted] claims of which [redacted] were Medicare Revlimid claims. RevAssist data shows a rise in prescriptions written by [redacted] for Revlimid while he was receiving speaker program-related payments from Celgene.[75]

110. Deposition testimony from Dr. Ralph Boccia and other documents produced by Celgene's promotional speakers and KOLs allows me to test my prior review of Celgene's payment practices to physicians and confirm their potential impact on damages.[76]

111. Dr. Boccia is a practicing oncologist in Maryland, who was paid at least [redacted] by Celgene over an eight year period to give promotional speeches for Celgene on

---

implementation of programs and services in the oncology therapeutic area. Envision assisted Celgene in the creation, implementation, coordination, and management of its promotional speakers' programs.

[75] I understand that Relator also maintains that payments to [redacted] through the promotional speakers' program were – in large part – compensation for his undocumented promotion of off-label uses to physicians to whom Relator was assigned and that [redacted] at times accompanied Relator on sales calls to pitch physicians.

[76] Dr. Boccia's deposition was taken approximately 1 week before the parties' expert reports were due on September 25, 2015, insufficient time for my review and assessment of impact on my analysis. I understand from counsel that the final version of the transcript, which allowed Dr. Boccia to make any necessary changes, was not available until after expert reports were due.

Revlimid.[77] When asked about his status in the medical community, Dr. Boccia stated that he doesn't consider himself a thought leader, but chooses to think of himself as a "good country doc." Deposition of Ralph Boccia ("Boccia Dep.") p. 237. But he is "good country doc" with unusual reach, influence, and ability to alter prescribing behavior of others.

112. Dr. Boccia's testimony on his other affiliations indicates that Celgene paid many of its promotional speakers to influence the prescribing behavior of others and not merely to increased their own prescribing behavior. In addition to acting as a promotional speaker for Celgene and numerous other pharmaceutical companies, Dr. Boccia is also a paid Medical Director to International Oncology Network ("ION") Clinical Research Program and Chairman of ION's Medical Advisory Program. ION is "the largest physician service organization and GPO specializing in the support of community oncology," whose parent is AmerisourceBergen Specialty Group a conglomerate of health care companies whose sister corporations include AmerisourceBergen Drug Corporation a giant pharmaceutical distributor and pharmacy company.[78] Dr. Boccia testified in a deposition that one of his roles for ION "is to set up, recruit faculty for, set the agenda for medical education meetings that ION puts on." Boccia Dep. at p. 17. This is significant because Celgene had a number of marketing initiatives with ION. *See* CELBRN0492436. Among them, was a webcast given by Dr. Boccia that resulted in 125 "ION HCP [Health Care Professional] 'touches' in 2008." *Id.* This marketing document indicates that Celgene products received about 1,355 "Live MD/RN touches" in 2008, excluding other touches the company received in ION publications, meetings, displays, and advertisements, among other things. *Id.* Celgene marketing documents indicates that Celgene's marketing and sales divisions

---

[77] JD_ENVISION000001. Exhibit 7 of Dr. Boccia's deposition appears to be the portion of Envision spreadsheet depicting payments made to Dr. Boccia.

[78] *See* http://www.amerisourcebergen.com/abcnew/news/press-releases/ion-solutions-and-foundation-medicine-enter-into-a-preferred-partnership-to-deliver-comprehensive-cancer-genomic-profiling-services.aspx.

jointly funded all of the joint ION-Celgene "Promotional On-label Programs." *Id*. Dr. Boccia is listed among approximately thirty other ION physicians as "ION Key Decision Makers." *Id*.[79]

113. Other third party documents likewise show the unique reach of Celgene's speakers and other KOLS. For example, Celgene paid [redacted] for promotional speeches on Revlimid over a 7 year period.[80] In addition to serving as a promotional speaker for Celgene, he served as a consultant to Celgene, participated in research funded by Celgene, and served as an author on numerous off-label uses of Celgene's drugs, a fact that he sometimes disclosed pursuant to Conflict of Interest Policies applicable on journals for his articles where he is listed as author were published.[81] [redacted] is similarly a physician who was likely paid by Celgene for reasons beyond his own prescribing habits. Dr. [redacted] has a long history with Celgene, dating back at least to articles co-authored with Jerry Zeldis in 2006.[82]

114. Despite this history,[redacted] sought to publicize his works in independent journals where relationships with Celgene would ordinarily preclude publications. For example, ASCO has a comprehensive conflict policy, addressing and generally prohibiting publication of

---

[79] Dr. Boccia also testified that he may have received compensation from participating in Celgene Advisory Boards. In one case, he volunteered to be on a Celgene Advisory Board this year, involving the use of Revlimid and Rituxin together. Exhibit 20 to Boccia Dep.

[80] JD_ENVISION000001; [redacted]_000054-58.

[81] *See* [redacted]_000093-96/

[82] *See, e.g.*, Blood, Volume 108, issue 11, November 16, 2006, Abstract 531:Preliminary Results from a Phase II Study of Lenalidomide
Monotherapy in Relapsed/Refractory Aggressive Non-Hodgkin s Lymphoma. Session Type: Oral Session
Peter H. Wiernik, Izidore Lossos, Joseph Tuscano, Glen Justice, Julie M. Vose, Dennis Pietronigro, Kenichi Takeshita, Annette Ervin-Haynes, Jerome B. Zeldis, Thomas M. Habermann. Our Lady of Mercy Cancer Center, New York Medical College, Bronx, NY; Sylvester Cancer Center-University of Miami, Miami, FL; University of California Davis Cancer Center, Sacramento, CA; Pacific Coast Hematology/Oncology Medical Group,Fountain Valley, CA; University of Nebraska, Omaha, NE; Celgene Corporation, Summit, NJ; Mayo Clinic, Rochester, MN

original research by authors who serve as speakers for pharmaceutical companies or who have other close ties to the pharmaceutical industry.[83] Under a predecessor policy, [redacted] sought exception to a conflicts of interest of policy that ordinarily would have prevented him from submitting a manuscript for publication in the Journal of Clinical Oncology because he was the principal investigator on the phase II trial that generated the data for the submitted manuscript and he received honoraria from Celgene.[84] Among his stated reasons were that the study received "a relatively small amount of funding from the study sponsor" and that "the amount of honoraria received by the principal investigator" [redacted] was "relatively small (< $10,000)."[85] He did not disclose his long history with Celgene or the overall large sums of money Celgene had paid him as a speaker.[86] Nor is it clear how [redacted] could represent the honoraria he received was under $10,000. His letter requests an exception from the Editor-in-Chief of the Journal of Clinical Oncology is dated November 17, 2011. I calculate that he had received [redacted] for promotional speaking on Revlimid just for the year 2011 at the time he drafted the letter. Just three days before, on November 14, 2011, he received [redacted] for speaking on Revlimid's use in multiple myeloma.

**3. Reasonableness of Speakers' Compensation**

115. I understand from counsel that there exists case law and government amicus briefs that support the position that there can be no "fair market value" for promotional speeches designed to induce increased drug utilization and that the amount of compensation may not be legally relevant for a kickback analysis. But assuming the degree of compensation was relevant,

---

[83] *See* http://jco.ascopubs.org/content/early/2013/04/22/JCO.2013.49.5002

[84] *See* [redacted]_000826; *see also* [redacted]_000828.

[85] [redacted]_000826

[86] Between March 2006 and March 20014, Celgene paid him more than [redacted] to for promotional speeches on Revlimid. JD_ENVISION000001.

recent documents and testimony also allow me to form an opinion on Celgene's compensation of promotional speakers.

116. At his deposition, Dr. Boccia testified about his experiences as a promotional speaker for Celgene. He explained that the slide decks for promotional speeches are put together by Celgene, and he has no role in this preparation of the slides or content of the speeches.[87] For his various speeches, Dr. Boccia repeatedly read the slide decks Celgene prepared on "The Role of Revlimid in Multiple Melanoma; he often delivered the same speech within days. For this activity, he received [redacted] for each speech.[88] On November 4, 2010, Dr. Boccia purportedly made a total of 6 discrete speeches on the treatment of multiple myeloma or MDS by Revlimid, receiving a total of [redacted] for that day alone.[89]

117. Dr. Boccia's testimony also indicates that it takes approximately 1 hour to read from Celgene's slide decks in the course of delivering a Celgene speech.[90] Similarly, recent documents show that Dr. James Berenson was likewise paid approximately [redacted] for a 2 hour promotional speech on Pomalyst, a newer thalidomide derivative marketed by Celgene.[91] Thus, Celgene was paying some promotional speakers roughly [redacted] an hour to repeatedly read the same slide decks to [presumably] different audiences of medical professions in quick succession. Indeed, Celgene's 2009 Speaker's Bureau Guidelines confirm that "National Physician Speakers," defined as those "affiliated with a large academic institution" who are "published" or who were "Celgene KOLs" received a standard rate of [redacted] per speech.[92]

---

[87] Boccia Dep. at 65:2-24, 65:25-66:12.

[88] JD_ENVISION000001. Speeches on MDS were paid out at [redacted] per speech.

[89] Each of these speeches are characterized by a discre "Job #" and an individual speaker fee. D_ENVISION000001.

[90] Boccia Dep. at 76:11-14.

[91] Berenson_03968.

[92] *See, e.g.* CELBRN0346800-06 at CELBRN0346802. Local physician speakers with only a "local influence" receive[redacted], regional physicians with "regional influence" received [redacted] "National Physician Speakers, who are published and affiliated "with a large academic

118. Other documents I reviewed enabled me to compare this rate to other work performed for Celgene. For example, documents indicate that Dr. Berenson assisted Celgene's vendor Envision in the actual development of content for Revlimid promotional speakers' programs; in doing so, he negotiated an honorarium of [redacted] (his usual hourly fee) for an initial 1 hour Webex meeting, payment of [redacted] for a live review meeting of 5-6 hours, [redacted] for a second web meeting of 3-4 hours, and ad hoc consults at a rate of [redacted]/hr.[93] Thus, Dr. Berenson received at least 5 as much per hour to read from a slide deck without the ability to deviate from Celgene's pre-designated content than to substantively contribute in the development of content of the promotional materials for FDA approval.[94] Likewise, [redacted] negotiated a consulting agreement with Celgene in which he would provide up to 3 hours of feedback on "unbranded patient cases" for a maximum rate of [redacted].[95] Yet, he too, received many thousands of dollars for reading slides for Celgene as a promotional speaker. The discrepancy between the rate for substantive services of these physicians and the standardized rate to deliver speeches confirms that Celgene's payment to promotional speakers was not simply compensation for their services. A methodology suggested by Polaris further bolsters this conclusion, particularly in light of the fact that the suggested methodology considers KOL status, preparation time, and travel time to be premiums to be added on to a base hourly rate for oncologists multiplied by the time to conduct an activity, and Celgene guidelines look to make universal payments, based on the influence and reach of the speaker.[96] The size of the payments gives rise to the common sense

---

institution" receive [redacted] and an "international physicians speaker" defined as chief or chair at a large academic institution, who are "world renowned" can receive [redacted] for each speech.

[93] Berenson_00919.

[94] Counsel explains that the promotional slide had to be approved by the FDA ultimately and this is why speakers could not deviate from the content Celgene had approved.

[95] [redacted]_000077.

[96] *See* http://polarismanagement.com/wp-content/uploads/2014/11/FMV-Physician-Consultants-Sept05-Pharm-Exec.pdf Using the hypothetical rate of Polaris of $190/hour as oncologist base pay and assuming an activity base rate of 1.3 (a generous assumption given the lack of time and effort affiliated with reading canned slides), the base rate of speaking would be $247. A two

inference that Celgene's goal was to induce attendees of speeches to increase their prescribing behavior and the speakers' stature is irrelevant as a substantive matter because they do not deviate from pre-approved slides.

### H. Charitable Foundation Kickback Damages

119. Based on my analysis of Medicare Parts A and B data and other available information, it is my expert opinion that these Celgene payments to certain charitable foundations were a ruse to cover the fact that these payments were actually illegal kickbacks designed to hide the fact that Celgene was contributing these payments to the foundations to get Medicare patients to use more Thalomid and Revlimid. It was in Celgene's financial interest to assist with a Medicare patient copay if, as a result, Celgene got back the Medicare payment portion (e.g. 80% of a Revlimid prescription cost). In reviewing the magnitude and specificity of Celgene's donations to the charitable foundations that provided this copayment assistance, I now believe it is reasonable to assume that these copay assistance foundation payments were designed to pay patient copays in violation of Anti-Kickback laws.

120. Based on my review of guidance from the Office of Inspector General, review of relevant documents, and discussions with counsel, I conclude that it could reasonably be determined that Celgene's payments to non-profit organization such as the Patient Access Network Foundation (PANF) and Chronic Disease Fund (CFD) constitute kickbacks in violation of the Anti-Kickback Statute. Accordingly, I proceed based on the assumption that prescriptions for Celgene products in which non-profits paid the co-pay are tainted by kickbacks. I calculate damages based on this.

---

hour speech would be worth $494. Adding a $600 KOL premium for Dr. Berenson, would justify compensation of $1,094 without travel or preparation time. As noted, Celgene appears to have paid the same amount regardless of whether travel for speeches was necessary. The preparation time would be minimal or non-existent for speakers routinely presenting the same slides.

121. As recognized by the Office of the Inspector General (OIG), the "anti-kickback statute makes it a criminal offense to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce or reward the referral or generation of business reimbursable by any Federal health care program."[97] The OIG has issued a Special Advisory Bulletin warning that pharmaceutical companies' offer of "copayment coupons to insured patients to reduce or eliminate the cost of their out-of-pocket copayments for specific brand-name drugs" "constitute remuneration offered to consumers to induce the purchase of specific items" and could violate the Anti-Kickback Statute.[98] The OIG further explained that items or services resulting from a violation of the Anti-Kickback Statute constitutes a false or fraudulent claims for the purposes of the False Claims Act.[99]

122. The OIG concluded that "[p]harmaceutical manufacturers that offer copayment coupons may be subject to sanctions if they fail to take appropriate steps that such coupons do not induce the purchase of Federal health care program items or services, including, but not limited to, drugs paid for by Medicare Part D."[100] Thus, Celgene could not directly offer coupons to Medicare patients to reduce or eliminate co-pays for Thalomid or Revlimid.

123. In issuing this alert, the OIG explained its rationale. Acknowledging that "copayment coupons provide an immediate financial benefit to beneficiaries," it explained that they "ultimately can *harm* both Federal health care programs and their beneficiaries."[101] One reason is that "[w]hen consumers are relieved of copayment obligations, manufacturers are relieved of a market constraint on drug prices." The OIG interpreted the Anti-Kickback Statute

---

[97] http://oig.hhs.gov/fraud/docs/alertsandbulletins/2014/SAB_Copayment_Coupons.pdf

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] *Id.* (emphasis added).

as applying to these arrangements in part because "[e]xcessive costs to Federal programs are among the harms that the anti-kickback statute is intended to prevent."

124. The OIG has also issued guidance (in the form of a Supplemental Bulletin) on pharmaceutical companies' "indirect remuneration to patients" through "contributions to PAP" (patient assistance programs) operated by independent charities.[102] Although the Bulletin focuses on the charity as the actor, rather than a funding pharmaceutical company, it is nonetheless instructive. This Bulletin noted that "[i]f a donation is made to a PAP to induce the PAP to…arrange for the purchase of the donor's federally reimbursable items, the [anti-kickback] statute could be violated."[103] The OIG expressed particular concern regarding situations where non-profits "define[d] their diseases funds so narrowly that earmarking effectively results in a donor's subsidization of its own products."[104] A charity may not permissibly "function as a conduit for payments or other benefits from the pharmaceutical manufacturer to patients."[105]

125. A charity "with narrowly defined disease funds might be subject to scrutiny if the disease funds result in finding exclusively or primarily the products of donors." Funds that are limited to subsets of available products, rather than all products approved by the FDA for treatment of the disease state covered or all produced covered by the Federal health care program (including generic or bioequivalent drugs) will be subject to more scrutiny.[106] Determinations of anti-kickback statute violations are made on a case-by case basis after examining the applicable facts and circumstances, including the intent of the parties. The Bulletin expressly noted that it focused on the conduct of charities and that the focus of any of its favorable advisory opinions

---

[102] http://oig.hhs.gov/fraud/docs/alertsandbulletins/2014/independent-charity-bulletin.pdf

[103] *Id.*

[104] *Id.*

[105] *Id.*

[106] *Id.*

had been "on the charities that requested the opinion—not the donors" based on acceptance that certain certifications were accurate. The OIG further noted that the charity could only certify as to its own actions to ensure independence from donors, that it could not certify as to actions of the donors and that OIG opinions regarding legality as to a charitable organization "do not address actions by donors to correlate their funding of PAPs with support for their own products" and that "[s]uch actions may be indicative of a donor's intent to channel its financial support to copayments of its own products, which would implicate the anti-kickback statute."

126. Based on the documents and testimony I reviewed, the payments Celgene made to non-profits to facilitate coverage of patient co-pays have the hallmarks of a prohibited relationship and prohibited payments that violate the Anti-Kickback Statute under the OIG guidance.

127. Deposition testimony by Celgene's Executive Director of Project Leadership, Katherine Stultz suggests that Celgene used an intermediary to do what it could not do directly: "provide direct assistance to patients with a Medicare plan" by paying their co-pay. Deposition of Katherine Stultz ("Stultz Dep.") at 84:3-5. The patient support services team, on which Stultz served, was trained "that a Medicare beneficiary needing copay assistance would need to be directed to a copay foundation if they needed assistance." *Id.* at 85:18-21. For that reason, Celgene paid millions of dollars to non-profit, non-governmental intermediaries ("NGOs") in order to ensure that patients would use Thalomid and Revlimid without having to pay a co-pay. Specifically, Celgene worked with non-profit organizations such as the Lymphoma Leukemia Society and Patient Advocacy Network Fund (PANF). Stultz Dep. at 86:22-24. Stultz testified that Celgene paid these non-profits between "50 and hundred million" annually. *Id.* at 91:5-8, 93:2-11. In return, the non-profits were required to use the money to fund co-pays for patients with multiple myeloma and MDS. *Id.* at 109:15-22:

> A. We would continuously fund these charitable donations, so that they would always have funding available to any patients in the disease areas of focus.
>
> Q. The disease areas of focus meaning what?

A. Multiple myeloma and MDS.

Q. Okay. Were the non-profits required to use the money for the copay?

A. The non-profits were required to use the money for copay within the bucket of which we had designated the money to be used for.

*Id.* at 115:4-8.

128. Celgene paid the non-profits as much as they claimed to need to finance co-pays for all patients with diseases its products treated who otherwise could not pay co-pays for treatment. *Id.* 110:9-23, 114:15-25, 118:1-14. Indeed, "if a physician ha[d] deemed the product is appropriate for a patient" Celgene "[would] assist in assuring access is available to the product," including by making sure that the copay is paid "[i]f the [Medicare or Medicaid] patient meets the qualifications of copay assistance." *Id.* at 118:3-14.

129. Other documents and testimony shows that the disease states of the non-profits Celgene funded were sufficiently narrow and the payments Celgene made sufficiently large that Celgene could be sure it was providing enough financial support to fund all co-payments of its own products, particularly in light of the interactions it had with non-profits.

130. The National Cancer Institute (NCI) identifies 25 unique drug formulations that have been approved by the FDA for multiple myeloma.[107] Despite this fact, the Chronic Disease Fund (CDF), a non-profit that Celgene funds, affirmatively confirms that "[u]nder our copay assistance programs, we cover a specific set of drugs for each diagnosis."[108] For multiple myeloma, CFD only covers 10 of these formulations,[109] Three of these drugs – Thalomid,

---

[107] *See* http://www.cancer.gov/about-cancer/treatment/drugs/multiple-myeloma NCI actually lists 35 drugs because it separately lists brand names and generic names, for example, listing both Revlimid and lenalidomide. I have eliminated redundancies where the drug is patented and only distributable by a single manufacturer as is currently the case with Revlimid, thereby reaching identifying the unique formulations.

[108] https://patientsandpros.cdfund.org/Programs/Products

[109] CDF covers: (1) cyclophosphamide, 2. Cytoxin, 3. Darzalex, 4. Doxil 5, Farydak, 6, Kyprolis, 7. Pomalyst, 8. Prednisone, 9. Revlimid, 10. Velcade. I made this determination by searching the

Revlimid, and Pomalyst – are manufactured by Celgene. In 2013, an analyst website, Seeking Alpha, published an article questioning CDF's business practices and its relationship with Celgene.[110] A copy of this article was emailed by a CDF employee to an employee of PANF, another co-pay organization.[111] Citing CDF's 2011 Audited Financials, it noted that just two pharmaceutical companies accounted for 81% of the 215 million in donations CDF received in 2011 and posited that Celgene was one of these two companies.

131. Celgene and CDF maintained close contact. Donations provided to CDF were not ad hoc. Instead they were based on contractual arrangements (specific to disease state), committing Celgene to donate designated amounts to designated disease funds; addendums were frequently entered to ensure all co-pays would be funded as co-pay projections (or actual payouts on Celgene drugs) changed.[112] CDF routinely provided Celgene both with co-pay forecasts for the following year as well as co-pay utilization.[113] Indeed, the contracts between Celgene and CFD expressly require CDF to regularly produce status reports to Celgene with information on the number of applicants, average amounts of co-pays, total amounts paid out, and the amount of Celgene's donation that remains available for use.[114] Contracts with PANF require PANF's provision of virtually identical information.[115] This evidence and the Stultz deposition testimony

---

entire product list and comparing the approved drugs listed by NCI. CDF does not list the specific drugs approved for each diagnosis.

[110] http://seekingalpha.com/article/1892111-celgene-and-the-chronic-disease-fund-the-next-domino-to-fall

[111] CDF_CLG_0003368.

[112] CDF_CLG_000728; CDF_CLG_0007286; CDF_CLG_0007289-93; CDF_CLG_0007313-14; CDF_BLG_0007316-325' CDF_CLG-0007328-330; CDF_CLG_0007351-52; CDF_CLG_0007390-92; CDF_CLG_0007404-05. Celgene's contracts with CDF appear to allow CDF to use up to 9% of Celgene's donation to fund operation and capital expenditure. *See* CDF_CLG_0007318.

[113] *E.g.* CDF_CLG_0000005-6; CDF_CLB_0007388-89 (2013 projections).

[114] Celgene, of course, tracked its market share and existing and expected profits and market shares by lines of therapy as documents I discuss in my original report make clear.

[115] *E.g.* BROWN_PANF_000001-07 at BROWN_PANF_000003.; BROWN_PANF_0000023.

strongly indicates that CDF and PANF provided Celgene with the information it needed to be sure it would fully fund all co-pays needed for its products[116] and that it successfully aligned its funding to achieve this goal.

132. Despite this evidence that CDF provided Celgene with extensive information that allowed Celgene to oversee the funding necessary to assure that all co-pays with respect to its drugs would be covered, I didn't receive sufficient information to calculate the CDF co-pay damages. PANF was the only charitable foundation for which I received sufficient information to calculate damages. I've attached my calculations of the Medicare damages (off-label, on-label and total) for the PANF copays. Celgene's kickback payments to just this one charitable foundation are responsible for over [redacted] in Part D damages. Should similar detailed information on copays be provided to me for CDF or other charitable foundations I will update these copay kickback damages calculations accordingly (Appendix H).

[116] *E.g*. Stultz Dep. *op. cit.*

| REVLIMID-DAMAGES DUE TO BOTH ON AND OFF-LABEL CLAIMS | | | | | | |
|---|---|---|---|---|---|---|
| YEAR | Drug | Claims paid through co-pays | Damages to Medicare due to PANF Part D copays | Trebling | Civil penalties | Total damages |
| 2006 | Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2007 | Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2008 | Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2009 | Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2010 | Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2011 | Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2012 | Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2013 | Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2014 | Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Total | Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| THALOMID-DAMAGES DUE TO BOTH ON AND OFF-LABEL CLAIMS | | | | | | |
|---|---|---|---|---|---|---|
| YEAR | Drug | Claims paid through co-pays | Damages to Medicare due to PANF Part D copays | Trebling | civil penalties | Total damages |
| 2006 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2007 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2008 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2009 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2010 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2011 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2012 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2013 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2014 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Total | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| REVLIMID-DAMAGES DUE TO OFF-LABEL CLAIMS | | | | | | |
|---|---|---|---|---|---|---|
| YEAR | Drug | Claims paid through co-pays | Damages to Medicare due to PANF Part D copays | Trebling | Civil penalties | Total damages |
| 2006 | Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2007 | Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2008 | Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2009 | Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2010 | Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2011 | Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2012 | Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2013 | Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2014 | Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Total | Revlimid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| THALOMID-DAMAGES DUE TO OFF-LABEL CLAIMS | | | | | | |
|---|---|---|---|---|---|---|
| YEAR | Drug | Claims paid through co-pays | Damages to Medicare due to PANF Part D copays | Trebling | Civil penalties | Total damages |
| 2006 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2007 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2008 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2009 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2010 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2011 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2012 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2013 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2014 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Total | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

## VII. Rebuttal Testimony and Testimony at Trial

133. Should the Court or Jury determine that additional interest charges apply to the relevant damages calculations, or should the damages calculations need to be updated to a more recent date, I am prepared to undertake such additional damages calculations.

134. If asked by counsel, I intend to present information at trial from this report and previous reports as well as prepare rebuttal reports as requested. If called to testify I would prepare additional trial exhibits based on the materials presented in this report. I reserve the right to update, revise or modify my opinions if new information is made available to me.

April 22, 2016

Joel Hay

Joel W. Hay

# APPENDIX A

**Appendix A:**

USC Schaeffer
Leonard D. Schaeffer Center for Health Policy & Economics

4/22/16

**CURRICULUM VITAE**

**JOEL W. HAY, PhD**

## PERSONAL INFORMATION

| | |
|---|---|
| Business/Mail Address | Professor of Pharmaceutical Economics and Policy<br>& Professor of Health Policy and Economics<br>University of Southern California<br>Schaeffer Center for Health Policy and Economics<br>University Park Campus,<br>Verna & Peter Dauterive Hall (VPD 214-L)<br>635 Downey Way<br>Los Angeles, CA 90089-3333 USA |
| Business Telephone | Office: (818) 338-5433<br>Assistant: (213) 821-7940<br>Fax: (213) 740-3460 (ATTN: Samantha) |
| E-Mail | jhay@usc.edu |
| USC Websites : | http://healthpolicy.usc.edu/ListItem.aspx?ID=4<br>http://pharmacyschool.usc.edu/faculty/profile/?id=374 |
| Graduate Program Website : | http://pharmacyschool.usc.edu/programs/pep/ |
| Schaeffer Center Street Address<br><br>(Deliveries, e.g. Fedex, UPS) | 635 Downey Way<br>Los Angeles, CA 90089-3333 USA<br>Main Phone/Front Desk: (213) 821-7940<br>J Hay Office: (213) 821-8160<br>Fax: (213) 740-3460 (ATTN: Samantha)<br>http://healthpolicy.usc.edu |

## Contact Information for Non-USC Activities

Joel W. Hay, PhD
22101 Dardenne St.
Calabasas, CA 91302
818-338-5433
joel.hay@gmail.com

## EDUCATION

| | |
|---|---|
| 1974 | B.A. (*Summa cum laude*), Economics, Amherst College |
| 1975 | M.A., Economics, Yale University |
| 1976 | M.Phil., Economics, Yale University |
| 1980 | Ph.D., Economics, Yale University |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| March 2009 – Present | Full Professor (with tenure),<br>Pharmaceutical Economics and Policy;<br>School of Pharmacy<br>Professor (by courtesy),<br>Department of Economics;<br>University of Southern California,<br>Los Angeles, California. |
| September 2009-Present | Full Professor,<br>Health Economics and Policy<br>Leonard D. Schaeffer Center for Health Policy and Economics<br>University of Southern California,<br>Los Angeles, California |
| 1992 – 2009 | Associate Professor (with tenure),<br>Pharmaceutical Economics and Policy;<br>School of Pharmacy.<br>Associate Professor (by courtesy),<br>Department of Economics;<br>University of Southern California,<br>Los Angeles, California. |
| September 1985 - May 1992 | Senior Research Fellow, Hoover Institution, Stanford University,<br>Stanford, California. |
| July 1983 - September 1985 | Senior Policy Analyst, Project HOPE, Center for Health Affairs,<br>Millwood, Virginia. |
| January 1981 - June 1983 | Visiting Lecturer, M.P.H. Program, Yale University, Department of Epidemiology and Public Health, and Institution for Social and Policy Studies. |
| June 1980 - September 1984 | Assistant Professor, Department of Behavioral Sciences<br>and Community Health, School of Dental Medicine<br>University Connecticut Health Center, Farmington, Connecticut.<br>(from 9/81) Assistant Professor, Department of Economics, UConn Storrs.<br>University of Connecticut Graduate School, Storrs, Connecticut. |
| June 1978 - June 1980 | Assistant Research Professor, Human Resources Research Center,<br>University of Southern California, Los Angeles, California. |

**ADDITIONAL EXPERIENCE:**

| | |
|---|---|
| 2015 | External Reviewer, Italian Ministry of Health, General Direction for Scientific Research and Health Innovation. |
| 2015 | Invited Advisor, U.S. Food and Drug Administration Policy on Review of Health Economics Modeling Claims. |
| 2014-present | Founding Member, International Academy of Health Preference Research (iahpr.org). |
| 2013-2015 | Extramural Reviewer, Healthcare Systems & Value Research Study Section Review Panel, Agency for Healthcare Research & Quality (AHRQ), U.S. Dept. of Health & Human Services. |
| 2012 | External Reviewer, Cochrane Tobacco Addiction Research Group, Cochrane Collaboration, www.cochrane.org. |
| 2012 | Health Economics Expert Consultant, State Attorneys General Working Group on Pharmaceutical Benefits Management (PBM) Market Competition Issues. |
| 2011-2013 | Extramural Reviewer, Healthcare Systems & Value Research Study Section Review Panel, Agency for Healthcare Research & Quality (AHRQ), U.S. Dept. of Health & Human Services. |

| | |
|---|---|
| 2011 | Extramural Grant Reviewer, Health Services Research Study Section, Agency for Healthcare Research & Quality (AHRQ), U.S. Dept. of Health & Human Services. |
| 2010 | Extramural Grant Reviewer, Health Services Research Study Section, Agency for Healthcare Research & Quality (AHRQ), U.S. Dept. of Health & Human Services. |
| 2010 | External Grant Reviewer, Netherlands Organisation for Health Research and Development (ZonMw) Health Technology Assessment Methodology Programme. |
| 2010 | External Program Contract Reviewer, Agency for Healthcare Research & Quality (AHRQ), U.S. Dept. of Health & Human Services; Developing Evidence to Inform Decisions about Effectiveness-2: The DEcIDE-2 Network. |
| 2007-2013 | Leadership Group, International Society for Pharmacoeconomics and Outcomes Research (ISPOR) Disease Management and Prevention Task Force. |
| 2007-2009 | Leadership Group, International Society for Pharmacoeconomics and Outcomes Research (ISPOR) Patient Preferences Research Task Force. |
| 2006-2010 | Co-Chair, ISPOR Drug Cost Task Force. |
| 2006 | Chair, Awards Committee; "The 2006 ISPOR Avedis Donabedian Outcomes Research Lifetime Achievement Award." Presented to Prof. George Torrance at the 11'th Annual International Meeting, Philadelphia, PA. |
| 2005 | External Project Reviewer; "The Uninsured and Access to Prescription Drugs in California. The Petris Center on Health Care Markets & Consumer Welfare, University of California, Berkeley. |
| 2005 | External Program Reviewer, Agency for Healthcare Research & Quality, Dept. of Health & Human Services; Developing Evidence to Inform Decisions about Effectiveness: The DEcIDE Network. |
| 2004-2010 | Health Policy Scientific Council, Intl. Soc. for Pharmacoeconomics & Outcomes Research. |
| 2004-2014 | Elected Executive Board Member, American Society of Health Economists (Ashecon.org). |
| 2004-2010 | Scientific Advisory Board Member, Disease Management Association of America |
| 2002-2003 | Institute of Medicine, National Academy of Sciences. Commissioned Author "Vaccine Reimbursement Policy in the US." |
| 2001-Present | Health Economist, UCLA Center for Vaccine Research, UCLA Harbor Medical Center, Torrance, CA. |
| 2001 | Health Plan Reform Consultant, Hong Kong Hospital Authority, Hong Kong. |
| 2000 | External Reviewer, National Institute on Aging, NIH Small Grants Program. |
| 1999 | External Reviewer, National Institutes of Health, National Institute on Aging, |
| 1999-2011 | Co-Investigator, USC Alzheimer Research Centers of California Research Program, California Dept. of Health Services. |
| 1999 | Consultant, Univ. Michigan Survey Research Center ADAMS/HRS Dementia Project |
| 1999 | External Reviewer, National Insts. of Health, National Institute of Digestive Diseases and Nutrition, Division of Digestive Diseases and Nutrition Hepatitis C Antiviral Long-term Therapy to Prevent Cirrhosis (HALT-C) Ancillary Studies Committee. |
| 1999-2000 | Economics Research Consultant, U.S. AHRQ, Southern California Evidence-Based Medicine Practice Project: Deep Vein Thrombosis Treatment in Trauma Surgery Literature Synthesis and Guideline Development. |
| 1999 | Member, Long Range Steering Committee Task Force, Harbor-UCLA Medical Center Research and Education Institution, Torrance, CA. |
| 1998-2011 | Rand USC Project Coordinator, U.S. Agency for Health Research and Quality, Southern California Evidence-Based Medicine Practice Project. |
| 1998-2002 | Founding Editor-In-Chief, *Value in Health*, Journal of the International Society for Pharmacoeconomics and Outcomes Research. |
| 1998 | External Reviewer, Cal Dept of Health Services Alzheimer's Program Research Fund. |
| 1998-2008 | Member, Pharmacy Practice Research Roundtable. |
| 1998-2007 | Member, Intl. Working Group on Alzheimer Disease Pharmacoeconomics Research. |
| 1998-2006 | Member, Coronary Heart Disease: The Interdisciplinary Council on Reducing the Risk, co-sponsored by the American Heart Association & Bristol-Myers Squibb. Dallas, TX. |
| 1997-98 | Co-Chair: ISPOR Working Group on Guidelines for Pharmacoeconomic Research. |
| 1997-98 | External Reviewer. Asset and Health Dynamics among the Oldest Old- Dementia Survey Supplement. University of Michigan Inst. for Social Research, Ann Arbor, MI. |
| 1997 – Present | Economic Consultant, Rand Corporation, Health Outcome Research Group, Santa Monica, CA |

| | |
|---|---|
| 1996-1998 | Co-Chair and Primary Organizer: ISPOR Lipid Pharmacoeconomics Conference. Orlando, FL. |
| 1996-1998 | Elected Member, Board of Directors, and Founding Member, International Society for Pharmacoeconomics and Outcomes Research (ISPOR), Philadelphia, PA. |
| 1995-2000 | Member, Expert Advisory Panel on Drug Utilization Review, United States Pharmacopoeial Convention, Rockville, MD. |
| 1995-96 | Research & Graduate Affairs Cmte., American Assoc. Colleges of Pharmacy, Alexandria, VA. |
| 1994-95 | Technical Review Study Section, "HIV Costs and Services Utilization Study (HCSUS)," Agency for Health Care Policy & Research, US Dept. Health & Human Serv., Rockville, MD. |
| 1993-94 | Member, Research Advisory Panel for Outcome Studies, Wellpoint Pharmacy Management, Blue Cross of Southern California. |
| 1993-1998 | Member, Advis. Cmte., American Soc. Consultant Pharmacists Research Foundation |
| 1993 | Member, Planning Committee, American Society of Consultant Pharmacists for ASCP Foundation Pharmacoeconomics Fellowship in Geriatric Long-Term Care |
| 1992-1993 | Technical Review Panelist, Drug Utilization Review Demonstration Project Contracts, Health Care Financing Administration, Baltimore, MD. |
| 1992 | Member, Council of Advisors, Geriatric Drug Therapy Research Inst., Arlington, VA. |
| 1992 | Access to Health Care Task Force Member, American Heart Assoc., Washington, D.C. |
| 1992 | Judge, Masters of Innovation Software Competition, Zenith Data Systems, Chicago, IL |
| 1991 | Advisor, Hungarian Parliament Health Care Reform Committee, Budapest, Hungary. |
| 1991 | Chief U.S. consultant, Hungarian health care reform project, Px Ltd., Budapest, Hungary. |
| 1990-91 | Visiting Scholar, Hong Kong Centre for Economic Research, Chinese University of Hong Kong, Shatin, New Territories. |
| 1990 | Invited outside reviewer, U.S. Congressional Budget Office Long Term Care Policy Statement. |
| 1990 | Invited outside expert, California AIDS Leadership Commission Hearings, Los Angeles, CA. |
| 1989 | Proposal Review Consultant, The Smith Richardson Foundation. |
| 1989 | Invited outside expert, Select panel on HIV/AIDS estimates and projections. U.S. Public Health Service, Centers for Disease Control. |
| 1989 | Consultant, The Henry J. Kaiser Family Foundation, Menlo Park, California. |
| 1988 | Consultant, General Assistance Program for the Homeless, Office of the County Counsel, County of Sacramento, CA. |
| 1988 | Proposal Reviewer, Special Study Section, National Institutes of Health, U.S. Dept. of Health & Human Services. |
| 1988 | Issue Development Participant, "Medication Use in the Elderly: A Critical Analysis," Geriatric Pharmacy Institute, Philadelphia College of Pharmacy and Science. |
| 1988 | Consultant, Patient Care/Health Service Delivery Subgroup, Executive Task Force on AIDS, U.S. Public Health Service. |
| 1987 | Consultant, Cost-benefit analysis of HIB vaccine, U.S. Food and Drug Administration. |
| 1987 | Proposal Reviewer, National Center for Health Services Research, U.S. Dept. of Health & Human Services. |
| 1986, 1989 | Proposal Review Consultant, The Henry J. Kaiser Family Foundation, Menlo Park, California. |
| 1984 – 1986 | Principal Investigator, Robert Wood Johnson Foundation; An Incentive Reimbursement Plan for Medicaid Home Health Care Services. |
| 1985 | Technical Consultant, Research Projects Approval Committee-Economics, The World Bank. |
| 1985 | Technical Advisory Panelist, HCFA Contract No. 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; Market Study for Home Health Care Services, Center for Health Policy Studies. |
| 1984 | Technical Review Consultant, National Center for Health Services Research, Hospital Care and Utilization Project. |
| 1984 | Consultant, County of San Diego; Member of Proposal Review Committee for County Regional Contracts to Provide Care to Medically Indigent Adults. |
| 1983 | Visiting Asst. Prof., Inst. for Social Sciences, University of Basel, Basel, Switzerland. |
| 1983 | Principal Investigator, U.S. Environmental Protection Agency; Mortality and Air Pollution: A Microanalytic Analysis. |
| 1981 – 1982 | Principal Investigator, Connecticut Research Foundation; Child Health Status and Cognitive Development. |
| 1981 | Visiting Fellow, Institution for Social & Policy Studies, Yale University, New Haven, CT. |
| 1980 | Consultant, National Preventive Dentistry Demonstration Project Evaluation Model, American Fund for Dental Health. |

| | |
|---|---|
| 1980 | Consultant, National Health Services Corps Personnel Selection Project, Policy Research Inc. |
| 1979 – 1980 | Principal Investigator, Doctoral Research Grant, National Center for Health Services Research. |
| 1979 – 1980 | Consultant, Cost Benefit Analysis of Outpatient Treatment for Patients from the Psychiatric Ward of L.A. County/USC Medical Center. |
| 1977 – 1978 | Instructor, Department of Economics, Yale University, New Haven, Connecticut. |
| 1976 – 1977 | Teaching Assistant, Dept. of Economics, Yale University, New Haven, Connecticut. |
| 1974 – 1976 | Research Consultant, National Bureau of Economic Research. |
| 1975 | Bibliographical Research Project (Russian Language) on Works of Academic Leo Kantorovich for Professor Tjalling Koopmans prior to their joint Nobel Prize Award in Economics. |

**HONORS AND DISTINCTIONS:**

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award Finalist; Shraddha Chaugule, 2015: "Exploring heterogeneity in attribute processing strategies: Use of hybrid random utility maximization-random regret minimization models in a Discrete Choice Experiment." S. Chaugule and J. Hay. (Joel Hay, faculty mentor).

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award Finalist; Emmanuel Drabo, 2014: "A Cost-effectiveness analysis of pre-exposure prophylaxis (PrEP) for the prevention of HIV among the MSM population of Los Angeles County." (Joel Hay, faculty mentor).

Academy of Managed Care Pharmacy Research Mentor, Best Student Poster Award; Kai Yeung. Yeung K, Hay JW. Cost-Utility Analysis of Romiplostim Versus Splenectomy in the Treatment of Chronic Refractory Immune Thrombocytopenic Purpura. Poster presentation at the Academy of Managed Care Pharmacy 23'rd Annual Meeting, March 29, 2011 Minneapolis, MN. (Joel Hay, faculty mentor).

International Society for Pharmacoeconomics and Outcomes Research: Best New Investigator Podium Presentation Award 2010 to Dr. Haesun Suh. (Joel Hay, faculty mentor).

International Society for Pharmacoeconomics and Outcomes Research: Distinguished Service Award, 2009.

International Society for Pharmacoeconomics and Outcomes Research: Outstanding Student Chapter of the Year, Joel Hay Student Chapter Faculty Advisor, 2009.

Joel Hay was Founding Editor-in-Chief of *Value in Health* the peer-reviewed scientific journal of the International Society for Pharmacoeconomics and Outcomes Research until 2003. This journal, started in 1998, became Medline-listed in 2002. In its first impact factor, Value in Health was ranked #1 in two categories for the year 2004, by the ISI Journal Citation Reports® (JCR) with an impact factor of 3.657. Value in Health led all other journals listed both in the Health Care Sciences and Services category in the JCR Science Edition and in the Health Policy & Services category in the JCR Social Sciences Edition.

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award; Danielle Zammit, 2004: "Preliminary Economic Analysis of The American Cancer Society Guidelines For Mammography Screening In Average-Risk Women Under 70 Years of Age." D. Zammit and J. Hay.

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award; Danielle Zammit, 2003: "Economic Analysis of The Use of Angiotensin Converting Enzyme Inhibitors in Patients With Diabetes Mellitus." D. Zammit and J. Hay.

International Society for Pharmacoeconomics and Outcomes Research: Distinguished Service Award, 2002.

Founding Member, American Society for Health Economics, San Diego, CA, 2002.

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award; Eric Wu, 2001:"Survival & Nursing Home Free Survival (NHFS) of Alzheimer's Disease Patients." E. Wu and J. Hay

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award; Jinmei Li, 2000: "Cost Effectiveness of Retinopathy Screening in Pediatric Patients with Type 1 Diabetes Mellitus." J. Li and J. Hay.

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award; Nishan Sengupta, 2000: "Cost Effectiveness Analysis of Tamoxifen in Breast Cancer Risk Reduction." N. Sengupta and J. Hay.

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award; Michelle Luo, 1999: "Cost Effectiveness Analysis of Genetic Testing For Breast Cancer." M. Luo and J. Hay.

International Society for Pharmacoeconomics and Outcomes Research: Research Excellence Award; 1999

Wallace Lectureship. Idaho State University College of Pharmacy, 1999

International Society for Pharmacoeconomics & Outcomes Research Exec. Board Recognition Award; 1998

International Society for Pharmacoeconomics and Outcomes Distinguished Service Award; 1998

Outstanding Speaker Award, American Association for Clinical Chemistry 1996

Founding Member, International Society for Pharmacoeconomics and Outcomes Research (ISPOR), Philadelphia, PA, 1995.

USC School of Pharmacy QSAD Centurion Professorship: 1993-1999

USC School of Pharmacy Founding Chair, Dept. of Pharmaceutical Economics & Policy, 1992

Reviewer, National Science Foundation, 1982: Economics Section, 1987: Economics Section, 1989: Economics Section

Yale University Fellowship, 1974 - 1978

W.T. Akery Prize for Undergraduate Thesis in Economics, 1974

Elected Phi Beta Kappa, 1974

**LANGUAGES:**
French (reading), Russian (reading),
APL, PL/1, FORTRAN, IBM 370 JCL, TSP, SAS, SPSS/X, STATA, LIMDEP, NLOGIT, QUAIL, BMDP, MS DOS, LOTUS 123, SPSS/PC, RATS, SST, VAX/VM.

**FIELDS OF GRADUATE TRAINING:**
Econometrics, Money, Labor

**RESEARCH INTERESTS:**
Pharmacoeconomics, Outcomes Research, Pharmaceutical Care, Health Economics, Econometrics

**PROFESSIONAL SOCIETIES:**

Academy of Managed Care Pharmacy
American Association of Colleges of Pharmacy
American Economics Association
American Public Health Association
American Society of Health Economists
Disease Management Association of America
Eastern Economics Association
Econometrics Society
International Academy of Health Preferences Research
International Health Economics Association
International Society for Pharmacoeconomics and Outcomes Research
International Society for Quality of Life Research
International Society of Technology Assessment in Health Care
Southern Economics Association
Western Economics Association

**TEACHING:**

| | |
|---|---|
| 1976 – 1977 | Teaching Assistant, Department of Economics, Yale University, New Haven, Connecticut. |
| 1977 – 1978 | Instructor, Department of Economics, Yale University, New Haven, Connecticut. |
| September - November 1980 | Health Economics at the Waterbury Hospital Pediatric Residency Program. |
| September - November 1980 | Social and Behavioral Sciences Seminar "Cost of Illness and Related Topics," Medical/Dental student; Required curriculum, University of Connecticut Health Center. |
| September 1980 - December 1982 | Social and Behavioral Sciences Lecturer "Issues in Health Care Financing and Delivery," Medical/Dental student required curriculum, University of Connecticut Health Center. |
| September - November 1981 | Social and Behavioral Sciences Seminar "Competition in the Health Care Delivery System," Medical/Dental student required curriculum, University of Connecticut Health Center. |
| September - November 1982 | Social and Behavioral Sciences Seminar "HMOs and the Market for Health Care," Medical/Dental Student required curriculum, Univ. of Connecticut Health Center. |
| December 1980 - January 1983 | Introductory Biostatistics Instructor, Medical/Dental student required curriculum, University of Connecticut Health Center. |
| January 1981 - June 1983 | Health Economics, M.P.H. Program, Yale University, Department of Epidemiology and Public Health, and Institution for Social and Policy Studies. |
| Fall Semester 1982 | Graduate Independent Studies Course, Department of Economics, University of Connecticut. |
| Spring Semester 1982 | Undergraduate Health Economics, University of Connecticut, Department of Economics. |
| Spring Semester 1983 | Undergraduate Independent Studies Course, Department of Economics, University of Connecticut. |
| Fall Semester 1992 | The Costs of Drug Abuse, Health Behavior (PSC 439); Economic Assessment of Pharmaceuticals, Contemporary Issues (PSC 551); Health Care Organization in the U.S., Public Health and Social Pharmacy (PSC 437); Department of Pharmaceutical Economics and Policy, USC |
| Spring Semester 1993 | Biostatistics and Literature Evaluation (PSC 331): Co-taught with Prof. McCombs; Department of Pharmaceutical Economics and Policy, USC |
| Fall Semester 1993 | The Costs of Drug Abuse, Health Behavior (PSC 439); Health-related Quality of Life Assessment, Contemporary Issues (PSC 551); U.S. Health Care Finance and Reform, Public Health and Social Pharmacy (PSC 437); Department of Pharmaceutical Economics and Policy, USC |
| Spring Semester 1994 | Biostatistics and Literature Evaluation (PSC 331): Cotaught with Prof. McCombs; Department of Pharmaceutical Economics and Policy, USC |
| Summer, 1994 | Introductory Undergraduate Health Economics (Econ 194BB), University of California, Santa Barbara, Summer Session |

| | |
|---|---|
| Fall Semester 1994 | Health Status/Quality of Life Assessment Health Behavior (PSC 439); Contemporary Issues (PSC 551); U.S. Health Care Finance and Reform, Public Health and Social Pharmacy (PSC 437); Department of Pharmaceutical Economics and Policy, USC |
| Spring Semester 1995 | Biostatistics and Literature Evaluation (PSC 331) |
| Spring Semester 1996 | Biostatistics and Literature Evaluation (PSC 331) |
| Spring Semester 1996 | Pharmacoeconomics: Introductory Graduate Course (PMEP 538) |
| Summer Semester 1996 | Pharmacoeconomics: Introductory Graduate Course (PMEP 538) |
| Spring Semester 1997 | Statistics Computer Laboratory (Phar 366) |
| Summer Semester 1997 | Pharmacoeconomics: Introductory Graduate Course (PMEP 538) |
| Spring Semester 1998 | Statistics Computer Laboratory (Phar 366) |
| Summer Semester 1998 | Pharmacoeconomics: Introductory Graduate Course (PMEP 538) |
| Spring Semester 1999 | Statistics Computer Laboratory (Phar 366) |
| Summer Semester 1999 | Pharmacoeconomics: Introductory Graduate Course (PMEP 538) |
| Spring Semester 2000 | Statistics Computer Laboratory (Phar 366) |
| Spring Semester 2000 | Pharmacy Level III Elective: Disease State Management. Pharmacoeconomics (1 Lecture) (Phar 571) |
| Fall Semester 2000 | Pharmacoeconomics Unit on Decision Analysis (Phar 553) |
| Summer Semester 2000 | Pharmacoeconomics: Introductory Graduate Course (PMEP 538) |
| Fall Semester 2001 | Pharmacoeconomics Unit on Decision Analysis (Phar 553) |
| Spring Semester 2001 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |
| Summer Semester 2001 | Pharmacoeconomics: Graduate Course (PMEP 538) |
| Fall Semester 2002 | Pharmacoeconomics Unit on Decision Analysis (Phar 553) |
| Spring Semester 2002 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |
| Summer Semester 2002 | Pharmacoeconomics: Graduate Course (PMEP 538) |
| Spring Semester 2002 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |
| Spring Semester 2003 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |
| Summer Semester 2003 | Pharmacoeconomics: Graduate Course (PMEP 538) |
| Fall Semester 2003 | Pharmacoeconomics Unit on Decision Analysis (PHRD 553) |
| Fall Semester 2003 | Health Care Policy (PHRD 507) |

| | |
|---|---|
| Spring Semester 2004 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |
| Fall Semester 2004 | Health Care Policy (PHRD 507) |
| Fall Semester 2004 | Pharmacoeconomics Unit on Decision Analysis (PHRD 614) |
| Summer Semester 2005 | Pharmacoeconomics: Graduate Course (PMEP 538) |
| Fall Semester 2005 | Health Care Policy (PHRD 507) |
| Spring Semester 2006 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |
| Fall Semester 2006 | Health Care Policy (PHRD 507) |
| Fall Semester 2006 | Research Design – Applied Cost Effectiveness Analysis (PMEP 509) |
| Summer Semester 2007 | Pharmacoeconomics: Graduate Course (PMEP 538) |
| Fall Semester 2007 | Health Care Policy (PHRD 507) |
| Fall Semester 2007 | Research Design – Applied Cost Effectiveness Analysis (PMEP 509) |
| Spring Semester 2008 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |
| Fall Semester 2008 | Health Care Policy (PHRD 507) |
| Fall Semester 2008 | Research Design – Applied Cost Effectiveness Analysis (PMEP 509) |
| Fall Semester 2008 | Pharmaceutical Economics and Policy Graduate Seminar (PMEP 698) |
| Spring Semester 2009 | Pharmaceutical Economics and Policy Graduate Seminar (PMEP 698) |
| Summer Semester 2009 | Pharmacoeconomics: Graduate Course (PMEP 538) |
| Fall Semester 2009 | Health Care Policy (PHRD 507) |
| Fall Semester 2009 | Industrial Systems Engineering Lecturer (ISE 599) |
| Spring Semester 2010 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |
| Summer Semester 2011 | Pharmacoeconomics: Graduate Course (PMEP 538) |
| Spring Semester 2012 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |
| Spring Semester 2012 | Health Economics Lecture: Social Work Graduate Course (SOWK 590) |
| Summer Semester 2013 | Pharmacoeconomics: Graduate Course (PMEP 538) |
| Spring Semester 2014 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |
| Summer Semester 2015 | Pharmacoeconomics: Graduate Course (PMEP 538) |
| Spring Semester 2016 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |

**USC UNIVERSITY SERVICE**

| | |
|---|---|
| 2015- 2016 | Faculty Position Search Committee, Dept. of Pharmaceutical and Health Economics, School of Pharmacy |
| 2013 – Present | Member, Task Force on Appointments and Promotions, School of Pharmacy |
| 2011 | External Reviewer, Sol Price School of Public Policy |
| 2009 | Chair, Faculty Position Search Committee, Dept. of Clinical Pharmacy, Pharmaceutical Economics and Policy, School of Pharmacy |
| 2006 - Present | Faculty Merit Review Coordinating Committee, School of Pharmacy |
| 2004-2005 | Chair, Faculty Position Search Committee, Dept. of Pharmaceutical Economics and Policy, School of Pharmacy |
| 2003 - 2014 | Admissions Committee, School of Pharmacy |
| 2003-2006 | Chair, Advanced Technology Committee, School of Pharmacy |
| 2002-2004 | New Curriculum Development: Course Coordinator, Phar 507: Health Policy for Pharmacists, School of Pharmacy |
| 2002 - 2011 | Advanced Technology Committee, School of Pharmacy |
| 2002 | Presentation on Human Subjects Review Policy, USC Faculty Senate Retreat |
| 2000-2001 | Computer Committee, School of Pharmacy |
| 2001 | Graduate Teaching Assistantship Program Evaluation Committee |
| 2000 – Present | Faculty Advisor, USC ISPOR Student Chapter |
| 1994 - Present | Pharmacy Student Applicant Interview Committee |
| 1992 - 1997 | Founding Chair, Dept. of Pharmaceutical Economics & Policy, Schl of Pharmacy |
| 1993 - 1995 | Member, Pharmacy Dean's Search Committee, Office of the Provost. |
| 1992 - 1997 | Member, Dean's Executive Committee, School of Pharmacy |
| 1992 - 1997 | Member, Appointments and Promotions Committee, School of Pharmacy |
| 1993 - 1995 | Economic Advisor, East Los Angeles/USC Project on Managed Care for the Medically Indigent; Pacific Center for Health Policy and Ethics |
| 1995 - 1997 | Member, Quality/Outcomes Subcommittee USC Physicians Office of Clinical Services |
| 1994 - 1997 | Member, Ph.D. Pharmaceutical Economics and Policy Admissions Committee |
| 1994 - 1997 | Member, M.S. Pharmaceutical Economics and Policy Admissions Committee |
| 1993 - 1997 | Member, University Graduate Studies Advisory Committee, USC Graduate School |
| 1993 | Developed Ph.D. Program in Pharmaceutical Economics (Graduate School Approved for Fall 1994) |
| 1993 | Proposal Reviewer, Zumberge Research and Innovation Fund Awards |
| 1993 | Candidate Interviewer, Pharm.D. Admissions Program, School of Pharmacy |
| 1993 | Chair, Graduate Ph.D. Program in Pharmaceutical Economics Curriculum Development, School of Pharmacy |
| 1992/1993 | Chair, Junior Faculty Position Search Committee, Dept. of Pharmaceutical Economics and Policy, School of Pharmacy |
| 1994/1995 | Chair, Junior Faculty Position Search Committee, Dept. of Pharmaceutical Economics and Policy, School of Pharmacy |

**OTHER UNIVERSITY SERVICE**

| | |
|---|---|
| 2015 | External Reviewer, School of Medicine, Pennsylvania State University, Hershey, PA. |
| 2015 | External Reviewer, Faculty of Pharmacy, University of Toronto, Toronto, Canada. |
| 2014-15 | External Reviewer, Pharmacy School, Tianjin University, Tianjin, China. |
| 2014-15 | External Reviewer, National University of Singapore, Singapore. |
| 2014 | External Reviewer, Faculty of Pharmacy, University of Maryland School of Pharmacy, Baltimore, MD. |

| | |
|---|---|
| 2014 | External Reviewer, Faculty of Pharmacy, University of Toronto, Toronto, Canada. |
| 2013 | External Reviewer, Department of Pediatrics, Harbor-UCLA Medical Center, Los Angeles, CA. |
| 2013 | External Reviewer, Dept. of Health Policy and Management, Texas A&M Health Sciences Center, College Station, TX. |
| 2013 | External Reviewer, Department of Pediatrics, Division of Neonatology, David Geffen School of Medicine at UCLA, Los Angeles, CA. |
| 2013 | External Reviewer, Dept. of Social Pharmacy, College of Pharmacy, Ewha Womans University, Seoul, Korea. |
| 2013 | External Reviewer, Department of Pediatrics, Division of Neonatology, David Geffen School of Medicine at UCLA, Los Angeles, CA. |
| 2012 | External Referee, School of Nursing, University of Michigan, Ann Arbor, MI. |
| 2011 | External Referee, School of Pharmacy, University of Colorado Anschutz Medical Campus, Aurora, CO. |
| 2011 | External Referee, University of Wisconsin School of Medicine and Public Health, Department of Population Health Sciences, Madison, WI. |
| 2010 | External Referee, Virginia Commonwealth University, School of Pharmacy, Department of Pharmacotherapy and Outcomes Sciences, Richmond, VA. |
| 2010 | External Referee, Nelson Mandela Metropolitan University, Faculty of Health Sciences, Port Elizabeth, South Africa. |
| 2010 | Outside Examiner, Doctoral Dissertation Committee, College of Pharmaceutical Sciences, Andhra University, Andhra Pradesh, India. |
| 2009 | External Referee, Tenure and Promotions Committee, Department of Pharmacy Practice and Science, University of Iowa, Iowa City, IA. |
| 2009 | External Referee, Tenure and Promotions Committee, Department of Pharmaceutical Sciences, Oregon State University, Corvallis, OR. |
| 2008 | External Referee, Appointments and Promotions Committee, Division of Pharmacy Practice and Administration, College of Pharmacy, Ohio State University, Columbus, OH. |
| 2006 | External Referee, Appointments and Promotions Committee, Department of Medicine, Brigham and Women's Hospital; Harvard Medical School, Boston, MA. |
| 2004 | External Referee, Appointments and Promotions Committee, Department of Pediatrics, Harbor-UCLA Medical Center, UCLA School of Medicine, Los Angeles, CA. |
| 2002 | External Examiner, Chinese University of Hong Kong Graduate School. Shatin, Hong Kong |
| 2001 | External Referee, Appointments and Promotions Committee, College of Pharmacy, University of Iowa, Iowa City, IA. |

| | |
|---|---|
| 2000 | External Referee, Appointments and Promotions Committee, Depart. of Pediatrics, Harbor-UCLA Med Center, UCLA Schl of Medicine, Los Angeles, CA. |
| 2000 | External Referee, Appointments and Promotions Committee, Department of Economics, Rice University, Houston, TX. |
| 1997 | External Referee, Appointments and Promotions Committee, School of Dentistry, University of Connecticut, Farmington, CT. |
| 1993 | External Referee, Promotions Committee, Department of Medicine, Baylor College of Medicine, Houston, TX. |
| 1993 | External Referee, Promotions Committee, Department of Medicine, University of California, San Diego, CA. |
| 1993 | External Referee, Promotions Committee, School of Nursing, University of California, San Francisco, CA. |
| 1993 | External Referee, Promotions Committee, Department of Economics, University of Hong Kong, Hong Kong. |
| 1992 | External Referee, Promotions Committee, School of Nursing, University of California, San Francisco, CA. |
| 1988 | External Referee, Tenure and Promotions Committee, Dept. of Economics, Univ. of North Carolina at Chapel Hill, NC. |

**ONGOING GRANT RESEARCH**

**Sponsor:** Centers for Disease Control and Prevention, US DHHS
**PI**: Joel Hay, PhD
**J Hay Role:** Health Economist and PI
**Title:** Economic Studies of Immunization Practices (1 UO1 IP000966-01)
**Amount:** $898,297
**Dates**: Approved, awaiting funding

**Sponsor:** Agency for Healthcare Research and Quality, US DHHS
**PI**: Ken Zangwill, MD
**J Hay Role:** Health Economist
**Title:** Evaluation and Management of the Young Febrile Infant and Related Healthcare Costs and Morbidities (1 R03 HS024146-01)
**Amount:** $100,000
**Dates**: 7/01/15-6/30/16

**Sponsor:** National Institute of Dental and Craniofacial Research
**PI**: Sharon Cermak, PhD
**J Hay Role:** Health Economist
**Title:** Sensory Adapted Dental Environments to Enhance Oral Care for Children (1 U01 DE024978-01)
**Amount:** $381,201 (First Year Directs)
**Dates**: 4/01/15-3/31/20

**Sponsor:** National Institute of Dental and Craniofacial Research
**PI**: Steve Yen, DMD
**J Hay Role:** Health Economist
**Title**: Clinical Effectiveness of Late Maxillary Protraction for Cleft Lip and Palate (U01 DE22937-01A1)
**Amount**: $3,250,000
**Dates**: 9/1/13 – 8/31/18

**Sponsor:** Baxter International
**PI:** Joel W. Hay, PhD
**Title:** Economic Evaluation of Hemophilia Inhibitor Bypass Agent Treatment: On Demand Versus Prophylaxis
**Amount:** $99,000
**Dates:** 1/1/14 – 12/31/15

**Sponsor:** National Institute of Child Health and Human Development T32 HD064578
**PI:** Florence Clark, PhD
**J Hay Role:** Co-Investigator
**Title:** TREET: Training in Rehabilitation Efficacy and Effectiveness
**Amount:** $102,692
**Dates:** 04/01/11 - 03/31/16

**COMPLETED GRANT RESEARCH (WHILE AT USC)**

**Sponsor:** Children's Hospital, Los Angeles
**PI:** Guy Young, MD
**J Hay Role:** Co-Investigator
**Title:** Economic Evaluation of Hemophilia Inhibitor Treatments
**Amount:** $95,000
**Dates:** 8/1/13 – 7/31/15

**Sponsor:** Agency for Healthcare Research and Quality, U.S. DHHS
**PI:** Joel W. Hay, PhD
**Title:** American Society of Health Economists Conference Grant
**Amount:** $35,000
**Dates:** 1/1/14 – 2/31/15

**Sponsor:** US Dept. of Health and Human Services/Asst. Secretary for Policy and Evaluation (DHHS/ASPE)
**PI:** Shinyi Wu, PhD
**J Hay Role:** Co-Investigator
**Title:** Care Management Technology to Facilitate Depression Care in Safety Net Diabetes Clinics
**Amount:** $1,977,461
**Dates:** 9/1/10 – 8/31/14

**Sponsor:** National Institutes of Health (trans agency)
**PI:** Jason Doctor, PhD
**J Hay Role:** Co-Investigator
**Title:** Use of Behavioral Economics to Improve Treatment of Acute Respiratory Infections
**Amount**: $8,353,371
**Dates:** 9/1/2010 – 8/31/2014

**Sponsor**: NIH, National Institute of Aging
**PI:** Florence Clark, PhD
**J Hay Role:** Co-Investigator
**Title:** Lifestyle Redesign for Pressure Ulcer Prevention in Spinal Cord Injury
**Amount:** $2,111,000
**Dates:** 9/08 – 8/14

**Sponsor:** EconoMedRx
**PI:** Joel W. Hay, PhD
**Title:** Economic Evaluation of the Market for Pediatric Antidepressants
**Amount:** $99,000
**Dates:** 8/1/12 – 7/31/14

**Sponsor:** Baxter International
**PI:** Joel W. Hay, PhD
**Title:** Economic Evaluation of Hemophilia Inhibitor Bypass Agent Testing Assay
**Amount:** $99,000
**Dates:** 8/1/12 – 6/31/13

**Sponsor:** Auxillium Pharmaceuticals
**PI:** Joel W. Hay, PhD
**Title:** Economic Evaluation of Dupuytren's Contracture Therapy
**Amount:** $165,000
**Dates:** 1/1/11 – 12/31/12

**Sponsor**: Sunovion Pharmaceuticals
**PI:** Joel W. Hay, PhD
**Title:** Costs of COPD Treatments
**Amount:** $85,000
**Dates:** 3/10 – 8/11

**Sponsor**: Baxter Pharmaceuticals
**PI:** Joel W. Hay, PhD
**Title:** Meta-analysis of Hemophilia Patient Inhibitor Therapy Efficacy
**Amount:** $85,000
**Dates:** 3/10 – 8/11

**Sponsor**: Baxter Pharmaceuticals
**PI:** Joel W. Hay, PhD
**Title:** Economic Evaluation of Hemophilia Patient Inhibitor Therapy
**Amount:** $80,000
**Dates:** 9/08 – 8/10

**Sponsor**: Prolacta Biosciences
**PI:** Joel W. Hay, PhD
**Title:** Economic Evaluation of Human Milk Fortifier in Necrotizing Enterocolitis
**Amount:** $80,000
**Dates:** 9/08 – 8/10

**Sponsor**: NIH, National Institute of Mental Health
**PI:** Kathy Ell, PhD
**J Hay Role:** Co-Investigator
**Title:** Major Depression in Diabetes Patients
**Amount:** $678,000
**Dates:** 9/04 –8/10

**Sponsor**: NIH, National Institute of Mental Health
**PI:** Megan Dwight-Johnson, MD
**J Hay Role:** Co-Investigator
**Title:** Patient Centered Care in the Public Sector
**Amount:** $2,642,000
**Dates:** 7/04 – 6/08

**Sponsor**: California Dept. of Health Services
**PI:** Lon Schneider, MD
**J Hay Role:** Economist
**Title:** Alzheimer Disease Costs, Quality of Life and Disease Burden
**Amount:** $600,000
**Dates:** 1/01 – 12/04

**Sponsor:** US Centers for Disease Control and Prevention, NIH
**PI:** Ken Zangwill, MD
**J Hay Role:** Sub-grant PI
**Title:** Economic Assessment of Rotavirus Burden of Illness in the Kaiser Southern California Health Plan
**Amount:** $260,000
**Dates:** 11/97 – 12/03

**Sponsor:** US Alzheimer Association, Merck Foundation, Janssen Pharmaceutica
**PI:** Joel W. Hay, PhD
**J Hay Role:** Economist
**Title:** Alzheimer Disease Global Burden of Illness
**Amount:** $200,000
**Dates:** 6/99 – 12/01

**Sponsor:** US National Institute on Aging
**PI:** Florence Clark, PhD
**J Hay Role:** Project Economist
**Title:** Well Elderly Occupational Therapy Demonstration Project
**Amount:** $1.3 million
**Dates:** 1/96 – 6/98

**Sponsor:** US PHS Agency for Health Care Policy Research
**PI:** Paul Schekelle, MD
**J Hay Role:** USC Project Coordinator
**Title:** Southern California Evidenced-Based Practice Center
**Amount:** $420,000
**Dates:** 3/98 – 9/99

**Sponsor:** Parke-Davis
**PI:** Joel W. Hay, PhD
**J Hay Role:** Economist
**Title:** Economic Assessment of Epilepsy Disease Management Intervention
**Amount:** $60,000
**Dates:** 6/95 9/98

**Sponsor:** US NIH, National Institute on Aging
**PI:** Mary Mittelman, PhD
**J Hay Role:** Sub-Grant Co-PI
**Title:** Economic Evaluation of Alzheimer Disease Caregiver Support Intervention
**Amount:** $190,000
**Dates:** 1/96 – 7/98

**Sponsor:** Bristol Myers Squibb
**PI:** Joel W. Hay, PhD
**J Hay Role:** USC Project Coordinator
**Title:** Pharmacoeconomics Fellowship
**Amount:** $30,000
**Dates:** 6/96

**Sponsor:** Bristol Myers Squibb
**PI:** Joel W. Hay, PhD
**J Hay Role:** USC Project Coordinator
**Title:** Pharmacoeconomics Training
**Amount:** $60,000
**Dates:** 6/96

**Sponsor:** Parke-Davis
**PI:** Joel W. Hay, PhD
**J Hay Role:** Economist
**Title:** Cognitive Function and the Costs of Alzheimer's Disease
**Amount:** $90,000
**Dates:** 6/94 8/96

**Sponsor:** Astra-Merck
**PI:** Phil Rappa
**J Hay Role:** USC Project Coordinator
**Title:** Pharmacoeconomics Training
**Amount:** $90,000
**Dates:** 8/94

**Sponsor:** Allergan
**PI:** Phil Rappa
**J Hay Role:** USC Project Coordinator
**Title:** Pharmacoeconomics Training
**Amount:** $20,000
**Dates:** 8/95

**Sponsor:** Amgen
**PI:** Phil Rappa
**J Hay Role:** USC Project Coordinator
**Title:** Pharmacoeconomics Training
**Amount:** $30,000
**Dates:** 7/94

**Sponsor:** Glaxo-Welcome Pharmaceuticals
**PI:** Phil Rappa
**J Hay Role:** USC Project Coordinator
**Title:** Pharmacoeconomics Training
**Amount:** $140,000
**Dates:** 3/93, 3/94

**Sponsor:** Miles Pharmaceuticals
**PI:** Joel W. Hay PhD
**J Hay Role:** Economist
**Title:** Economic Assessment of Anti-TNF in Treatment of Septic Shock
**Amount:** $130,000
**Dates:** 4/94 – 3/95

**Sponsor:** Kaiser Permanente Southern California Health Care Plan
**PI:** Jeff McCombs, PhD
**J Hay Role:** Project Economist
**Title:** The Kaiser/USC Pharmaceutical Care Demonstration Project
**Amount:** $860,000
**Dates:** 3/93 – 9/97

**Sponsor:** Syntex Roche Pharmaceuticals
**PI:** Joel W. Hay, PhD
**J Hay Role:** Project Coordinator
**Title:** Pharmacoeconomics Graduate program development
**Amount:** $120,000
**Dates:** 6/92 – 5/93

**PEER-REVIEWED PUBLICATIONS:**

1. **Hay JW**. "Public Service Delivery in Chicopee, Massachusetts," in *Student Originated Studies Conference Proceedings*, National Science Foundation, 1973, NSF No. 74-33.

2. **Hay JW**. *Occupational Choice and Occupational Earnings: Selectivity Bias in a Simultaneous Logit-OLS Model,* Ph.D. dissertation, Yale University, New Haven, 1980, published by the National Technical Information Service, Rockville, Maryland.

3. Formicola A, Gottsegan R, **Hay JW**. "Commentary on 'Periodontal Disease: Assessing the Effectiveness and Costs of the Keyes Technique'," in *Implications of Cost-Effectiveness Analysis of Medical Technology,* Office of Technology Assessment, U.S. Congress, Washington, D.C., 1981.

4. Yett D, Der W, Ernst R, **Hay JW**. "Blue Shield Plan Physician Participation." *Health Care Financing Review,* June, 1981 pp. 9-24.

5. Alvesalo I, Reisine S, **Hay JW**, Bailit H. "Effects of Fluoride and Regular Dental Care on Personal Dental Expenditures of Young Adults in Finland," *Community Dentistry and Oral Epidemiology*, 1982; 10:15-22.

6. Yett D, Der W, Ernst R, **Hay JW**. "A Model of Physician Pricing, Output, and Health Insurance Reimbursement: Findings from Study of Two Blue Shield Plans' Claims Data." In *Essays in Health Economics,* edited by Jacques Van der Gaag, William Neenan and Theodore Tsukahara, Praeger Press, New York, 1982, pp. 197-230.

7. **Hay JW**, Bailit H, Chiriboga D. "The Demand for Dental Health," *Social Science and Medicine,* Volume 16 (1982), pp. 1285-1289.

8. **Hay JW**, Leahy M. "Physician-Induced Demand: An Empirical Analysis of the Consumer Information Gap," *Journal of Health Economics,* Volume 1, (December, 1982), pp. 231-244.

9. **Hay JW**. "A Simultaneous Econometric Model for Physicians' Specialty Choice and Specialty Income," in *Actes du Dixieme Colloque International D'Econometrie Appliquee: Econometrie de la Sante,* Hospices Civil de Lyon, Lyon, France. February, 1983, pp. 260-270.

10. **Hay JW**. "The Impact of Public Health Care Financing Policies on Private Sector Hospital Costs." *Journal of Health Politics, Policy and Law,* Volume 7, No. 4 (1983), pp. 945-952.

11. Yett D, Der W, Ernst R, **Hay JW**. "Physician Pricing and Health Insurance Reimbursement," *Health Care Financing Review,* (December, 1983), pp. 69-80.

12. **Hay JW**, Leahy M. "Competition Among Health Plans: Some Preliminary Evidence," *Southern Economic Journal* 50,(January 1984), pp. 831-847.

13. **Hay JW**, Mandes G. "Home Health Care Cost-Function Analysis," *Health Care Financing Review* 5(3), (Spring 1984), pp. 111-116.

14. **Hay JW**, Olsen R. "Let Them Eat Cake: A Note on Comparing Alternative Models of the Demand for Medical Care," *J Business and Economic Statistics* 2(3), (July 1984), pp. 279-282.

15. **Hay JW**. "Occupational Choice and Occupational Earnings: A Method for Dealing with Selection Bias Among Economic Activities," in *Research in Population Economics,* Volume 5, edited by T. Paul Schultz and Kenneth Wolpin, JAI Press, Greenwich, Connecticut (1984) pp. 309-329.

16. **Hay JW**. "Variation in Per Capita Pharmaceutical Expenditures: Are Drugs Complements or Substitutes?" In *Pharmaceutical Economics,* Bjorn Lindgren, ed., Liber Forlag Press, Malmo, Sweden, 1985, pp. 21-36.

17. Yett D, Der W, Ernst R, **Hay JW**. "Fee Screen Reimbursement and Physician Fee Inflation," *Journal of Human Resources* 20(2), (Spring, 1985), pp. 278-291.

18. **Hay JW**, Hill WL. "Cost-Effectiveness of Two Transdermal Nitroglycerin Controlled-Release Systems," *Clinical Therapeutics,* 8(1), 1985, pp. 35-40.

19. Sloan F, **Hay JW**. "Medicare Pricing Mechanisms for Physician Services: An Overview of Alternative Approaches," *Medical Care Review,* 43(1), (Spring, 1986), pp. 59-100.

20. **Hay JW**, Ernst R. "The Cost Effectiveness of Home Intravenous Antibiotics," in *Proceedings: Outpatient Parenteral Antibiotic Therapy Symposium,* J.E. Putnam, Ed., IntraMed, New York, NY, 1987 pp. 7-14.

21. Welch B, **Hay JW**, Miller D, Olsen R, Rippey R, Welch A. "The Rand Health Insurance Study: A Summary Critique," *Medical Care,* 25(2), (February, 1987) pp. 148-156.

22. **Hay JW**, Daum R. "Cost Benefit Analysis of Two Strategies for Prevention of Haemophilus Influenzae Type B Infection," *Pediatrics,* 80(3) (September, 1987) pp. 319-329.

23. **Hay JW**, Leu R, Rohrer P. "Ordinary Least Squares and Sample Selection Models of Health Care Demand: Monte Carlo Comparison," *Journal of Business and Economic Statistics,* 1987; 5(4):499-506.

24. **Hay JW**, Ernst R. "The Economic Costs of Alzheimer's Disease," *American Journal of Public Health,* 77(9) (September, 1987) pp. 1-7.

25. **Hay JW**, Anderson G. "The Hospital Services Market: A Disequilibrium Analysis," *Southern Economic Journal,* 54(3) (January, 1988) pp. 656-665.

26. **Hay JW**, Osmond D, Jacobson M. "Projecting the Medical Costs of AIDS and ARC in the United States," *Journal of Acquired Immune Deficiency Syndromes,* 1(5) (October, 1988) pp. 466-485.

27. **Hay JW**. "Cost-Effectiveness of Three Transdermal Nitroglycerin Controlled-Release Systems," *Clinical Therapeutics,* 10(4), 1988, pp. 450-455.

28. **Hay JW**. "Econometric Issues in Modeling the Costs of AIDS," paper presented at the Johns Hopkins University Conference on The Economic Impact of AIDS: Research Methodology. *Health Policy,* 11(2) (April, 1989) pp. 125-145.

29. **Hay JW**. "Projecting the Medical Costs of HIV/AIDS: An Update with Focus on Epidemiology." In *New Perspectives on HIV-Related Illness: Progress in Health Services Research--Conference Proceedings.* National Center for Health Services Research, Pub. No. DHHS (PHS) 89-3449. 1989:84-97. Rockville, MD.

30. **Hay JW**. "The Health Care Cost Crisis," in L. Holland, ed., *Managed Health Care Strategies for the 1990s: Proceedings of a Symposium for Managed Care Professionals,* IntraMed, New York, 1990 pp. 30-39.

31. **Hay JW**. "AIDS Point and Counterpoint." *Priorities;* the American Council on Science and Health, Winter 1990, pp. 35-39.

32. Wittels E, **Hay JW,** Gotto A. "Medical Costs of Coronary Artery Disease." *American Journal of Cardiology,* February, 1990, Vol. 65, pp. 432-440.

33. **Hay JW**, Daum R."Cost-benefit Analysis of Haemophilus influenzae Type B Prevention: Conjugate Vaccination at Eighteen Months of Age," *Ped Inf Dis J,* April 1990, Vol. 9, pp. 246-252.

34. Gotto A, LaRosa J, Hunninghake D, Grundy S, Wilson J, Clarkson T, **Hay JW**. "The Cholesterol Facts: A Summary of the Evidence Relating Dietary Fats, Blood Cholesterol and Coronary Artery Disease" A Joint Statement of The American Heart Association and the National Heart, Lung and Blood Institute. *Circulation,* May, 1990, Vol. 81, No. 5, pp. 1721-1733.

35. **Hay JW**. "Physicians' Specialty Choice and Specialty Income," in G. Duru and J. H. P. Paelinck, eds. *Econometrics of Health Care,* Kluwer Academic Publishers, Amsterdam, Holland, 1990. pp. 95-113.

36. **Hay JW,** Robin E. "Cost-Effectiveness of Alpha-1 Antitrypsin Replacement Therapy in Treatment of Congenital Chronic Obstructive Pulmonary Disease." *American Journal of Public Health,* April 1991, Vol. 81, No. 4, pp. 427-433.

37. **Hay JW**, Wittels E, Gotto A. "An Economic Evaluation of Lovastatin for Cholesterol Lowering and Coronary Artery Disease Reduction," *American Journal of Cardiology,* April 15, 1991, Vol. 67, No. 9, pp. 789-796.

38. **Hay JW**. "Is Hong Kong Ready for Free Market Health Care?" in *Financing Health Care in the 1990s,* Hong Kong Medical Association and Hong Kong Society of Medical Executives, September, 1991, pp. 16-21.

39. **Hay JW**. "The Harm They Do to Others: A Primer on the External Costs of Drug Abuse," in E. Lazear and M. Krauss, eds. *Searching for Alternatives: Drug Control Policy in the United States,* Hoover Institution Press, Stanford, CA, November, 1991, pp. 200-225.

40. **Hay JW**, Hay AR. "Inflammatory Bowel Disease Costs-of-Illness," *Journal of Clinical Gastroenterology,* 1992, Vol. 14, No. 4, pp. 309-317.

41. Hay AR, **Hay JW**. "Inflammatory Bowel Disease Medical Cost Algorithms," *Journal of Clinical Gastroenterology,* 1992, Vol. 14, No. 4, pp. 318-327.

42. **Hay JW**. *Health Care in Hong Kong: An Economic Policy Assessment,* Chinese University Press, Hong Kong; 1992, 124pp. Chinese Language Edition, Chinese University Press, 1993, 114 pp.

43. **Hay JW**. "Pharmacoeconomics in the Hospital," *California Journal of Hospital Pharmacy*, Vol. 5, November, 1993, pg. 7.

44. **Hay JW**, Ernst R. A Perspective on the Costs and Benefits of Combination Vaccination for Prevention of Haemophilus Influenzae type B, Diphtheria, Pertussis and Tetanus, *Vaccine Bulletin*. December, 1993, 1 - 7.

45. **Hay JW**, Kizer K. "Medi-Cal Expenditures for Persons with AIDS," *AIDS and Public Policy Journal*, Vol. 8, No. 2, Summer, 1993, pp. 91-102.

46. **Hay JW**. "Incorporating Pharmacoeconomics into your Business Plan," *Managed Health Care Pharmacy* Vol. 1, No. 4., December, 1993, pp. 11-13.

47. **Hay JW**, Wolak F. "A Procedure for Estimating the Unconditional HIV Infection Distribution and Its Variability." *Journal of the Royal Statistical Society, Series C: Applied Statistics*, 1994; 43(4): 599-624.

48. Bozzette S, Parker R, **Hay JW**. "A Cost Analysis of Approved Antiretroviral Strategies in Advanced Human Immunodeficiency Virus Disease," *Journal of AIDS*, Vol. 7, 1994, pp. 355-362.

49. Ernst R, **Hay JW**. "The Economic and Social Costs of Alzheimer's Disease Revisited," *American Journal of Public Health*, Vol. 84, No. 8, August, 1994, pp. 1261-64.

50. DiMasi J, Mitchell J, **Hay JW**. "The Cost of Drug Development," *Pharmacy and Therapeutics*, Vol 19, No. 1, January, 1994, pp. 68-80.

51. **Hay JW**. "Evaluation of Pharmacoeconomics Studies," *Annals of Pharmacotherapy*, 1994;28:539-40.

52. McCombs J, Nichol M, Johnson K, **Hay JW**, Ebin V, Lawrence G, Schneider J. The Health Care Reformation and Pharmaceutical Care: Is Pharmacy's Vision Too Narrow? *American Journal of Health-Systems Pharmacy,* Vol. 52, June 1, 1995. pp. 1208-14.

53. McCombs J, Cody M, Besinque K, Borok G, Ershoff D, Groshen S, **Hay JW**, et al. "Measuring the Impact of Patient Counseling in the Outpatient Setting: The Research Design of the Kaiser Permanente/USC Patient Consultation Study," *Clinical Therapeutics*, Vol 17, No. 6, 1995. pp. 1188-1206.

54. Ashraf TA, **Hay JW**, Pitt B, Wittels E, Crouse J, Davidson M, Furberg C, Radican L. "Cost Effectiveness of Pravastatin in Secondary Prevention of Coronary Artery Disease," *American Journal of Cardiology* Vol 78, 1996. pp. 409-414.

55. **Hay JW**. "Commentary: The Scope of the AIDS Epidemic in the United States," *JAMA HIV/AIDS Journal* Scan Website, January, 1996.

56. **Hay JW**, Ernst R, Meissner C. "Respiratory Syncytial Virus Immune Globulin: A Cost Effectiveness Analysis," *American Journal of Managed Care* Vol 2, No. 7, 1996. pp. 851-861.

57. Gotto, A., **Hay JW**. "Costs of Lipid-Lowering Statin Drugs," Readers' Comments, *American Journal of Cardiology*, January 15, 1996, Vol. 77, pp. 225-226.

58. McCombs, J, Nichol M, Johnson, K, **Hay JW**, Ebin, V, Lawrence G, Schneider, J. La Visione del Futuro della Farmacia è troppo limitata? *Pro Pharmacopœa Supplemento Redazionale a L'Informatore Farmacuetico-Aggiornamento* Vol. 3 # 1, 1996; pp. 17-24.

59. Ernst R, **Hay JW**, Fenn C, Tinklenberg J, Yesavage J. "Cognitive Function and the Costs of Alzheimer's Disease: An Exploratory Study," *Archives of Neurology*, Vol. 54, 1997. pp. 687-693.

60. Ernst R, **Hay JW**. "Economic Research On Alzheimer Disease: A Review of The Literature," *Alzheimer Disease and Associated Disorders*, 1997. Vol. 11, Suppl 6, pp. 135-145.

61. **Hay JW**, Sano M, Whitehouse P. The Cost and Social Burdens of Alzheimer Disease Alzheimer Disease. Editorial. *Alzheimer Disease and Associated Disorders*, 1997. Vol. 11, No. 4, pp.1-3.

62. Clark, F. Azen, S, Zemke, R, Jackson J, Carlson, M, Mandel, D, **Hay JW**, et al. Occupational Therapy for Independent-Living Older Adults: A Randomized Controlled Trial. *JAMA*, 1997; Vol. 278 pp. 1321-1326.

63. **Hay JW**, Yu W, Ashraf T. "Pharmacoeconomics of Lipid-lowering Agents for Primary and Secondary Prevention of Coronary Heart Disease," *Pharmacoeconomics,* 1998; Vol. 15, No. 1, pp.47-74.

64. **Hay JW**, Schwartz S. "The ISPOR Lipid Conference," *Value in Health* 1998. Vol. 1, No. 2. pp. 95-99.

65. Langley PC, **Hay JW**, Schwartz JS, Smith SC, McKenney J. From Research into Practice: How Should Healthcare Organizations/Governments Decide About Lipid Therapy and Who Will Pay? *Value in Health* 1998. Vol. 1, No. 4. pp. 243-250.

66. **Hay JW**. "Economic Modeling and Sensitivity Analysis." *Value in Health* 1998; 1(3) pp.187-193.

67. **Hay JW**, Ernst R. "A Direction for *Value in Health*," *Value in Health* 1998. Vol 1, No. 3, pp. 149-154.

68. The International Working Group on Alzheimer's Disease (**JW Hay,** member). First International Pharmacoeconomic Conference on Alzheimer's Disease: Report and Summary. *Alzheimer Disease and Associated Disorders,* 1998. Volume 12, No. 4, pp. 266-280.

69. McCombs JS, Cody M, Parker JP, Johnson KA, Besinque K, Borok G, Ershoff D, Groshen S, **Hay JW**, Nichol MB, Nye MT. The Kaiser Permanente/USC Patient Consultation Study: Change in Use and Cost of Health Services. *Am J Health-Syst Pharm* 1998. Vol. 55, No. 2, pp. 2485-99.

70. **Hay JW**, Yu W. "Drug Patents and Prices, Can We Achieve Better Outcomes?" in Triplett J, ed. *Measuring the Prices of Medical Treatments*, Brookings Press, Washington, DC. 1999, pp.152-195.

71. **Hay JW**, Jackson J. Methodological Issues in Conducting Pharmacoeconomic Evaluations—Modeling Studies. *Value in Health*, 1999. Vol. 2 (No. 3), pp.78-81.

72. **Hay JW**, Ernst R, Kessler CM. "Cost-effectiveness analysis of alternative factor VIII products in treatment of hemophilia A," *Haemophilia,* 1999, Vol. 5, pp. 191-202.

73. Gotto A, Grundy S, …, **Hay JW**,… et al. Lowering LDL Cholesterol: Questions From Recent Meta-Analyses and Subset Analyses of Clinical Trial Data Issues From the Interdisciplinary Council on Reducing the Risk for Coronary Heart Disease, Ninth Council Meeting. *Circulation*. 1999;99:E1-E7.

74. **Hay JW**. "Health Care Costs and Outcomes: How Should We Evaluate Real World Data?" *Value in Health*, 1999. Vol. 2 (No. 6), 417-20.

75. **Hay JW**, Yu W. Prevalence, Patient Awareness, and Treatment of Dyslipidemia in the Diabetes Mellitus Population. *Drug Benefit Trends*, 1999. Suppl pp. 6-11.

76. Liu G, **Hay JW**. "An Economic Cost Analysis of Oral Ganciclovir Prophylaxis for the Prevention of CMV Disease," *Pharmaceutical Research*. 2000, 17(8): pp. 909-917.

77. **Hay JW**, Yu W, Ashraf T. "Pharmacoeconomics of Lipid-lowering Agents for Primary and Secondary Prevention of Coronary Heart Disease," In: Prakash A, editor. *Preventing Coronary Heart Disease*. Auckland: Adis International Ltd, 2000: pp. 49-77

78. Marcy M, Takata G, Chan LS, Shekelle P, Mason W, Wachsman L, Ernst R, **Hay JW**, Corley PM, Morphew T, Ramicone E, Nicholson C. Management of acute otitis media. *Evid Rep Technol Assess*. 2000 Jun;(15):1-4.

79. **Hay JW**, Yu W. Pharmacoeconomics and Outcomes Research: Expanding the Health Care "Outcomes" Market. *Value in Health*, 2000. 3(3). pp. 181-185.

80. **Hay JW**. Commentary: Cost-Effectiveness of Treating Hyperlipidemia in the Presence of Diabetes: Who Should Be Treated? *Journal of Evidence-Based Healthcare.* 2001. 5(1): pp. 27-29.

81. **Hay JW**. Pharmacoeconomic Guidelines: Where do we go from here?" *Value in Health*, 2001. 4(3):211.

82. Clark F, Azen S, Carlson M, Mandel D, LaBree L, **Hay JW**, Zemke R, Jackson J, Lipson L. Embedding health-promoting changes into the daily lives of independent-living older adults: Long-term follow-up of occupational therapy intervention. *Journal of Gerontology: Psychological Sciences*, 2001. 56B:60-63.

83. **Hay JW**. "Conjoint Analysis in Pharmaceutical Research." *J Managed Care Pharmacy* 2002; 8(3):206-209.

84. **Hay JW**, LaBree L, Luo R, Clark F, Carlson M, et al. "Cost Effectiveness of Preventive Occupational Therapy for Independent Living Adults." *Journal of the American Geriatrics Society*. 2002 50(8):1381-1388.

85. **Hay JW**. Pharmacoeconomics of Lipid Management. *Managed Care Consultant*, 2002; 2(2): 54-64.

86. Boone J, **Hay JW**, Aguanno J, Getzen T, Hortin G. Are the Correct Economic Factors Influencing Point-of-Care Testing? *Point of Care*; 2002 Vol. 1, #3, pp.212-221.

87. **Hay JW**. Long-term pravastatin treatment has sustained benefits for people with coronary heart disease. *Evidence-Based Cardiovascular Medicine*, December, 2002; 6:146-47.

88. **Hay JW**. Expensive Medical Conditions. *Health Affairs*, November/December 2002; 21(6):271-72.

89. Knapp KK, Ray MD. (for the Pharmacy Research Roundtable**, J Hay** member). A pharmacy response to the Institute of Medicine's 2001 initiative on quality in health care. *Am J Health-Syst. Pharm*. 2002; 59:2443-50.

90. **Hay JW**. Recent U.S. Trends in Lipid Medication Use: 1998-2001. *Cardiology Review*, April 2003. 20(4) Suppl: 35-37.

91. Chiou C-F, **Hay JW**, Wallace J, Bloom B, Neumann P, Sullivan S, Yu H-T, Keeler E, Henning J, Ofman J. Development and Validation of A Grading System for the Quality of Cost-Effectiveness Studies. *Medical Care* 2003; 41:32–44.

92. Ofman J, Sullivan S, Neumann P, Chiou C-F, Henning J, **Hay JW**. Examining The Value and Quality of Health Economic Analyses: Implications of Utilizing The QHES. *Journal of Managed Care Pharmacy*, 2003; 9(1):53-62.

93. Yuan Y, **Hay JW**, McCombs J. Mortality and Hospitalization Impacts of Pharmacy Consultation In Ambulatory Care. *American Journal of Managed Care*. 2003; 9(1):101-112.

94. Forrest S, Goetghebeur M, **Hay JW**. "Understanding the Underlying Drivers of Inpatient Cost Growth: A Literature Review. *American Journal of Managed Care*. 2003, 9(S1):S3-S13.

95. **Hay JW**. Hospital Cost Drivers: An Evaluation of 1998-2001 State-Level Data. *American Journal of Managed Care*. 2003, 9(S1):S14-S24.

96. Etemad L, **Hay JW**. Cost Effectiveness Analysis of Pharmaceutical Care in a Medicare Drug Benefit Program. *Value in Health*. 2003, 6(4):425-435.

97. **Hay JW**. Evaluating the Cost-Effectiveness of Statins. *Journal of Managed Care Pharmacy*. 2004; 10(1): 79-81.

98. Chen L, **Hay JW**. Cost-Effectiveness of Implanted Cardioverter Defibrillator for Sudden Death Prevention in Congestive Heart Failure. *Journal of Cardiovascular Drugs and Therapy*. 2004; 18(2): 161-170.

99. Dwight-Johnson M, Largomarsino I, Aisenberg E, **Hay JW**. "Understanding Depression Treatment Preferences among Low-Income Latinos using Conjoint Analysis". *Psychiatric Services* 2004;55(8):934-37.

100. Purdy K, **Hay JW**, Botteman M, Ward J. "Cost-Benefit Analysis of Selective Strategies for use of Acellular Pertussis Vaccine in Adolescents and Adults." *Clinical Infectious Diseases* 2004; 39:20–28.

101. **Hay JW**. "Evaluation and Review of Pharmacoeconomic Models." *Expert Opinion on Pharmacotherapy*, 2004; 5(9):1867-80.

102. Pharmacy Practice Research Roundtable (**JW Hay**, member). Advancing Pharmacy Practice Through Research: A 2004 Perspective. *J Am Pharm Assoc*. 2004;44:621–628.

103. Narayan S, **Hay JW**. Cost-effectiveness of generic Ritalin® (methylphenidate) versus generic Adderall® (amphetamine/dextroamphetamine mixed salts) for first-line treatment of attention deficit/hyperactivity disorder (ADHD) in children. *Expert Review of Pharmacoeconomics & Outcomes Research*, 2004; 4(6):1-8.

104. **Hay JW**, Zammit DC. Vaccine Policy Perspectives: Market Strategies. Paper commissioned by the Institute of Medicine to support: Financing Vaccines in the 21st Century. Assuring Access and Availability. Institute of Medicine of the National Academies. The National Academies Press, Washington, D.C. 2004.

105. **Hay JW**. Cost Effectiveness of Cardiovascular Medicines. *Current Atherosclerosis Reports,* 2005, 7:79-80.

106. **Hay JW**, Sterling K. "Cost Effectiveness Analysis of Fibrates for Dyslipidemia." *Pharmacoeconomics*. 2005; 23(2):133-141.

107. Letourneau-Wagner J, **Hay JW**. "The Cost Impacts of Vaccination in the United States: An Overview." *Managed Care Consultant* 2005; 4[2]:11-25.

108. **Hay JW**. "Application of Cost Effectiveness and Cost Benefit Analysis to Pharmaceuticals." Chapter 14 in Santoro M, Gorrie T, eds. *The Grand Bargain: Ethics and the Pharmaceutical Industry In the 21st Century*. Cambridge University Press, New York NY, 2005:225-248.

109. Fitzner K, Fox K, Schmidt J, Roberts M, Rindress D, **Hay JW**. Implementation and Outcomes of Commercial Disease Management Programs in the United States: the Disease Management Outcomes Consolidation Survey. *Disease Management Journal* 2005; 8(4):253-64.

110. **Hay JW**. "Appropriate Econometric Methods for Pharmacoeconometric Studies of Retrospective Claims Data: An Introductory Guide." *J Managed Care Pharmacy*. 2005; 11(4): 344-348.

111. **Hay JW**, Ward J. Economic Considerations For Pertussis Booster Vaccination In Adolescents. *Pediatric Infectious Disease Journal* 2005; 24(6): S127-S133.

112. **Hay JW**, Leahy M. "Cost Effectiveness of Oral Antihistamines in the California Medi-Cal Program." *Value in Health* 2005; 8(4):506-16.

113. Zhang L, **Hay JW**. "Cost Effectiveness Analysis of Rizatriptan and Sumatriptan versus Cafergot in the Acute Treatment of Migraine." *CNS Drugs* 2005; 19(7): 635-642.

114. Forrest S, Goetghebeur M, **Hay JW**. Medicare Part B coverage and reimbursement of outpatient prescription drugs: impact of current policy on clinical practices and health care expenditures. *Applied Health Economics and Health Policy* 2005; 4(1):9-14.

115. **Hay JW**. "Pharmacist Medication Review Study Design Concerns," Rapid Response Letter, *BMJ*, January 28, 2005. (http://bmj.bmjjournals.com/cgi/eletters/bmj.38338.674583.AEv2).

116. **Hay JW**. "Where's the Value in Health Care?" *Value in Health*; 2006; 9(2):11-14.

117. Stephens JM, Botteman MF, **Hay JW**. "Impact of Antidiabetic Medications on Utilization, Costs, and Glycemic Control within Managed Care Organizations: A Review of the Literature." *J Managed Care Pharmacy* 2006; 12(2):130-142.

118. Botteman M, Barghout V, Stephens J, **Hay JW**, Brandman J, Aapro M. Cost effectiveness of bisphosphonates in the management of breast cancer patients with bone metastases. *Annals of Oncology*, July 2006; 17: 1072-1082.

119. Spalding J, **Hay JW**. "The Cost-Effectiveness of Tumor Necrosis Factor Alpha Inhibitors as First-Line Agents in Rheumatoid Arthritis." *Pharmacoeconomics* 2006; Vol. 24 (12): pp. 1221-1232.

120. **Hay JW**. "Comment on Comparing Patient Access to Pharmaceuticals in UK and US. *Applied Health Economics and Health Policy* 2006; Vol. 5 (4): pp. 269-270(2).

121. Botteman MF, **Hay JW**, van Hout BA, Curry A, Wong R, Luo MP. Cost effectiveness of Adalimumab Therapy vs. Conventional Care in UK Patients with Active Ankylosing Spondylitis (AS). *Rheumatology* 2007 46(8):1320-1328.

122. Carpiuc KT, Stephens JM, Botteman MF, Feng W, **Hay JW**. A review of the clinical and economic outcomes of imatinib in Philadelphia chromosome-positive acute lymphoblastic leukemia. *Expert Opinion on Pharmacotherapy*. November 2007, Vol. 8(16), pp. 2775-2787.

123. **Hay JW**, Rindress D, Editors. *Disease Management Principles and Practices: The Current State of the Art*. Disease Management Association of America, Washington, DC. 2007.

124. Liou SY, Stephens JM, Carpiuc KT, Feng W, Botteman MF, **Hay JW**. Economic Burden of Haematological Adverse Effects in Cancer Patients A Systematic Review. *Clinical Drug Investigations* 2007; 27 (6): 381-96.

125. Costanzo MR, Johannes RS, Pine M, Gupta V, Saltzberg M, **Hay JW**, Yancy CW, Fonarow GC. "Effects of intravenous therapies on outcomes of inpatients with acutely decompensated heart failure: A propensity analysis using the ADHERE database." *American Heart Journal*. July, 2007; 154: 267-277.

126. Yuan Y, Iloeje U, Li H, **Hay JW**, Yao GB. Economic Implications Of Entecavir Treatment In Suppressing Viral Replication In Chronic Hepatitis B (Chb) Patients In China. *Value in Health* March, 2008; 11:S11-S22.

127. Zeiger R, **Hay JW**, Contreras R, Chen W, Quinn V, Seal B, Schatz M. "Risk-Stratified Medical Costs for Asthma Patients in a Managed Care Organization (MCO)." *J Allergy and Clinical Immunology*. 2008; 121:885-92.

128. Yuan Y, Iloeje U, **Hay JW**. Long-Term Cost Effectiveness of Entecavir in Suppressing Viral Replication in Chronic Hepatitis B (CHB) Patients Compared with Lamivudine." *J Managed Care Pharmacy*. 2008; 14(1):21-33.

129. Gabel J, Fahlman C, Kang R, Kletke P, Wozniak G, **Hay JW**. Where Do I Send Thee? Does Physician-Ownership Affect Referral Patterns To Ambulatory Surgery Centers? *Health Affairs*, 2008; 27:w165-w174.

130. **Hay JW**. Using Pharmacoeconomics to Value Pharmacotherapy. *Clinical Pharmacology and Therapeutics.* 2008; 84(2):197-200.

131. **Hay JW**. "Prices and Innovation in Pharmaceuticals and Biotechnology." Chapter 5, pp. 81-99; in *Research in Human Capital and Development, Volume 16, The Value of Innovation: Impact on Health, Life Quality, Safety, and Regulatory Research*, edited by Irina Farquhar, Kent Summers and Alan Sorkin. Emerald Group Publishing Limited, Bingley, U.K. 2008.

132. **Hay JW**. "The Pharmacoeconomics of Elevated Triglycerides and Their Management." *Medscape Expert Column.* June 16, 2008; (http://www.medscape.com/viewarticle/575862_print).

133. Orlewska E, Zammit D, Yuan Y, Kutikova L, Berak H, Halota W, **Hay JW**. Cost-effectiveness analysis of entecavir in the treatment of chronic hepatitis B (CHB) patients in Poland. *Exp Clin Hep* 2008; 4(3-4):20-28.

134. Gu NY, Gai Y, **Hay JW**. "The Effect of Patient Satisfaction with Pharmacist Consultation on Medication Adherence: An Instrumental Variable Approach." *Pharmacy Practice,* 2008 Oct-Dec;6(4):201-210.

135. Scranton R, Dhingra R, Lawler E, **Hay JW**, Yucel K, Guo A, Balzer T, Gaziano J. "A Six-Year Study of Diagnostic Lower Extremity Imaging Practice Patterns and Outcomes in Veterans Affairs Healthcare System." *International Journal of Angiology*. 2008; 17(2): 78-82.

136. Le Q, **Hay JW**. Cost-Effectiveness Analysis of Lapatinib in HER2-Positive Advanced Breast Cancer. *Cancer* 2009;115:489–98.

137. **Hay JW**, Scranton R, Yucel K, Guo A, Balzer T, Gaziano J. "Cost Impact Of Diagnostic Imaging For Lower Extremity Peripheral Vascular Disease (PVD)." *Value in Health* 2009; 12(2):262-266.

138. **Hay JW,** Kaliner M. Review of the Pharmacoeconomics of Second-Generation Antihistamines in the Treatment of Allergic Rhinitis: A U.S. Perspective. *Current Medical Research and Opinion*. 2009; 25(6): 1421-1431.

139. **Hay JW**, Smeeding J, Carroll NV, Drummond M, Garrison LP, Mansley EC, Mullins CD, Mycka JM, Seal B, Shi L. Good Research Practices in Measuring Drug Costs for Cost Effectiveness Analysis: A Report of the ISPOR Drug Cost Task Force. *Value in Health* 2010; 13(1):3-7.

140. **Hay JW**, Jhaveri M, Tangirala MK, Kaliner M. Cost and Resource Utilization Comparisons of Second Generation Antihistamines vs. Montelukast in Treatment of Allergic Rhinitis: Retrospective Analysis of a Large National Insurance Claims Database. *Allergy and Asthma Proceedings* 2009 Nov-Dec;30(6):634-42.

141. Garrison LP, Mansley E, Abbott T, Bresnahan B, **Hay JW**, Smeeding J. Research Practices for Measuring Drug Costs in Cost Effectiveness Analyses: Part II: A Societal Perspective. *Value in Health* 2010; 13(1):8-13.

142. Mansley E, Carroll N, Chen K, Shah N, Tak Piech C, **Hay JW**, Smeeding J. Good Research Practices for Measuring Drug Costs in Cost Effectiveness Analyses: A Managed Care Perspective - A Report of the ISPOR Drug Cost Task Force Part III. *Value in Health* 2010; 13(1):14-17.

143. Mullins CD, Seal B, Seoane-Vazquez E, Sankaranarayanan J, Asche C, Jayadevappa R, Lee W, Romanus D, Wang J, **Hay JW**, Smeeding J. Good Research Practices for Measuring Drug Costs in Cost Effectiveness Analyses: A Report of the ISPOR Drug Cost Task Force – Part IV: Medicare, Medicaid and Other US Government Payers Perspectives. *Value in Health* 2010; 13(1):18-24.

144. **Hay JW**, Zhou Z. Commentary: A systematic review of the cost-effectiveness of rFVIIa and APCC in the treatment of minor/moderate bleeding episodes for haemophilia patients with inhibitors. *Haemophilia* 2010; 16(2):366-368.

145. Mycka J, Dellamano R, Kolassa EM, Wonder M, Ghosh S, **Hay JW**, Smeeding J. Good Research Practices for Measuring Drug Costs in Cost Effectiveness Analyses: An Industry Perspective: A Report of the ISPOR Drug Cost Task Force – Part V. *Value in Health* 2010; 13(1):25-27.

146. Shi L, Hodges M, Drummond M, Ahn J, Li SC, Hu S, Augustovski F, **Hay JW**, Smeeding J. Good Research Practices for Measuring Drug Costs in Cost Effectiveness Analyses: An International Perspective: A Report of the ISPOR Drug Cost Task Force – Part VI. *Value in Health* 2010; 13(1):28-33.

147. Dwight-Johnson M, Lagomarsino I, **Hay JW,** Zhang L, Tang L, Green JM, Duan N. "Effectiveness of Collaborative Care in Addressing Depression Treatment Preferences Among Low-Income Latinos." *Psychiatric Services.* Nov 2010; 61: 1112 - 1118.

148. Skrepnek GH, Seal B, Tangirala M, **Hay JW**. "Adverse Events and Intravenous Versus Oral Bisphosphonate Use In Patients With Osteoporosis and Cancer in the U.S." *General Dentistry*, November/December, 2010; 58(6):484-92.

149. Mark TL, Joish VN, **Hay JW**, Sheehan D, Johnson S, Cao Z. "Antidepressant use in geriatric populations: the burden of side-effects and interactions on adherence and costs." A*merican Journal of Geriatric Psychiatry*. March 2011; 19(3):211–221. http://dx.doi.org/10.1097/JGP.0b013e3181f1803d

150. Clark F, Mandel D, Carlson M, Chou C-P, Cherry B, Jordan-Marsh M, Knight B, Mandel D, Blanchard J, Granger DA, Wilcox RR, Lai MY, White B, **Hay JW,** Lam C, Marterella A, Azen S. "Effectiveness of a Lifestyle Intervention in Promoting the Wellbeing of Independently Living Older People: Results of the Well Elderly 2 Randomised Controlled Trial." *Journal of Epidemiology and Community Health*, 2012 Sep; 66(9):782-90. http://dx.doi.org/10.1136/jech.2009.099754

151. **Hay JW**, Zhou Z. Economic comparison of aPCC vs rFVIIa in the home treatment of mild-to-moderate bleeding episodes in hemophilia patients with inhibitors. *Haemophilia*. 2011 Sep;17(5):e969-74.; http://dx.doi.org/10.1111/j.1365-2516.2011.02589.x

152. Ganapathy V, **Hay JW**, Kim JH. Analysis of Costs of Necrotizing Enterocolitis Among Extremely Premature Infants Fed Mother's Own Milk Fortified with Human-milk Based Supplement versus Bovine-milk based Supplement. *Breastfeeding Medicine*. February 2012, 7(1): 29-37. http://dx.doi.org/10.1089/bfm.2011.0002

153. **Hay JW**, Zhou Z. aPCC versus rFVIIa in treatment of hemophilia patients with inhibitors: A structured review of the pharmacoeconomic literature. *Journal of Medical Economics*, 2011; 14(4):516-525.

154. **Hay JW,** Katon W, Ell K**,** Lee P-J, Guterman J. An Economic Evaluation of Collaborative Care Management of Major Depression among Low-Income, Predominantly Hispanics with Diabetes**.** *Value in Health,* 2012 Mar-Apr;15(2):249-54. http://dx.doi.org/10.1016/j.jval.2011.09.008

155. Zhou Z, **Hay JW**. A systematic review and classical meta-analysis comparing the efficacy of bypassing agents in hemophilia patients with inhibitors. *Clinical Therapeutics,* February 2012; 34(2): 434-445. http://dx.doi.org/10.1016/j.clinthera.2012.01.001

156. Ding Y, Zangwill KM, **Hay JW**, Allred N, Yeh S. Cost-benefit Analysis of In-hospital Influenza Vaccination of Postpartum Women. *Obstetrics & Gynecology,* February 2012; 119(2, Part 1): 306-314. http://dx.doi.org/10.1097/AOG.0b013e318242af27

157. Suh H, **Hay JW**, Johnson K, Doctor J. Comparison of Cardiovascular Events between a Statin plus Fibrate Combination Therapy and a Statin Monotherapy in Patients with Diabetes. *Pharmacoepidemiology and Drug Safety,* 2012; 21: 470–484. http://dx.doi.org/10.1002/pds

158. Kawatkar AA, **Hay JW**, Stohl W, Nichol MB. Incremental Expenditure of Biologic Disease Modifying Anti-Rheumatic Treatment Using Instrumental Variables in Panel Data. *Health Economics,* July 2013. 22(7):807–823. http://dx.doi.org/10.1002/hec.2855

159. **Hay JW**, Chaugule SC, Young G. Bypass therapy assay testing as a strategy to reduce costs for treatment of hemophilia patients with inhibitors. *Haemophilia*, 2013. 19(5): 711–719; http://dx.doi.org/10.1111/hae.12171

160. Dwight Johnson MD, **Hay JW**, Unutzer J, Apesoa-Varano C, Hinton L. Depression Treatment Preferences of Older White and Mexican American Men. *General Hospital Psychiatry*, 2013. 35(1): 59-65. http://dx.doi.org/10.1016/j.genhosppsych.2012.08.003.

161. Ding Y, Yeh SH, Mink C, Zangwill KM, Allred NJ, **Hay JW**. Cost-benefit Analysis of In-hospital TDaP Vaccination of Postpartum Women. *Vaccine*. 2013; 31:2558–2564. http://dx.doi.org/10.1016/j.vaccine.2013.03.053.

162. Messali A, **Hay JW**, Villacorta R. The Cost-Effectiveness of Temozolomide in the Adjuvant Treatment of Newly Diagnosed Glioblastoma in the United States: A Literature Review and Markov Model. *Neuro-Oncology*. 2013; 15(11):1532-1542. http://dx.doi.org/10.1093/neuonc/not096

163. **Hay JW** (Section Chair). "Statistical Approaches for Evaluating Disease and Health Management Data," in Esposito D, Migliaccio-Walle K, Molsen E., Editors. "Reliability and Validity of Data For Outcomes Research & Disease And Health Management Programs *ISPOR Outcomes Good Practices Series,* ISPOR, Princeton, NJ, 2013. Chapter 29, pp. 343-346.

164. Jain R, **Hay JW**. "Statistical Methods for Randomized Controlled Trials: Discrete Outcomes," in Esposito D, Migliaccio-Walle K, Molsen E., Editors. "Reliability and Validity of Data For Outcomes Research & Disease And Health Management Programs *ISPOR Outcomes Good Practices Series,* ISPOR, Princeton, NJ, 2013. Chapter 34, pp. 365-373.

165. Petersen H, **Hay JW**. "Statistical Methods for Randomized Controlled Trials: Propensity Scores," in Esposito D, Migliaccio-Walle K, Molsen E., Editors. "Reliability and Validity of Data For Outcomes Research & Disease And Health Management Programs *ISPOR Outcomes Good Practices Series,* ISPOR, Princeton, NJ, 2013. Chapter 40, pp. 405-408.

166. **Hay JW**. "Statistical Methods for Randomized Controlled Trials: Nonparametric Statistical Methods," in Esposito D, Migliaccio-Walle K, Molsen E., Editors. "Reliability and Validity of Data For Outcomes Research & Disease And Health Management Programs *ISPOR Outcomes Good Practices Series,* ISPOR, Princeton, NJ, 2013. Chapter 45, pp. 427-432.

167. Aponte-González J, Fajardo-Bernal L, Diaz J, Eslava-Schmalbach J, Gamboa O, **Hay JW**. Cost-Effectiveness Analysis of the Bivalent and Quadrivalent Human Papillomavirus Vaccines from a Societal Perspective in Colombia. *PLOS One,* 2013; 8(11): e80639. http://dx.doi.org/10.1371/journal.pone.0080639

168. **Hay JW**. Competition, Market Power and Pricing in Brand Name Pharmaceutical Markets. *Harvard Health Policy Review*. Spring 2013 Vol. 14, No. 1; pp. 8-9.

169. Ganapathy V, **Hay JW**, Kim JH, Lee ML, Rechtman DL. Healthcare costs among survivors of neonatal necrotizing enterocolitis in a Medicaid cohort. *BMC Pediatrics,* 2013, Vol. 13:127 http://doi:10.1186/1471-2431-13-127

170. Bollu V, Ejzykowicz F, Rajagopalan K, Karafilidis J, **Hay JW**. Risk of all-cause hospitalization in COPD patients initiating long-acting or short-acting beta agonist therapy. *Journal of Medical Economics*, 2013, 16(8):1082-1088. http://dx.doi.org/10.3111/13696998.2013.815625

171. Villacorta R, **Hay JW**, Messali A. Cost effectiveness of moderate to severe psoriasis therapy with etanercept and ustekinumab in the United States. *PharmacoEconomics* 2013; 31:823–839. http://dx.doi.org/10.1007/s40273-013-0078-x

172. Mehta D, **Hay JW.** "Cost-Effectiveness of adding bevacizumab to first line therapy for patients with advanced ovarian cancer." *Gynecologic Oncology* 2014; 132(3):677-683. http://dx.doi.org/10.1016/j.ygyno.2014.01.021.

173. Gong C, **Hay JW**. "Cost-effectiveness analysis of abiraterone and sipuleucel-T in metastatic castration-resistant prostate cancer." *Journal of the National Comprehensive Cancer Network* 2014;12(10):1417–1425. http://www.jnccn.org/content/12/10/1417.full

174. Villacorta R, **Hay JW**, Messali A. Novel methods of measuring clinical outcomes from psoriasis and psoriatic arthritis clinical trials. *Expert Review of Pharmacoeconomics and Outcomes Research,* 2014; 14(4):1-14. http://dx.doi.org/10.1586/14737167.2014.917970

175. **Hay JW**. Current Issues in Pharmacoeconomic Modeling. *Journal of Health Technology Assessment*, 2014;2(1):6-9.

176. Messali A, Villacorta R, **Hay JW**. "A Review of the Economic Burden of Glioblastoma and the Cost Effectiveness of Pharmacologic Treatments." *Pharmacoeconomics*, 2014; 32(12):1201-1212. http://dx.doi.org/10.1007/s40273-014-0198-y

177. Clark F, Pyatak EA, Carlson M, Blanche EI, Vigen C, **Hay JW,** Mallinson T, Blanchard J, Unger JB, Garber SL, Diaz J, Florindez LI, Atkins M, Rubayi S, Azen SP and the PUPS 2 Study Group. Implementing trials of complex interventions in community settings: The USC–Rancho Los Amigos Pressure Ulcer Prevention Study (PUPS) *Clinical Trials* 2014; 11: 218–229. http://dx.doi.org/10.1177/1740774514521904

178. Thompson CA, **Hay JW**. Marijuana Use in Models for Health Outcomes. *American Journal of Medicine*, 2014; http://dx.doi.org/10.1016/j.amjmed.2014.07.039

179. Zhang X, **Hay JW**, Niu X. Cost-effectiveness of Fingolimod, Teriflunomide, Dimethyl Fumarate and Intramuscular Interferon Beta-1a in Relapsing-Remitting Multiple Sclerosis. *CNS Drugs*, 2014; http://dx.doi.org/10.1007/s40263-014-0207-x

180. Thompson CA, **Hay JW**. Estimating the Association between Metabolic Risk Factors and Marijuana Use in US Adults Using Data from the Continuous National Health and Nutrition Examination Survey. *Annals of Epidemiology*, 2015; S1047-2797(15)00041-1. http://dx.doi.org/10.1016/j.annepidem.2015.01.013

181. Grosse SD, Chaugule S, **Hay JW**. QALYs and Hemophilia: A Review. *Expert Reviews of Pharmacoeconomics and Outcomes Research,* 2015; 15(2): 267-283. http://dx.doi.org/10.1586/14737167.2015.1001372

182. Chen CX, **Hay JW**. Cost-Effectiveness Analysis of Alternative Screening and Treatment Strategies for Heterozygous Familial Hypercholesterolemia in the United States. *International Journal of Cardiology,* 2015; 181:417–424. http://dx.doi.org/10.1016/j.ijcard.2014.12.070

183. Cheetham C, Yuan Y, Niu F, Kalsekar A, Hechter R, Chiang K, **Hay JW**, Nyberg L. Factors Associated with Failure to Achieve SVR in Hepatitis C Genotype 3 Patients Within an Integrated Care Delivery System. *Journal of Managed Care and Specialty Pharmacy* 2015; 21(8):641-47.

184. **Hay JW.** A Special Commemorative Honoring William S. Comanor and 50 Years of Pharmaceutical Economics. *International Journal of the Economics of Business* 2015; 22(2):165-168. http://dx.DOI.org/10.1080/13571516.2015.1045742

185. Chen CX, **Hay JW**. Studies Should Avoid "Cherry-Picking" of Favorable Cost-Effectiveness Estimates. *JAMA* 2015; 314(16):1752. http://jama.jamanetwork.com/article.aspx?articleid=2466123

186. Chaugule SC, **Hay JW**, Young G. Understanding patient preferences and willingness to pay for hemophilia therapy. *Journal of Patient Preference and Adherence* 2015; 9:1623–1630. http://dx.doi.org/10.2147/PPA.S92985

187. Mehta DA, Oladapo AO, Epstein JD, Novack AR, Neufeld E, **Hay JW**. Estimating the potential cost of bypassing agent prophylaxis relative to the cost of rFVIIa on-demand using rFVIIa doses from multiple US registries. *Journal of Managed Care and Specialty Pharmacy* 2016; 22(2): xxx-xxx. www.amcp.org

188. Meeker D, Linder JA, Fox CR, Friedberg MW, Perselle SD, Goldstein NJ, Knight TK, **Hay JW**, Doctor JN. Behavioral Interventions to Decrease the Inappropriate Use of Antibiotics: A Multicenter Cluster Randomized Trial. *JAMA* 2016. 315(6):562-570. http://dx.doi.org/10.1001/jama.2016.0275

189. Ejzykowicz F, Bollu V, Rajagopalan K, **Hay JW**. Health Care Use and Costs Among Medicare Patients with Chronic Obstructive Pulmonary Disease Treated with Short-Acting Beta Agonists or Long-Acting Beta Agonists. *J Clinical Pathways* 2016;2(3):31-38. www.jcponline.com

190. Carlson M, Vigen C, Rubayi S, Blanche EI, Blanchard J, Atkins M, Bates-Jensen B, Garber SL, Pyatak EA, Diaz J, Florindez LI, **Hay JW**, Mallinson T, Unger JB, Azen SP, Scott M, Cogan A, Clark F. Lifestyle intervention for adults with spinal cord injury: Results of the USC–RLANRC Pressure Ulcer Prevention Study. Submitted.

191. **Hay JW**. Commentary: Cost-effectiveness of recombinant activated factor VII vs. plasma-derived activated prothrombin complex concentrate in the treatment of mild-to-moderate bleeding episodes in patients with severe haemophilia A and inhibitors in Spain. Submitted.

192. **Hay JW**, Zammit D, Schneider L. "Stated Preferences and Willingness to Pay for Treatment Attributes Among Alzheimer Disease Caregivers: Validation of the HUI-3 Utility Scale." Submitted.

193. Ganapathy V, **Hay JW**, Smoot K, Hermos J, Weber C, Grotzinger K. Resource utilization in thrombocytopenia of chronic liver diseases in the Veterans Affairs population. Submitted.

194. Kawatkar AA, **Hay JW**, Stohl W, Nichol MB. Consistent Estimation of Polychotomous Treatment Effects with Selection-bias and Unobserved Heterogeneity Using Panel Data Correlated Random Coefficients Model. Submitted.

195. Drabo E, **Hay JW**, Sood N, Vardavas R, Wagner Z. A Cost-Effectiveness Analysis of Pre-Exposure Prophylaxis (PREP) for the Prevention of HIV in the Los Angeles County MSM Population. Submitted.

196. Thompson CA, **Hay JW**, Lu Y, Doctor JN. Financial Incentives and Adolescent Health Promotion and Prevention: A Structured Review of the Literature. Submitted.

197. Ding Y, Mehta D, **Hay JW.** "Cost-effectiveness analysis of multimodal screening for ovarian cancer." To be submitted.

198. **Hay JW**, Wu S, Lee P-J, Guterman JJ, Ell K. Cost Effectiveness of Patient-Centered Technological Assessment and Monitoring of Depression for Low-Income Diabetic Patients. Submitted.

199. Gong C, **Hay JW**, Meeker D, Doctor J. Provider Preferences for Interventions for Reducing Inappropriate Antibiotic Prescribing. To be submitted.

200. Ejzykowicz F, **Hay JW**. Dynamic Panel Data vs. Two Part Model: Selection bias methodologies in health outcomes research. To be submitted.

201. McGinnis JJ, **Hay JW**. The Cost Effectiveness of Hepatitis C Treatments in Treatment Naïve Genotype 1 Patients. Submitted.

202. Chu L-H, Cohen DJ, **Hay JW.** A Hybrid Comparison of Cost-Effectiveness of Transcatheter Aortic Valve Replacement between Randomized Clinical Trials and Real World Practice in Treating Patients with Severe Aortic Stenosis. To be submitted.

203. **Hay JW**. Cost Effectiveness Analysis with and Without Stochastic Uncertainty. To be submitted.

204. Chaugule S, **Hay JW**. Comparing Regret Minimization Model and Random Utility Model Willingness-to-Pay (WTP) Estimation Methods for Policy Evaluation. To be submitted.

**TECHNICAL REPORTS:**

T1. **Hay, JW**. and Wolff, E.: "Educational Screening and Occupational Earnings," National Bureau of Economic Research Working Paper No. 174, New York, 1976.

T2. **Hay, JW**. "Physician Specialty Choice and Specialty Earnings," Final Report on Doctoral Research Grant #OASH 03150, National Center for Health Services Research, 1980.

T3. Yett, D., Der, W., Ernst, R., and **Hay, JW**. "Physician Pricing and Health Insurance Reimbursement," Final Report on Contract #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, Health Care Financing Administration, 1982.

T4. **Hay, JW**. and Gareis, J. "Pollution Dose-Response Curves at the Micro Level," final report on Contract #68-01-0543, Work Assignment #20, U.S. Environmental Protection Agency, 1983.

T5. **Hay, JW**. "An Introduction to Cost-Benefit and Cost-Effectiveness Analysis of Pharmaceuticals," Final Report to Rescon, Inc., Tysons Corner, Virginia, 1984.

T6. **Hay, JW**., Leu, R., Rohrer, P. and Doppman, R. "A Monte Carlo Investigation of Sample Selection Models with Application to Health Care Demand Estimation." Hoover Institution Working Papers in Economics, E-85-29, Stanford, CA, December, 1985.

T7. Welch, B., **Hay, JW**., Miller, D., Olsen, R. Rippey, R., and Welch, A. "The Rand Health Insurance Study: A Critique." Hoover Institution Working Papers in Economics, E-86-36, Stanford CA, August, 1986.

T8. Wilensky, G., Garrison, L., **Hay, JW**., Anderson, G., Reynolds, R., Headen, A. Schoenman, J. Study of the Impact of Increasing Physician Supply. Final Report, Contract No. HHS-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, Office of the Assistant Secretary for Planning and Evaluation, Department of Health and Human Services, Washington, D.C., March, 1987.

T9. **Hay, JW**., and Ernst, R. "The Economic Costs of Alzheimer's Disease." Hoover Institution Working Papers in Economics, E-87-18, Stanford CA, April, 1987.

T10. **Hay, JW**. "Econometric Issues in Modeling the Costs of AIDS." Hoover Institution Working Papers in Economics, E-88-36, Stanford CA, October, 1988.

T11. Ernst, R. and **Hay, JW**. *Estrogen Replacement Therapy: A Review of the Literature*, Report to Ciba-Geigy, Inc., Summit, NJ, October, 1988.

T12. **Hay, JW**. *Therapeutic Substitution and the Cost-effectiveness of Medication in Treatment of Acute Muscle Spasm Back Injury*. Report to Merck, Sharpe and Dohme, Inc., West Point, PA, October, 1988.

T13. **Hay, JW**. "Projecting the Medical Costs of HIV/AIDS: An Update with Focus on Political Epidemiology." Hoover Institution Working Papers in Economics E-89-17, Stanford CA, June, 1989.

T14. **Hay, JW**., Wolak, F. "Bootstrapping HIV/AIDS Projection Models: Back Calculation with Linear Inequality-Constrained Regression." Hoover Inst. Economic Working Papers, E-90-5, Stanford CA, February, 1990.

T15. Hay, A. and **Hay, JW**. "*Urinary Tract Infections: Diagnosis, Treatment and Cost-of-Illness Algorithms*." Report to Abbott Laboratories, Chicago IL, May, 1990.

T16. **Hay, JW**. *Cost Effectiveness of Calcium Channel Blockers,* Report to Lederle Labs, Wayne, NJ, Feb. 1991.

T17. **Hay, JW**., Osmond, D. and Wolak, F. *Projecting the Costs of AIDS and ARC in the United States,* Final Report, Grant No. HS 06092-01, Agency for Health Care Policy and Research, Public Health Service, U.S. Department of Health and Human Services, published by the National Technical Information Service, Springfield, VA, 1991.

T18. **Hay, JW**., Ernst, R. *Alzheimer's Disease Cost of Illness: An Update,* Report to Parke-Davis Division of Warner-Lambert Co., Morris Plains, NJ, May, 1991.

T19. **Hay, JW**., Ernst, R. *Cancer Costs of Illness,* Report to Bristol Meyers Squibb, Evansville, IN, September, 1991.

T20. **Hay, JW**., Max W. *Cost-Effectiveness Evaluation of Alzheimer's Disease Medications,* Report to Hoechst-Roussel Pharmaceuticals, Sommerville, NJ, October, 1991.

T21. Bozzette, S., **Hay, JW**. *Cost-Effectiveness of ddI under Current FDA Marketing Indications,* Report to Bristol Meyers Squibb Pharmaceuticals, Evansville, IN, December, 1991.

T22. **Hay, JW**., and Ernst, R. *Cost-Effectiveness of Ticlopidine vs Aspirin in Stroke Prevention,* Report to Syntex Laboratories, Palo Alto, CA, January, 1992.

T23. **Hay, JW**., and Ernst, R. *Cost-Effectiveness of Oral Keterolac vs Narcotics for Outpatient Analgesia.* Report to Syntex Laboratories, Palo Alto, CA, March, 1992.

T24. Khedheri, S, and **Hay, JW**. *Price Controls: An Interindustry Policy Analysis*, Report to Bristol-Meyers Squibb, Princeton, NJ, March, 1993.

T 25. **Hay, JW**, Ernst, R. *Cost Effectiveness Analysis of Oral vs. IV Etoposide in Combination Cancer Chemotherapy.* Report to Bristol-Meyers Squibb, Princeton, NJ, October, 1993.

T26. **Hay, JW**., Ernst, R, and Meissner, C. *Cost Effectiveness of Respiratory Syncytial Virus Immune Globulin Prophylaxis.* Report to Medimmune, Gathersburg, MD, November, 1993.

T27. **Hay, JW**., Ashraf, T. *Cost Effectiveness Analysis of Human Erythropoietin Treatment of Chemotherapy-Induced Anemia*. Report to Ortho-Biotech, New Brunswick, NJ, October, 1994.

T28. **Hay, JW**, Ernst, R. *Cost Effectiveness of Alternative Factor VIII Products in Treatment of Hemopilia A*. Report to the American Red Cross, New York, NY, December, 1994.

T29. Schroeder, V., and **Hay, JW**. "The Pravachol Cost of Care Model: Technical Summary. Report to Bristol-Myers Squibb, Plainsboro, NJ, February, 1997.

T30. Ernst, R, **Hay, JW**. Quality of Life in an Alzheimer Caregiver Intervention Demonstration Project. Final Report. NIH Grant No. 3-RO1-MH42216-08S1. December, 1998.

T31. **Hay, JW**, Luo, R, Ernst, R. Cost of Treatment in an Alzheimer Caregiver Intervention Demonstration Project. Final Report. NIH Grant No. 3-RO1-MH42216-08S1. December, 1998.

T32. **Hay, JW**, Ernst, R, Luo, R. Cost Effectiveness of an Alzheimer Caregiver Intervention Demonstration Project. Final Report. NIH Grant No. 3-RO1-MH42216-08S1. December, 1998.

T33. **Hay JW.** Retail Pharmacy Pricing Variation in the U.S. and Canada. Report to Abbott Laboratories, Evanston, IL. June, 2000.

T34. **Hay JW.** Chemotherapy-Induced Neuropathy: Costs and Quality of Life Impacts. Report to Aventis Pharmaceuticals, Bridgewater, NJ, 2001.

T35. **Hay JW.** "Hospital Cost Drivers: An Evaluation of State-Level Data." Report to Blue Cross and Blue Shield Association, Chicago, IL, 2002.

T36. Forrest S, Goetghebeur M, **Hay JW.** "Hospital Expenditure Growth in the United States 1990-2002: Findings from the Literature. Report to Blue Cross and Blue Shield Association, Chicago, IL, 2002.

T37. Forrest S, Goetghebeur M, **Hay JW.** Medicare Part B coverage and reimbursement of outpatient prescription drugs: impact of current policy on clinical practices and health care expenditures. Report to Abbott Laboratories, Abbott Park, IL. June 2003.

T38. **Hay JW.** Health Economics and Outcomes Research Development Plan for Alzheimer disease and ADHD compound. Report to Abbott Laboratories, Abbott Park IL. September 2003.

T39. **Hay JW,** Roberts M, Wentworth C. Drivers of U.S. health care cost components:2000-2002. Report to the Blue Cross and Blue Shield Association, Chicago, IL, 2004.

T40. **Hay JW,** Zammit D. "Stated Preferences and Willingness to Pay for Treatment Attributes Among Alzheimer Disease Caregivers: Validation of the HUI-3 Utility Scale." Report to the State of California Alzheimer Research Centers, Sacramento, CA. April, 2005.

T41. **Hay JW**. Cost Effectiveness Analysis with and Without Stochastic Uncertainty. *CESR-Schaeffer Working Paper No. 2015-005*. May, 2015. http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2601147.

**OTHER PUBLICATIONS:**

O1. **Hay, JW**."Comment on: The Influence of Economic Instability on Health: Proceedings," edited by J. John, D. Schwefel, and H. Zollner. *Kyklos*, Vol. 37, No. 2 (1984), pp. 322-323.

O2. **Hay, JW**. and Ricardo-Campbell, R.: "The Rand Health Insurance Study," Letter to the Editor, *The Lancet*, Vol. II:8498 (7/12/86), pg. 106.

O3. **Hay, JW**. and Buckels, J.: "Cost-Effectiveness: Antimicrobial Prophylaxis in General Surgery," in *Infection: A Complication of Surgery...Preventive and Management Techniques;* MedEd, Ltd., Wilton, CT, 1987.

O4. **Hay, JW**.: "An Introduction to Cost Effectiveness/Cost Benefit Analysis in Hospital Pharmacy Cost Containment," *Occasional Papers on Topics of Special Interest to Hospitals,* Lederle Laboratories, Wayne, NJ, 1987.

O5. **Hay, JW**.: "Pharmaceutical Cost Benefit/Cost Effectiveness Analysis in the Hospital Setting," *Occasional Papers on Topics of Special Interest to Hospitals, Report #2,* Lederle Laboratories, Wayne, NJ, 1987.

O6. **Hay, JW**.: "Commentary: Government Estimates on AIDS Too High," (adapted from J. Hay) Volume 2, *Oncology*, Number 11, (November 1988), pg. 34.

O7. **Hay, JW**.: "AIDS Epidemiology: A View From the Outside," in *The Economics of Health Care: Challenges for the Nineties,* Health Care Section, Center of Domestic and Comparative Policy Studies, Woodrow Wilson School of Public and International Affairs, Princeton University, 1990, pp.80-84.

O8. **Hay, JW**, Wittels EH, Gotto AM. "Reply: Economic Evaluation of Cholesterol Lowering," *American Journal of Cardiology*, Volume 68 October 15, 1991, pp. 1120-21.

O9. **Hay, JW**. "Incorrectly Framing Pharmacoeconomics." Letter; *American Journal of Hospital Pharmacy,* June, 1994, Vol 51, # 11, pp. 1473-74.

O10. Ernst, R, **Hay, JW**, Fenn, C, Tinklenberg, J, Yesavage, J. "Reply: Cognitive Function and the Costs of Alzheimer's Disease: An Exploratory Study," *Archives of Neurology*, Vol. 55, 1998.

O11. **Hay, JW.** "Commentary on Langley and McKenney Papers" *Value In Health*, Vol 1, No. 4. 1998.

O12. Interdisciplinary Council on Reducing the Risk for Coronary Heart Disease (**JW Hay** member). Highlights from the 10th Anniversary Meeting: A New Look at Primary Prevention. December, 1999.

O13. **Hay, JW**. "The Author's Reply to Comment on "Where's the Value in Health Care?" *Value in Health* 10. 2007.

O14. **Hay, JW.** "What is more valuable: Fenofibrate patents or fenofibrate clinical outcomes?" *Archives of Internal Medicine*, Oct 22, 2012;172(19):1521-2. doi: 10.1001/archinternmed.2012.4386.2012.

O15. **Hay, JW.** "Letter to the Editor: Economic Model of the Benefits of Male Circumcision is Highly Flawed," *JAMA Pediatrics*, February, 2013;167(2): 198. doi:10.1001/jamapediatrics.2013.829.

O16. **Hay, JW.** "Letter to the Editor: Baicker et al. The Oregon Experiment — Effects of Medicaid on Clinical Outcomes," *New England Journal of Medicine*; 2013. 369(6) pp. 581-582. DOI: 10.1056/NEJMc1306867.

**RECENT SCIENTIFIC PODIUM PRESENTATIONS AND POSTERS**

1. Ernst RL, **Hay JW**, Fenn C, Tinklenberg J. Yesavage JA. Cognitive Function and the Costs of Alzheimer's Disease: An Exploratory Pharmacoeconomic Study. 2nd Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, April 1997.

2. Sung JCY, **Hay JW**, Louie G, Popovian R. Cost-Effectiveness of Cyclophosphamide, Doxorubicin, and 5-Fluorouracil in Pre- menopausal Women With Lymph Node Positive, Early Stage Breast Cancer. 2nd Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, April 1997.

3. Yuan Y, **Hay JW**, Groshen S. An Application of the Time-Dependent Cox Regression Model in the Kaiser/USC Pharmacists' Consultation Intervention Study. 2nd Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, April 1997.

4. Venturini F, **Hay JW**. Cost-Effectiveness Analysis of Fluoxetine Versus Amitriptyline as Initial Treatment of a Major Depressive Disorder in Primary Care. 2nd Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, April 1997.

5. **Hay JW**. Economic Modeling and Sensitivity Analysis. 3rd Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, May 1998.

6. **Hay JW**, Schwartz S. The ISPOR Lipid Conference: Pharamacoeconomics and Outcomes Modeling Issues. 3rd Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, May 1998.

7. Yuan Y, **Hay JW**, LaPuerta P, Leahy M. Non-Parametric Analysis of Cost-Effectiveness Ratios of Pravastatin in Primary Prevention of Cardiovascular Disease. 3rd Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, May 1998.

8. Hui RL, **Hay JW**. Cost-Effectiveness Analysis of Screening of Type II Diabetes Mellitus in Non-Pregnant Adults. 3rd Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, May 1998.

9. Yu WM, **Hay JW**. Lipid Therapy and Cardiovascular Disease: How Many Americans Should be Treated. 3rd Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, May 1998.

10. Yuan Y, **Hay JW**, McCombs JS, Groshen S, Parker J. Time Dependent Survival Analysis of a Pharmacist's Intervention Study. 4th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 1999.

11. Luo R, **Hay JW**, and Hsiao C. Controlling for Simultaneity Bias in Outcomes Studies using Panel Data. 4th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 1999. This research led to a conference award of "Research Excellence."

12. Luo R, **Hay JW**, Clark F, Azen S, and Liu G. Cost-Effectiveness of Preventive Occupation Therapy on Healthy Elderly People. Podium presentation. Annual Meeting of the International Society of Pharmaceutical Outcomes Research, Virginia, May 1999.

13. Mathes A, **Hay JW**. The Value of Home Care in Metastatic Breast Cancer Management: Modeling Oral Versus Intravenous Chemotherapy at Home and at an Outpatient Clinic. 4th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 1999.

14. Juzba M, **Hay JW**. Cost-Effectiveness Analysis of Recombinant Human Erythropoientin vs Transfusion in HIV Patients Treated with Zidovudine. 4th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 1999.

15. Langley PC. **Hay JW**, Schwartz JS; Smith SC; McKenney J. From Research into Practice: How Should Healthcare Organizations/Governments Decide About Lipid Therapy and Who Will Pay? Reactor Panel and Open Forum. 4th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 1999.

16. Li J, **Hay JW**. Cost-Effectiveness of Rentinopathy Screening in Pediatric Patients with Type I Diabetes Mellitus. 5th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Washington, May 2000.

17. Sengupta N, **Hay JW**. Cost-Effectiveness of Tamoxifen in Breast Cancer Risk Reduction. 5th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Washington, May 2000.

18. **Hay JW**, Jackson J. Methodological Issues in Conducting Pharmacoeconomic Evaluations-Modeling Studies. 5th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Washington, May 2000.

19. Sullivan PW, **Hay JW**. Cost-Effectiveness of Rofecoxib Versus NSAIDS in the Treatment of Osteoarthritis. 6th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2001.

20. Charles R, **Hay JW**. The Cost-Effectiveness of Lifetime Factor VIII Prophylaxis in the Treatment of Severe Hemophilia A. 6th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2001.

21. Yu E, **Hay JW**, Varma R, Globe D. Four Year Cost-Effectiveness of Initial Trabeculectomy Versus Conventional Therapy in Primary Open-Angle Glaucoma (POGA). 6th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2001.

22. Mulani P, **Hay JW**. Cost-Effectiveness Model of Thrombolytic Therapy for Acute Myocardial Infraction. 6th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2001.

23. Sokolskiy L, **Hay JW**. Cost-Effectiveness Model of Prostate-Specific Antigen (PSA) Screening for Prostate Cancer. 6th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2001.

24. Chen K, **Hay JW**. Cost-Effectiveness of "Test &Treat" in Helicobacter Pylori (HP) Infected Dyspeptic Patients in Primary Care Setting. 6th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2001.

25. Wu EQ, **Hay JW**. Alternative Management Strategies for Dyspepsia. 6th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2001.

26. Bron MS, **Hay JW**. Cost-Effectiveness of Artificial Skin Substitute vs Allograft for Burn Patients. 6th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2001.

27. Shi JH, McCombs JS, **Hay JW**, Nichol MB, Chou CP, Hsiao C. Controlling for Biases from Measurement Errors in Health Outcomes Research Using Structural Equation Modeling. 6th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2001.

28. Sterling KL, **Hay JW**. Cost-Effectiveness of the Fibrates in the Reduction of Coronary Heart Disease Events. 7th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May, 2002.

29. Patel PA, **Hay JW**. The Cost-Effectiveness Analysis of Aspirin for Primary Prevention of Cardiovascular Disease. 7th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2002.

30. Etemad LR, **Hay JW**. Cost-Effectiveness Analysis of Pharmaceutical Care in a Medicare Drug Benefit Program. 7th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2002.

31. Patel BV, **Hay JW**. Colorectal Cancer Screening: A Cost-Effectiveness Model Comparing Virtual Colonoscopy and Conventional Colonoscopy. 7th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2002.

32. Park J, **Hay JW**. Cost-Effectiveness Analysis of Graftskin (Apligraf) and Becaplermin (Regranex) in Diabetic Neuropathic Foot Ulcers. 8th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2003.

33. Zammit DC, **Hay JW**. Meta-Analysis of the Effectiveness of Mammography Screening for Breast Cancer. 8th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2003.

34. Zammit DC, **Hay JW.** Economic Analysis Of The Use Of Angiotensin Converting Enzyme Inhibitors In Patients With Diabetes Mellitus. 8th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2003.

35. Yu YF, **Hay JW**, Yu AP. Cost-Effectiveness Analysis of Long-Term Hormone Replacement Therapy (Estrogen Plus Progestin) in Healthy Postmenopausal Women for Osteoporosis Prevention. 9th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2004.

36. Yu AP, **Hay JW**. Cost-Effectiveness Analysis of Dose-Dense Chemotherapy with Filgrastim as Postoperative Adjuvant Treatment of Breast Cancer. 9th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2004.

37. Setyawan J, **Hay JW**, Nichol MB. Cost-Effectiveness of Interventions to Improve Patient Medication Compliance in Major Depressive Disorder. 9th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2004.

38. Spalding JR, **Hay JW**. Cost-Effectiveness of Tumor Necrosis Factor Alpha (TNF-ALPHA) Inhibitors as First-Line Agents in Rheumatoid Arthritis. 9th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2004.

39. Barlev A, **Hay JW**. Cost-Utility of Cochlear Implants a Societal Perspective Analysis. 9th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2004.

40. Tonnu IQ, **Hay JW**. The Cost-Effectiveness Analysis Recombinant Human Erythropoietin Growth Factors vs. Transfusion in Chemotherapy Cancer Patients. 9thAnnual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2004.

41. Patel V, **Hay JW**. Cost-Effectiveness of Treatment Strategies for Rheumatoid Arthritis Patients with Inadequate Response to Methotrexate. 9th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2004.

42. Zhang L, **Hay JW**. Cost-Effectiveness Analysis of Rizatriptan and Sumatripan versus Cafegot in the Acute Treatment of Migraine. 9th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2004.

43. Narayan S, **Hay JW**. Cost-Effectiveness of Ratalin® versus Adderall® for First-Line Treatment of Attention Deficit/Hyperactivity Disorder (ADHD) in Children. 9th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2004.

44. Zammit DC, **Hay JW.** Preliminary Economic Analysis of The American Cancer Society Guidelines for Mammography Screening in Average-Risk Women under 70 Years of Age. 9th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2004.

45. Tencer T, **Hay JW**. The Cost-Effectiveness of Prostate-Specific Antigen Screening for Prostate Cancer Detection. 10th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Washington, May 2005.

46. Kawatkar AA, **Hay JW**. Cost-Effectiveness of Taxanes as Second Line Agents in Treatment of Metastatic Breast Cancer. 11th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, May 2006.

47. Vo P, **Hay JW**. Cost-Effectiveness Analysis for Treatments in Ankylosing Spondylitis. 11th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, May 2006.

48. Suh HS, **Hay JW**. Cost-Effectiveness Analysis of Immunization Strategies for the Control of Meningococcal Infectious disease. 12th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2007.

49. Gu NY, **Hay JW**, Gai YW. The Effect of Pharmacist Consultation on Patient Medication Adherence: An Instrumental Variable Approach. 12th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2007.

50. Yuan Y, Iloeje U, Parry D, **Hay JW**, Zammit D. Using Decision Simulation Model to Evaluate the Cost Effectiveness of Entecavir Compared to Adefovir Therapy in Lamivudine Refractory Chronic Hepatitis B (CHB) Patients: Analyses from a US Payer Perspective Abstract and poster presentation at the 12th ISPOR Annual International Meeting, Virginia, May 2007.

51. Zammit DC, **Hay JW**, Globe DR, Sugar CA, Gauderman WJ Adjusting for Trial Quality in a Meta-Analysis. Poster presentation at the 10th ISPOR Annual European Congress, Dublin Ireland, October 2007.

52. Zammit DC, **Hay JW**, Globe DR, Sugar CA, Gauderman WJ Framework For The Cost-Effectiveness Analysis Of Mammography Screening For Breast Cancer. Abstract and poster presentation at the 10th ISPOR Annual European Congress, Dublin Ireland, October 2007.

53. Ejzykowicz F, **Hay JW.** Cost-Effectiveness Analysis of Lapatinib Plus Capecitabine Vs Capecitabine Alone in the Second Line Treatment for Breast Cancer. Poster PCM 23, 13th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Toronto, Canada, 2008.

54. An JJ, **Hay JW**. Cost-Effectiveness of Erythropoiesis Stimulating Agent Therapy by Hemoglobin Targets in Chronic Kidney Disease. Poster PSY 15, 13th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Toronto, Canada, 2008.

55. Ganapathy V, **Hay JW**. Cost-Effectiveness of Once-Daily Stimulant, Non-Stimulant & Combined Stimulant/Behavioral Therapy Interventions in the Treatment of ADHD in Children. Poster PMH 28, 13th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Toronto, Canada, 2008.

56. Le QA and **Hay JW**. Cost-utility Analysis of Lapatinib (Tykerb®)in 2nd-Line Treatment of HER2-Positive Metastatic Breast Cancer. Poster PCN18, American Society of Clinical Oncology, San Diego, CA 2008.

57. Turpcu A and **Hay JW**. The Cost-Effectiveness of Ranibizumab (Lucentis®) in Treating Patients with Predominantly Classic, Minimally Classic, and Occult Neovascular Age-Related Macular Degeneration (AMD). Poster PSS 15, 13th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Toronto, Canada, 2008.

58. Lescrauwaet B, Nevens F, Zammit D, Yuan Y, **Hay JW**. Modeling Long-Term Mortality and Morbidity Impact with Entecavir Treatment in Chronic Hepatitis B Patients in Belgium. Podium presentation, ISPOR European Conference, Athens, Greece, November, 2008.

59. Zammit D, Yuan Y, Intorcia M, **Hay JW.** Using a Decision Simulation Model to Evaluate the Cost-Effectiveness of the Treatment of Nucleoside-Naïve HBe-Antigen Negative CHB Patients in Italy with Entecavir and Tenofovir Abstract and poster presentation at the 11th ISPOR Annual European Congress, Athens, Greece, November 2008.

60. **Hay JW**, Jhaveri M, Tangirala M, Kaliner M. Costs and Resource Utilization Comparisons of Second-Generation Antihistamines vs Montelukast in Treatment of Allergic Rhinitis: Retrospective Analysis of a Large National Insurance Claims Database. American Academy of Allergy, Asthma and Immunology Annual Meeting, March 2009, Washington, DC.

61. Le QA, **Hay JW**. Comparison Between Propensity-Score & Traditional Covariate Adjustment with Logistic Regression Models in Estimating Average Treatment Effects (ATES): Monte Carlo Simulation Results. Poster Session I [PMC10], ISPOR 14th Annual International Conference, May, 2009, Orlando, FL.

62. Mark TL, Joish VN, **Hay JW**, Sheehan D, Johnston S, Cao Z. Unintended Consequences Of Current Antidepressant Use In A Geriatric Population: The Burden Of Side-Effects On Adherence And Costs. ISPOR 14th Annual American Association of Psychiatry Conference, May, 2009, Orlando, FL.

63. Mark TL, Joish VN, **Hay JW**, Sheehan D, Choi JC, Johnston S, Cao Z. Unintended Consequences of Current Antidepressant Use In A Geriatric Population: Drug-Drug Interactions and Their Implications for Adherence. ISPOR 14th Annual American Association of Geriatric Psychiatry Conference, May, 2009, Orlando, FL. Am J Geriatr Psychiatry 2009;17(3), Supplement 1:A98.

64. Grant H. Skrepnek, Brian Seal, Muralikrishna Tangirala, **Joel W. Hay**. Adverse Dental Outcomes Associated With Intravenous Versus Oral Bisphosphonate Use In Patients With Osteoporosis. 7th International Symposium on Osteoporosis, April, 2009, Washington, DC.

65. Grant H. Skrepnek, Brian Seal, Muralikrishna Tangirala, **Joel W. Hay**. The Association Between Adverse Dental Outcomes And Intravenous Versus Oral Bisphosophonates Within Cancer Patients. European Calcified Tissue Society ECTS 2009, Vienna, Austria, 23-27 May 2009

66. **Hay JW**, Zhou ZY. "APCC Versus RFVIIA In Treatment Of Hemophilia Patients With Inhibitors: A Structured Review Of The Pharmacoeconomic Literature" abstract N° 846 - XXII Congress of the International Society on Thrombosis and Haemostasis, Boston, MA, July 11-16 2009.

67. **Hay JW**, Zhou ZY, Young G. "Economic Comparison Of APCC Vs RFVIIA For Mild-To-Moderate Bleeding Episodes In Hemophilia Patients With Inhibitors" abstract N° 836 - XXII Congress of the International Society on Thrombosis and Haemostasis, Boston, MA, July 11-16 2009.

68. Tangirala M, Jhaveri M, **Hay JW**. "Resource Use in Patients with Allergic Rhinitis (AR) Comorbidities: Oral Second Generation Antihistamines (SGAs) versus Montelukast (MTLK)" Annual Meeting of the American College of Allergy, Asthma & Immunology, Nov. 5-10 2009, Miami Beach, Florida.

69. Colayco D, **Hay JW**. Cost-Effectiveness Of Serotonin-Type 3 Receptor Antagonists For Chemotherapy-Induced Emesis In Non Small Cell Lung Cancer Patients Receiving Cisplatin-Based Chemotherapy. Poster PCN95. ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

70. Suh H, **Hay JW**. Dealing With Selection Bias In Nonlinear Settings: A Case Of Comparative Effectiveness Of Statin Plus Fibrate Combination Therapy Versus Statin Monotherapy In Type II Diabetes. Podium SB4. ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

71. Shin J, **Hay JW**. The Cost-Effectiveness Of Isotretinoin In Patients With Moderate-To-Severe Acne Vulgaris. Poster PSS6, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

72. Ganapathy V, **Hay JW**. Analysis Of Necrotizing Enterocolitis Costs Among Extremely Preterm Infants Fed Exclusively Human-Milk Based Diet Vs. Human-Milk Fortified With Bovine-Milk Based Supplements. Poster PIH18, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

73. Tran JN, **Hay JW**. Obesity And Health Care Costs And Utilization In The Veteran Affairs Population. Poster PSY34, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

74. Soo In Bang, **JW Hay**. Cost-Effectiveness Analysis Of Dutasteride, Tamsulosin And Combination Therapy In The Treatment Of Benign Prostatic Hyperplasia. Poster PUK 11, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

75. Chu K, **Hay JW**. Economic Analysis Of Endovascular Stenting For Peripheral Arterial Disease In Long Lesions Of The Superficial Femoral Artery. Poster PCV 83, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

76. Ding Y, **Hay JW**. Cost-effectiveness analysis of multimodal screening for ovarian cancer. Poster PCN 73, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

77. Schwartz E, **Hay JW**. Cost-Effectiveness Analysis in treating Overactive Bladder with Urge Incontinence in Women: A comparison between Oxybutynin and Tolterodine with exploratory analysis of Fesoterodine. Poster PUK 16, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

78. Rashid N, **Hay JW**. Cost Effectiveness Analysis of Managing Chronic Gout with Febuoxstat (Uloric) versus Allopurinol (Zyloprim). Poster PMS 20, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

79. Suh JK, **Hay JW**. Evaluation Of Cost-Effectiveness Of Chronic Hepatitis B Treatments: Entecavir And Telbivudine. Poster PGI 22, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

80. Poon JL, **Hay JW**. Cost Effectiveness Analysis of Breast Cancer Risk Reduction Therapy: Comparing Tamoxifen and Raloxifene. Poster PCN 71, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

81. Wiegand PW, **Hay JW**. Cost-Effectiveness of Statin Therapy for the Primary Prevention of Cardiovascular Events Predicted by the Reynolds Risk Score in Healthy Men and Women Aged 40 to 80 Years of Age. Poster PCV 74, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

82. Chang J, **Hay JW**. Cost Effectiveness Analysis of Anti-Epidermal Growth Factor Receptor (Anti-EGFR) Agents for Treatment Refractory Metastatic Colorectal Cancer (mCRC). Poster PCN 84, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

83. **Hay JW**, Katon WJ, Ell K, Lee P-J, Guterman JJ. Cost Effectiveness Analysis of Collaborative Care Management of Major Depression among Low-Income, Predominantly Hispanics with Diabetes. Poster presentation at the ICMPE 10'th Workshop on Costs and Assessment in Psychiatry "Mental Health Policy and Economics " March, 2011, Venice, Italy.

84. Unützer J, Dwight-Johnson, M, Apesoa-Varano C, **Hay JW**, Hinton L: Older men's preferences for depression care: Preliminary comparison of conjoint survey and qualitative interviews. American Association of Geriatric Psychiatry, March 18-21, 2011, San Antonio TX.

85. Yeung K**, Hay JW.** Cost-Utility Analysis Of Romiplostim Versus Splenectomy In The Treatment Of Chronic Refractory Immune Thrombocytopenic Purpura. Poster presentation at the Academy of Managed Care Pharmacy 23'rd Annual Meeting, March 29, 2011 Minneapolis, MN.

86. Ejzykowicz F, **Hay JW**, Sarocco P, Karafilidis J, Walsh J. Hospitalizations, medical management and switch therapy patterns in the COPD Medicare population. Poster PRS 36, ISPOR 16th Annual International Conference, May, 2011, Baltimore, MD.

87. Ding Y, **Hay JW**, Zangwill KM, Allred N, Yeh SH. Cost-benefit analysis of postpartum vaccination of birth mothers with influenza vaccine. Poster PIN 19, ISPOR 16th Annual International Conference, May, 2011, Baltimore, MD.

88. Zhou Z-Y, **Hay JW**. A systematic review and meta-analysis comparing the efficacy of bypassing agents in hemophilia patients with inhibitors. XXIII Congress of the International Society on Thrombosis and Hemostasis, July, 2011, Kyoto, Japan.

89. Ejzykowicz F, Rajagopalan K, Karafilidis J, **Hay JW**. Health Care Costs in a Medicare Population of COPD Patients Treated with Beta-Agonists. Presented at the American Society of Health System Pharmacists Midyear Meeting, December, 2011, New Orleans, LA.

90. Niu, X, **Hay JW**. Cost-Effectiveness Analysis of Nilotinib Versus Dasatinib In Patients With Imatinib-Resistant or Imatinib-Intolerant Chronic Myeloid Leukemia (CML). Poster PCN13, ISPOR 17th Annual International Conference, June, 2012, Washington, DC.

91. Villacorta, R, **Hay JW,** Messali A. Cost Effectiveness of Treatment With Etanercept or Ustekinumab For Moderate To Severe Psoriasis. Poster PSY27, ISPOR 17th Annual International Conference, June, 2012, Washington, DC.

92. Messali A, **Hay JW,** Villacorta, R. Cost-Effectiveness of Temozolomide in the Adjuvant Treatment of Newly Diagnosed Glioblastoma In the United States. Poster PCN78, ISPOR 17th Annual International Conference, June, 2012, Washington, DC.

93. Chagule, S, **Hay JW**. Cost Effectiveness of Cetuximab Plus Best Supportive Care (BSC) Versus BSC Alone In Last Line For Kras Wild Type Metastatic Colorectal Cancer Patient Population. Poster PCN64, ISPOR 17th Annual International Conference, June, 2012, Washington, DC.

94. Jiang, Y, **Hay JW**. Cost-Effectiveness of Denosumab v Alendronate for Prevention of Osteoporotic Fractures in the U.S. Poster PMS27, ISPOR 17th Annual International Conference, June, 2012, Washington, DC.

95. Blaylock, B, **Hay JW**, Zarchy T. Cost-Effectiveness of Diagnostic Sigmoidoscopy Before Colonoscopy in 40-49 Year Old Symptomatic Patients. Poster PMD29, ISPOR 17th Annual International Conference, June 2012, Washington, DC.

96. Chaugule, S, **Hay JW**. Bypass Therapy Assay Testing as a Strategy to Reduce Treatment Costs for Hemophilia Patients With Inhibitors. Poster PMD18, ISPOR 17th Annual International Conference, June, 2012, Washington, DC.

97. Matsuda, T, **Hay JW**. Cost-Effectiveness of Bariatric Surgery: Laparoscopic Gastric Bypass and Banding. Poster PSU24, ISPOR 17th Annual International Conference, June 2012, Washington, DC.

98. Ganapathy, V, **Hay JW,** Smoot, KJ, Lawler, E, Weber, HC, Grotzinger, KM. Resource Utilization in Thrombocytopenia of Chronic Liver Diseases in the Veterans Affairs Population. Poster PGI14, ISPOR 17th Annual International Conference, June 2012, Washington, DC.

99. Ding, Y, **Hay JW**, Zangwill, K, Yeh, S. Cost-Benefit Analysis of Hospital Based Postpartum Vaccination With Combined Tetanus Toxoid, Reduced Diphtheria Toxoid, and Acellular Pertussis Vaccine (Tdap). Poster PMD18, ISPOR 17th Annual International Conference, June 2012, Washington, DC.

100. Chaugule S, **Hay JW**, Young G. Bypass Therapy Assay Testing As a Strategy to Reduce Treatment Costs For Hemophilia Patients With Inhibitors. World Federation of Hemophilia, 2012 World Congress, June 2012, Paris, France.

101. Ding, Y, **Hay JW**, Zangwill, K, Yeh, S. Cost-Benefit Analysis of Hospital Based Postpartum Vaccination With Combined Tetanus Toxoid, Reduced Diphtheria Toxoid, and Acellular Pertussis Vaccine (TDAP). Western Pharmacoeconomics Conference, June 2012, Austin, TX.

102. Messali A, **Hay JW,** Villacorta, R. Probabilistic Sensitivity Analysis of the Cost-Effectiveness of Temozolomide in the Adjuvant Treatment of Newly Diagnosed Glioblastoma. Western Pharmacoeconomics Conference, June 2012, Austin, TX.

103. **Hay JW**. Cost Effectiveness Analysis With and Without Stochastic Uncertainty," American Society for Health Economics 4'th Biennial Conference, June 2012, Minneapolis, MN

104. Ejzykowicz F, Rajagopalan K, Bollu V, Karafilidis J, **Hay JW**. Effect of Long Acting Beta Agonist Therapy on Risk of Hospitalization in New Start COPD Patients. Abstract 265134. American Public Health Association 140'th Annual Meeting and Expo, October 29, 2012, San Francisco, CA.

105. Ni W, **Hay JW**, Zangwill K. Potential U.S. Medical Cost Savings Associated With Routine Hospital-Based Use Of A Rapid Diagnostic Tool For Bloodstream Infection. ISPOR 18th Annual International Conference, May 2013, New Orleans, LA.

106. Schwartz E, **Hay JW**. Modeling Diabetes Costs: a comparison of econometric methods using simulated error distributions. ISPOR 18th Annual International Conference, May 2013, New Orleans, LA.

107. Gu NY, Gai Y, Wu J, Raisch DW, **Hay JW**. Predicting healthcare costs in asthma using the EQ-5D health-related quality-of-life (HRQoL) index score with and without adjusting non-random positive spending using a US national representative population. 2nd International Allergen Symposium on Asthma & Economics, July, 2013, Sydney, Australia.

108. **Hay JW**, Strylewicz G, Rothfeld A, Chesler R, Doctor J. Provider Preferences for Interventions for Reducing Inappropriate Antibiotic Prescribing. Accepted Podium Presentation, Health Care Applications: Sawtooth Software Conference, October, 2013, Dana Point, CA.

109. Gu NY, Gai Y, Wu J, Raisch DW, **Hay JW**. Predicting Health Care Costs In Asthma Using The EQ-5D Index Score. ISPOR 16th Annual European Congress, 2-6 November 2013, Dublin, Ireland.

110. **Hay JW**, Oladapo AO, Epstein JD, Novack AR. Estimating the Potential Cost of Bypassing Agent Prophylaxis Relative to the Cost Of rFVIIa On-Demand Using Actual rFVIIa Doses From the UK NHD Registry. 7th Annual Congress of the European Association for Haemophilia and Allied Disorders, February 2014, Brussels, Belgium.

111. Linder JA, Meeker D, Friedberg MW, Persell SD, Fox CR, Goldstein NJ, Alan Rothfeld, **Hay JW**, Doctor JN. Improving Antibiotic Prescribing for Acute Respiratory Infections using Behavioral Economic Principles: A Cluster Randomized Trial. Society for General Internal Medicine 37'th Annual Meeting, April 2014, San Diego, CA.

112. Grosse SD, Chaugule S, **Hay JW**. Preference-based Measures of Health-related Quality of Life for Adults with Severe Hemophilia: Implications for the Cost-effectiveness of Prophylaxis. World Federation of Hemophilia 2014 World Congress, May, 2014, Melbourne, Australia.

113. Chaugule S, Young G, **Hay JW**. Understanding how patients, physicians and the general population value different types of hemophilia therapies and their willingness-to-pay for such therapies: a discrete choice experiment from the US perspective. World Federation of Hemophilia 2014 World Congress, May 2014, Melbourne, Australia.

114. **Hay JW,** Oladapo AO, Epstein JD, Novack AR. Understanding how patients, physicians and the general population value different types of hemophilia therapies and their willingness-to-pay for such therapies: a discrete choice experiment from the US perspective. World Federation of Hemophilia 2014 World Congress, May 2014, Melbourne, Australia.

115. **Hay JW,** Oladapo AO, Epstein JD, Novack AR, Neufeld EJ. Estimating the potential cost of bypassing agent prophylaxis relative to the cost of rFVIIa on-demand using actual rFVIIa doses from multiple US registries. World Federation of Hemophilia 2014 World Congress, May 2014, Melbourne, Australia.

116. McGinnis JJ, **Hay JW**. Cost-Effectiveness of Hepatitis C Treatments in Treatment Naïve Genotype 1 Patients. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

117. Patel N, **Hay JW**. Management of Spinal Cord Injury-Associated Neuropathic Pain With Pregabalin is Cost-Effective Over Gabapentin. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

118. Gong C, **Hay JW**. Cost-Effectiveness Analysis of Abiraterone And Sipuleucel-T In Metastatic Castration-Resistant Prostate Cancer. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

119. Chaugule S, **Hay JW**. Understanding What Patients Value and Their Willingness-To-Pay (WTP) For Hemophilia Therapies: A Discrete Choice Experiment. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

120. Ding Yao, **Hay JW**. Economic Burden Associated With Patients Diagnosed With Peyronie's Disease in the United States. Poster Tuesday morning, PIH21. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

121. Ding Yuchen, **Hay JW**. Cost-Effectiveness Comparison of Denosumab and Zoledronic Acid in the Treatment of Postmenopausal Osteoporosis. Poster Monday morning, PMS36. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

122. Drabo E, **Hay JW**, Vardavas R, Wagner ZR, Sood N. A Cost-Effectiveness Analysis of Pre-Exposure Prophylaxis (Prep) for the Prevention of HIV in the Los Angeles MSM Population. Poster, Wednesday morning, PIN43. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

123. Chen C, **Hay JW**. Cost-Effectiveness Analysis of Alternative Screening and Treatment Strategies for Familial Hypercholesterolemia in the United States. Poster Monday afternoon, PCV70. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

124. Chu LH, **Hay JW**, Cohen DJ. A Hybrid Comparison of Cost-Effectiveness of Transcatheter Aortic Valve Replacement Between Randomized Clinical Trials and Real World Practice in Treating Patients With Severe Aortic Stenosis, Poster Monday morning, PCV69. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

125. Jiao X, **Hay JW**. Cost-Effectiveness of Breast MRI and Mammography for Screening High Risk Populations. Poster Tuesday morning, PHS55. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

126. Lin CW, **Hay JW**. Cost Utility Analysis of Aflibercept, Ranibizumab, and Bevacizumab for the Treatment of Neovascular Agerelated Macular Degeneration. Poster Wednesday morning, PSS23. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

127. Massachi S, **Hay JW**. Cost-Effectiveness of Various Clostridium Difficile Infection (CDI) Treatments in Patients With Recurrent Infections. Poster Wednesday morning, PIN50. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

128. Mehta D, **Hay JW**. Cost-Effectiveness of Adding Bevacizumab to First Line Therapy for Patients With Advanced Ovarian Cancer. ISPOR 19th Annual International Conf., May 2014, Montreal, Quebec, Canada.

129. Ni W, **Hay JW**, Zangwill K. Economics Analysis of Diagnostic Methods for Clostridium Difficile Infection. Poster, Wednesday morning, PIN58. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

130. Ning N, **Hay JW**. The Cost-Effectiveness Of Liraglutide Vs Exenatide For The Treatment Of Type 2 Diabetes In The United States. Poster, Wednesday morning, PDB78. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

131. Thompson CA, **Hay JW**. Evaluating the Impact of Cannabis Use on Metabolic Syndrome Using Data From the Continuous National Health and Nutrition Examination Survey, Poster Tuesday afternoon, PMH13. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

132. Zhang X, **Hay JW**. Cost-Effectiveness of Fingolimod, Teriflunomide, Dimethyl Fumarate and Intramuscular Interferon Beta-1a In Relapsing-Remitting Multiple Sclerosis. Poster, Monday Morning, PND20 . ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

133. Jiao X, **Hay JW**. Cost-Effectiveness of Breast MRI and Mammography for Screening High Risk Populations. American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

134. Ding Yuchen, **Hay JW**. Cost-effectiveness Comparison between Generic zoledronic acid and denosumab (Prolia®) in the treatment of Postmenopausal Osteoporosis. American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

135. **Hay JW**. Behavioral Economics Interventions to Reduce Antibiotic Overprescribing. Organized Session, American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

136. **Hay JW**, Strylewicz G, Rothfeld A, Doctor J. Provider Preferences for Interventions for Reducing Inappropriate Antibiotic Prescribing. American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

137. Doctor J, Meeker D, **Hay JW**. Nudging guideline uptake: A randomized trial of physician public commitments. American Soc. for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

138. Meeker D, Doctor J, **Hay JW**. A Behavioral Economics Multi-site Randomized Trial to Reduce Provider Antibiotic Overprescribing. American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

139. Gong C, **Hay JW**. Cost-Effectiveness Analysis of Abiraterone and Sipuleucel-T in Metastatic Castration-Resistant Prostate Cancer. American Society for Health Economics 5'th Biennial Conference, June, 2014, Los Angeles, CA.

140. Thompson C, **Hay JW**. Evaluating the Impact of Marijuana Use on Metabolic Syndrome Using Data from the Continuous National Health and Nutrition Examination Survey. American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

141. Patel N, **Hay JW**. Pregabalin (Lyrica®) is cost-effective over Gabapentin (Neurontin®) as a First-Line Treatment for Neuropathic Pain (NeP) Management after Spinal Cord Injury (SCI). American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

142. Zhang X, **Hay JW**, Nu X. Cost-Effectiveness of Fingolimod, Teriflunomide, Dimethyl Fumarate and Intramuscular Interferon Beta-1a in Relapsing-Remitting Multiple Sclerosis. American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

143. Chen CX, **Hay JW**. The Cost-Effectiveness of Screening and Management Strategies for Familial Hypercholesterolemia in the United States: A Markov Model Analysis. American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

144. Mehta D, **Hay JW**. Cost-Effectiveness of Adding Bevacizumab to First Line Therapy for Patients with Advanced Ovarian Cancer. American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

145. Drabo E, **Hay JW**, Sood N, Wagner Z. A Cost-Effectiveness Analysis of Pre-Exposure Prophylaxis (PREP) for the Prevention of HIV in the Los Angeles County MSM Population. American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

146. Ding Yao, **Hay JW**. Impact Of Maternal Education On Child Immunization Propensity In China. ISPOR Asia Conference, September 2014, Beijing, China.

147. Cheetham C, Yong Y, Niu F, Kalsekar A, Hechter R, Chiang K, **Hay JW**, Nyberg L. Characterization of Hepatitis C Patients who fail to Achieve Sustained Virologic Response with Triple Therapy (Peg-Interferon alfa and Ribavirin with Boceprevir or Telaprevir). The Liver Meeting, November 2014, Boston, MA.

148. Chaugule S, **Hay JW**. Impact of differential framing of opt-out alternatives: Comparison of utility maximization vs. regret minimization models in a hemophilia therapy preferences study. Inaugural meeting of the International Academy of Health Preference Research, November 2014, Amsterdam, Netherlands, EU.

149. Thompson C, **Hay JW**. Role Of Behavioral Confounding in the Association Between Marijuana Use And BMI in US Adults. Poster PSY12 Wednesday, May 20, 2015. ISPOR 20th Annual International Meeting, May 16-20, 2015; Philadelphia, PA.

150. Drabo E, **Hay JW**. Rolling Out Oral Pre-Exposure Prophylaxis (Prep) is a Cost-Effective HIV Prevention Strategy Among Los Angeles County (LAC) Men Who Have Sex With Men (MSM). Poster PIN54 Tuesday, May 19, 2015. ISPOR 20th Annual International Meeting, May 16-20, 2015; Philadelphia, PA.

151. McGinnis JJ, **Hay JW**. The Cost Effectiveness of a Novel High Priced Combination Therapy For Hepatitis C in Treatment Naïve Genotype 1 Infected Patients. Poster PIN65 Tuesday, May 19, 2015. ISPOR 20th Annual International Meeting, May 16-20, 2015; Philadelphia, PA.

152. Han X, **Hay JW**. Cost-Effectiveness Analysis of Certolizumab, Etanercept, Golimumab and Tofacitinib for the Treatment of Moderately to Severely Active Rheumatoid Arthritis. Poster PMS52 Tuesday, May 19, 2015. ISPOR 20th Annual International Meeting, May 16-20, 2015; Philadelphia, PA.

153. Chaugule S, **Hay JW**. Does Differential Framing of Opt-Out Alternatives in Discrete Choice Experiments (DCES) Matter? Comparison of Random Utility Maximization (RUM) and Random Regret Minimization (RRM) Models. Poster PRM85 Monday, May 18, 2015. ISPOR 20th Annual International Meeting, May 16-20, 2015; Philadelphia, PA.

154. Chaugule S, **Hay JW**. Exploring Heterogeneity in Attribute Processing Strategies: Use of Hybrid Random Utility Maximization-Random Regret Minimization (RUM-RRM) Models in a Discrete Choice Experiment (DCE). Poster PRM140 Monday, May 18, 2015. ISPOR 20th Annual International Meeting, May 16-20, 2015; Philadelphia, PA.

155. Mehta DA, Hay JW. Systematic Literature Review of Economics Analyses Comparing aPCC and rFVIIa Across On-Demand, Prophylaxis and Surgery. Poster International Society of Thrombosis and Hemostasis 2015 Congress, June 23, 2015; Toronto, Canada.

156. Cheetham C, Yong Y, Niu F, Kalsekar A, Hechter R, Chiang K, **Hay JW**, Nyberg L. Characterization of Hepatitis C Patients who fail to Achieve Sustained Virologic Response with Triple Therapy (Peg-Interferon Alfa and Ribavirin with Boceprevir or Telaprevir). XXIII Congresso Brasileiro de Hepatologia, September 2015; Sao Paulo, Brazil.

157. Chaugule S, **Hay JW**. Advances in Willingness-to-Pay Estimation Methods for More Informed Decision Making. 2nd Meeting of the International Academy of Health Preference Research, October 2015, Brisbane, Australia.

158. Xu Y, Barzi A, **Hay JW**. Comparative Effectiveness of Panitumumab (P) and Cetuximab (C) in Metastatic Colorectal Cancer (mCRC) with Wild-Type KRAS (WTKRAS). American Society of Clinical Oncology 2016 Gastrointestinal Cancers Symposium, (January 21-23, 2016) San Francisco, CA.

159. Cheng W, Sadeghi S, Lenz H-J, **Hay JW**, Barzi A. Comparative-Effectiveness of FOLFIRINOX (FOL) versus Gemcitabine and nab-Paclitaxel (GNP) for the First-Line Treatment of Metastatic Pancreatic Cancer. American Society of Clinical Oncology 2016 Gastrointestinal Cancers Symposium, (January 21-23, 2016) San Francisco, CA.

160. Thompson C, **Hay JW**, Doctor J. “Does marijuana use lead to weight loss? Exploring the role of effect moderation in the association between marijuana use and BMI and waist circumference in US adults.” Scientific Poster Session, Marijuana and Cannabinoids: A Neuroscience Research Summit sponsored by the National Institutes of Health (March 22-23) Bethesda, MD.

161. Gong C, **Hay JW**, Meeker D, Doctor J. “Use of behavioral economics and social psychology to improve treatment of acute respiratory infections (BEARI): A Discrete Choice Experiment.” Scientific Podium Presentation, 2016 AMCP Managed Care & Specialty Pharmacy Annual Meeting; April 21-22, San Francisco, CA.

162. Henkhaus L, **Hay JW**. Cost Effectiveness of Empagliflozin/Linagliptin as 2nd-Line Therapy for Adults with Type 2 Diabetes. Poster PDB35. ISPOR 21th Annual International Meeting, May 21-25, Washington, DC.

163. Priyadarshini M, **Hay JW**. Cost-Effectiveness Analysis of Lurasidone and Olanzapine in the Treatment of Schizophrenia. Poster PMH40. ISPOR 21th Annual International Meeting, May 21-25, Washington, DC.

164. Bhagvandas N, **Hay JW**. Cost Effectiveness of Lurasidone, Quetiapine, and Olanzapine Monotherapy in the Treatment of Bipolar I Disorder Depression. Poster PMH39. ISPOR 21th Annual International Meeting, May 21-25, Washington, DC.

165. Nguyen A, **Hay JW**. Cost-Effectiveness of Trastuzumab in Adult Metastatic Gastric Cancer Patients with an Overexpression of HER2. Poster PCN109. ISPOR 21th Annual International Meeting, May 21-25, Washington, DC.

166. Lu T, **Hay JW**. Cost Effectiveness of Pembrolizumab and Ipilimumab in Advanced Melanoma. Poster PCN86. ISPOR 21th Annual International Meeting, May 21-25, Washington, DC.

167. Cheng W-H, **Hay JW**. Cost-Effectiveness Analysis Comparing Folfirinox and Nab-Paclitaxel (Abaraxane) Plus Gemcitabine for First-Line Treatment of Patients With Metastatic Pancreatic Cancer from the US Societal Perspective. Poster PCN108. ISPOR 21th Annual International Meeting, May 21-25, Washington, DC.

168. Xu Y, **Hay JW**. Comparative Effectiveness of Panitumumab Versus Cetuximab in Patients With Chemo-Refractory Wild-Type Kras Metastatic Colorectal Cancer. Poster PCN108. ISPOR 21th Annual International Meeting, May 21-25, Washington, DC.

**OP-EDS & MEDIA POSTS, LETTERS, ETC.:**

**Hay, JW**. "Vouchers Take the Catastrophe out of Catastrophic Care," Editorial Page, Camden Courier, May 1, 1987.

**Hay, JW**. "Time to Try to Bridge Gaps in Health Care for the Elderly," Editorial Page, Hartford Courant, May 13, 1987.

Bernstam, M., **Hay, JW**. and Swan, P. "Minimum Wage: Bulwark of the Privileged," Editorial Page, Wall Street Journal, June 15, 1987.

**Hay, JW**. and Bernstam, M. "Raising Minimum Wage Hurts Teens, Minorities," Point of View, San Francisco Chronicle, August 17, 1987.

Bernstam, M. and **Hay, JW**. "At the Minimum, Wage Law Will Reduce Jobs for Youth," Editorial Page, Orange County Register, December 23, 1987.

Bernstam, M. and **Hay, JW**. "California Panel Opens a Pandora's Box on Minimum Wage," Editorial Page, San Diego Union, February 14, 1988.

**Hay, JW**. "Trojan Horse: Dukakis' Health Plan is a Disaster," Editorial Page, San Jose Mercury News, August 11, 1988.

**Hay, JW**. "The 'Dream' That Will Break Massachusetts: Dukakis' Health-Care Plan No Way to Help the Poor," Editorial Page, Los Angeles Herald Examiner, August 28, 1988.

**Hay, JW**. and Ricardo-Campbell, R. "A Health Plan to Make Business Sick," Editorial Page, Hartford Courant, October 30, 1988.

**Hay, JW**. "Let's Not Exaggerate the Costs of AIDS," Editorial Page, Newsday, February 9, 1989.

**Hay, JW**. "AIDS Won't Break the Health-Care System," Editorial Page, Omaha World-Herald, February 12, 1989.

**Hay, JW**. "AIDS Isn't Bankrupting our Health-care System," Editorial Page, Sacramento Bee, February 13, 1989.

**Hay, JW**. "AIDS Costs Will Not Sink Health Budget," Editorial Page, San Jose Mercury News, March 8, 1989.

**Hay, JW**. "The Battle Against AIDS: Some of the Earlier Assumptions are Overdue for Reexamination," Editorial Page, San Diego Union, April 9, 1989.

**Hay, JW**. "The Good News About AIDS," Viewpoints, New York Newsday, May 18, 1989.

**Hay, JW**. "AIDS Infection Data Difficult to Refute," Letters to the Editor, Wall Street Journal, June 28, 1989.

**Hay, JW**. "Is Too Much Being Spent on AIDS?" Editorial Page, Wall Street Journal, October 3, 1989.

**Hay, JW**. "AIDS Epidemic: Falling Short of Projections?" Editorial, Texas Tribune, Austin, TX, November 9, 1989.

**Hay, JW**. "Crossings Dangerous," Letters to the Editor, Peninsula TimesTribune, December 3, 1989.

**Hay, JW**. "American Medicine: Should We Save Lives or Dollars?" *The Commonwealth*, The Weekly Newsletter of the Commonwealth Club of California, April 2, 1990; pp. 186-189.

**Hay, JW**. "Healthcare Policy Directions," The Executive Speaker, Vol. 11, No. 8 (August, 1990); pg. 2.

**Hay, JW**. "Is Hong Kong Ready for Free Market Health Care?" HKCER Letters, Hong Kong Center for Economic Research, (November, 1990), pp. 1-4.

**Hay, JW**. "Cocaine Abuse is Not a Victimless Crime," Editorial, The Los Angeles Daily Journal, Los Angeles, CA, and The San Francisco Daily Journal, San Francisco, CA, January 8, 1991.

**Hay, JW**. "Commentary: Cost-Effectiveness of Strategies for Detecting Diabetic Retinopathy," *Diabetes Spectrum,* Vol 5(2), March/April, 1992, pp. 109-110.

**Hay, JW**. "World Bank's Loan Won't Cure Hungary," The Wall Street Journal, Europe, July 15, 1992.

**Hay, JW**. "Amid Lofty Goals Lie Plethora Of Health-Care Myths," Los Angeles Daily News, September 26, 1993.

**Hay, JW**. "Bitter pill: One reason prescription drugs cost more in California," Opinion, San Jose Mercury News, February 6, 2002.

**Hay, JW**. "Allergy Drug-Cost Fight Carries Potential Risks," Letter to the Editor, Wall Street Journal, May 23, 2003.

**Hay, JW**. "Buying in Canada Won't Cut Drug Costs," Editorial, Los Angeles Times, August 31, 2004.

**Hay, JW**. "Against Marijuana Legalization" Editorial, New York Times Freakonomics Blog, May 22, 2009; http://freakonomics.blogs.nytimes.com/2009/05/22/pot-quorum/.

**Hay, JW**. "Against Proposition 19 Marijuana Legalization" Debatethisonline.com, October 25, 2010; http://www.debatethisonline.com/debate/marijuana_legalization_in_california_proposition_19_part_two.

**Hay, JW.** "A simple way to rein in health costs," Editorial, Orange County Register, December 10, 2012. http://www.ocregister.com/opinion/health-380238-care-tax.html.

**Hay, JW.** "Why health system is so broken," Editorial, Orange County Register, December 15, 2012. http://www.ocregister.com/opinion/health-380788-medicare-care.html.

**Hay, JW.** "The Medicare Fiscal Cliff," Editorial, Orange County Register, December 28, 2012. http://www.ocregister.com/opinion/health-380788-medicare-care.html.

**Hay, JW.** "Obamacare a deficit fighter?," Editorial, Orange County Register, January 16, 2013. http://www.ocregister.com/opinion/health-383520-billion-obamacare.html.

**Hay, JW.** "If you've got Obamacare, higher pay doesn't pay," Editorial, Orange County Register, February 11, 2013. http://www.ocregister.com/opinion/tax-495245-income-obamacare.html.

**Hay, JW.** "Drug company invests more in senators than new drugs," Editorial, Orange County Register, March 4, 2013.
http://www.ocregister.com/opinion/amgen-497914-political-drug.html.

**Hay, JW.** "Big Pharma facing price controls," Editorial, Orange County Register, March 20, 2013. http://www.ocregister.com/opinion/drug-500414-big-pharma.html.

**Hay, JW.** "We can't afford the Affordable Care Act," Editorial, Orange County Register, April 1, 2013. http://www.ocregister.com/opinion/health-501944-obamacare-care.html.

**Hay, JW.** "Singapore's Affordable Health Model," Editorial, Orange County Register, April 7, 2013. http://www.ocregister.com/opinion/health-503115-care-singapore.html.

**Hay, JW.** "Pipe Dreams and Quack Pot Medicine," Editorial, Orange County Register, May 14, 2013. http://www.ocregister.com/articles/marijuana-508205-drug-medical.html.

**Hay, JW.** "Medicaid: A costly, ineffective intervention," Editorial, Orange County Register, May 21, 2013. http://www.ocregister.com/articles/health-509333-care-medicaid.html

**Hay, JW.** "Obamacare: A 'scandal' that keeps on giving," Editorial, Orange County Register, June 10, 2013. http://www.ocregister.com/articles/health-511818-obamacare-insurance.html

**Hay, JW.** "Beaming Up Profits: Priciest treatments not always best," Editorial, Orange County Register, July 3, 2013. http://www.ocregister.com/articles/proton-515317-beam-treatment.html

**Hay, JW.** "Making headway against HIV/AIDS," Editorial, Orange County Register, July 8, 2013. http://www.ocregister.com/articles/hiv-515516-aids-drug.html

**Hay, JW.** "Obamacare poor fit for long-term care," Editorial, Orange County Register, July 30, 2013. http://www.ocregister.com/articles/term-518990-care-long.html

**Hay, JW.** "Thank You for Smoking," Editorial, Orange County Register, August 23, 2013. http://www.ocregister.com/articles/health-522519-hie-plan.html

**Hay, JW.** "Anatomy of health care billing," Editorial, Orange County Register, September 10, 2013. http://www.ocregister.com/articles/health-525003-medicare-mcallen.html

**Hay, JW.** "Unaffordable Care Acts Unpopularity Grows," Editorial, Orange County Register, October 1, 2013. http://www.ocregister.com/articles/health-528698-obamacare-care.html

**Hay, JW.** "Pharmacist Status Boosts Health Care," Editorial, Orange County Register, October 23, 2013. http://www.ocregister.com/articles/health-532413-care-pharmacists.html

**Hay, JW.** "Keep your Health Plan? Have They Got a Plan for You!" Editorial, Orange County Register, November 18, 2013. http://www.ocregister.com/articles/health-537272-coverage-obamacare.html

**Hay, JW. and Huesch, M.** "Health Prices: The Truth is Out There" Editorial, Orange County Register, November 25, 2013. http://www.ocregister.com/articles/health-538408-care-prices.html

**Hay, JW.** "The Doctor Won't See You Now," Editorial, Orange County Register, December 16, 2013. http://www.ocregister.com/articles/health-593400-plan-california.html

**Hay, JW.** "Obamacare Flight 001," Editorial, Orange County Register, January 9, 2014. http://www.ocregister.com/articles/hay-596654-introduction-joel.html

**Hay, JW.** "Making silk purses from sows' ears: Using regulatory loopholes to gouge patients," Editorial, Orange County Register, February 3, 2014. http://www.ocregister.com/articles/acthar-599759-drug-questcor.html

**Hay, JW.** "What's Wrong with American Hospitals," Editorial, Orange County Register, February 8, 2014. http://www.ocregister.com/articles/hospital-600886-care-year.html

**Hay, JW.** "Obamacare's Broken Promises," Editorial, Orange County Register, March 25, 2014. http://www.ocregister.com/articles/health-606912-obamacare-care.html

**Hay, JW.** "Health Care at the End of Life," Editorial, Los Angeles Register, April 18, 2014. http://www.losangelesregister.com/common/printer/view.php?db=laregister&id=597957

**Hay, JW and McGinnis, J.** "A Medical Breakthrough Actually Worth Paying For," Editorial, Orange County Register and Los Angeles Register, May 29, 2014. http://www.ocregister.com/articles/new-616291-drugs-hcv.html

**Hay, JW.** "Another serious blow for Obamacare," Editorial, Orange County Register July 31, 2014 and Los Angeles Register, August 1, 2014. http://www.ocregister.com/articles/health-630224-insurance-state.html

**Hay, JW.** "Catalina Island's Drastic Job- and Business-Killing Drought Response," Letter to the Editor, Los Angeles Times, May 12, 2015. http://www.latimes.com/opinion/readersreact/la-le-0512-tuesday-mormon-temple-lawn-20150512-story.html

**Hay, JW** and Huesch M. "Death spirals loom for health insurers," Orange County Register March 5, 2016. http://www.ocregister.com/common/printer/view.php?db=ocregister&id=706859

**SCIENTIFIC JOURNAL EDITOR and/or EDITORIAL BOARDS**

| | |
|---|---|
| Annals of Pharmacotherapy | 1992-1997 |
| Pharmaceutical Research | 1992-1997 |
| PharmacoEconomics | 1992-1999 |
| JAMA HIV/AIDS Web Site Editorial Review Panel | 1995-2001 |
| Journal of Cardiovascular Pharmacology and Therapeutics | 1995-2015 |
| Value in Health Founding Editor-in-Chief | 1998-2002 |
| Journal of Managed Care Pharmacy | 2004-2008 |
| CORE Evidence | 2005-present |
| CORE Evidence, Guest Editor | 2015 |
| The Open Health Services & Policy Journal | 2007-present |
| Expert Review of Clinical Pharmacology | 2007-present |
| International Journal of the Economics of Business<br>Guest Editor, *Special Issue: Commemorating*<br>*William S. Comanor and 50 Years of Pharmaceutical Economics* | 2014-2015 |

**JOURNAL REFEREE:**

Advances in Therapy, AIDS, American Journal of Cardiology, American Economic Review, American Heart Journal, American Journal of Health Economics, American Journal of Managed Care, American Journal of Managed Care and Specialty Pharmacy, American Journal of Public Health, Annals of Pharmacotherapy, Annals of the Rheumatic Diseases, Applied Health Economics and Health Policy, Archives of Pediatrics and Adolescent Medicine, BMC Medicine, BioDrugs, Canadian Journal of Diabetes, Cardiovascular Drugs and Therapy, Chest, Clinical Drug Investigation, Clinical Pharmacokinetics, Clinical Therapeutics, ClinicoEconomics and Outcomes Research, CNS Drugs, Consultant, Critical Care, Current Medical Research and Opinion, Drugs and Aging, Eastern Economic Journal, Econometric Reviews, Epilepsia, European Journal of Health Economics, Evaluation and Expert Opinion on Pharmacotherapy, Expert Opinion on Therapeutic Patents, Expert Review of Pharmacoeconomics and Outcomes Research, Farmeconomia, Gerontology, Health Affairs, Health Care Financing Review, Health Economics, Health Professions, Health and Quality of Life Outcomes, JAMA, Journal of Adolescent Health, Journal of Affective Disorders, Journal of Alzheimer Disease, Journal of the American Statistical Association, Journal of Applied Econometrics, Journal of Cardiovascular Pharmacology and Therapeutics, Journal of Chemotherapy, Journal of Clinical and Experimental Oncology, Journal of Econometrics, Journal of Environmental Management, Journal of Epidemiology and Community Health, Journal of Gerontology: Social Sciences, Journal of Health Care for the Poor and Underserved, Journal of Health Politics, Policy and Law, Journal of Human Resources, Journal of Managed Care Pharmacy, Journal of Manged Care and Specialty Pharmacy, Journal of Medical Economics, Journal of Medical Education, Journal of Perinatology, Journal of Public Economics, Journal of Public Health Dentistry, Medical Care, Medical Decision Making, Milbank Memorial Fund Quarterly, Nature Reviews Drug Discovery, New England Journal of Medicine, Obstetrics & Gynecology, Pediatric Drugs, Pediatrics, PharmacoEconomics, Priorities, Research in Population Economics, Review of Economics and Statistics, Social Science and Medicine, SciTechnol, Social Science Journal, Southern Economic Journal, Statistica Sinica, Topics in Hospital Pharmacy Management, Vaccine, Value in Health.

**BOOK MANUSCRIPT REFEREE:**

2006 Lisa Gordon
Editorial Assistant
Jones and Bartlett Publishers

**SCIENTIFIC CONFERENCE ORGANIZATION AND DEVELOPMENT**

| | |
|---|---|
| 1996-1998 | Co-Chair and Primary Organizer: ISPOR Lipid Pharmacoeconomics Conference. Orlando, FL. |
| 2001-2003 | International Health Economics Association 4th World Congress, San Francisco; Local Organizing Committee Member |
| 2004-2005 | Scientific Track Evaluation Panel; Disease Management Association of America Annual Conference. Orlando, FL. |
| 2005 | Scientific Advisory Committee, Third NIMH Pharmacoeconomics Workshop: MMA03 and Psychotropic Medications |
| 2007 | American Society of Health Economics Meeting Organizer, Duke University, Durham, NC. |
| 2009 | Western Pharmacoeconomics Conference: Decision Tools for the Health Care Puzzle, Co-Chair and Meeting Organizer; Pasadena CA. |
| 2014 | American Society of Health Economists: 4'th Biannual Conference, USC, Los Angeles, CA. |
| 2015 | Conference on a Half-Century of Pharmaceutical Economics, University of British Columbia, Vancouver, BC, Canada. |

**MEDIA APPEARANCES**

| | |
|---|---|
| October, 1989 | Time Magazine: "A Recount of AIDS Carriers." Article about J Hay's back calculation model for estimating the number of people infected with HIV/AIDS. October 9, 1989; pg. 103. |
| June, 1992 | "Should Marijuana be Legalized for Medicinal Purposes?" The Dr. Dean Show, NBC, San Francisco. |
| November, 1992 | "Prescription Drug Price Inflation: What Should Be Done?" Seniors Speak Out, KPBS, San Diego. |
| September, 1993 | "Health Care Reform: Access and Cost" syndicated Public Television show. |
| June, 1994 | "Heterosexual AIDS," Diane Crowe/Chuck Whitten Show, KAVL, Lancaster, CA. |
| September, 1994 | "Heterosexual AIDS," The Dennis Praeger TV Show, Los Angeles, CA. |
| October, 1994 | "Bias in Official Government Projections of HIV/AIDS," FOX Television News Service, New York, NY. |
| January-March, 1995 | "**Clinicoeconomics**" *Annenberg Center at Eisenhower* Three Part Television Series written by and featuring Joel W. Hay, Ph.D., Producer, Chuck Cox. Part 1: Principles of Clinicoeconomics; Part 2: The Outcomes Revolution--Measuring Health Related Quality of Life; Part 3: Practice Variation and Medical Guidelines Development. Rancho Mirage, CA. |
| September, 2000 | "Cost Effectiveness of Statins." International Task Force for Prevention of Coronary Heart Disease. Consensus on Statins Conference Webcast: www.chd-taskforce.com |
| May, 2001 | "Economic Considerations in Moving Second-generation Antihistamines from Prescription to OTC Status," CNN Headline News interview. |
| May, 2001 | "Economics of RU-481." Los Angeles Times interview. |
| April, 2002 | "Pharmacy Workforce Effects of Converting from the California to the National Pharmacy Licensure Examination." San Jose Mercury News interview. |
| December, 2002 | "National Issues Briefing To Examine Rising Hospital Costs," Washington Press Club Seminar covered by CSPAN http://www.kaisernetwork.org/healthcast/usnews/bcbs/02dec2002 . |
| October, 2005 | "Drug Safety in the Aftermath of Vioxx." Investors Business Daily interview. |
| January, 2007 | "Democratic Medicare drug plan poised to pass House," McClatchy Newspapers, http://www.mercurynews.com/mld/mercurynews/news/politics/16393085.htm. |
| January, 2007 | "House Passes Bill to Require Medicare Part D Price Negotiations". Lou Dobbs Show, CNN. |
| January, 2007 | "House Passes Bill to Require Medicare Part D Price Negotiations". Business & Media Institute (http://www.businessandmedia.org/articles/2007/20070112164308.aspx). |
| January, 2007 | "Pharmaceutical Industry Profitability, " Investors Business Daily interview. |
| April, 2008 | "Merck, Schering Keep Taking Heat For Vytorin Flub." Investors Business Daily interview. |
| November, 2008 | "Impact of CVS Generic Drug Pricing Plan." NBC Today Show. |
| November, 2008 | "Generic Drug Price Competition." KNBC Evening News. |

| | |
|---|---|
| November, 2008 | “Gains By Democrats Put Pharma On Edge” Investor’s Business Daily interview. |
| March, 2009 | J Hay quotations in “Can Marijuana Help Rescue California's Economy?” By Alison Stateman Time Online, March 13, 2009; http://www.time.com/time/nation/article/0,8599,1884956,00.html |
| July, 2009 | J Hay interview with Marc Brown on legalizing marijuana KABC TV Channel 7 Evening News. July 28 and July 29, 2009. |
| July, 2009 | J Hay interview with Nicole Busch on value of health co-op plans in the health insurance reform legislation. Fox News, July 31, 2009. |
| August, 2009 | J Hay interview on KCBS radio newsmaker show: Why marijuana shouldn’t be legalized. KCBS August 2. |
| August, 2009 | J Hay interview on KNBC-TV Sunday LA, August 2. Why marijuana shouldn’t be legalized. |
| August, 2009 | J Hay interview on Montel Williams Across America, August 5. Why marijuana shouldn’t be legalized. |
| August, 2009 | J Hay interview on KCBS Radio news: Should new federal laws be passed to protect pharmacy prescription information from commercial data vendors? August 19. |
| October, 2009 | J Hay interview on KCBS Radio news: Medical Marijuana Dispensaries. October 19. |
| October, 2009 | Panel discussion on Medical Marijuana and Marijuana Legalization. The Michael Krazny Show, KQED Radio, October, 20. |
| December, 2009 | J Hay interview on KCBS Radio news: Marijuana Legalization in California, December 18. |
| December, 2009 | J Hay interview by Reuters News: Marijuana Legalization in California, December 18. |
| January, 2010 | "Recent Advances in Otolaryngology," (www.audio-digest.org). |
| February, 2010 | J Hay interview on University of California media release on medical marijuana studies. February 18. http://www.webmd.com/pain-management/news/20100218/medical-marijuana-has-merit-research-shows?page=2 |
| March, 2010 | J Hay interview on Federal Restrictions on Cost Effectiveness Analysis, NPR’s Marketplace; http://marketplace.publicradio.org/display/web/2010/03/16/pm-health-care-costs/# |
| March, 2010 | “Orphan Drug Market Catches Pharma's Eye.” Investors Business Daily quotes from J Hay. |
| July, 2010 | “Bright Future Seen For Vaccine Research.” Investors Business Daily quotes from J Hay. |
| August, 2010 | “Walgren’s Flu Vaccine Gift Cards Don’t Make Sense,” Interview on KCBS Radio, San Francisco, CA 8/17/10. |
| September, 2010 | “Will Drugmakers' Fight To Defer Generics Hit Supreme Court?” Investors Business Daily quotes from J Hay. |
| November, 2010 | “Genentech Catching Some Heat For Pushing Expensive Eye Drug,” Investors Business Daily quotes from J Hay. |

| | |
|---|---|
| March, 2011 | "Medical Marijuana Deters Legitimate Medical Cannabinoids" March 13, 2011 Felice J. Freyer, Rhode Island News. http://www.projo.com/news/content/THC_03-13-11_RMMUHVQ_v16.15cf632.html# |
| April, 2011 | "Medicare on the table." Marketplace show, NPR 4-13-11, Gregory Warner, http://marketplace.publicradio.org/display/web/2011/04/13/pm-medicare-on-the-table/ |
| June, 2011 | "World Have Your Say: What would the world look like if all drugs were legalised?" BBC World Service, http://www.bbc.co.uk/programmes/p00gx5gq |
| August, 2011 | "Expert Discussion: Prescription For Pot—A Debate on the Merits of Medical Marijuana," MD Magazine: Peers & Perspectives: The Physician's Authority for Debate & Exchange. Podcast. |
| December, 2011 | "Lipitor's patent loss is consumers' gain," quotes from J Hay. Los Angeles Times, December 1, 2011. |
| January 2012 | "Excedrin, Gas-X and other Novartis drugs recalled," radio quotes from J Hay. Marketplace Morning Report, American Public Media, January 9, 2012. http://www.marketplace.org/topics/business/health-care/excedrin-gas-x-and-other-novartis-drugs-recalled |
| January 2012 | "FDA: Novartis Recall May Also Affect Painkillers," video quotes from J Hay. AP Video, January 9, 2012. http://youtu.be/dttrjWA_Sn0 |
| March, 2012 | "Individual mandate under review in Supreme Court," Marketplace show, NPR 3-27-12, Amy Scott, http://www.marketplace.org/topics/economy/health-care/individual-mandate-under-review-supreme-court |
| June, 2012 | "Health care reform trajectory won't be stopped by Supreme Court ruling," Southern California Public Radio 6-7-12. http://www.scpr.org/news/2012/06/07/32713/health-care-reform-trajectory-wont-be-stopped/ |
| August, 2012 | Comment on "As circumcision declines, health costs will go up, study projects," Los Angeles Times, August 21, 2012. http://www.latimes.com/news/science/la-sci-circumcision-health-costs-20120821,0,6266293,print.story |
| August, 2012 | Comment on "Study claims decline in circumcision will lead to increase in STDs." Larry Mantle Airtalk, Southern California Public Radio 8-21-12. http://www.scpr.org/programs/airtalk/2012/08/21/27999/study-circumcisions-numbers-drop-std-increase-sex/ |
| August, 2012 | Comment on "Walmart arms itself with vaccines," NPR Marketplace Morning Report. 8-23-12. http://www.marketplace.org/topics/business/health-care/walmart-arms-itself-vaccines |
| April, 2013 | Comment on "Students discuss usefulness of marijuana legalization," USC Daily Trojan, April 9, 2013. http://dailytrojan.com/2013/04/09/students-discuss-usefulness-of-marijuana-legalization/ |
| November, 2013 | Comment on "Widespread confusion over flu shot insurance benefits," Los Angeles Times, November 7, 2013. http://www.latimes.com/business/la-fi-lazarus-20131101,0,1800506,full.column#axzz2jPZ7iJpn |
| July, 2014 | Comment on "Does neurology need a faster FDA?" *Lancet Neurology*, Vol 13 August 2014; pp. 760-61. www.thelancet.com/neurology |
| October, 2014 | Comment on "Why there is no ebola vaccine," NPR Marketplace, October 1, 2014. http://www.marketplace.org/topics/health-care/why-there-no-ebola-vaccine |

October, 2014 Comment on “Economics of Ebola Vaccine,” NPR Marketplace, October 22, 2014. http://www.marketplace.org/topics/health-care/economics-behind-rush-ebola-vaccine

October, 2014 Comment on “Big pharma collaborates on Ebola vaccine,” Australian Broadcast Company radio interview, October 24, 2014. http://www.abc.net.au/am/content/2014/s4113595.htm

May, 2015 Comment on “CVS seeks to buy Omnicare,” NPR Marketplace, May 21, 2015. http://www.marketplace.org/topics/business/cvs-seeks-buy-omnicare

September, 2015 Comment on “Doctor's attempt to bring lower-price diabetes drug to market thwarted,” Los Angeles Times, September 4, 2015. http://www.latimes.com/business/la-fi-lazarus-20150904-column.html

September, 2015 “Daraprim Drug Price Hike,” Top of Mind with Julie Rose, BYU Radio, September 24, 2015. http://www.byuradio.org/show/e9a84fc9-4bb1-476f-bd5d-0e907b754af8/top-of-mind-with-julie-rose; http://www.byuradio.org/episode/5f014c3f-9e8e-452d-8c30-ba3100d70490?playhead=65&autoplay=true

December, 2015 “Drug Pricing and Pharmacies,” Top of Mind with Julie Rose, BYU Radio, December 16, 2015. http://www.byuradio.org/episode/80489567-65f0-4c8e-a6b1-bff75c6f2e3f?playhead=63&autoplay=true

January, 2016 Comment on “Afrezza patients worry they'll lose access to their insulin,” Los Angeles Times, January 8, 2016. http://www.latimes.com/business/la-fi-afrezza-patients-20160108-story.html

January, 2016 Comment on “The obscurity of drug spending in Medi-Cal: What do you want to know about State spending on high-cost drugs?” Pauline Bartalone, www.calmatters.org. https://medium.com/california-s-legal-drug-dilemma/the-obscurity-of-drug-spending-in-medi-cal-4ccf1df97392#.v1rgwujib

February, 2016 Comment on “The other ‘high-cost’ drugs: What specialty drugs mean for California.” Pauline Bartalone, www.calmatters.org. https://medium.com/california-s-legal-drug-dilemma/the-other-high-cost-drugs-what-specialty-drugs-mean-for-california-df18ddf1e632#.ydyg7zybx

February, 2016 Comment on “High Costs For Drugs Used By A Few Are Starting To Add Up,” Shots: NPR Health News, http://www.npr.org/sections/health-shots/2016/02/05/465699654/high-costs-for-drugs-used-by-a-few-are-starting-to-add-up

March, 2016 Comment on “Voter anger over surging prescription drug costs has generated a campaign issue,” Los Angeles Times, March 11, 2016. http://www.latimes.com/politics/la-na-florida-campaign-drug-prices-20160311-story.html

April, 2016 Comment on “What's California's prescription for rising drug costs?” Pauline Bartalone, www.calmatters.org. https://calmatters.org/articles/california-takes-measures-to-control-drug-spending-but-costs-soar/

**PUBLIC HEARING TESTIMONY AND PRESENTATIONS:**

December 1985 "The cost implications of adding Ranitidine to the Medi-Cal Drug Formulary," Medi-Cal Drug and Therapeutics Advisory Commission Hearings, California Department of Health Services, Sacramento, CA.

April 1987 "Cost-Benefit evaluation of Haemophilus influenzae type b capsular polysaccharide vaccine," FDA Workshop on Haemophilus b Polysaccharide Vaccine, US Food and Drug Administration, Rockville, MD.

| | |
|---|---|
| January 1990 | "AIDS Case Projections for California," California AIDS Leadership Committee, California Department of Health Services, Los Angeles County, CA. |
| August 1990 | "A Comparative Analysis of CDC and Other HIV/AIDS Projections and Recent (1990) Regional Cost Projections for California," Northern California Integrated Planning Project: HIV Epidemiology Task Force, Sacramento AIDS Foundation, Sacramento, CA. |
| September 1991 | "Cost-Effectiveness Issues in Cholesterol Treatment of Coronary Artery Disease," Panel on Adult Treatment Guidelines for Established Coronary Artery Disease; the National Institutes of Health, National Heart, Lung and Blood Institute and the American Heart Association, Washington, D.C. |
| July 1992 | "Research and Demonstration Waiver Request for Kaiser-Permanente Enhanced Pharmacy Services Project," California State Board of Pharmacy, Burlingame, CA. |
| January 1994 | "The Impact of the Clinton Health Care Reforms on Small Business," Congressional Testimony held at Diamond Bar, California at the invitation of Hon. Jay Kim, U.S. House of Representatives. |
| November 1996 | "The cost effectiveness of Pravastatin and the Medi-Cal Drug Formulary," Medi-Cal Drug Program, California Department of Health Services, Sacramento, CA. |
| May 2001 | "Economic Considerations in Moving Second-generation Antihistamines from Prescription to OTC Status," presentation to the US Food and Drug Administration Committee on Non-Prescription Drugs, Gaithersburg, MD. |
| March 2002 | "Pharmacy Workforce Effects of Converting from the California to the National Pharmacy Licensure Examination." Presentation to the California Assembly on AB 2165, Sacramento, CA. |
| February 2010 | "Cost-effectiveness of An Exclusively Human-Milk Based Diet Vs. Bovine-Milk Based Diet In The Prevention of Necrotizing Enterocolitis Among Extremely Premature Medicaid Infants (Gestation Age < 28 weeks)" Presentation to the Texas Medicaid Drug Utilization Review Program, Austin, TX. |
| February 2012 | "Competition Issues in the Pharmaceutical Benefits Manager (PBM) Market," Presentation to the Federal Trade Commission Bureau of Economics and the State Attorneys General Task Force on PBM Market Issues, Washington, DC. |

**CONFERENCES AND PRESENTATIONS SINCE 1998:**

| | |
|---|---|
| February, 1998 | "Methodological Issues in Conducting Pharmacoeconomic Evaluation—Modeling Studies" Panel Co-Chair. ISPOR Pharmacoeconomic Guidelines Consensus Development Conference. Crystal City, VA. |
| May, 1998 | "Lipid Therapy Cost Effectiveness: Are All Statins Equivalent?" Invited Plenary Session, Association of Managed Care Pharmacy Annual Meeting, Philadelphia, PA. |
| May, 1998 | "Alzheimer Disease Pharmacoeconomic Issues," Invited Session, Association of Managed Care Pharmacy Annual Meeting, Philadelphia, PA. |
| May, 1998 | "Hong Kong Health Care Reform," Harvard School of Public Health, Cambridge, MA. |
| June, 1998 | "Mortality and Hospital Utilization Differences in the Kaiser/USC Pharmaceutical Care Intervention Study," University of Florida College of Pharmacy, Gainesville, FL. |
| July, 1998 | "Alzheimer Disease Pharmacoeconomics," Invited Session, First International Conference on Alzheimer Disease Pharmacoeconomics, Amsterdam, Netherlands. |
| October, 1998 | "The Future of Pharmacy," Pharmacy Practice Research Roundtable Conference, San Diego, CA. |
| October, 1998 | "Lipid Therapy Cost Effectiveness," Calif. Society Health Systems Pharmacy, Anaheim, CA. |
| December, 1998 | "The US Pharmacoeconomic Methods Consensus Guidelines," ISPOR First Annual European Conference, Cologne, Germany. |
| March, 1999 | "Lipid Therapy Costs and Outcomes," New York University Department of Cardiology Grand Rounds, New York, NY. |
| April, 1999 | "Drug Patents and R&D Protection." The Wallace Lectureship, Idaho State University School of Pharmacy. Pocatello, ID. |
| April, 1999 | "Survival and Hospitalization in the Kaiser/USC Pharmaceutical Care Demonstration Project." The Wallace Lectureship, Idaho State Univ. School of Pharmacy. Boise, ID. |
| May, 1999 | "Cost Effectiveness Analysis of Occupational Therapy for Independent Living Elderly," ISPOR Annual Meeting, Podium Presentation. Washington, DC. |
| September, 1999 | "Rotavirus Cost of Illness," Rotavirus Vaccine Advisory Panel, Wyeth-Ayerst, Radnor, PA. |
| October, 1999 | "The Cost of Lipid Therapy: A Systems Approach," Interdisciplinary Council on Cardiovascular Risk Reduction, Washington, DC. |
| October, 1999 | "Survival and Hospital Utilization in the Kaiser/USC Pharmaceutical Care Study," Kaiser Permanente Research and Evaluation Dept Seminar., Pasadena, CA. |
| November, 1999 | "The High Cost of Drugs and What to Do About It," Univ. of California Riverside Life Society Extension Program, Riverside, CA. |
| November, 1999 | "Pharmacoeconomics of Epilepsy Medications," American Epilepsy Society, Orlando, FL. |
| February, 2000 | "Rotavirus Costs of Illness," Vaccine Research Center, Harbor-UCLA Medical Center, Torrance, CA. |

| | |
|---|---|
| February, 2000 | "Pharmaceutical Expenditure Growth and Medicare Outpatient Drug Benefits," Mid-Valley Independent Practice Association, Portland, OR. |
| April, 2000 | "Alzheimer Disease Cognition Measures and Economic Costs," Invited presentation. 2nd International Alzheimer Disease Pharmacoeconomic Conference, Stockholm, Sweden. |
| April, 2000 | "Pharmacoeconomics of Antibiotic Treatment Strategies," 10th Congress of the International Society for Infectious Disease, Buenos Aires, Argentina. |
| April, 2000 | "Economic Research Issues in Alzheimer Disease." State of California Alzheimer Research Centers Site Visit. Los Angeles, CA. |
| September, 2000 | "Cost Effectiveness of Statin Therapy." International Task Force for Prevention of Coronary Heart Disease. Consensus on Statins Conference. Invited Presentation. Paris, France. |
| September, 2000 | "Cost Effectiveness of Statin Therapy." Interdisclipinary Council on Coronary Heart Disease. Invited Presentation. New York, NY. |
| November, 2000 | "Pharmacy Retail Price Variation," Pharmaceutical Economics Seminar, UCLA School of Public Health. Westwood, CA. |
| March, 2001 | "Choicecare: A Health Insurance Market Plan for Hong Kong. Invited Seminar, Hong Kong Hospital Authority; Hong Kong. |
| May, 2001 | "Cost Effectiveness Considerations in Adult/Adolescent Pertussis Vaccination Strategies," Vaccine Health Advisory Group Conference, La Romana, Dominican Republic. |
| July, 2001 | "China's Health Care Reform," International Health Economics Assoc. Meeting, York, UK. |
| September, 2001 | "Cost Effectiveness of Statins: Implications for the National Cholesterol Education Panel Recommendations." Washington, DC. |
| November, 2001 | "Chemotherapy-Induced Neuropathy In Ovarian Cancer Cost Effectiveness." ISPOR European Conference, Cannes, France. |
| March, 2002 | "Conjoint Analysis of Alzheimer Disease Treatment Preferences: Preliminary Results." CCH/HSRC Methods Seminar, UCLA/NPI Center for Community Health and Health Services Research Center, Westwood, CA. |
| March, 2002 | "Ethics and Economics in Health Care Decision-making." USC Health Sciences Campus Seminar on Moral and Spiritual Issues in Health Care, Los Angeles, CA. |
| April, 2002 | "Current Status of Health Economics Checklists and Guidelines." Academy of Managed Care Pharmacy Annual Convention, Podium Presentation, Salt Lake City, UT. |
| May, 2002 | "Quality of life effects of chemotherapy-induced neuropathy in ovarian cancer (Abst 886)." "Neuropathy in Chemotherapy: Results of an Oncology Nurse Survey (Abst 2618)." Poster Presentations, American Society of Clinical Oncology Annual Meeting. Orlando, FL. |
| May, 2002 | "Vaccine Reimbursement Policy in the United States: Issue Development." Institute of Medicine, National Academy of Sciences. Washington, DC. |
| September, 2002 | "Recent Trends in U.S. Lipid Medication Use: 1998-2002. Interdisclipinary Council on Coronary Heart Disease. Invited Presentation. New York, NY. |
| September, 2002 | "Drugbusters: How to Manage your Medicine Cabinet." Invited Roundtable Presentation. Los Angeles Times Festival of Fitness and Health. Los Angeles, CA. |

| | |
|---|---|
| October, 2002 | “Recent Drivers of Hospital Inpatient Expenditure Growth.” Media presentation sponsored by the Blue Cross Blue Shield Association, Chicago, IL. |
| November, 2002 | “Rising Hospital Costs in California.” Panel Discussion sponsored by Blue Shield of California, Univ. of California, Berkeley, CA. |
| December, 2002 | “National Issues Briefing To Examine Rising Hospital Costs," Panel Discussion sponsored by U.S. News & World Report. Washington, DC. |
| January, 2003 | "What's Behind the Rise in Health Care Costs” Invited Keynote Presentation, Washington Business Group on Health Employer Summit. New York, NY. |
| March, 2003 | “High Tide for Benefits Budgets: Rising Healthcare Costs.” Invited Keynote Presentation, Illinois BlueCross BlueShield Natl Accounts Conf, San Diego, CA. |
| April, 2003 | “Current trends and future directions of Health-Systems in the US,” Health Economics and Outcomes Research Invited Presentation, Abbott Laboratories, Evanston, IL. |
| May, 2003 | “U.S. Health Care Expenditure Growth: Issues and Solutions.” St. Louis Civic Entrepreneurs Organization, St. Louis, MO. |
| June, 2003 | “U.S. Pharmaceutical Expenditure Growth:1999-2002” Paper presented at the Intl Health Economics Association 4’th World Congress, San Francisco, CA. |
| June, 2003 | “Medical Market Failures and Intellectual Property” Paper presented at the Intl Health Economics Association 4’th World Congress, San Francisco, CA. |
| August, 2003 | “Determinants of Survival and Nursing Home Placement for AD Patients.” Paper presented at the International Psychogeriatrics Association Annual Meetings, Chicago, IL. |
| December, 2003 | "Claritan's Shift to OTC Status: A Lesson for the HMOs." Paper presented at Pharmaceutical Economics And Policy Seminar, UCLA Schl of Public Health, Westwood, CA. |
| April, 2004 | “Pharmacoeconomics & Biotech.” Invited presentation at PDL Biopharma, Fremont, CA. |
| July, 2004 | “Cost Effectiveness Of Pertussis Vaccine In Adults And Adolescents.” Invited presentation, Pediatric Vaccine Workshop, New York, NY. |
| November, 2004 | “Vaccine Costs and Benefits.” Invited presentation, GSK Pediatric Vaccine Advisory Board., Scottsdale, AZ. |
| February, 2005 | “Patents, Drug R&D and Protection of Intellectual Property,” Invited Panel Presentation: International Trade in Pharmaceuticals, The International Law Society Meetings, Costa Mesa, CA. |
| May, 2005 | “Dually Eligible Mentally Ill Population” Session Chair; Third NIMH Pharmacoeconomics Workshop: MMA03 and Psychotropic Medications, NIMH, Bethesda, MD. |
| May, 2005 | “How Should Intellectual Property be Rewarded and Protected in the Global Pharmaceutical Industry?” Panel Discussion, USC Law School Intellectual Property Institute, Second Annual Conference. Beverly Hills, CA. |
| May, 2005 | “Structure & Design of Pharmacoeconomic Models.” With Marc Botteman and Ben Van Hout. ISPOR Short Course presented at the 10th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Washington, DC. |

| | |
|---|---|
| June, 2005 | "Implementation and Outcomes of Commercial Disease Management Programs in the United States: the Disease Management Outcomes Consolidation Survey." Nationwide Teleconference presentation with Mark Roberts. |
| October, 2005 | "Using Conjoint Analysis to Assess DM Intervention Attributes: Application to Alzheimer's Disease Caregivers." Paper presented at the Disease Management Association of America Annual Meeting, San Diego, CA. |
| October, 2005 | "Conjoint Analysis Validation Of The Hui-3 Utility Scale In An Alzheimer Disease Caregiver Population." Abstract 1216 presented at the International Society of Quality of Life Research, San Francisco, CA. |
| November, 2005 | "Economic Implication Of Hepatitis B Viral (HbV) Load Reduction For Entecavir In Hepatitis B E Antigen-Positive Chronic Hepatitis B (CHb) Patients" Presented at the 8'th ISPOR European Conference, Florence, Italy. |
| January, 2006 | "Methods for Selection Bias Adjustment: Propensity Scores, Instrumental Variables and the Heckman Method. Invited Grand Rounds Presentation, Maveric, Dept. of Veterans Affairs and Harvard Medical School, Boston, MA. |
| March, 2006 | "Cost Effectiveness of Entecavir for Chronic Hepatitis B Disease in China." Presented at the ISPOR Asian Conference, Shanghai, China. |
| March, 2006 | "Adjusting for Selection Bias in Administrative Health Care Databases." Invited Presentation, China Center for Pharmacoeconomics and Outcomes Research, Peking University, Beijing, China. |
| April, 2006 | "Stated Preference Theory (Conjoint Analysis) is the Best Way to Assess Health-Related Quality of Life for Economic Assessment of Drugs and Medical Interventions: An Application in Alzheimer Disease" Invited International Teleconference Presentation, ISPOR Student Chapter Network. |
| October, 2006 | "The Value of Biomedical Innovation." Invited Seminar, AstraZeneca Pharmaceuticals, Alderly Park, Cheshire, UK. |
| October, 2006 | "Cost Effectiveness of Magnetic Resonance Angiography versus Digital Subtraction Angiography for Peripheral Vascular Disease." Presentation at the 9'th European ISPOR Conference, Copenhagen, Denmark. |
| January, 2007 | "Stated Preference Theory in Assessing Health-Related Quality of Life for Economic Assessment in Alzheimer Disease. Invited Seminar; Medical University of South Carolina. |
| February, 2007 | "Stated Preference Theory in Assessing Health-Related Quality of Life for Economic Assessment in Alzheimer Disease. Invited Seminar; Tulane University School of Public Health. |
| October, 2007 | "Risk-Stratified Medical Costs for Asthma Patients in a Managed Care Organization (MCO)." Presentation at the 10'th European ISPOR Conference, Dublin, Ireland. |
| October, 2007 | "Stated Preference Theory in Assessing Health-Related Quality of Life for Economic Assessment in Alzheimer Disease. Invited Seminar; National University of Ireland, Galway, Ireland. |
| January, 2008 | "How Should Drug Prices be Measured?" Invited Seminar, School of Public Health, University of California Los Angeles, Los Angeles, CA. |

| | |
|---|---|
| February, 2008 | "How Not to Use Health Economics Data: Lessons from the U.S. Health Care Sector" invited presentation at the Hong Kong Hospital Authority Conference "Use of Health Economics Data in the Health Care Environment of Hong Kong The Way Forward." Hong Kong SAR, China. |
| March, 2008 | "Cost Effectiveness of Statins and Other Lipid Therapies." Invited presentation at the 3rd International Symposium on Healthy Aging: Meeting the Challenges of an Aging Population, Hong Kong SAR, China. |
| April, 2008 | "Pharmacoeconomic Modeling," Invited Lister Hill Seminar presentation, University of Alabama at Birmingham School of Public Health. Birmingham, AL. |
| August, 2008 | "Pharmacoeconomics Modeling and Empirical Analysis," Invited Lecture Series, National University of Colombia. Bogota, Colombia. |
| September, 2008 | "Issues in Pharmacoeconomic Methods," Invited Lecture, Amylin Pharmaceuticals, San Diego, CA. |
| November, 2008 | "Modeling Long-Term Mortality and Morbidity Impact with Entecavir Treatment in Chronic Hepatitis B Patients in Belgium." Benedicte Lescrauwaet, Frederik Nevens, Danielle Zammit, Yong Yuan, Joel Hay. Podium presentation, ISPOR European Conference, Athens, Greece. |
| December, 2008 | "Successful Pharmacoeconomic Models," Invited presentation, Mexico ISPOR Chapter, Mexico City, Mexico. |
| March, 2009 | "Drugs and Outcomes Research: Where are the Comparative Effectiveness Guideposts Moving To?" Opening Keynote Address, Western Pharmacoeconomics Conference, Pasadena, CA. |
| April, 2009 | "Comparative Effectiveness: What Does It Mean and How Do We Do It?" Invited University-Wide Seminar, USC School of Pharmacy, Los Angeles, CA. |
| April, 2009 | "Stated Preference Theory (Conjoint Analysis) Assessment of Health-Related Quality of Life for Economic Assessment of Medical Interventions," Invited Seminar, University of Washington School of Pharmacy, Seattle, WA. |
| April, 2009 | "Health Economic Evaluation of Oral versus IV Therapy in Oncology." Invited Presentation, Current And Emerging Trends In The Treatment Of Cancer: Pharmacoeconomics And Market Assessment, Guaraja, Brazil. |
| May, 2009 | "Comparative Effectiveness Research: What it is and Why We Need it." Invited Podium Presentation, International Society for Pharmacoeconomics and Outcomes Research 14th Annual International Meeting, Orlando, FL. |
| August, 2009 | "Outcomes Research, Comparative Effectiveness, Cost Effectiveness: What is Needed Now and Why?" Invited Seminar, Colombia Chapter: International Society for Pharmacoeconomics and Outcomes Research, Bogota, Colombia. |
| August, 2009 | "Pharmacoeconomics of Autoimmune Disease Therapy." Invited presentation, XII Colombian Rheumatology Congress, Bogota, Colombia. |
| October, 2009 | Debate on the Pros and Cons of Marijuana Legalization. Invited speakers, The Arsalyn Foundation, Duarte, CA. |
| November, 2009 | Resource Use in Patients with Allergic Rhinitis (AR) Comorbidities: Oral Second Generation Antihistamines (SGAs) versus Montelukast (MTLK)" Podium Presentation, Annual Meeting of the American College of Allergy, Asthma & Immunology, Miami Beach, Florida. |

| | |
|---|---|
| November, 2009 | "Impact of Obama's Health Care Reform on Payers" Speaker Panel Moderator; USC School of Pharmacy Board of Councilors Retreat. Los Angeles, CA. |
| November, 2009 | "Debate on Obama's Health Care Reform with Prof. Tom Rice, Vice Chancellor, UCLA," at UC Davis Mondavi Center, Davis CA. http://webcast.ucdavis.edu/IGA/2009/Health_Care_Debate_11-17-09.qtl |
| December, 2009 | "Resource Use in Patients with Allergic Rhinitis (AR) Comorbidities: Oral Second Generation Antihistamines (SGAs) versus Montelukast (MTLK)" Podium Presentation, Annual Meeting of the American College of Allergy, Asthma & Immunology, Nov. 5-10, Miami Beach, Florida. |
| January, 2010 | "Medical Marijuana: The Quack Pot Cure," Research Study Club Invited Presentation, Providence Saint Joseph Medical Center, Los Angeles, CA. |
| February, 2010 | "Health Care Reform," Arsalyn Foundation, UCLA, Los Angeles, CA. |
| March, 2010 | "Obama's Health Care Reform," USC Executive Master's Program in Health Administration, Lost Angeles, CA. |
| April, 2010 | "Obama Health Care Reform," USC Schl. of Pharmacy, Lamda Chi Seminar, Los Angeles, CA. |
| June, 2010 | "Economic Comparison of aPCC versus rFVIIa for mild-to-moderate bleeding episodes in hemophilia patients with inhibitors." Invited presentation, 8th Inhibitor Workshop for Opinion Leaders in Hemophilia." Gdansk, Poland. |
| September, 2010 | "Pharmacoeconomics & Comparative Effectiveness: A U.S. Perspective." Invited presentation to NECA (National Evidence-based Healthcare Collaborating Agency) Seoul, Korea. |
| September, 2010 | "Cost-effectiveness of An Exclusively Human-Milk Based Diet Vs. Bovine-Milk Based Diet In The Prevention of Necrotizing Enterocolitis Among Extremely Premature Infants." Invited presentation to the Cedars-Sinai Dept. of Pediatrics, Beverly Hills, CA. |
| September, 2010 | "Marijuana Legalization: No on Proposition 19." Invited presentation, Loyola Marymount University, Los Angeles, CA. |
| October, 2010 | "Marijuana Legalization: The Quack Pot Cure to California's Fiscal Woes." Invited presentation UCLA Extension Campus, Westwood, CA. |
| October, 2010 | "Marijuana Legalization Debate: Proposition 19." Invited presentation UCLA, Westwood, CA. |
| October, 2010 | "Marijuana Legalization Debate: Proposition 19." Invited presentation UCSC, Santa Cruz, CA. |
| October, 2010 | "Insurance Innovation: How to Succeed after Reform" Invited presentation, First Annual Schaeffer Center Conference, Leonard Schaeffer Center for Health Policy and Economics, University of Southern California, Los Angeles, CA. http://www.youtube.com/watch?v=SraGxvHlZWs |
| October, 2010 | "Marijuana: Potential Medical Consequences & Societal Issues Related to Legalization," Invited presentation, The Marijuana Conference: A Forum for Discussion of Business, Legal & Health Issues. New York, NY. |
| October, 2010 | "Marijuana Legalization: Proposition 19," Invited presentation, The Fell Conversation, School of Policy, Planning, and Development, University of Southern California, Los Angeles, CA. |

| | |
|---|---|
| December, 2010 | " Econometric Issues in Pharmacoeconomics," Invited presentation, National University of Colombia, School of Pharmacy, Bogota, Colombia. |
| December, 2010 | "Comparative Effectiveness Research in the Changing US Policy Environment," Invited presentation, ISPOR Chapter of Colombia, Bogota, Colombia. |
| December, 2010 | "Introduction to Pharmacoeconomics," Invited presentation, Universidad del Atlántico, School of Pharmacy, Barranquilla, Colombia. |
| December, 2010 | "Comparative Effectiveness and Outcomes Research," Invited presentation, Universidad del Atlántico, School of Pharmacy, Barranquilla, Colombia. |
| February, 2011 | "Pharmacy's Changing Roles Under Health Care Reform," Invited presentation, USC Pharmacy Student Industry Association. Los Angeles, CA. |
| March, 2011 | "Pitfalls in Comparative Effectiveness Research: From Poison IVs to Uninformed Posteriors." Invited Plenary Presentation, Western Pharmacoeconomics Conference, University of Washington, Seattle, WA. |
| April, 2011 | "Medical Marijuana: Therapeutic, Economic and Policy Issues." Invited presentation, Providence Tarzana Medical Center, Tarzana, CA. |
| April, 2011 | "Budget Impact Models in MCO Decision Making: Current Practice, Challenges and Insights," Invited Workshop presentation, Academy of Managed Care Pharmacy, 23'rd Annual Meeting, Minneapolis, MN. |
| May, 2011 | "Branded Pharmaceutical Markets and Anticompetitive Harm." Invited presentation, UCLA Dept. of Health Services, Graduate Seminar on Pharmaceutical Economics and Policy. Los Angeles, CA. |
| July, 2011 | "Health Economics Research Objectives." Invited presentation, UCLA Dept. of Health Services, Health Economics Workshop with Monash Univ., UCLA & USC, Los Angeles, CA. |
| September, 2011 | "Optimal Health Care Treatment Allocation With and Without Stochastic Uncertainty." Invited presentation, University of Tennessee College of Pharmacy. Memphis, TN. |
| October, 2011 | "Medical Marijuana: Therapeutic, Economic and Policy Issues." Invited presentation, Ventura Community Memorial Hospital, Ventura, CA. |
| October, 2011 | "Medicare: Financial, Economic and Policy Issues." Invited presentation, Association of Health Care Journalists, Business of Health Care Workshop, San Francisco, CA. |
| November, 2011 | "Meeting the Challenges of US Health Care Reform: Payer and Provider Perspectives for the Biopharmaceutical Market." Invited Panel Discussion, 2011 IMS Life Sciences Strategy Conference, San Francisco, CA. |
| November, 2011 | "Health Care Reform: Where Does Pharmacy Fit?" Invited presentation, USC Pharmacy Student Industry Association. Los Angeles, CA. |
| December, 2011 | "Health Care Costs in a Medicare Population of COPD Patients Treated with Beta-Agonists." American Society of Health System Pharmacists Midyear Meeting, New Orleans, LA. |
| December, 2011 | "Optimal Health Care Treatment Allocation With and Without Stochastic Uncertainty—Part I," Schaffer Center for Health Policy and Economics, USC. Los Angeles, CA. |
| February, 2012 | "Optimal Health Care Treatment Allocation With and Without Stochastic Uncertainty—Part II," Schaffer Center for Health Policy and Economics, USC. Los Angeles, CA. |

May, 2012 “Optimal Drug Treatment Allocation with & without Stochastic Uncertainty,” UCLA Seminar on Pharmaceutical Economics and Policy.” Los Angeles, CA.

May, 2012 “Optimal Personalized Treatment Allocation With & Without Stochastic Uncertainty,” Invited seminar, SingHealth Academy Symposium on Health Care Decision-making and Personalized Medicines, Singapore.

May, 2012 “Cancer Treatments, Expensive Medications and Cost Effectiveness: Perspectives of a Health Economist,” Panel Discussion, SingHealth Academy Symposium on Health Care Decisionmaking and Personalized Medicines, Singapore.

May, 2012 “Comparative Effectiveness & Outcomes Research: Where is the U.S. Headed?” National University of Singapore invited seminar, Singapore.

June, 2012 “Introduction to Economic Assessment of Drugs, Devices and Medical Interventions,” Conference Workshop, American Society for Health Economics 4’th Biennial Conference, Minneapolis, MN.

June, 2012 “Cost Effectiveness Analysis With and Without Stochastic Uncertainty,” Organized Podium Session, American Society for Health Economics 4’th Biennial Conference, Minneapolis, MN.

October, 2012 “U.S. Health Care Reform Issues,” Invited presentation, Arsalyn Foundation, Alhambra, CA.

November, 2012 “Preparing Drug Review Dossiers for the Academy of Managed Care Pharmacy,” Invited presentation, USC Managed Care Pharmacy Student Association, Los Angeles, CA.

February, 2013 “Hemophilia Inhibitor Bypass Agents: A Clinical and Economic Review of the Literature,” Invited Webinar on Hemophilia Treatment.

February, 2013 “Drug Patents, Intellectual Property and Pricing,” Invited seminar, Tulane University School of Public Health, New Orleans, LA.

February, 2013 “Stated Preferences and Conjoint Analysis: Theory and Applications,” Invited seminar, Tulane University School of Public Health, New Orleans, LA.

March, 2013 “Accountable Care Organizations and Health Care Reform,” Invited Seminar USC Medical and Pharmacy Students Collaboration.” USC, Los Angeles, CA.

April, 2013 “Optimal Health Care Treatment Allocation with & without Stochastic Uncertainty,” Invited Seminar, Veterans Affairs Health Care Program and University of New Mexico PEPPOR Graduate Program, Albuquerque, NM.

April, 2013 “The Current State of Comparative Effectiveness & Outcomes Research,” Invited Seminar, University of New Mexico PEPPOR Graduate Program, Albuquerque, NM.

September, 2013 “The U.S. Societal Costs of Cannabis,” Invited presentation. The Marijuana Conference, Rancho Cucamonga, CA.

October, 2013 “Conjoint Analysis of Provider Preferences for Interventions for Reducing Inappropriate Antibiotic Prescribing,” Invited presentation. BEARI Investigators Meeting. Los Angeles, CA.

November, 2013 “Pay-for-Delay Settlements for Pharmaceutical ANDA Cases: Right or Wrong?” Invited seminar, UCLA School of Public Health, Los Angeles, CA.

February, 2014 “Why Drugs Should Not Be Legalized,” Invited presentation. Arsalyn Foundation Student Conference, El Monte, CA.

| | |
|---|---|
| March, 2014 | "Cost-Effectiveness Analysis Under Stochastic Uncertainty," Steven M. Teutsch Prevention Effectiveness Fellowship invited presentation. U.S. Centers for Disease Control and Prevention, Atlanta, GA. |
| March, 2014 | "Assessment of Health-Related Quality of Life for Medical Interventions: A Discrete Choice Experiment Application in Alzheimer Disease," Steven M. Teutsch Prevention Effectiveness Fellowship invited presentation. U.S. Centers for Disease Control and Prevention, Atlanta, GA. |
| March, 2014 | "Hemophilia Treatments, Costs and Outcomes," invited presentation. National Center on Birth Defects and Developmental Disabilities; U.S. Centers for Disease Control and Prevention, Atlanta, GA. |
| September, 2014 | "Current U.S. Trends in Health Technology Pricing and Value," invited presentation. Forum on HTA and Reimbursement, Peking University, Beijing, China. |
| September, 2014 | "US Healthcare Financing System & Reforms," invited presentation. Health Care Financing Forum, Party School of the Central Committee of the Communist Party of China, Beijing, China. |
| September, 2014 | "U.S. Health Care Reform," invited Plenary Symposium presentation. ISPOR 6th Asia-Pacific Conference, Beijing, China. |
| February, 2015 | "Is there a Convergence of Health Economics with U.S. Health Policy?" Panel Discussion Invited Presentation, DePaul University Conference on Health Economics. Chicago, IL. |
| March, 2015 | "Pharmaceutical Research & Development: An Economist's Perspective." Invited Lecture, Harbor-UCLA Grand Rounds. Torrance, CA. |
| April, 2015 | "Cost Effectiveness Analysis with Stochastic Uncertainty," Invited seminar, Pharmaceutical Outcomes Research and Policy Program, University of Washington. Seattle, WA. |
| April, 2015 | "Regulating Health Economics Modeling Claims," Invited presentation to the Office of Medical Policy and the Center for Drug Evaluation and Research, Food and Drug Administration. Silver Spring, MD. |
| September, 2015 | "Orphan, Specialty and Low Volume/High-Priced Drugs," Workshop on Pharmaceutical Economics and Policy, Center for Health Economics and Outcomes Sciences, University of British Columbia. Vancouver, BC, Canada. |
| November, 2015 | "Cost Effectiveness Analysis with Stochastic Uncertainty," Invited seminar, Dept. of Economics, University of Iowa, Iowa City, IA. |
| March, 2016 | "What is Pharmacoeconomic Information Under FDAMA 114?" Invited Panel Discussion, AMCP Partnership Forum, FDAMA 114: Improving the Exchange of Pharmacoeconomic Data, Washington, DC. |
| March, 2016 | "Marijuana Legalization: Costs and Medical Harms." Invited discussion, USC Seminar, Preventive Medicine PM547: Public Health Policy and Politics, Los Angeles, CA. |
| April, 2016 | "Health Economics: An Introduction for Biomedical Engineers," Invited Keynote Lecture, 20th Annual Grodins Research Symposium, USC Dept. of Biomedical Engineering, Los Angeles, CA. |

## RESEARCH CERTIFICATIONS:

5/23/2010 Completion Report

**CITI Collaborative Institutional Training Initiative**

**Human Research Curriculum Completion Report**
**Printed on 5/23/2010**

**Learner:** Joel Hay (username: jhay@usc.edu)
**Institution:** University of Southern California
**Contact Information** CHP 140 J
1540 E Alcazar St.
USC Pharmaceutical Economics and Policy
Los Angeles, CA 90089 USA
Department: 330
Phone: 323-442-3296
Email: jhay@usc.edu
**Investigators Conducting both Biomedical and SBR Research:** This group has been established for investigators conducting both Biomedical and Social & Behavioral Research

**University of Southern California**

This is to certify that

HAY, JOEL W.

has completed the

Ethical Conduct in Research Course (Biomedical)

04/21/2004

Sponsored by
The Office of Compliance

Certificate Number: 1018

**University of Southern California**

This is to certify that

HAY, JOEL W.

has completed the human subjects education program
"Understanding the Fundamentals:
*Responsibilities and Requirements for the Protection of Human Subjects in Research"*
07/23/2004

Sponsored by
The Office of the Provost and the Office of Compliance
Your certification is valid for three years from the above date of completion.

Certificate Number: 2341

**University of Southern California**

This is to certify that

HAY, JOEL W.

has completed the

HIPAA Privacy Education Program

Sunday, March 23, 2003

Sponsored by
The Office of Compliance

Certificate Number: 2853

**FISCAL ADMINISTRATION COURSE INFO**

Joel Hay has completed
USC's Fiscal administration course
on Wed Jun 23, 2004.

Please contact the USC Office of Compliance at (213) 740-8258 if you have any questions.

**Human Participant Protections Education for Research Teams**

**Completion Certificate**

This is to certify that

**Joel Hay**

has completed the **Human Participants Protection Education for Research Teams** online course, sponsored by the National Institutes of Health (NIH), on 03/26/2004.

This course included the following:

- key historical events and current issues that impact guidelines and legislation on human participant protection in research.
- ethical principles and guidelines that should assist in resolving the ethical issues inherent in the conduct of research with human participants.
- the use of key ethical principles and federal regulations to protect human participants at various stages in the research process.
- a description of guidelines for the protection of special populations in research.
- a definition of informed consent and components necessary for a valid consent.
- a description of the role of the IRB in the research process.
- the roles, responsibilities, and interactions of federal agencies, institutions, and researchers in conducting research with human participants.

National Institutes of Health
http://www.nih.gov

**COLLABORATIVE INSTITUTIONAL TRAINING INITIATIVE (CITI PROGRAM)**
**COURSEWORK REQUIREMENTS REPORT***

* NOTE: Scores on this Requirements Report reflect quiz completions at the time all requirements for the course were met. See list below for details. See separate Transcript Report for more recent quiz scores, including those on optional (supplemental) course elements.

- **Name:** Joel Hay (ID: 618466)
- **Institution Affiliation:** University of Southern California (ID: 498)
- **Institution Unit:** 330
- **Phone:** 323-442-3296

- **Curriculum Group:** CITI Good Clinical Practice
- **Course Learner Group:** Same as Curriculum Group
- **Stage:** Stage 1 - Basic Course

- **Report ID:** 15187675
- **Completion Date:** 02/02/2015
- **Expiration Date:** N/A
- **Minimum Passing:** 80
- **Reported Score*:** 91

**CERTIFICATE OF COMPLETION**

This certifies that

*Joel Hay*

has successfully completed

**SANS Securing the Human Awareness Training**

for

**University of Southern California**

March 25th, 2016

(1 CPE Credit)

SANS

# APPENDIX B

**Appendix B:**

April 22, 2016

**Court and Arbitration Cases that Joel W. Hay, Ph.D. has offered reports, declarations, depositions or testimony in the past four years:**

Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries Ltd., Teva Neuroscience, Inc. and Yeda Research and Development Co., Ltd., Plaintiffs, v. Doctor Reddy's Laboratories, Ltd. and Doctor Reddy's Laboratories, Inc., Sandoz Inc. and Momenta Pharmaceuticals, Inc., Synthon Pharmaceuticals Inc., Synthon B.V., Synthon S.R.O. Blansko, and Pfizer, Inc., Mylan Pharmaceuticals Inc., Mylan Inc. and Amneal Pharmaceuticals LLC, Defendants. C.A. No. 1:14-cv-1171-GMS (consolidated). United States District Court for the District of Delaware.
I filed a report in April, 2016.
(I worked for defendants' attorneys).

Kowa Company, Ltd. et al., Plaintiffs, v. Amneal Pharmaceuticals LLC, Mylan Inc. et al., Orient Pharma Co., Ltd., Zydus Pharmaceuticals (USA) Inc. et al., Sawai USA, Inc. et al., Apotex, Inc. et al., Lupin Ltd. et al., Defendants. Civil Action No. 14-CV-2760 (PAC). United States District Court for the Southern District of New York.
I filed a report in April, 2016.
(I worked for defendants' attorneys).

Mylan Pharmaceuticals Inc. and Amneal Pharmaceuticals LLC,
Petitioners v. Yeda Research and Development Co. Ltd. Patent Owner. Case No. IPR2015-00643 (8,232,250 B2), Case No. IPR2015-00644 (8,399,413 B2), Case No. IPR2015-00830 (8,969,302 B2). United States Patent and Trademark Office, before the Patent Trial and Appeal Board. I filed a declaration in March 2016. I was deposed in April, 2016.
(I worked for petitioners' attorneys).

United States of America, ex rel. Beverly Brown, Plaintiff-Relator v. Celgene Corporation, Defendant. Civil Action No. CV10-03165 GHK (SSx). United States District Court Central District of California – Western Division.
I filed reports in September and December 2015. I filed a declaration in October 2015.
(I worked for plaintiffs' attorneys).

Abbvie Inc., Plaintiff, v. Medimmune, LLC, Defendant. Case No. 11 CH 4176. Circuit Court of the Nineteenth Judicial Circuit, Lake County, Illinois, Chancery Division.
I filed a report in this case in September 2013. I filed a rebuttal report in December 2013. I was deposed in February 2014. I testified at trial in September, 2015. The jury awarded plaintiff a complete victory at trial.
(I worked for plaintiff's attorneys).

Luitpold Pharmaceuticals, Inc., Plaintiff, v. Ed. Geistlich Söhne A.G. Für Chemische Industrie, and Osteomedical Ltd. Defendants. Case No. 11-cv-0681 (KBF) (THK). United States District Court, Southern District of New York.
I filed a report in this case in July 2012. I filed another report in October 2012. I was deposed in October 2012. I filed another report in April 2013. I filed two additional reports in August, 2015. Case settled.
(I worked for plaintiff's attorneys).

Astrazeneca AB, Aktiebolaget Hässle, Astrazeneca LP, KBI Inc. and KBI-E Inc., Plaintiffs and Counterclaim-Defendants, v. Mylan Laboratories Limited and Mylan Inc., Defendants and Counterclaim-Plaintiffs. United States District Court for the District of New Jersey Civil Action No. 3:12-cv-01378-MLC-TJB.
I filed a declaration in July 2015. Defendant won.
(I worked for defendant's attorneys).

Torrent Pharmaceuticals Limited and Apotex, Inc. and Mylan Pharmaceuticals Inc., Petitioners, v. Novartis AG and Mitsubishi Pharma Corp., Patent Owners. United States Patent and Trademark Office, Before the USPTO Patent Trial and Appeal Board. Case IPR2014-00784, Case IPR2015-00518, Patent 8,324,283 B2.
I filed a declaration in June 2015. Petitioners won.
(I worked for petitioners' attorneys).

Safeway Inc; Walgreen Co.; The Kroger Co.; New Albertson's, Inc.; American Sales Company, Inc.; And Heb Grocery Company, LP, Plaintiffs; Meijer, Inc. & Meijer Distribution, Inc.; Rochester Drug Co-Operative, Inc.; And Louisiana Wholesale Drug Company, Inc., On Behalf of Themselves and All Others Similarly Situated, Plaintiffs; Rite Aid Corporation; Rite Aid Hdqtrs Corp.; JCG (PJC) USA, LLC; Maxi Drug, Inc D/B/A Brooks Pharmacy; Eckerd Corporation; CVS Pharmacy, Inc.; and Caremark LLC, Plaintiffs; Smithkline Beecham Corporation, d/b/a Glaxosmithkline, Plaintiff; v. Abbott Laboratories, Defendant. United States District Court Northern District of California Oakland Division, Case Nos. C 07-5470 (CW), C 07-5985 (CW) (Consolidated Cases), C 07-6120 (CW), C 07-5702 (CW). All Related per November 19, 2007 Order to Case No. C 04-1511(CW).
I filed a report in March and two reports in July 2010. I was deposed in July 2010. I testified at jury trial in March 2011. I filed a report in February 2015 and another in March 2015. I was deposed in March 2015.
(I worked for defendant's attorneys).

In re Questcor Pharmaceuticals Inc. Securities Litigation, John K. Norton, Individually, the Federal Securities Laws and on Behalf of All Other Similarly Situated, Plaintiffs, vs. Questcor Pharmaceuticals, Inc., Don M. Bailey, Michael Mulroy, Stephen L. Cartt, David Young, David J. Medeiros, and Mitchell I. Blutt, Defendants. Case No. 8: 12-cv-01623-DMG(FMOx). United States District Court, Central District of California Southern Division.
I filed a report in February 2015.
(I worked for plaintiffs' attorneys).

Biotechnology Value Fund, L.P.; Biotechnology Value Fund II, L.P.; Investment 10, L.L.C.; BVF Investments, L.L.C.; BVF Inc.; And BVF X, LLC, Plaintiffs, v.
Celera Corporation; Credit Suisse Securities (USA) LLC; Kathy Ordonez; Richard H. Ayers; William G. Green; Peter Barton Hutt; Gail M. Naughton; Wayne I. Roe; and Bennett M. Shapiro, Defendants. Case No. CV-13-3248-WHA-DMR. United States District Court, Northern District of California, San Francisco Division.
I filed a report in November 2014. I was deposed in November 2014.
(I worked for defendants' attorneys).

U.S. et al. ex Relator. James Garbe, Plaintiffs, v. Kmart Corporation, Defendant. Case No. 3:12-cv-00881-NJR-PMF. United States District Court, Southern District of Illinois.
I filed a report in July 2014 and a declaration in September 2014. I was deposed in September 2014. I filed an additional report in November 2014.
(I worked for plaintiff's attorneys).

Teva Branded Pharmaceutical Products R&D, Inc., Teva Respiratory, LLC,
Norton (Waterford) Limited and Norton Healthcare Limited, Plaintiffs, V. Perrigo Pharmaceuticals Co., Perrigo Co. and Catalent Pharma Solutions, LLC, Defendants. Case No. 12-cv-01101-GMS (consolidated). United States District Court for the District of Delaware.
I filed a report in this case in March 2014. I was deposed in April 2014.
(I worked for defendant's attorneys).

Cadence Pharmaceuticals, Inc. and SCR Pharmatop, Plaintiffs, v. Fresenius Kabi USA, LLC et al., Defendants. Case No. 13-CV-00139 DMS (MDD). United States District Court for the Southern District of California.
I filed a report in this case in February 2014. I was deposed in March 2014.
(I worked for defendant's attorneys).

Pfizer Inc., Alpharma Pharmaceuticals LLC, and King Pharmaceuticals, Inc., Plaintiffs, v. Watson Laboratories, Inc. – Florida, Defendant. C.A. No. 11-914 (LPS). United States District Court for the District of Delaware.
I filed a report in this case in December 2013. I was deposed in January 2014. I testified at trial in February 2014.
(I worked for defendants' attorneys).

Pfizer Inc., Wyeth LLC., and Wyeth Pharmaceuticals Inc., Plaintiffs, v. Sandoz Inc., Intas Pharmaceutical Ltd., Astron Research Ltd., Accord Healthcare Ltd., and Accord Healthcare, Inc. USA, Defendants. C.A. No. 11-1252 (GMS) (MPT) Consolidated. United States District Court for the District of Delaware.
I filed a report in this case in October 2013. I was deposed in November 2013.
(I worked for defendants' attorneys).

Jennifer L. Saavedra, Dr. Melissa Strafford, Carol Jacquez, and David Matthews, Jr., on Behalf of Themselves and All Other Persons Similarly Situated, Plaintiffs, vs. Eli Lilly and Company, an Indiana corporation, Defendant. Case No. 2:12-CV-09366-SVW(MANX). United States District Court for the Central District of California.
I filed declarations in this case in August 2013, November 2013 and March 2014. I was deposed in December 2013.
(I worked for plaintiffs' attorneys).

Laura A. Plumlee, an Individual, on Behalf of Herself and All Other Persons Similarly Situated, Plaintiff, vs. Pfizer, Inc., a New York Corporation, Defendant. Case No. 13-CV-0414-LHK. U.S. District Court for the Northern District of California, San Jose Division.
I filed a report in this case in July 2013.
(I worked for plaintiffs' attorneys).

Spec Pharma, LLC (Complainant), v. Luitpold Pharmaceuticals, Inc., (Respondent). In Arbitration Before Jams, Inc., New York, NY.
I filed a report in this case in July 2013.
(I worked for respondent's attorneys).

Anacor Pharmaceuticals, Inc., (Claimant) and Valeant Pharmaceuticals International, Inc. (Respondent), In Arbitration Before Jams, Inc., San Francisco, CA. Ref. No. 1100072088 Hon. James Ware (Ret.).
I filed a report in this case in March 2013.
(I worked for respondent's attorneys).

Certain Underwriters at Lloyd's London, Subscribing To Policy No. 5481NS3003500, Certain Underwriters at Lloyd's, London Subscribing To Policy No. 5481NS3003700, Underwriters at Lloyd's, London, Subscribing To Policy No. 769/009020 and Underwriters at Lloyd's, London Subscribing To Certificate No. MPT-00144300, Plaintiffs/Counterdefendants, v. Abbott Laboratories, Defendant/Counterplaintiff. Circuit Court of Cook County, Illinois County Department, Chancery Division No. 03CH9307.
I filed a report in this case in September 2009 and a supplemental report in December 2012.
I was deposed in November 2009. I testified at trial in February 2013.
(I worked for defendant/counterplaintiff's attorneys). Defendant/Counterplaintiff won. Judge's Order cited Dr. Hay's testimony as "more credible" than the opposing expert in awarding the defendant's full request for damages.

United States of America, et al. ex rel. Helen Ge, M.D. Plaintiffs And Relator, v. Takeda Pharmaceutical Company Limited, and Takeda Pharmaceuticals U.S.A., Inc., f/k/a Takeda Pharmaceuticals North America, Inc. Defendants; United States of America, et al. ex rel. Helen Ge, M.D. Plaintiffs and Relator, v. Takeda Pharmaceutical Company Limited, and Takeda Pharmaceuticals U.S.A., Inc., f/k/a Takeda Pharmaceuticals North America, Inc. Defendants, Civil Action No. 11-10343-FDS. United States District Court, District of Massachusetts
I filed a report in this case in November 2012.
(I worked for relator's attorneys).

Takeda Pharmaceutical Co., Ltd., Takeda Pharmaceuticals North America, Inc., Takeda Pharmaceuticals LLC, and Takeda Pharmaceuticals America, Inc.,
Plaintiffs, v. Handa Pharmaceuticals, LLC, and Par Pharmaceutical, Inc. Defendants; Takeda Pharmaceutical Co., Ltd., Takeda Pharmaceuticals North America, Inc., Takeda Pharmaceuticals LLC, and Takeda Pharmaceuticals America, Inc.,
Plaintiffs, v. Impax Laboratories, Inc. Defendant, Case No. 3:11-cv-01610-JCS Related Case Nos. 3:11-cv-00840-JCS and 3:11-cv-01609-JCS. Hon. Joseph C. Spero, United States District Court, Northern District of California, San Francisco Division.
I filed a report in this case in September 2012. I filed a supplemental report in November 2012. I was deposed in November 2012.
(I worked for defendants' attorneys).

Celexa and Lexapro Marketing and Sales Practice Litigation, Plaintiffs, vs. Forest Pharmaceuticals and Forest Laboratories, Defendants, Case No. MDL No. 2067
Master Docket No. 09-MD-2067 (NMG). United States District Court
for the District of Massachusetts.
I filed a report in this case in September 2012. I filed a declaration in August 2013.
(I worked for plaintiffs' attorneys).

Androgel Antitrust Litigation (II) Case No. 1:09-MD-2084-TWT, End Payor Class Actions Fraternal Order of Police, Fort Lauderdale Lodge 31, Insurance Trust Fund, Plaintiff, v. Unimed Pharmaceuticals, Inc., et al., Defendants, Case No. 1:09-CV-2914-TWT; George Steven Legrand, Plaintiff, v. Unimed Pharmaceuticals, Inc., et al., Defendants, CASE NO. 1:10-CV-2883-TWT; Health Net, Inc., Plaintiff, v. Solvay Pharmaceuticals, Inc., et al., Defendants, Case No. 1:11-CV-334-TWT. United States District Court, Northern District of Georgia, Atlanta Division.
I filed a report in this case in August 2012. I was deposed in September 2012. Defendants won on summary judgment.
(I worked for defendants' attorneys).

# APPENDIX C

# Appendix C:

Defects in Tricare data resolved on 12/23/2015. Questions about the new data answered by Tricare on 03/02/2016.

Issue about the presence of Medicare Advantage in PDE files resolved by CMS on 01/15/2016.

**Bates documents**

CELBRN0714359
CELBRN0204655
CELBRN0095298
CELBRN0095301
CELBRN0714068
CELBRN0212364
CELBRN0212346-47
CELBRN0317545
CELBRN3310509
CELBRN064011
CELBRN0961785
CELBRN0754351
CELBRN0137120
CELBRN0175405
CELBRN0223299
CELBRN0229517
CELBRN0322454
CELBRN0322658
CELBRN0347838
CELBRN0348853
CELBRN0354694
CELBRN0354904
CELBRN1189552
CELBRN1190162
CELBRN1558694
CELBRN0175405
CELBRN0223299
CELBRN0229517
CELBRN0322454
CELBRN0322658
CELBRN0347838
CELBRN0348853
CELBRN0354694
CELBRN0354904
CELBRN1189552

CELBRN1190162
CELBRN1558694
CELBRN0175405
CELBRN0303825
CELBRN0175405
CELBRN0303825
CELBRN0322327
CELBRN0178363
CELBRN0316185
CELBRN1352139
CELBRN1355311
CELDOJ014072
CELBRN3542176
CELBRN3542179
CELBRN3542182
CELBRN3542176
CELBRN3542179
CELBRN3542182
CELBRN0574956
CELBRN0774524
CELBRN0781605
CELBRN0483855
CELBRN0751139
CELBRN0985199
CELBRN0147024
CELBRN0766998
CELBRN0098775-883
CELBRN0098788.
CELBRN0098800.
CELBRN1573074-107 at CELBRN1573092
CELBRN1573096-98
CELBRN1573539-562
CELBRN1573546
CELBRN0200954 (promotional budget document)
CELBRN064011 (promotional budget document)
CELBRN1199112 (Promotional Speakers' Bureau launch document); CELBRN1793011 (assessing success of speakers' programs as a function of Return on Investment and increased prescription of Celgene's drugs by speakers and those they influence)
CELBRN1793012
CELBRN0341872
CELBRN350180
CELBRN0341872
CELBRN0160314
CELBRN0168985.
CELBRN0346800-06 at CELBRN0346802

**Legal reports, exhibits and other case-related documents**

Celgene 2000 Marketing Plan
Report of Stephen Z. Fadem, M.D., FACP, FASN. September 24, 2015.
Cavanaugh Exhibit 32 BB2-0000002
Celgene 2013 Corporate Responsibility Document
Hay Rebuttal Report
Stultz Deposition
TAC ¶ 205
Deposition of Mark Alles
Revlimid 2005 Business Plan, slide 39
1999 Thalomid Marketing Plan
JD_ENVISION000001
Dr. Boccia's deposition
Exhibit 20 to Boccia Dep
[redacted]_000054-58.
[redacted]_000093-96
[redacted]_000828
[redacted]_000826
[redacted]_000826
Berenson_03968
Berenson_00919.
[redacted]_000077

**Websites and other references**

Michael A., Interactions Between Pharmaceutical Representatives and Doctors in Training; A Thematic Review, J Gen. Intern. Med. 2005; 20:777-786;

Schwartz, Thomas L.; Kuhles, Daniel J., II; Wade, Michael; Masand, Prakash S., Newly Admitted Psychiatric Patient Prescriptions and Pharmaceutical Sales Visits, Annals of Clinical Psychiatry; Sep. 2001; 13, 3; pg. 159;

Berndt, Ernst R.; Bui, Linda; Reiley, David R.; Urban, Glen L., Information, Marketing, and Pricing in the U.S. Antiulcer Drug Market, The American Econ. Rev.; May 1995; 85, 2; Pg. 100;

Norris, Pauline; Herxheimer, Andrew; Lexchin, Joel; Mansfield, Peter, Drug Promotion: What We Know, What We Have Yet to Learn, WHO/EDM/PAR/2004.3.

Kahneman, Daniel. *Thinking, Fast and Slow* (Kindle Locations; 6173-6175, 7668-7671). Farrar, Straus and Giroux. Kindle Edition. 2011

http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM167840.pdf

http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM165843.pdf

http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Benefits/Prescription-Drugs/Medicaid-Drug-Programs-Data-and-Resources.html (accessed November 11, 2015).

http://www.hrsa.gov/hansensdisease/dataandstatistics.html
http://www.va.gov/vetdata/Expenditures.asp; https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NationalHealthAccountsHistorical.html

https://www.cms.gov/openpayments/index.html

http://www.lexology.com/library/detail.aspx?g=60512c39-74f5-442e-a606-fda60ff9a29b;

http://www.mmm-online.com/pharmaceutical/cms-updates-cme-guidance/article/427425/.

http://www.propublica.org/article/glaxosmithkline-to-quit-paying-doctors-for-promotional-talks

https://hms.harvard.edu/about-hms/integrity-academic-medicine/faculty-policies-integrity-science/policy-conflicts-interest

Gretchen Jacobson, Anthony Damico, Tricia Neuman and Marsha Gold. Medicare Advantage 2015 Spotlight: Enrollment Market Update. Kaiser Family Foundation, June, 2015.

Hay JW, Smeeding J, Carroll NV, Drummond M, Garrison LP, Mansley EC, Mullins CD, Mycka JM, Seal B, Shi L. Good Research Practices in Measuring Drug Costs for Cost Effectiveness Analysis: A Report of the ISPOR Drug Cost Task Force. Value in Health 2010; 13(1):3-7.

Mansley E, Carroll N, Chen K, Shah N, Tak Piech C, Hay JW, Smeeding J. Good Research Practices for Measuring Drug Costs in Cost Effectiveness Analyses: A Managed Care Perspective - A Report of the ISPOR Drug Cost Task Force Part III. Value in Health 2010; 13(1):14-17.

Mullins CD, Seal B, Seoane-Vazquez E, Sankaranarayanan J, Asche C, Jayadevappa R, Lee W, Romanus D, Wang J, Hay JW, Smeeding J. Good Research Practices for Measuring Drug Costs in Cost Effectiveness Analyses: A Report of the ISPOR Drug Cost Task Force – Part IV: Medicare, Medicaid and Other US Government Payers Perspectives. Value in Health 2010; 13(1):18-24.

*U.S. v. Rogan*, 517 F.3d 449 (7th Cir. 2008); *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364 (4th Cir. 2015); *U.S. ex rel. Drakeford v. Tuomey*, 976 F. Supp. 2d 776 (D.S.C. 2013); *U.S ex rel. Freedman v. Suarez-Hoyos*, 2012 U.S. Dist. LEXIS 135230, at *15 (M.D. Fla. Sept. 22, 2012).

Expert Report of Ruben Steck, *Drakeford v. Tuomey*, Case No. 05-02858, Dkt. No. 671-5 (D.S.C. Oct. 15, 201).

http://www.amerisourcebergen.com/abcnew/news/press-releases/ion-solutions-and-foundation-medicine-enter-into-a-preferred-partnership-to-deliver-comprehensive-cancer-genomic-profiling-services.aspx.

Blood, Volume 108, issue 11, November 16, 2006, Abstract 531:Preliminary Results from a Phase II Study of Lenalidomide Monotherapy in Relapsed/Refractory Aggressive Non-Hodgkin s Lymphoma. Session Type: Oral Session

Peter H. Wiernik, Izidore Lossos, Joseph Tuscano, Glen Justice, Julie M. Vose, Dennis Pietronigro, Kenichi Takeshita, Annette Ervin-Haynes, Jerome B. Zeldis, Thomas M. Habermann. Our Lady of Mercy Cancer Center, New York Medical College, Bronx, NY; Sylvester Cancer Center-University of Miami, Miami, FL; University of California Davis Cancer Center, Sacramento, CA; Pacific Coast Hematology/Oncology Medical Group,Fountain Valley, CA; University of Nebraska, Omaha, NE; Celgene Corporation, Summit, NJ; Mayo Clinic, Rochester, MN

http://jco.ascopubs.org/content/early/2013/04/22/JCO.2013.49.5002

http://polarismanagement.com/wp-content/uploads/2014/11/FMV-Physician-Consultants-Sept05-Pharm-Exec.pdf

http://oig.hhs.gov/fraud/docs/alertsandbulletins/2014/SAB_Copayment_Coupons.pdf

http://oig.hhs.gov/fraud/docs/alertsandbulletins/2014/independent-charity-bulletin.pdf

http://www.cancer.gov/about-cancer/treatment/drugs/multiple-myeloma

https://patientsandpros.cdfund.org/Programs/Products

http://seekingalpha.com/article/1892111-celgene-and-the-chronic-disease-fund-the-next-domino-to-fall

**Data sources**

CDF_CLG_0003368
CDF_CLG_000728;
CDF_CLG_0007286;
CDF_CLG_0007289-93;
CDF_CLG_0007313-14;
CDF_BLG_0007316-325;
CDF_CLG-0007328-330;
CDF_CLG_0007351-52;
CDF_CLG_0007390-92;
CDF_CLG_0007404-05
CDF_CLG_0007318.
CDF_CLG_0007304
CDF_CLG_0000005-6;
CDF_CLB_0007388-89
BROWN_PANF_000001-07
BROWN_PANF_000003
BROWN_PANF_0000023
BROWN_PANF_0000155.
LR15_0169B_Medical_Data_1
LR15_0169B_Medical_Data_2
LR15_0169B_Medical_Data_3
LR15_0169B_Medical_Data_4
LR15_0169B_Prescription
Delaware - Data provided for Aug. 2003 - Feb. 2010 (Counsel)
Florida - (Counsel)
Louisiana (counsel) – Data provided for 2005 – 2015 Q2
Nevada - Data provided for Jun. 2000 - Jul. 2014 (Counsel)
New Jersey - Data provided for Jan. 2005 - Jun. 2015 (Counsel)
New York - Data provided for Feb. 2007 - Apr. 2015 (Counsel)
Texas - Data provided from Jan. 1999 to Apr. 2015 (Counsel)
Washington D.C. - Data provided for Dec. 2003 to Jan. 2009 (Counsel)
Wisconsin - Data provided from Apr. 1999 - Apr. 2015 (Counsel)
Medicare data files from CMS
Tricare data provided by Tricare
JD_ENVISION000001-2
RevAssist and STEPS data from counsel
CELBRN3568999
CELBRN3528142
081910

**Publicly available data sources used**

NPPES_Data_Dissemination_Aug_2015.zip from CMS.GOV website was used to obtain NPI numbers. Available at: http://download.cms.gov/nppes/NPI_Files.html.

California - Data provided for Q4 1998-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/15/2015

Connecticut - Data provided for Q4 2009 - Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 12/2/2015

Georgia - Data provided for Q2 2007-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/6/2015

Hawaii - Data provided for Q4 1998-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/15/2015

Illinois - Data provided for Q4 1998-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/6/2015

Indiana - Data provided for Q2 2005-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/15/2015

Louisiana (counsel) – Data provided for 2005 – 2015 Q2

Massachusetts - Data provided for Q4 1998-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/6/2015

Michigan - Data provided for Q4 1998-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/6/2015

Montana - Data provided for Q4 2005-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015

New Hampshire - Data provided for Q1 2005-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-

topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015

New Mexico - Data provided for Q2 2014-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015

North Carolina - Data provided for Q4 1998-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/6/2015

Oklahoma - Data provided for Q4 2007-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015

Rhode Island - Data provided for Q3 2007-Q2 2015(http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015

Tennessee - Data provided for Q3 2000-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015

Virginia - Data provided for Q1 2003-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015 Washington - Data provided for Q2 2012-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015

**Revlimid**

California - Data provided for Q1 2006-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/15/2015

Connecticut - Data provided for Q4 2009 - Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) 12/2/2015

Delaware - Data provided for Apr. 2007 - Apr. 2015 (Counsel)

Florida - (Counsel)

Georgia - Data provided for Q2 2007-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/6/2015

Hawaii - Data provided for Q3 2006-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/15/2015

Illinois - Data provided for Q2 2006-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/6/2015

Indiana - Data provided for Q4 2006-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/15/2015

Louisiana - (counsel) Data provided for 2006 – 2015 Q2

Massachusetts - Data provided for Q4 2006-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/6/2015

Michigan - Data provided for Q1 2006-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/6/2015

Montana - Data provided for Q1 2007-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015

Nevada - Data provided for Aug. 2006 - Apr. 2015 (Counsel)

New Hampshire - Data provided for Q4 2007-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015

New Jersey - Data provided for Mar. 2008 - Jun. 2015 (Counsel)

New Mexico - Data provided for Q3 2008-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015

New York - Data provided for Feb. 2007 - May 2015 (Counsel)

North Carolina - Data provided for Q1 2006-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/6/2015

Oklahoma - Data provided for Q4 2007-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015

Rhode Island - Data provided for Q3 2007-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015

Tennessee - Data provided for Q3 2006-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015

Texas - Data provided from Feb. 2006 to Apr. 2015 (Counsel)

Virginia - Data provided for Q3 2006-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015
Washington - Data provided for Q2 2012-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015

http://www.va.gov/vetdata/Expenditures.asp; https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NationalHealthAccountsHistorical.html
http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Benefits/Prescription-Drugs/Medicaid-Drug-Programs-Data-and-Resources.html

Gretchen Jacobson, Anthony Damico, Tricia Neuman and Marsha Gold. Medicare Advantage 2015 Spotlight: Enrollment Market Update. Kaiser Family Foundation, June, 2015.

CMS website.

To the extent not specifically identified above, all documents and materials are listed in Appendix C to each of Dr. Hay's earlier reports in this action dated 9/25/15, 10/26/15 and 12/7/15.

# APPENDIX D

# Appendix D: Medicare Analysis Method for On/Off-Label Thalomid and Revlimid Use and Damages Calculations

1. Study population

Select the patients both occurred in Part AB and Part D files. The Part AB inpatient, outpatient, and carrier file are used. Most of the line of therapy studies used only inpatient and outpatient claims. We add carrier file since it cover a large portion of the Medicare beneficiaries.

Using the contract_num from PartD data to define Part D claims whether covered by non-Medicare Advantage (non-MA) or by Medicare Advantage (MA) plan. Contract numbers beginning with "H" are "Local Medicare Advantage Prescription Drug (MA-PD) Plans". Contract numbers beginning with "R" are "Regional MA-PD Plans". Identify patients whose Part D claims were only covered by non-MA plans and patients who covered by non-MA plans before covered by any MA plans.

In order to cover all diagnostic information, it is required that the patients must have at least one diagnostic claims in the month prior to their first drug claims. Patients that didn't meet this criterion were excluded from the analysis.

2. Pre-index time period

Since both the Part AB and Part D data are from 2006. We need a washout period to exclude the unavailable diagnostic codes and drug claims shortly before 2006. We may use the first month in 2006 as the washout period. We will exclude any beneficiary had any Thalomid/Revlimid prescriptions or related diagnostic codes in January 2006. When we perform analysis, we will use the time period from February 1, 2006 to December 31, 2014.

3. Variable usages

a. Diagnostic codes

As I checked the Part AB databases, the following variables provide ICD-9 codes.
*Inpatient file*
CLM-ADMTG-DGNS-CD
CLM-PRNCPAL-DGNS-CD
CLM-DGNS-CD
*Outpatient file*
CLM-PRNCPAL-DGNS-CD
CLM-DGNS-CD
*Carrier File*
CLM-PRNCPAL-DGNS-CD
CLM-DGNS-CD

b. Diagnostic date

*Inpatient file*
Admission date
*Outpatient file*
Claim from date
*Carrier file*
Claim from date

c. Part D variables
Use FINL_ACTN_IND as the indicator for final claim. Y means final claim. We will only include records associated with "Y" in the damage analysis.
Count unique combination of prescription number (RX_NUM) and service date (RX_DOS_DT) as count of prescriptions when FINL_ACTN_IND is equal to Y.

Use CVRD-D-PLAN-PAID as the payment amount from Part D plan.

Use LISC_SUB as the extra payment amount from Part D plan.

Use CONTRACT_NUM to define Medicare Advantage and non-Medicare Advantage plan types.

4. Line of therapy definition for MM

a. First line.
If Thalomid/Revlimid were prescribed within the first 28 days of a patient's first diagnostic dates of MM, then patient's Thalomid/Revlimid prescriptions are considered first line.

b. Second line
If Thalomid/Revlimid were prescribed after the first 28 days of a patient's first diagnostic dates of MM, then patient's Thalomid/Revlimid prescriptions are considered second line.

5. Line of therapy definition for MCL

a. First line.
If Revlimid were prescribed within the first 28 days of a patient's first diagnostic dates of MCL, then patient's Revlimid prescriptions are considered first line.

b. Refractory Use.
If Revlimid were prescribed after the first 28 days of a patient's first diagnostic dates of MCL, then patient's Revlimid prescriptions are considered refractory use.

6. Define index dates

We append all the files from inpatient, outpatient and carrier files, including diagnostic dates and diagnostic codes. We will use diagnostic codes and diagnostic dates to define the first diagnostic dates of each patient for Myelodysplatic Syndromes (MDS), Multiple Myeloma (MM), Mantle Cell Lymphoma (MCL), and Erythema Nodosum Leprosum (ENL).

7. Off-Label Definition

a. Revlimid off-label definition.

From 04/01/2006 to 06/28/2006, if the service date is earlier than the first MDS diagnostic date, the prescription is considered off-label.

From 06/29/2006 to 06/04/2013, two conditions will be considered off-label.
i. Service date is earlier than both of first MDS and MM diagnostic dates.

ii. Service date is earlier than first MDS diagnostic dates but later than the first MM diagnostic date. Meanwhile, the prescription is first line.

From 06/05/2013 to 02/16/2015, four conditions will be considered off-i.
Service date is earlier than all of first MDS, MM, and MCL diagnostic dates.
ii. Service date is earlier than both of first MDS and MCL diagnostic dates but later than the first MM diagnostic date. Meanwhile, the prescription is MM first line.

iii. Service date is earlier than both of first MDS and MM diagnostic dates but later than the first MCL diagnostic date. Meanwhile, the prescription is MCL first line.

iv. Service date is earlier than first MDS diagnostic dates but later than the both first MM and MCL diagnostic date. Meanwhile, the prescription is MCL first line or MM first line.

b. Thalomid off-label definition

From 07/15/1998 to 05/24/2006, if the service date is earlier than the first ENL diagnostic dates.

From 05/25/2006 to present,
i. Service date is earlier than both the first ENL and MM diagnostic dates.

ii. Service date is earlier than first ENL diagnostic dates but later than the first MM diagnostic date. Meanwhile, the prescription is not first line.

7. Damage analyses

All the damages are only from Medicare Part D records associated with "Y" in the FINL_ACTN_IND variable.

a. Categorize patients by plan types.

i. non-MA only patients: patients whose medication were covered only by non-MA plans.
ii. non-MA plan first patients: patients who covered by non-MA plans before covered by any MA plans.
iii. MA only patients: patients whose medication were covered only by MA plans.

iv. MA plan first patients: patients whose medications were covered by MA plans earlier than any non-MA plans.
b. non-MA plan only and non-MA plan first damages
i. Sum up the CVRD-D-PLAN-PAID and LISC_SUB as the off-label paid amount of the scripts that are defined as off-label from non-MA plan only and non-MA plan first patients.

ii. Count the scripts that are defined as off-label associated with at least one positive CVRD-D-PLAN-PAID or one positive LISC_SUB from non-MA plan only and non-MA plan first patients.
iii. Calculate the off-label percentage of counts of scripts, total CVRD-D-PLAN-PAID and total LISC_SUB from non-MA plan only and non-MA plan first patients separately.

c. MA plan only and MA plan first damages

i. Calculate off-label percentages of count of scripts, CVRD-D-PLAN-PAID, and LISC_SUB using non-MA plan first patients.

i. Sum up the CVRD-D-PLAN-PAID and LISC_SUB as the on-label and off-label paid amount of the scripts from MA plan only and MA plan first patients.

ii. Count the scripts associated with at least one positive CVRD-D-PLAN-PAID or one positive LISC_SUB from MA plan only and MA plan first patients.

iii. Apply off-label percentages form non-MA plan first patients to the counts of scripts, total CVRD-D-PLAN-PAID, and total LISC_SUB of MA plan only and MA plan first patients to calculate the off-label count and damages.

d. Trebling damages are defined as the triple of damages from CVRD-D-PLAN-PAID and LISC_SUB.

e. Civil penalty is defined as count of scripts times 11,000.
f. Total damages are the sum of trebling damages and civil penalty.

# APPENDIX E

# Appendix E: Tricare Analysis Methodology for On/Off-Label Thalomid and Revlimid Use and Damages Calculations

## Tricare Data Analysis Methodology

Tricare data is the most complete dataset provided to me. The Tricare data includes information from 2001 Q4 to 2015 Q3 and contains more than 11,000 patients who received either Thalomid or Revlimid during this time period. It is also the only dataset with complete diagnosis information and care service dates for patients who received either Thalomid or Revlimid, particularly with such a large sample of patients.

Lines of therapy definitions for MM and MCL

a. First line

If Thalomid/Revlimid was prescribed within 28 days of a patient's first diagnostic date, then the patient's Thalomid/Revlimid prescriptions are considered first line.

b. Second and later lines of treatment

If Thalomid/Revlimid was prescribed after the first 28 days of a patient's first diagnostic date, then the patient's Thalomid/Revlimid prescriptions are considered second line (or later) treatment.

Diagnosis index dates

We search for initial diagnosis dates across all the Tricare Medical Data files. We use first occurrence of diagnostic codes and diagnostic dates to define the index diagnostic dates of each patient for Myelodysplastic Syndrome (MDS), Multiple Myeloma (MM), Mantle Cell Lymphoma (MCL), and Erythema Nodosum Leprosum (ENL). Since the data starts from 2001 we did not need a wash-out period for Revlimid. Of the claims for Thalomid seen for patients in the first month from the start of the data period in 2001, none had care dates for ENL during the entire duration of data. Thus, all these claims were off-label and a one month wash out period was not required during analysis. Also, diagnosis information was provided by Tricare on all the patients who ever received Revlimid or Thalomid so wash-out period was not deemed necessary.

Off-Label Definition

A. Revlimid off-label definition.

From 12/27/2005 to 06/28/2006, if the dispensed date is earlier than the first MDS diagnostic date, the prescription is considered off-label.

Any Revlimid claim, at any time, for a patient with an MDS diagnosis without a deletion 5q cytogenic abnormality is considered off-label.

From 06/29/2006 to 06/04/2013, two conditions are considered off-label.
(a) the dispensed date is earlier than both of first MDS and MM diagnostic dates.
(b) the dispensed date is earlier than first MDS diagnostic dates but later than the first MM diagnostic date. Meanwhile, the prescription is MM first line.

From 06/05/2013 to 02/16/2015, four conditions will be considered off-label.

(a) the dispensed date is earlier than all of first MDS, MM, and MCL diagnostic dates.
(b) the dispensed date is earlier than both of first MDS and MCL diagnostic dates but later than the first MM diagnostic date. Meanwhile, the prescription is MM first line.
(c) the dispensed date is earlier than both of first MDS and MM diagnostic dates but later than the first MCL diagnostic date. Meanwhile, the prescription is MCL first line.
(d) the dispensed date is earlier than first MDS diagnostic dates but later than the both first MM and MCL diagnostic date. Meanwhile, the prescription is MCL first line or MM first line.
From 02/16/2015 to 09/30/2015

(a) the dispensed date is earlier than all of first MDS, MM, and MCL diagnostic dates.
(b) the dispensed date is earlier than both of first MDS and MM diagnostic dates but later than the first MCL diagnostic date. Meanwhile, the prescription is MCL first line.

B. Thalomid off-label definition

From 07/15/1998 to 05/24/2006, if the service date is earlier than the first ENL diagnostic dates.

From 05/25/2006 to present,
i. Service date is earlier than both the first ENL and MM diagnostic dates.

ii. Service date is earlier than first ENL diagnostic dates but later than the first MM diagnostic date. Meanwhile, the prescription is not first line.

Even if Thalomid alone were prescribed in first-line without dexamethasone, it is still off-label use. Such off-label use was conservatively considered as on-label use in our analysis.

Even if Thalomid were added in first-line to another therapy, it had to be within the first treatment cycle of 28 days. This could be off-label because, for example, Thalomid cannot be given in combination with Velcade in first-line as on-label use. Such an off-label combination will conservatively be considered on-label first-line use in our data. So, if Thalomid was given only after the first 28 days following index diagnosis date (and even if it were additional therapy to other first-line use), it would be still considered off-label.

Damage analyses

1. First, I deleted all the duplicate claims from the dataset (dups =1 as per the information provided by Tricare). All other claims from the 'Prescription data' file were used towards the analysis.

2. I summed the 'Paid' variable in 'Prescription data' file as the paid amount for off-label claims from the prescriptions file that are defined as off-label (as per the definitions above) for all treatment facilities except MTF (Military Training facilities) as suggested by Tricare. When the claim was made at MTF, I summed up the 'Price' variable as suggested by Tricare.

3. On doing an initial preliminary check of the data, it was revealed to me that whenever the treatment facility was VA (Veterans Affairs) in the Tricare data, the amount paid by Tricare (as per the "Paid" variable suggested by Tricare for calculations) was always $0.01. Thus, the claims (and damage amounts) associated with VA were deleted from the final damages after calculations because of this ambiguity.

4. Treble damages were calculated as three times the straight-line damages.

5. Civil penalties were calculated as total number of claims times 11,000.

6. Total damages were calculated as the sum of treble damages and civil penalties.

As detailed in Appendix D, the strategy used for calculating damages using the lines of therapy logic outlined for the Medicare and Tricare data is a standard method for such an analysis in health economics.

# APPENDIX F

# Appendix F: Medicaid Data Analysis Methodology

I extracted prescription data from the larger SDUD data sets by year (1998-Q2 2015 for Thalomid, 2006-Q2 2015 for Revlimid) from medicaid.gov. I extracted data for Product Names "Revlimid", "Thalomid", and "Thalidomid" (this is the truncated name for "thalidomide" in the data sets). These datasets were available by quarter.

NDC numbering was consistent for both Thalomid and Revlimid entries and damages were restricted to state-specific time-periods. These periods were set by the passage of False Claims Acts in those states (i.e. Georgia passed their False Medicaid Claims Act on May 24, 2007 so claims before that date would not be eligible). The states with restricted time periods included: Connecticut, Georgia, Indiana, Montana, New Hampshire, New Jersey, New Mexico, Oklahoma, Rhode Island, Virginia, and Washington.

## State Data Provided by Counsel

- For State Medicaid program data provided by Counsel, only final claims were included towards analysis.
- Where information was provided on Encounters (non-final claims) vs FFS (Fee-for-service) status, only FFS claims were included towards analysis.
- Duplicate claim tries on the same day for the same patient were removed. For some states such as Louisiana and Florida duplicate entries appeared to be "correction" entries where for example there were 3 similar entries, 2 of which were positive, equal payment amounts, and 1 was a negative, equal reduction amount. Only 1 of the positive payment amount entries in these cases were retained as part of the final calculation.
- Louisiana: Duplicate correction entries were excluded. Only final claims were included towards damages.
- Nevada: Duplicate entries were removed (1) (Duplicate criteria = Same: MBR Member ID, Date of Service, Rx name and Rx quantity) No information on Encounters vs FFS status was provided, so no entries were excluded based on this criteria. Total Payment field used to calculate expenditures.
- New Jersey: Claims and expenditures already totaled, used as is. No information on Encounters vs FFS status was provided, so no entries were excluded based on this criteria.
- District of Columbia: FFS data only included (Encounter data excluded), No duplicate entries found (Duplicate criteria = Same: TCN)
- Wisconsin: Only Paid Claims included—denied claims excluded. No duplicate entries found (Duplicate criteria = Same: ICN, Prescription_Date)
- Florida: Duplicate correction entries were excluded. Only final claims were included towards damages.
- Virginia: Data provided by counsel was ambiguous so we accessed data from Medicaid website for the state of Virginia.
- Texas: Encounter claims were excluded from the analysis. Only final claims were included towards damages.

- New York: Only FFS claims included in the analysis. Variable "NET_PD_AMT_WITHOUT_PGP" used to sum up the payments to get the total claim paid amount.
- Delaware: Only final claims were included towards damages.

If the False Claims Act was passed in middle of a quarter (since data downloaded from Medicaid website was available only by quarter), the costs and claims were weighted by the amount of days eligible (For Georgia, 37 days are eligible for Q2 2007 so the claims/costs for that quarter are multiplied by a factor of 37/91).
Civil penalties and trebled damages by state were calculated using the information from counsel regarding "State False Claims Acts" for each of the included states.
Off-label claims and off-label straight line damages for states were calculated by applying the Tricare Revlimid and Tricare Thalomid total percentage of off-label claims and off-label expenditure percentages (see Tricare Section).

***Data sources:***

**Thalomid**

California - Data provided for Q4 1998-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/15/2015
Connecticut - Data provided for Q4 2009 - Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 12/2/2015
Delaware - Data provided for Aug. 2003 - Feb. 2010 (Counsel)
Florida - (Counsel)
Georgia - Data provided for Q2 2007-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/6/2015
Hawaii - Data provided for Q4 1998-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/15/2015
Illinois - Data provided for Q4 1998-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/6/2015
Indiana - Data provided for Q2 2005-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/15/2015
Louisiana (counsel) – Data provided for 2005 – 2015 Q2
Massachusetts - Data provided for Q4 1998-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/6/2015
Michigan - Data provided for Q4 1998-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/6/2015

Montana - Data provided for Q4 2005-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015
Nevada - Data provided for Jun. 2000 - Jul. 2014 (Counsel)
New Hampshire - Data provided for Q1 2005-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015
New Jersey - Data provided for Mar. 2008 - Jun. 2015 (Counsel)
New Mexico - Data provided for Q2 2014-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015
New York - Data provided for Feb. 2007 - Apr. 2015 (Counsel)
North Carolina - Data provided for Q4 1998-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/6/2015
Oklahoma - Data provided for Q4 2007-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015
Rhode Island - Data provided for Q3 2007-Q2 2015(http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015
Tennessee - Data provided for Q3 2000-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015
Texas - Data provided from Jan. 1999 to Apr. 2015 (Counsel)
Virginia - Data provided for Q1 2003-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015 Washington - Data provided for Q2 2012-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015
Washington D.C. - Data provided for Dec. 2003 to Jan. 2009 (Counsel)
Wisconsin - Data provided from Apr. 1999 - Apr. 2015 (Counsel)

**Revlimid**

California - Data provided for Q1 2006-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/15/2015
Connecticut - Data provided for Q4 2009 - Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) 12/2/2015
Delaware - Data provided for Apr. 2007 - Apr. 2015 (Counsel)
Florida - (Counsel)
Georgia - Data provided for Q2 2007-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/6/2015

Hawaii - Data provided for Q3 2006-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/15/2015
Illinois - Data provided for Q2 2006-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/6/2015
Indiana - Data provided for Q4 2006-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/15/2015
Louisiana - (counsel) Data provided for 2006 – 2015 Q2
Massachusetts - Data provided for Q4 2006-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/6/2015
Michigan - Data provided for Q1 2006-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/6/2015
Montana - Data provided for Q1 2007-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015
Nevada - Data provided for Aug. 2006 - Apr. 2015 (Counsel)
New Hampshire - Data provided for Q4 2007-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015
New Jersey - Data provided for Mar. 2008 - Jun. 2015 (Counsel)
New Mexico - Data provided for Q3 2008-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015
New York - Data provided for Feb. 2007 - May 2015 (Counsel)
North Carolina - Data provided for Q1 2006-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/6/2015
Oklahoma - Data provided for Q4 2007-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015
Rhode Island - Data provided for Q3 2007-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015
Tennessee - Data provided for Q3 2006-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015
Texas - Data provided from Feb. 2006 to Apr. 2015 (Counsel)
Virginia - Data provided for Q3 2006-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015

Washington - Data provided for Q2 2012-Q2 2015 (http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/prescription-drugs/medicaid-drug-programs-data-and-resources.html) Accessed on 11/17/2015
Washington D.C. - Data provided for June 2007 - March 2015 (Counsel)
Wisconsin - Data provided from Mar. 2006 - Apr. 2015 (Counsel)

# APPENDIX G

# Appendix G: Medicare KOL damages Methodology

The KOL speakers paid by Celgene for Revlimid promotion are available to me from year 2006 to 2014. I identified the KOL speakers' DEA and/or NPI numbers using their full names. Revlimid and Thalomid reimbursement records in Medicare Part D program were available to me from year 2006 to 2014. With DEA and/ or NPI numbers, I could identify the drug claims prescribed by the KOL speakers. As mentioned earlier, all Medicare prescriptions written by these KOL's represent illegal kickback damages.

The following provides a step-wise breakdown of methodology employed to carry out the analysis:

1. Identify KOLs' DEA and NPI codes

a. Extract KOL speaker's first name and last name from KOL speaker list.[1]
b. Use KOL speaker's first and last names to identify KOL speakers' DEA numbers from DEA list.[2]
c. Use KOL speaker's first and last names to identify KOL speakers' NPI numbers from NPI list.[3]

2. Identify Medicare PartD claims prescribed by KOLs.
a. The prescriber_id in Medicare Part D database is either in DEA or NPI format.
b. Collect all Revlimid and Thalomid claims associated with identified KOL speakers' DEA or NPI numbers in Medicare Part D database.

3. Categorize claims by plan types.
a. Use Contract_Num to identify claims covered by Medicare Advantage (MA) or Non Medicare Advantage plans (non-MA).
b. Categorize patients into:
i. non-MA only patients: patients whose medication were covered only by non-MA plans.
ii. non-MA plan first patients: patients who covered by non-MA plans before covered by any MA plans.

iii. MA patients: patients whose medication were covered only by MA plans and patients whose medications were covered by MA plans earlier than any non-MA plans.

4 Damages calculation
a. All the damages were only from Medicare Part D prescribed by KOLs records associated with "Y" in the FINL_ACTN_IND variable.
b. Separate Part D claims into groups according to the categories of patients.
c. Calculate the total CVRD-D-PLAN-PAID and total LISC_SUB from each claims group.

---

[1] JD_ENVISION000001-2

[2] CELBRN3568999, CELBRN3528142, and 081910

[3] NPPES_Data_Dissemination_Aug_2015.zip from CMS.GOV website was used to obtain NPI numbers. Available at: http://download.cms.gov/nppes/NPI_Files.html.

d. Count the claims associated with at least one positive CVRD-D-PLAN-PAID or one positive LISC_SUB as count of scripts.
e. The off-label percentage of each patient group was determined by Medicare damages analysis.
i. Off-label percentages of counts of scripts, CVRD-D-PLAN-PAID and LISC_SUB from Non-MA patients were applied to the KOL damages of non-MA patients.
ii. Off-label percentages of counts of scripts, CVRD-D-PLAN-PAID and LISC_SUB from Non-MA first patients were applied to the KOL damages of non-MA first patients.
iii. Off-label percentage of counts of scripts, CVRD-D-PLAN-PAID and LISC_SUB from Non-MA first patients were applied to the KOL damages of MA patients.
f. Off-label damages
i. Off-label count of scripts is defined as the count of scripts multiplied by off-label percentage.
ii. Off-label CVRD-D-PLAN-PAID is defined as total of CVRD-D-PLAN-PAID multiplied by off-label percentage.
iii. Off-label LISC_SUB is defined as total of LISC_SUB multiply off-label percentage.
g. On-label damages
i. On-label count of scripts is defined as the count of scripts multiplied by one minus off-label percentage.
ii. On-label CVRD-D-PLAN-PAID is defined as total of CVRD-D-PLAN-PAID multiplied by one minus off-label percentage.
iii. On-label LISC_SUB is defined as total of LISC_SUB multiplied by one minus off-label percentage.
h. Trebling damages are defined as the triple of damages from CVRD-D-PLAN-PAID and LISC_SUB.
i. Civil penalty is defined as the count of scripts times 11,000.
j. Total damages are the sum of trebling damages and civil penalty.

| KOL_Speakers | DEA | NPI |
|---|---|---|
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |

| | | |
|---|---|---|
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

| | | |
|---|---|---|
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |

| | | |
|---|---|---|
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |

| | | |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |

| | | |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |

| | | |
|---|---|---|
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |

| | | |
|---|---|---|
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |

| | | |
|---|---|---|
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |

| | | |
|---|---|---|
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | | |

| | | |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |

| | | |
|---|---|---|
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |

| | | |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |

# APPENDIX H

# Appendix H: PANF charitable foundation related damages to Medicare Program

## 1) Medicare co-pay calculation method for Part D and Medicare Advantage claims

Using the CONTRACT-NUM variable from PDE data files provided by CMS I determined whether the claims were covered by non-Medicare Advantage (non-MA i.e. Part D) or by Medicare Advantage (MA) plan. Contract numbers beginning with "H" were "Local Medicare Advantage Prescription Drug (MA-PD) Plans" and contract numbers beginning with "R" were "Regional MA-PD Plans". All other claims were Part D i.e. non-Medicare Advantage claims.

I used the PATIENT-PAY-AMT variable from the Medicare Part D to calculate the copay amount paid for Revlimid and Thalomid prescription claims. I then used the CVRD-D-PLAN-PAID (plan paid amount by Medicare) and LISC_SUB (Low income subsidy amount paid by Medicare) variables to determine the total amount paid amount for these prescription drug claims by Medicare. For this analysis, I included all the Medicare Part D and Medicare Advantage plan beneficiaries in the file.

## 2) PANF co-pay calculation method

The PANF data provided by counsel gives co-payment support amount provided by the charitable organization for co-pays of patients in Part D and Medicare Advantage program. The data contained information on organization paid amount and date of payment made for patients enrolled in Part D and Medicare Advantage program from 2005 to 2015. The data included both final and reversal payments. I used the payment_code variable to identify the final claim flagged by PDMI claim. I dropped all claims with PDMI reversals. I used the amount_paid_by_PANF variable to calculate the co-payment amount paid by the organization for Revlimid and Thalomid. I summed the co-payment amount paid by PANF by year for each of the two drugs.

## 3) Damages analysis method:

I calculated the co-pay amount paid by PANF for Revlimid and Thalomid Medicare Part D and Medicare Advantage (MA) prescription drug claims per year from the PANF data provided by counsel. I then calculated the total number of Part D and MA drug claims, total costs to Medicare (CVRD-D-PLAN-PAID+ LISC_SUB) and total patient co-pay amount for Revlimid and Thalomid by year for Part D and Medicare advantage drug claims from the PDE data provided by CMS. I calculated the number of claims and dollar amount paid by each of the Medicare programs (Part D and MA) for the co-payments made through PANF (for Revlimid and Thalomid claims). Then I calculated the total on-label and off-label drug claims for Revlimid and Thalomid and the cost to Medicare for these on-label and off-label claims based on the percentage of off-label use seen in the Medicare Part D (Non-MA only) patient population and Non-MA first patient population that was done based on the diagnostic information made available in Parts A and B giving me a more precise estimate of the on-label and off-label damages.

**Example:**

Calculation for the total dollar amount paid by Medicare Part D for Revlimid claims whose co-payments were made through PANF:

I first calculated the total co-payments made by PANF for Part D Revlimid claims for year 2006 using the PANF data provided by counsel [redacted]). I only included the final claims and deleted reversal payments. I then calculated the total amount (CVRD-D-PLAN-PAID+ LISC_SUB) paid by Medicare Part D program for Revlimid claims ([redacted]) and the total PATIENT-PAY-

AMT ([redacted]) for year 2006. Further, I calculated the amount paid by Medicare Part D program per dollar of co-pay amount for year 2006 [redacted]). I multiplied [redacted] with the total co-pay amount paid by PANF for Revlimid claims associated with Part D program in 2006 to get the total damages i.e. the amount paid for Revlimid on-label and off-label claims in 2006 [redacted]). Similarly, I calculated the total dollar amount paid by Medicare Advantage plan for year 2006 for Revlimid claims whose co-payments were made through PANF. I added the total amount paid by Medicare Part D program and Medicare Advantage program for claims whose co-payments were made by PANF to get the total damages for year 2006 for Revlimid.

I used the percentage of off-label use seen in patients enrolled in Part D only program in the Medicare data to get costs associated with Medicare Part D off-label claims whose co-payments were made by PANF. Similarly, I used the percentage of off-label use seen in patients enrolled in Part D program first but who later on moved on Medicare Advantage program to calculate the costs associated with Medicare Advantage off-label claims whose co-payments were made by PANF.

# APPENDIX I

## Appendix I: Methodology for calculating the total number of prescriptions (and costs associated) by KOLs in Celgene's Revlimid Speaker's program using RevAssist data:

I was provided with a list of the physicians, who served as key opinion leaders (KOL) for Revlimid by counsel and received payment from Celgene for various speaking arrangements. The data on payments received by KOL ranged from 2006 to 2014 and were specific for Revlimid speaking arrangements. The list comprised of 556 physicians. The following methodology was employed to identify and calculate the total number of prescriptions[1] written by these physicians and calculate the associated damages.

1. Extract KOL speaker's first name and last name from KOL list.
2. Using KOL speaker's first and last names to identify KOL speakers' prescriber_ids in Celgene data using Celgene.Prescriber file.
3. Collect all dispensations associated with identified KOL speakers' prescriber_ids in Celgene.dispensation file.
4. Merge the dispensation claims with Celgene.dispensation_sequence file to get dosage associated with each dispensation.
5. Use prescription_date and dosage to get cost of each dispensation. The costs were determined using Redbook.
6. I calculated the total costs of Revlimid prescriptions by Celgene's KOLs.

Prescriber IDs Identified for Speakers in the RevAssist data

| Speaker | Prescriber_id |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

[1] I will be calling 'dispensations' as 'prescriptions' for the purpose of this analysis.

| | | | |
|---|---|---|---|
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |

| | | | |
|---|---|---|---|
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |

| | | | |
|---|---|---|---|
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |

| | | | | |
|---|---|---|---|---|
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |

| | |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

| | | | |
|---|---|---|---|
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |

| | | | |
|---|---|---|---|
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |

| | | | | |
|---|---|---|---|---|
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |

| | |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

# APPENDIX J

# Appendix J: Methodology for investigating statistically significant difference in prescribing behavior of Celgene's high paid vs. low paid KOLs from Revlimid Speakers program

I calculated if there is a statistically significant difference in prescribing behavior of the physicians who received high payments from Celgene versus those who received lower payments. The high paid physicians were defined as physicians who received more than $100,000 dollars from Celgene over the period of 2006 to 2014. This threshold of $100,000 to define high payment was later tested in a sensitivity analysis with threshold of $150,000 and $200,000. The prescribing behavior was measured based on the prescription count of Revlimid over this time frame considered.[1]

At a defining threshold of $100,000 there were [redacted] physicians who received higher than threshold payment. The mean number of prescriptions for physicians paid more than $100,000 was [redacted] while the mean number of prescriptions for physicians paid less than $100,000 was [redacted] (See Appendix I for calculating the total prescriptions written by each of the KOLs). This difference was statistically significant with a p value of <0.0001. The statistically significant difference held over the other two thresholds of $150,000 and $200,000 payments as well. The following table summarizes the results:

Table 10: Comparison of prescriptions between highly paid KOLs and low paid KOLs.

| Threshold: Pay>100,000 | | | | |
|---|---|---|---|---|
| | Prescriptions | Number of KOLs | Prescriptions/KOL | P value |
| **Pay>100,000** | [redacted] | [redacted] | [redacted] | |
| **Pay<100,000** | [redacted] | [redacted] | [redacted] | <0.0001 |
| | | | | |
| **Threshold: Pay>150,000** | | | | |
| | Prescriptions | Number of KOLs | Prescriptions/KOL | P value |
| **Pay>150,000** | [redacted] | [redacted] | [redacted] | |
| **Pay<150,000** | [redacted] | [redacted] | [redacted] | <0.0001 |
| | | | | |
| **Threshold: Pay>200,000** | | | | |
| | Prescriptions | Number of KOLs | Prescriptions/KOL | P value |
| **Pay>200,000** | [redacted] | [redacted] | [redacted] | |
| **Pay<200,000** | [redacted] | [redacted] | [redacted] | <0.0001 |

[1] I conducted this analysis using RevAssist data since it should consist of the entire universe of prescriptions for Revlimid through each of the physicians. Since Medicare prescriptions are a part of the RevAssist data, any result that applies to RevAssist data should apply to Medicare data as well (given there is appropriate sample size to conduct the test in Medicare data).

# EXHIBIT E

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO, | Case No. 10-cv-03165GHK |
| Plaintiffs, | |
| Ex rel. | |
| BEVERLY BROWN, | |
| Plaintiff-Relator, | |
| v. | |
| CELGENE CORPORATION, | |
| Defendant. | |

VIDEOTAPED DEPOSITION OF JOEL W. HAY, PH.D.

June 24, 2016

9:37 a.m.

REPORTED BY:

Kristi Caruthers, CLR, CSR No. 10560

could, and certainly Dr. Cockburn had ample opportunity to provide evidence for what those might be. He went through multiple, different what he considered to be, quote, "independent," unquote, alternative explanations.

I pointed out in great detail in my rebuttal report by (a) not one of the things he mentioned was independent of Celgene's promotional activities, and (b) why I found it unconvincing that they were important causes.

BY MS. DUNNE:

Q. Did you undertake your own causation analysis?

A. Yeah. It's discussed in my rebuttal report.

Q. What causation analysis did you undertake?

A. Well, I think the way to describe what I'm doing is the -- I certainly considered the option of doing a regression model approach, but because of the fact that most of the critical data had been destroyed in this case, certainly after June 2006, and a lot of other data was not available for whatever reason, as someone who is an expert in econometrics and multivariate

regression analysis, I know that if you have an incomplete time period, then you're leaving out important variables. The regression analysis will be unreliable.

So the alternative approach I used to get at substantial cause was in the framework of something called the Donabedian structure-process-outcome analysis, which is a sort of a mixed methods approach. It's not a purely quantitative approach; it's an approach that looks at the evidence in a more holistic and qualitative manner.

Q. What's the basis for your believing that all the evidence after June 2006 was destroyed?

MR. WILLIAMS: Objection; misstates testimony.

THE WITNESS: Well, I certainly didn't get the individual-level sales visit contact data for any time period systematically after June 2006. I got smatterings of information from alternative sources, but then you run into the problem of how do you key in smatterings of data from other sources to match the data that you have up to June 2006, and that was not a reliable

Some things are just -- you know, you could come up with all kinds of alternatives. Maybe there was an earthquake and it made his trigger finger tremble and he accidentally shot the other guy, but in most cases, there are levels of evidence that rise to the standard where you don't necessarily have to have access to all possible confounders to be able to come to a reasonable conclusion about something that has substantial causal influence.

BY MS. DUNNE:

Q. But you haven't quantified any causal impact in this case of Celgene's conduct on off-label prescribing, have you?

MR. WILLIAMS: Objection; misstates testimony.

THE WITNESS: Well, I've said it's reasonable to conclude that a hundred percent of the off-label prescriptions are substantially caused by the off-label promotion.

BY MS. DUNNE:

Q. You referenced, and I'll pronounce, Donabedian. I'm not sure.

Can you spell that for me, this mixed methodology you referred to?

A. D-o-n-a-b-e-d-i-a-n.

Q. Did you refer to that in your report?

MR. WILLIAMS: Vague and ambiguous.

THE WITNESS: I may not have mentioned it by name, but it's kind of like second nature to people in the health service research field, to the point where -- as I said, I'm a founding member of the International Society of Pharmacoeconomics and Outcomes Research, founding board member, founding editor and chief of their scientific journal, and ISPOR made their most distinguished award category, the Avedis Donabedian Lifetime Achievement Award because his research is so critical to all the things we do in pharmaceutical economics and outcomes research.

BY MS. DUNNE:

Q. Have you published research that is based on the Donabedian mixed methodology?

A. Maybe not having identified it as such, but I'm sure I've looked at structure process and outcome. Many times I've certainly taught my students how to do it. It's a very standard technique that anybody in health services research should be aware of.

Q. When you publish your research, do you typically set forth methodology you used and any outcomes that you reached?

A. Typically, yeah.

Q. So explain to me what this Donabedian mixed methodology is.

MS. ABIN: Oops, sorry. Can we go off the record?

THE VIDEOGRAPHER: We're off the record -- we're off the record. The time is 11:32.

(Whereupon, a recess was held from 11:32 a.m. to 11:37 a.m.)

THE VIDEOGRAPHER: We're back on the record. The time is 11:37.

BY MS. DUNNE:

Q. So when we broke, we were talking about this Donabedian methodology, and that's typically a methodology that is applied to draw inferences about quality of care; isn't that right?

A. It's used to look at healthcare outcomes, and certainly quality of care is one of the factors, yes.

Q. And it's not intended to quantify

MR. WILLIAMS: Yes.

DEPOSITION REPORTER: Do you need a rough?

MR. WILLIAMS: Yes, please.

DEPOSITION REPORTER: Do you need a rough?

MR. WILLIAMS: Sure. Regular delivery is fine.

(The deposition concluded at 6:04 p.m.)

* * *

_______________________________
(Signature of Deponent)

State of California )
) ss
County of Los Angeles)

I, KRISTI CARUTHERS, a Certified Shorthand Reporter duly licensed and qualified in and for the State of California, do hereby certify that there came before me on the 24th day of June, 2016 at 555 West Fifth Street, Suite 4000, Los Angeles, California 90013, the following named person, to-wit: Joel W. Hay, Ph.D., who was duly sworn to testify the truth, the whole truth, and nothing but the truth of knowledge touching and concerning the matters in controversy in this cause; and that he was thereupon examined under oath and his examination reduced to typewriting under my supervision; that the deposition is a true record of the testimony given by the witness.

I further certify that pursuant to FRCP Rule 30(e)(1) that the signature of the deponent:

( ) was requested by the deponent or a party before the completion of the deposition;

(X) was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

CERTIFIED TO BY ME on this 28th day of June, 2016.

KRISTI CARUTHERS
CSR NO. 10560

# EXHIBIT F

*In the Matter Of:*

United States of America, et al v

Celgene Corporation

Katherine Stultz Confidential 30b6

June 10, 2015

*A. William Roberts, Jr. and Associates*
*We're About Service... Fast, Accurate and Friendly*
*(800) 743-DEPO*
*www.scheduledepo.com*

AWR | TRIAL SOLUTIONS
Trial Technology In Our Hands And Off Your Mind AWR

**A. William Roberts, Jr. & Associates**
court reporting | videography | trial presentation | nationwide scheduling
**scheduledepo.com | 800-743-DEPO**

a commercial copay program that Celgene provides.
Q. You said a copay foundation?
A. Yes.
Q. What is a copay foundation?
A. These are groups that were established in the early 2000s, mid 2000s that are nonprofit organizations that provide assistance to patients for their copay needs.
Q. When you say they were established in the early 2000s, do you have any more specifics as to the date that they were established?
A. I cannot. There are several different ones of these, so I don't know when they were established.
Q. Okay. Let's talk about each one of them. Can you give me a list?
A. Sure. So copay foundations that I am familiar with include the CDF, the Chronic Disease Fund, LLS, the Lymphoma Leukemia Society.
Q. Wait. Chronic Disease Fund, CDF. LLF.
A. Lymphoma Leukemia Society, PANF, I believe it stands for Patient Advocacy Network Fund. Those are examples off the top of my mind.
Q. Okay. These were all created in the

2000s?

A. These were all created in the 2000s as independent, nonprofit organizations to assist with copay -- to have -- to provide copay assistance.

Q. How were they created?

A. I -- I don't know.

Q. Who was involved with their creation?

A. These are independent nonprofit organizations that have their own missions and charters, and they may provide other services besides copay assistance as well.

Q. Did you have any contact with each of these groups?

A. Yes, we did.

Q. And what was your -- what was the scope of the patient support committee's contact with these groups?

A. As the director of the team, I would meet with them usually on an annual basis. Not all of the groups. I need to clarify a point, if I can.

Q. Uh-huh.

A. Copay assistance by all of these groups were usually buckets of disease areas of interest. So what I mean by that is CDF would list we will

cover patients for 15 different types of cancer. Most of these were cancer related. Celgene would -- would donate to the diseases that matched our indications.

So, for example, we would donate to the myeloma bucket. We would donate to the myeloplastic bucket of funding. These non-profits can then utilize that funding to help any patient using any product, not just Celgene products with multiple myeloma or MDS that required copay assistance.

Q. What about with regard to the let's say CDF, the five different disease states that they dealt with --

A. Yes.

Q. -- could they use that bucket for that?

A. We -- they could use the bucket to help with copay assistance with whatever they wanted to use the bucket for. We as a company only donated to the buckets of designation that were applicable to our products.

Q. Okay. Tell me how that bucket worked. I am not sure I am getting this whole bucket concept.

A. Okay. So the nonprofit's mission is

myeloma donation or the MDS donation. If these non-profits were doing something that we were not per our intention, we would not be privy to know that.

Q. Okay. How much money did Celgene give these none-rofits?

A. I don't have the exact number, but it is in the tens of millions.

Q. And what proportion of the copay that these non-profits were reimbursing for were for Celgene products?

A. We could not know that because the donations were not per product. The donations were disease states. If a patient was prescribed a completely different product for multiple myeloma and needed a donation and went to Lymphoma Leukemia Society, they would get money even if it was Celgene's money. It didn't matter once it went into the bucket.

Q. Who -- who actually set these entities up, these three entities that you're talking about?

A. So there is many more than these three entities. I was just giving you examples of the ones that I remember off the top of my head.

Q. What are some of the other ones that

perhaps three years old.
Q. So when you say in the tens of millions of dollars per year, are you talking about more than 50 million?
A. 15 or 50?
Q. 5-0.
A. Yes, probably.
Q. More than a hundred million?
A. No, not more than a hundred.
Q. So between 50 and a hundred million?
A. Yes.
Q. Did any of these entities exist prior to 2000?
A. I can't speak to that. Well, the Lymphoma Leukemia Society has been around for quite a long time. I don't know that these services have been around as one of their product offerings prior to this time period.
Q. How is it that these entities began to offer these services in the 2000s?
A. They are patient advocacy groups. They saw a need in their patients and the copay gap for patients with cancer therapies continued to get larger and larger. They are here to service their patients.

experiencing any issues with copay assistance with the charitable foundations."

Do you see that?

A. Yes.

Q. Why did you put "should not" in capital letters?

A. So the date of this letter is the end of the year. As mentioned earlier, the charitable donations are donations -- not just Celgene, but other companies put money into these charitable donations. There was this feeling always at the end of the year that these donations would run out of money because it was getting toward the end of the year. So my emphasis there was that Celgene -- Celgene did not put in money just in January and said we are done. We would continuously fund these charitable donations, so that they would always have funding available to any patients in the disease areas of focus.

Q. The disease areas of focus meaning what?

A. Multiple myeloma and MDS.

Q. Any kind of multiple myeloma?

A. You -- nothing is distinguished in the coding. You can't know what type of multiple

MS. DUNNE: Objection. Beyond the -- speculation as to --

Q. What understanding did you have as to why the sales reps cared about the copay issues?

A. As stated earlier sales reps were directly interfacing with offices and they often heard issues and concerns from offices, practice manager, billings coordinator of concerns that they had accessing Celgene products.

Q. Was financing the copay a factor in sales of the Celgene products?

MS. DUNNE: Objection vague.

A. I -- what I would -- what I would like to answer is that the Celgene patient support team's entire creation was to ensure that Celgene patient support was the one who was answering these questions for the offices and not the sales representative.

Q. Okay. If Celgene didn't cover, you know -- why was it important at all to cover these copays?

A. Celgene's mission and value is to ensure patients that are prescribed our products have access to our products. It is a core value of the company.

what their goals and needs were, and he would determine within Celgene how we would like to support them.

Q. Were you able to determine how many copays each of these non-profits was making for Celgene products?

A. We could not determine that because the non-profits were in turn providing assistance to all patients under the diagnoses of areas of interest to us.

Q. Were you able to determine how many different types of products were being reimbursed under these copay programs?

A. We would not know what services and/or products were being -- where that was being utilized under the bucket of disease areas of interest.

Q. Was there a file that you kept regarding -- we have covered the correspondence that you may or may not have had with these non-profits?

A. A file. I don't -- I do not recall.

Q. E-mails?

A. We communicated via e-mail, yes.

Q. Okay. With regard to CCF -- CDF, excuse me.

A. Uh-huh.

knowledge of?

A. You asked the question as to my personal knowledge of going through the procedures of having a copay program approved.

Q. Right. I -- I just want to know do you have personal knowledge as to whether the copay program involving the nonprofits --

A. Yes.

Q. -- was actually approved by outside counsel?

MS. DUNNE: Objection, copay versus -- regarding nonprofits is vague. I am not sure --

Q. Okay. You testified to a program where Celgene gave money to various not for profits?

A. Yes.

Q. And that money was used to make copayments for individual patients who are using Celgene products and other products, right?

A. Yes.

Q. I just want to know if Celgene's participation in that program, right, was reviewed and approved by outside counsel?

MS. DUNNE: This is directed to you in your personal capacity because you are not

THE VIDEOGRAPHER: The time is approximately 3:15, and this is the end of media number 4.

(Time noted: 3:15 p.m.)

KATHERINE STULTZ

Subscribed and sworn to before me
this day of , 2015

.

C E R T I F I C A T I O N

I, DEBBIE ZAROMATIDIS, a Shorthand Reporter and a Notary Public, do hereby certify that the foregoing witness, KATHERINE STULTZ, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

<%Signature%>

DEBBIE ZAROMATIDIS

# EXHIBIT G

Case 2:10-cv-03165-GHK-SS Document 299 Filed 06/29/16 Page 1 of 26 Page ID #:15162

-

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

UNITED STATES, et al., ex rel. BEVERLY BROWN,

Plaintiff-Relator,

v.

CELGENE CORPORATION,

Defendant.

Case No. CV 10-3165 GHK (SS)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO STRIKE REBUTTAL REPORT OF DR. CHARLES L. BENNETT OR, ALTERNATIVELY, TO COMPEL HIM TO ANSWER DEPOSITION QUESTIONS**

**(Dkt. No. 291)**

**I.**

**INTRODUCTION**

On June 7, 2016, Defendant Celgene Corporation filed a "Motion to Strike Rebuttal Report of Dr. Charles L. Bennett or, Alternatively, to Compel Him to Answer Deposition Questions."[1] ("Motion," Dkt. No. 291). The Parties filed a Joint Stipulation in connection with the Motion pursuant to Local Rule 37-2 ("Jt.

[1] The Court will cite to Dr. Bennett's rebuttal report, attached as Exhibit E to the Declaration of Brian D. Hershman (Dkt. No. 291), as the "Bennett Rpt."

Case 2:10-cv-03165-GHK-SS Document 299 Filed 06/29/16 Page 2 of 26 Page ID #:15163

Stip."), including the declaration of Brian D. Hershman in support of the Motion ("Hershman Decl. I") and of Justin S. Brooks in opposition to the Motion ("Brooks Decl.").[2] (Id.). On June 14, 2016, Defendant filed a Supplemental Memorandum in support of the Motion ("D Supp. Memo."), including a second declaration of Brian D. Hershman ("Hershman Decl. II").[3] (Dkt. No. 294).

On June 28, 2016, the Court held a hearing. For the following reasons, and the reasons stated on the record at the hearing, Defendant's Motion to Strike Rebuttal Report of Dr. Charles L. Bennett or, Alternatively, to Compel Him to Answer Deposition Questions is GRANTED IN PART AND DENIED IN PART.

## II.

## FACTUAL BACKGROUND

Relator commenced this action in 2010 claiming violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq. The operative Third Amended Complaint alleges that Defendant unlawfully marketed certain drugs to cancer patients and their physicians for unapproved purposes and paid kickbacks to physicians for prescribing the drugs off label. (Dkt. No. 72, ¶¶ 3-18). On

[2] Concurrently with the Motion, Defendant filed an Application to File Under Seal Document 291-6, i.e., a copy of the report of Defendant's economic expert, Dr. Iain Cockburn, which was attached as Exhibit A to the Brooks Declaration. (Dkt. No. 292). However, on June 9, 2016, Defendant withdrew the Application and, on behalf of both Parties, submitted a publicly-filed redacted copy of Dr. Cockburn's Report for use in ruling on the Motion. (Dkt. No. 293).

[3] Relator did not file a supplemental memorandum.

Case 2:10-cv-03165-GHK-SS Document 299 Filed 06/29/16 Page 3 of 26 Page ID #:15164

October 1, 2013, the District Judge ordered the complaint unsealed and served on Defendant, along with the government's Notice of Election to Decline Intervention. (Dkt. No. 59).

On June 8, 2015, the Court set September 25, 2015 as the deadline for designating expert witnesses; October 25, 2015 as the deadline for designating rebuttal expert witnesses; and November 20, 2015 as the deadline for completing expert discovery.[4] (Hershman Decl. I, Exh. F at 3). Accordingly, on September 25, 2015, the Parties exchanged their initial expert reports. Defendant disclosed six oncologists, among other experts.[5] (Jt. Stip. at 1). Relator disclosed an economist and a nephrologist as

---

[4] On April 8, 2016, the Court issued an Amended Scheduling Order that continued the deadline for completion of expert discovery to June 30, 2016. (Dkt. No. 256 at 1). The April 8, 2016 Amended Scheduling Order superseded an earlier Amended Scheduling Order issued on November 12, 2015. (See Dkt. No. 256). None of the Amended Scheduling Orders issued after June 8, 2015 altered the September 25, 2015 deadline set by that Order for the initial disclosure of the Parties' respective experts.

[5] Defendant does not identify its six oncologists by name, and attached copies of the expert reports of only two of them, Dr. Daniel P. Petrylak (Hershman Decl. I, Exh. I) and Dr. Paul G. Richardson (id., Exh. H), to the declaration supporting its portion of the Joint Stipulation. Relator attached the expert reports of two other oncologists disclosed by Defendant, Dr. Coutre (Brooks Decl., Exh. C) and Dr. Norton (id., Exh. E), to the declaration supporting her portion of the Joint Stipulation. It appears from the content of Dr. Bennett's Report that Drs. William Bensinger and Daniel Haller may be Defendant's other two oncologist expert witnesses. (See Bennett Rpt. at 5, 45). Relator also submitted copies of the expert report of Defendant's economic expert, Dr. Iain M. Cockburn, (Dkt. No. 293), and several pages of the transcript of the deposition of another of Defendant's expert witnesses, Dr. Christopher Cogle, M.D., in which Dr. Cogle broadly confirms the list of subjects discussed in his report. (Brooks Decl., Exh. C).

Case 2:10-cv-03165-GHK-SS Document 299 Filed 06/29/16 Page 4 of 26 Page ID #:15165

her experts, but did not disclose an oncologist. (Id.). On October 26, 2015, Relator submitted a "rebuttal" expert report of oncologist Dr. Charles L. Bennett.[6] According to Relator, Defendant has deposed Dr. Bennett twice since the submission of his expert report. (Id. at 29-30, 32, 38).

**III.**

**THE PARTIES' CONTENTIONS**

Defendant contends that Dr. Bennett's Report should be stricken as untimely because Relator did not disclose Dr. Bennett in the initial round of expert reports exchanged on September 25, 2015. According to Defendant, even though the Report is presented as a "rebuttal," it devotes its "first 40 pages" to Dr. Bennett's "own affirmative opinions," many of which "mirror allegations made in Relator's Complaint and all of which concern issues on which Relator bears the burden of proof." (Jt. Stip. at 2; id. at 7-13). While Defendant seeks an Order striking Dr. Bennett's Report in its entirety, Defendant appears to object primarily to Dr. Bennett's opinions on: (1) Defendant's alleged failure to properly report adverse events to the FDA, (2) Defendant's alleged failure to properly disclose to the medical community or the government the risks of venous thromboembolism ("VTE") from the use of Defendant's drugs, and the "appropriate prophylaxis", and (3) Defendant's alleged delay in complying with post-marketing

[6] On December 14, 2015, Relator submitted a corrected version of Dr. Bennett's rebuttal expert report, which is the operative version at issue in the Motion. (Hershman Decl. I, Exh. E at 49; Jt. Stip. at 1 n.1).

Case 2:10-cv-03165-GHK-SS Document 299 Filed 06/29/16 Page 5 of 26 Page ID #:15166

commitments to the FDA, none of which Defendant asserts were addressed by its experts. (Id. at 2).

Defendant further argues that there is no legally cognizable basis to excuse the delay because Relator cannot establish that the failure to timely disclose Dr. Bennett's Report was substantially justified or harmless. (Id. (citing Fed. R. Civ. P. 37(c)(1)); see also id. at 13-15). First, Defendant notes that Relator has offered no excuse to explain why Dr. Bennett was not disclosed in the initial round of exchanges and argues that Relator cannot do so because the subject matter of Dr. Bennett's Report could "reasonably have been anticipated." (Id. at 2, 13). Second, Defendant maintains that it has been harmed because by presenting Dr. Bennett as a rebuttal expert, Relator prevented Defendant "from rebutting Dr. Bennett's opinions" by the deadline for the submission of rebuttal expert reports. (Id. at 3; see also id. at 14-15).

Defendant contends in the alternative that if the Court does not strike Dr. Bennett's Report in its entirety, Dr. Bennett should be ordered to respond to questions that he refused to answer at his December 17, 2015 deposition concerning an earlier FCA suit against him, which ultimately settled. (Id. at 3, 15-19). Defendant maintains that the subject matter of that suit, which alleged improper personal use of government grant money, "bears directly on Dr. Bennett's credibility and potential bias as a witness." (Id. at 3).

Case 2:10-cv-03165-GHK-SS Document 299 Filed 06/29/16 Page 6 of 26 Page ID #:15167

In opposition, Relator contends that Dr. Bennett's report is appropriately deemed rebuttal evidence. Relator argues that an expert's report is properly construed as rebuttal "so long as it 'address[es] the 'same subject matter' identified by the [opposing party's] initial expert.'" (Id. at 4-5) (quoting Farris v. Int'l Paper Co., 2014 U.S. Dist. LEXIS 100216, at *4 (C.D. Cal. July 21, 2014) (some brackets in original)). Relator maintains that Dr. Bennett's Report satisfies this standard because it contradicts the "affirmative statements on safety" offered by Defendant's experts, who collectively opined that "Thalomid and Revlimid are safe drugs whose side effects and risk profiles are and were known to the medical community." (Jt. Stip. at 3; see also id. at 19-25). Relator states that Dr. Bennett's rebuttal required "a careful literature review and comprehensive analysis of discovery," which Dr. Bennett then "applied to explain why the opinions of [Defendant's] experts on safety and knowledge of the medical community are flawed, false, and incomplete." (Id. at 3-4) (emphasis in original). In particular, Relator contends that Dr. Bennett used the information he gathered to disprove the "model" identified by Defendant's experts, which Relator argues rests on the "flawed" assumptions that (1) physicians had access to accurate information about the drugs (despite Defendant's alleged concealment of "critical safety information"), and (2) oncologists "actually consult" the sources of information that Defendant's experts identified. (Id. at 4; see also id. at 25-28).

Case 2:10-cv-03165-GHK-SS Document 299 Filed 06/29/16 Page 7 of 26 Page ID #:15168

Relator further argues that even if Dr. Bennett's Report addresses topics that fall outside the scope of proper rebuttal, which Relator denies, the Report should still not be stricken because Defendant cannot show prejudice. (Id. at 5, 28-33). Relator emphasizes that Defendant had "8 months to test [Dr. Bennett's] opinions and did so over the course of 2 days of deposition." (Id. at 5). Furthermore, Relator argues that Defendant's claim of prejudice is not credible because prior to the instant Motion, brought at the very close of expert discovery, Defendant had never expressed any desire, in writing, to prepare a formal rebuttal report concerning Dr. Bennett's opinions.[7] (Id.). Relator also contends that even if Defendant were harmed, the appropriate remedy would be to construe Dr. Bennett's Report as an initial report and allow Defendant to submit a rebuttal expert report. (Id.).

Finally, Relator argues that Defendant should not be permitted to require Dr. Bennett to sit for "a third deposition" concerning "an unrelated and settled False Claims Act case." (Id.; see also id. at 33-39). Relator notes that Defendant "already has extensive information on the lawsuit, the settlement, and the nature of the allegations," including the amounts paid to the government by Dr. Bennett personally and by Northwestern University, Dr. Bennett's former employer. (Id. at 5). The FCA suit against Dr. Bennett alleged that grant money was used for personal

[7] Relator concedes that Defendant announced its intention to use its experts to rebut Dr. Bennett's opinions at the experts' depositions. (Jt. Stip. at 5).

purposes, "something that is not remotely at issue in this case," but which has a strong "propensity to inflame the jury and confuse the issues." (*Id.* at 5-6). In addition, Relator argues that such a deposition would be unduly burdensome because it would require the participation of Dr. Bennett's former counsel to determine, "on a question-by-question basis, whether certain information requested is protected from disclosure." (*Id.* at 6; *see also id.* at 38-39).

In response, Defendant emphasizes that Relator "cannot introduce rebuttal expert testimony to support her *affirmative* claims." (D Supp. Memo. at 1). According to Defendant, Relator put the safety of Defendant's drugs at issue by filing this action. As such, safety evidence is part of Relator's case-in-chief and should have been addressed in Relator's initial expert reports. (*Id.* at 2). Furthermore, Defendant argues that Dr. Bennett's opinions on the incidence of deep vein thrombosis ("DVT"), Defendant's alleged concealment of the same, and Defendant's alleged failure to "identify and report on optimal prophylaxis [for DVT] in post-marketing studies" are not appropriate rebuttal because Defendant's experts opined only that (1) the risk of DVT was well-known in the medical community, and (2) the medical community "'appreciated the need for prophylaxis and how to adopt appropriate prophylaxis.'" (*Id.* (quoting Jt. Stip. at 21)). Similarly, Defendant argues that Dr. Bennett's opinions concerning Defendant's purported attempts to conceal the risk of DVTs are improper because "none of {Defendant's] experts opined on [Defendant's] attempts to disclose or conceal information regarding

Case 2:10-cv-03165-GHK-SS Document 299 Filed 06/29/16 Page 9 of 26 Page ID #:15170

DVTs." (D. Supp. Memo. at 2-3). In addition, Defendant notes that Dr. Bennett stated at his deposition that "he would not have an opinion" as to whether Defendant properly reported adverse events, and argues that Relator should be held to that representation. (Id. at 3 (quoting Hershman Decl. II, Exh. T)).

Defendant further contends that Relator's attempt to argue that Defendant was not harmed fails. (D. Supp. Memo. at 4). According to Defendant, if the Court were to permit Dr. Bennett's Report to function as an initial expert report, the rebuttal deadline and expert discovery cut-off would need to be continued, thus delaying proceedings, and Defendant would be required to incur additional costs to "retain and designate rebuttal experts." (Id.).

Finally, Defendant contends that Dr. Bennett should be compelled to answer questions about the government's prior FCA action. According to Defendant, Dr. Bennett's testimony regarding his alleged misuse of grant funds is relevant impeachment evidence because Dr. Bennett is being offered in part as an expert in medical ethics. (Id.). Defendant therefore claims it is entitled at the discovery stage to inquire about the details of Dr. Bennett's misconduct, particularly because some of the studies cited in Dr. Bennett's Report were part of the government's earlier FCA case against him. (Id. at 5). Finally, Defendant claims that Relator's privilege arguments are "disingenuous" because Defendant is seeking only factual information, and Relator has personal knowledge about whether he diverted grant funds for personal expenditures. (Id.).

Case 2:10-cv-03165-GHK-SS Document 299 Filed 06/29/16 Page 10 of 26 Page ID #:15171

## IV.

## STANDARD

Under Federal Rule of Civil Procedure 26(a)(2)(A), parties must disclose the identity of any expert witness they "may use at trial." Rule 26(a)(2)(D) requires parties to make these disclosures "at the times and in the sequence that the court orders." Rule 26 permits rebuttal expert testimony only to the extent that it is "intended solely to contradict or rebut evidence on the same subject matter" addressed by another party's expert. Fed. R. Civ. P. 26(a)(2)(D)(ii). As such, the Rule anticipates that litigants will disclose expert evidence necessary to support their case-in-chief in the initial round of expert disclosures, as "[a] party who forgoes designating experts on the initial disclosure date will . . . find itself in a purely reactive mode, greatly restricted in its ability to offer expert testimony." Int'l Bus. Machines Corp. v. Fasco Indus., Inc., 1995 WL 115421, at *3 (N.D. Cal. Mar. 15, 1995); see also Lindner v. Meadow Gold Dairies, Inc., 249 F.R.D. 625, 636 (D. Hawai'i 2008) (rebuttal experts cannot testify in their parties' case-in-chief).

Pursuant to the limitations set forth in Rule 26, rebuttal evidence is appropriate only to "explain, repel, counteract or disprove the evidence of the adverse party." Crowley v. Chait, 322 F. Supp. 2d 530, 551 (D. N.J. 2004) (internal quotation marks and citation omitted); see also Peals v. Terre Haute Police Dep't, 535 F.3d 621, 630 (7th Cir. 2008) ("The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of evidence

Case 2:10-cv-03165-GHK-SS Document 299 Filed 06/29/16 Page 11 of 26 Page ID #:15172

offered by an adverse party.") (internal quotation marks and citation omitted). "Rebuttal testimony is not a means for a party to reemphasize its arguments[;] nor is it an opportunity for the plaintiff to correct any oversights in its case-in-chief." Grace Christian Fellowship v. KJG Investments Inc., 2008 WL 2412981, at *1 (E.D. Wis. June 12, 2008) (citing Emerick v. U.S. Suzuki Motor Corp., 750 F.2d 19, 22 (3rd Cir. 1984)); see also Int'l Bus. Machines Corp., 1995 WL 115421, at *3 ("'[R]ebuttal' experts cannot put forth their own theories; they must restrict their testimony to attacking the theories offered by the adversary's experts."); Cruz v. Durbin, 2014 WL 4182334, at *2 (D. Nev. Aug. 21, 2014) ("[An] expert's rebuttal testimony may not introduce new, alternative or previously unconsidered theories.").

Evaluating whether an expert witness has submitted legitimate rebuttal testimony poses "a more procedural than substantive" question. Wireless Agents, LLC v. Sony Ericsson Mobile Commc'ns AB, 2006 WL 5127278, at *2 (N.D. Tex. May 31, 2006). "In performing this analysis, the court 'does not ask whether the designating party has designated a rebuttal expert whose opinions have probative value or even whether they will be admissible at trial,' but focuses on (1) the evidence the rebuttal expert purports to contradict or rebut; (2) whether the rebuttal evidence is on the same subject matter as the opposing expert's report; and (3) whether the rebuttal evidence is intended solely to rebut or contradict the opposing expert's evidence." United States v. Austin Radiological Ass'n, 2014 WL 2515696, at *4 (W.D. Tex. June 4, 2014) (quoting Wireless Agents, 2006 WL 5127278 at *2).

Case 2:10-cv-03165-GHK-SS Document 299 Filed 06/29/16 Page 12 of 26 Page ID #:15173

"It is well settled that evidence which properly belongs in the case-in-chief but is first introduced in rebuttal may be rejected, so as to avoid prejudice to the defendant and to ensure the orderly presentation of proof." Emerick, 750 F.2d at 22 (citing Skogen v. Dow Chemical Company, 375 F.2d 692, 705 (8th Cir. 1967)); see also Hellmann-Blumberg v. Univ. of Pac., 2013 WL 3422699, at *2 (E.D. Cal. July 8, 2013) ("[If] the rebuttal expert attempts to add supplemental opinions outside of the existing report, such testimony must be excluded."). Furthermore, because the purpose of rebuttal evidence is to address "new unforeseen facts brought out in the other side's case," Cates v. Sears, Roebuck & Co., 928 F.2d 679, 685 (5th Cir. 1991), many courts have held that if "rebuttal" expert testimony is presented to "contradict an expected and anticipated portion of the other party's case-in-chief, then the witness is not a rebuttal witness or anything analogous to one." In re Apex Oil Co., 958 F.2d 243, 245 (8th Cir. 1992); see also Amos v. Makita U.S.A., 2011 WL 43092, at *2 (D. Nev. Jan. 6, 2011) (quoting same); Century Indem. Co. v. Marine Group, LLC, 2015 WL 5521986, at *3 (D. Or. Sept. 16, 2015) (same).

Nonetheless, the fact that evidence could have been addressed in a party's case-in-chief does not necessarily preclude its admission in rebuttal. See Benedict v. United States, 822 F.2d 1426, 1428 (6th Cir. 1987); see also Crowley, 322 F. Supp. 2d at 551 (Rule 26 does not require automatic exclusion of "anything an expert could have included in his or her original report" because "[s]uch a rule would lead to the inclusion of vast amounts of arguably irrelevant material in an expert's report on the off

Case 2:10-cv-03165-GHK-SS Document 299 Filed 06/29/16 Page 13 of 26 Page ID #:15174

chance that failing to include any information in anticipation of a particular criticism would forever bar the expert from later introducing the relevant material."). "All that is required is for the information to repel other expert testimony . . . ." Id. This may require a party to marshal evidence and argument in a rebuttal report to explain why the opposing party's expert is wrong. As one court explained, "[a]n opening expert report is an early salvo in the process of defining issues for trial, and thus it is more understandable at the expert discovery stage that a party may need to include significant elaboration in a rebuttal report to challenge the assertions of the opponent's expert reports." Bone Care Int'l, LLC v. Pentech Pharmaceuticals, Inc., 2010 WL 3894444, at *15 n.13 (N.D. Ill. 2010); see also Park W. Radiology v. CareCore Nat'l LLC, 675 F. Supp. 2d 314, 326 (S.D. N.Y. 2009) (rebuttal expert may properly use new methodologies "for the purpose of rebutting or critiquing the opinions of [the opposing party's] expert witness").

Courts disagree on the exact scope of the phrase "same subject matter." See Austin Radiological Ass'n, 2014 WL 2515696, at *4 ("The scope of rebuttal testimony is left to the sound discretion of the trial judge.") (quoting GWTP Inv., L.P. v. SES Americom, Inc., 2007 WL 7630459, at *9 (N.D. Tex. Aug. 3, 2007)); United States v. Luschen, 614 F.2d 1164, 1170 (8th Cir. 1980) ("[T]he decision to admit rebuttal testimony is entrusted to the sound discretion of the district court.") (internal quotation marks and citation omitted). Many "courts have been 'reluctant to narrowly construe the phrase 'same subject matter' beyond its plain

language.'" Allen v. Dairy Farmers of Am., Inc., 2013 WL 211303, at *5 (D. Vt. Jan. 18, 2013) (quoting T.C. Sys. Inc., v. Town of Colonie, New York, 213 F. Supp. 2d 171, 180 (N.D. N.Y. 2002)); see also Armstrong v. I-Behavior Inc., 2013 WL 2419794, at *3 (D. Colo. June 3, 2013) (declining to "place an overly restrictive interpretation on this operative phrase"). Other courts have cautioned against expansive readings of the "same subject matter" requirement. As one court explained, "If the phrase 'same subject matter' is read broadly to encompass any possible topic that relates to the subject matter at issue, it will blur the distinction between 'affirmative expert' and 'rebuttal expert.' More importantly, such [a] broad reading of Rule 26(a)(2)(C)(ii) will render the scope of the subject matter limitless and will lead to unjust results . . . ." Vu v. McNeil-PPC, Inc., 2010 WL 2179882, at *3 (C.D. Cal. May 7, 2010).

"Rule 37(c)(1) gives teeth to [these disclosure] requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1106 (9th Cir. 2001) (affirming exclusion of opinions expressed in untimely expert report); see also Goodman v. Staples the Office Superstore, LLC, 644 F.3d 817, 827 (9th Cir. 2011) (quoting same). Rule 37(c)(1) is a "self-executing," "automatic" sanction designed to provide a strong inducement for disclosure. Yeti by Molly, 259 F.3d at 1106 (quoting Fed. R. Civ. P. 37 advisory committee's note (1993)). Accordingly, the Ninth Circuit "give[s] particularly wide latitude

Case 2:10-cv-03165-GHK-SS Document 299 Filed 06/29/16 Page 15 of 26 Page ID #:15176

to the district court's discretion to issue sanctions under Rule 37(c)(1)." Id.

However, "[t]wo express exceptions ameliorate the harshness of Rule 37(c)(1): The information may be introduced if the parties' failure to disclose the required information is substantially justified or harmless." Id.; see also Plumley v. Mockett, 836 F. Supp. 2d 1053, 1064 (C.D. Cal. 2010) ("[F]ailure to disclose testimony is not substantially justified where, as here, the need for such testimony could reasonably have been anticipated.") (citing Wong v. Regents of the Univ. of Calif., 410 F.3d 1052, 1061-62 (9th Cir. 2005)); S.W. v. City of New York, 2011 WL 3038776, at *4 (E.D. N.Y. July 25, 2011) ("Even assuming that portions of plaintiffs' experts' reports should have been included in their initial reports, there is no prejudice to [defendant] by permitting plaintiffs' experts to serve these reports since expert depositions have not been taken and no trial date has been set."). "[T]he nonmoving party bears the burden of demonstrating that that an allegedly improper disclosure is either proper, harmless, or substantially justified." Cruz, 2014 WL 4182334, at *2 (citing Torres v. City of Los Angeles, 548 F.3d 1197, 12123 (9th Cir. 2008)); see also Goodman, 644 F.3d at 827.

\\

\\

\\

\\

Case 2:10-cv-03165-GHK-SS Document 299 Filed 06/29/16 Page 16 of 26 Page ID #:15177

V.

DISCUSSION

**A. Exclusion Is Not Warranted Because Any Purported Prejudice Can Be Remedied By Permitting Defendant To Address Dr. Bennett's Report**

Defendant contends that Dr. Bennett's Report exceeds the scope of proper rebuttal testimony because it argues issues not raised in Defendant's initial expert reports, i.e. whether Defendant (1) failed to properly report adverse events to the FDA, (2) failed to properly disclose to the medical community or the government VTE risks and "appropriate prophylaxis," and (3) delayed in complying with post-marketing commitments to the FDA. (Jt. Stip. at 2). Relator argues that Dr. Bennett's Report is properly construed as rebuttal evidence because it contradicts the "affirmative statements on safety" offered by Defendant's experts, whose opinions, Relator contends, are predicated on the false assumptions that "Thalomid and Revlimid are safe drugs whose side effects and risk profiles are and were known to the medical community." (Id. at 3).

Defendant does not argue that its experts' opinions are not predicated, at least in part, on the dual contentions that thalidomide and lenalidomide are safe -- or safer than other existing drugs -- for some off-label cancer treatments, and that the medical community had accurate information about the drugs' safety and risks that allowed practitioners to make informed

decisions about the drugs' use. Indeed, the record shows that these assumptions permeate the experts' opinions. (See, e.g., Hershman Decl. I, Exh. H (Richardson Rpt.), at 6 ("Thalidomide . . . proved revolutionary, as it substantially improved response rates in multiple myeloma patients after other treatments had failed and led to more complete remissions . . . [and] lacked the toxicities of existing chemotherapy regimens . . . ."); Brooks Decl., Exh. C (Coutre Rpt.) at 5 ("Initial clinical trials of thalidomide and lenalidomide demonstrated significant clinical activity in [chronic lymphocytic leukemia] patients."); Hershman Decl. I, Exh. I (Petrylak Rpt.) at 6 (thalidomide and lenalidomide "demonstrated significant clinical activity" in advanced forms of prostate cancer); Brooks Decl., Exh. A (Cockburn Rpt.) at 5 ("During the period at issue, physicians . . . had access to and reported regularly relying on a variety of sources of information concerning off-label uses of medications."); id., Exh. E (Norton Rpt.) at 9 ("In the practice of oncology, the best available evidence regarding cancer treatment often comes from published or even ongoing clinical trials."); id., Exh. F (Cogle Depo.) at 40 (testifying that his report addressed the use of thalidomide and lenalidomide in the treatment of myelodysplastic syndrome and that he anticipated offering testimony at trial to respond to Dr. Bennett's rebuttal to his report).

Instead, Defendant generally argues that Relator was required to disclose any evidence she had on the drugs' purported risks and the lack of accurate information in the medical community about those risks in the initial exchange of expert reports because she

had the burden to establish those facts in her case-in-chief. More particularly, Defendant appears to contend that Dr. Bennett cannot argue on rebuttal that Defendant distorted information about its drugs by failing to report adverse events or to disclose known risks to the medical community because even if the "subject matter" of Defendant's expert reports broadly concerned drug safety or the availability of accurate information, Defendant's experts did not specifically opine on Defendant's duty to report adverse events or known risks.

It is unnecessary for the Court to parse whether and where Dr. Bennett properly rebuts the opinions expressed in Defendant's expert reports, or where he offers impermissible new theories as opposed to using permissible "methodologies." Even if some of Dr. Bennett's opinions, or portions of those opinions, exceed the permissible scope of rebuttal, the prejudice to Defendant appears easily curable. Defendant received Dr. Bennett's report before the close of expert discovery and does not deny that it has had the opportunity to depose Dr. Bennett at length about the substance of his Report. Additionally, as evidenced by Dr. Cogle's testimony, Defendant's experts had the opportunity to read Dr. Bennett's Report before they were deposed, and thus were able to take his arguments into account in preparing for their depositions. (See Brooks Decl., Exh. F (Cogle Depo.) at 40). Indeed, Dr. Cogle explicitly stated his intention to respond to Dr. Bennett's Report at trial. Accordingly, Defendant cannot claim to have been ambushed by Dr. Bennett's opinions or complain of having been unable to test them. See, e.g., Amos, 2011 WL 43092, at *4 ("A

party is not harmed where, even though an expert disclosure fails to satisfy Fed. R. Civ. P. 26, the party knew about the expert, knew about the content of the expert's testimony, and had an opportunity to depose the expert."); Calvert v. Ellis, 2014 WL 3897949, at *5 (D. Nev. Aug. 8. 2014) (declining to exclude rebuttal expert testimony, even though untimely disclosed, where the rebuttal expert was disclosed in time for the witness to be deposed, "other, less severe sanctions" were available, and the "harm can easily be remedied") (internal quotation marks and citations omitted); cf. Frontline Med. Associates, Inc. v. Coventry Health Care, 263 F.R.D. 567, 570 (C.D. Cal. 2009) ("Harmlessness may be established if [an untimely initial disclosure under Rule 26(a)(1)(A)(iii)] is made sufficiently in advance of the discovery cut-off date to permit the opposing party to conduct discovery and defend against the damages claims.").

The only prejudice the Court can discern is that if any opinion, or building block of any opinion, proffered by Dr. Bennett should in fact have been disclosed in the initial exchange of expert reports, and if Defendant's experts, or any one of them, did not have an opportunity to respond to that opinion, either directly (in the expert's own deposition), or indirectly (through counsel's questions to Dr. Bennett during the two days of Dr. Bennett's deposition), Defendant might have some argument or evidence to rebut Dr. Bennett's affirmative opinions that has not been addressed in discovery. Accordingly, the Court concludes that the appropriate course, based on the unique facts of this case, is to permit Defendant to "sur-rebut" Dr. Bennett's "rebuttal." The

extension of expert discovery to allow for the preparation of sur-rebuttals, if Defendant deems it necessary, need not be extensive in light of the amount of time Defendant has been in possession of Dr. Bennett's Report and the fact that Defendant has already deposed Dr. Bennett at length.

Because trial is not imminent and in fact, no trial date has been set, (see Jt. Stip. at 14), and because Dr. Bennett's Report has not caused any disruption to this action, there is ample opportunity to cure any possible prejudice. Accordingly, the Court authorizes Defendant, if necessary and solely at Defendant's election, to formally rebut Dr. Bennett's opinions by supplementing its expert report(s)[8] within thirty days of the date of this Order.

**B. Defendant Is Entitled To Question Dr. Bennett About His Involvement In The Prior FCA Litigation**

The Court finds that Defendant is entitled to question Dr. Bennett about the FCA suit brought against him by Melissa Theis in 2009 in which the government intervened. (See Hershman Decl. I, Exh. J). Information relating to that investigation is relevant to Dr. Bennett's general credibility, and is therefore discoverable. As Defendant argues, Dr. Bennett:

\\

\\

[8] Pursuant to Rule 26(e)(2), a party's duty to supplement extends to expert reports, which may be supplemented up to the time the party's pretrial disclosures are due under Rule 26(a)(3), or thirty days before trial, absent a different time set by the Court.

Case 2:10-cv-03165-GHK-SS Document 299 Filed 06/29/16 Page 21 of 26 Page ID #:15182

> opines on Celgene's purported failure to report results in connection with a clinical study and its purported "engendering" of publications on the use of Revlimid to treat chronic lymphocytic leukemia knowing of supposedly "unacceptable" health risks. Testimony regarding his misuse of federal research funds is relevant and bears on Dr. Bennett's credibility, competence, and potential bias.

(Jt. Stip. at 17) (internal citations omitted). The Court agrees.

The FCA action alleged that Dr. Bennett unlawfully submitted false claims for reimbursement from a government grant and used the funds for his personal benefit and the benefit of his family and friends. Dr. Bennett resigned during the investigation and both Dr. Bennett and his former employer, Northwestern University, ultimately settled the claims with the government for substantial sums. As one court observed in authorizing a defendant to question the opposing party's expert about alleged unprofessional conduct that was the subject of a different case, "How [the expert] comported himself may be relevant to truthfulness, competence, or bias, again at least enough so that questions were appropriate at the deposition." Woodson v. Rodriguez, 2011 U.S. Dist. LEXIS 5737, at *7 (N.D. Cal. May 29, 2011); see also Navarro de Cosme v. Hosp. Pavia, 922 F.2d 926, 932 (1st Cir. 1991) (defendant's questions to plaintiff's expert about his submission of "an inflated invoice for fees earned as an expert witness" in another case properly "pertained to [the expert's] credibility"); Jewell v. Life Ins.

Case 2:10-cv-03165-GHK-SS Document 299 Filed 06/29/16 Page 22 of 26 Page ID #:15183

Co. of N. Am., 508 F.3d 1303, 1312 (10th Cir. 2007) ("The question of the credibility of an expert -- as opposed to the question of the reliability of the expert's conclusions -- concerns whether the expert is believable. Credibility embraces such matters as professional qualifications, mental capacity, bias and interest, and bad moral character.") (internal citation omitted); Kerns v. Sealy, 2007 WL 2012867, at *4 (S.D. Ala. July 6, 2007) (recognizing that an expert's "prior bad acts or other prior instances of untruthfulness . . . may provide fertile ground for vigorous cross-examination at trial").

Furthermore, discoverability, even following the amendment of the Federal Rules in December 2015, and admissibility are separate inquiries. It is well settled that relevance for purposes of discovery is "defined broadly." White Mountain Communities Hospital Inc. v. Hartford Cas. Ins. Co., 2015 WL 8479062, at *1 (D. Ariz. Dec. 9, 2015). Additionally, "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Torres v. Arellano, 2016 WL 3125699, at *1 (E.D. Cal. June 2, 2016) (citing Fed. R. Civ. P. 26(b)(1)); see also Carroll v. Stewart, 2016 WL 1615431, at *1 (W.D. Wash. Apr. 22, 2016) (relevance for purposes of discovery "is defined very broadly") (internal quotation marks and citation omitted).

The primary case upon which Relator relies, State Farm Mut. Auto. Ins. Co. v. Physiomatrix, Inc., 2013 WL 10936871 (E.D. Mich. Nov. 26, 2013), is inapposite. (See Jt. Stip. at 35). In that

case, plaintiff insurance company alleged that several doctors and physical therapy clinics conspired to refer patients to each other for unnecessary procedures, for which the doctors and clinics charged inflated prices that were ultimately paid by the insurance company. The complaint also alleged that certain personal injury law firms used the medical providers' inflated bills in suits against the insurance company in what appeared to be a quid pro quo arrangement between the medical providers and the attorneys. Id. at *1. However, the complaint did not name the personal injury attorneys as defendants. Id. Plaintiff sought discovery related to the law firms "for purposes of testing the credibility of the firms' attorneys who may be called to testify at trial." Id. at 10. The court denied the discovery request, stating: "Because there has been no showing that an attorney from either firm is likely to testify in this case, the Court declines at this juncture to permit [plaintiff] to compel this discovery solely for the purpose of testing the credibility of these potential witnesses." Id. (emphasis added). Here, neither party questions whether Dr. Bennett will be called as a witness.

Relator's argument that Dr. Bennett should not be required to answer questions about the government's FCA case because Defendant may seek information protected by the attorney-client privilege is entirely speculative. Relator argues that her "counsel does not know if Dr. Bennett had any independent understanding of whether he used 'grant money' for personal purchases or whether his entire understanding is informed by privileged attorney communications, which he would necessarily disclose by discussing these matters at

deposition." (Jt. Stip. at 39) (footnote omitted). Relator correctly notes that where underlying facts cannot be proven "without resort to the privileged materials," even underlying facts may be protected from disclosure. (Id. at 38) (citing Murdoch v. Castro, 609 F.3d 983, 995 (9th Cir. 2010)). However, mere conjecture that Dr. Bennett's memory of the facts underlying the government's FCA case might be "intertwined" with confidential communications is an insufficient basis to deny discovery, as it is predicated on an assumption that may not be true. See Woodson, 2011 U.S. Dist. LEXIS 57437, at *7 (privilege not implicated where counsel "made it clear that he did not want to inquire into privileged communications and asked only about facts and what happened"). Accordingly, the Court ORDERS Dr. Bennett to present himself for a further deposition of no more than two hours, limited to the facts underlying the government's FCA action against him. The parties shall meet and confer to arrange for a mutually agreeable date, time and location within thirty days for the additional deposition. Defendant shall serve a deposition notice for the agreed-upon date, time and location. If the parties cannot agree, then Defendant shall serve a Notice of Deposition, allowing at least ten days notice, and setting the date, time and location for the additional deposition.

\\

\\

\\

\\

\\

\\

Case 2:10-cv-03165-GHK-SS Document 299 Filed 06/29/16 Page 25 of 26 Page ID #:15186

**VI.**

**CONCLUSION**

The Court's review of Dr. Bennett's Report leads it to believe that the better practice for Relator would have been to have disclosed Dr. Bennett's Report at the time of the initial expert cut-off date. The length, degree of detail and complexity of Dr. Bennett's Report suggests that Relator had access to Dr. Bennett long before the expert disclosure date and the Court is concerned that the delay in disclosure may have been, as Defendant suggests, an improper litigation strategy. Relator is advised that the Court expects all deadlines to be complied with unless there is good cause for delay.

At the hearing on Defendant's Motion, Defendant raised the possibility of striking certain paragraphs of Dr. Bennett's Report, in lieu of striking the entire Report, as a potential remedy for the late disclosure. However, the Court finds that provision of a sur-rebuttal report is sufficient to address any possible prejudice resulting from the late disclosure of Dr. Bennett's report and is a more efficient remedy that attempting to parse out which paragraphs of the Bennett Report are truly non-rebuttal

Accordingly, Defendant's Motion to Strike Rebuttal Report of Dr. Charles L. Bennett or, Alternatively, to Compel Him to Answer Deposition Questions is GRANTED IN PART and DENIED IN PART. If necessary and at Defendant's sole election, Defendant shall submit to Relator within thirty days of the date of this Order supplements

Case 2:10-cv-03165-GHK-SS Document 299 Filed 06/29/16 Page 26 of 26 Page ID #:15187

to its expert report(s). In addition, also within thirty days of the date of this Order, Dr. Bennett shall present himself for a follow up deposition of no more than two hours, limited solely to the facts underlying the government's FCA case against him, at a date, location and time mutually agreeable to the Parties, or, if no date is agreed upon, at a date, location and time set by Defendant upon reasonable notice.

IT IS SO ORDERED.

DATED: June 29, 2016

/S/
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT H

Case 2:10-cv-03165-GHK-SS Document 192 Filed 06/08/15 Page 1 of 4 Page ID #:4912

Thomas H. Bienert, Jr., State Bar No. 135311
tbienert@bmkattorneys.com
Ariana Seldman Hawbecker, State Bar No. 190506
ahawbecker@bmkattorneys.com
BIENERT, MILLER & KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Tel.: (949) 369-3700/Fax: (949) 369-3701

Reuben A. Guttman *(admitted pro hac vice)*
rguttman@whistleblowerlaws.com
Traci L. Buschner *(admitted pro hac vice)*
tbuschner@whistleblowerlaws.com
GUTTMAN, BUSCHNER & BROOKS, PLLC
1625 Massachusetts Ave., NW, Suite 500
Washington, DC 20036
Tel.: (202) 800-8001/Fax: (202) 827-0041

Richard A. Harpootlian *(admitted pro hac vice)*
rah@harpootlianlaw.com
Christopher P. Kenney *(admitted pro hac vice)*
cpk@harpootlianlaw.com
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street
Columbia, SC 29201
Tel.: (803) 252-4848/Fax: (803) 252-4810

*Attorneys for Plaintiff-Relator*
BEVERLY BROWN

FILED
CLERK, U.S. DISTRICT COURT
6/8/2015
CENTRAL DISTRICT OF CALIFORNIA
BY: BH DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, | Case No. 10-cv-03165 GHK (SSx)<br><br>**~~[PROPOSED]~~ ORDER RE STIPULATION TO EXTEND DISCOVERY DEADLINES** |

Case 2:10-cv-03165-GHK-SS Document 192 Filed 06/08/15 Page 2 of 4 Page ID #:4913

NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO,

Plaintiffs,
*Ex rel.*

BEVERLY BROWN,

Plaintiff-Relator,

v.

CELGENE CORPORATION,

Defendant.

The Court, having reviewed and considered the *Stipulation to Extend Discovery Deadlines* (the "Stipulation") between Plaintiff-Relator Beverly Brown ("Relator") and Defendant Celgene Corporation ("Defendant") (collectively, the "Parties"), and good cause appearing,

**THE COURT HEREBY ORDERS** that:

1. The Stipulation is APPROVED;
2. The deadline for completing non 3rd party fact (including current and former Celgene employee witnesses) discovery will remain as set forth in the Scheduling Order, namely to be completed by July 24, 2015;
3. The parties will have until August 15, 2015 to agree upon a mediator to use for mediation no later than October 31, 2015;
4. The deadline for completing 3rd party fact discovery will be extended from July 24, 2015, until September 25, 2015;

5. The deadline for designating expert witnesses will be extended from July 24, 2015, until September 25, 2015;
6. The deadline for designating rebuttal expert witnesses will be extended from August 24, 2015, until October 25, 2015;
7. The deadline for completing expert discovery will be extended from September 25, 2015, until November 20, 2015;
8. The deadline for completing any summary judgment motion will be extended from November 16, 2015, to January 29, 2016.
9. All other deadlines in the Scheduling Order will remain the same.

**IT IS SO ORDERED.**

DATED: 6/8/15 By: ______________________

Hon. George H. King
United States District Judge

Respectfully submitted,

SIDLEY AUSTIN LLP
/s/ *Kimberly A. Dunne* /s/
Kimberly A. Dunne
Michelle B. Goodman
Sean A. Commons
Attorneys for Defendant
Celgene Corporation

JONES DAY
/s/ *Karen P. Hewitt* /s/
Karen P. Hewitt
Toni-Ann Citera
Brian D. Hershman
Attorneys for Defendant
Celgene Corporation

///

///

Case 2:10-cv-03165-GHK-SS Document 192 Filed 06/08/15 Page 4 of 4 Page ID #:4915

BIENERT, MILLER & KATZMAN, PLC
*/s/ Thomas H. Bienert, Jr. /s/*
Thomas H. Bienert, Jr.
Ariana Seldman Hawbecker
Attorneys for Plaintiff-Relator
Beverly Brown

GUTTMAN, BUSCHNER & BROOKS, PLLC
*/s/ Reuben A. Guttman /s/*
Reuben A. Guttman
Traci L. Buschner
Attorneys for Plaintiff-Relator
Beverly Brown

RICHARD A. HARPOOTLIAN, P.A.
*/s/ Richard A. Harpootlian /s/*
Richard A. Harpootlian
Christopher P. Kenney
Attorneys for Plaintiff-Relator
Beverly Brown

# EXHIBIT I

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| United States of America, ex rel. Beverly Brown, Plaintiff-Relator<br><br>v.<br><br>Celgene Corporation,<br>Defendant | Civil Action No. CV10-03165 GHK (SSx) |

**EXPERT REPORT OF JOEL W. HAY, PH.D.**

# TABLE OF CONTENTS

**Page**


I. Introduction ....................1

II. Summary of Opinions ....................4

III. Celgene Sales Representatives, at the Direction of Management, Aggressively Promoted Off-Label Uses of Revlimid and Thalomid ....................7

A. Off-label sales of Thalomid and Revlimid are thoroughly tainted by aggressive allegedly illegal promotion by Celgene Sales Representatives ....................7

B. Celgene aggressively marketed and sold Thalomid and Revlimid for oncology off-label indications ....................10

1. Celgene made sales and marketing plans for off-label indications ....................10

2. Celgene Appears to Have Promoted Off-Label Uses by Misrepresenting Compendia Support ....................14

3. Celgene employed an extensive “publications strategy” ....................15

4. Transcripts of physicians coversations with sales representatives show sales visits are permeated with illegal promotion ....................17

5. Celgene provided articles and training for non-labeled uses of Thalomid and Revlimid ....................20

6. Celgene pushed for doses that are not indicated in the label ....................21

7. Unreasonably high number of sales contacts with physicians for few leprosy patients ....................21

C. The Food and Drug Administration sent warning letters to Celgene for promoting Thalomid for off-label oncology indications ....................23

II. Data soures and assumptions for damages calculations ....................24

IV. RevAssist and STEPS program - Total illegal off-label use of Thalomid and Revlimid, 2001Q3 - 2015Q1 ....................29

A. Total off-label usage of Thalomid 2001Q3 - 2015Q1 ....................29

B. Total off-label usage of Revlimid 2006-2015 ....................30

V. Damages to the Medicare Program due to illegal off-label marketing and promotions of Thalomid and Revlimid ....................30

A. Damages to the Medicare program due to alleged illegal off-label marketing of Thalomid ....30

B. Damages to the Medicare program due to alleged illegal off-label marketing of Revlimid ....31

A. Veterans Affairs Department ....33

B. TRICARE ....34

C. Others (Federal employees, 340B Public Clinics, Indian Health Service) ....35

1. Federal Employees Health Benefits (FEHB) ....35

2. 340B Public Clinics ....37

3. Indian Health Service (IHS) ....38

VII. Damages to each of the State Medicaid Programs due to alleged illegal off-label prescribing of Thalomid and Revlimid ....39

VIII. Damages to other State Programs (State and local employees) ....43

A. State and local employees ....44

IX. Other programs ....44

A. CHIP - The Children's Health Insurance Program (Joint state-federal partnership) ....44

B. State correction inmates ....44

X. Damages to Medicare due to Kickbacks to physicians in the Celgene's Revlimid Speakers Program ....44

A. Damages to Medicare program due to kickbacks to physicians in Revlimid Speaker Program ....46

1. Higher paid speakers prescribed significantly more than lower paid prescribers ....48

XI. Conclusions ....50

Appendix A: Curriculum Vitae ....51

Appendix B: Legal case reports and testimony ....139

Appendix C: All documents considered ....144

Appendix D: Key Assumptions and Technical Appendix ....148

D.1 RevAssist and STEPS data analysis methodology ........ 148

D.2 Humana data analysis methodology for calculation of alleged Revlimid off-label use ........ 151

D.3. Medicare Damages Methodology ........ 153

D.4 Damages calculation methodology for Federal Programs ........ 154

D.5 Veterans Affairs - Damages calculation methodology and data sources ........ 155

D.6 Tricare - Damages calculation methodology and data sources ........ 155

D.7 Federal Employees Health Benefits - Damages calculation methodology and data sources ........ 156

D.8 340B Clinics - Damages calculation methodology and data sources ........ 156

D.9 Indian Health Service (IHS) - Damages calculation methodology and data sources ........ 156

D.10 Medicaid - Damages calculation methodology and data sources ........ 157

D.11 State employee health plans – Methodology for damages ........ 164

D.12 Childrens Health Insurance Plan (CHIP) damages calculations methodology ........ 167

D.13 State correction inmates – damages calculations methodology ........ 170

D.14 KOL speaker compensation analysis using Medicare data - Methodology ........ 172

D15. Methodology for analysis of KOL prescriptions using Celgene RevAssist data: ........ 185

D16. Methodology to evaluate if speakers (KOLs) paid high compensation by Celgene prescribed more than low paid KOLs: ........ 194

Figure showing correlation in Revlimid speaking fees paid by Celgene to Dr. Joseph Tuscano and prescriptions of Revlimid. Dr. Tuscano was paid more than $600,000 in the KOL speaker program. ........ 195

Appendix E: ICD-9 Codes Categorization ........ 197

Appendix F: Thalomid and Revlimid NDC Codes Categorization ........ 198

F.1 NDC codes for Thalomid ........ 198

F.2 NDC codes for Revlimid ........ 198

Appendix G: AWP Pricing (Redbook) ....... 199

G.1 Thalomid AWP Prices ....... 199

G.2 Revlimid AWP Prices ....... 201

Appendix H: NDCs of Dexamethasone ....... 203

Appendix I: NDCs of Alternative Therapies to Revlimid ....... 207

# I. Introduction

1. I, Joel W. Hay, Ph.D., having been retained by counsel for the Plaintiff-Relator to provide expert testimony on her behalf in the above-captioned action, submit this Expert Report.

2. I am a tenured Full Professor and Founding Chair of Pharmaceutical Economics and Policy in the School of Pharmacy, with joint appointments in the Schaeffer Center for Health Policy and Economics and in the Department of Economics at the University of Southern California (USC). I also serve as the USC Project Coordinator for the Rand Evidence-Based Medicine Practice Centers of Southern California, funded by the U.S. Agency for Healthcare Research and Quality. I am a Health Economics Research Scholar at the UCLA Center for Pediatric Vaccine Research. I am a founding Executive Board member of the American Society for Health Economics. I am also an extramural grants reviewer for the U.S. Agency for Healthcare Research and Quality.

3. Our academic department at USC is the largest and most prominent department in the United States focused specifically on pharmaceutical economics and health economics. Since I initiated the graduate programs in Pharmaceutical Economics and Policy in 1994, we have graduated over 120 Ph.D. and M.S. students in this field. We currently have 32 graduate students in residence.

4. I earned my B.A. *summa cum laude* in economics from Amherst College in 1974, and my M.A., M.Phil. and Ph.D. in economics from Yale University between 1976-1980. I have taught at Yale University, Stanford University, University of California Santa Barbara, the University of Connecticut, and USC.

5. From 1978-1980, I was an Assistant Research Professor at USC. From 1980-1984, I was an Assistant Professor in the School of Dental Medicine and the Department of Economics at the University of Connecticut. I was a Senior Policy Analyst with Project Hope from 1983-1985. From 1985-1992, I was a Senior Research Fellow at the Hoover Institution at Stanford University. I have been a tenured faculty member at USC since 1992.

6. I have authored or coauthored over 500 scientific reports, articles and abstracts, including 180 peer-reviewed scientific articles in the fields of pharmaceutical economics, health economics, health care markets, outcomes research, disease management, statistics, econometrics, epidemiology and health care in journals, including: *American Journal of Cardiology*, *American Journal of Managed Care*, *American Journal of Public Health*, *Archives of Neurology*, *Haemophilia*, *Health Care Financing Review*, *Health Affairs*, *Health Economics*, *Health Policy*, *JAMA*, *Journal of AIDS*, *Journal of the American Geriatrics Society*, *Journal of Business & Economic Statistics*, *Journal of Clinical Gastroenterology*, *Journal of Health Economics*, *Journal of Health Politics, Policy and Law*, *Journal of Human Resources*, *Journal of the Royal Statistical Association*, *Medical Care*, *Pediatrics*, *Pharmacoepidemiology & Drug Safety*, *Psychiatric Services* and *Value in Health*.

7. I have served as a consultant to the U.S. Centers for Medicare and Medicaid Services, U.S. Agency for Healthcare Research and Quality, U.S. Centers for Disease Control and Prevention, U.S. Public Health Service, U.S. Food and Drug Administration (FDA), U.S. Environmental Protection Agency, Government of Hungary, Hong Kong Centre for Economic Research, Hong Kong Medical Executives Association, World Bank, California AIDS Commission, California Medi-Cal Drug Advisory Board, County of San Diego Medically Indigent Adult Program and County of Sacramento Homeless Program.

8. I have also written numerous health care-related op-eds published in papers such as the Wall Street Journal, New York Times, Los Angeles Times, , San Francisco Chronicle, San Diego Union-Tribune, Orange County Register, Sacramento Bee and Newsday. I have been interviewed numerous times on television and radio regarding health-related and drug-related policy issues, including media networks such as PBS, CBS, ABC, NBC, Fox News, C-SPAN and Air America.

9. I have served as a member of the Expert Advisory Panel on Drug Utilization Review, United States Pharmacopeial Convention; and a member of the JAMA Web Site HIV/AIDS Editorial Review Panel. I am a founder and founding member of the Board of Directors

of the International Society for Pharmacoeconomics and Outcomes Research. Outcomes research is the field of using rigorous scientific evidence to evaluate the tangible outcomes of drugs and other treatments on patients' quality of life and ability to function in their chosen activities (*e.g.*, work, family, social activities, leisure).

10. As a pharmaceutical economist, I have taught and studied about pharmaceutical marketing and drug promotion activities for more than three decades. I have participated in pharmaceutical company-sponsored advisory boards dealing with marketing and promotion issues for nearly all of the major and many smaller pharma companies. I have opined on pharmaceutical marketing and promotion in numerous legal cases, including several False Claims Actions.[1]

11. I was a founding Executive Committee member for the federally sponsored Southern California Evidence-Based Medicine Practice Center (EPC) started in 1998 and funded by the federal Agency for Healthcare Research and Quality. This Center is the key regional site for developing and evaluating medical and clinical evidence regarding comparative treatment effectiveness. The Southern California EPC is a collaborative research network managed at the Rand Corporation but collaborating with all the major academic medical research centers in southern California, including Rand, USC, UCLA, UCI, UCSD, UCR, Cedars-Sinai, Kaiser-Permanente Division of Research and the Greater Los Angeles Veteran Affairs Healthcare System. I was the USC project coordinator for this EPC for 13 years and focused on the study design, statistical evaluation, and outcomes evidence associated with treatment alternatives for various diseases and conditions.

12. The Agency for Healthcare Research and Quality (AHRQ) is the primary federal agency within the US Department of Health and Human Services tasked with evaluating and

[1] For example, three recent cases on which I worked are: *U.S. et al. ex rel. James Garbe v.. Kmart Corporation*, Case No. 3:12-cv-00881-NJR-PMF. United States District Court, Southern District of Illinois; United States of America, et al. ex rel. Helen Ge, M.D. Plaintiffs and Relator, v. Takeda Pharmaceutical Company Limited, and Takeda Pharmaceuticals U.S.A., Inc., f/k/a Takeda Pharmaceuticals North America, Inc. Defendants, Civil Action No. 1-11-cv-10343-PBS. United States District Court, District of Massachusetts; United States of America, et al. ex rel. Helen Ge, M.D. Plaintiffs and Relator, v. Takeda Pharmaceutical Company Limited, and Takeda Pharmaceuticals U.S.A., Inc., f/k/a Takeda Pharmaceuticals North America, Inc. Defendants, Civil Action No. 1:10-CV-11043-FDS. United States District Court, District of Massachusetts.

promulgating scientific evidence on the quality and value of medical care. My doctoral research was funded by the predecessor federal agency to AHRQ in 1978-1980. Since then I have participated in numerous AHRQ-funded projects and have served as an appointed external grants reviewer for AHRQ for the past four years as well as previously and subsequently on an ad hoc basis.

13. I served as the Founding Editor-in-Chief of *Value in Health*, the peer-reviewed scientific journal of the International Society for Pharmacoeconomics and Outcomes Research, from its 1998 inception until 2003. In its first scientific citation impact factor, *Value in Health* was ranked number one in two categories for the year 2004 by the ISI Journal Citation Reports® (JCR) with an impact factor of 3.657. *Value in Health* led all other journals listed both in the Health Care Sciences and Services category in the JCR Science Edition and in the Health Policy & Services category in the JCR Social Sciences Edition. These categories include all scientific journals relating to health economics and pharmaceutical economics.

14. I have provided expert reports and testimony in numerous court and arbitration panel actions relating to pharmaceutical and medical issues. A more complete listing of my qualifications and publications is outlined on my *curriculum vitae*, which is attached as Appendix A. A list of my recent legal case reports and testimony are attached as Appendix B. A list of the materials that I have considered in writing this report is included in Appendix C.

15. I am being compensated for my testimony in the present case at my standard rate of $975.00 per hour, plus any reasonable out-of-pocket expenses. No payments to me are contingent upon the outcome of this or any other hearings or litigation or upon the nature of my opinions.

## II. Summary of Opinions

16. A summary of my opinions is as follows:

| Summary - Damages to each of the Plaintiff payers | | | |
|---|---|---|---|
| Payer | Damages calculated for each of the payers from data available | Additional FCA damages of $11,000 per claim | Total damages (damages + additional FCA civil penalties) |
| Medicare | [redacted] | [redacted] | [redacted] |
| Veterans Affairs | [redacted] | | [redacted] |
| TRICARE | [redacted] | | [redacted] |
| FEHB | [redacted] | | [redacted] |
| Indian Health Service | [redacted] | | [redacted] |
| 340B Clinics | [redacted] | | [redacted] |
| Medicaid | [redacted] | | [redacted] |
| State Employees Programs | [redacted] | | [redacted] |
| CHIP- State counterpart | [redacted] | | [redacted] |
| CHIP-Federal counterpart | [redacted] | | [redacted]4 |
| State correction inmates program | [redacted] | | [redacted] |
| Total damages | [redacted] | | [redacted] |

Note: The additional FCA damages of [redacted] ($11,000 penalty for every allegedly fraudulent claim for a total of [redacted] fraudulent claims) combined for the states of New York, District of Columbia, Lousiana, Delaware, Wisconsin, New Jersey, Texas and Nevada and Virginia have been added to the Medicaid damages of [redacted] in the table above to get the total damages (Medicaid damages + additional FCA damages of $11,000 per allegedly fraudulent claim to FCA) of [redacted] [2]

[2] I had precise claims information only for the states of New York, District of Columbia, Louisiana, Delaware, Wisconsin, New Jersey, Texas, Nevada and Virginia. So additional FCA damages were calculated and incorporated pertaining to only these states.

Table 16: Damages to Medicare due to kickbacks to physicians for Revlimid Speaking arrangements

| | Number of allegedly fraudulent claims | Damages calculated from Medicare Part D | Additional FCA damages of $11,000 per claim | Total damages (damages + additional FCA damages) |
|---|---|---|---|---|
| Thalomid | [redacted] | [redacted] | [redacted] | [redacted] |
| Revlimid | [redacted] | [redacted] | [redacted] | [redacted] |
| Total | [redacted] | [redacted] | [redacted] | [redacted] |

| | **On-label allegedly fraudulent claims** | **On-label damages** | **Additional FCA civil penalties** | **Total damages** |
|---|---|---|---|---|
| Revlimid | [redacted] | [redacted] | [redacted] | [redacted] |
| Thalomid | | | | |
| Total | | | | |

| | **Off-label allegedly fraudulent claims** | **Off-label damages** | **Additional FCA penalties** | **Total damages** |
|---|---|---|---|---|
| Revlimid | [redacted] | [redacted] | [redacted] | [redacted] |
| Thalomid | [redacted] | [redacted] | [redacted] | [redacted] |
| Total | [redacted] | [redacted] | [redacted] | [redacted] |

The sum of total damages is [redacted][3] Counsel has advised me that the straightline damages may be further subject to treble damages (excluding the FCA penalties). I reserve the right to update these opinions if new information is made available to me.

[3] This includes the total damages to plaintiff payers and the damages to Medicare due to on-label claims as a result of alleged kickbacks to physicians for Revlimid speaking programs. The damages due to off-label claims as a result of alleged kickbacks to physicians for Revlimid speaking programs are already a sub-set of the damages to the Medicare program as a whole. Once I analyze the Medicare Part A and Part B claims data I will be able to back out any duplicate damages currently included in both the alleged kickback damages and the Medicare claims damages.

## III. Celgene Sales Representatives, at the Direction of Management, Aggressively Promoted Off-Label Uses of Revlimid and Thalomid

### A. Off-label sales of Thalomid and Revlimid are thoroughly tainted by aggressive allegedly illegal promotion by Celgene Sales Representatives

17. As shown in this section immediately below; Celgene engaged in extensive and aggressive promotion of Thalomid and Revlimid for uses that were not indicated on the FDA-approved product marketing labels, or were not indicated on the FDA-approved marketing labels at the time the Celgene sales force promoted these off-label uses of Thalomid and Revlimid, often misrepresenting the support for such uses.[4] Furthermore, Celgene sales representatives frequently provided physicians and other prescribers with journal articles and other materials that discussed, and in many cases misrepresented, safe and efficacious off-label use of Thalomid and/or Revlimid.[5] Moreover, rather than engaging in responsible good faith efforts to monitor and eliminate such illegal promotion, the evidence clearly shows that Celgene executives and top management actively encouraged this illegal promotion by the Celgene sales force.

18. Based on my experience, as well as advice from counsel, I understand such off-label promotion by pharmaceutical sales representatives to be illegal under the Food Drug and Cosmetics Act ("FDCA") and implementing regulations (*e.g.* 21 U.S.C. §§ 331(a)-(b), 352(a), (f); 21 U.S.C. § 301, et seq.; 21 C.F.R. § 202.1.; 21 U.S.C. § 321(n)) as well as the False Claims Act (and similar state laws) where it induces the presentation of claims to government payors for non-reimbursable uses of drugs. *See, e.g.*, 31 U.S.C. § 3729(a)(1)(A); 31 U.S.C. § 3729(a)(1)(B); 42 U.S.C. § 1369r-8(k). I also understand from counsel and direct review of warning letters issued to Celgene by the FDA that Celgene was governed by more stringent restructions on the

---

[4] The off-label promotion referenced in my report is only a sampling. I do not purport to discuss the full body of evidence of Celgene's off-label promotion.

[5] See, for example, the Report of Stephen Z. Fadem, M.D., FACP, FASN.September 24, 2015.

distribution and promotion of Thalomid and Revlimid than exist for virtually any other drugs under subpart H of FDA regulations. 21 CFR § 314.520(H), 21 CFR § 314.550(H) ("Subpart H").

19. It is my opinion, based on more than three decades of experience with drug marketing and promotion, that this extensive and pervasive illegal promotion so thoroughly tainted the decisions by prescribers to carefully and reasonably weigh the treatment options regarding off-label indications for Thalomid and Revlimid that it rendered ***ALL*** of the off-label sales of Thalomid and Revlimid thoroughly tainted by Celgene's illegal off-label promotion.

20. Physicians and other prescribers have a reasonable expectation that sales promotion messages they hear from pharmaceutical sales representatives such as those from Celgene are not illegal, and follow FDA guidelines for accurate and reliable on-label use of their products. Even those doctors who may not have fully remembered which indications were on-label or off-label, or who may have believed themselves that their own prescribing was independent of Celgene promotion were unquestionably influenced by the Celgene-sponsored Key Opinion Leaders promoting off-label indications, the Celgene-sponsored marketing materials promoting off-label indications and their own physician colleagues who were influenced by sales representatives promoting off-label indications. Many doctors, knowing that anything that Celgene sales representatives said could be reasonably presumed not to be illegal and to fit within the FDA-approved marketing label, would have inaccurately assumed that whatever the sales representatives were telling them was within the FDA-approved marketing indications.

21. Pharmaceutical companies wouldn't spend huge sums on marketing and promotion, including allegedly illegal promotion, if physicians based their prescribing decisions only on their "training and experience, their independent medical judgment, existing clinical studies and medical literature" as Celgene has stated in a filed pleading provided to me. Dkt. No. 125 at 18. Celgene's self-serving claim flies in the face of an enormous body of market research, psychological and behavioral economics literature that demonstrates that while people, including experts, believe that they make rational and objective decisions, their actual decisions are

unconsciously influenced by a host of subjective and arbitrary factors.[6] As but one example, Nobel Prize winning psychologist Prof. Daniel Kahneman points to the fact that parole boards are more likely to grant parole to inmates immediately after eating meals than during other times of the day. Prof. Kahneman's book, *Thinking Fast and Slow*, provides several examples of physicians making decisions on subjective rather than objective criteria. For example Kahneman notes:[7]

> 22. …preferences of physicians and patients between hypothetical therapies for lung cancer varied markedly when their probable outcomes were described in terms of mortality or survival. Surgery, unlike radiation therapy, entails a risk of death during treatment. As a consequence, the surgery option was relatively less attractive when the statistics of treatment outcomes were described in terms of mortality rather than in terms of survival. …An important finding of the study is that physicians were just as susceptible to the framing effect as medically unsophisticated people (hospital patients and graduate students in a business school). Medical training is, evidently, no defense against the power of framing.

23. Should further information be provided to me to show that some percentage of Thalomid and Revlimid sales were not due to illegal promotion, or should the Court or Jury find that some percentage of Thalomid and Revlimid off-label sales were not tainted by Celgene's extensive and pervasive off-label marketing and promotion activities, it would be straightforward for me to update and adjust all of my damages calculations by any such Court-ordered percentage adjustment.

---

[6] Moreover, Celgene's claims ignore the evidence that Celgene both improperly manipulated and misrepresented the medical literature as to safe and effective uses of Thalomid and Revlimid, as addressed more fully by Relator's clinical expert, Dr. Fadem, based on his review of the discovery produced and scientific literature.

[7] Kahneman, Daniel. *Thinking, Fast and Slow* (Kindle Locations; 6173-6175, 7668-7671). Farrar, Straus and Giroux. Kindle Edition. 2011.

### B. Celgene aggressively marketed and sold Thalomid and Revlimid for oncology off-label indications

#### 1. Celgene made sales and marketing plans for off-label indications

24. The "2004 Business Plan: Western Region" was created for the January 1, 2004 Celgene Corporation West Region comprising of twenty-two states. This plan was by regional sales director Larry Bishop (then one of three regional directors) and provided specific goals in overall sales, new patient growth, targeted malignancies (at a time in which Celgene had no FDA approved cancer uses) among other things. The plan clearly emphasizes and calls for sales representatives to promote and sell Thalomid for off-label indications when it was only approved for Leprosy:[8]

[redacted]

Section 4.1 of the same Business Plan states:

[redacted]

[8] Cavanaugh Exhibit 32 BB2-0000002

25. Marketing presentations from as early as 2001 show plans to market, promote and selloff-label uses of Thalomid. E.g.; Thalomid Marketing Overview submitted by Amy C. Cavers, Director, Marketing Oncology. Multiple pages are devoted to current (off-label) use.[9]

26. Off-label marketing and sales plans are not limited to Thalomid and not limited to Celgene's earlier years. In the lead up to the 2006 launch of Revlimid, the Pacific Coast Sales District prepared a business plan.[10] The plan focused on targeting "Tier One Targets" (presumably highest potential prescribers). With regard to "Physicians," the plan stated:

> [redacted]

However, Revlimid has only been approved in treatment of Myelodyplastic Syndrome with 5q deletion (-5q syndrome drug).

27. [redacted][11]

[9] CELBRN0714359.

[10] CELDOJ0204655/CELBRN0204655 Revlimid Launch; Pacific Coast District Business Plan, at page 40.

[11] CELBRN0095298, CELBRN0095301.

28. Long before Thalomid had any cancer indication, a 2001 Powerpoint slideset presentation states: "Four events occurred last year that transformed Celgene:" (Slide 2 Notes) Discussion about Thalomid revenues increased substantially "…as it became an established drug in the armamentarium for the treatment of Multiple Myeloma: additionally it established Celgene as a commercial oncology company."[12]

29. A 2004 email chain regarding running a report on the number of patients for various diseases that were treated with Thalomid include off-label indications such as melanoma, prostate, renal, and MDS. Jonathan Merle, a sales manager in Celgene's Western region indicates he is "using this information to find out where the focus has been (or not been) and to demonstrate potential in some areas such as prostate cancer and the potential for penetration in these areas."[13] Likewise, in a March 8, 2004 email to all Florida sales representatives, Florida District Manager Eileen Bohannon praised a sales representative's strategies and success in convincing practitioners to use Thalomid for treatment of multiple myeloma, MDS, prostate cancer and other off-label using, noting they probably earned him "3 ovary patients" just that week and would effectively "increase sales."[14] The email was circulated throughout the organization with praise by management, reaching Tom Cavanaugh, who now serves as Celgene's Vice President of U.S. Sales & Marketing.[15]

30. In late 2006, [redacted] a Celgene sales representative in the West Region, used [redacted] to present a CME at Hoag Hospital in Orange County. She confronted him after he failed to mention in a CME the use of Revlimid to treat non 5q deletion MDS patients.

---

[12] CELBRN0714068.

[13] CELBRN0212364.

[14] CELBRN0212346-47.

[15] *Id.*

She learned to chase down doctors after learning that Shawn Gormish, their manager, had done the same thing following a CME at UCLA. [16]

31. Despite the fact that Thalomid didn't receive a multiple myeloma indication until 2006, Celgene's 2013 Corporate Responsibility document states:[17]

> "1998 - FDA approves the use of thalidomide for treatment of multiple myeloma – Celgene markets it as THALOMID® and begins shipments."

[16] TAC ¶ 205

[17] Celgene 2013 Corporate Responsibility Document




### 2. Celgene Appears to Have Promoted Off-Label Uses by Misrepresenting Compendia Support

32. In a February 18, 2000 email from Eileen Finnegan to some of Celgene's most senior management and sales managers, including then CEO Sol Barer, current CEO Robert Hugin, Director of Medical Affairs Ken Resztak, and sales manager Deanna Pankey, Finnegan proclaimed that "[t]he AHFS (American Hospital Formulary Servbicer) Drug Information, which

is being released today from the printers, **has recognized THALOMID'S effectiveness in several off-label indications including many cancer uses (breast, ovarian, head etc.)"**[18] As explained by Dr. Steven Z. Fadem, Relator's clinical expert, through 2008, the AHFS stated that Thalomid was "being evaluated for the treatment of a variety of malignancies, including advanced or metastatic breast cancer], Kaposi's sarcoma]', melanoma+', multiple myeloma]', ovarian cancer+', primary brain tumors]' (recurrent high-grade astrocytomas and mixed gliomas), androgenindependent prostate cancer+', and renal carcinoma]" but that "further study [was] needed to establish safety and efficacy of the drug in the treatment of [the] various malignancies and identify optimal doses of the drug in patients with cancer." Dkt. No. 224 at 7 n.4; Expert Report of Steven Z. Fadem ¶ 80. Dr. Fadem opined that Ms. Finnegan's interpretation of the compendium was "not scientifically plausible." Dkt. No. 224 at 7 n.4; Expert Report of Steven Z. Fadem ¶¶ 79-81. Finnegan's representation of the compendium was greeted as "[g]reat news regarding the Compendia!" and treated as a rallying call to sales representatives to "incorporate into your calls [to physicians] when you hear that reimbursement is an obstacle."[19]

### 3. Celgene employed an extensive "publications strategy"

33. Coincident with the launch of Revlimid, Celenge employed an entity called Excerpta Medica to engage in a comprehensive publications strategy. Celgene used Excerpta Medica to release numerous scientific publications on off-label uses of Revlimid. Documents reviewed indicate purposes behind the retention of Excerpta Medica and release of these publications on off-label use were to "negate competitor claims," "create noise" and "raise awareness/maintain noise in absences of data."[20] "Publication planning" was included in Celgene's marketing budget. For example, Celgene's 2007 marketing budget included [redacted]

---

[18] CELBRN0317545 (emphasis in the original).

[19] *Id.* Although it makes sense to note this here, I primarily leave it to Relator's clinical expert to address Celgene's representations of the compendia to promote sales of Revlimid and Thalomid, and in particular whether Celgene promoted sales by misrepresenting the compendia or scientific literature.

[20] CELBRN3310509 at 102.

for publication planning for Revlimid.[21] Dozens of line items in Celgene's marketing budget are for Excerpta Medica.[22] Excerpta Medica's "Publication plan development" made it clear the publication management would include "desired position in each indication" and "[c]onsistent messaging for publications," including specific consistent messages to be used across publications addressing off-label uses of Revlimid for CLL and NHL.[23]

34. Publication status reports show that Excerpta Medica successfully published high numbers of publications on off-label uses of Revlimid, such as use of Revlimid to treat CLL and NHL and the use of Revlimid to treat multiple myeloma in a manner that was not approved by the FDA.[24] Celgene had extensive involvement in the publication process. Along with Excerpta Medica, Celgene confirmed the content of these publications, confirmed the authors of these publications, reviewed drafts, edited the drafts, and ultimately had final approval over the publications.[25] Celgene's Board of Directors received periodic reports on Celgene's publications released through Excerpta Medica.[26] In late 2008, the Marketing Department expressed dismay that Excerpta Medica was not releasing publications fast enough. In October 2008, Braden Parker – the Director of Oncology Marketing – wrote to Senior Vice President of Marketing Francis Brown on the speed of publication release, stating:

> [redacted][27]

[21] CELBRN064011 at 1.
[22] *Id.* at 20.
[23] CELBRN0961785 at 4, 49, 63.
[24] *Id.*
[25] *Id.* at 5.
[26] CELBRN0754351 at 35.
[27] CELBRN0137120.

35. Although I am not opining on whether such activity is legal or illegal – particularly as I understand that the FDA imposes unique restictions on the promotion of restricted subpart H drugs like Revlimid and Thalomid – it seems clear that Celgene viewed these publications on off-label uses of its drugs as key promotional efforts.

**4. Transcripts of physicians coversations with sales representatives show sales visits are permeated with illegal promotion**

36. Celgene employed a third party vendor (Impact Rx) to provide Celgene officials with "reports from doctors on what Celgene sales representatives told them about Revlimid."[28] The reports of these communications are referred to as "verbatim reports." The examples of the "verbatim" reports for the time period of 2009-2010 were available to me for review.

37. Verbatim reports show that Celgene sales representatives blatantly promoted Thalomid and Revlimid for off-label indications.[29] In particular, hundreds of verbatims show sales representatives promoted Revlimid for lines of therapies that weren't indicated. For example, in 2010 when Revlimid was only approved for second line multiple myeloma and only in combination with dexamethasone; verbatims from Celgene's Oncolink Promotion reports record unaided messages such as:[30]

> **"Discussed the use of Revlimid in multiple myeloma, both in first and second line settings. Also, in combination with other agents, as well."**

---

[28] Such reports were available to me for the 2009-2010 time period. CELBRN0175405, CELBRN0223299, CELBRN0229517, CELBRN0322454, CELBRN0322658, CELBRN0347838, CELBRN0348853, CELBRN0354694, CELBRN0354904, CELBRN1189552, CELBRN1190162, CELBRN1558694

[29] CELBRN0175405, CELBRN0223299, CELBRN0229517, CELBRN0322454, CELBRN0322658, CELBRN0347838, CELBRN0348853, CELBRN0354694, CELBRN0354904, CELBRN1189552, CELBRN1190162, CELBRN1558694

[30] CELBRN0175405.

38. Another example below shows discussion of first-line use of Revlimid for multiple myeloma. This discussion also suggests that sales representatives discussed the possibility of treatment of Revlimid in treatment of cancers such as Chronic Lymphocytic Leukemia (CLL) in 2010, despite there being no CLL indication for Revlimid.[31]

> **"…Extensive discussion about the use of Revlimid for the treatment of multiple myeloma. Now it's FDA approved for first line use. Also discussed…it's possibilities in the treatment of non 5q- syndromes and possibly CLL."**

39. Verbatims also suggest that Celgene sales representatives misrepresented to physicians that Revlimid was indicated as a first-line treatment for Multiple Myeloma when it was not. For example:[32]

> **"Today was Celgene day in the office, and the rep and I talked about one of their great products, called Revlimid, which has a first line indication for multiple myeloma, in combination with dexamethasone, low-dose dexamethasone, good responses, first line, and, in particular, it has a great application for those individuals who are potential candidates to undergo stem cell transplantation for multiple myeloma."**

40. There are numerous verbatims showing sales discussion about the use of Thalomid and Revlimid that are not within the labeled indications. For example;[33]

---

[31] CELBRN0303825.

[32] CELBRN0175405.

[33] CELBRN0303825.

**"So the rep really talked about Revlimid, the fact that it will be combined with Velcade, but had to be combined in a lower dose."**

**"Discussed use of Revlimid both for multiple myeloma and in MDS that is not 5q minus."**

**"…[The rep} also talked about using Revlimid as a part of Decade/Revlimid/Decadron up front treatment, especially in patients who were eligible to going on to treatment. We also talked about again Revlimid being used for the deletion 5 chromosome MDS and also using for patients who do not have deletion 5 but have high risk refractory MDS."**

41. According to Celgene' Director of Marketing, Mark Alles, *any* discussion of off-label use by sales representatives was improper and should not have occurred, whether or not in response to physicians; rather, sales representatives should have referred physicians to Celgene's Medical Affairs group to answer any questions regarding off-label use.[34] However, these reports were disseminated among Celgene's senior management. For example, Head of Sales Shawn Tomasello received these verbatim reports on "Revlimid Promotion" in connection with an analytical report from ImpactRx and circulated them to Celgene's entire Sales Directors Distribution list with a directive to review the information closely."[35] I have not seen any documents or testimony that Celgene took any steps to proscribe or stop such conduct.

42. In Chad Saward's Monthly Activity report, he wrote "Accomplishments" "submitted nearly 30 Med Request Forms" and under "Goals" he wrote "submit a Med. Info Req form for nearly every call;" "I discussed colorectal, prostate, renal cell carcinoma, melanoma MDS and MM (TAC ¶ 183).

[34] Deposition of Mark Alles at 151:2-25. I understand Relator's counsel maintain that it was also illegal under subpart H and other FDCA regulations and laws applicable to Celgene.

[35] CELBRN0322327

### 5. Celgene provided articles and training for non-labeled uses of Thalomid and Revlimid

43. During her sales training at Celgene the Relator and her colleagues were given copies of an abstract by Dr. William Figg and others that appeared in the July 2001 issue of Clinical Cancer Research. Deena Harding, then Celgene Sales Manager, told the Relator to use it when calling upon doctors who treated prostate cancer, a disease for which Thalomid had no indication.[36]

44. Celgene distributed a document titled "Renal Cell Carcinoma Express Report from the 38th Annual Mtg of ASCO to be used by Relator and others to promote the use of Thalidomide for renal cell carcinoma in 2002, again outside the Thalomid indications.[37]

45. In March 2002; ISIS 2002 NYC – [redacted], of Celgene's sales group, presented a PowerPoint slideset on the Mid-South Region, in which she sought to emphasize Solid Tumor and found ways to justify being in the doctor's office with co-promotion or product acquisition information outside the Thalomid label.[38]

46. In or about 2003, the Relator's fellow sales representatives, [redacted] and [redacted], conducted training on Thalomid's use in colorectal cancer, a disease completely outside of Thalomid's labeled indications. The training materials provided "Selling points of Thalomid Use" in colorectal cancer, as well as "Potential Probes" for physicians, including "What is your treatment regimen for [colorectal cancer] [patients]?[39]

47. In 1999, Celgene strategized on how they could train sales representatives to sell Thalomid for off-label indications.[40]

---

[36] TAC ¶ 155

[37] TAC ¶ 172

[38] CELBRN0178363

[39] TAC ¶ 207.

[40] CELBRN0316185.

"Could we possibly have a program where we train reps on the way to sell drug off of protocol? Many reps seem to get caught up in the idea that all patients are on protocol. We need to emphasize the large number of patients that don't qualify for protocols and can use Thalomid?"

48. As yet another example in 2004: Celgene conducted Prostate Cancer Training: Objective "Prepare the field organization to respond to unsolicited requests for data on the use of Thalomid in AIPC (Androgen-Independent Prostate Cancer."[41] A notice of an August 15, 2003 meeting with Sol Barer who was then CEO of Celgene(and others) and Wayne Pines, discusses potential ways to disseminate information to doctors on Thalomid in melanoma from two JOC publications (Sol Barer, Francis Brown), despite Thalomid having never received any such marketing indications.[42]

### 6. Celgene pushed for doses that are not indicated in the label

49. There are are also notes from sales representatives that indicate discussions with physicians about Thalomid doses not indicated on the FDA-approved marketing label.[43]

### 7. Unreasonably high number of sales contacts with physicians for few leprosy patients

50. According to Celgene's 2000 10-K, filed with the Securities and Exchange Commission, it had 98 sales respresentatives as of February 15, 2001, who were "engaged in sales and commercialization activities." Per Celgene's 2005 10-K, it had 204 employees "who were engaged in sales and commercialization activities" as of March 1, 2005. Documents for the time-period of August 2004 – October 2005 show between 4,000 and 5,000 Celgene sales rep contacts

[41] CELBRN0095671.

[42] CELBRN1352139, CELBRN1355311.

[43] CELDOJ014072.

per month with physicians even though there were only 130 or so new leprosy cases per year.[44] More than 80% of these contacts were with physicians belonging to hem-oncology and oncology specialities while dermatologists and internal medicine specialties treat leprosy.[45] It seems obvious that the lion's share of sales contacts were being made for promoting off-label indications.[46] This is also evident from the fact that during the same period Celgene sold about [redacted] Thalomid capsules per month.[47] Why would Celgene be providing 5,000 sales contacts per month selling [redacted] capsules per month when there were 131 new leprosy cases each year? In an August 15, 2006 email from Jerry Zeldis (a longstanding chief medical director at Celgene) to Francis Brown (Celgene's Senior VP of marketing and sales), Curtis Quigley (Celgene's Vice President of Sales Operation and Distribution, serving directly under Brown) with cc to Barer, Hugin and Stirling, provided Thalomid patient and prescription milestones since the September 1998 launch of Thalomid. Zeldis writes "Wow! Who would ever imagine that there were that many leprosy patients in the US - since the FDA clearly does not allow non-ENL [leprosy patients] to receive thalidomide."[48] So Celgene executives themselves cynically acknowledged that all these Thalomid sales were not for leprosy patients and that these sales contacts and

---

[44] CELBRN3542176, CELBRN3542179, CELBRN3542182. See also; for Leprosy cases per year: http://www.hrsa.gov/hansensdisease/dataandstatistics.html accessed September 19, 2015.

[45] CELBRN3542176, CELBRN3542179, CELBRN3542182.

[46] In my experience it would not even take one full-time sales representative to detail all doctors treating 130 new leprosy patients per year. Celgene should not have been sending sales representatives to detail physicians on off-label uses. It should have left them to their own devices to decide appropriate off-label use based on their "training and experience, their independent medical judgment, existing clinical studies and medical literature…." as it claims to have done.

[47] CELBRN0574956, CELBRN0774524, CELBRN0781605, CELBRN0483855, CELBRN0751139, CELBRN0985199.

[48] CELBRN0147024, CELBRN0766998.

Thalomid capsules sold were for conditions not indicated on the label. Rather than being alarmed and taking good faith actions to ensure that Celgene was marketing their products within the FDA-approved labels, these Celgene executives apparently joked among themselves about the fact that Thalomid sales vastly exceeded what was necessary to treat the small number of leprosy patients in the U.S.

51. For these reasons, and given that there is no evidence that Celgene did anything to constrain this off-label marketing, it is reasonable to conclude that all (100%) off-label use of Thalomid and Revlimid was tainted by off-label promotion. Should additional evidence or Court findings establish that some level of off-label prescribing was not due to off-label promotion, it will be straightforward to adjust my damages calculations by the relevant percentage.

### C. The Food and Drug Administration sent warning letters to Celgene for promoting Thalomid for off-label oncology indications

52. The FDA contacted Celgene in mid 1998 to "discuss concerns about promotion materials containing uses of thalidomide other than those" approved by the FDA. A few months later, FDA issued an untitled letter to Celgene regarding three of its press releases regarding Thalomid that were "misleading".[49]

53. In 2000, FDA sent another warning letter to Celgene regarding its "promotional activities that state or suggest that Thalomid is safe and effective for use in treating multiple myeloma" and its representations "to physicians that Thalomid can be used to treat various cancers …" Although noting specific interactions between sales representatives and physicians that had been brought to its attention, the FDA largely focused on Celgene's dissemination of third party press releases on off-label uses and public statements made by Celgene at investor meetings

49 http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM167840.pdf accessed on September 23, 2015.

regarding its plans for sales representative to engage in off-label "detail" sessions with physicians,stating that "Celgene is demonstrating a continuing pattern and practice of violative behavior…"[50]

54. Although Celgene may have stoped issuing press releases lauding the use of off-label uses of Thalomid after receiving these warning letters, as noted above, its business plans and other documents make it clear that it used sales representatives to heavily promote off-label uses in individual interactions with physicians, a method more difficult to detect by the FDA and other governing bodies.

## II. Data soures and assumptions for damages calculations

55. I have been advised by counsel that if a government plaintiff paid for any part of a prescription of Thalomid or Revlimid, and if that claim was an off-label prescription due to illegal marketing promotion by Celgene, then the portion of that claim paid by the government plaintiff is recoverable as damages. Counsel has further advised me that under the federal False Claims Act (31 U.S.C. §§ 3729–3733, also called the "Lincoln Law") each such claim partially reimbursed by a federal government health care payer (e.g., Medicare, Medicaid, Veterans Affairs, Tricare, etc.) is further subject to a maximum potential additional penalty of $11,000 per prescription claim and potential treble damages.

56. In this report, I have calculated the damages to Medicare, Medicaid, VA, Tricare and other federal and state government programs due to illegal off-label marketing and promotions of Thalomid and Revlimid using data sources provided by counsel for analysis by this report deadline. It is likely that my damage calculations will become more precise as more detailed data

[50]http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM165843.pdf accessed September 23, 2015

are made available to me. Many of my requests for more detailed data from Celgene and various state and federal agencies have not yet been answered or the data was otherwise provided too late to analyze.[51] Accordingly, my damages calculations and analysis are based on conservative assumptions (*e.g.*, assumptions that may lead the damages to be understated if more complete information were provided).

57. The key assumptions and strategies for analysis to overcome limitations in the data I analyzed are:

- All on-label prescriptions of Thalomid or Revlimid are not related to any alleged illegal promotion activities.
- Where dates of the patient's initial diagnosis were not available, the prescription was considered on-label if the patient was ever diagnosed with any of the approved indications for Thalomid and Revlimid.
- ICD-9 (International Statistical Classification of Diseases and related Health Problems) codes are not available for first line and second line multiple myeloma therapies. ICD-9 codes is a set of codes used by physicians, hospitals, and allied health workers to indicate **diagnosis** for all patient encounters. RevAssist and STEPS data and most datasets provided to me do not give any information of the drugs other than Revlimid and Thalomid prescribed for the patients. For Revlimid usage in multiple myeloma, the prescription was considered on-label when no information was available to me on the lines of therapies for the multiple myeloma

[51] For example, I received an accessible version of Medicare Part A and B data one week before my report was due. The original data – still produced very late – was corrupted and inaccessible.

indication. The Medicare A and B data that I received too late to analyze for this report may enable me to determine whether particular multiple myeloma patients received Revlimid or Thalomid as a first or second line therapy and also to determine whether they received it as a monotherapy, contrary to the label.

- Prescriptions were considered on-label where information was not available on whether Thalomid or Revlimid was prescribed along with Dexamethasone for the multiple myeloma indication. As noted above and discussed further below, I may be able to make a determination based on the Medciare A and B data now received and/or additional data received or forthcoming.
- Thalomid was approved as a first-line treatment for multiple myeloma on May 25, 2006. So every multiple myeloma prescription for Thalomid was considered on-label after May 25, 2006 in the Celgene STEPS data as there was no information on dexamethasone prescriptions available to me.
- Revlimid was approved for second-line multiple myeloma treatment on June 30, 2006. With the Celgene RevAssist data, I was able to determine the aggregate Revlimid usage. However, it was impossible to analyze the illegal off-label use with these data because it was not possible to distinguish between lines of therapies.
- Because it was the most detailed claims data we had access to for assessing off-label use of Revlimid, we used Humana claims data to determine the percentage of off-label usage by analyzing treatment received by Revlimid patients by lines of therapies.
- Prescriptions for patients with and without 5q cytogenetic abnormality were considered on-label where information was not available regarding presence of a

5q cytogenetic abnormality in Myelodysplastic Syndrome (MDS) patients, and thus were not included in my damages calculations even though some of these claims were off-label.

58. I calculated the aggregate (all payers included) off-label usage of Thalomid and Revlimid for the years 2001Q3 to 2015 from Celgene's RevAssist and STEPS data. I understand there is a dispute as to the appropriate statute of limtiations and that damages may be recoverable back to April of 2000. I expect to be able to calculate damages back to April of 2000 with additional data.

59. From Celgene's STEPS data I was able to analyze the aggregate percentage off-label use of Thalomid. As no information was available to me with regards to whether Thalomid was prescribed with dexamethasone for multiple myeloma after June 29, 2006; all multiple myeloma claims were assumed to be on-label after this date. This is a conservative assumption for the percentage of allegedly illegal off-label Thalomid use after June 29, 2006.

60. Although there is some payer information available in the RevAssist and STEPS data, it was impossible to use this data to calculate the damages for each of the key government plaintiffs (e.g., Medicare, Medicaid, State and other Federal programs) directly because unique payer codes or payer names were not mapped to specific government programs (e.g., Medicare, Medicaid, Tricare, Veterans Affairs, etc.). Hence, the quantification of allegedly illegal off-label usage of Thalomid and Revlimid for each of the payers is based on the respective data sources made available to me from each of the payers or through publicly available information.

61. I calculated Medicare damages from Medicare Part D data. Since Medicare Part A and Part B data were provided to me too close to my initial report deadline to be analyzed, I was

not able to utilize the Part A and Part B data for my damage calculations. With additional time I will be able to do a more detailed and comprehensive econometric analysis to supplement this report where I will be able to identify allegedly illegal off-label use of Revlimid by lines of therapy for Medicare and also determine if both Thalomid and Revlimid were prescribed with dexamethasone for Medicare patients. Because Revlimid and Thalomid was also sold (and allegedly illegally promoted) to doctors prescribing under the Medicare Advantage program, and since Medicare Advantage data on these sales were not provided to me, these Medicare damages calculations are **understated.** Should additional information on Medicare Advantage Revlimid and Thalomid sales become available to me I will adjust my damages calculations accordingly.

62. I also received the claims data on Revlimid and Thalomid and corresponding diagnosis information from the Medicaid programs of the states of New York, Louisiana, Wisconsin, Delaware and the District of Columbia and Virginia. From this data, I was able to calculate the damages to the Medicaid programs for each of these states using a very conservative calculation strategy. I also received the claims data with no diagnosis information from the Medicaid programs of the states of Texas, Nevada and New Jersey. I calculated the damages for these and other states through projections from the detailed datasets in my posession as well as publicly available resources.

63. I have requested Celgene's data on all Thalomid and Revlimid marketing and promotion including sales vists and spending on KOL meetings and CME programs. Thus far most of these data haven't been made available to me. Through discovery, I was able to get reasonably complete information only for August 2004 through June 2006. In my professional experience, pharmaceutical companies maintain detailed and comprehensive time-specific records of their drug-specific promotional and marketing spending and provider contact interactions. However, in

a 2008 email I reviewed called a "Disposal Notice", Celgene employees were instructed to destroy all Activity Reports, Weekly Activity Reports, Monthly Reports, District Manager Reports, Field contact records, and Meeting records that predated 2006 or 2007.[52] I also understand from conversations with counsel that email files from key custodians no longer exist, possibly because Celgene did not have a document retention policy in place addressing email preservation until November 2011. Thus, it may be that Celgene has not preserved the documents I would need to perform the most comprehensive analysis.

## IV. RevAssist and STEPS program - Total illegal off-label use of Thalomid and Revlimid, 2001Q3 - 2015Q1

### A. Total off-label usage of Thalomid 2001Q3 - 2015Q1

64. The total number of off-label prescriptions[53] of Thalomid from the STEPS program for the years 2001Q3-2015Q1 was [redacted] This number represented [redacted] of the overall prescriptions during the same time period. Until May 24, 2006 i.e. until the approval of Thalomid for multiple myeloma in first-line with dexamethasone, more than [redacted] Thalomid use was due to off-label promotions of Thalomid by Celgene Sales representatives (Technical Appendix D.1 for methodology).

Table 1: Thalomid and off-label use in STEPS data

| | Off-label | On-label | Total Prescriptions | % off-label |
|---|---|---|---|---|
| 2001Q3-2005 | [redacted] | [redacted] | [redacted] | [redacted] |
| 2006 | | | | |
| 2007-2015Q1 | | | | |
| Total | | | | |

[52] I do not know whether a similar directive was issued later that would have addressed documents that post-date 2007.

[53] Dispensations – I used the "Dispensations file" from Celgene's RevAssist and STEPS data file to calculate total Thalomid and Revlimid prescriptions. Celgene's definition of "dispensations" includes new prescriptions plus prescription refills. Henceforth I will refer to "dispensations" (new prescriptions plus refill prescriptions) as "prescriptions."

65. Because approval for first line usage in multiple myeloma makes Thalomid on-label for all subsequent lines of therapies, all multiple myeloma Thalomid prescriptions were treated as on-label after May 24, 2006.

### B. Total off-label usage of Revlimid 2006-2015

66. The total number of prescriptions for Revlimid from the RevAssist program for the years 2006-2015Q1 was [redacted] (see Technical Appendix D.1 for analysis details). The percent off-label use for Revlimid was [redacted] of the total Revlimid use (see Technical Appendix D.2 for analysis details). I used this percentage to calculate the alleged illegal off-label use of Revlimid for the RevAssist prescriptions. The alleged illegal off-label prescriptions for Revlimid were [redacted]

## V. Damages to the Medicare Program due to illegal off-label marketing and promotions of Thalomid and Revlimid

### A. Damages to the Medicare program due to alleged illegal off-label marketing of Thalomid

67. The total number of Thalomid claims from the Medicare Part D data for the years 2006-2014 is [redacted] (See technical Appendix D.3 for methodology). The total amount paid by Medicare for these claims is [redacted] (approximately [redacted] in U.S. dollars -- not converted to current U.S. dollars).

68. The damages to the Medicare program due to allegedly fraudulent Thalomid claims for the **2006-2014** time-period are [redacted]

69. The total calculated allegedly fraudulent Thalomid claims for the time-period 2006-2014 were [redacted] Considering that every claim is subject to a potential $11,000 in additional False Claims Act (FCA) penalty damages, the additional FCA damages to the Medicare program for the 2006-2014 period for allegedly fraudulent Thalomid claims are [redacted]**.** The total damages to Medicare program during the time-period of 2006-2014 (damages+additional FCA damages) are [redacted]

70. I calculated the illegal off-label use of Thalomid for years going back to 2001 Q3 for the Medicare program based on the off-label prescriptions seen in STEPS data (See technical Appendix D.3 for methodology). Thus, the damages to the Medicare program for the period of 2001Q3–2014 are [redacted] The total number of calculated allegedly fraudulent claims to the Medicare program for the period of 2001Q3 – 2014 is [redacted] Considering that every claim is subject to $11,000 in additional FCA penalty damages, the additional FCA damages to the Medicare program for the 2001Q3-2014 period for allegedly fraudulent Thalomid claims is [redacted] The total damages to Medicare program during the time-period of 2001Q3-2014 (damages+additional FCA damages) are [redacted].

**B. Damages to the Medicare program due to alleged illegal off-label marketing of Revlimid**

71. The total number of Revlimid claims from the Medicare Part D data for 2006 through 2014 is [redacted] The total amount paid by Medicare for these claims is [redacted] (approximately [redacted] in nominal U.S. dollars).

72. I calculated the number of allegedly fraudulent Medicare Revlimid claims to be [redacted] (See Appendix D.3). Similarly, the dollar value of the damages from these claims

amounted to [redacted] Considering that every claim is subject to $11,000 in FCA damages, the additional FCA damages to the Medicare program for the 2006-2014 time-period due to allegedly fraudulent Revlimid claims are [redacted] Thus, the total damages to the Medicare program due to allegedly fraudulent Revlimid claims (including additional FCA damages are [redacted]

73. I intend to update my analysis for damages to the Medicare program by utilizing the information available from Medicare Part A and Part B data made available too late to analyze for this report.

Table 2: Total damages to Medicare Program

| | Allegedly Fraudulent claims | Damages from Medicare data | Additional FCA damages of $11,000 per claim | Total damages (damages + additional FCA civil penalties of $11,000 per claim) |
|---|---|---|---|---|
| Revlimid | [redacted] | [redacted] | [redacted] | |
| Thalomid | [redacted] | [redacted] | [redacted] | [redacted] |
| Total | [redacted] | [redacted] | [redacted] | |

## VI. Damages to other federal programs (Veterans Affairs (VA), Tricare, Indian Health Service and 340B Public Clinics)

I calculated the damages for Veterans Affairs, Tricare, Indian Health Service, Federal employees Health Benefits Program and 340B Public Clinics based on the resources available to me (See Appendices D.4, D.5, D.6, D.7, D.8 and D.9 for description of methodology).

**A. Veterans Affairs Department**

74. The total damages to the VA for (years 1999-2014) allegedly fraudulent Thalomid and Revlimid claims are [redacted]

Table 3: Damages to the VA due to Thalomid allegedly fraudulent prescriptions

| Year | Medical Care expenditures (VA) | Thalomid damages (VA) |
|---|---|---|
| 1999 | [redacted] | [redacted] |
| 2000 | [redacted] | [redacted] |
| 2001 | [redacted] | [redacted] |
| 2002 | [redacted] | [redacted] |
| 2003 | [redacted] | [redacted] |
| 2004 | [redacted] | [redacted] |
| 2005 | [redacted] | [redacted] |
| 2006 | [redacted] | [redacted] |
| 2007 | [redacted] | [redacted] |
| 2008 | [redacted] | [redacted] |
| 2009 | [redacted] | [redacted] |
| 2010 | [redacted] | [redacted] |
| 2011 | [redacted] | [redacted] |
| 2012 | [redacted] | [redacted] |
| 2013 | [redacted] | [redacted] |
| 2014 | [redacted] | [redacted] |
| Total | | [redacted] |

Table 4: Damages to the VA due to allegedly fraudulent Revlimid off-label prescriptions

| Year | Medical Care expenditures (VA) | Revlimid damages |
|---|---|---|
| 1999 | [redacted] | |
| 2000 | [redacted] | |
| 2001 | [redacted] | |
| 2002 | [redacted] | |
| 2003 | [redacted] | |

| | | |
|---|---|---|
| 2004 | [redacted] | |
| 2005 | [redacted] | |
| 2006 | [redacted] | [redacted] |
| 2007 | [redacted] | [redacted] |
| 2008 | [redacted] | [redacted] |
| 2009 | [redacted] | [redacted] |
| 2010 | [redacted] | [redacted] |
| 2011 | [redacted] | [redacted] |
| 2012 | [redacted] | [redacted] |
| 2013 | [redacted] | [redacted] |
| 2014 | [redacted] | [redacted] |
| Total | | [redacted] |

**B. TRICARE**

75. Although I calculated the damages for Tricare based on the resources available to me, counsel received a data production from Tricare just before my report was due and I expect to be able to provide a more precise analysis when I supplement this report.

76. The damages to Tricare due to allegedly fraudulent claims for Thalomid for the years 1999-2014 are [redacted]

Table 5: Damages to Tricare program due to allegedly fraudulent Thalomid prescriptions

| **Thalomid allegedly fraudulent claim damages to TRICARE** | | |
|---|---|---|
| **Year** | **NHE** | **Damages** |
| 1999 | [redacted] | [redacted] |
| 2000 | [redacted] | [redacted] |
| 2001 | [redacted] | [redacted] |
| 2002 | [redacted] | [redacted] |
| 2003 | [redacted] | [redacted] |
| 2004 | [redacted] | [redacted] |
| 2005 | [redacted] | [redacted] |
| 2006 | [redacted] | [redacted] |
| 2007 | [redacted] | [redacted] |

| | | |
|---|---|---|
| 2008 | [redacted] | [redacted] |
| 2009 | | |
| 2010 | | |
| 2011 | | |
| 2012 | | |
| 2013 | | |
| 2014 | | |
| Total | | [redacted] |

77. The damages to Tricare due to allegedly fraudulent claims for Revlimid for the years 2006-2014 are [redacted]

Table 6: Damages to Tricare program due allegedly fraudulent prescriptions

| Year | NHE | Damages |
|---|---|---|
| 2014 | [redacted] | [redacted] |
| 2013 | | |
| 2012 | | |
| 2011 | | |
| 2010 | | |
| 2009 | | |
| 2008 | | |
| 2007 | | |
| 2006 | | |
| Total | | [redacted] |

### C. Others (Federal employees, 340B Public Clinics, Indian Health Service)

#### 1. Federal Employees Health Benefits (FEHB)

78. The total calculated damages to Federal Employees Health Benefits program due to allegedly fraudulent claims for Thalomid during 1999-2014 are [redacted] Similarly, the

calculated damages to FEHB due to allegedly fraudulent claims for Revlimid are [redacted] during 2006-2014.

Table 7: Damages to FEHBP program due to allegedly fraudulent Thalomid off-label prescriptions

| Year | NHE | Damages |
|---|---|---|
| 1999 | [redacted] | [redacted] |
| 2000 | [redacted] | [redacted] |
| 2001 | [redacted] | [redacted] |
| 2002 | [redacted] | [redacted] |
| 2003 | [redacted] | [redacted] |
| 2004 | [redacted] | [redacted] |
| 2005 | [redacted] | [redacted] |
| 2006 | [redacted] | [redacted] |
| 2007 | [redacted] | [redacted] |
| 2008 | [redacted] | [redacted] |
| 2009 | [redacted] | [redacted] |
| 2010 | [redacted] | [redacted] |
| 2011 | [redacted] | [redacted] |
| 2012 | [redacted] | [redacted] |
| 2013 | [redacted] | [redacted] |
| 2014 | [redacted] | [redacted] |
| Total | | [redacted] |

**Note: NHE – National Health Expenditure**

Table 8: Damage to FEHBP program due to allegedly fraudulent Revlimid off-label prescriptions

| Year | NHE | Damages |
|---|---|---|
| 2014 | [redacted] | [redacted] |
| 2013 | [redacted] | [redacted] |
| 2012 | [redacted] | [redacted] |
| 2011 | [redacted] | [redacted] |
| 2010 | [redacted] | [redacted] |
| 2009 | [redacted] | [redacted] |
| 2008 | [redacted] | [redacted] |
| 2007 | [redacted] | [redacted] |

| | | |
|---|---|---|
| 2006 | [redacted] | [redacted] |
| Total | | [redacted] |

**Note: NHE – National Health Expenditure**

### 2. 340B Public Clinics

79. The total calculated damages to 340B Public Clinics (year 1999-2014) due to allegedly fraudulent Thalomid and Revlimid prescriptions are [redacted]

Table 9: Damages to 340B public clinicals program due to allegedly fraudulent Thalomid off-label prescriptions

| Year | Drug expenditure | Thalomid damage in 340B |
|---|---|---|
| 1999 | [redacted] | [redacted] |
| 2000 | [redacted] | [redacted] |
| 2001 | [redacted] | [redacted] |
| 2002 | [redacted] | [redacted] |
| 2003 | [redacted] | [redacted] |
| 2004 | [redacted] | [redacted] |
| 2005 | [redacted] | [redacted] |
| 2006 | [redacted] | [redacted] |
| 2007 | [redacted] | [redacted] |
| 2008 | [redacted] | [redacted] |
| 2009 | [redacted] | [redacted] |
| 2010 | [redacted] | [redacted] |
| 2011 | [redacted] | [redacted] |
| 2012 | [redacted] | [redacted] |
| 2013 | [redacted] | [redacted] |

| | | |
|---|---|---|
| 2014 | [redacted] | [redacted] |
| Total | | [redacted] |

Table 10: Damages to 340B public clinicals program due to allegedly fraudulent Revlimid off-label prescriptions

| Year | Drug expenditures 340B Clinics | Damages |
|---|---|---|
| 2006 | [redacted] | [redacted] |
| 2007 | [redacted] | [redacted] |
| 2008 | [redacted] | [redacted] |
| 2009 | [redacted] | [redacted] |
| 2010 | [redacted] | [redacted] |
| 2011 | [redacted] | [redacted] |
| 2012 | [redacted] | [redacted] |
| 2013 | [redacted] | [redacted] |
| 2014 | [redacted] | [redacted] |
| | Total | [redacted] |

### 3. Indian Health Service (IHS)

80. The total calculated damages to IHS (years 1999-2014) due to allegedly fraudulent Thalomid and Revlimid claims are [redacted]

Table 11: Damages to IHS program due to allegedly fraudulent Thalomid off-label prescriptions

| Year | Total medical spending | Thalomid damage |
|---|---|---|
| 1999 | [redacted] | [redacted] |
| 2000 | [redacted] | [redacted] |
| 2001 | [redacted] | [redacted] |
| 2002 | [redacted] | [redacted] |
| 2003 | [redacted] | [redacted] |
| 2004 | [redacted] | [redacted] |
| 2005 | [redacted] | [redacted] |
| 2006 | [redacted] | [redacted] |
| 2007 | [redacted] | [redacted] |

| | | |
|---|---|---|
| 2008 | [redacted] | [redacted] |
| 2009 | [redacted] | [redacted] |
| 2010 | [redacted] | [redacted] |
| 2011 | [redacted] | [redacted] |
| 2012 | [redacted] | [redacted] |
| 2013 | [redacted] | [redacted] |
| 2014 | [redacted] | [redacted] |
| Total | | [redacted] |

Table 12: Damage to IHS program due to allegedly fraudulent Revlimid off-label prescriptions

| Year | Medical spending | Revlimid damages (IHS) |
|---|---|---|
| 1999 | [redacted] | |
| 2000 | [redacted] | |
| 2001 | [redacted] | |
| 2002 | [redacted] | |
| 2003 | [redacted] | |
| 2004 | [redacted] | |
| 2005 | [redacted] | |
| 2006 | [redacted] | [redacted] |
| 2007 | [redacted] | [redacted] |
| 2008 | [redacted] | [redacted] |
| 2009 | [redacted] | [redacted] |
| 2010 | [redacted] | [redacted] |
| 2011 | [redacted] | [redacted] |
| 2012 | [redacted] | [redacted] |
| 2013 | [redacted] | [redacted] |
| 2014 | [redacted] | [redacted] |
| Total | | [redacted] |

## VII. Damages to each of the State Medicaid Programs due to alleged illegal off-label prescribing of Thalomid and Revlimid

81. For the states of New York, District of Columbia, Delaware, Louisiana and Virginia counsel provided Revlimid and Thalomid Medicaid claims and corresponding diagnosis

information for all the patients prescribed these medications. I also received claims data for the states of Texas, Nevada, New Jersey and Wisconsin[54] (See technical appendix D.10 for methodology for damages calculations). The Medicaid states data ranged over varying time-periods as seen in Table 13 and Table 14. These datasets also had the claim amount paid by the state for each of the Revlimid and Thalomid prescriptions. The damages for each of these states can be seen in table 13.

82. Some of the key findings for a state such as New York that has one of the highest pharmaceutical spending[55] (the two only other states with comparable pharmaceutical spending are Florida and California) are that more than [redacted] of the Thalomid claims were for off-label indications in the pre-May 24, 2006 period when Thalomid was only approved for leprosy (1,952 claims). While in the post May 24, 2006 period, [redacted] of Thalomid claims were for off-label indications.

83. Counsel received data for Florida too close to my report due date. I intend to supplement this report with damages calculated using Mediciaid data for the state of Florida. Data for the states of California and Conneticut are also anticipated as mentioned before in the report.

Table 13. Damages to Medicaid State programs due to allegedly fraudulent Thalomid claims

[54] We were not able to match the diagnoisis information with the claims information for Wisconsin data. So, although we received a diagnosis file with the claims file we believe the diagnosis file was useless for performing analysis.

[55] CMS.gov website

| State | Year data available | Allegedly fraudulent Thalomid claims | Damages to the state calculated from data | Total damages (every claim is subject to $11,000 in additional FCA civil penalties + damages from state data) |
|---|---|---|---|---|
| New York | 2005-2014 | [redacted] | [redacted] | [redacted] |
| District of Columbia | 2003-Mar 2015 | [redacted] | [redacted] | [redacted] |
| Wisconsin | 2004-2014 | [redacted] | [redacted] | [redacted] |
| Louisiana | 2005-May 2015 | [redacted] | [redacted] | [redacted] |
| Delaware | 2008-2015 | [redacted] | [redacted] | [redacted] |
| Texas | 1999-2015 | [redacted] | [redacted] | [redacted] |
| Nevada | 2000-2015 | [redacted] | [redacted] | [redacted] |
| New Jersey | 2005-2015 | [redacted] | [redacted] | [redacted] |
| Virginia | 1998 – 2015 | [redacted] | [redacted] | [redacted] |
| **Total** | | [redacted] | [redacted] | [redacted] |

84. Again, considering the example of the state of New York, in the pre-June 2006 period (when Revlimid was not approved for second-line treatment of multiple myeloma), [redacted] ([redacted]) of the claims [redacted] claims in New York medicaid program) were for off-label indications (although this number is small because of the small time-period between the initial approval of Revlimid and its approval in treatment of multiple myeloma.) **These datasets did not allow for analysis by lines of therapies because all the drug claims for patients who received Revlimid were not provided. So the calculation for Revlimid damages is at best very conservative.**

85. The damages to the Medicaid program of all the states combined (except Colorado and Minnesota) due to allegedly fraudulent thalomid claims are [redacted] (not including additional FCA damages). The total damages (accounting for additional FCA damages to the

states of (New York, District of Columbia, Wisconsin, Louisiana, Delaware, Texas, Nevada, New Jersey, Virginia) to all the states combined (except Minnesota and Colorado) due to allegedly fraudulent Thalomid claims for the period of 1999-2014 are [redacted]. (See Technical Appendix D.10 for State-wise damages methodology).

| Table 14: Damages to Medicaid State programs due to allegedly fraudulent Revlimid claims | | | | |
|---|---|---|---|---|
| State | Year data available | Allegedly fraudulent Revlimid claims | Damages to the state calculated from data | Total damages (every claim is subject to $11,000 in additional FCA civil penalties +damages from state data) |
| New York | 2005-2014 | [redacted] | [redacted] | [redacted] |
| District of Columbia | 2005-Mar 2015 | [redacted] | [redacted] | [redacted] |
| Wisconsin | 2005-2014 | [redacted] | [redacted] | [redacted] |
| Louisiana | 2005-May 2015 | [redacted] | [redacted] | [redacted] |
| Delaware | 2008-2015 | [redacted] | [redacted] | [redacted] |
| Texas | 2005-2015 | [redacted] | [redacted] | [redacted] |
| Nevada | 2005-2015 | [redacted] | [redacted] | [redacted] |
| New Jersey | 2005-2015 | [redacted] | [redacted] | [redacted] |

| | | | | |
|---|---|---|---|---|
| Virginia | 2005-2015 | [redacted] | [redacted] | [redacted] |
| Total | | [redacted] | [redacted] | [redacted] |

86. The damages to the Medicaid program of all the states combined (except Colorado and Minnesota) due to allegedly fraudulent Revlimid claims are [redacted] (not including additional FCA damages). The total damages (accounting for additional FCA damages to the states of New York, District of Columbia, Wisconsin, Louisiana, Delaware, Texas, Nevada, New Jersey, Virginia to all the states combined (except Minnesota and Colorado) due to allegedly fraudulent Revlimid claims for the period of 2006-2014 are [redacted]. (See Technical Appendix D.10 for State-wise damages breakdown).

Table 15: Damages to Medicaid programs of all the states combined (except CO and MN)

| Damages to Medicaid programs of all the states (except CO and MN) | | | |
|---|---|---|---|
| | Damages calculated | Additional FCA damages of $11,000 per claim | Total damages (damages + additional FCA civil penalties) |
| Thalomid | [redacted] | [redacted] | [redacted] |
| Revlimid | [redacted] | [redacted] | [redacted] |
| Total | [redacted] | [redacted] | [redacted] |

## VIII. Damages to other State Programs (State and local employees)

For other state programs, the damages will be projected from the Medicaid damages.

### A. State and local employees

87. The aggregate Revlimid damages across all states was [redacted] The aggregate Thalomid damages across all states was [redacted] (except Colorado and Minnesota). (See technical appendix D.11 for methodology for damages calculations)

## IX. Other programs

### A. CHIP - The Children's Health Insurance Program (Joint state-federal partnership)

88. The damages to CHIP's federal counter-part due to allegedly fraudulent Thalomid claims were [redacted] while the damages to CHIP's state counter-part were [redacted].

89. The damages to CHIP's federal counter-part due to allegedly fraudulent Revlimid claims were [redacted] while the damages to CHIP's state counter-part were [redacted]. (see appendix D.12 for methodology and other details)

### B. State correction inmates

90. The total damages due to allegedly fraudulent Revlimid claims across all states were [redacted]. The total damages due to allegedly fraudulent Thalomid claims across all states were [redacted]. (see appendix D.13 for methodology and other details).

## X. Damages to Medicare due to Kickbacks to physicians in the Celgene's Revlimid Speakers Program

91. Many drug companies provide reasonable compensation to expert physicians and other KOLs to speak to other doctors and clinicians in fair and balanced presentations on the role of the sponsor's drugs in patient management. However, if the purpose of a pharmaceutical KOL program is to reward such doctors for prescribing the KOL sponsor's own drugs, such prescribing

may be illegal under federal and state anti-kickback statutes. Counsel has advised me that – based on evidence from Celgene's production56 – it is reasonable to conclude that a significant if not the primary purpose of Celgene's KOL speaker program was to reward these KOLs for writing substantial numbers of prescriptions for Thalomid and Revlimid or to otherwise induce such speakers to do so based on the remuneration, and therefore all Medicare prescriptions written by these KOL's represent illegal kickback damages.57

92. I was also provided with legal authority as well the expert report submitted in another case that was upheld on appeal to the U.S. Court of Appeals for the Fourth Circuit that indicates all prescriptions tainted by kickbacks or improper referrals are false claims for the purposes of the False Claims Act and that the full amount of government money paid in connection with these prescriptions is properly included in a damages analysis. *E.g. U.S. v. Rogan*, 517 F.3d 449 (7th Cir. 2008); *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364 (4th Cir. 2015); *U.S. ex rel. Drakeford v. Tuomey*, 976 F. Supp. 2d 776 (D.S.C. 2013); *U.S ex rel. Freedman v. Suarez-Hoyos*, 2012 U.S. Dist. LEXIS 135230, at *15 (M.D. Fla. Sept. 22, 2012) ("assuming the Government proves that it paid claims that were tainted by a kickback arrangement and that it would not have paid such claims had it known the truth, the amount of the Government's damages resulting from the payment of such claims equals the full amount that Medicare paid"); Expert Report of Ruben

[56] *See, e.g.* CELBRN0200954 (promotional budget document); CELBRN064011 (promotional budget document); CELBRN1199112 (Promotional Speakers' Bureau launch document); CELBRN1793011 (assessing success of speakers' programs as a function of Return on Investment and increased prescription of Celgene's drugs by speakers and those they influence); CELBRN1793012 (same); CELBRN0341872 (same); CELBRN350180 (same); CELBRN0341872 (same), CELBRN0160314 (same); CELBRN0168985

[57] Counsel has represented that based on the evidence and testimony produced in discovery in this case, Relator can establish as a legal matter – through statutory authority, case law, and Office of the Inspector General (OIG) guidance – that Celgene's payment of speakers' fees was illegal and violated the Anti-Kickback Statute. Note: A portion of these damages are a sub-set of the damages to Medicare calculated before. However, counsel asked me to perform a separate kickbacks related analysis. This makes sense because on-label prescriptions that are the product of kickbacks constitute damages under the False Claims Act.

Steck, *Drakeford v. Tuomey,* Case No. 05-02858, Dkt. No. 671-5 (D.S.C. Oct. 15, 201). I have thus conducted an analysis based on the presumption that payment of speakers fees are kickbacks and that the prescriptions prescribed by recipients of these fees are tainted, rendering the full amount of government money expended on each prescription appropriate for inclusion in damages. Should any of these presumptions be disproven or should it be shown at trial that certain of these prescriptions should not be considered false claims subject to the False Claims Act, I can refine my damages assessment.

### A. Damages to Medicare program due to kickbacks to physicians in Revlimid Speaker Program

93. Counsel provided Celgene's Revlimid Speaker program data that included names and specific details such as dates and amounts of payment made to [redacted] speakers for Revlimid speaking arrangements.[58] Of these, I could identify [redacted] physicians in the Medicare Part D data who were paid by Celgene to provide KOL speaker activities using the DEA or NPI numbers.[59] For these [redacted] physicians, I could indentify a total of [redacted] Revlimid claims. These Revlimid claims resulted in [redacted] in damages to Medicare if we were to consider only the amount paid by Medicare for these claims. Similarly, foe these [redacted] physicians, I could identify a total of [redacted] Thalomid claims. These claims resulted in [redacted] in damages to the Medicare program. (see Appendix D.14 for methodology)

94. Assuming each of the allegedly fraudulent claims is subject to a maximum of [redacted] in FCA damages, the 73,186 Revlimid claims result in additional FCA damages of

[58] JD_ENVISION000001

[59] The National Provider Identifier (NPI) is a Health Insurance Portability and Accountability Act (HIPAA) Administrative Simplification Standard. The NPI is a unique identification number for covered health care providers. A DEA number (DEA Registration Number) is a **number** assigned to a health care provider (such as a medical practitioner, pharmacist, dentist, or veterinarian) by the U.S. Drug Enforcement Administration allowing them to write prescriptions for controlled substances.

[redacted] to Medicare. And similarly, [redacted] Thalomid claims result in additional FCA damages of [redacted] to Medicare.

Table 16: Damages to Medicare due to kickbacks to physicians for Revlimid Speaking arrangements

| | Number of allegedly fraudulent claims | Damages calculated from Medicare Part D | Additional FCA damages of $11,000 per claim | Total damages (damages + additional FCA damages) |
|---|---|---|---|---|
| Thalomid | [redacted] | [redacted] | [redacted] | [redacted] |
| Revlimid | [redacted] | [redacted] | [redacted] | [redacted] |
| Total | [redacted] | [redacted] | [redacted] | [redacted] |

Table 16.1: Damages to Medicare due to kickbacks to physicians for Revlimid Speaking arrangements due to allegedly fraudulent on-label claims

| | **On-label fraudulent claims** | **On-label damages** | **Additional FCA civil penalties** | **Total damages** |
|---|---|---|---|---|
| Revlimid | [redacted] | [redacted] | [redacted] | [redacted] |
| Thalomid | | | | |
| Total | | | | |

Table 16.2: Damages to Medicare due to kickbacks to physicians for Revlimid Speaking arrangements due to allegedly fraudulent off-label claims

| | **Off-label allegedly fraudulent claims** | **Off-label damages** | **Additional FCA penalties** | **Total damages** |
|---|---|---|---|---|
| Revlimid | [redacted] | [redacted] | [redacted] | [redacted] |
| Thalomid | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Total | | [redacted] | | | [redacted] | | [redacted] | | [redacted] |

**1. Higher paid speakers prescribed significantly more than lower paid prescribers**

95. I investigated whether there is a statistically significant difference in prescribing behavior of the physicians who received high payments from Celgene for speaking arrangements compared to those who received low payments over the years for Celgene's Revlimid Speaker Program. High paid physicians were defined as a physician who received greater than $100,000 from Celgene over the period of 2006-2014. I conducted this analysis using different thresholds i.e. threshold of $150,000, $200,000 and $100,000 as a high payment. The prescribing behavior was measured based on the prescriptions of Revlimid over this time frame considered.[60]

96. This analysis reveals that at every threshold higher paid speakers prescribed statistically significantly more than low paid KOL prescribers ($p<0.001$). (see appendix D.15 and D.16 for methodology)

**2. Examples of some speaker payments made to physicians and the prescribing pattern seen**

97. [redacted] was paid [redacted] for Revlimid-related speaking arrangements beginning in Q1 2006 through Q1 2014 according to the ENVISION data.[61] There

60 I conducted this analysis using RevAssist data (technical appendix D.15) since it should consist of the entire universe of prescriptions for Revlimid through each of the physicians. Since Medicare prescriptions are a part of the RevAssist data, any result that applies to RevAssist data should apply to Medicare data as well (given there is appropriate sample size to conduct the test in Medicare data).

61 JD_ENVISION000001. Please note: Counsel tells me that Envision Communications is a global medical education company that provides strategic planning, development, and implementation of programs and services in the oncology therapeutic area. Envision assisted Celgene in the creation, implementation, coordination, and management of its promotional speakers' programs.

is a rise in [redacted] prescriptions for Revlimid (as analyzed from the RevAssist data)[62] during the same time-period. Between Q1 2014 to Q1 2015 when Celgene payments to [redacted] stopped, there was a sudden drop in prescriptions (see figure in appendix D.16).

98. [redacted] was paid [redacted] by Celgene for Revlimid-related speaking arrangements. The Revlimid prescriptions from [redacted] almost completely stopped after the final payment made by Celgene in Q2 2014. Dr. Abounour was paid [redacted] by Celgene for Revlimid-related speaking arrangements. There is a seen an increase in prescriptions at the time when Clegene speaker payments were made in the RevAssist data.

99. [redacted] was paid [redacted] by Celgene for Revlimid-related speaking arrangements. Notwithstanding that this payment appears excessive for speaking arrangements over the years, there is seen a rise in prescriptions in RevAssist data of Revlimid while the speaker program-related payments were made by Celgene.

100. In a supplemental report, I may identify additional damages under a kickback theory pursuant to an analysis of Medicare A and B data and documents produced by individual physician speakers in discovery. This data and these documents were produced too late for me to analyze. I also understand that certain non-profit organizations assisted patients with the co-pays for Revlimid and Thalomid. I have reviewed certain information and documents produced by some of these organizations but was unable to identify the amount of government money expended in connection with Revlimid and Thalomid prescriptions facilitated by these organizations based on existing documents and data. I understand that certain additional discovery may be forthcoming from some or all of these organizations that could facilitate this analysis in conjunction with Medicare A, B, and D data and data produced by Celgene. In a supplemental report, I may include such prescriptions in a damages analysis if I receive the necessary data to conduct such an analysis and Relator's counsel identifies the legal basis for inclusion of these prescriptions in a damages analysis.

---

[62] See appendix D.15

## XI. Conclusions

Additional Testimony, Rebuttal Testimony and Testimony at Trial

101. I have received a number of additional datasets, including Medicare Part A and Part B, and data from several state Medicaid programs too late to analyze for this report. Moreover, I am expecting to receive other data relating to Celgene's marketing and promotion activities and other government programs. I fully intend to supplement and update my opinions after this new information is analyzed.

102. I intend to update my damages calculations with any court-ordered interest rate adjustment to bring the damages current to the court-ordered date of award should the Plaintiff-Relator prevail.

103. If asked by counsel, I intend to present information from this report at trial as well as prepare rebuttal reports as requested. If called to testify I would prepare additional trial exhibits based on the materials presented in this report. I reserve the right to update, revise or modify my opinions if new information is made available to me.

September 25 2015,

Joel W. Hay

Appendix A: Curriculum Vitae

# CURRICULUM VITAE

## JOEL W. HAY, PhD

### PERSONAL INFORMATION

Business/Mail Address
Professor of Pharmaceutical Economics and Policy
& Professor of Health Policy and Economics
University of Southern California
Schaeffer Center for Health Policy and Economics
University Park Campus,
Verna & Peter Dauterive Hall (VPD 214-L)
635 Downey Way
Los Angeles, CA 90089-3333 USA

Business Telephone
Office: (818) 338-5433
Assistant: (213) 821-7940
Fax: (213) 740-3460 (ATTN: Samantha)

E-Mail
jhay@usc.edu

USC Websites :
http://healthpolicy.usc.edu/ListItem.aspx?ID=4
http://pharmacyschool.usc.edu/faculty/profile/?id=374

Graduate Program Website : http://pharmacyschool.usc.edu/programs/pep/

Schaeffer Center Street Address 635 Downey Way
Los Angeles, CA 90089-3333 USA
(Deliveries, e.g. Fedex, UPS) Main Phone/Front Desk: (213) 821-7940
J Hay Office: (213) 821-8160
Fax: (213) 740-3460 (ATTN: Samantha)
http://healthpolicy.usc.edu

### Contact Information for Non-USC Activities

Joel W. Hay, PhD
22101 Dardenne St.
Calabasas, CA 91302
818-338-5433
joel.hay@gmail.com

**EDUCATION**

| | |
|---|---|
| 1974 | B.A. (*Summa cum laude*), Economics, Amherst College |
| 1975 | M.A., Economics, Yale University |
| 1976 | M.Phil., Economics, Yale University |
| 1980 | Ph.D., Economics, Yale University |

**PROFESSIONAL EXPERIENCE**

| | |
|---|---|
| March 2009 – Present | Full Professor (with tenure), Pharmaceutical Economics and Policy; School of Pharmacy Professor (by courtesy), Department of Economics; University of Southern California, Los Angeles, California. |
| September 2009-Present | Full Professor, Health Economics and Policy Leonard D. Schaeffer Center for Health Policy and Economics University of Southern California, Los Angeles, California |
| 1992 – 2009 | Associate Professor (with tenure), Pharmaceutical Economics and Policy; School of Pharmacy. Associate Professor (by courtesy), Department of Economics; University of Southern California, Los Angeles, California. |
| September 1985 - May 1992 | Senior Research Fellow, Hoover Institution, Stanford University, Stanford, California. |
| July 1983 - September 1985 | Senior Policy Analyst, Project HOPE, Center for Health Affairs, Millwood, Virginia. |
| January 1981 - June 1983 | Visiting Lecturer, M.P.H. Program, Yale University, Department of Epidemiology and Public Health, and Institution for Social and Policy Studies. |
| June 1980 - September 1984 | Assistant Professor, Department of Behavioral Sciences and Community Health, School of Dental Medicine University Connecticut Health Center, Farmington, Connecticut. (from 9/81) Assistant Professor, Department of Economics, UConn Storrs. University of Connecticut Graduate School, Storrs, Connecticut. |
| June 1978 - June 1980 | Assistant Research Professor, Human Resources Research Center, University of Southern California, Los Angeles, California. |

**ADDITIONAL EXPERIENCE:**

| | |
|---|---|
| 2015 | External Reviewer, Italian Ministry of Health, General Direction for Scientific Research and Health Innovation. |
| 2015 | Invited Advisor, U.S. Food and Drug Administration Policy on Review of Health Economics Modeling Claims. |
| 2014-present | Founding Member, International Academy of Health Preference Research (iahpr.org). |

| | |
|---|---|
| 2013-2015 | Extramural Reviewer, Healthcare Systems & Value Research Study Section Review Panel, Agency for Healthcare Research & Quality (AHRQ), U.S. Dept. of Health & Human Services. |
| 2012 | External Reviewer, Cochrane Tobacco Addiction Research Group, Cochrane Collaboration, www.cochrane.org. |
| 2012 | Health Economics Expert Consultant, State Attorneys General Working Group on Pharmaceutical Benefits Management (PBM) Market Competition Issues. |
| 2011-2013 | Extramural Reviewer, Healthcare Systems & Value Research Study Section Review Panel, Agency for Healthcare Research & Quality (AHRQ), U.S. Dept. of Health & Human Services. |
| 2011 | Extramural Grant Reviewer, Health Services Research Study Section, Agency for Healthcare Research & Quality (AHRQ), U.S. Dept. of Health & Human Services. |
| 2010 | Extramural Grant Reviewer, Health Services Research Study Section, Agency for Healthcare Research & Quality (AHRQ), U.S. Dept. of Health & Human Services. |
| 2010 | External Grant Reviewer, Netherlands Organisation for Health Research and Development (ZonMw) Health Technology Assessment Methodology Programme. |
| 2010 | External Program Contract Reviewer, Agency for Healthcare Research & Quality (AHRQ), U.S. Dept. of Health & Human Services; Developing Evidence to Inform Decisions about Effectiveness-2: The DEcIDE-2 Network. |
| 2007-2013 | Leadership Group, International Society for Pharmacoeconomics and Outcomes Research (ISPOR) Disease Management and Prevention Task Force. |
| 2007-2009 | Leadership Group, International Society for Pharmacoeconomics and Outcomes Research (ISPOR) Patient Preferences Research Task Force. |
| 2006-2010 | Co-Chair, ISPOR Drug Cost Task Force. |
| 2006 | Chair, Awards Committee; "The 2006 ISPOR Avedis Donabedian Outcomes Research Lifetime Achievement Award." Presented to Prof. George Torrance at the 11'th Annual International Meeting, Philadelphia, PA. |
| 2005 | External Project Reviewer; "The Uninsured and Access to Prescription Drugs in California. The Petris Center on Health Care Markets & Consumer Welfare, University of California, Berkeley. |
| 2005 | External Program Reviewer, Agency for Healthcare Research & Quality, Dept. of Health & Human Services; Developing Evidence to Inform Decisions about Effectiveness: The DEcIDE Network. |
| 2004-2010 | Health Policy Scientific Council, Intl. Soc. for Pharmacoeconomics & Outcomes Research. |
| 2004-2014 | Elected Executive Board Member, American Society of Health Economists (Ashecon.org). |
| 2004-2010 | Scientific Advisory Board Member, Disease Management Association of America |
| 2002-2003 | Institute of Medicine, National Academy of Sciences. Commissioned Author "Vaccine Reimbursement Policy in the US." |
| 2001-Present | Health Economist, UCLA Center for Vaccine Research, UCLA Harbor Medical Center, Torrance, CA. |
| 2001 | Health Plan Reform Consultant, Hong Kong Hospital Authority, Hong Kong. |
| 2000 | External Reviewer, National Institute on Aging, NIH Small Grants Program. |
| 1999 | External Reviewer, National Institutes of Health, National Institute on Aging, |
| 1999-2011 | Co-Investigator, USC Alzheimer Research Centers of California Research Program, California Dept. of Health Services. |
| 1999 | Consultant, Univ. Michigan Survey Research Center ADAMS/HRS Dementia Project |

| | |
|---|---|
| 1999 | External Reviewer, National Insts. of Health, National Institute of Digestive Diseases and Nutrition, Division of Digestive Diseases and Nutrition Hepatitis C Antiviral Long-term Therapy to Prevent Cirrhosis (HALT-C) Ancillary Studies Committee. |
| 1999-2000 | Economics Research Consultant, U.S. AHRQ, Southern California Evidence-Based Medicine Practice Project: Deep Vein Thrombosis Treatment in Trauma Surgery Literature Synthesis and Guideline Development. |
| 1999 | Member, Long Range Steering Committee Task Force, Harbor-UCLA Medical Center Research and Education Institution, Torrance, CA. |
| 1998-2011 | Rand USC Project Coordinator, U.S. Agency for Health Research and Quality, Southern California Evidence-Based Medicine Practice Project. |
| 1998-2002 | Founding Editor-In-Chief, *Value in Health*, Journal of the International Society for Pharmacoeconomics and Outcomes Research. |
| 1998 | External Reviewer, Cal Dept of Health Services Alzheimer's Program Research Fund. |
| 1998-2008 | Member, Pharmacy Practice Research Roundtable. |
| 1998-2007 | Member, Intl. Working Group on Alzheimer Disease Pharmacoeconomics Research. |
| 1998-2006 | Member, Coronary Heart Disease: The Interdisciplinary Council on Reducing the Risk, co-sponsored by the American Heart Association & Bristol-Myers Squibb. Dallas, TX. |
| 1997-98 | Co-Chair: ISPOR Working Group on Guidelines for Pharmacoeconomic Research. |
| 1997-98 | External Reviewer. Asset and Health Dynamics among the Oldest Old- Dementia Survey Supplement. University of Michigan Inst. for Social Research, Ann Arbor, MI. |
| 1997 – Present | Economic Consultant, Rand Corporation, Health Outcome Research Group, Santa Monica, CA |
| 1996-1998 | Co-Chair and Primary Organizer: ISPOR Lipid Pharmacoeconomics Conference. Orlando, FL. |
| 1996-1998 | Elected Member, Board of Directors, and Founding Member, International Society for Pharmacoeconomics and Outcomes Research (ISPOR), Philadelphia, PA. |
| 1995-2000 | Member, Expert Advisory Panel on Drug Utilization Review, United States Pharmacopoeial Convention, Rockville, MD. |
| 1995-96 | Research & Graduate Affairs Cmte., American Assoc. Colleges of Pharmacy, Alexandria, VA. |
| 1994-95 | Technical Review Study Section, "HIV Costs and Services Utilization Study (HCSUS)," Agency for Health Care Policy & Research, US Dept. Health & Human Serv., Rockville, MD. |
| 1993-94 | Member, Research Advisory Panel for Outcome Studies, Wellpoint Pharmacy Management, Blue Cross of Southern California. |
| 1993-1998 | Member, Advis. Cmte., American Soc. Consultant Pharmacists Research Foundation |
| 1993 | Member, Planning Committee, American Society of Consultant Pharmacists for ASCP Foundation Pharmacoeconomics Fellowship in Geriatric Long-Term Care |
| 1992-1993 | Technical Review Panelist, Drug Utilization Review Demonstration Project Contracts, Health Care Financing Administration, Baltimore, MD. |
| 1992 | Member, Council of Advisors, Geriatric Drug Therapy Research Inst., Arlington, VA. |
| 1992 | Access to Health Care Task Force Member, American Heart Assoc., Washington, D.C. |

| | |
|---|---|
| 1992 | Judge, Masters of Innovation Software Competition, Zenith Data Systems, Chicago, IL |
| 1991 | Advisor, Hungarian Parliament Health Care Reform Committee, Budapest, Hungary. |
| 1991 | Chief U.S. consultant, Hungarian health care reform project, Px Ltd., Budapest, Hungary. |
| 1990-91 | Visiting Scholar, Hong Kong Centre for Economic Research, Chinese University of Hong Kong, Shatin, New Territories. |
| 1990 | Invited outside reviewer, U.S. Congressional Budget Office Long Term Care Policy Statement. |
| 1990 | Invited outside expert, California AIDS Leadership Commission Hearings, Los Angeles, CA. |
| 1989 | Proposal Review Consultant, The Smith Richardson Foundation. |
| 1989 | Invited outside expert, Select panel on HIV/AIDS estimates and projections. U.S. Public Health Service, Centers for Disease Control. |
| 1989 | Consultant, The Henry J. Kaiser Family Foundation, Menlo Park, California. |
| 1988 | Consultant, General Assistance Program for the Homeless, Office of the County Counsel, County of Sacramento, CA. |
| 1988 | Proposal Reviewer, Special Study Section, National Institutes of Health, U.S. Dept. of Health & Human Services. |
| 1988 | Issue Development Participant, "Medication Use in the Elderly: A Critical Analysis," Geriatric Pharmacy Institute, Philadelphia College of Pharmacy and Science. |
| 1988 | Consultant, Patient Care/Health Service Delivery Subgroup, Executive Task Force on AIDS, U.S. Public Health Service. |
| 1987 | Consultant, Cost-benefit analysis of HIB vaccine, U.S. Food and Drug Administration. |
| 1987 | Proposal Reviewer, National Center for Health Services Research, U.S. Dept. of Health & Human Services. |
| 1986, 1989 | Proposal Review Consultant, The Henry J. Kaiser Family Foundation, Menlo Park, California. |
| 1984 – 1986 | Principal Investigator, Robert Wood Johnson Foundation; An Incentive Reimbursement Plan for Medicaid Home Health Care Services. |
| 1985 | Technical Consultant, Research Projects Approval Committee-Economics, The World Bank. |
| 1985 | Technical Advisory Panelist, HCFA Contract No. 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; Market Study for Home Health Care Services, Center for Health Policy Studies. |
| 1984 | Technical Review Consultant, National Center for Health Services Research, Hospital Care and Utilization Project. |
| 1984 | Consultant, County of San Diego; Member of Proposal Review Committee for County Regional Contracts to Provide Care to Medically Indigent Adults. |
| 1983 | Visiting Asst. Prof., Inst. for Social Sciences, University of Basel, Basel, Switzerland. |
| 1983 | Principal Investigator, U.S. Environmental Protection Agency; Mortality and Air Pollution: A Microanalytic Analysis. |
| 1981 – 1982 | Principal Investigator, Connecticut Research Foundation; Child Health Status and Cognitive Development. |
| 1981 | Visiting Fellow, Institution for Social & Policy Studies, Yale University, New Haven, CT. |
| 1980 | Consultant, National Preventive Dentistry Demonstration Project Evaluation Model, American Fund for Dental Health. |
| 1980 | Consultant, National Health Services Corps Personnel Selection Project, Policy Research Inc. |

| | |
|---|---|
| 1979 – 1980 | Principal Investigator, Doctoral Research Grant, National Center for Health Services Research. |
| 1979 – 1980 | Consultant, Cost Benefit Analysis of Outpatient Treatment for Patients from the Psychiatric Ward of L.A. County/USC Medical Center. |
| 1977 – 1978 | Instructor, Department of Economics, Yale University, New Haven, Connecticut. |
| 1976 – 1977 | Teaching Assistant, Dept. of Economics, Yale University, New Haven, Connecticut. |
| 1974 – 1976 | Research Consultant, National Bureau of Economic Research. |
| 1975 | Bibliographical Research Project (Russian Language) on Works of Academic Leo Kantorovich for Professor Tjalling Koopmans prior to their joint Nobel Prize Award in Economics. |

**HONORS AND DISTINCTIONS:**

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award Finalist;
Shraddha Chaugule, 2015:"Exploring heterogeneity in attribute processing strategies: Use of hybrid random utility maximization-random regret minimization models in a Discrete Choice Experiment." S. Chaugule and J. Hay. (Joel Hay, faculty mentor).

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award Finalist;
Emmanuel Drabo, 2014: "A Cost-effectiveness analysis of pre-exposure prophylaxis (PrEP) for the prevention of HIV among the MSM population of Los Angeles County." (Joel Hay, faculty mentor).

Academy of Managed Care Pharmacy Research Mentor, Best Student Poster Award; Kai Yeung. Yeung K, Hay JW. Cost-Utility Analysis of Romiplostim Versus Splenectomy in the Treatment of Chronic Refractory Immune Thrombocytopenic Purpura. Poster presentation at the Academy of Managed Care Pharmacy 23'rd Annual Meeting, March 29, 2011 Minneapolis, MN. (Joel Hay, faculty mentor).

International Society for Pharmacoeconomics and Outcomes Research: Best New Investigator Podium Presentation Award 2010 to Dr. Haesun Suh. (Joel Hay, faculty mentor).

International Society for Pharmacoeconomics and Outcomes Research: Distinguished Service Award, 2009.

International Society for Pharmacoeconomics and Outcomes Research: Outstanding Student Chapter of the Year, Joel Hay Student Chapter Faculty Advisor, 2009.

Joel Hay was Founding Editor-in-Chief of *Value in Health* the peer-reviewed scientific journal of the International Society for Pharmacoeconomics and Outcomes Research until 2003. This journal, started in 1998, became Medline-listed in 2002. In its first impact factor, Value in Health was ranked #1 in two categories for the year 2004, by the ISI Journal Citation Reports® (JCR) with an impact factor of 3.657. Value in Health led all other journals listed both in the Health Care Sciences and Services category in the JCR Science Edition and in the Health Policy & Services category in the JCR Social Sciences Edition.

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award;
Danielle Zammit, 2004: "Preliminary Economic Analysis of The American Cancer Society

Guidelines For Mammography Screening In Average-Risk Women Under 70 Years of Age." D.

Zammit and J. Hay.

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award;
Danielle Zammit, 2003: "Economic Analysis of The Use of Angiotensin Converting Enzyme

Inhibitors in Patients With Diabetes Mellitus." D. Zammit and J. Hay.

International Society for Pharmacoeconomics and Outcomes Research: Distinguished Service Award, 2002.

Founding Member, American Society for Health Economics, San Diego, CA, 2002.

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award;
Eric Wu, 2001:"Survival & Nursing Home Free Survival (NHFS) of Alzheimer's Disease Patients." E. Wu and J. Hay

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award;
Jinmei Li, 2000: "Cost Effectiveness of Retinopathy Screening in Pediatric Patients with Type 1 Diabetes Mellitus." J. Li and J. Hay.

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award;
Nishan Sengupta, 2000: "Cost Effectiveness Analysis of Tamoxifen in Breast Cancer Risk Reduction." N. Sengupta and J. Hay.

International Society for Pharmacoeconomics and Outcomes Research Mentor: Best Student Poster Award; Michelle Luo, 1999: "Cost Effectiveness Analysis of Genetic Testing For Breast Cancer." M. Luo and J. Hay.

International Society for Pharmacoeconomics and Outcomes Research: Research Excellence Award; 1999

Wallace Lectureship. Idaho State University College of Pharmacy, 1999

International Society for Pharmacoeconomics & Outcomes Research Exec. Board Recognition Award; 1998

International Society for Pharmacoeconomics and Outcomes Distinguished Service Award; 1998

Outstanding Speaker Award, American Association for Clinical Chemistry 1996

Founding Member, International Society for Pharmacoeconomics and Outcomes Research (ISPOR), Philadelphia, PA, 1995.

USC School of Pharmacy QSAD Centurion Professorship: 1993-1999

USC School of Pharmacy Founding Chair, Dept. of Pharmaceutical Economics & Policy, 1992

Reviewer, National Science Foundation, 1982: Economics Section, 1987: Economics Section, 1989: Economics Section

Yale University Fellowship, 1974 - 1978

W.T. Akery Prize for Undergraduate Thesis in Economics, 1974

Elected Phi Beta Kappa, 1974

**LANGUAGES:**

French (reading), Russian (reading),
APL, PL/1, FORTRAN, IBM 370 JCL, TSP, SAS, SPSS/X, STATA, LIMDEP, NLOGIT, QUAIL, BMDP, MS DOS, LOTUS 123, SPSS/PC, RATS, SST, VAX/VM.

**FIELDS OF GRADUATE TRAINING:**
Econometrics, Money, Labor

**RESEARCH INTERESTS:**
Pharmacoeconomics, Outcomes Research, Pharmaceutical Care, Health Economics, Econometrics

**PROFESSIONAL SOCIETIES:**

Academy of Managed Care Pharmacy
American Association of Colleges of Pharmacy
American Economics Association
American Public Health Association
American Society of Health Economists
Disease Management Association of America
Eastern Economics Association
Econometrics Society
International Academy of Health Preferences Research
International Health Economics Association
International Society for Pharmacoeconomics and Outcomes Research
International Society for Quality of Life Research
International Society of Technology Assessment in Health Care
Southern Economics Association
Western Economics Association

**TEACHING:**

1976 – 1977 Teaching Assistant, Department of Economics, Yale University, New Haven, Connecticut.

1977 – 1978 Instructor, Department of Economics, Yale University, New Haven, Connecticut.

September - November 1980 Health Economics at the Waterbury Hospital Pediatric Residency Program.

September - November 1980 Social and Behavioral Sciences Seminar "Cost of Illness and Related Topics," Medical/Dental student; Required curriculum, University of Connecticut Health Center.

September 1980 - December 1982 Social and Behavioral Sciences Lecturer "Issues in Health Care Financing and Delivery," Medical/Dental student required curriculum, University of Connecticut Health Center.

September - November 1981 Social and Behavioral Sciences Seminar "Competition in the Health Care Delivery System," Medical/Dental student required curriculum, University of Connecticut Health Center.

September - November 1982 Social and Behavioral Sciences Seminar "HMOs and the Market for Health Care," Medical/Dental Student required curriculum, Univ. of Connecticut Health Center.

December 1980 - January 1983 Introductory Biostatistics Instructor, Medical/Dental student required curriculum, University of Connecticut Health Center.

January 1981 - June 1983 Health Economics, M.P.H. Program, Yale University, Department of Epidemiology and Public Health, and Institution for Social and Policy Studies.

Fall Semester 1982 Graduate Independent Studies Course, Department of Economics, University of Connecticut.

Spring Semester 1982 Undergraduate Health Economics, University of Connecticut, Department of Economics.

Spring Semester 1983 Undergraduate Independent Studies Course, Department of Economics, University of Connecticut.

Fall Semester 1992 The Costs of Drug Abuse, Health Behavior (PSC 439); Economic Assessment of Pharmaceuticals, Contemporary Issues (PSC 551); Health Care Organization in the U.S., Public Health and Social Pharmacy (PSC 437); Department of Pharmaceutical Economics and Policy, USC

Spring Semester 1993 Biostatistics and Literature Evaluation (PSC 331): Co-taught with Prof. McCombs; Department of Pharmaceutical Economics and Policy, USC

| | |
|---|---|
| Fall Semester 1993 | The Costs of Drug Abuse, Health Behavior (PSC 439); Health-related Quality of Life Assessment, Contemporary Issues (PSC 551); U.S. Health Care Finance and Reform, Public Health and Social Pharmacy (PSC 437); Department of Pharmaceutical Economics and Policy, USC |
| Spring Semester 1994 | Biostatistics and Literature Evaluation (PSC 331): Cotaught with Prof. McCombs; Department of Pharmaceutical Economics and Policy, USC |
| Summer, 1994 | Introductory Undergraduate Health Economics (Econ 194BB), University of California, Santa Barbara, Summer Session |
| Fall Semester 1994 | Health Status/Quality of Life Assessment Health Behavior (PSC 439); Contemporary Issues (PSC 551); U.S. Health Care Finance and Reform, Public Health and Social Pharmacy (PSC 437); Department of Pharmaceutical Economics and Policy, USC |
| Spring Semester 1995 | Biostatistics and Literature Evaluation (PSC 331) |
| Spring Semester 1996 | Biostatistics and Literature Evaluation (PSC 331) |
| Spring Semester 1996 | Pharmacoeconomics: Introductory Graduate Course (PMEP 538) |
| Summer Semester 1996 538) | Pharmacoeconomics: Introductory Graduate Course (PMEP |
| Spring Semester 1997 | Statistics Computer Laboratory (Phar 366) |
| Summer Semester 1997 538) | Pharmacoeconomics: Introductory Graduate Course (PMEP |
| Spring Semester 1998 | Statistics Computer Laboratory (Phar 366) |
| Summer Semester 1998 538) | Pharmacoeconomics: Introductory Graduate Course (PMEP |
| Spring Semester 1999 | Statistics Computer Laboratory (Phar 366) |
| Summer Semester 1999 538) | Pharmacoeconomics: Introductory Graduate Course (PMEP |
| Spring Semester 2000 | Statistics Computer Laboratory (Phar 366) |
| Spring Semester 2000 | Pharmacy Level III Elective: Disease State Management. Pharmacoeconomics (1 Lecture) (Phar 571) |
| Fall Semester 2000 | Pharmacoeconomics Unit on Decision Analysis (Phar 553) |
| Summer Semester 2000 538) | Pharmacoeconomics: Introductory Graduate Course (PMEP |
| Fall Semester 2001 | Pharmacoeconomics Unit on Decision Analysis (Phar 553) |

| | |
|---|---|
| Spring Semester 2001 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |
| Summer Semester 2001 | Pharmacoeconomics: Graduate Course (PMEP 538) |
| Fall Semester 2002 | Pharmacoeconomics Unit on Decision Analysis (Phar 553) |
| Spring Semester 2002 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |
| Summer Semester 2002 | Pharmacoeconomics: Graduate Course (PMEP 538) |
| Spring Semester 2002 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |
| Spring Semester 2003 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |
| Summer Semester 2003 | Pharmacoeconomics: Graduate Course (PMEP 538) |
| Fall Semester 2003 | Pharmacoeconomics Unit on Decision Analysis (PHRD 553) |
| Fall Semester 2003 | Health Care Policy (PHRD 507) |
| Spring Semester 2004 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |
| Fall Semester 2004 | Health Care Policy (PHRD 507) |
| Fall Semester 2004 | Pharmacoeconomics Unit on Decision Analysis (PHRD 614) |
| Summer Semester 2005 | Pharmacoeconomics: Graduate Course (PMEP 538) |
| Fall Semester 2005 | Health Care Policy (PHRD 507) |
| Spring Semester 2006 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |
| Fall Semester 2006 | Health Care Policy (PHRD 507) |
| Fall Semester 2006 | Research Design – Applied Cost Effectiveness Analysis (PMEP 509) |
| Summer Semester 2007 | Pharmacoeconomics: Graduate Course (PMEP 538) |
| Fall Semester 2007 | Health Care Policy (PHRD 507) |
| Fall Semester 2007 | Research Design – Applied Cost Effectiveness Analysis (PMEP 509) |
| Spring Semester 2008 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |
| Fall Semester 2008 | Health Care Policy (PHRD 507) |
| Fall Semester 2008 | Research Design – Applied Cost Effectiveness Analysis (PMEP 509) |
| Fall Semester 2008 | Pharmaceutical Economics and Policy Graduate Seminar (PMEP 698) |
| Spring Semester 2009 | Pharmaceutical Economics and Policy Graduate Seminar (PMEP 698) |
| Summer Semester 2009 | Pharmacoeconomics: Graduate Course (PMEP 538) |

| | |
|---|---|
| Fall Semester 2009 | Health Care Policy (PHRD 507) |
| Fall Semester 2009 | Industrial Systems Engineering Lecturer (ISE 599) |
| Spring Semester 2010 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |
| Summer Semester 2011 | Pharmacoeconomics: Graduate Course (PMEP 538) |
| Spring Semester 2012 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |
| Spring Semester 2012 | Health Economics Lecture: Social Work Graduate Course (SOWK 590) |
| Summer Semester 2013 | Pharmacoeconomics: Graduate Course (PMEP 538) |
| Spring Semester 2014 | Pharmaceutical Econometrics: Graduate Course (PMEP 549) |
| Summer Semester 2015 | Pharmacoeconomics: Graduate Course (PMEP 538) |

**USC UNIVERSITY SERVICE**

| | |
|---|---|
| 2013 – Present | Member, Task Force on Appointments and Promotions, School of Pharmacy |
| 2011 | External Reviewer, Sol Price School of Public Policy |
| 2009 | Chair, Faculty Position Search Committee, Dept. of Clinical Pharmacy, Pharmaceutical Economics and Policy, School of Pharmacy |
| 2006 - Present | Faculty Merit Review Coordinating Committee, School of Pharmacy |
| 2004-2005 | Chair, Faculty Position Search Committee, Dept. of Pharmaceutical Economics and Policy, School of Pharmacy |
| 2003 - 2014 | Admissions Committee, School of Pharmacy |
| 2003-2006 | Chair, Advanced Technology Committee, School of Pharmacy |
| 2002-2004 | New Curriculum Development: Course Coordinator, Phar 507: Health Policy for Pharmacists, School of Pharmacy |
| 2002 - 2011 | Advanced Technology Committee, School of Pharmacy |
| 2002 | Presentation on Human Subjects Review Policy, USC Faculty Senate Retreat |
| 2000-2001 | Computer Committee, School of Pharmacy |
| 2001 | Graduate Teaching Assistantship Program Evaluation Committee |
| 2000 – Present | Faculty Advisor, USC ISPOR Student Chapter |
| 1994 - Present | Pharmacy Student Applicant Interview Committee |
| 1992 - 1997 | Founding Chair, Dept. of Pharmaceutical Economics & Policy, Schl of Pharmacy |
| 1993 - 1995 | Member, Pharmacy Dean's Search Committee, Office of the Provost. |
| 1992 - 1997 | Member, Dean's Executive Committee, School of Pharmacy |
| 1992 - 1997 | Member, Appointments and Promotions Committee, School of Pharmacy |
| 1993 - 1995 | Economic Advisor, East Los Angeles/USC Project on Managed Care for the Medically Indigent; Pacific Center for Health Policy and Ethics |
| 1995 - 1997 | Member, Quality/Outcomes Subcommittee USC Physicians Office of Clinical Services |
| 1994 - 1997 | Member, Ph.D. Pharmaceutical Economics and Policy Admissions Committee |
| 1994 - 1997 | Member, M.S. Pharmaceutical Economics and Policy Admissions Committee |
| 1993 - 1997 | Member, University Graduate Studies Advisory Committee, USC Graduate School |
| 1993 | Developed Ph.D. Program in Pharmaceutical Economics (Graduate School Approved for Fall 1994) |
| 1993 | Proposal Reviewer, Zumberge Research and Innovation Fund Awards |
| 1993 | Candidate Interviewer, Pharm.D. Admissions Program, School of Pharmacy |
| 1993 | Chair, Graduate Ph.D. Program in Pharmaceutical Economics Curriculum Development, School of Pharmacy |
| 1992/1993 | Chair, Junior Faculty Position Search Committee, Dept. of Pharmaceutical Economics and Policy, School of Pharmacy |
| 1994/1995 | Chair, Junior Faculty Position Search Committee, Dept. of |

| | |
|---|---|
| | Pharmaceutical Economics and Policy, School of Pharmacy |

**OTHER UNIVERSITY SERVICE**

| | |
|---|---|
| 2015 | External Reviewer, Faculty of Pharmacy, University of Toronto, Toronto, Canada. |
| 2014-15 | External Reviewer, Pharmacy School, Tianjin University, Tianjin, China. |
| 2014-15 | External Reviewer, National University of Singapore, Singapore. |
| 2014 | External Reviewer, Faculty of Pharmacy, University of Maryland School of Pharmacy, Baltimore, MD. |
| 2014 | External Reviewer, Faculty of Pharmacy, University of Toronto, Toronto, Canada. |
| 2013 | External Reviewer, Department of Pediatrics, Harbor-UCLA Medical Center, Los Angeles, CA. |
| 2013 | External Reviewer, Dept. of Health Policy and Management, Texas A&M Health Sciences Center, College Station, TX. |
| 2013 | External Reviewer, Department of Pediatrics, Division of Neonatology, David Geffen School of Medicine at UCLA, Los Angeles, CA. |
| 2013 | External Reviewer, Dept. of Social Pharmacy, College of Pharmacy, Ewha Womans University, Seoul, Korea. |
| 2013 | External Reviewer, Department of Pediatrics, Division of Neonatology, David Geffen School of Medicine at UCLA, Los Angeles, CA. |
| 2012 | External Referee, School of Nursing, University of Michigan, Ann Arbor, MI. |
| 2011 | External Referee, School of Pharmacy, University of Colorado Anschutz Medical Campus, Aurora, CO. |
| 2011 | External Referee, University of Wisconsin School of Medicine and Public Health, Department of Population Health Sciences, Madison, WI. |
| 2010 | External Referee, Virginia Commonwealth University, School of Pharmacy, Department of Pharmacotherapy and Outcomes Sciences, Richmond, VA. |
| 2010 | External Referee, Nelson Mandela Metropolitan University, Faculty of Health Sciences, Port Elizabeth, South Africa. |

| | |
|---|---|
| 2010 | Outside Examiner, Doctoral Dissertation Committee, College of Pharmaceutical Sciences, Andhra University, Andhra Pradesh, India. |
| 2009 | External Referee, Tenure and Promotions Committee, Department of Pharmacy Practice and Science, University of Iowa, Iowa City, IA. |
| 2009 | External Referee, Tenure and Promotions Committee, Department of Pharmaceutical Sciences, Oregon State University, Corvallis, OR. |
| 2008 | External Referee, Appointments and Promotions Committee, Division of Pharmacy Practice and Administration, College of Pharmacy, Ohio State University, Columbus, OH. |
| 2006 | External Referee, Appointments and Promotions Committee, Department of Medicine, Brigham and Women's Hospital; Harvard Medical School, Boston, MA. |
| 2004 | External Referee, Appointments and Promotions Committee, Department of Pediatrics, Harbor-UCLA Medical Center, UCLA School of Medicine, Los Angeles, CA. |
| 2002 | External Examiner, Chinese University of Hong Kong Graduate School. Shatin, Hong Kong |
| 2001 | External Referee, Appointments and Promotions Committee, College of Pharmacy, University of Iowa, Iowa City, IA. |
| 2000 | External Referee, Appointments and Promotions Committee, Depart. of Pediatrics, Harbor-UCLA Med Center, UCLA Schl of Medicine, Los Angeles, CA. |
| 2000 | External Referee, Appointments and Promotions Committee, Department of Economics, Rice University, Houston, TX. |
| 1997 | External Referee, Appointments and Promotions Committee, School of Dentistry, University of Connecticut, Farmington, CT. |
| 1993 | External Referee, Promotions Committee, Department of Medicine, Baylor College of Medicine, Houston, TX. |
| 1993 | External Referee, Promotions Committee, Department of Medicine, University of California, San Diego, CA. |
| 1993 | External Referee, Promotions Committee, School of Nursing, University of California, San Francisco, CA. |
| 1993 | External Referee, Promotions Committee, Department of Economics, |

| | |
|---|---|
| | University of Hong Kong, Hong Kong. |
| 1992 | External Referee, Promotions Committee, School of Nursing, University of California, San Francisco, CA. |
| 1988 | External Referee, Tenure and Promotions Committee, Dept. of Economics, Univ. of North Carolina at Chapel Hill, NC. |

**ONGOING GRANT RESEARCH**

**Sponsor:** Centers for Disease Control and Prevention, US DHHS

**PI**: Joel Hay, PhD

**J Hay Role:** Health Economist and PI

**Title:** Economic Studies of Immunization Practices (1 UO1 IP000966-01)

**Amount:** $898,297

**Dates**: Approved, awaiting funding

**Sponsor:** Agency for Healthcare Research and Quality, US DHHS

**PI**: Ken Zangwill, MD

**J Hay Role:** Health Economist

**Title:** Evaluation and Management of the Young Febrile Infant and Related Healthcare Costs and Morbidities (1 R03 HS024146-01)

**Amount:** $100,000

**Dates**: 7/01/15-6/30/16

**Sponsor:** National Institute of Dental and Craniofacial Research

**PI**: Sharon Cermak, PhD

**J Hay Role:** Health Economist

**Title:** Sensory Adapted Dental Environments to Enhance Oral Care for Children (1 U01 DE024978-01)

**Amount:** $381,201 (First Year Directs)

**Dates**: 4/01/15-3/31/20

**Sponsor:** National Institute of Dental and Craniofacial Research

**PI**: Steve Yen, DMD

**J Hay Role:** Health Economist

**Title**: Clinical Effectiveness of Late Maxillary Protraction for Cleft Lip and Palate (U01 DE22937-01A1)

**Amount**: $3,250,000

**Dates**: 9/1/13 – 8/31/18

**Sponsor:** Baxter International

**PI:** Joel W. Hay, PhD

**Title:** Economic Evaluation of Hemophilia Inhibitor Bypass Agent Treatment: On Demand Versus Prophylaxis

**Amount:** $99,000

**Dates:** 1/1/14 – 12/31/15

**Sponsor:** National Institute of Child Health and Human Development T32 HD064578

**PI:** Florence Clark, PhD

**J Hay Role:** Co-Investigator

**Title:** TREET: Training in Rehabilitation Efficacy and Effectiveness

**Amount:** $102,692

**Dates:** 04/01/11 - 03/31/16

## COMPLETED GRANT RESEARCH (WHILE AT USC)

**Sponsor:** Children's Hospital, Los Angeles

**PI:** Guy Young, MD

**J Hay Role:** Co-Investigator

**Title:** Economic Evaluation of Hemophilia Inhibitor Treatments

**Amount:** $95,000

**Dates:** 8/1/13 – 7/31/15

**Sponsor:** Agency for Healthcare Research and Quality, U.S. DHHS

**PI:** Joel W. Hay, PhD

**Title:** American Society of Health Economists Conference Grant

**Amount:** $35,000

**Dates:** 1/1/14 – 2/31/15

**Sponsor:** US Dept. of Health and Human Services/Asst. Secretary for Policy and Evaluation (DHHS/ASPE)

**PI:** Shinyi Wu, PhD

**J Hay Role:** Co-Investigator

**Title:** Care Management Technology to Facilitate Depression Care in Safety Net Diabetes Clinics

**Amount:** $1,977,461

**Dates:** 9/1/10 – 8/31/14

**Sponsor:** National Institutes of Health (trans agency)

**PI:** Jason Doctor, PhD

**J Hay Role:** Co-Investigator

**Title:** Use of Behavioral Economics to Improve Treatment of Acute Respiratory Infections

**Amount**: $8,353,371

**Dates:** 9/1/2010 – 8/31/2014

**Sponsor**: NIH, National Institute of Aging

**PI:** Florence Clark, PhD

**J Hay Role:** Co-Investigator

**Title:** Lifestyle Redesign for Pressure Ulcer Prevention in Spinal Cord Injury

**Amount:** $2,111,000

**Dates:** 9/08 – 8/14

**Sponsor:** EconoMedRx

**PI:** Joel W. Hay, PhD

**Title:** Economic Evaluation of the Market for Pediatric Antidepressants

**Amount:** $99,000

**Dates:** 8/1/12 – 7/31/14

**Sponsor:** Baxter International

**PI:** Joel W. Hay, PhD

**Title:** Economic Evaluation of Hemophilia Inhibitor Bypass Agent Testing Assay

**Amount:** $99,000

**Dates:** 8/1/12 – 6/31/13

**Sponsor:** Auxillium Pharmaceuticals

**PI:** Joel W. Hay, PhD

**Title:** Economic Evaluation of Dupuytren's Contracture Therapy

**Amount:** $165,000

**Dates:** 1/1/11 – 12/31/12

**Sponsor**: Sunovion Pharmaceuticals

**PI:** Joel W. Hay, PhD

**Title:** Costs of COPD Treatments

**Amount:** $85,000

**Dates:** 3/10 – 8/11

**Sponsor**: Baxter Pharmaceuticals

**PI:** Joel W. Hay, PhD

**Title:** Meta-analysis of Hemophilia Patient Inhibitor Therapy Efficacy

**Amount:** $85,000

**Dates:** 3/10 – 8/11

**Sponsor**: Baxter Pharmaceuticals

**PI:** Joel W. Hay, PhD

**Title:** Economic Evaluation of Hemophilia Patient Inhibitor Therapy

**Amount:** $80,000

**Dates:** 9/08 – 8/10

**Sponsor**: Prolacta Biosciences

**PI:** Joel W. Hay, PhD

**Title:** Economic Evaluation of Human Milk Fortifier in Necrotizing Enterocolitis

**Amount:** $80,000

**Dates:** 9/08 – 8/10

**Sponsor**: NIH, National Institute of Mental Health

**PI:** Kathy Ell, PhD

**J Hay Role:** Co-Investigator

**Title:** Major Depression in Diabetes Patients

**Amount:** $678,000

**Dates:** 9/04 –8/10

**Sponsor**: NIH, National Institute of Mental Health

**PI:** Megan Dwight-Johnson, MD

**J Hay Role:** Co-Investigator

**Title:** Patient Centered Care in the Public Sector

**Amount:** $2,642,000

**Dates:** 7/04 – 6/08

**Sponsor**: California Dept. of Health Services

**PI:** Lon Schneider, MD

**J Hay Role:** Economist

**Title:** Alzheimer Disease Costs, Quality of Life and Disease Burden

**Amount:** $600,000

**Dates:** 1/01 – 12/04

Sponsor: US Centers for Disease Control and Prevention, NIH

**PI:** Ken Zangwill, MD

**J Hay Role:** Sub-grant PI

**Title:** Economic Assessment of Rotavirus Burden of Illness in the Kaiser Southern California Health Plan

**Amount:** $260,000

**Dates:** 11/97 – 12/03

Sponsor: US Alzheimer Association, Merck Foundation, Janssen Pharmaceutica

**PI:** Joel W. Hay, PhD

**J Hay Role:** Economist

**Title:** Alzheimer Disease Global Burden of Illness

**Amount:** $200,000

**Dates:** 6/99 – 12/01

Sponsor: US National Institute on Aging

**PI:** Florence Clark, PhD

**J Hay Role:** Project Economist

**Title:** Well Elderly Occupational Therapy Demonstration Project

**Amount:** $1.3 million

**Dates:** 1/96 – 6/98

**Sponsor:** US PHS Agency for Health Care Policy Research

**PI:** Paul Schekelle, MD

**J Hay Role:** USC Project Coordinator

**Title:** Southern California Evidenced-Based Practice Center

**Amount:** $420,000

**Dates:** 3/98 – 9/99

Sponsor: Parke-Davis

**PI:** Joel W. Hay, PhD

**J Hay Role:** Economist

**Title:** Economic Assessment of Epilepsy Disease Management Intervention

**Amount:** $60,000

**Dates:** 6/95 9/98

Sponsor: US NIH, National Institute on Aging

**PI:** Mary Mittelman, PhD

**J Hay Role:** Sub-Grant Co-PI

**Title:** Economic Evaluation of Alzheimer Disease Caregiver Support Intervention

**Amount:** $190,000

**Dates:** 1/96 – 7/98

Sponsor: Bristol Myers Squibb

**PI:** Joel W. Hay, PhD

**J Hay Role:** USC Project Coordinator

**Title:** Pharmacoeconomics Fellowship

**Amount:** $30,000

**Dates:** 6/96

Sponsor: Bristol Myers Squibb

**PI:** Joel W. Hay, PhD

**J Hay Role:** USC Project Coordinator

**Title:** Pharmacoeconomics Training

**Amount:** $60,000

**Dates:** 6/96

Sponsor: Parke-Davis

**PI:** Joel W. Hay, PhD

**J Hay Role:** Economist

**Title:** Cognitive Function and the Costs of Alzheimer's Disease

**Amount:** $90,000

**Dates:** 6/94 8/96

Sponsor: Astra-Merck

**PI:** Phil Rappa

**J Hay Role:** USC Project Coordinator

**Title:** Pharmacoeconomics Training

**Amount:** $90,000

**Dates:** 8/94

Sponsor: Allergan

**PI:** Phil Rappa

**J Hay Role:** USC Project Coordinator

**Title:** Pharmacoeconomics Training

**Amount:** $20,000

**Dates:** 8/95

Sponsor: Amgen

**PI:** Phil Rappa

**J Hay Role:** USC Project Coordinator

**Title:** Pharmacoeconomics Training

**Amount:** $30,000

**Dates:** 7/94

Sponsor: Glaxo-Welcome Pharmaceuticals

**PI:** Phil Rappa

**J Hay Role:** USC Project Coordinator

**Title:** Pharmacoeconomics Training

**Amount:** $140,000

**Dates:** 3/93, 3/94

Sponsor: Miles Pharmaceuticals

**PI:** Joel W. Hay PhD

**J Hay Role:** Economist

**Title:** Economic Assessment of Anti-TNF in Treatment of Septic Shock

**Amount:** $130,000

**Dates:** 4/94 – 3/95

Sponsor: Kaiser Permanente Southern California Health Care Plan

**PI:** Jeff McCombs, PhD

**J Hay Role:** Project Economist

**Title:** The Kaiser/USC Pharmaceutical Care Demonstration Project

**Amount:** $860,000

**Dates:** 3/93 – 9/97

Sponsor: Syntex Roche Pharmaceuticals

**PI:** Joel W. Hay, PhD

**J Hay Role:** Project Coordinator

**Title:** Pharmacoeconomics Graduate program development

**Amount:** $120,000

**Dates:** 6/92 – 5/93

## PEER-REVIEWED PUBLICATIONS:


1. **Hay JW**. "Public Service Delivery in Chicopee, Massachusetts," in *Student Originated Studies Conference Proceedings*, National Science Foundation, 1973, NSF No. 74-33.

2. **Hay JW**. *Occupational Choice and Occupational Earnings: Selectivity Bias in a Simultaneous Logit-OLS Model*, Ph.D. dissertation, Yale University, New Haven, 1980, published by the National Technical Information Service, Rockville, Maryland.

3. Formicola A, Gottsegan R, **Hay JW**. "Commentary on 'Periodontal Disease: Assessing the Effectiveness and Costs of the Keyes Technique'," in *Implications of Cost-Effectiveness Analysis of Medical Technology,* Office of Technology Assessment, U.S. Congress, Washington, D.C., 1981.

4. Yett D, Der W, Ernst R, **Hay JW**. "Blue Shield Plan Physician Participation." *Health Care Financing Review*, June, 1981 pp. 9-24.

5. Alvesalo I, Reisine S, **Hay JW**, Bailit H. "Effects of Fluoride and Regular Dental Care on Personal Dental Expenditures of Young Adults in Finland," *Community Dentistry and Oral Epidemiology*, 1982; 10:15-22.

6. Yett D, Der W, Ernst R, **Hay JW**. "A Model of Physician Pricing, Output, and Health Insurance Reimbursement: Findings from Study of Two Blue Shield Plans' Claims Data." In *Essays in Health Economics*, edited by Jacques Van der Gaag, William Neenan and Theodore Tsukahara, Praeger Press, New York, 1982, pp. 197-230.

7. **Hay JW**, Bailit H, Chiriboga D. "The Demand for Dental Health," *Social Science and Medicine*, Volume 16 (1982), pp. 1285-1289.

8. **Hay JW**, Leahy M. "Physician-Induced Demand: An Empirical Analysis of the Consumer Information Gap," *Journal of Health Economics*, Volume 1, (December, 1982), pp. 231-244.

9. **Hay JW**. "A Simultaneous Econometric Model for Physicians' Specialty Choice and Specialty Income," in *Actes du Dixieme Colloque International D'Econometrie Appliquee: Econometrie de la Sante,* Hospices Civil de Lyon, Lyon, France. February, 1983, pp. 260-270.

10. **Hay JW**. "The Impact of Public Health Care Financing Policies on Private Sector Hospital Costs." *Journal of Health Politics, Policy and Law,* Volume 7, No. 4 (1983), pp. 945-952.

11. Yett D, Der W, Ernst R, **Hay JW**. "Physician Pricing and Health Insurance Reimbursement," *Health Care Financing Review*, (December, 1983), pp. 69-80.

12. **Hay JW**, Leahy M. "Competition Among Health Plans: Some Preliminary Evidence," *Southern Economic Journal* 50,(January 1984), pp. 831-847.

13. **Hay JW**, Mandes G. "Home Health Care Cost-Function Analysis," *Health Care Financing Review* 5(3), (Spring 1984), pp. 111-116.

14. **Hay JW**, Olsen R. "Let Them Eat Cake: A Note on Comparing Alternative Models of the Demand for Medical Care," *J Business and Economic Statistics* 2(3), (July 1984), pp. 279-282.

15. **Hay JW**. "Occupational Choice and Occupational Earnings: A Method for Dealing with Selection Bias Among Economic Activities," in *Research in Population Economics,* Volume 5, edited by T. Paul Schultz and Kenneth Wolpin, JAI Press, Greenwich, Connecticut (1984) pp. 309-329.

16. **Hay JW**. "Variation in Per Capita Pharmaceutical Expenditures: Are Drugs Complements or Substitutes?" In *Pharmaceutical Economics*, Bjorn Lindgren, ed., Liber Forlag Press, Malmo, Sweden, 1985, pp. 21-36.

17. Yett D, Der W, Ernst R, **Hay JW**. "Fee Screen Reimbursement and Physician Fee Inflation," *Journal of Human Resources* 20(2), (Spring, 1985), pp. 278-291.

18. **Hay JW**, Hill WL. "Cost-Effectiveness of Two Transdermal Nitroglycerin Controlled-Release Systems," *Clinical Therapeutics*, 8(1), 1985, pp. 35-40.

19. Sloan F, **Hay JW**. "Medicare Pricing Mechanisms for Physician Services: An Overview of Alternative Approaches," *Medical Care Review*, 43(1), (Spring, 1986), pp. 59-100.

20. **Hay JW**, Ernst R. "The Cost Effectiveness of Home Intravenous Antibiotics," in *Proceedings: Outpatient Parenteral Antibiotic Therapy Symposium,* J.E. Putnam, Ed., IntraMed, New York, NY, 1987 pp. 7-14.

21. Welch B, **Hay JW**, Miller D, Olsen R, Rippey R, Welch A. "The Rand Health Insurance Study: A Summary Critique," *Medical Care*, 25(2), (February, 1987) pp. 148-156.

22. **Hay JW**, Daum R. "Cost Benefit Analysis of Two Strategies for Prevention of Haemophilus Influenzae Type B Infection," *Pediatrics*, 80(3) (September, 1987) pp. 319-329.

23. **Hay JW**, Leu R, Rohrer P. "Ordinary Least Squares and Sample Selection Models of Health Care Demand: Monte Carlo Comparison," *Journal of Business and Economic Statistics,* 1987; 5(4):499-506.

24. **Hay JW**, Ernst R. "The Economic Costs of Alzheimer's Disease," *American Journal of Public Health,* 77(9) (September, 1987) pp. 1-7.

25. **Hay JW**, Anderson G. "The Hospital Services Market: A Disequilibrium Analysis," *Southern Economic Journal*, 54(3) (January, 1988) pp. 656-665.

26. **Hay JW**, Osmond D, Jacobson M. "Projecting the Medical Costs of AIDS and ARC in the United States," *Journal of Acquired Immune Deficiency Syndromes,* 1(5) (October, 1988) pp. 466-485.

27. **Hay JW**. "Cost-Effectiveness of Three Transdermal Nitroglycerin Controlled-Release Systems," *Clinical Therapeutics,* 10(4), 1988, pp. 450-455.

28. **Hay JW**. "Econometric Issues in Modeling the Costs of AIDS," paper presented at the Johns Hopkins University Conference on The Economic Impact of AIDS: Research Methodology. *Health Policy,* 11(2) (April, 1989) pp. 125-145.

29. **Hay JW**. "Projecting the Medical Costs of HIV/AIDS: An Update with Focus on Epidemiology." In *New Perspectives on HIV-Related Illness: Progress in Health Services Research--Conference Proceedings.* National Center for Health Services Research, Pub. No. DHHS (PHS) 89-3449. 1989:84-97. Rockville, MD.

30. **Hay JW**. "The Health Care Cost Crisis," in L. Holland, ed., *Managed Health Care Strategies for the 1990s: Proceedings of a Symposium for Managed Care Professionals*, IntraMed, New York, 1990 pp. 30-39.

31. **Hay JW**. "AIDS Point and Counterpoint." *Priorities;* the American Council on Science and Health, Winter 1990, pp. 35-39.

32. Wittels E, **Hay JW,** Gotto A. "Medical Costs of Coronary Artery Disease." *American Journal of Cardiology,* February, 1990, Vol. 65, pp. 432-440.

33. **Hay JW**, Daum R."Cost-benefit Analysis of Haemophilus influenzae Type B Prevention: Conjugate Vaccination at Eighteen Months of Age," *Ped Inf Dis J,* April 1990, Vol. 9, pp. 246-252.

34. Gotto A, LaRosa J, Hunninghake D, Grundy S, Wilson J, Clarkson T, **Hay JW**. "The Cholesterol Facts: A Summary of the Evidence Relating Dietary Fats, Blood Cholesterol and Coronary Artery Disease" A Joint Statement of The American Heart Association and the National Heart, Lung and Blood Institute. *Circulation,* May, 1990, Vol. 81, No. 5, pp. 1721-1733.

35. **Hay JW**. "Physicians' Specialty Choice and Specialty Income," in G. Duru and J. H. P. Paelinck, eds. *Econometrics of Health Care,* Kluwer Academic Publishers, Amsterdam, Holland, 1990. pp. 95-113.

36. **Hay JW,** Robin E. "Cost-Effectiveness of Alpha-1 Antitrypsin Replacement Therapy in Treatment of Congenital Chronic Obstructive Pulmonary Disease." *American Journal of Public Health,* April 1991, Vol. 81, No. 4, pp. 427-433.

37. **Hay JW**, Wittels E, Gotto A. "An Economic Evaluation of Lovastatin for Cholesterol Lowering and Coronary Artery Disease Reduction," *American Journal of Cardiology,* April 15, 1991, Vol. 67, No. 9, pp. 789-796.

38. **Hay JW**. "Is Hong Kong Ready for Free Market Health Care?" in *Financing Health Care in the 1990s,* Hong Kong Medical Association and Hong Kong Society of Medical Executives, September, 1991, pp. 16-21.

39. **Hay JW**. "The Harm They Do to Others: A Primer on the External Costs of Drug Abuse," in E. Lazear and M. Krauss, eds. *Searching for Alternatives: Drug Control Policy in the United States,* Hoover Institution Press, Stanford, CA, November, 1991, pp. 200-225.

40. **Hay JW**, Hay AR. "Inflammatory Bowel Disease Costs-of-Illness," *Journal of Clinical Gastroenterology,* 1992, Vol. 14, No. 4, pp. 309-317.

41. Hay AR, **Hay JW**. "Inflammatory Bowel Disease Medical Cost Algorithms," *Journal of Clinical Gastroenterology,* 1992, Vol. 14, No. 4, pp. 318-327.

42. **Hay JW**. *Health Care in Hong Kong: An Economic Policy Assessment,* Chinese University Press, Hong Kong; 1992, 124pp. Chinese Language Edition, Chinese University Press, 1993, 114 pp.

43. **Hay JW**. "Pharmacoeconomics in the Hospital," *California Journal of Hospital Pharmacy,* Vol. 5, November, 1993, pg. 7.

44. **Hay JW**, Ernst R. A Perspective on the Costs and Benefits of Combination Vaccination for Prevention of Haemophilus Influenzae type B, Diphtheria, Pertussis and Tetanus, *Vaccine Bulletin*. December, 1993, 1 - 7.

45. **Hay JW**, Kizer K. "Medi-Cal Expenditures for Persons with AIDS," *AIDS and Public Policy Journal*, Vol. 8, No. 2, Summer, 1993, pp. 91-102.

46. **Hay JW**. "Incorporating Pharmacoeconomics into your Business Plan," *Managed Health Care Pharmacy* Vol. 1, No. 4., December, 1993, pp. 11-13.

47. **Hay JW**, Wolak F. "A Procedure for Estimating the Unconditional HIV Infection Distribution and Its Variability." *Journal of the Royal Statistical Society, Series C: Applied Statistics*, 1994; 43(4): 599-624.

48. Bozzette S, Parker R, **Hay JW**. "A Cost Analysis of Approved Antiretroviral Strategies in Advanced Human Immunodeficiency Virus Disease," *Journal of AIDS*, Vol. 7, 1994, pp. 355-362.

49. Ernst R, **Hay JW**. "The Economic and Social Costs of Alzheimer's Disease Revisited," *American Journal of Public Health*, Vol. 84, No. 8, August, 1994, pp. 1261-64.

50. DiMasi J, Mitchell J, **Hay JW**. "The Cost of Drug Development," *Pharmacy and Therapeutics*, Vol 19, No. 1, January, 1994, pp. 68-80.

51. **Hay JW**. "Evaluation of Pharmacoeconomics Studies," *Annals of Pharmacotherapy*, 1994;28:539-40.

52. McCombs J, Nichol M, Johnson K, **Hay JW**, Ebin V, Lawrence G, Schneider J. The Health Care Reformation and Pharmaceutical Care: Is Pharmacy's Vision Too Narrow? *American Journal of Health-Systems Pharmacy*, Vol. 52, June 1, 1995. pp. 1208-14.

53. McCombs J, Cody M, Besinque K, Borok G, Ershoff D, Groshen S, **Hay JW**, et al. "Measuring the Impact of Patient Counseling in the Outpatient Setting: The Research Design of the Kaiser Permanente/USC Patient Consultation Study," *Clinical Therapeutics*, Vol 17, No. 6, 1995. pp. 1188-1206.

54. Ashraf TA, **Hay JW**, Pitt B, Wittels E, Crouse J, Davidson M, Furberg C, Radican L. "Cost Effectiveness of Pravastatin in Secondary Prevention of Coronary Artery Disease," *American Journal of Cardiology* Vol 78, 1996. pp. 409-414.

55. **Hay JW**. "Commentary: The Scope of the AIDS Epidemic in the United States," *JAMA HIV/AIDS Journal* Scan Website, January, 1996.

56. **Hay JW**, Ernst R, Meissner C. "Respiratory Syncytial Virus Immune Globulin: A Cost Effectiveness Analysis," *American Journal of Managed Care* Vol 2, No. 7, 1996. pp. 851-861.

57. Gotto, A., **Hay JW**. "Costs of Lipid-Lowering Statin Drugs," Readers' Comments, *American Journal of Cardiology*, January 15, 1996, Vol. 77, pp. 225-226.

58. McCombs, J, Nichol M, Johnson, K, **Hay JW**, Ebin, V, Lawrence G, Schneider, J. La Visione del Futuro della Farmacia è troppo limitata? *Pro Pharmacopœa Supplemento Redazionale a L'Informatore Farmacuetico-Aggiornamento* Vol. 3 # 1, 1996; pp. 17-24.

59. Ernst R, **Hay JW**, Fenn C, Tinklenberg J, Yesavage J. "Cognitive Function and the Costs of Alzheimer's Disease: An Exploratory Study," *Archives of Neurology*, Vol. 54, 1997. pp. 687-693.

60. Ernst R, **Hay JW**. "Economic Research On Alzheimer Disease: A Review of The Literature," *Alzheimer Disease and Associated Disorders*, 1997. Vol. 11, Suppl 6, pp. 135-145.

61. **Hay JW**, Sano M, Whitehouse P. The Cost and Social Burdens of Alzheimer Disease Alzheimer Disease. Editorial. *Alzheimer Disease and Associated Disorders*, 1997. Vol. 11, No. 4, pp.1-3.

62. Clark, F. Azen, S, Zemke, R, Jackson J, Carlson, M, Mandel, D, **Hay JW**, et al. Occupational Therapy for Independent-Living Older Adults: A Randomized Controlled Trial. *JAMA*, 1997; Vol. 278 pp. 1321-1326.

63. **Hay JW**, Yu W, Ashraf T. "Pharmacoeconomics of Lipid-lowering Agents for Primary and Secondary Prevention of Coronary Heart Disease," *Pharmacoeconomics*, 1998; Vol. 15, No. 1, pp.47-74.

64. **Hay JW**, Schwartz S. "The ISPOR Lipid Conference," *Value in Health* 1998. Vol. 1, No. 2. pp. 95-99.

65. Langley PC, **Hay JW**, Schwartz JS, Smith SC, McKenney J. From Research into Practice: How Should Healthcare Organizations/Governments Decide About Lipid Therapy and Who Will Pay? *Value in Health* 1998. Vol. 1, No. 4. pp. 243-250.

66. **Hay JW**. "Economic Modeling and Sensitivity Analysis." *Value in Health* 1998; 1(3) pp.187-193.

67. **Hay JW**, Ernst R. "A Direction for *Value in Health*," *Value in Health* 1998. Vol 1, No. 3, pp. 149-154.

68. The International Working Group on Alzheimer's Disease (**JW Hay,** member). First International Pharmacoeconomic Conference on Alzheimer's Disease: Report and Summary. *Alzheimer Disease and Associated Disorders*, 1998. Volume 12, No. 4, pp. 266-280.

69. McCombs JS, Cody M, Parker JP, Johnson KA, Besinque K, Borok G, Ershoff D, Groshen S, **Hay JW**, Nichol MB, Nye MT. The Kaiser Permanente/USC Patient Consultation Study: Change in Use and Cost of Health Services. *Am J Health-Syst Pharm* 1998. Vol. 55, No. 2, pp. 2485-99.

70. **Hay JW**, Yu W. "Drug Patents and Prices, Can We Achieve Better Outcomes?" in Triplett J, ed. *Measuring the Prices of Medical Treatments*, Brookings Press, Washington, DC. 1999,

pp.152-195.

71. **Hay JW**, Jackson J. Methodological Issues in Conducting Pharmacoeconomic Evaluations—Modeling Studies. *Value in Health*, 1999. Vol. 2 (No. 3), pp.78-81.

72. **Hay JW**, Ernst R, Kessler CM. "Cost-effectiveness analysis of alternative factor VIII products in treatment of hemophilia A," *Haemophilia*, 1999, Vol. 5, pp. 191-202.

73. Gotto A, Grundy S, …, **Hay JW**,… et al. Lowering LDL Cholesterol: Questions From Recent Meta-Analyses and Subset Analyses of Clinical Trial Data Issues From the Interdisciplinary Council on Reducing the Risk for Coronary Heart Disease, Ninth Council Meeting. *Circulation*. 1999;99:E1-E7.

74. **Hay JW**. "Health Care Costs and Outcomes: How Should We Evaluate Real World Data?" *Value in Health*, 1999. Vol. 2 (No. 6), 417-20.

75. **Hay JW**, Yu W. Prevalence, Patient Awareness, and Treatment of Dyslipidemia in the Diabetes Mellitus Population. *Drug Benefit Trends*, 1999. Suppl pp. 6-11.

76. Liu G, **Hay JW**. "An Economic Cost Analysis of Oral Ganciclovir Prophylaxis for the Prevention of CMV Disease," *Pharmaceutical Research*. 2000, 17(8): pp. 909-917.

77. **Hay JW**, Yu W, Ashraf T. "Pharmacoeconomics of Lipid-lowering Agents for Primary and Secondary Prevention of Coronary Heart Disease," In: Prakash A, editor. *Preventing Coronary Heart Disease*. Auckland: Adis International Ltd, 2000: pp. 49-77

78. Marcy M, Takata G, Chan LS, Shekelle P, Mason W, Wachsman L, Ernst R, **Hay JW**, Corley PM, Morphew T, Ramicone E, Nicholson C. Management of acute otitis media. *Evid Rep Technol Assess*. 2000 Jun;(15):1-4.

79. **Hay JW**, Yu W. Pharmacoeconomics and Outcomes Research: Expanding the Health Care "Outcomes" Market. *Value in Health*, 2000. 3(3). pp. 181-185.

80. **Hay JW**. Commentary: Cost-Effectiveness of Treating Hyperlipidemia in the Presence of Diabetes: Who Should Be Treated? *Journal of Evidence-Based Healthcare*. 2001. 5(1): pp. 27-29.

81. **Hay JW**. Pharmacoeconomic Guidelines: Where do we go from here?" *Value in Health*, 2001. 4(3):211.

82. Clark F, Azen S, Carlson M, Mandel D, LaBree L, **Hay JW**, Zemke R, Jackson J, Lipson L. Embedding health-promoting changes into the daily lives of independent-living older adults: Long-term follow-up of occupational therapy intervention. *Journal of Gerontology: Psychological Sciences*, 2001. 56B:60-63.

83. **Hay JW**. "Conjoint Analysis in Pharmaceutical Research." *J Managed Care Pharmacy* 2002; 8(3):206-209.

84. **Hay JW**, LaBree L, Luo R, Clark F, Carlson M, et al. "Cost Effectiveness of Preventive Occupational Therapy for Independent Living Adults." *Journal of the American Geriatrics Society*. 2002 50(8):1381-1388.

85. **Hay JW**. Pharmacoeconomics of Lipid Management. *Managed Care Consultant*, 2002; 2(2): 54-64.

86. Boone J, **Hay JW**, Aguanno J, Getzen T, Hortin G. Are the Correct Economic Factors Influencing Point-of-Care Testing? *Point of Care*; 2002 Vol. 1, #3, pp.212-221.

87. **Hay JW**. Long-term pravastatin treatment has sustained benefits for people with coronary heart disease. *Evidence-Based Cardiovascular Medicine*, December, 2002; 6:146-47.

88. **Hay JW**. Expensive Medical Conditions. *Health Affairs*, November/December 2002; 21(6):271-72.

89. Knapp KK, Ray MD. (for the Pharmacy Research Roundtable**, J Hay** member). A pharmacy response to the Institute of Medicine's 2001 initiative on quality in health care. *Am J Health-Syst. Pharm*. 2002; 59:2443-50.

90. **Hay JW**. Recent U.S. Trends in Lipid Medication Use: 1998-2001. *Cardiology Review*, April 2003. 20(4) Suppl: 35-37.

91. Chiou C-F, **Hay JW**, Wallace J, Bloom B, Neumann P, Sullivan S, Yu H-T, Keeler E, Henning J, Ofman J. Development and Validation of A Grading System for the Quality of Cost-Effectiveness Studies. *Medical Care* 2003; 41:32–44.

92. Ofman J, Sullivan S, Neumann P, Chiou C-F, Henning J, **Hay JW**. Examining The Value and Quality of Health Economic Analyses: Implications of Utilizing The QHES. *Journal of Managed Care Pharmacy*, 2003; 9(1):53-62.

93. Yuan Y, **Hay JW**, McCombs J. Mortality and Hospitalization Impacts of Pharmacy Consultation In Ambulatory Care. *American Journal of Managed Care*. 2003; 9(1):101-112.

94. Forrest S, Goetghebeur M, **Hay JW**. "Understanding the Underlying Drivers of Inpatient Cost Growth: A Literature Review. *American Journal of Managed Care*. 2003, 9(S1):S3-S13.

95. **Hay JW**. Hospital Cost Drivers: An Evaluation of 1998-2001 State-Level Data. *American Journal of Managed Care*. 2003, 9(S1):S14-S24.

96. Etemad L, **Hay JW**. Cost Effectiveness Analysis of Pharmaceutical Care in a Medicare Drug Benefit Program. *Value in Health*. 2003, 6(4):425-435.

97. **Hay JW**. Evaluating the Cost-Effectiveness of Statins. *Journal of Managed Care Pharmacy*. 2004; 10(1): 79-81.

98. Chen L, **Hay JW**. Cost-Effectiveness of Implanted Cardioverter Defibrillator for Sudden

Death Prevention in Congestive Heart Failure. *Journal of Cardiovascular Drugs and Therapy*. 2004; 18(2): 161-170.

99. Dwight-Johnson M, Largomarsino I, Aisenberg E, **Hay JW**. "Understanding Depression Treatment Preferences among Low-Income Latinos using Conjoint Analysis". *Psychiatric Services* 2004;55(8):934-37.

100. Purdy K, **Hay JW**, Botteman M, Ward J. "Cost-Benefit Analysis of Selective Strategies for use of Acellular Pertussis Vaccine in Adolescents and Adults." *Clinical Infectious Diseases* 2004; 39:20–28.

101. **Hay JW**. "Evaluation and Review of Pharmacoeconomic Models." *Expert Opinion on Pharmacotherapy*, 2004; 5(9):1867-80.

102. Pharmacy Practice Research Roundtable (**JW Hay**, member). Advancing Pharmacy Practice Through Research: A 2004 Perspective. *J Am Pharm Assoc*. 2004;44:621–628.

103. Narayan S, **Hay JW**. Cost-effectiveness of generic Ritalin® (methylphenidate) versus generic Adderall® (amphetamine/dextroamphetamine mixed salts) for first-line treatment of attention deficit/hyperactivity disorder (ADHD) in children. *Expert Review of Pharmacoeconomics & Outcomes Research*, 2004; 4(6):1-8.

104. **Hay JW**, Zammit DC. Vaccine Policy Perspectives: Market Strategies. Paper commissioned by the Institute of Medicine to support: Financing Vaccines in the 21st Century. Assuring Access and Availability. Institute of Medicine of the National Academies. The National Academies Press, Washington, D.C. 2004.

105. **Hay JW**. Cost Effectiveness of Cardiovascular Medicines. *Current Atherosclerosis Reports*, 2005, 7:79-80.

106. **Hay JW**, Sterling K. "Cost Effectiveness Analysis of Fibrates for Dyslipidemia." *Pharmacoeconomics*. 2005; 23(2):133-141.

107. Letourneau-Wagner J, **Hay JW**. "The Cost Impacts of Vaccination in the United States: An Overview." *Managed Care Consultant* 2005; 4[2]:11-25.

108. **Hay JW**. "Application of Cost Effectiveness and Cost Benefit Analysis to Pharmaceuticals." Chapter 14 in Santoro M, Gorrie T, eds. *The Grand Bargain: Ethics and the Pharmaceutical Industry In the 21st Century*. Cambridge University Press, New York NY, 2005:225-248.

109. Fitzner K, Fox K, Schmidt J, Roberts M, Rindress D, **Hay JW**. Implementation and Outcomes of Commercial Disease Management Programs in the United States: the Disease Management Outcomes Consolidation Survey. *Disease Management Journal* 2005; 8(4):253-64.

110. **Hay JW**. "Appropriate Econometric Methods for Pharmacoeconometric Studies of Retrospective Claims Data: An Introductory Guide." *J Managed Care Pharmacy*. 2005; 11(4): 344-348.

111. **Hay JW**, Ward J. Economic Considerations For Pertussis Booster Vaccination In Adolescents. *Pediatric Infectious Disease Journal* 2005; 24(6): S127-S133.

112. **Hay JW**, Leahy M. "Cost Effectiveness of Oral Antihistamines in the California Medi-Cal Program." *Value in Health* 2005; 8(4):506-16.

113. Zhang L, **Hay JW**. "Cost Effectiveness Analysis of Rizatriptan and Sumatriptan versus Cafergot in the Acute Treatment of Migraine." *CNS Drugs* 2005; 19(7): 635-642.

114. Forrest S, Goetghebeur M, **Hay JW**. Medicare Part B coverage and reimbursement of outpatient prescription drugs: impact of current policy on clinical practices and health care expenditures. *Applied Health Economics and Health Policy* 2005; 4(1):9-14.

115. **Hay JW**. "Pharmacist Medication Review Study Design Concerns," Rapid Response Letter, *BMJ*, January 28, 2005. (http://bmj.bmjjournals.com/cgi/eletters/bmj.38338.674583.AEv2).

116. **Hay JW**. "Where's the Value in Health Care?" *Value in Health*; 2006; 9(2):11-14.

117. Stephens JM, Botteman MF, **Hay JW**. "Impact of Antidiabetic Medications on Utilization, Costs, and Glycemic Control within Managed Care Organizations: A Review of the Literature." *J Managed Care Pharmacy* 2006; 12(2):130-142.

118. Botteman M, Barghout V, Stephens J, **Hay JW**, Brandman J, Aapro M. Cost effectiveness of bisphosphonates in the management of breast cancer patients with bone metastases. *Annals of Oncology*, July 2006; 17: 1072-1082.

119. Spalding J, **Hay JW**. "The Cost-Effectiveness of Tumor Necrosis Factor Alpha Inhibitors as First-Line Agents in Rheumatoid Arthritis." *Pharmacoeconomics* 2006; Vol. 24 (12): pp. 1221-1232.

120. **Hay JW**. "Comment on Comparing Patient Access to Pharmaceuticals in UK and US. *Applied Health Economics and Health Policy* 2006; Vol. 5 (4): pp. 269-270(2).

121. Botteman MF, **Hay JW**, van Hout BA, Curry A, Wong R, Luo MP. Cost effectiveness of Adalimumab Therapy vs. Conventional Care in UK Patients with Active Ankylosing Spondylitis (AS). *Rheumatology* 2007 46(8):1320-1328.

122. Carpiuc KT, Stephens JM, Botteman MF, Feng W, **Hay JW**. A review of the clinical and economic outcomes of imatinib in Philadelphia chromosome-positive acute lymphoblastic leukemia. *Expert Opinion on Pharmacotherapy*. November 2007, Vol. 8(16), pp. 2775-2787.

123. **Hay JW**, Rindress D, Editors. *Disease Management Principles and Practices: The Current State of the Art*. Disease Management Association of America, Washington, DC. 2007.

124. Liou SY, Stephens JM, Carpiuc KT, Feng W, Botteman MF, **Hay JW**. Economic Burden of Haematological Adverse Effects in Cancer Patients A Systematic Review. *Clinical Drug*

*Investigations* 2007; 27 (6): 381-96.

125. Costanzo MR, Johannes RS, Pine M, Gupta V, Saltzberg M, **Hay JW**, Yancy CW, Fonarow GC. “Effects of intravenous therapies on outcomes of inpatients with acutely decompensated heart failure: A propensity analysis using the ADHERE database.” *American Heart Journal*. July, 2007; 154: 267-277.

126. Yuan Y, Iloeje U, Li H, **Hay JW**, Yao GB. Economic Implications Of Entecavir Treatment In Suppressing Viral Replication In Chronic Hepatitis B (Chb) Patients In China. *Value in Health* March, 2008; 11:S11-S22.

127. Zeiger R, **Hay JW**, Contreras R, Chen W, Quinn V, Seal B, Schatz M. “Risk-Stratified Medical Costs for Asthma Patients in a Managed Care Organization (MCO).” *J Allergy and Clinical Immunology*. 2008; 121:885-92.

128. Yuan Y, Iloeje U, **Hay JW**. Long-Term Cost Effectiveness of Entecavir in Suppressing Viral Replication in Chronic Hepatitis B (CHB) Patients Compared with Lamivudine.” *J Managed Care Pharmacy*. 2008; 14(1):21-33.

129. Gabel J, Fahlman C, Kang R, Kletke P, Wozniak G, **Hay JW**. Where Do I Send Thee? Does Physician-Ownership Affect Referral Patterns To Ambulatory Surgery Centers? *Health Affairs*, 2008; 27:w165-w174.

130. **Hay JW**. Using Pharmacoeconomics to Value Pharmacotherapy. *Clinical Pharmacology and Therapeutics*. 2008; 84(2):197-200.

131. **Hay JW**. “Prices and Innovation in Pharmaceuticals and Biotechnology.” Chapter 5, pp. 81-99; in *Research in Human Capital and Development, Volume 16, The Value of Innovation: Impact on Health, Life Quality, Safety, and Regulatory Research*, edited by Irina Farquhar, Kent Summers and Alan Sorkin. Emerald Group Publishing Limited, Bingley, U.K. 2008.

132. **Hay JW**. “The Pharmacoeconomics of Elevated Triglycerides and Their Management.” *Medscape Expert Column*. June 16, 2008; (http://www.medscape.com/viewarticle/575862_print).

133. Orlewska E, Zammit D, Yuan Y, Kutikova L, Berak H, Halota W, **Hay JW**. Cost-effectiveness analysis of entecavir in the treatment of chronic hepatitis B (CHB) patients in Poland. *Exp Clin Hep* 2008; 4(3-4):20-28.

134. Gu NY, Gai Y, **Hay JW**. “The Effect of Patient Satisfaction with Pharmacist Consultation on Medication Adherence: An Instrumental Variable Approach.” *Pharmacy Practice*, 2008 Oct-Dec;6(4):201-210.

135. Scranton R, Dhingra R, Lawler E, **Hay JW**, Yucel K, Guo A, Balzer T, Gaziano J. “A Six-Year Study of Diagnostic Lower Extremity Imaging Practice Patterns and Outcomes in Veterans Affairs Healthcare System.” *International Journal of Angiology*. 2008; 17(2): 78-

82.

136. Le Q, **Hay JW**. Cost-Effectiveness Analysis of Lapatinib in HER2-Positive Advanced Breast Cancer. *Cancer* 2009;115:489–98.

137. **Hay JW**, Scranton R, Yucel K, Guo A, Balzer T, Gaziano J. "Cost Impact Of Diagnostic Imaging For Lower Extremity Peripheral Vascular Disease (PVD)." *Value in Health* 2009; 12(2):262-266.

138. **Hay JW,** Kaliner M. Review of the Pharmacoeconomics of Second-Generation Antihistamines in the Treatment of Allergic Rhinitis: A U.S. Perspective. *Current Medical Research and Opinion*. 2009; 25(6): 1421-1431.

139. **Hay JW**, Smeeding J, Carroll NV, Drummond M, Garrison LP, Mansley EC, Mullins CD, Mycka JM, Seal B, Shi L. Good Research Practices in Measuring Drug Costs for Cost Effectiveness Analysis: A Report of the ISPOR Drug Cost Task Force. *Value in Health* 2010; 13(1):3-7.

140. **Hay JW**, Jhaveri M, Tangirala MK, Kaliner M. Cost and Resource Utilization Comparisons of Second Generation Antihistamines vs. Montelukast in Treatment of Allergic Rhinitis: Retrospective Analysis of a Large National Insurance Claims Database. *Allergy and Asthma Proceedings* 2009 Nov-Dec;30(6):634-42.

141. Garrison LP, Mansley E, Abbott T, Bresnahan B, **Hay JW**, Smeeding J. Research Practices for Measuring Drug Costs in Cost Effectiveness Analyses: Part II: A Societal Perspective. *Value in Health* 2010; 13(1):8-13.

142. Mansley E, Carroll N, Chen K, Shah N, Tak Piech C, **Hay JW**, Smeeding J. Good Research Practices for Measuring Drug Costs in Cost Effectiveness Analyses: A Managed Care Perspective - A Report of the ISPOR Drug Cost Task Force Part III. *Value in Health* 2010; 13(1):14-17.

143. Mullins CD, Seal B, Seoane-Vazquez E, Sankaranarayanan J, Asche C, Jayadevappa R, Lee W, Romanus D, Wang J, **Hay JW**, Smeeding J. Good Research Practices for Measuring Drug Costs in Cost Effectiveness Analyses: A Report of the ISPOR Drug Cost Task Force – Part IV: Medicare, Medicaid and Other US Government Payers Perspectives. *Value in Health* 2010; 13(1):18-24.

144. **Hay JW**, Zhou Z. Commentary: A systematic review of the cost-effectiveness of rFVIIa and APCC in the treatment of minor/moderate bleeding episodes for haemophilia patients with inhibitors. *Haemophilia* 2010; 16(2):366-368.

145. Mycka J, Dellamano R, Kolassa EM, Wonder M, Ghosh S, **Hay JW**, Smeeding J. Good Research Practices for Measuring Drug Costs in Cost Effectiveness Analyses: An Industry Perspective: A Report of the ISPOR Drug Cost Task Force – Part V. *Value in Health* 2010; 13(1):25-27.

146. Shi L, Hodges M, Drummond M, Ahn J, Li SC, Hu S, Augustovski F, **Hay JW**, Smeeding J.

Good Research Practices for Measuring Drug Costs in Cost Effectiveness Analyses: An International Perspective: A Report of the ISPOR Drug Cost Task Force – Part VI. *Value in Health* 2010; 13(1):28-33.

147. Dwight-Johnson M, Lagomarsino I, **Hay JW,** Zhang L, Tang L, Green JM, Duan N. "Effectiveness of Collaborative Care in Addressing Depression Treatment Preferences Among Low-Income Latinos." *Psychiatric Services.* Nov 2010; 61: 1112 - 1118.

148. Skrepnek GH, Seal B, Tangirala M, **Hay JW**. "Adverse Events and Intravenous Versus Oral Bisphosphonate Use In Patients With Osteoporosis and Cancer in the U.S." *General Dentistry*, November/December, 2010; 58(6):484-92.

149. Mark TL, Joish VN, **Hay JW**, Sheehan D, Johnson S, Cao Z. "Antidepressant use in geriatric populations: the burden of side-effects and interactions on adherence and costs." *American Journal of Geriatric Psychiatry*. March 2011; 19(3):211–221. http://dx.doi.org/10.1097/JGP.0b013e3181f1803d

150. Clark F, Mandel D, Carlson M, Chou C-P, Cherry B, Jordan-Marsh M, Knight B, Mandel D, Blanchard J, Granger DA, Wilcox RR, Lai MY, White B, **Hay JW,** Lam C, Marterella A, Azen S. "Effectiveness of a Lifestyle Intervention in Promoting the Wellbeing of Independently Living Older People: Results of the Well Elderly 2 Randomised Controlled Trial." *Journal of Epidemiology and Community Health*, 2012 Sep; 66(9):782-90. http://dx.doi.org/10.1136/jech.2009.099754

151. **Hay JW**, Zhou Z. Economic comparison of aPCC vs rFVIIa in the home treatment of mild-to-moderate bleeding episodes in hemophilia patients with inhibitors. *Haemophilia*. 2011 Sep;17(5):e969-74.; http://dx.doi.org/10.1111/j.1365-2516.2011.02589.x

152. Ganapathy V, **Hay JW**, Kim JH. Analysis of Costs of Necrotizing Enterocolitis Among Extremely Premature Infants Fed Mother's Own Milk Fortified with Human-milk Based Supplement versus Bovine-milk based Supplement. *Breastfeeding Medicine*. February 2012, 7(1): 29-37. http://dx.doi.org/10.1089/bfm.2011.0002

153. **Hay JW**, Zhou Z. aPCC versus rFVIIa in treatment of hemophilia patients with inhibitors: A structured review of the pharmacoeconomic literature. *Journal of Medical Economics*, 2011; 14(4):516-525.

154. **Hay JW,** Katon W, Ell K**,** Lee P-J, Guterman J. An Economic Evaluation of Collaborative Care Management of Major Depression among Low-Income, Predominantly Hispanics with Diabetes**.** *Value in Health*, 2012 Mar-Apr;15(2):249-54. http://dx.doi.org/10.1016/j.jval.2011.09.008

155. Zhou Z, **Hay JW**. A systematic review and classical meta-analysis comparing the efficacy of bypassing agents in hemophilia patients with inhibitors. *Clinical Therapeutics*, February 2012; 34(2): 434-445. http://dx.doi.org/10.1016/j.clinthera.2012.01.001

156. Ding Y, Zangwill KM, **Hay JW**, Allred N, Yeh S. Cost-benefit Analysis of In-hospital Influenza Vaccination of Postpartum Women. *Obstetrics & Gynecology*, February 2012;

119(2, Part 1): 306-314. http://dx.doi.org/10.1097/AOG.0b013e318242af27

157. Suh H, **Hay JW**, Johnson K, Doctor J. Comparison of Cardiovascular Events between a Statin plus Fibrate Combination Therapy and a Statin Monotherapy in Patients with Diabetes. *Pharmacoepidemiology and Drug Safety*, 2012; 21: 470–484. http://dx.doi.org/10.1002/pds

158. Kawatkar AA, **Hay JW**, Stohl W, Nichol MB. Incremental Expenditure of Biologic Disease Modifying Anti-Rheumatic Treatment Using Instrumental Variables in Panel Data. *Health Economics*, July 2013.
22(7):807–823. http://dx.doi.org/10.1002/hec.2855

159. **Hay JW**, Chaugule SC, Young G. Bypass therapy assay testing as a strategy to reduce costs for treatment of hemophilia patients with inhibitors. *Haemophilia*, 2013. 19(5): 711–719; http://dx.doi.org/10.1111/hae.12171

160. Dwight Johnson MD, **Hay JW**, Unutzer J, Apesoa-Varano C, Hinton L. Depression Treatment Preferences of Older White and Mexican American Men. *General Hospital Psychiatry*, 2013. 35(1): 59-65. http://dx.doi.org/10.1016/j.genhosppsych.2012.08.003.

161. Ding Y, Yeh SH, Mink C, Zangwill KM, Allred NJ, **Hay JW**. Cost-benefit Analysis of In-hospital TDaP Vaccination of Postpartum Women. *Vaccine*. 2013; 31:2558–2564. http://dx.doi.org/10.1016/j.vaccine.2013.03.053.

162. Messali A, **Hay JW**, Villacorta R. The Cost-Effectiveness of Temozolomide in the Adjuvant Treatment of Newly Diagnosed Glioblastoma in the United States: A Literature Review and Markov Model. *Neuro-Oncology*. 2013; 15(11):1532-1542. http://dx.doi.org/10.1093/neuonc/not096

163. **Hay JW** (Section Chair). “Statistical Approaches for Evaluating Disease and Health Management Data,” in Esposito D, Migliaccio-Walle K, Molsen E., Editors. “Reliability and Validity of Data For Outcomes Research & Disease And Health Management Programs”, *ISPOR Outcomes Good Practices Series*, ISPOR, Princeton, NJ, 2013. Chapter 29, pp. 343-346.

164. Jain R, **Hay JW**. “Statistical Methods for Randomized Controlled Trials: Discrete Outcomes,” in Esposito D, Migliaccio-Walle K, Molsen E., Editors. “Reliability and Validity of Data For Outcomes Research & Disease And Health Management Programs”, *ISPOR Outcomes Good Practices Series*, ISPOR, Princeton, NJ, 2013. Chapter 34, pp. 365-373.

165. Petersen H, **Hay JW**. “Statistical Methods for Randomized Controlled Trials: Propensity Scores,” in Esposito D, Migliaccio-Walle K, Molsen E., Editors. “Reliability and Validity of Data For Outcomes Research & Disease And Health Management Programs”, *ISPOR Outcomes Good Practices Series*, ISPOR, Princeton, NJ, 2013. Chapter 40, pp. 405-408.

166. **Hay JW**. “Statistical Methods for Randomized Controlled Trials: Nonparametric Statistical Methods,” in Esposito D, Migliaccio-Walle K, Molsen E., Editors. “Reliability and Validity of Data For Outcomes Research & Disease And Health Management Programs”, *ISPOR Outcomes Good Practices Series*, ISPOR, Princeton, NJ, 2013. Chapter 45, pp. 427-432.

167. Aponte-González J, Fajardo-Bernal L, Diaz J, Eslava-Schmalbach J, Gamboa O, **Hay JW**. Cost-Effectiveness Analysis of the Bivalent and Quadrivalent Human Papillomavirus Vaccines from a Societal Perspective in Colombia. *PLOS One*, 2013; 8(11): e80639. http://dx.doi.org/10.1371/journal.pone.0080639

168. **Hay JW**. Competition, Market Power and Pricing in Brand Name Pharmaceutical Markets. *Harvard Health Policy Review*. Spring 2013 Vol. 14, No. 1; pp. 8-9.

169. **G**anapathy V, **Hay JW**, Kim JH, Lee ML, Rechtman DL. Healthcare costs among survivors of neonatal necrotizing enterocolitis in a Medicaid cohort. *BMC Pediatrics*, 2013, Vol. 13:127 http://doi:10.1186/1471-2431-13-127

170. Bollu V, Ejzykowicz F, Rajagopalan K, Karafilidis J, **Hay JW**. Risk of all-cause hospitalization in COPD patients initiating long-acting or short-acting beta agonist therapy. *Journal of Medical Economics*, 2013, 16(8):1082-1088. http://dx.doi.org/10.3111/13696998.2013.815625

171. Villacorta R, **Hay JW**, Messali A. Cost effectiveness of moderate to severe psoriasis therapy with etanercept and ustekinumab in the United States. *PharmacoEconomics* 2013; 31:823–839. http://dx.doi.org/10.1007/s40273-013-0078-x

172. Mehta D, **Hay JW.** "Cost-Effectiveness of adding bevacizumab to first line therapy for patients with advanced ovarian cancer." *Gynecologic Oncology* 2014; 132(3):677-683. http://dx.doi.org/10.1016/j.ygyno.2014.01.021.

173. Gong C, **Hay JW**. "Cost-effectiveness analysis of abiraterone and sipuleucel-T in metastatic castration-resistant prostate cancer." *Journal of the National Comprehensive Cancer Network* 2014;12(10):1417–1425. http://www.jnccn.org/content/12/10/1417.full

174. Villacorta R, **Hay JW**, Messali A. Novel methods of measuring clinical outcomes from psoriasis and psoriatic arthritis clinical trials. *Expert Review of Pharmacoeconomics and Outcomes Research*, 2014*;* 14(4):1-14. http://dx.doi.org/10.1586/14737167.2014.917970

175. **Hay JW**. Current Issues in Pharmacoeconomic Modeling. *Journal of Health Technology Assessment*, 2014;2(1):6-9.

176. Messali A, Villacorta R, **Hay JW**. "A Review of the Economic Burden of Glioblastoma and the Cost Effectiveness of Pharmacologic Treatments." *Pharmacoeconomics*, 2014; 32(12):1201-1212. http://dx.doi.org/10.1007/s40273-014-0198-y

177. Clark F, Pyatak EA, Carlson M, Blanche EI, Vigen C, **Hay JW,** Mallinson T, Blanchard J, Unger JB, Garber SL, Diaz J, Florindez LI, Atkins M, Rubayi S, Azen SP and the PUPS 2 Study Group. Implementing trials of complex interventions in community settings: The USC–Rancho Los Amigos Pressure Ulcer Prevention Study (PUPS) *Clinical Trials* 2014; 11: 218–229. http://dx.doi.org/10.1177/1740774514521904

178. Thompson CA, **Hay JW**. Marijuana Use in Models for Health Outcomes. *American Journal*

*of Medicine*, 2014; http://dx.doi.org/10.1016/j.amjmed.2014.07.039

179. Zhang X, **Hay JW**, Niu X. Cost-effectiveness of Fingolimod, Teriflunomide, Dimethyl Fumarate and Intramuscular Interferon Beta-1a in Relapsing-Remitting Multiple Sclerosis. *CNS Drugs*, 2014; http://dx.doi.org/10.1007/s40263-014-0207-x

180. Thompson CA, **Hay JW**. Estimating the Association between Metabolic Risk Factors and Marijuana Use in US Adults Using Data from the Continuous National Health and Nutrition Examination Survey. *Annals of Epidemiology*, 2015; S1047-2797(15)00041-1. http://dx.doi.org/10.1016/j.annepidem.2015.01.013

181. Grosse SD, Chaugule S, **Hay JW**. QALYs and Hemophilia: A Review. *Expert Reviews of Pharmacoeconomics and Outcomes Research*, 2015; 15(2): 267-283. http://dx.doi.org/10.1586/14737167.2015.1001372

182. Chen CX, **Hay JW**. Cost-Effectiveness Analysis of Alternative Screening and Treatment Strategies for Heterozygous Familial Hypercholesterolemia in the United States. *International Journal of Cardiology*, 2015; 181:417–424. http://dx.doi.org/10.1016/j.ijcard.2014.12.070

183. Cheetham C, Yuan Y, Niu F, Kalsekar A, Hechter R, Chiang K, **Hay JW**, Nyberg L. Factors Associated with Failure to Achieve SVR in Hepatitis C Genotype 3 Patients Within an Integrated Care Delivery System. *Journal of Managed Care and Specialty Pharmacy* 2015; 21(8):641-47.

184. **Hay JW.** A Special Commemorative Honoring William S. Comanor and 50 Years of Pharmaceutical Economics. *International Journal of the Economics of Business* 2015; 22:2, 165-168. http://dx.DOI.org/10.1080/13571516.2015.1045742

185. Chen CX, **Hay JW**. Studies Should Avoid "Cherry-Picking" of Favorable Cost-Effectiveness Estimates. Forthcoming, *JAMA*.

186. Mehta DA, Oladapo AO, Epstein JD, Novack AR, Neufeld E, **Hay JW**. Estimating the potential cost of bypassing agent prophylaxis relative to the cost of rFVIIa on-demand using rFVIIa doses from multiple US registries. Forthcoming, *Journal of Managed Care and Specialty Pharmacy* 2015.

187. Chaugule SC, **Hay JW**, Young G. Understanding patient preferences and willingness to pay for hemophilia therapy. Forthcoming, *Journal of Patient Preference and Adherence*.

188. **Hay JW**. Commentary: Cost-effectiveness of recombinant activated factor VII vs. plasma-derived activated prothrombin complex concentrate in the treatment of mild-to-moderate bleeding episodes in patients with severe haemophilia A and inhibitors in Spain. Submitted.

189. **Hay JW**, Zammit D, Schneider L. "Stated Preferences and Willingness to Pay for Treatment Attributes Among Alzheimer Disease Caregivers: Validation of the HUI-3 Utility Scale." Submitted.

190. Ganapathy V, **Hay JW**, Smoot K, Hermos J, Weber C, Grotzinger K. Resource utilization in thrombocytopenia of chronic liver diseases in the Veterans Affairs population. Submitted.

191. Kawatkar AA, **Hay JW**, Stohl W, Nichol MB. Consistent Estimation of Polychotomous Treatment Effects with Selection-bias and Unobserved Heterogeneity Using Panel Data Correlated Random Coefficients Model. Submitted.

192. Drabo E, **Hay JW**, Sood N, Vardavas R, Wagner Z. A Cost-Effectiveness Analysis of Pre-Exposure Prophylaxis (PREP) for the Prevention of HIV in the Los Angeles County MSM Population. Submitted.

193. Ejzykowicz F, Bollu V, Karafilidis J, Navaie M, **Hay JW**. Health Service Utilization and Costs among Medicare Beneficiaries with Chronic Obstructive Pulmonary Disease: The Benefits of Therapy with Long-Acting Beta Agonists. Submitted.

194. Thompson CA, **Hay JW**, Lu Y, Doctor JN. Financial Incentives and Adolescent Health Promotion and Prevention: A Structured Review of the Literature. Submitted.

195. Ding Y, Mehta D, **Hay JW.** "Cost-effectiveness analysis of multimodal screening for ovarian cancer." To be submitted.

196. **Hay JW**, Wu S, Lee P-J, Guterman JJ, Ell K. Cost Effectiveness of Patient-Centered Technological Assessment and Monitoring of Depression for Low-Income Diabetic Patients. Submitted.

197. Gong C, **Hay JW**, Meeker D, Doctor J. Provider Preferences for Interventions for Reducing Inappropriate Antibiotic Prescribing. To be submitted.

198. Ejzykowicz F, **Hay JW**. Dynamic Panel Data vs. Two Part Model: Selection bias methodologies in health outcomes research. To be submitted.

199. McGinnis JJ, **Hay JW**. The Cost Effectiveness of Hepatitis C Treatments in Treatment Naïve Genotype 1 Patients. Submitted.

200. Chu L-H, Cohen DJ, **Hay JW.** A Hybrid Comparison of Cost-Effectiveness of Transcatheter Aortic Valve Replacement between Randomized Clinical Trials and Real World Practice in Treating Patients with Severe Aortic Stenosis. To be submitted.

201. Meeker D, Linder JA, Fox CR, Friedberg MW, Perselle SD, Goldstein NJ, Knight TK, **Hay JW**, Doctor JN. Behavioral Interventions to Decrease the Inappropriate Use of Antibiotics: A Multicenter Cluster Randomized Trial. Submitted.

202. **Hay JW**. Cost Effectiveness Analysis with and Without Stochastic Uncertainty. To be submitted.

203. Chaugule S, **Hay JW**. Comparing Regret Minimization Model and Random Utility Model Willingness-to-Pay (WTP) Estimation Methods for Policy Evaluation. To be submitted.

**TECHNICAL REPORTS:**

T1. **Hay, JW**. and Wolff, E.: "Educational Screening and Occupational Earnings," National Bureau of Economic Research Working Paper No. 174, New York, 1976.

T2. **Hay, JW**. "Physician Specialty Choice and Specialty Earnings," Final Report on Doctoral Research Grant #OASH 03150, National Center for Health Services Research, 1980.

T3. Yett, D., Der, W., Ernst, R., and **Hay, JW**. "Physician Pricing and Health Insurance Reimbursement," Final Report on Contract #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, Health Care Financing Administration, 1982.

T4. **Hay, JW**. and Gareis, J. "Pollution Dose-Response Curves at the Micro Level," final report on Contract #68-01-0543, Work Assignment #20, U.S. Environmental Protection Agency, 1983.

T5. **Hay, JW**. "An Introduction to Cost-Benefit and Cost-Effectiveness Analysis of Pharmaceuticals," Final Report to Rescon, Inc., Tysons Corner, Virginia, 1984.

T6. **Hay, JW**., Leu, R., Rohrer, P. and Doppman, R. "A Monte Carlo Investigation of Sample Selection Models with Application to Health Care Demand Estimation." Hoover Institution Working Papers in Economics, E-85-29, Stanford, CA, December, 1985.

T7. Welch, B., **Hay, JW**., Miller, D., Olsen, R. Rippey, R., and Welch, A. "The Rand Health Insurance Study: A Critique." Hoover Institution Working Papers in Economics, E-86-36, Stanford CA, August, 1986.

T8. Wilensky, G., Garrison, L., **Hay, JW**., Anderson, G., Reynolds, R., Headen, A. Schoenman, J. Study of the Impact of Increasing Physician Supply. Final Report, Contract No. HHS-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, Office of the Assistant Secretary for Planning and Evaluation, Department of Health and Human Services, Washington, D.C., March, 1987.

T9. **Hay, JW**., and Ernst, R. "The Economic Costs of Alzheimer's Disease." Hoover Institution Working Papers in Economics, E-87-18, Stanford CA, April, 1987.

T10. **Hay, JW**. "Econometric Issues in Modeling the Costs of AIDS." Hoover Institution Working Papers in Economics, E-88-36, Stanford CA, October, 1988.

T11. Ernst, R. and **Hay, JW**. *Estrogen Replacement Therapy: A Review of the Literature*, Report to Ciba-Geigy, Inc., Summit, NJ, October, 1988.

T12. **Hay, JW**. *Therapeutic Substitution and the Cost-effectiveness of Medication in Treatment of Acute Muscle Spasm Back Injury*. Report to Merck, Sharpe and Dohme, Inc., West Point, PA, October, 1988.

T13. **Hay, JW**. "Projecting the Medical Costs of HIV/AIDS: An Update with Focus on Political Epidemiology." Hoover Institution Working Papers in Economics E-89-17, Stanford CA, June, 1989.

T14. **Hay, JW**., Wolak, F. "Bootstrapping HIV/AIDS Projection Models: Back Calculation with Linear Inequality-Constrained Regression." Hoover Inst. Economic Working Papers, E-90-5, Stanford CA, February, 1990.

T15. Hay, A. and **Hay, JW**. "*Urinary Tract Infections: Diagnosis, Treatment and Cost-of-Illness Algorithms*." Report to Abbott Laboratories, Chicago IL, May, 1990.

T16. **Hay, JW**. *Cost Effectiveness of Calcium Channel Blockers*, Report to Lederle Labs, Wayne, NJ, Feb. 1991.

T17. **Hay, JW**., Osmond, D. and Wolak, F. *Projecting the Costs of AIDS and ARC in the United States*, Final Report, Grant No. HS 06092-01, Agency for Health Care Policy and Research, Public Health Service, U.S. Department of Health and Human Services, published by the National Technical Information Service, Springfield, VA, 1991.

T18. **Hay, JW**., Ernst, R. *Alzheimer's Disease Cost of Illness: An Update*, Report to Parke-Davis Division of Warner-Lambert Co., Morris Plains, NJ, May, 1991.

T19. **Hay, JW**., Ernst, R. *Cancer Costs of Illness*, Report to Bristol Meyers Squibb, Evansville, IN, September, 1991.

T20. **Hay, JW**., Max W. *Cost-Effectiveness Evaluation of Alzheimer's Disease Medications*, Report to Hoechst-Roussel Pharmaceuticals, Sommerville, NJ, October, 1991.

T21. Bozzette, S., **Hay, JW**. *Cost-Effectiveness of ddI under Current FDA Marketing Indications*, Report to Bristol Meyers Squibb Pharmaceuticals, Evansville, IN, December, 1991.

T22. **Hay, JW**., and Ernst, R. *Cost-Effectiveness of Ticlopidine vs Aspirin in Stroke Prevention*, Report to Syntex Laboratories, Palo Alto, CA, January, 1992.

T23. **Hay, JW**., and Ernst, R. *Cost-Effectiveness of Oral Keterolac vs Narcotics for Outpatient Analgesia*. Report to Syntex Laboratories, Palo Alto, CA, March, 1992.

T24. Khedheri, S, and **Hay, JW**. *Price Controls: An Interindustry Policy Analysis*, Report to Bristol-Meyers Squibb, Princeton, NJ, March, 1993.

T 25. **Hay, JW**, Ernst, R. *Cost Effectiveness Analysis of Oral vs. IV Etoposide in Combination Cancer Chemotherapy*. Report to Bristol-Meyers Squibb, Princeton, NJ, October, 1993.

T26. **Hay, JW**., Ernst, R, and Meissner, C. *Cost Effectiveness of Respiratory Syncytial Virus Immune Globulin Prophylaxis*. Report to Medimmune, Gathersburg, MD, November, 1993.

T27. **Hay, JW**., Ashraf, T. *Cost Effectiveness Analysis of Human Erythropoietin Treatment of Chemotherapy-Induced Anemia*. Report to Ortho-Biotech, New Brunswick, NJ, October, 1994.

T28. **Hay, JW**, Ernst, R. *Cost Effectiveness of Alternative Factor VIII Products in Treatment of Hemopilia A*. Report to the American Red Cross, New York, NY, December, 1994.

T29. Schroeder, V., and **Hay, JW**. "The Pravachol Cost of Care Model: Technical Summary. Report to Bristol-Myers Squibb, Plainsboro, NJ, February, 1997.

*T30. Ernst, R, **Hay, JW**. Quality of Life in an Alzheimer Caregiver Intervention Demonstration Project. Final Report. NIH Grant No. 3-RO1-MH42216-08S1. December, 1998.*

T31. ***Hay, JW**, Luo, R, Ernst, R. Cost of Treatment in an Alzheimer Caregiver Intervention Demonstration Project. Final Report. NIH Grant No. 3-RO1-MH42216-08S1. December, 1998.*

T32. ***Hay, JW**, Ernst, R, Luo, R. Cost Effectiveness of an Alzheimer Caregiver Intervention Demonstration Project. Final Report. NIH Grant No. 3-RO1-MH42216-08S1. December, 1998.*

T33. ***Hay JW.** Retail Pharmacy Pricing Variation in the U.S. and Canada. Report to Abbott Laboratories, Evanston, IL. June, 2000.*

T34. **Hay JW.** Chemotherapy-Induced Neuropathy: Costs and Quality of Life Impacts. Report to Aventis Pharmaceuticals, Bridgewater, NJ, 2001.

T35. **Hay JW.** "Hospital Cost Drivers: An Evaluation of State-Level Data." Report to Blue Cross and Blue Shield Association, Chicago, IL, 2002.

T36. Forrest S, Goetghebeur M, **Hay JW.** "Hospital Expenditure Growth in the United States 1990-2002: Findings from the Literature. Report to Blue Cross and Blue Shield Association, Chicago, IL, 2002.

T37. Forrest S, Goetghebeur M, **Hay JW.** Medicare Part B coverage and reimbursement of outpatient prescription drugs: impact of current policy on clinical practices and health care expenditures. Report to Abbott Laboratories, Abbott Park, IL. June 2003.

T38. **Hay JW.** Health Economics and Outcomes Research Development Plan for Alzheimer disease and ADHD compound. Report to Abbott Laboratories, Abbott Park IL. September 2003.

T39. **Hay JW,** Roberts M, Wentworth C. Drivers of U.S. health care cost components:2000-2002. Report to the Blue Cross and Blue Shield Association, Chicago, IL, 2004.

T40. **Hay JW,** Zammit D. "Stated Preferences and Willingness to Pay for Treatment Attributes Among Alzheimer Disease Caregivers: Validation of the HUI-3 Utility Scale." Report to the State of California Alzheimer Research Centers, Sacramento, CA. April, 2005.

T41. **Hay JW**. Cost Effectiveness Analysis with and Without Stochastic Uncertainty. *CESR-Schaeffer Working Paper No. 2015-005*. May, 2015. http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2601147.

**OTHER PUBLICATIONS:**

O1. **Hay, JW**."Comment on: The Influence of Economic Instability on Health: Proceedings," edited by J. John, D. Schwefel, and H. Zollner. *Kyklos*, Vol. 37, No. 2 (1984), pp. 322-323.

O2. **Hay, JW**. and Ricardo-Campbell, R.: "The Rand Health Insurance Study," Letter to the Editor, *The Lancet*, Vol. II:8498 (7/12/86), pg. 106.

O3. **Hay, JW**. and Buckels, J.: "Cost-Effectiveness: Antimicrobial Prophylaxis in General Surgery," in *Infection: A Complication of Surgery...Preventive and Management Techniques;* MedEd, Ltd., Wilton, CT, 1987.

O4. **Hay, JW**.: "An Introduction to Cost Effectiveness/Cost Benefit Analysis in Hospital Pharmacy Cost Containment," *Occasional Papers on Topics of Special Interest to Hospitals*, Lederle Laboratories, Wayne, NJ, 1987.

O5. **Hay, JW**.: "Pharmaceutical Cost Benefit/Cost Effectiveness Analysis in the Hospital Setting," *Occasional Papers on Topics of Special Interest to Hospitals, Report #2,* Lederle Laboratories, Wayne, NJ, 1987.

O6. **Hay, JW**.: "Commentary: Government Estimates on AIDS Too High," (adapted from J. Hay) Volume 2, *Oncology*, Number 11, (November 1988), pg. 34.

O7. **Hay, JW**.: "AIDS Epidemiology: A View From the Outside," in *The Economics of Health Care: Challenges for the Nineties*, Health Care Section, Center of Domestic and Comparative Policy Studies, Woodrow Wilson School of Public and International Affairs, Princeton University, 1990, pp.80-84.

O8. **Hay, JW**, Wittels EH, Gotto AM. "Reply: Economic Evaluation of Cholesterol Lowering," *American Journal of Cardiology*, Volume 68 October 15, 1991, pp. 1120-21.

O9. **Hay, JW**. "Incorrectly Framing Pharmacoeconomics." Letter; *American Journal of Hospital Pharmacy*, June, 1994, Vol 51, # 11, pp. 1473-74.

O10. Ernst, R, **Hay, JW**, Fenn, C, Tinklenberg, J, Yesavage, J. "Reply: Cognitive Function and the Costs of Alzheimer's Disease: An Exploratory Study," *Archives of Neurology*, Vol. 55, 1998.

O11. **Hay, JW.** "Commentary on Langley and McKenney Papers" *Value In Health*, Vol 1, No. 4. 1998.

O12. Interdisciplinary Council on Reducing the Risk for Coronary Heart Disease (**JW Hay** member). Highlights from the 10th Anniversary Meeting: A New Look at Primary Prevention. December, 1999.

O13. **Hay, JW**. "The Author's Reply to Comment on "Where's the Value in Health Care?" *Value in Health* 10. 2007.

O14. **Hay, JW.** "What is more valuable: Fenofibrate patents or fenofibrate clinical outcomes?" *Archives of Internal Medicine*, Oct 22, 2012;172(19):1521-2. doi: 10.1001/archinternmed.2012.4386.2012.

O15. **Hay, JW.** "Letter to the Editor: Economic Model of the Benefits of Male Circumcision is Highly Flawed," *JAMA Pediatrics*, February, 2013;167(2): 198. doi:10.1001/jamapediatrics.2013.829.

O16. **Hay, JW.** "Letter to the Editor: Baicker et al. The Oregon Experiment — Effects of Medicaid on Clinical Outcomes," *New England Journal of Medicine*; 2013. 369(6) pp. 581-582. DOI: 10.1056/NEJMc1306867.

**RECENT SCIENTIFIC PODIUM PRESENTATIONS AND POSTERS**

1. Ernst RL, **Hay JW**, Fenn C, Tinklenberg J. Yesavage JA. Cognitive Function and the Costs of Alzheimer's Disease: An Exploratory Pharmacoeconomic Study. 2nd Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, April 1997.

2. Sung JCY, **Hay JW**, Louie G, Popovian R. Cost-Effectiveness of Cyclophosphamide, Doxorubicin, and 5-Fluorouracil in Pre- menopausal Women With Lymph Node Positive, Early Stage Breast Cancer. 2nd Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, April 1997.

3. Yuan Y, **Hay JW**, Groshen S. An Application of the Time-Dependent Cox Regression Model in the Kaiser/USC Pharmacists' Consultation Intervention Study. 2nd Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, April 1997.

4. Venturini F, **Hay JW**. Cost-Effectiveness Analysis of Fluoxetine Versus Amitriptyline as Initial Treatment of a Major Depressive Disorder in Primary Care. 2nd Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, April 1997.

5. **Hay JW**. Economic Modeling and Sensitivity Analysis. 3rd Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, May 1998.

6. **Hay JW**, Schwartz S. The ISPOR Lipid Conference: Pharamacoeconomics and Outcomes Modeling Issues. 3rd Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, May 1998.

7. Yuan Y, **Hay JW**, LaPuerta P, Leahy M. Non-Parametric Analysis of Cost-Effectiveness Ratios of Pravastatin in Primary Prevention of Cardiovascular Disease. 3rd Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, May 1998.

8. Hui RL, **Hay JW**. Cost-Effectiveness Analysis of Screening of Type II Diabetes Mellitus in Non-Pregnant Adults. 3rd Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, May 1998.

9. Yu WM, **Hay JW**. Lipid Therapy and Cardiovascular Disease: How Many Americans Should be Treated. 3rd Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, May 1998.

10. Yuan Y, **Hay JW**, McCombs JS, Groshen S, Parker J. Time Dependent Survival Analysis of a Pharmacist's Intervention Study. 4th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 1999.

11. Luo R, **Hay JW**, and Hsiao C. Controlling for Simultaneity Bias in Outcomes Studies using

Panel Data. 4th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 1999. This research led to a conference award of "Research Excellence."

12. Luo R, **Hay JW**, Clark F, Azen S, and Liu G. Cost-Effectiveness of Preventive Occupation Therapy on Healthy Elderly People. Podium presentation. Annual Meeting of the International Society of Pharmaceutical Outcomes Research, Virginia, May 1999.

13. Mathes A, **Hay JW**. The Value of Home Care in Metastatic Breast Cancer Management: Modeling Oral Versus Intravenous Chemotherapy at Home and at an Outpatient Clinic. 4th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 1999.

14. Juzba M, **Hay JW**. Cost-Effectiveness Analysis of Recombinant Human Erythropoientin vs Transfusion in HIV Patients Treated with Zidovudine. 4th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 1999.

15. Langley PC. **Hay JW**, Schwartz JS; Smith SC; McKenney J. From Research into Practice: How Should Healthcare Organizations/Governments Decide About Lipid Therapy and Who Will Pay? Reactor Panel and Open Forum. 4th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 1999.

16. Li J, **Hay JW**. Cost-Effectiveness of Rentinopathy Screening in Pediatric Patients with Type I Diabetes Mellitus. 5th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Washington, May 2000.

17. Sengupta N, **Hay JW**. Cost-Effectiveness of Tamoxifen in Breast Cancer Risk Reduction. 5th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Washington, May 2000.

18. **Hay JW**, Jackson J. Methodological Issues in Conducting Pharmacoeconomic Evaluations-Modeling Studies. 5th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Washington, May 2000.

19. Sullivan PW, **Hay JW**. Cost-Effectiveness of Rofecoxib Versus NSAIDS in the Treatment of Osteoarthritis. 6th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2001.

20. Charles R, **Hay JW**. The Cost-Effectiveness of Lifetime Factor VIII Prophylaxis in the Treatment of Severe Hemophilia A. 6th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2001.

21. Yu E, **Hay JW**, Varma R, Globe D. Four Year Cost-Effectiveness of Initial Trabeculectomy Versus Conventional Therapy in Primary Open-Angle Glaucoma (POGA). 6th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2001.

22. Mulani P, **Hay JW**. Cost-Effectiveness Model of Thrombolytic Therapy for Acute Myocardial Infraction. 6th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2001.

23. Sokolskiy L, **Hay JW**. Cost-Effectiveness Model of Prostate-Specific Antigen (PSA) Screening for Prostate Cancer. 6th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2001.

24. Chen K, **Hay JW**. Cost-Effectiveness of "Test &Treat" in Helicobacter Pylori (HP) Infected Dyspeptic Patients in Primary Care Setting. 6th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2001.

25. Wu EQ, **Hay JW**. Alternative Management Strategies for Dyspepsia. 6th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2001.

26. Bron MS, **Hay JW**. Cost-Effectiveness of Artificial Skin Substitute vs Allograft for Burn Patients. 6th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2001.

27. Shi JH, McCombs JS, **Hay JW**, Nichol MB, Chou CP, Hsiao C. Controlling for Biases from Measurement Errors in Health Outcomes Research Using Structural Equation Modeling. 6th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2001.

28. Sterling KL, **Hay JW**. Cost-Effectiveness of the Fibrates in the Reduction of Coronary Heart Disease Events. 7th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May, 2002.

29. Patel PA, **Hay JW**. The Cost-Effectiveness Analysis of Aspirin for Primary Prevention of Cardiovascular Disease. 7th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2002.

30. Etemad LR, **Hay JW**. Cost-Effectiveness Analysis of Pharmaceutical Care in a Medicare Drug Benefit Program. 7th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2002.

31. Patel BV, **Hay JW**. Colorectal Cancer Screening: A Cost-Effectiveness Model Comparing Virtual Colonoscopy and Conventional Colonoscopy. 7th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2002.

32. Park J, **Hay JW**. Cost-Effectiveness Analysis of Graftskin (Apligraf) and Becaplermin (Regranex) in Diabetic Neuropathic Foot Ulcers. 8th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2003.

33. Zammit DC, **Hay JW**. Meta-Analysis of the Effectiveness of Mammography Screening for Breast Cancer. 8th Annual International Meeting of the International Society for

Pharmacoeconomics and Outcomes Research, Virginia, May 2003.

34. Zammit DC, **Hay JW.** Economic Analysis Of The Use Of Angiotensin Converting Enzyme Inhibitors In Patients With Diabetes Mellitus. 8th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2003.

35. Yu YF, **Hay JW**, Yu AP. Cost-Effectiveness Analysis of Long-Term Hormone Replacement Therapy (Estrogen Plus Progestin) in Healthy Postmenopausal Women for Osteoporosis Prevention. 9th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2004.

36. Yu AP, **Hay JW**. Cost-Effectiveness Analysis of Dose-Dense Chemotherapy with Filgrastim as Postoperative Adjuvant Treatment of Breast Cancer. 9th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2004.

37. Setyawan J, **Hay JW**, Nichol MB. Cost-Effectiveness of Interventions to Improve Patient Medication Compliance in Major Depressive Disorder. 9th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2004.

38. Spalding JR, **Hay JW**. Cost-Effectiveness of Tumor Necrosis Factor Alpha (TNF-ALPHA) Inhibitors as First-Line Agents in Rheumatoid Arthritis. 9th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2004.

39. Barlev A, **Hay JW**. Cost-Utility of Cochlear Implants a Societal Perspective Analysis. 9th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2004.

40. Tonnu IQ, **Hay JW**. The Cost-Effectiveness Analysis Recombinant Human Erythropoietin Growth Factors vs. Transfusion in Chemotherapy Cancer Patients. 9thAnnual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2004.

41. Patel V, **Hay JW**. Cost-Effectiveness of Treatment Strategies for Rheumatoid Arthritis Patients with Inadequate Response to Methotrexate. 9th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2004.

42. Zhang L, **Hay JW**. Cost-Effectiveness Analysis of Rizatriptan and Sumatripan versus Cafegot in the Acute Treatment of Migraine. 9th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2004.

43. Narayan S, **Hay JW**. Cost-Effectiveness of Ratalin® versus Adderall® for First-Line Treatment of Attention Deficit/Hyperactivity Disorder (ADHD) in Children. 9th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2004.

44. Zammit DC, **Hay JW.** Preliminary Economic Analysis of The American Cancer Society Guidelines for Mammography Screening in Average-Risk Women under 70 Years of Age. 9th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2004.

45. Tencer T, **Hay JW**. The Cost-Effectiveness of Prostate-Specific Antigen Screening for Prostate Cancer Detection. 10th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Washington, May 2005.

46. Kawatkar AA, **Hay JW**. Cost-Effectiveness of Taxanes as Second Line Agents in Treatment of Metastatic Breast Cancer. 11th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, May 2006.

47. Vo P, **Hay JW**. Cost-Effectiveness Analysis for Treatments in Ankylosing Spondylitis. 11th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Philadelphia, May 2006.

48. Suh HS, **Hay JW**. Cost-Effectiveness Analysis of Immunization Strategies for the Control of Meningococcal Infectious disease. 12th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2007.

49. Gu NY, **Hay JW**, Gai YW. The Effect of Pharmacist Consultation on Patient Medication Adherence: An Instrumental Variable Approach. 12th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Virginia, May 2007.

50. Yuan Y, Iloeje U, Parry D, **Hay JW**, Zammit D. Using Decision Simulation Model to Evaluate the Cost Effectiveness of Entecavir Compared to Adefovir Therapy in Lamivudine Refractory Chronic Hepatitis B (CHB) Patients: Analyses from a US Payer Perspective Abstract and poster presentation at the 12th ISPOR Annual International Meeting, Virginia, May 2007.

51. Zammit DC, **Hay JW**, Globe DR, Sugar CA, Gauderman WJ Adjusting for Trial Quality in a Meta-Analysis. Poster presentation at the 10th ISPOR Annual European Congress, Dublin Ireland, October 2007.

52. Zammit DC, **Hay JW**, Globe DR, Sugar CA, Gauderman WJ Framework For The Cost-Effectiveness Analysis Of Mammography Screening For Breast Cancer. Abstract and poster presentation at the 10th ISPOR Annual European Congress, Dublin Ireland, October 2007.

53. Ejzykowicz F, **Hay JW.** Cost-Effectiveness Analysis of Lapatinib Plus Capecitabine Vs Capecitabine Alone in the Second Line Treatment for Breast Cancer. Poster PCM 23, 13th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Toronto, Canada, 2008.

54. An JJ, **Hay JW**. Cost-Effectiveness of Erythropoiesis Stimulating Agent Therapy by Hemoglobin Targets in Chronic Kidney Disease. Poster PSY 15, 13th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Toronto, Canada, 2008.

55. Ganapathy V, **Hay JW**. Cost-Effectiveness of Once-Daily Stimulant, Non-Stimulant & Combined Stimulant/Behavioral Therapy Interventions in the Treatment of ADHD in Children. Poster PMH 28, 13th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Toronto, Canada, 2008.

56. Le QA and **Hay JW**. Cost-utility Analysis of Lapatinib (Tykerb®)in 2nd-Line Treatment of HER2-Positive Metastatic Breast Cancer. Poster PCN18, American Society of Clinical Oncology, San Diego, CA 2008.

57. Turpcu A and **Hay JW**. The Cost-Effectiveness of Ranibizumab (Lucentis®) in Treating Patients with Predominantly Classic, Minimally Classic, and Occult Neovascular Age-Related Macular Degeneration (AMD). Poster PSS 15, 13th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Toronto, Canada, 2008.

58. Lescrauwaet B, Nevens F, Zammit D, Yuan Y, **Hay JW**. Modeling Long-Term Mortality and Morbidity Impact with Entecavir Treatment in Chronic Hepatitis B Patients in Belgium. Podium presentation, ISPOR European Conference, Athens, Greece, November, 2008.

59. Zammit D, Yuan Y, Intorcia M, **Hay JW.** Using a Decision Simulation Model to Evaluate the Cost-Effectiveness of the Treatment of Nucleoside-Naïve HBe-Antigen Negative CHB Patients in Italy with Entecavir and Tenofovir Abstract and poster presentation at the 11th ISPOR Annual European Congress, Athens, Greece, November 2008.

60. **Hay JW**, Jhaveri M, Tangirala M, Kaliner M. Costs and Resource Utilization Comparisons of Second-Generation Antihistamines vs Montelukast in Treatment of Allergic Rhinitis: Retrospective Analysis of a Large National Insurance Claims Database. American Academy of Allergy, Asthma and Immunology Annual Meeting, March 2009, Washington, DC.

61. Le QA, **Hay JW**. Comparison Between Propensity-Score & Traditional Covariate Adjustment with Logistic Regression Models in Estimating Average Treatment Effects (ATES): Monte Carlo Simulation Results. Poster Session I [PMC10], ISPOR 14th Annual International Conference, May, 2009, Orlando, FL.

62. Mark TL, Joish VN, **Hay JW**, Sheehan D, Johnston S, Cao Z. Unintended Consequences Of Current Antidepressant Use In A Geriatric Population: The Burden Of Side-Effects On Adherence And Costs. ISPOR 14th Annual American Association of Psychiatry Conference, May, 2009, Orlando, FL.

63. Mark TL, Joish VN, **Hay JW**, Sheehan D, Choi JC, Johnston S, Cao Z. Unintended Consequences of Current Antidepressant Use In A Geriatric Population: Drug-Drug Interactions and Their Implications for Adherence. ISPOR 14th Annual American Association of Geriatric Psychiatry Conference, May, 2009, Orlando, FL. Am J Geriatr Psychiatry 2009;17(3), Supplement 1:A98.

64. Grant H. Skrepnek, Brian Seal, Muralikrishna Tangirala, **Joel W. Hay**. Adverse Dental

Outcomes Associated With Intravenous Versus Oral Bisphosphonate Use In Patients With Osteoporosis. 7th International Symposium on Osteoporosis, April, 2009, Washington, DC.

65. Grant H. Skrepnek, Brian Seal, Muralikrishna Tangirala, **Joel W. Hay**. The Association Between Adverse Dental Outcomes And Intravenous Versus Oral Bisphosophonates Within Cancer Patients. European Calcified Tissue Society ECTS 2009, Vienna, Austria, 23-27 May 2009

66. **Hay JW**, Zhou ZY. "APCC Versus RFVIIA In Treatment Of Hemophilia Patients With Inhibitors: A Structured Review Of The Pharmacoeconomic Literature" abstract N° 846 - XXII Congress of the International Society on Thrombosis and Haemostasis, Boston, MA, July 11-16 2009.

67. **Hay JW**, Zhou ZY, Young G. "Economic Comparison Of APCC Vs RFVIIA For Mild-To-Moderate Bleeding Episodes In Hemophilia Patients With Inhibitors" abstract N° 836 - XXII Congress of the International Society on Thrombosis and Haemostasis, Boston, MA, July 11-16 2009.

68. Tangirala M, Jhaveri M, **Hay JW**. "Resource Use in Patients with Allergic Rhinitis (AR) Comorbidities: Oral Second Generation Antihistamines (SGAs) versus Montelukast (MTLK)" Annual Meeting of the American College of Allergy, Asthma & Immunology, Nov. 5-10 2009, Miami Beach, Florida.

69. Colayco D, **Hay JW**. Cost-Effectiveness Of Serotonin-Type 3 Receptor Antagonists For Chemotherapy-Induced Emesis In Non Small Cell Lung Cancer Patients Receiving Cisplatin-Based Chemotherapy. Poster PCN95. ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

70. Suh H, **Hay JW**. Dealing With Selection Bias In Nonlinear Settings: A Case Of Comparative Effectiveness Of Statin Plus Fibrate Combination Therapy Versus Statin Monotherapy In Type II Diabetes. Podium SB4. ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

71. Shin J, **Hay JW**. The Cost-Effectiveness Of Isotretinoin In Patients With Moderate-To-Severe Acne Vulgaris. Poster PSS6, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

72. Ganapathy V, **Hay JW**. Analysis Of Necrotizing Enterocolitis Costs Among Extremely Preterm Infants Fed Exclusively Human-Milk Based Diet Vs. Human-Milk Fortified With Bovine-Milk Based Supplements. Poster PIH18, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

73. Tran JN, **Hay JW**. Obesity And Health Care Costs And Utilization In The Veteran Affairs Population. Poster PSY34, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

74. Soo In Bang, **JW Hay**. Cost-Effectiveness Analysis Of Dutasteride, Tamsulosin And

Combination Therapy In The Treatment Of Benign Prostatic Hyperplasia. Poster PUK 11, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

75. Chu K, **Hay JW**. Economic Analysis Of Endovascular Stenting For Peripheral Arterial Disease In Long Lesions Of The Superficial Femoral Artery. Poster PCV 83, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

76. Ding Y, **Hay JW**. Cost-effectiveness analysis of multimodal screening for ovarian cancer. Poster PCN 73, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

77. Schwartz E, **Hay JW**. Cost-Effectiveness Analysis in treating Overactive Bladder with Urge Incontinence in Women: A comparison between Oxybutynin and Tolterodine with exploratory analysis of Fesoterodine. Poster PUK 16, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

78. Rashid N, **Hay JW**. Cost Effectiveness Analysis of Managing Chronic Gout with Febuoxstat (Uloric) versus Allopurinol (Zyloprim). Poster PMS 20, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

79. Suh JK, **Hay JW**. Evaluation Of Cost-Effectiveness Of Chronic Hepatitis B Treatments: Entecavir And Telbivudine. Poster PGI 22, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

80. Poon JL, **Hay JW**. Cost Effectiveness Analysis of Breast Cancer Risk Reduction Therapy: Comparing Tamoxifen and Raloxifene. Poster PCN 71, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

81. Wiegand PW, **Hay JW**. Cost-Effectiveness of Statin Therapy for the Primary Prevention of Cardiovascular Events Predicted by the Reynolds Risk Score in Healthy Men and Women Aged 40 to 80 Years of Age. Poster PCV 74, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

82. Chang J, **Hay JW**. Cost Effectiveness Analysis of Anti-Epidermal Growth Factor Receptor (Anti-EGFR) Agents for Treatment Refractory Metastatic Colorectal Cancer (mCRC). Poster PCN 84, ISPOR 15th Annual International Conference, May, 2010, Atlanta, GA.

83. **Hay JW**, Katon WJ, Ell K, Lee P-J, Guterman JJ. Cost Effectiveness Analysis of Collaborative Care Management of Major Depression among Low-Income, Predominantly Hispanics with Diabetes. Poster presentation at the ICMPE 10'th Workshop on Costs and Assessment in Psychiatry "Mental Health Policy and Economics " March, 2011, Venice, Italy.

84. Unützer J, Dwight-Johnson, M, Apesoa-Varano C, **Hay JW**, Hinton L: Older men's preferences for depression care: Preliminary comparison of conjoint survey and qualitative interviews. American Association of Geriatric Psychiatry, March 18-21, 2011, San Antonio TX.

85. Yeung K**, Hay JW.** Cost-Utility Analysis Of Romiplostim Versus Splenectomy In The Treatment Of Chronic Refractory Immune Thrombocytopenic Purpura. Poster presentation at the Academy of Managed Care Pharmacy 23'rd Annual Meeting, March 29, 2011 Minneapolis, MN.

86. Ejzykowicz F, **Hay JW**, Sarocco P, Karafilidis J, Walsh J. Hospitalizations, medical management and switch therapy patterns in the COPD Medicare population. Poster PRS 36, ISPOR 16th Annual International Conference, May, 2011, Baltimore, MD.

87. Ding Y, **Hay JW**, Zangwill KM, Allred N, Yeh SH. Cost-benefit analysis of postpartum vaccination of birth mothers with influenza vaccine. Poster PIN 19, ISPOR 16th Annual International Conference, May, 2011, Baltimore, MD.

88. Zhou Z-Y, **Hay JW**. A systematic review and meta-analysis comparing the efficacy of bypassing agents in hemophilia patients with inhibitors. XXIII Congress of the International Society on Thrombosis and Hemostasis, July, 2011, Kyoto, Japan.

89. Ejzykowicz F, Rajagopalan K, Karafilidis J, **Hay JW**. Health Care Costs in a Medicare Population of COPD Patients Treated with Beta-Agonists. Presented at the American Society of Health System Pharmacists Midyear Meeting, December, 2011, New Orleans, LA.

90. Niu, X, **Hay JW**. Cost-Effectiveness Analysis of Nilotinib Versus Dasatinib In Patients With Imatinib-Resistant or Imatinib-Intolerant Chronic Myeloid Leukemia (CML). Poster PCN13, ISPOR 17th Annual International Conference, June, 2012, Washington, DC.

91. Villacorta, R, **Hay JW,** Messali A. Cost Effectiveness of Treatment With Etanercept or Ustekinumab For Moderate To Severe Psoriasis. Poster PSY27, ISPOR 17th Annual International Conference, June, 2012, Washington, DC.

92. Messali A, **Hay JW,** Villacorta, R. Cost-Effectiveness of Temozolomide in the Adjuvant Treatment of Newly Diagnosed Glioblastoma In the United States. Poster PCN78, ISPOR 17th Annual International Conference, June, 2012, Washington, DC.

93. Chagule, S, **Hay JW**. Cost Effectiveness of Cetuximab Plus Best Supportive Care (BSC) Versus BSC Alone In Last Line For Kras Wild Type Metastatic Colorectal Cancer Patient Population. Poster PCN64, ISPOR 17th Annual International Conference, June, 2012, Washington, DC.

94. Jiang, Y, **Hay JW**. Cost-Effectiveness of Denosumab v Alendronate for Prevention of Osteoporotic Fractures in the U.S. Poster PMS27, ISPOR 17th Annual International Conference, June, 2012, Washington, DC.

95. Blaylock, B, **Hay JW**, Zarchy T. Cost-Effectiveness of Diagnostic Sigmoidoscopy Before Colonoscopy in 40-49 Year Old Symptomatic Patients. Poster PMD29, ISPOR 17th Annual International Conference, June 2012, Washington, DC.

96. Chaugule, S, **Hay JW**. Bypass Therapy Assay Testing as a Strategy to Reduce Treatment

Costs for Hemophilia Patients With Inhibitors. Poster PMD18, ISPOR 17th Annual International Conference, June, 2012, Washington, DC.

97. Matsuda, T, **Hay JW**. Cost-Effectiveness of Bariatric Surgery: Laparoscopic Gastric Bypass and Banding. Poster PSU24, ISPOR 17th Annual International Conference, June 2012, Washington, DC.

98. Ganapathy, V, **Hay JW,** Smoot, KJ, Lawler, E, Weber, HC, Grotzinger, KM. Resource Utilization in Thrombocytopenia of Chronic Liver Diseases in the Veterans Affairs Population. Poster PGI14, ISPOR 17th Annual International Conference, June 2012, Washington, DC.

99. Ding, Y, **Hay JW**, Zangwill, K, Yeh, S. Cost-Benefit Analysis of Hospital Based Postpartum Vaccination With Combined Tetanus Toxoid, Reduced Diphtheria Toxoid, and Acellular Pertussis Vaccine (Tdap). Poster PMD18, ISPOR 17th Annual International Conference, June 2012, Washington, DC.

100. Chaugule S, **Hay JW**, Young G. Bypass Therapy Assay Testing As a Strategy to Reduce Treatment Costs For Hemophilia Patients With Inhibitors. World Federation of Hemophilia, 2012 World Congress, June 2012, Paris, France.

101. Ding, Y, **Hay JW**, Zangwill, K, Yeh, S. Cost-Benefit Analysis of Hospital Based Postpartum Vaccination With Combined Tetanus Toxoid, Reduced Diphtheria Toxoid, and Acellular Pertussis Vaccine (TDAP). Western Pharmacoeconomics Conference, June 2012, Austin, TX.

102. Messali A, **Hay JW,** Villacorta, R. Probabilistic Sensitivity Analysis of the Cost-Effectiveness of Temozolomide in the Adjuvant Treatment of Newly Diagnosed Glioblastoma. Western Pharmacoeconomics Conference, June 2012, Austin, TX.

103. **Hay JW**. Cost Effectiveness Analysis With and Without Stochastic Uncertainty," American Society for Health Economics 4'th Biennial Conference, June 2012, Minneapolis, MN

104. Ejzykowicz F, Rajagopalan K, Bollu V, Karafilidis J, **Hay JW**. Effect of Long Acting Beta Agonist Therapy on Risk of Hospitalization in New Start COPD Patients. Abstract 265134. American Public Health Association 140'th Annual Meeting and Expo, October 29, 2012, San Francisco, CA.

105. Ni W, **Hay JW**, Zangwill K. Potential U.S. Medical Cost Savings Associated With Routine Hospital-Based Use Of A Rapid Diagnostic Tool For Bloodstream Infection. ISPOR 18th Annual International Conference, May 2013, New Orleans, LA.

106. Schwartz E, **Hay JW**. Modeling Diabetes Costs: a comparison of econometric methods using simulated error distributions. ISPOR 18th Annual International Conference, May 2013, New Orleans, LA.

107. Gu NY, Gai Y, Wu J, Raisch DW, **Hay JW**. Predicting healthcare costs in asthma using the EQ-5D health-related quality-of-life (HRQoL) index score with and without adjusting non-

random positive spending using a US national representative population. 2nd International Allergen Symposium on Asthma & Economics, July, 2013, Sydney, Australia.

108. **Hay JW**, Strylewicz G, Rothfeld A, Chesler R, Doctor J. Provider Preferences for Interventions for Reducing Inappropriate Antibiotic Prescribing. Accepted Podium Presentation, Health Care Applications: Sawtooth Software Conference, October, 2013, Dana Point, CA.

109. Gu NY, Gai Y, Wu J, Raisch DW, **Hay JW**. Predicting Health Care Costs In Asthma Using The EQ-5D Index Score. ISPOR 16th Annual European Congress, 2-6 November 2013, Dublin, Ireland.

110. **Hay JW**, Oladapo AO, Epstein JD, Novack AR. Estimating the Potential Cost of Bypassing Agent Prophylaxis Relative to the Cost Of rFVIIa On-Demand Using Actual rFVIIa Doses From the UK NHD Registry. 7th Annual Congress of the European Association for Haemophilia and Allied Disorders, February 2014, Brussels, Belgium.

111. Linder JA, Meeker D, Friedberg MW, Persell SD, Fox CR, Goldstein NJ, Alan Rothfeld, **Hay JW**, Doctor JN. Improving Antibiotic Prescribing for Acute Respiratory Infections using Behavioral Economic Principles: A Cluster Randomized Trial. Society for General Internal Medicine 37'th Annual Meeting, April 2014, San Diego, CA.

112. Grosse SD, Chaugule S, **Hay JW**. Preference-based Measures of Health-related Quality of Life for Adults with Severe Hemophilia: Implications for the Cost-effectiveness of Prophylaxis. World Federation of Hemophilia 2014 World Congress, May, 2014, Melbourne, Australia.

113. Chaugule S, Young G, **Hay JW**. Understanding how patients, physicians and the general population value different types of hemophilia therapies and their willingness-to-pay for such therapies: a discrete choice experiment from the US perspective. World Federation of Hemophilia 2014 World Congress, May 2014, Melbourne, Australia.

114. **Hay JW,** Oladapo AO, Epstein JD, Novack AR. Understanding how patients, physicians and the general population value different types of hemophilia therapies and their willingness-to-pay for such therapies: a discrete choice experiment from the US perspective. World Federation of Hemophilia 2014 World Congress, May 2014, Melbourne, Australia.

115. **Hay JW,** Oladapo AO, Epstein JD, Novack AR, Neufeld EJ. Estimating the potential cost of bypassing agent prophylaxis relative to the cost of rFVIIa on-demand using actual rFVIIa doses from multiple US registries. World Federation of Hemophilia 2014 World Congress, May 2014, Melbourne, Australia.

116. McGinnis JJ, **Hay JW**. Cost-Effectiveness of Hepatitis C Treatments in Treatment Naïve Genotype 1 Patients. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

117. Patel N, **Hay JW**. Management of Spinal Cord Injury-Associated Neuropathic Pain With Pregabalin is Cost-Effective Over Gabapentin. ISPOR 19th Annual International

Conference, May 2014, Montreal, Quebec, Canada.

118. Gong C, **Hay JW**. Cost-Effectiveness Analysis of Abiraterone And Sipuleucel-T In Metastatic Castration-Resistant Prostate Cancer. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

119. Chaugule S, **Hay JW**. Understanding What Patients Value and Their Willingness-To-Pay (WTP) For Hemophilia Therapies: A Discrete Choice Experiment. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

120. Ding Yao, **Hay JW**. Economic Burden Associated With Patients Diagnosed With Peyronie's Disease in the United States. Poster Tuesday morning, PIH21. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

121. Ding Yuchen, **Hay JW**. Cost-Effectiveness Comparison of Denosumab and Zoledronic Acid in the Treatment of Postmenopausal Osteoporosis. Poster Monday morning, PMS36. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

122. Drabo E, **Hay JW**, Vardavas R, Wagner ZR, Sood N. A Cost-Effectiveness Analysis of Pre-Exposure Prophylaxis (Prep) for the Prevention of HIV in the Los Angeles MSM Population. Poster, Wednesday morning, PIN43. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

123. Chen C, **Hay JW**. Cost-Effectiveness Analysis of Alternative Screening and Treatment Strategies for Familial Hypercholesterolemia in the United States. Poster Monday afternoon, PCV70. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

124. Chu LH, **Hay JW**, Cohen DJ. A Hybrid Comparison of Cost-Effectiveness of Transcatheter Aortic Valve Replacement Between Randomized Clinical Trials and Real World Practice in Treating Patients With Severe Aortic Stenosis, Poster Monday morning, PCV69. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

125. Jiao X, **Hay JW**. Cost-Effectiveness of Breast MRI and Mammography for Screening High Risk Populations. Poster Tuesday morning, PHS55. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

126. Lin CW, **Hay JW**. Cost Utility Analysis of Aflibercept, Ranibizumab, and Bevacizumab for the Treatment of Neovascular Agerelated Macular Degeneration. Poster Wednesday morning, PSS23. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

127. Massachi S, **Hay JW**. Cost-Effectiveness of Various Clostridium Difficile Infection (CDI) Treatments in Patients With Recurrent Infections. Poster Wednesday morning, PIN50. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

128. Mehta D, **Hay JW**. Cost-Effectiveness of Adding Bevacizumab to First Line Therapy for Patients With Advanced Ovarian Cancer. ISPOR 19th Annual International Conf., May

2014, Montreal, Quebec, Canada.

129. Ni W, **Hay JW**, Zangwill K. Economics Analysis of Diagnostic Methods for Clostridium Difficile Infection. Poster, Wednesday morning, PIN58. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

130. Ning N, **Hay JW**. The Cost-Effectiveness Of Liraglutide Vs Exenatide For The Treatment Of Type 2 Diabetes In The United States. Poster, Wednesday morning, PDB78. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

131. Thompson CA, **Hay JW**. Evaluating the Impact of Cannabis Use on Metabolic Syndrome Using Data From the Continuous National Health and Nutrition Examination Survey, Poster Tuesday afternoon, PMH13. ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

132. Zhang X, **Hay JW**. Cost-Effectiveness of Fingolimod, Teriflunomide, Dimethyl Fumarate and Intramuscular Interferon Beta-1a In Relapsing-Remitting Multiple Sclerosis. Poster, Monday Morning, PND20 . ISPOR 19th Annual International Conference, May 2014, Montreal, Quebec, Canada.

133. Jiao X, **Hay JW**. Cost-Effectiveness of Breast MRI and Mammography for Screening High Risk Populations. American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

134. Ding Yuchen, **Hay JW**. Cost-effectiveness Comparison between Generic zoledronic acid and denosumab (Prolia®) in the treatment of Postmenopausal Osteoporosis. American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

135. **Hay JW**. Behavioral Economics Interventions to Reduce Antibiotic Overprescribing. Organized Session, American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

136. **Hay JW**, Strylewicz G, Rothfeld A, Doctor J. Provider Preferences for Interventions for Reducing Inappropriate Antibiotic Prescribing. American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

137. Doctor J, Meeker D, **Hay JW**. Nudging guideline uptake: A randomized trial of physician public commitments. American Soc. for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

138. Meeker D, Doctor J, **Hay JW**. A Behavioral Economics Multi-site Randomized Trial to Reduce Provider Antibiotic Overprescribing. American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

139. Gong C, **Hay JW**. Cost-Effectiveness Analysis of Abiraterone and Sipuleucel-T in Metastatic Castration-Resistant Prostate Cancer. American Society for Health Economics 5'th Biennial Conference, June, 2014, Los Angeles, CA.

140. Thompson C, **Hay JW**. Evaluating the Impact of Marijuana Use on Metabolic Syndrome Using Data from the Continuous National Health and Nutrition Examination Survey. American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

141. Patel N, **Hay JW**. Pregabalin (Lyrica®) is cost-effective over Gabapentin (Neurontin®) as a First-Line Treatment for Neuropathic Pain (NeP) Management after Spinal Cord Injury (SCI). American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

142. Zhang X, **Hay JW**, Nu X. Cost-Effectiveness of Fingolimod, Teriflunomide, Dimethyl Fumarate and Intramuscular Interferon Beta-1a in Relapsing-Remitting Multiple Sclerosis. American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

143. Chen CX, **Hay JW**. The Cost-Effectiveness of Screening and Management Strategies for Familial Hypercholesterolemia in the United States: A Markov Model Analysis. American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

144. Mehta D, **Hay JW**. Cost-Effectiveness of Adding Bevacizumab to First Line Therapy for Patients with Advanced Ovarian Cancer. American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

145. Drabo E, **Hay JW**, Sood N, Wagner Z. A Cost-Effectiveness Analysis of Pre-Exposure Prophylaxis (PREP) for the Prevention of HIV in the Los Angeles County MSM Population. American Society for Health Economics 5'th Biennial Conference, June 2014, Los Angeles, CA.

146. Ding Yao, **Hay JW**. Impact Of Maternal Education On Child Immunization Propensity In China. ISPOR Asia Conference, September 2014, Beijing, China.

147. Cheetham C, Yong Y, Niu F, Kalsekar A, Hechter R, Chiang K, **Hay JW**, Nyberg L. Characterization of Hepatitis C Patients who fail to Achieve Sustained Virologic Response with Triple Therapy (Peg-Interferon alfa and Ribavirin with Boceprevir or Telaprevir). The Liver Meeting, November 2014, Boston, MA.

148. Chaugule S, **Hay JW**. Impact of differential framing of opt-out alternatives: Comparison of utility maximization vs. regret minimization models in a hemophilia therapy preferences study. Inaugural meeting of the International Academy of Health Preference Research, November 2014, Amsterdam, Netherlands, EU.

149. Thompson C, **Hay JW**. Role Of Behavioral Confounding in the Association Between Marijuana Use And BMI in US Adults. Poster PSY12 Wednesday, May 20, 2015. ISPOR 20th Annual International Meeting, May 16-20, 2015; Philadelphia, PA.

150. Drabo E, **Hay JW**. Rolling Out Oral Pre-Exposure Prophylaxis (Prep) is a Cost-Effective HIV Prevention Strategy Among Los Angeles County (LAC) Men Who Have Sex With Men (MSM). Poster PIN54 Tuesday, May 19, 2015. ISPOR 20th Annual International Meeting,

May 16-20, 2015; Philadelphia, PA.

151. McGinnis JJ, **Hay JW**. The Cost Effectiveness of a Novel High Priced Combination Therapy For Hepatitis C in Treatment Naïve Genotype 1 Infected Patients. Poster PIN65 Tuesday, May 19, 2015. ISPOR 20th Annual International Meeting, May 16-20, 2015; Philadelphia, PA.

152. Han X, **Hay JW**. Cost-Effectiveness Analysis of Certolizumab, Etanercept, Golimumab and Tofacitinib for the Treatment of Moderately to Severely Active Rheumatoid Arthritis. Poster PMS52 Tuesday, May 19, 2015. ISPOR 20th Annual International Meeting, May 16-20, 2015; Philadelphia, PA.

153. Chaugule S, **Hay JW**. Does Differential Framing of Opt-Out Alternatives in Discrete Choice Experiments (DCES) Matter? Comparison of Random Utility Maximization (RUM) and Random Regret Minimization (RRM) Models. Poster PRM85 Monday, May 18, 2015. ISPOR 20th Annual International Meeting, May 16-20, 2015; Philadelphia, PA.

154. Chaugule S, **Hay JW**. Exploring Heterogeneity in Attribute Processing Strategies: Use of Hybrid Random Utility Maximization-Random Regret Minimization (RUM-RRM) Models in a Discrete Choice Experiment (DCE). Poster PRM140 Monday, May 18, 2015. ISPOR 20th Annual International Meeting, May 16-20, 2015; Philadelphia, PA.

155. Mehta DA, Hay JW. Systematic Literature Review of Economics Analyses Comparing aPCC and rFVIIa Across On-Demand, Prophylaxis and Surgery. Poster International Society of Thrombosis and Hemostasis 2015 Congress, June 23, 2015; Toronto, Canada.

156. Cheetham C, Yong Y, Niu F, Kalsekar A, Hechter R, Chiang K, **Hay JW**, Nyberg L. Characterization of Hepatitis C Patients who fail to Achieve Sustained Virologic Response with Triple Therapy (Peg-Interferon Alfa and Ribavirin with Boceprevir or Telaprevir). XXIII Congresso Brasileiro de Hepatologia, September 2015; Sao Paulo, Brazil.

157. Chaugule S, **Hay JW**. Advances in Willingness-to-Pay Estimation Methods for More Informed Decision Making. 2nd Meeting of the International Academy of Health Preference Research, October 2015, Brisbane, Australia.

158. Xu Y, Barzi A, **Hay JW**. Comparative Effectiveness of Panitumumab (P) and Cetuximab (C) in Metastatic Colorectal Cancer (mCRC) with Wild-Type KRAS (WTKRAS). American Society of Clinical Oncology 2016 Gastrointestinal Cancers Symposium, (January 21-23, 2016) San Francisco, CA.

159. Cheng W, Sadeghi S, Lenz H-J, **Hay JW**, Barzi A. Comparative-Effectiveness of FOLFIRINOX (FOL) versus Gemcitabine and nab-Paclitaxel (GNP) for the First-Line Treatment of Metastatic Pancreatic Cancer. American Society of Clinical Oncology 2016 Gastrointestinal Cancers Symposium, (January 21-23, 2016) San Francisco, CA.

**OP-EDS & MEDIA POSTS, LETTERS, ETC.:**

**Hay, JW**. "Vouchers Take the Catastrophe out of Catastrophic Care," Editorial Page, Camden Courier, May 1, 1987.

**Hay, JW**. "Time to Try to Bridge Gaps in Health Care for the Elderly," Editorial Page, Hartford Courant, May 13, 1987.

Bernstam, M., **Hay, JW**. and Swan, P. "Minimum Wage: Bulwark of the Privileged," Editorial Page, Wall Street Journal, June 15, 1987.

**Hay, JW**. and Bernstam, M. "Raising Minimum Wage Hurts Teens, Minorities," Point of View, San Francisco Chronicle, August 17, 1987.

Bernstam, M. and **Hay, JW**. "At the Minimum, Wage Law Will Reduce Jobs for Youth," Editorial Page, Orange County Register, December 23, 1987.

Bernstam, M. and **Hay, JW**. "California Panel Opens a Pandora's Box on Minimum Wage," Editorial Page, San Diego Union, February 14, 1988.

**Hay, JW**. "Trojan Horse: Dukakis' Health Plan is a Disaster," Editorial Page, San Jose Mercury News, August 11, 1988.

**Hay, JW**. "The 'Dream' That Will Break Massachusetts: Dukakis' Health-Care Plan No Way to Help the Poor," Editorial Page, Los Angeles Herald Examiner, August 28, 1988.

**Hay, JW**. and Ricardo-Campbell, R. "A Health Plan to Make Business Sick," Editorial Page, Hartford Courant, October 30, 1988.

**Hay, JW**. "Let's Not Exaggerate the Costs of AIDS," Editorial Page, Newsday, February 9, 1989.

**Hay, JW**. "AIDS Won't Break the Health-Care System," Editorial Page, Omaha World-Herald, February 12, 1989.

**Hay, JW**. "AIDS Isn't Bankrupting our Health-care System," Editorial Page, Sacramento Bee, February 13, 1989.

**Hay, JW**. "AIDS Costs Will Not Sink Health Budget," Editorial Page, San Jose Mercury News, March 8, 1989.

**Hay, JW**. "The Battle Against AIDS: Some of the Earlier Assumptions are Overdue for Reexamination," Editorial Page, San Diego Union, April 9, 1989.

**Hay, JW**. "The Good News About AIDS," Viewpoints, New York Newsday, May 18, 1989.

**Hay, JW**. "AIDS Infection Data Difficult to Refute," Letters to the Editor, Wall Street Journal, June 28, 1989.

**Hay, JW**. "Is Too Much Being Spent on AIDS?" Editorial Page, Wall Street Journal, October 3, 1989.

**Hay, JW**. "AIDS Epidemic: Falling Short of Projections?" Editorial, Texas Tribune, Austin, TX, November 9, 1989.

**Hay, JW**. "Crossings Dangerous," Letters to the Editor, Peninsula TimesTribune, December 3, 1989.

**Hay, JW**. "American Medicine: Should We Save Lives or Dollars?" *The Commonwealth*, The Weekly Newsletter of the Commonwealth Club of California, April 2, 1990; pp. 186-189.

**Hay, JW**. "Healthcare Policy Directions," The Executive Speaker, Vol. 11, No. 8 (August, 1990); pg. 2.

**Hay, JW**. "Is Hong Kong Ready for Free Market Health Care?" HKCER Letters, Hong Kong Center for Economic Research, (November, 1990), pp. 1-4.

**Hay, JW**. "Cocaine Abuse is Not a Victimless Crime," Editorial, The Los Angeles Daily Journal, Los Angeles, CA, and The San Francisco Daily Journal, San Francisco, CA, January 8, 1991.

**Hay, JW**. "Commentary: Cost-Effectiveness of Strategies for Detecting Diabetic Retinopathy," *Diabetes Spectrum,* Vol 5(2), March/April, 1992, pp. 109-110.

**Hay, JW**. "World Bank's Loan Won't Cure Hungary," The Wall Street Journal, Europe, July 15, 1992.

**Hay, JW**. "Amid Lofty Goals Lie Plethora Of Health-Care Myths," Los Angeles Daily News, September 26, 1993.

**Hay, JW**. “Bitter pill: One reason prescription drugs cost more in California,” Opinion, San Jose Mercury News, February 6, 2002.

**Hay, JW**. “Allergy Drug-Cost Fight Carries Potential Risks,” Letter to the Editor, Wall Street Journal, May 23, 2003.

**Hay, JW**. “Buying in Canada Won't Cut Drug Costs,” Editorial, Los Angeles Times, August 31, 2004.

**Hay, JW**. “Against Marijuana Legalization” Editorial, New York Times Freakonomics Blog, May 22, 2009; http://freakonomics.blogs.nytimes.com/2009/05/22/pot-quorum/.

**Hay, JW**. “Against Proposition 19 Marijuana Legalization” Debatethisonline.com, October 25, 2010; http://www.debatethisonline.com/debate/marijuana_legalization_in_california_proposition_19_part_two.

**Hay, JW.** “A simple way to rein in health costs,” Editorial, Orange County Register, December 10, 2012. http://www.ocregister.com/opinion/health-380238-care-tax.html.

**Hay, JW.** “Why health system is so broken,” Editorial, Orange County Register, December 15, 2012. http://www.ocregister.com/opinion/health-380788-medicare-care.html.

**Hay, JW.** “The Medicare Fiscal Cliff,” Editorial, Orange County Register, December 28, 2012. http://www.ocregister.com/opinion/health-380788-medicare-care.html.

**Hay, JW.** “Obamacare a deficit fighter?,” Editorial, Orange County Register, January 16, 2013. http://www.ocregister.com/opinion/health-383520-billion-obamacare.html.

**Hay, JW.** "If you've got Obamacare, higher pay doesn't pay," Editorial, Orange County Register, February 11, 2013.
http://www.ocregister.com/opinion/tax-495245-income-obamacare.html.

**Hay, JW.** "Drug company invests more in senators than new drugs," Editorial, Orange County Register, March 4, 2013.
http://www.ocregister.com/opinion/amgen-497914-political-drug.html.

**Hay, JW.** "Big Pharma facing price controls," Editorial, Orange County Register, March 20, 2013.
http://www.ocregister.com/opinion/drug-500414-big-pharma.html.

**Hay, JW.** "We can't afford the Affordable Care Act," Editorial, Orange County Register, April 1, 2013.
http://www.ocregister.com/opinion/health-501944-obamacare-care.html.

**Hay, JW.** "Singapore's Affordable Health Model," Editorial, Orange County Register, April 7, 2013.
http://www.ocregister.com/opinion/health-503115-care-singapore.html.

**Hay, JW.** "Pipe Dreams and Quack Pot Medicine," Editorial, Orange County Register, May 14, 2013.
http://www.ocregister.com/articles/marijuana-508205-drug-medical.html.

**Hay, JW.** "Medicaid: A costly, ineffective intervention," Editorial, Orange County Register, May 21, 2013.
http://www.ocregister.com/articles/health-509333-care-medicaid.html

**Hay, JW.** "Obamacare: A 'scandal' that keeps on giving," Editorial, Orange County Register, June 10, 2013.
http://www.ocregister.com/articles/health-511818-obamacare-insurance.html

**Hay, JW.** "Beaming Up Profits: Priciest treatments not always best," Editorial, Orange County Register, July 3, 2013.
http://www.ocregister.com/articles/proton-515317-beam-treatment.html

**Hay, JW.** "Making headway against HIV/AIDS," Editorial, Orange County Register, July 8, 2013.
http://www.ocregister.com/articles/hiv-515516-aids-drug.html

**Hay, JW.** "Obamacare poor fit for long-term care," Editorial, Orange County Register, July 30, 2013.
http://www.ocregister.com/articles/term-518990-care-long.html

**Hay, JW.** "Thank You for Smoking," Editorial, Orange County Register, August 23, 2013.
http://www.ocregister.com/articles/health-522519-hie-plan.html

**Hay, JW.** "Anatomy of health care billing," Editorial, Orange County Register, September 10, 2013.
http://www.ocregister.com/articles/health-525003-medicare-mcallen.html

**Hay, JW.** "Unaffordable Care Acts Unpopularity Grows," Editorial, Orange County Register, October 1, 2013.
http://www.ocregister.com/articles/health-528698-obamacare-care.html

**Hay, JW.** "Pharmacist Status Boosts Health Care," Editorial, Orange County Register, October 23, 2013.
http://www.ocregister.com/articles/health-532413-care-pharmacists.html

**Hay, JW.** "Keep your Health Plan? Have They Got a Plan for You!" Editorial, Orange County Register, November 18, 2013.
http://www.ocregister.com/articles/health-537272-coverage-obamacare.html

**Hay, JW. and Huesch, M.** "Health Prices: The Truth is Out There" Editorial, Orange County Register, November 25, 2013.
http://www.ocregister.com/articles/health-538408-care-prices.html

**Hay, JW.** "The Doctor Won't See You Now," Editorial, Orange County Register, December 16, 2013.
http://www.ocregister.com/articles/health-593400-plan-california.html

**Hay, JW.** "Obamacare Flight 001," Editorial, Orange County Register, January 9, 2014.
http://www.ocregister.com/articles/hay-596654-introduction-joel.html

**Hay, JW.** "Making silk purses from sows' ears: Using regulatory loopholes to gouge patients," Editorial, Orange County Register, February 3, 2014.
http://www.ocregister.com/articles/acthar-599759-drug-questcor.html

**Hay, JW.** "What's Wrong with American Hospitals," Editorial, Orange County Register, February 8, 2014.
http://www.ocregister.com/articles/hospital-600886-care-year.html

**Hay, JW.** "Obamacare's Broken Promises," Editorial, Orange County Register, March 25, 2014.
http://www.ocregister.com/articles/health-606912-obamacare-care.html

**Hay, JW.** "Health Care at the End of Life," Editorial, Los Angeles Register, April 18, 2014.
http://www.losangelesregister.com/common/printer/view.php?db=laregister&id=597957

**Hay, JW and McGinnis, J.** "A Medical Breakthrough Actually Worth Paying For," Editorial, Orange County Register and Los Angeles Register, May 29, 2014.
http://www.ocregister.com/articles/new-616291-drugs-hcv.html

**Hay, JW.** "Another serious blow for Obamacare," Editorial, Orange County Register July 31, 2014 and Los Angeles Register, August 1, 2014. http://www.ocregister.com/articles/health-630224-insurance-state.html

**Hay, JW.** "Catalina Island's Drastic Job- and Business-Killing Drought Response," Letter to the Editor, Los Angeles Times, May 12, 2015. http://www.latimes.com/opinion/readersreact/la-le-0512-tuesday-mormon-temple-lawn-20150512-story.html

**SCIENTIFIC JOURNAL EDITOR and/or EDITORIAL BOARDS**

| | | |
|---|---|---|
| Annals of Pharmacotherapy | | 1992-1997 |
| Pharmaceutical Research | | 1992-1997 |
| PharmacoEconomics | | 1992-1999 |
| JAMA HIV/AIDS Web Site Editorial Review Panel | | 1995-2001 |
| Journal of Cardiovascular Pharmacology and Therapeutics | | 1995-2015 |
| Value in Health | Founding Editor-in-Chief | 1998-2002 |
| Journal of Managed Care Pharmacy | | 2004-2008 |
| CORE Evidence | | 2005-present |
| CORE Evidence, Guest Editor | | 2015 |
| The Open Health Services & Policy Journal | | 2007-present |
| Expert Review of Clinical Pharmacology | | 2007-present |
| International Journal of the Economics of Business<br>Guest Editor, *Special Issue: Commemorating*<br>*William S. Comanor and 50 Years of Pharmaceutical Economics* | | 2014-2015 |

**JOURNAL REFEREE:**

Advances in Therapy, AIDS, American Journal of Cardiology, American Economic Review, American Heart Journal, American Journal of Health Economics, American Journal of Managed Care, American Journal of Managed Care and Specialty Pharmacy, American Journal of Public Health, Annals of Pharmacotherapy, Annals of the Rheumatic Diseases, Applied Health Economics and Health Policy, Archives of Pediatrics and Adolescent Medicine, BMC Medicine, BioDrugs, Canadian Journal of Diabetes, Cardiovascular Drugs and Therapy, Chest, Clinical Drug Investigation, Clinical Pharmacokinetics, Clinical Therapeutics, ClinicoEconomics and Outcomes Research, CNS Drugs, Consultant, Critical Care, Current Medical Research and Opinion, Drugs and Aging, Eastern Economic Journal, Econometric Reviews, Epilepsia, European Journal of Health Economics, Evaluation and Expert Opinion on Pharmacotherapy, Expert Opinion on Therapeutic Patents, Expert Review of Pharmacoeconomics and Outcomes Research, Farmeconomia, Gerontology, Health Affairs, Health Care Financing Review, Health Economics, Health Professions, Health and Quality of Life Outcomes, JAMA, Journal of Affective Disorders, Journal of Alzheimer Disease, Journal of the American Statistical Association, Journal of Applied Econometrics, Journal of Cardiovascular Pharmacology and Therapeutics, Journal of Chemotherapy, Journal of Clinical and Experimental Oncology, Journal of Econometrics, Journal of Environmental Management, Journal of Epidemiology and Community Health, Journal of Gerontology: Social Sciences, Journal of Health Care for the Poor and Underserved, Journal of Health Politics, Policy and Law, Journal of Human Resources, Journal of Managed Care Pharmacy, Journal of Manged Care and Specialty Pharmacy, Journal of Medical Economics, Journal of Medical Education, Journal of Perinatology, Journal of Public Economics, Journal of Public Health Dentistry, Medical Care, Medical Decision Making, Milbank Memorial Fund Quarterly, Nature Reviews Drug Discovery, New England Journal of Medicine, Obstetrics & Gynecology, Pediatric Drugs, Pediatrics, PharmacoEconomics, Priorities, Research in Population Economics, Review of Economics and Statistics, Social Science and Medicine, SciTechnol, Social Science Journal, Southern Economic Journal, Statistica Sinica, Topics in Hospital Pharmacy Management, Vaccine, Value in Health.

**BOOK MANUSCRIPT REFEREE:**

2006 Lisa Gordon
Editorial Assistant
Jones and Bartlett Publishers

## SCIENTIFIC CONFERENCE ORGANIZATION AND DEVELOPMENT

1996-1998 Co-Chair and Primary Organizer: ISPOR Lipid Pharmacoeconomics Conference. Orlando, FL.

2001-2003 International Health Economics Association 4th World Congress, San Francisco; Local Organizing Committee Member

2004-2005 Scientific Track Evaluation Panel; Disease Management Association of America Annual Conference. Orlando, FL.

2005 Scientific Advisory Committee, Third NIMH Pharmacoeconomics Workshop: MMA03 and Psychotropic Medications

2007 American Society of Health Economics Meeting Organizer, Duke University, Durham, NC.

2009 Western Pharmacoeconomics Conference: Decision Tools for the Health Care Puzzle, Co-Chair and Meeting Organizer; Pasadena CA.

2014 American Society of Health Economists: 4'th Biannual Conference, USC, Los Angeles, CA.

2015 Conference on A Half-Century of Pharmaceutical Economics , University of British Columbia, Vancouver, BC, Canada.

## MEDIA APPEARANCES

October, 1989 Time Magazine: "A Recount of AIDS Carriers." Article about J Hay's back calculation model for estimating the number of people infected with HIV/AIDS. October 9, 1989; pg. 103.

June, 1992 "Should Marijuana be Legalized for Medicinal Purposes?" The Dr. Dean Show, NBC, San Francisco.

November, 1992 "Prescription Drug Price Inflation: What Should Be Done?" Seniors Speak Out, KPBS, San Diego.

September, 1993 "Health Care Reform: Access and Cost" syndicated Public Television show.

June, 1994 "Heterosexual AIDS," Diane Crowe/Chuck Whitten Show, KAVL, Lancaster, CA.

September, 1994 "Heterosexual AIDS," The Dennis Praeger TV Show, Los Angeles, CA.

October, 1994 "Bias in Official Government Projections of HIV/AIDS," FOX Television News Service, New York, NY.

January-March, 1995 "**Clinicoeconomics**" *Annenberg Center at Eisenhower* Three Part Television Series written by and featuring Joel W. Hay, Ph.D., Producer, Chuck Cox. Part 1: Principles of Clinicoeconomics; Part 2: The Outcomes Revolution--Measuring Health Related Quality of Life; Part 3: Practice Variation and Medical Guidelines Development. Rancho Mirage, CA.

September, 2000 "Cost Effectiveness of Statins." International Task Force for Prevention of Coronary Heart Disease. Consensus on Statins Conference Webcast: www.chd-taskforce.com

May, 2001 "Economic Considerations in Moving Second-generation Antihistamines from Prescription to OTC Status," CNN Headline News interview.

May, 2001 "Economics of RU-481." Los Angeles Times interview.

April, 2002 "Pharmacy Workforce Effects of Converting from the California to the National Pharmacy Licensure Examination." San Jose Mercury News interview.

December, 2002 "National Issues Briefing To Examine Rising Hospital Costs," Washington Press Club Seminar covered by CSPAN http://www.kaisernetwork.org/healthcast/usnews/bcbs/02dec2002 .

October, 2005 "Drug Safety in the Aftermath of Vioxx." Investors Business Daily interview.

January, 2007 "Democratic Medicare drug plan poised to pass House," McClatchy Newspapers, http://www.mercurynews.com/mld/mercurynews/news/politics/16393085.htm.

January, 2007 "House Passes Bill to Require Medicare Part D Price Negotiations". Lou Dobbs Show, CNN.

| | |
|---|---|
| January, 2007 | "House Passes Bill to Require Medicare Part D Price Negotiations". Business & Media Institute (http://www.businessandmedia.org/articles/2007/20070112164308.aspx). |
| January, 2007 | "Pharmaceutical Industry Profitability, " Investors Business Daily interview. |
| April, 2008 | "Merck, Schering Keep Taking Heat For Vytorin Flub." Investors Business Daily interview. |
| November, 2008 | "Impact of CVS Generic Drug Pricing Plan." NBC Today Show. |
| November, 2008 | "Generic Drug Price Competition." KNBC Evening News. |
| November, 2008 | "Gains By Democrats Put Pharma On Edge" Investor's Business Daily interview. |
| March, 2009 | J Hay quotations in "Can Marijuana Help Rescue California's Economy?" By Alison Stateman Time Online, March 13, 2009; http://www.time.com/time/nation/article/0,8599,1884956,00.html |
| July, 2009 | J Hay interview with Marc Brown on legalizing marijuana KABC TV Channel 7 Evening News. July 28 and July 29, 2009. |
| July, 2009 | J Hay interview with Nicole Busch on value of health co-op plans in the health insurance reform legislation. Fox News, July 31, 2009. |
| August, 2009 | J Hay interview on KCBS radio newsmaker show: Why marijuana shouldn't be legalized. KCBS August 2. |
| August, 2009 | J Hay interview on KNBC-TV Sunday LA, August 2. Why marijuana shouldn't be legalized. |
| August, 2009 | J Hay interview on Montel Williams Across America, August 5. Why marijuana shouldn't be legalized. |
| August, 2009 | J Hay interview on KCBS Radio news: Should new federal laws be passed to protect pharmacy prescription information from commercial data vendors? August 19. |
| October, 2009 | J Hay interview on KCBS Radio news: Medical Marijuana Dispensaries. October 19. |
| October, 2009 | Panel discussion on Medical Marijuana and Marijuana Legalization. The Michael Krazny Show, KQED Radio, October, 20. |
| December, 2009 | J Hay interview on KCBS Radio news: Marijuana Legalization in California, December 18. |
| December, 2009 | J Hay interview by Reuters News: Marijuana Legalization in California, December 18. |
| January, 2010 | "Recent Advances in Otolaryngology," (www.audio-digest.org). |
| February, 2010 | J Hay interview on University of California media release on medical marijuana studies. February 18. |

| | |
|---|---|
| | http://www.webmd.com/pain-management/news/20100218/medical-marijuana-has-merit-research-shows?page=2 |
| March, 2010 | J Hay interview on Federal Restrictions on Cost Effectiveness Analysis, NPR's Marketplace; http://marketplace.publicradio.org/display/web/2010/03/16/pm-health-care-costs/# |
| March, 2010 | "Orphan Drug Market Catches Pharma's Eye." Investors Business Daily quotes from J Hay. |
| July, 2010 | "Bright Future Seen For Vaccine Research." Investors Business Daily quotes from J Hay. |
| August, 2010 | "Walgren's Flu Vaccine Gift Cards Don't Make Sense," Interview on KCBS Radio, San Francisco, CA 8/17/10. |
| September, 2010 | "Will Drugmakers' Fight To Defer Generics Hit Supreme Court?" Investors Business Daily quotes from J Hay. |
| November, 2010 | "Genentech Catching Some Heat For Pushing Expensive Eye Drug," Investors Business Daily quotes from J Hay. |
| March, 2011 | "Medical Marijuana Deters Legitimate Medical Cannabinoids" March 13, 2011 Felice J. Freyer, Rhode Island News. http://www.projo.com/news/content/THC_03-13-11_RMMUHVQ_v16.15cf632.html# |
| April, 2011 | "Medicare on the table." Marketplace show, NPR 4-13-11, Gregory Warner, http://marketplace.publicradio.org/display/web/2011/04/13/pm-medicare-on-the-table/ |
| June, 2011 | "World Have Your Say: What would the world look like if all drugs were legalised?" BBC World Service, http://www.bbc.co.uk/programmes/p00gx5gq |
| August, 2011 | "Expert Discussion: Prescription For Pot—A Debate on the Merits of Medical Marijuana," MD Magazine: Peers & Perspectives: The Physician's Authority for Debate & Exchange. Podcast. |
| December, 2011 | "Lipitor's patent loss is consumers' gain," quotes from J Hay. Los Angeles Times, December 1, 2011. |
| January 2012 | "Excedrin, Gas-X and other Novartis drugs recalled," radio quotes from J Hay. Marketplace Morning Report, American Public Media, January 9, 2012. http://www.marketplace.org/topics/business/health-care/excedrin-gas-x-and-other-novartis-drugs-recalled |
| January 2012 | "FDA: Novartis Recall May Also Affect Painkillers," video quotes from J Hay. AP Video, January 9, 2012. http://youtu.be/dttrjWA_Sn0 |
| March, 2012 | "Individual mandate under review in Supreme Court," Marketplace show, NPR 3-27-12, Amy Scott, http://www.marketplace.org/topics/economy/health-care/individual-mandate-under-review-supreme-court |

| | |
|---|---|
| June, 2012 | "Health care reform trajectory won't be stopped by Supreme Court ruling," Southern California Public Radio 6-7-12. http://www.scpr.org/news/2012/06/07/32713/health-care-reform-trajectory-wont-be-stopped/ |
| August, 2012 | Comment on "As circumcision declines, health costs will go up, study projects," Los Angeles Times, August 21, 2012. http://www.latimes.com/news/science/la-sci-circumcision-health-costs-20120821,0,6266293,print.story |
| August, 2012 | Comment on "Study claims decline in circumcision will lead to increase in STDs." Larry Mantle Airtalk, Southern California Public Radio 8-21-12. http://www.scpr.org/programs/airtalk/2012/08/21/27999/study-circumcisions-numbers-drop-std-increase-sex/ |
| August, 2012 | Comment on "Walmart arms itself with vaccines," NPR Marketplace Morning Report. 8-23-12. http://www.marketplace.org/topics/business/health-care/walmart-arms-itself-vaccines |
| April, 2013 | Comment on "Students discuss usefulness of marijuana legalization," USC Daily Trojan, April 9, 2013. http://dailytrojan.com/2013/04/09/students-discuss-usefulness-of-marijuana-legalization/ |
| November, 2013 | Comment on "Widespread confusion over flu shot insurance benefits," Los Angeles Times, November 7, 2013. http://www.latimes.com/business/la-fi-lazarus-20131101,0,1800506,full.column#axzz2jPZ7iJpn |
| July, 2014 | Comment on "Does neurology need a faster FDA?" *Lancet Neurology*, Vol 13 August 2014; pp. 760-61. www.thelancet.com/neurology |
| October, 2014 | Comment on "Why there is no ebola vaccine," NPR Marketplace, October 1, 2014. http://www.marketplace.org/topics/health-care/why-there-no-ebola-vaccine |
| October, 2014 | Comment on "Economics of Ebola Vaccine," NPR Marketplace, October 22, 2014. http://www.marketplace.org/topics/health-care/economics-behind-rush-ebola-vaccine |
| October, 2014 | Comment on "Big pharma collaborates on Ebola vaccine," Australian Broadcast Company radio interview, October 24, 2014. http://www.abc.net.au/am/content/2014/s4113595.htm |
| May, 2015 | Comment on "CVS seeks to buy Omnicare," NPR Marketplace, May 21, 2015. http://www.marketplace.org/topics/business/cvs-seeks-buy-omnicare |
| September, 2015 | Comment on "Doctor's attempt to bring lower-price diabetes drug to market thwarted," Los Angeles Times, September 4, 2015. http://www.latimes.com/business/la-fi-lazarus-20150904-column.html |

**PUBLIC HEARING TESTIMONY AND PRESENTATIONS:**

| | |
|---|---|
| December 1985 | "The cost implications of adding Ranitidine to the Medi-Cal Drug Formulary," Medi-Cal Drug and Therapeutics Advisory Commission Hearings, California Department of Health Services, Sacramento, CA. |

| | |
|---|---|
| April 1987 | "Cost-Benefit evaluation of Haemophilus influenzae type b capsular polysaccharide vaccine," FDA Workshop on Haemophilus b Polysaccharide Vaccine, US Food and Drug Administration, Rockville, MD. |
| January 1990 | "AIDS Case Projections for California," California AIDS Leadership Committee, California Department of Health Services, Los Angeles County, CA. |
| August 1990 | "A Comparative Analysis of CDC and Other HIV/AIDS Projections and Recent (1990) Regional Cost Projections for California," Northern California Integrated Planning Project: HIV Epidemiology Task Force, Sacramento AIDS Foundation, Sacramento, CA. |
| September 1991 | "Cost-Effectiveness Issues in Cholesterol Treatment of Coronary Artery Disease," Panel on Adult Treatment Guidelines for Established Coronary Artery Disease; the National Institutes of Health, National Heart, Lung and Blood Institute and the American Heart Association, Washington, D.C. |
| July 1992 | "Research and Demonstration Waiver Request for Kaiser-Permanente Enhanced Pharmacy Services Project," California State Board of Pharmacy, Burlingame, CA. |
| January 1994 | "The Impact of the Clinton Health Care Reforms on Small Business," Congressional Testimony held at Diamond Bar, California at the invitation of Hon. Jay Kim, U.S. House of Representatives. |
| November 1996 | "The cost effectiveness of Pravastatin and the Medi-Cal Drug Formulary," Medi-Cal Drug Program, California Department of Health Services, Sacramento, CA. |
| May 2001 | "Economic Considerations in Moving Second-generation Antihistamines from Prescription to OTC Status," presentation to the US Food and Drug Administration Committee on Non-Prescription Drugs, Gaithersburg, MD. |
| March 2002 | "Pharmacy Workforce Effects of Converting from the California to the National Pharmacy Licensure Examination." Presentation to the California Assembly on AB 2165, Sacramento, CA. |
| February 2010 | "Cost-effectiveness of An Exclusively Human-Milk Based Diet Vs. Bovine-Milk Based Diet In The Prevention of Necrotizing Enterocolitis Among Extremely Premature Medicaid Infants (Gestation Age < 28 weeks)" Presentation to the Texas Medicaid Drug Utilization Review Program, Austin, TX. |
| February 2012 | "Competition Issues in the Pharmaceutical Benefits Manager (PBM) Market," Presentation to the Federal Trade Commission Bureau of Economics and the State Attorneys General Task Force on PBM Market Issues, Washington, DC. |

**CONFERENCES AND PRESENTATIONS SINCE 1998:**

| | |
|---|---|
| February, 1998 | "Methodological Issues in Conducting Pharmacoeconomic Evaluation—Modeling Studies" Panel Co-Chair. ISPOR Pharmacoeconomic Guidelines Consensus Development Conference. Crystal City, VA. |
| May, 1998 | "Lipid Therapy Cost Effectiveness: Are All Statins Equivalent?" Invited Plenary Session, Association of Managed Care Pharmacy Annual Meeting, Philadelphia, PA. |
| May, 1998 | "Alzheimer Disease Pharmacoeconomic Issues," Invited Session, Association of Managed Care Pharmacy Annual Meeting, Philadelphia, PA. |
| May, 1998 | "Hong Kong Health Care Reform," Harvard School of Public Health, Cambridge, MA. |
| June, 1998 | "Mortality and Hospital Utilization Differences in the Kaiser/USC Pharmaceutical Care Intervention Study," University of Florida College of Pharmacy, Gainesville, FL. |
| July, 1998 | "Alzheimer Disease Pharmacoeconomics," Invited Session, First International Conference on Alzheimer Disease Pharmacoeconomics, Amsterdam, Netherlands. |
| October, 1998 | "The Future of Pharmacy," Pharmacy Practice Research Roundtable Conference, San Diego, CA. |
| October, 1998 | "Lipid Therapy Cost Effectiveness," Calif. Society Health Systems Pharmacy, Anaheim, CA. |
| December, 1998 | "The US Pharmacoeconomic Methods Consensus Guidelines," ISPOR First Annual European Conference, Cologne, Germany. |
| March, 1999 | "Lipid Therapy Costs and Outcomes," New York University Department of Cardiology Grand Rounds, New York, NY. |
| April, 1999 | "Drug Patents and R&D Protection." The Wallace Lectureship, Idaho State University School of Pharmacy. Pocatello, ID. |
| April, 1999 | "Survival and Hospitalization in the Kaiser/USC Pharmaceutical Care Demonstration Project." The Wallace Lectureship, Idaho State Univ. School of Pharmacy. Boise, ID. |
| May, 1999 | "Cost Effectiveness Analysis of Occupational Therapy for Independent Living Elderly," ISPOR Annual Meeting, Podium Presentation. Washington, DC. |
| September, 1999 | "Rotavirus Cost of Illness," Rotavirus Vaccine Advisory Panel, Wyeth-Ayerst, Radnor, PA. |
| October, 1999 | "The Cost of Lipid Therapy: A Systems Approach," Interdisciplinary Council on Cardiovascular Risk Reduction, Washington, DC. |
| October, 1999 | "Survival and Hospital Utilization in the Kaiser/USC Pharmaceutical Care Study," Kaiser Permanente Research and Evaluation Dept Seminar., Pasadena, CA. |

| | |
|---|---|
| November, 1999 | "The High Cost of Drugs and What to Do About It," Univ. of California Riverside Life Society Extension Program, Riverside, CA. |
| November, 1999 | "Pharmacoeconomics of Epilepsy Medications," American Epilepsy Society, Orlando, FL. |
| February, 2000 | "Rotavirus Costs of Illness," Vaccine Research Center, Harbor-UCLA Medical Center, Torrance, CA. |
| February, 2000 | "Pharmaceutical Expenditure Growth and Medicare Outpatient Drug Benefits," Mid-Valley Independent Practice Association, Portland, OR. |
| April, 2000 | "Alzheimer Disease Cognition Measures and Economic Costs," Invited presentation. 2nd International Alzheimer Disease Pharmacoeconomic Conference, Stockholm, Sweden. |
| April, 2000 | "Pharmacoeconomics of Antibiotic Treatment Strategies," 10th Congress of the International Society for Infectious Disease, Buenos Aires, Argentina. |
| April, 2000 | "Economic Research Issues in Alzheimer Disease." State of California Alzheimer Research Centers Site Visit. Los Angeles, CA. |
| September, 2000 | "Cost Effectiveness of Statin Therapy." International Task Force for Prevention of Coronary Heart Disease. Consensus on Statins Conference. Invited Presentation. Paris, France. |
| September, 2000 | "Cost Effectiveness of Statin Therapy." Interdisclipinary Council on Coronary Heart Disease. Invited Presentation. New York, NY. |
| November, 2000 | "Pharmacy Retail Price Variation," Pharmaceutical Economics Seminar, UCLA School of Public Health. Westwood, CA. |
| March, 2001 | "Choicecare: A Health Insurance Market Plan for Hong Kong. Invited Seminar, Hong Kong Hospital Authority; Hong Kong. |
| May, 2001 | "Cost Effectiveness Considerations in Adult/Adolescent Pertussis Vaccination Strategies," Vaccine Health Advisory Group Conference, La Romana, Dominican Republic. |
| July, 2001 | "China's Health Care Reform," International Health Economics Assoc. Meeting, York, UK. |
| September, 2001 | "Cost Effectiveness of Statins: Implications for the National Cholesterol Education Panel Recommendations." Washington, DC. |
| November, 2001 | "Chemotherapy-Induced Neuropathy In Ovarian Cancer Cost Effectiveness." ISPOR European Conference, Cannes, France. |
| March, 2002 | "Conjoint Analysis of Alzheimer Disease Treatment Preferences: Preliminary Results." CCH/HSRC Methods Seminar, UCLA/NPI Center for Community Health and Health Services Research Center, Westwood, CA. |

| | |
|---|---|
| March, 2002 | “Ethics and Economics in Health Care Decision-making.” USC Health Sciences Campus Seminar on Moral and Spiritual Issues in Health Care, Los Angeles, CA. |
| April, 2002 | “Current Status of Health Economics Checklists and Guidelines.” Academy of Managed Care Pharmacy Annual Convention, Podium Presentation, Salt Lake City, UT. |
| May, 2002 | “Quality of life effects of chemotherapy-induced neuropathy in ovarian cancer (Abst 886).” “Neuropathy in Chemotherapy: Results of an Oncology Nurse Survey (Abst 2618).” Poster Presentations, American Society of Clinical Oncology Annual Meeting. Orlando, FL. |
| May, 2002 | “Vaccine Reimbursement Policy in the United States: Issue Development.” Institute of Medicine, National Academy of Sciences. Washington, DC. |
| September, 2002 | “Recent Trends in U.S. Lipid Medication Use: 1998-2002. Interdisclipinary Council on Coronary Heart Disease. Invited Presentation. New York, NY. |
| September, 2002 | “Drugbusters: How to Manage your Medicine Cabinet.” Invited Roundtable Presentation. Los Angeles Times Festival of Fitness and Health. Los Angeles, CA. |
| October, 2002 | “Recent Drivers of Hospital Inpatient Expenditure Growth.” Media presentation sponsored by the Blue Cross Blue Shield Association, Chicago, IL. |
| November, 2002 | “Rising Hospital Costs in California.” Panel Discussion sponsored by Blue Shield of California, Univ. of California, Berkeley, CA. |
| December, 2002 | “National Issues Briefing To Examine Rising Hospital Costs," Panel Discussion sponsored by U.S. News & World Report. Washington, DC. |
| January, 2003 | "What's Behind the Rise in Health Care Costs” Invited Keynote Presentation, Washington Business Group on Health Employer Summit. New York, NY. |
| March, 2003 | “High Tide for Benefits Budgets: Rising Healthcare Costs.” Invited Keynote Presentation, Illinois BlueCross BlueShield Natl Accounts Conf, San Diego, CA. |
| April, 2003 | “Current trends and future directions of Health-Systems in the US,” Health Economics and Outcomes Research Invited Presentation, Abbott Laboratories, Evanston, IL. |
| May, 2003 | “U.S. Health Care Expenditure Growth: Issues and Solutions.” St. Louis Civic Entrepreneurs Organization, St. Louis, MO. |

| | |
|---|---|
| June, 2003 | "U.S. Pharmaceutical Expenditure Growth:1999-2002" Paper presented at the Intl Health Economics Association 4'th World Congress, San Francisco, CA. |
| June, 2003 | "Medical Market Failures and Intellectual Property" Paper presented at the Intl Health Economics Association 4'th World Congress, San Francisco, CA. |
| August, 2003 | "Determinants of Survival and Nursing Home Placement for AD Patients." Paper presented at the International Psychogeriatrics Association Annual Meetings, Chicago, IL. |
| December, 2003 | "Claritan's Shift to OTC Status: A Lesson for the HMOs." Paper presented at Pharmaceutical Economics And Policy Seminar, UCLA Schl of Public Health, Westwood, CA. |
| April, 2004 | "Pharmacoeconomics & Biotech." Invited presentation at PDL Biopharma, Fremont, CA. |
| July, 2004 | "Cost Effectiveness Of Pertussis Vaccine In Adults And Adolescents." Invited presentation, Pediatric Vaccine Workshop, New York, NY. |
| November, 2004 | "Vaccine Costs and Benefits." Invited presentation, GSK Pediatric Vaccine Advisory Board., Scottsdale, AZ. |
| February, 2005 | "Patents, Drug R&D and Protection of Intellectual Property," Invited Panel Presentation: International Trade in Pharmaceuticals, The International Law Society Meetings, Costa Mesa, CA. |
| May, 2005 | "Dually Eligible Mentally Ill Population" Session Chair; Third NIMH Pharmacoeconomics Workshop: MMA03 and Psychotropic Medications, NIMH, Bethesda, MD. |
| May, 2005 | "How Should Intellectual Property be Rewarded and Protected in the Global Pharmaceutical Industry?" Panel Discussion, USC Law School Intellectual Property Institute, Second Annual Conference. Beverly Hills, CA. |
| May, 2005 | "Structure & Design of Pharmacoeconomic Models." With Marc Botteman and Ben Van Hout. ISPOR Short Course presented at the 10th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, Washington, DC. |

| | |
|---|---|
| June, 2005 | "Implementation and Outcomes of Commercial Disease Management Programs in the United States: the Disease Management Outcomes Consolidation Survey." Nationwide Teleconference presentation with Mark Roberts. |
| October, 2005 | "Using Conjoint Analysis to Assess DM Intervention Attributes: Application to Alzheimer's Disease Caregivers." Paper presented at the Disease Management Association of America Annual Meeting, San Diego, CA. |
| October, 2005 | "Conjoint Analysis Validation Of The Hui-3 Utility Scale In An Alzheimer Disease Caregiver Population." Abstract 1216 presented at the International Society of Quality of Life Research, San Francisco, CA. |
| November, 2005 | "Economic Implication Of Hepatitis B Viral (HbV) Load Reduction For Entecavir In Hepatitis B E Antigen-Positive Chronic Hepatitis B (CHb) Patients" Presented at the 8'th ISPOR European Conference, Florence, Italy. |
| January, 2006 | "Methods for Selection Bias Adjustment: Propensity Scores, Instrumental Variables and the Heckman Method. Invited Grand Rounds Presentation, Maveric, Dept. of Veterans Affairs and Harvard Medical School, Boston, MA. |
| March, 2006 | "Cost Effectiveness of Entecavir for Chronic Hepatitis B Disease in China." Presented at the ISPOR Asian Conference, Shanghai, China. |
| March, 2006 | "Adjusting for Selection Bias in Administrative Health Care Databases." Invited Presentation, China Center for Pharmacoeconomics and Outcomes Research, Peking University, Beijing, China. |
| April, 2006 | "Stated Preference Theory (Conjoint Analysis) is the Best Way to Assess Health-Related Quality of Life for Economic Assessment of Drugs and Medical Interventions: An Application in Alzheimer Disease" Invited International Teleconference Presentation, ISPOR Student Chapter Network. |
| October, 2006 | "The Value of Biomedical Innovation." Invited Seminar, AstraZeneca Pharmaceuticals, Alderly Park, Cheshire, UK. |
| October, 2006 | "Cost Effectiveness of Magnetic Resonance Angiography versus Digital Subtraction Angiography for Peripheral Vascular Disease." Presentation at the 9'th European ISPOR Conference, Copenhagen, Denmark. |
| January, 2007 | "Stated Preference Theory in Assessing Health-Related Quality of Life for Economic Assessment in Alzheimer Disease. Invited Seminar; Medical University of South Carolina. |

| | |
|---|---|
| February, 2007 | "Stated Preference Theory in Assessing Health-Related Quality of Life for Economic Assessment in Alzheimer Disease. Invited Seminar; Tulane University School of Public Health. |
| October, 2007 | "Risk-Stratified Medical Costs for Asthma Patients in a Managed Care Organization (MCO)." Presentation at the 10'th European ISPOR Conference, Dublin, Ireland. |
| October, 2007 | "Stated Preference Theory in Assessing Health-Related Quality of Life for Economic Assessment in Alzheimer Disease. Invited Seminar; National University of Ireland, Galway, Ireland. |
| January, 2008 | "How Should Drug Prices be Measured?" Invited Seminar, School of Public Health, University of California Los Angeles, Los Angeles, CA. |
| February, 2008 | "How Not to Use Health Economics Data: Lessons from the U.S. Health Care Sector" invited presentation at the Hong Kong Hospital Authority Conference "Use of Health Economics Data in the Health Care Environment of Hong Kong The Way Forward." Hong Kong SAR, China. |
| March, 2008 | "Cost Effectiveness of Statins and Other Lipid Therapies." Invited presentation at the 3rd International Symposium on Healthy Aging: Meeting the Challenges of an Aging Population, Hong Kong SAR, China. |
| April, 2008 | "Pharmacoeconomic Modeling," Invited Lister Hill Seminar presentation, University of Alabama at Birmingham School of Public Health. Birmingham, AL. |
| August, 2008 | "Pharmacoeconomics Modeling and Empirical Analysis," Invited Lecture Series, National University of Colombia. Bogota, Colombia. |
| September, 2008 | "Issues in Pharmacoeconomic Methods," Invited Lecture, Amylin Pharmaceuticals, San Diego, CA. |
| November, 2008 | "Modeling Long-Term Mortality and Morbidity Impact with Entecavir Treatment in Chronic Hepatitis B Patients in Belgium." Benedicte Lescrauwaet, Frederik Nevens, Danielle Zammit, Yong Yuan, Joel Hay. Podium presentation, ISPOR European Conference, Athens, Greece. |
| December, 2008 | "Successful Pharmacoeconomic Models," Invited presentation, Mexico ISPOR Chapter, Mexico City, Mexico. |

| | |
|---|---|
| March, 2009 | "Drugs and Outcomes Research: Where are the Comparative Effectiveness Guideposts Moving To?" Opening Keynote Address, Western Pharmacoeconomics Conference, Pasadena, CA. |
| April, 2009 | "Comparative Effectiveness: What Does It Mean and How Do We Do It?" Invited University-Wide Seminar, USC School of Pharmacy, Los Angeles, CA. |
| April, 2009 | "Stated Preference Theory (Conjoint Analysis) Assessment of Health-Related Quality of Life for Economic Assessment of Medical Interventions," Invited Seminar, University of Washington School of Pharmacy, Seattle, WA. |
| April, 2009 | "Health Economic Evaluation of Oral versus IV Therapy in Oncology." Invited Presentation, Current And Emerging Trends In The Treatment Of Cancer: Pharmacoeconomics And Market Assessment, Guaraja, Brazil. |
| May, 2009 | "Comparative Effectiveness Research: What it is and Why We Need it." Invited Podium Presentation, International Society for Pharmacoeconomics and Outcomes Research 14th Annual International Meeting, Orlando, FL. |
| August, 2009 | "Outcomes Research, Comparative Effectiveness, Cost Effectiveness: What is Needed Now and Why?" Invited Seminar, Colombia Chapter: International Society for Pharmacoeconomics and Outcomes Research, Bogota, Colombia. |
| August, 2009 | "Pharmacoeconomics of Autoimmune Disease Therapy." Invited presentation, XII Colombian Rheumatology Congress, Bogota, Colombia. |
| October, 2009 | Debate on the Pros and Cons of Marijuana Legalization. Invited speakers, The Arsalyn Foundation, Duarte, CA. |
| November, 2009 | Resource Use in Patients with Allergic Rhinitis (AR) Comorbidities: Oral Second Generation Antihistamines (SGAs) versus Montelukast (MTLK)" Podium Presentation, Annual Meeting of the American College of Allergy, Asthma & Immunology, Miami Beach, Florida. |
| November, 2009 | "Impact of Obama's Health Care Reform on Payers" Speaker Panel Moderator; USC School of Pharmacy Board of Councilors Retreat. Los Angeles, CA. |
| November, 2009 | "Debate on Obama's Health Care Reform with Prof. Tom Rice, Vice Chancellor, UCLA," at UC Davis Mondavi Center, Davis CA. http://webcast.ucdavis.edu/IGA/2009/Health_Care_Debate_11-17-09.qtl |
| December, 2009 | "Resource Use in Patients with Allergic Rhinitis (AR) Comorbidities: Oral Second Generation Antihistamines (SGAs) versus Montelukast (MTLK)" Podium Presentation, Annual Meeting of the American College of Allergy, Asthma & Immunology, Nov. 5-10, Miami Beach, Florida. |
| January, 2010 | "Medical Marijuana: The Quack Pot Cure," Research Study Club Invited Presentation, Providence Saint Joseph Medical Center, Los Angeles, CA. |
| February, 2010 | "Health Care Reform," Arsalyn Foundation, UCLA, Los Angeles, CA. |
| March, 2010 | "Obama's Health Care Reform," USC Executive Master's Program in Health Administration, Lost Angeles, CA. |

| | |
|---|---|
| April, 2010 | “Obama Health Care Reform,” USC Schl. of Pharmacy, Lamda Chi Seminar, Los Angeles, CA. |
| June, 2010 | “Economic Comparison of aPCC versus rFVIIa for mild-to-moderate bleeding episodes in hemophilia patients with inhibitors.” Invited presentation, 8th Inhibitor Workshop for Opinion Leaders in Hemophilia.” Gdansk, Poland. |
| September, 2010 | “Pharmacoeconomics & Comparative Effectiveness: A U.S. Perspective.” Invited presentation to NECA (National Evidence-based Healthcare Collaborating Agency) Seoul, Korea. |
| September, 2010 | “Cost-effectiveness of An Exclusively Human-Milk Based Diet Vs. Bovine-Milk Based Diet In The Prevention of Necrotizing Enterocolitis Among Extremely Premature Infants.” Invited presentation to the Cedars-Sinai Dept. of Pediatrics, Beverly Hills, CA. |
| September, 2010 | “Marijuana Legalization: No on Proposition 19.” Invited presentation, Loyola Marymount University, Los Angeles, CA. |
| October, 2010 | “Marijuana Legalization: The Quack Pot Cure to California’s Fiscal Woes.” Invited presentation UCLA Extension Campus, Westwood, CA. |
| October, 2010 | “Marijuana Legalization Debate: Proposition 19.” Invited presentation UCLA, Westwood, CA. |
| October, 2010 | “Marijuana Legalization Debate: Proposition 19.” Invited presentation UCSC, Santa Cruz, CA. |
| October, 2010 | “Insurance Innovation: How to Succeed after Reform" Invited presentation, First Annual Schaeffer Center Conference, Leonard Schaeffer Center for Health Policy and Economics, University of Southern California, Los Angeles, CA. http://www.youtube.com/watch?v=SraGxvHlZWs |
| October, 2010 | “Marijuana: Potential Medical Consequences & Societal Issues Related to Legalization,” Invited presentation, The Marijuana Conference: A Forum for Discussion of Business, Legal & Health Issues. New York, NY. |
| October, 2010 | “Marijuana Legalization: Proposition 19,” Invited presentation, The Fell Conversation, School of Policy, Planning, and Development, University of Southern California, Los Angeles, CA. |
| December, 2010 | “ Econometric Issues in Pharmacoeconomics,” Invited presentation, National University of Colombia, School of Pharmacy, Bogota, Colombia. |
| December, 2010 | “Comparative Effectiveness Research in the Changing US Policy Environment,” Invited presentation, ISPOR Chapter of Colombia, Bogota, Colombia. |
| December, 2010 | “Introduction to Pharmacoeconomics,” Invited presentation, Universidad del Atlántico, School of Pharmacy, Barranquilla, Colombia. |
| December, 2010 | “Comparative Effectiveness and Outcomes Research,” Invited presentation, Universidad del Atlántico, School of Pharmacy, Barranquilla, Colombia. |

| | |
|---|---|
| February, 2011 | "Pharmacy's Changing Roles Under Health Care Reform," Invited presentation, USC Pharmacy Student Industry Association. Los Angeles, CA. |
| March, 2011 | "Pitfalls in Comparative Effectiveness Research: From Poison IVs to Uninformed Posteriors." Invited Plenary Presentation, Western Pharmacoeconomics Conference, University of Washington, Seattle, WA. |
| April, 2011 | "Medical Marijuana: Therapeutic, Economic and Policy Issues." Invited presentation, Providence Tarzana Medical Center, Tarzana, CA. |
| April, 2011 | "Budget Impact Models in MCO Decision Making: Current Practice, Challenges and Insights," Invited Workshop presentation, Academy of Managed Care Pharmacy, 23'rd Annual Meeting, Minneapolis, MN. |
| May, 2011 | "Branded Pharmaceutical Markets and Anticompetitive Harm." Invited presentation, UCLA Dept. of Health Services, Graduate Seminar on Pharmaceutical Economics and Policy. Los Angeles, CA. |
| July, 2011 | "Health Economics Research Objectives." Invited presentation, UCLA Dept. of Health Services, Health Economics Workshop with Monash Univ., UCLA & USC, Los Angeles, CA. |
| September, 2011 | "Optimal Health Care Treatment Allocation With and Without Stochastic Uncertainty." Invited presentation, University of Tennessee College of Pharmacy. Memphis, TN. |
| October, 2011 | "Medical Marijuana: Therapeutic, Economic and Policy Issues." Invited presentation, Ventura Community Memorial Hospital, Ventura, CA. |
| October, 2011 | "Medicare: Financial, Economic and Policy Issues." Invited presentation, Association of Health Care Journalists, Business of Health Care Workshop, San Francisco, CA. |
| November, 2011 | "Meeting the Challenges of US Health Care Reform: Payer and Provider Perspectives for the Biopharmaceutical Market." Invited Panel Discussion, 2011 IMS Life Sciences Strategy Conference, San Francisco, CA. |
| November, 2011 | "Health Care Reform: Where Does Pharmacy Fit?" Invited presentation, USC Pharmacy Student Industry Association. Los Angeles, CA. |
| December, 2011 | "Health Care Costs in a Medicare Population of COPD Patients Treated with Beta-Agonists." American Society of Health System Pharmacists Midyear Meeting, New Orleans, LA. |
| December, 2011 | "Optimal Health Care Treatment Allocation With and Without Stochastic Uncertainty—Part I," Schaffer Center for Health Policy and Economics, USC. Los Angeles, CA. |
| February, 2012 | "Optimal Health Care Treatment Allocation With and Without Stochastic Uncertainty—Part II," Schaffer Center for Health Policy and Economics, USC. Los Angeles, CA. |
| May, 2012 | "Optimal Drug Treatment Allocation with & without Stochastic Uncertainty," UCLA Seminar on Pharmaceutical Economics and Policy." Los Angeles, CA. |

| | |
|---|---|
| May, 2012 | "Optimal Personalized Treatment Allocation With & Without Stochastic Uncertainty," Invited seminar, SingHealth Academy Symposium on Health Care Decision-making and Personalized Medicines, Singapore. |
| May, 2012 | "Cancer Treatments, Expensive Medications and Cost Effectiveness: Perspectives of a Health Economist," Panel Discussion, SingHealth Academy Symposium on Health Care Decisionmaking and Personalized Medicines, Singapore. |
| May, 2012 | "Comparative Effectiveness & Outcomes Research: Where is the U.S. Headed?" National University of Singapore invited seminar, Singapore. |
| June, 2012 | "Introduction to Economic Assessment of Drugs, Devices and Medical Interventions," Conference Workshop, American Society for Health Economics 4'th Biennial Conference, Minneapolis, MN. |
| June, 2012 | "Cost Effectiveness Analysis With and Without Stochastic Uncertainty," Organized Podium Session, American Society for Health Economics 4'th Biennial Conference, Minneapolis, MN. |
| October, 2012 | "U.S. Health Care Reform Issues," Invited presentation, Arsalyn Foundation, Alhambra, CA. |
| November, 2012 | "Preparing Drug Review Dossiers for the Academy of Managed Care Pharmacy," Invited presentation, USC Managed Care Pharmacy Student Association, Los Angeles, CA. |
| February, 2013 | "Hemophilia Inhibitor Bypass Agents: A Clinical and Economic Review of the Literature," Invited Webinar on Hemophilia Treatment. |
| February, 2013 | "Drug Patents, Intellectual Property and Pricing," Invited seminar, Tulane University School of Public Health, New Orleans, LA. |
| February, 2013 | "Stated Preferences and Conjoint Analysis: Theory and Applications," Invited seminar, Tulane University School of Public Health, New Orleans, LA. |
| March, 2013 | "Accountable Care Organizations and Health Care Reform," Invited Seminar USC Medical and Pharmacy Students Collaboration." USC, Los Angeles, CA. |
| April, 2013 | "Optimal Health Care Treatment Allocation with & without Stochastic Uncertainty," Invited Seminar, Veterans Affairs Health Care Program and University of New Mexico PEPPOR Graduate Program, Albuquerque, NM. |
| April, 2013 | "The Current State of Comparative Effectiveness & Outcomes Research," Invited Seminar, University of New Mexico PEPPOR Graduate Program, Albuquerque, NM. |
| September, 2013 | "The U.S. Societal Costs of Cannabis," Invited presentation. The Marijuana Conference, Rancho Cucamonga, CA. |
| October, 2013 | "Conjoint Analysis of Provider Preferences for Interventions for Reducing Inappropriate Antibiotic Prescribing," Invited presentation. BEARI Investigators Meeting. Los Angeles, CA. |

November, 2013 "Pay-for-Delay Settlements for Pharmaceutical ANDA Cases: Right or Wrong?" Invited seminar, UCLA School of Public Health, Los Angeles, CA.

February, 2014 "Why Drugs Should Not be Legalized," Invited presentation. Arsalyn Foundation Student Conference, El Monte, CA.

March, 2014 "Cost-Effectiveness Analysis Under Stochastic Uncertainty," Steven M. Teutsch Prevention Effectiveness Fellowship invited presentation. U.S. Centers for Disease Control and Prevention, Atlanta, GA.

March, 2014 "Assessment of Health-Related Quality of Life for Medical Interventions: A Discrete Choice Experiment Application in Alzheimer Disease," Steven M. Teutsch Prevention Effectiveness Fellowship invited presentation. U.S. Centers for Disease Control and Prevention, Atlanta, GA.

March, 2014 "Hemophilia Treatments, Costs and Outcomes," invited presentation. National Center on Birth Defects and Developmental Disabilities; U.S. Centers for Disease Control and Prevention, Atlanta, GA.

September, 2014 "Current U.S. Trends in Health Technology Pricing and Value," invited presentation. Forum on HTA and Reimbursement, Peking University, Beijing, China.

September, 2014 "US Healthcare Financing System & Reforms," invited presentation. Health Care Financing Forum, Party School of the Central Committee of the Communist Party of China, Beijing, China.

September, 2014 "U.S. Health Care Reform," invited Plenary Symposium presentation. ISPOR 6th Asia-Pacific Conference, Beijing, China.

February, 2015 "Is there a Convergence of Health Economics with U.S. Health Policy?" Panel Discussion Invited Presentation, DePaul University Conference on Health Economics. Chicago, IL.

March, 2015 "Pharmaceutical Research & Development: An Economist's Perspective." Invited Lecture, Harbor-UCLA Grand Rounds. Torrance, CA.

April, 2015 "Cost Effectiveness Analysis with Stochastic Uncertainty," Invited seminar, Pharmaceutical Outcomes Research and Policy Program, University of Washington. Seattle, WA.

April, 2015 "Regulating Health Economics Modeling Claims," Invited presentation to the Office of Medical Policy and the Center for Drug Evaluation and Research, Food and Drug Administration. Silver Spring, MD.

September, 2015 "Orphan, Specialty and Low Volume/High-Priced Drugs," Workshop on Pharmaceutical Economics and Policy, Center for Health Economics and Outcomes Sciences, University of British Columbia. Vancouver, BC, Canada.

# RESEARCH CERTIFICATIONS:

04/21/2004

Sponsored by
The Office of Compliance

Certificate Number: 1018

USC Pharmaceutical Economics and Policy
Los Angeles, CA 90089 USA
Department: 330
Phone: 323-442-3296
Email: jhay@usc.edu

**Investigators Conducting both Biomedical and SBR Research:** This group has been established for investigators conducting both Biomedical and Social & Behavioral Research

```
on Wed Jun 23, 2004.

Please contact the USC Office of Compliance at (213) 740-8258
if you have any questions.
```

**University of Southern California**

This is to certify that

HAY, JOEL W.

has completed the

HIPAA Privacy Education Program

Sunday, March 23, 2003

Sponsored by
The Office of Compliance

Certificate Number: 2853

conduct of research with human participants.

- the use of key ethical principles and federal regulations to protect human participants at various stages in the research process.
- a description of guidelines for the protection of special populations in research.
- a definition of informed consent and components necessary for a valid consent.
- a description of the role of the IRB in the research process.
- the roles, responsibilities, and interactions of federal agencies, institutions, and researchers in conducting research with human participants.

National Institutes of Health
http://www.nih.gov

9.

- **Completion Date:** 02/02/2015
- **Expiration Date:** N/A
- **Minimum Passing:** 80
- **Reported Score*:** 91

**Appendix B: Legal case reports and testimony**

September 25, 2015

**Court and Arbitration Cases that Joel W. Hay, Ph.D. has offered reports, declarations, depositions or testimony in the past four years:**

Abbvie Inc., Plaintiff, v. Medimmune, LLC, Defendant. Case No. 11 CH 4176. Circuit Court of the Nineteenth Judicial Circuit, Lake County, Illinois, Chancery Division.
I filed a report in this case in September 2013. I filed a rebuttal report in December 2013. I was deposed in February 2014. I testified at trial in September, 2015. The jury awarded plaintiff a complete victory at trial.
(I worked for plaintiff's attorneys).

Luitpold Pharmaceuticals, Inc., Plaintiff, v. Ed. Geistlich Söhne A.G. Für Chemische Industrie, and Osteomedical Ltd. Defendants. Case No. 11-cv-0681 (KBF) (THK). United States District Court, Southern District of New York.
I filed a report in this case in July 2012. I filed another report in October 2012. I was deposed in October 2012. I filed another report in April 2013. I filed two additional reports in August, 2015.
(I worked for plaintiff's attorneys).

Astrazeneca AB, Aktiebolaget Hässle, Astrazeneca LP, KBI Inc. and KBI-E Inc., Plaintiffs and Counterclaim-Defendants, v. Mylan Laboratories Limited and Mylan Inc., Defendants and Counterclaim-Plaintiffs. United States District Court for the District of New Jersey Civil Action No. 3:12-cv-01378-MLC-TJB.
I filed a declaration in July 2015.
(I worked for defendant's attorneys).

Torrent Pharmaceuticals Limited and Apotex, Inc. and Mylan Pharmaceuticals Inc., Petitioners, v. Novartis AG and Mitsubishi Pharma Corp., Patent Owners. United States Patent and Trademark Office, Before the USPTO Patent Trial and Appeal Board. Case IPR2014-00784, Case IPR2015-00518, Patent 8,324,283 B2.
I filed a declaration in June 2015.
(I worked for petitioners' attorneys).

Safeway Inc; Walgreen Co.; The Kroger Co.; New Albertson's, Inc.; American Sales Company, Inc.; And Heb Grocery Company, LP, Plaintiffs; Meijer, Inc. & Meijer Distribution, Inc.; Rochester Drug Co-Operative, Inc.; And Louisiana Wholesale Drug Company, Inc., On Behalf of Themselves and All Others Similarly Situated, Plaintiffs; Rite Aid Corporation; Rite Aid Hdqtrs Corp.; JCG (PJC) USA, LLC; Maxi Drug, Inc D/B/A Brooks Pharmacy; Eckerd Corporation; CVS Pharmacy, Inc.; and Caremark LLC, Plaintiffs; Smithkline Beecham Corporation, d/b/a Glaxosmithkline, Plaintiff; v. Abbott Laboratories, Defendant. United States District Court Northern District of California Oakland Division, Case Nos. C 07-5470 (CW), C 07-5985 (CW) (Consolidated Cases), C 07-6120 (CW), C 07-5702 (CW). All Related per November 19, 2007 Order to Case No. C 04-1511(CW).
I filed a report in March and two reports in July 2010. I was deposed in July 2010. I testified at jury trial in March 2011. I filed a report in February 2015 and another in March 2015. I was deposed in March 2015.
(I worked for defendant's attorneys).

In re Questcor Pharmaceuticals Inc. Securities Litigation, John K. Norton, Individually, the Federal Securities Laws and on Behalf of All Other Similarly Situated, Plaintiffs, vs. Questcor

Pharmaceuticals, Inc., Don M. Bailey, Michael Mulroy, Stephen L. Cartt, David Young, David J. Medeiros, and Mitchell I. Blutt, Defendants. Case No. 8: 12-cv-01623-DMG(FMOx). United States District Court, Central District of California Southern Division.
I filed a report in February 2015.
(I worked for plaintiffs' attorneys).

Biotechnology Value Fund, L.P.; Biotechnology Value Fund II, L.P.; Investment 10, L.L.C.; BVF Investments, L.L.C.; BVF Inc.; And BVF X, LLC, Plaintiffs, v.
Celera Corporation; Credit Suisse Securities (USA) LLC; Kathy Ordonez; Richard H. Ayers; William G. Green; Peter Barton Hutt; Gail M. Naughton; Wayne I. Roe; and Bennett M. Shapiro, Defendants. Case No. CV-13-3248-WHA-DMR. United States District Court, Northern District of California, San Francisco Division.
I filed a report in November 2014. I was deposed in November 2014.
(I worked for defendants' attorneys).

U.S. et al. ex rel. James Garbe, Plaintiffs, v. Kmart Corporation, Defendant. Case No. 3:12-cv-00881-NJR-PMF. United States District Court, Southern District of Illinois.
I filed a report in July 2014 and a declaration in September 2014. I was deposed in September 2014. I filed an additional report in November 2014.
(I worked for plaintiff's attorneys).

Teva Branded Pharmaceutical Products R&D, Inc., Teva Respiratory, LLC,
Norton (Waterford) Limited and Norton Healthcare Limited, Plaintiffs, V. Perrigo Pharmaceuticals Co., Perrigo Co. and Catalent Pharma Solutions, LLC, Defendants. Case No. 12-cv-01101-GMS (consolidated). United States District Court for the District of Delaware.
I filed a report in this case in March 2014. I was deposed in April 2014.
(I worked for defendant's attorneys).

Cadence Pharmaceuticals, Inc. and SCR Pharmatop, Plaintiffs, v. Fresenius Kabi USA, LLC et al., Defendants. Case No. 13-CV-00139 DMS (MDD). United States District Court for the Southern District of California.
I filed a report in this case in February 2014. I was deposed in March 2014.
(I worked for defendant's attorneys).

Pfizer Inc., Alpharma Pharmaceuticals LLC, and King Pharmaceuticals, Inc., Plaintiffs, v. Watson Laboratories, Inc. – Florida, Defendant. C.A. No. 11-914 (LPS). United States District Court for the District of Delaware.
I filed a report in this case in December 2013. I was deposed in January 2014. I testified at trial in February 2014.
(I worked for defendants' attorneys).

Pfizer Inc., Wyeth LLC., and Wyeth Pharmaceuticals Inc., Plaintiffs, v. Sandoz Inc., Intas Pharmaceutical Ltd., Astron Research Ltd., Accord Healthcare Ltd., and Accord Healthcare, Inc. USA, Defendants. C.A. No. 11-1252 (GMS) (MPT) Consolidated. United States District Court for the District of Delaware.
I filed a report in this case in October 2013. I was deposed in November 2013.
(I worked for defendants' attorneys).

Jennifer L. Saavedra, Dr. Melissa Strafford, Carol Jacquez, and David Matthews, Jr., on Behalf of Themselves and All Other Persons Similarly Situated, Plaintiffs, vs. Eli Lilly and Company, an Indiana corporation, Defendant. Case No. 2:12-CV-09366-SVW(MANX). United States District Court for the Central District of California.
I filed declarations in this case in August 2013, November 2013 and March 2014. I was deposed in December 2013.

(I worked for plaintiffs' attorneys).
Laura A. Plumlee, an Individual, on Behalf of Herself and All Other Persons Similarly Situated, Plaintiff, vs. Pfizer, Inc., a New York Corporation, Defendant. Case No. 13-CV-0414-LHK. U.S. District Court for the Northern District of California, San Jose Division.
I filed a report in this case in July 2013.
(I worked for plaintiffs' attorneys).

Spec Pharma, LLC (Complainant), v. Luitpold Pharmaceuticals, Inc., (Respondent). In Arbitration Before Jams, Inc., New York, NY.
I filed a report in this case in July 2013.
(I worked for respondent's attorneys).

Anacor Pharmaceuticals, Inc., (Claimant) and Valeant Pharmaceuticals International, Inc. (Respondent), In Arbitration Before Jams, Inc., San Francisco, CA. Ref. No. 1100072088 Hon. James Ware (Ret.).
I filed a report in this case in March 2013.
(I worked for respondent's attorneys).

Certain Underwriters at Lloyd's London, Subscribing To Policy No. 5481NS3003500, Certain Underwriters at Lloyd's, London Subscribing To Policy No. 5481NS3003700, Underwriters at Lloyd's, London, Subscribing To Policy No. 769/009020 and Underwriters at Lloyd's, London Subscribing To Certificate No. MPT-00144300, Plaintiffs/Counterdefendants, v. Abbott Laboratories, Defendant/Counterplaintiff. Circuit Court of Cook County, Illinois County Department, Chancery Division No. 03CH9307.
I filed a report in this case in September 2009 and a supplemental report in December 2012. I was deposed in November 2009. I testified at trial in February 2013.
(I worked for defendant/counterplaintiff's attorneys). Defendant/Counterplaintiff won. Judge's Order cited Dr. Hay's testimony as "more credible" than the opposing expert in awarding the defendant's full request for damages.

United States of America, et al. ex rel. Helen Ge, M.D. Plaintiffs and Relator, v. Takeda Pharmaceutical Company Limited, and Takeda Pharmaceuticals U.S.A., Inc., f/k/a Takeda Pharmaceuticals North America, Inc. Defendants, Civil Action No. 11-10343-FDS. United States District Court, District of Massachusetts
I filed a report in this case in November 2012.
(I worked for relator's attorneys).

Takeda Pharmaceutical Co., Ltd., Takeda Pharmaceuticals North America, Inc., Takeda Pharmaceuticals LLC, and Takeda Pharmaceuticals America, Inc.,
Plaintiffs, v. Handa Pharmaceuticals, LLC, and Par Pharmaceutical, Inc. Defendants; Takeda Pharmaceutical Co., Ltd., Takeda Pharmaceuticals North America, Inc., Takeda Pharmaceuticals LLC, and Takeda Pharmaceuticals America, Inc.,
Plaintiffs, v. Impax Laboratories, Inc. Defendant, Case No. 3:11-cv-01610-JCS Related Case Nos. 3:11-cv-00840-JCS and 3:11-cv-01609-JCS. Hon. Joseph C. Spero, United States District Court, Northern District of California, San Francisco Division.
I filed a report in this case in September 2012. I filed a supplemental report in November 2012. I was deposed in November 2012.
(I worked for defendants' attorneys).

Celexa and Lexapro Marketing and Sales Practice Litigation, Plaintiffs, vs. Forest Pharmaceuticals and Forest Laboratories, Defendants, Case No. MDL No. 2067
Master Docket No. 09-MD-2067 (NMG). United States District Court
for the District of Massachusetts.
I filed a report in this case in September 2012. I filed a declaration in August 2013.

(I worked for plaintiffs' attorneys).

Androgel Antitrust Litigation (II) Case No. 1:09-MD-2084-TWT, End Payor Class Actions Fraternal Order of Police, Fort Lauderdale Lodge 31, Insurance Trust Fund, Plaintiff, v. Unimed Pharmaceuticals, Inc., et al., Defendants, Case No. 1:09-CV-2914-TWT; George Steven Legrand, Plaintiff, v. Unimed Pharmaceuticals, Inc., et al., Defendants, CASE NO. 1:10-CV-2883-TWT; Health Net, Inc., Plaintiff, v. Solvay Pharmaceuticals, Inc., et al., Defendants, Case No. 1:11-CV-334-TWT. United States District Court, Northern District of Georgia, Atlanta Division.
I filed a report in this case in August 2012. I was deposed in September 2012. Defendants won on summary judgment.
(I worked for defendants' attorneys).

Warner Chilcott Company, LLC and Hoffmann-La Roche Inc., Plaintiffs, v. Teva Pharmaceuticals USA, Inc., Defendant. C.A. No. 08-627-LPS (Consolidated with following cases). Warner Chilcott Company, LLC and Hoffmann-La Roche Inc., Plaintiffs, v. Apotex, Inc. and Apotex Corp., Defendants. C.A. No. 09-143-LPS. Warner Chilcott Company, LLC and Hoffmann-La Roche Inc., Plaintiffs, v. Mylan Pharmaceuticals, Inc., Defendant. C.A. No. 10-285-LPS. United States District Court, District of Delaware.
I filed a report in this case in February 2012. I was deposed in March 2012.
(I worked for defendants' attorneys).

Allergan, Inc., Plaintiff and Counter-Defendant, v. Merz Pharmaceuticals, LLC, and Merz Aesthetics, Inc., et al., Defendants and Counterclaimants. Case No. SACV11-446 AG (Ex). Honorable Andrew J. Guilford, United States District Court, Central District of California.
I filed four reports and one declaration in this case in December 2011 and January 2012. I was deposed in January 2012. I testified at trial in March 2012.
(I worked for defendants' and counterclaimants' attorneys).

Hoffmann-La Roche Inc. and Genentech, Inc., Plaintiffs, v. Watson Laboratories, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., Cobalt Pharmaceuticals Inc. and Cobalt Laboratories, Inc., Defendants. Civil Action No. 07-4539, Civil Action No. 07-4540, Civil Action No. 08-4054, Civil Action No. 10-6206 (consolidated with Civil Action No. 07-4539 for all purposes); Hoffmann-La Roche Inc. and Genentech, Inc., Plaintiffs, v. Apotex Inc. and Apotex Corp., Defendants. Civil Action No. 07-4417 (SRC) (MAS) Civil Action No. 08-3065 (SRC) (MAS), Civil Action No. 08-4053 (SRC) (MAS) Civil Action No. 10-6241 (SRC) (MAS), (consolidated for all purposes under 07-4417); Hoffmann-La Roche Inc. and Genentech, Inc., Plaintiffs, v. Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's Laboratories, Inc., Defendants. Civil Action No. 07-4516 (SRC) (MAS), Civil Action No. 08-3607 (SRC) (MAS), Civil Action No. 08-4055 (SRC) (MAS), Civil Action No. 10-5623 (SRC) (MAS), (consolidated for all purposes under 07-4516); Hoffmann-La Roche Inc. and Genentech, Inc., Plaintiffs, v. Orchid Chemicals & Pharmaceuticals, Ltd. Orchid Healthcare, Orchid Pharmaceuticals Inc. and Orgenus Pharma Inc., Defendants. Civil Action No. 07-4582 (SRC) (MAS), Civil Action No. 08-4051 (SRC) (MAS), Civil Action No. 10-4050 (SRC) (MAS), (consolidated for all purposes under 07-4582); Hoffmann-La Roche Inc. and Genentech, Inc., Plaintiffs, v. Mylan Inc., Mylan Pharmaceuticals Inc., Genpharm ULC (formerly known as GENPHARM INC.) and GENPHARM, L.P., Defendants. Civil Action No. 07-4661 (SRC) (MAS), Civil Action No. 08-4052 (SRC) (MAS), Civil Action No. 11-0579 (SRC) (MAS), (consolidated for all purposes under 07-4661). Hon. Stanley R. Chesler, U.S.D.J., Hon. Michael A. Shipp, U.S.M.J., United States District Court, District of New Jersey.
I filed a report in this case in November 2011, I was deposed in December 2011. I filed a rebuttal report and a declaration in February 2012. I testified at trial in March 2012.
(I worked for defendants' attorneys).

Hoffmann-La Roche Inc. and Genentech, Inc., Plaintiffs, v. Watson Laboratories, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., Cobalt Pharmaceuticals Inc. and Cobalt Laboratories, Inc., Defendants. Civil Action No. 07-4539, Civil Action No. 07-4540, Civil Action No. 08-4054, Civil Action No. 10-6206 (consolidated with Civil Action No. 07-4539 for all purposes); Hon. Stanley R. Chesler, U.S.D.J., Hon. Michael A. Shipp, U.S.M.J., United States District Court, District of New Jersey.
I filed a report in this case in October 2011. I was deposed in December 2011.
(I worked for defendants' attorneys).

**Appendix C: All documents considered**

## Case Specific Documents

Cavanaugh Exhibit 32 BB2-0000002
CELBRN0714359
CELDOJ0204655
CELBRN0204655
CELBRN0095298
CELBRN0095301
CELBRN0714068
CELBRN0212364
CELBRN0212346-47
TAC ¶ 205
CELBRN0317545
CELBRN3310509 at 102
CELBRN064011 at 1
CELBRN0961785 at 4, 49, 63
CELBRN0754351 at 35
CELBRN0137120
CELBRN0175405
CELBRN0223299
CELBRN0229517
CELBRN0322454
CELBRN0322658
CELBRN0347838
CELBRN0348853
CELBRN0354694
CELBRN0354904
CELBRN1189552
CELBRN1190162
CELBRN1558694
CELBRN0175405
CELBRN0223299
CELBRN0229517
CELBRN0322454
CELBRN0322658
CELBRN0347838
CELBRN0348853
CELBRN0354694
CELBRN0354904
CELBRN1189552

CELBRN1190162
CELBRN1558694
CELBRN0175405
CELBRN0303825
CELBRN0175405
CELBRN0303825
Deposition of Mark Alles at 151:2-25
CELBRN0322327
TAC ¶ 155
TAC ¶ 172
CELBRN0178363
TAC¶ 207
CELBRN0316185
CELBRN0095671
CELBRN1352139
CELBRN1355311
CELDOJ014072
CELBRN3542176
CELBRN3542179
CELBRN3542182
CELBRN3542176
CELBRN3542179
CELBRN3542182
CELBRN0574956
CELBRN0774524
CELBRN0781605
CELBRN0483855
CELBRN0751139
CELBRN0985199
CELBRN0147024
CELBRN0766998
CELBRN0200954
CELBRN064011
CELBRN1199112
CELBRN1793011
CELBRN1793012
CELBRN0341872
CELBRN350180
CELBRN0341872
CELBRN0160314
CELBRN0168985

JD_ENVISION000001

**Non-case Specific Documents**

U.S. et al. ex rel. James Garbe, Plaintiffs, v. Kmart Corporation, Defendant. Case No. 3:12-cv-00881-NJR-PMF. United States District Court, Southern District of Illinois

United States of America, et al. ex rel. Helen Ge, M.D. Plaintiffs And Relator, v. Takeda Pharmaceutical Company Limited, and Takeda Pharmaceuticals U.S.A., Inc., f/k/a Takeda Pharmaceuticals North America, Inc. Defendants

United States of America, et al. ex rel. Helen Ge, M.D. Plaintiffs and Relator, v. Takeda Pharmaceutical Company Limited, and Takeda Pharmaceuticals U.S.A., Inc., f/k/a Takeda Pharmaceuticals North America, Inc. Defendants, Civil Action No. 11-10343-FDS. United States District Court, District of Massachusetts

Kahneman, Daniel. *Thinking, Fast and Slow* (Kindle Locations; 6173-6175, 7668-7671). Farrar, Straus and Giroux. Kindle Edition. 2011

Revlimid Launch; Pacific Coast District Business Plan, at page 40

Celgene 2013 Corporate Responsibility Document

http://www.hrsa.gov/hansensdisease/dataandstatistics.html

http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM167840.pdf

http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM165843.pdf

CMS.gov website

Section 510 of the Federal Food, Drug, and Cosmetic Act (Act) (21 U.S.C. § 360)

http://www.va.gov/vetdata/Expenditures.asp

Fiscal Year 2008,2009,2010, 2011, 2012, 2013, 2014 Budget Estimate

TRICARE Program: Access, Cost, and Quality Fiscal Year Report to Congress

Federal Employees Health Benefits Program (FEHB): An overview – Feb 25, 2015 by Kirstin Blom and Ada Cornell

http://www.medpac.gov/documents/november-2014-meeting-presentation-the-340b-drug-pricing-program.pdf?sfvrsn=0

http://www.harriswilliams.com/sites/default/files/industry_reports/340b_discount_drug_program_overview.pdf

http://www.ncai.org/resources/ncai-publications/indian-country-budget-request/FY2013_Budget_Health_Care.pdf

http://www.ihs.gov/newsroom/factsheets/ihsyear2014profile/

https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office/StateProfiles.html

http://meps.ahrq.gov/mepsweb/

http://www.pewtrusts.org/~/media/assets/2014/08/stateemployeehealthcarereportseptemberupdate.pdf?la=en
http://kff.org/other/state-indicator/total-chip-spending/
http://www.medicaid.gov/chip/downloads/chip_report_congress-2014.pdf
http://www.pewtrusts.org/~/media/assets/2014/07/stateprisonhealthcarespendingreport.pdf

## Appendix D: Key Assumptions and Technical Appendix

### D.1 RevAssist and STEPS data analysis methodology

Celgene's data from the STEPS and RevAssist program was used to calculate the total off-label usage for Thalomid and Revlimid. For Thalomid, I was able to calculate the alleged illegal off-label use of Thalomid going back to 2001 Q3. I intend to supplement my analysis if credible data for years prior to 2001 Q3 becomes available to me.

Data resources used from the RevAssist and STEPS program:

- were obtained from the Dispensation file.[63] The Dispensation_date was used to determine time periods for assignment of damages.
- Patient conditions were from the Patient_condition file. Celgene has a variable condition_ID that was used to determine the patient diagnosis. Celgene also provided a file (DLM diagnosis file) that helped to crosswalk the internal condition_IDs used by Celgene with the ICD-9 codes of the indications. For example, Table 1 below shows the crosswalk between Celgene's condition_IDs and ICD-9 codes from the data files for Thalomid approved indications. The diagnosis descriptions (Diagnosis_Text) are taken directly from Celgene's data and appear to be Celegene's informal descriptors. They do not correspond to the official ICD-9 descriptions for these numeric codes. Before May 24, 2006 Thalomid is on-label for Erythema Nodosum Leprosum (ENL) and the corresponding Condition_IDs are 10 ~ 17. After May 24, 2006, Thalomid was approved for first line use of Multiple Myeloma. In addition to 10~17, Condition_IDs of 271 and 272 are considered on-label use.

Condition_ID and ICD-9 codes crosswalk example

[63] Definition of "Dispensations." – New prescriptions plus prescription refills

| CONDITION_ID | DIAGNOSIS_CODE | DIAGNOSIS_TEXT |
|---|---|---|
| 10 | 030 | LEPROSY |
| 11 | 030 | LEPROMATOUS LEPROSY |
| 12 | 030.1 | TUBERCULOID LEPROSY |
| 13 | 030.1 | REALLY BAD LEPROSY [sic] |
| 14 | 030.2 | INDETERMINATE LEPROSY |
| 15 | 030.3 | BORDERLINE LEPROSY |
| 16 | 030.8 | LEPROSY NEC |
| 17 | 030.9 | LEPROSY NOS |
| 271 | 203.0 | MULTIPLE MYELOMA ET AL [sic] |
| 272 | 203.0 | MULTIPLE MYELOMA |

- The Unique Patient_ID was used to link the dispensation file and the patient condition file.
- The Dose_Sequence file was used to get the dose and quantity dispensed. This file was linked to the dispensation file by the dispensation_ID. The crosswalk between dose of Thalomid and Revlimid and the internal Celgene code for the same was found in the Dosage_Strength file.
- Redbook AWP pricing was used to calculate the costs of off-label prescribing for Thalomid and Revlimid. These calculations did not include the rebates and discounts provided by Celgene since, despite my requests, I have not been provided with Celgene's price discounting information. This was used to get the proportion of off-label use of Thalomid for Medicare for the time-period of 2001Q3-2005.

Key assumptions that I made for calculating damages with Celgene's RevAssist and STEPS program:

- Where dates of initial diagnosis were not available, the prescription was considered on-label if the patient was ever diagnosed with any of the approved indications for Thalomid and Revlimid.
- Since information was not available regarding prescription of dexamethasone along with Thalomid, all prescriptions with and without dexamethasone were considered on-label for approved indications.
- Since Thalomid was approved for treatment of multiple myeloma in first line, any use of Thalomid for multiple myeloma was considered on-label after May 24, 2006
- It was not possible to determine first-line and second-line use of Revlimid from RevAssist data in the absence of data on all the claims for all the medications for patients who received Revlimid.
- For Revlimid, we were only able to determine the total usage between 2005 Q4 – 2015 Q1. Humana data was used to calculate the percent off-label use by analyzing the data by lines of therapy.
- Diagnostic information was not available in the claims data on deletion of 5q cytogenic abnormality, a condition of on-label prescribing for these medications. So conservatively all MDS prescriptions were considered on-label.

### D.2 Humana data analysis methodology for calculation of alleged Revlimid off-label use

The Humana database, comprising claims from 2007 to 2013 was employed to study percentage off-label use of Revlimid by lines of therapy. From the available files of Humana, the Rx_claims_All, med_claims_all files were used. The Rx_claims_all file was used to identify the prescriptions of the Revlimid, dexamethasone and other related drugs for multiple myeloma. The med_claims_all file was used to identify the diagnosis of the patients. The off-label and on-label usage of Revlimid was defined based on presence or absence of relevant diagnosis codes; prior prescriptions of alternative drug for a given time period; before prescription of Revlimid. The analysis was performed on patients with data in both rx_claims_all and med_claims_all files. Patients with data in only rx_claims_all file and missing data in med_claims_all were dropped from analysis. Since the reason for missing information from med_claims_all file is not known, this results in a conservative estimate of off-label usage for Revlimid.

The following provides a step-wise breakdown of the methodology employed to carry out the analysis:

1. Collect all the Revlimid claims from Rx_Claim_All file, using NDC codes for Revlimid (see Appendix F).[64]

2. Select all drug claims of Revlimid users from Rx_Claim_All file.

3. Search all NDCs for alternative drugs to Revlimid. (Appendix I)

[64] The Drug Listing Act of 1972 requires registered drug establishments to provide the Food and Drug Administration (FDA) with a current list of all drugs manufactured, prepared, propagated, compounded, or processed by it for commercial distribution. (See Section 510 of the Federal Food, Drug, and Cosmetic Act (Act) (21 U.S.C. § 360)). Drug products are identified and reported using a unique, three-segment number, called the National Drug Code (NDC), which serves as a universal product identifier for drugs. FDA publishes the listed NDC numbers and the information submitted as part of the listing information in the NDC Directory which is updated daily.

4. Obtain all the claims of alternative drugs from Revlimid users. Set up the first fill_date within each patient as index_date_otherther. (Appendix I)

5. Search all NDCs for dexamethasone. (Appendix H)

6. Obtain all the claims of dexamethasone from Revlimid users. Set up the first fill_date within each patient as index_date_dexa.

7. Collect all the diagnoses of Revlimid users, using medical_primary_diagnosis_code and MEDICAL_DIAGNOSIS_CODE_2- MEDICAL_DIAGNOSIS_CODE_9.

8. Users with both rx and diagnosis data retained. Users with missing diagnosis information dropped

9. Search all ICD-9 codes for myelodysplatic syndromes (MDS).

10. Obtain all the diag of myelodysplatic syndromes from Revlimid users. Set up the first medical_treatment_date within each patient as index_date_MDS.

11. Search all ICD-9 codes for Multiple Myeloma (MM).

12. Obtain all the diag of multiple myeloma from Revlimid users. Set up the first medical_treatment_date within each patient as index_date_MM.

13. Search all ICD-9 codes for mantle cell lymphoma (MCL).

14. Obtain all the diag of mantle cell lymphoma from Revlimid users. Set up the first medical_treatment_date within each patient as index_date_MCL.

15. Off-label definition.

From 01/01/2007 to 06/05/2013,

a) Fill_date of Revlimid claims is earlier than all of index_date_MDS and index_date_MM.

b) Fill_date of Revlimid claims is earlier than all of index_date_MDS, but later than index_date_MM. Meanwhile, the Fill_date is earlier than both index_date_otherther and index_date_dexa.

From 01/01/2007 to 12/31/2014,

a) Fill_date of Revlimid claims is earlier than all of index_date_MDS, index_date_MM, and index_date_MCL.

b) Fill_date of Revlimid claims is earlier than all of index_date_MDS and index_date_MCL, but later than index_date_MM. Meanwhile, the Fill_date is earlier than both index_date_otherther and index_date_dexa.

5. Damages definition

Damages is defined as the total of net_paid_amount from off-label Revlimid claims.

**D.3. Medicare Damages Methodology**

I used Medicare Part D data to calculate the damages to Medicare. This data contained 100% of the amounts paid by the Medicare Part D program for each of the Thalomid and Revlimid claims during 2006 to 2014. Medicare Advantage claims for Revlimid and Thalomid were not available and so our estimates of Medicare Thalomid and Revlimid payments are lower than what actually was purchased by Medicare.

Using these data, I first calculated the total claims for Thalomid and Revlimid from 2006 to 2014. I calculated the Medicare off-label use and corresponding damages for Thalomid and Revlimid by using off-label percentages seen in STEPS data and Humana data.[65]

On average, for the 2006-2014 time-period, the Medicare damages were [redacted] of the overall illegal off-label use of Thalomid from the STEPS program. I calculated the illegal off-label use of Thalomid for years going back to 2001 Q3 in STEPS data. I calculated the damages to the Medicare program from 2001Q3 to 2005 to be [redacted] of the damages derived from STEPS program for those years.

For Revlimid, based on the [redacted] off-label use on Revlimid in Humana dataset, I calculated the damages to Medicare program due to allegedly fraudulent Revlimid claims to be [redacted] of the total Revlimid claims and those amounted to [redacted] claims.

### D.4 Damages calculation methodology for Federal Programs

Damages to other federal programs are calculated based on the analysis I was able to do on Medicare off-label claims for Thalomid and Revlimid based on annual program medical expenditures. Thus, if the damages to Medicare for the year 2011 were D% of the total Medicare pharmaceutical expenditure/healthcare expenditure for the year 2011; then the damages for the U.S Department of Veterans Affaris (VA), Tricare, Federal employment health benefits and 340B public clinics are calculated at D% of their total program pharmaceutical spending/total healthcare expenditures for the year 2011. Where program pharmaceutical expenditures were

[65] I intend to update my analysis for damages to the Medicare program by utilizing the information from Medicare Part A and Part B data made available too late to analyze for this report. Given the information from Medicare Part A and Part B, I shall be able to analyze the off-label use by lines of therapy. My current damage estimates are understated.

available I used that percent, while for programs that only reported overall health care expenditures I used that percent based on Medicare spending. Since I have not yet been provided data on Revlimid and Thalomid spending in the Medicare Advantage program, these calculations are conservative. If I receive data to calculate the Medicare Advantage damages due to allegedly fraudulent Revlimid and Thalomid claims, all of these calculations will be updated.

### D.5 Veterans Affairs - Damages calculation methodology and data sources

The total medical care expenditure is available from the VA website for most??? years.[66] For the years for which the medical expenditure was not reported, I calculated the budget of the VA for total medical care expenditures from years available to me. I calculated the damages using the methodology described in D.4

### D.6 Tricare - Damages calculation methodology and data sources

The number of enrollees per year in the Tricare and the pharmaceutical expenditure for the enrollees per year is available from Tricare's report to the Congress for certain years.[67] I calculated the Tricare pharmaceutical expenditures budget based on this information. The years for which the pharmaceutical expenditure was not available to me, I calculated the budget of the Tricare Pharmaceutical expenditure budget for the remaining years from years for which this is reported. I calculated the damages using the methodology described in D.4

---

[66] http://www.va.gov/vetdata/Expenditures.asp. See also, Department of Veterans Affairs Fiscal Year 2008,2009,2010, 2011, 2012, 2013, 2014 Budget Estimate

[67] NHEs in 2007 and 2009-2014 are from Evaluation of the TRICARE Program: Access, Cost, and Quality Fiscal Year Report to Congress.
NHEs in 1999-2006 and 2008 are extrapolated from NHEs in 2007 and 2012.

### D.7 Federal Employees Health Benefits - Damages calculation methodology and data sources

The total number of federal employees and retirees enrolled for health benefits and the total federal healthcare expenditure is reported years.[68] For those years for which the total enrollment and healthcare expenditure is not available, I extrapolated the damages and adjusted for medical cost inflation based on the years for which it is available. I calculated the damages using the methodology described in D.4.

### D.8 340B Clinics - Damages calculation methodology and data sources

The total drug expenditures on 340B drugs by 340B providers is available for the years 2005, 2010, 2013 and 2014.[69] I calculated the damages using the methodology described in D.4. For those years for which data on 340B drug expenditures is not reported, I extrapolated the damages based on the years for which data is reported.

### D.9 Indian Health Service (IHS) - Damages calculation methodology and data sources

The total number of enrollees and per capita healthcare expenditure is available for 2010-2014 for the Indian Health Service.[70] I calculated the total healthcare expenditures for each of the years based on the information available for 2010-2014. I calculated the damages using the methodology

---

[68] Example; Federal Employees Health Benefits Program (FEHB): An overview – Feb 25, 2015 by Kirstin Blom and Ada Cornell gives the number of FEHB enrollees and associated costs for the year 2014.

[69] http://www.medpac.gov/documents/november-2014-meeting-presentation-the-340b-drug-pricing-program.pdf?sfvrsn=0. See also, http://www.harriswilliams.com/sites/default/files/industry_reports/340b_discount_drug_program_overview.pdf

[70] Example; Indian Health Service healthcare spending per user for the year 2013: http://www.ncai.org/resources/ncai-publications/indian-country-budget-request/FY2013_Budget_Health_Care.pdf accessed August 9, 2015. 2. Example; Enrollment and healthcare spending of Indian Health Service year 2014: http://www.ihs.gov/newsroom/factsheets/ihsyear2014profile/ accessed August 9, 2015

described in D.4. For the years data was not available to me, I extrapolated the damages on the years for which data is reported.

**D.10 Medicaid - Damages calculation methodology and data sources**

**Damages calculation for the states with both claims and diagnosis information available:**

I received claims data on Revlimid and Thalomid and corresponding diagnosis information from the Medicaid programs of the states of New York, Louisiana, Wisconsin, Delaware and the District of Columbia. From these data, I was able to calculate the damages to the Medicaid programs for each of these states using a conservative calculation strategy.

The key assumptions and strategies for analysis to overcome limitations in the data I analyzed are:

- All on-label prescriptions of Thalomid or Revlimid are not related to any alleged illegal promotion activities.
- Where dates of the patient's initial diagnosis were not available, the prescription was considered on-label if the patient was ever diagnosed with any of the approved indications for Thalomid and Revlimid.
- ICD-9 (International Statistical Classification of Diseases and related Health Problems) codes are not available for first line and second line multiple myeloma therapies. ICD-9 codes is a set of codes used by physicians, hospitals, and allied health workers to indicate **diagnosis** for all patient encounters. RevAssist and STEPS data and most datasets provided to me do not give any information of the drugs other than Revlimid and Thalomid prescribed for the patients. For Revlimid usage in multiple myeloma, the prescription was considered on-label when no

information was available to me on the lines of therapies for the multiple myeloma indication.

- Prescriptions were considered on-label where information was not available on whether Thalomid or Revlimid was prescribed along with Dexamethasone for the multiple myeloma indication.
- Thalomid was approved as a first-line treatment for multiple myeloma on May 25, 2006. So every multiple myeloma prescription for Thalomid was considered on-label after May 25, 2006 in the Celgene STEPS data as there was no information on dexamethasone prescriptions available to me.
- Revlimid was approved for second-line multiple myeloma treatment on June 30, 2006. With the Celgene RevAssist data, I was able to determine the aggregate Revlimid usage. However, it was impossible to analyze the illegal off-label use with these data because it was not possible to distinguish between lines of therapies.
- Because it was the most detailed claims data we had access to for assessing off-label use of Revlimid, we used Humana claims data to determine the percentage of off-label usage by analyzing treatment received by Revlimid patients by lines of therapies.
- Prescriptions for patients with and without 5q cytogenetic abnormality were considered on-label where information was not available regarding presence of a 5q cytogenetic abnormality in Myelodysplastic Syndrome (MDS) patients, and thus were not included in my damages calculations even though some of these claims were off-label.

**Damages calculation for the states with no diagnosis information available:**

Based on discovery requests I have received claims data on Revlimid and Thalomid for the states of Nevada, New Jersey and Texas. I calculated the overall Thalomid and Revlimid usage for each of these states using NDC codes seen in Appendix F. The damages for allegedly fraudulent Thalomid claims for these states were calculated based on the alleged percent illegal off-label use of Thalomid derived from the STEPS data. Similarly, the damages due to allegedly fraudulent Revlimid claims for these states were approximated based on the alleged percent illegal off-label use of Revlimid derived from the Humana data. This methodology is similar to that employed for the Medicare damages calculations. For these particular states, it was assumed that the states gave counsel complete data available to them for Revlimid and Thalomid subsequent to their marketing approval.

**Damages calculation methodology for the states where claims data needed for calculations is not available**:

A number of states have not made any Revlimid or Thalomid claims data available despite subpoenas from counsel. Medicaid enrollees and pharmaceutical spending for each of these states for the period of 2004-2015 were obtained from the cms.gov website.[71]

**Damages calculation for the states with no claims or diagnosis information available:** For states where no claims or diagnosis information was available, I calculated the damages based on

[71] https://www.cms.gov/Medicare-Medicaid-Coordination/Medicare-and-Medicaid-Coordination/Medicare-Medicaid-Coordination-Office/StateProfiles.html

accessed August 11, 2015

the proportion of Medicare damages of the total medicare pharmaceutical spending for that year. For example; if Medicare damages for Thalomid represented 'y%' of its pharmaceutical spending for year the 2011, then for each of the states with no data available, the damages were approximated to be 'y%' of that state's pharmaceutical spending for the year 2011. The same strategy was employed for estimating damages related to allegedly fraudulent Revlimid claims.

State-wise damages to Medicaid program due to Revlimid's allegedly fraudulent off-label prescriptions

| | |
|---|---|
| AK | [redacted] |
| AL | [redacted] |
| AR | [redacted] |
| AZ | [redacted] |
| CA | [redacted] |
| CT | [redacted] |
| FL | [redacted] |
| GA | [redacted] |
| HI | [redacted] |
| IA | [redacted] |
| ID | [redacted] |
| IL | [redacted] |
| IN | [redacted] |
| KS | [redacted] |
| KY | [redacted] |
| MA | [redacted] |
| MD | [redacted] |
| ME | [redacted] |
| MI | [redacted] |
| MO | [redacted] |
| MS | [redacted] |
| MT | [redacted] |
| NC | [redacted] |
| ND | [redacted] |
| NE | [redacted] |
| NH | [redacted] |
| NM | [redacted] |
| OH | [redacted] |
| OK | [redacted] |
| OR | [redacted] |
| PA | [redacted] |
| RI | [redacted] |
| SC | [redacted] |
| SD | [redacted] |
| TN | [redacted] |
| UT | [redacted] |
| VT | [redacted] |
| WA | [redacted] |

| | |
|---|---|
| WV | [redacted] |
| **WY** | |
| NY | |
| DC | [redacted] |
| WI | [redacted] |
| LA | |
| DE | |
| TX | |
| NV | |
| NJ | [redacted] |
| VA | [redacted] |
| Total | |

Statewise damage to Medicaid due to Thalomid's allegedly fraudulent off-label prescriptions

| | |
|---|---|
| AK | [redacted] |
| AL | |
| AR | |
| AZ | |
| CA | |
| CT | |
| FL | |
| GA | |
| HI | |
| IA | |
| ID | |
| IL | |
| IN | |
| KS | |
| KY | |
| MA | |
| MD | |
| ME | |
| MI | |
| MO | |
| MS | |
| MT | |

| | |
|---|---|
| NC | [redacted] |
| ND | [redacted] |
| NE | [redacted] |
| NH | [redacted] |
| NM | [redacted] |
| OH | [redacted] |
| OK | [redacted] |
| OR | [redacted] |
| PA | [redacted] |
| RI | [redacted] |
| SC | [redacted] |
| SD | [redacted] |
| TN | [redacted] |
| UT | [redacted] |
| VT | [redacted] |
| WA | [redacted] |
| WV | [redacted] |
| WY | [redacted] |
| NY | [redacted]5 |
| DC | [redacted] |
| WI | [redacted] |
| LA | [redacted] |
| DE | [redacted] |
| TX | [redacted] |
| NV | [redacted] |
| NJ | [redacted] |
| VA | [redacted] |
| Total | [redacted] |

**D.11 State employee health plans – Methodology for damages**

The total number of state and local employees in the U.S. and for each of the states is available through the MEPS dataset and through public reports by PEW Charitable Trusts.[72] The damages are calculated in the following way:

The damages to state employee health plans, due to off-label prescriptions of Thalomid and Revlimid were approximated based on the annual healthcare expenditure of each state plan. The annual health expenditure for each state as reported by PEW Charitable Trusts report for year 2011 to 2013 were used. The annual expenditure for other years (1999-2014) where data was not available was extrapolated based on the annual growth rate for these 3 years. The extrapolation was done separately for each state. The damages due to allegedly fraudulent Thalomid and Revlimid claims were estimated as a percentage of the annual total health care expenditure. The damages were based on the percent off-label claims for Thalomid and Revlimid estimated in Medicare data. For example; if Medicare damages for Thalomid represented 'y%' of its pharmaceutical spending for year the 2011, then for each of the states with no data available, the damages were approximated to be 'y%' of that state's pharmaceutical spending for the year 2011. The same strategy was employed for estimating damages related to allegedly fraudulent Revlimid claims.

---

72 http://www.pewtrusts.org/~/media/assets/2014/08/stateemployeehealthcarereportseptemberupdate.pdf

Damages due to allegedly fraudulent Thalomid and Revlimid prescriptions to state employee health plans (1999 – 2014):

| State | RevlimidAggregate | Thalomid aggregate |
|---|---|---|
| Alabama | [redacted] | [redacted] |
| Alaska | [redacted] | [redacted] |
| Arizona | [redacted] | [redacted] |
| Arkansas | [redacted] | [redacted] |
| California | [redacted] | [redacted] |
| Connecticut | [redacted] | [redacted] |
| Delaware | [redacted] | [redacted] |
| Florida | [redacted] | [redacted] |
| Georgia | [redacted] | [redacted] |
| Hawaii | [redacted] | [redacted] |
| Idaho | [redacted] | [redacted] |
| Illinois | [redacted] | [redacted] |
| Indiana | [redacted] | [redacted] |
| Iowa | [redacted] | [redacted] |
| Kansas | [redacted] | [redacted] |
| Kentucky | [redacted] | [redacted] |
| Louisiana | [redacted] | [redacted] |
| Maine | [redacted] | [redacted] |
| Maryland | [redacted] | [redacted] |
| Massachusetts | [redacted] | [redacted] |
| Michigan | [redacted] | [redacted] |
| Mississippi | [redacted] | [redacted] |
| Missouri | [redacted] | [redacted] |
| Montana | [redacted] | [redacted] |
| Nebraska | [redacted] | [redacted] |
| Nevada | [redacted] | [redacted] |
| New hamshire | [redacted] | [redacted] |
| New Jersey | [redacted] | [redacted] |
| New Mexico | [redacted] | [redacted] |
| New York | [redacted] | [redacted] |
| North Carolina | [redacted] | [redacted] |
| North Dakota | [redacted] | [redacted] |
| Ohio | [redacted] | [redacted] |
| Oklahoma | [redacted] | [redacted] |
| Oregon | [redacted] | [redacted] |
| Rhode Island | [redacted] | [redacted] |

| | | |
|---|---|---|
| **South Carolina** | [redacted] | [redacted] |
| **South Dakota** | [redacted] | [redacted] |
| **Tennessee** | [redacted] | [redacted] |
| **Texas** | [redacted] | [redacted] |
| **Utah** | [redacted] | [redacted] |
| **Vermont** | [redacted] | [redacted] |
| **Virginia** | [redacted] | [redacted] |
| **Washington** | [redacted] | [redacted] |
| **West Virginia** | [redacted] | [redacted] |
| **Wisconsin** | [redacted] | [redacted] |
| **Wyoming** | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] |

**D.12 Childrens Health Insurance Plan (CHIP) damages calculations methodology**

The total expenditure for CHIP is available for the years 1999-2009.[73] I calculated the total expenditures for years 2010-2014 based on the growth rate of CHIP expenditures from 2008 to 2014. I approximated 2009. The federal and state share of the expenditures is also available to me for the years 1999-the damages to CHIP program separately for federal and state entities. I based the approximation on my analysis of damages to the Medicare program. For example; if the damages to Medicare program for the year 2009 were ‘z%’ of the total Medicare health expenditure, then the damages to the CHIP program were also ‘z%’ of the total CHIP expenditure for the year 2009.

[73] See; http://kff.org/other/state-indicator/total-chip-spending/ See also; http://www.medicaid.gov/chip/downloads/chip_report_congress-2014.pdf accessed August 8, 2015

| | Federal Share - Damages due to fraudulent Thalomid prescriptions | |
|---|---|---|
| | Total CHIP spending | Damages |
| 2014 | [redacted] | [redacted] |
| 2013 | | |
| 2012 | | |
| 2011 | | |
| 2010 | | |
| 2009 | | |
| 2008 | | |
| 2007 | | |
| 2006 | | |
| 2005 | | |
| 2004 | | |
| 2003 | | |
| 2002 | | |
| 2001 | | |
| 2000 | | |
| 1999 | | |
| | Total | [redacted] |

| State Share - Damages due to fraudulent Thalomid prescriptions | | |
|---|---|---|
| Year | Total CHIP spending | Damages |
| 1999 | [redacted] | [redacted] |
| 2000 | [redacted] | [redacted] |
| 2001 | [redacted] | [redacted] |
| 2002 | [redacted] | [redacted] |
| 2003 | [redacted] | [redacted] |
| 2004 | [redacted] | [redacted] |
| 2005 | [redacted] | [redacted] |
| 2006 | [redacted] | [redacted] |
| 2007 | [redacted] | [redacted] |
| 2008 | [redacted] | [redacted] |
| 2009 | [redacted] | [redacted] |

| | | |
|---|---|---|
| 2010 | [redacted] | [redacted] |
| 2011 | [redacted] | [redacted] |
| 2012 | [redacted] | [redacted] |
| 2013 | [redacted] | [redacted] |
| 2014 | [redacted] | [redacted] |
| | Total | [redacted] |

| Federal Share - Damages due to fraudulent Revlimid prescriptions | | |
|---|---|---|
| Year | Total CHIP spending | Damages |
| 2014 | [redacted] | [redacted] |
| 2013 | [redacted] | [redacted] |
| 2012 | [redacted] | [redacted] |
| 2011 | [redacted] | [redacted] |
| 2010 | [redacted] | [redacted] |
| 2009 | [redacted] | [redacted] |
| 2008 | [redacted] | [redacted] |
| 2007 | [redacted] | [redacted] |
| 2006 | [redacted] | [redacted] |
| Total | | [redacted] |

| State Share - Damages due to allegedly fraudulent Revlimid prescriptions | | |
|---|---|---|
| Year | Total CHIP spending | Damages |
| 2014 | [redacted] | [redacted] |
| 2013 | [redacted] | [redacted] |
| 2012 | [redacted] | [redacted] |
| 2011 | [redacted] | [redacted] |
| 2010 | [redacted] | [redacted] |
| 2009 | [redacted] | [redacted] |
| 2008 | [redacted] | [redacted] |
| 2007 | [redacted] | [redacted] |
| 2006 | [redacted] | [redacted] |
| | Total | [redacted] |

**D.13 State correction inmates – damages calculations methodology**

The damages to the state correction inmates program was estimated in a similar fashion as described for the state employee health plan. I had total medical expenditure for the years 2007 to 2013 for the state correction inmates plan through the PEW Charitable Trust[74]. The annual medical expenditure for other years were extrapolated based on the growth rate observed for these years. The damages were based on the percent off-label claims for Thalomid and Revlimid estimated in Medicare data. For example; if Medicare damages for Thalomid represented 'y%' of its pharmaceutical spending for year the 2011, then for each of the states with no data available, the damages were approximated to be 'y%' of that state's pharmaceutical spending for the year 2011. Same strategy was employed for estimating damages related to allegedly fraudulent Revlimid claims.

Total damages to state correction inmates program due to allegedly fraudulent Thalomid and Revlimid claims (1999 – 2014):

| State | Revlimid Aggregate | Thalomid aggregate |
|---|---|---|
| Alabama | [redacted] | |
| Alaska | | |
| Arizona | | |
| Arkansas | | |
| California | | |
| Connecticut | | |
| Delaware | | |
| Florida | | |
| Georgia | | |

74 http://www.pewtrusts.org/~/media/assets/2014/07/stateprisonhealthcarespendingreport.pdf.

Accessed August 2015

| | | |
|---|---|---|
| **Hawaii** | [redacted] | |
| **Idaho** | [redacted] | |
| **Illinois** | [redacted] | |
| **Indiana** | [redacted] | |
| **Iowa** | [redacted] | |
| **Kansas** | [redacted] | |
| **Kentucky** | [redacted] | |
| **Louisiana** | [redacted] | |
| **Maine** | [redacted] | |
| **Maryland** | [redacted] | |
| **Massachusetts** | [redacted] | |
| **Michigan** | [redacted] | |
| **Mississippi** | [redacted] | |
| **Missouri** | [redacted] | |
| **Montana** | [redacted] | |
| **Nebraska** | [redacted] | |
| **Nevada** | [redacted] | |
| **New Hampshire** | [redacted] | |
| **New Jersey** | [redacted] | |
| **New Mexico** | [redacted] | |
| **New York** | [redacted] | |
| **North Carolina** | [redacted] | |
| **North Dakota** | [redacted] | |
| **Ohio** | [redacted] | |
| **Oklahoma** | [redacted] | |
| **Oregon** | [redacted] | |
| **Pennsylvania** | [redacted] | |
| **Rhode Island** | [redacted] | |
| **South Carolina** | [redacted] | |
| **South Dakota** | [redacted] | |
| **Tennessee** | [redacted] | |
| **Texas** | [redacted] | |
| **Utah** | [redacted] | |
| **Vermont** | [redacted] | |
| **Virginia** | [redacted] | |
| **Washington** | [redacted] | |
| **West Virginia** | [redacted] | |
| **Wisconsin** | [redacted] | |

| | | |
|---|---|---|
| Wyoming | [redacted] | |
| Total | | |

**D.14 KOL speaker compensation analysis using Medicare data - Methodology**

The KOL speakers paid by Celgene for Revlimid promotion are available from 2006 to 2014. I identified the KOL speakers' DEA and/or NPI numbers using their full names. Revlimid and Thalomid reimbursement records in Medicare Part D program were available for 2006 to 2014. With DEA and/or NPI numbers, I could identify the drug claims prescribed by the KOL speakers. As discussed earlier, all Medicare prescriptions written by these KOLs represent allegedly illegal kickback damages.

The following provides a step-wise breakdown of the methodology employed to carry out the analysis:

1. Extract KOL speaker's first name and last name from KOL speaker list.
2. Use KOL speaker's first and last names to identify KOL speakers' DEA numbers from the DEA list.
3. Using KOL speaker's first and last names to identify KOL speakers' NPI numbers from the NPI list.
4. The prescriber_id in the Medicare Part D database is either in DEA or NPI format.
5. Collect all Revlimid and Thalomid claim associated with identified KOL speakers' DEA number or NPI number in Medicare Part D data.
6. The KOL damages are defined as the total CVRD-D-PLAN-PAID of claims prescribed by identified KOL speakers.

Please see all the identifiable KOL speakers with DEA and/or NPI numbers in the table below.

Table 11: List of KOL with DEA and / or NPI numbers identified in Medicare Part D data.

| KOL_Speakers | DEA | NPI |
|---|---|---|
| [redacted] | | |

| | | | |
|---|---|---|---|
| [redacted] | | [redacted] | |
| [redacted] | | | [redacted] |
| [redacted] | | [redacted] | |
| [redacted] | | | [redacted] |
| [redacted] | | | |
| [redacted] | | [redacted] | |
| [redacted] | | | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| | | | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | | [redacted] |
| [redacted] | | [redacted] | |
| [redacted] | | | [redacted] |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| | | | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | | [redacted] |
| [redacted] | | [redacted] | |
| [redacted] | | | [redacted] |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | [redacted] | |
| [redacted] | | | |

| | | |
|---|---|---|
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | | [redacted] |
| | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |

| | | |
|---|---|---|
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | | |

| | | |
|---|---|---|
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| | | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |

| | | |
|---|---|---|
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |

| | | |
|---|---|---|
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| | | |
| [redacted] | [redacted] | |

| | | |
|---|---|---|
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | | |

| | | |
|---|---|---|
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| | | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |

| | | |
|---|---|---|
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| | | |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | |
| | | |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | [redacted] |

| | | |
|---|---|---|
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |

| | | |
|---|---|---|
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |

| | | |
|---|---|---|
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| | | |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| | | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| | | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | [redacted] |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | | [redacted] |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |

| | | |
|---|---|---|
| [redacted] | [redacted] | |
| [redacted] | | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |

**D15. Methodology for analysis of KOL prescriptions using Celgene RevAssist data:**

I was provided with a list of the physicians, who served as key opinion leaders (KOL) for Revlimid and received payment from Celgene from 2006 to 2014 for Revlimind speaking arrangements. The list comprised of 556 physicians. The following methodology was employed to identify the precriptions written by these physicians and calculate the associated damages.

1. Extract KOL speaker's first name and last name from KOL list.

2. Using KOL speaker's first and last names to identify KOL speakers' prescriber_ids in Celgene data using Celgene.Prescriber file.

3. Collect all dispensations associated with identified KOL speakers' prescriber_ids in Celgene.dispensation file.

4. Merge the dispensation claims with Celgene.dispensation_sequence file to assign dosage to each dispensation.

5. Use prescription_date and dosage to assign cost to each dispensation.

6. The KOL damages are defined as the total costs of dispensations prescribed by KOL speakers.

Prescriber IDs Identified for Speakers in the RevAssist data

| Speaker | Prescriber_id |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

| | | |
|---|---|---|
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |

| | | |
|---|---|---|
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |

| | | |
|---|---|---|
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |

| | | |
|---|---|---|
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |

[redacted]

| | | | |
|---|---|---|---|
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |
| [redacted] | | | [redacted] |

[redacted]

| | | | | |
|---|---|---|---|---|
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |
| | [redacted] | | [redacted] | |

| | | |
|---|---|---|
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |
| [redacted] | | [redacted] |

**D16. Methodology to evaluate if speakers (KOLs) paid high compensation by Celgene prescribed more than low paid KOLs:**

I investigated if there is a statistically significant difference in prescribing behavior of the physicians who received high payments from Celgene for Celgene's Revlimid Speaker Program. The high paid physicians were defined as physician who received greater than $100,000 from Celgene over the period of 2006 to 2014. I conducted this analysis using different thresholds i.e. threshold of $150,000, $200,000 and $100,000 as the compensation cut-point. The prescribing behavior was measured based on the prescriptions of Revlimid over this time frame considered.[75]

[75] I conducted this analysis using RevAssist data (technical appendix D.15)since it should consist of the entire universe of prescriptions for Revlimid through each of the physicians. Since Medicare prescriptions are a part of the RevAssist data, any result that applies to RevAssist data should apply to Medicare data as well (given there is appropriate sample size to conduct the test in Medicare data).

At a defining threshold of $100,000 there were [redacted] physicians who received higher than threshold payment. The mean number of prescriptions per high paying physician was [redacted]; whereas the mean number of prescriptions per low paying physician was [redacted]. This difference was statistically significant with a p-value of <0.0001. The statistically significant difference held over the other two compensation thresholds. The following table summarises the results.

Table 10: Comparison of prescription between highly paid KOLs and low paid KOLs.

| **Threshold: Pay>100,000** | | | | |
|---|---|---|---|---|
| | PrescriptionCount | Number of KOL | Prescriptions/KOL | P value |
| **Pay>100,000** | [redacted] | | | |
| **Pay<100,000** | | | | <0.0001 |
| | | | | |
| **Threshold: Pay>150,000** | | | | |
| | PrescriptionCount | Number of KOL | Prescriptions/KOL | P value |
| **Pay>150,000** | [redacted] | | | |
| **Pay<150,000** | | | | <0.0001 |
| | | | | |
| **Threshold: Pay>200,000** | | | | |
| | PrescriptionCount | Number of KOL | Prescriptions/KOL | P value |
| **Pay>200,000** | [redacted] | | | |
| **Pay<200,000** | | | | <0.0001 |

**Figure showing correlation in Revlimid speaking fees paid by Celgene to [redacted] and prescriptions of Revlimid. [redacted] was paid more than [redacted] in the KOL speaker program.**


Prescription counts - [redacted]
45
40
35
30
25
20
15
10
5
0
[redacted]
Q1-06
Q3-06
Q1-07
Q3-07
Q1-08
Q3-08
Q1-09
Q3-09
Q1-10
Q3-10
Q1-11
Q3-11
Q1-12
Q3-12
Q1-13
Q3-13
Q1-14
Q3-14
Q1-15

**Appendix E: ICD-9 Codes Categorization**

On-label ICD-9 Codes for Thalomid

| On Label Diagnosis | Diagnosis Text |
|---|---|
| 30.0 | LEPROSY/LEPROMATOUS LEPROSY |
| 30.1 | TUBERCULOID LEPROSY/REALLY BAD LEPROSY |
| 30.2 | INDETERMINATE LEPROSY |
| 30.3 | BORDERLINE LEPROSY |
| 30.8 | LEPROSY NEC |
| 30.9 | LEPROSY NOS |
| 203.0 | MULTIPLE MYELOMA |
| 203.01 | MULTIPLE MYELOMA |
| 203.02 | MULTIPLE MYELOMA |

On-label ICD-9 Codes for Revlimid

| On_Label Diagnosis | Diagnosis Text |
|---|---|
| 238.71 | MYELODYSPLASTIC SYNDROME |
| 238.72 | MYELODYSPLASTIC SYNDROME |
| 238.73 | MYELODYSPLASTIC SYNDROME |
| 238.74 | MYELODYSPLASTIC SYNDROME |
| 238.75 | MYELODYSPLASTIC SYNDROME |
| 238.76 | MYELODYSPLASTIC SYNDROME |
| 203.0 | MULTIPLE MYELOMA |
| 203.01 | MULTIPLE MYELOMA |
| 203.02 | MULTIPLE MYELOMA |
| 200.4 | MANTLE CELL LYMPHOMA, UNSPECIFIED SITE, EXTRANODAL AND SOLID ORGAN SITES |
| 200.41 | MANTLE CELL LYMPHOMA, LYMPH NODES OF HEAD, FACE, AND NECK |
| 200.42 | MANTLE CELL LYMPHOMA, INTRATHORACIC LYMPH NODES |
| 200.43 | MANTLE CELL LYMPHOMA, INTRA-ABDOMINAL LYMPH NODES |
| 200.44 | MANTLE CELL LYMPHOMA, LYMPH NODES OF AXILLA AND UPPER LIMB |
| 200.45 | MANTLE CELL LYMPHOMA, LYMPH NODES OF INGUINAL REGION AND LOWER LIMB |
| 200.46 | MANTLE CELL LYMPHOMA, INTRAPELVIC LYMPH NODES |
| 200.47 | MANTLE CELL LYMPHOMA, SPLEEN |
| 200.48 | MANTLE CELL LYMPHOMA, LYMPH NODES OF MULTIPLE SITES |

## Appendix F: Thalomid and Revlimid NDC Codes Categorization

### F.1 NDC codes for Thalomid

| NDC |
|---|
| 59572010511 |
| 59572010513 |
| 59572010592 |
| 59572010593 |
| 59572020514 |
| 59572020517 |
| 59572020594 |
| 59572020597 |
| 59572021015 |
| 59572021095 |
| 59572021513 |
| 59572021593 |
| 59572022016 |
| 59572022096 |

### F.2 NDC codes for Revlimid

| NDC |
|---|
| 59572040200 |
| 59572040228 |
| 59572040500 |
| 59572040528 |
| 59572040530 |
| 59572041000 |
| 59572041028 |
| 59572041030 |
| 59572041500 |
| 59572041521 |
| 59572042000 |
| 59572042021 |
| 59572042500 |
| 59572042521 |
| 59572042525 |

## Appendix G: AWP Pricing (Redbook)

### G.1 Thalomid AWP Prices

| Year | Dosage (mg) | Unit price |
|---|---|---|
| 1998 | 50 | $7.50 |
| | 100 | - |
| | 150 | - |
| | 200 | - |
| 1999 | 50 | $7.84 |
| | 100 | - |
| | 150 | - |
| | 200 | - |
| 2000 | 50 | $8.21 |
| | 100 | - |
| | 150 | - |
| | 200 | - |
| 2001 | 50 | $9.02 |
| | 100 | - |
| | 150 | - |
| | 200 | - |
| 2002 | 50 | $12.00 |
| | 100 | - |
| | 150 | - |
| | 200 | - |
| 2003 | 50 | $21.49 |
| | 100 | $41.14 |
| | 150 | - |
| | 200 | $78.75 |
| | | |
| | 100 | $58.76 |
| | 150 | - |
| | 200 | $94.45 |
| 2005 | 50 | $42.38 |
| | 100 | $89.38 |
| | 150 | - |
| | 200 | $99.69 |
| 2006 | 50 | $73.12 |
| | 100 | $128.58 |
| | 150 | $140.54 |
| | 200 | $146.39 |
| 2007 | 50 | $102.61 |
| | 100 | $166.56 |

| | | |
|---|---|---|
| | 150 | $178.09 |
| | 200 | $189.63 |
| **2008** | 50 | $124.02 |
| | 100 | $201.32 |
| | 150 | $215.26 |
| | 200 | $229.20 |
| **2009** | 50 | $136.58 |
| | 100 | $221.70 |
| | 150 | $237.05 |
| | 200 | $252.41 |
| **2010** | 50 | $150.15 |
| | 100 | $243.73 |
| | 150 | $260.61 |
| | 200 | $277.50 |
| **2011** | 50 | $171.90 |
| | 100 | $279.03 |
| | 150 | $298.35 |
| | 200 | $317.68 |
| **2012** | 50 | $182.21 |
| | 100 | $295.77 |
| | 150 | $316.25 |
| | 200 | $336.74 |
| **2013** | 50 | $187.68 |
| | 100 | $304.64 |
| | 150 | $325.74 |
| | 200 | $346.85 |
| **2014** | 50 | $199.11 |
| | 100 | $323.19 |
| | 150 | $345.57 |
| | 200 | $367.97 |
| **2015** | 50 | $205.08 |
| | 100 | $332.89 |
| | 150 | $355.94 |
| | 200 | $379.01 |

**G.2 Revlimid AWP Prices**

| | | |
|---|---|---|
| **2005** | 2.5 | - |
| | 5 | $258.00 |
| | 10 | $270.00 |
| | 15 | - |
| | 20 | - |
| | 25 | - |
| **2006** | 2.5 | - |
| | 5 | $258.00 |
| | 10 | $270.00 |
| | 15 | $336.00 |
| | 20 | - |
| | 25 | $354.00 |
| **2007** | 2.5 | - |
| | 5 | $283.54 |
| | 10 | $296.73 |
| | 15 | $346.08 |
| | 20 | - |
| | 25 | $364.62 |
| **2008** | 2.5 | - |
| | 5 | $311.61 |
| | 10 | $326.11 |
| | 15 | $363.04 |
| | 20 | - |
| | 25 | $377.38 |
| **2009** | 2.5 | - |
| | 5 | $324.07 |
| | 10 | $339.16 |
| | 15 | $388.66 |
| | 20 | - |
| | 25 | $392.47 |
| **2010** | 2.5 | - |
| | 5 | $388.00 |
| | 10 | $406.05 |
| | 15 | $407.70 |
| | 20 | - |
| | 25 | $411.71 |
| **2011** | 2.5 | - |
| | 5 | $440.07 |
| | 10 | $447.62 |
| | 15 | $449.45 |
| | 20 | - |

| | | |
|---|---|---|
| | 25 | $453.87 |
| **2012** | 2.5 | $440.07 |
| | 5 | $466.47 |
| | 10 | $474.48 |
| | | |
| | 20 | - |
| | 25 | $481.10 |
| **2013** | 2.5 | $480.46 |
| | 5 | $480.46 |
| | 10 | $488.71 |
| | 15 | $490.71 |
| | 20 | $495.53 |
| | 25 | $495.53 |
| **2014** | 2.5 | $514.67 |
| | 5 | $514.67 |
| | 10 | $523.51 |
| | 15 | $525.65 |
| | 20 | $530.81 |
| | 25 | $530.81 |
| **2015** | 2.5 | $580.03 |
| | 5 | $580.03 |
| | 10 | $580.03 |
| | 15 | $580.03 |
| | 20 | $580.03 |
| | 25 | $580.03 |

**Appendix H: NDCs of Dexamethasone**

| NDC |
|---|
| 00023334807 |
| 00023334808 |
| 00054317644 |
| 00054317757 |
| 00054317763 |
| 00054417925 |
| 00054418025 |
| 00054418125 |
| 00054418225 |
| 00054418231 |
| 00054418325 |
| 00054418425 |
| 00054418625 |
| 00054817425 |
| 00054817525 |
| 00054817625 |
| 00054817925 |
| 00054818025 |
| 00054818125 |
| 00054818325 |
| 00065063136 |
| 00065064705 |
| 00065064710 |
| 00065064725 |
| 00065064835 |
| 00065065205 |
| 00065065210 |
| 00065853302 |
| 00069017702 |
| 00065065225 |
| 51552043004 |
| 51552043001 |
| 51552043002 |
| 62991202202 |
| 62991202204 |
| 38779040506 |
| 38779040505 |
| 38779040504 |
| 38779040503 |
| 38779040501 |

| |
|---|
| 60432046608 |
| 49884008501 |
| 49884008401 |
| 49884008601 |
| 49884008701 |
| 49884012901 |
| 00603114756 |
| 64980050924 |
| 00054317763 |
| 00054418025 |
| 00054818025 |
| 00054418125 |
| 00054817425 |
| 00054418225 |
| 00054818125 |
| 00054418325 |
| 00054817625 |
| 00054418425 |
| 00054817525 |
| 00054418625 |
| 00054818325 |
| 00054317757 |
| 00054817925 |
| 00054417925 |
| 54879000308 |
| 62991202205 |
| 52372072202 |
| 52372072203 |
| 52372072204 |
| 52372072201 |
| 38779040508 |
| 51927108100 |
| 55553080705 |
| 55553066110 |
| 51552002505 |
| 51552002501 |
| 51552002504 |
| 51552002502 |
| 51552002503 |
| 52372067906 |
| 52372067905 |
| 52372067901 |
| 52372067904 |

| |
|---|
| 52372067902 |
| 52372067903 |
| 63323051610 |
| 63323016530 |
| 63323050601 |
| 63323016501 |
| 63323016505 |
| 63370007025 |
| 63370007050 |
| 63370007010 |
| 63370007035 |
| 63370007020 |
| 63370007045 |
| 63370007015 |
| 62991104102 |
| 62991104103 |
| 62991104104 |
| 62991104106 |
| 62991104101 |
| 62991104105 |
| 38779007106 |
| 38779007109 |
| 38779007101 |
| 38779007103 |
| 38779007104 |
| 38779007105 |
| 38779007108 |
| 38779007102 |
| 38779287602 |
| 38779287601 |
| 67457042130 |
| 67457042254 |
| 67457042010 |
| 00069454101 |
| 67457042312 |
| 00069454501 |
| 00069454301 |
| 00069454701 |
| 45861003880 |
| 51927143000 |
| 61314029405 |
| 63307014001 |
| 63307014005 |

| |
|---|
| 24208072002 |
| 00641036721 |
| 00641036725 |
| 00069017702 |
| 00069017701 |
| 00069017802 |
| 00069019202 |
| 00069017902 |
| 00069019201 |
| 00069017901 |
| 00069017801 |
| 51927440500 |
| 62991153502 |
| 62991153504 |
| 38779190509 |
| 38779190503 |
| 38779190504 |
| 38779190508 |
| 38779190501 |
| 51927223100 |
| 63370006015 |
| 63370006035 |
| 63370006050 |
| 63370006020 |
| 63370006025 |
| 55553009205 |
| 51552002404 |
| 51552002402 |
| 51552002401 |
| 51552002403 |
| 38779190505 |
| 25332001105 |

## Appendix I: NDCs of Alternative Therapies to Revlimid

### (1) Aredia

| NDC |
|---|
| 00083260901 |
| 00083260601 |
| 00078046461 |
| 00078046391 |
| 00083260104 |

### (2) BiCNU

| NDC |
|---|
| 00015301260 |
| 23155026141 |
| 00015301238 |

### (3) Velcade

| NDC |
|---|
| 63020004901 |

### (4) Kyprolis

| NDC |
|---|
| 76075010101 |

### (5) Doxil

| NDC |
|---|
| 17314960002 |
| 17314960001 |
| 59676096002 |
| 59676096001 |

### (6) Farydak

| NDC |
|---|
| 00078065206 |
| 00078065106 |
| 00078065006 |

### (7) Mozobil

| NDC |
|---|
| 58468014001 |
| 00024586201 |

### (8) Pomalyst

| NDC |
|---|
| 59572050421 |
| 59572050400 |
| 59572050100 |
| 59572050300 |
| 59572050221 |
| 59572050321 |
| 59572050200 |
| 59572050121 |

**(9) Zometa**

| NDC |
|---|
| 00078035084 |
| 00078059061 |
| 00078038725 |

**(10) Cyclophosphamide**

| NDC |
|---|
| 00015050301 |
| 00015050302 |
| 00015050303 |
| 00015050041 |
| 00015050401 |
| 00015050141 |
| 00015050541 |
| 00015050641 |
| 00015050241 |
| 00015053941 |
| 00015054641 |
| 00015054741 |
| 00015054841 |
| 00015054941 |
| 00015054712 |
| 00015054912 |
| 00015054812 |
| 00013560693 |
| 00013561693 |
| 00013563670 |
| 00013564670 |
| 00013562693 |
| 00054813025 |
| 00054808925 |
| 00641226341 |

| |
|---|
| 00641226241 |
| 00641226441 |
| 00641226541 |
| 10019095601 |
| 10019095501 |
| 10019095616 |
| 10019095711 |
| 10019095701 |
| 10019095550 |
| 38779050605 |
| 38779050604 |
| 38779050603 |
| 00054412925 |
| 00054413025 |
| 00054038325 |
| 00054038225 |
| 00781325594 |
| 00781323394 |
| 00781324494 |
| 51927487100 |
| 51927442100 |

**(11) Thalomid**

| NDC |
|---|
| 59572021095 |
| 59572021015 |
| 59572021593 |
| 59572021513 |
| 59572022096 |
| 59572022016 |
| 59572020514 |
| 59572020597 |
| 59572020517 |
| 59572020594 |
| 59572010511 |
| 59572010592 |
| 59572010593 |
| 59572010513 |

# EXHIBIT J

Case 2:10-cv-03165-GHK-SS Document 249 Filed 10/23/15 Page 1 of 189 Page ID #:6700

Karen P. Hewitt (State Bar No. 145309)
kphewitt@JonesDay.com
Brian D. Hershman (State Bar No. 168175)
bhershman@JonesDay.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071.2300
Telephone: +1.213.489.3939
Facsimile: +1.213.243.2539

Kimberly A. Dunne (State Bar No. 142721)
kdunne@sidley.com
Michelle B. Goodman (State Bar No. 218607)
mgoodman@sidley.com
Sean A. Commons (State Bar No. 217603)
scommons@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: +1.213.896.6000
Facsimile: +1.213.896.6600

Attorneys for Defendant
CELGENE CORPORATION

(Additional Counsel listed on following page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO,

Plaintiffs,

*Ex rel.*

Case No. 10-cv-03165 GHK (SSx)

Assigned to the Honorable George H. King

**CELGENE CORPORATION'S OPPOSITION TO RELATOR'S *EX PARTE* APPLICATION**

Third-Party Fact Discovery: Closed
Rebuttal Expert Deadline: 10/25/2015
Expert Discovery Cutoff: 11/20/2015
Pretrial Conf. Date: Not Set
Trial Date: Not Set

Case 2:10-cv-03165-GHK-SS Document 249 Filed 10/23/15 Page 2 of 189 Page ID #:6701

BEVERLY BROWN,

Plaintiff-Relator,

v.

CELGENE CORPORATION,

Defendant.

*Additional Counsel:*

Toni-Ann Citera (admitted *pro hac vice*)
tcitera@JonesDay.com
JONES DAY
222 East 41st Street
New York, NY 10017
Telephone: +1.212.326.3939
Facsimile: +1.212.755.7306

James C. Stansel (admitted *pro hac vice*)
jstansel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: +1.202.736.8092
Facsimile: +1.202.736.8711

Case 2:10-cv-03165-GHK-SS Document 249 Filed 10/23/15 Page 3 of 189 Page ID #:6702

# TABLE OF CONTENTS


Page

I. ARGUMENT ..... 4

A. Dr. Hay's Proposed Expert Report Is Not a "Supplement" and Should Thus Be Excluded ..... 4

1. Relator's Failure to Comply with Deadlines Set by this Court Is Not Substantially Justified ..... 6

2. Relator's Submission of a Revised Expert Report at this Stage in the Proceedings Is Not Harmless ..... 10

B. Relator Has Not Met the Burden of Showing Good Cause to Obtain Ex Parte Relief to Modify the Scheduling Order ..... 12

Case 2:10-cv-03165-GHK-SS Document 249 Filed 10/23/15 Page 4 of 189 Page ID #:6703

## TABLE OF AUTHORITIES

Page

**CASES**

*Beller ex. rel. Beller v. United States*,
221 F.R.D. 696 (D.N.M. 2003) .......... 12

*Carson Harbor Village, Ltd. v. Unocal Corp.*,
No. 96-cv-3281-MMM, 2003 WL 22038700
(C.D. Cal. Aug. 8, 2003) .......... 6, 7

*Caviness v. Holland*, No. CV 109-098, 2011 U.S. Dist. LEXIS 31328
(S.D. Ga. Mar. 17, 2011) .......... 7, 8, 9

*Dixie Steel Erectors, Inc. v. Grove U.S., L.L.C.*, No. CIV-04-390-F,
2005 WL 3558663
(W.D. Okla. Dec. 29, 2005) .......... 5

*Hoffman v. Const. Protective Servs.*,
541 F.3d 1175 (9th Cir. 2008) .......... 10

*In re Asbestos Prods. Liab. Litig.*,
289 F.R.D. 424 (E.D. Pa. 2013) .......... 12

*Lanard Toys, Ltd. v. Novelty, Inc.*,
375 F. App'x 705 (9th Cir. 2010) .......... 10

*Medtronic Vascular, Inc. v. Abbot Cardiovascular Systems, Inc.*, 2008
U.S. Dist. LEXIS 112148 at *6
(N.D. Cal. Oct. 15, 2008) .......... 6

*Mission Power Eng'g Co. v. Continental Cas. Co.*,
883 F. Supp 488 (C.D. CA 1995) .......... 12

*Plumley v. Mockett*,
836 F. Supp. 2d 1053, 1062 (C.D. Cal. 2010) .......... 5, 7

Case 2:10-cv-03165-GHK-SS Document 249 Filed 10/23/15 Page 5 of 189 Page ID #:6704

## TABLE OF AUTHORITIES
## (continued)

**Page**

*Spirit Aerosystems, Inc. v. SPS Techs., LLC,* No. 09-CV-1144-EFM-KGG, 2013 WL 6196314 (D. Kan. Nov. 27, 2013) .......... 6

*Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052 (9th Cir. 2005) .......... 10

*Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101 (9th Cir. 2001) .......... 4, 10

**Other Authorities**

Fed. R. Civ. P. 16(f) .......... 4

Fed. R. Civ. P. 26 .......... 4, 5, 10, 11

Fed. R. Civ. P. 26(a) .......... 4

Fed. R. Civ. P. 26(a)(2)(C) .......... 4

Fed. R. Civ. P. 26(e) .......... 4, 5, 6

Fed. R. Civ. P. 37 .......... 4

Fed. R. Civ. P. 37(c)(1) .......... 4

Fed. R. Civ. P. 45(a)(4) .......... 9

Almost four weeks after the deadline set by this Court's Scheduling Order for the exchange of expert reports, Relator Beverly Brown ("Relator") seeks, on an *ex parte* basis, to introduce an entirely new expert report. Although Relator claims that she merely seeks to "supplement" a previously-prepared expert report, her own application belies this assertion. In reality, Relator seeks to *replace* her original expert report, which was based on data Relator was not permitted to use, with a completely new report that would be based on different data and would use an entirely new methodology.

Courts have repeatedly rejected such improper abuses of the discovery rules, and this Court should do the same.

The Application should be denied for at least the following reasons:

- ***Relator is not seeking to supplement but to supplant her expert's report.*** Relator is not seeking to add to the analysis of her expert, but to change it completely. She would remove any opinions based on an analysis of one data set (Humana), and replace it with a different analysis of a different data set (Medicare).
- ***Relator has unduly delayed seeking relief.*** Though Relator admits she knew of the purported corrupted Medicare data at the time she submitted her report, and of the prohibition of using the Humana data likely before that date,[1] she failed to file her *ex parte* application until two days before the deadline for rebuttal reports.
- ***Relator failed to exercise diligence in pursuing the information on which Relator now wants to rely.*** Relator served a subpoena on CMS for the Medicare A and B data in November 2014. Yet Relator failed to make further attempts to pursue the data until many months later,

[1] Relator's application is internally inconsistent as to when Relator first learned she was not permitted to use the Humana data. As discussed *infra*, Relator claims she did not learn of Humana's objection until *after* she served Dr. Joel W. Hay's ("Dr. Hay") report, but later represents she learned at least two weeks *before* the exchange of expert reports.

close to when expert reports were due.

Relator cannot justify her failure to abide by the Federal Rules and the deadlines set by this Court's Scheduling Order based on her claim that "[t]he difficulty obtaining Medicare data was beyond [her] control." (Dkt. No. 241 at 3:3.) As Relator's submission makes clear, the parties were aware of the difficulties obtaining data from CMS and, for that reason, agreed to ask this Court to extend the deadline for expert disclosures from July 24, 2015 to September 25, 2015. The Court agreed, and on June 8, 2015 entered a revised Scheduling Order that extended the deadline for both parties. (Dkt. No. 192.) CMS produced the Medicare Part A and Part B data on August 17, 2015. That same day, Relator requested a 30-day extension of the expert report deadline, noting that "[g]iven that we're just getting this info (and still waiting for some), I don't see how either side's experts can have reports done by the current due date of September 25, 2015." Declaration of Brian D. Hershman ("Hershman Decl.") at Ex. B. Celgene agreed to consider that request, asked for additional information about the data Relator had not received, and made clear it would not agree to an extension of the expert disclosure deadline unless all of the other corresponding dates, including the mediation date, were also moved. *Id.* On September 1, Relator chose not to seek an extension of the expert report deadline. *Id.* at ¶ 4. At that time, Relator had known for a week that the Medicare Part A and Part B data was not accessible. (Dkt. No. 247-1 at ¶ 12.)

Consistent with the timeline for expert disclosures set by the Scheduling Order, Relator and Celgene exchanged expert reports on September 25, 2015. Included among the reports submitted by Relator was the expert report of economist Dr. Joel W. Hay. Dr. Hay's report, which is 209 pages long, discloses Dr. Hay's opinions as to causation and damages, the data on which Dr. Hay purports to rely, and the methodology for his calculations. Although Dr. Hay concedes that he had access to the Part A and B data approximately a week before

his report was due, the report does not rely on that data. Instead, his damages calculations are based on claims data from Medicare Part D and the Humana database.[2] Indeed, the Humana data provides the underpinnings for Dr. Hay's entire expert report since he uses this data to calculate and extrapolate damages for all other Federal and State programs.

Since the exchange of initial expert reports on September 25, 2015, Celgene has spent considerable time analyzing Dr. Hay's report, the data and the methodology on which he purports to rely. Rebuttal expert reports are required to be exchanged on October 26, 2015,[3] a mere three days from now, and Celgene has worked diligently and is prepared to comply with the Court's Scheduling Order and submit a rebuttal report addressing Dr. Hay's report *as submitted.*

With the deadline for rebuttal reports imminent, Relator now seeks *ex parte* relief to "supplement" her current report and substitute new data which changes the entire methodology and analysis of the expert report. In particular, after making the strategic decision to rely on Medicare Part D and Humana data not only to calculate damages but to extrapolate damages for all other State and Federal programs, Relator wants a "do-over." Relator claims she lacked permission to use the Humana data, and therefore wants to substitute Medicare Part A and Part B data, thereby changing the entire analysis. Relator asserts this do-over is justified because Relator had difficulties obtaining the Medicare Part A and Part B data.

Relator's *ex parte* request to essentially rewrite Dr. Hay's expert report with a yet-undisclosed "supplement" ***ten weeks*** after the deadline for expert disclosures and *after the deadline for rebuttal reports* is improper and should be rejected. Not only will this substitution significantly impact the underlying assumptions and

---

[2] Celgene does not concede Dr. Hay's report meets the standards for expert testimony, and intends to challenge Dr. Hay's methodology and conclusions in rebuttal expert reports and future pleadings in this case.

[3] Because the Scheduling Order references October 25, 2015 for the mutual exchange – a Sunday – the parties agreed to exchange the rebuttal reports on the following business day.

Case 2:10-cv-03165-GHK-SS Document 249 Filed 10/23/15 Page 9 of 189 Page ID #:6708

calculations of Dr. Hay's entire expert report (thus negatively impacting Celgene's *timely* rebuttal reports based on Dr. Hay's current analysis), Dr. Hay will have the benefit of Celgene's initial expert reports and rebuttal analysis when drafting his "supplement." Relator has been aware of the scheduling deadlines for months, and has known she has the burden to prove causation and damages from the outset of this case. Yet she has waited until days before the *rebuttal* reports deadline to ask this Court for emergency relief that amounts to a do-over of her sole expert report on causation and damages. The discovery rules and this Court's Scheduling Order are intended to prevent this type of abuse.

# I. ARGUMENT

Rule 26 requires parties to disclose all expert evidentiary material that may be relied upon at trial at the time directed by the court. Fed. R. Civ. P. 26(a)(2)(C). "Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). Under this rule, untimely expert witness testimony must be excluded, unless the "parties' failure to disclose the required information is substantially justified or harmless." *Id.* Furthermore, a party that fails to comply with a scheduling order is subject to the sanctions available to a court to enforce its orders, including those authorized by Rule 37. Fed. R. Civ. P. 16(f).

## A. Dr. Hay's Proposed Expert Report Is Not a "Supplement" and Should Thus Be Excluded

Citing the Rule 26(e) requirement that a party must supplement an expert report, "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties," Fed. R. Civ. P. 26(e), Relator claims she is entitled to submit a "supplemental" report for two reasons: (1) Medicare data is "superior" to other available data and necessary to conduct an

"optimal" damages analysis; and (2) Relator received "defective" discovery that prevented Dr. Hay from conducting the most complete analysis. (Dkt. 247 at 2:27-3:2.) Relator is wrong.

Relator does not seek to supplement Dr. Hay's report; she seeks to supplant it. As Relator concedes, she intends to "excise the unusable Humana data analysis and supplant it with an analysis of Part A and Part B data." (*Id.* at 8:16-17.) In addition, Relator seeks permission to have Dr. Hay incorporate additional data from certain state Medicaid agencies into his report (*id.* at 10:21-25), and to have Dr. Hay conduct an analysis to support Relator's allegations regarding ICD-9 codes (*see* Dkt. No. 247-1 at ¶ 9), a topic that was not even mentioned in his initial report. This wholesale replacement of her expert's report is not a "supplement."

As the court held in *Plumley v. Mockett*, "supplementary disclosures do not permit a party to introduce new opinions after the disclosure deadline under the guise of a 'supplement.' Although Rule 26(e) obliges a party to 'supplement or correct' its disclosures upon information later acquired, this 'does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report (indeed, the lawsuit from the outset). To rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports ....'" 836 F. Supp. 2d 1053, 1062 (C.D. Cal. 2010) (quoting *Beller ex. rel. Beller v. United States*, 221 F.R.D. 696, 701 (D.N.M. 2003)). Indeed, as the court recognized, allowing such "supplemental" reports "would surely circumvent the full disclosure requirement implicit in Rule 26 and would interfere with the Court's ability to set case management deadlines.'" *Id.; see also Dixie Steel Erectors, Inc. v. Grove U.S., L.L.C.,* No. CIV-04-390-F, 2005 WL 3558663, at *6 (W.D. Okla. Dec. 29, 2005) (noting that allowing late supplementation of preliminary report substantially undermines goal of reducing civil litigation expense and delay).

Yet that is precisely what Relator seeks to do here. After making the

strategic decision to calculate damages based on one set of data, and utilizing a methodology to extrapolate from that data to all other State and Federal government programs, Relator now seeks *ex parte* relief to replace her deficient report with a new report *after* the deadline for rebuttal reports and *after* the close of expert discovery. This she cannot do. As the court held in *Medtronic Vascular, Inc. v. Abbot Cardiovascular Sys., Inc.*, a party may not rely on supplementation "as a way to remedy a deficient expert report or as a means of getting in, in effect, a brand new report." No. C-06-1066 PJH (EMC), 2008 U.S. Dist. LEXIS 112148, at *6 (N.D. Cal. Oct. 15, 2008); *see also Spirit Aerosystems, Inc. v. SPS Techs., LLC,* No. 09-CV-1144-EFM-KGG, 2013 WL 6196314, at *7 (D. Kan. Nov. 27, 2013) ("Rule 26(e) may not be used to provide an extension of the expert report deadline or sandbag one's opponent with issues that should have [been] included in the original report.").

Moreover, Relator's *ex parte* application makes clear that Relator seeks permission not simply to "supplement" her expert report with a few straggling items of late-produced information. On the contrary, Relator seeks to supplant the entire basis and analysis of her initial report with an entirely new data set and with new information that Relator asserts is a superior theory. (Dkt. No. 247 at 8:15-18.) Such new opinions force Celgene to respond to a continually moving target and are beyond the scope of proper supplementation. Indeed, "[e]xcluding expert evidence as a sanction for failure to disclose expert witnesses in a timely fashion is 'automatic and mandatory' unless the party can show the violation is 'either justified or harmless.'" *Carson Harbor Village, Ltd. v. Unocal Corp.*, No. 96-cv-3281-MMM, 2003 WL 22038700, at *2 (C.D. Cal. Aug. 8, 2003) (citation omitted). Relator can show neither.

**1. Relator's Failure to Comply with Deadlines Set by this Court Is Not Substantially Justified.**

Relator cannot meet the burden of demonstrating that her failure to comply

Case 2:10-cv-03165-GHK-SS Document 249 Filed 10/23/15 Page 12 of 18 Page ID #:6711

with the Rules and this Court's Scheduling Order was substantially justified. "[F]ailure to disclose testimony is not substantially justified where, as here, the need for such testimony could reasonably have been anticipated." *Plumley*, 836 F. Supp. 2d at 1064 (citing *Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1061-62 (9th Cir. 2005)). Here, Relator bears the burden of proof and she was aware of the significance of claims data when she filed her initial complaint under seal in April 2010, if not sooner. Relator was certainly aware of the need for such information when the initial deadline for the exchange of initial expert reports was set in December 2014, and again when the parties stipulated (and the Court ordered) the current deadline for the exchange of expert reports in June 2015. The situation in which Relator finds herself is not due to the discovery of new information that was unavailable at the time the initial reports were due. Rather, as Relator's *ex parte* application makes clear, Relator made the strategic decision to rely on a different data set and different methodology when submitting her initial report, and she now regrets that decision. But Relator's regret does not justify a do-over, and Relator cannot establish good cause for the relief she seeks, let alone good cause for an *ex parte* application for relief, based on this record.

Moreover, Relator's attempt to blame the delay on production by CMS—ironically the very entity on whose behalf she is purportedly pursuing this case—is unpersuasive.[4] "From the outset, Plaintiff was undoubtedly aware, or should have been aware," of the significance and relevance of claims data from CMS, including Medicare Part A and Part B data. *Caviness v. Holland*, No. CV 109-098, 2011 U.S. Dist. LEXIS 31328, at *10 (S.D. Ga. Mar. 17, 2011). "To the extent Plaintiff contends that the record shows that [s]he has 'vigorously sought documents' from

[4] Relator's attempt to shift blame to Celgene's counsel for a purported two-week delay in filing a protective order in the face of many months with no action is also misplaced. (Dkt. No. 247 at 11:17-12:14.) As the record establishes, Relator notified Celgene of CMS's request for a protective order, and Celgene reviewed, revised and approved the protective order within a two-week period. (*Id.*) All of this occurred in June 2015, several months before the deadline for exchanging expert reports.

Case 2:10-cv-03165-GHK-SS Document 249 Filed 10/23/15 Page 13 of 18 Page ID #:6712

[a third party], the Court respectfully disagrees…. Plaintiff waited until … well into discovery, to issue a subpoena seeking 'necessary documents' from [the third party]. Plaintiff's unexplained, substantial delay is wholly inconsistent with the kind of diligence that would warrant a finding that the late disclosures with respect to [the expert] were substantially justified." *Id.* at *10-11.

While Relator spends many pages in the application attempting to show diligence, her efforts to correct her mistakes during the last leg of the race are too little too late. Indeed, while Relator indicates she served a subpoena on CMS in November 2014, her effort to repeatedly contact CMS about the production did not occur until *late July 2015*, only two months before the deadline for expert reports. Moreover, in August 2015, knowing about the issues with the "late-produced" Part A and Part B data, she declined the opportunity to seek an extension of the expert report deadlines. Hershman Decl. at ¶¶ 3-4. And although Dr. Hay has had an accessible version of that data since mid-September, there is nothing to indicate that he made any attempt to use it prior to October 16. This is hardly diligence. Further, Relator expresses a desire to "supplement" Dr. Hay's report with information from state Medicaid agencies (Dkt. No. 247 at 10:21-25), yet Relator offers absolutely no explanation for why she waited until April 2015 to subpoena those state Medicaid agencies, and has demonstrated no diligence in connection with those subpoenas.

Relator is not the victim of late-produced data. Relator finds herself in this position because she made the strategic decision to put forth a damages theory that relies on Medicare Part D and Humana data, and decided not to timely (i.e. *before* the initial exchange) seek relief to extend the deadlines for the initial exchange of expert reports. After discovering that she lacked permission to use the Humana data, Relator chose not to disclose this issue to Celgene, and instead misleadingly claimed that she needed an extension because of delays and problems with the

production of Medicare Part A and Part B data.[5] *See* Hershman Decl. at ¶ 11. Indeed, at no time *prior to the submission of the ex parte application* did Relator notify Celgene that Dr. Hay lacked permission to use the Humana data, yet Relator suggests that Celgene is to blame for declining to grant Relator an extension. Relator's blame is misplaced. Celgene properly and timely exchanged expert reports in compliance with the Federal Rules and the Court's Scheduling Order. Celgene has completed its rebuttal analysis and will comply with the deadline for submission of rebuttal reports based on Dr. Hay's report *as written and submitted*. Relator has not shown substantial justification for changing the rules in the 9th inning.[6]

Finally, Relator's purported justification for "supplementation" does not withstand scrutiny. Relator claims that she was not aware Humana (through USC) objected to Dr. Hay's use of the data until *after she submitted Dr. Hay's report* (i.e. after *September 25, 2015*). (Dkt. 247 at 3:9-11; Dkt. 247-1 at ¶ 12.) According to Relator, "[o]nly after the report was submitted, did USC change course." (*Id.*) But Relator later represents that she "sought the production of the Humana data through a formal subpoena[7] after USC stated their data set could not be produced to

[5] Notably, during this time period, Celgene was requesting from Relator production of the Humana data that Dr. Hay purported to rely on. Rather than "come clean" with the information that Dr. Hay lacked permission to use the data, Relator repeatedly informed Celgene that the data would be forthcoming. Hershman Decl. at ¶¶ 7-11, Ex. D.

[6] This is not the first time Relator has engaged in this type of gamesmanship. As described more fully in Celgene's Motion to Compel Amended Initial Disclosures, Interrogatory Responses, and Production of Documents (Dkt. No. 193-1), Relator similarly waited for Celgene to comply with an agreed-upon deadline to exchange amended initial disclosures, and notified Celgene she would not serve amended disclosures only *after* Celgene had served its amended disclosures pursuant to the parties' agreement. Relator also purported to add damages, *after the close of discovery*, from Federal and State programs that were nowhere mentioned in her complaint, her initial disclosures, or her discovery. *See* Defendant's *Ex* Parte Application to Exclude Testimony and Evidence Related to Previously Undisclosed Damages Theory (Dkt. No. 240).

[7] Notably, Celgene has no record of receiving a notice of this subpoena prior to its service on Humana, despite a certificate of service attesting that such a notice was emailed on September 11, 2015. Hershman Decl. ¶¶ 5-6, Ex. C. Failure to give proper notice to Celgene prior to serving a subpoena on a third party is a violation of Rule 45(a)(4).

Case 2:10-cv-03165-GHK-SS Document 249 Filed 10/23/15 Page 15 of 18 Page ID #:6714

Celgene." (*Id.* at 8:10-12.) Significantly, Relator issued her subpoena to Humana *on September 11, 2015*(i.e. two weeks *before* the exchange of expert reports). *See* Hershman Decl. at ¶¶ 5-6, Ex. C. Both of those statements cannot be true – either USC objected *prior* to September 11, 2015 (which triggered the subpoena to Humana) or USC did not object until *after* September 25, 2015. Based on the timeline, it appears clear that Relator knew of the issue (and chose not to disclose it to Celgene) before she submitted Dr. Hay's original report. In any event, what is clear is that Relator is playing fast and loose with the rules, and is still not being forthright with Celgene or this Court.

**2. Relator's Submission of a Revised Expert Report at this Stage in the Proceedings Is Not Harmless.**

Relator also cannot meet the burden of demonstrating that submitting a supplemental expert report ***ten weeks*** after the initial deadline, ***after*** the deadline for rebuttal reports, is harmless. The Ninth Circuit has articulated several factors for the Court to consider when determining whether a violation of the expert discovery rules is harmless, including: "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not disclosing the evidence." *Lanard Toys, Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 713 (9th Cir. 2010) (citing *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003)). Notably, the Ninth Circuit has found that "even absent a showing in the record of bad faith or willfulness, exclusion is an appropriate remedy" for a failure to comply with the rules regarding experts and their reports. *Yeti by Molly*, 259 F.3d at 1106. Indeed, requiring a modification of the Scheduling Order is itself sufficient to defeat harmlessness. *Wong,* 410 F.3d at 1062 ("Disruption to the schedule of the court and other parties … is not harmless."); *Hoffman v. Const. Protective Servs*., 541 F.3d 1175, 1180 (9th Cir. 2008) (failure to comply with Rule 26 was not harmless where the court would be required to create a new briefing

schedule).

Relator's assertion that Celgene will not be harmed because Relator referenced the possibility of "supplementing" Dr. Hay's report and Celgene did not object is baseless. (Dkt. No. 247 at 21:2-14.) Relator chose to proceed with the current schedule for exchange of initial expert reports, and Celgene complied by participating in the mutual exchange in accordance with the Scheduling Order on September 25, 2015. Thereafter, Celgene proceeded with preparation of rebuttal reports under the reasonable expectation that Relator followed the mandates of Rule 26 and this Court's Scheduling Order by disclosing Dr. Hay's full expert opinions and analysis. Contrary to Relator's implication, Celgene had no reason to believe vague references to "supplementation" meant a wholesale rewriting of Relator's expert report on damages, and Celgene in no way consented to the remedy that Relator currently seeks by way of this *ex parte* application.

Relator also proposes to "remedy" the harm caused by her expert's supplanted analysis by agreeing to extend the time for Celgene to submit a rebuttal report and depose Dr. Hay. But such a remedy (while necessary if the Court does grant this *ex parte* application), is not sufficient to prevent prejudice to Celgene. Celgene has already provided its initial expert report based on the Scheduling Order agreed by the parties. Celgene intends to comply with the Court's Scheduling Order and submit its rebuttal report to Dr. Hay by October 26, 2015. Thus, Dr. Hay will have the benefit of Celgene's initial reports and rebuttal reports when he proposes to provide his "supplemental" report in December 2015. Such a schedule defeats the *mutual* exchange contemplated by the Scheduling Order, which prejudices Celgene and effectively punishes it for compliance.

Moreover, while reopening discovery would be necessary, it "will not cure the problem…. Should the Court allow the supplemental expert report, it would be bound to reopen discovery to allow [Celgene] time for its own experts to review the new reports and formulate new opinions. Additionally, because Dr. [Hay] offers

new opinions in his report, or at least new bases for his opinions, [Celgene] would have a right to take a new deposition of this expert. The new deposition testimony might well lead to [Celgene] having to modify its prior reports or retain new experts to counter the opinion testimony being offered in Dr. [Hay]'s revised report." *Beller*, 221 F.R.D. at 700; *see also In re Asbestos Prods. Liab. Litig*., 289 F.R.D. 424, 427 (E.D. Pa. 2013). This altered schedule would add considerable time and expense and unjustly prejudice Celgene, who has been working diligently to comply with the Court's deadlines.

In addition, Relator's proposal of a December 7, 2015 deadline to resubmit her expert report on causation and damages is simply unrealistic and unworkable. As Relator is well aware, due to the nature of a joint brief filing, initial drafts of dispositive motions will have to be exchanged well in advance of the January 29, 2016 deadline. If Celgene is properly permitted 30 days to offer a new rebuttal report to Dr. Hay's opinions, the deadline to do so would be January 6, 2016. Celgene would then have to depose Dr. Hay, and thereafter evaluate additional arguments and evidence for purposes of summary judgment. The timeline Relator proposes is completely unrealistic. Celgene should not be forced to wait months to depose Dr. Hay and challenge his yet-undisclosed opinions and conclusions. Nor should Celgene be forced to postpone the summary judgment schedule by several months to accommodate Dr. Hay's belated analysis.

**B. Relator Has Not Met the Burden of Showing Good Cause to Obtain *Ex Parte* Relief to Modify the Scheduling Order**

Relator's *ex parte* request to supplant her existing report with an entirely new report just days before Celgene's rebuttal reports are due should be denied. She has failed to exercise diligence in addressing a problem of her own making, has not been forthright, and has unduly delayed filing this application. Moreover, Relator has failed to establish good cause for seeking *emergency* relief from this Court. *See Mission Power Eng'g Co. v. Continental Cas. Co.*, 883 F. Supp 488, 492 (C.D.

Case 2:10-cv-03165-GHK-SS Document 249 Filed 10/23/15 Page 18 of 18 Page ID #:6717

CA 1995) (*ex parte* relief requires a showing of irreparable injury and that crisis was created without fault of party seeking relief). While Relator does not identify when she became aware of her expert's improper utilization of Humana data, it is apparent that Relator decided not to disclose the issue to Celgene or this Court and instead manufactured this "emergency" based on supposed late production of Medicare Part A and Part B data. But Relator's strategic decision to rely on the Humana data, and then to conceal the issue from Celgene until immediately prior to the deadline for exchange of *rebuttal* reports, does not provide substantial justification for immediate action by this Court. On that ground alone this Court would be justified in denying the *ex parte* application.

Celgene has timely submitted its expert reports and will timely submit its rebuttal reports. It would be fundamentally unfair to allow Dr. Hay to submit an entirely new report after having the benefit of Celgene's initial expert reports and rebuttal analysis. The Court therefore should preclude Relator from submitting a "supplemental" report for Dr. Hay outside the deadlines set in the Scheduling Order.

Dated: October 23, 2015 JONES DAY

By: /s/ Brian D. Hershman
Brian D. Hershman

Attorneys for Defendant
CELGENE CORPORATION

# EXHIBIT K

## REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, ex rel. Beverly Brown, Plaintiff-Relator | ) | |
| v. | ) | Civil Action No. CV10-03165 GHK (SSx) |
| Celgene Corporation, Defendant | ) | |

**EXPERT SUPPLEMENTAL REPORT OF JOEL W. HAY, PH.D.**

# TABLE OF CONTENTS

**Page**

I. Introduction....1

II. Summary of Opinions....1

III. Updated Damages Calculations Based on New Data....4

IV. Damages Calculation Methodology....5

V. Damage Calculations....8

- A. Medicare Part D Damages....8
- B. Medicare Advantage Plan (Medicare Part C) Damages....12
- C. Tricare Damages....17
- D. VA Damages....18
- E. Medicaid Damages....22
- F. Kickback Damages Predicated on Payments to Promotional Speakers....27
- G. Kickbacks in the Form of Payments to Physicians....28
- H. Damages to Medicare program due to kickbacks to physicians in Revlimid Speaker Program....32
  - 1. Higher paid speakers prescribed significantly more than lower paid prescribers....32
  - 2. Examples of some speaker payments made to physicians and the prescribing pattern seen....33
  - 3. Reasonableness of Speakers' Compensation....37
- I. Charitable Foundation Kickback Damages....39

VI. Rebuttal Testimony and Testimony at Trial....49

## I. Introduction

1. I, Joel W. Hay, Ph.D., having been retained by counsel for Relator, Beverly Brown, to provide expert testimony on her behalf in the above-captioned action, submit this Supplemental Expert Report. Counsel directed me to, as I promised in both of my previous reports, update my initial damages calculation report, based on new information provided by CMS, other state and federal health care programs, and my consideration of other new and available evidence.

2. My qualifications were summarized at pages 1 through 4 of my opening Expert Report dated September 25, 2015 (hereinafter the "Opening Report"). A more complete listing of my qualifications and publications is outlined on my *curriculum vitae*, which is attached to this Report as Appendix A. My recent legal case reports and testimony are attached as Appendix B. A list of the materials that I have considered in writing this report is included in Appendix C.

3. Except where important to understand these supplemental calculations, I do not reincorporate factual predicates – such as the significant documentary and testimonial evidence of off-label promotion – addressed in my Opening Report or in my Rebuttal Report of October 26, 2015 (hereinafter the "Rebuttal Report"). I incorporate by reference all material set forth in my prior reports in this case.

## II. Summary of Opinions

4. My summary damages calculations are as follows:

| Off-label Damages Summary | | | | | |
|---|---|---|---|---|---|
| | Off-Label claims | Costs due to Off-Label Claims | Trebling | Civil Penalties per Claim | Total Off-Label Damages |
| Medicare Part D | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Medicare Advantage Plans (Part C) | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| | | | | | |
|---|---|---|---|---|---|
| Tricare | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Veterans Affairs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Medicaid Programs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

**On-label Damages Summary**

| | On-label claims | Costs due to on-label Claims | Trebling | Civil Penalties per Claim | Total on-Label Damages |
|---|---|---|---|---|---|
| Medicare Part D | [redacted] | | [redacted] | [redacted] | [redacted] |
| Medicare Advantage Plans (Part C) | [redacted] | | [redacted] | [redacted] | [redacted] |
| Tricare | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Veterans Affairs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Medicaid Programs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | | [redacted] | [redacted] | [redacted] |

**Total (on-label and off-label) Damages Summary**

| | Total claims | Costs due to Total Claims | Trebling | Civil Penalties per Claim | Total Off-Label Damages |
|---|---|---|---|---|---|
| Medicare Part D | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Medicare Advantage Plan (Part C) | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Tricare | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Veterans Affairs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| | | | | | |
|---|---|---|---|---|---|
| Medicaid Programs | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

5. The additional data I received also enabled me to compute additional damages due to on-label prescribing and kickback payments to charitable foundations, promotional speakers, and KOLs as described in detail below. These damages overlap to some extent with the Summary Damages listed above, but they are factually based on Celgene's conduct, and redundancies would be eliminated should the Court or Jury exclude some portion of the Summary Damages listed above from the damages award. They are, thus, appropriate alternative legal theories for recovery.

| **Damages to Medicare program due to on-label claims from Celgene promotional speakers** | | | | | |
|---|---|---|---|---|---|
| | **On-Label Count** | **On-Label Cost** | **Trebling** | **Civil Penalty** | **Total on-label damages** |
| Revlimid | [redacted] | | | | |
| Thalomid | [redacted] | [redacted] | [redacted] | | [redacted] |

| **Damages to Medicare program due to payments to non-profit foundations** | | | | | | |
|---|---|---|---|---|---|---|
| **Drug** | **Indication** | **Claims paid through PANF co-pays** | **Damages to Medicare due to PANF Part D copays** | **Trebling** | **Civil penalties** | **Total damages** |
| **Thalomid** | Off-Label | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | On-Label | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| | **Total** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Revlimid** | Off-Label | [redacted] | | [redacted] | [redacted] | [redacted] |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | On-Label | [redacted] | | [redacted] | [redacted] | |
| | **Total** | [redacted] | | [redacted] | [redacted] | |

## III. Updated Damages Calculations Based on New Data

6. At pages 27 through 28 of my Opening Report, I explained that "Medicare Part A and Part B data were provided to me too close to my initial report deadline to be analyzed," and accordingly was not utilized in my damage calculations at that time. Additionally, I noted that I had not been provided with Medicare Advantage data on sales of Thalomid and Revlimid, and that my Medicare damages calculations accordingly were understated. I also noted that I had not received data from all state Medicaid agencies. I am still missing some data. For example, California continues to promise production and claims they are close to producing but has not provided a set date by which they promise to produce. But I received data from Florida, which I analyzed. I also stated that I would analyze data from Tricare in a supplemental report because I received that production just before my report was due and I have done so. As a general matter, I reserved the right to update my opinions if new information was made available to me and have done so based on this new data as well as deposition testimony and documents produced by third party promotional speakers or Key Opinion Leaders (KOLs) that was received in time to analyze. *See* Appendix C for additional details.

7. I have now had an opportunity to review and analyze the Medicare Part A and Part B data, as well as Medicare Advantage data and additional newly-provided information as reflected in Appendix C (collectively "New Data"). Based on the New Data, and application of the New Data to existing materials, I have been able to update my opinions as set forth in this Report.

## IV. Damages Calculation Methodology

8. In calculating damages due to Celgene's illegal off-label promotion, I have followed the same fundamental methodology used in my Opening Report. Based on the New Data, I have updated my damage calculations utilizing my original methodology. In doing so, I also have relied at times on the data and information previously received, including that which formed the basis for the opinions in my Opening Report. In many instances, the New Data permitted me to analyze the existing data in a more complete and refined way, and thus reach more complete and refined opinions.

9. I have limited my updated damages calculations to Medicare, Medicaid, Tricare, and Veterans Affairs program damages. It is still my opinion that other state and federal programs (e.g., FEHBP, state retirees, Indian Health Service, 340B Public Clinics, corrections inmates, etc.) also suffered legitimate damages because these entities paid for off-label prescriptions of Thalomid and Revlimid. However, for specificity and precision, I have limited my updated damages calculations to state and federal programs that are either parties in this action and/or have been subpoenaed for Revlimid and Thalomid claims and expenditure information. Should counsel direct me to do so, I will further update my damages calculations to include the additional government programs previously included in my Opening Report.

10. As stated in my Opening Report, most branded drug payment programs include rebate, discounts, coupons, and other price reduction mechanisms that ensure that neither the list (published) prices such as the Wholesale Acquisition Cost (WAC) nor the Average Wholesale Price (AWP), nor the prices listed in most claims history files nor other drug dispensation files, represent the true transaction prices for these drugs. There are often confidential rebates and kickbacks (reverse payments) that flow back from the brand drug manufacturer to other parties on both the demand and supply side of the pharmaceutical market place.[1] I have asked repeatedly for

[1] Hay JW, Smeeding J, Carroll NV, Drummond M, Garrison LP, Mansley EC, Mullins CD, Mycka JM, Seal B, Shi L. Good Research Practices in Measuring Drug Costs for Cost Effectiveness Analysis: A Report of the ISPOR Drug Cost Task Force. Value in Health 2010; 13(1):3-7. Mansley

Celgene's detailed accounting records on Thalomid and Revlimid sales and rebates, to no avail. As also stated in my Opening Report, despite what we've learned about Celgene's data destruction policies, it is inconceivable to me that Celgene does not possess detailed financial records on all of the rebates, discounts, and other price givebacks and kickbacks that it provided to all customers for all sales of Thalomid and Revlimid. In any event, such information was not available to me. I have refrained from resorting to inaccurate records of "average drug rebates" disclosed in the literature, and will not attempt to consider drug rebates until and unless Celgene discloses its true detailed price rebates and kickbacks on Thalomid and Revlimid sales. At that point I will be pleased to update my damages calculations to reflect these true rebates and kickbacks.

11. Nevertheless, one category of information related to rebates and kickbacks I am now able to properly analyze based on the New Data is data related to payments Celgene made to non-profit charitable foundations that it characterized as "donations." These charitable foundations would then use the payments from Celgene to fund patient co-pays for Thalomid and Revlimid prescriptions. It is my understanding that Anti-Kickback Statutes do not permit pharmaceutical companies to pay the drug co-pays of Medicare patients directly, and I reviewed guidance from the Office of the Inspector General (OIG) explaining that an arrangement under which a pharmaceutical company makes payments to a non-profit organization that, in turn, funds co-pays for Medicare patients may also constitute a violation of the Anti-Kickback Statute because a potential purpose and effect of the company's payment to the non-profit is to illegally fund patient co-pays. It is further my understanding that Relator contends that the purpose and effect of Celgene's payments to non-profits was to fund Medicare patient co-pays in violation of the

E, Carroll N, Chen K, Shah N, Tak Piech C, Hay JW, Smeeding J. Good Research Practices for Measuring Drug Costs in Cost Effectiveness Analyses: A Managed Care Perspective - A Report of the ISPOR Drug Cost Task Force Part III. Value in Health 2010; 13(1):14-17. Mullins CD, Seal B, Seoane-Vazquez E, Sankaranarayanan J, Asche C, Jayadevappa R, Lee W, Romanus D, Wang J, Hay JW, Smeeding J. Good Research Practices for Measuring Drug Costs in Cost Effectiveness Analyses: A Report of the ISPOR Drug Cost Task Force – Part IV: Medicare, Medicaid and Other US Government Payers Perspectives. Value in Health 2010; 13(1):18-24.

Anti-Kickback Statute. In light of this, I have utilized the New Data (in particular Medicare A and B data), as well as existing data amenable to further analysis based on the New Data, to calculate the damages resulting from Celgene's payments to non-profit organizations that then funded Medicare patient co-pays.

12. In addition, New Data in the form of documents and deposition testimony from Celgene's promotional speakers and KOLs allowed me to both analyze this new information in and of itself and to further analyze existing data in order to refine my prior kickback analysis. This analysis confirms that, from the time the FDA approved Revlimid for treatment of ENL in 1998, Celgene's promotional efforts thoroughly saturated the available channels of information for Revlimid and Thalomid during the relevant time periods through, among other things, payments to KOLs and other speakers and endorsers, payments to non-profit organizations, influence over clinical trials and scientific literature, and sales visits. This level of market influence through promotional efforts is unprecedented in my 30 years of experience studying the pharmaceutical industry, and the New Data from these third parties confirms that Celgene's pervasive payments in addition to its off-label promotional efforts thoroughly tainted the market. Among other things, I am unaware of any other company whose entire business model was to off-label market for unapproved indications rather than for the very narrow indication it used to gain market access, and thus build a previously non-existent market on that basis. Nor have I ever studied a company that employed such extensive efforts to influence and manipulate the literature and scientific data regarding its products.

13. It is my understanding that Relator contends that Celgene's various promotional efforts were illegal, either because they constituted off-label promotion in violation of the False Claims Act, violated the Anti-Kickback Statute, or both. If the trier of fact agrees with this contention, then it would be reasonable to further conclude that all prescriptions – both off-label and on-label – of both Revlimid and Thalomid during the relevant time period resulted from Celgene's illegal conduct. Therefore, in this Supplemental Report I have included additional

damages calculations based on all Thalomid and Revlimid sales to government programs, including both off-label and on-label prescriptions.

14. As I've also said repeatedly in my two prior reports, should the Court or Jury find that some portions of Thalomid or Revlimid prescriptions were not generated by illegal activities and are not part of legitimate recoverable damages, it will be straightforward for me to revise my damages calculations to exclude any such legitimate portion of Thalomid and Revlimid sales.

## V. Damage Calculations

### A. Medicare Part D Damages

15. I was able to reach a more nuanced determination on Medicare Part D off-label damages than I did in the Opening Report by using Parts A and B data on diagnostic coding that was produced by CMS after my report was due. Other than Thalomid and Revlimid, I did not have access to Part D drug usage (e.g., dexamethasone) for Medicare, so the calculations of off-label prescriptions are conservative. However, the Medicare A and B data allowed me to determine whether the patient was diagnosed with ENL, MM, MDS and MCL. It also allowed me to determine when the patient was diagnosed with any of these conditions helping me to determine lines of therapy. This is important for a determination of off-label damages because during much of the relevant times Thalomid and Revlimid were only approved in treatment of certain disease states. Revlimid was approved for treatment in only more aggressive diseases states as a second line therapy up until February 2015. As a general matter, the Parts A and B diagnostic data confirms that Thalomid and Revlimid were often prescribed off-label for indications such as MM, MDS, MCL and other cancers.

16. Other than Thalomid and Revlimid payments, I did not have access to Part D drug usage (e.g., dexamethasone) for Medicare, so the calculations of off-label prescriptions are conservative, since I was unable to examine whether patients were using other medications besides Thalomid or Revlimid. For example, use of Revlimid not solely in combination with

| THALOMID-DAMAGES DUE TO ON-LABEL CLAIMS | | | | | | |
|---|---|---|---|---|---|---|
| YEAR | Drug | Claims paid through PANF co-pays | Damages to Medicare due to PANF Part D copays | Trebling | Civil penalties | Total damages |
| 2006 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2007 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2008 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2009 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2010 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2011 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2012 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2013 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2014 | Thalomid | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Total** | **Thalomid** | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

## VI. Rebuttal Testimony and Testimony at Trial

67. Should the Court or Jury determine that additional interest charges apply to the relevant damages calculations, or should the damages calculations need to be updated to a more recent date, I am prepared to undertake such additional damages calculations.

68. If asked by counsel, I intend to present information at trial from this report and previous reports as well as prepare rebuttal reports as requested. If called to testify I would prepare additional trial exhibits based on the materials presented in this report. I reserve the right to update, revise or modify my opinions if new information is made available to me.

December 7, 2015

Joel Hay

Joel W. Hay

# ADDITIONAL PAGES OF EXHIBIT K CITED BY RELATOR

20. Celgene's own Revlimid Corporate Accounts 2005 Business Plan (5/19/2005) acknowledges that even before Part D Medicare was the largest single payer for oncology drugs.[5] In fact, coverage of oral medications was one of the primary reasons why Medicare Part C plans were popular enough to attract between 13% and 18% of the entire Medicare population between 1999 and 2005.[6]

21. ResDAC confirmed in an email to me from Lori Siedelman, MPH (11/4/15) that CMS' Prescription Drug Event (PDE) file for Medicare Part D claims excludes drug utilization that is covered by Medicare Advantage plans. This was further confirmed to me in a teleconference that I had on 11/24/15 with CMS officials arranged through CMS Legal Counsel, Ms. Eden Heard. This means that not only did Medicare pay for numerous Thalomid claims prior to Medicare Part D program inception in 2006, but that my damages calculations for Thalomid and Revlimid need to be increased for the period from 2006 to the present to reflect the 16% to 30% of Medicare drug coverage beneficiaries receiving these drugs while belonging to the Medicare Advantage plans with federally-paid drug benefits outside of the Part D fee-for-service plans.

22. Since I was unable to obtain CMS claims history files for Medicare Advantage beneficiaries, I calculated Medicare Advantage damages during the 2006 to 2014 period by extrapolating annual Part D damages shown above based on the annual percentage of Medicare beneficiaries belonging to Medicare Advantage.[7] For the period 1999 through 2005, I calculated

[5] Revlimid 2005 Business Plan, slide 39. "Oncology's Largest Single Payer is CMS" with 49% of total payments; 40% of that is Medicare, 9% of that Medicaid. Slide 40 shows Medicare + Choice is a big component of outpatient drug payors.
[6] Gretchen Jacobson, Anthony Damico, Tricia Neuman and Marsha Gold. Medicare Advantage 2015 Spotlight: Enrollment Market Update. Kaiser Family Foundation, June, 2015. In fact, prior to Part D coverage in 2006, patients with excessive drug costs, such as Thalomid patients with drug costs of several thousand dollars per month, would be precisely the Medicare patients most likely to sign up for a Medicare + Choice plan if they had no other source of drug coverage.
[7] Jacobson et al. 2015, *op cit*. I always intended to update my Medicare calculation to include Part C damages explicitly. In my prior report I calculated placeholder straight-line damages for Part C based on Celgene's STEPS data. I then lacked the more-nuanced Parts A and B information that I

# EXHIBIT L

Case 2:10-cv-03165-GHK-SS Document 262 Filed 01/21/16 Page 1 of 39 Page ID #:6837

Karen P. Hewitt (State Bar Number 145309)
kphewitt@jonesday.com
Brian D. Hershman (State Bar Number 168175)
bhershman@jonesday.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071.2300
Telephone: (213) 489-3939
Facsimile: (213) 243-2539

Kimberly A. Dunne (State Bar Number 142721)
kdunne@sidley.com
Michelle B. Goodman (State Bar Number 218607)
mgoodman@sidley.com
Sean A. Commons (State Bar Number 217603)
scommons@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

Attorneys for Defendant
CELGENE CORPORATION
(*Additional Counsel listed on following page*)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO,

Plaintiffs,
*Ex rel.*

BEVERLY BROWN,

Plaintiff-Relator,

v.

Case No. 10-cv-03165 GHK (SSx)

Assigned to: Hon. George H. King

**ORDER RE JOINT STIPULATION TO EXTEND DEADLINES AS TO CERTAIN EXPERTS**

CELGENE CORPORATION,

Defendant.

*Additional Counsel*

Toni-Ann Citera (admitted *pro hac vice*)
tcitera@jonesday.com
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

Case 2:10-cv-03165-GHK-SS Document 262 Filed 01/21/16 Page 3 of 3 Page ID #:6839

The Court having reviewed and considered the Joint Stipulation to Extend Deadlines as to Certain Experts (the "Stipulation") between Plaintiff-Relator Beverly Brown ("Relator") and Defendant Celgene Corporation ("Defendant"), and good cause appearing,

**THE COURT HEREBY ORDERS** that:

1. The Stipulation is APPROVED;
2. The deadline for Dr. Joel Hay to submit his supplemental expert report, for Defendant to submit its rebuttal to Dr. Joel Hay and the deadline to complete expert discovery in the Amended Scheduling Order (Docket No. 256) shall be VACATED.

**IT IS SO ORDERED.**

Dated: January 21, 2016

/S/
Hon. Suzanne H. Segal
Magistrate Judge

# EXHIBIT M

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA, the )
States of CALIFORNIA, COLORADO,)
CONNECTICUT, DELAWARE, )
FLORIDA, GEORGIA, HAWAII, )
ILLINOIS, INDIANA LOUISIANA, )
MARYLAND, MASSACHUSETTS, )
MICHIGAN, MINNESOTA, MONTANA, )
NEVADA, NEW HAMPSHIRE, )
NEW JERSEY, NEW MEXICO, )
NEW YORK, NORTH CAROLINA, )
OKLAHOMA, RHODE ISLAND, )
TENNESSEE, TEXAS, )
VIRGINIA, WASHINGTON, )
WISCONSIN, the DISTRICT OF )
COLUMBIA, and the CITY OF )
CHICAGO, )
Plaintiffs, )
Ex rel. )
BEVERLY BROWN, )
Plaintiff-Relator, ) No. 10-CV-03165
v. )
CELGENE CORPORATION, ) Assigned to:
Defendant. )Hon. George H. King
------------------------------

Videotaped Deposition of CHARLES L. BENNETT, M.D., Ph.D., MPP, taken at 222 41st Street, New York, New York, commencing at 9:39 a.m., Thursday, December 17, 2015, before Mercedes Marney, Registered Professional Reporter and Notary Public.

JOB No. 2197613
PAGES 1 - 342

BY MS. CITERA:
Q. Okay. Well, what do you mean, "in a general way"?
A. Well, the way the sentence is written, it's very categorical.
"Drugs for off-label uses can lead to important treatment breakthroughs," that's almost like a mom-and-apple-pie-type sentence.
There's a lot of drugs for off-label uses that can also lead to non-important treat -- breakthroughs. Some can lead, and some don't lead, to.
Q. But you prepared this petition with the Connecticut Attorney General; isn't that right?
A. Right.
And some can, as I say.
Q. And did you object to that language at the time?
MR. WILLIAMS: Objection, argumentative.
THE WITNESS: No.
BY MS. CITERA:
Q. And, then, do you agree with the statement that says, "Indeed, Thalomid is an

example of such a breakthrough. By all indications, it provides a valuable treatment option for patients stricken by certain forms of cancer"?
A. Yes.
Q. So Thalomid was a breakthrough for cancer; isn't that right?
A. Yes.
Q. Would you agree that, in the context of treating cancer patients, it may not always be practical to wait for an on-label indication before using a drug?
A. In general, yes.
Q. Because patients are dying; is that right?
MR. WILLIAMS: Objection: lacks foundation, incomplete hypothetical.
THE WITNESS: That answer -- that question is -- it's a sort of -- that -- you know --
BY MS. CITERA:
Q. Let me rephrase it.
Would you agree that it can take years for a drug to get an indication by the FDA?
A. Yes.

I declare under penalty of perjury under the laws that the foregoing is true and correct.

Executed on ________________ , 20___,
at _____________, ___________________________.

___________________________________
CHARLES L BENNETT, M.D., Ph.D., MPP

# C E R T I F I C A T E

STATE OF NEW YORK )
) ss.
COUNTY OF NEW YORK )

I, MERCEDES MARNEY, court reporter and notary public within and for the State of New York, do hereby certify:

That CHARLES L. BENNETT, M.D., Ph.D., MPP, the witness whose deposition is hereinbefore set forth, was duly sworn by me, and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have here unto set my hand this 29th day of December, 2015.

Mercedes Marney, Court Reporter
Notary Public - State of New York
Registration No.: 01MA6325098
Expiration Date: 05/18/2019

# EXHIBIT N

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Kimberly A. Dunne (SBN 142721)
kdunne@sidley.com
Michelle B. Goodman (SBN 218607)
mgoodman@sidley.com
Sean A. Commons (SBN 217603)
scommons@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

Karen P. Hewitt (SBN 145309)
kphewitt@jonesday.com
Brian D. Hershman (SBN 168175)
Bhershman@jonesday.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539

Attorneys for Defendant Celgene Corporation
(*Additional Counsel listed on following page*)

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO,

Plaintiffs,

*Ex rel.*

BEVERLY BROWN,

Plaintiff-Relator,

v.

Case No. 10-cv-03165 GHK (SSx)

Assigned to: Hon. George H. King

**CORRECTED SUPPLEMENTAL REBUTTAL REPORT OF IAIN M. COCKBURN**

**[CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER]**

CELGENE CORPORATION, )
Defendant. )
)

James C. Stansel (admitted *pro hac vice*)
jstansel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

Toni-Ann Citera (admitted *pro hac vice*)
tcitera@jonesday.com
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

Table of Contents


I. OVERVIEW ..... 2

II. SUMMARY OF OPINIONS ..... 3

III. DR. HAY'S UNSUPPORTED ASSUMPTION THAT CELGENE ILLEGALLY CAUSED ALL PRESCRIPTIONS IS CONTRADICTED BY THE EVIDENCE AND RELEVANT LITERATURE ..... 9

A. DR. HAY FAILS TO OFFER ANY BASIS FOR HIS ASSERTION THAT THERE IS A CAUSAL RELATIONSHIP BETWEEN ALLEGED OFF-LABEL PROMOTION AND ON-LABEL PRESCRIPTIONS ..... 10

B. DR. HAY FAILS TO OFFER ANY BASIS FOR HIS ASSERTION THAT THERE IS A CAUSAL RELATIONSHIP BETWEEN ALLEGED OFF-LABEL PROMOTION AND OFF-LABEL PRESCRIPTIONS ..... 13

C. DR. HAY MAKES SEVERAL ERRORS IN ESTIMATING THE TOTAL NUMBER OF OFF-LABEL PRESCRIPTIONS FOR ALL GOVERNMENT PROGRAMS ..... 28

D. DR. HAY FAILS TO ACCOUNT FOR STEPS NECESSARY TO EXCLUDE OFF-LABEL PRESCRIPTIONS THAT ARE NOT AT ISSUE ..... 36

E. DR. HAY FAILS TO ACCOUNT FOR ALL OF THE STEPS NECESSARY TO ESTIMATE ECONOMIC DAMAGES RESULTING FROM ALLEGED OFF-LABEL PROMOTION ..... 42

F. DR. HAY'S DAMAGES ESTIMATES FOR EACH GOVERNMENT PROGRAM ARE FLAWED AND UNRELIABLE ..... 47

G. SUMMARY OF THE IMPACT OF CORRECTING DR. HAY'S OFF-LABEL DAMAGES FOR ERRORS AND OMISSIONS ACROSS ALL GOVERNMENT PROGRAMS ..... 72

IV. DR. HAY'S PROMOTIONAL SPEAKER PROGRAM KICKBACK DAMAGES ESTIMATES ARE FLAWED AND OVERSTATED ..... 73

A. DR. HAY'S NEW "FAIR MARKET VALUE" ARGUMENT IS FLAWED ..... 73

B. DR. HAY FAILS TO DEMONSTRATE THAT THE SPEAKER PAYMENTS MADE BY CELGENE CAUSED THE RECIPIENTS TO PRESCRIBE THALOMID® AND REVLIMID® ..... 77

C. DR. HAY'S METHOD TO ESTIMATE KICKBACK DAMAGES IS FLAWED ..... 82

V. DR. HAY'S CHARITABLE FOUNDATION KICKBACK DAMAGES ESTIMATES LACK FOUNDATION ..... 86

A. DR. HAY'S ASSUMPTIONS AND ASSERTIONS ARE INCORRECT ..... 87

B. DR. HAY'S CHARITABLE CONTRIBUTION DAMAGES AND PENALTY ESTIMATES ARE OVERSTATED ..... 90

# I. OVERVIEW

1. My name is Iain M. Cockburn. I am the Richard C. Shipley Professor of Management in the School of Management at Boston University. I previously submitted reports in this matter on September 25, 2015 (hereafter, "9/25/15 Cockburn Report") and October 26, 2015 (hereafter, "10/26/15 Cockburn Rebuttal Report").[1] I presented my background and experience in the 9/25/15 Cockburn Report. The most recent version of my curriculum vitae is included as Appendix A.

2. I have been asked by Counsel for Celgene to review and respond to the various expert reports submitted by Dr. Joel W. Hay. Dr. Hay has submitted four reports in this matter: an original report dated September 25, 2015 (hereafter, "9/25/15 Hay Report"), a rebuttal report dated October 26, 2015 (hereafter, "10/26/15 Hay Rebuttal Report"), a report dated December 7, 2015, which was further corrected on December 10, 2015 (hereafter, "12/10/15 Hay Report"), and a report dated April 22, 2016, which was further corrected on May 6, 2016 (hereafter, "5/6/16 Hay Report"). It is my understanding that the 5/6/16 Hay Report consolidates all of Dr. Hay's previous opinions and contains the entirety of his opinions and damages calculations.

3. For ease of review, I have consolidated all of my rebuttal opinions, including those expressed in the 10/26/15 Cockburn Rebuttal Report, into this Supplemental Rebuttal Report. A comprehensive list of data and documents reviewed in connection with this Supplemental Rebuttal Report is included as Appendix B.

4. I understand from Counsel that the appropriate time period over which damages/penalties should be assessed will be decided by the Court. For purposes of

[1] Expert Report of Iain M. Cockburn, September 25, 2015 ("9/25/15 Cockburn Report") and Expert Rebuttal Report of Iain M. Cockburn, October 26, 2015 ("10/26/15 Cockburn Rebuttal Report").

Celgene. In fact, for the vast majority of physicians who received payments from Celgene, there are examples of non-paid physicians with very similar Thalomid® and Revlimid® prescribing patterns. In addition, Dr. Hay's kickback damages are also greatly overstated because he includes all claims for prescriptions written by physicians who received payments, regardless of when the prescriptions occurred relative to the payments. Dr. Hay similarly makes no attempt to determine whether donations made by Celgene to non-profit copay foundations were intended to induce prescriptions of Thalomid® or Revlimid® and instead assumes that all such donations were kickbacks and that all "prescriptions for Celgene products in which non-profits paid the copay are tainted by kickbacks."[6]

11. The 5/6/16 Hay Report purports to update the damages calculations presented in the 9/25/15 Hay Report and the 12/10/15 Hay Report. Dr. Hay states that the 12/10/15 Hay Report was necessary because "Medicare Part A and Part B data were provided to me too close to my initial report deadline to be analyzed, and accordingly was not utilized in my damages calculations [in the 9/25/15 Hay Report]."[7] Dr. Hay also states that the 5/6/16 Hay Report was necessary because "[c]ertain information regarding the Medicare Part D and Tricare [sic] data were ambiguous in the prior production and were not clarified prior to the submission of my Supplemental Report of 12-7-15."[8] However, based on my review of the data sources and reports, the 5/6/16 Hay Report does not merely update his previous damages calculations to use these additional data sources. Instead, it adds several new theories of damages that could have been included in the original 9/25/15 Hay Report, presents new methodologies for calculating damages that could have been applied to the data used for the original 9/25/15 Hay Report, and corrects several

[6] 5/6/16 Hay Report, ¶ 120.
[7] 5/6/16 Hay Report, ¶ 68.
[8] 5/6/16 Hay Report, ¶ 69.

issues I pointed out in the 10/26/15 Cockburn Rebuttal Report. Specifically, the 5/6/16 Hay Report includes the following additions and revisions to the original 9/25/15 Hay Report that are not based on the alternative data sources identified by Dr. Hay:

11.1. <u>New penalty calculations for damages theories disclosed in the 9/25/15 Hay Report:</u> In the 5/6/16 Hay Report, Dr. Hay adds (1) TRICARE penalties; (2) Medicaid penalties for numerous states; and (3) Department of Veterans Affairs ("VA") penalties.

11.2. <u>New damages theories and corresponding damages and penalties not disclosed in the 9/25/15 Hay Report:</u> In the 5/6/16 Hay Report, Dr. Hay adds (1) damages and penalties totaling $5,760 million and $9,560 million, respectively, for what he asserts were <u>on-label</u> Thalomid® and Revlimid® claims purportedly caused by Celgene's alleged off-label promotion and/or kickbacks; (2) damages and penalties totaling $95 million and $474 million, respectively, for off-label Thalomid® and Revlimid® claims that he believes were paid by the federal Medicare Part C program over the 1998-2005 period; (3) damages and penalties totaling $627 million and $1,491 million, respectively, associated with Thalomid® use in second-line MM that he now asserts are off-label, notwithstanding his prior opposite opinion that once Thalomid® was approved for first-line MM, all subsequent lines were on-label; (4) kickback damages and penalties totaling $99 million and $188 million, respectively, for off-label Thalomid® and Revlimid® Medicare claims for prescriptions written by Celgene-sponsored speakers; and (5) damages and penalties totaling $594 million and $889 million, respectively, that he alleges are a result of payments Celgene made to charitable organizations.

11.3. <u>Other revisions:</u> The 5/6/16 Hay Report also contains revisions directly responsive to some of the errors and methodological critiques identified in the 10/26/15 Cockburn Rebuttal Report. In the 5/6/16 Hay Report, Dr. Hay (1)

corrects his prior error of including non-final and duplicate Medicare Prescription Drug Event ("PDE") records; (2) uses a different method for determining second-line use in MM and mantle cell lymphoma ("MCL") patients; (3) adjusts the Medicare off-label rates to account for incomplete medical claims data for some patients; (4) uses the publicly available Medicaid State Drug Utilization Data ("SDUD") for Medicaid estimates; (5) abandons the use of Medicare off-label rates as representative of the Medicaid population; (6) drops extrapolated Part A/B Medicare damages for Thalomid® for the 2001-2005 period; (7) drops Medicaid damages/penalties for states not listed in the Complaint; and (8) drops the unreliable and speculative damages calculations for Federal Employees Health Benefits Program, Indian Health Service, 340B Clinics, State Employees Programs, Children's Health Insurance Program, and State correction inmates programs.

12. Exhibits 1.A-1.D show a comparison of the damages and penalty estimates between the 9/25/15 Hay Report, the 12/10/15 Hay Report, and the 5/6/16 Hay Report. As these exhibits illustrate, Dr. Hay's damages and penalty estimates vary greatly between his three reports.

## III. DR. HAY'S UNSUPPORTED ASSUMPTION THAT CELGENE ILLEGALLY CAUSED ALL PRESCRIPTIONS IS CONTRADICTED BY THE EVIDENCE AND RELEVANT LITERATURE

13. As I stated in the 9/25/15 Cockburn Report, economic damages to government payers are calculated as the amount that these payers actually paid for Thalomid® and Revlimid® less the amount that they would have paid absent the alleged off-label promotion by Celgene.[9] To properly perform this calculation, it is critical to assess the total number of Thalomid® and Revlimid® prescriptions that would have been paid by the Government absent the alleged off-label promotion and

[9] 9/25/15 Cockburn Report, ¶ 12.

### *3. Dr. Hay's Inclusion of Second-Line MM Claims for Thalomid® in Off-label Damages is Inaccurate and Inconsistent with his Prior Opinion*

41. In the original 9/25/15 Hay Report, Dr. Hay opined that Thalomid® use in second-line MM was on-label after Thalomid®'s approval for first-line MM in 2006:

> "Since Thalomid was approved for treatment of multiple myeloma in first line, any use of Thalomid for multiple myeloma was considered *on-label* after May 24, 2006 [emphasis added]."[71]

42. In the 5/6/16 Hay Report, Dr. Hay concludes the opposite -- asserting that use of Thalomid® in second-line MM is off-label -- and includes all second-line MM claims in his off-label estimates. Including these second-line MM claims substantially increased Dr. Hay's estimate of the post-2006 Thalomid® off-label rate relative to the 9/25/15 Hay Report (*i.e.*, from 21 percent in the 9/25/15 Hay Report to upwards of 80 percent for the relevant government programs in the 5/6/16 Hay Report).

43. Dr. Hay provides no explanation for this change in opinion, and it has nothing to do with the availability of Medicare Part A and B data or any other information produced after Dr. Hay prepared the 9/25/15 Hay Report. Moreover, Dr. Hay's new opinion is inconsistent with testimony from medical experts in this case, which supports Dr. Hay's original view that once a drug is approved for first-line use, physicians will consider it for subsequent lines of therapy.[72] Absent a specific

---

[71] 9/25/15 Hay Report, ¶ 65 and Appendix D, p. 150.

[72] For example, Dr. Bensinger states "[i]f a compendia entry is supportive of use in the first-line (*i.e.*, in newly diagnosed patients), it means that the drug can also be used in subsequent lines of therapy (*i.e.*, relapsed or refractory/progressive/aggressive disease; these terms are interchangeable)." (9/25/15 Bensinger Report, ¶ 38). Dr. Norton also opines that it is common for oncologists to consider drugs approved for

medical reason why Thalomid® could not be safely used as a second-line therapy, which Dr. Hay does not identify, there is no sound economic basis for treating second-line MM use of Thalomid® off-label.

#### *4. Dr. Hay Changed his Method for Identifying Line of Therapy*

44. Dr. Hay also changed the method used to assess line of therapy in the claims data. In the 9/25/15 Hay Report, Dr. Hay's line-of-therapy assessment hinged on the observation of selected oral chemotherapy agents prior to Revlimid® prescriptions.[73] I pointed out in the 10/26/15 Cockburn Rebuttal Report that this inappropriately ignored numerous injectable and infusible chemotherapies and other first-line medical treatments, leading to overstated Revlimid® off-label estimates. In the 12/10/15 and 5/6/16 Hay Reports, prescriptions are instead treated as second-line when the patient's first Thalomid®/Revlimid® prescription followed his or her first relevant diagnosis (*i.e.*, MM or MCL) by more than 28 days – even if there is no evidence of a prior therapy.[74] Dr. Hay offers no basis for assuming that this new approach to assess line of therapy is reliable.

44.1. Dr. Hay's new approach does not directly address the key question of whether patients were treated with other MM/MCL therapies prior to initiation of Thalomid®/Revlimid®. The standard and more accurate approach to assessing line of therapy is to analyze the full prior treatment history of each patient

---

first line cancer treatments as appropriate to use in later lines (9/25/15 Norton Report, ¶ 57).

[73] 9/25/15 Hay Report, Appendix D.2. As noted above, Dr. Hay did not assess line of therapy for Thalomid® in the 9/25/15 Hay Report.

[74] I note that although Dr. Hay claimed in his October 22, 2015 declaration that together the Medicare Part A/B/D data were superior to the Humana data and provided all the necessary information to determine accurate off-label rates, this was misleading. While the Medicare data do provide information as to injectable and infusible chemotherapy treatments, the Medicare data do not include information on other oral chemotherapies taken by the Thalomid® and Revlimid® patients (whereas the Humana data contained both). Thus, Dr. Hay could not appropriately assess line of therapy using the Medicare data requested by Relator.

eligible individuals that are often referred to as Medicare Advantage) damages for the period prior to 2006. He cites to no Medicare claims, payments or other direct evidence of reimbursement by Medicare during this time period. Instead, Dr. Hay estimates the total number of Thalomid® Part C prescriptions prior to 2006 by applying the number of Thalomid® prescriptions per Medicare Part C patient in the PDE data in 2006 to the number of Medicare enrollees with prescription drug coverage. He then uses the 9/25/15 Hay Report calculation of the Thalomid® off-label rate based on the Celgene REMS data to estimate the number of off-label prescriptions for Part C enrollees.[109] This method results in Dr. Hay believing there were damages of $95 million and penalties of $474 million associated with federal Medicare payments prior to 2006.

65. However, as described by Ms. Norwalk, prior to 2006 Medicare Part C plans were not required to offer outpatient prescription drug coverage. If a plan chose to offer a drug coverage benefit, it was a supplemental benefit and the cost was paid by the private plan or the beneficiary, and was not reimbursed by the Medicare program.[110] Thus, pre-2006 Medicare Part C damages should be zero, and Dr. Hay's Medicare Part C damages and penalties for that period lack any basis in fact.[111]

---

[109] As this shows, none of these data sources use the Part A/B data Dr. Hay believes were produced too close to the 9/25/15 Hay Report. Thus, Dr. Hay could have used the same extrapolation method he now proffers at the time of the 9/25/15 Hay Report had he believed it worthwhile. Moreover, the patients included in the REMS data are not necessarily representative of the Medicare Part C patients. Dr. Hay has done nothing to test whether his out-of-sample extrapolation is reliable.

[110] Expert Supplemental Rebuttal Report of Leslie V. Norwalk, June 3, 2016 ("6/3/16 Norwalk Report"), ¶ 8.

[111] Notwithstanding that damages and penalties should be zero in light of the fact that Medicare Part C did not cover Thalomid® during this period, Dr. Hay's extrapolation method is speculative at best, particularly for his penalty calculations. Most of the Part C plans with drug coverage prior to 2006 offered very limited coverage with caps of only a few thousand dollars per year (see, *e.g.*, Gold, M., *et al.*, "Monitoring Medicare+Choice: What Have We Learned? Findings and Operational Lessons for Medicare Advantage," MATHEMATICA Policy Research Inc., 2004, Table 10, available at http://www.mathematica-

preparation and travel time.[177] On the other hand, consulting engagements can vary from simply having a telephone conversation with a drug manufacturer, to private engagements that do not result in public opinions, to attending a meeting and offering opinions. While there may be some types of consulting work that more closely resemble speaking engagements, one cannot merely assume that consulting fees should be equal to speaking fees.

130. Key opinion leader ("KOL") speaking engagements are quite common in the industry and many pharmaceutical companies pay the same KOLs to speak about similar drugs. Examining the standard price of actual transactions for the same good/service is the standard way to determine market value in economics.

131. In the case of speaking fees, data are publicly available that can be used to understand standard rates. I used Open Payments, a database managed by CMS to disclose industry payments to physicians, in order to compare the speaking engagement fees paid by Celgene for engagements related to Revlimid® to those paid by other pharmaceutical companies for engagements related to competitor MM drugs (*i.e.*, Velcade® and Kyprolis®).[178] Based on Open Payments data for the period August 2013 to December 2014, I found that the average payment for non-consulting services (*e.g.*, speaking engagements) made by Celgene was $1,759 per engagement as compared to approximately $3,000 per engagement for Millennium

---

[177] In fact, this is something that Dr. Hay acknowledges in his report when he adds a "KOL" premium to the base rate in his hypothetical example. He fails to add the additional payment for preparation and/or travel time. 5/6/16 Hay Report, Footnote 96.

[178] Open Payments collects data on the financial relationships between physicians and teaching hospitals with healthcare manufacturing companies. This can include payments for research, consulting, speaking fees, meals, or travel. For this calculation, I included payments where the field labeled "nature_of_payment_or_transfer_of_value" was equal to "Compensation for services other than consulting, including serving as faculty or as a speaker at a venue other than a continuing education program." (Centers for Medicare & Medicaid Services, "Open Payments," available at https://www.cms.gov/openpayments/)

Pharmaceuticals and Onyx Pharmaceuticals, the producers of Velcade® and Kyprolis®, respectively (see Exhibit 9).[179] Additionally, I found that Celgene's speaker payments exceeded $3,000 in only 51 out of 954 events and 10 out of 189 physicians. Based on this analysis, Celgene speaking fees for Revlimid® appear to have been lower on average than those paid by other pharmaceutical companies for competitor MM drugs. This contradicts Dr. Hay's contention that Celgene's speaker fees were unreasonably high.

132. I also reviewed the speaking fees recorded in Open Payments for the specific physicians identified by Dr. Hay. As shown in Exhibit 10, this analysis also suggests that Celgene paid these speakers the same or less than competitors for similar services. Consider the following examples:

132.1. [redacted] was paid on average $3,115 per Revlimid® speaking engagement (Celgene paid him for a total of 13 engagements) between 2013 and 2014. [redacted] was also paid on average $3,911 per Velcade® related engagement by Millennium Pharmaceuticals and $3,460 per Kyprolis® related engagement by Onyx Pharmaceuticals (together these two companies paid him for a total of 71 engagements over the same time period). Thus, in the case of Dr. [redacted] Celgene's average payment per engagement (and number of engagements) appears to be lower than that of its competitors.

132.2. [redacted] was paid an average of $1,945 per Revlimid® engagement from Celgene, which is lower than the $3,300 he received per Kyprolis® engagement from Onyx Pharmaceuticals.

---

[179] The amounts reported on Open Payments for Celgene are consistent with the amounts reported in the ENVISION data. The period covered by the Open Payments data, August 2013 to December 2014, is at the end of the time period at issue in this case. Although the average amount paid by Celgene in the ENVISION data for speaking engagements varied over time, from an average of approximately [redacted] in 2006 to approximately [redacted] in 2014 across all speakers, in no case did the average exceed that of the other companies calculated based on Open Payments data.

132.3. [redacted] was paid an average of $1,750 per Revlimid® event from Celgene, which is lower than the $3,254 he received per Velcade® engagement from Millennium Pharmaceuticals and the $2,819 he received per Kyprolis® engagement from Onyx Pharmaceuticals.

133. Dr. Hay's new opinion that Celgene was paying unreasonable amounts for speaking engagements does not appear to be supported by the data when a proper economic analysis using appropriate comparators is conducted. In fact, the evidence suggests that the opposite is true; that is, Celgene paid fees consistent with or lower than the value set by the market for speaking engagements.

### B. DR. HAY FAILS TO DEMONSTRATE THAT THE SPEAKER PAYMENTS MADE BY CELGENE CAUSED THE RECIPIENTS TO PRESCRIBE THALOMID® AND REVLIMID®

134. Dr. Hay states that he was asked by Counsel for Relator to "test the reasonableness of Relator's assertion that Celgene made payments for the purpose of inducing or rewarding physicians for prescribing or recommending Celgene drugs."[180] His conclusion that Relator's assertion is reasonable is not based on any reliable or proper methodology.[181]

135. Dr. Hay acknowledges that "[h]istorically, some drug companies have provided reasonable compensation to expert physicians and other KOLs to speak to other doctors and clinicians in fair and balanced presentations on the role of the sponsor's drugs in patient management."[182] His analysis, however, does not attempt to determine which payments made by Celgene were reasonable compensation for services rendered and which (if any) were allegedly unlawful kickbacks. From an economic perspective, one would want to establish whether or not prescriptions were

---

180 5/6/16 Hay Report, ¶ 94.
181 5/6/16 Hay Report, ¶ 101.
182 5/6/16 Hay Report, ¶ 99.

Exhibits 15.A and 15.B. Correcting Dr. Hay's calculations for the selected methodological issues described above and eliminating overlap among these corrections reduces his charitable foundation damages by $567 million (*i.e.*, over 95 percent) and his charitable foundation penalties by $855 million (*i.e.*, over 96 percent).[214] Looking at each drug separately, the impact of all the adjustments combined results in a reduction to damages of at least 79 percent.

* * *

168. I reserve the right to supplement and amend this report, as well as provide a supplemental report, should additional information become available to me.

I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.



Date: June 3, 2016 Iain M. Cockburn

[214] Should the Court find that trebling damages is appropriate, the cumulative reduction to Dr. Hay's treble damages would be $1,702 million.

**CONFIDENTIAL**

**Exhibit 1.A**
**Comparison of Dr. Hay's Estimated Single Damages**




**Notes:**
[1] In the 9/25/15 Hay Report, Medicaid damages were calculated for 49 states. In the 12/10/15 Hay Report, damages were calculated for only 27 states. In the 5/6/16 Hay Report, Maryland was dropped from Dr. Hay's analysis and damages were calculated for only 26 states.
[2] Includes Federal Employees Health Benefits Program, Indian Health Service, 340B Clinics, State Employees Programs, Children's Health Insurance Program, and State correction inmates programs.

**Sources:**
Expert Report of Dr. Joel W. Hay, September 25, 2015; Expert Supplemental Report of Dr. Joel W. Hay, December 7, 2015; Expert Report of Dr. Joel W. Hay, April 22, 2016.

**CONFIDENTIAL**

**Exhibit 1.B**
**Comparison of Dr. Hay's Estimated Penalties**




**Notes:**
[1] In the 9/25/15 Hay Report, Medicaid penalties were calculated for only nine states. In the 12/10/15 Hay Report, penalties were calculated for 27 states. In the 5/6/16 Hay Report, Maryland was dropped from Dr. Hay's analysis and penalties were calculated for 26 states.
[2] Includes Federal Employees Health Benefits Program, Indian Health Service, 340B Clinics, State Employees Programs, Children's Health Insurance Program, and State correction inmates programs.

**Sources:**
Expert Report of Dr. Joel W. Hay, September 25, 2015; Expert Supplemental Report of Dr. Joel W. Hay, December 7, 2015; Expert Report of Dr. Joel W. Hay, April 22, 2016.

CONFIDENTIAL

**Exhibit 1.C**
**Comparison of Dr. Hay's Estimated Kickback <u>Single Damages</u>**




**Sources:**
Expert Report of Dr. Joel W. Hay, September 25, 2015; Expert Supplemental Report of Dr. Joel W. Hay, December 7, 2015; Expert Report of Dr. Joel W. Hay, April 22, 2016.

CONFIDENTIAL

**Exhibit 1.D**
**Comparison of Dr. Hay's Estimated Kickback <u>Penalties</u>**




**Sources:**
Expert Report of Dr. Joel W. Hay, September 25, 2015; Expert Supplemental Report of Dr. Joel W. Hay, December 7, 2015; Expert Report of Dr. Joel W. Hay, April 22, 2016.

# ADDITIONAL PAGES OF EXHIBIT N CITED BY RELATOR

bortezomib in the second-line treatment of MM.[106] The most conservative cost offset percentage from these three papers is the estimate by Hornberger *et al.* (2009), that analyzed the relative cost-effectiveness of bortezomib and Revlimid® plus dexamethasone for 669 patients.[107] Following the same calculation described above, I found the cost offset percentage to be 52 percent. I note that based on another paper discussed in the 9/25/15 Cockburn Report, the costs to the Government for alternative treatments could have been almost 15 percent *higher* than the costs of Revlimid®.[108]

## F. DR. HAY'S DAMAGES ESTIMATES FOR EACH GOVERNMENT PROGRAM ARE FLAWED AND UNRELIABLE

63. In addition to the methodological flaws and errors described in the preceding Sections III.C-E, Dr. Hay's calculations of damages and penalties for each of the government programs contain additional program-specific errors. In this section, I describe those additional program-specific issues and then, for each program, estimate the impact on Dr. Hay's damages and penalty estimates if one were to perform the steps Dr. Hay fails to undertake.

### *1. DR. HAY'S MEDICARE PART C DAMAGES ARE UNSUPPORTED AND UNRELIABLE*

#### i. Pre-2006 Damages

64. In the 5/6/16 Hay Report, Dr. Hay calculates, for the first time, Medicare Part C (Medicare-approved managed care insurance plans for Medicare-

---

[106] 9/25/15 Cockburn Report, ¶ 91.

[107] 9/25/15 Cockburn Report, ¶ 91. Hornberger, J., *et al.*, "The Cost-Effectiveness of Bortezomib in Relapsed/Refractory Multiple Myeloma: Swedish Perspective," *European Journal of Hematology*, Vol. 85, No. 6, 2010, pp. 484-491, at pp. 486, 488.

[108] Based on the findings reported by Durie *et al.* (2013), I estimated a cost offset percentage of 113 percent (Durie, B., *et al.*, "Total Cost Comparison in Relapsed/Refractory Multiple Myeloma," Journal of Medical Economics, Vol. 16, No. 5, 2013, pp. 614-622).

66. To justify these damages/penalties, Dr. Hay argues that "[p]rior to the inception of Medicare Part D, Thalomid and other oral prescription drugs were covered by a number sources [sic], including Medicare Part C."[112] He goes on to cite irrelevant statistics about the portion of oncology drugs covered by Medicare in this time period and the percentage of patients enrolled in a Medicare Part C plan, and appears to rely on these statistics to assume that the federal Medicare program indeed paid Thalomid® claims prior to Part D.[113] Nothing that Dr. Hay cites supports the conclusion that Medicare Part C covered prescriptions for Thalomid® before 2006.

67. First, Dr. Hay notes that even before Part D, Medicare was the largest payer for oncology drugs.[114] This is neither surprising nor relevant. Under the Part B portion of Medicare, Medicare paid for injectable and infused chemotherapies, which during this time period were a major proportion of all chemotherapies.[115] Given that most forms of cancer are more prevalent among elderly patients, Medicare could easily be the largest single payer for oncology drugs without covering any oral chemotherapies, the only type of oncology drug at issue here. As described in Ms. Norwalk's 6/3/16 Report, except for a small number of Thalomid®

---

mpr.com/~/media/publications/PDFs/monitor.pdf). This would cover at most one to two Thalomid® prescriptions. Thus, it is highly unlikely that the number of Thalomid® prescriptions and expenditures per enrollee was the same as that found for Medicare Part C patients in 2006 (*i.e.*, after Medicare began expressly covering oral chemotherapies). Additionally, as described in Section III.F.1.ii below, Dr. Hay's Part C damages estimates in the period 2006-2014 are overstated and flawed, which in turn renders the Part C damages for the period pre-2006 incorrect.

[112] 5/6/16 Hay Report, ¶ 83.

[113] Dr. Hay does not calculate Medicare Part C Revlimid® damages prior to 2006 because Revlimid® was not FDA approved for marketing until late 2005.

[114] 5/6/16 Hay Report, ¶ 84.

[115] 9/25/15 Norwalk Report, ¶¶ 23, 24, 45. See *e.g.*, O'Neill VJ, Twelves CJ. "Oral cancer treatment: developments in chemotherapy and beyond," *British Journal of Cancer*, No. 87, 2002, 933-937. In fact, injectable/infused chemotherapies continue to be a major proportion of all chemotherapies even as of 2012. OptumRx Oncology Insight Report, page 3, available at https://broker.uhc.com/assets/OptumRxOncologyInsightReport_May2014.pdf.

claims in the Medicare Replacement Drug Demonstration project, the federal Medicare program did not pay for oral chemotherapies even through the Part C program.[116] Thus, the fact that Medicare was a major payer for injectable and infusible chemotherapies is irrelevant to determining whether Medicare actually paid for Thalomid® and Revlimid® under Part C prior to 2006.

68. Second, Dr. Hay states that between 13 and 18 percent of all Medicare enrollees chose a Medicare Part C plan and assumes, without support, that the Thalomid® and Revlimid® patients would be "precisely the Medicare patients most likely to sign up" for a Part C plan.[117] The overall percentage of Medicare enrollees who chose Part C does not inform the question of whether the federal Medicare program paid any Thalomid® and Revlimid® claims under Part C.

ii. Post-2006 Damages

69. The 5/6/16 Hay Report includes Medicare damages/penalties post-2006 that, while labeled "Medicare Part D," actually include both categories of patients included in the CMS PDE data, *i.e.*, those covered under Part D plans and those covered under Part C plans. In Section III.F.2 below, I describe in more detail the methodological flaws that pertain to the post-2006 combined Part C and Part D estimates.

70. Specific to his Part C off-label estimate in the post-2006 period, Dr. Hay's extrapolated estimate is speculative. As explained above, the Part A and B data do not include any medical claims for Part C patients. Instead, Dr. Hay calculates and applies to Part C prescriptions the off-label rate for the small number of patients who first started on Thalomid®/Revlimid® when they were covered by a Part D plan, and subsequently switched to Part C.[118] He provides no support for the

[116] 6/3/16 Norwalk Report, ¶ 4.a.

[117] 5/6/16 Hay Report, Footnote 58.

[118] Only three percent of Medicare Part C patients were in the group Dr. Hay uses to extrapolate Part C off-label rates.

proposition that this small group of patients is representative of the much larger Part C population.[119] As a result, there is no basis for assuming that this out-of-sample extrapolation of prescriptions is reliable.[120]

### *2. "MEDICARE PART D"*

71. Dr. Hay's "Medicare Part D" (which as mentioned above actually includes both Part C and Part D) off-label damages and penalty estimates changed dramatically from the 9/25/15 Hay Report to the 5/6/16 Hay Report.[121] As shown in Exhibits 1.A and 1.B, Dr. Hay's "Medicare Part D" damages decreased 75 percent (from $6,772 million to $1,665 million) and his "Medicare Part D" penalties decreased 73 percent (from $11,675 million to $3,145 million) from his original estimates. This significant drop can be explained by a series of major

---

[119] His attempted justification is to say that the off-label rates he estimates for the larger Part D only population are comparable to the off-label rates he estimates for the small group of switchers. However, this comparison is misleading as both his estimates are for Part D patients. The vast majority of Part C patients may have characteristics that are different from the small fraction of Part D patients who switched. Dr. Hay does not make any adjustments to account for these potential differences.

[120] It is common knowledge in health economics and economics in general that making "out-of-sample" extrapolations (*i.e.*, when one takes results from a specific population and applies them to other populations without adjustments) is speculative and error-prone. Dr. Hay himself has several publications that warn against taking his results and applying them to other populations. For example, Dr. Hay and his colleagues state "Medi-Cal (Medicaid) patients are low-income and from a relatively lower socioeconomic status compared to typical US AR patients and managed care enrollees […]. Generalizability of these findings beyond the Medi-Cal or Medicaid populations should be done with caution." Hay, J.W., and M. Leahy, "Cost and Utilization Impacts of Oral Antihistamines in the California Medi-Cal Program," *Value in Health*, Vol. 8, No. 4, 2005, pp. 506-516, at p. 514; Dwight-Johnson, M., Lagomasino, I.T., Hay, J.W., *et al*., "Effectiveness of Collaborative Care in Addressing Depression Treatment Preferences Among Low-Income Latinos," Psychiatric Services, Vol. 61, No. 11, 2010, pp. 1112-1118, at p. 1117.

[121] Dr. Hay also calculates Medicare damages for his new on-label damages theory. However, as I described in Section III.A above, these damages are baseless.

methodological flaws, some of which Dr. Hay addressed after my 10/26/15 Cockburn Rebuttal Report identified them.[122]

72. Dr. Hay's most recent damages estimates still contain serious conceptual and technical errors (described in Sections III.C-E above) that make them unreliable and overstated. Below are the adjustments that should be made to correct these errors and omissions.

i. Corrections to Dr. Hay's "Medicare Part D" Damages and Penalties

73. Limit to relevant time period. Dr. Hay's "Medicare Part D" estimates should be limited to the core time period of January 1, 2006 to March 1, 2011.[123]

74. Ensure sufficient medical history (see Section III.C.1). To mimic a continuous eligibility requirement for the Medicare claims data, I imposed the requirement that for prescriptions for a given patient to be included in the analysis, records for that patient must have had diagnostic information in at least four out of the six months preceding their first Thalomid®/Revlimid® prescription.[124] This approach actually results in *fewer* prescriptions being excluded from the analysis compared with Dr. Hay's method while at the same time reducing the number of

---

[122] See paragraph 11.3 above.

[123] The beginning of the core time period corresponds to the introduction of Medicare Part D.

[124] I chose six months as it is the lower end of the range typically used for continuous eligibility requirements by health economists working with claims data. This is more conservative from a damages perspective relative to applying the commonly used requirement of 12 months. For examples of health economic studies conducted on claims data in the oncology field that used six or 12 months eligibility requirements, see, *e.g.*, Griffiths, R., *et al.*, "Addition of rituximab to chemotherapy alone as first-line therapy improves overall survival in elderly patients with mantle cell lymphoma," Blood, Vol. 118, No. 18, 2011, pp. 4808-4816, at p. 4809; Lang, K., *et al.*, "Survival, healthcare resource use and costs among stage IV ER + breast cancer patients not receiving HER2 targeted therapy: a retrospective analysis of linked SEER-Medicare data," BMC Health Services Research, 2014 14:298, at p. 4; Karve, S., *et al.*, "Treatment Patterns, Costs, and Survival among Medicare-Enrolled Elderly Patients Diagnosed with Advanced Stage Gastric Cancer: Analysis of a Linked Population-Based Cancer Registry and Administrative Claims Database," Journal of Gastric Cancer, 15(2):87-104, at p. 88.

patients who do not have sufficient history from being inappropriately classified as on-/off-label.[125]

75. Remove on-label MDS prescriptions. I corrected Dr. Hay's analysis to remove the on-label MDS prescriptions that he erroneously included in his off-label damages by ignoring the fact that the MDS 5q deletion code was not created until late 2006 (see Section III.C.2).

76. Remove second-line Thalomid® MM prescriptions. I adjusted Dr. Hay's estimates to classify as on-label second-line therapy for MM patients (see Section III.C.3).

77. Limit prescriptions to the off-label uses listed in Relator's Complaint. To estimate the impact of this omission (see Section in III.D.1), I compiled a list of the conditions that Relator alleged were the subject of off-label promotion in her Complaint and determined the associated diagnosis codes corresponding to these conditions (see Appendix Exhibit A.1 for the list of conditions and codes). I then examined the medical diagnoses listed in each patient's records prior to each prescription Dr. Hay treats as off-label and if the patient did not have any diagnoses corresponding to the conditions listed in the Complaint, the prescription was excluded. This correction is partial in that conditions listed in the Complaint for which there may be no evidence of off-label promotion are still included.

78. Remove prescriptions associated with compendia-supported conditions. To estimate and remove compendia-supported off-label uses that are explicitly reimbursable by Medicare (see Section III.D.2), I compiled a list of the conditions that Dr. Bensinger has determined were compendia supported over the 2006 to 2015

[125] In his analysis, Dr. Hay excludes 31 percent of Thalomid® and 16 percent of Revlimid® Medicare prescriptions that do not meet his criteria for sufficient medical history (Dr. Hay moves these prescriptions into his on-label damages estimates). In comparison, the rule I propose results in 29 percent of Thalomid® and 14 percent of Revlimid® Medicare prescriptions being excluded from the analysis.

time period.[126] I then excluded any prescriptions for patients with a compendia-supported diagnosis preceding their Thalomid® and Revlimid® use.[127]

79. Remove prescriptions associated with medical-journal-supported conditions. To estimate and remove prescriptions that are explicitly reimbursable by Medicare because they are for uses supported by one of the CMS-approved oncology journals (see Section III.D.2), I compiled a list of the conditions that Dr. Bensinger determined were supported in the relevant journals. I then examined the prescriptions deemed to be off-label by Dr. Hay and identified the prescriptions that were preceded by a diagnosis of a journal-supported condition during the relevant time period. Given that CMS reimbursement rules for journal-supported conditions began in 2009, I did not exclude any prescriptions prior to this date.[128] Although Dr. Bensinger's analysis ends in Q1 2011, I understand that evidence will be presented at trial to demonstrate that, with the exception of CLL, no negative studies were published in the period following Q1 2011 that would change Dr. Bensinger's assessment of conditions supported by medical literature. Consequently, to correct

126 I also relied on the expert report submitted by Ms. Norwalk who identified the different compendia and level of evidence accepted by CMS for reimbursement purposes over time (9/25/15 Norwalk Report, ¶¶ 58, 59, 99). Appendix Exhibits A.2 and A.3 contain lists of compendia/journal-supported conditions for Thalomid® and Revlimid®, corresponding ICD-9 codes, as well as relevant time periods of support.

127 When the supported condition was a specific line of therapy, I kept Dr. Hay's approach of using 28 days to determine line of therapy. The terms "relapsed" and "refractory" were considered synonyms of second-line treatment based on Dr. Bensinger's report (9/25/15 Bensinger Report, ¶ 38).

128 Ms. Norwalk explains that effective January 1, 2009, the Medicare Improvements for Patients and Providers Act "expanded the definition of 'medically accepted indication' for Part D." Under the new "medically accepted indication" standard, uses determined by a Part D plan to be supported based on clinical evidence in any of 26 peer-reviewed medical journals approved by the Secretary of HHS are required to be covered. Ms. Norwalk also explains that "[a] Part D Plan can extend coverage based on clinical evidence in these journals even if one or more compendia identifies a use as not indicated and even if the journals do not uniformly support a use." (9/25/15 Norwalk Report, ¶¶ 59-60)

Dr. Hay's analysis, I assumed that all conditions supported by medical literature as of Q1 2011 remain supported through the end of the damages period, with the exception of CLL.[129]

80. Remove prescriptions for patients with prior experience. To assess the impact of Dr. Hay's failure to account for the impact of patient experience on off-label use (see Section III.D.4), I considered patients with three or more Thalomid®/Revlimid® prescriptions to be "experienced" users for whom the demonstrated efficacy and positive benefits of the use of Thalomid®/Revlimid® are likely to be the most important factor driving continued use. Any prescriptions for patients occurring after the point at which they become experienced were excluded.[130]

81. Remove prescriptions written by physicians with prior experience. To assess the impact of Dr. Hay's failure to consider physician experience (see Section III.D.4), I considered physicians with three or more patients treated with Thalomid®/Revlimid® (and who in turn each received at least three off-label prescriptions) to be "experienced" physicians for whom efficacy and clinical experience are likely to be the most important factor driving continued use.[131] The Medicare PDE data alone are not sufficient to get a complete picture of the number of patients treated by each physician because these data only reflect the Medicare population. To the extent that physicians also treat patients with other types of insurance (both from private and other government payers), a complete assessment of physician experience requires a database that include all patients who received

---

[129] See Appendix Exhibits A.2 and A.3 for lists of compendia/journal-supported conditions for Thalomid® and Revlimid®, corresponding ICD-9 codes, and relevant time periods of support. I again applied Dr. Hay's method for line of therapy for purposes of estimating the impact of this omitted step.

[130] 9/25/15 Richardson Report, ¶ 73.

[131] 9/25/15 Richardson Report, ¶ 75.

Thalomid® and Revlimid®, such as the REMS data. Thus, I used REMS data to determine the percentage of Thalomid®/Revlimid® prescriptions written by experienced physicians after the point at which they become experienced.[132]

82. Remove cost of alternative treatments. To calculate the actual economic loss to the Government caused by any off-label claims, I estimated costs the Government would have incurred in the absence of these prescriptions (see Section III.E.2). As described above, I found the cost offset percentage to be 62 percent for Thalomid® and 52 percent for Revlimid®.

ii. Summary of the Impact of Correcting Dr. Hay's "Medicare Part D" Damages and Penalties

83. The impact of these corrections on a stand-alone basis (*i.e.*, the impact if that were the only change made to Dr. Hay's calculations) and cumulatively (*i.e.*, the impact of making all changes and eliminating any overlap) on Dr. Hay's $1,665 million total "Medicare Part D" off-label damages estimates and $3,145 million total "Medicare Part D" off-label penalty estimates is shown in Exhibits 4.A and 4.B.[133] Correcting Dr. Hay's calculations for the selected methodological issues and omitted steps described above and eliminating overlap among these corrections reduces his Medicare off-label damages by $1,654 million (*i.e.*, over 99 percent) and his Medicare off-label penalties by $3,092 million (*i.e.*, over 98 percent).[134] Looking at each drug separately, the impact of all the adjustments combined results in a reduction to damages of at least 99 percent.

[132] See Exhibits 4.A and 4.B for a description of the methodology used to estimate physician experience.

[133] Dr. Hay used the top end of the penalty per claim range when estimating penalties. In making corrections to his estimates, I also apply the top end for consistency only and do not intend to suggest that it is appropriate.

[134] Should the Court find that trebling damages is appropriate, the cumulative reduction to Dr. Hay's treble damages would be $4,963 million.

84. In fact, even with the adjustments above, the remaining dollars still are overstated as a measure of economic damages. There are numerous issues and omissions that I was unable to correct for given the information produced by Relator and the Government. For instance, as I described above, Dr. Hay assumes the "amount paid" field in the PDE data contains the Government's actual costs, despite the fact that CMS has stated repeatedly it does not. I have not seen any data produced by Relator or the Government that would allow me to adjust for this defect in his methodology. Furthermore, as I explained above, even absent explicit coverage for off-label uses, Medicare has approved claims for some off-label uses of Thalomid®/Revlimid® using prior authorization and/or reconsideration/appeals processes (see paragraph 27.4). At least from an economic perspective, any claims that the Government independently determined were medically appropriate and required insurers/payers to treat as covered through these processes cannot be attributed to alleged improper promotion by Celgene and should be excluded from damages calculations. Finally, as described above in paragraph 27, Dr. Hay has never conducted an analysis needed to account for other factors that contribute to Thalomid®/Revlimid® off-label use (*e.g.*, the presence of unmet medical need in cancer patients, the abundance of published scientific evidence and the recommendations made in treatment guidelines that supported Thalomid®/Revlimid® off-label).[135]

### *3. TRICARE*

85. Dr. Hay revised his TRICARE damages estimate to use the claims data produced by the DoD instead of the extrapolation method presented in the 9/25/15 Hay Report. Based on this revised approach, Dr. Hay's TRICARE off-label

[135] While the corrections I presented result in a number that more reasonably approximates damages, any remaining prescriptions would still need to be evaluated carefully to determine whether they are in fact properly included in damages.

records to be reviewed, there is a high potential for manual review to result in errors, and indeed, I have identified numerous instances where Dr. Hay made mistakes in identifying index dates or simply missed on-label diagnosis codes for patients, causing, on net, Dr. Hay's damages to be overstated.[139]

89. Second, Dr. Hay calculated penalties for prescriptions where TRICARE did not pay anything (or paid a negative amount).[140] I see no economic basis for assessing a penalty for an action that had no financial impact on the Government and I removed those prescriptions from the analysis.[141]

90. Limit to relevant time period. Dr. Hay's corrected TRICARE estimates should be limited to the core time period of April 27, 2004 to March 1, 2011.

91. Use actual cost to the TRICARE program. As discussed in Section III.E.1 above, Dr. Hay should remove the substantial rebates Celgene paid to TRICARE relating to use of Thalomid® and Revlimid®.[142] In addition, Dr. Hay fails to adjust the data to account for the actual cost to the DoD of prescriptions dispensed at military treatment facilities ("MTF"). For these prescriptions, Dr. Hay uses the AWP "sticker price" reported on the Thalomid®/Revlimid® prescriptions

---

[139] Dr. Hay's errors resulting from his manual process impacted damages in both directions. That is, there were 16,493 prescriptions for which I found his index date to be wrong, of which 7,191 resulted in Dr. Hay incorrectly classifying a prescription as on-/off-label. In 449 of these cases, Dr. Hay's manual process resulted in erroneously identifying prescriptions as on-label when they should have been identified as off-label by Dr. Hay and 6,742 cases where his manual process erroneously identified the prescription as off-label when they should have been identified as on-label by Dr. Hay. Appendix Exhibit B shows some examples of the errors I found and describes my systematic method for assigning index dates.

[140] There were 554 prescriptions for which TRICARE payment was less than or equal to $0.

[141] I also note that Dr. Hay double-counted penalties in instances where the same prescription is partially filled and picked up on two separate transactions as well as in cases where TRICARE is secondary payer to another government program.

[142] I subtracted rebates paid by Celgene for all prescriptions dispensed in the retail pharmacy setting (location field of "Reta" as confirmed by the DoD on the January 14, 2016 conference call).

104. Limit to relevant time period. Dr. Hay's corrected Medicaid estimates should be limited to the core time period of April 27, 2004 to March 1, 2011.

105. Use actual cost to the Medicaid programs. As with TRICARE, to calculate the true costs to the Medicaid programs, I remove the substantial rebates Celgene paid to Medicaid for Thalomid® and Revlimid®.

106. Limit prescriptions to the off-label uses listed in Relator's Complaint. To correct Dr. Hay's Medicaid damages and penalty estimates, I recalculated the TRICARE off-label rates after limiting to prescriptions associated with conditions listed in the Complaint (using the same method described for Medicare in paragraph 77) and applied the resulting rates to Medicaid reimbursements.

107. Remove prescriptions associated with compendia-supported conditions. To estimate the impact of Dr. Hay's failure to account for compendia support, I followed the same approach as described above for Medicare (see paragraph 78) to identify compendia-listed conditions (*i.e.*, relying on Dr. Bensinger's report to compile a list of compendia-supported conditions and on Ms. Norwalk's report for information on compendia accepted by Medicaid over the time period at issue). Then, I recalculated TRICARE off-label rates after removing prescriptions for compendia-supported conditions according to Medicaid reimbursement policies and applied the revised rates to Thalomid®/Revlimid® Medicaid reimbursements.[157]

108. Remove prescriptions for patients and physicians with prior experience. To assess the magnitude of the impact of correcting for patient experience, I recalculated the TRICARE off-label rates after excluding prescriptions for experienced patients (using the same method described for Medicare in paragraph 80) and applied the revised rates to the Thalomid®/Revlimid® Medicaid

[157] I also understand that the Medicaid programs of certain states have policies for covering off-label uses of Thalomid® and Revlimid® beyond those supported by compendia (9/25/15 Norwalk Report, ¶¶ 103-123). Prescriptions for such uses should also be excluded from damages.

120. Because Dr. Hay's extrapolation is based on his estimate of Medicare damages, all of the methodological errors identified in his Medicare analysis flow through to his VA damages/penalties. In Section III.F.2.i, I identified several of these errors. After correcting these errors, I applied the revised Medicare damages estimates in his extrapolation.

121. Limit to relevant time period. Dr. Hay's corrected VA estimates should be limited to the core time period of April 27, 2004 to March 1, 2011.

122. Limit prescriptions to the off-label uses listed in Relator's Complaint. To correct Dr. Hay's VA damages and penalty estimates, I recalculated the Medicare off-label damages after limiting to prescriptions associated with conditions listed in the Complaint (using the same method described for Medicare in paragraph 77) and used the resulting damages to extrapolate VA damages.

123. Remove prescriptions for patients and physicians with prior experience. To assess the magnitude of the impact of correcting for patient experience, I recalculated the Medicare off-label damages after excluding prescriptions for experienced patients (using the same method described for Medicare in paragraph 80) and used the resulting damages to extrapolate VA damages. For physician experience, I utilized the REMS-based method described above for Medicare (see paragraph 81).

124. Remove cost of alternative treatments. To illustrate the potential impact of Dr. Hay's failure to calculate the actual loss to the VA program, I used the same approach as described above for Medicare (see paragraph 82).

ii. Summary of the Impact of Correcting Dr. Hay's VA Damages and Penalties

125. The impact of these corrections on a stand-alone basis and cumulatively on Dr. Hay's $155 million total VA damages estimates and $321 million total VA penalty estimates is shown in Exhibits 7.A and 7.B. Correcting Dr. Hay's

contains numerous errors and is not the amount paid by the Government; and (2) he fails to limit the damages to those prescriptions for which the Relator's assertion is "reasonable."[189]

145. As I discussed in paragraph 59 above, Dr. Hay ignores the fact that CMS has clearly stated the dollar amounts in the PDE data do not reflect the actual costs to the Government. Thus, the "value" Dr. Hay calculates for his promotional speaker program damages is incorrect and unreliable. I am not aware of any data produced by Relator or the Government that would allow me to correct this error in Dr. Hay's analysis.

146. Even using Dr. Hay's flawed value of prescriptions as a starting point, correcting for his failure to limit damages and penalties to those connected to Relator's kickback theory substantially reduces his damages and penalties.

147. First, as I did for off-label damages/penalties, I start by limiting the damages period to the core time period. Given the start of the ENVISION speaker payments was in January 2006, the relevant damages period for promotional speaker program damages is January 1, 2006 to March 1, 2011.

[189] Dr. Hay asserts that the "legal authority" for damages in FCA cases involving alleged kickbacks is the *US v. Rogan* case and quotes the damages theory used by the Plaintiff's expert in that case, who states "assuming that the Government proves that it paid claims that were tainted by a kickback arrangement and that would not have paid such claims had it known the truth, the amount of the Government's damages resulting from the payment of such claims equals the full amount that Medicare paid" (5/6/16 Hay Report, ¶ 102 and Footnote 72). Even if one were to assume this is the correct measure of economic damages, Dr. Hay fails to undertake an analysis that approximates this. For one, he makes no attempt to determine which prescriptions the Government would not have paid had it "known the truth." Given the grave nature of the cancers Thalomid® and Revlimid® were treating and the significant advances these drugs offered, it is plausible that the Government would have paid many of these prescriptions rather than deny a patient access to these treatments. Also, as I discuss in paragraph 145, he does nothing to estimate the amount Medicare actually paid for these prescriptions as opposed to the private Part D plan.

estimated number of claims by $11,000 to calculate penalties.[208] This approach suffers from several methodological errors, which I correct below.

163. First, as I did for off-label and promotional speaker program damages/penalties, I start by limiting the damages period to the core time period of January 1, 2006 to March 1, 2011.[209]

164. Second, Dr. Hay overstates the copayments paid by PANF due to a mistake he made in processing the PANF data. The PANF data are not limited to "final" records for Thalomid®/Revlimid® claims where PANF paid the copayment. Rather, the data include multiple entries for a given claim when that claim was adjusted over time (*i.e.*, the data include both the original record with the original positive payment amount as well as the reversal record with the corresponding reversed payment amount). To calculate the total copayment assistance to Medicare Part C and Part D beneficiaries, Dr. Hay tallied up the copayments in the PANF data for Part C and Part D beneficiaries. Dr. Hay attempted to adjust for reversals by removing the records with "payment code" equal to "PDMI Reversal." However, this ignores that the reversal records have corresponding original records that need to be removed. This error caused Dr. Hay to overstate the amount of copayments PANF made.[210] I adjusted Dr. Hay's estimates to properly remove reversals.[211]

---

[208] 5/6/16 Hay Report, Appendix H, pp. 190-191.

[209] January 1, 2006 is used as the start date as that is the date of the first PANF copayment for Thalomid®/Revlimid®.

[210] To find the corresponding claim, I identified the claim with a "payment code" of "PDMI Claim" that matched the reversal on the following variables: "PAN ID Number," "Claim Number," "RX Number," "Drug Name," "NDC," "Metric Quantity," "Days Supply," and "Date of Service". I matched 8,354 out of 8,380 reversals to their claims using this method. All of the reversals completely offset the amount paid by PANF for the claim, so I removed both the claim and the reversal. For the remaining 26 reversals, I identified the corresponding claims by matching on everything except for the claim number. If the reversal completely offset the amount paid by PANF for the matching claim, then I removed both the claim and the reversal; if not, then I removed the reversal but kept the claim.

2007

15. *Abbott Laboratories, Fournier Industrie et Santé, and Laboratoires Fournier S.A. v. Teva Pharmaceuticals USA Inc.* Civil Action No. 02-1512 (KAJ) (consolidated), US District Court for the District of Delaware. Retained by Goodwin Procter LLP to provide economic analysis related to alleged antitrust violations. Export Report, Deposition Testimony, and Testimony at Trial on behalf of Teva.

16. *Juan Carlos Parodi v. Cordis Corporation*. Case No. 50 133 T 00108 06, American Arbitration Association International Center for Dispute Resolution. Retained by Patterson Belknap Webb & Tyler LLP to provide economic analysis related to alleged breach of contract. Expert Report, Deposition Testimony, and Testimony before the Panel on behalf of Cordis.

17. *In re Zyprexa Products Liability Litigation MDL No. 1596: UFCW Local 1776 and Participating Employers Health And Welfare Fund, Eric Tayag, and Mid-West National Life Insurance Company Of Tennessee, on behalf of themselves and other similarly situated Plaintiffs v. Eli Lilly and Company*. Case Numbers 05 CV 2948 (JBW) and 05 CV 4115 (JBW), US District Court for the Eastern District of New York. Retained by Pepper Hamilton LLP to provide economic analysis related to alleged fraudulent promotion. Expert Report, Deposition Testimony, and Testimony at Trial on behalf of Eli Lilly.

2008

18. *Nissim Corp. v. Time Warner Inc., Warner Bros. Entertainment Inc. Warner Home Video Inc., and New Line Home Entertainment Inc.* Case No. 07-20624-CIV-Cooke/Brown, US District Court for the Southern District of Florida. Expert Report on behalf of Nissim regarding damages for alleged patent infringement.

19. *Astrazeneca LP and Astrazeneca AB v. Ivax Pharmaceuticals, Inc.* Civil Action No. 05-5142 (RMB)(AMD), US District Court for the District of New Jersey. Retained by Goodwin Procter to provide economic analysis related to alleged patent infringement. Expert Report and Deposition Testimony on behalf of Ivax.

20. *Biogen Idec Inc. v. Genentech Inc*. Case No. 74 180 00654 06 LOPE, American Arbitration Association. Retained by Mintz Levin Cohn Ferris Glovsky and Popeo LLC to provide economic analysis relating to alleged breach of contract. Expert Report, Deposition Testimony, and Testimony before the Panel on behalf of Biogen Idec.

2009

21. *MacroGenics Inc. v. Centocor Inc. and Ortho McNeil Pharmaceutical Inc.* CPR File No. G-09-08, Arbitration Pursuant to the Rules for Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution. Retained by Arnold and Porter LLP to provide economic analysis related to alleged breach of contract. Expert Report, Deposition Testimony, and Testimony before the Panel on behalf of MacroGenics.

22. *In re Zyprexa Products Liability Litigation MDL No. 1596: State of Louisiana, State of West Virginia, State of Mississipi v. Eli Lilly and Company*. Case Numbers 05-CV-1549 (JBW), 05-CV-1455, 06-CV-5826 (JBW) and 07-CV 645 (JBW), US District Court for the Eastern District of New York. Retained by Pepper Hamilton LLP to provide economic analysis related to alleged fraudulent promotion. Expert Report on behalf of Eli Lilly.

**Exhibit 14.A**

**Impact of Corrections on Dr. Hay's Promotional Speaker Estimates: Damages**

| | Thalomid® | | | | Revlimid® | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Stand-alone | | Cumulative | | Stand-alone | | Cumulative | | Stand-alone | | Cumulative | |
| | Reduction ($m) | Amount Remaining ($m) | Reduction ($m) | Amount Remaining ($m) | Reduction ($m) | Amount Remaining ($m) | Reduction ($m) | Amount Remaining ($m) | Reduction ($m) | Amount Remaining ($m) | Reduction ($m) | Amount Remaining ($m) |
| Dr. Hay's on- and off-label estimates[1] | | | | [redacted] | | | | [redacted] | | | | [redacted] |
| Limit to relevant time period: January 1, 2006 - March 1, 2011[2] | | | [redacted] | [redacted] | | | [redacted] | [redacted] | | | [redacted] | [redacted] |
| *The impact of the following corrections is calculated out of Dr. Hay's on- and off-label damages limited to the January 1, 2006 - March 1, 2011 period* | | | | | | | | | | | | |
| Remove physicians who received zero speaker fees and prescriptions where amount paid by Medicare equals zero[3] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Remove prescriptions prior to first payment | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Remove prescriptions six months after last payment | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Remove physicians whose prescribing patterns match at least three non-paid physicians[4] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Remove prescriptions consistent with non-speaker growth[5] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Dr. Hay's estimate after all adjustments[6]** | | | [redacted] | [redacted] | | | [redacted] | [redacted] | | | [redacted] | [redacted] |

**Notes:**

[1] Dr. Hay's promotional speaker program damages and penalties are duplicative of his on- and off-label damages and penalty estimates.

[2] Given the start of the ENVISION speaker payments was in January 2006, the relevant damages period for promotional speaker program damages is January 1, 2006 to March 1, 2011.

[3] The amount paid by Medicare equals zero when both the "CVRD_D_PLAN_PAID" and the "LICS_AMT" fields equal zero.

[4] A prescriber was considered a match to a paid physician if (1) he had not received any payment from Celgene based on company data and (2) his prescription counts were within five percent of the paid physician's prescription counts in both the pre- and post-periods. The pre-period was defined as 2002 to 2005 and the post-period was defined as 2006 onward. The creation of these periods was based on the start date of the ENVISION payment data in 2006.

[5] The growth for non-paid physicians is calculated using the REMS data as follows. First, the average total prescriptions (*i.e.*, Thalomid® and Revlimid® combined) per non-paid physician per year is calculated from 2005 to 2014 among physicians with more than two prescriptions in a given year in the REMS data. Second, the growth rates in the average prescribing for each year from 2006 to 2014 relative to 2005 are calculated. Third, these rates are applied to the 2005 prescriptions of each of the paid physicians to estimate the paid physicians' "but-for" prescriptions assuming their growth would have been the same as that of non-speakers. Fourth, I calculate any excess prescriptions by subtracting but-for prescriptions from actual. Finally, I calculate an excess rate by dividing excess by total prescriptions for each prescriber and apply the excess rate to the prescriber's Medicare Part C and Part D prescriptions.

[6] Should the Court find that trebling is appropriate, after trebling, the amount remaining is $10.3 million for Thalomid® and $51.5 million for Revlimid®.

**Sources:**

Expert Report of Joel W. Hay, Ph.D., September 25, 2015; Expert Report of Joel W. Hay, Ph.D., April 22, 2016; Medicare Part D Prescription Drug Event (PDE) data; Medicare Part A and B data; REMS data; JD_ENVISION000001.

CONFIDENTIAL

**Exhibit 14.B**

**Impact of Corrections on Dr. Hay's Promotional Speaker Estimates: Penalties**

| | Thalomid® | | | | Revlimid® | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Stand-alone | | Cumulative | | Stand-alone | | Cumulative | | Stand-alone | | Cumulative | |
| | Reduction ($m) | Amount Remaining ($m) | Reduction ($m) | Amount Remaining ($m) | Reduction ($m) | Amount Remaining ($m) | Reduction ($m) | Amount Remaining ($m) | Reduction ($m) | Amount Remaining ($m) | Reduction ($m) | Amount Remaining ($m) |
| Dr. Hay's on- and off-label estimates[1] | | | | [redacted] | | | | [redacted] | | | | [redacted] |
| Limit to relevant time period: January 1, 2006 - March 1, 2011[2] | | | [redacted] | [redacted] | | | [redacted] | [redacted] | | | [redacted] | [redacted] |
| *The impact of the following corrections is calculated out of Dr. Hay's on- and off-label damages limited to the January 1, 2006 - March 1, 2011 period* | | | | | | | | | | | | |
| Remove physicians who received zero speaker fees and prescriptions where amount paid by Medicare equals zero[3] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Remove prescriptions prior to first payment | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Remove prescriptions six months after last payment | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Remove physicians whose prescribing patterns match at least three non-paid physicians[4] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| Remove prescriptions consistent with non-speaker growth[5] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| **Dr. Hay's estimate after all adjustments** | | | [redacted] | [redacted] | | | [redacted] | [redacted] | | | [redacted] | [redacted] |

**Notes:**

[1] Dr. Hay's promotional speaker program damages and penalties are duplicative of his on- and off-label damages and penalty estimates.

[2] Given the start of the ENVISION speaker payments was in January 2006, the relevant damages period for promotional speaker program damages is January 1, 2006 to March 1, 2011.

[3] The amount paid by Medicare equals zero when both the "CVRD_D_PLAN_PAID" and the "LICS_AMT" fields equal zero.

[4] A prescriber was considered a match to a paid physician if (1) he had not received any payment from Celgene based on company data and (2) his prescription counts were within five percent of the paid physician's prescription counts in both the pre- and post-periods. The pre-period was defined as 2002 to 2005 and the post-period was defined as 2006 onward. The creation of these periods was based on the start date of the ENVISION payment data in 2006.

[5] The growth for non-paid physicians is calculated using the REMS data as follows. First, the average total prescriptions (*i.e.* , Thalomid® and Revlimid® combined) per non-paid physician per year is calculated from 2005 to 2014 among physicians with more than two prescriptions in a given year in the REMS data. Second, the growth rates in the average prescribing for each year from 2006 to 2014 relative to 2005 are calculated. Third, these rates are applied to the 2005 prescriptions of each of the paid physicians to estimate the paid physicians' "but-for" prescriptions assuming their growth would have been the same as that of non-speakers. Fourth, I calculate any excess prescriptions by subtracting but-for prescriptions from actual. Finally, I calculate an excess rate by dividing excess by total prescriptions for each prescriber and apply the excess rate to the prescriber's Medicare Part C and Part D prescriptions.

**Sources:**

Expert Report of Joel W. Hay, Ph.D., September 25, 2015; Expert Report of Joel W. Hay, Ph.D., April 22, 2016; Medicare Part D Prescription Drug Event (PDE) data; Medicare Part A and B data; REMS data; JD_ENVISION000001.

# EXHIBIT O

Thomas H. Bienert, Jr., State Bar No. 135311
tbienert@bmkattorneys.com
Ariana Seldman Hawbecker, State Bar No. 190506
ahawbecker@bmkattorneys.com
BIENERT, MILLER & KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Tel: (949) 369-3700/Fax (949) 369-3701

Reuben A. Guttman *(admitted pro hac vice)*
rguttman@whistleblower.com
Traci L. Buschner *(admitted pro hac vice)*
tbuschner@gbblegal.com
Justin S. Brooks *(admitted pro hac vice)*
jbrooks@gbblegal.com
Dan Guttman *(admitted pro hac vice)*
diguttman@aol.com
GUTTMAN, BUSCHNER & BROOKS PLLC
1625 Massachusetts Ave., NW, Suite 500
Washington, DC 20036
Tel: (202) 800-3001/Fax: (202) 827-0041

Richard A. Harpootlian (*admitted pro hac vice*)
rah@harpootlianlaw.com
Christopher P. Kenney (*admitted pro hac vice*)
cpk@harpootlianlaw.com
RICHARD A. HARPOOTLIAN, PA
1410 Laurel Street
Post Office Box 1090 (29201)
Columbia, South Carolina 29202
Tel: (803) 252-4848/Fax: (803) 252-4810

Nancy Gertner (*admitted pro hac vice*)
ngertner@law.harvard.edu
Langdell 328
1525 Massachusetts Ave.
Cambridge, Massachusetts 02138
Tel. (617) 851-3812

*Attorneys for Plaintiff - Relator*
BEVERLY BROWN

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO,

Plaintiffs,
*Ex rel.*

BEVERLY BROWN,

Plaintiff-Relator,

v.

CELGENE CORPORATION,

Defendant.

Case No. 10-cv-03165 GHK (SSx)

**RELATOR'S OPPOSITION TO CELGENE'S *EX PARTE* APPLICATION TO VACATE SUMMARY JUDGMENT DEADLINE**

Third-Party Fact Discovery: closed
Rebuttal Expert Deadline: Not set
Expert Discovery Cutoff: Not set
Pretrial Conf. Date: Not set
Trial Date: Not set

Case 2:10-cv-03165-GHK-SS Document 275 Filed 02/24/16 Page 3 of 7 Page ID #:13624

## I. INTRODUCTION

Celgene unnecessarily moves for another continuance of the deadline to file Motions for Summary Judgment ("MSJ"). Celgene's 12 page *ex parte* application avoids the reality of the situation; namely, that the parties have the information necessary to file MSJ pleadings and move this six-year old case forward. Indeed, Celgene offers no explanation whatsoever why it purportedly must depose Relator's *damages* expert before it can move for summary judgment, and instead uses its motion to mischaracterize the facts and baselessly impugn Relator's motives, all in an effort to delay an MSJ ruling against it based on the overwhelming evidence that Celgene engaged in a fifteen year calculated, systemic scheme to use kickbacks and off-label promotion to illegally peddle billions of dollars of its drugs, Thalomid and Revlimid.

The Court should deny Celgene's motion.

## II. THE PARTIES HAVE ALREADY COMPLETED ALL FACT AND EXPERT DISCOVERY NECESSARY FOR SUMMARY JUDGMENT

There is no need for a further delay in MSJ briefing. Fact discovery has long been finished. All 13 of Celgene's experts and all 4 of Relator's experts have provided expert reports and rebuttal reports, and 15 of the parties' 17 collective experts have been deposed. The only experts who have not been deposed are Relator's damages expert, USC Professor Dr. Joel Hay and Celgene's damages expert Dr. Iain Cockburn. Both experts, however, have submitted lengthy initial and rebuttal reports spelling out their methodologies and analyses. Indeed, Dr. Hay has provided Celgene with: (1) a 214 page Report; (2) a 156 page Supplemental Report; and (3) a 160 page Rebuttal Report. Each of these reports concludes that Celgene has illegally received billions of dollars in government payments. Dr. Cockburn has similarly produced hundreds of pages worth of reports. Put simply, there is no mystery about either party's claims, defenses, or evidence.

The only open issue that remains is that the parties are awaiting additional damages data from the government. Specifically, Medicare recently provided some corrections to

Case 2:10-cv-03165-GHK-SS Document 275 Filed 02/24/16 Page 4 of 7 Page ID #:13625

the information it previously provided, and TRICARE (the Department of Defense's medical program) has indicated it will be providing additional data in the next few weeks.[1] Once he receives that additional data, Dr. Hay anticipates that he will need to issue a corrected version of his report to account for it. While it is difficult to predict without seeing the data itself, the only aspects of Dr. Hay's report that are likely to change are his damages numbers themselves. He does not anticipate any change in his underlying methodologies.

Thus, not only has Celgene completed all fact discovery and non-damages expert discovery, it has a very clear picture of Relator's damages theories, including the methods by which her damages are calculated.

## III. CELGENE ESTABLISHES NO GOOD CAUSE TO MODIFY THE SCHEDULING ORDER

"Federal Rule of Civil Procedure 16(b) gives district courts wide latitude in entering scheduling orders" so that scheduling orders may be appropriately tailored to the facts of a case, and scheduling orders should not be modified "except upon a showing of good cause and by leave of the district judge." *Burks v. Oklahoma Publ. Co.*, 81 F.3d 975, 978 (10th Cir. 1996) (district court's decision not to amend scheduling order was appropriate); *Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1027 (9th Cir. 2006) (same); *Forte v. County of Merced*, 2015 U.S. Dist. LEXIS 12816, at *23 (E.D. Cal. Feb. 3, 2014) (denying modification where plaintiff had not argued good cause).

Courts in this Circuit have recognized that the measure of damages "is a question of fact to be resolved at trial." *Or. Metallurgical Corp. v. Burlington N. & Santa Fe Ry. Co.*, 101 Fed. Appx. 184, 186 (9th Cir. 2004); *Henderson v. Chase Home Fin., LLC*, 2012 U.S.

[1] Relator served a subpoena on TRICARE on November 17, 2014, well over a year ago and still awaits the necessary information to finalize Dr. Hay's numbers. The Court previously recognized that there was good cause to extend the time for Dr. Hay to submit a final report due to "Dr. Hay's inability to timely use Medicare data in his Reports [and that this] was due primarily due to factors beyond Relator's control" [given that] Relator subpoenaed Medicare data from the government in November 2014." Dkt. No. 253 at 2. Medicare finally resolved all data issues on February 8, 2015, and Relator waits on TRICARE.

Case 2:10-cv-03165-GHK-SS Document 275 Filed 02/24/16 Page 5 of 7 Page ID #:13626

Dist. LEXIS 130063, *23 (D. Ariz. Sept. 11, 2012) ("the amount of damages that [plaintiffs] are entitled to is a question of fact for the jury) Indeed, so long as there is sufficient evidence that damage occurred, the measure of damages is a trial issue. Celgene has not shown, and has not even attempted to argue, that Dr. Hay's testimony is necessary to show the existence of damages, let alone liability, within the relevant legal framework. Nor could it. The documents and evidence speaks for itself. Discovery has produced a plethora of evidence of sales representatives promoting off-label uses and attribution of off-label prescriptions to these efforts.

Indeed, there is ample evidence from discovery, both in the form of documents and deposition testimony (including unrebutted testimony of Relator) that sales representatives promoted off-label uses and physicians prescribed Celgene's drugs to treat these off-label conditions as a result of these efforts. Within the framework of Judge King's decision denying Celgene's motion to dismiss, this is sufficient to establish liability and some damages to the government as a result. Dkt. No. 147. Celgene does not explain how Dr. Hay is relevant to this inquiry or any arguments they would make in opposition to summary judgment. He is not. Because it has not even attempted to show how Dr. Hay's deposition is necessary to a summary judgment decision as opposed to quantifying the amount of damages at trial, Celgene has not shown good cause to delay summary judgment.

Moreover, Celgene's motion must be viewed against the backdrop of the case status and tactics. The current MSJ filing date of April 18, 2016, marks the six year anniversary of the case, almost to the day.[2] Judge King has made clear that he wants the case to move along expeditiously. *See* Dkt. No. 257. Celgene produced over 600,000 documents and over 4,000,000 pages of documents, yet wrongly declared almost every one of them "Confidential" so they cannot be publically referenced or known. Celgene was required by the Court to engage in meaningful mediation and indicated to the Court that it would have mediation on February 2, 2016 (*see* Dkt. No. 258, Joint Status Report), yet refused to engage

[2] The original complaint was filed under seal on April 27, 2010.

in that mediation – Relator met with the mediator alone that day – and has refused to even schedule a mediation date.

Celgene's fraud on the government and the public, and its strategy to "game the system" by covering up the facts and avoiding addressing the merits in the case have gone on too long. The case is ripe for MSJ and, thereafter, trial. Celgene's motion should be denied.

Dated: February 24, 2016

**BIENERT, MILLER & KATZMAN, PLC**

By: /s/ *Thomas H. Bienert, Jr. /s/*
Thomas H. Bienert, Jr.
Ariana Seldman Hawbecker

Reuben A. Guttman *(admitted pro hac vice)*
Traci L. Buschner *(admitted pro hac vice)*
Justin S. Brooks (*admitted pro hac vice)*
**GUTTMAN, BUSCHNER & BROOKS PLLC**

Richard A. Harpootlian (*admitted pro hac vice*)
Christopher P. Kenney (*admitted pro hac vice*)
**RICHARD A. HARPOOTLIAN, PA**

Nancy Gertner (*admitted pro hac vice*)

*Attorneys for Plaintiff-Relator*
*BEVERLY BROWN*

## CERTIFICATE OF SERVICE

That I am a citizen of the United States and am a resident or employed in Orange County, California; that my business address is 903 Calle Amanecer, Suite 350, San Clemente, California 92673; that I am over the age of 18 and not a party to the above-entitled action.

That I am employed by a member of the United States District Court for the Central District of California and at whose direction I caused service of: **RELATOR'S OPPOSITION TO CELGENE'S *EX PARTE* APPLICATION TO VACATE SUMMARY JUDGMENT DEADLINE** on the interested parties as follows:

**X** **BY ELECTRONIC MAIL:** by electronically filing the foregoing with the Clerk of the District Court using its ECF System pursuant to the Electronic Case Filing provision of the United States District Court General Order and the E-Government Act of 2002, which electronically notifies said parties in this case:

Howard F. Daniels
howard.daniels@usdoj.gov
Kimberly A. Dunne
kdunne@sidley.com
laefilingnotice@sidley.com
Michelle Goodman
mgoodman@sildey.com
Toni-Ann Citera
tcitera@jonesday.com
John P. Fisher
John.Fisher@doj.ca.gov

Jay Edward Smith
js@gslaw.org
Sean A. Commons
scommons@sidley.com
laefilingnotice@sidley.com
Karen P. Hewitt
kphewitt@jonesday.com
Brian D. Hershman
bhershman@jonesday.com
Frank John Broccolo
frank@broccololaw.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 24, 2016 at San Clemente, California.

*/s/ Coleen Grogan /s/*
Coleen Grogan

# EXHIBIT P

**CONFIDENTIAL**

Kimberly A. Dunne (SBN 142721)
kdunne@sidley.com
Michelle B. Goodman (SBN 218607)
mgoodman@sidley.com
Sean A. Commons (SBN 217603)
scommons@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

Karen P. Hewitt (SBN 145309)
kphewitt@jonesday.com
Brian D. Hershman (SBN 168175)
Bhershman@jonesday.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539

Attorneys for Defendant Celgene Corporation
(*Additional Counsel listed on following page*)

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO,

Plaintiffs,

*Ex rel.*

BEVERLY BROWN,

Plaintiff-Relator,

v.

Case No. 10-cv-03165 GHK (SSx)

Assigned to: Hon. George H. King

**REBUTTAL REPORT OF IAIN M. COCKBURN**

**[CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER]**

**CONFIDENTIAL**

CELGENE CORPORATION, )
Defendant. )
)

James C. Stansel (admitted *pro hac vice*)
jstansel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

Toni-Ann Citera (admitted *pro hac vice*)
tcitera@jonesday.com
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

Table of Contents


I. OVERVIEW ..... 3

II. SUMMARY OF OPINIONS ..... 3

III. DR. HAY'S UNSUPPORTED ASSUMPTION THAT CELGENE CAUSED ALL OFF-LABEL PRESCRIPTIONS IS CONTRADICTED BY THE EVIDENCE AND RELEVANT LITERATURE ..... 9

A. Dr. Hay Fails to Offer a Reliable Methodology to Demonstrate a Causal Relationship Between Alleged Off-label Promotion and Off-label Prescriptions ..... 9

B. Evidence Suggests That Substantial Thalomid® and Revlimid® Off-label Use Would Have Occurred Absent Alleged Off-label Promotion ..... 13

IV. SUMMARY OF DR. HAY'S DAMAGES AND PENALTIES ..... 24

A. Medicare ..... 25

B. Medicaid ..... 27

C. Other Federal and State Government Programs ..... 29

V. DR. HAY'S OFF-LABEL DAMAGES ESTIMATES CONTAIN NUMEROUS ERRORS AND ARE UNRELIABLE ..... 30

A. Dr. Hay Erroneously Calculates Medicare Damages Prior to 2006 ..... 30

B. Dr. Hay Misuses the Claims Data Produced in This Case and Vastly Overstates Off-label Prescriptions and Reimbursements for Thalomid® and Revlimid® ..... 32

C. Dr. Hay's Medicaid Extrapolation Method Results in Damages That Are Nonsensical ..... 35

D. The Medicaid Payment Amounts for Thalomid® and Revlimid® Used by Dr. Hay Do Not Appear to Reflect the True Cost to Medicaid ..... 38

E. Dr. Hay's Damages Estimates for Government Programs Other Than Medicare and Medicaid Are Baseless ..... 40

F. Dr. Hay's Thalomid® and Revlimid® Off-label Rate Estimates Are Unreliable ..... 46

VI. DR. HAY FAILS TO ACCOUNT FOR ALL THE STEPS THAT ARE NECESSARY TO ESTIMATE ECONOMIC DAMAGES STEMMING FROM THE ALLEGED OFF-LABEL PROMOTION ..... 50

A. Dr. Hay Fails to Limit Reimbursements Potentially at Issue to Off-label Uses With Alleged Evidence of Off-label Promotion ..... 50

B. Dr. Hay Fails to Account for Off-label Uses Expressly Covered by the Government ..... 52

C. Dr. Hay Fails to Remove Thalomid® and Revlimid® Off-label Uses That Were Reimbursed Following Prior Authorization or Appeals ..... 54

D. Dr. Hay Fails to Account for Other Causes of Off-label Uses ..... 55

E. Dr. Hay's Damages Estimates Do Not Properly Account for the Costs to the Government in the But-for World ..... 57

**VII. DR. HAY'S KICKBACK DAMAGES ESTIMATES ARE FLAWED ....................58**

**A. Dr. Hay Fails to Demonstrate That the Speaker Payments Made by Celgene Caused the Recipients to Prescribe Thalomid® and Revlimid® ....................58**

**B. Dr. Hay's Method to Estimate Kickback Damages is Flawed ....................63**

**VIII. CONCLUSION ....................65**

# I. OVERVIEW

1. My name is Iain M. Cockburn. I am the Richard C. Shipley Professor of Management in the School of Management at Boston University. I have been asked by counsel for Celgene to review and respond to the expert report by Dr. Joel W. Hay dated September 25, 2015.[1]

2. I have presented my background and experience in the report I submitted on September 25, 2015, along with the data and documents reviewed in connection with that report.[2] Additional data and documents reviewed in connection with this rebuttal report are listed in Appendix A. Relator's counsel, however, has not made available certain data on which Dr. Hay apparently relied as well as sufficient information about all of the calculations he made to estimate damages. I understand counsel for Celgene has tried without success to obtain these materials. I also have been advised that Dr. Hay's report relates to certain healthcare programs that Relator's counsel never identified during the course of discovery and, thus, were not the subject of discovery by either party. Therefore, I reserve the right to supplement and amend this report upon receiving such data and information.

# II. SUMMARY OF OPINIONS

3. Relator's expert Joel W. Hay submitted an expert report on causation and damages purportedly associated with Relator's allegations that Celgene caused false claims to be submitted to government healthcare programs by promoting Thalomid® and Revlimid® for certain off-label uses and by paying kickbacks to physicians to induce them to prescribe these drugs. He estimates damages of $23.7 billion in total, with $8.7 billion stemming from False Claims Act ("FCA") damages for the alleged off-label promotion, $14.4 billion stemming from penalties associated

1 Expert Report of Dr. Joel W. Hay, September 25, 2015 ("Hay Report").

2 Expert Report of Dr. Iain M. Cockburn, September 25, 2015 ("Cockburn Report").

failure to consider the Government's "but-for costs," his damages methodology is wholly unreliable and does not meet professional standards in the field of economics.

## VII. DR. HAY'S KICKBACK DAMAGES ESTIMATES ARE FLAWED

82. In his kickback analysis, Dr. Hay counts as damages all Medicare payments for on-label Thalomid® and Revlimid® prescriptions that were written by physicians who received speaker payments, as reflected in the ENVISION speaker data.[136] All claims generated by these prescriptions are also counted in his calculation of FCA penalties. This leads to alleged kickback damages and penalties totaling $573 million.

83. Dr. Hay's methodology for calculating kickback damages and penalties is unreliable for two key reasons: (1) Dr. Hay fails to establish that the payments made by Celgene caused the recipients to prescribe Thalomid® and Revlimid®; and (2) it is characterized by many of the same errors and unsupported assumptions described above.

### A. Dr. Hay Fails to Demonstrate That the Speaker Payments Made by Celgene Caused the Recipients to Prescribe Thalomid® and Revlimid®

84. The very first step required to establish whether there are any damages stemming from kickback allegations is to assess whether there is a connection between the allegedly unlawful payments received by the physicians and prescriptions those physicians wrote.[137] Dr. Hay's attempt at demonstrating this connection falls short. Dr. Hay acknowledges that, "[m]any drug companies provide reasonable compensation to expert physicians and other KOLs to speak to other doctors and clinicians in fair and balanced presentations on the role of the sponsor's

[136] ENVISION speaker data are available from 2006 to 2014 (JD_ENVISION000001).

[137] Cockburn Report, ¶ 93.

drugs in patient management."[138] Despite this acknowledgement, his analysis does not attempt to determine which payments made by Celgene were legitimate compensation for services rendered and which were allegedly unlawful kickbacks. Rather, relying solely on the opinion from counsel for Relator, he elects to include in his damages all prescriptions written by any physician who appears in the ENVISION data.[139]

85. To provide support for the notion that Celgene's payments induced the recipients to prescribe Thalomid® and Revlimid®, Dr. Hay cites a few physicians who received the highest amount of payments from Celgene and who wrote a large number of prescriptions. However, the examples he chooses hardly support his logic.

85.1. Consider [redacted], whose prescription history in REMS is used by Dr. Hay to justify his calculation of kickback damages.[140] Prescriptions written by [redacted] were relatively flat before and following his first speaker payment on March 30, 2006 (see Exhibit 5). The increase in prescriptions that Dr. Hay is attributing to Celgene's payments did not occur until 2013, when [redacted] became the principal investigator for a clinical trial of Revlimid®. As can be seen from the Exhibit, his role as clinical trial investigator contributed to the increased prescribing at this moment as opposed to the consistent speaker payments he received over time. In addition, prescriptions for clinical trials are typically free and are unlikely to be reimbursed by a government entity. Moreover, the steep drop off that Dr. Hay asserts is a result of the end of Celgene and [redacted] financial

[138] Hay Report, ¶ 91.

[139] In fact, he does not even exclude physicians that appear in the ENVISION data but with payments of $0. There were three such prescribers, each with approximately 200 Thalomid® and Revlimid® prescriptions. Despite the fact that there is no evidence these three physicians received any payments, Dr. Hay includes their prescriptions in damages.

[140] Hay Report, ¶ 97 and Appendix D.16.

98. Dr. Hay's damages assumptions and calculations contain numerous errors and methodological flaws that together render his estimates unreliable and would reduce his damages and penalty calculations by nearly 100 percent. These include counting the same prescription multiple times in damages and penalties, assuming damages and penalties during a time period when Thalomid® was not covered by Medicare, failing to subtract rebates received by government payers, and using a speculative and flawed extrapolation method for the majority of government programs that results in Dr. Hay estimating damages for off-label claims that are higher than total payments for both on- and off-label claims. Dr. Hay made methodological choices that deviate from generally accepted professional standards resulting in substantially exaggerated damages figures. As a result of these issues, Dr. Hay's calculations are highly unreliable.

* * *

I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: October 26, 2015

Iain M. Cockburn

# EXHIBIT Q

Case 2:10-cv-03165-GHK-SS Document 194 Filed 06/30/15 Page 1 of 3 Page ID #:5138

Karen P. Hewitt (State Bar Number 145309)
kphewitt@jonesday.com
Brian D. Hershman (State Bar Number 168175)
bhershman@jonesday.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071.2300
Telephone: (213) 489-3939
Facsimile: (213) 243-2539

Kimberly A. Dunne (State Bar Number 142721)
kdunne@sidley.com
Michelle B. Goodman (State Bar Number 218607)
mgoodman@sidley.com
Sean A. Commons (State Bar Number 217603)
scommons@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

Attorneys for Defendant
CELGENE CORPORATION
(*Additional Counsel listed on following page*)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO ,

Plaintiffs,

*Ex rel.*

Case No. 10-cv-03165 GHK (SSx)

Assigned to the Honorable George H. King

**DEFENDANT'S AMENDED NOTICE OF MOTION AND MOTION TO COMPEL AMENDED INITIAL DISCLOSURES, INTERROGATORY RESPONSES AND PRODUCTION OF DOCUMENTS**

Date: July 21, 2015
Time: 10:00 a.m.
Place: Courtroom 23 – 3rd Floor
Magistrate Judge: Suzanne Segal

Filing Date: June 29, 2015
Party Discovery Cutoff Date: July 24, 2015
Pretrial Conf. Date: [not set]
Trial Date: [not set]

Case 2:10-cv-03165-GHK-SS Document 194 Filed 06/30/15 Page 2 of 3 Page ID #:5139

BEVERLY BROWN,

Plaintiff-Relator,

v.

CELGENE CORPORATION,

Defendant.

*Additional Counsel*

Toni-Ann Citera (admitted *pro hac vice*)
tcitera@jonesday.com
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

James C. Stansel (admitted pro hac vice)
jstansel@sidley.com
SIDLEY AUSTIN LLP
1501 K. St. NW
Washington, DC 20005
Telephone: (202) 736-8092
Facsimile: (202) 736-8711

Case 2:10-cv-03165-GHK-SS Document 194 Filed 06/30/15 Page 3 of 3 Page ID #:5140

## NOTICE OF MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on July 21, 2015 at 10:00 a.m., in Courtroom 23 of the above-referenced court, Defendant Celgene Corporation ("Celgene" or "Defendant") will and hereby does move, pursuant to Rule 37 of the Federal Rules of Civil Procedure and Local Rule 37-1 *et seq.*, for an order requiring Relator Beverly Brown ("Relator") to amend her Rule 26(a)(1) Initial Disclosures, provide full responses to Celgene's Interrogatory Nos. 2 and 4, and produce documents responsive to Celgene's Requests for Production Nos. 3-5, all within five (5) days of the hearing on this motion. Celgene files this Amended Notice to clarify that the motion will be heard by Magistrate Judge Segal in Courtroom 23.

This Motion is based upon this Notice; the concurrently filed Joint Stipulation of the Parties and the Declaration of Brian D. Hershman; all pleadings and papers on file herein; and any additional argument and material the Court may consider at the hearing on this Motion.

Pursuant to Local Rule 37-1, the parties' counsel conferred telephonically about the subject matter of this Motion. Pursuant to Local Rule 37-2.1, attached as Exhibit s A and B to the Hershman Declaration are copies of the Court's Initial Scheduling Order and Amended Scheduling Order.

Dated: June 30, 2015

JONES DAY / SIDLEY AUSTIN LLP

By /s/ Brian D. Hershman
Brian D. Hershman

Attorneys for Defendant
CELGENE CORPORATION

# EXHIBIT R

Case 2:10-cv-03165-GHK-SS Document 270 Filed 02/23/16 Page 1 of 19 Page ID #:13199

Karen P. Hewitt (State Bar Number 145309)
kphewitt@jonesday.com
Brian D. Hershman (State Bar Number 168175)
bhershman@jonesday.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071.2300
Telephone: (213) 489-3939
Facsimile: (213) 243-2539

Kimberly A. Dunne (State Bar Number 142721)
kdunne@sidley.com
Michelle B. Goodman (State Bar Number 218607)
mgoodman@sidley.com
Sean A. Commons (State Bar Number 217603)
scommons@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

Attorneys for Defendant
CELGENE CORPORATION
(*Additional Counsel listed on following page*)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO ,

Plaintiffs,

*Ex rel.*

Case No. 10-cv-03165 GHK (SSx)

Assigned to the
Honorable George H. King

**DEFENDANT'S *EX PARTE* APPLICATION TO VACATE SUMMARY JUDGMENT DEADLINE; MEMORANDUM OF POINTS AND AUTHORITIES**

{Declaration of Michelle B. Goodman and [Proposed] Order filed concurrently herewith}

Third-Party Fact Discovery: closed
Rebuttal Expert Deadline: Not set
Expert Discovery Cutoff: Not set
Pretrial Conf. Date: Not set
Trial Date: Not set

Case 2:10-cv-03165-GHK-SS Document 270 Filed 02/23/16 Page 2 of 19 Page ID #:13200

BEVERLY BROWN,

Plaintiff-Relator,

v.

CELGENE CORPORATION,

Defendant.

*Additional Counsel*

Toni-Ann Citera (admitted *pro hac vice*)
tcitera@jonesday.com
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

James C. Stansel (admitted *pro hac vice*)
jstansel@sidley.com
SIDLEY AUSTIN LLP
1501 K. St. NW
Washington, DC 20005
Telephone: (202) 736-8092
Facsimile: (202) 736-8711

Defendant Celgene Corporation ("Celgene" or "Defendant") hereby moves *ex parte* for an order vacating the current deadline of April 18, 2016 for filing any summary judgment motion. Celgene seeks this relief because Relator Beverly Brown ("Relator") still has not submitted the "final" expert report of Dr. Joel W. Hay, even though Relator has sought and obtained several extensions to do so. And although the delay in submitting the report results exclusively from the choices made by Relator and her expert, Relator refuses to stipulate to the relief, necessitating this *ex parte* application.

On October 22, 2015, Relator sought from this Court a ten-week extension to submit a corrected expert report of Dr. Hay, claiming that she needed to "supplant" the Humana data upon which Dr. Hay relied with Medicare Part A and B data from CMS[1] (Dkt. 247), and obtained the relief on November 4, 2015 (Dkt. 253). Because TRICARE and CMS (on whose behalf Relator purportedly is suing) delayed in providing the information and/or provided incomplete or inaccurate information, the parties stipulated (and this Court entered an order) to vacate the expert report deadline for Dr. Hay, the deadline for Celgene to submit its rebuttal to Dr. Hay, and the date for the close of expert discovery. (Dkt. 261, 262.) In that stipulation, the parties specifically raised the issue that the summary judgment deadline may need to be moved if the information from TRICARE and CMS was not immediately forthcoming. (Dkt. 261.)

That possibility has come to fruition. TRICARE still has not provided the information that Relator claims she needs to complete the report of Dr. Hay, and therefore *Relator* has not yet submitted the final expert report of Dr. Hay. Because Relator has not submitted the corrected report, Celgene has not submitted its rebuttal to Dr. Hay, and the parties have not completed expert discovery. Although

[1] Although Relator attempted to conceal this fact from Celgene and the Court, Dr. Hay was *required* to replace the Humana data because he never obtained permission to use it in the first place. Dr. Hay's failure to obtain permission was the actual reason Dr. Hay needed to "supplant" the Humana data with data from CMS. (*See* Dkt. 249 at 8:21-9:4.)

this delay was caused by Relator and government payors (and not by Celgene), Relator refuses to stipulate to extend the summary judgment deadline. Instead, Relator insists Celgene should proceed with the current deadline for summary judgment,[2] in the absence of a key expert report that is central to Relator's liability and damages theories (and with no apparent date when Relator will submit Dr. Hay's report). At the same time, Relator refuses to stipulate that she will not rely on Dr. Hay's reports or opinions in opposing summary judgment. This situation is manifestly unfair and prejudicial to Celgene.

With the summary judgment deadline only eight weeks away, Celgene seeks this *ex parte* relief to vacate the current summary judgment deadline and postpone setting the new date until after Relator submits a final expert report for Dr. Hay.

In accordance with Local Rule 7-19, Relator's counsel was notified on February 18, 2016 that this application would be made on or around February 22, 2016. (*See* Declaration of Michelle B. Goodman ("Goodman Decl.") at ¶ 12.) Relator's counsel indicated that Relator intends to oppose this application. (*Id.*)

The contact information for Relator's counsel is as follows:

Thomas H. Bienert, Jr., State Bar No. 135311
tbienert@bmkattorneys.com
Ariana Seldman Hawbecker, State Bar No. 190506
ahawbecker@bmkattorneys.com
BIENERT, MILLER & KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Tel: (949) 369-3700/Fax: (949) 369-3701

Reuben A. Guttman (*admitted pro hac vice*)
rguttman@gbblegal.com
Traci L. Buschner (*admitted pro hac vice*)

[2] Two previous scheduling orders contemplated the completion of expert discovery *ten weeks* in advance of the deadline to file summary judgment. Thus, Relator's proposal that Celgene submit its summary judgment motion before expert discovery is completed (indeed, before Relator even submits Dr. Hay's supplemental report) is inconsistent with the agreed upon scheduling order.

Case 2:10-cv-03165-GHK-SS Document 270 Filed 02/23/16 Page 5 of 19 Page ID #:13203

tbuschner@gbblegal.com
Justin S. Brooks (*admitted pro hac vice*)
jbrooks@gbblegal.com
Dan Guttman (*admitted pro hac vice*)
diguttman@aol.com
GUTTMAN, BUSCHNER & BROOKS PLLC
1625 Massachusetts Ave., NW, Suite 500
Washington, DC 20036
Tel: (202) 800-3001/Fax: (202) 827-0041

Richard A. Harpootlian (*admitted pro hac vice*)
rah@harpootlianlaw.com
Christopher P. Kenney (*admitted pro hac vice*)
cpk@harpootlianlaw.com
RICHARD A. HARPOOTLIAN, PA
1410 Laurel Street
Post Office Box 1090 (29201)
Columbia, South Carolina 29202
Tel: (803) 252-4848/Fax: (803) 252-4810

For the reasons set forth herein and in the accompanying Memorandum of Points and Authorities, Declaration of Michelle B. Goodman and exhibits thereto, Celgene respectfully urges the Court to issue an order vacating the current deadline of April 18, 2016 for completing any summary judgment motion.

Dated: February 23, 2016

JONES DAY / SIDLEY AUSTIN LLP

By /s/ *Brian D. Hershman*
Brian D. Hershman

Attorneys for Defendant
CELGENE CORPORATION

## TABLE OF CONTENTS

Page

I. ARGUMENT ..... 2

A. Procedural Background ..... 2

B. Good Cause Exists to Vacate the Summary Judgment Deadline ..... 4

1. Dr. Hay's Expert Report Is Relevant to Celgene's Summary Judgment Motion ..... 5

2. Celgene Will Be Prejudiced If Relator Can Submit an Expert Report After Celgene Exchanges with Relator its Portion of the Summary Judgment Brief ..... 6

C. Celgene Is Entitled to *Ex Parte* Relief ..... 10

II. CONCLUSION ..... 12

Case 2:10-cv-03165-GHK-SS Document 270 Filed 02/23/16 Page 7 of 19 Page ID #:13205

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Ballard v. United States*, No. EDCV 06-715-VAP ........ 9

*Mission Power Eng'g Co. v. Continental Casualty Co.*, 883 F. Supp. 488 (C.D. Cal. 1995) ........ 10, 11

*Tokai Corp. v. Easton Enters.*, No. EDCV 07-883-VAP ........ 9

**OTHER AUTHORITIES**

Local Rule 7-19 ........ 2

Case 2:10-cv-03165-GHK-SS Document 270 Filed 02/23/16 Page 8 of 19 Page ID #:13206

## MEMORANDUM OF POINTS AND AUTHORITIES

Having twice sought – and obtained – relief from this Court to amend the scheduling order to obtain additional time to submit a final report from her expert, Dr. Joel W. Hay, Relator Beverly Brown ("Relator") now seeks to take advantage of that delay by forcing Celgene Corporation ("Celgene" or "Defendant") to file its summary judgment motion *before* Dr. Hay submits his final report and *before* Celgene has deposed Dr. Hay. That is fundamentally inequitable and will cause Celgene additional, and substantial, prejudice.

On November 4, 2015, well after the original September 25, 2015 deadline for submitting expert reports had passed, and after Celgene submitted its rebuttal reports, Relator (over Celgene's objection) obtained *ex parte* relief to submit a corrected report of Dr. Hay to replace his opinions based on data he did not have permission to use (the "Humana data"), with data obtained from Medicare Parts A and B (also referred to as "CMS data"), assuring the Court that such relief would not result in prejudice to Celgene. (Ex. B[3] [Dkt. 247] at 21:1-19.) In his "supplemental expert report," submitted on December 7, 2015, Dr. Hay chose to replace the Humana data with data obtained from TRICARE as well as data obtained from Medicare Parts A and B, despite his knowledge that the data was incomplete. Thereafter, Relator claimed that she needed to submit a *further* "supplemental" report as a result of the incomplete or incorrect data from TRICARE and CMS, and obtained on January 21, 2016, an order from this Court vacating the deadlines for expert reports and the close of expert discovery. (Ex. G [Dkt. 262].)

The issues regarding the Medicare Parts A and B data have been resolved, but Relator does not know when TRICARE will be able to correct or supplement its data, has not considered alternative data sources upon which Dr. Hay can base his

[3] All references to Ex. __ are to the exhibits attached to the Declaration of Michelle B. Goodman ("Goodman Decl.") filed concurrently herewith.

opinions, and will not agree that she will not rely on Dr. Hay's opinions or testimony to oppose any motion for summary judgment.[4] (Goodman Decl. ¶ 12.) Yet Relator now seeks to take advantage of her own conduct and cause further prejudice and harm to Celgene by refusing to vacate the summary judgment deadline. This Court should grant *ex parte* relief and vacate the summary judgment deadline.

**I. ARGUMENT**

**A. Procedural Background**

On June 8, 2015, the Court entered an order in connection with the parties' stipulation to extend discovery deadlines and the deadline for summary judgment. (Ex. A [Dkt. 192].) The parties stipulated to and the Court approved a schedule wherein expert discovery closed ten weeks in advance of the deadline for summary judgment (with expert discovery closing on November 20, 2015 and the deadline for summary judgment as January 29, 2016). (*Id.*)

Thereafter, on October 22, 2015, Relator applied *ex parte* for an order extending the deadline for Dr. Hay to supplement his expert report. (Ex. B [Dkt. 247].) Celgene opposed this request, arguing that it would suffer delay, harm, and prejudice as a result. (Ex. C [Dkt. 249] at 10:10-12:20.) The Court granted Relator's application on November 4, 2015. (Ex. D [Dkt. 253].) On November 12, 2015, the Court entered an Amended Scheduling Order that provided the following deadlines: (1) December 7, 2015 as the deadline for Dr. Hay's supplemental report; (2) January 20, 2016 as the deadline for Celgene's rebuttal to Dr. Hay; (3) February 10, 2016 as the deadline to complete expert discovery; and (4) April 18, 2016 as the deadline for completing any summary judgment motion. (Ex. E [Dkt. 256].) Again, the Court approved a schedule wherein expert discovery closed ten weeks in

---

[4] Because Relator has not yet submitted Dr. Hay's final report, Celgene has not submitted its rebuttal to Dr. Hay and the depositions of those experts have not been conducted.

Case 2:10-cv-03165-GHK-SS Document 270 Filed 02/23/16 Page 10 of 19 Page ID #:13208

advance of the deadline for summary judgment (with expert discovery closing on February 10, 2016 and the deadline for summary judgment on April 18, 2016). (*Id.*)

Although Relator purported to submit Dr. Hay's supplemental report on December 7, 2015, the report itself was replete with qualifications claiming that the data Dr. Hay relied upon was still incomplete. Thereafter, Relator claimed that she needed to submit a *further* "supplemental" report as a result of the incomplete data from two government payors (on whose behalf she purports to sue). In particular, according to Relator, (1) TRICARE produced incorrect or incomplete data upon which Dr. Hay relied, and was still investigating the issue on how to address and replace the data; and (2) CMS also needed to clarify certain issues with respect to the data it provided. (*See* Ex. F [Dkt. 261] at 3:16-24.)

Even though Relator's failure to submit a final report by the December 7, 2015 deadline was in no way the result of Celgene's conduct, Celgene agreed to vacate the deadline so as to allow Dr. Hay once again to revise his supplemental report. The parties therefore stipulated to vacate the dates for Dr. Hay's revised supplemental report, for Celgene's rebuttal report, and for the close of expert discovery. The parties further agreed to meet and confer to obtain accurate data and information from TRICARE and CMS. (*Id.* at 4:1-14.) The Court entered an order vacating the expert deadlines on January 21, 2016. (Ex. G [Dkt. 262].)

While the parties agreed in the January 19, 2016 stipulation that the motion for summary judgment deadline should not be altered at that time, the parties informed the Court they may seek an extension of the deadline if expert discovery cannot be completed sufficiently in advance of the deadline. (Ex. F at 4:15-17.) As of the filing of this *ex parte* application, Relator has not submitted a corrected supplemental expert report for Dr. Hay, and has not been able to provide a date by which she will do so. (Goodman Decl. ¶ 12.)

Given the delay in completing the exchange of expert reports and expert discovery, Celgene notified Relator of its intention to ask the Court to vacate the

date currently set for completing any summary judgment motion, and requested that Relator stipulate to this relief. (*See* Ex. H.) Celgene explained that vacating the summary judgment date was required because (1) Relator still had not submitted a revised report for Dr. Hay; (2) Relator was unable to provide a date by which she would submit a final report because the TRICARE data which Dr. Hay claimed was necessary to complete his report was still not available; and (3) expert discovery had not closed, thus causing substantial prejudice to Celgene by allowing Dr. Hay to tailor his report to Celgene's motion. (Goodman Decl. ¶ 9, Ex. H.) Relator refused to jointly stipulate to vacate the summary judgment deadline, and opposes Celgene's effort to seek this relief. (*Id.* at ¶¶ 10-12, Ex. I.) Celgene therefore files this *ex parte* application before the Court.

**B. Good Cause Exists to Vacate the Summary Judgment Deadline**

Relator has previously agreed to, and the Court has entered, on two occasions, a schedule wherein expert discovery would be completed ten weeks in advance of the deadline for summary judgment. However, as a result of delays *by Relator* in submitting her own expert report, compliance with that schedule is no longer possible.

The situation in which the parties currently find themselves is a result of Relator's own strategic decisions. Dr. Hay initially chose to rely on Humana data to estimate the number of off-label claims paid by certain government programs. However, when he found out that he did not have permission to use the data, Relator applied *ex parte* to allow Dr. Hay to submit a "supplemental report," purportedly to replace the Humana data with Medicare Part A and B data, claiming such data was "superior" to all other available data. (*See* Ex. B [Dkt. 247] at 2:23-3:2.) Although the Court granted Relator's request to allow Dr. Hay to replace the Humana data with the CMS data, Dr. Hay changed his methodology again to rely on TRICARE as well as CMS data in his supplemental report to estimate the off-label percentage of certain government programs. When it became known that the

TRICARE and CMS data upon which Dr. Hay relied was incomplete or inaccurate, Relator sought (and Celgene stipulated to) a *further* extension of Dr. Hay's report so as to address corrected TRICARE and CMS data. Thus, any supplemental report will employ a third methodology to estimate off-label claims.

Relator now seeks to take advantage of the delay created by her own strategic choices by requiring Celgene to submit its opening portion of the joint summary judgment brief[5] without the benefit of knowing Relator's expert's theories on liability and damages. Not only is this inappropriate because it forces Celgene to submit its portion of the summary judgment brief before ascertaining Relator's liability and damages theories, it gives Relator a preview of Celgene's arguments before submitting a final "corrected" expert report and before discovery of that expert can be completed.

Therefore, good cause exists to modify the current scheduling order to vacate the summary judgment deadline of April 18, 2016.

1. <u>Dr. Hay's Expert Report Is Relevant to Celgene's Summary Judgment Motion</u>

As an initial matter, Dr. Hay's expert report is relevant to Celgene's summary judgment motion. While Relator has taken the position that Dr. Hay's expert report is not relevant to summary judgment issues because it relates to "damages" (*see* Goodman Decl. ¶¶ 10-12, Ex. I), Dr. Hay's report is not so limited. In the current iteration of Dr. Hay's report, Dr. Hay not only provides theories for calculating damages, he puts forth various "legal theories for recovery" (Goodman Decl. ¶ 7); theories that Celgene intends to challenge at summary judgment.

For example, in paragraphs 11, 12, 32, and 39 of the current draft of the report, Dr. Hay offers expert opinions on "Celgene's promotional efforts" and how

[5] Because Judge King requires a joint summary judgment submission, the moving party (in this case Celgene) must submit its portion of the summary judgment brief well in advance of the April 18, 2016 deadline. Given this procedure, unless the summary judgment deadline is vacated, Celgene may have to exchange its opening portion with Relator *before* Dr. Hay submits his final expert report.

these efforts purportedly caused physicians to write off-label prescriptions. (*Id.*) In paragraphs 51 through 54, Dr. Hay also purports to opine on Celgene's payments to physicians to conduct promotional speaker programs, and how this purportedly caused physicians to write on-label and off-label prescriptions. (*Id.*) In paragraph 55, Dr. Hay further opines that Celgene's contributions to certain charitable foundations to assist patients in receiving life-extending medical care was improper and was designed "to get Medicare patients to use more Thalomid and Revlimid." (*Id.*)[6] While these are only a few illustrative examples of what is contained in the *current* report,[7] they demonstrate that Dr. Hay's expert report is not limited to the issue of how to calculate damages, but in fact puts forth Relator's theories of liability, directly implicating central issues of the case such as causation (*i.e.,* how Celgene purportedly influenced prescriptions).

Indeed, although Relator has questioned the need for an extension of the summary judgment deadline, Relator's conduct has not been consistent with her stated position. When Celgene's counsel asked if Relator would stipulate not to rely on Dr. Hay's yet-to-be-submitted expert report in opposing Celgene's summary judgment motion, Relator refused to so stipulate. (Goodman Decl. ¶¶ 11-12.) Relator therefore wants Celgene to submit its opening brief without the benefit of Dr. Hay's final report, but does not agree to similarly limit her opposing arguments at summary judgment. Relator cannot have it both ways.

2. <u>Celgene Will Be Prejudiced If Relator Can Submit an Expert Report After Celgene Exchanges with Relator its Portion of the Summary Judgment Brief</u>

Celgene will suffer substantial harm and prejudice if Celgene must exchange with Relator its portion of the summary judgment brief before Relator submits the

---

[6] Celgene does not concede, and in fact strongly disagrees, that these are proper expert opinions, and reserves the right to challenge these expert opinions on other grounds in future proceedings.

[7] Because Dr. Hay has not submitted his *final* report, Celgene has no way of knowing if these or other theories of liability will be included in that report.

final expert report for Dr. Hay. Celgene intends to move for summary judgment on the ground that Relator does not have sufficient evidence to create a genuine issue of material fact with respect to the causes of action asserted in the complaint. Yet Celgene does not know the full extent of the evidence upon which Relator intends to rely because she has not submitted a final expert report from Dr. Hay and expert discovery is not closed. Indeed, absent an extension of the summary judgment deadline, Relator can raise new arguments in Dr. Hay's report that Celgene will not have the opportunity to address in its summary judgment briefing, and Relator can tailor Dr. Hay's expert report in an attempt to defeat summary judgment. That would be manifestly unfair to Celgene, who has complied with all Court ordered deadlines (unlike Relator who has repeatedly sought and been granted continuances). Indeed, because of this potential for manipulation, the agreed upon schedule permitted Celgene to file its summary judgment brief *after* the close of expert discovery and to seek discovery of Relator's *entire* theories before submitting its portion of the summary judgment brief. That procedure should remain in place.

Moreover, Celgene's concern that Relator will manipulate the summary judgment process is not an idle one; Relator has already shown she will engage in this type of gamesmanship. As the Court may recall, Relator previously sought *ex parte* relief to allow Dr. Hay to submit a "supplemental" report. (*See* Ex. B [Dkt. 247].) In that application, Relator represented to this Court that she was seeking an extension to submit a corrected report purportedly to replace incomplete Humana data with Medicare Part A and B data from CMS.[8] (*Id.* at 8:16-18.) The Court's November 4, 2015 order granting Relator's request was based on Relator's representation to the Court that "Dr. Hay submitted his Report without the benefit of a complete set of Medicare data due to difficulties in obtaining the data from the

[8] In reality, Dr. Hay lacked permission to use the Humana data. (*See* Ex. C [Dkt. 249] at 8:21-9:4.)

government, and the government's production of a corrupted database." (Ex. D [Dkt. 253] at p. 2.) The Court's finding of "good cause" was also based on the fact that "Relator did not receive a usable copy of the Medicare Part A and B data she requested until one week before Dr. Hay's initial report was due," and that this "was due primarily to factors beyond Relator's control." (*Id.*)

Yet rather than supplement the report to simply "excise the unusable Humana data analysis and supplant it with an analysis of Part A and Part B data," (Ex. B [Dkt. 247] at 8:16-18) – as Relator told the Court she would do – Dr. Hay used this opportunity to completely rewrite his original expert report. Indeed, with the benefit of all of Celgene's timely-served expert reports, Dr. Hay improperly revised his own expert report to offer entirely *new theories* of liability and damages based on information that was available prior to the original report, including the following: (1) "Charitable Foundation Kickback Damages" (Hay Supplemental Report at ¶¶ 55-66); (2) Medicare kickback damages predicated on all on-label prescriptions beyond those written by the physicians in Celgene's Revlimid Speakers Program (¶¶ 30-50); (3) "Reasonableness of Speakers' Compensation" (¶¶ 51-54); and (4) "Medicare Advantage Plan (Medicare Part C) Damages" (¶¶ 19-23). None of these theories were addressed in Dr. Hay's original report.

Celgene believes that these additional theories are improper, are beyond the scope of the Court's order permitting Relator to submit a "supplemental" report limited to the CMS data, and intends to file a motion to strike the new opinions raised in the "supplemental" expert report at the appropriate time. For purposes of this *ex parte* application, however, Celgene raises Relator's conduct simply to illustrate the manifest prejudice that would result if relief is not granted. Notably, if Celgene is required to submit its portion of the summary judgment brief to Relator before Dr. Hay "finalizes" his expert report, and before the completion of expert discovery, Celgene is left guessing as to what ultimate theories of liability and damages Relator will put forth. This places Celgene in an untenable position that

Case 2:10-cv-03165-GHK-SS Document 270 Filed 02/23/16 Page 16 of 19 Page ID #:13214

can only be rectified by vacating the current summary judgment deadline, and permitting Celgene to submit its portion of the brief *after* the close of expert discovery, as the parties contemplated and the Court has repeatedly ordered.

Courts have recognized the importance of sequencing scheduling deadlines to prevent this type of prejudice. For example, in *Ballard v. United States*, No. EDCV 06-715-VAP (OPx), 2007 BL 304104 (C.D. Cal. Aug. 28, 2007), the court noted that plaintiffs' untimely expert disclosures left defendant with little time in which to prepare for and conduct expert discovery in preparation for summary judgment. The Court concluded "that exclusion of Plaintiffs' experts is the only appropriate sanction to prevent unfair surprise and dilatory tactics that preclude the opposing party from conducting meaningful expert discovery in preparation for motions for summary judgment and for trial." *Id.* at *4; *see also Tokai Corp. v. Easton Enters.*, No. EDCV 07-883-VAP (FMOx), 2009 BL 357918, *3 (C.D. Cal. Oct. 23, 2009) (refusing to consider expert declarations on summary judgment when "neither witness submitted an expert report during expert discovery, and Defendants did not have the opportunity to depose either witness").

Here, Celgene is not asking (although it could) that Relator be precluded from revising (again) Dr. Hay's expert report. Instead, Celgene is merely asking that the current summary judgment deadline be vacated so as to avoid unfair surprise to Celgene resulting from Relator's (and government payors') conduct. This is the minimal relief that will avoid prejudice to Celgene, and allow the parties to proceed in the manner contemplated by previous scheduling orders.

Finally, while in some cases courts may hear summary judgment motions before the close of expert discovery, such a procedure is neither appropriate nor feasible here. The Court's Case Management Order does not permit a party to file more than one motion for summary judgment without leave of Court. (*See* Dkt. 142.) Moreover, the filing of multiple summary judgment motions would be impractical, inefficient and a waste of judicial resources. For that reason, previous

scheduling orders provided a ten-week gap between the close of expert discovery and the deadline to file a summary judgment motion. Celgene intends to file one summary judgment motion to challenge Relator's case; Celgene is entitled to complete discovery before filing such a motion.

### C. Celgene Is Entitled to *Ex Parte* Relief

*Ex parte* motions are appropriate to provide extraordinary relief. *Mission Power Eng'g Co. v. Continental Casualty Co.*, 883 F. Supp. 488, 490-93 (C.D. Cal. 1995). Here, extraordinary relief is needed to address Relator's delay in expert discovery in the face of an impending deadline for summary judgment.

The deadline for summary judgment is currently April 18, 2016 (Ex. E [Dkt. 256].) To comply with the joint brief procedure in advance of April 18, 2016, the parties must meet and confer and begin the process of exchanging drafts in the coming weeks (if not days). Celgene cannot adequately do so given that Relator has not submitted Dr. Hay's final expert report (and has not proposed a date to do so) and Celgene has not had an opportunity to depose Dr. Hay. Given these circumstances, Celgene now has no choice but to seek emergency relief from the Court.[9]

To justify *ex parte* relief under *Mission Power*, a party must satisfy a two-pronged test: "First, the evidence must show that [Celgene's] cause will be irreparably prejudiced if the underlying motion is heard according to regular noticed motion procedures. Second, it must be established that [Celgene] is without fault in creating the crisis that requires *ex parte* relief, or that the crisis occurred as a result of excusable neglect." 883 F. Supp. at 392.

Celgene satisfies both prongs. First, Celgene will be irreparably prejudiced if the current deadline for summary judgment stands, and Relator is permitted to offer

[9] Even if Relator were to provide Dr. Hay's revised report *this week*, the current schedule – which provides for a rebuttal report by Celgene and then depositions of the remaining experts – would not permit the parties to complete expert discovery and file summary judgment briefing by the April 18, 2016 deadline.

Case 2:10-cv-03165-GHK-SS Document 270 Filed 02/23/16 Page 18 of 19 Page ID #:13216

evidence and expert testimony *after* Celgene submits its opening brief for summary judgment. Although the deadline for submitting initial expert reports was September 25, 2015, and Celgene complied with this deadline, Relator has yet to disclose the "corrected" expert report of her liability and damages expert. Celgene therefore has not had an opportunity to ascertain Relator's liability and damages theories, to submit a rebuttal report, or to depose Relator's expert to determine and challenge those theories. Being forced to exchange its portion of the summary judgment brief without an opportunity to ascertain these theories would irreparably prejudice and harm Celgene. With the summary judgment deadline rapidly approaching, Celgene cannot afford to wait for over a month for the regularly noticed motion procedures, when the harm is clearly immediate.

With regard to the second *Mission Power* prong, Celgene is not at fault in creating the situation warranting *ex parte* relief. To the contrary, it is Relator who initially sought relief from this Court to submit an expert report ten weeks after the deadline for initial expert disclosures. The "corrected" expert report Relator submitted on December 7, 2015, went far beyond the scope permitted by the Court, and expanded on Dr. Hay's opinions rather than simply "supplanting" one data set with another. Furthermore, even after being afforded ten extra weeks to submit Dr. Hay's report, Relator has yet to submit a *final* expert report for Dr. Hay. The Court's immediate intervention is the only option to address Relator's conduct.

In sum, Celgene is unable to resolve this issue without requiring the Court's intervention. Once the Court's intervention became necessary, Celgene moved quickly to address this situation, bringing this *ex parte* application in advance of the deadline for filing the summary judgment motion.

Case 2:10-cv-03165-GHK-SS Document 270 Filed 02/23/16 Page 19 of 19 Page ID #:13217

## II. CONCLUSION

For the foregoing reasons, the Court should grant Celgene's *ex parte* application.

Dated: February 23, 2016

JONES DAY / SIDLEY AUSTIN LLP

By /s/ *Brian D. Hershman*
Brian D. Hershman

Attorneys for Defendant
CELGENE CORPORATION

# EXHIBIT S

E-FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 10-3165-GHK(SSx) | Date | DECEMBER 1, 2014 |
| Title | UNITED STATES, ex rel BEVERLY BROWN vs. CELGENE CORPORATION | | |

| | |
|---|---|
| **Presiding: The Honorable** | **GEORGE H. KING, CHIEF U. S. DISTRICT JUDGE** |

| | | |
|---|---|---|
| Beatrice Herrera | N/A | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| THOMAS H. BIENERT, JR.<br>JAMES J. SABELLA<br>REUBEN A. GUTTMAN<br>DAVID T. FISCHER | KIMBERLY A. DUNNE<br>KAREN P. HEWITT<br>BRIAN D. HERSHMAN |

**Proceedings:** **(IN CHAMBERS) SCHEDULING CONFERENCE AND ORDER ENTERING SCHEDULING DATES**

Court conducts scheduling conference with counsel, and now enters the following scheduling dates:

1. Any stipulation or motion to amend as to any claims, defenses and/or parties shall be lodged/filed by no later than January 16, 2015, failing which it shall be deemed that party's waiver of any such amendments in this action.

2. All fact discovery shall be COMPLETED by no later than July 24, 2015. Completion means that any discovery that is not received in hand by the requesting party by the completion date will be denied. If any discovery motions are necessary, the parties shall ensure that they are calendared and heard by the magistrate judge sufficiently in advance of the completion date to permit actual production, by the completion date, of any discovery the judge might order.

3. The parties shall designate their expert witnesses, and make the required disclosures, by no later than July 24, 2015, and do likewise for any rebuttal expert witnesses by no later than August 24, 2015.

4. All expert discovery shall be COMPLETED by no later than September 25, 2015.

5. The parties shall comply with Local Rule 16-15 by no later than October 12, 2015. The parties elect to go to private mediation. We approve this election. If the case settles, counsel shall notify the court clerk forthwith. If the case does not settle, counsel shall file a joint status report with the court within 48 hours of termination of settlement discussions.

6. No motion for summary judgment may be filed without a joint certification by counsel that they have complied in good faith with Local Rule 16-15 as set forth above. Any motion for summary judgment shall be filed in compliance with the Local Rules, as well as our Order Re: Summary Judgment Motions issued concurrently herewith, by no later than November 16, 2015, and noticed for hearing thereafter regularly under the Local Rules. Any untimely or non-conforming motion will be denied. Any motion for summary judgment that is filed without a certification of compliance with Local Rule 16-15 as set forth above will be stricken and denied.

Case 2:10-cv-03165-GHK-SS Document 160 Filed 12/01/14 Page 2 of 2 Page ID #:4765

E-FILED

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 10-3165-GHK(SSx) | Date | DECEMBER 1, 2014 |
| Title | UNITED STATES, ex rel BEVERLY BROWN vs. CELGENE CORPORATION | | |

7. The court will set pre-trial conference and trial dates, if necessary, after resolution of the summary judgment motion(s), if any.

8. Failure by any party and/or counsel to strictly comply with the Federal and Local Rules, as well as our Orders, will result in the imposition of an appropriate sanction against the offending party/counsel.

**IT IS SO ORDERED.**

: **20**

Initials of Preparer Bea

# EXHIBIT T

Karen P. Hewitt (State Bar No. 145309)
kphewitt@JonesDay.com
Brian D. Hershman (State Bar No. 168175)
bhershman@JonesDay.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071.2300
Telephone: +1.213.489.3939
Facsimile: +1.213.243.2539

Kimberly A. Dunne (State Bar No. 142721)
kdunne@sidley.com
Michelle B. Goodman (State Bar No. 218607)
mgoodman@sidley.com
Sean A. Commons (State Bar No. 217603)
scommons@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: +1.213.896.6000
Facsimile: +1.213.896.6600

Attorneys for Defendant
CELGENE CORPORATION

(Additional Counsel listed on following page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO,<br><br>Plaintiffs,<br><br>*Ex rel.* | Case No. 10-cv-03165 GHK (SSx)<br><br>Assigned to the Honorable George H. King<br><br>[DISCOVERY MATTER]<br><br>**AMENDED SCHEDULING ORDER** |

| |
|---|
| BEVERLY BROWN,<br>Plaintiff-Relator,<br>v.<br>CELGENE CORPORATION,<br>Defendant. |

*Additional Counsel:*

Toni-Ann Citera (admitted *pro hac vice*)
tcitera@JonesDay.com
JONES DAY
222 East 41st Street
New York, NY 10017
Telephone: +1.212.326.3939
Facsimile: +1.212.755.7306

James C. Stansel (admitted *pro hac vice*)
jstansel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: +1.202.736.8092
Facsimile: +1.202.736.8711

The Court, having reviewed and considered Plaintiff-Relator Beverly Brown's ("Relator") Notice of Proposed Amended Schedule and Defendant Celgene Corporation's ("Defendant") Notice of Proposed Amended Schedule, and good cause appearing.

**THE COURT HEREBY ORDERS** that:

1. The deadline for Relator to submit the Supplemental Expert Report of Dr. Joel W. Hay ("Hay Supplemental Report") shall be December 7, 2015.

2. The deadline for Defendant to submit a rebuttal expert report to the Hay Supplemental Report shall be January 20, 2016.

3. The deadline for completing expert discovery shall be extended from November 20, 2015 to February 10, 2016.

4. The deadline for completing any summary judgment motion shall be extended from January 29, 2016 to April 18, 2016. Defendant shall submit its initial draft of the joint summary judgment brief to Relator by February 26, 2016. Relator shall submit her portion of the joint brief to Defendant by March 25, 2016. Defendant shall incorporate its reply arguments and file the joint summary judgment brief by April 18, 2016.

5. All other deadlines in the Scheduling Order will remain the same.

**IT IS SO ORDERED.**

Dated: 11/12/15 ____________ By: /S/

Hon. Suzanne H. Segal
United States Magistrate Judge

Case 2:10-cv-03165-GHK-SS Document 256 Filed 11/12/15 Page 4 of 4 Page ID #:6815

Respectfully submitted,

JONES DAY

*/s/ Brian D. Hershman*

Brian D. Hershman
Attorneys for Defendant
Celgene Corporation

# EXHIBIT U

Karen P. Hewitt (State Bar No. 145309)
kphewitt@JonesDay.com
Brian D. Hershman (State Bar No. 168175)
bhershman@JonesDay.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071.2300
Telephone: +1.213.489.3939
Facsimile: +1.213.243.2539

Kimberly A. Dunne (State Bar No. 142721)
kdunne@sidley.com
Michelle B. Goodman (State Bar No. 218607)
mgoodman@sidley.com
Sean A. Commons (State Bar No. 217603)
scommons@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: +1.213.896.6000
Facsimile: +1.213.896.6600

Attorneys for Defendant
CELGENE CORPORATION

(Additional Counsel listed on following page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO,<br><br>Plaintiffs,<br><br>*Ex rel.* | Case No. 10-cv-03165 GHK (SSx)<br><br>Assigned to the Honorable George H. King<br><br>[DISCOVERY MATTER]<br><br>**AMENDED SCHEDULING ORDER** |

Case 2:10-cv-03165-RGK-SS Document 305-3 Filed 07/25/16 Page 646 of 651 Page ID #:15965

BEVERLY BROWN,

Plaintiff-Relator,

v.

CELGENE CORPORATION,

Defendant.

*Additional Counsel:*

Toni-Ann Citera (admitted *pro hac vice*)
tcitera@JonesDay.com
JONES DAY
222 East 41st Street
New York, NY 10017
Telephone: +1.212.326.3939
Facsimile: +1.212.755.7306

James C. Stansel (admitted *pro hac vice*)
jstansel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: +1.202.736.8092
Facsimile: +1.202.736.8711

Case 2:10-cv-03165-GHK-SS Document 288 Filed 04/08/16 Page 3 of 3 Page ID #:13858

The Court, having reviewed and considered Plaintiff-Relator Beverly Brown's ("Relator") and Defendant Celgene Corporation's ("Defendant") Joint Stipulation re: Amended Scheduling Order, and good cause appearing,

**THE COURT HEREBY ORDERS** that:

1. The deadline for Relator to submit the Final Supplemental Expert Report of Dr. Joel W. Hay ("Hay Final Supplemental Report") shall be April 22, 2016.

2. The deadline for Defendant to submit a rebuttal expert report to the Hay Final Supplemental Report shall be June 3, 2016.

3. The deadline for completing expert discovery shall be June 30, 2016.

4. The deadline for completing any summary judgment motion shall be August 29, 2016. The parties shall meet and confer in person regarding summary judgment by July 1, 2016. The moving party shall submit her/its initial draft of the joint summary judgment brief to the opposing party by July 18, 2016. The opposing party shall submit her/its portion of the joint brief to the moving party by August 18, 2016. The moving party shall file the joint summary judgment brief by August 29, 2016.

5. All other deadlines in the Scheduling Order will remain the same.

**IT IS SO ORDERED.**

Dated: 4/08/16 ____________ By: /S/
Hon. Suzanne H. Segal
United States Magistrate Judge

# EXHIBIT V

DEPARTMENT OF HEALTH AND HUMAN SERVICES

# OFFICE OF INSPECTOR GENERAL

WASHINGTON, DC 20201

## Special Advisory Bulletin

Pharmaceutical Manufacturer Copayment Coupons

September 2014

Pharmaceutical manufacturers offer copayment coupons to insured patients to reduce or eliminate the cost of their out-of-pocket copayments for specific brand-name drugs.[1] These coupons constitute remuneration offered to consumers to induce the purchase of specific items.

When the item in question is one for which payment may be made, in whole or in part, under a Federal health care program (including Medicare Part D), the anti-kickback statute is implicated. The anti-kickback statute makes it a criminal offense to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce or reward the referral or generation of business reimbursable by any Federal health care program. Section 1128B(b) of the Social Security Act (the Act).[2] Where remuneration is paid purposefully to induce or reward referrals of items or services payable by a Federal health care program, the anti-kickback statute is violated.

A claim that includes items or services resulting from a violation of the anti-kickback statute constitutes a false or fraudulent claim for purposes of the False Claims Act. Section 1128B(g) of the Act.[3] The False Claims Act imposes liability for knowingly presenting or causing to be presented a false claim for payment by the United States. 31 U.S.C. § 3729.[4]

---

[1] For purposes of this Special Advisory Bulletin, copayment coupons are any form of direct support offered by manufacturers to insured patients to reduce or eliminate immediate out-of-pocket costs for specific prescription medications. They include print coupons, electronic coupons, debit cards, and direct reimbursements, as described in OIG report entitled, *Manufacturer Safeguards May Not Prevent Copayment Coupon Use for Part D Drugs*, OEI-05-12-00540 (OEI Report).

[2] 42 U.S.C § 1320a-7b(b). "Federal health care program" is defined at section 1128B(f) of the Act and includes programs such as Medicare and Medicaid. 42 U.S.C. § 1320a-7b(f).

[3] 42 U.S.C. § 1320a-7b(g).

[4] In addition, section 1128A(a)(5) of the Act provides for the imposition of civil monetary penalties against any person who offers or transfers remuneration to a Medicare or State health care program (including Medicaid) beneficiary that the benefactor knows or should know is

Cost-sharing requirements for Federal health care program drugs serve an important role in protecting both Federal health care programs and their beneficiaries. These cost-sharing requirements promote: (1) prudent prescribing and purchasing choices by physicians and patients based on the true costs of drugs and (2) price competition in the pharmaceutical market. While copayment coupons provide an immediate financial benefit to beneficiaries, they ultimately can harm both Federal health care programs and their beneficiaries.[5] The availability of a coupon may cause physicians and beneficiaries to choose an expensive brand-name drug when a less expensive and equally effective generic or other alternative is available. When consumers are relieved of copayment obligations, manufacturers are relieved of a market constraint on drug prices. Excessive costs to Federal programs are among the harms that the anti-kickback statute is intended to prevent.

The pharmaceutical industry is aware of the anti-kickback statute and its application to copayment coupons. Copayment coupons typically bear a statement that the coupon may not be used by beneficiaries of Federal health care programs.

The Office of Inspector General, Office of Evaluation and Inspections (OEI), conducted a study analyzing the measures pharmaceutical manufacturers use to prevent their coupon programs from inducing the purchase of drugs paid for by Part D. We are issuing this Special Advisory Bulletin concurrently with the OEI Report.[6]

---

likely to influence the beneficiary's selection of a particular provider, practitioner, or supplier of any item or service for which payment may be made, in whole or in part, by Medicare or a State health care program (including Medicaid) (the beneficiary inducement CMP). 42 U.S.C. § 1320a-7a(a)(5). In circumstances in which the offer or acceptance of copayment coupons may induce a beneficiary to use a particular practitioner or pharmacy, a violation of this statute may occur.

[5] We recognize that copayment support may benefit beneficiaries by encouraging adherence to medication regimens, particularly when copayments are so high as to be unaffordable to many patients. Manufacturers that desire to assist Federal health care program beneficiaries who cannot afford their copayments have the option of donating to independent charities that provide financial support to patients without regard for the particular medication a patient may be using. For guidance specifically related to such charities, see OIG Supplemental Special Advisory Bulletin: Independent Charity Patient Assistance Programs, 79 Fed. Reg. 31120 (May 26, 2014) available at: http://oig.hhs.gov/fraud/docs/alertsandbulletins/2014/independent-charity-bulletin.pdf and OIG Special Advisory Bulletin on Patient Assistance Programs of Medicare Part D Enrollees, 70 Fed. Reg. 70623 (Nov. 22, 2005), available at: http://oig.hhs.gov/fraud/docs/alertsandbulletins/2005/2005PAPSpecialAdvisoryBulletin.pdf .

[6] Like the OEI report, this Special Advisory Bulletin focuses on the measures used by pharmaceutical manufacturers in connection with the copayment coupons they offer. However, pharmacies that accept manufacturer coupons for copayments owed by Federal health care program beneficiaries also may be subject to sanctions under the anti-kickback statute, the beneficiary inducement CMP, and the False Claims Act.

The OEI Report describes measures that surveyed manufacturers report they have in place to prevent use of copayment coupons to fund copayments for drugs paid for by Part D and concludes that these measures may not prevent all such use. It states that all manufacturers place notices on the coupons or coupon materials that Federal program beneficiaries are not eligible to use them, for at least some coupon formats. However, not all manufacturers use such notices on all coupon formats. In addition, while most manufacturers also use claims edits in the processing of at least some of their coupons, the OEI Report concludes that these claims edits may not reliably identify all claims submitted in connection with drugs paid for by Part D. The OEI Report also finds that coupons are not transparent in the pharmacy claims transaction system to entities other than manufacturers, which impedes Part D plans and others from identifying and monitoring the use of coupons for drugs paid for by Part D. The OEI Report recommends that the Centers for Medicare & Medicaid Services (CMS) cooperate with industry stakeholder efforts to improve the reliability of mechanisms to determine when copayment coupons are used in connection with the purchase of drugs paid for, in part, by Part D. These mechanisms include improving the reliability of claims edits and making copayment coupons universally identifiable in pharmacy claims transactions. Such transparency with respect to coupon use would permit all Federal health care program payors—not just the sponsors of Part D plans—to recognize coupon transactions.

Regardless of future actions by CMS, the offerors of coupons ultimately bear the responsibility to operate these programs in compliance with Federal law. Pharmaceutical manufacturers that offer copayment coupons may be subject to sanctions if they fail to take appropriate steps to ensure that such coupons do not induce the purchase of Federal health care program items or services, including, but not limited to, drugs paid for by Medicare Part D. Failure to take such steps may be evidence of intent to induce the purchase of drugs paid for by these programs, in violation of the anti-kickback statute.