# EXHIBIT AA

## Justin Brooks

**From:** Heard, Eden (HHS/OGC) <Eden.Heard@hhs.gov>
**Sent:** Wednesday, January 20, 2016 10:22 AM
**To:** Justin Brooks; 'jstansel@sidley.com'; 'kdunne@sidley.com'; Olson, William E. (CIV) (William.E.Olson@usdoj.gov)
**Cc:** Johnson, Amanda S. (CMS/CM); Allen, Karen M. (CMS/OTS); Horton, Dinah L. (CMS/OTS)
**Subject:** FW: Celgene - final action question - response to example provided

Amanda Johnson has provided written responses below. We can still have a call at 11 a.m. on Friday if you think it's necessary, and if that works for Will and Sidley.

Eden Heard
HHS/OS/OGC, CMS Division
(202) 401-7418

**Notice:** The contents of this message and any attachments may be privileged and confidential. Please do not disseminate without the approval of the Office of the General Counsel. If you are not an intended recipient, or have received this message in error, please delete it without reading it and please do not print, copy, forward, disseminate, or otherwise use the information. Also, please notify the sender that you have received this communication in error. Your receipt of this message is not intended to waive any applicable privilege.

---

**From:** Justin Brooks [mailto:JBrooks@gbblegal.com]
**Sent:** Friday, January 15, 2016 10:25 AM
**To:** Heard, Eden (HHS/OGC); 'jstansel@sidley.com'; 'kdunne@sidley.com'
**Cc:** Olson, William E. (CIV) (William.E.Olson@usdoj.gov); mwilliams@bmkattorneys.com
**Subject:** RE: Celgene - final action question - response to example provided

Thank you, Eden. We'd like final clarification and/or confirmation on the below points as soon as it's possible for CMS to do so. We need this to rerun our numbers and produce an accurate supplemental report. We are happy to schedule a final call with our experts, your team, and Celgene's experts if necessary to reach final resolution.

**1)** In the data set provided, there are 2,269 bene_ids were associated with both "H" (Local Medicare Advantage Prescription Drug (MA-PD) Plans) and "S" Prescription Drug Plans (PDP). How should we deal with the patients with multiple plan types?

> CMS response: Low-income beneficiaries can change plans at any time. In addition, other beneficiaries may be granted a special enrollment period in which they change plans. Any change in plans will become effective at the beginning of the month because enrollment can only change on a monthly basis. The

contract of record is responsible for the beneficiary claims with DOS that occur during the time the beneficiary is enrolled in its plan.

**2)** According to the table,

"H" for Local Medicare Advantage Prescription Drug (MA-PD) Plans,

"R" for Regional MA-PD Plans,

"S" for Prescription Drug Plans (PDP),

"E" for Employer Group Waiver Plans (EGWP),

"X" for LI NET plan.

Should we consider "H" and "R" as MA patients and the rest ("S", "E" and "X" ) as non MA patients?

CMS response: H and R represent the MA plans and the others are the stand alone PDPs.

**3)** How do we identify the final paid claim by Medicare when we see multiple claims for a patient per service date (even if we see that these claims are due to claims submitted by different service providers)?

CMS response: The final "paid" claim will be identified with a CLM_FINL_ACTN_IND of "Y" and either a 1 (original), 2 (adjusted), or 4 (resubmitted) in the CLM_TYPE_CD field. Claims with a CLM_FINL_ACTN_IND of "Y" and a CLM_TYPE_CD of "4" are deleted PDEs and were not included in the annual Part D payment reconciliation. In the case of Medicare Part D, we don't pay on a claim basis so the claims with a CLM_FINL_ACTN_IND of "Y" and either a 1 (original), 2 (adjusted), or 4 (resubmitted) in the CLM_TYPE_CD field are the claims that were part of the annual Part D payment reconciliation.

**4)** For 3) above, when different payment amounts are seen for multiple claims for a patient per service date, how to identify the final claim amount paid?

CMS response: The total cost of the drug will be the sum of GDCB and GDCA. The PDE provides a breakdown of what the plan (CPP and NPP) and the beneficiary (Pt. Pay amount) paid at the point-of-sale. The government cost is not determined at the POS but is determined in the annual Part D payment reconciliation. The reconciliation occurs at the PBP level, not the claim level.

Justin S. Brooks
Guttman, Buschner & Brooks PLLC
1515 Locust Street, Suite 501
Philadelphia, PA 19102
Direct Dial: (302) 327-9210

Mobile: (610) 547-9556
jbrooks@gbblegal.com

**From:** Heard, Eden (HHS/OGC) [mailto:Eden.Heard@hhs.gov]
**Sent:** Monday, January 11, 2016 2:25 PM
**To:** 'jstansel@sidley.com' <jstansel@sidley.com>; Justin Brooks <JBrooks@gbblegal.com>; 'kdunne@sidley.com' <kdunne@sidley.com>
**Cc:** Olson, William E. (CIV) (William.E.Olson@usdoj.gov) <William.E.Olson@usdoj.gov>
**Subject:** Celgene - final action question - response to example provided

The CMS Integrated Data Repository (IDR) views this one PDE as four different PDEs because of the Rptd Service Provider ID, in which the sponsor submitted a different Service Provider ID in each submission. Was this the only instance like this that you found? There are key fields on the PDE that the IDR uses to classify PDEs into families (families are the summary of changes to one PDE). Because of the slight variation in the Service Provider ID, the IDR classifies this as four different PDEs but it is really only one PDE. We don't know how often this occurs. As stated previously, there is only one final action PDE in a family. This is a situation in which IDR thinks there are four different families.

| Date of Service | Rx Service Reference Number | Fill Number | Rptd Service Provider ID | Rptd Service Provider ID Qlfyr | Dispensing Status Code | Claim Effec Indicator |
|---|---|---|---|---|---|---|
| 5/4/2007 | 000000003546 | 1 | PAPERCLAIM | 99 | | Y |
| 5/4/2007 | 000000003546 | 1 | 4541416 | 07 | | Y |
| 5/4/2007 | 000000003546 | 1 | PAPER CLM | 99 | | Y |
| 5/4/2007 | 000000003546 | 1 | PAPER CLAIM | 99 | | Y |

Eden Heard
HHS/OGC/CMS Division
(202) 401-7418

**Notice:** The contents of this message and any attachments may be privileged and confidential. Please do not disseminate without the approval of the Office of the General Counsel. If you are not an intended recipient, or have received this message in error, please delete it without reading it and please do not print, copy, forward, disseminate, or otherwise use the information. Also, please notify the sender that you have received this communication in error. Your receipt of this message is not intended to waive any applicable privilege.

# EXHIBIT BB

**Justin Brooks**

**From:** Stansel, James C. <jstansel@sidley.com>
**Sent:** Wednesday, January 20, 2016 9:34 PM
**To:** Justin Brooks; Heard, Eden (HHS/OGC)
**Cc:** Dunne, Kimberly A.; Olson, William E. (CIV) (William.E.Olson@usdoj.gov); Johnson, Amanda S. (CMS/CM); Allen, Karen M. (CMS/OTS); Horton, Dinah L. (CMS/OTS)
**Subject:** RE: Celgene - final action question - response to example provided

Thanks for these responses. We've taken a look and think it would still be helpful to have a call. Friday at 11 ET works for us. On the last response, did you mean "PDP" instead of "PBP"? Thanks.

**JAMES STANSEL**
Partner

**Sidley Austin LLP**
+1 202 736 8092
jstansel@sidley.com

---

**From:** Justin Brooks [mailto:JBrooks@gbblegal.com]
**Sent:** Wednesday, January 20, 2016 10:22 AM
**To:** Heard, Eden (HHS/OGC)
**Cc:** Stansel, James C.; Dunne, Kimberly A.; Olson, William E. (CIV) (William.E.Olson@usdoj.gov); Johnson, Amanda S. (CMS/CM); Allen, Karen M. (CMS/OTS); Horton, Dinah L. (CMS/OTS)
**Subject:** Re: Celgene - final action question - response to example provided

Thanks very much! We will provide the information to our expert and let you know if a call remains necessary from our perspective. It might make sense to pencil it in for now. We'll get back to you as quickly as possible with our perspective on whether we need a follow-up call.

Justin S. Brooks
Guttman, Buschner & Brooks PLLC
1515 Locust Street, Suite 501
Philadelphia, PA 19102
Direct Dial: (302) 327-9210
Mobile: (610) 547-9556
jbrooks@gbblegal.com

On Jan 20, 2016, at 10:18 AM, Heard, Eden (HHS/OGC) <Eden.Heard@hhs.gov> wrote:

> Amanda Johnson has provided written responses below. We can still have a call at 11 a.m. on Friday if you think it's necessary, and if that works for Will and Sidley.
>
> Eden Heard
> HHS/OS/OGC, CMS Division
> (202) 401-7418

**Notice:** The contents of this message and any attachments may be privileged and confidential. Please do not disseminate without the approval of the Office of the General Counsel. If you are not an intended recipient, or have received this message in error, please delete it without reading it and please do not print, copy, forward, disseminate, or otherwise use the information. Also, please notify the sender that you have received this communication in error. Your receipt of this message is not intended to waive any applicable privilege.

---

**From:** Justin Brooks [mailto:JBrooks@gbblegal.com]
**Sent:** Friday, January 15, 2016 10:25 AM
**To:** Heard, Eden (HHS/OGC); 'jstansel@sidley.com'; 'kdunne@sidley.com'
**Cc:** Olson, William E. (CIV) (William.E.Olson@usdoj.gov); mwilliams@bmkattorneys.com
**Subject:** RE: Celgene - final action question - response to example provided

Thank you, Eden. We'd like final clarification and/or confirmation on the below points as soon as it's possible for CMS to do so. We need this to rerun our numbers and produce an accurate supplemental report. We are happy to schedule a final call with our experts, your team, and Celgene's experts if necessary to reach final resolution.

**1)** In the data set provided, there are 2,269 bene_ids were associated with both "H" (Local Medicare Advantage Prescription Drug (MA-PD) Plans) and "S" Prescription Drug Plans (PDP). How should we deal with the patients with multiple plan types?

> CMS response: Low-income beneficiaries can change plans at any time. In addition, other beneficiaries may be granted a special enrollment period in which they change plans. Any change in plans will become effective at the beginning of the month because enrollment can only change on a monthly basis. The contract of record is responsible for the beneficiary claims with DOS that occur during the time the beneficiary is enrolled in its plan.

**2)** According to the table,

"H" for Local Medicare Advantage Prescription Drug (MA-PD) Plans,

"R" for Regional MA-PD Plans,

"S" for Prescription Drug Plans (PDP),

"E" for Employer Group Waiver Plans (EGWP),

"X" for LI NET plan.

Should we consider "H" and "R" as MA patients and the rest ("S", "E" and "X" ) as non MA patients?

CMS response: H and R represent the MA plans and the others are the stand alone PDPs.

**3)** How do we identify the final paid claim by Medicare when we see multiple claims for a patient per service date (even if we see that these claims are due to claims submitted by different service providers)?

CMS response: The final "paid" claim will be identified with a CLM_FINL_ACTN_IND of "Y" and either a 1 (original), 2 (adjusted), or 4 (resubmitted) in the CLM_TYPE_CD field. Claims with a CLM_FINL_ACTN_IND of "Y" and a CLM_TYPE_CD of "4" are deleted PDEs and were not included in the annual Part D payment reconciliation. In the case of Medicare Part D, we don't pay on a claim basis so the claims with a CLM_FINL_ACTN_IND of "Y" and either a 1 (original), 2 (adjusted), or 4 (resubmitted) in the CLM_TYPE_CD field are the claims that were part of the annual Part D payment reconciliation.

**4)** For 3) above, when different payment amounts are seen for multiple claims for a patient per service date, how to identify the final claim amount paid?

CMS response: The total cost of the drug will be the sum of GDCB and GDCA. The PDE provides a breakdown of what the plan (CPP and NPP) and the beneficiary (Pt. Pay amount) paid at the point-of-sale. The government cost is not determined at the POS but is determined in the annual Part D payment reconciliation. The reconciliation occurs at the PBP level, not the claim level.

Justin S. Brooks
Guttman, Buschner & Brooks PLLC
1515 Locust Street, Suite 501
Philadelphia, PA 19102
Direct Dial: (302) 327-9210
Mobile: (610) 547-9556
jbrooks@gbblegal.com

---

**From:** Heard, Eden (HHS/OGC) [mailto:Eden.Heard@hhs.gov]
**Sent:** Monday, January 11, 2016 2:25 PM
**To:** 'jstansel@sidley.com' <jstansel@sidley.com>; Justin Brooks <JBrooks@gbblegal.com>; 'kdunne@sidley.com' <kdunne@sidley.com>
**Cc:** Olson, William E. (CIV) (William.E.Olson@usdoj.gov) <William.E.Olson@usdoj.gov>
**Subject:** Celgene - final action question - response to example provided

The CMS Integrated Data Repository (IDR) views this one PDE as four different PDEs because of the Rptd Service Provider ID, in which the sponsor submitted a different Service Provider ID in each submission. Was this the only instance like this that you found? There are key fields on the PDE that the IDR uses to classify PDEs into families (families are the summary of changes to one PDE). Because of the slight variation in the Service Provider ID, the IDR classifies this as four different PDEs but it is really only one PDE. We don't know how often this occurs. As stated previously, there is only one final action PDE in a family. This is a situation in which IDR thinks there are four different families.

| Date of Service | Rx Service Reference Number | Fill Number | Rptd Service Provider ID | Rptd Service Provider ID Qlfyr | Dispensi Status Code |
|---|---|---|---|---|---|
| 5/4/2007 | 000000003546 | 1 | PAPERCLAIM | 99 | |
| 5/4/2007 | 000000003546 | 1 | 4541416 | 07 | |
| 5/4/2007 | 000000003546 | 1 | PAPER CLM | 99 | |
| 5/4/2007 | 000000003546 | 1 | PAPER CLAIM | 99 | |

Eden Heard
HHS/OGC/CMS Division
(202) 401-7418

**Notice:** The contents of this message and any attachments may be privileged and confidential. Please do not disseminate without the approval of the Office of the General Counsel. If you are not an intended recipient, or have received this message in error, please delete it without reading it and please do not print, copy, forward, disseminate, or otherwise use the information. Also, please notify the sender that you have received this communication in error. Your receipt of this message is not intended to waive any applicable privilege.

**************************************************************************************************

This e-mail is sent by a law firm and may contain information that is privileged or confidential. If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.

**************************************************************************************************

# EXHIBIT CC

**Justin Brooks**

| | |
|---|---|
| **From:** | Heard, Eden (HHS/OGC) <Eden.Heard@hhs.gov> |
| **Sent:** | Tuesday, March 1, 2016 11:42 AM |
| **To:** | Stansel, James C.; Justin Brooks; Dunne, Kimberly A. |
| **Cc:** | Olson, William E. (CIV) (William.E.Olson@usdoj.gov) |
| **Subject:** | RE: Celgene - final action question - response to example provided |

We believe that the information we've already provided (quoted in your email) adequately explains what the CPP field represents. The 2011 Participant Guide that we sent the parties on Jan. 22 explains in Section 4.3 that "amounts reported in CPP and Patient Pay Amount will vary based on the beneficiary's position in the benefit." Page 96. These variances are reflected in the various scenarios starting at page 99, section 4.3.1. You may also find the explanations of CPP in relation to risk corridors in the following OIG report to be helpful: http://oig.hhs.gov/oas/reports/region1/180830102.pdf

Eden Heard
HHS/OS/OGC, CMS Division
(202) 401-7418

**Notice:** The contents of this message and any attachments may be privileged and confidential. Please do not disseminate without the approval of the Office of the General Counsel. If you are not an intended recipient, or have received this message in error, please delete it without reading it and please do not print, copy, forward, disseminate, or otherwise use the information. Also, please notify the sender that you have received this communication in error. Your receipt of this message is not intended to waive any applicable privilege.

---

**From:** Stansel, James C. [mailto:jstansel@sidley.com]
**Sent:** Wednesday, February 10, 2016 11:09 PM
**To:** Heard, Eden (HHS/OGC); Justin Brooks; Dunne, Kimberly A.
**Cc:** Olson, William E. (CIV) (William.E.Olson@usdoj.gov)
**Subject:** RE: Celgene - final action question - response to example provided

Thank you for these additional answers. With respect to your answer to number 3 below, you stated that "CPP is the Part D amount that the plan paid at the point of sale. CMS pays the plan with a direct subsidy to cover the cost in CPP. CPP is then used in the calculation to determine the risk sharing in reconciliation." In your previous email of January 20, you stated, "The government cost is not determined at the POS but is determined in the annual Part D payment reconciliation. The reconciliation occurs at the PBP level, not the claim level." Is it correct that because of the prospective and capitated nature of the direct subsidy and the retrospective and capitated nature of the risk share reconciliation process, that the CPP amount is not necessarily the amount that Medicare has paid for a particular prescription?

**JAMES STANSEL**
Partner

**Sidley Austin LLP**
+1 202 736 8092
jstansel@sidley.com

**From:** Heard, Eden (HHS/OGC) [mailto:Eden.Heard@hhs.gov]
**Sent:** Tuesday, February 09, 2016 10:49 AM
**To:** Justin Brooks; Stansel, James C.; Dunne, Kimberly A.
**Cc:** Olson, William E. (CIV) (William.E.Olson@usdoj.gov)
**Subject:** Celgene - final action question - response to example provided

Justin,

Please see the CMS responses below, in red.

Eden Heard
HHS/OS/OGC, CMS Division
(202) 401-7418

**Notice:** The contents of this message and any attachments may be privileged and confidential. Please do not disseminate without the approval of the Office of the General Counsel. If you are not an intended recipient, or have received this message in error, please delete it without reading it and please do not print, copy, forward, disseminate, or otherwise use the information. Also, please notify the sender that you have received this communication in error. Your receipt of this message is not intended to waive any applicable privilege.

---

**From:** Justin Brooks [mailto:JBrooks@gbblegal.com]
**Sent:** Wednesday, January 27, 2016 10:17 AM
**To:** Heard, Eden (HHS/OGC); 'jstansel@sidley.com'; 'kdunne@sidley.com'; Olson, William E. (CIV) (William.E.Olson@usdoj.gov)
**Cc:** Johnson, Amanda S. (CMS/CM); Allen, Karen M. (CMS/OTS); Horton, Dinah L. (CMS/OTS)
**Subject:** RE: Celgene - final action question - response to example provided

Eden,

I hope you had a nice weekend and made out ok with the storm. We have a few minor clarification questions following last weeks' call and provision of the reconciliation information. I think once we get these clarifications, we'll be off to the races and ready to promptly finalize a revised supplemental report. Questions/clarification requests below. Thanks, Justin

1. "ADJ_DEL_CD" to be used instead of CLM_TYPE_CD to determine the final claim paid amount for analysis.

   Blank indicates Original PDE
   'A' indicates adjusted claim
   'R' indicates resubmitted claim
   'D indicates deleted claim

   Based on our call with CMS on Jan 22, 2016, it is our understanding that for patients with multiple final claims per service date, only claims indicated as 'D' for "ADJ_DEL_CD" variable should be excluded from analysis when final indicator variable is 'Y'. And all the other claims are included as damages for Adj_Del_CD ONLY when the Final Transactions Code is "Y".

CMS Comments: Yes, your understanding of claims indicated as 'D' for "ADJ_DEL_CD" variable is correct.

2. We do not see any deleted claims in the CMS data with Final Action Status of "Y". So all the claims with final action indicator 'Y' will be included in analysis. That means we will have multiple final claims for some patients on some specific days. Please see attached example of multiple claims with final action indicator 'Y' for the same patient same day. All the claims in this example will be included in the analysis based on our discussion with CMS on Jan 22, 2016. Please confirm.

CMS comment: Any PDE with a Adj_Del_CD of A or Blank or R and a final action status of Y represents a final claim.

3. It is our understanding that the following abbreviations have the following meanings.

CPP: Covered D Plan Paid Amount
NPP: Non-covered Plan Paid Amount. NPPs are to be excluded.

It is our understanding that when it exceeds zero, the Covered Plan Payment (CPP) variable reflects the full amount that Medicare pays for each valid PDE claim. Is this correct?

CMS comment: CPP is the Part D amount that the plan paid at the point of sale. CMS pays the plan with a direct subsidy to cover the cost in CPP. CPP is then used in the calculation to determine the risk sharing in reconciliation.

Justin S. Brooks
Guttman, Buschner & Brooks PLLC
1515 Locust Street, Suite 501
Philadelphia, PA 19102
Direct Dial: (302) 327-9210
Mobile: (610) 547-9556
jbrooks@gbblegal.com

---

**From:** Heard, Eden (HHS/OGC) [mailto:Eden.Heard@hhs.gov]
**Sent:** Wednesday, January 20, 2016 10:22 AM
**To:** Justin Brooks <JBrooks@gbblegal.com>; 'jstansel@sidley.com' <jstansel@sidley.com>; 'kdunne@sidley.com' <kdunne@sidley.com>; Olson, William E. (CIV) (William.E.Olson@usdoj.gov) <William.E.Olson@usdoj.gov>
**Cc:** Johnson, Amanda S. (CMS/CM) <Amanda.Johnson@cms.hhs.gov>; Allen, Karen M. (CMS/OTS) <Karen.Allen@cms.hhs.gov>; Horton, Dinah L. (CMS/OTS) <Dinah.Horton@cms.hhs.gov>
**Subject:** FW: Celgene - final action question - response to example provided

Amanda Johnson has provided written responses below. We can still have a call at 11 a.m. on Friday if you think it's necessary, and if that works for Will and Sidley.

Eden Heard
HHS/OS/OGC, CMS Division
(202) 401-7418

**Notice:** The contents of this message and any attachments may be privileged and confidential. Please do not disseminate without the approval of the Office of the General Counsel. If you are not an intended recipient, or have received this message in error, please delete it without reading it and please do not print, copy, forward, disseminate, or otherwise use the information. Also, please notify the sender that you have received this communication in error. Your receipt of this message is not intended to waive any applicable privilege.

---

**From:** Justin Brooks [mailto:JBrooks@gbblegal.com]
**Sent:** Friday, January 15, 2016 10:25 AM
**To:** Heard, Eden (HHS/OGC); 'jstansel@sidley.com'; 'kdunne@sidley.com'
**Cc:** Olson, William E. (CIV) (William.E.Olson@usdoj.gov); mwilliams@bmkattorneys.com
**Subject:** RE: Celgene - final action question - response to example provided

Thank you, Eden. We'd like final clarification and/or confirmation on the below points as soon as it's possible for CMS to do so. We need this to rerun our numbers and produce an accurate supplemental report. We are happy to schedule a final call with our experts, your team, and Celgene's experts if necessary to reach final resolution.

**1)** In the data set provided, there are 2,269 bene_ids were associated with both "H" (Local Medicare Advantage Prescription Drug (MA-PD) Plans) and "S" Prescription Drug Plans (PDP). How should we deal with the patients with multiple plan types?

> CMS response: Low-income beneficiaries can change plans at any time. In addition, other beneficiaries may be granted a special enrollment period in which they change plans. Any change in plans will become effective at the beginning of the month because enrollment can only change on a monthly basis. The contract of record is responsible for the beneficiary claims with DOS that occur during the time the beneficiary is enrolled in its plan.

**2)** According to the table,

"H" for Local Medicare Advantage Prescription Drug (MA-PD) Plans,

"R" for Regional MA-PD Plans,

"S" for Prescription Drug Plans (PDP),

"E" for Employer Group Waiver Plans (EGWP),

"X" for LI NET plan.

Should we consider "H" and "R" as MA patients and the rest ("S", "E" and "X" ) as non MA patients?

CMS response: H and R represent the MA plans and the others are the stand alone PDPs.

**3)** How do we identify the final paid claim by Medicare when we see multiple claims for a patient per service date (even if we see that these claims are due to claims submitted by different service providers)?

CMS response: The final "paid" claim will be identified with a CLM_FINL_ACTN_IND of "Y" and either a 1 (original), 2 (adjusted), or 4 (resubmitted) in the CLM_TYPE_CD field. Claims with a CLM_FINL_ACTN_IND of "Y" and a CLM_TYPE_CD of "4" are deleted PDEs and were not included in the annual Part D payment reconciliation. In the case of Medicare Part D, we don't pay on a claim basis so the claims with a CLM_FINL_ACTN_IND of "Y" and either a 1 (original), 2 (adjusted), or 4 (resubmitted) in the CLM_TYPE_CD field are the claims that were part of the annual Part D payment reconciliation.

**4)** For 3) above, when different payment amounts are seen for multiple claims for a patient per service date, how to identify the final claim amount paid?

CMS response: The total cost of the drug will be the sum of GDCB and GDCA. The PDE provides a breakdown of what the plan (CPP and NPP) and the beneficiary (Pt. Pay amount) paid at the point-of-sale. The government cost is not determined at the POS but is determined in the annual Part D payment reconciliation. The reconciliation occurs at the PBP level, not the claim level.

Justin S. Brooks
Guttman, Buschner & Brooks PLLC
1515 Locust Street, Suite 501
Philadelphia, PA 19102
Direct Dial: (302) 327-9210
Mobile: (610) 547-9556
jbrooks@gbblegal.com

---

**From:** Heard, Eden (HHS/OGC) [mailto:Eden.Heard@hhs.gov]
**Sent:** Monday, January 11, 2016 2:25 PM
**To:** 'jstansel@sidley.com' <jstansel@sidley.com>; Justin Brooks <JBrooks@gbblegal.com>; 'kdunne@sidley.com' <kdunne@sidley.com>
**Cc:** Olson, William E. (CIV) (William.E.Olson@usdoj.gov) <William.E.Olson@usdoj.gov>
**Subject:** Celgene - final action question - response to example provided

The CMS Integrated Data Repository (IDR) views this one PDE as four different PDEs because of the Rptd Service Provider ID, in which the sponsor submitted a different Service Provider ID in each submission. Was this the only instance like this that you found? There are key fields on the PDE that the IDR uses to classify PDEs into families (families are the summary of changes to one PDE). Because of the slight variation in the Service Provider ID, the IDR classifies this as four different PDEs but it is really only one PDE. We don't know how often this

occurs. As stated previously, there is only one final action PDE in a family. This is a situation in which IDR thinks there are four different families.

| Date of Service | Rx Service Reference Number | Fill Number | Rptd Service Provider ID | Rptd Service Provider ID Qlfyr | Dispensing Status Code | Cla Ind |
|---|---|---|---|---|---|---|
| 5/4/2007 | 000000003546 | 1 | PAPERCLAIM | 99 | | Y |
| 5/4/2007 | 000000003546 | 1 | 4541416 | 07 | | Y |
| 5/4/2007 | 000000003546 | 1 | PAPER CLM | 99 | | Y |
| 5/4/2007 | 000000003546 | 1 | PAPER CLAIM | 99 | | Y |

Eden Heard
HHS/OGC/CMS Division
(202) 401-7418

**Notice:** The contents of this message and any attachments may be privileged and confidential. Please do not disseminate without the approval of the Office of the General Counsel. If you are not an intended recipient, or have received this message in error, please delete it without reading it and please do not print, copy, forward, disseminate, or otherwise use the information. Also, please notify the sender that you have received this communication in error. Your receipt of this message is not intended to waive any applicable privilege.

******************************************************************************************************

This e-mail is sent by a law firm and may contain information that is privileged or confidential. If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.

******************************************************************************************************

# EXHIBIT DD

# FILED UNDER SEAL

# EXHIBIT EE

# Medical Report

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO, | Case No. 10-cv=03165 GHK (SSx) |
| Plaintiffs, | Assigned to: Hon George H. King |
| *Ex rel.* | Rebuttal of Report of William Bensinger, M.D. |
| BEVERLY BROWN, | October 25, 2015 |
| Plaintiff-Relator, | |
| v. | |
| CELGENE CORPORATION, | |
| Defendant | |

**INTRODUCTION**

1. These comments are intended to clarify issues relating to whether or not the CMS approved compendia medically support the off label use of thalidomide (Thalomid®) or lenalidomide (Revlimid®) for the following issues :

| (Thalomid®) | (Revlimid®) |
|---|---|
| 1. Bladder cancer<br>2. Brain cancer<br>3. Breast cancer<br>4. Cervical cancer<br>5. Colorectal Cancer<br>6. Esophageal Cancer<br>7. Kaposi's sarcoma<br>8. Leukemia (includes CLL)<br>9. Lung Cancer<br>10. Lymphoma<br>11. Melanoma<br>12. New onset multiple myeloma (pre FDA approval 2006)<br>13. Multiple myeloma not in combination with dexamethasone<br>14. Myelodysplastic syndromes<br>15. Ovarian cancer<br>16. Pancreatic cancer<br>17. Prostate cancer<br>18. Renal (kidney) cancer<br>19. Thyroid cancer<br>20. Uterine cancer | 1. Brain cancer<br>2. Leukemia (includes CLL)<br>3. Lymphoma<br>4. Multiple myeloma (pre FDA approval 2015)<br>5. Newly diagnosed multiple myeloma<br>6. Multiple myeloma not in combination with dexamethasone<br>7. Myelodysplastic syndromes<br>8. Myelofibrosis<br>9. Prostate cancer<br>10. Stem-cell transplant maintenance therapy in multiple myeloma |

2. For purposes of this report I have relied upon the report of Celgene expert witness, William Bensinger, and the files that supported his arguments. In addition, I relied upon the publicly available references cited in my report below and the Deposition of Kristen Minne (rough copy).

3. There were five compendia that were recognized by Medicare or Medicaid as relevant for use of off-label oncology medications:

| Name | Year |
|---|---|
| American Hospital Formulary Service Drug Information (AHFS) | 1998 |
| Thomson Micromedex DrugDex (DrugDex) | 1998 |
| United States Pharmacopoeia Drug Information (USP-DI) | 1998-2007 |
| Clinical Pharmacology | 2008 |
| National Comprehensive Cancer Network Drugs and Biologics Compendium (NCCN) | 2008 |

4. The journals accepted by CMS were:

| Until late 2007 | After 2007 |
|---|---|
| 1. American Journal of Medicine<br>2. Annals of Internal Medicine<br>3. Blood<br>4. British Journal of Cancer<br>5. British Journal of Hematology<br>6. British Medical Journal<br>7. Cancer<br>8. Drugs<br>9. European Journal of Cancer<br>10. Journal of the American Medical Association<br>11. Journal of Clinical Oncology<br>12. Journal of the National Cancer Institute<br>13. Lancet<br>14. Leukemia<br>15. New England Journal of Medicine | 16. Annals of Oncology<br>17. Annals of Surgical Oncology<br>18. Biology of Blood and Marrow Transplantation<br>19. Bone Marrow Transplantation<br>20. Clinical Cancer Research<br>21. Gynecologic Oncology<br>22. International Journal of Radiation, Oncology, Biology, and Physics<br>23. Journal of the National Comprehensive Cancer Network<br>24. Journal of Urology<br>25. Lancet Oncology<br>26. Radiation Oncology |

4. At the heart of this dispute is what constitutes support. The mere mention of a drug without suitable substantiation cannot result in support for its use, regardless of the ranking. One must rely on underlying scientific studies to validate if support is based on fact, and hence valid. Most compendia divide their ranking levels into three categories.

5. There is no equivocation that a drug with a category of "I" for use in a medical condition should receive full support and that support has basis in the medical literature. There is also no question that a drug listed as category "III" or NEUTRAL should not be used or supported by the medical community,

and that that this too should be reflected in the compendia. A Class III or Neutral ranking means either that the drug is dangerous, ineffective or the results are too equivocal (or even lacking) to make a determination.

6. Category "II" creates a great deal of confusion. Herein lies a disconnect between what is "listed" in the compendia, referenced, and for some, considered as "supported," vs what is "supportable" through looking at facts required to determine what this support actually is. In theory, these facts come from the medical literature. The medical literature cited, when reviewed and analyzed, can fall short of providing the support required for Medicare or another payor to reimburse for its use.

7. To their discredit, compendia may reverse their statements regarding support without citing an addition or change in existing evidence. If these entries had been backed by valid clinical trials, there would be no equivocation on the part of the compendia. Moreover, where a compendium recommends off-label uses where safety has not been adequately considered, the support must be questioned. For example, a recent deposition of a Drugdex representative revealed that Drugdex's outside reviewers are not required to take safety into account in their recommendations. (Minne (rough draft) at p. 148-149.)

8. Another issue is how the medical literature for some products and their off-label uses, is generated. There are concerns that Celgene used an outside source, Excerpta Medica, to canvas the medical literature and determine if there was a lack of data relating to the products for which they were consulted. The plan was to then create review articles – "maintain noise in the absence of data" (Figure 3 of Fadem 9/24/15), - write these articles, and then solicit academic physicians to accept authorship. These articles could be used as references. The inherent bias created when a team sponsored by the manufacturer is dumping medical articles into a space that is known for credibility and objectivity is highly destructive to the process that we regard as medical science. Thus we have a further challenge – what is reliable scientific literature or what is, as termed by Excerpta Medica, "noise?"

9. The expert for the defense, Dr. William Bensinger, is an oncologist in Seattle, Washington who is highly familiar with the products used by Celgene. He is highly experienced with the off-label use of many of these products. As a speaker for the company, a consultant to the company, a key opinion leader, and a consultant to some of the compendia, he has inherent biases and experiences that challenge the concept of discovering whether the compendia used objective criteria to develop their concept of support. He all too often blends what he would do as a biased practitioner with would the physician in the community should do. Hence, in his report, his expertise works to his detriment. I do not mean this in a negative way at all – not all of the physicians, pharmacists or payors who will consult the compendia will be

as versed on how to best use this drug. Recommending the drug on the face value of the compendia, but without valid support from reliable medical literature can result in harm to a patient at worse, and wasteful spending at best. This is particularly true if the general oncologist is consulting the compendia with respect to caring for a patient. In circumstances where a drug is listed in the compendia for an off-label indication, but found to be unsafe, government reimbursement is not allowed.

10. The lack of a medical label does not mean that the drug is not worthy of use, but that its safe and effective use has yet to be proven, and more importantly, appropriately documented. The prescriber of a drug must be made aware of the dose that will be most effective and safe, and cognizant of the benefits vs. risks of using the new drug over drug therapies already established. The prescriber and the user must be made aware of serious adverse events, and how they might impact treatment. Rushing a drug to market for an unapproved use prior to creating a safe environment is dangerous. Celgene has admitted this in its fight to keep generic thalidomide from being used off label. In this regard, they are correct.

11. Bensinger has proposed that if a drug is supported for first line use it can also be used in subsequent lines of therapy, and that if it can be used as a single agent, it can be used in combination. My experience differs in that all too often untested drug combinations have led to lethal metabolism errors. The medical literature is fraught with combinations that have resulted in fatal arrhythmias, liver failure or kidney failure. Hence the use of combination drugs without testing is a setup for patient hazard.

12. It is all too easy for one to accept that because a drug can be used as a single agent, it can also have benefit as a combination drug. From a safety viewpoint there can be unintended consequences that are well known in the general medicine community – the development of secondary tumors (acute myelocytic leukemia - AML, Hodgkin's lymphoma, myelodysplastic syndrome - MDS) when using Revlimid and melphalan. A newly diagnosed cancer patient may have dim hopes for a cure, and thus settle for aggressive, yet unproven therapy. Once in remission, and when suddenly faced with acute myelogenous leukemia, one must look back and question if the safest therapy was really used. Until safety studies are conducted, the community physician and the patient must participate in a tough, opinion-based shared decision-making process. The manufacturer must not bias this process. Compendia should not encourage the use of drug combinations before their safe use together has been established. Reimbursement for a drug combination that results in a hazard to the patient should never be allowed.

13. ¶40 through 42 of Bensinger's report highlight a major problem with compendia usage. Both USP-DI and AHFS rely on narrative discussions, but do not offer readily accessible references that one can review to validate

their claim of acceptance or support. In my opinion, users will take the recommendation in the compendia at face value when all too often an analysis of references will lead to a different perspective of the drug with respect to safety and effectiveness. Take Drugdex for instance; it lists references, but on the other hand many of these references are not supportive. But, the reader can look up these citations and determine first hand whether support is valid.

14. In ¶75 of my report I create a table that not only outlines the Drugdex compendia's support level for various malignancies, but also the references cited, again giving readers the opportunity to see first hand where support has and has not been substantiated. A major difference in Bensinger's opinion and mine is that he states support is present when only a case report has been documented. Regardless, one cannot consider a clinical paper as worthy of substantiating compendia support if it is a case report, appears in a supplement, is a pilot study, an abstract or meeting presentation. Open label or phase II clinical trials generate data about how well a product works, and how safe it is. They may show that a new drug has promise and conclude that further investigation is necessary, but do not show comparisons between a control – placebo or conventional drug. Open label studies are not blinded to the investigators who in drug-sponsored trials receive support from the manufacturer, and may be biased. Phase III trials that are well conducted are blinded to the investigator, have control arms and are well powered. They scientifically examine whether a study drug is more effective than standard of care and whether or not it has fewer side effects. While some trials look at the impact on biomarkers such as paraprotein levels or changes in the hemoglobin level, others look at mortality rates and quality of life.

15. The intent of using a compendia listing to support reimbursement is to inform doctors and providers of the safe and effective use of a potential product, and to allow for reimbursement for reasonable and necessary medications used in the care for a sick patient while the intended drug moves through the process of being vetted by the FDA. This generally takes a couple of years while the valid phase III clinical trials having been published in peer reviewed medical journals are undergoing FDA review. In situations where Celgene products demonstrated the necessary effectiveness and safety measures in well-conducted clinical trials to meet FDA standards, they wasted no time in applying for and receiving an FDA indication and the right to publish a product label. When there was not sufficient evidence to receive FDA support the product lingered on the pages of compendia for years. In these instances, Celgene was not able to demonstrate that their products, Thalomid and Revlimid were either safer or more effective than conventional therapies already in use. The proof of this lies, not in the testimony of the experts, but in the fact for many off-label uses ample time has passed without Celgene securing drug approval. For others, approval was achieved after the drug was demonstrated to be safe – in some situations that entailed changing

the dosing regimen, and in many creating warnings and more effective labels. Regardless of the ranking ascribed by the compendia, if a valid clinical trial cannot conclusively demonstrate that a drug is safe and effective, support cannot be validated.

**Analysis by selected product**

*Thalomid in Newly Diagnosed Myeloma*

16. In ¶90 of his report, Bensinger notes that DrugDex first supported the use of Thalomid ® for use in refractory myeloma in volume 104. (THA C 00393). He cites an open-label phase 2 trial of 24 relapsing or refractory patients by Larkin, et al, (addressed in Fadem ¶62). Of these 24 patients 9 could not tolerate the drug. This study was performed in refractory patients and confirmed that clinical trials were needed to determine the effective dose. [1] This was in refractory, and not newly diagnosed patients. The additional study that Bensinger references in ¶91 was also in relapsed myeloma patients. (THA C 003730) This New England Journal of Medicine paper studied 84 previously treated patients, and treated with escalating doses. The response was based upon a change in paraprotein that lasted at least six weeks. The total rate of response by these criteria was 32%, and one third of the patients had mild symptoms with ten percent having adverse effects. Overall survival at one year was 58±5. [2] Bensinger continues to cite articles that refer to refractory myeloma. In Volume 121 of DrugDex (THA C 004564) (¶93) he references newly diagnosed therapy, and references a combination therapeutic regimen of thalidomide with vincristine, Adriamycin and dexamethasone (VAD). A 74% response rate was achieved with this intensive regimen. This study was not double-blinded and did not compare thalidomide patients to others, but instead was an open label study that was not randomized. The authors concluded long-term studies were needed to assess this combination regimen's effect on long-term outcomes in myeloma patients. This study tells us nothing about thalidomide as a chemotherapeutic agent for newly diagnosed myeloma; it was never designed to demonstrate that it was effective as a single agent in newly diagnosed myeloma. [3]

17. Bensinger, in ¶95 states that an indication to treat newly diagnosed patients without dexamethasone was added to DrugDex in volume 129. (THA C 005193). For clarification, (THA C 005197) the indication approved by the US FDA for newly diagnosed multiple myeloma patients was granted in combination with dexamethasone. In this paragraph, he cites two studies, one showing the efficacy of Thalomid® added to intensive melphalan therapy in patients with two stem-cell transplants. He cites improved response. This *New England Journal of Medicine* study was conducted is 668 patients between the years 1998 and 2004. The newly diagnosed multiple myeloma patients received two cycles of melphalan each supported by autologous

hematopoietic stem-cell transplantation. The patients were randomized such that 323 received Thalomid® (Thal) and 345 did not receive it.(control group) the patients were followed a median of 42 months. The complete response in the Thal group was 62% and 43% in the control group, and the event free rate at 5 years was 56% in the Thal group and 44% controls. But, over all survival was not improved. Median survival after relapse was only 1.1 years Thal group, compared with 2.7 years in the control group. The patients in the Thal group had a higher incidence of neuropathy and deep vein thrombosis. The study concluded that there was a trade-off between event free survival and adverse events while overall survival was not better. [4] In the second study he cites that Thalomid® added to melphalan and prednisone (MP) showed an improved response over (MP) alone. This was a randomized trial in elderly, newly diagnosed patients between 60-85 years of age. The patients received either MP plus thalidomide (n-129) (MPT) or MP alone (n=126). In this intent to treat study the MP+T group had a better response rate, 76% for MPT and 47.6 for MP alone. The two year event-free survival rate was 54% for MPT and 27% for MP alone. The 3-year survival rate was 80% for MPT and 64% for PM. But, the trade off was that the rate of grade 3 or 4 adverse events was 48% in the MPT group and 25% in the MP group. The study concluded that longer follow-up would be needed to assess the effect on overall survival. [5] The two above referenced studies did not mention the incidence of secondary malignancy encountered with thalidomide and melphalan combinations.

18. In ¶112.1 Bensinger references Clinical Pharmacology (Elsevier0000072), stating that off-label treatment of newly diagnosed multiple myeloma with Thalomid® without dexamethasone is supported. But, it should be noted that it was dosed in combination with melphalan and an alternate corticosteroid. The study referenced (Elsevier0000074) demonstrated significantly longer median overall survival. This was a French, open label, intent to treat randomized controlled trial of 447 previously untreated multiple myeloma patients between 65-75 years of age who were randomized to either a combination of melphalan and prednisone – also a corticosteroid - (n=196) or to the same combination plus thalidomide (N=125) or to reduced-intensity stem cell transplantation with melphalan (N=126). The endpoint was survival. The group randomized to receive Thalomid® survived a median of 51.6 months, in contrast with the groups not receiving thalidomide. (median survival 33.2 months) or stem-cell transplantation (survival = 38.3) The dose was started at 200 mg per day and if tolerated increased to 400 mg per day after 2-4 weeks. [6]

19. The second study (See Bensinger ¶112.2) used Thalomid® as a single agent in advanced and refractory myeloma with lead author, Bart Barlogie. This was not a phase 3 comparison study, but an open label continuation of a previous study using Thalomid® as a single agent in 169 advanced myeloma patients, escalating the dose in 200 mg increments every two weeks. It

looked as plasma protein as a marker, and extended his earlier study of 84 patients. It was not controlled. The observed two year survival was 48%±6. However, only 24 patients were able to complete the study. The remaining patients were removed either because of progression of disease or toxicity. Barlogie commented that Thalomid® had definite activity in refractory myeloma, but that issues of pharmacokinetics, dose intensity, scheduling, mechanism of action and drug combinations needed to be addressed. [7]

20. Bensinger ¶118 states that NCCN supports using Thalomid® without dexamethasone for the treatment of multiple myeloma in four circumstances (CELBINSINGER00000173) in ¶118.1-4: 1) newly diagnosed multiple myeloma patients who are not candidates for a stem-cell transplant 2) in combination with prednisone or single agent following stem-cell transplant or induction chemotherapy 3) in combination with prednisone and melphalan to treat relapsed multiple myeloma at least six months after induction chemotherapy in nontransplant candidates and 4) as a single agent for palliative therapy to treat refractory multiple myeloma patients who are not transplant candidates. NCCN compendia entries follow their published guidelines and focus on specific clinical circumstances. Three studies, two published in 2010 and one in 2012 can be used to support the use of thalidomide in combination with bortezomib and dexamethasone as induction therapy for myeloma. [8] [9] [10]

21. A major disadvantage is that many of the workgroup members act as either consultants, key opinion thought leaders, researchers, speakers or advisors for drug manufacturers. NCCN was not recognized by CMS until after 2008, and thus these compendia entries are only applicable after these dates, and pertain only to the specific instances referenced above. (Ref: NCCN Guidelines Version 2.2016 Multiple Myeloma. )

*Revlimid® in Newly Diagnosed Myeloma before 2015*

22. In ¶146 Bensinger begins a discussion on the use of Revlimid® in the NCCN compendia for various myeloma conditions 1) (Bensinger ¶147 - ¶ 148) Since November 5, 2008 supporting treatment of newly diagnosed multiple myeloma with combination bisphosphonates and dexamethasone 2) (Bensinger ¶149) Use of Revlimid® without dexamethasone to treat relapsed or refractory myeloma and as a single agent for palliative therapy in transplant ineligible patients 3) (Bensinger ¶150) Maintenance therapy following a stem-cell transplant since February 8, 2010.

23. Looking beyond the ratings to the strength of the articles is critical to assess whether the compendia and the guidelines it is built on are basing their support on well-grounded clinical evidence or opinion. With respect to consensus opinion (where sufficient data is lacking), seven of the people who served on the NCCN Multiple Myeloma Workgroup served as members of the

scientific advisory board, as consultants, speakers or expert witnesses for Celgene, including Dr. Bensinger (compensated 2006-2013 $269,000 for speaking engagements alone). This is not to reflect negatively on the panel, nor Dr. Bensinger, but highlights how physicians can have a conflict of interest that interferes with purely objective decision-making. This admixture of services is a conflict of interest, and it often discredits the guideline making process, as outlined by the Institute of Medicine Committee on conflict of Interest in Medical Research, education and Practice. [11-13] This is especially true when indications are listed as Category I based on abstracts, or other data that should not be considered. In a review of the NCCN guidelines, many of the references cited are abstracts or presentations. Furthermore, the success of a combination therapy regimen does not translate to meaning the drug will have the same benefit as a single agent, nor *vice-versa.* Finally, the value of a drug for one purpose does not translate to its value for another without valid study. (See Fadem ¶89 9/24/15)

24. Two of the articles cited in current NCCN guidelines are abstracts. In 2010 two additional articles were published and cited, one being a retrospective analysis and not a clinical trial.[14,15] It must clearly be noted that as of the date of this report, the NCCN guidelines state "Based on the results of this meta-analysis lenalidomide and dexamethasone seems (sic) well-tolerated and more effective than thalidomide and dexamethasone. However, randomized prospective trials are needed to confirm these results."

25. Among non-transplant candidates, melphalan and prednisone have been the standard treatment since 1960. Revlimid® (lenalidomide) was initially studied in newly diagnosed multiple myeloma in a study published in 2007. Although the response rate was high, there was a high level of grade 3 and 4 toxicity. [16] In 2012 the same group published a study of continuous lenalidomide treatment for newly diagnosed multiple myeloma patients over 65. This was a double blind, randomized clinical trial comparing induction with melphalan-prednisone-lenalidomide (MPL-L, N=152) followed by lenalidomide maintenance with either melphalan-prednisone (MP, n=154) or MPL (N=153) followed by placebo. MPL-L had a 31-month progression free survival, compared with 14 months (MPL) or 13 months (MP). Around a third of patients receiving lenalidomide had grade 4 toxicity. Patient free survival was not improved in patients older than 75 years of age. [17]

26. The rate of second tumor formation was twice as high (7%) in the above study among patients receiving lenalidomide. [17] The relationship between Revlimid® and secondary malignancy has been confirmed in other studies. [18-20] Herein lies the problem of making a hasty approval of a product without completely studying its long-term effects. In May 7, 2012 the FDA issued an extensive update regarding the risk of developing a secondary malignancy when using Revlimid®

27. In September 2014 the FIRST study was published in the New England Journal of Medicine. (N=1623) Patients were randomly assigned to lenalidomide and dexamethasone in 28-day cycles until disease progression (CL, n=535), to the same combination for 72 weeks (L-18 cycles, n=541) or to melphalan-prednisone-thalidomide for 72 weeks (MPT, 547). The primary endpoint was progression-free survival. The group treated with CL had a median progression free survival of 25.5 months, compared with 20.7 months for the L-18 group and 21.2 months for MPT). 4-year survival was slightly increased ( 59% with the CL group, 56 L-18, 51 MPT). Toxicity was higher with the Thalomid® group than with CL.[21] The European Medicines Agency suspended Celgene Europe Limited's application to expand indication for the use of Revlimid® in newly diagnosed multiple myeloma. It was approved February 20, 2015 for use in newly diagnosed multiple myeloma patients ineligible for a transplant. On February 18, 2015 the U.S. Food and Drug Administration expanded its existing indication for Revlimid in combination with dexamethasone to include newly diagnosed multiple myeloma.

*Revlimid in Myelodysplastic Syndrome without Del (5q)*

28. In ¶128 Bensinger argues that AHFS published a compendium supplement (Off-Label Use Determination) in 2009 that stated the evidence supporting use of Revlimid® for MDS without del -5q was of moderate quality to sufficiently support its use. He states that this was based not only on a number of studies but also on AHFS reviewer's observations in their own practices. The Celgene expert also claimed this support was current through the 2014 edition. The study referenced as MDS-002 (CELBENSINGER00000254), This was phase II (N=214) and was a safety and efficacy study of patients who were transfusion dependent with MDS who did not have the del-5q cytogenetic abnormality. Treatment started with 21-day cycles, but was changed to continuous. Therapy was interrupted when toxicity developed. 43% of the patients did have a reduction in transfusion requirements, and 26% became transfusion independent. The median duration of transfusion independence was 10 months. On a downside, Grade 3-4 neutropenia and thrombocytopenia were respectively reported in 30 and 25% of patients, resulting in drug modification. These patients achieve transfusion independence 2.5 times less frequently than those with the del-5q deletion. In 2009, some experts recommended the use of Revlimid® in patients who had received prior ESA and were transfusion dependent. However, others were more cautious, citing that evidence was lacking and it was not clear how those who had previously received ESA therapy would respond. In addition, because of the spectrum of adverse hematological effects, the drug was felt to have limited benefit in patients who had thrombocytopenia or neutropenia as manifestations of MDS. It was felt additional studies were needed.[22] AHFS Drug Information 2011 states, "Based on current evidence, use of lenalidomide is not fully established in low or intermediate 1 - risk,

transfusion dependent MDS in patients without the 5q abnormality because of a lack of a well-defined population that would derive clinical benefit as defined by pretreatment characteristic (e.g. ESA response, serum erythropoietin concentrations."

29. In ¶134, Bensinger refers to DrugDex support of Revlimid in combination with dexamethasone to treat newly diagnosed multiple myeloma. He cites THA C 001964-THA C 001969. I was unable to find any resources that began with "THA" referencing Revlimid®. Vol 135 of Drugdex was around 2008. The clinical trials relating to Revlimid® and dexamethasone in the treatment of newly diagnosed multiple myeloma have been discussed elsewhere. (See Fadem ¶83 and ¶84 9/24/15)

30. In ¶136 Bensinger states Revlimid® along with dexamethasone has been supported for treatment of newly-diagnosed multiple myeloma since April 25, 2012. (Elsevier0000341-64) based upon two studies. But, one must question how well the studies substantiated this support. One study did not really compare the use of lenalidomide with placebo, but with high and low dose dexamethasone. It was a randomized controlled trial (n=445) of untreated multiple myeloma patients. It was not blinded, but open label. 214 patients received high dose dexamethasone and 205 patients low dose dexamethasone. Although the high dose dexamethasone group had a higher complete or partial response, survival was higher in the low dose group (96% vs 87%). Grade three or four toxicity was worse in the high dose group. 12 of the high dose group died and only one of the low dose group. Deep vein thrombosis occurred in 57 of the high and 27 of the low dose group. 84 of the total patient population of 445 had deep vein thrombosis. The study had to be halted.[15] The second study was a randomized controlled trial comparing lenalidomide (Revlimid®) and dexamethasone to dexamethasone alone in newly diagnosed myeloma. Although the progression free survival was better 78% vs 52%, the overall survival was similar (94% vs 88%) and toxicities were more pronounced, particularly grade 3-4 neutropenia (21% vs 5%) and thromboembolic events (23.5% vs 5%).[23]

31. In ¶143 Bensinger claims NCCN[24] supports treating MDS in patients without del-5q since November, 2008. It is recommended in patients with no del(5q) , serum erythropoietin levels greater than 500 mU/mL and a low probability of response to immunosuppressive agents. In ¶144 he writes that since November 8, 2008 NCCN supported the use of Revlimid® in lower risk symptomatic anemia patients without del(5q) and ESA resistance, as well as no response to immunosuppressive therapy. The major clinical trial that evaluated the use of Revlimid® in patients with MDS who did not have del(5q) was referenced above. [22] In the 2015 NCCN Guideline, Revlimid is only to be considered in the small group of MDS patients without del(5q) who have an elevate serum EPO levels greater than 500 mu and a poor probability of a response to immunosuppressive therapy (ATG or cyclosporine). It was noted that the side effect profile is high and

the risk of benefit lower in this population base; additional studies were needed.

*Malignant Melanoma*

32. In ¶89, of his report Bensinger states that Drugdex began to support Thalomid® to treat recurrent malignant melanoma starting with volume 112. However, he references a single case report. His claim that this is enough to support use of Thalomid® must be questioned. A single case report offers no insights into dosing, side effects, or strength for comparison with standard treatment. These are all required for clinical decision making. A case report is a manuscript that is authored for the purpose of describing a therapeutic intervention in a single case. It simply lacks scientific validity, based upon our established concepts of the scientific method, to serve as a guide for clinical practitioners or payors. There are many reasons why a case report can work as an isolated event, one being that the disease being treated was actually misdiagnosed. Should a series of case reports be developed, then insight can be given to investigators desiring to form clinical trials. There is simply no bridge whatsoever between a case report and clinical decision support. To confirm as supportive, a case report, as done in those Drugdex volumes referenced by Dr. Bensinger, short-circuits and undermines the process that leads to a drug becoming approved and accepted for use by the general public. This process has been universally accepted by both the medical and pharmaceutical professions, and stakeholders in industry, as well as government regulators.

33. The case report referenced was by Kudva, et al.,[25] and was a letter to the letter to the editor of the New England Journal of Medicine. In this case two lesions appeared in a 63 year old man who had had a stage II melanoma excised with wide margins a year earlier. The biopsy was made by aspiration and the lesions judged to be metastases. Because of his debilitating stroke, aggressive chemotherapy was not considered, and instead he was treated first with BCG without a response. He was then treated with thalidomide, 200 mg each day with complete response. The dose was reduced to 100 mg. Despite this promising case report being published in a prestigious journal, and been disseminated through the media (Reuters) (http://www.virtualtrials.com/news3.cfm?item=1343&showtext=y), no further case reports of this impact were published, and hence no clinical trials ever performed. Thus, no support for melanoma in clinical practice was ever engendered.

*Chronic Lymphocytic Leukemia*

34. ¶131 of Bensinger's report states that DrugDex in volume 139 (2009) released an entry supportive of using Revlimid® for relapsed or refractory B cell chronic lymphocytic leukemia (B-CLL). He further notes this entry was based on two Phase II clinical trials, and that support remained unchanged

until Volume 160 when it stated Revlimid® should not be used to treat CLL outside a clinical trial. This, he writes, was consistent with changes in FDA labeling that was released November 4, 2013.

35. One of the phase II trials was led by Asher Chanan-Khan of Roswell Park in Buffalo, New York. (N= 43) Patients were treated with Revlimid® for refractory B-CLL 25 mg per day for 21 days. 47% of the patients showed a response, and in 9% there was a complete remission. Fatigue, thrombocytopenia and neutropenia were the most common adverse effects. As a result of tumor lysis syndrome two of the first 29 patients, the protocol was modified to slower the escalation of the dose of Revlimid®. The authors concluded only that the study was encouraging and warranted further investigation. [26] The second study was out of MD Anderson Cancer Center in Houston, Texas. Led by Alessandra Ferrajoli, 44 patients with relapsed or refractory B-CLL were treated with Revlimid®, 10 mg each day escalating to 25 mg/day. Three achieved a complete response and 10 a partial remission. Myelosuppression was the most common adverse event. They concluded that "Work continues in evaluating the most effective dose and schedule..." [27]

36. A review article by Chanan-Khan cited two clinical trials of single-agent Revlimid® for B-CLL but with respect to the benefits, claims "This observation has opened a new avenue in CLL therapeutics, with major impact on the development of future treatment regimens." This is followed by "Future clinical investigation will thus focus on defining the most optimal dose of lenalidomide in this patient population..." [28]

37. A publication entitled "Higher doses of lenalidomide are associated with unacceptable toxicity including life-threatening tumor flare in patients with chronic lymphocytic leukemia" was published out of Columbus, Ohio. It described four consecutive serious adverse events - one resulting in death in patients who were being treated with Revlimid® 25 mg/day for relapsed B-CLL . Three of the patients had tumor flare and one sepsis with renal failure.[29]

38. In 2011, a B-CLL study published the results of two serious adverse events as the dose of Revlimid® was escalated to 25 mg/day. One, who had been treated with tumor lysis syndrome prophylaxis, for three weeks, developed acute kidney injury associated with hyperkalemia (K = 8.2 mEq/L) and an acute myocardial infarction. The kidney injury resolved when the Revlimid® was stopped. The second patient thrombocytopenia, grade 3 neutropenia and fatal sepsis on the Revlimid® 10 mg/day dose. The data safety monitoring committee halted the study in 2006, and it reopened in 2007 with 25 patients. Of those, 8 had to stop study drug. Tumor flare occurred in 22 of the patients. 11 had an elevated serum creatinine and 10 hyperkalemia. 15 had an infection. None of the patients attained complete remission and three died by 20 months post treatment. The study recommended a conservative

approach.[30]

39. The previous report by this author (see Fadem¶26-29 9/24/15) demonstrates the dangers of accepting and promoting a product before the culmination of a phase III trial, whether in the medical literature or via compendia. Phase III trials allow for novel therapy to be compared with existing treatment regimens. When in the instance comparison was made, the death rate was higher in the patients treated with Revlimid®. (http://www.fda.gov/Drugs/DrugSafety/ucm361444.htm)

**Rebuttal to Dr. Bensinger's Review of the Literature**

*Myelodysplastic Syndrome – Revlimid®*

40. In a review of the literature, Bensinger ¶160, cites that Revlimid® was clinically effective in treating MDS without the del-5q cytogenic abnormality, citing an open label single center trial. This was an uncontrolled study of 43 patients who were either synthetic ESA resistant or had high levels of endogenous erythropoietin. The complication rate was high, 65% neutropenia and 74%thrombocytopenia necessitating interrupting therapy in over half (585) of the patients. 34 of the patients showed a response. The response was highest in patients with a 5q31.1 (del-5q) chromosome deletion (83%). Among the others, the response was 57% with a normal karyotype and 12% with other karyotype abnormalities. However, the duration of transfusion independence was not reached during the course of the study. In the absence of a 5q deletion, patients who showed a response were less than those with complications. The last author of this small, open-label, uncontrolled study was J.B. Zeldis, the Chief Medical Officer of Celgene. [31] In a subsequent multicenter, phase 2 trial, discussed in ¶161, Raza looked at 214 patients across 38 sites. There were no controls. Grade 3 / 4 neutropenia was present in 30% and thrombocytopenia in 25% of patients. 26% of patients achieved transfusion independence that lasted a median of 41 weeks. In an additional 37 patients the transfusion requirement was cut in half. Overall the rate of improvement was 43%. The authors concluded that further investigation was warranted. Raza disclosed that she is on the Celgene speaker bureau with an annual honorarium of over $10,000. Zeldis, is a Celgene employee and stockholder. He is a patent holder for lenalidomide. [32] As mentioned elsewhere (Fadem ¶95 9/24/15) this was a phase 2 study, and as such did not demonstrate that this drug was sufficiently studied to qualify for medical acceptance.

41. Bensinger also (Bensinger ¶162) mentioned a multicenter single arm Phase I combination trial of lenalidomide and azacitidine to treat higher-risk MDS patients. This was a study of 18 patients, one of whom had the chromosome 5q deletion. 7 had other karyotype abnormalities. The patients were followed for seven months. The overall response rate was 67%, during which

time, 3 had hematologic improvement and 8 a compete response. The authors conclude that they were able to establish a phase II dose for azacitidine and lenalidomide, and that this combination was well tolerated with an acceptable hematologic toxicity rate and a response rate that was not inferior to single agent studies. [33]

*Newly Diagnosed Multiple Myeloma – Revlimid®*

42. In ¶163 Bensinger claims that there is support in the medical literature dating to August 23, 2005 for its use in the treatment of multiple myeloma. He references a phase 2 clinical trial of 34 patients with newly diagnosed myeloma treated with lenalidomide 25 mg/day for a 21 day cycle and dexamethasone 40 mg given on days 1-4,9-12 and 17-20 of each cycle. [34] This study as been extensively discussed elsewhere (Fadem ¶83 9/24/15). Bensinger ¶164 cites a review article, and claims the combination of studies detailed in the review are sufficient to start treating relapsing (with and without dexamethasone) and newly diagnosed multiple myeloma with dexamethasone and Revlimid® . The lead author of this review lists the Celgene Corporation as his corresponding address. Herein lies an obvious bias and conflict of interest. He, and the other authors (including J.B. Zeldis) expressed belief "that appropriate combination therapy involving lenalidomide will lead to highly effective therapy for treating a variety of malignant conditions." One must clarify that this article is a review of the medical literature, and as such composed of a number of clinical studies. A problem inherent in review articles is that if a given study does not meet the scientific standards to support the use of a medical product, then a group of studies also not meeting these standards cannot be offered as support. [35]

43. In ¶165 Bensinger refers to the GIMENA trial in newly diagnosed multiple myeloma patients. It was a combination trial published by Palumbo in 2007. [16] This has been discussed above in ¶25 of this report.

*Single Agent – Refractory Multiple Myeloma – Revlimid®*

44. He also, in ¶166 mentions an article by Paul Richardson that was published in 2009. This was a safety and efficacy study of 222 refractory multiple myeloma patients who were treated with lenalidomide (Revlimid®) 30 mg/day for a 21-day cycle every 28 days. 26% of patients had a partial response, and median overall survival was 23.2 months. 60% of patients had grade 3 or 4 adverse events (neutropenia). The study showed that the drug was active as a single agent, but without controls, and not being able to compare this therapy with conventional therapy makes it difficult to qualify it as supportive for widespread use in clinical practice. [36]

45. In summary, this rebuttal article serves to clarify the position of this author in relation to some of the expert opinions expressed by Dr. William

Bensinger. It should not be inferred that my silence on any particular opinion expressed by Dr. Bensinger means that I agree with this analysis. This author reserves the right to amend this report should additional information become available.

## References


1. Larkin M. Low-dose thalidomide seems to be effective in multiple myeloma. Lancet 1999;354:925-.
2. Singhal S, Mehta J, Desikan R, et al. Antitumor activity of thalidomide in refractory multiple myeloma. The New England journal of medicine 1999;341:1565-71.
3. Zervas K, Dimopoulos MA, Hatzicharissi E, et al. Primary treatment of multiple myeloma with thalidomide, vincristine, liposomal doxorubicin and dexamethasone (T-VAD doxil): a phase II multicenter study. Ann Oncol 2004;15:134-8.
4. Barlogie B, Tricot G, Anaissie E, et al. Thalidomide and hematopoietic-cell transplantation for multiple myeloma. The New England journal of medicine 2006;354:1021-30.
5. Palumbo A, Bringhen S, Caravita T, et al. Oral melphalan and prednisone chemotherapy plus thalidomide compared with melphalan and prednisone alone in elderly patients with multiple myeloma: randomised controlled trial. Lancet 2006;367:825-31.
6. Facon T, Mary JY, Hulin C, et al. Melphalan and prednisone plus thalidomide versus melphalan and prednisone alone or reduced-intensity autologous stem cell transplantation in elderly patients with multiple myeloma (IFM 99-06): a randomised trial. Lancet 2007;370:1209-18.
7. Barlogie B, Desikan R, Eddlemon P, et al. Extended survival in advanced and refractory multiple myeloma after single-agent thalidomide: identification of prognostic factors in a phase 2 study of 169 patients. Blood 2001;98:492-4.
8. Rosinol L, Oriol A, Teruel AI, et al. Superiority of bortezomib, thalidomide, and dexamethasone (VTD) as induction pretransplantation therapy in multiple myeloma: a randomized phase 3 PETHEMA/GEM study. Blood 2012;120:1589-96.
9. Cavo M, Tacchetti P, Patriarca F, et al. Bortezomib with thalidomide plus dexamethasone compared with thalidomide plus dexamethasone as induction therapy before, and consolidation therapy after, double autologous stem-cell transplantation in newly diagnosed multiple myeloma: a randomised phase 3 study. Lancet 2010;376:2075-85.
10. Kaufman JL, Nooka A, Vrana M, Gleason C, Heffner LT, Lonial S. Bortezomib, thalidomide, and dexamethasone as induction therapy for patients with symptomatic multiple myeloma: a retrospective study. Cancer 2010;116:3143-51.
11. Institute of Medicine Committee on Conflict of Interest in Medical Research E, Practice. The National Academies Collection: Reports funded by National Institutes of Health. In: Lo B, Field MJ, eds. Conflict of Interest in Medical Research, Education, and Practice. Washington (DC): National Academies Press (US) National Academy of Sciences; 2009.
12. Steinbrook R, Kassirer JP, Angell M. Justifying conflicts of interest in medical journals: a very bad idea. Bmj 2015;350:h2942.

13. Schünemann HJ, Al-Ansary LA, Forland F, et al. Guidelines International Network: Principles for Disclosure of Interests and Management of Conflicts in GuidelinesG-I-N Principles for Conflicts of Interest in Guidelines. Annals of internal medicine 2015;163:548-53.
14. Gay F, Hayman SR, Lacy MQ, et al. Lenalidomide plus dexamethasone versus thalidomide plus dexamethasone in newly diagnosed multiple myeloma: a comparative analysis of 411 patients. Blood 2010;115:1343-50.
15. Rajkumar SV, Jacobus S, Callander NS, et al. Lenalidomide plus high-dose dexamethasone versus lenalidomide plus low-dose dexamethasone as initial therapy for newly diagnosed multiple myeloma: an open-label randomised controlled trial. The Lancet Oncology 2010;11:29-37.
16. Palumbo A, Falco P, Corradini P, et al. Melphalan, prednisone, and lenalidomide treatment for newly diagnosed myeloma: a report from the GIMEMA--Italian Multiple Myeloma Network. J Clin Oncol 2007;25:4459-65.
17. Palumbo A, Hajek R, Delforge M, et al. Continuous lenalidomide treatment for newly diagnosed multiple myeloma. The New England journal of medicine 2012;366:1759-69.
18. Palumbo A, Bringhen S, Kumar SK, et al. Second primary malignancies with lenalidomide therapy for newly diagnosed myeloma: a meta-analysis of individual patient data. The Lancet Oncology 2014;15:333-42.
19. Attal M, Lauwers-Cances V, Marit G, et al. Lenalidomide maintenance after stem-cell transplantation for multiple myeloma. The New England journal of medicine 2012;366:1782-91.
20. McCarthy PL, Owzar K, Hofmeister CC, et al. Lenalidomide after stem-cell transplantation for multiple myeloma. The New England journal of medicine 2012;366:1770-81.
21. Benboubker L, Dimopoulos MA, Dispenzieri A, et al. Lenalidomide and dexamethasone in transplant-ineligible patients with myeloma. The New England journal of medicine 2014;371:906-17.
22. Raza A, Reeves JA, Feldman EJ, et al. Phase 2 study of lenalidomide in transfusion-dependent, low-risk, and intermediate-1 risk myelodysplastic syndromes with karyotypes other than deletion 5q. Blood 2008;111:86-93.
23. Zonder JA, Crowley J, Hussein MA, et al. Lenalidomide and high-dose dexamethasone compared with dexamethasone as initial therapy for multiple myeloma: a randomized Southwest Oncology Group trial (S0232). Blood 2010;116:5838-41.
24. Greenberg PL, Attar E, Bennett JM, et al. NCCN Clinical Practice Guidelines in Oncology: myelodysplastic syndromes. Journal of the National Comprehensive Cancer Network : JNCCN 2011;9:30-56.
25. Kudva GC, Collins BT, Dunphy FR, 2nd. Thalidomide for malignant melanoma. The New England journal of medicine 2001;345:1214-5.
26. Chanan-Khan A, Miller KC, Musial L, et al. Clinical efficacy of lenalidomide in patients with relapsed or refractory chronic lymphocytic leukemia: results of a phase II study. J Clin Oncol 2006;24:5343-9.

27. Ferrajoli A, Lee BN, Schlette EJ, et al. Lenalidomide induces complete and partial remissions in patients with relapsed and refractory chronic lymphocytic leukemia. Blood 2008;111:5291-7.
28. Chanan-Khan AA, Cheson BD. Lenalidomide for the treatment of B-cell malignancies. J Clin Oncol 2008;26:1544-52.
29. Andritsos LA, Johnson AJ, Lozanski G, et al. Higher doses of lenalidomide are associated with unacceptable toxicity including life-threatening tumor flare in patients with chronic lymphocytic leukemia. J Clin Oncol 2008;26:2519-25.
30. Chen CI, Bergsagel PL, Paul H, et al. Single-agent lenalidomide in the treatment of previously untreated chronic lymphocytic leukemia. J Clin Oncol 2011;29:1175-81.
31. List A, Kurtin S Fau - Roe DJ, Roe Dj Fau - Buresh A, et al. Efficacy of lenalidomide in myelodysplastic syndromes.
32. Raza A, Reeves Ja Fau - Feldman EJ, Feldman Ej Fau - Dewald GW, et al. Phase 2 study of lenalidomide in transfusion-dependent, low-risk, and intermediate-1 risk myelodysplastic syndromes with karyotypes other than deletion 5q.
33. Sekeres MA, List Af Fau - Cuthbertson D, Cuthbertson D Fau - Paquette R, et al. Phase I combination trial of lenalidomide and azacitidine in patients with higher-risk myelodysplastic syndromes.
34. Rajkumar SV, Hayman SR, Lacy MQ, et al. Combination therapy with lenalidomide plus dexamethasone (Rev/Dex) for newly diagnosed myeloma. Blood 2005;106:4050-3.
35. Bartlett JB, Tozer A Fau - Stirling D, Stirling D Fau - Zeldis JB, Zeldis JB. Recent clinical studies of the immunomodulatory drug (IMiD) lenalidomide.
36. Richardson P, Jagannath S Fau - Hussein M, Hussein M Fau - Berenson J, et al. Safety and efficacy of single-agent lenalidomide in patients with relapsed and refractory multiple myeloma.


Stephen Z. Fadem, M.D., FACP
Kidney Associates, PLLC

Digitally signed by Stephen Fadem
DN: cn=Stephen Fadem, o=Stephen Z Fadem MD PA, ou, email=fadem@bcm.edu, c=US
Location: Houston
Date: 2015.10.25 12:56:12 -05'00'

# EXHIBIT FF

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, the )
States of CALIFORNIA, COLORADO, )
CONNECTICUT, DELAWARE, )
FLORIDA, GEORGIA, HAWAII, )
ILLINOIS, INDIANA, LOUISIANA, )
MARYLAND, MASSACHUSETTS, )
MICHIGAN, MINNESOTA, )
MONTANA, NEVADA, NEW )
HAMPSHIRE, NEW JERSEY, NEW )
MEXICO, NEW YORK, NORTH )
CAROLINA, OKLAHOMA, RHODE )
ISLAND, TENNESSEE, TEXAS, )
VIRGINIA, WASHINGTON, )
WISCONSIN, the DISTRICT OF )
COLUMBIA, and the CITY OF )
CHICAGO, ) Case No.
) 10-cv-03165 GHK (SSX)
Plaintiffs, )
Ex rel. )
)
BEVERLY BROWN, )
)
Plaintiff-Relator, )
)
v. )
)
CELGENE CORPORATION, )
)
Defendant. )
______________________________)

- CONFIDENTIAL -

DEPOSITION OF

IAIN MICHAEL COCKBURN

TUESDAY, JUNE 28, 2016

BOSTON, MASSACHUSETTS

Reported by:
JAMES A. SCALLY, RMR, CRR
JOB NO. 16-42838

VIDEOTAPED DEPOSITION OF IAIN MICHAEL COCKBURN, a witness called by the Plaintiffs, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before James A. Scally, RMR, CRR, a Notary Public in and for the Commonwealth of Massachusetts, at the offices of Nutter McClennen & Fish, 155 Seaport Boulevard, Boston, Massachusetts, on Tuesday, June 28, 2016, commencing at 9:34 a.m.

10:59:47 effect at all. And a second question is, you know, what is its magnitude. So one could imagine you're looking at potential causes A, B, and C. Suppose, you know, suppose you did a properly conducted analysis; you know, one could imagine identifying, well, cause A as having a major effect, you know, cause B as also having a major effect, and cause C as having a -- a -- a minor effect in the sense that it's present, but it has no substantive impact or a
11:00:10 very small quantitative impact on the outcome of interest.

Q. Okay. Now I want to talk a little bit about methodology. And I know in your report you have some opinions about methodology, and we'll talk
11:00:39 about those. First, you read Dr. Hay's deposition, and in his deposition, he talked about something called the Donabedian structure, process, and outcomes analysis. Do you recall reading that?

A. Well, to be clear, I reviewed Dr. Hay's
11:00:55 deposition. I do recall him discussing this Donabedian framework.

Q. Okay. And by the way, I apologize if I don't use the term "review." I've trained myself not to use that when I'm talking to academics,
11:01:09 because I know that means something specific in the

academic world when it comes to journals and the like.

But you reviewed, in a colloquial sense, his deposition transcript; you read him talking about the Donabedian structure, process, and outcomes analysis; right?

11:01:23

A. Yes. It was a rough transcript. There were -- you know, there were clearly some -- there were some parts of it in the course -- in the process of my review that I couldn't really understand what was going on because of transcription problems or had to make a guess. I assume that will all get cleared up. But I do, as I -- as I said, recall Dr. Hay discussing this Donabedian framework.

11:01:36

11:01:51

Q. Okay. Are you familiar with the Donabedian framework?

A. I've come across it before.

Q. Okay. Do you have any opinions about that framework as a -- as an analytical tool?

11:02:01

A. I think that like many such frameworks, it may be a helpful way for people to organize their thoughts. It does not, however, constitute a way of -- of testing causality.

Q. Okay. And so I take it, then, you disagree

11:02:25

or are critical of Dr. Hay's use of that analytical framework in this case?

MS. DUNNE: Objection. Compound.

A. Well, the discussion in Dr. Hay's deposition was the first time I became aware that he -- he may or may not -- his claim he used it in this case. I am critical. I think that this is some -- you know, I don't want to sound pejorative, but the world has moved on. You know, this framework dates back to an era where people were struggling to make -- make sense of complex problems like the association between certain practices in a medical care delivery organization and then certain outcomes. For its time, as many frameworks are helpful for people to organize their thoughts and think more clearly about a problem, the world has moved on. This Donabedian framework has been -- I think is often criticized, and I think rightly so, for not applying the same standards of -- of causality that -- that people in the health care area, health care field, would apply to -- to other questions.

Q. Does, in your view, the Donabedian -- and I'll just call it the Donabedian analysis to shorten it; is that okay?

A. Okay.
Q. Does the Donabedian analysis --
A. Actually, no. I can't agree with it's an analysis. It's a framework.
11:04:06 Q. A framework. Okay. So I'll use your terminology.
Does the Donabedian framework, in your view, fall outside of the generally accepted principles -- sorry. I've got the wrong term -- the
11:04:16 generally accepted professional standards for economists?
A. It would not, in my opinion, meet the professional standard in economics for establishing a causal relationship between a hypothesized cause
11:04:30 and an effective interest.
Q. And why is that? You don't have to repeat what you've already told me, but anything beyond what you told me in your answer a couple answers ago?
11:04:43 A. Because it doesn't employ any of the -- the methods which are currently now accepted as being a demonstration of a causal impact.
Q. Okay. Anything else?
A. It's just a framework. It's just an
11:05:03 assertion, if it's helpful to think about these

11:15:59 11:16:12 11:16:27 11:16:57 11:17:20

the underlying assumptions are met, it would meet the professional standard for demonstrating a causal relationship. So it is conceivable to me that Dr. Hay could have developed or accessed the right kinds of data and applied the right kind of statistical methodology to come up with an analysis of causality which met the professional standard. I think that is certainly possible.

Q. And I -- and I appreciate that answer, but I'm trying to hone in on something different. If you were to ask me if it's raining today, I could say it's possible, or I could turn and look out the window; right? My question is did you look out the window, so to speak. Did you yourself do any kind of an analysis to determine whether or not that methodology, the differences-in-differences, could have been used in this case to, in your view, appropriately determine a causal relationship?

A. In thinking about this problem, and, you know, I generally suggested, I think, in my -- in my opening report that broadly described as regression, there are statistical techniques which could be deployed. It certainly struck me as possible then and -- and, in my opinion, it's possible now to use this kind of identification strategy, as -- as was

deployed in the Larkin paper and is the -- is the backbone of the difference-in-differences method.

You know, in that -- in that paper, the authors looked at a set of academic medical centers, and they went out and, through their own investigation, were able to time or date the point at which each of these institutions did or did not adopt a certain policy regarding detailing. They were enable -- they were then able, through the correct deployment of statistical methodology, to compare changes in prescribing behavior, you know, among the -- the phrase is "the control group," those that did not adopt this policy change, and those did that.

So I think Dr. Hay, had he -- had he chosen, could certainly have used a similar method. He could have looked at off-label prescribing of the drugs in question here in different types of institutions and paid some -- done some original investigation and identified which of them had which kinds of policies, and, you know, that would have been a step in the direction of demonstrating that promotion of any kind was having an impact on -- on prescribing behavior for these drugs.

Q. Did you --

A. He did not do that.
Q. Sorry to interrupt you.
A. I think he certainly could have.
Q. Okay.
11:19:00 A. I can't see any obstacle to -- to conducting that study.
Q. Did you do that kind of a study in this case?
A. I wasn't asked to.
11:19:06 Q. Okay. Could you have if you had been asked to, in the same way you say Dr. Hay could have?
A. Yes. I think it -- that's certainly a study I think will be worth trying in this context.
Q. Do you know if there were institutions
11:19:21 during the time periods relevant to this case, and I'll take your core time period of 2004 to 2011, were there institutions through which Celgene's two drugs at issue in this case, Thalomid and Revlimid, were prescribed that had policies prohibiting
11:19:40 detailing by salespeople?
A. If you can show me the -- the Larkin study, it would be a good point to start. If you can show that to me, I'll be happy to --
Q. Okay.
11:19:51 A. -- identify those institutions. It's my

A. I hadn't.
Q. Have you attempted in this case to perform any kind of a regression analysis?
A. To establish a causal relationship
11:27:45 between --
Q. Correct.
A. -- illegal off-label prescribing and off-label prescriptions?
Q. Yeah.
11:27:53 A. No.
Q. Have you assessed the feasibility of performing any kind of a regression analysis in this case to establish that causal relationship that you've described?
11:28:09 A. Well, yes, I have.
Q. How so?
A. We were just discussing the context of differences-in-differences regression. When I sat and thought about, you know, the challenge facing
11:28:19 Dr. Hay, you know, one of the things which occurred to me was, you know, this differences-in-differences method is -- is now commonly deployed and has at least a chance of -- of establishing to the professional standard a causal relationship. You
11:28:34 know, to implement it, one would need to, you know,

11:29:01 11:29:19 11:29:41 11:29:57 11:30:16

look at the types of circumstances where you can find a -- a treated group and a control group. Indeed, thinking about institutions which -- which, you know, allow sales reps on the premises or don't or may have policies about the involvement of -- of their employees in outside activities of one kind or another or don't is -- is very much the type of thing which would be first on my mind in thinking about how to solve this problem. There are others.

Q. The Larkin paper that you've talked about, was it solely looking at policies relating to detailing by salespeople and trying to -- in other words, isolate that as a causal factor?

A. I'd need to look at it again more closely. My understanding, it was focussed on the direct promotional activity of sales representatives.

Q. So it wasn't focussed, to your recollection, on indirect promotional activities?

A. No. But the power of the methodology is it's able to isolate the impact of the specific treatment, in this case a policy restricting detailing activity.

Q. So if what you wanted to know, if I'm understanding your testimony, if all I wanted to know or if all I wanted to do, I should say, is

11:30:35
isolate for salesperson detailing, as a causal factor, I could look at the policies of different institutions, see the ones that don't allow detailing, and do the sorts of differences-in-differences analysis you're describing; right?

A. Well, conducting that kind of study would, in my mind, be capable of producing the type of evidence which I think would either support or -- or be dispositive as to the asserted causal relationship. Now, it may have limitations, right,

11:30:53
as regards whether it was generalizable to -- to all of the prescriptions at issue, but it certainly would be capable of providing the kind of evidence which I would accept as supportive of Dr. Hay's hypothesis.

11:31:17

Q. You had used the term a minute ago, "direct promotion." Are there in your understanding indirect forms of promotion by pharmaceutical companies?

11:31:27
A. Did I say "direct promotion"?

Q. You did say "direct promotion."

A. In what context?

Q. I think you were talking about --

A. I don't recall saying that.

11:31:33
Q. -- detailing. And -- and I think, and tell

Q. Okay. But you could down the road, as you say, depending on jury findings?

A. Yes.

Q. How did you come up with those numbers of three prescriptions per patient and then three patients per doctor, each with three prescriptions? Where did those come from?

15:00:20

A. Well, these are numbers which are consistent with the opinion of Dr. Richardson which is cited in my -- in my report in the footnotes. It's also consistent with my knowledge and understanding gleaned from -- from practicing physicians in other cases. It's -- you described it as a bright line rule. I wouldn't describe it as a bright line rule. I think it's a reasonable number upon which to base this assessment of -- of what could the magnitude be of adjusting for patient experience or physician experience.

15:00:41

15:00:59

Q. You -- I think you mentioned Dr. Richardson's report, and I know you cited that in the footnote in your report. Did you read Dr. Richardson's deposition?

15:01:18

A. No.

Q. Did you ask for it?

A. No.

15:01:26

15:01:39
15:01:55
15:02:15
15:02:37
15:02:54

Q. Did you read any of the depositions of Celgene's experts in this case?
A. I've read -- obviously, we're discussing Dr. Hay's deposition.
Q. Well, I'm focussed on Celgene's experts, at least as you understand them. Not -- not the relator's experts.
A. Oh, I'm sorry. I misheard you.
I looked at the -- some portions of the transcript of Dr., I believe it's pronounced Boccia, which I cite. I also looked at some portions of -- of Dr. Bensinger's deposition, but I wouldn't say that I -- I read them thoroughly.
Q. That was a review, not a read?
A. Well, I was looking -- I was looking for, you know, specific support for specific issues.
Q. Okay. And did you do any kind of an empirical analysis or any kind of a study of the sort we've been talking about today to determine if in fact three prescriptions per patient is the -- the right number at which to cut off the causal chain between off-label promotion and the prescriptions?
A. Well, as I said, I don't believe that it's a -- necessarily the definitive cutoff. I think

15:03:09
15:03:30
15:03:42
15:04:01
15:04:20

it's a reasonable number to base this analysis on, you know, which is intended -- you know, as we've discussed repeatedly, it's not a damages estimate. The purpose of this analysis is to demonstrate the -- the likely impact. You will see in the appendices to my report, and this is where I'm a little bit worried about where we began right at the beginning about the corrected versus supplemental, you know, so I don't necessarily want to get into specific numbers. I should just note the appendix. It's Exhibit 8, I believe, which I think might have been impacted by one of those -- those corrections.

Q. Well, I won't hold you to these numbers --

A. Yeah.

Q. -- if they're corrected in a -- in final version. But is there something conceptually that you want to describe about Exhibit 8?

A. Well, Exhibit 8 shows the -- you know, I did a number of -- of calculations. Exhibit 8 reports the ones showing what is the impact of changing the time period. In the course of my analysis, you know, I certainly looked at the implications of -- of using a cutoff of -- of three versus four just -- just as a rough cut back of the envelope. I don't think I ever got to a definitive

15:04:38
15:04:58
15:05:14
15:05:28
15:05:36

calculation on that point. But I was, in my mind, just, if you like, reality checking or -- or trying to get a handle on, you know, is this a particularly consequential choice. Consistent with my experience in other cases, you know, whether you were to choose three or four or five doesn't materially affect the conclusion to be drawn from the -- this analysis, which is that patient experience or physician experience can -- you know, if the prescription can be attributed to that factor, can have a relatively large impact on your assessment of the number of -- of prescriptions that would go into a damages calculation.

Q. Okay. And -- and I know you're resisting calling it a bright line rule, but for purposes of your opinions in this case and these corrections that you've described, you applied that uniformly, the three prescription rule and the three patient --

A. Yes.

Q. -- three prescription rule; correct?

A. Yes.

Q. And you did not do any sort of an empirical analysis of the sort you've talked about today to test whether or not that is in fact the right number to use to cut off the causal chain between off-label

promotion and off-label prescriptions?

A. Well, were I to advance a damages calculation which was based in part or in whole upon the calculation of this kind --

15:05:56 Q. You would do that?

A. -- then I would give careful consideration as to whether it will be necessary and what kind of analysis, you know, could support that.

Q. Do you know if there's any published 15:06:09 literature in the economics field or in the health care field or in the health care economics field adopting this three prescription rule or the three patient/three prescription rule as a point at which to cut off the causal link between off-label 15:06:25 promotion or promotion generally and prescribing behavior?

A. Well, as I sit here, I don't recall any study of specifically to that point in the medical context, and it's not unusual, in my experience, in 15:06:46 economics for people to come up with ways of measuring experience and -- and categorizing experience according to -- to rules which make sense in the context of that investigation.

Q. But at least in this context, you're not 15:06:59 aware of any study that's done that vis-a-vis the

effect of promotion on prescribing behavior?
A. Not that I can recall sitting here.
Q. Do you know whether Celgene, when it was engaging in its promotional activities, do you know if it considered its job done, so to speak, once a patient had had three prescriptions or once a doctor had had three patients with three prescriptions? Did it -- did it stop trying to sell --
MS. DUNNE: Objection.
Q. -- for example?
A. I can't speak to the state of mind of Celgene --
Q. Well --
A. -- as a corporate entity.
Q. I'm not -- well, let me -- I won't -- I don't want to phrase it in terms of state of mind. Let's talk about what actually happened.
Do you know whether Celgene in fact stopped promoting to doctors once they were, as you describe it, experienced, meaning had treated three patients with three prescriptions each? Did Celgene stop trying to promote to those people?
MS. DUNNE: Objection. Vague.
A. I would be surprised if they did, not least because of their obligations to -- to monitor and

administer the REMS program.
Q. Well, let me distinguish --
A. Or --
Q. Go ahead.
15:08:04 A. There may be many reasons why they would want to have contacts with -- you know, these are going to be relatively high-prescribing physicians who've written -- had more than three patients, each of whom have had more than three prescriptions. You
15:08:20 know, we talked earlier about one of the -- you know, one of the economic reasons why a pharmaceutical company may want its sales force to call on physicians is -- is to gain a better knowledge and understanding of how they're using the
15:08:33 drug in practice. It's duly diligent, I think, for them to call upon physicians and ask them if they have any questions or concerns that the company can -- can assist them with. So it would -- like I said, I think I'd be very surprised if they -- if
15:08:51 Celgene stopped calling on these physicians.
Q. But there would have been no reason for Celgene to continue trying to sell drugs to those doctors; right?
MS. DUNNE: I'm going to object
15:08:58 again.

Q. Because the promotion --
MR. WILLIAMS: Let me finish my question.
Q. Because the promotion would have had no effect on those doctors under your hypothesis here; correct?
MS. DUNNE: Objection. Assumes a fact not in evidence, vague as to time, drug, et cetera.
15:09:03
15:09:26
A. I'm finding your question hard to answer because it's --
Q. Let me ask a different question.
A. -- vague and expansive.
Q. Your -- and let's focus on the experienced physician aspect of this. Under your sort of, I don't know if we want to call it a hypothesis or rule that you're applying here in paragraph 81, is it correct that this presupposes that once a doctor had three patients, each of whom had had three prescriptions, Celgene could have never done any promotion vis-a-vis that doctor again, and that doctor would have continued his or her prescribing behavior unchanged than if they had continued to promote; right?
15:09:36
15:09:57
A. No, I don't think that's clear.
15:10:17

15:10:28
15:10:42
15:11:02
15:11:15
15:11:35

Q. So you think the promotion beyond the three prescriptions/three patients could have still been having an effect on the doctor's prescribing behavior?

MS. DUNNE: Objection.

A. Well, promotion may well -- has -- you know, has been shown to have an effect. Sometimes it's muted; its impact is difficult to -- to assess accurately. Once the product's on label, it's not inconceivable to me that a sales representative engaging in -- in the persuasive, you know, part of -- of -- of promotion or otherwise communicating with the physician, might well have been able to -- to cause them to increase their level of prescribing. That's quite possible. So what you're suggesting to me I think is -- is really not tenable, which is that nothing they can do after the first three prescriptions makes any difference.

Q. Okay. And that's fair. And that was the question I was asking. Promotion beyond those three prescriptions could, in your view, continue to make a difference. You don't rule out that possibility; right?

A. I don't rule it out.

Q. By the way, in looking at paragraphs 80 and

needs to be net of what alternative therapy would have cost, that's an economic opinion, certainly not a legal opinion; right?

A. It's not a legal opinion.

15:32:22 Q. Okay. I have the wrong page number in my notes here, so bear with me a moment.

Okay. Look at page 53 of your supplemental rebuttal, if you would, please.

A. Yes.

15:33:11 Q. One of the things you did as part of your corrections, as you've described them, is to, looking at paragraph 78, "Remove prescriptions associated with compendia-supported conditions"; correct?

15:33:26 A. Yes.

Q. And it looks like, if we look now at Exhibit 4.A, for example, that's reflected, again, we're looking at now just the Medicare off-label estimates and your corrections, and I see under

15:33:54 Rev -- or under Thalomid -- sorry -- "Remove prescriptions associated with compendia-supported conditions," and that results in a reduction of 310.8 million; correct?

A. Yes.

15:34:04 Q. So, and that's off again at the 352.4

million; right?
A. Yes.
Q. So that's the vast majority; correct?
A. It's a large fraction.
15:34:14 Q. Yeah. And below that on 4.A is "Remove prescriptions associated with medical-journal-supported conditions"; right?
A. Right.
Q. And that would result, in your view, in
15:34:26 $154.4 million reduction; correct?
A. Correct.
Q. In looking back now at the body of the report, page 53, and focussed on the compendia, it says you -- you with me?
15:34:41 A. Paragraph 78, line 20 of page 53, yes.
Q. Okay. It says you compiled a list of the conditions that Dr. Bensinger has determined were compendia supported over the 2006-to-2015 time period.
15:34:54 A. Yes.
Q. And then you excluded patients with one of those diagnoses; correct?
A. Yes.
Q. So in terms of determining which conditions
15:35:04 had compendia support, you relied entirely on Dr.

15:35:36
15:35:59
15:36:17
15:36:33
15:36:50

Bensinger's -- or his report, I should say?

A. Not entirely, though, but some of the compendia, you know, based upon -- you know, I rely here on -- my mind has gone blank. Excuse me. One second.

Ms. -- excuse me. Looking at the compendia, at various editions of the -- some of the compendia where there's a -- there's a scoring of -- of, you know, Roman I or Roman II or Roman III, and my understanding of how that would be interpreted by -- by Medicare, according to Ms. Norwalk, you know, in those instances, I don't need to rely necessarily on Dr. Bensinger to go -- Bensinger to go through and identify, you know, in which edition of which compendia, you know, was it supported such that under the Medicare manual, you know, there would have been reimbursement. You know, there are other compendia which don't supply that kind of simple rating that I, as a nonmedical expert, could -- could interpret. You know, that's where -- that's where I rely upon Dr. Bensinger's opinion.

Q. Is it your understanding that if a compendia does provide that numerical rating, it's as simple as looking at the rating and requires no further expertise to understand whether that

15:37:00
15:37:20
15:37:31
15:37:47
15:37:56

compendia listing actually supports a particular use?

MS. DUNNE: Objection. Vague.

A. As I said, I look at those -- you know, I -- I go first to -- to Ms. Norwalk's report and opinion, which, you know, as I read it, suggests that the Medicare manual would support reimbursement almost automatically if you're relying on a particular compendia and there's a particular condition and -- and it's given, you know, the relevant rating.

Q. You say almost automatically. What do you understand are the factors that go into whether or not it is in fact reimbursable?

A. I need to go back and look at Dr. Norwalk's report.

Q. So, in any event, you're relying on Dr. Norwood for that aspect of this opinion; you're relying upon Dr. Bensinger beyond that; correct?

A. Yes.

Q. You're not purporting --

A. Well, not going -- I mean I'd say belt and suspenders. My -- my primary way of -- you know, for those compendia which have these numeric ratings, I read those, I look at that data in light

of Ms. Norwalk's opinion. I understood Dr. Bensinger has -- Bensinger has independently offered an opinion as to -- as to -- as to those issues.

15:38:13 Q. Do you consider yourself an expert in -- in analyzing compendia and determining whether they support a particular use of a drug?

A. No.

15:38:24 Q. And you're not purporting to offer expert testimony on that subject, i.e., whether there was compendia -- was or was not compendia support for a particular use?

A. No. I am relying on Ms. Norwalk and Dr. Bensinger in the -- in the proportions that we've just been discussing.

15:38:37 Q. What about your next correction, which is on page 54 described in paragraph 79?

A. Yes.

15:38:58 Q. There you also reference Dr. Bensinger. Are you relying on anything other than Dr. Bensinger's opinions with respect to that correction?

A. No.

15:39:08 Q. And so is it true, then, that if the jury decides they don't believe Dr. Bensinger and they reject his opinions, your correction here wouldn't

be reliable either?

A. I think that's fair.

Q. And the same is true for the compendia: If the jury -- to the extent you relied on Dr. Bensinger, the jury rejected Dr. Bensinger's opinions, then your resulting opinion wouldn't be reliable; correct?

A. The parts of my -- the parts of my -- and one would -- one would need to go back and look at each compendia, you know, whether it was scored, whether Dr. -- you know, whether there was a rating as to the degree of whether it was supported or not, right? You know, so as I understand your -- you know, as I understand your hypothetical, Ms. Norwalk's opinion is accepted by the jury, but Dr. Bensinger is not.

Q. Sure. We can go with that.

A. Okay. Well, then I would go through, I think, that the -- Ms. Norwalk's opinion in combination with the -- the documents showing over time what the -- the ratings were for the degree of support for each of these indications, you know -- I'm sorry. I'm lost in my answer.

Only the -- only the exclude -- you know, under your hypothetical, only the exclusions which

rely solely on Dr. Bensinger would be ones that I would -- I would want to revisit or rethink about or -- or understand whether there was some kind of alternate support for.

15:40:31 Q. Okay. And the same thing if the jury were to reject Ms. Norwalk's opinions: To the extent you relied on those opinions with respect to what's in paragraph 79, those would no longer be reliable -- yeah, 79. Those would -- no. Sorry.

15:40:44 A. Well, then --

Q. Let me start over. 78.

A. Like I said --

Q. Well, let me -- let me just get a clean question.

15:40:50 A. Sorry.

Q. To the extent you relied on Ms. Norwalk for your opinions as stated in paragraph 78, if the jury were to reject her opinions, then your opinions would no longer be reliable; correct?

15:41:02 A. To the extent that those opinions relied on -- on Ms. Norwalk, but I'm not sure -- in your hypothetical, has the jury not accepted Dr. Bensinger and Ms. Norwalk?

Q. Sure. We'll take that hypothetical.

15:41:15 Either one.

15:41:24
15:41:30
15:41:33
15:53:37
15:53:52

A. Well, then I don't think I would have support to conduct this analysis.

MS. DUNNE: Time for a break maybe?

MR. WILLIAMS: Sure. Yeah.

MS. DUNNE: Before we go on to the next one?

MR. WILLIAMS: Let's take a few minutes. I think we're getting close. So I can look and see if I can cut some things out.

MS. DUNNE: Okay. Great.

THE VIDEOGRAPHER: Going off the record?

MR. WILLIAMS: Yeah.

THE VIDEOGRAPHER: We're now going off the record at 3:41 p.m.

(Recess.)

THE VIDEOGRAPHER: We are now back on the record at 3:53 p.m.

BY MR. WILLIAMS:

Q. Dr. Cockburn, I had asked you earlier whether the rebate information that you had covered all payors or just some of them. And I'm wondering if you could look at Exhibits 4.A and 4.B and see if

# EXHIBIT GG

Kimberly A. Dunne (SBN 142721)
kdunne@sidley.com
Michelle B. Goodman (SBN 218607)
mgoodman@sidley.com
Sean A. Commons (SBN 217603)
scommons@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

Karen P. Hewitt (SBN 145309)
kphewitt@jonesday.com
Brian Hershman (SBN 168175)
bhershman@jonesday.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539

Attorneys for Defendant Celgene Corporation
(*Additional Counsel listed on following page*)

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO,<br>Plaintiffs,<br>*Ex rel.*<br>BEVERLY BROWN,<br>Plaintiff-Relator,<br>v.<br>CELGENE CORPORATION,<br>Defendant. | Case No. 10-cv-03165 GHK (SSx)<br><br>Assigned to: Hon. George H. King<br><br>EXPERT SUPPLEMENTAL REBUTTAL REPORT OF LESLIE V. NORWALK |

James C. Stansel (admitted *pro hac vice*)
jstansel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

Toni-Ann Citera (admitted *pro hac vice*)
tcitera@jonesday.com
Jennifer L. Del Medico
jdelmedico@jonesday.com
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

## I. Background

1. I submitted a report on September 25, 2015 to address certain reimbursement policies of the Medicare and Medicaid programs administered by the Centers for Medicare and Medicaid Services ("CMS"). On October 26, 2015, I submitted a report in response to the September 25, 2015 report of Dr. Stephen Z. Fadem to respond to his claims regarding whether CMS-recognized compendia are reliable sources of support. This report is in response to Dr. Joel W. Hay's revised supplemental report submitted on April 22, 2016, which was further corrected on May 6, 2016 ("5/6/16 Hay Report").

2. The opinions offered in this report are based on my background, training, and experience described in my initial September 25, 2015 report ("Norwalk Initial Report"), which also attached my curriculum vitae as Exhibit A. My opinions have also been informed by my review of documents and other information cited in this report and referenced in Exhibit A.

3. As with my previous reports, the opinions herein are being offered in my capacity as an independent expert, not on behalf of CMS, the U.S. Department of Health & Human Services ("HHS"), or any other department or agency of the federal government. I do not purport to speak on behalf of any of these agencies, and I am not asserting that these opinions have been endorsed by them.

## II. Summary of Opinions

4. Dr. Hay's 5/6/16 Report continues to rely upon assumptions and draw conclusions that, for reasons explained in my prior declarations, do not reflect how certain federal programs operate. This report will address a subset of defects in his analysis that I have identified since I submitted my Initial Report.

a. First, Dr. Hay alleges that the Medicare Advantage program (also known as Medicare Part C) incurred damages prior to the 2006 implementation of the Medicare Part D prescription drug benefit. According to Dr. Hay, these damages

purportedly came from the federal government reimbursing outpatient prescriptions as part of the Medicare Advantage program prior to 2006. In fact, the federal government did not reimburse outpatient prescriptions as part of the Medicare Advantage program before 2006 unless the drug was administered incident to a physician's services and therefore covered by the Medicare Part B program. Because Thalomid® and Revlimid® are oral medications, and thus not administered incident to a physician's services, these drugs were not covered by Medicare Part B. Therefore, contrary to Dr. Hay's belief, the federal government did not pay for Thalomid® and Revlimid® as part of the Medicare Advantage Program prior to 2006.[1]

b. Second, as I explained in my Initial Report, Medicare does not incur a cost based on any individual Part D covered prescription. CMS pays Part D Plans (and Medicare Advantage Plans offering outpatient prescription coverage since 2006) on a modified capitated basis. Under this model, Plans are paid a prospective, fixed payment at the beginning of the coverage period that is intended to cover all the reimbursable prescriptions and services provided to enrollees. The fixed payment does not vary based on the cost of any prescription or any service provided to an enrollee. Dr. Hay ignores this modified capitated structure and instead relies on Prescription Drug Event ("PDE") data that Plans provide to CMS. This PDE data reflects an unadjusted prescription cost that does represent the true cost to the Part D Plan because it does not account for rebates and other discounts. Moreover, the PDE data does not reflect or relate to the modified capitated payment from Medicare to a Plan.

---

[1] This lack of coverage for outpatient, self-administered prescriptions led to the Medicare Replacement Drug Demonstration ("MRDD") Project in 2004, which included Thalomid®, and eventually, Medicare Part D. *See* Norwalk Initial Report, ¶ 18.

c. Third, Dr. Hay includes all Medicare Part D off-label Thalomid® and Revlimid® prescriptions in his damages calculation. However, Part D Plans must cover certain off-label uses—those supported by compendia or CMS-recognized medical literature—and have discretion to cover other off-label uses. In addition to Part D Plans, Medicare's independent review contractor, Maximus, interprets what qualifies as adequate "support" to require coverage of off-label uses and has required Part D Plans to cover many of the off-label uses alleged in this case.

d. Fourth, Dr. Hay alleges that Celgene's donations to non-profit, independent patient assistance programs ("PAPs") are kickbacks when those donations are used to fund co-payment assistance for Medicare Part D beneficiaries. To ensure beneficiary access to drugs, HHS and CMS issued guidance in 2006 that referenced and incorporated guidance issued by the HHS Office of the Inspector General ("OIG") in 2005 reassuring manufacturers that, so long as certain criteria are met, they could donate to independent PAPs, which could, in turn, subsidize Part D co-payments. Indeed, CMS wanted to ensure that manufacturers did not stop donating to these PAPs because that would negatively impact beneficiary access to therapies.

## III. <u>Medicare Advantage / Medicare Part C</u>

5. Dr. Hay alleges that Thalomid® prescriptions were reimbursed by Medicare, prior to the implementation of Medicare Part D, through the Medicare Advantage program, also known as Medicare Part C.[2] Dr. Hay cites to no data produced during this litigation or public sources showing that Medicare made payments for Thalomid® prescriptions during this time period. In fact, the federal government incurred no cost related to the prescription drug benefit of any Medicare Advantage Plan prior to 2006 for drugs such as Thalomid® and Revlimid®, which

[2] Dr. Hay acknowledges in his revised report that Revlimid® would not have been reimbursed by Medicare Advantage prior to 2006 because it was not FDA approved for marketing until late 2005.

were not covered under Medicare Part B because they were not provided incident to a physician service in a physician's office. *See* Norwalk Initial Report, ¶¶ 22, 25.

6. Medicare beneficiaries entitled to Medicare Part A (inpatient services) and enrolled in Part B (outpatient services) can choose to remain in these fee-for-service programs (meaning each individual service is reimbursed separately), or can opt into a managed care Medicare Advantage Plan (meaning CMS pays a private health plan a prospective, fixed per-beneficiary payment that does not vary based on the prescriptions or services provided) to receive the inpatient and outpatient services covered by Parts A and B.

7. Medicare Advantage Plans are operated by private health care entities such as insurers. Medicare pays these private entities a capitated (*i.e.*, fixed), per-enrollee rate to provide services to enrolled beneficiaries. Every Medicare Advantage Plan must provide services equal to those offered by traditional Medicare fee-for-service. In other words, Medicare Advantage Plans must cover everything covered by Medicare Parts A and B, though they have flexibility in how they provide those benefits and the patient cost-sharing amounts they require. Since 2006 and the implementation of Part D, most Medicare Advantage providers have offered at least one plan with a prescription drug benefit equivalent to Part D. Medicare subsidizes this drug benefit through Part D.

8. However, prior to 2006, Medicare did not subsidize outpatient prescription drug coverage unless the drug was covered under Part B. If Medicare Advantage Plans chose to cover drugs that were not covered by Part B, it was through a supplemental benefit that was not reimbursed by the federal government. *See* 65 Fed. Reg. 40170, 40206-07 (June 29, 2000) (explaining that supplemental benefits, including a drug benefit, are not covered by Medicare and are, instead, "fully paid for by [Medicare Advantage] enrollees through a separate premium or cost sharing."). Some Medicare Advantage Plans made prescription coverage a mandatory

supplemental benefit in addition to basic Medicare coverage, and others made it optional. In either case, the prescription drug benefit was fully paid by the Plan and beneficiary through separate co-insurance, such as a premium, deductible, or co-payment. *Id.* at 40206; *see also* 42 C.F.R. §§ 422.100, 422.2 (defining mandatory and optional supplemental benefits as "not covered by Medicare"). The federal government incurred no cost related to the prescription drug benefit of any Medicare Advantage Plan prior to 2006.

9. Since the implementation of Part D in 2006, prescription drugs offered through a Medicare Advantage Plan are covered through premiums paid in part by Medicare to the Medicare Advantage Plan and in part by the beneficiary through co-insurance fees in the same way as prescription drugs offered by Part D Plans. That is, prescriptions are reimbursed on a modified capitated basis. *See* Norwalk Initial Report, ¶¶ 54-57.

10. Dr. Hay incorrectly relies on PDE data in his 5/6/16 Report as the basis for calculating post-2006 Medicare Advantage and Part D damages. The PDE data is submitted to CMS by Medicare Advantage and Part D Plans and reflects the unadjusted cost to a Medicare Advantage or Part D Plan for a prescription. The PDE data does not reflect the net cost to the Plan because it does not account for discounts or any other price adjustments. In other words, it does not reflect what the Plans paid for the prescriptions and thus, does not reflect the actual cost to the government, including because the amount the government pays is not calculated on a per-drug basis.

## IV. <u>Medicare Part D</u>

11. Dr. Hay misstates various aspects of the Medicare Part D program. I address two here: (1) his conclusion that all off-label uses of Thalomid® and Revlimid® resulted in damages; and (2) his allegation that Celgene's contributions to

non-profit patient assistance programs constitute kickbacks that resulted in false claims.

**A. <u>Medicare Part D Appeals</u>**

12. Dr. Hay's damages calculation for Medicare Part D encompass all off-label uses of Thalomid® and Revlimid®. As I explained in my Initial Report, many off-label uses are covered and reimbursed by Medicare Part D. Part D Plans must cover off-label, on-compendia uses, as well as off-label uses that are not supported by compendia but are supported by CMS-recognized literature. Norwalk Initial Report, ¶¶ 11, 58-60. Off-label uses can also be covered by Medicare Part D based on formularies or coverage policies, or on a case-by-case basis through prior authorization and appeals processes. Norwalk Initial Report, ¶¶ 62-63. These processes are implemented not only by individual Part D Plans, but also by CMS's contractor which reviews the decisions made by individual Plans.

13. Maximus is the independent review contractor that CMS employs—and has employed since the beginning of the Part D Program—to review appeals of drug coverage denials by Part D Plans, including Medicare Advantage Plans that offer the prescription drug benefit. In instances where an individual is denied coverage for a particular drug by a Part D Plan, the individual can appeal that decision, first to the Plan itself, and then to Maximus for a second review (and if needed, thereafter to an administrative law judge, an administrative review board, and ultimately, a judge in federal court). Appeals to Maximus follow particular procedures, as set forth in its Part D QIC Reconsideration Procedures Manual. Of particular note, appeals that require a medical necessity determination, including, for example, formulary exception requests and determinations of whether an off-label use is "medically accepted," are reviewed and decided by a board certified physician. *See* Maximus Federal Services, Part D QIC Reconsideration Procedures Manual, at 4 (Dec. 2014), available at

http://www.medicarepartdappeals.com/sites/default/files/PartD_ReconManual-v9.3.pdf; *see also* Medicare Prescription Drug Benefit Manual, Ch. 18 § 40.2.1 (explaining that a coverage determination based on clinical documentation such as unmet coverage criteria is considered a determination based on medical necessity). The physician's review is *de novo* and the appeal outcome is binding. If the appeal is decided in favor of the beneficiary, the Part D Plan must cover the drug at issue. *See* Medicare Prescription Drug Benefit Manual, Ch. 18 § 130.3.1 ("If the Part D Plan sponsor's decision is reversed in whole or in part by any other appeal entity, the Part D Plan sponsor must authorize or provide the benefit under dispute within 72 hours from the date it receives notice from the appeal entity reversing the determination.").

14. I have reviewed documents relating to appeals of Thalomid® and Revlimid® coverage decisions by Part D Plans that Maximus produced in this litigation subsequent to my Initial Report. Similar to the Part D Plans' appeals documents, some of which I referenced in my September 25, 2015 report, *see* Norwalk Initial Report, ¶ 76, the Maximus materials reflect that the government approves coverage for off-label uses, including off-label uses challenged in the Third Amended Complaint and Dr. Hay's 5/6/16 Report.

15. Maximus often requires documentation that a proposed off-label use is for a "medically accepted" indication with "support" in a compendia entry. Norwalk Initial Report, ¶ 31. The appeals show that, when determining what is "medically accepted," Maximus interprets the concept of "support" broadly. For instance, Maximus approved appeals and required coverage for off-label uses in the following circumstances:

a. Maximus found adequate support based on compendia entries that indicate an off-label use of Thalomid® is under investigation. *See* MAXIMUS089623-26 (requiring coverage for Thalomid® to treat renal cell cancer in May 2009 based on language from an AHFS entry that says the drug is "being

evaluated for the treatment of a variety of malignancies, including . . . renal carcinoma"); MAXIMUS105235-38 (requiring coverage for Thalomid® in September 2008 to treat ovarian cancer based on an AHFS entry that says the drug "is being evaluated for the treatment of a variety of malignancies, including. . . ovarian cancer ").

b. Maximus found adequate support based on a compendia entry indicating that Thalomid® *may* have activity in treating an off-label cancer, even though the entry indicates that Thalomid® should be used as a last resort. *See* MAXIMUS000633-36 (requiring coverage for Thalomid® to treat prostate cancer in May 2006 based on a USP-DI entry that says the drug "should be reserved for desperate clinical situations").

c. Maximus found adequate support based on compendia entries that do not meet the Medicare Benefit Policy Manual definition of "medical acceptance," such as DrugDex entries for Thalomid® with a III rating, even though the Medicare Benefit Policy Manual, Ch. 15, § 50.4.5.B states that "[a] use is not medically accepted by a compendium if the . . . indication is a Category 3 in NCCN or a Class III in DrugDex." *See* MAXIMUS036875-79 (requiring coverage for Thalomid® to treat mantle cell non-Hodgkin's lymphoma in August 2006 based on supportive language in a DrugDex entry with a III rating); MAXIMUS105845-49 (requiring coverage for Thalomid® to treat renal cancer in October 2008 based on a DrugDex entry with a III rating because the language related to renal cancer was supportive, and based on language in an AHFS entry stating that Thalomid® has been used in the treatment of renal cancer). Maximus also found adequate support where a disease was mentioned in DrugDex without any rating. *See* MAXIMUS111143-46 (covering Thalomid® to treat pancreatic cancer in November 2008 because the DrugDex entry said that the drug has "demonstrated efficacy in controlling malignancies including pancreatic cancer").

16. Maximus also has found adequate support for off-label uses based on medical literature. Appeals show that, similar to its treatment of compendia, Maximus has found adequate "support" in medical literature in situations where the Medicare Benefit Policy Manual's definition of what should be considered "supportive" of a "medically accepted" off-label use is not met. For instance, appeals were approved by Maximus requiring coverage for off-label uses as follows:

a. Maximus found adequate support based on medical literature describing a case report even though the Medicare Benefit Policy Manual, Ch. 15, §50.4.5.C provides that "case reports are generally considered uncontrolled and anecdotal information and do not provide adequate supportive clinical evidence for determining accepted uses of drugs." *See* MAXIMUS118910-12 (requiring the Part D Plan to cover Revlimid® to treat acute myeloid leukemia in March 2009 based on a case report published in *Leukemia* in November 2006).

b. Maximus found adequate support based on medical literature describing a small, non-randomized trial even though the Medicare Benefit Policy Manual, Ch. 15, §50.4.5.C suggests that non-randomized studies require a "significant number" of subjects. *See*, *e.g.*, MAXIMUS145613-21 (requiring the Part D Plan to cover Thalomid® for chronic lymphocytic leukemia in September 2009 based on a 40-person trial published in *Leukemia* in May 2009).

c. Maximus found adequate support based on abstracts published in CMS-approved medical journals even though the Medicare Benefit Policy Manual, Ch. 15, §50.4.5.C states that "[a]bstracts (including meeting abstracts) are excluded from consideration." *See* MAXIMUS151397-401, 407-11 (requiring coverage for Revlimid® to treat prostate cancer in April 2010 based on two abstracts, one following the ASCO meeting, published in *Journal of Clinical Oncology* and *Cancer* in 2007).

17. In some instances where there is no support in recognized compendia or medical literature, Maximus has granted appeals and required coverage based on other evidence that supports an off-label use as reasonable and necessary for a particular patient. *See* MAXIMUS003296-31 (requiring coverage of Thalomid® to treat smoldering multiple myeloma without dexamethasone on July 14, 2006 because corticosteroids were contraindicated for the patient); MAXIMUS128572-76 (requiring coverage of Thalomid® to treat non-small cell lung cancer in July 2009 based on two ongoing clinical studies and the physician's statement that indicated the therapy was medically necessary, even though "[t]here are no citations in the Medicare approved compendia nor is there clinical research published in the Medicare approved publications that support the use of Thalomid (Thalidomide) for treatment of non-small cell lung cancer").

18. Through the appeals process, Maximus has required coverage for many of the off-label uses at issue in this matter. As indicated by the examples cited above, Maximus required coverage for Thalomid® to treat leukemia, lung cancer, lymphoma, multiple myeloma without dexamethasone, prostate cancer, pancreatic cancer, renal cancer, and ovarian cancer, and has required coverage for Revlimid® to treat leukemia and prostate cancer.

19. Additionally, Maximus has also ensured Part D Plans are providing coverage of "medically accepted" uses as defined by the Medicare Manual, namely, those uses that are supported by the CMS-recognized compendia and literature, within the corresponding parameters set out in the Manual. Specifically, in addition to the indications already discussed, Maximus has required coverage for Thalomid® to treat brain cancer, Kaposi's sarcoma, melanoma, and MDS. *See, e.g.*, MAXIMUS038349-53 (requiring a Part D Plan to cover Thalomid® to treat MDS on November 8, 2006 based on a supportive DrugDex entry); MAXIMUS080854-59 (requiring a Part D Plan to cover Thalomid® on January 26, 2008 for the treatment of glioblastoma

multiforme brain cancer based on a supportive DrugDex entry); MAXIMUS047672-77 (requiring a Part D Plan to cover Thalomid® in September 2006 for the treatment of malignant melanoma based on a supportive DrugDex entry); MAXIMUS138944-47 (requiring coverage of Thalomid® on November 7, 2009 to treat AIDS-related Kaposi's sarcoma based on a supportive DrugDex entry).

20. Likewise, Maximus has required coverage for Revlimid® to treat lymphoma, first-line multiple myeloma, MDS without del-5Q deletion, and myelofibrosis. *See* MAXIMUS115411-14, 426-29 (requiring the Part D Plan to cover Revlimid® to treat mantle cell non-Hodgkin's lymphoma in January 2009 based on a October 20, 2008 *Journal of Clinical Oncology* article); MAXIMUS029029-33 (requiring coverage for Revlimid® as treatment for first-line multiple myeloma on June 3, 2014 based on a supportive NCCN entry); MAXIMUS117626-29 (requiring coverage for Revlimid® as treatment for MDS without a del-5Q deletion on February 26, 2009 based on a supportive NCCN entry and research published the year before in *Blood*, a Medicare-approved journal); and MAXIMUS118659-62 (requiring coverage in March 2009 for Revlimid® to treat myelofibrosis based on an article published in *Blood* on August 15, 2006).

**B. <u>Non-Profit Patient Assistance Programs</u>**

21. Dr. Hay asserts in his 5/6/16 Report that Celgene's contributions to charitable patient assistance foundations, including the Patient Access Network Foundation ("PANF") and the Chronic Disease Fund ("CDF"), constitute kickbacks. Dr. Hay appears to misunderstand the Agency's guidance on this subject. Specifically, he appears to believe based on his review of OIG guidance and conversations with Relator's counsel that it violates the Anti-Kickback Statute if a pharmaceutical company's donations to a non-profit, independent patient assistance program ("PAP") are used to cover Medicare Part D co-payments. 5/6/16 Hay Report, ¶ 120. According to Dr. Hay, this is "illegally fund[ing] patient co-pays." *Id.*

at ¶ 74. He goes on to say that it is "clearly" in Celgene's financial interest to assist with a Medicare co-pay if, as a result, "Celgene got back the Medicare payment portion (*e.g.*, 80% of a Revlimid® prescription cost)." *Id.* at ¶ 119.

22. Dr. Hay's description of how charitable kickbacks could create financial incentives for manufacturers or increase government costs does not accurately describe Medicare coverage.

a. Under Medicare ***Part B***, a patient's co-payment is typically 20 percent with Medicare covering the remaining 80 percent of the cost. That is not the case for Medicare Part D. Individual Part D Plans set beneficiaries' cost-sharing responsibilities. These cost-sharing amounts can vary significantly from one Part D Plan to the next, or within a Plan depending on a variety of factors such as whether the drug is listed on the Plan's formulary and where the beneficiary falls in the coverage spectrum (*e.g.*, if they are in the "donut hole," which is the coverage gap that occurs after a beneficiary hits his or her initial spending limit, versus receiving catastrophic coverage after the donut hole).

b. Drug manufacturers, including Celgene, negotiate drug prices, rebates, and any other discounts with various entities, including Part D Plans, pharmacies, pharmacy benefits managers, and others that reduce the cost of a prescription; the cost of a Thalomid® or Revlimid® prescription is therefore different from one Plan to the next, and the payment to Celgene is not dependent on the co-payment amount.

c. As discussed in my Initial Report, the cost of Thalomid®, Revlimid®, or any Part D covered drug to a Plan is not directly passed through to Medicare. *See* Norwalk Initial Report, ¶¶ 54-57; *see also* Email from Eden Heard, HHS Office of General Counsel, CMS Division, to Justin Brooks et al. (January 20, 2016) (noting "[i]n the case of Medicare Part D, we don't pay on a claim basis …. The government cost is not determined at the [point of sale] but is determined in the

annual Part D payment reconciliation. The reconciliation occurs at the [Part D Plan] level, not the claim level.") (attached as Exhibit B). Part D Plans are paid on a prospective, modified capitated basis, and those payments do not vary or depend on the cost of any individual prescription. Norwalk Initial Report, ¶¶ 54-55. Thus, Medicare is not responsible for the cost of a Part D prescription minus the co-payment amount as suggested by Dr. Hay.

23. Contrary to Dr. Hay's views about OIG guidance from 2014, HHS, the OIG, and CMS have stated that manufacturers may make donations to *bona fide* charitable organizations, and those donations may be used to fund Medicare Part D beneficiaries' co-payments so long as certain criteria are met. The 2014 guidance cited by Dr. Hay also states that "Independent Charity PAPs provide a valuable resource to financially needy patients." 79 Fed. Reg. 31120, 31123 (May 30, 2014). The OIG reminds stakeholders that "[l]ongstanding OIG guidance, including [a] 2005 [special advisory bulletin], makes clear that pharmaceutical manufacturers can effectively contribute to the safety net by making cash donations to independent, *bona fide* charitable assistance programs." *Id.* at 31121.

24. By way of background, as CMS prepared for the launch of the Medicare Part D program, ensuring continued access to drugs for the financially needy was a major concern. Prior to Part D, Medicare beneficiaries of limited means could receive prescription drugs through manufacturer and independent charity PAPs at little or no cost. Since most prescription drugs were not available through Medicare, these PAPs did not raise anti-kickback considerations under Medicare because there was little to no impact (or potential impact) on Medicare spending. However, once Congress approved the Medicare prescription drug benefit, manufacturers, independent charities, and beneficiaries that had long supported, operated, or relied on PAPs to help patients obtain their medications began to worry that the Anti-Kickback Statute

might be interpreted to limit the availability of subsidized prescriptions for Part D beneficiaries.

25. In 2005, OIG issued its initial guidance on manufacturer-run and independent, non-profit PAPs. 70 Fed. Reg. 70623 (November 22, 2005). Just three months after OIG's advisory bulletin, the Secretary of HHS issued a statement to "clarify any confusion that may exist." In a letter to the CEO of PhRMA, the trade association for pharmaceutical companies, Secretary Leavitt stated that "nothing in the law prevents pharmaceutical companies from continuing to support" independent PAPs. *See* Letter from Michael O. Leavitt, Secretary of HHS, to Billy Tauzin, President and CEO of PhRMA (February 9, 2006) (attached as Exhibit C).

26. Secretary Leavitt's letter to PhRMA pointed to OIG's special advisory bulletin, in which OIG spelled out five guideposts for "properly structured" independent PAPs:

a. A pharmaceutical manufacturer cannot directly or indirectly influence or control the independent PAP.

b. The PAP must award assistance in an independent manner such that the assistance provided cannot be attributed to a manufacturer.

c. The PAP must award assistance without regard to manufacturers' interests and without consideration of the patient's choice of product, provider, practitioner, supplier, or Part D Plan.

d. The PAP must award assistance based on verified financial need using uniform measures applied in a consistent manner.

e. The PAP cannot provide manufacturers with data that allows a manufacturer to correlate the amount or frequency of its donations with the number of subsidized prescriptions for its products. (Though, PAPs are allowed to provide aggregate data to donors about the number of patients per disease state receiving assistance.) *See* 70 Fed. Reg. at 70626.

27. Just a few months after the Secretary's letter to pharmaceutical companies, CMS issued its own official guidance stating that manufacturers could continue to support properly structured "independent PAPs operated by bona fide public charities." CMS, Memorandum re: HPMS Q&A - Patient Assistance Programs (October 4, 2006), at 4 (attached as Exhibit D).

28. According to the OIG, Secretary Leavitt, and CMS, so long as the five factors articulated in the 2005 OIG Guidelines are satisfied, manufacturers can contribute to independent PAPs, which can provide co-payment assistance to Part D beneficiaries.

29. During my time at CMS, determining whether an independent PAP was properly structured and the OIG criteria met was a legal analysis within the purview of the OIG, and my understanding is that it remains so today. *See* CMS, Perspective on Pharmaceutical Company Patient Assistance Programs, at 2 (January 25, 2006), available at http://oig.hhs.gov/fraud/docs/alertsandbulletins/2006/CMSPAP.pdf. As a result, this report does not opine on the application of those five factors to the facts of this case, beyond noting that Dr. Hay does not appear to identify any evidence that the five factors were violated by Celgene, CDF, PANF, or any other independent PAP or specific findings or guidance by the OIG prohibiting the types of contracts between Celgene and PAPs, such as CDF and PANF.

30. Since the inception of the Part D program, HHS—from the Secretary down—has been invested in ensuring that independent PAPs continue to receive donations from manufacturers and are able to use those donations to subsidize Part D prescriptions for the benefit of patients.

Dated: June 3, 2016 By: ____________________

Leslie V. Norwalk

# Exhibit A

# EXHIBIT A
# MATERIALS CONSIDERED

**Court Documents:**

Expert Report of Joel W. Hay, *United States of America, et al., ex rel. Beverly Brown v. Celgene Corporation*, Case No. 10-cv-03165, United States District Court, Central District of California – Western Division, September 25, 2015.

Revised Supplemental Expert Report of Joel W. Hay, *United States of America, et al., ex rel. Beverly Brown v. Celgene Corporation*, Case No. 10-cv-03165, United States District Court, Central District of California – Western Division, April 22, 2016.

Revised Supplemental Expert Report of Joel W. Hay (Corrected), *United States of America, et al., ex rel. Beverly Brown v. Celgene Corporation*, Case No. 10-cv-03165, United States District Court, Central District of California – Western Division, May 6, 2016.

Expert Report of Leslie V. Norwalk, *United States of America, et al., ex rel. Beverly Brown v. Celgene Corporation*, Case No. 10-cv-03165, United States District Court, Central District of California – Western Division, September 25, 2015.

Rebuttal Expert Report of Leslie V. Norwalk, *United States of America, et al., ex rel. Beverly Brown v. Celgene Corporation*, Case No. 10-cv-03165, United States District Court, Central District of California – Western Division, October 26, 2015.

**Bates-Stamped Documents:**

MAXIMUS000633-36

MAXIMUS003296-31

MAXIMUS029029-33

MAXIMUS036875-79

MAXIMUS038349-53

MAXIMUS047672-77

MAXIMUS080854-59

MAXIMUS089623-26

MAXIMUS105235-38

MAXIMUS105845-49

MAXIMUS111143-46

**EXHIBIT A**
**MATERIALS CONSIDERED**

MAXIMUS115411-14

MAXIMUS115426-29

MAXIMUS117626-29

MAXIMUS118659-62

MAXIMUS118910-12

MAXIMUS128572-76

MAXIMUS138944-47

MAXIMUS145613-21

MAXIMUS151397-401

MAXIMUS151407-11

**Statutes and Regulations:**

42 C.F.R. § 422.100

42 C.F.R. § 422.2

**Publicly Available Materials:**

65 Fed. Reg. 40170 (June 29, 2000)

70 Fed. Reg. 70623 (Nov. 22, 2005)

79 Fed. Reg. 31120 (May 30, 2014)

CMS, Medicare Benefit Policy Manual, Ch. 15, § 50.4.5 (Rev. 96) (Oct. 24, 2008), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/bp102c15.pdf.

CMS, Memorandum re: HPMS Q&A - Patient Assistance Programs (Oct. 4, 2006), https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovGenIn/Downloads/MemoPAPsOutsidePartDBenefit_100406.pdf.

CMS, Perspective on Pharmaceutical Company Patient Assistance Programs (Jan. 25, 2006), http://oig.hhs.gov/fraud/docs/alertsandbulletins/2006/CMSPAP.pdf.

**EXHIBIT A**
**MATERIALS CONSIDERED**

CMS, Medicare Prescription Drug Benefit Manual, Ch. 18 § 40.2.1 (Rev. 9) (Feb. 22, 2013), https://www.cms.gov/Medicare/Appeals-and-Grievances/MedPrescriptDrugApplGriev/index.html?redirect=/medprescriptdrugapplgriev/13_forms.asp.

CMS, Medicare Prescription Drug Benefit Manual, Ch. 18 § 130.3.1 (Rev. 2) (June 22, 2006), https://www.cms.gov/Medicare/Appeals-and-Grievances/MedPrescriptDrugApplGriev/downloads/partdmanualchapter18.pdf.

Email from Eden Heard, HHS Office of General Counsel, CMS Division, to Justin Brooks *et al.* (Jan. 20, 2016)

Letter from Michael O. Leavitt, Secretary of HHS, to Billy Tauzin, President and CEO of PhRMA (Feb. 9, 2006), http://oig.hhs.gov/fraud/docs/alertsandbulletins/2006/TauzinPAP.pdf.

Maximus Federal Services, Part D QIC Reconsideration Procedures Manual (Dec. 2014), http://www.medicarepartdappeals.com/sites/default/files/PartD_ReconManual-v9.3.pdf.

# Exhibit B

**From:** Heard, Eden (HHS/OGC) [mailto:Eden.Heard@hhs.gov]
**Sent:** Wednesday, January 20, 2016 10:22 AM
**To:** Justin Brooks; Stansel, James C.; Dunne, Kimberly A.; Olson, William E. (CIV) (William.E.Olson@usdoj.gov)
**Cc:** Johnson, Amanda S. (CMS/CM); Allen, Karen M. (CMS/OTS); Horton, Dinah L. (CMS/OTS)
**Subject:** FW: Celgene - final action question - response to example provided

Amanda Johnson has provided written responses below. We can still have a call at 11 a.m. on Friday if you think it's necessary, and if that works for Will and Sidley.

Eden Heard
HHS/OS/OGC, CMS Division
(202) 401-7418

**Notice:** The contents of this message and any attachments may be privileged and confidential. Please do not disseminate without the approval of the Office of the General Counsel. If you are not an intended recipient, or have received this message in error, please delete it without reading it and please do not print, copy, forward, disseminate, or otherwise use the information. Also, please notify the sender that you have received this communication in error. Your receipt of this message is not intended to waive any applicable privilege.

**From:** Justin Brooks [mailto:JBrooks@gbblegal.com]
**Sent:** Friday, January 15, 2016 10:25 AM
**To:** Heard, Eden (HHS/OGC); 'jstansel@sidley.com'; 'kdunne@sidley.com'
**Cc:** Olson, William E. (CIV) (William.E.Olson@usdoj.gov); mwilliams@bmkattorneys.com
**Subject:** RE: Celgene - final action question - response to example provided

Thank you, Eden. We'd like final clarification and/or confirmation on the below points as soon as it's possible for CMS to do so. We need this to rerun our numbers and produce an accurate supplemental report. We are happy to schedule a final call with our experts, your team, and Celgene's experts if necessary to reach final resolution.

**1)** In the data set provided, there are 2,269 bene_ids were associated with both "H" (Local Medicare Advantage Prescription Drug (MA-PD) Plans) and "S" Prescription Drug Plans (PDP). How should we deal with the patients with multiple plan types?

> CMS response: Low-income beneficiaries can change plans at any time. In addition, other beneficiaries may be granted a special enrollment period in which they change plans. Any change in plans will become effective at the beginning of the month because enrollment

can only change on a monthly basis. The contract of record is responsible for the beneficiary claims with DOS that occur during the time the beneficiary is enrolled in its plan.

**2)** According to the table,

"H" for Local Medicare Advantage Prescription Drug (MA-PD) Plans,

"R" for Regional MA-PD Plans,

"S" for Prescription Drug Plans (PDP),

"E" for Employer Group Waiver Plans (EGWP),

"X" for LI NET plan.

Should we consider "H" and "R" as MA patients and the rest ("S", "E" and "X" ) as non MA patients?

CMS response: H and R represent the MA plans and the others are the stand alone PDPs.

**3)** How do we identify the final paid claim by Medicare when we see multiple claims for a patient per service date (even if we see that these claims are due to claims submitted by different service providers)?

CMS response: The final "paid" claim will be identified with a CLM_FINL_ACTN_IND of "Y" and either a 1 (original), 2 (adjusted), or 4 (resubmitted) in the CLM_TYPE_CD field. Claims with a CLM_FINL_ACTN_IND of "Y" and a CLM_TYPE_CD of "4" are deleted PDEs and were not included in the annual Part D payment reconciliation. In the case of Medicare Part D, we don't pay on a claim basis so the claims with a CLM_FINL_ACTN_IND of "Y" and either a 1 (original), 2 (adjusted), or 4 (resubmitted) in the CLM_TYPE_CD field are the claims that were part of the annual Part D payment reconciliation.

**4)** For 3) above, when different payment amounts are seen for multiple claims for a patient per service date, how to identify the final claim amount paid?

CMS response: The total cost of the drug will be the sum of GDCB and GDCA. The PDE provides a breakdown of what the plan (CPP and NPP) and the beneficiary (Pt. Pay amount) paid at the point-of-sale. The government cost is not determined at the POS but is determined in the annual Part D payment reconciliation. The reconciliation occurs at the PBP level, not the claim level.

Justin S. Brooks
Guttman, Buschner & Brooks PLLC
1515 Locust Street, Suite 501
Philadelphia, PA 19102
Direct Dial: (302) 327-9210
Mobile: (610) 547-9556
jbrooks@gbblegal.com

**From:** Heard, Eden (HHS/OGC) [mailto:Eden.Heard@hhs.gov]
**Sent:** Monday, January 11, 2016 2:25 PM
**To:** 'jstansel@sidley.com' <jstansel@sidley.com>; Justin Brooks <JBrooks@gbblegal.com>; 'kdunne@sidley.com' <kdunne@sidley.com>
**Cc:** Olson, William E. (CIV) (William.E.Olson@usdoj.gov) <William.E.Olson@usdoj.gov>
**Subject:** Celgene - final action question - response to example provided

The CMS Integrated Data Repository (IDR) views this one PDE as four different PDEs because of the Rptd Service Provider ID, in which the sponsor submitted a different Service Provider ID in each submission. Was this the only instance like this that you found? There are key fields on the PDE that the IDR uses to classify PDEs into families (families are the summary of changes to one PDE). Because of the slight variation in the Service Provider ID, the IDR classifies this as four different PDEs but it is really only one PDE. We don't know how often this occurs. As stated previously, there is only one final action PDE in a family. This is a situation in which IDR thinks there are four different families.

| Date of Service | Rx Service Reference Number | Fill Number | Rptd Service Provider ID | Rptd Service Provider ID Qlfyr | Dispensing Status Code | Claim Effective Indicator |
|---|---|---|---|---|---|---|
| 5/4/2007 | 000000003546 | 1 | PAPERCLAIM | 99 | | Y |
| 5/4/2007 | 000000003546 | 1 | 4541416 | 07 | | Y |
| 5/4/2007 | 000000003546 | 1 | PAPER CLM | 99 | | Y |
| 5/4/2007 | 000000003546 | 1 | PAPER CLAIM | 99 | | Y |

Eden Heard
HHS/OGC/CMS Division
(202) 401-7418

**Notice:** The contents of this message and any attachments may be privileged and confidential. Please do not disseminate without the approval of the Office of the General Counsel. If you are not an intended recipient, or have received this message in error, please delete it without reading it and please do not print, copy, forward, disseminate, or otherwise use the information. Also, please notify the sender that you have received this communication in error. Your receipt of this message is not intended to waive any applicable privilege.

# Exhibit C

THE SECRETARY OF HEALTH AND HUMAN SERVICES
WASHINGTON, D.C. 20201

FEB - 9 2006

The Honorable Billy Tauzin
President and CEO
The Pharmaceutical Research and Manufacturers of America
1100 Fifteenth Street, NW
Washington, DC 20005

Dear Mr. Tauzin:

Pharmaceutical companies' patient assistance programs (PAPs) have proven to be a vital source of medication for many Americans. However, there has been concern about federal laws and regulations affecting pharmaceutical companies' ability to continue these programs with the advent of the Medicare prescription drug benefit. I wanted to take this opportunity to clarify any confusion that may exist.

As you know, the decision to operate a PAP is up to each pharmaceutical company, not the United States Government. The terms and conditions are determined by the company, without government involvement. Recent guidance from the Centers for Medicare & Medicaid Services (CMS) and the Office of the Inspector General (OIG) make clear that lawful opportunities exist to provide drug assistance to Medicare beneficiaries. This guidance is attached for your review.

Specifically, PAPs can continue to assist Part D enrollees through a properly structured program that operates entirely outside the Part D benefit. Under this approach, the beneficiary does not use his or her Part D benefit to obtain the drug and the cost of the drug is not applied toward the enrollee's true out-of-pocket costs.

Other opportunities exist as well. Many pharmaceutical companies have donated to bona fide independent charities that operate PAPs that serve financially needy Medicare and other patients. Nothing in the law prevents pharmaceutical companies from continuing to support these vital programs.

The recent OIG guidance clearly supports the continuation of assistance by pharmaceutical company PAPs for needy Medicare beneficiaries and provides guidance on properly structuring such arrangements, including programs operating outside Part D.

Again, HHS recognizes the value of pharmaceutical PAPs to their clients, including Medicare beneficiaries. It is my hope that HHS and PhRMA can work together to create opportunities for the Medicare drug benefit and PAPs to work in tandem.

Sincerely,

Michael O. Leavitt

Enclosures

it to the agency. Thus, each firm submitting a compliance extension request will need 5 hours of employee time to complete the request. Given that 56 businesses are expected to submit written requests in year one, the total burden hours for year one are 280.

In year two, FDA expects about one-half as many firms to request a labeling compliance extension. So for year two, 28 firms are expected to file a request for an extension to the labeling compliance date. Again, assuming that it will take 5 hours to complete each request, the total burden hours for year two will be 140.

Dated: November 14, 2005.

**Jeffrey Shuren,**

*Assistant Commissioner for Policy.*

[FR Doc. 05–23040 Filed 11–21–05; 8:45 am]

BILLING CODE 4160–01–S

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Food and Drug Administration

**[Docket No. 2005N–0343]**

### Agency Information Collection Activities; Announcement of Office of Management and Budget Approval; Guidance for Requesting an Extension to Use Existing Label Stock After the Trans Fat Labeling Effective Date of January 1, 2006

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice.

**SUMMARY:** The Food and Drug Administration (FDA) is announcing that a collection of information entitled "Guidance for Requesting an Extension to Use Existing Label Stock after the *Trans* Fat Labeling Effective Date of January 1, 2006" has been approved by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (the PRA). Elsewhere in this issue of the **Federal Register**, FDA is publishing a notice announcing an opportunity for public comment on this collection of information. Since this collection received emergency approval that expires on January 1, 2006, FDA is following the normal PRA clearance procedures by issuing that notice.

**FOR FURTHER INFORMATION CONTACT:** Peggy Robbins, Office of Management Programs (HFA–250), Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857, 301–827–1223.

**SUPPLEMENTARY INFORMATION:** In the **Federal Register** of September 1, 2005 (70 FR 52108), the agency announced that the proposed information collection had been submitted to OMB for review and clearance under 44 U.S.C. 3507. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. OMB has now approved the information collection and has assigned OMB control number 0910–0571. The approval expires on January 31, 2006. A copy of the supporting statement for this information collection is available on the Internet at *http://www.fda.gov/ohrms/dockets.*

Dated: November 14, 2005.

**Jeffrey Shuren,**

*Assistant Commissioner for Policy.*

[FR Doc. 05–23041 Filed 11–21–05; 8:45 am]

BILLING CODE 4160–01–S

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Health Resources and Services Administration

### Advisory Commission on Childhood Vaccines; Notice of Meeting

In accordance with section 10(a)(2) of the Federal Advisory Committee Act (Pub. L. 92–463), notice is hereby given of the following meeting:

*Name:* Advisory Commission on Childhood Vaccines (ACCV).

*Date and Time:* December 12, 2005, 9 a.m.—5 p.m., EST.

*Place:* Audio Conference Call and Parklawn Building, Conference Rooms G & H, 5600 Fishers Lane, Rockville, MD 20857.

The ACCV will meet on Monday, December 12, from 9 a.m. to 5 p.m. The public can join the meeting in person at the address listed above or by audio conference call by dialing 1–800–369–6048 on December 12 and providing the following information:

*Leader's Name:* Dr. Geoffrey Evans.

*Password:* ACCV.

*Agenda:* The agenda items for the December meeting will include, but are not limited to: A summary of the U.S. Court of Federal Claims' 18th Judicial Conference; a report from the ACCV Workgroup looking at proposed guidelines for future changes to the Vaccine Injury Table; and updates from the Division of Vaccine Injury Compensation (DVIC), Department of Justice, National Vaccine Program Office, Immunization Safety Office (Centers for Disease Control and Prevention), National Institute of Allergy and Infectious Diseases (National Institutes of Health), and Center for Biologics and Evaluation Research (Food and Drug Administration). Agenda items are subject to change as priorities dictate.

*Public Comments:* Persons interested in providing an oral presentation should submit a written request, along with a copy of their presentation to: Ms. Cheryl Lee, Principal Staff Liaison, DVIC, Healthcare Systems Bureau (HSB), Health Resources and Services Administration (HRSA), Room 11C–26, 5600 Fishers Lane, Rockville, Maryland 20857 or e-mail *clee@hrsa.gov.* Requests should contain the name, address, telephone number, and any business or professional affiliation of the person desiring to make an oral presentation. Groups having similar interests are requested to combine their comments and present them through a single representative. The allocation of time may be adjusted to accommodate the level of expressed interest. DVIC will notify each presenter by mail or telephone of their assigned presentation time. Persons who do not file an advance request for a presentation, but desire to make an oral statement, may announce it at the time of the comment period. These persons will be allocated time as it permits.

*For Further Information Contact:* Anyone requiring information regarding the ACCV should contact Ms. Cheryl Lee, Principal Staff Liaison, DVIC, HSB, HRSA, Room 11C–26, 5600 Fishers Lane, Rockville, MD 20857; telephone (301) 443–2124 or e-mail *clee@hrsa.gov.*

Dated: November 15, 2005.

**Tina M. Cheatham,**

*Director, Division of Policy Review and Coordination.*

[FR Doc. 05–23042 Filed 11–21–05; 8:45 am]

BILLING CODE 4165–15–P

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Office of Inspector General

### Publication of OIG Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees

**AGENCY:** Office of Inspector General (OIG), HHS.

**ACTION:** Notice.

**SUMMARY:** OIG periodically develops and issues guidance, including Special Advisory Bulletins, to alert and inform the health care industry about potential problems or areas of special interest. This **Federal Register** notice sets forth the recently issued OIG Special Advisory Bulletin addressing patient assistance programs for Medicare Part D enrollees.

**FOR FURTHER INFORMATION CONTACT:** Darlene M. Hampton, Office of Counsel to the Inspector General, (202) 619–0335.

**SUPPLEMENTARY INFORMATION:**

**Special Advisory Bulletin: Patient Assistance Programs for Medicare Part D Enrollees (November 2005)**

*I. Introduction*

Patient assistance programs (PAPs) have long provided important safety net assistance to patients of limited means

who do not have insurance coverage for drugs, typically serving patients with chronic illnesses and high drug costs. PAPs are structured and operated in many different ways. PAPs may offer cash subsidies, free or reduced price drugs, or both. Some PAPs offer assistance directly to patients, while others replenish drugs furnished by pharmacies, clinics, hospitals, and other entities to eligible patients whose drugs are not covered by an insurance program. Some PAPs are affiliated with particular pharmaceutical manufacturers; others are operated by independent charitable organizations (such as, for example, patient advocacy and support organizations) without regard to any specific donor or industry interests.

Many pharmaceutical manufacturers have historically sponsored PAPs that assist patients whose outpatient prescription drugs are not covered by an insurance program (including some Medicare beneficiaries), in obtaining the manufacturer's products for free or at greatly reduced cost. Beginning on January 1, 2006, Medicare Part D will offer Medicare beneficiaries who elect to enroll broad coverage for outpatient prescription drugs. Accordingly, Medicare beneficiaries who enroll in Part D will no longer qualify under traditional PAP eligibility criteria. Part D enrollees will incur cost-sharing obligations (including deductibles and copayments), although many low-income beneficiaries will qualify for subsidies that will reduce or eliminate their financial obligations.[1] Pharmaceutical manufacturers have expressed interest in continuing to assist Medicare Part D enrollees of limited means who do not qualify for the low-income subsidy.

OIG is mindful of the importance of ensuring that financially needy beneficiaries who enroll in Part D receive medically necessary drugs, and OIG supports efforts of charitable organizations and others to assist financially needy beneficiaries, as long as the assistance is provided in a manner that does not run afoul of the Federal anti-kickback statute or other laws.[2] We have been asked whether the anti-kickback statute will be implicated if pharmaceutical manufacturer PAPs[3] continue to offer assistance to financially needy Medicare beneficiaries who enroll in Part D by subsidizing their cost-sharing obligations for covered Part D drugs. For the reasons set forth below and consistent with extant OIG guidance, we conclude that pharmaceutical manufacturer PAPs that subsidize Part D cost-sharing amounts present heightened risks under the anti-kickback statute. However, in the circumstances described in this Bulletin, cost-sharing subsidies provided by *bona fide*, independent charities unaffiliated with pharmaceutical manufacturers should not raise anti-kickback concerns, even if the charities receive manufacturer contributions. In addition, we believe other arrangements described in this Bulletin, if properly structured, may pose reduced risk. Thus, we believe lawful avenues exist for pharmaceutical manufacturers and others to help ensure that all Part D beneficiaries can afford medically necessary drugs.

Given the importance of ensuring continued access to drugs for beneficiaries of limited means and the expedited time frame for implementation of the Part D benefit, we are issuing this Special Advisory Bulletin to identify potentially abusive PAP structures, as well as methods of providing assistance that mitigate or vitiate the potential for fraud and abuse. This Special Advisory Bulletin draws on the government's prior fraud and abuse guidance and enforcement experience. However, because the Part D benefit has not yet begun, and any assessment of fraud and abuse is necessarily speculative, this Bulletin cannot, and is not intended to, be an exhaustive discussion of relevant risks or beneficial practices.

At the outset, it is important to note the following:

- PAPs need not disenroll all Medicare beneficiaries from their existing PAPs to be compliant with the fraud and abuse laws. Enrollment in Part D is voluntary; therefore, existing PAPs may continue to provide free or reduced price outpatient prescription drugs to Medicare beneficiaries who have not yet enrolled in Part D. The Centers for Medicare & Medicaid Services (CMS) anticipates instituting procedures that will help PAPs determine if PAP clients have enrolled in Part D.
- Occasional, inadvertent cost-sharing subsidies provided by a pharmaceutical manufacturer PAP to a Part D enrollee should not be problematic under the anti-kickback statute (*e.g.*, where, despite due diligence, a pharmaceutical manufacturer PAP does not know and should not have known that a beneficiary has enrolled in Medicare Part D).
- Nothing in the Part D program or in any OIG laws or regulations prevents pharmaceutical manufacturers or others from providing assistance (*e.g.*, through cash subsidies or free drugs) to uninsured patients. Nothing in this Bulletin impacts programs that assist uninsured patients.
- Nothing in this guidance should be construed as preventing pharmacies from waiving cost-sharing amounts owed by a Medicare beneficiary on the basis of a good faith, individualized assessment of the patient's financial need (or failure of reasonable collection efforts), so long as the waiver is neither routine, nor advertised. Financial need-based waivers that meet these criteria have long been permitted.[4] However, a pharmacy has not waived a cost-sharing amount if the amount has been paid to the pharmacy, in cash or in kind, by a

---

[1] *See* 42 CFR 423.782.

[2] This Bulletin focuses on the application of the Federal anti-kickback statute. Other potential risk areas, including, for example, potential liability under the False Claims Act, 31 U.S.C. 3729–33, or other Federal or State laws, are not addressed here. Moreover, this Bulletin focuses on arrangements that involve pharmaceutical manufacturers directly or indirectly subsidizing Part D cost-sharing amounts. Programs that subsidize Part D premium amounts pose risks under the anti-kickback statute that are not addressed here. Similarly, PAPs established by health plans that subsidize cost sharing or premium amounts under Part D raise different issues and may require a different analysis. While this Bulletin may provide some useful guidance for other kinds of PAP arrangements, such PAPs are not specifically considered here.

[3] For purposes of this Special Advisory Bulletin, a pharmaceutical manufacturer PAP includes any PAP that is directly or indirectly operated or controlled in any manner by a pharmaceutical manufacturer or its affiliates (including, without limitation, any employee, agent, officer shareholder, or contractor (including, without limitation, any wholesaler, distributor, or pharmacy benefits manager)). Moreover, for purposes of an anti-kickback analysis, we would not consider a charitable foundation (or similar entity) formed, funded or controlled by a manufacturer or any of its affiliates (including, without limitation, any employee, agent, officer, shareholder, or contractor (including, without limitation, any wholesaler, distributor, or pharmacy benefits manager)) to be a *bona fide*, independent charity, because interposition of the entity would not sever the nexus between the patient subsidies and the manufacturer. Indeed, in most cases, the foundation would receive all of its funding from the pharmaceutical manufacturer (or its affiliates) and would provide subsidies only for the manufacturer's products.

[4] *See, e.g.*, section 1128A(i)(6)(A) of the Act; OIG Special Advisory Bulletin on Offering Gifts and Other Inducements to Beneficiaries, August 2002, *http:oig.hhs.gov/fraud/docs/alertsandbulletins/SABGiftsandInducements.pdf.* The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) included a safe harbor specifically incorporating these criteria for waivers of cost-sharing amounts for Part D drugs. Additionally, the safe harbor protects cost-sharing waivers offered to individuals who qualify for the low income subsidy, even if the waivers are routine and do not follow an individualized determination of financial need, provided they are not advertised. *See* Section 1860D–42 of MMA, codified at 42 U.S.C. 1320a–7b(b)(3)(G).

third party (including, without limitation, a PAP).

*II. The Federal Anti-Kickback Statute*

The Federal anti-kickback statute, section 1128B(b) of the Social Security Act (the Act),[5] makes it a criminal offense knowingly and willfully to offer, pay, solicit, or receive any remuneration to induce or reward the referral or generation of business reimbursable by any Federal health care program, including Medicare and Medicaid. Where remuneration is paid purposefully to induce or reward referrals of items or services payable by a Federal health care program, the anti-kickback statute is violated. By its terms, the statute ascribes criminal liability to parties on both sides of an impermissible "kickback" transaction. For purposes of the anti-kickback statute, "remuneration" includes the transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in kind. The statute has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. Violation of the statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both. OIG may also initiate administrative proceedings to exclude a person from Federal health care programs or to impose civil money penalties for kickback violations under sections 1128(b)(7) and 1128A(a)(7) of the Act.[6]

A determination regarding whether a particular arrangement violates the anti-kickback statute requires a case-by-case evaluation of all of the relevant facts and circumstances, including the intent of the parties. For PAPs, the nature, structure, sponsorship, and funding of the particular PAP are necessarily relevant to the analysis.

*III. Patient Assistance Programs*

As described more fully below, cost-sharing subsidies provided by pharmaceutical manufacturer PAPs pose a heightened risk of fraud and abuse under the Federal anti-kickback statute. However, there are non-abusive alternatives available. In particular, as discussed below, pharmaceutical manufacturers can donate to *bona fide* independent charity PAPs, provided appropriate safeguards exist. Moreover, this Bulletin discusses several other alternatives that may pose a reduced risk of fraud and abuse.

This section addresses in turn: pharmaceutical manufacturer PAPs, independent charity PAPs, manufacturer PAPs that operate "outside of Part D"; "coalition model" PAPs, and bulk replacement programs.

A. Pharmaceutical Manufacturer PAPs

Analytically, pharmaceutical manufacturer PAPs raise two main issues in connection with the Part D program: (i) Whether subsidies they provide can count toward a Part D enrollee's true out-of-pocket costs (known as the TrOOP); and (ii) whether the subsidies implicate the Federal anti-kickback statute.[7]

As to the first issue, the Part D regulations make clear that beneficiaries may count toward their TrOOP assistance received from any source other than group health plans, other insurers and government funded health programs, and similar third party payment arrangements.[8] The preamble to the Part D regulations explains that cost-sharing assistance furnished by a PAP, including a manufacturer PAP, will count toward a beneficiary's TrOOP expenditures, even if the PAP does not comply with the fraud and abuse laws.[9] This approach relieves beneficiaries of the financial risk of accepting assistance from an entity that may be improperly structured or operated.

As to the second issue, the core question is whether the anti-kickback statute would be implicated if a manufacturer of a drug covered under Part D were to subsidize cost-sharing amounts (directly or indirectly through a PAP) incurred by Part D beneficiaries for the manufacturer's product. Consistent with our prior guidance addressing manufacturer cost-sharing subsidies in the context of Part B drugs,[10] we believe such subsidies for Part D drugs would implicate the anti-kickback statute and pose a substantial risk of program and patient fraud and abuse.[11] Simply put, the subsidies would be squarely prohibited by the statute, because the manufacturer would be giving something of value (*i.e.*, the subsidy) to beneficiaries to use its product. Where a manufacturer PAP offers subsidies tied to the use of the manufacturer's products (often expensive drugs used by patients with chronic illnesses), the subsidies present all of the usual risks of fraud and abuse associated with kickbacks, including steering beneficiaries to particular drugs; increasing costs to Medicare; providing a financial advantage over competing drugs; and reducing beneficiaries= incentives to locate and use less expensive, equally effective drugs.

It is impossible to predict with certainty the way in which abuse may occur in a new benefit program that is not yet operational. The following are illustrative examples of some types of abuse that may occur:

- Increased costs to the program. We are concerned that a manufacturer might use beneficiary cost-sharing subsidies, which help beneficiaries meet their TrOOP requirement, to increase the number of beneficiaries using the manufacturer's product who reach the

---

[5] 42 U.S.C. 1320a–7b(b).

[6] 42 U.S.C. 1320a–7(b)(7); 42 U.S.C. 1320a–7a(a)(7).

[7] In some cases, a subsidy for Part D cost-sharing obligations provided by a pharmaceutical manufacturer may also implicate the prohibition on offering inducements to beneficiaries, as set forth in section 1128A(a)(5) of the Act, if the subsidy is likely to influence the beneficiary's selection of a particular provider, practitioner, or supplier, such as a physician or pharmacy. We have interpreted "provider, practitioner, or supplier" to exclude pharmaceutical manufacturers unless they also own or operate pharmacies, pharmaceutical benefits management companies, or other entities that file claims for payment under the Medicare or Medicaid programs. *See* Special Advisory Bulletin on Offering Gifts and Other Inducements to Beneficiaries, supra note 4.

[8] *See* 42 CFR 423.100; 42 CFR 423.464; 70 FR 4194, 4239 (January 28, 2005). We note that CMS is the proper agency to address questions about the mechanics of calculating TrOOP. In certain circumstances, knowing improper TrOOP calculations may give rise to liability under the False Claims Act, 31 U.S.C. 3729–33.

[9] *See* 70 FR 4194 at 4239.

[10] *See, e.g.*, OIG Advisory Opinion Nos. 02–13 and 03–3 (unfavorable opinions involving proposals from pharmaceutical manufacturer PAPs to subsidize Part B cost-sharing amounts). We note that the cost and utilization management features of the Part D program, while important, do not sufficiently mitigate the risks.

[11] Some in the industry have asserted that cost-sharing subsidies for Part D drugs differ from cost-sharing subsidies for Part B drugs so long as the subsidies are given to patients who are in a Part D "coverage gap" (*i.e.*, a benefit period during which the beneficiary pays 100% of the cost of the drugs). To support their position, they contend either that beneficiaries in the coverage gap are functionally "uninsured" or that the situation is comparable to providing free drugs to financially needy beneficiaries so long as no Federal health care program is billed for all or part of the drug, a practice we previously permitted in the context of subsidies for Part B drugs. *See* OIG Advisory Opinion Nos. 02–13 and 03–3. Under Part D, a "coverage gap" is a period of insurance coverage. *See* CMS Frequently Asked Question ID 4855, *http://questions.cms.hhs.gov/cgi-bin/cmshhs.cfg/php/enduser/std_adp.php?p_faqid=4855* (regarding prescription drug benefit coordination of benefits and TrOOP). During the coverage gap, beneficiaries remain enrolled in their Part D plans and have a continuing obligation to pay Part D premiums; Part D plans continue to receive the monthly per-enrollee direct subsidy from the Medicare program. Moreover, subsidies during the coverage gap are not like furnishing free drugs where no Federal health care program is billed. Sufficient spending during the coverage gap qualifies the beneficiary to reach the catastrophic coverage portion of the Part D benefit, at which point the Medicare program resumes payment for most of the costs of the beneficiary's drugs. In this regard, the different structures of the Part B and Part D benefits are crucial to the analysis.

catastrophic benefit in any given coverage year and to hasten the point during the coverage year at which beneficiaries reach the catastrophic benefit. This is of particular import because Medicare will make cost-based payments during the catastrophic coverage benefit.[12] We know from experience that cost-based reimbursement is inherently prone to abuse, including by vendors that sell products reimbursed on a cost basis. Similarly, we are concerned about the use of cost-sharing subsidies to shield beneficiaries from the economic effects of drug pricing, thus eliminating a market safeguard against inflated prices. Inflated prices could have a "spillover" effect on the size of direct subsidies, reinsurance payments, and risk corridor payments paid by Medicare to Part D plans in future years,[13] potentially resulting in higher costs to the Medicare program.

- Beneficiary steering and anti-competitive effects. Subsidies provided by traditional pharmaceutical manufacturer PAPs have the practical effect of locking beneficiaries into the manufacturer's product, even if there are other equally effective, less costly alternatives (and even if the patient's physician would otherwise prescribe one of these alternatives). Subsidizing Medicare Part D cost-sharing amounts will have this same steering effect. Moreover, as we have previously noted in the Part B context, cost-sharing subsidies can be very profitable for manufacturers, providing additional incentives for abuse. So long as the manufacturer's sales price for the product exceeds its marginal variable costs plus the amount of the cost-sharing assistance, the manufacturer makes a profit. These profits can be considerable, especially for expensive drugs for chronic conditions. We are concerned that pharmaceutical manufacturers may seek improperly to maximize these profits by creating sham "independent" charities to operate PAPs; by colluding with independent charity programs to ensure that the manufacturer's contributions only or primarily benefit patients using its products (discussed in more detail below); or by manipulating financial need or other eligibility criteria to maximize the number of beneficiaries qualifying for cost-sharing subsidies.

These risks are necessarily illustrative, not exhaustive, of the potential risks presented by pharmaceutical manufacturer PAPs that subsidize Part D cost-sharing amounts.

Cost-sharing subsidies offered by a pharmaceutical manufacturer PAP to the dispensing supplier differ in two important respects from a provider's or supplier's unadvertised, non-routine waiver of cost-sharing amounts based on a patient's financial need, which has long been permitted. First, the subsidies result in the dispensing supplier receiving full payment for the product and avoiding the risk of non-collection, thus providing the supplier with an economic incentive to favor the subsidized product and a disincentive to recommend a lower-cost alternative, such as a generic. In addition, the availability of PAP assistance is typically advertised and may influence a beneficiary's choice of product (through the prescribing physician acting on behalf of the beneficiary). Moreover, once a beneficiary is enrolled in a pharmaceutical manufacturer PAP, the beneficiary is effectively locked into using the pharmaceutical manufacturer's product, since the beneficiary risks losing financial assistance if he or she switches products, even if an equally effective, but less expensive, product would be in his or her best medical interests.

A definitive conclusion regarding whether a particular manufacturer PAP violates the anti-kickback statute would require a case-by-case analysis of all of the relevant facts and circumstances, including the intent of the parties. However, for the reasons noted above, we believe that pharmaceutical manufacturer PAPs that subsidize Part D cost-sharing amounts raise substantial concerns under the anti-kickback statute.

## B. Independent Charity PAPs

Long-standing OIG guidance makes clear that pharmaceutical manufacturers can effectively contribute to the pharmaceutical safety net by making cash donations to independent, *bona fide* charitable assistance programs.[14]

Under a properly structured program, donations from a pharmaceutical manufacturer to an independent, *bona fide* charity that provides cost-sharing subsidies for Part D drugs should raise few, if any, anti-kickback statute concerns, so long as:

(i) Neither the pharmaceutical manufacturer nor any affiliate of the manufacturer (including, without limitation, any employee, agent, officer, shareholder, or contractor (including, without limitation, any wholesaler, distributor, or pharmacy benefits manager)) exerts any direct or indirect influence or control over the charity or the subsidy program;

(ii) The charity awards assistance in a truly independent manner that severs any link between the pharmaceutical manufacturer's funding and the beneficiary (*i.e.*, the assistance provided to the beneficiary cannot be attributed to the donating pharmaceutical manufacturer);

(iii) The charity awards assistance without regard to the pharmaceutical manufacturer's interests and without regard to the beneficiary's choice of product, provider, practitioner, supplier, or Part D drug plan;

(iv) The charity provides assistance based upon a reasonable, verifiable, and uniform measure of financial need that is applied in a consistent manner; and[15]

(v) The pharmaceutical manufacturer does not solicit or receive data from the charity that would facilitate the manufacturer in correlating the amount or frequency of its donations with the number of subsidized prescriptions for its products.[16]

---

[12] *See* 42 CFR 423.329. For purposes of calculating payments under catastrophic coverage, the cost of a beneficiary's drug is based in part on the plan's negotiated price (*i.e.*, a price that is set by the plan based on negotiations with pharmaceutical manufacturers and pharmacies).

[13] *See* 42 CFR 423.329; 42 CFR 423.336.

[14] In-kind donations of drugs to independent charity PAPs pose additional risks not yet directly addressed in prior OIG guidance, and we have insufficient experience with them to offer detailed guidance here. While in-kind donations have the potential benefit of increasing the value of donations (because marginal costs of drugs are generally low), they also have the effect of creating a direct correlation between the donation and use of a particular donor's product, thereby weakening important safeguards of an independent charity PAP arrangement. Moreover, there would appear to be difficult accounting and valuation issues raised by the use of in-kind product to subsidize Part D cost-sharing obligations, both for purposes of calculating TrOOP and for purposes of determining the amount of in-kind drug that equals the Part D cost-sharing amount owed.

[15] We recognize that what constitutes an appropriate determination of financial need may vary depending on individual patient circumstances. We believe that independent charity PAPs should have flexibility to consider relevant variables beyond income. For example, PAPs may choose to consider the local cost of living; a patient's assets and expenses; a patient's family size; and the scope and extent of a patient's medical bills.

[16] We have previously approved a *bona fide* independent charity PAP arrangement that included only limited reporting of *aggregate* data to donors in the form of monthly or less frequent reports containing *aggregate* data about the number of all applicants for assistance in a disease category and the number of patients qualifying for assistance in that disease category. *See* OIG Advisory Opinion No. 02–1. No individual patient information may be conveyed to donors. Moreover, neither patients nor donors may be informed of the donation made to the PAP by others, although, as required by Internal Revenue Service regulations, the PAP's annual report and a list of donors may be publicly available. *See* OIG Advisory Opinion No. 04–15. Reporting of data that is not in the aggregate or that is patient specific would be problematic, as would reporting of any data, whether or not in the

Simply put, the independent charity PAP must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries' drug choices.[17]

We recognize that some *bona fide* independent charities reasonably focus their efforts on patients with particular diseases (such as cancer or diabetes) and that some of these charities permit donors to earmark their contributions generally for support of patients with a specific disease. In general, the fact that a pharmaceutical manufacturer's donations are earmarked for one or more broad disease categories should not significantly raise the risk of abuse. However, we are concerned that, in some cases, charities may artificially define their disease categories so narrowly that the earmarking effectively results in the subsidization of one (or a very few) of donor's particular products. For example, we would be concerned if disease categories were defined by reference to specific symptoms, severity of symptoms, or the method of administration of drugs, rather than by diagnoses or broadly recognized illnesses or diseases. This type of arrangement would present an elevated risk of fraud and abuse because of the increased likelihood that the PAP would function as an improper conduit for manufacturers to provide funds to patients using their specific drugs. To avoid this risk, pharmaceutical manufacturers should not influence, directly or indirectly, the identification of disease or illness categories,[18] and pharmaceutical manufacturers should limit their earmarked donations to PAPs that define categories in accordance with widely recognized clinical standards and in a manner that covers a broad spectrum of available products.[19]

### C. PAPs Operating Outside Part D

CMS has issued guidance stating that PAPs may elect to provide free drugs to financially needy Medicare Part D enrollees outside the Part D benefit.[20] In these circumstances, the beneficiary obtains drugs without using his or her Part D insurance benefit. Beginning when a beneficiary's assistance under a PAP became effective, no claims for payment for any covered outpatient prescription drug provided outside of the Part D benefit may be filed with a Part D plan or the beneficiary, and the assistance must not count toward the beneficiary's TrOOP or total Part D spending for any purpose. For the reasons noted in connection with pharmaceutical manufacturer PAPs discussed above, PAPs that provide assistance outside the Part D benefit only during the coverage gap (*i.e.*, "wrapping around" the Part D benefit) pose a heightened risk of abuse. However, while it is difficult to assess the application of the fraud and abuse laws to PAPs that operate outside Part D absent a specific set of facts, it would appear that PAPs that furnish free outpatient prescription drugs entirely outside the Part D benefit pose a reduced risk under the anti-kickback statute, provided that:

(i) The PAP includes safeguards that ensure that Part D plans are notified that the drug is being provided outside the Part D benefit so that no payment is made for the subsidized drug by any Part D plan and no part of the costs of the subsidized drug is counted toward any beneficiary's TrOOP;

(ii) The PAP provides assistance for the whole Part D coverage year (or the portion of the coverage year remaining after the beneficiary first begins receiving the PAP assistance);[21]

(iii) The PAP assistance remains available even if the beneficiary's use of the subsidized drug is periodic during the coverage year;

(iv) The PAP maintains accurate and contemporaneous records of the subsidized drugs to permit the Government to verify the provision of drugs outside the Part D benefit;

(v) Assistance is awarded based on reasonable, uniform, and consistent measures of financial need and without regard to the providers, practitioners, or suppliers used by the patient or the Part D plan in which the patient is enrolled; and

(vi) The arrangement complies with any then-existing guidance from CMS.

In addition, to promote quality of care, we believe it would be important for PAPs that provide free drugs outside the Part D benefit to coordinate effectively with Part D plans so that the plans can undertake appropriate drug utilization review and medication therapy management program activities.

### D. "Coalition Model" PAPs

We are aware of nascent efforts by some in the industry to develop arrangements through which multiple pharmaceutical manufacturers would join together to offer financially needy Part D enrollees a card or similar vehicle that would entitle the enrollees to subsidies of their cost-sharing obligations for the manufacturers' products, typically in the form of discounts off the negotiated price otherwise available to the enrollee under his or her Part D plan. It is premature to offer definitive guidance on these evolving programs. Although these programs would operate so that the manufacturers effectively underwrite only the discounts on their own products, we observe that the risk of an illegal inducement potentially may be reduced if: (i) The program contains features that adequately safeguard against incentives for card holders to favor one drug product (or any one supplier, provider, practitioner, or Part D plan) over another; (ii) the program includes a large number of manufacturers, including competing manufacturers and manufacturers of both branded and generic products, sufficient to sever any nexus between the subsidy and a beneficiary's choice of drug; and (iii) each participating pharmaceutical manufacturer offers subsidies for *all* of its products that are covered by *any* Part D plan formulary. Other safeguards may also be needed to reduce the risk of an improper inducement. Moreover, a program under which Part D enrollees pay a portion of their drug costs out-of-pocket would tend to reduce the risk of abuse by preserving the beneficiary's incentive to locate and purchase equally effective, lower cost drugs.

---

aggregate, related to the identity, amount, or nature of subsidized drugs.

[17] For further guidance on establishing compliant independent charity PAPs, see OIG Advisory Opinion Nos. 04–15, 02–1, 98–17, and 97–1 (favorable opinions issued to *bona fide*, independent charities that accept industry funding).

[18] Nothing in this Bulletin should be construed as preventing a charity from obtaining educational materials from donors that the donors generally make available to practitioners or the general public (*e.g.*, clinical information about drug products).

[19] We recognize that, in rare circumstances, there may only be one drug covered by Part D for the diseases in a particular category or only one pharmaceutical manufacturer (including its affiliates) that makes all of the Part D covered drugs for the diseases in a particular category. In these unusual circumstances, the fact that a disease category only includes one drug or manufacturer would not, standing alone, be determinative of an anti-kickback statute violation. Such a determination could only be made on a case-by-case basis after examining all of the applicable facts and circumstances, including the intent of the parties. We note that it would be important for the PAP program to cover additional products or manufacturers as they become available.

[20] *See* CMS Frequently Asked Question ID 6153, *http://questions.cms.hhs.gov/cgi-bin/cmshhs.cfg/php/enduser/std_adp.php?p_faqid=6153* (regarding PAPs providing assistance with Part D drug costs to Part D enrollees outside of the Part D benefit and without counting towards TrOOP).

[21] We note that our position that PAPs operating outside the Part D benefit should provide assistance for the remainder of the coverage year is consistent with our observation in several advisory opinions that manufacturers "may provide free drugs to financially needy beneficiaries, so long as no Federal health care program is billed for all or part of the drugs." OIG Advisory Opinion Nos. 02–13 and 03–3.

*IV. Bulk Replacement Models*

Bulk replacement" or similar programs, pursuant to which pharmaceutical manufacturers (or their affiliated PAPs) provide in-kind donations in the form of free drugs to pharmacies, health centers, clinics, and other entities that dispense drugs to qualifying uninsured patients, are different from traditional PAPs that provide assistance directly to patients. These programs potentially implicate the Federal anti-kickback statute if the free drugs are given to a recipient that is in a position to generate Federal health care program business for the donor manufacturer. Whether a particular bulk replacement program complies with the fraud and abuse laws would require a case-by-case analysis. In undertaking any analysis, we would consider, among other factors, how the program is structured and whether there are safeguards in place: (i) To protect Federal health care program beneficiaries from being steered to particular drugs based on the financial interests of their health care providers or suppliers; (ii) to protect the Federal health care programs from increased program costs; and (iii) to ensure that bulk replacement drugs are not improperly charged to Federal health care programs. Additionally, bulk replacement as a means of subsidizing only the Medicare Part D cost-sharing amount potentially raises substantial risks related to accounting for the amount of replacement drug that would be equivalent to the cost-sharing amount owed by the beneficiary; properly attributing that amount to specific beneficiaries; and properly calculating TrOOP.

**V. Transitioning From Existing Pharmaceutical Manufacturer PAPs**

OIG is mindful of the importance of a smooth, effective transition for beneficiaries who are currently participating in pharmaceutical manufacturer PAPs and elect to enroll in Medicare Part D. While most such enrollees are likely to qualify for the low-income subsidies available under Part D, we are concerned that there may not be sufficient independent charity PAPs available before the January 1, 2006 start date of the Part D program to accommodate beneficiaries of limited means who may need an alternative PAP arrangement. We recognize the importance of not unnecessarily burdening or alarming beneficiaries. We believe that manufacturers will play an important role in ensuring an effective transition.

With respect to pharmaceutical manufacturer PAPs that are in existence prior to the date of publication of this Special Advisory Bulletin, during the initial calendar year of the Part D benefit, OIG will take into consideration in exercising its enforcement discretion with respect to administrative sanctions arising under the anti-kickback statute whether the PAP is taking prompt, reasonable, verifiable, and meaningful steps to transition patients who enroll in Part D to alternative assistance models, such as independent charities.

In addition to taking steps to transition beneficiaries to other programs, pharmaceutical manufacturer PAPs can reduce their fraud and abuse exposure by taking one or more of the following steps: (i) Adjusting financial need criteria to reflect the lower drug costs incurred by Part D enrollees (*i.e.*, liability for premiums and cost-sharing amounts only, instead of the total cost of the drugs); (ii) where possible, subsidizing other drugs in the same class as the manufacturer's products covered by the PAP if a beneficiary's physician prescribes an alternate product; and (iii) checking CMS eligibility files, to the extent available, on a reasonably regular basis to determine whether PAP patients have enrolled in Part D and should be transitioned to other assistance programs. Occasional, inadvertent cost-sharing subsidies provided to a Part D enrollee should not be problematic (*e.g.*, where, despite due diligence, a pharmaceutical manufacturer PAP does not know and should not have known that a beneficiary has enrolled in Medicare Part D). Notwithstanding a pharmaceutical manufacturer's compliance with the foregoing, the Government will take enforcement action in cases where there is evidence of unlawful intent.

The potential variability of PAPs, the fact that the Part D program is not yet operational, and the fact that it is not possible to predict all future or potential fraud and abuse schemes with certainty, make it difficult to provide comprehensive general guidance on the application of the anti-kickback statute to PAPs for Part D enrollees at this time. We intend to monitor the situation closely and may issue further guidance, if needed. Nothing in this Bulletin should be construed as precluding any form of lawful assistance not described in this Bulletin.

*VI. OIG Advisory Opinion Process*

OIG has an advisory opinion process that is available to individuals and entities, including pharmaceutical manufacturers, that want assurance that they will not run afoul of the fraud and abuse laws.[22] OIG advisory opinions are written opinions that are legally binding on OIG, the Department, and the party that requests the opinion. To obtain an opinion, the requesting party must submit a detailed, written description of its existing or proposed business arrangement. The length of time that it takes for OIG to issue an opinion varies based upon a number of factors, including the complexity of the arrangement, the completeness of the submission, and how promptly the requestor responds to requests for additional information. Further information about the process, including frequently asked questions, can be found on the OIG Web page at *http://oig.hhs.gov/fraud/advisoryopinions.html.*

The Office of Inspector General (OIG) was established at the Department of Health and Human Services by Congress in 1976 to identify and eliminate fraud, abuse, and waste in the Department's programs and to promote efficiency and economy in departmental operations. OIG carries out this mission through a nationwide program of audits, investigations, and inspections. The Health Care Fraud and Abuse Control Program, established by the Health Insurance Portability and Accountability Act of 1996 (HIPAA), authorized OIG to provide guidance to the health care industry to prevent fraud and abuse and to promote the highest level of ethical and lawful conduct. To further these goals, OIG issues Special Advisory Bulletins about industry practices or arrangements that potentially implicate the fraud and abuse authorities subject to enforcement by OIG.

**Daniel R. Levinson,**

*Inspector General.*

[FR Doc. 05–23038 Filed 11–21–05; 8:45 am]

BILLING CODE 4150–04–P

## DEPARTMENT OF HOMELAND SECURITY

**[DHS–2005–0054]**

## Office of State and Local Government Coordination and Preparedness; SAFER Grant Program

**AGENCY:** Office of State and Local Government Coordination and Preparedness, DHS.

**ACTION:** Notice and request for comment.

**SUMMARY:** Pursuant to the Paperwork Reduction Act, the Department of Homeland Security (DHS) solicited comments on the proposed collection of information in connection with the Staffing for Adequate Fire and Emergency (SAFER) Grant Application.

[22] Section 1128D(b) of the Act; 42 CFR part 1008.

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
200 Independence Avenue, SW
Washington, DC 20201

CMS
CENTERS for MEDICARE & MEDICAID SERVICES

# CMS Perspective on Pharmaceutical Company Patient Assistance Programs January 25, 2006

- The decision to keep a patient assistance program is up to the pharmaceutical company, not the US government. The terms of the programs are determined by the company, without any government involvement.

- There is nothing in the law that prohibits a pharmaceutical company patient assistance program from providing drug assistance to Medicare beneficiaries, even those enrolled in a Medicare prescription drug plan, but that help has to be *outside* the Medicare coverage – just as it has been until now.

- No company needs to end its patient assistance program on account of the drug benefit starting. Lawful avenues exist for pharmaceutical companies and others to help Part D beneficiaries with their drug costs. Pharmaceutical company patient assistance programs may elect to provide free drugs to financially needy Medicare Part D enrollees outside the Part D benefit. In these circumstances, the beneficiary obtains the patient assistance program drugs without using his or her Part D insurance benefit.

- Specifically, pharmaceutical company patient assistance programs **can** provide coverage for particular drugs that are included in the Medicare drug benefit. This assistance would remain independent of the Medicare drug coverage, as it was before 2006. Any assistance a pharmaceutical patient assistance program provides to a Part D enrollee for prescription drugs that would have been covered under his or her Part D plan would not count as an incurred cost that would be applied toward the enrollee's true out-of-pocket costs (known as "TrOOP") balance or total drug expenditures. In other words, beginning when a beneficiary's assistance under a patient assistance program became effective, no claims for payment for any covered outpatient prescription drug provided outside of the Part D benefit may be filed with a Part D plan or the beneficiary, and the assistance must not count toward the beneficiary's TrOOP or total Part D spending for any purpose.

- In fact, a company can continue its patient assistance program at a much lower cost than in the past, because most of the seniors eligible for pharmaceutical company patient assistance programs now have access to very comprehensive coverage through the Medicare program's Limited Income Subsidy.

- Nothing in any Office of the Inspector General (OIG) laws, regulations, or guidance prevents pharmaceutical company patient assistance programs from providing free or reduced price outpatient prescription drugs to uninsured patients and Medicare beneficiaries who have not enrolled in Part D.

- In addition, as outlined more fully in the OIG guidance, lawful avenues exist for pharmaceutical company patient assistance programs to assist financially needy Part D enrollees. The OIG has issued a Special Advisory Bulletin addressing the application of the fraud and abuse laws to pharmaceutical company patient assistance programs (see http://oig.hhs.gov/fraud/docs/alertsandbulletins/2005/PAPAdvisoryBlletinFinal-Final.pdf).

    - The Bulletin explains that pharmaceutical companies face a heightened risk of liability under the fraud and abuse laws if they assist Part D enrollees by paying all or a portion of the Part D cost-sharing amounts owed by the Part D enrollees for the company's products. For reasons explained more fully in the OIG's Bulletin, these types of cost-sharing subsidies pose all the usual risks of fraud and abuse associated with kickbacks, including steering beneficiaries to particular drugs; increasing costs to Medicare; providing a financial advantage over competing drugs; and reducing beneficiaries' incentives to locate and use less expensive, equally effective drugs.

    - The Bulletin also makes clear that pharmaceutical companies may choose to provide free or reduced price drugs to financially needy Part D beneficiaries, so long as the assistance program is properly structured and the free or reduced price drugs are provided entirely outside the Part D benefit. They may also choose to make cash donations to bona fide, independent charities that assist Medicare beneficiaries with drug expenses.

- For example, suppose Ms. Smith has qualified for a patient assistance program for a particular, costly cancer drug. She signs up for Part D for her other medications, but her income and assets are too high to qualify for the Part D low-income subsidy. The pharmaceutical company could continue to provide her cancer drug through their patient assistance program, so that Ms. Smith continues to face the same out-of-pocket costs for the cancer drug as she did before. Ms. Smith would not get coverage from her Part D plan for the cancer drug. Because the pharmaceutical company would only need to provide such coverage for Medicare beneficiaries with incomes that are limited but too high to qualify for the low-income subsidy, the company could continue the assistance program for people like Ms. Smith at a significantly lower cost than before Part D began.

- If a company chooses to do so, it can have a "win-win": significantly lowering the cost of its patient assistance program compared to before the drug benefit, so that it can help more people getting drugs they need, and at the same time they can make sure that all people who have depended on the pharmaceutical company's patient assistance program in the past can get the same or more help.

- OIG guidance states that companies may enter into data sharing agreements with CMS to facilitate plan tracking of beneficiary drug utilization. CMS will work with companies interested in pursuing a data sharing agreement in accordance to the OIG guidance.

# Exhibit D

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850

CENTERS for MEDICARE & MEDICAID SERVICES

## CENTER FOR BENEFICIARY CHOICES

**October 4, 2006**

**Memorandum To:** All Part D Sponsors

**Subject:** HPMS Q & A - Patient Assistance Programs

**From:** Cynthia Tudor, Ph.D., Director, Medicare Drug Benefit Group

The following question and answer on patient assistance programs operating outside the Part D benefit has been revised and updated in the Frequently Asked Questions Database on the CMS website at http://questions.cms.hhs.gov.

Q: Can patient assistance programs (PAPs) provide assistance with Part D drug costs to Part D enrollees outside of the Part D benefit and without counting towards TrOOP?

A: We have previously advised that drug payments made by PAPs on behalf of Part D enrollees could count toward TrOOP, unless these organizations qualify as group health plans, insurance or otherwise, or other similar third-party payment arrangements. However, we clarify that we will allow PAPs the option of providing assistance for covered Part D drugs on behalf of Part D enrollees outside the Part D benefit. Under this option, a PAP would operate outside of the Part D benefit, and any assistance it provides to a Part D enrollee for drugs that would have been covered under his or her Part D plan would not count as an incurred cost that would be applied toward the enrollee's TrOOP balance or total drug spend. In other words, when operating outside the Part D benefit (and beginning at the point at which a beneficiary's assistance under a PAP is effective), a claim for the drug for which a PAP had provided assistance would never be submitted to a beneficiary's Part D plan.

Operating outside the Part D benefit does not preclude a PAP sponsor from requiring its enrollees – including those enrolled in a Part D plan – from paying a nominal copayment when they fill a prescription for a covered Part D drug for which they provide assistance. We believe that any copayments assessed by PAPs operating outside the Part D benefit should be nominal, since only nominal beneficiary cost-sharing is consistent with the concept of operating outside Part D. Moreover, given that copayments are typically assessed for purposes of minimizing drug overutilization, the assessment of anything but nominal cost-sharing by PAPs is seemingly inconsistent with the mission of a charitable organization structured to provide assistance with prescription drug costs to low-income patients.

Although PAP payments made for those covered Part D drugs outside the benefit may never count toward enrollees' TrOOP or total drug spend balances, we clarify that any nominal

PAP copayment amounts paid by Part D enrollees will be aggregated to their TrOOP and total drug spend balances, provided the enrollees take responsibility for submitting the appropriate documentation to their plan. It will not be permissible, however, for beneficiary payments structured as administrative fees or premiums to be aggregated to Part D TrOOP and total drug spend balances, as these types of beneficiary out-of-pocket expenditures do not meet the definition of "incurred costs" at 42 CFR 423.100.

Enrollee submission of this documentation is necessary because a PAP operating outside the Part D benefit should never submit a claim for assistance provided for a covered Part D drug to a Part D enrollee's Part D plan. Consistent with our guidance on claims processing, plans should process these enrollee-submitted claims in the order in which they are received, not based on date of service.

As noted elsewhere, in order to facilitate implementation of this policy, plans should establish processes and clear instructions for enrollee paper claim submissions such that they can distinguish between claims submitted for : (1) out-of-network coverage; (2) adjustment to TrOOP balances based on wraparound payments by supplemental payers not previously submitted to the plan; (3) documentation submitted for a purchase made via a discount card or other special cash discount outside the Part D benefit in any applicable deductible or coverage gap phase of the benefit; and (4) documentation submitted for a copayment assessed by a PAP sponsor operating outside the Part D benefit for assistance provided with covered Part D drug costs. We plan to develop and share with plans model paper claims submission forms they can use or revise for these purposes.

The choice of whether to operate inside or outside the Part D benefit would be entirely at each individual PAP's discretion, although the PAP would still need to comply with the Federal fraud and abuse statutes. We note that the issue of establishing criteria for applicability of PAP assistance remains up to each individual PAP. PAPs have discretion to decide at what point financial burden triggers PAP assistance – for example, a set income level or an asset test or a ratio of drug cost to income or assets. [We note, however, that a criterion of being uninsured would be problematic because we do not consider a Part D enrollee in the benefit's coverage gap to be "uninsured" for purposes of a PAP's determination of financial need. Although a Part D enrollee may be required to pay 100 percent cost-sharing until he or she has accrued $3,600 in TrOOP expenditures, that individual continues to have coverage under the Part D plan given his or her access to negotiated prices and continued payment of premiums.]

Once a beneficiary satisfies a PAP's eligibility criteria, however, we believe the PAP should provide assistance through the end of the year. If, for budgetary reasons, a PAP declines to commit to providing assistance through the year, the PAP may decide to limit the amount of drug it will provide to any PAP enrollee. If a PAP decides to set such a cap, such cap should apply uniformly to all PAP enrollees - and not just to Medicare beneficiaries - and should be determined in a manner that is not directly or indirectly related to other drug expenditures by Part D enrollees. PAPs must not employ a cap to terminate PAP assistance in a manner designed to correlate with when the beneficiary's other drug expenditures might suffice to trigger catastrophic coverage under Part D or otherwise as a proxy for when Federal reimbursement would be available for the beneficiary's drugs. (Please refer to Appendix A

for some examples of how TrOOP and total Part D drug spend are affected depending on when enrollment in a capped program takes place and whether an enrollee surpasses the cap in a given coverage year).

The option of operating outside the Part D benefit, with or without the assessment of nominal enrollee copayments for assistance provided, will allow PAP sponsors to continue providing needed assistance to financially needy beneficiaries – those whose incomes are too high to qualify for the low-income subsidy, but whose incomes are low enough that out-of-pocket costs on drugs are still burdensome – while allowing the individual PAPs flexibility to determine the form of their donations and, if operated with sufficient safeguards, to use existing PAP programs to assist needy beneficiaries. We note, however, that we will be monitoring the impact of this guidance and reserve the right to revise it for future plan contract years..

We also emphasize that the most effective – and, ultimately, for the beneficiary, the safest – way for PAPs to operate outside the Part D benefit would involve front-end data exchanges with CMS through the use of PAP-specific trading partner agreements, which we will provide further information about in forthcoming guidance. General information about eligibility file exchange with supplemental payers and other entities is provided in our coordination of benefits guidance. To the extent that a PAP exchanges eligibility files with us, we will be able to flag it as a non-TrOOP eligible payer for the particular Part D drugs it provides Part D enrollees at no cost. This information would therefore be available to plans through the TrOOP facilitation process, and plans would be alerted to the fact that they must follow up with the PAP to identify the prescription drug provided outside the benefit. This, in turn, would allow plans to set their systems to recognize that drug as part of a patient's profile, while setting systems edits to prevent any payment for that prescription. As a result, a beneficiary will be able to obtain free product through the PAP without affecting either TrOOP or total drug spend amounts on plan PDE records. As a result of the data exchange process, the PAP will also receive information regarding its enrollees' Part D enrollment status.

To address safety concerns associated with prescription drugs provided outside the Part D benefits, the front-end data exchange process will enable, as described above, plans to follow-up with PAPs to identify those Part D drugs an enrollee is receiving outside the Part D benefit. This will facilitate plans' provision of required drug utilization review and, if applicable, medication therapy management program activities. If a PAP did not exchange information with CMS in the manner outlined above, such information would remain unknown to the plan, which could potentially lead to quality of care issues. For these reasons, we strongly encourage PAPs wishing to operate outside the Part D benefit participate in this process. Alternatively, a PAP could provide its enrollees with a notice they could provide to their Part D plans indicating that they are receiving one or more drug products from that PAP.

PAP sponsors, whether operating inside or outside the Part D benefit, remain responsible for complying with relevant fraud and abuse laws, including the anti-kickback statute. Liability under the anti-kickback statute requires a case-by-case analysis of the particular facts and circumstances, including the intent of the parties. However, to the extent that PAPs choose to operate within the Part D benefit, generally, the least problematic way of providing

assistance with the costs of covered Part D drugs to Part D enrollees is through support of independent PAPs operated by bona fide public charities without regard to donor interests. Properly structured, these programs can offer an alternative that reduces the risk of fraud or abuse. Among other things, the charity must make an independent determination of patient need, and the patient's receipt of assistance may not depend directly or indirectly on the patient's use of any particular product or supplier of drugs.

We have also received inquiries about the ability of PAPs to pay Part D premiums on behalf of enrollees or to provide free or discounted product through a coalition of manufacturers. Nothing in CMS rules and regulations prohibit such arrangements. We also note that organizations or entities offering patient assistance programs must comply with all relevant fraud and abuse laws, including, when applicable, the Federal anti-kickback statute and the civil monetary penalty prohibiting inducements to beneficiaries. The HHS Office of the Inspector General (OIG) enforces Federal fraud and abuse statutes, and all questions regarding the compliance of specific arrangements with these statutes should be referred to the OIG.

**Examples of Impact on TrOOP and Total Part D Drug Expenditures in Capped Patient Assistance Programs**

**<u>Scenario 1</u>**: Mrs. Jones enrolls in a PDP with a defined standard benefit with an effective coverage date of January 1, 2007. Mrs. Jones applies for assistance with her drug costs with PAP X. PAP X does not impose any nominal beneficiary cost-sharing, but finds that she meets the financial need criteria to receive $5,000 worth of free Drug ABC beginning January 1, 2007. Mrs. Jones uses $2,500 worth of free Drug ABC in 2007.

| Donated Product | Dollar Value of Donated Product | Dollar Value of Donated Product Utilized | Impact on Total Drug Spend | Impact on TrOOP |
|---|---|---|---|---|
| ABC | $5000 | $2500 | $0 | $0 |

**<u>Scenario 2</u>:** Mrs. Jones enrolls in a PDP with a defined standard benefit with an effective coverage date of January 1, 2007. Mrs. Jones applies for assistance with her drug costs with PAP X. PAP X does not impose any nominal beneficiary cost-sharing, but finds that she meets the financial need criteria to receive $5,000 worth of free Drug ABC beginning March 1, 2007. Mrs. Jones purchases $1,265 worth of Drug ABC between January 1 and March 1, 2007 and purchases no additional covered Part drugs. She then uses $2,500 worth of free Drug ABC between March 1 and December 31, 2007.

| Donated Product | Dollar Value of Donated Product | Dollar Value of Donated Product Utilized | Impact on Total Drug Spend | Impact on TrOOP |
|---|---|---|---|---|
| ABC | $5000 | $2500 | $1265 | $515 ($265 deductible plus 25% coinsurance on $1000) |

**<u>Scenario 3</u>:** Mrs. Jones enrolls in a PDP with a defined standard benefit with an effective coverage date of January 1, 2007. Mrs. Jones applies for assistance with her drug costs with PAP Y. PAP Y imposes nominal cost-sharing of $5 for each prescription filled, and finds that she meets the financial need criteria to receive $5,000 worth of free Drug ABC beginning March 1, 2007. Mrs. Jones purchases $1,265 worth of Drug ABC between January 1 and March 1, 2007 and purchases no additional covered Part D drugs. She then uses $2,500 worth of free Drug ABC between March 1 and December 31, 2007. PAP Y imposes $50 of nominal beneficiary cost-sharing ($5 for each of 10 fills) between March 1 and December 31, 2007. Mrs. Jones submits the appropriate documentation to her PDP for all the nominal copayments assessed by the plan so that they may be aggregated to her TrOOP and total drug spend balances.

| Donated Product | Dollar Value of Donated Product | Dollar Value of Donated Product Utilized | Impact on Total Drug Spend | Impact on TrOOP |
|---|---|---|---|---|
| ABC | $5000 | $2500 | $1315 ($1265 of total drug spend prior to March 1, 2007, plus $50 in nominal PAP copayments) | $565 ($265 deductible, plus 25% coinsurance on $1000, plus $50 in nominal PAP copayments) |

**<u>Scenario 4</u>:** Mrs. Jones enrolls in a PDP with a defined standard benefit with an effective coverage date of January 1, 2007. Mrs. Jones applies for assistance with her drug costs with PAP X. PAP X does not impose any nominal beneficiary cost-sharing, but finds that she meets the financial need criteria to receive $5,000 worth of free Drug ABC beginning May 15, 2007. Mrs. Jones purchases $1,265 worth of Drug ABC between January 1 and May 15, 2007, and she purchases no additional covered Part D drugs. She then uses $5,000 worth of free Drug ABC between May 15 and November 1, 2007. Since she has reached PAP X's spending cap for Drug ABC, she begins to use her Part D benefit again for Drug ABC beginning November 1, 2007. She purchases $1,000 worth of Drug ABC between November 1 and December 31, 2007 (during this time period, she is in the coverage gap of the standard defined benefit given use of other covered Part D drugs throughout the year).

| Donated Product | Dollar Value of Donated Product | Dollar Value of Donated Product Utilized | Impact on Total Drug Spend | Impact on TrOOP |
|---|---|---|---|---|
| ABC | $5000 | $5000 | $2265 | $1515 ($265 deductible |

| | | | | |
|---|---|---|---|---|
| | | | | plus 25% coinsurance on 1st $1000 plus $1000 in coverage gap) |

Please contact Alissa DeBoy at (410) 786-6041 if you have any questions about this guidance.

# EXHIBIT HH

**Time Log**
**Dr. Iain Cockburn: Thalomid/Revlimid, October 2015**

| Date | Task | Start time | End time | Hours |
|---|---|---|---|---|
| 10/1/2015 | Document review | 8:00 PM | 11:00 PM | 3 |
| 10/2/2015 | Meet with AG | 1:00 PM | 3:30 PM | 2.5 |
| 10/8/2015 | Call with AG | 3:00 PM | 3:30 PM | 0.5 |
| 10/10/2015 | Document review | 3:00 PM | 5:30 PM | 2.5 |
| 10/10/2015 | Draft report | 8:00 PM | 9:30 PM | 1.5 |
| 10/12/2015 | Draft report | 10:00 AM | 12:30 PM | 2.5 |
| 10/13/2015 | Draft report | 11:00 AM | 12:00 PM | 1 |
| 10/13/2015 | Call with AG | 2:00 PM | 2:45 PM | 0.75 |
| 10/16/2015 | Meet with AG | 2:00 PM | 4:04 PM | 2.25 |
| 10/19/2015 | Draft report | 9:00 PM | 10:30 PM | 1.5 |
| 10/20/2015 | Draft report | 8:30 AM | 9:30 AM | 1 |
| 10/20/2015 | Call with AG | 2:00 PM | 2:30 PM | 0.5 |
| 10/25/2015 | Draft report | 9:30 AM | 11:30 AM | 2 |
| 10/25/2015 | Call with AG | 4:30 PM | 5:00 PM | 0.5 |
| 10/26/2015 | Draft report | 12:15 AM | 12:30 AM | 0.25 |
| 10/26/2015 | Draft report | 6:45 PM | 7:30 PM | 0.75 |
| 10/26/2015 | Call with AG | 7:30 PM | 8:00 PM | 0.5 |
| 10/26/2015 | Draft report | 10:00 PM | 10:30 PM | 0.5 |
| 10/26/2015 | Call with AG | 10:30 PM | 10:45 PM | 0.25 |
| 10/30/2015 | Document review | 9:30 AM | 10:30 AM | 1 |
| | | | TOTAL HOURS | 25.25 |

**Time Log**
**Dr. Iain Cockburn: Thalomid/Revlimid, November, 2015**

| Date | Task | Start time | End time | Worked |
|---|---|---|---|---|
| 11/2/2015 | Document review | 7:00 PM | 9:00 PM | 2 |
| 11/3/2015 | Document review | 8:00 PM | 10:00 PM | 2 |
| 11/4/2015 | Document review | 9:00 AM | 10:00 AM | 1 |
| 11/4/2015 | Call with AG | 1:30 PM | 3:00 PM | 1.5 |
| 11/6/2015 | Document review | 4:30 PM | 6:30 PM | 2 |
| 11/9/2015 | Call with AG | 1:30 PM | 1:45 PM | 0.25 |
| | | | TOTAL HOURS | 8.75 |

**Time Log**
**Dr. Iain Cockburn: Thalomid/Revlimid, December, 2015**

| Date | Task | Start time | End time | Worked |
|---|---|---|---|---|
| 12/8/2015 | Document review | 9:30 AM | 10:30 AM | 1 |
| 12/9/2015 | Document review | 8:00 AM | 9:00 AM | 1 |
| 12/9/2015 | Call with AG | 11:00 AM | 12:00 PM | 1 |
| 12/22/2015 | Meet with AG | 9:30 AM | 12:00 PM | 2.5 |
| 12/30/2015 | Meet with AG | 9:00 AM | 12:30 PM | 3.5 |
| | | | TOTAL HOURS | 9 |

**Time Log**

**Dr. Iain Cockburn: Thalomid/Revlimid, January 2016**

| Date | Task | Start time | End time | Worked |
|---|---|---|---|---|
| 1/4/2016 | Call with AG | 11:45 AM | 12:00 PM | 0.25 |
| 1/5/2016 | Meet with AG | 10:00 AM | 11:30 AM | 1.5 |
| 1/5/2016 | Call with counsel | 11:30 AM | 12:00 PM | 0.5 |
| 1/5/2016 | Meet with AG | 12:00 PM | 1:30 PM | 1.5 |
| 1/13/2016 | Draft report | 9:00 AM | 10:30 AM | 1.5 |
| 1/14/2016 | Document review | 9:45 AM | 10:00 AM | 0.25 |
| 1/14/2016 | Call with AG | 10:15 AM | 10:30 AM | 0.25 |
| 1/14/2016 | Call with AG | 10:30 AM | 11:00 AM | 0.5 |
| 1/14/2016 | Meet with AG | 3:00 PM | 3:30 PM | 0.5 |
| 1/14/2016 | Call with counsel | 3:30 PM | 5:00 PM | 1.5 |
| 1/20/2016 | Document review | 10:00 AM | 10:30 AM | 0.5 |
| | | | TOTAL HOURS | 8.75 |

**Time Log**
**Dr. Iain Cockburn: Thalomid/Revlimid, May 2016**

| Date | Task | Start time | End time | Worked |
|---|---|---|---|---|
| 5/7/2016 | Document review | 1:00 PM | 3:00 PM | 2 |
| 5/11/2016 | Meet with AG | 9:30 AM | 12:00 PM | 2.5 |
| 5/13/2016 | Call with AG | 1:00 PM | 2:00 PM | 1 |
| 5/18/2016 | Draft report | 1:15 PM | 5:45 PM | 4.5 |
| 5/18/2016 | Draft report | 8:30 PM | 10:30 PM | 2 |
| 5/19/2016 | Draft report | 9:30 AM | 11:30 AM | 2 |
| 5/19/2016 | Meet with AG | 1:00 PM | 3:15 PM | 2.25 |
| 5/20/2016 | Meet with AG | 1:30 PM | 2:30 PM | 1 |
| 5/26/2016 | Call with AG | 10:30 AM | 11:30 AM | 1 |
| 5/26/2016 | Draft report | 7:30 PM | 10:00 PM | 2.5 |
| 5/28/2016 | Draft report | 1:00 PM | 2:00 PM | 1 |
| 5/29/2016 | Document review | 8:00 PM | 10:00 PM | 2 |
| 5/31/2016 | Call with AG | 2:00 PM | 2:30 PM | 0.5 |
| | | | TOTAL HOURS | 24.25 |

# EXHIBIT II
# FILED UNDER SEAL

# EXHIBIT JJ

SIDLEY AUSTIN LLP
SIDLEY

SIDLEY AUSTIN LLP
555 WEST FIFTH STREET
LOS ANGELES, CA 90013
(213) 896 6000
(213) 896 6600 FAX

kdunne@sidley.com
(213) 896 6659

BEIJING
BOSTON
BRUSSELS
CHICAGO
DALLAS
GENEVA
HONG KONG
HOUSTON
LONDON
LOS ANGELES
NEW YORK
PALO ALTO
SAN FRANCISCO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
WASHINGTON, D.C.

FOUNDED 1866

January 13, 2016

**VIA FedEx**

Andy Slavitt
Acting Administrator
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244

Re: Request For Authorization To Obtain Supplemental Expert Testimony From Leslie V. Norwalk Pursuant 45 C.F.R. Part 2
*U.S. ex rel. Brown v. Celgene Corporation*, Case No. 10-cv-03165. (C.D. Cal.)

Dear Administrator Slavitt:

We represent Celgene Corporation ("Celgene"), the defendant in the above-entitled *qui tam* lawsuit (the "*Brown* Lawsuit"). Pursuant to 45 C.F.R. § 2.4, and *Touhy v. Ragen*, 340 U.S. 462 (1951) (collectively, the "*Touhy* regulations"), we are writing to request supplemental authorization to allow Leslie V. Norwalk, the former Acting Administrator for the Centers for Medicare & Medicaid Services ("CMS"), to provide additional expert testimony in the *Brown* Lawsuit. CMS granted initial approval for Ms. Norwalk's testimony on February 25, 2015. However, during the course of expert discovery, the plaintiff has raised additional allegations related to the Medicare program that require Ms. Norwalk's response. While we believe these additional allegations are encompassed by the initial *Touhy* approval, we understand that counsel for the Department of Health and Human Services ("HHS") disagrees as to one topic related to non-profit funding for patient copayments under the Medicare Part D program so we seek supplemental approval for that topic. Ms. Norwalk's response to these additional allegations is due January 20, 2016. We therefore seek expedited review of this request.

We submitted an initial *Touhy* request for Ms. Norwalk's testimony on January 21, 2015. In that initial request, we explained the nature of the case, Ms. Norwalk's relevant background, and the anticipated nature of Mr. Norwalk's testimony. We have attached the initial request here for your reference. On February 25, 2015, CMS approved Ms. Norwalk's testimony on five topics: (1) the structure of the Medicare and Medicaid programs, including the roles of carriers and Part D and Medicare Advantage Plan Sponsors, and the discretion that such entities and programs have in the coverage and reimbursement of prescription drugs, particularly of anti-cancer drugs, including for off-label uses; (2) Medicare and Medicaid coverage and

reimbursement criteria and requirements generally, including, but not limited to, relevant statutory, regulatory and sub-regulatory criteria, approved compendia, medical literature, and medically accepted indications; (3) the role of Pharmacy & Therapeutics ("P&T") committees, pharmacists, and other relevant personnel at carriers, Part D and Medicare Advantage Plan Sponsors, state Medicaid agencies and CMS in the development of coverage policies, prior authorization criteria, formularies, preferred drug lists, and specialty tiers; (4) data that is exchanged among physicians, pharmacies, carriers, Medicare Part D and Medicare Advantage Plan Sponsors, state Medicaid agencies and CMS; and (5) the Medicare and Medicaid appeals processes.

In response to Plaintiff's Supplemental Expert report, we anticipate that Ms. Norwalk will testify as to the following subjects in rebuttal:

1. The structure and funding of Medicare Advantage plans prior to and after the implementation of the Medicare Part D program.

2. The structure and funding of the Medicare Part D program, including the payment by patients of copayments and other cost sharing.

3. Coverage determinations of off-label uses decided in the appeal process as shown in documents received from CMS' vendor Maximus.

4. The role of independent charity programs in providing funding for patient copayments under the Medicare Part D program.

We believe that the first two topics fall squarely within CMS' prior *Touhy* approval of topics (1) and (2) and the third falls squarely within topic (5). As such, we address the three factors set forth in the *Touhy* regulations relevant to requests for testimony from former CMS employees with respect to the fourth topic anticipated to be covered in Ms. Norwalk's report. 45 C.F.R. § 2.4(a).

**1. Nature Of The Requested Supplemental Testimony**

In recent weeks, and since the previous approval, one of plaintiff's experts, Dr. Joel W. Hay, submitted a supplemental report alleging that Celgene made kickback payments to charitable foundations, which is not an allegation found in the Third Amended Complaint. Specifically, Dr. Hay states that the Anti-Kickback Statute does not permit pharmaceutical manufacturers to make donations to independent charitable patient assistance foundations that pay drug co-payments on behalf of Medicare beneficiaries. We are therefore requesting supplemental approval for Ms. Norwalk to discuss the nature of HHS's guidance pertaining to charitable foundations, including, but not limited to, CMS's guidance on manufacturers'

contributions to such foundations and the reimbursability of Medicare covered medications purchased with co-payment assistance from such foundations.

We do not intend to ask Ms. Norwalk to offer testimony concerning any decisions in which she personally was involved. In addition, Celgene will not elicit the disclosure of privileged information that Ms. Norwalk may have acquired while at CMS, has instructed Ms. Norwalk not to discuss or disclose any information protected by privilege, and has no objection to the Government attending any deposition or hearing where Ms. Norwalk may testify for purposes of protecting privilege. Celgene also acknowledges that any testimony offered by Ms. Norwalk in the *Brown* Lawsuit will be in her individual capacity, and not on behalf of HHS or CMS. Ms. Norwalk will disclose that the opinions she may offer do not necessarily represent the opinions or policies of HHS or CMS, and that neither HHS or CMS endorse the accuracy of her statements.

**2. Why The Information Sought Is Unavailable By Any Other Means**

As a former senior administrator of CMS, who has since enhanced her relevant expertise, Ms. Norwalk is uniquely qualified to provide expert testimony about CMS's guidance pertaining to charitable foundations, including the agency's guidance to industry. As with our initial request, Celgene anticipates that Ms. Norwalk's testimony will be based largely on matters that are part of the public record, such as statutes, regulations, coverage policies, and other guidance documents. However, with that said, publically-available resources standing alone are no substitute for testimony from an expert steeped in the workings and application of statutes, regulations, policies, and guidance materials. Ms. Norwalk's testimony is essential to assist the district court and any trier of fact concerning the complexities of Medicare coverage and reimbursement, particularly vis-à-vis the Anti-Kickback Statute.

**3. Why The Testimony Would Be In The Interest Of The Department Of Health & Human Services ("HHS") Or The Federal Government**

As we explained previously, Ms. Norwalk's testimony, both on the previously approved topics and on the topic requested herein, will be in the interest of HHS, CMS, and the federal government. HHS serves as the "U.S. government's principal agency for protecting the health of all Americans and providing essential human services, especially for those who are least able to help themselves." Brown's suit, which she brings on behalf of the government, calls into question numerous medically accepted uses of Thalomid® and Revlimid® as treatments for life threatening illnesses. Thalomid® and Revlimid® are used by thousands of critically ill patients to treat various forms of cancer, among other serious illnesses. It is in the interest of HHS, CMS, and the federal government to help develop the truth regarding appropriate uses and payments for these drugs.

SIDLEY AUSTIN LLP
SIDLEY



Furthermore, the United States, including HHS and CMS specifically, indisputably has an interest in the *Brown* lawsuit, which is not simply a dispute between "private litigants." 45 C.F.R. § 2.1(b). Brown is asserting claims under the False Claims Act, and, notwithstanding the decision of the United States not to intervene in this case, it remains the real party in interest. In this and other cases, the United States has expressed a keen interest in the development of the law in the area of the reimbursability of off-label uses for cancer treatments. Likewise, the United States, and HHS and CMS in particular, has an interest in ensuring the nature and scope of HHS's and CMS's guidance on reimbursement are properly understood. In general, then, the Government has an interest in ensuring the correct interpretation and understanding of its statutes, rules, and regulations respecting the matters at issue in the *Brown* Lawsuit, including for coverage and reimbursement of anti-cancer drugs. Ms. Norwalk's anticipated testimony would further that interest by ensuring a better understanding by the Court and trier of fact of the Medicare program.

Finally, because Ms. Norwalk is no longer employed by the federal government, there is no risk that authorizing her testimony will detract from any official duties.

* * *

If you have any questions, would like more information, or would like to discuss these matters, please do not hesitate to contact me. Thank you in advance for your anticipated cooperation.

Very truly yours,

Kimberly A. Dunne /JCS

Kimberly A. Dunne

Enclosures

cc: Eden Heard, Centers for Medicare and Medicaid Services (via email)
Toni-Ann Citera, Esq., Jones Day LLP, Jones Day LLP
James C. Stansel, Esq., Sidley Austin LLP
Reuben Guttman, Esq. (via email)
Richard Harpootlian, Esq. (via email)
Justin Brooks, Esq. (via email)
Thomas H. Bienert, Jr., Esq. (via email)

SIDLEY AUSTIN LLP
SIDLEY

SIDLEY AUSTIN LLP
555 WEST FIFTH STREET
LOS ANGELES, CA 90013
(213) 896 6000
(213) 896 6600 FAX

kdunne@sidley.com
(213) 896 6659

BEIJING, BOSTON, BRUSSELS, CHICAGO, DALLAS, GENEVA, HONG KONG, HOUSTON, LONDON, LOS ANGELES, NEW YORK, PALO ALTO, SAN FRANCISCO, SHANGHAI, SINGAPORE, SYDNEY, TOKYO, WASHINGTON, D.C.

FOUNDED 1866

January 21, 2015

**VIA FedEx**

Marilyn B. Tavenner
Administrator
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244

Re: Request For Authorization To Obtain Expert Testimony From Leslie V. Norwalk Pursuant 45 CFR Part 2
*U.S. ex rel. Brown v. Celgene Corporation*, Case No. 10-cv-03165. (C.D. Cal.)

Dear Administrator Tavenner:

We represent Celgene Corporation ("Celgene"), the defendant in the above-entitled *qui tam* lawsuit (the "*Brown* Lawsuit"). Pursuant to 45 C.F.R. § 2.4, and *Touhy v. Ragen*, 340 U.S. 462 (1951) (collectively, the "*Touhy* regulations"), we are writing to request authorization to allow Leslie V. Norwalk, the former Acting Administrator for the Centers for Medicare & Medicaid Services ("CMS"), to provide expert testimony in the *Brown* Lawsuit. In this letter, we will address the three factors set forth in the *Touhy* regulations relevant to requests for testimony from former CMS employees:

(1) The nature of the requested testimony;

(2) Why the information sought is unavailable by any other means; and

(3) Why the testimony would be in the interest of the Department of Health & Human Services ("HHS") or the federal government.

45 C.F.R. § 2.4(a).

SIDLEY AUSTIN LLP
SIDLEY



## I. Relevant Background Of The *Brown* Lawsuit And The Two Drugs At Issue

The *Brown* lawsuit concerns claims brought against Celgene by a former employee alleging violations of the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A), (B), and various state and other false claims statutes based on Celgene's alleged promotion of the drugs Thalomid® and Revlimid® for non-reimbursable off-label uses. Brown's theory rests on the notion that physicians prescribed these drugs to terminally ill cancer and other patients based on Celgene's allegedly improper off-label promotion, as opposed to the physicians' medical training and judgment, clinical data, clinical experience, patient response, academic literature, and the needs of their patients. Brown alleges that the prescriptions written by physicians somehow led to presentment and reimbursement of false requests for payment under government programs including Medicare, Medicaid, TRICARE, and the Veterans Administration ("VA"). Brown also alleges that Celgene, in violation of the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), improperly induced some physicians to prescribe and otherwise recommend Thalomid® and Revlimid® by paying them to speak at Celgene-sponsored events, and asserts that this alleged conduct resulted in false claims being submitted to government programs. Celgene disputes Brown's allegations. After Brown filed her complaint in April 2010, the United States conducted an exhaustive investigation of her allegations. In September 2013, the Government declined to intervene in her suit. Fact discovery closes and expert disclosures are due on July 24, 2015. Expert discovery closes on September 25, 2015.

At the heart of this case is the drug Thalomid® (also known by its generic name thalidomide). In the late 1950s and early 1960s, decades before Celgene existed, thalidomide was used outside the United States as an anti-nausea medication for pregnant women. Later, it was discovered that thalidomide caused birth defects when taken during pregnancy, and most countries subsequently banned its use. At the U.S. Food and Drug Administration's ("FDA") urging, Celgene brought Thalomid® to market in the United States in 1998. The FDA initially approved Thalomid® to treat erythema nodosum leprosum ("ENL"), a leprosy complication that results in painful skin lesions, while recognizing that the drug would have additional uses.

Following its initial approval, and in light of the known risk of birth defects, the FDA required Celgene to implement a stringent risk management program pursuant to 21 C.F.R. § 314 (Subpart H) to govern the distribution of Thalomid® for any use, whether approved by the FDA or not. First known as the System for Thalidomide Education and Prescribing Safety (S.T.E.P.S.®) and now known as Thalomid REMS®, the distribution program imposes mandatory requirements on patients, physicians, and pharmacists before Thalomid® is prescribed and dispensed. Physicians who wish to prescribe Thalomid® to their patients must undertake a series of steps to comply with this program well beyond what would be necessary to prescribe most different medications.

Because Thalomid® has anti-angiogenic and immunomodulatory properties (meaning it inhibits new blood vessel growth and can alter immune responses), physicians and scientists recognized—as early as 1998—Thalomid's® effectiveness for treating various forms of multiple myeloma ("MM"), a plasma cell cancer, as well as other cancers and diseases for which there were few, if any, FDA-approved treatments at the time. In 2004, CMS included Thalomid® for MM in the Medicare Replacement Drug Demonstration Project ("MRDD"). The FDA approved Thalomid® for MM in May 2006 in combination with another drug, dexamethasone.

Celgene developed Revlimid® (generic name lenalidomide) and brought it to market in 2005, when it was approved by the FDA for a progressive bone marrow disorder known as myelodysplastic syndrome ("MDS") with chromosome 5q deletion. As with Thalomid®, the FDA imposed a restricted distribution program for Revlimid® pursuant to 21 C.F.R. § 314 (Subpart H) known first as RevAssist® and now as Revlimid REMS®, similar to the S.T.E.P.S.® program. In June 2006, Revlimid®, in combination with dexamethasone, was approved for MM in patients who have received at least one prior therapy. In June 2013, the FDA approved Revlimid® for mantle cell lymphoma ("MCL") in certain patients who have received two prior therapies, one of which included bortezomib. As with Thalomid®, physicians and scientists have recognized Revlimid®'s efficacy in treating other cancers and diseases, including newly-diagnosed MM.

## II. Reasons For Celgene's Request For Testimony

### A. The Nature Of The Requested Testimony

Leslie Norwalk worked for CMS from 2001 to 2007. At the time she left, she was Acting Administrator of CMS, and immediately prior to that she served as Deputy Administrator of CMS. In these roles, Ms. Norwalk managed the day-to-day operations of the Medicare and Medicaid programs. By virtue of this experience, she acquired extensive knowledge about the administration of these programs. Combined with the training, experience, and expertise acquired before and after serving at CMS, Ms. Norwalk is uniquely qualified to offer testimony regarding the administration of these programs.

Celgene has retained Ms. Norwalk as an expert and expects to ask her to offer opinions and testimony concerning the following subjects covering the time period from 1998 to the present: (1) the structure of the Medicare and Medicaid programs, including the roles of carriers and Part D and Medicare Advantage Plan Sponsors, and the discretion that such entities and programs have in the coverage and reimbursement of prescription drugs, particularly of anti-cancer drugs such as Thalomid® and Revlimid®, including for off-label uses; (2) Medicare and Medicaid coverage and reimbursement criteria and requirements, including, but not limited to, relevant statutory, regulatory and sub-regulatory criteria, approved compendia, medical

SIDLEY AUSTIN LLP
SIDLEY



literature, medically accepted indications, and the Medicare Replacement Drug Demonstration; (3) the role of Pharmacy & Therapeutics ("P&T") committees, pharmacists, and other relevant personnel at carriers, Part D and Medicare Advantage Plan Sponsors, state Medicaid agencies and CMS in the development of coverage policies, prior authorization criteria, formularies, preferred drug lists, and specialty tiers; (4) data that is exchanged among physicians, pharmacies, carriers, Medicare Part D and Medicare Advantage Plan Sponsors, state Medicaid agencies and CMS; (5) the Medicare and Medicaid appeals processes; and (6) whether and, if so, the extent to which allegedly unlawful promotion of a drug by a pharmaceutical manufacturer to a physician for an off-label indication could be material to the determination of whether a claim submitted by that physician or a pharmacy is reimbursable under Medicare and Medicaid.

We do not intend to ask Ms. Norwalk to offer testimony concerning any decisions in which she personally was involved. In addition, Celgene will not elicit the disclosure of privileged information that Ms. Norwalk may have acquired while at CMS, has instructed Ms. Norwalk not to discuss or disclose any information protected by privilege, and has no objection to the Government attending any deposition or hearing where Ms. Norwalk may testify for purposes of protecting privilege. Celgene also acknowledges that any testimony offered by Ms. Norwalk in the *Brown* Lawsuit will be in her individual capacity, not on behalf of the Department of Health and Human Services ("HHS") or CMS. Ms. Norwalk would disclose that the opinions she may offer do not necessarily represent the opinions or policies of HHS or CMS, and that neither HHS or CMS endorse the accuracy of her statements.

### B. The Information Sought Is Unavailable By Any Other Means

As a former senior administrator of CMS, who has since enhanced her relevant expertise, Ms. Norwalk is uniquely qualified to provide expert testimony about the structure of the Medicare and Medicaid programs, reimbursement for prescription drugs under those programs, and whether alleged "off-label marketing" is material to reimbursement decisions under those programs. Although Celgene anticipates that Ms. Norwalk's testimony will be based largely on matters that are part of the public record, such as statutes, regulations, coverage policies, and other guidance documents, publically-available resources standing alone are no substitute for testimony from an expert steeped in the workings and application of statutes, regulations, policies, and guidance materials. Ms. Norwalk's testimony is essential to assist the district court and any trier of fact concerning the complexities of Medicare and Medicaid coverage and reimbursement.

### C. The Testimony Will Be In The Interest Of HHS, CMS, And The Federal Government

Ms. Norwalk's testimony will be in the interest of HHS, CMS, and the federal government. HHS serves as the "U.S. government's principal agency for protecting the health of all Americans and providing essential human services, especially for those who are least able to help themselves." Brown's suit, which she brings on behalf of the government, calls into question numerous medically accepted uses of Thalomid® and Revlimid® as treatments for life threatening illnesses. Thalomid® and Revlimid® are used by thousands of critically ill patients to treat various forms of cancer, among other serious illnesses. It is in the interest of HHS, CMS, and the federal government to help develop the truth regarding appropriate uses for these drugs, including the known standard of care for both indicated uses and off-label uses.

Furthermore, the United States, including HHS and CMS specifically, indisputably has an interest in the *Brown* lawsuit, which is not simply a dispute between "private litigants." 45 C.F.R. § 2.1(b). Brown is asserting claims under the False Claims Act, and, notwithstanding the decision of the United States not to intervene in this case, it remains the real party in interest. In this and other cases, the United States has expressed a keen interest in the development of the law in the area of the reimbursability of off-label uses for cancer treatments. The Government has an interest in ensuring the correct interpretation and understanding of its statutes, rules, and regulations respecting the matters at issue in the *Brown* Lawsuit, including for coverage and reimbursement of anti-cancer drugs. Ms. Norwalk's anticipated testimony would further that interest by ensuring a better understanding by the Court and trier of fact of the Medicare and Medicaid programs.

Finally, because Ms. Norwalk is no longer employed by the federal government, there is no risk that authorizing her testimony will detract from any official duties.

* * *

If you have any questions, would like more information, or would like to discuss these matters, please do not hesitate to contact me. Thank you in advance for your anticipated cooperation.

Very truly yours,

Kimberly A. Dunne

Enclosures

cc: Toni-Ann Citera, Esq.
James C. Stansel, Esq., Sidley Austin LLP
David T. Fischer, Esq. (via email)
James J. Sabella, Esq. (via email)
Thomas H. Bienert, Jr., Esq. (via email)