# EXHIBIT A

# REDACTED VERSION FOR PUBLIC FILING

Kimberly A. Dunne (SBN 142721)
kdunne@sidley.com
Michelle B. Goodman (SBN 218607)
mgoodman@sidley.com
Sean A. Commons (SBN 217603)
scommons@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600

Karen P. Hewitt (SBN 145309)
kphewitt@jonesday.com
Brian D. Hershman (SBN 168175
bhershman@jonesday.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539

Attorneys for Defendant Celgene Corporation
(*Additional Counsel listed on following page*)

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO,<br><br>*Ex rel*. BEVERLY BROWN,<br><br>Plaintiff-Relator,<br>vs.<br><br>CELGENE CORPORATION,<br><br>Defendant. | Case No. 10-cv-03165 GHK (SSx)<br><br>Assigned to: Hon. George H. King<br><br>**DEFENDANT CELGENE CORPORATION'S REVISED INITIAL DISCLOSURES** |

James C. Stansel (admitted *pro hac vice*)
jstansel@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

Toni-Ann Citera (admitted *pro hac vice*)
tcitera@jonesday.com
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

**CELGENE CORPORATION'S REVISED INITIAL DISCLOSURES PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(1)**

Pursuant to Federal Rule of Civil Procedure 26(a)(1), Defendant Celgene Corporation ("Celgene") submits the following revised Initial Disclosures based on the information reasonably available at the present time. Celgene makes these disclosures subject to, and without waiving, its right to protect from disclosure any and all communications protected by the attorney-client privilege, the attorney work product doctrine, and any other applicable privilege or protection. Celgene makes these disclosures without waiving any argument that it may have concerning the relevancy or admissibility of, or proper weight to be accorded to, any of the materials produced or information contained herein.

Pursuant to Federal Rule of Civil Procedure 26(e), Celgene reserves the right to supplement or amend these disclosures based upon the Court's resolution of any subsequent motion, and further reserves its right to supplement or amend these disclosures on the basis of subsequent developments, including without limitation, additional factual investigation and on the basis of additional information and discovery provided by Relator Beverly Brown ("Relator"), the Government, or any other individual or entity.

## I. WITNESSES

Pursuant to Rule 26(a)(1)(A)(i) of the Federal Rules of Civil Procedure, Celgene identifies the following individuals as likely to have discoverable information that Celgene may use to support its defenses, excluding witnesses to be used solely for impeachment:

| Name | Contact Information | Subject Matter Of Information |
|---|---|---|
| Kenneth Algazy, MD | University of Pennsylvania<br>Philadelphia, Pennsylvania | Use of Thalomid and Revlimid, Veterans Affairs |
| Mark Alles | Mr. Alles may be contacted through Celgene's counsel. | Thalomid and Revlimid Marketing; Management Direction |
| Edward Arenson, MD | Swedish Medical Group<br>Englewood, Colorado | Use of Thalomid |
| Terry Barter | [redacted] | Revlimid Patient |
| Sol Barer | Mr. Barer may be contacted through Celgene's counsel.[1] | Management Direction |
| Lynn Bemiller, MD | South County Hematology and Oncology<br>Chula Vista, California | Use of Thalomid and Revlimid |
| Gregory Berk, MD | Sideris Pharmaceuticals<br>Lexington, Massachusetts | Use of Thalomid |
| Linnie Burney | Ms. Burney may be contacted through Celgene's counsel. | Thalomid and Revlimid Sales |
| Thomas Cavanaugh | Mr. Cavanaugh may be contacted through Celgene's counsel. | Thalomid and Revlimid Sales; Marketing; Management Direction |
| Morton Coleman, MD | New York Presbyterian Hospital/Weill Cornell | Use of Thalomid and Revlimid; ; Speaker Programs |
| Kirby Davidson | [redacted] | Parent of patient successfully treated with Thalomid |
| Daniel DeAngelo, MD | Dana-Farber Cancer Center<br>Boston, Massachusetts | Use of Thalomid and Revlimid |

[1] Celgene's counsel can be reached at:

Kimberly A. Dunne
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
(213) 896-6659

Toni-Ann Citera
JONES DAY
222 East 41st Street
New York, NY 10017
(212) 326-3939

| Name | Contact Information | Subject Matter Of Information |
|---|---|---|
| Jerry Dermon | Mr. Dermon may be contacted through Celgene's counsel. | Thalomid and Revlimid Sales; Management Direction |
| Dawn Devore | Ms. Devore may be contacted through Celgene's counsel. | Thalomid and Revlimid Sales |
| Dwight D'Iorio | Mr. D'Iorio may be contacted through Celgene's counsel. | Thalomid Sales; Medical Education |
| Eileen Finnegan | Ms. Finnegan may be contacted through Celgene's counsel. | Government Affairs and Related Reimbursement Issues |
| John Freeman | Mr. Freeman may be contacted through Celgene's counsel. | Thalomid and Revlimid Safety Issues |
| Sergio Giralt, MD | Dr. Giralt may be contacted through Jonathan Walland, in-house counsel at Memorial Sloan Kettering Cancer Center | Use of Thalomid and Revlimid; Speaker Programs |
| Shawn Gormish | Mr. Gormish may be contacted through Celgene's counsel. | Thalomid and Revlimid Sales; Reimbursement |
| Stephen Groft, MD | 2 Harvard Ct.<br>Rockville, MD 20850 | Government Knowledge; NIH Funding of Thalomid Research |
| Deanna Harding | Ms. Harding may be contacted through Celgene's counsel. | Thalomid and Revlimid Sales |
| Todd Hyde | Mr. Hyde may be contacted through Celgene's counsel. | Thalomid and Revlimid Sales |
| Scott Holmes | Mr. Holmes may be contacted through Celgene's counsel. | Patient Support; Government Affairs and Related Reimbursement Issues |
| Jay Kaminski | Mr. Kaminski may be contacted through Celgene's counsel. | Thalomid Sales |
| Michael Keating, MD | University of Texas, MD Anderson Cancer Center | Use of Thalomid and Revlimid |

| **Name** | **Contact Information** | **Subject Matter Of Information** |
|---|---|---|
| Kathleen Long | Ms. Long may be contacted through Celgene's counsel. | Sales Training; Regulatory Issues |
| Patrick Long | Mr. Long may be contacted through Celgene's counsel. | Sales Training; Regulatory Issues |
| Lindsay Luke | Ms. Luke may be contacted through Celgene's counsel. | Thalomid Sales; Marketing; Medical Affairs |
| Jeffrey Rowell | Mr. Rowell may be contacted through Celgene's counsel. | Thalomid and Revlimid Sales |
| Thomas Martin, MD | UCSF<br>San Francisco, California | Use of Thalomid and Revlimid; Speaker Programs |
| Bruno Medeiros, MD | Stanford University<br>Stanford, California | Use of Thalomid and Revlimid; Speaker Programs |
| Chad Saward | Mr. Saward may be contacted through Celgene's counsel. | Thalomid Sales; Medical Education |
| Paul Sheehan | Mr. Sheehan may be contacted through Celgene's counsel. | Thalomid and Revlimid REMS |
| George Somlo, MD | Dr. Somlo may be contacted through Jennifer Ing, Deputy General Counsel at City of Hope | Use of Thalomid and Revlimid |
| Jennifer Sturm | Ms. Sturm may be contacted through Celgene's counsel. | Thalomid and Revlimid Sales |
| Shawn Tomasello | Ms. Tomasello may be contacted through Celgene's counsel. | Revlimid Sales |
| Alana Torgelson | Ms. Torgelson may be contacted through Celgene's counsel. | Thalomid Sales; Corporate Account Manager Responsibilities |
| Alison Tozer | Ms. Tozer may be contacted through Celgene's counsel. | Medical Information |
| Joseph Tuscano, MD | U.C. Davis Comprehensive Cancer Center<br>Sacramento, California | Use of Thalomid and Revlimid; Speaker Programs |
| Robert Vescio, MD | Cedars Sinai<br>Los Angeles, California | Use of Thalomid and Revlimid; Speaker Programs |
| Bruce Williams | Mr. Williams may be contacted through Celgene's counsel. | Thalomid Sales; Marketing |

| Name | Contact Information | Subject Matter Of Information |
|---|---|---|
| William Woolever | Mr. Woolever may be contacted through Celgene's counsel. | Regulatory Issues |
| Jerry Zeldis | Mr. Zeldis may be contacted through Celgene's counsel. | Regulatory and Clinical Issues |
| Representative(s) of National Comprehensive Cancer Network, Inc. | National Comprehensive Cancer Network, Inc. can be contacted through its counsel:<br><br>Jennifer B. Jordan<br>Morgan, Lewis & Bockius LLP<br>1701 Market Street<br>Philadelphia, PA 19103-2921<br>Phone: 215.963.5959<br>jjordan@morganlewis.com | Reimbursement Issues, Off-Label Uses of Thalomid and Revlimid, as well as the topics identified in the deposition notices and cross-notices |
| Representative(s) of Reed Elsevier Inc. | Reed Elsevier Inc. can be contacted through its counsel:<br><br>Caroline Johnson Tanner<br>Holland & Knight<br>1201 West Peachtree Street, N.E., One Atlantic Center, Suite 2000 \| Atlanta GA 30309<br>Phone 404.898.8184<br>caroline.tanner@hklaw.com | Reimbursement Issues, Off-Label Uses of Thalomid and Revlimid, as well as the topics identified in the deposition notices and cross-notices |
| Representative(s) of Truven Health Analytics, Inc. | Truven Health Analytics, Inc. can be contacted through its counsel:<br><br>Joan L. Rosenstock<br>Satterlee Stephens Burke & Burke LLP<br>230 Park Avenue<br>New York, NY 10169<br>Phone: (212) 404-8709<br>Email: jrosenstock@ssbb.com | Reimbursement Issues, Off-Label Uses of Thalomid and Revlimid, as well as the topics identified in the deposition notices and cross-notices |
| Representative(s) of American Society of Healthsystem Pharmacists, Inc. | American Society of Healthsystem Pharmacists, Inc. can be contacted through its counsel:<br><br>Philip T. "Pete" Evans<br>Holland & Knight<br>800 17th Street N.W., Suite 1100 \|<br>Washington, DC 20006<br>Phone: 202.457.7043<br>philip.evans@hklaw.com \| | Reimbursement Issues, Off-Label Uses of Thalomid and Revlimid, as well as the topics identified in the deposition notices and cross-notices |

| **Name** | **Contact Information** | **Subject Matter Of Information** |
|---|---|---|
| Representative(s) of the Patient Association Network Foundation and other patient support foundations | The Patient Association Network Foundation can be contacted through its counsel:<br><br>David M. Lubitz<br>Schaner & Lubitz, PLLC<br>Legal Counsel to PAN<br>Phone: (240) 482-2849 | Patient Reimbursement Support |
| Representative(s) of Excerpta Medica B.V. | Apollo Building<br>Herikerbergweg 17<br>1101 CN Amsterdam<br>Netherlands<br>Phone: +31 (0)20 797 1400 | Medical Writing and Publication Support |
| Representative(s) of Envision | Envision can be contacted through its counsel:<br><br>Jennifer L. Chunias<br>Goodwin Procter<br>53 State Street<br>Boston, MA 02109<br>Phone: (617) 570-8239 | Speaker Programs |
| Representatives of The LASH Group | The deposition of this entity has been noticed. On information and belief, The Lash Group can be contacted through the following counsel:<br><br>Elisabeth S. Campbell<br>Associate General Counsel<br>AmerisourceBergen Corporation<br>1300 Morris Drive<br>Chesterbrook, PA 19087-5594 | The topics identified in the deposition notice |
| Representative(s) of AlphaImpact Rx | AlphaImpact Rx can be contacted through its counsel:<br><br>Garth G. Hoyt, Esquire<br>McCausland Keen & Buckman<br>Radnor Court, Suite 160<br>259 North Radnor-Chester Road<br>Radnor, PA 19087-5257<br>Phone: (610) 341-1080 | Market Research |
| Representative(s) of FDA who were aware of off-label uses of Thalomid and Revlimid | Celgene is in the process of identifying these individuals and will supplement its disclosures. | Government Knowledge |

| Name | Contact Information | Subject Matter Of Information |
| --- | --- | --- |
| Representative(s) of the Centers for Medicare and Medicaid Services, Medicare carriers, and Medicaid state agencies who approved coverage for Thalomid and Revlimid for off-label uses | Celgene is in the process of identifying these individuals and will supplement its disclosures. | Government Knowledge and Reimbursement Issues |
| Representative(s) of pharmacies that submitted claims for reimbursement for Thalomid and Revlimid for off-label uses | Celgene is in the process of identifying these individuals and will supplement its disclosures. | Reimbursement Issues |

In addition, Celgene reserves the right to depose or call at trial any person identified in Relator's initial disclosures or Complaint.

## II. DOCUMENTS

Pursuant to Rule 26(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, Celgene identifies the following documents, electronically stored information, and tangible things that Celgene has in its possession, custody, or control and may use to support its defenses, unless the use would be solely for impeachment:

The approximately 500,000 documents produced to the Government in response to a subpoena issued pursuant to the Health Insurance Portability and Accountability Act of 1996, as subsequently narrowed by agreements with the Government, which includes, among other categories, documents regarding the marketing and sale of Thalomid and Revlimid, communications with the FDA regarding Thalomid and Revlimid, relevant training programs, and organizational structure.

Documents produced by Celgene, Relator, the Government, any third party, or any other entity or individual in connection with discovery in this litigation.

Documents relating to reimbursement by any federal or state agency, any federal or state healthcare program, or any agent or payor acting on behalf of a federal or state healthcare program of uses of Thalomid and Revlimid for any of the conditions or treatments at issue in the complaint, including through preauthorization programs, step edits, or appeals.

Any compendia, scientific journal, or other publication recognized under federal or state law, any federal or state healthcare program, or any agent or payor acting on behalf of a federal or state healthcare program for purposes of determining reimbursability, medical acceptance, or the standard of care for any of the conditions or treatments at issue in the complaint.

Scientific publications, journal articles, and other publicly available materials relating to uses or benefits of Thalomid and Revlimid for any of the conditions or treatments at issue in the complaint.

Disclosures, reports, and communications to or by any federal or state agency, any federal or state healthcare program, or any agent or payor acting on behalf of a federal or state healthcare program relating to reimbursability, reimbursement, or medical acceptance of off-label uses in general and of off-label uses of Thalomid and Revlimid in particular.

Any documents referenced in the original or any amended complaint filed by Relator in this action, including any scientific publications, journal articles, and other publicly available materials.

Any and all filings, discovery, or testimony from *Lopatic v. Celgene Corp. et al.*, No. 00115013 (Ca. Super. Ct.), or any other litigation or proceeding in which Relator or any person identified in Relator's Rule 26 initial disclosures participated as a party, third party, or witness.

Any and all disclosures by Relator to any federal or state department or agency prior to the filing of the original complaint concerning allegations in the original or any amended complaint.

Celgene reserves the right to supplement its production and this disclosure as more information becomes available.

## III. DAMAGES

Pursuant to Federal Rule of Civil Procedure Rule 26(a)(1)(A)(iii), Celgene states that it does not claim any category of damages.

## IV. INSURANCE

Pursuant to Rule 26(a)(1)(A)(iv) of the Federal Rules of Civil Procedure, Celgene has not identified any applicable insurance agreement that will cover this action.

Date: September 21, 2015

Respectfully submitted,

Sidley Austin LLP

By: *<u>/s/ Kimberly A. Dunne</u>*
Kimberly A. Dunne
Attorney for Defendant
CELGENE CORPORATION

# EXHIBIT F
# REDACTED VERSION FOR PUBLIC FILING

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Case No. 10-cv-03165 GHK(SSx)
-----------------------------------x
UNITED STATES OF AMERICA, THE STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO,

Plaintiffs,

-and-

BEVERLY BROWN,

Plaintiff-Relator,

-against-

CELGENE CORPORATION,

Defendant.

-----------------------------------------x

July 30, 2015
8:33 a.m.
CONFIDENTIAL
VIDEOTAPED

EXAMINATION BEFORE TRIAL, of BOB HUGIN, taken by the Plaintiffs, pursuant to Notice, held at the offices of SIDLEY AUSTIN, 787 Seventh Avenue, New York, New York, before Goldy Gold, a Professional Registered Reporter and Notary Public of the State of New York.

payments to health care providers, and that information is provided to the Health and Human Services Department and it's available on their website.

So there is complete disclosure of all payments that all pharmaceutical companies make to health care providers.

Q. Right, but that, that requirement didn't go in effect until the last two years, right?

A. In the United States, yes.

Q. Right, okay. And now what I want to know is, prior to that regulatory requirement date, the affordable care act sunshine provisions, did Celgene publish any document that either told investors or analysts how much money the doctors who were talking to them were being paid by Celgene Corporation, sir?

A. I don't know if we did that, I'm not aware of it. But I am aware of that there is a great sensitivity to process to ensure that any conflicts in any data and representations to relationships between parties is completely and appropriately disclosed in accordance with all of the conventions of data that's presented.

Q. Okay. Well, through discovery, we have

a lot of information about how much Celgene has paid doctors, including Dr. Palumbo, Dr. List, Dr. Dimopoulos, Dr. Sager and so forth. Right?

Do you think, do you think that there would be any harm caused to Celgene if that information were made public?

A. No, I do not.

Q. Do you think there would be any harm caused to Celgene if it were made public how much money Dr. Palumbo was paid by Celgene to talk to investors?

A. I'm sorry. Repeat the question.

Q. Do you think that there would be any harm to Celgene Corporation if it was made public how much money was paid by Dr. Palumbo to talk to investors or analysts?

A. No. In fact, I will even add that even most investors are aware of that.

Q. Well, we have data going back at least to, say, 2004 recording the payments that Celgene, either directly or indirectly through Envision, has made to several hundred doctors.

Would there be any harm to the Celgene Corporation if that information were made public?

A. I do not believe there would be any

harm.

Q. Has Celgene ever voluntarily, other than through the recent regulatory requirements, made that information public?

A. Not that I'm aware of.

Q. Is there any reason for that?

A. There hasn't been any real extensive discussion about that. There hasn't been a significant request for it.

Q. Now, you have used this phrase "independent investigators." Does that mean also that Celgene had no involvement in the preparation of any article or abstract memorializing their work?

A. Sorry. Could you repeat the question. I'm not sure I understand.

Q. You mentioned independent investigators, right? I assume that, on occasion, independent investigators who engage in investigation have their work summarized or put forth in a journal article?

A. Yes.

Q. Now, for those independent investigators, let's say Dr. Weber, for example, who has published journal articles, do you know Dr. Weber?

beholden to Celgene. So that's -- that's how I look at it.
Q. Has Dr. Vescio ever done any studies for Celgene?
A. I don't know.
Q. Do you know who Dr. Vescio is?
A. Not -- not intimately, no.
Q. But you understand he has been a speaker for Celgene, right?
A. I believe that to be true, but I could not tell you that I know that as a fact.
Q. And Dr. Berenson you know who he is, right?
A. I do, I do know who Dr. Berenson is. I don't know what he does today, but I have met Dr. Berenson over the years.
Q. And you know that he's been involved in Celgene's studies, right?
A. No, I don't -- I don't know that specifically. I would not be surprised that he has done studies with our drugs. But I do not -- I can't tell you that I can tell you a study that he's done or been involved in.
Q. If I tell you that [redacted] was paid over [redacted] from Celgene over the years, would you

still tell me that he's independent?

MS. DUNNE: Objection. Hypothetical.

THE WITNESS: I would -- I would -- I would guess I would probably say yes. More than probably; I would say yes.

Because -- but I first have to understand it. My view is, and my understanding is, anything we pay someone is for valuable services provided at a fair price. And there's a clear process for any transactions or any payments made to third parties to ensure that they're done in an appropriate way.

And if [redacted] was paid -- [redacted] was the name? [redacted]? -- I'm highly confident that the services he provided and the work that he did was fairly compensated and was appropriate for him to do.

And I am confident that, though I don't know [redacted], that he would say and do that he thinks is the right thing to do for patients and for research. And I have no doubt that he would not be inappropriately influenced by that relationship.

BY MR. GUTTMAN:

Q. As chairman of the board of Celgene Corporation, can you name to me a vendor who was in charge of determining or evaluating whether the fees the doctors are paid for consulting services or speaking services or other work, whether those fees are set at fair market value?

A. I'm sorry. There were a couple of words I didn't hear.

Q. As the chairman of the board of Celgene Corporation, can you name to me a vendor, an outside vendor that Celgene has hired to evaluate whether doctors are being paid fair market value compensation for work as speakers, consultants, or on advisory boards?

A. I can't give you a specific name, but I know in the process of establishing our -- the appropriateness of our payments, it includes both internal people, internal legal counsel, regulatory counsel, and external legal counsel and regulatory advisors.

So there is a very complete process of analyzing what we do and how we do it, to ensure, most importantly, that we get fair value for what we're paying for. We're not looking to give money away that we don't receive good value for.

So we feel very comfortable there is a good process in place and that fair value is received.

Q. That Celgene gets fair value?

A. That Celgene is getting fair value, meaning that it's not overpaying for services that are rendered.

Q. Meaning Celgene does a return-on-investment analysis for what it pays?

A. We do return on investment as a corporation, but not on individual transactions. Is this something that is valuable to be done and is it being fairly compensated. Is it appropriate and is it being fairly compensated.

Q. But do you look at what the doctor is paid by his or her institution that he or she primarily works for, if you know?

A. I don't know.

Q. Do you look at what the doctor charges the Medicare or Medicaid system for services?

MR. SALKY: And just "you" there is meaning Celgene, as opposed to him personally?

MR. GUTTMAN: Celgene. Yes.

THE WITNESS: Sir, I don't understand the question.

BY MR. GUTTMAN:

Q. Sir, just be calm. I don't want to waste your time, because I ow you're a busy guys, but can you identify to me any criteria, specific criteria, that Celgene would have value or has a value?

MS. DUNNE: In the use of his independent capacity. He's not here as a company 30(b)(6) witness.

MR. GUTTMAN: Yes. I mean, he is what he is. He's the chairman of the board of the company.

BY MR. GUTTMAN:

Q. I just want to know can you identify any specific criteria that Celgene uses to evaluate whether a doctor or "a key opinion leader is paid fair market value?

A. Absolutely. There are processes. I have even been involved in some discussions over the years to ensure the process is integrated, complete, and ensuring that there is adequate oversight of it.

Q. I'm not asking you whether there is process. I'm asking you what specific factors are considered.

MR. SALKY: If you know.

THE WITNESS: There are so many factors considered, I don't know that I would know all the factors.

BY MR. GUTTMAN:

Q. Just name for me three or four.

A. The most first thing is, what is the service that someone is looking to have done. Is that something that's important for Celgene? Is it something Celgene should pay for? Is this person the best person to deliver that service. And then is that a fair price, in terms of both from a market industry point of view and for the value that is being conveyed for that service.

Q. That's what you can remember?

A. Yes.

Q. Anything else?

A. I don't remember other specifics.

MR. SALKY: I think we're -- if we can, if you're going to a new document --

MR. GUTTMAN: It's okay, I can --

MR. SALKY: Take a break. Let's take a short break.

VIDEOGRAPHER: The time is approximately 10:56 a.m. This is the end of media 2, and we're off the record.

# EXHIBIT NN
# REDACTED VERSION FOR PUBLIC FILING

*In the Matter Of:*

# United States of America, et al v Celgene Corporation

## Katherine Stultz Confidential 30b6

June 10, 2015

CONFIDENTIAL

COPY

*A. William Roberts, Jr. and Associates*
*We're About Service... Fast, Accurate and Friendly*
*(800) 743-DEPO*
*www.scheduledepo.com*

AWR | TRIAL SOLUTIONS

**A. William Roberts, Jr. & Associates**
court reporting | videography | trial presentation | nationwide scheduling
**scheduledepo.com | 800-743-DEPO**

talk about copay assistance.

A. Yes.

Q. Right. What did you mean by that?

A. So even if a patient has coverage meaning the insurance company will pay for the drug, some element of payment is still the responsibility of the patient. This is true for all payors with the exception of the VA. In the VA all services, treatments, diagnoses are free. In all other circumstances there is a cost sharing. So copay means the difference between what is reimbursed and what the patient needs to pay.

Q. What was the range of the copays that you were seeing or that Celgene saw?

A. So Medicare Part D beneficiaries now had access to prescription drug benefit after January 1, 2006. Within the beneficiary provisions there was an element of costs that the patient needed to go through as an initial outlay, and it is called a donut hole is the common terminology for -- for the language. I don't recall the exact amount because that cost sharing changed over time, but there was a period of time for one prescription that could be upwards of 5, $6,000 and as low as $5 and everything in between.

Q. And the 5 to 6 was Revlimid at the high end and Thalomid at the lower end?

A. No, it had nothing to do with Revlimid or Thalomid. There was a minimal amount of funding in Medicare Part D that a patient was responsible for. It had nothing to do with Revlimid or Thalomid. It had to do with prescription drugs. So if a patient had 15 medications, those would be added up to meet this donut hole.

Q. Okay. So we got the donut hole, and is the donut hole part of the category of copay assistance that you're talking about?

A. Yes, for Medicare patients only.

Q. Okay. Did Medicare patients have a copay other than this donut hole program?

A. Absolutely not. Medicare tiering of it is such that there was an initial outlay that was the responsibility of the patient, and then there was coverage there afterwards.

Q. So when you talk about copay at least with Medicare you're talking about the donut hole?

A. Yes.

Q. Okay. What other types of copays?

A. So if you are a private commercial insurance individual, you're insurance company will

set different tiers or percentages.

Q. Okay.

A. For some insurance carriers they tier products, and they might have a fixed dollar amount. So if you're, as an example, a tier one could be $5 out of pocket and a tier 4 could be a hundred dollars out of pocket. Other insurance carriers give you a percentage. Certain medications would be 5 percent out of pocket. Other medications might be 50 percent out of pocket. They all varied, and each carrier had their own set of rules.

Q. What about Medicaid?

A. Medicaid assistance I am not recalling the exact cost sharing situation with Medicaid.

Q. And what about state employee health plans and federal employee health plans?

A. Again, I -- the federal and state employee health plans would mimic the commercial and private health plans. Each one of them sets their own rules as to the tiering of different medications.

Q. And all that we are talking about is within what you called this category of copay assistance?

A. Yes, but what you can provide

assistance with varies on who the audience is.
Q. Why is that?
A. Because if it's a Medicare beneficiary, we, Celgene Corporation, could not provide direct assistance to patients with a Medicare plan --
Q. Why --
A. -- and --
Q. I'm sorry.
A. -- and/or any other government funded insurance carrier.
Q. And why couldn't you provide direct assistance?
A. I understand those are the regulations and the laws.
Q. Do you know the name for those regulations and laws?
A. I don't know the name.
Q. Have you ever been trained on those regulations or laws?
A. Formally trained, no.
Q. Any training sessions on those regulations or laws?
A. I am certain we have had training sessions on those laws. This is why we have hired these vendors that are external experts like Access

Medica, Documedica, ACS. These are very sophisticated complex issues that we rely on these third party vendors to help set the appropriate standards.

Q. Does Celgene have any internal rules regarding its compliance with these regulations or laws --

MS. DUNNE: I object to vague --

Q. -- that we are talking about?

A. Which rules?

Q. You told me that Celgene couldn't provide direct copay assistance --

A. Yes.

Q. -- if it was a government plan, right?

A. Yes.

Q. And I want to know whether Celgene had any internal rules with regard to that?

A. So it would be part of our training that a Medicare beneficiary needing copay assistance would need to be directed to a copay foundation if they needed assistance.

Q. And that's the only thing you were trained on?

A. No. And then if a commercial patient needed assistance, they would be trained to utilize

a commercial copay program that Celgene provides.
Q. You said a copay foundation?
A. Yes.
Q. What is a copay foundation?
A. These are groups that were established in the early 2000s, mid 2000s that are nonprofit organizations that provide assistance to patients for their copay needs.
Q. When you say they were established in the early 2000s, do you have any more specifics as to the date that they were established?
A. I cannot. There are several different ones of these, so I don't know when they were established.
Q. Okay. Let's talk about each one of them. Can you give me a list?
A. Sure. So copay foundations that I am familiar with include the CDF, the Chronic Disease Fund, LLS, the Lymphoma Leukemia Society.
Q. Wait. Chronic Disease Fund, CDF. LLF.
A. Lymphoma Leukemia Society, PANF, I believe it stands for Patient Advocacy Network Fund. Those are examples off the top of my mind.
Q. Okay. These were all created in the

2000s?

A. These were all created in the 2000s as independent, nonprofit organizations to assist with copay -- to have -- to provide copay assistance.

Q. How were they created?

A. I -- I don't know.

Q. Who was involved with their creation?

A. These are independent nonprofit organizations that have their own missions and charters, and they may provide other services besides copay assistance as well.

Q. Did you have any contact with each of these groups?

A. Yes, we did.

Q. And what was your -- what was the scope of the patient support committee's contact with these groups?

A. As the director of the team, I would meet with them usually on an annual basis. Not all of the groups. I need to clarify a point, if I can.

Q. Uh-huh.

A. Copay assistance by all of these groups were usually buckets of disease areas of interest. So what I mean by that is CDF would list we will

cover patients for 15 different types of cancer. Most of these were cancer related. Celgene would -- would donate to the diseases that matched our indications.

So, for example, we would donate to the myeloma bucket. We would donate to the myeloplastic bucket of funding. These non-profits can then utilize that funding to help any patient using any product, not just Celgene products with multiple myeloma or MDS that required copay assistance.

Q. What about with regard to the let's say CDF, the five different disease states that they dealt with --

A. Yes.

Q. -- could they use that bucket for that?

A. We -- they could use the bucket to help with copay assistance with whatever they wanted to use the bucket for. We as a company only donated to the buckets of designation that were applicable to our products.

Q. Okay. Tell me how that bucket worked. I am not sure I am getting this whole bucket concept.

A. Okay. So the nonprofit's mission is

perhaps three years old.

Q. [redacted]

Q. Did any of these entities exist prior to 2000?

A. I can't speak to that. Well, the Lymphoma Leukemia Society has been around for quite a long time. I don't know that these services have been around as one of their product offerings prior to this time period.

Q. How is it that these entities began to offer these services in the 2000s?

A. They are patient advocacy groups. They saw a need in their patients and the copay gap for patients with cancer therapies continued to get larger and larger. They are here to service their patients.

experiencing any issues with copay assistance with the charitable foundations."

Do you see that?

A. Yes.

Q. Why did you put "should not" in capital letters?

A. So the date of this letter is the end of the year. As mentioned earlier, the charitable donations are donations -- not just Celgene, but other companies put money into these charitable donations. There was this feeling always at the end of the year that these donations would run out of money because it was getting toward the end of the year. So my emphasis there was that Celgene -- Celgene did not put in money just in January and said we are done. We would continuously fund these charitable donations, so that they would always have funding available to any patients in the disease areas of focus.

Q. The disease areas of focus meaning what?

A. Multiple myeloma and MDS.

Q. Any kind of multiple myeloma?

A. You -- nothing is distinguished in the coding. You can't know what type of multiple

money. This was -- this was a misconception by the offices, so we wanted to ensure that the sales team was aware that if they heard this from the offices that this should not be an issue and hence my last comment "If you hear concerns, please bring them forward to the patient support team."

Q. Okay. Did you ever hear concerns?

A. We heard many concerns, and oftentimes they were unfounded concerns, which is why we directed them back to the patient support team.

Q. Would you ever hear a concern that a charitable organization had run out of money?

A. We would hear concerns from -- no, to -- it -- we would never hear concerns in an acute way like that.

Q. Right.

A. Again, we would have business reviews with the charitable foundation to understand again where they were as an entity, and we would -- we would then manage our donations based on what their fiscal needs were.

Q. Did Celgene ever provide information to these charitable organizations about the prescription writing habits with regard to prescribing Celgene products?

Q. Okay. Who were those functional leads that endorsed the organization?

A. So while I was leading the patient support team, I would propose a budget to my management, which at the time was Curt Quigley, who would then put the budget in front of Sean Tomasello -- actually, no. It was not Sean Tomasello. It was Mark Ellis, who then would put the budget in front of Bob Hugin.

Q. Bob Hugin the CEO?

A. At the time he was CFO.

Q. So first it would be you, then Quigley, and then Sean Tomasello?

A. No, not Sean Tomasello. I apologize. I am looking at the wrong time period. Mark Ellis.

Q. Mark Ellis. And who is Mark Ellis?

A. Mark Ellis was at the time the head of the -- I am going to speculate. I really don't know what his exact time was at the time, but he was responsible for the commercial organization in some capacity.

Q. And who -- how did you decide what number to propose for each of these non-profits?

A. Again, they were based on business reviews that we would have with the nonprofits of

EXHIBIT
KS 4

**From:** Katherine Stultz
**Sent:** Tuesday, November 17, 2009 8:08 AM
**To:** Celgene (Sales Force-NO CSL)
**Cc:** Curtis Quigley; John Chin; Shawn Tomasello; Robert McMahon; Braden Parker; Adam Waldman; Michele Korfin; Jamie Czajkowski; David Bullock; Brooke Studer; Thomas Girardi; Steven Bourke; Jillian Fahey; Maggie Aloisio; PSC; Mark Craffey; Kristin Feldner; Mac Connor; Shiva Sekhar; Cara Thompson; Priya Mahale; Cynthia Edlow; Jane Thomas; Jerry Dermon; Kimberly Metcalf; Maxim Kosoy; Kevin Sweeney
**Subject:** Enhancements to Celenge Patient Support

[redacted]


Confidential CELDRN0214744

[redacted]

[redacted]

[redacted]

*Katherine Vega Stultz*
Celgene Corporation
Director Patient Support & Reimbursement Services
732-652-6317 office
908 656 0400 cell
kstultz@celgene.com

CELGENE PATIENT SUPPORT


Confidential CELBRN0214745

# EXHIBIT OO
# REDACTED VERSION FOR PUBLIC FILING

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Case No. 10-cv-03165 GHK(SSx)

-----------------------------------x

UNITED STATES OF AMERICA, THE STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO,

Plaintiffs,

-and-

BEVERLY BROWN,

Plaintiff-Relator,

-against-

CELGENE CORPORATION,

Defendant.

-----------------------------------------x

July 30, 2015
8:33 a.m.
CONFIDENTIAL
VIDEOTAPED

EXAMINATION BEFORE TRIAL, of BOB HUGIN, taken by the Plaintiffs, pursuant to Notice, held at the offices of SIDLEY AUSTIN, 787 Seventh Avenue, New York, New York, before Goldy Gold, a Professional Registered Reporter and Notary Public of the State of New York.

A P P E A R A N C E S :

GUTTMAN BUSCHNER & BROOKS, PLLC
Attorneys for Plaintiff-Relator
BEVERLY BROWN
1625 Massachusetts Avenue, N.W.
Washington D.C. 20036
BY: REUBEN GUTTMAN, ESQ.
-and-
BY: TRACI L. BUSCHNER, ESQ.

SIDLEY AUSTIN, LLP
Attorneys for Defendant
555 West Fifth Street
Suite 4000
Los Angeles, California 90013

BY: KIMBERLY A. DUNNE, ESQ.

JONES DAY
Attorneys for Defendant
222 East 41st Street
New York, New York 10017

BY: KAREN HEWITT, ESQ.

ZUCKERMAN SPAEDER, LLP
Attorneys for the Witness
1800 M Street N.W.
Washington, D.C. 20036

BY: STEVEN SALKY, ESQ.
E-mail: Ssalky@zuckerman.com

ALSO PRESENT:

Dan Guttman, Esq.
Peter Cooper, Videographer

Q. Okay. On page 43375 of this exhibit, you were asked a question:

"Hi, guys, thanks for taking the question. A couple of financial questions, maybe one for Dave. Can you help us with the co-pay assistance, how you guys are thinking about this for this year and what your expectations are for growth in these expenses in '09? And I have a follow-up on the Revlimid guidance."

And you write -- you say "Geoff, it's Bob."

I gather you're just saying that on the phone because you wanted to identify yourself, right?

A. I believe that to be true.

Q. Right. And -- and so you know this -- this was Geoff Meacham at J.P. Morgan? Meacham.

A. Yes.

Q. And then he says, "Okay."

And then you say "On the co-pay assistance, again, as everyone knows, it's independent third-party nonprofit foundations not affiliated with Celgene that do provide assistance to patients that aren't able to afford the co-pay, and most of these foundations provide support to

patients up to seven times the poverty level. Clearly, as the economy weakens and hopefully it doesn't weaken much more than the pretty weakened state that it's in today, that we're going to see more patients that may qualify for this kind of need. Our focus at Celgene in the U.S. that we support these foundations in a way to ensure that they do have the access to provide the support for patients in the disease states that we are involved in in myeloma and MDS?"

Do you see that?

A. I do.

Q. How come Celgene just didn't make contributions to these foundations for all disease states?

A. I'm sorry?

Q. How come Celgene didn't make contributions to these foundations to cover patients for all disease states?

A. I -- I would love for Celgene to have the resources to put the -- to cover co-payments and assistance programs for every patient in the world.

But in terms of prioritization, we start with the foundations that support patients that have the diseases that we're researching and

that we're doing. And so we support a wide range of foundations, not just myeloma, MDS, but other -- leukemias and lymphomas and other ones.

So we're trying to be as supportive as possible, but -- but it's -- it's targeted to where, you know, we know there is patient need and where we prioritize to do things in line with where we're focused.

But it's only with people who have OIG certification in terms of the process and independence. There is a -- it's a -- it's a very important part of the system. When people can't afford to pay --

Q. "OIG," meaning what?

A. Officer inspector general.

Q. Which officer inspector general?

A. My understanding, it is whatever officer inspector general would oversee nonprofit foundations to ensure they're doing things in compliance with regulations as to that. They -- they do receive a letter from -- an OIG letter saying that they're in compliance with.

Q. Do you know how much money Celgene paid every year for co-pay assistance to these foundations?

A. I -- I don't know the number off the top of my head, but I could easily find it.

Q. Well, Ms. Stultz testified that it was [redacted]. Does that sound about right?

A. Yes.

Q. And do you know what that was booked to?

A. [redacted]

Q. Well, what about, for example, the contribution to the University of Arkansas, for the

THE WITNESS: Could you repeat the question?

BY MR. GUTTMAN:

Q. Yes. You're not telling me that running money through co-pay assistance foundations to cover patients' co-pays had no value to Celgene's bottom line?

MR. SALKY: Same objection.

MS. DUNNE: Join.

THE WITNESS: What would I -- what I would say is that Celgene makes charitable contributions to independent, third-party, nonprofit co-payment foundations that are not therapy specific. They may be disease-related specific, but they're not therapy-related specific.

And we get no information as to which of our patients receive co-payment assistance, what percentage of their funds go to patients that receive our drugs.

That being said, I am sure that patients on our drugs benefit from that. And then in the end -- if they are able to, the drug is reimbursed -- we would benefit from it.

But we have no information -- we make them completely with the intention of helping patients. And we have no information as to who gets it and what percentage gets our drugs or anything else. And that do we benefit from it? Probably yes.

BY MR. GUTTMAN:

Q. So you're telling me that your patient support coordination team, which communicates directly with doctors' offices, doesn't make recommendations as to the availability of co-pay money through these foundations?

A. I --

MR. SALKY: Objection to the form of the question.

Go ahead.

THE WITNESS: I certainly hope our people give advice to doctors, nurses, patients -- cancer patients, family members of cancer patients who are dying to find access -- the most effective access to co-payment assistance if they financially cannot support the co-payment structure that insurance companies demand from them. So I hope they're doing that in every way possible.

MR. GUTTMAN: We'll take a break.

VIDEOGRAPHER: The time is approximately 2:07 p.m. This is the end of Media No. 4 and we're off the record.

(Whereupon, a recess was taken.)

VIDEOGRAPHER: The time is approximately 2:19 p.m. This is the beginning of Media No. 5 and we're on the record.

BY MR. GUTTMAN:

Q. Do you know an individual by the name of [redacted]?

A. Yes.

Q. Who is [redacted] [redacted]?

A. He's a former employee of Celgene.

Q. What did he do at Celgene, if you know?

A. I'm not sure. I know he had multiple jobs. But the one I do remember -- it might have been his last job -- had something to do with operational activities. But I'm not -- I'm not specific on what he did.

Q. Do you know why he left Celgene?

A. I know there were disagreements about certain things, but I don't -- but I can't tell you, so... I -- I was briefed when it happened on the specifics of it, but I can't remember what they are,

# EXHIBIT QQ
# REDACTED VERSION FOR PUBLIC FILING

---

**From:** Sol Barer
**Sent:** Monday, August 06, 2007 4:42 PM
**To:** Francis Brown; Shawn Tomasello
**Cc:** Robert Hugin
**Subject:** [redacted]

Thanks. Good progress.

---

**From:** Francis Brown
**Sent:** Monday, August 06, 2007 4:12 PM
**To:** Shawn Tomasello
**Cc:** Sol Barer; Robert Hugin
**Subject:** [redacted]

Thanks Shawn.

Francis

---

**From:** Shawn Tomasello
**Sent:** Monday, August 06, 2007 3:55 PM
**To:** Curtis Quigley; Mark Alles; Francis Brown; Tom Tomayko; Fred Thomas
**Subject:** [redacted]

Below find two examples where patients probably would not have received a much needed tx for their disease if not for the third party co pay foundations and a PSC to reassure the patient that resources are available for them to get their medications.

ShawnT

---

**From:** Dorothy Bickford
**Sent:** Monday, August 06, 2007 7:15 AM
**To:** Anissa Anderson; Kristin Schwieger; Karen D'Avanzo; Regan Yardley; David Lustig; Ernesto Diaz; Beth Piekarczyk; Ellen Bohanan
**Cc:** Charles Rios; Lillian Gonzalez; Scott Holmes; Shawn Tomasello; Tee Lander; Melissa Manner; Nelson Pope
**Subject:** [redacted]

Team—

Please see the two success stories from Lillian Gonzalez—who was helping Charlie celebrate his birthday last week!! ☺

These are the success stories that we need to remind all of our customers about…there is help out there. AND we need to be asking

"Do you have **any** patient that you would (**or have)** held back from the promise of Revlimid because you think they can not afford their donut hole?"

Thanks, Charlie, for sharing…..and Lillian for keeping these two patients in the hunt for a good outcome!!

Dot

++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

Hola Charlie,

FYI,

I was working with an MDS pt of [redacted]. After working w/ the pt and assisting with the co-pay applications and processes… I am glad to inform you that the pt rcv'd funding through the Patient Access Network Foundation (PANF) a total of $7500. Yeah! Drug was dispensed and pt has begun Revlimid therapy.

Have a great weekend! ☺

Thanks,

*Lillian Gonzalez*
Celgene Corporation
Patient Support Coordinator
86 Morris Avenue
Summit, NJ 07901
800.931.8691 ext 4090
888.432.9325 fax

---

**From:** Lillian Gonzalez
**Sent:** Friday, August 03, 2007 1:55 PM
**To:** Charles Rios
**Subject:** [redacted]

Hi Charlie,

FYI,

I've been working with a Thalomid MM pt since 5/2007…. Finally, the drug was dispensed after much going back and forth w/ applications and such. Drug was dispensed and pt began therapy. The pt rcv'd CDF funding w/ a 0% copay… Yeah!

Thanks,

*Lillian Gonzalez*
Celgene Corporation
Patient Support Coordinator
86 Morris Avenue
Summit, NJ 07901
800.931.8691 ext 4090
888.432.9325 fax