1   Kimberly A. Dunne (SBN 142721)
    kdunne@sidley.com
2   Michelle B. Goodman (SBN 218607)
    mgoodman@sidley.com
3   Sean A. Commons (SBN 217603)
    scommons@sidley.com
4   SIDLEY AUSTIN LLP
    555 West Fifth Street, Suite 4000
5   Los Angeles, CA 90013
    Telephone:  (213) 896-6000
6   Facsimile:  (213) 896-6600

7   Karen P. Hewitt (SBN 145309)
    kphewitt@jonesday.com
8   Brian D. Hershman (SBN 168175)
    bhershman@jonesday.com
9   JONES DAY
    555 South Flower Street, Fiftieth Floor
10  Los Angeles, CA 90071
    Telephone:  (213) 489-3939
11  Facsimile:  (213) 243-2539

12  Attorneys for Defendant Celgene Corporation
    (*Additional Counsel listed on following page*)

13                    **UNITED STATES DISTRICT COURT**

14       **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO, | Case No. 10-cv-03165 GHK (SSx)<br><br>Assigned to: Hon. George H. King<br><br>**JOINT STIPULATION REGARDING DEFENDANT CELGENE'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date:  October 17, 2016<br><br>Hearing Time:  9:30 a.m. |
| Plaintiffs, | |
| *Ex rel.* | |
| BEVERLY BROWN, | |
| Plaintiff-Relator, | |
| v. | |
| CELGENE CORPORATION, | |
| Defendant. | |

Toni-Ann Citera (admitted *pro hac vice*)
tcitera@jonesday.com
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

## **JOINT CERTIFICATION**

Pursuant to the Court's Order Re:  Summary Judgment Motions and Fed. R. Civ. Proc. 56, Defendant Celgene Corporation ("Celgene" or "Defendant"), as movant, and Relator Beverly Brown ("Relator"), as respondent, submit the following Joint Stipulation Regarding Defendant Celgene's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment.  In accordance with the Court's Order and Local Rule 7-3, counsel for the parties have conferred in-person prior to filing this Motion.

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 1

CELGENE'S INTRODUCTION .............................................................................. 1

RELATOR'S INTRODUCTION .............................................................................. 2

I.   CELGENE: SUMMARY JUDGMENT SHOULD BE GRANTED ON RELATOR'S CLAIMS BASED ON OFF-LABEL PROMOTION. ............... 4

    A.   Celgene:  Relator Cannot Prove Off-Label Promotion Caused Claims ................................................................................................ 5

    B.   Relator: Celgene Misstates the Causation Standard and Ignores Widespread Evidence That It Caused Off-Label Prescriptions ............ 11

        1.   The Evidence Shows That Celgene's Pervasive Off-Label Marketing Caused Doctors to Write Off-Label Prescriptions .... 12

            a.   Celgene Extensively Promoted Off-Label Uses ............... 12

            b.   Celgene's Promotion Caused Off-Label Prescriptions .... 13

            c.   Off-Label Prescriptions Were Paid by the Government ................................................................... 15

        2.   Celgene's Causation Standard Is Contrary to This Court's Prior Ruling and Applicable Law ............................................... 15

    C.   Celgene:  Relator Has Identified No False Claims. ............................. 17

        1.   Celgene:  Government Programs Are Not Prohibited From Reimbursing Off-Label Claims For Thalomid® and Revlimid®.............................................................................. 17

        2.   Relator: Neither Medicare Contractors nor Most State Medicaid Payors Have Discretion to Pay Off-Label Prescriptions ......................................................................... 20

        3.   Celgene:  A Claim Does Not Imply A Medically Accepted Use. ...................................................................................... 25

        4.   Relator: Providers Certify a Claim Complies with the Law ....... 27

    D.   Celgene:  Relator Cannot Prove The Alleged Falsity Was Material. ... 28

    E.   Relator: Celgene's Conduct Was Material to Reimbursement ............. 31

    F.   Celgene:  Relator Cannot Prove Celgene Acted With Scienter. .......... 33

    G.   Relator: Celgene Acted with the Requisite Scienter ........................... 35

II.   CELGENE:  SUMMARY JUDGMENT IS APPROPRIATE ON
      RELATOR'S KICKBACK CLAIMS. ............................................................ 36

      A.    Celgene:  Relator Cannot Prove Celgene Paid Kickbacks. ................. 36

      B.    Relator: Celgene Paid Physicians to Prescribe and Promote Its
            Drugs ................................................................................................... 39

      C.    Celgene:  Relator Cannot Prove Alleged Kickbacks Caused
            Claims .................................................................................................. 41

      D.    Relator: Celgene Mischaracterizes the Kickback Causation
            Standard ............................................................................................... 43

III.  CELGENE:  SUMMARY JUDGMENT IS WARRANTED ON ALL
      CLAIMS BEFORE APRIL 27, 2004. ......................................................... 45

IV.   RELATOR: THE TEN-YEAR STATUTE OF LIMITATIONS APPLIES ... 47

V.    CELGENE:  SUMMARY JUDGMENT SHOULD BE GRANTED ON
      ALL CLAIMS AFTER APRIL 27, 2010. ..................................................... 49

VI.   RELATOR: ESCOBAR DOES NOT CUT OFF LIABILITY IN 2010 ........ 49

VII.  CELGENE:  SUMMARY JUDGMENT SHOULD BE GRANTED AS
      TO ALL PROGRAMS LACKING OFF-LABEL CLAIMS DATA. ............. 49

VIII. RELATOR: THERE IS NO BASIS FOR EXCLUDING CLAIMS
      DATA .................................................................................................. 50

CONCLUSION ..................................................................................................... 50

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JOINT STIPULATION RE: CELGENE'S MOTION FOR SUMMARY JUDGMENT

1

# **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*U.S. ex rel. Aflatooni v. Kitsap Physicians Servs.*,
5        314 F.3d 995 (9th Cir. 2002) .................................................................5

6

*Amarin Pharma, Inc. v. FDA*,
7        119 F. Supp. 3d 196 (S.D.N.Y. 2015) ....................................................4

8

*In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*,
9        804 F.3d 633 (3d Cir. 2015) ................................................................16

10

*U.S. ex. rel. Bauchwitz v. Holloman*,
11        671 F. Supp. 2d 674 (E.D. Pa. 2009).....................................................46

12

*Bergman*,
13        995 F. Supp. 2d at 373 .......................................................................22

14

*U.S. ex rel. Booker v. Pfizer, Inc.*,
15        2016 WL 3017381 (D. Mass. May 23, 2016)....................................38, 41

16

*Broome v. Burwell*,
17        No. 14-01248, 2015 U.S. Dist. LEXIS 44040 (D. Ore. 2015) .............20, 21

18

*Buckman Co. v. Plaintiffs' Legal Comm.*,
        531 U.S. 341 (2001).............................................................................1

19

*Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
20        637 F.3d 1047, 1055 (9th Cir. 2011) ....................................................17

21

*U.S. ex rel. Cestra v. Cephalon, Inc.*,
22        No. 14-1842, 2015 U.S. Dist. LEXIS 71505.........................................22

23

*City of Vernon v. So. Cal. Edison Co.*,
24        955 F.2d 1361 (9th Cir. 1992) .............................................................11

25

*U.S. ex rel. Clausen v. Laboratory Corp. of Amer.*,
        290 F.3d 1301 (11th Cir. 2002) .............................................................5

26

*U.S. ex rel. Colquitt v. Abbott Labs.*,
27        2016 U.S. Dist. LEXIS 1556 (N.D. Tex. Jan. 7, 2016)...........................36

28

iii

*U.S. ex rel. Colquitt v. Abbott Labs.*,
2016 WL 8000 (N.D. Tex. January 7, 2016)....................................................14, 15

*In re Credit Suisse-AOL Sec. Litig.*,
No. 02-12146, 2011 U.S. Dist. LEXIS (D. Mass. Aug. 26, 2011)........................50

*U.S. ex rel. Crews v. NCS Healthcare of Ill.*,
460 F.3d 853 (7th Cir. 2006) ...............................................................................9

*U.S. ex rel. Dalitz v. AmSurg Corp.*,
U.S. Dist. LEXIS 177374 (E.D. Cal. Dec. 24, 2014)...........................................27

*Diamond v. Sec'y of HHS*,
No. 1:13-CV-2481, 2015 U.S. Dist. LEXIS 9271 (N.D. Ohio Jan. 6,
2015) ............................................................................................................20, 21

*U.S. ex rel. Dickson v. Bristol-Meyers Squibb Co.*,
123 F. Supp. 3d 584 (D.N.J. 2015)....................................................................20, 21

*U.S. ex rel. Donegan v. Anesthesia Assoc. of Kansas City*,
2015 WL 3616640 (W.D. Mo. June 9, 2015)........................................................34

*U.S. ex rel. Drummond v. Solvay*,
2016 U.S. Dist. LEXIS 43133 (S.D. Tex. Mar. 31, 2016) .................................9, 50

*U.S. ex rel. Fox RX, Inc. v. Omnicare, Inc.*,
2012 WL 8020674 (N.D. Ga. Aug. 29, 2012)....................................................20, 21

*U.S. ex rel. Fox Rx, Inc.*,
2014 WL 2158412, at *5 n.14 (N.D. Ga. May 23, 2014) ....................................26

*U.S. ex rel. Franklin v. Parke-Davis*,
147 F. Supp. 2d 39 (D. Mass. 2001).....................................................................16

*U.S. ex rel. Franklin v. Parke-Davis*,
2003 WL 22048255 (D. Mass. August 22, 2003) ..........................................15, 22

*U.S. ex rel. Freedman v. Suarez-Hoyos*,
No. 8:04-CV-933-T-24 EAJ, 2012 WL 4344199 (M.D. Fla. Sept. 21,
2012) .....................................................................................................................44

*U.S. ex rel. Hagood v. Sonoma County Water Agency*,
929 F.2d 1416 (9th Cir. 1991).........................................................................34, 39

iv

*U.S. ex rel. Hess v. Sanofi-Synthelabo Inc.*,
   2006 WL 1064127 (E.D. Mo. April 21, 2006).......................................30

*U.S. ex rel. Hopper v. Anton*,
   91 F.3d 1261 (9th Cir. 1996) ................................................................17

*U.S. ex rel. Hyatt v. Northrop Corp.*,
   91 F.3d 1211 (9th Cir. 1996)................................................................46

*Ironworkers Local Union 68 v. AstraZeneca Pharms.*,
   634 F.3d 1352 (11th Cir. 2011) ................................................18, 23, 24

*Ironworkers Local Union No. 68 v. AstraZeneca Pharms. L.P.*,
   585 F. Supp. 2d 1339 (M.D. Fla. 2008), *aff'd on other grounds*, 634
   F.3d 1352 (11th Cir. 2011) ..............................................................5, 22

*J.A. Jones Construction Co. v. United States*,
   390 F.2d 886 (U.S. Ct. Cl. 1968)..........................................................32

*U.S. ex rel. Jamison v. McKesson Corp.*,
   900 F. Supp. 2d 683 (N.D. Miss. 2012) ...............................................36

*Kellogg Brown & Root Servs., Inc. v. U.S.*,
   99 Fed. Cl. 488 (2011)...................................................................42, 44

*U.S. ex rel. Kester v. Novartis Pharm. Corp.*,
   23 F. Supp. 3d 242 (S.D.N.Y. 2014) ....................................................43

*U.S. ex rel. Ketroser v. Mayo Found.*,
   729 F.3d 825 (8th Cir. 2013) ...............................................................34

*U.S. ex rel. King v. Solvay*,
   2015 WL 8732010 (S.D. Tex. Dec. 14, 2015) ................................11, 12

*Klaczak v. Consol. Med. Transport*,
   458 F. Supp. 2d 622 (N.D. Ill. 2006)...............................................38, 41

*Layzer v. Leavitt*,
   770 F. Supp. 2d 579 (S.D.N.Y. 2011) ......................................20, 21, 34

*Lund v. 3M Co.*,
   No. 13-02776, 2015 U.S. Dist. LEXIS 99109 (C.D. Cal. July 21,
   2015) ....................................................................................................50

*Magnum v. Action Collection Serv., Inc.*,
   575 F.3d 935 (9th Cir. 2009) ................................................................47

*Malhotra v. Steinberg*,
   No. 09-1618, 2012 U.S. Dist. LEXIS 155922 (W.D. Wash. Oct. 29,
   2012) ................................................................................................47, 49

*Mazur v. Merck & Co.*,
   964 F.2d 1348 (3d Cir. 1992) ..................................................................5

*U.S. ex rel. McDermott v. Genentech*,
   2006 WL 3741920 (D. Maine 2006) ......................................................26

*Miller v. Abbott Labs.*,
   2016 U.S. App. LEXIS 8882 (6th Cir. May 12, 2016) ...............42, 44, 45

*Moore v. Navarro*,
   No. C 00-03213, 2004 WL 783104 (N.D. Cal. Mar. 31, 2004) .............46

*In re Neurontin Marketing & Sales Practices Litigation*,
   712 F.3d 21 (1st Cir. 2013)...............................................9, 10, 15, 16

*In re Neurontin Mktg. & Sales Practices Litig.*,
   No. 04-cv-10739-PBS, 2011 U.S. Dist. LEXIS 99593 (D. Mass. Aug.
   31, 2011) ...............................................................................................24

*Nievod v. Sebellius*,
   No. 11-4134, 2013 U.S. Dist. LEXIS 17550 (N.D. Cal. Feb. 8, 2013)...........20, 21

*U.S. ex rel. Osheroff v. Tenet Healthcare Corp.*,
   2012 WL 2871264 (S.D. Fla. July 12, 2012) ........................................36

*Parikh v. Citizens Med. Ctr.*,
   977 F. Supp. 2d 654 (S.D. Tex. 2013)...................................................41

*In re Pfizer Inc. Sec. Litig.*,
   819 F.3d 642 (2d Cir. 2016) .................................................................50

*U.S. ex rel. Phalp v. Lincare Holdings Inc.*,
   2015 WL 4528955 (S.D. Fla. July 13, 2015) ........................................34

*U.S. ex rel. Polansky v. Pfizer*,
   __ F.3d. __, 2016 U.S. App. LEXIS 8974 (2d Cir. 2016)......................25

vi

*U.S. ex rel. Polansky v. Pfizer, Inc.*,
  2009 WL 1456582 (E.D.N.Y. May 22, 2009) .......................................6, 17, 19, 28

*U.S. ex rel. Polansky v. Pfizer, Inc.*,
  822 F.3d 613 (2d Cir. 2016) .........................................................................26, 28

*U.S. ex rel. Purcell v. MWI Corp.*,
  807 F.3d 281 (D.C. Cir. 2015) ...............................................................................34

*U.S. ex rel. Quinn v. Omnicare, Inc.*,
  382 F.3d 432 (3d Cir. 2004) .....................................................................................5

*Roeder v. Burwell*,
  No. 15- 01194, 2016 U.S. Dist. LEXIS 81035 (E.D. Va. June 21, 2016) ...............................................................................................................20, 21

*U.S. ex rel. Rost v. Pfizer*,
  253 F.R.D. 11 (D. Mass. 2008) .............................................................................35

*Safeco Ins. Co. v. Burr*,
  551 U.S. 47 (2007)..............................................................................33, 34, 35, 36

*U.S. ex rel. Saldivar v. Fresenius Medical Care Holdings, Inc.*,
  2015 WL 7293156 (N.D. Ga. Oct. 30, 2015) .........................................................34

*Santa Maria v. Pac. Bell*,
  202 F.3d 1170 (9th Cir. 2000) .........................................................................45, 47

*Schmidt*,
  386 F.3d at 244 ......................................................................................................28

*Sergeants Benevolent Assoc. Health and Welfare Fund v. Sanofi-Aventis*,
  806 F.3d 71 (2d Cir. 2015) ....................................................................................10

*Sorrell v. IMS Health, Inc.*,
  131 S. Ct. 2653 (2011)...........................................................................................10

*U.S. ex rel. Steury v. Cardinal Health, Inc.*,
  625 F.3d 262 (5th Cir. 2010) .................................................................................27

*Stitt v. Williams*,
  919 F.2d 516 (9th Cir. 1990) .................................................................................47

JOINT STIPULATION RE: CELGENE'S MOTION FOR SUMMARY JUDGMENT

*Tagney v. Burwell,*
No. 14-14149-WGY*32 n.24 (D. Mass. May 10, 2016)..................................20, 21

*U.S. ex rel. Turner v. Michaelis Jackson & Assoc.,*
2011 WL 13510 (S.D. Ill. Jan. 4, 2011) .............................................8, 12

*U.S. v. Bay State Ambulance & Hospital Rental Service, Inc.,*
874 F.2d 20 (1st Cir. 1989)..........................................................40

*U.S. v. Caronia,*
703 F.3d 149 (2d Cir. 2012) ...............................................1, 4, 25, 37

*U.S. v. Carrell,*
681 F. Supp. 2d 874 (M.D. Tenn. 2009) ...............................................47

*U.S. v. Greber,*
760 F.2d 68 (3d Cir.1985) ...........................................................40

*U.S. v. Kass,*
740 F.2d 1493 (11th Cir. 1984) .....................................................45

*U.S. v. Krikheli,*
461 Fed. Appx. 7 (2d Cir. 2012)..............................................36, 38, 40

*U.S. v. Kubrick,*
444 U.S. 111 (1979)................................................................46

*U.S. v. McClatchey,*
217 F.3d 823 (10th Cir. 2000) ..............................................37, 40, 41

*U.S. v. McLeod,*
721 F.2d 282 (9th Cir. 1983) .......................................................28

*U.S. v. Patel,*
778 F.3d 607 (7th Cir. 2015) ...................................................37, 41

*U.S. v. Rivera,*
55 F.3d 703 (1st Cir. 1995).........................................................28

*U.S. v. Rogan,*
517 F.3d 449 (7th Cir. 2008) .......................................................43

*Strom ex rel. U.S. v. Scios, Inc.,*
676 F. Supp. 2d 884 (N.D. Cal. 2009)............................................17, 22

JOINT STIPULATION RE: CELGENE'S MOTION FOR SUMMARY JUDGMENT

*U.S. v. Shaw*,
   106 F. Supp. 2d 103 (D. Mass. 2000) ................................................................41

*UFCW Local 1776 v. Eli Lilly & Co.*,
   620 F.3d 121 (2d Cir. 2010) ...............................................................................6

*United States v. Kats*,
   871 F.2d 105 (9th Cir. 1989) .....................................................................*passim*

*United States v. Miles*,
   360 F.3d 472 (5th Cir. 2004) ..............................................................................38

*United States v. TEVA Pharm. USA, Inc.*,
   2016 WL 750720 (S.D.N.Y. Feb. 22, 2016) ......................................................43

*Univ. of Texas Sw. Med. Ctr. v. Nassar*,
   133 S. Ct. 2517 (2013)..........................................................................................5

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
   136 S.Ct. 1989 (2016)................................................................................*passim*

*In re Vioxx Prods. Liab. Litig.*,
   2010 U.S. Dist. LEXIS 142767 (E.D. La. Mar. 31, 2010) ....................................6

*U.S. ex rel. Wilkins v. United Health Group, Inc.*,
   659 F.3d 295 (3d Cir. 2011) ...............................................................................39

*Winter v. United States*,
   244 F.3d 1088 (9th Cir. 2001) ............................................................................47

*Wolf v. Travolta*,
   No. 12-00938, 2016 U.S. Dist. LEXIS 28007 (C.D. Cal. Mar. 4, 2016) ..............47

**Statutes**

21 U.S.C. § 321(n) ....................................................................................................25

21 U.S.C. § 331.....................................................................................................4, 24

21 U.S.C. § 352(a) ....................................................................................................24

21 U.S.C. § 352(f)(1) .................................................................................................24

21 U.S.C. § 355..........................................................................................................24

JOINT STIPULATION RE: CELGENE'S MOTION FOR SUMMARY JUDGMENT

31 U.S.C. § 3729(b)(4) ...........................................................................................31

31 U.S.C. § 3731(b)(2) ..............................................................................45, 46, 47

42 U.S.C. § 139w-102(e)(1) ..................................................................................20

42 U.S.C. § 1301(b) ...............................................................................................20

42 U.S.C. § 1320a-7b(b)(2) ............................................................................36, 39

42 U.S.C. § 1320a-7b(g) ........................................................................................42

42 U.S.C. § 1395w-102(e)(1) ..........................................................................18, 19

42 U.S.C. § 1395w-102(e)(4)(i)(II)(2009) ............................................................19

42 U.S.C. § 1395x(t)(2)(B) ....................................................................................19

42 U.S.C. § 1395y(a)(1)(A) ...................................................................................17

42 U.S.C. § 3729(b)(1) ..........................................................................................33

Tex. Hum. Res. Code § 36.002(4)(B) ....................................................................22

Tex. Hum. Res. Code § 36.052 ..............................................................................22

**Other Authorities**

21 C.F.R. § 201.5 ...................................................................................................24

21 C.F.R. § 201.128 ...............................................................................................24

21 C.F.R. § 312.7(a) ................................................................................................4

32 C.F.R. § 199.2(b) ..............................................................................................19

32 C.F.R. § 199.4(g)(1) ..........................................................................................17

38 C.F.R. § 17.38(b) ........................................................................................17, 19

62 Fed. Reg. 625, 628 (Jan. 6, 1997) .....................................................................19

63 Fed. Reg. 64,556, 64,558 (Nov. 20, 1998) .........................................................4

65 Fed. Reg. 14,286, 14, 287 (Mar. 16, 2000) ........................................................4

69 Fed. Reg. 38,898 (June 29, 2004) .....................................................................30

1 Tex. Admin. Code § 354.1921, Ex. 252 ................................................................22

JOINT STIPULATION RE: CELGENE'S MOTION FOR SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

### CELGENE'S INTRODUCTION

Thalomid® and Revlimid® have been recognized as breakthrough treatments, undeniably extended the lives of cancer patients, and been reimbursed for a variety of off-label uses by government health programs for over 17 years.  Despite the overwhelming and uniform testimony from oncologists as to the benefits of these drugs and extensive scientific research supporting their use, Relator suggests that Celgene corrupted the judgment of every prescribing physician and hoodwinked the Government into unknowingly reimbursing every on-label and off-label use of these drugs.  Relator seeks roughly $40 billion in damages and penalties under the False Claims Act ("FCA") for *all* claims for these drugs reimbursed by Medicare, Medicaid, the Department of Veterans Affairs ("VA"), and TRICARE since 1998 based on the proposition that, absent alleged off-label promotion and kickbacks, no doctor would have prescribed these drugs, and no program would have reimbursed *any* use.[1]

Relator's claims fail as a matter of law.  It is well-established that doctors may lawfully prescribe drugs for off-label uses.  *U.S. v. Caronia*, 703 F.3d 149, 153 (2d Cir. 2012).  Off-label use is both prevalent and "essential" to "optimal medical" treatment, particularly in oncology, where physicians constantly evaluate new treatment options.  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001).  When deciding how to treat cancer patients, doctors rely on their training, medical literature, recommendations of colleagues and experts, and experience in light of each patient's history and symptoms.  Relator has no evidence that Celgene's allegedly illegal conduct corrupted the judgment of any, much less *all*, doctors, and liability cannot be based on lawful activities like supporting clinical research, helping publish research, funding speaker programs, and making charitable contributions.

---

[1] On August 23, 2016, Magistrate Judge Segal struck substantial portions of the report of Relator's damages expert, Dr. Joel Hay, because it improperly included new opinions and methodologies in the guise of a "supplement."  Ex. 311 [Dkt. 320].

Moreover, Relator's claims based on Celgene's alleged off-label promotion fail because there is nothing false about any claim for reimbursement.  Even if there were, Relator has no evidence that any alleged falsity was material to any reimbursement decision.  The Government has known about the widespread off-label uses of Thalomid® and Revlimid® for as long as those drugs have been approved, and yet continues to reimburse for such uses *to this day*—even after learning of Relator's allegations in 2010.  In these circumstances, Celgene could not have acted with the scienter required for FCA liability.  Relator's claims based on alleged kickbacks also fail because there is no evidence Celgene knowingly and willfully paid anyone as a *quid pro quo* for prescriptions, or that any payment caused a prescription, much less every prescription ever written.  Summary judgment should be granted to Celgene.

## RELATOR'S INTRODUCTION

In 1998, Celgene was at a crossroads. It had won FDA approval for its lone product, Thalomid, but the approval was for a rare, leprosy-related skin disease with a tiny patient population. Celgene had hoped to get a lucrative label indication for AIDS wasting – and had hired a sales team to sell to that market – but the FDA said no. The company's prospects were dim, and its very existence was in jeopardy.

So Celgene came up with a plan. That plan was to create from scratch an entirely off-label cancer market for Thalomid, built on off-label promotion and kickbacks. Celgene deployed its sales force (misleadingly dubbed "Immunology Specialists") to sell oncologists on off-label uses; designed a secret publications strategy to spin the scientific literature in its favor; began paying doctors around the country to prescribe and recommend Thalomid; and worked to improperly influence compendia listings.  This off-label marketing and kickback scheme continued apace after Celgene launched Revlimid and obtained two narrow cancer indications in 2006.

Celgene's off-label promotion plan was a massive success. The company went from the verge of extinction to the multi-billion company it is today. But while Celgene's scheme was an economic triumph, it was also illegal. Federal law prohibits

pharmaceutical companies both from off-label promoting the way Celgene did, and from paying the kickbacks Celgene paid. Notably, apart from conclusory lip service, Celgene does not deny this. It does not ask the Court to decide the legality of its conduct, acknowledging that, at a minimum, that is an issue for the jury to decide based on the evidence.

Instead, Celgene argues that the legality or illegality of its conduct is essentially irrelevant, and that even if it blatantly broke the law (which it did), it nevertheless should be given a free pass. Celgene is wrong.

Celgene's first argument – that Relator cannot prove causation –ignores not only the massive volume of evidence in this case, but also this Court's ruling on Celgene's motion to dismiss, in which it rejected Celgene's virtually identical legal arguments. [*See* Dkt. 147]. There, the Court laid out the causation standards that apply in this case, and the evidence overwhelmingly shows that Celgene's off-label promotion caused doctors to write prescriptions under those standards.

Celgene's remaining off-label arguments – that Relator cannot prove falsity, materiality, or scienter – likewise ignore the evidence and misstate the law governing drug reimbursement and FCA claims. It also rests upon the false assertion that Thalomid and Revlimid were wonder drugs that warranted special treatment and an exemption form the legal restraints governing all other pharmaceuticals. Not only are the doctors Celgene enlists to tout its drugs to this Court the same doctors it paid kickbacks, the truth is that both drugs are highly toxic with serious adverse side effects. Their use in off-label indications was tantamount to human experimentation. Celgene compounded this by instructing its sales representatives to conceal the drugs' risks, including most notably the potential for lethal blood clots.

Equally baseless are Celgene's kickback arguments, which disregard controlling Ninth Circuit law holding that a payment is illegal if even one purpose of the payment is to induce or reward prescriptions. Celgene's internal documents leave no doubt that this was not only one of the goals behind Celgene's speaker payments,

"charitable donations," and similar payments – it was the *only* goal.

In short, Celgene did exactly what the FCA and the laws and regulations governing drug sales are designed to prevent: it secured an indication for which it never intended to market for the sole purpose of selling the drug for unproven, unsafe, and unapproved uses. In the process, Celgene jeopardized patient safety and caused the government to pay out billions of dollars in claims. A jury should decide whether and to what extent to hold Celgene liable for that conduct.

## I. CELGENE:  SUMMARY JUDGMENT SHOULD BE GRANTED ON RELATOR'S CLAIMS BASED ON OFF-LABEL PROMOTION.

There is no law prohibiting off-label communications by manufacturers.  The law prohibits "misbranding," 21 U.S.C. § 331, which the FDA interprets to restrict off-label communications in certain circumstances the FDA deems "promotional." However, the FDA does not consider all manufacturer communication of off-label information "promotional," and specifically permits manufacturers to share off-label information in certain circumstances, including by distributing reprints of scientific articles, responding to unsolicited questions regarding off-label use, participating in scientific exchange, and supporting continuing medical education programs.[2]  Celgene denies that it engaged in off-label promotion, and disputes that Relator can base liability on truthful, non-misleading communications about off-label use, as courts have held the First Amendment protects such communications.  *Caronia*, 703 F.3d at 161; *Amarin Pharma, Inc. v. FDA*, 119 F. Supp. 3d 196, 237 (S.D.N.Y. 2015). Regardless, summary judgment is warranted on Relator's claims based on off-label promotion because she has presented no evidence that Celgene knowingly caused the

---

[2] *See* 21 C.F.R. § 312.7(a); 65 Fed. Reg. 14,286, 14, 287 (Mar. 16, 2000); 63 Fed. Reg. 64,556, 64,558 (Nov. 20, 1998); FDA, Revised Draft Guidance for Industry, Distributing Scientific and Medical Publications on Unapproved New Uses – Recommended Practices (Feb. 2014); FDA, Draft Guidance for Industry, Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices (Dec. 2011); FDA Guidance for Industry, Industry-Supported Scientific and Educational Activities (Dec. 1997); *see* Ex. 304 at 19919-35 (¶¶ 60-90).

submission of a materially false claim for reimbursement.

**A.    Celgene:  Relator Cannot Prove Off-Label Promotion Caused Claims.**

As this Court previously held, to hold Celgene liable under the FCA, Relator must prove that Celgene engaged in off-label promotion and that it was a "substantial factor" in causing pharmacies to submit claims to government payors.  Ex. 45 at 4778.[3]  It is "textbook tort law that an action 'is not regarded as a cause of an event if the particular event would have occurred without it.'"  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2525 (2013).  Accordingly, to avoid summary judgment, Relator must do more than simply assert that alleged off-label promotion "must have" caused false claims to be submitted to government payors.  *U.S. ex rel. Quinn v. Omnicare, Inc.*, 382 F.3d 432, 440 (3d Cir. 2004); *U.S. ex rel. Aflatooni v. Kitsap Physicians Servs.*, 314 F.3d 995, 1002 (9th Cir. 2002) ("it is not enough" for Relator "to describe a private scheme in detail" and then assert "that claims requesting illegal payments must have been submitted").  Relator must present evidence that (1) alleged promotion caused a doctor to prescribe Thalomid® and Revlimid® where that doctor otherwise would not have; and (2) a claim for reimbursement for that prescription was submitted to the Government.  *U.S. ex rel. Clausen v. Laboratory Corp. of Amer.*, 290 F.3d 1301, 1313 (11th Cir. 2002) (relator must provide evidence "linking the [alleged] schemes to the submission of … actual claims").  Relator has done neither.

The burden of proving that alleged off-label promotion caused prescriptions is substantial because physicians exercise "independent judgment" and weigh multiple factors before deciding whether to prescribe a drug for a particular patient.  *See Mazur*

---

[3] The causation standard *separately* requires Relator to prove proximate causation – *i.e.* that claims "were a foreseeable and natural consequence" of Celgene's conduct.  Ex. 45 at 4778.  Given Relator's inability to satisfy the "substantial factor" requirement, it is not necessary for the Court to analyze proximate causation.  The learned intermediary doctrine and Relator's cases holding that the presence of doctors in the causal chain does not preclude *proximate* cause as a matter of law are irrelevant.

*v. Merck & Co.,* 964 F.2d 1348, 1355-56 (3d Cir. 1992); *Ironworkers Local Union No. 68 v. AstraZeneca Pharms. L.P.*, 585 F. Supp. 2d 1339, 1344 (M.D. Fla. 2008) (plaintiffs could not establish causation where "physicians use their independent medical judgment to decide whether [a drug] is the best treatment for a given patient"), *aff'd on other grounds*, 634 F.3d 1352 (11th Cir. 2011).  Because of the complexity of prescribing decisions and physicians' independent judgment, courts require individualized evidence that promotional conduct caused specific physicians to write specific prescriptions.  *E.g.*, *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 136 (2d Cir. 2010) (holding "Plaintiffs cannot use generalized proof" because physicians may rely on information "to different degrees, or not at all.").[4]

The burden of proving causation is particularly demanding here because physicians had compelling reasons to prescribe Celgene's drugs.  Relator's own expert, Dr. Bennett, agrees that Thalomid® was a "breakthrough" for "patients stricken by certain forms of cancer."  Ex. 313, Bennett Dep. 20283:1-8.  Even before the FDA approved Thalomid® in 1998 to treat erythema nodosum leprosum ("ENL"), it was studied for use in cancer and research indicated it could benefit patients.  Ex. 8 at 651-52 (¶ 40).  In 1997, the FDA had "great interest in thalidomide for a wide variety of conditions" including "various malignancies."  Ex. 62 at 5456.  From 1997-1998, FDA's Division of Oncology permitted 575 single-patient studies of Thalomid® for advanced malignancies.  Ex. 65 at 5604; Ex. 25 at 4172 (¶¶ 6-7).[5]

---

[4] *See also In re Vioxx Prods. Liab. Litig.*, 2010 U.S. Dist. LEXIS 142767, at *20-25 (E.D. La. Mar. 31, 2010) ("Courts have often rejected the argument that 'generalized allegations and aggregate proof' are sufficient to adequately prove causation . … [I]t is not sufficient for Plaintiff to generally assert that Merck's misrepresentations led to the prescription of Vioxx.  Each decision by each doctor and each patient was different.  The effect that any alleged misrepresentations had on each decision is unique."); *U.S. ex rel. Polansky v. Pfizer, Inc.*, 2009 WL 1456582, at *9-10 (E.D.N.Y. May 22, 2009) (dismissing FCA off-label promotion claim on the ground that statistical evidence was insufficient to demonstrate causation).

[5] This evidence disproves Relator's unsupported, fanciful, and false story that Celgene "create[d] from scratch an entirely off-label cancer market" after "the FDA said no" to "a potentially lucrative label indication for AIDS wasting."  *Supra* p. 2.

JOINT STIPULATION RE: CELGENE'S MOTION FOR SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10

Since then, both Thalomid® and Revlimid® have been studied for cancer uses in hundreds of clinical trials.  Ex. 8 at 649-50, 727-30 (¶¶ 34-36 & Exs. 1-4).  Thousands of articles have been published on use of both drugs in treating various cancers, including multiple myeloma ("MM"), myelodysplastic syndrome ("MDS"), renal cell carcinoma, prostate cancer, melanoma, and chronic lymphocytic leukemia ("CLL").  *Id.* at 651-54, 731-32 (¶¶ 40-44 & Exs. 5-6).  Celgene's experts establish that the clinical research supports use of these drugs in MM, MDS, and other cancers.  Ex. 20 at 3363, 3376-82 (¶¶ 21, 59-67, 70-72); Ex. 11 at 1669, 1678-81, 1683 (¶¶ 24-25, 49, 51, 54-55, 61-62); Ex. 18 at 3084-89, 3093 (¶¶ 42-50, 60); Ex.313, Bennett Dep. at 20279:7-9, 20280:6-8, 20281:9-12 (conceding expertise of Celgene's experts).

11
12
13
14
15
16
17
18
19
20
21

The FDA approved Thalomid® for newly diagnosed MM in 2006.  Ex. 50. Revlimid® is approved for the treatment of MM (with dexamethasone) and certain forms of MDS and mantle cell lymphoma.  Exs. 49, 51, 52, 53.  Researchers continue to study both drugs for use in other cancers.  Ex. 8 at 649-50, 652-54, 730, 732 (¶¶ 34-36, 41-44 & Exs. 4, 6); Ex. 10 at 939-40, 1448-1455 (¶ 59, Ex. 38); Ex. 11 at 1678-79, 1681, 1856-70, 1887-95 (¶¶ 47-51, 56 & Exs. 9-10, 13); Ex. 18 at 3084-85, 3091, 3202-09, 3286-88 (¶¶ 43, 57 & Exs. 11, 22); Exs. 66-67, 70-71, 74-75.  Numerous practicing oncologists have testified that off-label use of these drugs has extended and improved the lives of their cancer patients.  Ex. 23 at 4138-39 (¶¶ 11-14); Ex. 24 at 4158 (¶¶ 10-13); Ex. 29 at 4202 (¶ 6); Ex. 31 at 4217-19 (¶¶ 3-4, 7); Ex. 32 at 4241-42 (¶¶ 4-5); Ex. 33 at 4283-84 (¶¶ 4-5); Ex. 34 at 4396-98 (¶¶ 12, 15-16).

22
23
24
25
26
27
28

Against this backdrop, Relator's claim that *no* doctor would have prescribed these drugs for *any* use absent Celgene's alleged off-label promotion is patently unreasonable.  The undisputed evidence – including the testimony of Relator's experts – confirms that physicians consider multiple factors in prescribing, including clinical data regarding the efficacy of the drug, the physician's personal experience with the drug, published journal articles, and presentations at medical conferences.  Ex. 15 at 2730-32 (¶¶ 29-32); Ex. 322, Hay Dep. 20373:08-13, 20378:24-379:11; Ex. 313,

7

Bennett Dep. 20282:6-9, 20284:9-11; Ex. 316, Campbell Dep. 20329:25-330:5, 20334:18-25, 20335:13-19, 20336:19-337:3.  Physicians who regularly prescribed these drugs have uniformly confirmed that they exercised their own independent medical judgment and based their prescribing decisions on the extensive clinical data and published articles regarding the efficacy of these drugs for off-label uses, their patient's particular condition, and their patient's wishes.  Ex. 21 at 4064 (¶ 9); Ex. 22 at 4110-12 (¶¶ 4-7); Ex. 23 at 4139-40 (¶¶ 16-17); Ex. 24 at 4158 (¶ 14); Ex. 26 at 4180 (¶ 9); Ex. 27 at 4185-86 (¶¶ 7, 9-11); Ex. 29 at 4202-03 (¶ 8); Ex. 30 at 4212-13 (¶¶ 3-4); Ex. 31 at 4218-19 (¶¶ 4, 7-8); Ex. 32 at 4242-43 (¶ 6); Ex. 33 at 4284-85 (¶¶ 7-8); Ex. 34 at 4398 (¶ 17); Ex. 35 at 4561-62 (¶¶ 2-4); Ex. 36 at 4569-70 (¶¶ 4, 7); Ex. 37 at 4581, 4584 (¶¶ 3, 12).  Some doctors work in practices that do not interact with pharmaceutical sales representatives, and those who have met with sales representatives – including Relator's expert – have consistently testified that they do not base prescribing decisions on what a sales representative says.  Ex. 23 at 4139 (¶ 16); Ex. 30 at 4214 (¶ 9); Ex. 31 at 4220 (¶ 8); Ex. 33 at 4284-85 (¶ 7); Ex. 34 at 4400 (¶ 23); Ex. 35 at 4561-62 (¶¶ 2-3, 5); Ex. 318, Fadem Dep. 20348:17-23.

In stark contrast, Relator offers *no testimony* from any physician that alleged off-label promotion caused him or her to prescribe Thalomid® or Revlimid® when he or she otherwise would not have done so.  Relator points only to isolated internal company call notes, weekly activity reports, and business plans (many over a decade old), and argues that she need only show that a single prescription resulted from alleged off-label promotion.  Relator is wrong.  The case she cites reinforces Relator's burden to present individualized evidence of causation, stating that "a relator has the burden of proving, in at least one instance, the submission of an *actually* false claim …. In other words, a relator must establish actual presentment of a false claim *at an individualized transaction level*." *U.S. ex rel. Turner v. Michaelis Jackson & Assoc.*, 2011 WL 13510 at * 7 (S.D. Ill. Jan. 4, 2011).  Moreover, at best Relator attempts to link instances of alleged promotion to prescriptions; it is not "sufficient to raise an

issue of material fact that unlawful marketing allegedly documented in these call notes caused the physicians to write the prescriptions … that *were later the subject of claims for payment from [Medicaid]*" as that would "require a jury to draw inference upon inference to find a claim was submitted after a sales representative delivered an off-label message to a particular physician." *U.S. ex rel. Drummond v. Solvay*, 2016 U.S. Dist. LEXIS 43133, at *36-37 (S.D. Tex. Mar. 31, 2016); *U.S. ex rel. Crews v. NCS Healthcare of Ill.*, 460 F.3d 853, 857 (7th Cir. 2006) (affirming summary judgment on FCA claim because though "[s]tatistically unlikely," it was "possible" that all recycled drugs were given to non-Medicaid patients and relator "introduce[d] no evidence that this is not what happened."). Because Relator here lacks individualized evidence of causation, summary judgment is warranted.

Relator cannot prove causation through the testimony of Dr. Hay, who Relator admits is simply a "*damages* expert" with opinions not relevant "to any arguments [Relator] would make in opposition to summary judgment." Ex. 46 at 4787, 4789 (emphasis in original). Dr. Hay does not *analyze* causation. He "*assumes* a one hundred percent (100%) causal relationship between Celgene's illegal activities and its off-label sales." Ex. 13 at 2384 (¶ 59) (emphasis added). As Relator concedes, Dr. Hay only assessed whether it would be reasonable for a jury to conclude that all off-label prescriptions were caused by Celgene's alleged promotion. But that is a legal issue for this Court to decide; it is not a proper subject of expert testimony and is not admissible evidence. Dr. Hay admits the only quantitative analysis he conducted – comparing the number of prescriptions by a small subset of high-prescribers with the number of visits by Celgene representatives (Ex. 14 at 2585-87 (¶¶ 53-54)) – shows correlation, not causation. *Id*. 74:25-75:04.

Even under *In re Neurontin Marketing & Sales Practices Litigation*, 712 F.3d 21 (1st Cir. 2013)—the only decision to uphold use of aggregate evidence to prove causation—Relator's claims fail. Unlike the expert there, Dr. Hay lacks any regression analysis or other recognized model that could control for the numerous

9

factors that impact prescribing decisions.  Ex. 9 at 748, 751-59 (¶¶ 22, 26-27.10).

Dr. Hay's testimony is even more tenuous than the expert testimony found insufficient to survive summary judgment in *Sergeants Benevolent Assoc. Health and Welfare Fund v. Sanofi-Aventis*, 806 F.3d 71 (2d Cir. 2015).  There, as here, an expert asserted that *all* prescriptions were caused by misrepresentations.  The Second Circuit affirmed summary judgment for the defendant and distinguished the First Circuit's decision in *Neurontin*, because where "Plaintiffs' theory … is effectively all-or-nothing," the plaintiff must produce "sufficiently powerful" evidence, such as a robust regression model, to rule out "the number of factors that enter into doctors' prescribing decisions …."  *Id.* at 94, 97.  "[I]t is simply not reasonable to infer" that all prescriptions were caused by alleged misrepresentations.  *Id.* at 94.  The expert in *Sergeants*, like Dr. Hay, relied upon evidence of a correlation and her "experience." *Id.* at 91.  As a matter of law, such "simplistic proof" was not sufficient to prove causation in *Sergeants*, and it is not sufficient here.  *Id.* at 97.

Dr. Hay has argued that he need not account for any factors other than alleged off-label promotion that enter into doctors' prescribing decisions unless each is completely independent of Celgene's influence.  Ex. 322, Hay Dep. 20368:07-09.  Dr. Hay then purports to find influence because Celgene provided financial and research support for some clinical studies, provided writing assistance to certain authors, submitted requests to particular compendia to obtain expanded support of Thalomid® and Revlimid®, and visited many prescribing physicians.  *Id.* 70:03-13; 76:01-05.

Dr. Hay disregards that none of these actions are unlawful, that the FDA specifically permits many forms of off-label communication (*supra* n.2), and that the First Amendment protects still more.  *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2659 (2011) ("Speech in aid of pharmaceutical marketing … is a form of expression protected by the Free Speech Clause" that "must be subjected to heightened judicial scrutiny.").  There is nothing illegal or fraudulent in providing financial and other support for clinical research, including drafting articles for peer-reviewed journals

10

where, as here, the undisputed evidence shows that authors at all times retained responsibility and control over the content.  Ex. 12 at 2144 (¶ 11); Ex. 32 at 4244 (¶ 10); Ex. 34 at 4398-99 (¶ 19).  Nor is there anything improper or fraudulent about submitting truthful clinical data about off-label uses to compendia.  *Importantly, there is absolutely no evidence that clinical data were manipulated or that study results were inaccurately reported in published articles.  See U.S. ex rel. King v. Solvay*, 2015 WL 8732010, at *4-7 (S.D. Tex. Dec. 14, 2015) (granting summary judgment because evidence company monitored and directed investigator's progress, reviewed and revised the final manuscript, employed medical writers to assist in drafting, and identified "thought leaders" to serve as authors not sufficient to demonstrate fraud).

Dr. Hay's failure to differentiate between claims caused by factors other than Celgene's alleged off-label promotion—including the wealth of published clinical data, physician experience, and Celgene's lawful, non-promotional off-label communications—is not merely a question of damages; it means Relator has no proof of causation at all.  *See City of Vernon v. So. Cal. Edison Co.*, 955 F.2d 1361, 1372-73 (9th Cir. 1992) (affirming summary judgment due to failure of plaintiff's damages expert to distinguish between the causal effect of lawful and unlawful acts).  Without any meaningful, recognized economic model or analytical framework to determine which, *if any*, off-label claims were actually caused by Celgene's alleged conduct, a jury would have no non-speculative basis to find causation as to any claim.  Relator cannot survive summary judgment on her all-or-nothing off-label theory.

## B. <u>Relator</u>: Celgene Misstates the Causation Standard and Ignores Widespread Evidence That It Caused Off-Label Prescriptions

This Court already delineated the proper causation standards in this case. In denying Celgene's motion to dismiss, the Court ruled that "general tort law principles" govern causation in FCA cases, and that Celgene "may be liable for false claims submitted by others if its conduct was a substantial factor in bringing about the false claims and such claims were a foreseeable and natural consequence of its

11

conduct." Dkt. 147 at 14, 17. The Court further stated "[t]he causal chain is straightforward: (1) Celgene allegedly fraudulently promoted Thalomid and Revlimid for non-reimbursable, off-label uses to physicians, (2) this off-label marketing caused physicians to write off-label prescriptions, and (3) many of these non-reimbursable prescriptions were submitted to government payors for reimbursement." *Id.* at 17.[6] The sole question now is whether the evidence supports Relator's allegations. It does.

### 1.     *The Evidence Shows That Celgene's Pervasive Off-Label Marketing Caused Doctors to Write Off-Label Prescriptions*

#### a.     *Celgene Extensively Promoted Off-Label Uses*

The evidence undermines Celgene's claim that it sat by passively while the scientific literature caused doctors to prescribe its drugs off-label. Celgene's earliest marketing plans reveal its strategy to actively and aggressively promote Thalomid off-label as soon as the FDA approved the drug for ENL in 1998.[7] Celgene hired scores of sales representatives to "detail" oncologists and other doctors treating cancer.[8] Between 1999 and the end of 2005, Celgene's so-called "Immunology Specialists" and "Hematology and Oncology Consultants" made tens of thousands of visits to such doctors.[9] The sales force was told to push the off-label use of Thalomid for a wide variety of cancers "on every call."[10] As evidenced by field contact reports and "verbatim" reports, and confirmed by Celgene's own CEO, Celgene's off-label scheme continued unabated after Celgene introduced Revlimid and the FDA granted

---

[6] Celgene's motion fails if Relator can produce evidence that even a *single* off-label prescription resulted from Celgene's illegal promotion. *U.S. ex rel. Turner v. Michaelis Jackson & Associates, L.L.C.*, 2011 WL 13510 at *7 (S.D. Ill. Jan. 4, 2011).
[7] *See, e.g.,* Ex. 90 at 6347, *et seq.*; Ex. 93 at 6421, 6429, 6435-44; Ex. 94 at 6447, 6550, 6466-74; Ex. 96 at 6484, 6487-88 (1999-2004 Celgene business plans describing off-label goals, tactics, and strategies); Ex. 13 at ¶¶ 32-63, pp. 2372-85.
[8] Ex. 82 at 5894:1-4, 5894:23-5895:16; Ex. 86 at 6098; Ex. 97 at 6510; Ex. 98 at 6556; Ex. 103 at 13197; Ex. 104 at 13195-99; Ex. 92 at 6377:6-6379:1, 6380:8-6382:4; Ex. 105 at 13200-14; Ex. 347, Decl. of B. Brown ("Brown Decl.") ¶¶ 15-32.
[9] Ex. 347, Brown Decl. ¶¶ 16, 25; Ex. 99 at 6835:8-24; Exs. 100-102; Ex. 13 ¶ 58, pp.2382-83 (expert report summarizing sales call data in Exs. 100-102).
[10] Ex. 96 at 006484.

---

12

Thalomid a single, narrow cancer indication in 2006.[11]

In addition to its sales detailing, the evidence shows that Celgene manipulated physicians' decision-making though a covert "publications strategy" that tainted medical literature through paid ghost writers who embedded Celgene's off-label "messaging" in purportedly scientific communications.[12] Celgene also improperly tainted clinical studies and compendia listings.[13]

            b.   *Celgene's Promotion Caused Off-Label Prescriptions*

As this Court observed, "[t]o suggest that Celgene's alleged expansive, multi-faceted efforts to create an off-label market for Thalomid and Revlimid did not cause physicians to prescribe Thalomid or Revlimid for non-reimbursable uses strains credulity." Dkt. 147 at p. 11. This point was likewise "obvious" to Celgene in a 2007 petition to the FDA.[14] The evidence only confirms it.

Celgene built an off-label cancer market from nothing. Before 1998, Thalomid was not approved for any purpose, and thus no doctor could prescribe it. Between 1998 and 2006, it was not approved for any type of cancer.[15] Yet during those years, Celgene sales representatives made tens of thousands of visits to oncologists, who

---

[11] Ex. 106 13290-305; Ex. 107 at 13410-22 (verbatim reports); Ex. 108 at 13432:4-16, 3433:25-3444:10, 3445:13-3446:12, 3447:6-19, 3450:6-3457:6; 3457:10-3463:4 (Celgene CEO admitting reports show improper promotion); Ex. 109 at 13471, 73-76; Ex. 13 ¶¶ 44-50, pp. 2378-81 (summarizing post-2006 promotion); Ex. 347, Brown Decl. ¶¶ 77-94, Exs. L-V (showing tactics to induce off-label prescriptions); Ex. 110 (directing profiling of Revlimid for newly diagnosed multiple myeloma into 2015).

[12] Ex. 88 at 6331-33; Ex. 93 at 6429; Ex. 127 at 14320-22; Ex. 128 at 14324-28; Ex. 129 at 14331-33; Ex. 130 at 14335, *et seq.*; Ex. 131 at 14342, 46; Ex. 132 at 14497; Ex. 133 at 14519-22, 29-68, 79, 82; Ex. 134 at 14615, 23.

[13] Ex. 14 at ¶¶ 61-111, pp. 2589-609; Ex. 124 at ¶¶ 18-29, pp. 14115-17; Ex. 13 at ¶¶ 94-114, pp. 2407-16 (expert reports summarizing evidence of Celgene's manipulation of physicians' independent judgment); *see also* SUF P84-P123.

[14] *See* Ex. 76 at 5681.

[15] Despite investigative study beginning in 1997 –which Celgene was not a part of until it bought EntreMed's patent rights at the end of 1998 – the FDA still expressed doubt that thalidomide had a place in treating malignancy in 2001. *E.g.* Ex. 65, p. 5604

---

13

then wrote tens of thousands of off-label prescriptions.[16] In internal documents, the sales force consistently credited its sales efforts with causing these prescriptions.[17] Indeed, Celgene compensated sales representatives in large part on their sales volume,[18] and diligently tracked the "return on investment" from its promotional activities.[19] Contrary to its current claims, in other words, Celgene always believed its promotional efforts caused doctors to prescribe its drugs.

Instead of addressing this evidence, Celgene attacks Dr. Hay. It argues that he offers no causation opinions, but also that his opinions lock Relator into an "all or nothing" causation dichotomy. Neither is true. Dr. Hay did not purport to "prove" causation, but did conclude (by testing a sampling of evidence) that it would be reasonable for a jury to find that 100% of off-label prescriptions resulted from Celgene's promotional efforts.[20] The jury is free to either agree or find a different percentage, and that is the point – it is up to the jury. Given the extent of Celgene's off-label promotion, the fact that there was absolutely no cancer market for Celgene's drugs before its promotional scheme began, Celgene's corruption of doctors' other information sources, and Celgene's own admissions about causation, the jury will have more than enough evidence to reach its own conclusions on this issue.

Celgene also criticizes Dr. Hay because he did not perform a regression analysis. But as Dr. Hay explained, a reliable regression analysis was not possible here,[21] and Celgene cannot cite a single case holding that regression analysis is required. Indeed, the opposite is true. *See, e.g.*, *U.S. ex rel. Colquitt v. Abbott Labs.*, 2016 WL 8000, *23-27 (N.D. Tex. January 7, 2016) (finding adequate causation evidence in FCA case without regression analysis or other expert opinion).

---

[16] Exs. 100-102; Ex. 13 ¶¶ 58, 79-93, pp. 2383-84, 2391-2406.
[17] Ex. 111 at 13536-37; Ex. 112 at 13544-46; Ex. 113 at 13555; Ex. 114 at 13559.
[18] Ex. 108 at 13448:13-3449:21; Ex. 103 at 13196-97.
[19] Ex. 115 at 13563, *et seq.*; Ex. 116 at 13574; Ex. 118 at 13661-62.
[20] Ex. 13 at ¶¶ 24-27, pp. 2268-70.
[21] Ex. 299 at 19866:16-871:21; Exs. 300-301 (emails re Celgene document destruction); Ex. 14 ¶¶ 33-35, n.23, pp. 2575-76.

14

c.      *Off-Label Prescriptions Were Paid by the Government*

As quantified in Dr. Hay's report, there is no dispute that hundreds of thousands of off-label prescriptions for Thalomid and Revlimid were submitted to and paid by government payors during the relevant period.[22]

## 2.      *Celgene's Causation Standard Is Contrary to This Court's Prior Ruling and Applicable Law*

Celgene largely ignores the causation principles and legal authorities the Court applied in its prior ruling. Instead, it argues that "courts require individualized evidence that promotional conduct caused specific physicians to write specific prescriptions." *Supra* at 6:2-4. Celgene thus posits an impossible-to-meet standard, under which a relator would need to prove hundreds of thousands of individual claims on doctor-by-doctor, prescription-by-prescription basis. This is not the law.

Indeed, courts repeatedly have rejected Celgene's "individualized proof" standard in FCA cases. *See, e.g.*, *U.S. ex rel. Franklin v. Parke-Davis*, 2003 WL 22048255, *4-5 (D. Mass. August 22, 2003); *U.S. ex rel. Colquitt*, 2016 WL 8000 at *24-25; *see also See* Dkt. 147 at p. 11 (rejecting Celgene's "independent medical judgment" argument on motion to dismiss).

Courts likewise have rejected Celgene's position in RICO cases with more rigid causation and reliance standards than the FCA's hybrid "fraud or false claims" standard. For instance, in *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21 (1st Cir. 2013), the First Circuit rejected Pfizer's argument that Kaiser did not adequately show causation because it did not "take into account the patient-specific, idiosyncratic decisions of individual prescribing physicians." *Id.* at 45. The court held that Kaiser was not required to make a doctor-by-doctor showing, or otherwise "offer evidence which positively exclude[s] every other possible cause." Rather, "'[o]nce a plaintiff presents evidence that he suffered the sort of injury that would be the

---

[22] *Id.* at pp. 2391-2406 (setting forth claims and damages calculations).

JOINT STIPULATION RE: CELGENE'S MOTION FOR SUMMARY JUDGMENT

expected consequence of the defendant's wrongful conduct,' the burden shifts to the defendant to rebut this causal inference." *Id.* (quoting *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 758 (7th Cir. 2011)).

Here, off-label claims are precisely the "sort of injury that would be the expected consequence" of Celgene's illegal promotion. As this Court and others have recognized, such claims "were not only foreseeable, they were an *intended* consequence of Celgene's alleged fraudulent scheme." *See* Dkt. 147 at p. 11 (emphasis added); *see also In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633, 644-46 (3d Cir. 2015) (rejecting the "learned intermediary" theory). Further, "[u]nder black letter law . . . an intervening force only breaks the causal connection when it is unforeseeable." *U.S. ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 52-53 (D. Mass. 2001). Not only did Celgene foresee that doctors would write off-label prescriptions, that was its express goal.

Celgene offers physician declarations claiming its conduct had no impact on their prescribing decisions, but the jury will have good reason to reject that testimony. Virtually all declarants received payments from Celgene as speakers or otherwise.[23] Moreover, research confirms that drug company payments influence physician decisions, but doctors either do not recognize this impact or are loathe to admit it.[24]

The record here is more than sufficient to allow a jury to conclude Celgene caused doctors to prescribe Celgene's drugs for off-label uses. Any further dispute merely presents "a question . . . regarding the total number of prescriptions that were attributable to [Celgene's] actions." Dkt. 147 at p. 11. That is an issue for trial.

---

[23] Ex. 120 at ¶ 7, pp. 13683-84; Ex. 121 at 13688, *et seq.* (listing doctors who received speaking fees, with Celgene declarants highlighted); Ex. 21 at 4063-64, Ex. 22 at 4112-13; Ex. 23 at 4141-42; Ex. 26 at 4180-82; Ex. 27 at 4187-88; Ex. 29 at 4203-04; Ex. 31 at 4219-21; Ex. 32 at 4243-46; Ex. 33 at 4285-86; Ex. 34 at 4400-01; Ex. 36 at 4571-72; Ex. 37 at 4581-84 (physician declarants admitting they received payments).
[24] Ex. 120 at ¶¶ 4-7, pp. 13682-84; Ex. 122 ¶¶ at 9-23, pp. 14056-62.

JOINT STIPULATION RE: CELGENE'S MOTION FOR SUMMARY JUDGMENT

**C.     Celgene:  Relator Has Identified No False Claims.**

**1.     *Celgene:  Government Programs Are Not Prohibited From Reimbursing Off-Label Claims For Thalomid® and Revlimid®.***

"An actual false claim is the *sine qua non* of an FCA violation." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011).  Relator identifies no claim that is factually false, *i.e.*, that misrepresents the drug prescribed, patient diagnosis, or reason for the prescription.  Instead, she argues that all off-label, off-compendia claims submitted to Medicare, Medicaid, VA, and TRICARE are false because they are statutorily non-reimbursable.[25]  Relator's definition of statutorily non-reimbursable, however, conflates two separate statutory standards:  (1) whether a drug is dispensed for a use that is "reasonable and necessary," and (2) whether a drug is dispensed for a use that is "medically accepted."

The parties agree that Medicare may not reimburse for a use that is "not reasonable and necessary for the diagnosis or treatment of an illness."  42 U.S.C. § 1395y(a)(1)(A).  Medicaid, VA, and TRICARE apply different standards but similarly do not reimburse for medically unnecessary treatments.  38 C.F.R. § 17.38(b); 32 C.F.R. § 199.4(g)(1); Ex. 16 at 2852 (¶ 101); Ex. 7 at 621-22 (¶¶ 13-16); Ex. 19 at 3342-43 (¶¶ 33-36).  For this reason, a claim requesting reimbursement for a treatment that one knows is not reasonable and necessary is "false."  *See Strom ex rel. U.S. v. Scios, Inc.*, 676 F. Supp. 2d 884, 891 (N.D. Cal. 2009).

Relator baldly asserts – for the first time at summary judgment –that "[m]isbranded drugs, by definition, can never be 'reasonable and necessary,'" but cites no support for that proposition.  Whether a drug is considered misbranded by the FDA (*e.g.*, because of off-label promotion) has nothing to do with whether its use for any particular patient is reasonable and necessary for purposes of reimbursement.[26]

---

[25] As this Court previously recognized, "an FCA claim cannot be predicated on off-label promotion alone."  Ex. 45 at 4774; *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996); *Polansky.*, 2009 WL 1456582 at * 7.
[26] Celgene's 2007 FDA petition did not "admit" that Thalomid® had been misbranded.

Instead, "a drug is medically necessary and appropriate when a physician, in practicing sound medicine, may reasonably prescribe his patient that drug to treat a condition because the drug has some positive effect on and is appropriate (i.e., safe) in treating that condition." *Ironworkers Local Union 68 v. AstraZeneca Pharms.*, 634 F.3d 1352, 1360 n.20 (11th Cir. 2011). Relator has not identified any Thalomid® or Revlimid® prescription that was not reasonable and necessary for the treatment of a particular patient. Instead, she claims that the "safety/efficacy balance" makes *all* uses of Thalomid® for cancer before 2006 and use of Revlimid® for CLL unreasonable and unnecessary. *Infra.* p. 23. Potential side effects, even if serious, do not make a use unreasonable and unnecessary.[27] Relator cannot prevail under a theory that off-label claims were unreasonable and unnecessary.

The parties disagree as to whether Medicare, Medicaid, VA, or TRICARE may reimburse for a use that is reasonable and necessary but not "medically accepted." The "medically accepted" standard comes from the Social Security Act. Until 2009, Medicaid and Medicare Part D shared the same definition of "medically accepted," a term which is defined in Medicare Part D as part of the definition of a "covered part D drug," and "includes … any use of a covered part D drug for a medically accepted indication." 42 U.S.C. § 1395w-102(e)(1). A "[m]edically accepted indication" in turn encompasses any use supported by certain compendia or, for Medicare Part D

---

*Infra.* p. 24. Rather, the petition stated that if a generic version was introduced for ENL in 2007 with a label that did not include all of the safety and dosing information in the 2007 Thalomid® label, its labeling would be inadequate as compared to the then-existing Thalomid® MM label. Ex. 76.

[27] Relator's contention that the drugs have potentially serious side effects and are "medically risky" does not raise a disputed question of fact as to whether their use was reasonable and necessary. As Relator's expert admits, "[m]ost cancer drugs have serious side effects," Fadem Dep. 47:6-7, yet that does not mean that a "physician, in practicing sound medicine, may [not] reasonably prescribe his patient that drug to treat a condition." *Ironworkers Local*, 634 F.3d at 1360 n.20. The cases upon which Relator relies equating "medically risky" and "reasonable and necessary" only state that at the pleading stage, an allegation in a complaint that a use is "medically risky" suffices to allege the use is "reasonable and necessary."

JOINT STIPULATION RE: CELGENE'S MOTION FOR SUMMARY JUDGMENT

after January 1, 2009, any of 26 medical journals.  42 U.S.C. § 1395w-102(e)(1) (2006-2008); 42 U.S.C. § 1395w-102(e)(4)(i)(II)(2009); 42 U.S.C. § 1395x(t)(2)(B); Medicare Benefit Policy Manual § 50.4.5 (2008).

While Celgene can establish that most uses of Thalomid® and Revlimid® were on-label, supported by compendia, and/or supported by medical literature, that dispute is immaterial.  Accepting Relator's contention that no off-label use was supported at any time, her claims fail as a matter of law because the programs at issue do not prohibit reimbursement for a reasonable and necessary off-label, off-compendia use.  Relator's expert admits, and Relator's brief does not dispute, that nothing prevents either the VA or TRICARE from reimbursing reasonable and necessary off-label, off-compendia uses.  Ex. 322, Hay Dep. 20375:23-376:05; 20377:18-24; *see also, e.g.*, 62 Fed. Reg. 625, 628 (Jan. 6, 1997); 32 C.F.R. § 199.2(b); 38 C.F.R. § 17.38(b); Ex. 7 at 620 (¶ 10); Ex. 19 at 3335-36 (¶¶ 11-12).  As the Government acknowledges, Medicaid also gives states discretion to cover reasonable and necessary off-label, off-compendia uses.  Ex. 44 at 4760; *Polansky v. Pfizer, Inc.*, 2009 WL 1456582 at * 9 (E.D.N.Y. May 22, 2009) (Medicaid leaves "reimbursement for off-label prescriptions" to "the discretion of the states") (citing 42 U.S.C. § 1396r-8(d)(1)(B)); Ex. 16 at 3017, 3019 (Exs. V-W) (letters by CMS confirming that states "may," but are not required to, limit coverage to medically accepted uses).  Many states reimburse for any off-label use without limitation.  Ex. 40 at 4606-07 (¶¶ 3-7); Ex. 41 at 4609 (¶¶ 4-9); Ex. 42 at 4611 (¶¶ 3-4).

Relator's position that Medicare is statutorily prohibited from reimbursing any off-label use of Thalomid® and Revlimid® is contrary to the long-standing practices of that program, and would mean that Medicare has been exceeding its statutory authority for a decade.  *E.g.*, Ex. 17 at 3033 (¶ 4.c).  Medicare emphasizes access to care, particularly for life-extending oncology therapies, and often chooses to provide coverage when faced with a choice between allowing patients to die without treatment or reimbursing off-label, off-compendia use.  *See, e.g.*, Ex. 16 at 2833-35 (¶¶ 53, 57).

"Medical acceptance" determines only when Medicare *must* reimburse for oncology treatments.  Ex. 16 at 2818 (¶ 11).  It does not prohibit Medicare from exercising its discretion to go beyond medical acceptance and reimburse reasonable and necessary off-label, off-compendia uses.  The statutory definition of a covered part D drug "*includes* … any use of a covered part D drug for a medically accepted indication." 42 U.S.C. § 139w-102(e)(1) (emphasis added).  When used in a definition in the Social Security Act, the word "includes" "shall not be deemed to exclude other things otherwise within the meaning of the term defined."  42 U.S.C. § 1301(b); *see Layzer v. Leavitt*, 770 F. Supp. 2d 579, 583-87 (S.D.N.Y. 2011) (rejecting effort to limit oncology drug coverage under Medicare to "medically accepted" uses as not reasonable in light of "clear" statutory language, explaining that coverage "includes" but is not limited to medically accepted uses); Ex. 16 at 2818 (¶ 11); *but see, e.g.*, *U.S. ex rel. Fox RX, Inc. v. Omnicare, Inc.*, 2012 WL 8020674, at *6-9 (N.D. Ga. Aug. 29, 2012).  Other than *Fox*, none of the cases cited by Relator address the issue presented here – namely, the extent of Medicare's discretion to reimburse oncology uses that do not meet the definition of "medically accepted." *Diamond*, *Roeder*, *Nievod*, *Tagney*, and *Broome* were appeals from Medicare's decision to deny coverage for non-oncology uses and thus concerned only whether Medicare was *required* to reimburse those uses.  *Dickson* held only that on-label uses are always reasonable and necessary.

2. *Relator: Neither Medicare Contractors nor Most State Medicaid Payors Have Discretion to Pay Off-Label Prescriptions*

Prior to this lawsuit, Celgene recognized Medicare Part D plans will not and legally cannot reimburse off-label uses that lack compendia support.[28]  Likewise, in

---

[28] *See infra* p. 35. Relator does not concede that the VA and TRICARE have such discretion and Dr. Hay only testified that they may reimburse for drugs "[i]f they're lawful under all federal applicable law." Hay Dep. at 269:14-20; see also 275:18-24 (Celgene excerpts). Their reimbursement and limitations are similar to Medicare. *See* Ex. 19, p. 3331, at ¶¶ 18, 27, 37-43; Ex. 13, p. 2354, at pp. 41-42; Ex. 277; Ex. 278.

moving to dismiss, Celgene never argued Part D contractors have discretion to reimburse non-medically accepted uses. Dkt. 106 at 8-9. Celgene's new argument has been almost universally rejected by courts and is not supported by facts.

Celgene's bare assertion that "'[m]edical acceptance' determines only when Medicare *must* reimburse for oncology treatments" is wrong. A Medicare prescription is not reimbursable unless it is ***both*** "reasonable and necessary" and "medically accepted." *U.S. ex rel. Dickson v. Bristol-Meyers Squibb Co.*, 123 F. Supp. 3d 584, 603-04 (D.N.J. 2015); *see also Diamond v. Sec'y of HHS*, No. 1:13-CV-2481; 2015 U.S. Dist. LEXIS 9271, at *14 (N.D. Ohio Jan. 6, 2015). Thus, CMS maintains and courts have consistently held that Part D contractors do ***not*** have discretion to approve a Medicare prescription that is not medically accepted. *E.g.*, *Roeder v. Burwell*, No. 15- 01194, 2016 U.S. Dist. LEXIS 81035, at *7 & n.8 (E.D. Va. June 21, 2016) ("Part D coverage is unambiguously limited to drugs prescribed for a 'medically accepted indication'"); *Nievod v. Sebelius*, No. 11-4134, 2013 U.S. Dist. LEXIS 17550, at *26-27 (N.D. Cal. Feb. 8, 2013); *Fox RX., Inc.*, 2012 U.S. Dist. LEXIS 145036, at *23-25.

Celgene cites a single case, *Layzer v. Leavitt*, 770 F. Supp. 2d 579 (S.D.N.Y. 2011), that held Medicare Part D payors have discretion to reimburse off-label prescriptions. It is a minority view roundly rejected. *See, e.g.*, *Tagney v. Burwell*, No. 14-14149-WGY*32 n.24 (D. Mass. May 10, 2016) (*Layzer* is the "minority view"); *Broome v. Burwell*, No. 14-01248, 2015 U.S. Dist. LEXIS 44040, at *10 n.1 (D. Ore. 2015) (rejecting *Layzer*); *Nievod*, 2013 U.S. Dist. LEXIS 17550, at *26 n.4 (same).

There are sound policy reasons for Congress's decision to limit reimbursement of Part D drugs to off-label uses that are medically accepted. As CMS warns "patient harm may arise from off-label uses that are not medically accepted."[29] Congress balanced this concern as well as practical and fiscal concerns, with the recognition that science – but not marketing – may move faster than the FDA approval process.

---

[29] Ex. 204, CMS "Off-label Pharmaceutical Marketing" Bulletin, at 15567.

21

Celgene's view that CMS must pay for any drug that a physician asserts is reasonable and necessary would render Congress' careful compromise meaningless. Nor does Congress's formulation unreasonably deny treatment to patients. Physicians may prescribe Revlimid and Thalomid even if reimbursement is not available.

Like Medicare, many states[30] *refuse* to reimburse off-label prescriptions.[31] Thus, Celgene's argument as to Medicaid "at best [ ] goes to the amount of damages and does not provide a basis for summary judgment of no liability." *Parke-Davis*, 2003 U.S. Dist. LEXIS 15754, at *9-10 (declining to do a state-by-state analysis of Medicaid coverage where defendant had not). Celgene also misrepresents state statutes. For example, to be placed on Texas's Medicaid formulary, Celgene expressly certified compliance with state and federal law and assumed a duty to update. 1 Tex. Admin. Code § 354.1921.[32] Failure to notify Texas of its off-label marketing, compendia misrepresentations, and kickback payments violated Texas's statute, and Celgene is liable for any resulting payments Texas Medicaid made plus statutory damages and civil penalties. Tex. Hum. Res. Code §§ 36.002(4)(B), 36.052.

Even if government payors had discretion to reimburse off-label prescriptions, most of the prescriptions for Celgene's drugs would still be nonreimbursable false claims because they were not reasonable and necessary. As Celgene acknowledges, a prescription that is not reasonable and necessary is false. *See, e.g., Strom*, 676 F. Supp. 2d at 891. A use that is "medically risky" is not "reasonable and necessary" and, thus, is not reimbursable even if compendia support exists. *U.S. ex rel. Cestra v. Cephalon, Inc.*, No. 14-1842, 2015 U.S. Dist. LEXIS 71505; *Bergman*, 995 F. Supp. 2d at 373 (same).[33] Many of Celgene's prescriptions were not reasonable and

---

[30] Celgene provided declarations from Plaintiff States (Exs. 38-40 & 42) that it never produced in discovery, and Relator objects to their use to support this motion.
[31] *E.g.* Ex. 254 ¶ 4, pp. 19211-12 (testifying that Montana only reimburses Revlimid for FDA-approved or compendium-supported, off-label uses).
[32] Ex. 252 (Celgene 2006 Certification to Texas), p.19189-92; Ex. 257.
[33] Celgene mispresents *Ironworkers Local*: the court stated, "a drug is medically necessary and appropriate **when** a physician, in practicing sound medicine, **may**

22

necessary because they were unsafe. As Celgene explained in its 2007 FDA petition, use of Thalomid for multiple myeloma prior to public dissemination of the 2006-07 label created unreasonable risks because safe and effective dosing was not understood.[34] But Celgene's sales representatives promoted Thalomid for multiple myeloma and other cancers for 7 years while safe and effective dosing was unknown, also misrepresenting the risk of deadly side effects, such as deep vein thrombosis (DVT).[35] Patients died or sustained severe injury because of this.[36]

Celgene also promoted Revlimid for chronic lymphocytic leukemia (CLL) knowing that the drug put patients at unacceptable risk for dangerous complications.[37] Indeed, compendia DrugDex cautioned that Revlimid should be used for CLL only in the clinical trial setting.[38] In 2013, the FDA revised Revlimid's label to make this contraindication official.[39] Revlimid was never reasonable or necessary for CLL.

Although all drugs have toxicities, the safety/efficacy balance of some drugs can be so poor that a given use is never reasonable and necessary outside a clinical trial, and there is ample evidence that Thalomid for cancer uses before its 2006 label

---

reasonably prescribe his patient that drug to treat a condition because the drug has some positive effect on and is appropriate (*i.e.*, safe) in treating that condition." *Ironworkers Local*, 634 F.3d at 1360 (emphasis added).

[34] Ex. 76 at 5703-07; Ex. 186 at 15276-77, 15300 (FDA adopting dosing regimen of study E1A00 and rejecting other studies Celgene submitted).

[35] Ex. 92 at 6376:6-25, 6377:1-5; Ex. 105 at 13203, 13205; Ex. 177 at 15164:8-19; Ex. 178 at 15174:3-23; Ex. 192; Ex. 124 at ¶¶ 27, 39, 50, 54, 88, 114, 116, 124-28, pp. 14117, *et seq.*; Ex. 179 at 15178:21-79:1, 15180:20-81:23, 15184:15-85:12; Ex. 295 at 19836:5-19837:25; Ex. 347, Brown Decl. ¶¶ 42-47.

[36] Ex. 178 at 15172:13-173:11; Ex. 188 at 15330; Ex. 124 ¶¶ 27, 39, 50, 54, pp. 14117-27.

[37] Exs. 195-96; Ex. 294 at 19823:16-824:8, 19825:23-832:1; Ex. 158 at 15015:2-025:23; Ex. 198 at 15372-73; Ex. 199 at 15459-61; Ex. 124 ¶¶ 126-29, pp. [14157-58; Ex. 126 ¶¶ 26-29, 47, Figures 2-6, pp. 14278, 285, 307-310; Ex. 347, Brown Decl. ¶ 93 (CLL promotion through sales detailing, CEO statements and publications strategy during period of recognized dangers).

[38] Ex. 281 at 19634:11-19635:21; Ex. 282 (Revlimid 2010 DrugDex Monograph), p. 19671; *see also id.* pp. 19663-65.

[39] Ex. 124 ¶ 128, p. 14158; *see also* www.fda.gov/Drugs/DrugSafety/ucm361444.htm.

and Revlimid for CLL fall into this category.[40] This raises a dispute of fact as to whether these uses are reimbursable that a jury must resolve.

Additionally, prescriptions resulting from Celgene's promotion were written for a "misbranded" drug, presenting strong if not dispositive evidence of FDCA violations that can form predicates for FCA violations in appropriate circumstances. *See* 21 U.S.C. § 331 (prohibiting drug companies from introducing misbranding drugs into commerce); *Ironworkers Local*, 634 F.3d at 1357 n.5 (a drug is misbranded if its "promotional and advertising material, describes any intended uses for the drug not approved by the FDA.") "Intended use" means uses for which a drug manufacturer "objective[ly] inten[d]s" it to be used, 21 U.S.C. § 355; 21 C.F.R. § 201.128, which may be demonstrated by "oral or written statements by [it and its] representatives." 21 C.F.R. § 201.128. *In re Neurontin Mktg. & Sales Practices Litig.*, No. 04-cv-10739-PBS, 2011 U.S. Dist. LEXIS 99593, at *2 (D. Mass. Aug. 31, 2011). Celgene intended to sell for off-label cancer uses even before its ENL indication was approved, and its sales force put this plan into action. *See* Section I.B.1., *supra*; SUP P3-39.

A drug is also misbranded if its labeling is "false or misleading in any particular," including because of failure to provide "adequate directions for use." 21 U.S.C. §§ 352(a), 352(f)(1); 21 C.F.R. § 201.5. Celgene's 2007 FDA petition effectively admitted Thalomid was misbranded for eight years because the labeling did not contain adequate safety and dosing information, and thereby posed "unacceptable safety risks."[41] Two years earlier Connecticut Attorney General Richard Blumenthal successfully petitioned the FDA to enhance warnings in Celgene's label because "all the information necessary to make the best treatment decision possible" regarding off-label uses was not on the label.[42] Drugs that are misbranded because there is no information allowing them to be safely used for their

---

[40] Ex. 179 at 15180:20-181:23, 184:15-185:12, 186:8-187:1, 188:2-191:8.
[41] Ex. 76 at 5702-07; Ex. 178 at 15174:11-23; *see also* SUF P137-143.
[42] Ex. 58 at 5333; Ex. 124 ¶¶ 10, 38, 50, 59, 70, 72-73, pp. 14114-35.

24

1    "intended use" can never be reasonable and necessary. *Supra*, pp. 22-24.

2        The First Amendment does not insulate Celgene from liability for its off-label

3    promotion. *Coronia* is not the law of the Ninth Circuit, but the Second Circuit

4    nonetheless recognized that "off-label promotion that is false or misleading is not

5    entitled to First Amendment protection." 793 F.3d. at 165, n.11. Because Celgene's

6    off-label promotion failed to adequately disclose safety and dosing instructions, it was

7    false and misleading. 21 U.S.C. § 321(n). Moreover, Celgene is not liable for

8    "speech," but rather its realized efforts to distribute misbranded, nonreimbursable

9    drugs paid for by the government. *See U.S. ex rel. Polansky v. Pfizer*, __ F.3d. __,

10   2016 U.S. App. LEXIS 8974, *4 n.2 (2d Cir. 2016) (promotional speech provides

11   *evidence* a drug is intended for a use that is not included on its FDA-approved label).

12       Physicians may, in the exercise of their independent judgment, prescribe drugs

13   for off-label purposes and – to the extent permitted by statute – government programs

14   can and do reimburse off-label prescriptions. But pharmaceutical companies may not

15   misbrand drugs and may not promote off-label uses, particularly through

16   misrepresentations of safety, efficacy, or compendia support. Because Celgene did, it

17   is liable for the submission of nonreimbursable claims its actions induced.

18           **3.    *Celgene:  A Claim Does Not Imply A Medically Accepted Use.***

19       Even if Relator were correct that no program may reimburse for "reasonable

20   and necessary" treatments that were not "medically accepted," her claims would still

21   fail.  Relator's theory can stand only if every request for reimbursement impliedly

22   certifies legal entitlement to be paid.  Under Relator's theory, if a use is not

23   "medically accepted," everyone who caused a claim to be submitted (patients,

24   physicians, and pharmacies) can be sued under the FCA.  Relator misunderstands the

25   requirements for liability under an implied false certification theory.

26       In *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, ("*Escobar*") the

27   Supreme Court declined to adopt such an expansive approach.  136 S.Ct. 1989, 2000

28   (2016). The Court held that the implied false certification theory can support liability

if two conditions are satisfied:  (1) the claim does not merely request payment, but also makes "specific representations" about the goods or services provided; and (2) the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations "misleading half-truths." *Id.* at 2001.  Neither condition is met here.

First, the claims here merely request payment.  Physicians are permitted to write prescriptions for off-label uses without regard to whether the prescriptions will be reimbursed.  Few patients know whether a use is on-label or off-label, much less whether it is "medically accepted."  *See U.S. ex rel. Polansky v. Pfizer, Inc.*, 822 F.3d 613, 619-20 (2d Cir. 2016).  And pharmacists do not have a duty to determine whether a use is on-label, off-label, or supported by compendia or medical literature.  *U.S. ex rel. Fox Rx, Inc.*, 2014 WL 2158412, at *5 n.14 (N.D. Ga. May 23, 2014).  Only Medicare and Medicaid have the responsibility to determine whether a particular claim is "medically accepted" or otherwise reimbursable.  As the Second Circuit recently explained, one should be "dubious" of a theory that any of the earlier "participants in the relevant transactions" – the doctor, the patient, or the pharmacist – "would have knowingly, impliedly certified that any prescription … was for an on-label use." *Polansky*, 822 F.3d at 619-20.

Moreover, the regulatory structure demonstrates that Medicare and Medicaid do not assume every claim submitted will be reimbursed.  Medicare and Medicaid programs can – and frequently do – ask for diagnosis information (for example, through prior authorization) before approving reimbursement.  Ex. 16 at 2837-38, 2841-42, 2858 (¶¶ 62-63, 71-74, 118-119).  Denials can be appealed, and the evidence demonstrates that Medicare *has* reimbursed off-label, off-compendia uses of Thalomid® and Revlimid®.  Ex. 17 at 3037-41 (¶¶ 15-20).  "It cannot be an actionable violation of the FCA for an individual to provide truthful information to the government, in order to allow the government to determine whether or not that information establishes eligibility for a certain program." *U.S. ex rel. McDermott v.*

26

*Genentech*, 2006 WL 3741920 (D. Maine 2006) (internal quotations omitted); *U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 269 (5th Cir. 2010) ("when payment is not conditioned on a certification of compliance, it is not fair to infer such certification from a mere request for payment.").

Second, to the extent claims contain specific representations about the uses for which the drugs were prescribed (such as diagnosis information), Relator has not shown any to be false or misleading. *Escobar* involved use of codes that indicated staff members had specific medical qualifications, such as licenses, which they lacked. The Court found the defendant's noncompliance with the licensing requirements made those representations false and misleading. The same thing cannot be said here. Relator has no evidence that information on claim forms was inaccurate, or that physicians certified "medical acceptance," since doctors can prescribe for any use they consider reasonable and necessary. [43]  Absent such evidence, Relator's claims fail.

### 4.     *Relator: Providers Certify a Claim Complies with the Law*

Celgene misrepresents the nature of certification. As a condition of payment, providers certify goods or services are reasonable and necessary, as required by statute, and that the prescription complies with all federal health care laws. The January 1998 Medicare provider application published by CMS's predecessor required providers to certify as follows:

> I understand that payment of a claim by Medicare or other federal health care programs is conditioned on the claim and the underlying transaction complying with such laws, regulations and program instructions (including the anti-kickback statute and the Stark law), and on a provider/supplier being in compliance with any applicable conditions of participation in any federal health care program. [44]

CMS's subsequent applications contain virtually identical certifications. [45] *U.S. ex rel.*

---

[43] For the first time at summary judgment, Relator relies on a Medicare provider application that conditions payment on the claim complying with all federal health care laws. This new theory is unavailing because there is no federal health care law that requires Medicare providers to submit claims only for "medically accepted" uses.

[44] Ex. 283, 1998 HCFA Enrollment Form, p. 19706.

[45] Ex. 284, 2001 CMS Enrollment Form, p. 19744; Ex. 285, 2011 Form, p.19770.

JOINT STIPULATION RE: CELGENE'S MOTION FOR SUMMARY JUDGMENT

*Dalitz v. AmSurg Corp*., U.S. Dist. LEXIS 177374, at *16-19 (E.D. Cal. Dec. 24, 2014) (certification establishes a condition of payment); Dkt. No. 147 at 3-5 (same).

Whether providers or pharmacies violate the FCA through submission of an off-label claims is irrelevant because they likely lack the requisite scienter. The proper focus is on the party whose conduct caused a false claim (*Schmidt*, 386 F.3d at 244), and courts routinely find FCA liability where an innocent actor submits a claim that is downstream from the initial fraudulent act. *See, e.g.*, *U.S. v. Rivera*, 55 F.3d 703, 706-07 (1st Cir. 1995); *U.S. v. McLeod*, 721 F.2d 282, 282 (9th Cir. 1983); Dkt. 147 at 4-5.

Nor does dicta in *Polansky* support Celgene's argument. The Second Circuit upheld dismissal because promotion for uses outside NCEP guidelines for Lipitor was *not* off-label promotion because these guidelines were advisory. *Polansky*, 822 F.3d at 615-16, 619-20. But it noted a relator could likely "surmount the impediment of implied certification in a case in which it would be obvious to anyone that the use promoted is not one that is approved." *Id.* at 620. In other words, a case like this one.

Celgene intended to distribute misbranded, nonreimbursable drugs and caused prescriptions for these drugs to be submitted for payment. Indeed, it purposely misrepresented compendia support to physicians because it knew many physicians would only write and many (if not all) Part D plans would only reimburse uses believed to be medically accepted.[46] *Escobar* reaffirms that such inducement of submissions through such falsehoods and half-truths is actionable. 136 S. Ct. at 2000.

## D.    Celgene:  Relator Cannot Prove The Alleged Falsity Was Material.

Summary judgment also should be granted because Relator lacks evidence that any implied misrepresentation or omission was material.  As the Supreme Court recently stressed, materiality is a "rigorous" and "demanding" standard, but not "too fact intensive for courts to dismiss False Claims Act cases … at summary judgment." *Escobar*, 136 S.Ct. at 2002, 2003, & 2004 n.6.  A misrepresentation is material only if

---

[46] Ex. 164; Ex. 161; Ex. 92 at 6383:20-384:24, 6388:2-389:14; Ex. 347, ¶¶ 33-41.

the Government "would attach importance to it in determining" whether to pay and if knowledge of the matter "would have induced [the Government] to act differently." *Id.* at 2003 & n.5.  Importantly, it is not "sufficient for a finding of materiality that the Government would have the *option* to decline to pay if it knew of the defendant's noncompliance." *Id.* at 2003.  When "the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated" that is "very strong" evidence of lack of materiality, and when "the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position" that is further "strong" evidence of the lack of materiality.  *Id.* at 2003-04.

Under this standard, Relator's claims must fail because the Government chose to, and continues to, reimburse off-label uses of these drugs with full knowledge that the uses are off-label. The Government has always known that these drugs would be used off-label.  Before the FDA first approved Thalomid® for ENL in 1998, the Government "kn[e]w that thalidomide [was] being studied as a treatment for many serious diseases, including … cancer."  Ex. 55 at 4872 (FDA Deputy Commissioner, FDA Dermatological and Opthalmic Drugs Advisory Comm. Mtg. (Sept. 4, 1997)). FDA further knew that approval would result in off-label uses that "dwarfed" on-label ENL prescriptions.  Ex. 56 at 5182 (FDA Director, Division of Dermatologic and Dental Drug Products, at the FDA Dermatological and Ophthalmic Drugs Advisory Comm. Mtg. (Sept. 5, 1997)).  Since approval of each drug, the FDA has received regular reports from Celgene disclosing all uses of the drugs.  Ex. 1 at 4 (¶ 6); Ex. 4 (excerpts from S.T.E.P.S. ® Reports for Q4 1998 to June 2013); Ex. 6 (excerpts of RevAssist® Reports for December 2005 to June 2014).  Celgene's first such report disclosed that in the last quarter of 1998, the vast majority of Thalomid® prescriptions were for off-label uses, including MM and other cancers.  Ex. 4 at 151.Government programs also routinely received disease-related information (such as diagnosis, line of therapy, and patient history) through prior authorization and other programs.  Ex.

1  16 at 2837-38, 2841-42, 2858 (¶¶ 62-63, 71-74, 118-19).

Moreover, there is ample evidence that the Government knowingly reimbursed off-label uses of these drugs.  In 2004, when Congress required CMS to conduct a demonstration project that would pay for certain drugs before the introduction of Medicare Part D, CMS specifically approved coverage for Thalomid® to treat MM (in any line of therapy), an off-label use at the time.  69 Fed. Reg. 38,898 (June 29, 2004).  And since 2010, the Government has known of Relator's allegations in this case, yet has continued to reimburse off-label prescriptions.  Ex. 13 at 2393, 2397-2401, 2403-06 (calculating off-label damages post-2010).  As noted in *Escobar*, the Government's decision to continue to reimburse for these uses with full knowledge that they are off-label demonstrates a lack of materiality.  *Escobar*, 136 S.Ct. at 2003-04.

Further, to the extent a program did not ask for diagnosis information about a particular claim, it proves that information was not material.  *U.S. ex rel. Hess v. Sanofi-Synthelabo Inc.*, 2006 WL 1064127 (E.D. Mo. April 21, 2006) (where Medicare claim does not request information about stage of cancer, the stage was legally immaterial to government's decision to pay); Ex. 16 at 2882 (Ex. D) (October 7, 2011, CMS letter re OIG Memorandum Report: Ensuring That Medicare Part D Reimbursement is Limited to Drugs Provided for Medically Accepted Indications (concluding that mandatory utilization controls would interfere with access to quality care).[47]  For example, several States placed Thalomid® and Revlimid® on Medicaid formularies and did not consider diagnosis information material to reimbursement decisions.  *E.g.*, Ex. 38 at 4602-03 (¶¶ 3-5); Ex. 39 at 4604-05 (¶¶ 3-4); Ex. 41 at 4608-09 (¶¶ 2-9); Ex. 42 at 4610-11 (¶ 2).

Relator argues that the Government did not know about, and would not approve

---

[47] Contrary to Relator's assertion, the OIG report does not suggest that Part D plans are unable to ensure use is limited to medically accepted indications.  Rather, as CMS said in its response to that report, Part D plans have utilization management tools such as prior authorization that enable them to determine whether a claim is for a medically accepted use.  Ex. 16 at 2882.

of, Celgene's alleged off-label promotion, but that does not create a factual dispute about materiality.  The alleged misrepresentation or omission that makes the claim for payment false is what must be material.  Until now, Relator has not argued that claims were false because of Celgene's alleged off-label promotion.  Rather, as this Court recognized, "she alleges that claims were false because they violated the Medicare/Medicaid statutes' requirements for reimbursement."  Ex. 45 at 4774.  In any event, Relator does not cite any evidence that any Government program has ever denied, or could deny, reimbursement to a patient because of promotional conduct by a manufacturer.[48]  For these reasons, summary judgment should be granted.

## E.   Relator: Celgene's Conduct Was Material to Reimbursement

Celgene's materiality arguments fail. The Supreme Court recently reaffirmed that the test for materiality is whether "the false or fraudulent statements have the potential to influence the government's decisions." *Escobar*, 136 S. Ct. at 1996; *see also* 31 U.S.C. § 3729(b)(4) ("material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property").

There is *no* evidence the Government tolerates off-label promotion. CMS consistently denounces off-label promotion and produced guidance documents explaining how to recognize it.[49] Many of its concerns manifested in this case. Celgene promoted unsafe or ineffective off-label drug uses, including with false and misleading statements and material omissions.[50] DOJ's consistent pursuit of off-label

---

[48] The fact that the Government has brought enforcement actions for alleged off-label promotion and has "supported" but not intervened in Relator's case does not satisfy the "rigorous" materiality standard as that standard would then be met simply by virtue of the filing of an FCA claim.  *Escobar*, 136 S. Ct. at 2002.

[49] *E.g.* Ex. 203, Ex. 204.

[50] *See* fn. 34 (misrepresentations on likelihood of DVT and dosing problems); Ex.106 at 13305, Ex. 107 at 13414; Ex. 160; Ex.161 at 15036-07; and Ex. 126 ¶¶ 79-80, 89-91, pp. 14299-303 (misrepresentations of compendia support); *see also* SUF D16 and Ex. 92 at 6402:1-14, 6403:12-405:17 (studies by Celgene KOLs given to sales reps to promote presented false and misleading picture of drug safety and efficacy).

31

JOINT STIPULATION RE: CELGENE'S MOTION FOR SUMMARY JUDGMENT

promotion like Celgene's is highly probative of materiality.[51] Here, the Government supported Relator by responding to discovery, providing supportive Statements of Interest, and providing declarations authenticating claims data.[52] Celgene's argument that the off-label uses at issue are actually reimbursable fails for the reasons discussed. The only remaining question is whether actual reimbursement of some off-label claims shows lack of materiality as a matter of law. It does not.

*Escobar* explains payment with "***actual*** knowledge that certain requirements were ***violated***" may evidence lack of materiality. *Escobar*, 136 S. Ct. at 2004 (emphasis added). Government knowledge of off-label *use* of Celgene's drugs, which can be lawful, is not relevant to this inquiry.[53] The relevant issue is whether the Government recognized Celgene was *promoting* off-label (a violation) and knowingly approved off-label uses (despite such uses being statutorily nonreimbursable). Celgene has not shown the Government knew Celgene promoted off-label or knowingly reimbursed off-label uses. Pre-approval, the FDA recognized off-label use would likely continue as a by-product of approval but expressed *concern* over this: off-label use was a large reason some Committee members voted *against* ENL approval.[54] Later, FDA issued a Warning Letter to Celgene when it became aware of off-label promotion, warning Thalomid could be removed from the market.[55] The government did not bless Celgene's off-label promotion.

OIG expressly stated that "PDP sponsors are unable to systematically ensure that Medicare reimbursement for Part D drugs…is limited to drugs provided for

---

[51] Exs. 205-210.

[52] Celgene's suggestion that a non-intervened case necessarily lacks materiality is not supported by *Escobar* and would vitiate the *qui tam* provisions of the FCA. As the government consistently states, non-intervention does not mean a case lacks merit.

[53] Celgene's reports of off-label uses to the FDA also should not be imputed to CMS. *E.g. J.A. Jones Construction Co. v. United States*, 390 F.2d 886, 891 (U.S. Ct. Cl. 1968).

[54] *E.g.* Ex. 56 at 5182-85; Ex. 62 at 5457-58; Ex. 55 at 4872, 4997.

[55] Ex. 202 (2000 Warning Letter); *see also* Ex. 201 (1998 Warning Letter).

JOINT STIPULATION RE: CELGENE'S MOTION FOR SUMMARY JUDGMENT

1  medically accepted indications."[56] Celgene capitalized on this by misrepresenting

2  compendia support to ensure physicians would write off-label Revlimid prescriptions,

3  assured by a consultant that most Part D plans do not have sophisticated enough

4  systems to identify if a use is medically accepted.[57] Critically, where contractors *could*

5  determine there was no compendia support, they did not pay.[58]

6       Finally, the Government has rejected Celgene's argument that a prior

7  authorization or receipt of diagnostic information means a payor made a reasoned

8  determination a use was medically accepted and, therefore, does not give rise to a

9  false claim.[59] CMS's rejection of OIG's suggestion of utilization review as a solution

10  to contractor inability to identify medically accepted uses does not mean CMS accepts

11  being defrauded into reimbursing off-label uses. There is a statutory mechanism the

12  Government consistently invokes to recover money for off-label claims *were* paid but

13  wrongfully so. It is called the False Claims Act. It applies to Celgene's conduct.

14       **F.    Celgene:  Relator Cannot Prove Celgene Acted With Scienter.**

15       Even if Relator could prove that claims for off-label uses of Thalomid® and

16  Revlimid® were materially false because they were statutorily non-reimbursable,

17  Celgene would still be entitled to summary judgment because Relator cannot establish

18  that Celgene knew that those claims were definitively non-reimbursable.

19       "Knowledge" under the FCA requires actual knowledge, deliberate ignorance,

20  or reckless disregard.  42 U.S.C. § 3729(b)(1).  In *Safeco Ins. Co. v. Burr*, 551 U.S.

21  47, 69-70 (2007), the Supreme Court held that, as a matter of law, a defendant is not

22  reckless unless its understanding of the applicable legal requirements is "objectively

---

23  [56] Ex. 16 at 2874.
24  [57] Ex. 164 at 15086 (complaint by competitor resulted in ACCC listing limitation of Revlimid usage for MDS del5-q after initially portraying it as supported for use in all MDS but that most payors did not possess sophisticated enough testing to limit reimbursement to indicated or supported uses); Ex. 347, Brown Decl. ¶¶ 33, 38-39 (sales representatives represented ACCC listings as compendia support and physicians prescribed based on belief this was true); Ex. 92 at 6383:20-6385:4, 6388:2-23).
25
26
27
[58] Exs. 167-176 (coverage denials); *see also* SUF P135, P188-198.
28  [59] *E.g.* Ex. 254 ¶¶ 3-4; Ex. 255; *see also* Ex. 286, pp. 19788-89.

---

33

1  unreasonable."  Where the defendant's reading of a statute is objectively reasonable,

2  evidence of the defendant's actual, subjective understanding is insufficient to create a

3  dispute of fact.  *Id.* at 70 n.20; *see also U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d

4  281, 290 (D.C. Cir. 2015).  Many courts have applied *Safeco* to the FCA's knowledge

5  standard and granted summary judgment due to a lack of scienter where, as here, a

6  relator could not demonstrate that a defendant's interpretation of statutes and

7  regulations was objectively unreasonable.[60]

8      Even if Relator's statutory construction is correct, it is not objectively

9  unreasonable to think that government payors have discretion to reimburse off-label,

10  off-compendia uses for the treatment of life-threatening diseases.  A district court has

11  interpreted the statute to permit Medicare to reimburse off-label, off-compendia uses,

12  rebuffing Relator's reading as not "reasonable."  *Layzer*, 770 F. Supp. 2d at 583-87.

13  A position "sufficiently convincing" to "have persuaded [a] District Court to adopt it"

14  cannot be objectively unreasonable.  *Safeco*, 551 U.S. at 69-70.  Celgene's

15  interpretation is also consistent with how the Government has described the scope of

16  coverage when communicating with States.  *E.g.*, Ex. 16 at 3017, 3019 (Exs. V-W).

17      Relator's citation to a Celgene document discussing Medicare reimbursement

18  does not suggest that Celgene "did not actually believe Part D plans could reimburse

19  off-label uses."  *Infra.* p.36.  To the contrary, that document supports Celgene's

20  position that Medicare knowingly reimbursed off-label uses, as it shows that *80% of*

21  Revlimid® Medicare claims were subject to prior authorization.  Ex. 246 at 19066; *see*

22

23  [60] *U.S. ex rel. Donegan v. Anesthesia Assoc. of Kansas City*, 2015 WL 3616640 (W.D. Mo. June 9, 2015) (granting summary judgment); *U.S. ex rel. Phalp v. Lincare Holdings Inc.*, 2015 WL 4528955 (S.D. Fla. July 13, 2015) (granting summary judgment); *U.S. ex rel. Saldivar v. Fresenius Medical Care Holdings, Inc.*, 2015 WL 7293156 (N.D. Ga. Oct. 30, 2015) (granting summary judgment); *accord U.S. ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 832 (8th Cir. 2013) (defendant's "reasonable interpretation of any ambiguity inherent in the regulations belies the scienter necessary" for FCA fraud); *see also U.S. ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1420 (9th Cir. 1991) ("To take advantage of a legal question … is to be neither deliberately ignorant nor recklessly disregardful.").

*U.S. ex rel. Rost v. Pfizer*, 253 F.R.D. 11 (D. Mass. 2008) ("if a state knowingly chose to reimburse for a drug, even for an off-label use, after a prior authorization review, liability would not attach because extensive government knowledge would negate the intent requirement under the FCA as a matter of law."). As this Court recognized, and as Relator argued at the motion to dismiss stage, coverage determinations entail complex medical determinations about which experts can disagree. Ex. 45 at 4775. In these circumstances, it cannot be "objectively unreasonable" for Celgene to believe that claims were reimbursed because the Government considered them properly reimbursable. Relator cannot establish scienter as a matter of law.

### G.   <u>Relator</u>: Celgene Acted with the Requisite Scienter

Pre-litigation, Celgene consistently recognized Part D plans could and would not reimburse uses that are not medically accepted. For example, Celgene stated:

> Part D plans take a risk of losing its 80% reinsurance subsidy from CMS if they cover a part D drug which does not have a FDA approved indication and not compendia listed in a reference guide which is officially recognized by CMS. Additionally, more restrictions are placed with the higher use of oral oncologics due to their costs.[61]

Similarly, in a 2010 Medco Account Plan, Celgene stated that that "[d]rugs must be listed in 1 of 4 compendia or FDA labeled indication in order to get reimbursed by the government."[62] Celgene likewise stated in a 2008 overview that "[t]he US Market Requires Indications or Compendia Listings for Reimbursement."[63] In addition, Celgene knew that contractor AccessMed – which it paid to appeal coverage denials of Revlimid and Thalomid –regularly argued compendia support as a basis for reimbursement and that Maximus typically upheld Part D Plans' coverage denials on the ground that compendia support did not exist.[64]

*Safeco* and the FCA cases Celgene cites do not support its argument. These

---

[61] Ex. 246 at 19066 (August 2008 presentation); *see also* SUF P202-210.
[62] Ex. 222 at 17832; *see also* Ex. 211; SUF P202-203; P124-135.
[63] Ex. 280, p. 19552.
[64] Ex. 223 at 17853-54; Ex. 224 at 17860; Ex. 92 at 6401:7-20; Exs. 167-176.

cases involve "subjective bad faith," not "subjective intent" and consider defendant's wrong but *honest* interpretation of statutory provisions in a manner most favorable to it. *E.g. Safeco*, 551 U.S. 47, n.20, 66-70. None hold there is no scienter where a defendant *knowingly* violated the statutory construction it actually believed applied.

At best, Celgene's scienter is an issue for the jury. *U.S. ex rel. Colquitt v. Abbott Labs.*, 2016 U.S. Dist. LEXIS 1556, at *22, (N.D. Tex. Jan. 7, 2016) (denying SMJ where "[r]elator… pointed to evidence, which if believed, indicates Defendants had a far-reaching scheme to unlawfully benefit from an off-label use of their products and never had a good faith belief that their stents were eligible for Medicare reimbursement"). But where Celgene (a) did not *actually* believe Part D plans could reimburse off-label uses; (b) utilized an off-label strategy that included efforts to misrepresent compendia support; and (c) capitalized on Plans' perceived inability to limit reimbursement to medically accepted uses, the Court has ample basis to hold Celgene's "belief" was "objectively unreasonable" as a matter of law.

## II. CELGENE:  SUMMARY JUDGMENT IS APPROPRIATE ON RELATOR'S KICKBACK CLAIMS.

### A.  Celgene:  Relator Cannot Prove Celgene Paid Kickbacks.

Summary judgment also is warranted on Relator's claims based on alleged violations of the AKS.  42 U.S.C. § 1320a-7b(b)(2)(B).  The AKS criminalizes only a knowing and willful offer of payment in exchange for prescriptions.  *U.S. v. Krikheli*, 461 Fed. Appx. 7, 11 (2d Cir. 2012) (affirming instruction that government must prove "the remuneration was offered or paid as a *quid pro quo* in return for the referring of the patient").[65]  As one court recently explained, "the contemplated

---

[65] *Accord U.S. ex rel. Jamison v. McKesson Corp.*, 900 F. Supp. 2d 683, 699 (N.D. Miss. 2012) (entering judgment for defendants because "the Government has failed to show any *quid pro quo* in the dealings between the [defendants]"); *U.S. ex rel. Osheroff v. Tenet Healthcare Corp.*, 2012 WL 2871264, at *8 (S.D. Fla. July 12, 2012) (dismissing AKS claims where "[t]here are no factual allegations suggesting any *quid pro quo* of below-fair-market-values leases in exchange for referrals").

inducement must be what is referred to as a *quid pro quo* ('this for that') transaction, one in which a person pays for meals or gives speaker payments (the 'this') to a physician in exchange for the order or prescribing of [defendant's] drugs (the 'that')." Ex. 340 at 21057, Jury Instructions in *U.S. v. Reichel*, (D. Mass. June 17, 2016).

Relator has no evidence that *any* payments Celgene made to doctors, charitable foundations, or anyone else violate the AKS.  Mere evidence that such payments occurred is not sufficient to withstand summary judgment because the AKS does not criminalize "[p]ayments made for legitimate services (such as giving a speech)," even if those might result in increased prescriptions.  *U.S. v. Patel*, 778 F.3d 607, 639 (7th Cir. 2015).  Moreover, an arrangement that a company hopes or expects to result in prescriptions does not violate the AKS; "mere oral encouragement" to prescribe is not illegal.  *U.S. v. McClatchey*, 217 F.3d 823, 834 (10th Cir. 2000).  "A defendant cannot be convicted of [violating] the Anti-Kickback statute merely because he sought to cultivate a business relationship or create a reservoir of goodwill that might ultimately affect one or more unspecified purchase or order decisions."  Ex. 340 at 21057.

Although Relator need not prove that a *quid pro quo* was the only purpose for a payment, she must offer evidence that one purpose was a criminal purpose, *i.e.*, that one purpose was to offer payment *in exchange* for prescriptions or recommendations. *See United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989).  Relator has no such evidence.  Relator criticizes Celgene's promotional speaker programs, but it is legal to pay honoraria to physicians who deliver such programs, and the fact that the programs support the on-label use of the drug does not constitute a "recommendation" in violation of the AKS.  *See Caronia*, 703 F.3d at 156 ("Speaker programs enlist physicians, for pay, to speak to other physicians").  Relator's own experts concede that there is nothing illegal about compensating doctors for giving speaker programs (Ex. 13 at 2409 (¶ 99)), and that "[i]t's a good thing to have people that are knowledgeable in a field try and educate the people who are less knowledgeable" (Ex. 316, Campbell Dep. 20333:19-23).  And Relator cites no case in which a company has

37

been held to violate the AKS merely by paying another to discuss its drugs. *Cf. Krikheli*, 461 Fed. Appx at 11 (advertising or recommending services to physicians who then exercised independent judgment in prescribing does not violate the AKS); *United States v. Miles*, 360 F.3d 472, 479–81 (5th Cir. 2004) (hiring agency to send promotional materials to physicians, and paying agency for each patient referred does not violate AKS).

Relator's assertion that Celgene's speaker programs had a "pecuniary motive," does not establish a criminal motive. *Infra.*, p. 41. As one court recently explained in granting summary judgment on similar kickback claims, pharmaceutical companies are "for profit" ventures and, like all companies, expect and intend to increase prescriptions by educating physicians about their products. *U.S. ex rel. Booker v. Pfizer, Inc.*, 2016 WL 3017381, at *6-7 (D. Mass. May 23, 2016). Evidence that a company tracks its return on investment from such programs is "unremarkable" and does not suggest that the programs had a "universal and improper purpose" of inducing speakers to prescribe. *Id*. The fact that Celgene tracked prescriptions subsequently written by attendees (but not speakers) "directly refutes any accusation that the series was a sham meant to compensate prescribing speakers." *Id.*

Relator has no evidence to support criminal intent. Celgene's speaker programs were organized by a third party vendor, Envision Communications. Speakers were paid a flat fee per event, based on experience and breadth of geographic recognition, factoring in preparation, travel, and presentation time, in amounts consistent with industry peers. Ex. 21 at 4064 (¶ 11); Ex. 23 at 4141 (¶ 21); Ex. 27 at 4187 (¶ 14); Ex. 28 at 4191-92 (¶¶ 7-10); Ex. 33 at 4285 (¶ 9); Ex. 36 at 4572 (¶ 11); Ex. 37 at 4582 (¶ 8). Relator has no evidence that these honoraria exceeded fair market value.

This is not a case that turns on crediting a legitimate motive over an illicit one. Here, there is "not even a shred of evidence" supporting Relator's claim that Celgene knowingly and willfully paid kickbacks. *Klaczak v. Consol. Med. Transport*, 458 F. Supp. 2d 622, 681 (N.D. Ill. 2006). Summary judgment should be granted.

### B. __Relator__: Celgene Paid Physicians to Prescribe and Promote Its Drugs

Celgene rewarded doctors with paid clinical trials, advisory board positions, and authorship of ghost-written articles to prescribe its drugs.[66] It also laundered money through co-pay foundations to fill coverage donut holes, resulting in co-pay coverage for thousands of Thalomid and Revlimid prescriptions,[67] each a false claim subject to civil penalties. *Hagood*, 929 F.2d at 1421. Celgene provides no basis to dismiss these allegations, only properly briefing payments to promotional speakers.

To establish an AKS violation, Relator must show Celgene knowingly and willfully paid or offered payment to physicians to: (1) induce or reward prescription of its drugs or (2) *recommend* other physicians write prescriptions reimbursed by public healthcare programs. *E.g.* 42 U.S.C. § 1320a-7b(b)(2); *U.S. ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 313 (3d Cir. 2011). Celgene did both.

Celgene paid millions to physicians – most of whom Celgene considered KOLs with ability to prescribe large volumes of drugs and influence other physicians' prescribing behavior – to give prepared speeches recommending Celgene's drugs.[68] Celgene's payments began in 1998, through a "Visiting Faculty" program that paid doctors to promote Thalomid under the pretext of providing medical education.[69] The company launched a more aggressive, openly promotional version in 2006 through vendor Envision.[70] This program retained hundreds of physicians and paid up to $5,000 per speech – payments that bore no relation to what speakers earned as practicing clinicians or professors.[71] In 2010 alone, top speakers received over

---

[66] *E.g.*, Exs. 130-32; *see also* Ex. 120, p. 1368; Ex 94 p. 6447; Ex. 228 at 18000-09.

[67] Ex. 119 at 13671:1-673:19, 13674:5-676:19, 13677:15-22, 13678:4-8; Ex. 293 at 19817:24-818:5, 19819:19-820:14; *see also* Dkt. No. 305-1 pp.52-66.

[68] *See* Ex. 242 at 19020:16-021:23; Ex. 233; Ex. 234; Ex. 235, p. 18386.

[69] Ex. 93, p. 6440; Ex. 234; Ex. 296 at 19842:23-19846:5; Ex. 231; Ex. 92 at 6390:20-6391:22; *see also* SUF P216-226.

[70] Ex. 108 at 13464:21-466:19; Ex. 238.

[71] Ex. 108 at 13468:7-10, 13469:2-8; Ex. 242 at 19022:5-023:2. Regarding fair market value, Dr. Richardson was paid $3,000 to give one hour prepared speeches (Ex. 302) but billed Celgene only $500 hour for his expert report. Ex. 121 pp. EA-013889-900,

$100,000 per person, with one doctor receiving $200,000.[72]

The purpose of the Envision program is promotional, not educational. There are no formal criteria for participation. The sales force – not Celgene's medical staff – selects speakers, termed Celgene's "most important customers," to cultivate relationships,[73] and "neutralize" physicians (*i.e.* Dr. James Berenson) hostile to Celgene's products.[74] Celgene's marketing materials describe this strategy as "consultative selling."[75] Celgene closely tracks "Promotional Programs ROI," judging program success (and performance of sales representatives facilitating speeches) on whether its payments increased prescription by physician speakers or attendees.[76]

Celgene concedes AKS liability attaches under governing law if ***one purpose*** of payment is to induce or reward prescription. *Kats*, 871 F.2d at 108 (the AKS is violated "even if the payments were also intended to compensate for professional services" so long as "one of the material purposes" was "to obtain money for the referral of services") (upholding jury charge); *see also Krikheli*, 461 F. App'x at 1; *McClatchey*, 217 F.3d 823 at 835; *U.S. v. Greber,* 760 F.2d 68, 69 (3d Cir.1985). But Celgene continues to misstate the law despite paying lip service to *Kats*.

Relying on First Circuit cases, Celgene asserts no liability attaches unless speakers' programs have "a universal improper purpose" and fail to impart "legitimate" educational value. This authority is inapposite because the First Circuit fell short of adopting the one purpose test. *U.S. v. Bay State Ambulance & Hospital Rental Service, Inc.*, 874 F.2d 20, 32 (1st Cir. 1989); *McClatchey*, 217 F.3d at n.8 (First Circuit "explicitly declined" to set a standard for AKS liability). District courts under its jurisdiction are authorized – but not required – to adopt a stricter

---

013902. Dr. Bensinger was paid $4,000 per speech (Ex. 303) but billed between $750-$1000 an hour for his expert report.  *Cf.* Ex. 121, pp. EA-013833, 013836, 0133838-9.
[72] Ex. 121 at 13929-56 (Envision payment records for 2010); *see also* SUF 248.
[73] Ex. 287, p. 19791; Ex. 245.
[74] *See* Ex. 288, pp. 19792-96; Ex. 298; Ex. 111, p. 13536-58; Ex. 121.
[75] *See, e.g.*, Ex. 229 p. 18050.
[76] Ex. 115, p. 13570; Ex. 116; Ex. 118 at 13661-62; Ex. 247; Ex. 248, pp. 19085-93.

JOINT STIPULATION RE: CELGENE'S MOTION FOR SUMMARY JUDGMENT

interpretation of the AKS than *Kats* allows. *E.g. Booker,* 2016 U.S. Dist. LEXIS 68019, at *21 (not applying one purpose test); *but see U.S. v. Shaw*, 106 F. Supp. 2d 103, 121 (D. Mass. 2000) (choosing to follow *Kats*). Celgene's remaining cases either support Relator (*Reichel* Instr. at 5-6) or otherwise recognize AKS liability attaches unless *no* purpose of payment was to increase prescription or there was no payment *at all*. *Patel*, 778, F.3d at 617-18 (dicta envisioning *hypothetical* scenario of *no* referral or no relationship between referral and compensation); *McClatchey*, 217 F.3d at 834 (oral encouragement to refer in *absence* of payment does not violate the AKS).

Unlike *Klazack*, this is not a case where there is "not a shred of evidence" of pecuniary motive. 458 F. Supp. 2d at 677, 680; *see also Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 668 (S.D. Tex. 2013) (Celgene has not established application of any safe harbors). In addition to the above-cited evidence on pecuniary motive, there is other ample evidence by which a jury could conclude Celgene's speakers' programs were devoid of educational value as to on-label indications and that the primary – if not exclusive – purpose of payments thereunder was to reward and induce prescriptions. *Shaw*, 106 F. Supp. 2d at 121. For example, (1) Celgene's annual cap on promotional speakers' compensation was at least double that of most pharmaceutical companies; (2) speech preparation was minimal to nonexistent; (3) physicians could deliver unlimited numbers of daily speeches, and some spoke up to 8 times in one day, receiving $22,500 to repeatedly deliver the same two pre-approved speeches; (4) Celgene instituted a very high number of programs annually despite *no* new Revlimid indication between 2006 and 2013 and minimal label changes;[77] and (5) Celgene used speakers' programs as a vehicle to promote and generate off-label prescription.[78]

**C.    Celgene:  Relator Cannot Prove Alleged Kickbacks Caused Claims.**

_____

[77] http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Label_ApprovalHistory#apphist

[78] Ex. 242, at 19020:16-19021:14; Ex. 239; Ex. 240 (West Region programs); Ex. 249, pp. 19107-08; Ex. 250, pp. 19155, 19163; Ex. 121 (Boccia tab); Ex. 347, Brown Decl. ¶¶ 71-72, 75, 94; Ex. 92, pp. 6390:6391:22; *see also* SUF P227-53.

Relator's kickback claims fail for a separate and independent reason: she cannot prove that any alleged kickback caused a prescription, much less *every* on-label and off-label prescription ever written, including before doctors received payments and by doctors who *never* received payments from Celgene.

Although a mere offer of payment can violate the AKS, an AKS violation can lead to FCA liability only when a claim for reimbursement "includes items or services *resulting from* a violation of" the AKS.  42 U.S.C. § 1320a-7b(g) (emphasis added). Relator must prove not only kickbacks (as opposed to legitimate payments), but also which, if any, prescriptions and claims for reimbursement were caused by the alleged kickbacks.  *Kellogg Brown & Root Servs., Inc. v. U.S.*, 99 Fed. Cl. 488, 513 (2011) (rejecting FCA claims because Government failed to establish causal link between kickbacks and any false claim).  Merely asserting that any and all claims were "tainted" by kickbacks does not suffice.  *See id*. (rejecting proposition that "an FCA claim can be based on taint from a kickback alone"); *Miller v. Abbott Labs.*, 2016 U.S. App. LEXIS 8882, at *19-20 (6th Cir. May 12, 2016) (rejecting as "not objectively reasonable" theory that "any offer of anything of value violates the FCA" because payments must be linked both to "a healthcare provider's recommendation of [defendant's] products to federal-program patients" and to claims "submitted to the government by those federal-program patients").

Relator offers no evidence that any payment from Celgene to any physician, charitable organization, or anyone else was a substantial factor in any physician's prescription decision.  The undisputed evidence demonstrates that no such link exists. Ex. 21 at 4064 (¶ 10); Ex. 23 at 4141 (¶ 21); Ex. 26 at 4180 (¶ 10); Ex. 27 at 4188 (¶ 17); Ex. 29 at 4204 (¶ 12); Ex. 31 at 4219 (¶ 6); Ex. 34 at 4401 (¶ 25); Ex. 36 at 4572 (¶ 11); Ex. 37 at 4583-84 (¶ 11).  Even Relator's expert testified that payments for promotional programs do not impact his prescribing decisions.  Ex. 318, Fadem Dep. 20349:21-22 ("I'm not influenced by being a speaker for a drug company.").

Relator's damages expert, Dr. Hay, included as damages *all* prescriptions –

42

both on-label and off-label – ever written by a doctor paid to speak at a Revlimid® on-label promotional program "based on the presumption that … prescriptions prescribed by physicians who received these fees are tainted." Ex. 13 at 2411 (¶ 102); Ex. 322, Hay Dep. 20374:13-18 (assuming based on "advi[ce] by [Relator's] counsel that … all of those prescriptions would constitute damages").  No court has recognized such a "taint" theory.  Dr. Hay did not conduct any qualitative causation analysis.  His only "analysis" was a comparison of the number of prescriptions written by physicians receiving more than a certain threshold to those who received less.  He also described the prescribing history of five individual speakers. Ex. 13 at 2412-16 (¶¶ 106-114).[79] Without evidence of causation, Relator's cannot survive summary judgment.

### D. **Relator: Celgene Mischaracterizes the Kickback Causation Standard**

Celgene mistakenly argues there is an insufficient nexus between the kickback and the prescription. The Court should reject Celgene's argument for three reasons.

First, a kickback need not be successful to be actionable: an offer is sufficient to prove an AKS violation. *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 263 (S.D.N.Y. 2014). A payment can constitute a kickback if but one of its purposes is to induce or reward prescriptions. *Kats*, 871 F.2d at 108. Under the one-purpose test, the AKS does not contain a "but for" causation requirement, and "does not require a kick-back scheme to succeed in generating new business." *United States v. TEVA Pharm. USA, Inc.*, 2016 WL 750720, at *17 (S.D.N.Y. Feb. 22, 2016).

Second, when a kickback arrangement taints a claim, the individuals responsible for offering the illegal remuneration *cause* a false claim to be submitted, resulting in liability under the FCA and not simply the AKS: this conclusion flows from the longstanding rule that the Government would have refused payment altogether had it been aware of the kickback arrangement. *U.S. v. Rogan*, 517 F.3d

---

[79] Contrary to Relator's contentions, Dr. Hay did not find that prescriptions decreased after payments stopped.  Prescriptions and payments stopped at the same time because the *data* stopped at the same time. Ex. 13 at 2393 (Medicare data 2006-2014), 2549 (payment data 2006-2014).

JOINT STIPULATION RE: CELGENE'S MOTION FOR SUMMARY JUDGMENT

449, 452-53 (7th Cir. 2008); *see also U.S. ex rel. Freedman v. Suarez-Hoyos*, No. 8:04-CV-933-T-24 EAJ, 2012 WL 4344199, at *4 (M.D. Fla. Sept. 21, 2012) ("damages [amount] resulting from the payment of false claims tainted by a kickback arrangement equals the full amount that Medicare paid on such claims"). Establishing a causal link between the kickback and the claim merely requires proof "a kickback arrangement existed" and was "a substantial factor in bringing about" the submission, which was "a normal consequence of the situation created by the kickback arrangement." *Freedman*, 2012 WL 4344199, at *8 (collecting cases). The evidence described above is more than sufficient to support such a conclusion.

Third, Celgene mischaracterizes Dr. Hay's opinions. Dr. Hay found "that at every threshold higher paid speakers prescribed statistically significantly more than low paid KOL prescribers" and that individual physicians prescribed less when they stopped speaking for Celgene or simply spoke less.[80] This relationship is not – as Celgene claims – a function of the "data stopping." Dr. Hay had data on speaker payments through October 2014 and Medicare data through December 2014, and some speakers – such as Dr. Rafat Abonour – stopped getting paid for promotional speaking in *2013*: between 2006 and 2014, speakers prescribed less after *they* – as individuals – stopped speaking promotionally as well as during periods where they simply spoke *less* and received less money from Celgene.[81] This is powerful evidence a jury could rely on to find Celgene's payments had their intended effect.

Though it acknowledges *Kats* is the seminal Ninth Circuit case on this issue, Celgene relies on cases with no application. For instance, *Kellogg* involved a different kickback statute, the Anti-Kickback Act, not the AKS. 99 Fed. Cl. At 502. Likewise, *Miller v. Abbott* is an FCA retaliation case and does not address AKS causation

---

[80] Ex. 13, Hay Expert Report, ¶¶ 105; Appendices D, G-J, pp. 2412-15, 2516, 2530-60; Ex. 14 ¶ 110, p. 2609; Ex. 21.

[81] *Id.* ¶¶ 105-114; Appendices D, G-J, pp. 2412-15, 2516, 2530-60; Ex. 14 ¶ 110, p. 2609; Ex. 21.

JOINT STIPULATION RE: CELGENE'S MOTION FOR SUMMARY JUDGMENT

1    standards. 2016 WL 2799688, at *5-6.

2        Finally, and independent from Dr. Hay, there is ample evidence that Celgene

3    paid speakers under Envision to recommend its drugs and that this actually *caused*

4    doctors they pitched to prescribe.[82] Payment to *recommend* a drug is a violation of the

5    AKS (*supra* pp. 38-39), and Celgene cites no case that allows it to avoid FCA liability

6    for paying physicians to successfully induce other physicians to prescribe its drugs.

7    **III.   CELGENE:  SUMMARY JUDGMENT IS WARRANTED ON ALL**

8        **CLAIMS BEFORE APRIL 27, 2004.**

9        This action was filed on April 27, 2010, and partial summary judgment is

10   appropriate as to all claims submitted before April 27, 2004 as outside the FCA's six-

11   year statute of limitations.  Relator seeks to avoid this time bar by arguing her claims

12   were tolled, either because she did not know the facts or law, or because Celgene

13   prevented her from filing suit, until within three years of when she filed.  31 U.S.C.

14   § 3731(b)(2).  Relator's reliance on cases interpreting different language in different

15   statutes is misplaced, and none of her tolling theories is supported by the evidence.

16       The statute is not tolled until a relator has "marshaled every conceivable item of

17   proof [s]he might eventually be able to use at trial."  *Santa Maria v. Pac. Bell*, 202

18   F.3d 1170, 1178-79 (9th Cir. 2000).  A relator merely needs "sufficient information to

19   know of the possible existence of a claim."  *Id.*; *U.S. v. Kass*, 740 F.2d 1493, 1497

20   (11th Cir. 1984) (holding "it is not necessary" to "have all details of a claim before the

21   statutory period begins to run").  Here, Relator's complaint confirms she was aware of

22   all of the essential facts before 2007.  *E.g.*, Ex. 43 ¶¶ 105, 118, 130, 154, 155, 162,

23   163, 193 (describing alleged instances of off-label promotion before April 2007); *id.*

24   ¶¶ 200, 202, 237, 238, 240 (describing involvement with promotional speakers

25   program before 2007).  Her deposition independently confirms she knew the core

26   facts before April 27, 2007.  Ex. 315, Brown Dep. 20295:2-22 (describing 2003 or

27   ───────────────
     [82] Ex. 248, pp. 019086-87; Ex. 113, p. 13551, Ex. 240, 2010 West Region Programs
28   Per Rep-District "Job No. Cel-7416." p. 18464; Ex. 121; *see also* SUF P245.

2004 call about off-label use); 20296:2-302:20 (describing 2001 "ride-along" where physicians shown abstracts about off-label uses and told about off-label uses); 20308:22-25 (instructed to use off-label information beginning in 2001); 20305:3-12 (describing speaker programs before 2005); 20304:7-13 (describing speaker program practices dating back to 2001).

Relator's undisputed knowledge of the facts underlying her claims more than three years before filing this lawsuit thus prevents any tolling.  *See U.S. ex rel. Hyatt v. Northrop Corp.*, 91 F.3d 1211, 1217 (9th Cir. 1996) (limitations period "begins to run once [the] qui tam plaintiff knows or reasonably should have known the facts"); *Moore v. Navarro*, No. C 00-03213, 2004 WL 783104, at *3 (N.D. Cal. Mar. 31, 2004) (holding § 3731(b)(2) tolling inapplicable unless relator proves he could not reasonably have learned the facts more than three years before filing).

Relator's claim that she did not learn of these facts until she approached the FDA and counsel is nonsensical.  Neither the FDA nor counsel could have informed her of these facts.  And tolling does not depend on whether Relator "knew or could reasonably be expected to know" how the facts would be viewed "in the eyes of the law."  *U.S. v. Kubrick*, 444 U.S. 111, 121 (1979); *U.S. ex rel. Bauchwitz v. Holloman*, 671 F. Supp. 2d 674, 696 (E.D. Pa. 2009) (plaintiff "need not … know that the conduct is actionable under the law").  Regardless, Relator *did* know the law.  Before Celgene, she worked at Pfizer, where she was trained on the AKS and rules about off-label promotion.  Ex. 315, Brown Dep. 20294:3-20 (at Pfizer "[w]e were told of a quid pro quo, and that meant you can't pay.  My understanding was that you can't encourage a doctor through payment," and she was told "[t]hat you only sell within the indication."), 20306:23-307:5 (in 2001-03, when allegedly told to promote off-label at Celgene, she "said, 'Wait a minute, we cannot do this.  I came from Pfizer.  I know.'").[83]  Relator's claims prior to April 27, 2004 are time-barred.

---

[83] Relator's claim that she believed Celgene's so-called representations that the conduct of which she complains was lawful does not save her claims.  Fraudulent

## IV.   <u>RELATOR</u>: THE TEN-YEAR STATUTE OF LIMITATIONS APPLIES

Celgene has the burden of proving that the FCA's six-year statute of limitations applies as a matter of law. *Wolf v. Travolta*, No. 12-00938, 2016 U.S. Dist. LEXIS 28007, at *30 (C.D. Cal. Mar. 4, 2016); *U.S. v. Carrell*, 681 F. Supp. 2d 874, 883-84 (M.D. Tenn. 2009). To meet this burden, it must show an absence of a factual dispute as to the dates Relator knew sufficient material facts underlying her claims. *Malhotra v. Steinberg*, No. 09-1618, 2012 U.S. Dist. LEXIS 155922, at *6-10 (W.D. Wash. Oct. 29, 2012) (denying summary judgment on FCA claim because defendant did not prove relator clearly understood he was taking kickbacks in 2006). Celgene has not met its burden.

Certainly, 31 U.S.C. § 3731(b)(2) does not toll the statute until a relator marshals every conceivable item of proof. But it does toll the statute until a relator knows or has a basis to know enough material facts to recognize both the cause and *existence* of an injury. *E.g. Winter v. United States*, 244 F.3d 1088, 1090-92 (9th Cir. 2001) (FTCA claim did not accrue when plaintiff was disabused about his suspicions by medical professionals); *Magnum v. Action Collection Serv., Inc.*, 575 F.3d 935, 939-41 (9th Cir. 2009) (statute tolled by discovery rule).

Relator's experience at Pfizer did not enable her to identify Celgene's improper promotional practices.[84] Upon hire by Celgene in 2001, she was told she would be a "medical liaison" and "ST.E.P.S. enforcer" and not a sales representative, and in response to initial expressions of concern about off-label discussions, she was assured "cancer is different" and that she was allowed to discuss medical literature on Thalomid's use in cancer with physicians.[85] By 2003, Celgene formally codified its

---

concealment, which Relator did not allege, requires proof that Celgene took "active steps to prevent the plaintiff from suing in time" or "misrepresented or concealed facts necessary to support" a claim, and that Relator reasonably relied on that conduct. *Santa Maria*, 202 F.3d at 1176; *Stitt v. Williams*, 919 F.2d 516, 523 (9th Cir. 1990).
[84] Ex. 347, Brown Decl. ¶¶ 5-14; Ex. 243 at 19028:16-19030:9.
[85] Ex. 347, Brown Decl. ¶¶ 15-19, 25-26, 27-28.

stance and classified off-label discussions with doctors as permissible "profiling" for future indications.[86] Into 2006, Celgene taught Relator to promote by misrepresenting the existence of compendia support and even what the compendia *were*: Relator carried the ACCC Drug-Based Bulletin on calls to doctors and was taught to present it as a compendia (it was not) and misrepresent off-label uses it supposedly supported.[87] Until 2006, when the FDA insisted on Thalomid's black box warning, Celgene taught Relator to tell physicians DVT was a function of cancer and that Thalomid therapies did not increase its risk (a position Celgene knew was not true).[88]

Relator only learned these key facts when instructions to change ICD-9 codes in late 2007 prompted her to approach the FDA and counsel; prior to that, she believed Celgene when it told her she was not in sales and was permissibly discussing off-label uses that were safe, efficacious and reimbursable as a function of compendia support. Only after discussions with the FDA and counsel did Relator realize that government payors, physicians, and potentially patients had been *injured* because she had been "selling" from her date of hire and had been misrepresenting safety, efficacy, and compendia support for nonreimbursable, off-label uses Celgene targeted.[89]

Similarly, Relator's role in the earlier speakers' programs (some justified as CME) was minimal and she did not understand the basis for speaker selection until 2008.[90] Celgene management then (a) revised the Field Contact Report assessments to expressly tie the use of speakers' programs to increased prescription writing; (b) asked Relator to secure a specific speaker – Dr. Robert Vescio – who increased Thalomid prescriptions after he spoke at Celgene-sponsored CME; (c) asked her to begin facilitating one-on-one detailing where physicians were paid to promote off-label uses

---

[86] *Id.* ¶¶ 29-32, Ex. B; *see also* Ex. 92 at 6380:8-382:4, 6399:21-400:2.
[87] Ex. 347, Brown Decl. ¶¶ 37-41.
[88] *Id.* ¶¶ 42-47 (citing additional exhibits from Evidentiary Appendix).
[89] *Id.* ¶¶ 48-59, 63-64; *see also id.* ¶¶ 60-62.
[90] *Id.* ¶¶ 65-66.

JOINT STIPULATION RE: CELGENE'S MOTION FOR SUMMARY JUDGMENT

to other doctors; and (d) asked her to target doctors prescribing competitor drugs.[91]

Because factual disputes remain as to the dates Relator knew and reasonably could have known the facts material to her claims, the applicable statute of limitations should be decided by a jury. *Malhotra*, 2012 U.S. Dist. LEXIS 155922, at *6-10.

## V. CELGENE:  SUMMARY JUDGMENT SHOULD BE GRANTED ON ALL CLAIMS AFTER APRIL 27, 2010.

When "the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated," that is "very strong evidence" of lack of materiality.  *Escobar*, 136 S.Ct. at 2003-04.  There is no dispute that the Government has been aware of Relator's allegations since her complaint was filed. Celgene is entitled to summary judgment on all claims after April 27, 2010.

## VI. RELATOR: *ESCOBAR* DOES NOT CUT OFF LIABILITY IN 2010

The *filing* of a Complaint does not establish the "actual knowledge" discussed by *Escobar*. Nor is the "Government" a monolithic entity that turns on a dime. At best, liability continues until CMS receives and evaluates the evidence. Thus, civil settlements often cover post-filing conduct. For example, Endo Pharmaceuticals recently settled allegations of off-label promotion.  While the civil suit was filed in 2005, the civil settlement covered conduct through December 2007.[92]

In addition, here there is evidence Celgene continued to violate federal and state false claims act laws after the filing of the complaint. For example, Celgene's promotional speakers' program continues to induce kickback-tainted prescriptions.

## VII. CELGENE:  SUMMARY JUDGMENT SHOULD BE GRANTED AS TO ALL PROGRAMS LACKING OFF-LABEL CLAIMS DATA.

The only programs for which Relator has evidence that off-label claims were actually submitted and reimbursed are Medicare, TRICARE, and the Florida Medicaid program.  For all others, Relator relies solely on evidence about the total number of

---

[91] *Id.* ¶¶ 67-75; *see also id.* ¶ 76 (describing Celgene's in-house legal counsel's role).
[92] Ex. 290 at 19797-98; *see also* Ex. 207.

claims paid, not the number of off-label claims.  Relator cannot close the evidentiary gap with expert testimony purporting to estimate off-label claims.  Relator bears the burden of proof and must identify admissible evidence – not mere speculation – that reimbursement claims for off-label uses were actually submitted to, and paid by, the Government.  *Solvay*, 2016 U.S. Dist. LEXIS 43133, at *44, 49-50 (granting summary judgment on off-label promotion claims where Relator lacked admissible claims data for Medicaid programs).  Summary judgment should be granted on this ground as to all programs other than Medicare, TRICARE, and the Florida Medicaid program.

## VIII.  <u>RELATOR</u>: THERE IS NO BASIS FOR EXCLUDING CLAIMS DATA

Celgene appears to challenge the use of TRICARE off-label rates and SDUD data to calculate damages for certain payors. This approach is largely a product of data limitations, and Dr. Hay addresses why his methodology reliably estimates the off-label claims these programs paid.[93] Whether to credit Dr. Hay's approach is up to the jury. *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 665-66 (2d Cir. 2016).

Celgene's reliance on *Solvay* is also inapposite. *Solvay* focused on failure to authenticate data, but Dr. Hay used claims data produced by many of the challenged payors, and this data was authenticated by declarations.[94] Finally, dismissal prior to *Daubert* proceedings addressing the methodology in greater detail is premature. *In re Credit Suisse-AOL Sec. Litig.*, No. 02-12146, 2011 U.S. Dist. LEXIS, at *19-24 (D. Mass. Aug. 26, 2011); *Lund v. 3M Co.,* No. 13-02776, 2015 U.S. Dist. LEXIS 99109, at *4-6 (C.D. Cal. July 21, 2015). A one-paragraph criticism of Dr. Hay's methodology – without an explanation as to how Relator failed to produce admissible data for certain payors – is an inadequate basis to dismiss any payor's cause of action.

## CONCLUSION

For the foregoing reasons, Celgene contends that summary judgment should be granted, and Relator contends that it should be denied.

---

[93] Ex. 279 at 278:4-286:17; Ex. 14 ¶ 91, Appendix E (pp. 2402-06, 2520-23).
[94] *E.g.* Exs. 264-276.

Dated: August 29, 2016

Respectfully submitted,

SIDLEY AUSTIN LLP AND JONES DAY

By:    /s/   *Kimberly A. Dunne*
       Kimberly A. Dunne
       Attorneys for Defendant
       CELGENE CORPORATION

       /s/   *Michael R. Williams*
       Michael R. Williams
       **BIENERT, MILLER & KATZMAN, PLC**
       903 Calle Amanecer, Suite 350
       San Clemente, CA 92673
       Tel: (949) 369-3700
       Fax (949) 369-3701
       Attorneys for Relator Beverly Brown

JOINT STIPULATION RE: CELGENE'S MOTION FOR SUMMARY JUDGMENT

## SIGNATURE ATTESTATION

     I am the ECF User whose identification and password are being used to file the foregoing Joint Stipulation Regarding Defendant Celgene's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment.  In compliance with Local Rule 5.4.3.4(a)(2)(i), I hereby attest that the signatory has concurred in the content of Relator's portion of this filing and has authorized this filing.


Dated:  August 29, 2016


                          By:    */s/  Kimberly A. Dunne*

217078978