# EXHIBIT A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO,
Plaintiffs,

Ex rel.

BEVERLY BROWN,
Plaintiff-Relator,

VS.

CELGENE CORPORATION,
Defendant.

Case No. 10-cv-03165 GHK (SSx)

Assigned to: Honorable George H. King

*****************************************************

ORAL/VIDEOTAPED DEPOSITION OF

STEPHEN Z. FADEM, M.D.

NOVEMBER 3, 2015

*****************************************************

Q. And you said that your -- the nature of your practice was nephrology and internal medicine; is that right?

A. Correct.

Q. Can you explain to me each of those practices? So what does the practice of internal medicine for you entail and what does the nephrology practice entail?

A. I'm a board-certified internist, and as an internist, I'm -- I have my specialty in taking care of patients with medical diseases, internal medicine diseases, which encompasses oncology, cardiology, gastroenterology, rheumatology, hematology, and -- but then I've -- beyond that, I've become specialized in nephrology, and I did a two-year fellowship program in kidney diseases where I learned about the kidney and diseases of the kidney and kidney transplantation and patients with -- with complex problems that are related to acid base and electrolyte disorders and patients who required dialysis, patients who had hypertension, had diabetes with secondary kidney disease.

And of course in my scope of work as a nephrologist, I see a lot of patients who have an underlying malignancy. And so I still see patients

who have a variety of internal medicine problems. I see a lot of patients with cardiology diseases -- cardiovascular diseases, I should have said. I see a lot of patients with cerebrovascular diseases, a lot who have endocrine disorders and rheumatologic disorders. And so that's what I do.

Q. For the patients who have underlying malignancies, are you treating them for kidney dysfunction as a result of those malignancies?

A. Yes, I'm either -- as a result or concomitant. Many of the patients that I have who already have kidney disease develop a malignancy. And, for example, a patient with chronic kidney disease may develop myeloma. And so I may have to refer that patient to a friend of mine and -- who's an oncologist, and we might have to put that patient on medication for that myeloma.

Q. Do you treat cancer as part of your practice?

A. Well, I'm -- I mean, as an internist, I could; but because of where I live, I generally refer the patient to somebody who not only has a specialty in oncology but who has a subspecialty in the type of cancer that the patient has.

I'm within walking distance of MD

Anderson hospital. So if I have a patient who develops, say, a osteosarcoma, I'll refer that patient to the oncologist who has a specialty -- subspecialty and who is a special interest just in osteosarcoma. Or years ago, if I had a patient who had myeloma, I would refer that patient to Ray Alexanian or -- because he's the doctor that I -- I worked with in the past who I know has got an expertise in myeloma.

And so because of where I live, I have the luxury of being able to refer patients to super subspecialists.

Q. Are you board certified in oncology?

A. No.

Q. Are you board certified in hematology?

A. No.

Q. What is the nature of your work as the medical director for the Houston Kidney Center integrated service network?

A. Well, that became DaVita. You familiar with DaVita?

Q. I'm familiar with DaVita.

A. Okay. DaVita is a dialysis company that took over the company Total Renal Care. Total Renal Care acquired my dialysis units, and then they

Q. What are the most common drugs that you prescribe?

A. You're going to love this answer. Erythropoietin.

Q. What other drugs, if you're going to name the top five drugs?

A. Well, as a nephrologist in -- in the dialysis unit doxercalciferol, or precalciferol, iron compounds and erythropoiesis stimulating agents.

In my office practice, the most common drugs that I prescribe are drugs to try to prevent kidney disease, and that's really where my -- my real focus is.

I don't have a large clinic, and it's not the major job that I have. Luckily my kids are grown and -- and I've just got grandkids that I can see on the weekends, and so most of what I do -- like I said, I'm a work alcoholic; I'm the exception, not the rule. But what I do is, I deal with patients who have a lot of problems, and I try to prevent them from needing dialysis and try to -- or preempt them to get a kidney transplant. So I use drugs like ACEs and ARBs and -- ACE inhibitors or angiotensin receptor blockers. Or I make sure

talking about is a drug made by Amgen, but I don't use that off label at all. That's still under investigation. That's not even available off label.

Most of the drugs that are still under investigation are not available off label. People haven't released them for off-label use.

Q. Do you consult compendia in the course of your medical practice?

A. I have looked through it in the past, but for the most part, I do not.

Q. What are the circumstances where you have looked through it?

A. When I was on a P&T committee, I -- I would look to see what they would say, just to...

Q. And when did you sit on a P&T committee?

A. Years ago. I haven't done it in a long time. I was on the St. Luke's hospital P&T committee many years ago. I can't remember exactly when.

Q. More than 20 years ago? I'm just trying to get a benchmark.

A. Maybe. Might have been 20. About that long ago.

Q. And did you assist in evaluating drugs for inclusion in the formulary?

have sent over to them. I have gotten consults from MD Anderson for kidney patients, but most of those have been ifosfamide-induced renal failure; but, no, most of the experiences I had with myeloma were during my -- my period of working with Dr. Alexanian.

Q. So since your training as a medical student, you haven't treated patients for cancer?

A. No, not really, or -- well, not say -- yeah, medical student with Marshall, and then the internship and residency was with Alexanian.

So since the end of my residency, I have not treated patients for cancer.

Q. And you've never had occasion to prescribe Thalomid or Revlimid; correct?

A. I never have.

Q. Have you ever treated a patient for kidney dysfunction or other complications who was taking Thalomid or Revlimid?

A. No, not really. I think we're pretty careful that, you know, those drugs were avoided. The -- the studies that were done excluded renal patients. Remember, Dr. Zeldis was pretty careful to make sure that -- he even used the term "walking dead," that the population of patients I deal with

together right now, and we're using Velcade. I don't recall them ever using Revlimid on any of my patients. I think it's mainly been Velcade.
Q. And do you know about Dr. Holoye?
A. I don't know. I can ask him.
Q. I'm just asking as you sit here today.
Do you know what treatments Dr. Campos uses?
A. No. I don't even know if Dr. Campos is retired yet. He's a little bit older than the other two.
Q. So you haven't referred anyone to him recently?
A. Not in a long time. Because they all worked in the same group, so I usually use the two younger doctors now. But I trained with Dr. Campos. He was one of the doctors that I trained with years ago when I was an intern.
Q. Do you have any familiarity with the process whereby a compendium evaluates drugs for different disease states?
A. Other than what I've read in testimony in depositions, I really don't have any other process. I don't personally know any compendia people.

Q. You noted in your rebuttal report that you had read the deposition transcript for the witness for DRUGDEX.

A. I did. I went through that. I don't remember it that well, but I did go through that.

Q. Did you read any of the transcripts for the other compendia depositions?

A. Tell me the names and I'll tell you whether I did or not.

Q. Of the compendia, AHFS.

A. I can't remember. I can't remember whether I was given that one or not.

Q. All right. Would it be listed on -- it would be listed --

A. Yeah, I would have gone through it.

Q. -- in your report if you reviewed it?

A. Yeah, I mean, I would read that and go through it and look at it.

Q. Do you have any knowledge about what steps compendia go through to establish the qualifications of their reviewers?

A. I know it's quite -- it's really -- I know there were some problems, that they really didn't have enough staff and they were kind of behind schedule, and they didn't really get to do

things as -- as well as they should. I know there were some safety concerns where they really didn't get to go over safety as well as they should.

Q. Who is the "they" that you're referring to?

A. I know that -- well, when I say "they," I mean the people that put together the compendia. I mean, you know, just from -- from what I recall. I would have to go through -- if you have -- if you want to show me the depositions, I'll be happy to go through them, and it will recall what I've read, if you have the depositions. Do you have the depositions? I'll be happy to review them.

Q. You just said you reviewed only one deposition.

A. I only reviewed one that I can recall. If you have that one, I'll be happy to go over that with you, and if you have a list of them, it might refresh my memory.

Q. So is it fair to say your knowledge of any compendia process is limited to the deposition you might have reviewed in this case?

MR. HARPOOTLIAN: Object to the form.

A. I -- I haven't been asked to -- in my

scope of work, to study how compendia are put together, and I haven't done a thorough review of that process. So I -- as we sit here today, I'm not prepared to answer your question affirmatively.

Q. (BY MS. DUNNE) In your report, page 13, paragraph 42 in your report.

A. Okay.

MR. HARPOOTLIAN: What page?

THE WITNESS: 13, 42.

MS. DUNNE: 13.

Q. (BY MS. DUNNE) You criticized the submission or the sharing of certain information by a Celgene employee with the AHFS compendia.

Do you see that?

A. That I know about, yes.

Q. Well, you know about what you reviewed, the document?

A. Yeah, that's what I reviewed, yes.

Q. Do you know what, if anything, AHFS did with the information that Celgene shared?

A. Do I know what?

Q. What, if anything, the AHFS compendium did with the information that Celgene shared?

A. Well, I have that figure that you probably saw, if you went through my report. So I

A. Well, in my opinion, the statement does. That's exactly what I was trying to do, is I was trying to show how this letter is evidence of a Celgene employee trying to influence the people of a compendia to -- to make a decision. And --

Q. Do you have any knowledge whether it's common in the industry for manufacturers to share clinical information with compendia for consideration?

A. You can -- some people will call it sharing clinical information. That's a very euphemistic term. Other people will say trying to influence what the compendia is going to say.

Q. So my question is: Do you have any understanding as to whether it's common in the industry for manufacturers to share clinical information with compendia for consideration?

A. I know that in this case, I'm just commenting on what I am seeing right now.

Q. Do you have any understanding about whether manufacturers routinely or often submit clinical information to compendia for consideration?

A. Well, I -- I think that in the -- only from the qui tams that -- that I've been involved in where it's common that some of the companies that

get sued for -- you know, for these types of things do it.

I don't know about other companies, whether they do it. I would presume that if you have a compendia and you're trying to come up with an objective article, that you should be left alone, as a compendia author, to do your own research and shouldn't have a member of a pharmaceutical company, a large pharmaceutical company, calling you and sending letters to you.

Q. Do you have any knowledge about how compendia handle submissions by manufacturers?

A. Well, I can -- all I can comment on is what I am seeing right here. Based on what I am seeing right here, I have this knowledge, and this is what I'm reporting to. Whether other companies are also doing this, you know, I hope they're not, but there -- there might be. And they might also be companies that you might know a lot about because you might be defending them.

But I would think that if this type of activity is going on, it's -- it's really messing up the objectivity of the compendia.

The compendia is supposed to be objective. They're supposed to be looking at the

medical literature, the published medical literature that's out there, and they're supposed to be looking at the clinical trials, and they're supposed to be looking at whether or not a drug is safe and whether or not a drug is effective. And if they're trying to do that and then somebody is calling them and saying, I don't like this or somebody doesn't like that, it's -- I mean, it's sort of like, you know, somebody's mother calling trying to get the daughter on the cheerleading squad.

And I can see that -- I don't know what other companies do, because I haven't done that many qui tams. But I can see what this company's done, and I know that I have been asked in the last couple of weeks to be a consultant to industry. And in the company that I'm going to be working with, this type of activity will never happen.

Q. But it's true that you have no idea how AHFS handles submissions by manufacturers; correct?

A. Well, it's obvious that, you know, they -- they accept these letters like this one. They accept them. I don't know -- you know, and it's obvious that, you know, you're going to show me or may show me whether or not the compendia changed or not. I'm just going to say that if the compendia

changed as a result of this letter, or if the compendia changed from before to after, then that's problematic, in my opinion, and that's where I -- that's where my limitations stop. Because I'm not part of a compendia review committee.

Q. If you could turn to page 11, paragraph 37.

Is it your opinion that a drug can only be supported in a compendium if a manufacturer is seeking FDA approval for the use?

A. I think that's the way it should be. I think that if you have a drug -- the FDA is our friend. The FDA is trying to show that a drug is safe and effective to protect the public. And if you have a drug that's safe and you have a drug that's effective, why shouldn't it be approved by the FDA? And if you can't get it approved by the FDA and you're trying to go through a back door by going through the compendia, then shame on you.

And my opinion is that if you have a drug that's safe and effective and you know that it's going to take the compendia a few years because they're backlogged -- it's going to take the FDA, rather, a few years because they're backlogged, but you know that drug is eventually going to be going

sure they can do anything they want. But what I'm trying to say is, a drug company can do anything it wants. A compendia obviously does things without considering sometimes. They might say the drug is supported without really doing the research to see if it's supported.

So the answer is, yes, they can say it's supported, and they do say it's supported.

My argument with that is, just because they say "supported" -- just because they say "supported" doesn't mean that when you drill down into the medical literature that that drug is supportable. There may not be substantive literature that supports it.

Q. And is it your opinion that a drug is not supportable if there is not an SNDA pending?

MR. HARPOOTLIAN: Objection. Asked and answered.

He just said that it could be.

A. You're actually going beyond that. No, there may not be an NDA pending, but there may be a clinical trial that has been completed that is going to get the company to think, hey, we just had this beautiful clinical trial, and it's a positive study, there's acceptable benefit of this drug, there's

what we're talking about right here.

You have a lot of references in some of these -- in these compendia, and when you look down and you look at the references, they very poorly support that that drug should be used. And yet the word "support" is in the compendia. They say they support the drug. They call it IIa or IIb. They say they support it.

But as Judge King says, you know, in a statement that he made, and as I am saying, what a compendia says is support.

If you look at it carefully and you do a deep dive, it's not necessarily what support is. In other words -- and this is what lawyers do. I mean, you-all hear something on the face of it and then you do cross-examination to get where the details are. This is what a background check is.

So what we're doing, we're asking the compendia to put stuff out there without doing a background check. And what I did was, I did a background check on what the compendia did, and I found that the evidence was lacking.

MS. DUNNE: Can you mark this as Exhibit 6, please.

(Fadem Exhibit 6 marked/introduced.)

they -- you know, they might pay for it. But my argument is that if you do a deep dive, you might find that what they're saying is supported. If you go down to the literature that's quoted and supported, it may not be supportable by the actual studies that they're sending in.

Q. So is it fair to say, essentially, that you're challenging CMS's decision to rely on compendia?

A. Am I challenging CMS's decision? I challenge CMS frequently, and -- and we challenge their decisions constantly. And -- and I really do challenge it. I think it's created a great deal of problem to rely on compendia. And so is it my opinion, yes. It's my personal opinion.

When they talk about support, they're an insurance company, and they're going to pay what they see -- the compendia says support, they're going to pay. They're not going to do the background check. And what I did was did the background check. And the background check showed that even though CMS paid or they authorized payment for these products, if you do the background check, they weren't supported. Period.

Q. Going back to paragraph 37 that we were

REPORTER CERTIFICATION

THE STATE OF TEXAS :
COUNTY OF HARRIS :

I, DENYCE SANDERS, a Certified Shorthand Reporter and Notary Public in and for the State of Texas, do hereby certify that the facts as stated by me in the caption hereto are true; that the above and foregoing answers of the witness, STEPHEN Z. FADEM, M.D., to the interrogatories as indicated were made before me by the said witness after being first duly sworn to testify the truth, and same were reduced to typewriting under my direction; that the above and foregoing deposition as set forth in typewriting is a full, true, and correct transcript of the proceedings had at the time of taking of said deposition.

I further certify that I am not, in any capacity, a regular employee of the party in whose behalf this deposition is taken, nor in the regular employ of this attorney; and I certify that I am not interested in the cause, nor of kin or counsel to either of the parties.

That the amount of time used by each party at the deposition is as follows:

MS. DUNNE - 05:49:44
MR. HARPOOTLIAN - 00:15:07

GIVEN UNDER MY HAND AND SEAL OF OFFICE on this, the 8th day of November, 2015.

Denyce Sanders
DENYCE SANDERS, RDR, CRR, TCRR
Notary Public in and for
Harris County, T E X A S

My Commission Expires: 4-14-17
Certification No.: 4038
Expiration Date: 12-31-15
U.S. LEGAL Support, Inc.
363 N. Sam Houston Parkway, 12th Floor
Houston, Texas 77060; 713.653.7100
Firm No. 122