Thomas H. Bienert, Jr., State Bar No. 135311
tbienert@bmkattorneys.com
Michael R. Williams, State Bar No. 192222
mwilliams@bmkattorneys.com
BIENERT, MILLER & KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Tel: (949) 369-3700/Fax: (949) 369-3701

Reuben A. Guttman *(admitted pro hac vice)*
rguttman@gbblegal.com
Traci L. Buschner *(admitted pro hac vice)*
tbuschner@gbblegal.com
Justin S. Brooks *(admitted pro hac vice)*
jbrooks@gbblegal.com
Dan Guttman *(admitted pro hac vice)*
diguttman@aol.com
GUTTMAN, BUSCHNER & BROOKS PLLC
2000 P Street, N.W., Suite 300
Washington, DC 20036
Tel: (202) 800-3001/Fax: (202) 827-0041

Richard A. Harpootlian (*admitted pro hac vice*)
rah@harpootlianlaw.com
Christopher P. Kenney (*admitted pro hac vice*)
cpk@harpootlianlaw.com
RICHARD A. HARPOOTLIAN, PA
1410 Laurel Street
Post Office Box 1090 (29201)
Columbia, South Carolina 29202
Tel: (803) 252-4848/Fax: (803) 252-4810

Nancy Gertner (*admitted pro hac vice*)
ngertner@law.harvard.edu
Langdell 328
1525 Massachusetts Ave.
Cambridge, Massachusetts 02138
Tel: (617) 851-3812

Attorneys for Plaintiff - Relator
BEVERLY BROWN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, WISCONSIN, the DISTRICT OF COLUMBIA, and the CITY OF CHICAGO,<br><br>　　　　　　　Plaintiffs,<br>　　　　　　　*Ex rel.*<br><br>BEVERLY BROWN,<br><br>　　　　　　　Plaintiff-Relator,<br><br>v.<br><br>CELGENE CORPORATION,<br><br>　　　　　　　Defendant. | Case No. 10-cv-03165 RGK (SSx)<br>Assigned to the Honorable R. Gary Klausner<br><br>**PLAINTIFF-RELATOR BEVERLY BROWN'S MOTION FOR AN ORDER (1) AWARDING 30% STATUTORY RELATOR SHARE, AND (2) ORDERING THE UNITED STATES TO IMMEDIATELY MAKE THE RELATOR SHARE PAYMENT TO RELATOR**<br><br>[Filed concurrently with Notice of Motion; Declarations of Beverly A. Brown, Hon. Nancy Gertner (ret.), and Reuben Guttman]<br><br>Hearing Date:　　November 6, 2017<br>Hearing Time:　　9:00 a.m.<br>Location:　　　　Courtroom 850 |

# Table of Contents

I.      INTRODUCTION. ...................................................................................... 1

II.     FACTUAL AND PROCEDURAL BACKGROUND. ................................ 2

        A.      While working for Celgene, Ms. Brown becomes concerned about
                the company's conduct and reports it to management and the
                government. ................................................................................... 2

        B.      After Ms. Brown's discussions with the FDA open her eyes to the
                extent of Celgene's wrongdoing, she retains counsel. ................... 3

        C.      Ms. Brown files this Action and cooperates extensively in the
                government's investigation, but the United States declines to
                intervene. ....................................................................................... 3

        D.      G&E withdraws as Ms. Brown's counsel. ...................................... 4

        E.      Ms. Brown aggressively litigates this action on her own following
                the government's election not to intervene. ................................... 4

        F.      On the eve of trial, Ms. Brown reaches a $280 million settlement
                with Celgene and works with the government to finalize the
                settlement. ...................................................................................... 6

        G.      Relator's attempts for more than three months to resolve the relator
                share issue with DOJ. .................................................................... 6

        H.      DOJ agrees to immediately pay Relator the statutory minimum
                25%, with both parties reserving their rights as to the remaining
                5%. ................................................................................................. 7

        I.      Ms. Brown's former counsel G&E sends DOJ a letter falsely
                claiming to have a lien over Ms. Brown's relator share award. ..... 7

        J.      The United States reneges on its agreement to make a partial relator
                share payment, while also refusing to offer Ms. Brown anything
                beyond the statutory minimum 25% relator share. ........................ 8

III.    MS. BROWN IS ENTITLED TO A FULL 30 PERCENT RELATOR
        SHARE. ........................................................................................... 9

A.    Ms. Brown's dedicated and diligent pursuit of the case after the United States declined to intervene directly resulted in a record recovery for the United States. ........................................................ 11

B.    The other factors likewise support a 30 percent relator share ...................... 12

    1.    Ms. Brown promptly reported the fraud internally at Celgene and then promptly reported to the government when Celgene's response was inadequate. ................................... 12

    2.    Ms. Brown provided extensive cooperation to the government in its investigation, including secretly wearing a wire. ............................................................................ 13

    3.    The result in this case came at a tremendous personal and professional cost to Ms. Brown. .......................................... 14

C.    Ms. Brown should not be penalized for obtaining an outstanding result. ................................................................................. 16

IV.   THIS COURT SHOULD ORDER THE UNITED STATES TO IMMEDIATELY PAY THE RELATOR SHARE AWARD TO MS. BROWN. ............................................................................ 18

A.    DOJ intends to withhold Ms. Brown's relator share based on G&E's purported lien, a lien G&E noticed in the instant case. ................... 18

B.    G&E wrongly told DOJ that it has an attorney lien when it does not. .................................................................................... 19

C.    The United States has no basis to withhold distribution of the relator share to Ms. Brown. .......................................................... 20

V.    CONCLUSION ................................................................................. 21

# **Table of Authorities**

<u>Cases</u>

*Alderman v. Hamilton,*
 205 Cal. App. 3d 1033 (1988) ...............................................................19, 20

*Arnall v. Superior Court,*
 190 Cal. App. 4th 360 (2010) .....................................................................19

*Carroll v. Interstate Brands Corp.,*
 99 Cal. App. 4th 1168 (2002) .....................................................................19

*Curry v. Del Priore,*
 941 F.2d 730 (9th Cir. 1991) ......................................................................18

*Fergus v. Songer,*
 150 Cal. App. 4th 552 (2007) .....................................................................20

*In re Bailey,*
 197 F.3d 997 (9th Cir. 1999) ......................................................................20

*Kenneally v. Bosa Cal. LLC,*
 No. 09-CV-2039 WQH JMA, 2011 WL 1045136 (S.D. Cal. Mar. 22, 2011) ..............18

*Novinger v. E.I. DuPont De Nemours & Co.,*
 809 F.2d 212 (3d Cir. 1987).......................................................................18

*United States ex rel. Alderson v. Quorum Health Group, Inc.,*
 171 F. Supp. 2d 1323 (M.D. Fla. 2001)............................................10, 11, 17

*United States ex rel. Green v. Northrop Corp,*
 59 F.3d 953 (9th Cir. 1995) .........................................................................9

*United States ex rel. Harman v. Trinity Indus., Inc.,*
 2017 WL 4325279 (5th Cir. September 29, 2017) .........................................12

*United States ex rel. Harrison v. Baran,*
 No. 14-CV-02639, 2015 WL 5446833 (C.D. Cal. August 28, 2015)............................10

*United States ex rel. Johnson-Pochardt v. Rapid City Regional Hosp.,*
 252 F. Supp. 2d 892 (D.S.D. 2003) ......................................................10, 13

*United States ex rel. Kelly v. Boeing Co.,*
 9 F.3d 743 (9th Cir. 1993) ..........................................................................10

*United States ex rel. Merena v. SmithKline Beecham Corp.,*
   52 F. Supp. 2d 420 (E.D. Pa. 1998) ...................................................................17

*United States ex rel. Merena v. SmithKline Beecham Corp.,*
   205 F.3d 97 (3rd Cir. 2000)................................................................................17

*United States ex rel. Pedicone v. Mazak Corp.,*
   807 F. Supp. 1350 (S.D. Ohio 1992) .........................................................10, 12

*United States ex rel. Pratt v. Alliant Techsystems, Inc.,,*
   50 F. Supp. 2d 942 (C.D. Cal. 1999) ........................................................10, 13

*United States ex rel. Ryan v. Endo Parms., Inc.,*
   2015 WL 4273290 (E.D. Pa. July 15, 2015).......................................12, 13, 17

*United States ex rel. Smith v. Lampers,*
   69 F. App'x 719 (6th Cir. 2003) ........................................................................10

*United States ex rel. Springfield Terminal Ry. Co. v. Quinn,*
   14 F.3d 645 (D.C. Cir. 1994) ..............................................................................9

*Wang v. FMC Corp.,*
   975 F.2d 1412 (9th Cir. 1992) .............................................................................9

<u>Statutes</u>

31 U.S.C. § 3730(d)(2)..............................................................................................9

Cal. Bus. & Prof. Code § 6147(a)(4) ......................................................................19

<u>Other Authorities</u>

Ben Hallman, *Whistleblowers, Beware: Most Claims End in Disappointment, Despair,*
   Huffington Post, June 4, 2012............................................................................14

# I.      Introduction.

After the United States declined to intervene in this False Claims Act ("FCA") *qui tam* action, plaintiff-relator Beverly Brown ("Ms. Brown" or "Relator") litigated this case on her own.  Facing long odds, a pharmaceutical giant defendant, and two of the world's largest law firms, Ms. Brown took the case through exhaustive fact and expert discovery, retained and paid millions of dollars to expert witnesses, opposed and largely defeated defendant Celgene Corporation's ("Celgene") summary judgment motion, and prepared the case for an estimated eight week jury trial.  With trial just weeks away, Ms. Brown negotiated a $280 million settlement under which Celgene paid the United States nearly $260 million on July 26, 2017, as well as over $20 million to the various state and municipal plaintiffs.

Under the FCA, Ms. Brown is statutorily entitled to between 25 and 30 percent of the settlement amount.  But despite having the $260 million for two and a half months, the United States has yet to pay Ms. Brown any portion of the amount to which she is legally entitled.  In fact, the United States has refused even to meaningfully negotiate with Ms. Brown, offering her only the absolute minimum 25 percent statutory relator share – the percentage Ms. Brown would be been entitled to receive had she settled the case the day after the government declined to intervene.  Accordingly, the United States has left Ms. Brown no choice but to bring this motion.

Under the well-established factors that determine relator share percentage, Ms. Brown is entitled to the full 30 percent.  With the government having left the case for dead, Ms. Brown took it further than almost any other non-intervened case in FCA history, and achieved a settlement that is among the highest ever in a non-intervened case.  She did all of this on her own, with little or no assistance from the government.  Moreover, at every step of the way, Ms. Brown worked tirelessly to support the prosecution of the case and bring it to successful conclusion.  Few FCA relators have ever done or achieved as much as Ms. Brown, and her efforts are precisely the type for which the full 30 percent relator share are reserved.

MOTION FOR ORDER REGARDING STATUTORY RELATOR SHARE

Furthermore, the United States has indicated that, whatever Ms. Brown's recovery, it will not pay her, but instead intends to deposit the entire relator share with this Court. The United States' refusal to pay is based solely on a single-page letter it received from Ms. Brown's former law firm, Grant & Eisenhofer, P.A. ("G&E"), which is not a party or counsel in this case. G&E claims it has an attorneys' charging lien against Ms. Brown's recovery in this case. As a matter of law, however, G&E has no lien because its fee agreement with Ms. Brown violated California law and she exercised her statutory right to void it. G&E thus has no contract with Ms. Brown, no lien against her recovery, and no basis to prevent or delay payment of the relator share to her. The United States accordingly has no basis to deprive Ms. Brown of payment – and forestall the conclusion of this action – by depositing Ms. Brown's relator share with the Court.[1]

Thus, in accordance with both statute and established case law, Ms. Brown requests that this Court order the United States to immediately pay her $77,780,892, representing 30 percent of the $259,269,640 settlement that the United States received in this Action.

## II.    Factual and procedural background.

### A.    While working for Celgene, Ms. Brown becomes concerned about the company's conduct and reports it to management and the government.

Ms. Brown began working for Celgene in 2001. Declaration of Beverly A. Brown ("Brown Decl.") ¶ 2. She was at all times based in Southern California. *Id.*

For the first several years of her employment, Ms. Brown did not suspect or perceive any wrongdoing within the company. *Id.* ¶ 3. In late 2007, however, Ms. Brown became concerned because management was asking her to call doctors' offices to ask them to change certain billing codes associated with Celgene's drugs. *Id.*; *see also* Dkt. No. 371 (MSJ Ruling at 2). Ms. Brown believed this conduct was illegal, and sent a letter to Celgene management reporting the issue. *Id.* ¶ 4, Ex. A. During the same time frame, Ms. Brown

---

[1] Ms. Brown has served this motion on G&E contemporaneous with its service on the United States.

MOTION FOR ORDER REGARDING STATUTORY RELATOR SHARE

also developed concerns about Celgene's sales techniques, and in particular that she was being asked to push drug combinations for which there was no literature support. *Id*. ¶ 5.

When Celgene did not adequately respond to Ms. Brown's concerns, she contacted the U.S. Food and Drug Administration ("FDA"). Brown Decl. ¶ 6. Ms. Brown had multiple conversations with FDA employees, and provided documentation to the FDA regarding Celgene's conduct. *Id*.

**B.    After Ms. Brown's discussions with the FDA open her eyes to the extent of Celgene's wrongdoing, she retains counsel.**

Ms. Brown's discussions with the FDA reinforced her concerns about the legality of Celgene's business practices. Brown Decl. ¶ 6. She sought legal advice and hence met with Reuben Guttman, who was then a lawyer with G&E. Brown Decl. ¶ 7. Ms. Brown met with Mr. Guttman here in California. *Id*.

Ms. Brown was impressed with Mr. Guttman and, after extensive discussions, decided to retain him and his then firm G&E to pursue a case against Celgene on behalf of the United States. Brown Decl. ¶ 7. Ms. Brown was presented with a G&E fee agreement dated October 19, 2009, which was executed by G&E's Managing Director, Jay Eisenhofer (the "G&E Fee Agreement"). *Id*. ¶ 8, Ex. B. Ms. Brown signed the G&E Fee Agreement at her home in California. *Id*. She never signed any other fee agreements with G&E, and she never left California in connection with her engagement of G&E. *Id*. ¶¶ 8-9.

**C.    Ms. Brown files this Action and cooperates extensively in the government's investigation, but the United States declines to intervene.**

Ms. Brown filed this action on April 27, 2010. Dkt. No. 1. As is customary in FCA actions, the case was filed under seal and remained so while the government investigated and determined whether or not it would intervene in the case. Declaration of Reuben A. Guttman ("Guttman Decl.") ¶ 6. Ms. Brown worked closely with the United States over the course of its investigation, including, among other things, providing thousands of pages of internal Celgene documents and wearing a concealed recording device to gather inside

information at the company.  *See* Brown Decl. ¶¶ 10-13; Guttman Decl. ¶¶ 7-8.  She also participated in meetings with the government.  Brown Decl. ¶ 11; Guttman Decl. ¶¶ 7-8.

On October 31, 2013, after investigating for three and a half years, the United States filed a Notice of Election to Decline Intervention and the Court unsealed the Complaint. Dkt. No. 59.  On April 9, 2014, the various state and municipal plaintiffs likewise filed a Notice of Election to Decline Intervention.  Dkt. No. 101.

### D.   G&E withdraws as Ms. Brown's counsel.

In April of 2015, Ms. Brown learned that G&E was terminating Reuben Guttman's employment with the firm.  Brown Decl. ¶ 30.  Because Ms. Brown had initially hired Mr. Guttman as her lawyer, had developed a close working relationship with him, and trusted him as the lawyer best able to represent her interests, she sent a letter to G&E terminating the firm as her counsel.  *Id*. ¶¶ 30-33, Ex. C.  To avoid interruption of her case, with Ms. Brown's authorization, G&E was asked to remain on the case as co-counsel with Mr. Guttman, but G&E declined.  *Id*. ¶ 33; Declaration of Hon. Nancy Gertner (ret.) ("Gertner Decl.") ¶¶ 5-10.  G&E formally withdrew as Ms. Brown's counsel on May 15, 2015.  Dkt. No. 187.

At all times since G&E's withdrawal, Ms. Brown has been represented in this action by Guttman, Buschner & Brooks; Bienert, Miller & Katzman, PLC; Richard Harpootlian, PA; and retired District Court judge Nancy Gertner of Harvard Law School.

### E.   Ms. Brown aggressively litigates this action on her own following the government's election not to intervene.

After the United States and all other government plaintiffs declined to intervene in this action, Ms. Brown elected to litigate the case on her own.  The case was significantly delayed, and at increased costs with regard to expert reports, because the Department of Human Services Centers for Medicare and Medicaid Services (CMS) twice provided defective data to Relator's counsel.  Guttman Decl. ¶ 10.

Over the next approximately three years, she and her counsel aggressively prosecuted all aspects of the case, including among other things:

MOTION FOR ORDER REGARDING STATUTORY RELATOR SHARE

- Reviewing roughly 4 million pages of documents produced by Celgene and various third parties, including a large number of documents belatedly produced while fact depositions were ongoing;
- Taking and defending 23 fact depositions, in locations throughout the country;
- Retaining and working closely with 4 nationally-renowned experts to educate them about the case, complete their analyses, and draft their initial, rebuttal, and supplemental reports;
- Taking and defending 19 expert depositions, again in locations throughout the country;
- Filing or responding to 9 separate discovery motions;
- Opposing and defeating three separate pleading motions filed by Celgene;
- Opposing and defeating the bulk of Celgene's motion for summary judgment, including preparing and filing a nearly 100-page list of uncontroverted facts and close to 400 exhibits;
- Opposing Celgene's motion for reconsideration of the Court's summary judgment ruling or, alternatively, for interlocutory appeal to the Ninth Circuit;
- Preparing for and participating in three days of mediation and numerous follow up discussions with Hon. Layn Phillips (ret.) and Hon. Gary Feess (ret.); and
- Extensively preparing for a scheduled April 25, 2017 trial date, including preparing and filing 7 motions *in limine* and *Daubert* motions, while also preparing exhibit and witness lists, a memorandum of facts and contentions of law, jury instructions, special verdict forms, deposition designations, and witness outlines.
- Negotiating with the state and municipal plaintiffs with regard to the relator share on their portion of the settlement.

Guttman Decl. ¶ 11.  Ms. Brown had extensive involvement and was a critical resource for her attorneys in these activities.  *Id*. ¶ 12.  She also personally provided key testimony, in

the form of both a day-long deposition and a declaration successfully opposing Celgene's summary judgment motion. *Id*. ¶¶ 13-14.

**F.  On the eve of trial, Ms. Brown reaches a $280 million settlement with Celgene and works with the government to finalize the settlement.**

On March 22, 2017, Ms. Brown and Celgene reached agreement on a settlement in principal, subject to approval by the United States and the other government plaintiffs. Guttman Decl. ¶ 15.  Trial was scheduled for just over a month away, on April 25, 2017. *Id*.; *see also* Dkt. No. 396.

Relator immediately informed representatives of the United States Department of Justice ("DOJ") of the terms of the settlement in principal.  Guttman Decl. ¶ 16.  Due to delays in the government approval process, Ms. Brown had to resume her trial preparations in early July 2017, with the trial date (continued to July 25, 2017) again looming.  *Id*. ¶ 16-17.  The United States ultimately approved all settlement terms and, on July 12, 2017, Ms. Brown, Celgene, and the United States executed the settlement agreement. *Id*. ¶¶ 18.  Under the settlement, Celgene paid the United States $259,269,640 on July 26, 2017.  *Id*. ¶ 19.[2]

On July 28, 2017, the Court entered an order dismissing Relator's claims brought on behalf of the United States.  Dkt. No. 495.  The Court retained jurisdiction "to adjudicate, if necessary, Relator Brown's claim to a share of the proceeds of the Civil Action pursuant to 31 U.S.C. § 3730(d)." *Id*.

**G.  Relator's attempts for more than three months to resolve the relator share issue with DOJ.**

On June 14, 2017, in anticipation of settlement approval and finalization, Relator's counsel sent DOJ a detailed proposal for resolution of the statutory relator's share at a full 30 percent relator's share.  Guttman Decl. ¶ 20.  DOJ did not substantively respond.  *Id.*

---

[2] The balance of the $280 million settlement was paid to the state and municipal plaintiffs. Guttman Decl. ¶ 19.  Unlike the United States, the state and municipal plaintiffs engaged with in prompt and meaningful discussions about resolving the relator share, and Ms. Brown already has reached agreement with the state and municipal plaintiffs for a 28.5 percent relator share as to their portion of the settlement.  *Id*. ¶ 35.

After the settlement was finalized in late July 2017, Relator's counsel followed up with DOJ in an effort to resolve the relator share issue, still with no substantive response. *Id.* ¶ 21. Relator's counsel continued to follow up with DOJ throughout the first half of August 2017, but while DOJ acknowledged it had to pay at least 25% relator's share, DOJ never provided a substantive response to Relator's 30 percent proposal. *Id.* Ex. 1.

### H.     DOJ agrees to immediately pay Relator the statutory minimum 25%, with both parties reserving their rights as to the remaining 5%.

On August 15, 2017, having still received no substantive response from DOJ and with DOJ having acknowledged its legal obligation to pay at least 25%, Relator's counsel requested a conference pursuant to Local Rule 7-3 regarding her intent to move for immediate payment of the minimum 25 percent relator's share pending ultimate resolution of the full 30% of the relator's share issue. Guttman Decl. ¶ 22; Ex. 2. DOJ then agreed to pay Relator her 25% minimum statutory relator's share immediately, while Relator and DOJ would then continue discussions on the amount of any additional relator's share payment above 25 percent and up to 30 percent. *Id.* ¶¶ 23-24, Exs. 3, 4.

On September 13, 2017, after the parties had finalized the written agreement, DOJ's representative stated in an email that he believed DOJ would have authority to make the agreed-upon immediate 25% minimum statutory payment "within the next day or so." Guttman Decl. ¶ 25, Ex. 5.

### I.     Ms. Brown's former counsel G&E sends DOJ a letter falsely claiming to have a lien over Ms. Brown's relator share award.

On September 14, 2017, counsel for G&E emailed a letter to DOJ. Guttman Decl. ¶ 26. At the time it sent it letter, G&E had not represented Ms. Brown for nearly two and a half years. *Id.*

In its single-page letter to DOJ, G&E asserted that it "has an attorney's charging lien" on Ms. Brown's recovery in this action, stating that "[t]he terms of the lien are set forth in Plaintiff-Relator's retention agreement with Grant & Eisenhofer P.A. dated October 19, 2009." Guttman Decl. ¶ 27; Ex. 6. G&E went on to assert that it had "incurred fees and

MOTION FOR ORDER REGARDING STATUTORY RELATOR SHARE

expenses of $7,759,350.48 in representing" Ms. Brown and was entitled to recovery of this amount, plus a full 40% contingency on Ms. Brown's recovery, bringing the claimed value of its purported lien to $41,359,350.48.  *Id.*  G&E requested that the United States "withhold the amount of $41,359,350.48 million from any amounts disbursed to" Ms. Brown.  *Id.*[3]

**J.      The United States reneges on its agreement to make an immediate partial relator share payment, while also refusing to offer Ms. Brown anything beyond the statutory minimum 25% relator share.**

On September 18, 2017, DOJ sent a letter to Ms. Brown's counsel stating that, based solely on the letter from G&E, DOJ would not disburse the previously agreed-upon 25 percent interim relator share payment to Ms. Brown unless G&E consented in writing to such disbursement.  Guttman Decl. ¶ 29, Ex. 7.  DOJ thus effectively made G&E the arbiter of whether Ms. Brown would be paid her statutory relator share.  Following receipt of DOJ's letter, Relator's counsel requested a conference pursuant to Local Rule 7-3 addressing two topics:   (1) DOJ's refusal to pay any funds to Ms. Brown based on the unsworn and unsupported G&E letter; and (2) Relator's more than three-month old proposal that she receive a 30 percent relator share.  *Id.* ¶ 30.

With respect to G&E's purported lien claim, Ms. Brown's counsel informed DOJ of the following facts, all of which G&E had omitted from or misrepresented in its letter:

- The G&E Fee Agreement, upon which G&E expressly based its purported lien, failed to comply with California law and was therefore voidable at Ms. Brown's election;

- Ms. Brown had exercised her right to void the G&E Fee Agreement;

---

[3] On August 10, 2017, G&E filed a lawsuit in this Court against Ms. Brown and two of the law firms representing her in this case, Bienert, Miller & Katzman and Richard Harpootlian, P.A.  Guttman Decl. ¶ 36, Ex. 9 (Complaint in Case No. CV 17-5968 PSG (PJWx)).  G&E filed an Amended Complaint on September 29, 2017.  *Id.* ¶ 37, Ex. 10.  Despite filing suit nearly two months ago, G&E has yet to serve either its original Complaint or Amended Complaint on any of the defendants.  *Id.* ¶ 38; Brown Decl. ¶ 46.

- With a void fee agreement, G&E had no lien rights under California law and thus no basis to demand that DOJ withhold any funds from Ms. Brown; and

- G&E had filed suit against Ms. Brown in the Central District of California more than a month earlier, but had not even served the lawsuit on her.

Guttman Decl. ¶ 31; *see also id*. ¶ 33, Ex. 8 (letter to G&E counsel further describing omissions and misrepresentations in G&E's letter to DOJ).

Ms. Brown's counsel also explained that, under California law, G&E is entitled to, at the absolute most, a *quantum meruit* recovery based on its claimed $7.7 million in fees and costs, which is a fraction of the $41.3 million it was asking DOJ to withhold.  Guttman Decl. ¶ 31.  Despite these facts, DOJ remained unwilling to distribute the relator share to Ms. Brown, and instead proposed to deposit the relator share with this Court.  *Id*. ¶ 32.

On the issue of relator share, DOJ declined to offer Ms. Brown anything more than the statutory minimum 25 percent.  Guttman Decl. ¶ 34.  DOJ offered no basis for either its statutory minimum offer or its rejection of Ms. Brown's 30 percent proposal, other than to state that Ms. Brown should be satisfied with a 25 percent relator share because it is "a lot of money."  *Id*.

## III. Ms. Brown is entitled to a full 30 percent relator share.

Where a private citizen has filed suit under the FCA and the United States has declined to intervene, the FCA mandates that the plaintiff-relator shall receive a payment that "shall not be less than 25 percent and not more than 30 percent of the proceeds of the action or settlement."  31 U.S.C. § 3730(d)(2).  The purpose of this statutory "bounty" is to "set up incentives to supplement government enforcement" of the FCA "by 'encouraging insiders privy to a fraud on the government to blow the whistle on the crime.'"  *United States ex rel. Green v. Northrop Corp*, 59 F.3d 953, 963 (9th Cir. 1995) (quoting *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994) and *Wang v. FMC Corp.*, 975 F.2d 1412, 1419 (9th Cir. 1992)).  Congress added the 25 to 30 percent relator share provisions to the FCA for the express purpose of "increas[ing] the financial and other incentives for private individuals to bring suits under the Act and thereby

MOTION FOR ORDER REGARDING STATUTORY RELATOR SHARE

to enlist the aid of the citizenry in combatting the rising problem of 'sophisticated and widespread fraud.'"  *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 745 (9th Cir. 1993) (quoting S. Rep. No. 345 at 2, 23-24).

The trial court has discretion to determine the "reasonable" amount to be paid to a relator within the statutory range.  *United States ex rel. Alderson v. Quorum Health Group, Inc.*, 171 F. Supp. 2d 1323, 1331 (M.D. Fla. 2001).  The factors properly considered as part of this analysis include:

- "[T]he importance of the relator's participation in the action and the relevance of the information brought forward."  *United States ex rel. Harrison v. Baran*, 2015 WL5446833, *8, CV 14-02639 RGK(AJWx) (C.D. Cal. August 28, 2015) (quoting *Northrop*, 59 F.3d at 964).

- The "degree of the relator's involvement in the case."  *Id*.

- "[T]he relator's contribution to the final outcome."  *United States ex rel. Johnson-Pochardt v. Rapid City Regional Hosp.*, 252 F. Supp. 2d 892, 897 (D.S.D. 2003).

- Whether the relator promptly reported the fraud, either internally or to the government.  *Quorum Health*, 171 F. Supp. 2d at 1333.

- The extent to which the relator cooperated with the government in investigating the case.  *United States ex rel. Pratt v. Alliant Techsystems, Inc.*, 50 Supp. 2d 942, 948 (C.D. Cal. 1999).

- Whether the relator pursued the case "at considerable personal and professional expense to [herself]."  *United States ex rel. Pedicone v. Mazak Corp.*, 807 F. Supp. 1350 (S.D. Ohio 1992), *overruled on other grounds by U.S. ex rel. Smith v. Lampers*, 69 F. App'x 719 (6th Cir. 2003).

Applying these factors here, it is evident that Ms. Brown deserves a full 30 percent relator share.

MOTION FOR ORDER REGARDING STATUTORY RELATOR SHARE

**A.** **Ms. Brown's dedicated and diligent pursuit of the case after the United States declined to intervene directly resulted in a record recovery for the United States.**

The most critical factor in assessing a reasonable relator share is the extent to which the relator contributed to and is responsible for the result.  Here, Ms. Brown's efforts are the *only* reason this case ended with the outstanding result it did.

When the government declines to intervene in an FCA case, few relators opt to continue on with their cases.  Guttman Decl. ¶ 9.  This is because, as one court observed, "the prospect of recovery in a non-intervened case is dramatically reduced."  *Quorum Health*, 171 F. Supp. 2d at 1336, n.38.  Despite long odds, however, Ms. Brown opted to continue with the case after the government declined to intervene, because she believed it was the right thing to do given the wrongdoing she had seen.  Brown Decl. ¶ 29.

Ms. Brown prosecuted the case aggressively, thoroughly, and to the brink of trial.  As detailed in Section II.E. above and in the accompanying declarations, Ms. Brown and her counsel took the case through the entire gamut of federal litigation: extensive fact and expert discovery; dozens of fact and expert depositions; multiple dispositive motions; multiple days of mediation with two retired federal judges; numerous pre-trial motions; and substantial preparation for an estimated eight week trial.  Guttman Decl. ¶ 11.  In fact, short of actually trying the case, Ms. Brown performed every task conceivable to successfully prosecute a large and complex FCA case, and did so against a multi-billion dollar corporation represented by two of the world's largest law firms.  *Id.* ¶ 10.

As one would expect, the costs associated with litigating this case to the eve of trial were substantial.  Ms. Brown incurred more than $3 million in out-of-pocket costs for expert witnesses, mediation fees, document management, and extensive cross-country travel for depositions that took place in literally every corner of the nation.  Guttman Decl. ¶¶ 10-11.

Moreover, this was not merely an attorney-driven effort.  Ms. Brown herself played a large and crucial role in the case.  She gave a full-day deposition, in which she was a credible witness who substantially bolstered the case.  Guttman Decl.  ¶ 13.  She also

provided a lengthy declaration in opposition to Celgene's summary judgment motion (Dkt. No. 333-48), which Judge King cited repeatedly in denying summary judgment as to key aspects of Ms. Brown's claims. *See* Dkt. No. 371 at 2, 5, 27. More importantly, throughout the case, Ms. Brown was a critical resource for her attorneys as they furthered their factual and legal theories, engaged in extensive motion practice, prepared for key depositions, and otherwise moved the case toward a successful outcome. Guttman Decl. ¶ 12.

The United States may contend, as it has done in other cases, that Ms. Brown is not entitled to a full 30 percent relator share because this case did not proceed all the way through trial. As an initial matter, courts repeatedly have rejected this argument because the FCA makes no distinction between settled cases and tried cases for purposes of relator share entitlement. *See, e.g.*, *United States ex rel. Ryan v. Endo Pharms., Inc.*, 2015 WL4273290, *4 (E.D. Pa. July 15, 2015); *Pedicone*, 807 F. Supp. at 1353. Further, a settlement – and particularly one achieved on the eve of trial when a plaintiff's leverage is at its highest – is often a far better outcome for the government than a trial verdict, which is subject to reversal on appeal and, even if upheld, often results in a multi-year delay in payment. *See, e.g., United States ex rel. Harman v. Trinity Indus., Inc.*, 2017 WL 4325279 (5th Cir. September 29, 2017) (reversing $663 million jury verdict in favor of relator). Here, the United States actually received its $260 million within just weeks after the settlement was finalized.

Put simply, the outstanding outcome in this case would not have occurred if not for Ms. Brown's extraordinary efforts and her unwaivering dedication and persistence. Her efforts warrant a full 30 percent relator share.

### B. The other factors likewise support a 30 percent relator share.

#### 1. Ms. Brown promptly reported the fraud internally at Celgene and then promptly reported to the government when Celgene's response was inadequate.

As described in Section II.A. above, as soon as Ms. Brown perceived that she was being asked to take part in illegal conduct, she reported the matter to Celgene management

and, after management failed to adequately respond, to the FDA. *See* Brown Decl. ¶¶ 3-6. Ms. Brown's conduct in first reporting Celgene's wrongdoing internally and then reporting to the government weighs heavily in favor of a full relator share. *See Johnson-Pochardt*, 252 F. Supp. 2d at 900-01 (identifying the relator's internal reporting of the fraud as a factor justifying a higher award). This is particularly true because Ms. Brown did so while still employed with Celgene, placing her "at risk for both retaliation and termination." *Id*.

## 2. Ms. Brown provided extensive cooperation to the government in its investigation, including secretly wearing a wire.

Through her employment at Celgene, Ms. Brown had extensive first-hand knowledge of Celgene's promotional practices. Brown Decl. ¶ 10. Ms. Brown detailed those practices to the government over the course of its investigation. *Id*. ¶¶ 10-13. She made herself available for multiple discussions with FDA personnel, and then later met several occasions with DOJ lawyers and agents to provide them with information. *Id*. Ms. Brown was well-prepared for each meeting and provided the Government with unfettered, inside knowledge of the fraud alleged in her Complaint. *Id*. ¶ 11; Guttman Decl. ¶ 7.

In addition to her personal knowledge, Ms. Brown also provided the government with key documents evidencing Celgene's conduct, which helped cull from the thousands she had collected from the company. Brown Decl. ¶ 12; Guttman Decl. ¶ 7. The documents Ms. Brown provided to the government were so extensive that they filled 7 CD-roms. Guttman Decl. ¶ 7; *see Johnson-Pochardt*, 252 F. Supp. 2d at 897 (praising relator for providing the government with "a stack of documents . . . that was nearly one foot high).

Ms. Brown's cooperation also went well beyond providing information and documents. Most notably, at DOJ's request, she secretly wore a recording device to capture internal company discussions, including at Celgene's National Sales Meeting. Brown Decl. ¶ 13; Guttman Decl. ¶ 8. During the same conference, Ms. Brown met with and provided information to federal agents. Brown Decl. ¶ 13. Courts repeatedly have cited this precise type of investigative assistance as a factor justifying a large relator share award. *See, e.g.*, *Pratt*, 50 F. Supp. 2d at 945-46; *Ryan*, 2015 WL 4273290 at *3.

During a substantial portion of this time, Ms. Brown remained employed with Celgene.  Brown Decl. ¶¶ 19-20.  Thus, not only was Ms. Brown placed in the difficult position of maintaining absolute secrecy while working for the very company she knew was being investigated, she also had what effectively was second job.  Ms. Brown spent substantial hours supporting the investigation while remaining employed on a full-time basis during the day.  *Id*. ¶¶ 11-12.

### 3. The result in this case came at a tremendous personal and professional cost to Ms. Brown.

Ms. Brown is an enormously principled person who took an enormous personal and professional risk by bringing her *qui tam* lawsuit.  The "risk/reward" analysis of qui tam lawsuits is quite daunting – 80 percent of cases filed under the False Claim Act are not successful and, in cases where the relator is successful, the average bounty is $150,000.[4]  In Ms. Brown's case, her risk increased substantially when the government declined to intervene and, thereafter, took very little interest in supporting her case.  She and her counsel prosecuted the case alone.  All the "risk" was on Ms. Brown, and none was on the government.  The $280,000,000 "reward" recouped for the government was solely due to the risk and work of Ms, Brown and her counsel.

As described above, Ms. Brown was still working at Celgene when she spoke up about possible wrongdoing.  Her doing "the right thing" caused the company to subject her to criticism, isolation and, ultimately, lack of advancement in the company.  In the eight years working at Celgene before learning and speaking up about potential wrongdoing, she received good performance reviews, won numerous sales awards, and received company shares and bonuses. Brown Decl. ¶ 14.  That changed when she filed her internal complaint in October 2008, expressing concerns that Celgene managers and employees were purposefully using inaccurate ICD-9 billing codes so that the government would have to pay for Celgene prescriptions.  *Id*. ¶ 3-4.  After complaining, for the first time in her lengthy

---

[4] "Whistleblowers, Beware:  Most Claims End in Disappointment, Despair," Ben Hallman, *Huffington Post,* June 4, 2012.

MOTION FOR ORDER REGARDING STATUTORY RELATOR SHARE

career at Celgene, Ms. Brown received poor performance reviews and open criticism from her supervisor. *Id*. ¶ 15, 17. She was also bypassed for promotion and was excluded from company team-building events. *Id*. ¶ 15-16. In the ensuing years, she often felt ostracized. *Id*. ¶ 15.

Once the *qui tam* lawsuit was filed under seal with the government, Ms. Brown was still working at Celgene, and the government wanted her to assist from the inside. As described above, she provided the government thousands of documents and wore a wire. During this time, Ms. Brown lived a "double life" purportedly working as a normal Celgene employee, while gathering and providing evidence for the government. Brown Decl. ¶ 19. This period caused significant stress for Ms. Brown, who was required to maintain secrecy about her lawsuit, while worrying about being found out and feeling guilt about working for a company that was promoting drugs to patients who may not have benefitted from them, or worse, may be harmed by them. *Id*. ¶ 19-20.

By the time Ms. Brown finally resigned form Celgene in the summer of 2011, her feelings about the company's wrongdoing was so strong that she refused to sell her $400,000 worth of stock options as mandated by the company, preferring to walk away from the stock and its substantial value. Brown Decl. ¶ 20.

But leaving Celgene did not bring an end Ms. Brown's difficulties. At 54 years old, Ms. Brown was placed in the difficult position of finding a sales job without any references from anyone at Celgene, her employer for the prior ten years. Brown Decl. ¶ 22. This lack of references made it very difficult for her to locate another sales job. *Id*. The jobs she did find did not pay nearly what Celgene paid and did not last long. *Id*. ¶ 23. Her inability to find meaningful work caused financial problems for her family; among other things, she worried that she would not be able to cover her daughter's college tuition. *Id*. ¶ 24.

Ms. Brown's efforts and sacrifices caused issues beyond diminishing her ability to make money. Her sense of self-worth was threatened when she could not find or hold down a job in sales, her lifetime avocation. Brown Decl. ¶ 25. She worried about the stigma of being labeled a whistleblower, and even worried that her husband's job would be

jeopardized once the case was unsealed.  *Id.* ¶ 22, 24.   She also worried that press scrutiny could bring about other problems, including safety issues.  *Id.* ¶ 21.

Ms. Brown's risk and stress was exacerbated by the incredible amount of time she endured the stress and pressure of this case – almost a full decade.  While she knew the case might be with the government for some time, she did not expect or appreciate that the government would have the case for as long as it did – about three and a half years – before even deciding whether or not to intervene.  Brown Decl. ¶ 26.  During that entire time she worried that the government might not be able to do anything about Celgene's actions and that her career would be ruined for nothing.  *Id.*

Of course, all of these hardships and concerns occurred even before the government declined to get involved in the case.  Once the government declined and the case was unsealed, the stress and risk to Ms. Brown only increased.  She was then faced with the Herculean task of pursuing her case in the public eye against a 100 billion dollar company and its two international law firms.  Brown Decl. ¶ 29.  She worried what her future would be like if the case failed.  *Id.*

Not surprisingly the time spent handling the case on her own, after the government declined to take the case, has been the most stressful period of her life.  Brown Decl. ¶ 29.  Her stress continues, as notwithstanding Ms. Brown's significant sacrifices and perseverance, the federal government has yet to pay her.  Instead it has used every opportunity to delay payment, has not negotiated with her in good faith (other than to blithely suggest that she should be happy with a statutory minimum share), and now has refused to pay her entirely based solely on an unsupported demand by her former lawyers. For all she has done in this case, Ms. Brown deserves better.

**C.   Ms. Brown should not be penalized for obtaining an outstanding result.**

The sole basis DOJ has provided for rejecting Ms. Brown's proposed 30 percent relator share (and for only offering her the minimum 25 percent share) is the large amount of the settlement.  Guttman Decl. ¶ 34.  But this is neither an accepted nor appropriate basis to reduce Ms. Brown's relator share.

As an initial matter, no court has agreed with the government's position that a higher settlement amount should result in a lower relator share percentage, and courts have repeatedly and forcefully rejected that position.  For instance, in *United States ex rel. Merena v. SmithKline Beecham Corp.*, the court observed that "[t]here is nothing in the statute to suggest that the amount of the total recovery is, or should be, an appropriate consideration in determining the percentage range or in calculating the total qui tam award," and reasoned that "[h]ad Congress intended the amount of the award to be a relevant factor," it would have said so in the FCA itself.  52 F. Supp. 2d 420, 434 (E.D. Pa. 1998) (reversed on other grounds by *United States ex rel. Merena v. SmithKline Beecham Corp.* 205 F.3d 97 (3d Cir. 2000)).

Similarly, in *Ryan*, the court noted the absence of any case law supporting the government's position and stating that "[i]f Congress had intended limitations, like in the case of large awards, it would have explicitly included them within the statutory framework of the FCA."  2015 WL4273290 at *5; *see also Quorum Health*, 171 F. Supp. 2d at 1335 n.37 (observing that "Congress could have capped the relator's share or established a sliding scale to graduate the available percentages as the size of the recovery increases," and ruling that "the conspicuous absence of an explicit cap or a mechanism to taper the available percentage argues forcefully against the government's position that the size of the recovery is a factor warranting consideration").

Furthermore, reducing a relator's percentage award based on the size of the settlement would turn the purposes behind the FCA on their head.  The FCA exists to root out fraud, and its *qui tam* provisions are designed to incentivize relators to work with the government in doing so.  It makes no sense that a relator who uncovers fraud of greater magnitude should be rewarded at a lower percentage than those who uncover smaller scale fraud.  In this case, Ms. Brown's extraordinary efforts have caused the United States to recover nearly $260 million.  Reducing her relator share percentage because she achieved too much success would send the wrong message to other would-be whistleblowers.

MOTION FOR ORDER REGARDING STATUTORY RELATOR SHARE

**IV.** **This Court should order the United States to immediately pay the relator share award to Ms. Brown.**

Regardless of the amount of relator share owed Ms. Brown, the United States has informed her that it will refuse to distribute any portion of the funds to her. Instead, DOJ says it intends to deposit Ms. Brown's entire relator share – the funds to which she is statutorily entitled based on her efforts over the last 8 years – with the Court. The sole basis upon which DOJ proposed to deprive Ms. Brown of her money is G&E's claimed attorneys' lien over Ms. Brown's recovery in this case. But G&E has no such lien as a matter of law, and the Court accordingly should order the United States to immediate distribute the relator share to Ms. Brown.

**A.** **DOJ intends to withhold Ms. Brown's relator share based on G&E's purported lien, a lien G&E noticed in the instant case.**

When it dismissed the claims against Celgene in this action, the Court expressly retained jurisdiction "to adjudicate, if necessary, Relator Brown's claim to a share of the proceeds of the Civil Action pursuant to 31 U.S.C. § 3730(d)." Dkt. No. 495. Part and parcel of the adjudication of Ms. Brown's relator share is the actual payment of that relator share to Ms. Brown. Because DOJ has refused to pay the relator share to Ms. Brown based solely on G&E's purported lien, this Court retains jurisdiction to resolve the validity of that lien and, if it deems appropriate, order payment of the relator share. The lien in question is squarely before this Court because, in June 2015, G&E filed a notice of its purported lien in this case, shortly after it withdrew as Ms. Brown's counsel. Dkt. No. 190.[5]

---

[5] It is widely recognized that district courts have ancillary jurisdiction to adjudicate fee-related disputes arising from litigation pending before them, including over the validity of attorney fee liens. *See Curry v. Del Priore*, 941 F.2d 730, 731–32 (9th Cir. 1991) ("Courts have long recognized that fee disputes arising from litigation pending before a district court fall within that court's ancillary jurisdiction."); *Kenneally v. Bosa Cal. LLC*, No. 09-CV-2039 WQH JMA, 2011 WL 1045136, at *3 (S.D. Cal. Mar. 22, 2011) (exercising ancillary jurisdiction over dispute relating to attorney's charging lien). *See Novinger v. E.I. DuPont De Nemours & Co.,* 809 F.2d 212, 217 (3d Cir. 1987) (noting that ancillary jurisdiction is "particularly necessary for disputes" involving fees to be paid withdrawing counsel "because they bear directly upon the ability of the court to dispose of cases before it in a fair manner"). Ms. Brown has served G&E with this motion.

**B.     G&E wrongly told DOJ that it has an attorney lien when it does not.**

G&E's letter to DOJ is inaccurate and misleading.  G&E has no lien as a matter of law.

Under California law, a valid attorney fee lien can be created in only two ways: (1) by an express provision in an attorney-fee contract; or (2) by implication where the retainer agreement is to look for the judgment for payment of legal services rendered. *Carroll v. Interstate Brands Corp.*, 99 Cal. App. 4th 1168, 1172 (2002).  Indeed, "[u]nlike a service lien or a mechanic's lien . . . an attorney's lien is ***not*** created by the mere fact that an attorney has performed services in a case." *Id.* (emphasis added).  An attorney fee lien, in other words, is exclusively a creature of contract.

G&E purports to have a contingency fee contract with Ms. Brown, in the form of the G&E Fee Agreement.  It is this agreement that G&E pointed to as the basis for its claimed lien in its letter to DOJ, and indeed is the only agreement Ms. Brown ever entered into with G&E.  *See* Guttman Decl. Ex. 6; Brown Decl. ¶ 8.  The G&E Fee Agreement does not have an express lien provision (*see* Brown Decl. Ex. B), and G&E thus presumably asserts that it has an implied lien by virtue of the contingency nature of the contract.  This, however, cannot be true because G&E's Fee Agreement is a void contract that has no legal force or effect.

California law imposes strict standards and requirements for attorney fee agreements, and in particular contingency fee agreements.  Among other requirements, a contingency fee agreement must include a "statement that the fee is not set by law but is negotiable between the attorney and client." Cal. Bus. & Prof. Code § 6147(a)(4).  Failure to comply with that requirement "renders the agreement voidable at the option of the plaintiff, and the attorney shall thereupon be entitled to collect a reasonable fee." *Id.* § 6147(b); *see also Arnall v. Superior Court*, 190 Cal. App. 4th 360, 369 (2010) (holding that contingency fee agreement was voidable by client under Section 6147 where "sole deficiency was the absence of the fee negotiability statement").  The purpose of Section 6147 is to "protect clients and to ensure fee agreements are fair and understood by clients." *Alderman v.*

MOTION FOR ORDER REGARDING STATUTORY RELATOR SHARE

*Hamilton*, 205 Cal. App. 3d 1033, 1037 (1988).  Accordingly, fee agreements are to be strictly construed against the attorney.  *Id.*

On its face, the G&E Fee Agreement does not comply with Section 6147, lacking the requisite statement that the contingency fee is "not set by law, but is negotiable between the attorney and client."  Brown Decl. Ex. B.  Ms. Brown accordingly has the statutory right to void it, and she in fact exercised that right and voided the agreement.  *Id.* ¶ 45, Ex. G.

Once a fee agreement is voided, it no longer has any legal effect whatsoever.  *See Fergus v. Songer*, 150 Cal. App. 4th 552, 573 (2007) ("If the contingency fee agreement is void, there is no contingency fee arrangement.").  At that point, the voided contract "is no contract at all; it binds no one and is a mere nullity."  *Id.*  "Consequently, such a contract cannot be enforced."  *Id.*

There is, in other words, no contract between G&E and Ms. Brown.  Without a contract, there is no lien.  *See In re Bailey*, 197 F.3d 997, 1002 (9th Cir. 1999) (holding that a void contingency fee agreement created no lien against the client's recovery).[6]

## C.    The United States has no basis to withhold distribution of the relator share to Ms. Brown.

The sole basis G&E claimed for its request that DOJ withhold the relator share from Ms. Brown was its purported lien.  Guttman Decl. Ex. 6.  Without a valid lien there is absolutely no basis to withhold or delay Ms. Brown's relator share payment.  Though it has had a lawsuit pending against Ms. Brown for two months (Case No. 2:17-cv-05968-PSG-PJW, filed August 10, 2017), G&E has not so much as served that lawsuit on Ms. Brown or the other defendants.  *Id.* ¶ 38; Brown Decl. ¶ 46.

In short, G&E has no lien under California law, and the United States has no basis whatsoever to continue to withhold the relator share payment to which Ms. Brown is entitled and that she more than earned over the last 8 years.

---

[6] While G&E has no fee agreement and no lien, it is entitled to have its quantum meruit claim for its reasonable hours worked at a reasonable rate (together with Ms. Brown's defenses to that claim) adjudicated in G&E's separate lawsuit against Ms. Brown and her counsel that has been assigned to Judge Guitierrez.

## V. Conclusion.

It is time for this case to come to an end. Plaintiff-Relator Beverly Brown respectfully requests that this Court: (1) enter an order granting her a 30 percent relator share in this action; (2) order that, because the G&E Fee Agreement is void and G&E therefore has no lien, the United States shall immediately make the relator share payment to her in the full amount of $77,780,892; and (3) close this case in its entirety.

Dated: October 9, 2017

**BIENERT, MILLER & KATZMAN, PLC**

By: /s/ *Michael R. Williams* /s/
  Thomas H. Bienert, Jr.
  Michael R. Williams

Reuben A. Guttman (*admitted pro hac vice*)
Traci L. Buschner (*admitted pro hac vice*)
Justin S. Brooks (*admitted pro hac vice*)
**GUTTMAN, BUSCHNER & BROOKS PLLC**

Richard A. Harpootlian (*admitted pro hac vice*)
Christopher P. Kenney (*admitted pro hac vice*)
**RICHARD A. HARPOOTLIAN, PA**

Nancy Gertner (*admitted pro hac vice*)

*Attorneys for Plaintiff-Relator*
*BEVERLY BROWN*

MOTION FOR ORDER REGARDING STATUTORY RELATOR SHARE